# Exhibit 37

# CAPITAL SENTENCING STRATEGY:
## A Defense Primer

JEFFREY J. POKORAK
St, Mary's University School Of Law
1 Camino Santa Maria
San Antonio, Texas 78228

210/436-3779 -- Phone
210/436-1119 -- Fax

## 20TH ANNUAL ADVANCED CRIMINAL LAW COURSE

### JULY 25-28, 1994

### DALLAS, TEXAS

BB

## ACKNOWLEDGEMENTS

These materials have been assembled from those currently being prepared and distributed by the Texas Appellate Practice and Educational Resource Center. Therefore, these materials may not be reproduced under any circumstances without express permission of the Texas Resource Center and the author.

Two attorneys at the Center are currently providing additional materials and strategy assistance to trial attorneys involved in capital litigation. These attorneys are:

**ROBERT C. OWEN**
Senior Staff Attorney
The Texas Resource Center
1206 San Antonio
Austin, Texas 78701

800/375-0050 — Phone
512/477-2153 -- Fax


**BRENT E. NEWTON**
The Texas Resource Center
3223 Smith #215
Houston, Texas 77006

800/725-5005 — Phone
713/522-2733 — Fax

# TABLE OF CONTENTS

INTRODUCTION                                                                      1


### I.

OVERVIEW OF THE TEXAS DEATH PENALTY STATUTES                                      2


### II.

THE FUTURE DANGEROUSNESS SPECIAL ISSUE                                            8


### III.

INVESTIGATING THE PUNISHMENT PHASE OF A CAPITAL TRIAL                            17


### IV.

GETTING THE COURTS TO WORK (AND PAY!) FOR YOUR CLIENT                            23


### V.

CAPITAL VOIR DIRE STRATEGY: PRESERVING CURRENT ISSUES FOR APPEAL                 37


CONCLUSION                                                                       51


SAMPLE MOTIONS                                                            APPENDIX

# INTRODUCTION

The purpose of these materials is to give attorneys representing a capital defendant in Texas some initial tools for preparing the punishment phase of the trial.

As with the guilt/innocence phase of the capital case, the defense attorney must, based on all reasonable inferences, establish a rational <u>theory of defense at punishment</u>. As any attorney now appointed to a capital case should know, this does not mean waiting until the moment the jury returns a verdict of guilty to capital murder to decide what to do. Simply put, lone testimony from your client's mother that she loves her son is not sufficient -- legally or morally -- to secure a life sentence. After the Supreme Court's decision in <u>Penry v. Lynaugh</u>, ___ U.S. ___ (1989), every attorney in Texas is on notice that even minimally adequate representation of someone facing a death sentence includes the investigation, development, and presentation of "mitigating" evidence. What this means in Texas -- both to the Texas Court of Criminal Appeals and ultimately to the United States Supreme Court -- is still up for debate. And debate for defense counsel translates into error on appeal if the outstanding issues are adequately preserved and argued.

What is not really up for debate, however, is the need to fully prepare and carefully think through a punishment presentation that convincingly explains to the jury why your client should be sentenced to life, rather than to death. That said, your goal in most cases will not be to prepare and present this brilliant strategy at the punishment phase of a capital trial. Rather, the primary strategy in almost every capital case currently brought in Texas ought to be a pre-trial resolution of the case that keeps your client alive. The full preparation of a sound punishment strategy only enhances your chances of a good plea agreement. First, a well prepared defense -- at both stages -- increases the defendant's bargaining position by suggesting the real possibility of a punishment phase loss to the prosecution. Second, the Trial Court -- ultimately meaning the county in which your case is being tried -- should be forced to expend the serious money necessary to ensure that your client receives a minimally competent defense. As the costs mount in your pursuit of a fair trial, the chances for a favorable resolution short of trial increase. Finally, if you are forced to go to trial and then to a capital punishment phase, if you are fully prepared to present a coherent defense punishment case, you will be ready -- both factually and legally -- to fight to win.

To get to this winning point in the preparation of a life-saving punishment case, as with the case in chief, requires intense fact development, a keen familiarity with the law, and an ability to put the two together in novel ways that preserve error years into the future. This last point should not be minimized. Death penalty cases are unique in that the litigation of the case often stretches a decade beyond trial. The ability to recognize holes in the law and/or to anticipate legal changes is often the difference between an execution and a commutation in ten years. Therefore, just as your punishment theory is as much a pre-trial strategy as it is a punishment phase presentation preparation, it is also litigation for appellate courts -- state and federal -- who will consider the case long after the jury has rendered a sentence.

# I.

## OVERVIEW OF THE TEXAS DEATH PENALTY STATUTES

**A.    The Original Statute: Art. 37.071**

In 1973, Texas enacted a unique statute that mandated the death penalty if 12 jurors unanimously agreed that the state proved two or three special issues beyond a reasonable doubt and a sentence of life in prison if ten or more jurors found that one or more of those special issues was not proved beyond a reasonable doubt.[1]  The special issues asked:

> 1. whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.[2]

> 2. whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[3]

> 3. if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to provocation, if any, by the deceased.[4]

Any "evidence that the court deem(ed) relevant to sentence" could be presented in the punishment phase to prove these special issues, other than "evidence secured in violation of the Constitution of the United States or of the State of Texas."[5]  The state could not waive the death penalty[6] and the trial judge could not sentence the defendant to life in prison for capital murder pursuant to a negotiated plea agreement.[7]

Before <u>Penry v. Lynaugh</u>[8] was decided in 1989, the defendant was not entitled to jury instructions about the definition of any of the terms in the special issues[9] or instructions about mitigating evidence.[10]  The

[1] <u>See</u> Art. 37.071(b)(c)(e), V.A.C.C.P. (Vernon 1974).

[2] <u>See</u> Art. 37.071(b)(1), V.A.C.C.P. (Vernon 1974).

[3] <u>See</u> Art. 37.071(b)(2), V.A.C.C.P. (Vernon 1974).

[4] Art. 37.071(b)(3), V.A.C.C.P. (Vernon 1974).

[5] <u>See</u> Art. 37.071(a), V.A.C.C.P. (Vernon 1974).

[6] <u>Sorola v. State</u>, 693 S.W.2d 417 (Tex. Crim. App. 1985); <u>Ex parte Bailey</u>, 626 S.W.2d 741 (Tex. Crim. App. 1981).

[7] <u>Ex parte Bailey</u>, 626 S.W.2d 606 (Tex. Crim. App. 1981).  However, the statute permitted a plea to the lesser included offense of murder with an affirmative finding of a deadly weapon in exchange for a sentence of life in prison, which meant that the defendant would be eligible for parole in 20 years, as he would if he received a life sentence for capital murder.  <u>Ex parte McClelland</u>, 588 S.W.2d 957 (Tex. Crim. App. 1979).

[8] 492 U.S. 302 (1989).

[9] <u>King v. State</u>, 553 S.W.2d 105, 107 (Tex. Crim. App. 1977).

law of parties did not apply to the special issues,[11] but the failure to instruct the jury about this in the case of a nontriggerman was not reversible error.[12] The statute gave both sides the right to make jury arguments "for and against the sentence of death,"[13] but this was construed to mean arguments for and against affirmative answers to the special issues.[14]

## B.    Penry and Art. 37.071:  A Square Peg in a Round Hole

Penry v. Lynaugh forced the Texas Court of Criminal Appeals to put a square constitutional peg into the round hole of the special issues. "The discretion to execute or merely incarcerate one convicted of capital murder was purposefully taken from judge and jury alike by the Legislature" when Art. 37.071 was enacted and the "only discretion left to jurors (was) in the mitigating weight which they may assign to relevant evidence bearing upon the special issues."[15] When Penry held that the special issues violated the eighth amendment as applied because they did not give the jury a "vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence,"[16] the Court of Criminal Appeals complained that

> (t)he Supreme Court failed to understand that under Texas law the jury does
> not 'impose the death penalty.'...As such the high Court failed to inform this
> Court how the jury is to give 'mitigating effect' to mitigating evidence that is
> not capable of being considered (by honestly answering) the special issues.[17]

There were only three ways to solve this problem: instruct the jury to render a general verdict of death or life in prison; ask the jury to answer an additional nonstatutory special issue about the appropriate punishment in light of the mitigating evidence[18] or give the jurors an instruction that allowed them to falsely answer the special issues "no." Art. 37.071 did not expressly forbid or permit any of these vehicles for complying with Penry, but Art. 37.07(a), V.A.C.C.P., prohibits the submission of nonstatutory special issues or

---

[10]Cordova v. State, 733 S.W.2d 175, 190 (Tex. Crim. App. 1987).

[11]Green v. State, 682 S.W.2d 271, 287 n.4 (Tex. Crim. App. 1984).

[12]Cuevas v. State, 742 S.W.2d 331, 352 (Tex. Crim. App. 1987).

[13]See Art. 37.071(a), V.A.C.C.P. (Vernon 1974).

[14]Rogers v. State, 774 S.W.2d 247, 256 (Tex. Crim. App. 1989).

[15]Hernandez v. State, 757 S.W.2d 744, 751 (Tex. Crim. App. 1988) (plurality opinion), overruled on other grounds, Fuller v. State, 829 S.W.2d 191, 200 (Tex. Crim. App. 1992).

[16]492 U.S. at 326.

[17]Trevino v. State, 815 S.W.2d 592, 621, n.11 (Tex. Crim. App. 1991) (emphasis added).

[18]In Oregon, which had a death penalty statute that was identical to the original Texas law, the Oregon Supreme Court held that a trial judge could comply with Penry by instructing the jury to answer a special issue about the appropriate punishment that was neither required, permitted or forbidden by any Oregon law. State v. Wagner, 786 P.2d 93 (Ore. 1990), on remand from, 492 U.S. 914 (1989).

a general verdict in a capital sentencing trial.[19]  Nevertheless, the Texas Court of Criminal Appeals held that in cases where Penry requires a vehicle for the jury to give effect to mitigating evidence with relevance beyond the scope of the statutory issues, the trial court can submit a nonstatutory special issue[20] or give a "nullification" instruction that allows the jurors to impose a life sentence by lying when they answer the statutory special issues of deliberateness, future dangerousness and provocation.[21]

A panel of the Fifth Circuit has said in dicta that a nullification instruction does not satisfy Penry because

> the jury would certainly be confused by instructions that seem to be allowing
> a 'no' answer even when the question itself called for a 'yes' answer.  And if
> the latter should be given, modifying the plain meaning of the question, and
> if the jury answers 'yes,' how are we to know that the jury actually
> considered and rejected all evidence mitigating against the death penalty
> rather than gave its honest answer to the question asked?[22]

The Court of Criminal Appeals has repeatedly approved of nullification charges in spite of this clear warning from the federal court that will review the cases where they were given.[23]

C.    The 1991 Amendment to Art. 37.071

The Texas Legislature solved this problem by adding a Penry special issue to the statute and eliminating

---

[19]See Art. 37.07(1)(a), (2)(b), V.A.C.C.P.; McPherson v. State, 851 S.W.2d 846, 848-50 (Tex. Crim. App. 1992); see also Harris v. State, 790 S.W.2d 568, 579 (Tex. Crim. App . 1989) (Art. 37.07 prohibits nonstatutory special issues in guilt stage); Stewart v. State, 686 S.W.2d 118, 124 (Tex. Crim. App. 1984) (same).

[20]McPherson v. State, 851 S.W.2d at 850.  The Court of Criminal Appeals reasoned that a Texas trial judge can submit a special issue about the appropriate punishment in light of the mitigating evidence that is not authorized by any Texas law, expressly forbidden by Art. 37.01(1)(a) (2)(b), V.A.C.C.P., and contrary to the intent of the legislature that enacted Art. 37.071(b)(e), V.A.C.C.P. (Vernon 1974), because Penry was an eighth amendment case and the eighth amendment "takes precedence" over Texas statutes under the supremacy clause of the federal constitution.  McPherson v. State, 851 S.W.2d at 850.  This analysis was plainly wrong.  Penry did not tell the Texas Court of Criminal Appeals how  to construe or apply Texas law because the Supreme Court did not have the power to do so.  The eighth amendment only prohibits certain standards for imposing the death penalty.  It is up to the state legislature to create standards that comply with the eighth amendment and up to the state courts to decide what the legislature's enactments mean.

[21]McPherson v. State, 851 S.W.2d at 850; see, e.g., Fuller v. State, 829 S.W.2d 191, 209 (Tex. Crim. App. 1992).

[22]Graham v. Collins, 896 F.2d 893, 896-97 n.3 (5th Cir. 1990), rev'd on other grounds, 950 F.2d 1009 (5th Cir. 1992) (en banc), aff'd, 506 U.S. ___, 113 S. Ct. 892 (1993).

[23]See, e.g., Coble v. State, ___ S.W.2d ___, No.71,084, slip op. at 22 & n.18 (Tex. Crim. App. Nov. 3, 1993) ("a jury nullification charge is sufficient to meet Penry requirements"); San Miguel v. State, ___ S.W.2d ___, No.71,334 slip op. at 4 (Tex. Crim. App. May 26, 1993); Hittle v. State, ___ S.W.2d ___, No.71,138, slip op. at 13 (Tex. Crim. App. 1993) (unpublished); Smith v. State, ___ S.W.2d ___, No. 71,099, slip op. at 2 & nn. 2-3 (Tex. Crim. App. Feb. 24, 1993); Blue v. State, ___ S.W.2d ___, No. 70,912, slip op. (Tex. Crim. App. 1992) (unpublished).

the special issues of deliberateness and provocation in cases where the defendant was accused of committing a capital murder on or after September 1, 1991. The state can waive the death penalty unilaterally or in exchange for a guilty plea to capital murder and allow the court to sentence the defendant to life in prison.[24] The defendant must serve 35 years of a life sentence for capital murder to become eligible for parole.

Under the 1991 law, both sides can introduce "any evidence that the court deems relevant to sentence, including evidence of the defendant's background, character or the circumstances of the offense that mitigates against the imposition of the death penalty," with the exception of unconstitutionally obtained evidence,[25] and the jury must always decide whether the state proved one or two special issues beyond a reasonable doubt:

> 1. whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

> 2. in cases where the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.[26]

The court must give the jurors two instructions about how to answer these special issues:

> ¶members of the jury need not agree on what particular evidence supports a negative answer to these issues.[27]

> ¶consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offenses that militates against the imposition of the death penalty.[28]

If the jury answers either or both of the special issues "no," the court must sentence the defendant to life in prison.[29] Twelve votes are required for an affirmative answer to an issue and 10 or more votes are required for a negative response.[30]

The jurors must answer the Penry special issue only if they answered the previous special issue or

---

[24]See Art. 37.071(1), V.A.C.C.P. (Vernon Pocket Part 1993).

[25]See Art. 37.071(2)(a), V.A.C.C.P. (Vernon Pocket Part 1993).

[26]See Art. 37.071(2)(b)(1) (2)(c), V.A.C.C.P. (Vernon Pocket Part 1993). This special issue will hereafter be referred to as the "anti-parties" issue.

[27]See Art. 37.071(2)(d) (3), V.A.C.C.P. (Vernon Pocket Part 1993); see also Mills v. Maryland, 486 U.S. 367 (1988) (eighth amendment forbids jury instructions that require unanimity about the existence of mitigating circumstances).

[28]See Art. 37.071(2)(d)(1), V.A.C.C.P. (Vernon Pocket Part 1993).

[29]See Art. 37.071(2)(g), V.A.C.C.P. (Vernon Pocket Part 1993).

[30]See Art. 37.071(3)(d), V.A.C.C.P. (Vernon Pocket Part 1993).

issues "yes." The <u>Penry</u> issue asks

> whether, taking into consideration all of the evidence, including the
> circumstances of the offense, the defendant's character and background, and
> the personal moral culpability of the defendant, there is a sufficient mitigating
> circumstance or circumstances to warrant that a sentence of life imprisonment
> rather than a death sentence be imposed.[31]

The law does not allocate the burden of proof or persuasion on the <u>Penry</u> special issue, but the court must give the jurors two instructions about how to answer it:

> ¶you need not agree on what particular evidence supports an affirmative
> response.[32]

> ¶You shall consider mitigating evidence to be evidence that a juror might
> regard as reducing the defendant's moral blameworthiness.[33]

Twelve votes are necessary for a negative answer to the <u>Penry</u> special issue that results in a death sentence and 10 or more votes are required for an affirmative response that results in a life sentence.[34] The Court of Criminal Appeals must reform a death sentence to a sentence of life in prison "if the court finds that there is insufficient evidence to support" a negative answer."[35]

D.      The 1993 Law: Art. 37.0711

In 1993, the legislature enacted Art. 37.0711, V.A.C.C.P., to provide a statutory vehicle for complying with <u>Penry v. Lynaugh</u> in trials that were not covered by the 1991 amendment to Art. 37.071. Art. 37.0711 applies retroactively on or after August 30, 1993, to all trials for capital murders that were allegedly committed before September 1, 1991.[36] The statute allows the state to waive the death penalty unilaterally or as part of a plea bargain.[37] If a defendant is sentenced to life in prison, he must serve 20 years of his term before he is eligible for parole.

Under Art. 37.0711, the jury must always answer the original Texas special issues:

> 1. whether the conduct of the defendant that caused the death of the deceased
> was committed deliberately and with the reasonable expectation that the death
> of the deceased would result.

---

[31]<u>See</u> Art. 37.071(2)(e), V.A.C.C.P (Vernon Pocket Part 1993).

[32]<u>See</u> Art. 37.071(2)(f) (3), V.A.C.C.P. (Vernon Pocket Part 1993).

[33]<u>See</u> Art. 37.071(2)(f) (4), V.A.C.C.P. (Vernon Pocket Part 1993).

[34]Art. 37.071(3)(f)(2), V.A.C.C.P.

[35]<u>See</u> Art. 44.251(a), V.A.C.C.P.

[36]<u>See</u> Art. 37.0711(1), V.A.C.C.P.

[37]<u>See</u> Art. 37.0711(2), V.A.C.C.P.

2. whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

3. if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to provocation, if any, by the deceased.[38]

If the jury answers one or more of those special issues "no," the court must impose a sentence of life in prison.[39] However, if the 12 jurors answer the original special issues "yes," they must answer the <u>Penry</u> special issue, regardless of what mitigating evidence was introduced:

4. whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[40]

The court must give the jury the following instruction about how to answer the <u>Penry</u> special issue:

you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.[41]

The law does not allocate the burden of proof or persuasion on the <u>Penry</u> special issue, but the Court of Criminal Appeals must reform a death sentence to a term of life in prison if the evidence was insufficient to support a negative answer.[42]

When the defendant was convicted of the capital offense of murdering two or more people during the same criminal transaction or pursuant to the same scheme or course of action,[43] the jury's answers to provocation and <u>Penry</u> special issues must be based only on "the conduct of the deceased individual first named in the indictment."[44] The Court of Criminal Appeals held that an identical limitation on the provocation special issue in Art. 37.071[45] violates <u>Penry</u> as applied in cases where there was evidence that more than one of the

---

[38]<u>See</u> Art. 37.0711(3)(b), V.A.C.C.P. The state still has the burden of proving these special issues beyond a reasonable doubt, 12 votes are still required for an affirmative answer to an issue and 10 votes are still required for a negative response. <u>See</u> Art. 37.0711(3)(c)(d), V.A.C.C.P.

[39]<u>See</u> Art. 37.0711(3)(g), V.A.C.C.P.

[40]<u>See</u> Art. 37.0711(3)(e), V.A.C.C.P.

[41]<u>See</u> Art. 37.071(2)(f)(4), V.A.C.C.P. (Vernon Pocket Part 1993).

[42]<u>See</u> Art. 44.251(a), V.A.C.C.P. (Vernon Pocket Part 1994).

[43]<u>See</u> V.T.C.A, Penal Code § 19.03 (a)(6).

[44]<u>See</u> Art. 37.0711(3)(h), V.A.C.C.P.

[45]<u>See</u> Art. 37.071(f), V.A.C.C.P. (Vernon 1974).

victims provoked the defendant.[46] However, a multiple murder defendant greatly benefits from this instruction in a trial that is governed by Art. 37.0711 because it requires the jurors to disregard the fact that he murdered more than one person when they decide whether he deserves the death penalty by answering the Penry special issue.

## II.

## THE FUTURE DANGEROUSNESS SPECIAL ISSUE

### A.  Introduction

In every Texas capital sentencing trial, the state must prove beyond a reasonable doubt as a condition precedent to obtaining the death penalty:

Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[47]

Justice Truman Roberts described the future dangerousness special issue as "truly execrable" and "absurd."[48] The legislator who drafted the law said that it was intended to "determine whether the defendant "was just a flat mean person."[49] Justice Roberts believed that "the statute would have been much better if that language had been used" instead of requiring jurors to make speculative judgments about what a defendant might do in the future.[50]   Under the current formulation of the Texas punishment structure, in most cases this is the death qualifying aggravating factor.  That is, the state need only prove this special issue and then your client must meet a burden that convinces the jury that, in spite of this concern, they nonetheless should receive a sentence of life rather than death.  This formulation has been the critical prosecution vehicle for heaping aggravating and prejudicial information into the minds of the jurors who consider your client's ultimate sentence.  Because of this, every defense attorney must know the "future dangerousness" inquiry cold, attack it mercilessly, and prepare to defend against it on all fronts.

### B.  The Meaning of the Term "Probability"

The term "probability" does not have a statutory definition.  The Texas Court of Criminal Appeals has held that a defendant is not entitled to one in the court's charge because the jurors "are presumed to know and apply" a single commonly understood meaning of any word in the Texas Code of Criminal Procedure that was

---

[46]First v. State, 846 S.W.2d 836 (Tex. Crim. App. 1992).

[47]See Art. 37.071(b)(1), V.A.C.C.P. (Vernon 1974); Art. 37.071(2)(b)(1), V.A.C.C.P. (Vernon Pocket Part 1993); Art. 37.0711(3)(b)(2), V.A.C.C.P. (Vernon Pocket Part 1994).  Decisions that construed and applied the future dangerousness special issue under the 1973 law are controlling in cases that were tried under the 1991 and 1993 amendments because the language is identical and the Legislature intended to give it the same meaning.

[48]Horne v. State, 607 S.W.2d 556, 565 (Tex. Crim. App. 1980) (Roberts, J.,  concurring).

[49]Horne v. State, 607 S.W.2d at 565 n.9 (Roberts, J., concurring).

[50]Horne v. State, 607  S.W.2d at 565 n.9 (Roberts, J., concurring).

not defined by the legislature.[51] The Court of Criminal Appeals and the Fifth Circuit have held that the term "probability" does not violate the eighth amendment vagueness and overbreadth doctrines as applied without a definition.[52]

When the Court of Criminal Appeals reviews the sufficiency of the evidence of future dangerousness, it defines the term "probability" to mean "more than a bare chance."[53] This means "something more than a possibility"[54] and something less than "beyond peradventure."[55] In one case, the Court of Criminal Appeals indicated that a 10% chance might not be sufficient to establish a probability.[56] In another case, the court said that the future dangerousness special issue "required the state to prove that (the defendant) would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society."[57] This sounds like the preponderance of the evidence standard, but the word probability has never been given such a precise definition in any other case. In fact, the Court of Criminal Appeals has described the jury's task in answering the future dangerousness special issue as a "necessarily speculative enterprise."[58] This is the most accurate description of the issue. A scientific study established that 107 Texas capital murderers whose sentences were reduced to life in prison after a jury found that they would pose a continuing threat to society committed fewer violent crimes in prison than a control group of 107 capital murderers who received life sentences because a jury found that they would not be dangerous.[59]

C.        Probability of Future Violence and the State's Burden of Proving it Exists Beyond a Reasonable Doubt

The use of the word "probability" does not reduce the state's burden of proving the future

---

[51]Cuevas v. State, 742 S.W.2d 331, 346 (Tex. Crim. App. 1987); accord Earhart v. State, 823 S.W.2d 607, 632 (Tex. Crim. App. 1991); Caldwell v. State, 818 S.W.2d 790, 797 (Tex. Crim. App. 1991).

[52]Lewis v. State, 815 S.W.2d 560, 562-63 (Tex. Crim. App. 1991); Barnard v. Collins, 958 F.2d 634 (5th Cir. 1992); see also Jurek v. Texas, 428 U.S. 262, 274-75 (1976) (future dangerousness special issue not void for vagueness on its face).

[53]Ellason v. State, 815 S.W.2d 656, 659 (Tex. Crim. App. 1991).

[54]Hughes v. State, ___ S.W.2d ___, No. 70,901, slip op. at 8 (Tex. Crim. App. Dec. 9, 1992) (on original submission), rev'd on other grounds, ___ S.W.2d ___, (Tex. Crim. App. Jun. 23, 1993) (on rehearing). This may violate the Lockett rule. (E)vidence that the defendant would not pose a danger if spared but incarcerated must be considered" as a mitigating circumstance, Skipper v. South Carolina, 476 U.S. 1, 5 (1986), but the jury can certainly answer the future dangerousness issue "yes" if the defendant proves by a 51% preponderance of the evidence that he will never commit another violent crime.

[55]Burns v. State, 761 S.W.2d 353, 356 (Tex. Crim. App. 1988) (plurality opinion).

[56]In Hughes v. State, a juror was subject to a challenge for cause because he would have answered the future dangerousness special issue yes if there was a "10 percent" possibility of future violence. ___ S.W.2d at ___, No.70,901, slip op. at 6 (on original submission).

[57]Muniz v. State, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993).

[58]Burns v. State, 761 S.W.2d at 358.

[59]Marquart, *Gazing Into the Crystal Ball: Can Jurors Accurately predict Dangerousness in Capital Cases?* 23 Law & Soc. 449 (1989).

dangerousness special issue to anything less than a reasonable doubt.[60]   A probability is a lower burden of proof than beyond a reasonable doubt,[61] but the word probability is part of a question of fact about the defendant's future behavior rather than modification of the state burden of proof.[62]   The burden of proof beyond a reasonable doubt requires a separate judgment about the credibility and sufficiency of the evidence that was introduced to prove that fact.   For example, if the only evidence of future dangerousness was the circumstances of the capital offense and a psychiatrist's opinion that the defendant will commit additional violent crimes, a rational juror might have a reasonable doubt about whether a probability of future violence exists because the capital crime alone was insufficient to prove it and the psychiatrist was not a credible witness.

D.   Criminal Acts of Violence

The term "criminal acts of violence" in the future dangerousness special issue does not have a statutory definition.[63]   It was borrowed from another statute that criminalizes possession of a firearm by a person who has been convicted of a felony "involving an act of violence or threatened violence to a person or property,"[64] but that statute does not define an act of violence either.[65]

The Court of Criminal Appeals has suggested that violent felon in possession of a weapon cases can be used as precedents to determine whether a criminal act is violent within the meaning of the future dangerousness special issue.[66]   Those cases teach that some crimes are violent per se and other crimes may or may not be violent, depending on the facts and circumstances.[67]   The test is the defendant's intent rather than the result of his conduct.[68]   Criminal mischief is a violent crime per se because it requires the intent to damage

---

[60]Sosa v. State, 769 S.W.2d 909, 917 (Tex. Crim. App. 1989).

[61]Compare Strickland v. Washington, 466 U.S. 668, 694 (1984) (a probability is a lower burden than a preponderance of the evidence) and Woolridge v. State, 827 S.W.2d 900, 903 (Tex. Crim. App. 1992) (beyond a reasonable doubt is a higher burden than a preponderance of the evidence).

[62] Horne v. State, 607 S.W.2d 556, 563 (Tex. Crim. App. 1980) (Roberts. J., concurring).

[63]The Court of Criminal Appeals has held that the defendant is not entitled to a jury instruction about the definition of "criminal acts of violence" because the legislature intended to give the term its commonly understood meaning and jurors are presumed to know and apply it.   Boyd v. State, 811 S.W.2d 105, 113 (Tex. Crim. App. 1991); King v. State, 553 S.W.2d 105, 107 (Tex. Crim. App. 1977).   The Court of Criminal Appeals and the Fifth Circuit have also held that the term does not violate the eighth amendment void for vagueness or overbreadth doctrines without a definition.   Goss v. State, 826 S.W.2d 162, 169 (Tex. Crim. App. 1992); Boyd v. State, 811 S.W.2d at 113; Thompson v. Lynaugh, 821 F.2d 1054 (5th Cir. 1987).

[64]See Cockrum v. State, 758 S.W.2d 577, 583 n.9 (Tex. Crim. App. 1988) (quoting V.T.C.A., Penal Code § 46.05).

[65]See Gardner v. State, 699 S.W.2d 831 (Tex. Crim. App. 1985).

[66]Cockrum v. State, 758 S.W.2d at 593.   In theory, this means that a defendant is eligible for the death penalty in Texas if there is more than a bare chance that he will intentionally run over fences with a tractor and let the cows behind them escape because that is a criminal act of violence as a matter of law.   See Drager v. State, 548 S.W.2d 890 (Tex. Crim. App. 1977).

[67]Ware v. State, 749 S.W.2d 852 (Tex. Crim. App. 1988).

[68]Hamilton v. State, 676 S.W.2d 120 (Tex. Crim. App. 1984).

or destroy property.[69]

Nonviolent offenses can be used to prove that the defendant will commit criminal acts of violence because the defendant's criminal behavior may escalate in the future.[70] Using marijuana is not a criminal act of violence,[71] but it is admissible to prove that the defendant will commit violent crimes.[72] In one case where the evidence of future dangerousness was held to be sufficient, the Court of Criminal Appeals found that it was of "extreme importance" that the defendant "made no effort to rehabilitate himself and no serious effort to secure steady employment" after he was convicted of possessing marijuana.[73] In another close sufficiency case, the defendant's abuse of drugs that were prescribed by a doctor to treat his back pain after he had surgery was considered to be a factor of some significance.[74]

E.    Continuing Threat

The future dangerousness special issue requires something more than a probability that the defendant will commit criminal acts of violence: the state must also prove that those violent crimes would constitute a continuing threat to society. However, there is no statutory definition of the term "continuing threat"[75] and the Court of Criminal Appeals has never treated it as a separate fact that must be proved when it reviews the sufficiency of the evidence.

Jackson v. State[76] is the only Texas case that gave the term "continuing threat" a meaning that was distinct from criminal acts of violence. Jackson objected that the prosecutor misstated the law by telling a juror during voir dire that he had to answer the future dangerousness special issue "yes" if he believed that the defendant could be "rehabilitated over the next ten, twenty or thirty years," but would probably commit criminal acts of violence that would constitute a continuing threat to society during that period of time.[77] The Court of Criminal Appeals held that this statement was improper "because it limited a juror's discretion in evaluating what he or she considered to be a continuing threat to society."[78]

---

[69]Brimberry v. State, 774 S.W.2d 773 (Tex. App.- 12 Dist. 1989).

[70]Cockrum v. State, 758 S.W.2d at 593.

[71]Cockrum v. State, 758 at 593.

[72]Willis v. State, 785 S.W.2d 378, 387 (Tex. Crim. App. 1990).

[73]Smith v. State, 540 S.W.2d 693, 696 (Tex. Crim. App. 1976); But see Horne v. State, 607 S.W.2d 556, 560 (1980) (unadjudicated past history of giving and selling marijuana was not probative of future dangerousness) (dicta supported by three of nine justices).

[74]Willis v. State, 785 S.W.2d at 387.

[75]The defendant is not entitled to an instructional definition because the Legislature intended to give the words their commonly understood meaning and jurors are presumed to know and apply it. Goss v. State, 826 S.W.2d 162, 169 (Tex. Crim. App. 1992).

[76]823 S.W.2d 18 (Tex. Crim. App. 1990).

[77]822 S.W.2d at 24.

[78]822 S.W.2d at 25.

In <u>Johnson v. Texas</u>,[79] the Supreme Court held that the term continuing threat is a vehicle for giving effect to mitigating evidence. <u>Johnson</u> found that the special issues did not preclude the jury from considering a defendant's youth as a mitigating circumstance in part because the

> crucial term employed in the second special issue—"continuing threat to society"—affords the jury room for independent judgment in reaching its decision. Indeed, we cannot forget that "a Texas capital jury deliberating over the Special Issues is aware of the consequences of its answers, and is likely to weigh mitigating evidence as it formulates these answers in a manner similar to that employed by capital juries in 'pure balancing States.'"[80]

The Court of Criminal Appeals has never used this interpretation of the term "continuing threat to society." In fact, the Court of Criminal Appeals has held that the jury's "attention should be directed only to answering the special issues without regard to the sentence that will ultimately be imposed."[81]

F.    <u>Society and Parole</u>

The word "society" does not have a statutory definition. The defendant is not entitled to a jury instruction that defines the term because there is a presumption that all undefined words in the Texas Code of Criminal Procedure have a commonly understood meaning that jurors know and apply.[82] The Texas Court of Criminal Appeals has held that the word 'society" is not unconstitutionally vague as applied without a definition,[83] but many jurors are confused about whether it refers to free society, prison society or society as a whole.[84] If a juror interprets the future dangerousness special issue as a question about whether the defendant is likely to commit violent crimes against members of free society after he is sentenced to life in 100 prison, he must consider the possibility of parole or pardon to answer it.[85] This interpretation is prejudicial to capital defendants who are very dangerous in the free world and not violent in the controlled environment of a prison.[86]

---

[79]506 U.S. ___ , 113 S. Ct. 2658 (1993).

[80]506 U.S. at ___, 113 S. Ct. at 2670.

[81]<u>Knox v. State</u>, 744 S.W.2d 53, 64 (Tex. Crim. App. 1987).

[82]<u>Caldwell v. State</u>, 818 S.W.2d 790, 798 (Tex. Crim. App. 1991).

[83] <u>Rougeau v. State</u>, 738 S.W.2d 651, 660 (Tex. Crim. App. 1987); <u>O'Bryan v. State</u>, 591 S.W.2d 464, 475 (Tex. Crim. App. 1979).

[84]<u>See, e.g.</u>, <u>Felder v. State</u>, 758 S.W.2d 760, 764 (Tex. Crim. App. 1988).

[85]<u>See</u> <u>Felder v. State</u>, 758 S.W.2d at 762-66.

[86]<u>See</u> <u>Franklin v. Lynaugh</u>, 487 U.S. 164, 186 (1988) (O'Connor and Blackmun, JJ., concurring) (future dangerousness special issue allowed jury to give mitigating effect to fact that defendant was the kind of person who could live in the "highly structured" prison environment without endangering others); <u>Id.</u> 487 U.S. at 189-90 (Brennan, Stevens and Marshall, JJ., dissenting) (future dangerousness special issue allowed jury to consider as mitigating "evidence (which) suggested that a sentence to prison, rather than to death, would adequately protect society from future acts of violence by petitioner); <u>Lackey v. State</u>, 816 S.W.2d 392, 407 n.3 (Tex. Crim. App. 1991) (jurors asked for a definition of 'society" during deliberations because they were uncertain about whether "prison life" was relevant to future dangerousness special issue); <u>Felder v. State</u>, 758 S.W.2d at 764 (prospective juror believed that future dangerousness special issue allowed him to consider that defendant

The Supreme Court believes that "the question of a defendant's likelihood of injuring others in prison is precisely the question posed by the second Texas Special Issue."[87] The Texas Court of Criminal Appeals has agreed with that statement in some cases and disagreed with it in others. For example, the Court of Criminal Appeals has said that:

¶"it is obvious to us that in deciding whether to answer the second special issue in the negative the jury would focus its attention on the 'society' that would exist for the defendant and that 'society' would be the 'society' that is within the Texas Department of Corrections."[88]

¶there is not "a single case which arguably supports (the) theory that a potential juror's view is supposed to be that a defendant sentenced to life in prison will serve the rest of his life in prison."[89]

¶the question is whether the defendant will pose a continuing threat to society "in or out of prison"[90]

¶society includes not only free citizens, but also inmates in the penitentiary.[91]

The meaning of the term "society" is further complicated by a similar debate about a standard jury instruction which states that "the mandatory punishment for capital murder is death or confinement in the penitentiary for life"[92] and "you are not to discuss among yourselves how long the accused would be required to serve the sentence that you impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Parole and the Governor and are no concern of yours."[93] The Fifth Circuit believes that this instruction "may aptly be characterized 'as stating that life means life,'"[94] but the Texas Court of Criminal Appeals has held that a juror must somehow put the "possibility of parole" or pardon "completely out of his mind" when he decides whether the defendant would pose a continuing threat to society[95] without presuming

---

"may not be a threat to prison society, but if he's given a life sentence and in twenty years he's paroled back into the free society, at that time he will be a threat to the free society").

[87]Franklin v. Lynaugh, 467 U.S. at 179 n.9 (emphasis added).

[88]Rougeau v. State, 738 S.W.2d at 660. This quotation must be read in context to understand what it really means. In Rougeau, the defendant argued that it was improper for the prosecutor to tell prospective jurors that the term "society" includes prison society. 738 S.W.2d at 659. The Court of Criminal Appeals emphasized that the future dangerousness special issue focuses on prison society, but it was apparently only trying to say that society was not limited to the free world. See 738 S.W.2d at 659.

[89]Boyd v. State, 811 S.W.2d 105, 121 (Tex. Crim. App. 1991).

[90]Muniz v. State, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993).

[91]Jones v. State, 843 S.W.2d 487, 495 (Tex. Crim. App. 1992).

[92]See, e.g., Knox v. Collins, 928 F.2d 657, 661 (5th Cir. 1991) (emphasis added).

[93]See, e.g., King v. Lynaugh, 850 F.2d 1055, 1057 (5th Cir. 1988) (en banc).

[94]Knox v. Collins, 928 F.2d at 662 (quoting King v. Lynaugh, 850 F.2d at 1057).

[95]Felder v. State, 758 S.W.2d at 766.

"that a defendant sentenced to life will serve the rest of his life in prison."[96]  It is impossible to perform that mental gymnastic.  A juror cannot decide whether the defendant will pose a continuing threat to society in the future without considering <u>where</u> the defendant will be if he is not executed.  If a juror does not presume that the defendant will remain in prison, he must acknowledge there is at least a possibility that the defendant will get out.  This translates into considering the possibility of parole or pardon, unless there is some evidence that the defendant might escape from prison.

G.     The Test for Legally Sufficient Evidence of Future Dangerousness

        The Texas Court of Criminal Appeals has held in 11 cases that the evidence was legally insufficient to prove the future dangerousness special issue.[97]  Although sufficiency cases are fact specific, the Court of Criminal Appeals treats each of these 11 cases as "a precedent to be carefully considered as a guideline in future cases."[98]

        The Court of Criminal Appeals uses the federal due process test[99] to review the sufficiency of the evidence of future dangerousness: whether viewing all of the evidence[100] in the light most favorable to the prosecution, any rational jury could have found beyond a reasonable doubt that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[101]  If the evidence is found to be legally insufficient, the Court of Criminal Appeals must reform the defendant's sentence to life in prison.[102]

---

[96]<u>Boyd v. State</u>, 811 S.W.2d at 121.

[97]<u>See</u> <u>Ellason v. State</u>, 815 S.W.2d 656 (Tex. Crim. App. 1991); <u>Smith v. State</u>, 779 S.W.2d 417 (Tex. Crim. App. 1989); <u>Huffman v. State</u>, 746 S.W.2d 212 (Tex. Crim. App. 1988); <u>Marras v. State</u>, 741 S.W.2d 395 (Tex. Crim. App. 1987); <u>Beltran v. State</u>, 738 S.W.2d 382 (Tex. Crim. App. 1987); <u>Keeton v. State</u>, 724 S.W.2d 58 (Tex. Crim. App. 1987); <u>Roney v. State</u>, 632 S.W.2d 598 (Tex. Crim. App. 1982); <u>Garcia v. State</u>, 626 S.W.2d 42 (Tex. Crim. App. 1981); <u>Wallace v. State</u>, 618 S.W.2d 67 (Tex. Crim. App. 1981); <u>Brasfield v. State</u>, 600 S.W.2d 288 (Tex. Crim. App. 1980); <u>Warren v. State</u>, 562 S.W.2d 474 (Tex. Crim. App. 1978). The Fifth Circuit has only found the evidence of future dangerousness to be insufficient in one case. <u>See</u> <u>Vanderbilt v. Collins</u>, 994 F.2d 189 (5th Cir. 1993) (dicta).

[98]<u>Ellason v. State</u>, 815 S.W.2d at 660.

[99]<u>See</u> <u>Jackson v. Virginia</u>, 443 U.S. 307 (1989).

[100]Legally inadmissible evidence must be considered along with the admissible evidence, even if the trial court erroneously overruled an objection to the inadmissible evidence.  <u>Lockhart v. Nelson</u>, 488 U.S. 33 (1988).  However, if the jurors were erroneously instructed not to consider admissible evidence when they answered the special issue it is not considered in reviewing the sufficiency of the evidence, unless the prosecution objected to the erroneous instruction.  <u>Marras v. State</u>, 741 S.W.2d 395, 408 (Tex. Crim. App. 1987); <u>But see</u> <u>Brown v. Collins</u>, 937 F.2d 175 (Tex. Crim. App. 1991) (sufficiency of the evidence must be tested against the statute, regardless of whether the court's charge was correct).

[101]<u>Ellason v. State</u>, 815 S.W.2d at 659 (and cases cited therein).

[102] <u>Brasfield v. State</u>, 600 S.W.2d at 298.  If there was a reversible error at the guilt phase and the evidence of future dangerousness is found to be legally insufficient on appeal, the Court of Criminal Appeals must order a new trial for capital murder and the double jeopardy clause bars the state from seeking the death penalty again.  <u>Id.</u> (citing <u>Burks v. United States</u>, 437 U.S. 1 (1978) ).  If the defendant was convicted of the capital murder of one person and the state introduced evidence of the murder of a second person that he committed

The Court of Criminal Appeals considers a "nonexclusive" list of eight factors when it reviews the sufficiency of the evidence of future dangerousness:[103]

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7. psychiatric evidence

8. character evidence.

The Court of Criminal Appeals has not assigned weights to these factors or held that any one of them is dispositive.[104] The absence of psychiatric evidence does not mean that the evidence as a whole was insufficient[105] and the absence of a criminal record is not a prerequisite to a finding of insufficient evidence. In seven of the 11 cases where the evidence as a whole was legally insufficient to prove future dangerousness, the defendant had committed as least one previous crime.[106]

The Court of Criminal Appeals looks carefully at the facts of the capital murder in isolation to

---

during the same criminal transaction, a finding of legally insufficient evidence of future dangerousness collaterally estopps the state from seeking the death penalty if he is separately tried for the capital murder of the second victim. Ex parte Mathes, 830 S.W.2d 596, 597 (Tex.Crim. App. 1992) (citing Bullington v. Missouri, 451 U.S. 430 (1981) and Ashe v. Swenson, 397 U.S. 436 (1970) ).

[103]See, e.g., Cockrum v. State, 758 S.W.2d 577, 593 (Tex. Crim. App. 1988); Keeton v. State, 724 S.W.2d at 61.

[104]But cf. Ellason v. State, 815 S.W.2d at 664 ("Youth alone is not particularly probative").

[105]Brooks v. State, 599 S.W.2d 312, 323 (Tex. Crim. App. 1979).

[106]See Ellason v. State, 815 S.W.2d at 659-60 (8 to 10 unadjudicated burglaries, domestic violence and drug use); Huffman v. State, 746 S.W.2d 215-17, 223-25 (two burglaries, unspecified violation of parole, drug use, brief unarmed assaults on police officer and jail guard, domestic violence (Tex. Crim. App. 1988); Beltran v. State, 738 S.W.2d at 288 (two drunk driving convictions and unadjudicated resisting arrest by striking a police officer once with his hand); Keeton v. State, 724 S.W.2d at 60 (possession of marijuana and probation revoked); Roney v. State, 632 S.W.2d at 603 (extraneous robbery on night of capital murder); Wallace v. State, 618 S.W.2d at 69 (unadjudicated attempted armed robbery a month before the capital murder and A.W.O.L. conviction in Army); Warren v. State, 562 S.W.2d at 476 (felony theft conviction and probation revoked because of burglary of a vending machine).

BB-16

Advanced Criminal Law Course

determine whether it was sufficient by itself to prove the future dangerousness special issue.[107] If the facts of the capital offense were insufficient, the Court of Criminal Appeals examines the rest of the evidence, including the mitigating evidence.[108]

The circumstances of the crime can be the most probative evidence of future dangerousness,[109] but the offense must be especially "heinous or evince" an "aberration of character" that is "peculiarly dangerous" to "alone justify an affirmative response"[110] because it "would destroy the purpose of the punishment stage in a capital murder trial" to find that "virtually every" capital murderer poses a continuing threat to society."[111] The Court of Criminal Appeals has also held that an unplanned capital murder must be especially violent, barbaric and cold-blooded to prove future dangerousness by itself,[112] but these pejorative adjectives provide no real guidance for deciding sufficiency claims.[113]

The Court of Criminal Appeals has implied that two edged sword mitigating evidence, such as mental illness or intoxication, that can make the defendant more dangerous and reduce his moral blameworthiness by impairing his ability to control his impulses and understand the consequences of his conduct at the time of the offense, should be given aggravating weight in reviewing the sufficiency of the evidence.[114] This may violate the eighth amendment principle of meaningful appellate review in cases where the defendant presented mitigating evidence of a transient character trait, such as youth, that may rationally call for an affirmative or a negative response to the future dangerousness special issue, depending on the facts of the case.[115] A presumption that a rational jury always considers that evidence to be an aggravating factor would probably deny the defendant "individualized treatment" of his mitigating evidence on direct appeal.[116]

---

[107]Kunkle v. State, 771 S.W.2d at 449.

[108]Kunkle v. State, 771 S.W.2d at 449; Brooks v. State, 599 S.W.2d 312, 323 (Tex. Crim. App. 1979).

[109]O'Bryan v. State, 591 S.W.2d 464, 480 (Tex. Crim. App. 1979); But cf. Chambers v. State, ___ S.W.2d ___, No. 71, 345, slip op. at 6 (Tex. Crim. App. Oct. 27, 1993) (holding that evidence at the punishment stage alone was sufficient to prove future dangerousness without considering evidence of the crime).

[110]Smith v. State, 779 S.W.2d at 420.

[111]Roney v. State, 632 S.W.2d at 603.

[112]Cantu v. State, 842 S.W.2d 667, 675 (Tex. Crim. App. 1992).

[113]In fact, the "so heinous" test for a crime that proves future dangerousness would violate the void for vagueness and overbreadth doctrines if it was a statutory aggravating circumstance instead of a description of a type of evidence that is sufficient to prove one. See Maynard v. Cartwright, 486 U.S. 356 (1988) ("especially heinous, atrocious or cruel" statutory aggravating circumstance was vague and overly broad).

[114]Richard v. State, 842 S.W.2d 279, 284 (Tex. Crim. App. 1992); Madden v. State, 799 S.W.2d 683, 694 n.17 (Tex. Crim. App. 1990); Burns v. State, 761 S.W.2d 353, 355 n.3 (Tex. Crim. App. 1988) (plurality opinion); But see Ellason v. State, 815 S.W.2d at 664 ("Youth alone is not particularly probative of whether one will or will not commit criminal acts of violence...However, when youth is intertwined with other evidence,...its significance as a (mitigating) factor becomes clearer").

[115]Cf. Johnson v. Texas, ___ U.S. ___, 113 S. Ct. 2658, 2669 (1993) ("the fact that a juror might view the evidence of youth as aggravating, as opposed to mitigating, does not mean that the rule of Lockett is violated").

[116]See Parker v. Dugger, 498 U.S. 308, 322 (1991).

16

The Court of Criminal Appeals has never held that the evidence of future dangerousness was legally insufficient because the mitigating evidence of the defendant's character, background and record would have persuaded any rational jury that he will not commit violent acts in the future. In Felder v. State,[117] the evidence at the defendant's second trial for a capital murder showed that he was convicted of three burglaries before he stabbed the deceased during a robbery to prevent her from identifying him, but there was no evidence that he had committed a single violent act during the 12 years that had elapsed since he was arrested for that capital offense. The Court of Criminal Appeals held that the evidence was sufficient to prove that Felder was a continuing threat to society in spite of this because he did not introduce any affirmative proof of his nonviolent record in prison.[118]

## III.

## INVESTIGATING THE PUNISHMENT PHASE OF A CAPITAL TRIAL

With this information regarding the Texas sentencing structure, and what you can expect from the State on the future dangerousness inquiry, it is critical that you meet their fire with your consoling waters. In the current death penalty statute, the vehicle given by the legislature to combat the State's future dangerousness tool is:

> whether, taking into consideration all of the evidence, including the
> circumstances of the offense, the defendant's character and background, and
> the personal moral culpability of the defendant, there is a sufficient mitigating
> circumstance or circumstances to warrant that a sentence of life imprisonment
> rather than a death sentence be imposed.[119]

As this special issue implies, everything about the circumstances of the underlying offense (or other prior bad acts), the defendant's character, and the defendant's record (read "history") is relevant to the jury's final determination of this issue. Therefore, this section is designed to present an initial list of essential people to talk to and records to obtain. Each person and document will have information that will lead to additional people and records that you will need to talk to or obtain. Each case will have its own unique set of records, people and events to investigate. This list is best used as an inspirational guide intended to provoke your own ideas for avenues of inquiry.

A.      Life History Investigation

1.      A thorough intergenerational life history must be developed, incorporating all life history documents
        and interviews with all first and second degree relatives, friends, peers. As relatives with histories of
        relevant physical illness (diabetes, endocrine/hormonal, and neurological) and mental illnesses are

---

[117]758 S.W.2d 760, 771 (Tex. Crim. App. 1988).

[118]758 S.W.2d at 771. The federal constitution allows the state to place the burden on the defendant to introduce mitigating evidence of his law abiding or nonviolent record in a capital sentencing trial, Delo v. Lashley, 507 U.S. ___, 113 S .Ct. 1222 (1993), but the Supreme Court has not decided whether this rule applies in reviewing the sufficiency of the evidence of a statutory aggravating circumstance issue like future dangerousness that the state must prove.

[119]See Art. 37.071(2)(e), V.A.C.C.P (Vernon Pocket Part 1993).

identified, obtain their medical and life history documents.

* Where were grandparents and parents from? How did they support themselves through the years?

* What kind of housing, medical care, nutrition, and education did grandparents and parents have?

* Find the folks (aunts, cousins, neighbors) who knew that sexual, physical, or psychological abuse occurred in the family.

* Investigate anyone who had the opportunity to abuse your client in any way. If parents worked, investigate the people who cared for your client and had access to him.

2.  Find schoolmates, cousins, neighbors, or others -- including family members and caretakers -- who would have known your client and/or the family during his developmental years.  Check for:

* Nightmares, sleep disturbances, fear of the dark;

* Rocking, biting, head banging during early childhood (Look at symptoms of Pervasive Development Disorder in Psychiatric Textbook, 5th edition);

* Withdrawal, quietness, shyness;

* Peculiar concern about food, weight loss;

* Difficulty reading, speech impediments;

* Anxiety, nervousness, crying, hiding;

* Superstitions;

* Fears, responses to crises.

3.  <u>Birth Certificates</u>.  Get birth certificates for your client and all family members.  Family includes siblings, parents, step-parents, grandparents, children, spouse, significant other.  Birth certificates are available from the Department of Vital Statistics in each state -- some states require a signed release.  Be sure to obtain from your client and each member of her family signed releases for this and for other records listed below.  You will need each person's full name, birth date, social security number and any other names previously used.

4.  <u>Birth records</u>.  Obtain birth records from hospital, doctors, midwives.  This includes prenatal (i.e., the mother's) and birth (i.e., the client's) records.  You will need these records for your client as well as all siblings.

5.  Obtain a thorough <u>pregnancy history</u> with mother for each child: drugs, alcohol, beatings/physical abuse, accidents, bleeding, nutrition, edema, nerves, sleep patterns, length of labor, anesthetic during labor, forceps, any trauma, home remedies, nausea, weight gain/loss.  This will complement the prenatal and birth records you receive.

6.  Church records. Did your client go to Church? Is so, what church? Do they have records? Were there people in the church who remember him and things about it? Interview these people.

7.  School records. Get all school records for your client, his parents, siblings and children. Check with each school attended as well as the school board. Ask the school board and each school if outside private or public agencies conducted psychological evaluations or special testing. Contact those agencies and obtain their records. Review school yearbooks and publications and copy all pages related to your client or a family member.

8.  Adult Education Records. Obtain all adult education records on your client. Check with Job Corps, Urban league, private agencies, community colleges, GED programs, vocational programs.

9.  Locate teachers and counselors who remember your client and/or his family. Talk to them.

10. Childhood photographs. Ask family, relatives, friends for these.

11. Were the homes he lived in near industry -- what toxins was he exposed to through his environment?

12. Medical records. Get all of your client's, your client's parents', siblings', spouse or significant other's, and children's medical records for any hospitalization or hospital, public and private clinic or doctor's office treatment. Check every hospital for every person regardless of whether anyone a family member was treated there. Separately check at each emergency room in every geographic area where your client lived. Ask specifically for films of x-rays, CT scans, MRIs as well as narrative reports.

13. Mental health records. Has a psychiatric evaluation ever been made of your client or anyone in her family? If so, get all records, including any testing, raw data, interview notes, tapes, photos, preliminary reports, memos from attorneys, and any material whatsoever in file. If any person was hospitalized involuntarily, obtain the court records and talk to the attorneys involved.

14. Talk to your client and family members about any history of mental illness, mental retardation, physical illnesses or disability in the family? If so, get records. Find out from your client and family members the names of family doctors, dates of hospitalization, etc. Talk to the family doctor or any other doctor who treated the family member.

15. Has your client, or anyone in his family ever tried to commit suicide? Document any occasion and get thorough history. Are there police records? Hospital/ER records?

16. Death Certificates. Get death certificates for any close family members who have died. Obtain all related medical and hospital records, the autopsy report and the obituary.

17. Work records. Get any work-related records available. Look especially for injuries, worker's compensation, performance evaluation, salary. Talk to former employers and co-workers, especially those who worked with your client prior to the offense.

18. Police response calls and incident reports. Check police files for any incident reports and dispatches to parents' home and any other place where your client lived. Look for domestic disturbances, alcohol or drug-related incidents, bizarre conduct by parents or caretaker, visitors.

19. Jail, court, and police records for offenses by family members. Obtain these records on all arrests and convictions for your client's family -- parents, siblings, children, spouse, significant other, etc. This includes attorney files for any attorney who represented any of these persons at trial, on appeal, in collateral proceedings, etc. Check for records at any place that the family has lived. Jail records

should include classification reports, psychological reports, medications administered, disciplinary reports, medical records, visitor logs, etc.

20.    Civil Proceedings. Check all civil court proceedings to see if your client or parents were sued or sued anyone including divorce proceedings initiated and abandoned or completed. Obtain all child support orders, custody decrees, and peace bonds/temporary restraining orders. Get the attorney files on any divorce (from both parties if possible).

21.    Marriage Certificates. Get marriage certificate for client, parents and grandparents. This includes previous and subsequent marriages.

22.    Social service agencies. Was your client's family ever on welfare or some other form of government aid. Check with social services to see if family has any records or reports for neglect, abuse, special needs. Obtain home study reports, referrals and results of testing or counseling, intervention, placement in foster home, termination of parental rights. Check this information for client, siblings, parents, children.

23.    Texas Youth Commission. For your client and all siblings obtain records, reports, evaluations, tests including counseling conferences, intervention reports, foster placement records, any other form of treatment or placement.

24.    Juvenile courts and facilities. Obtain all juvenile court records for your client and siblings. You may need a court order. Check each juvenile facility in every state your client lived for all medical, intake, evaluation, disciplinary and school records.

25.    Parole and probation. Get all parole and probation records, including juvenile. Check with the local parole office as well as regional and central offices.

26.    Private social service agencies. Check with Catholic Social Services, private juvenile shelters, Big Brothers, Boys' Clubs and other private agencies for any records on your client, siblings, or family.

27.    Military records. Obtain complete file for client and any family member. If a parent served in the military, also obtain all medical and school records the military has for your client.

28.    Jail, court, and police records for client's prior offenses. Obtain these records on all arrests and convictions for your client. Check for records at any place that the family has lived. This includes:

a.    Attorney files for any attorney who represented your client at trial, on appeal, in collateral proceedings, etc. ((Use a release signed by your client which includes the release of all work product);

b.    Jail records (classification reports, psychological reports, medications administered, disciplinary reports, medical records, visitor logs, etc.);

c.    Public court records;

d.    Prosecutor's file;

e.    News clips about your client and the offense;

f.    For every co-defendant, court, prosecutor, jail, attorney records.

If any priors involved a police officer, obtain that officer's personnel file, the internal affairs division

investigation and report, and the citizen review board report.

29. What is your client's alcohol, drug history, including when he first inhaled glue, organic solvents, gasoline, freon, paint, paint thinner, etc. The drug/alcohol history needs to be as detailed as possible: age first used, amount, frequency, circumstances, street name, effect on behavior, physiological effects. This needs to be done with particular detail for the few days prior to and including the offense.

30. Develop a diet (including alcohol and drugs) history of your client for week of offenses. What did he eat, when, how much? When did he sleep – how many hours, where. What was his sleep pattern around time of offenses. Did his weight fluctuate? How much time was there between the death in his family and the offenses?

31. Prison records. Get the Texas Dept. of Criminal Justice files for prior incarcerations. Include administrative, classification, employment, educational, and medical, psychiatric, disciplinary records.

B.      Trial Investigation

Often, the investigation of the trial issues will itself lead to information necessary to the development of your punishment theory of defense.

1. Attorney files for every attorney who may have represented your client pre-trial, or at a previous trial or appeal if applicable.

2. Prosecution and police files in this case. Make sure that police lab reports, incident reports, witness statements, etc. are included.

3. Jail, court, and police records for this offense. Obtain these records for your client. Jail records should include classification reports, psychological reports, medications administered, disciplinary reports, medical records, visitor logs, etc. Ask for these records by name. If this offense involved a the shooting of a police officer, obtain that officer's personnel file, the internal affairs division report, and the citizen review board report.

4. Autopsy records for all victims. This includes photos, bench notes, tape recordings, memos from prosecution, and any other material whatsoever in pathologist's files.

5. Investigate the medical examiner's background. Sources to contact include professional regulation agency, criminal and civil courts, universities and schools attended, employment records. Compare his testimony about qualifications with actual qualifications. Look for fraud and misrepresentation. Also investigate the qualifications of the pathologists who actually performed the autopsies.

6. Victim Court Records. Check criminal and civil courts for any proceedings involving the victim. Check every county where they are known to have lived.

7. Were any previous attorneys in prior cases disciplined, disbarred, drug abusers, alcoholics?

8. Co-defendants in this offense. Get prior (and subsequent?) criminal records including arrest records, court files, incarceration records, state law enforcement rap sheets, FBI rap sheets. Be sure to check juvenile proceedings and police records.

Obtain court, police and incarceration records for co-defendants on this offense. If the co-defendant was tried, get a copy of the trial transcript. Obtain the attorney file.

C.      Developing a Defense Theory of Punishment

Once you have assembled everything -- both information and records -- regarding your client's life, you must create a defense. Although all this may be presented at trial to overwhelm the jury, just as with a guilt/innocence strategy, your punishment strategy will be most effective if it is constructed carefully. Although each case is unique, the most successful punishment strategies seem to perform several functions at once:

1.      Humanize your client. Don't just make him out to be a fellow human being, make him out to be a unique human being. Everyone has positive character traits and people who know them to be good and valuable individuals. Present him as someone who, although flawed, is valuable and loved.

2.      Do not shy away from negative evidence (mental illness, abuse, drug addiction, etc.). Although your client's past might increase the likelihood of his future dangerousness, you're mistaken if you believe the State won't find it or use it.

3.      Use all your mitigating evidence and relate it to the criminal act. Negative qualities are often the primary source of explanatory evidence. For example, in Eddings v. Oklahoma, the defendant's child abuse at the hands of his police officer father was directly linked through expert testimony to Edding's murder of a police officer. Likewise, some people are on death row for acts that they performed out of loyalty to or love of another person.

4.      Present a theory that allows the good and bad to coexist in your client. Jurors recognize the potential for evil in themselves and, if properly presented, may understand it in your client.

5.      Explain as much as possible. Facts in a vacuum are what prosecutions are made of. They would like to portray the most superficial version of your client as a mean dog who needs to be put down. DON'T LET THEM! If your client is a drug or alcohol addict, explain why he is addicted and when he began using; if your client is schizophrenic; explain why he is mentally ill and why the State previously failed to treat him, if he is loved, explain why and how; if he was previously convicted, explain the surrounding circumstances.

6.      Use your witnesses to fully develop the picture of a person who is life-worthy. Present all your witnesses as you would a cohesive alibi or insanity defense -- aim with each piece of evidence toward the telling of a unified vision of your client's value and worth. Psychiatrists, psychologists, other doctors, prison or corrections experts, all can create the ultimate picture of how your client can be productive and helpful even if incarcerated.

Ultimately, you must present a defense that demonstrates and conveys how much you believe that your client should live and why he should not die for the crime for which the jury has just convicted him. These defenses are daily winning in Texas because, as much as people want to have the death penalty, those same people, once jurors, actually do think long and hard before sentencing a fellow traveler to die.

## IV.

## GETTING THE COURTS TO WORK (AND PAY!) FOR YOUR CLIENT

A.    The Rule of Ake v. Oklahoma

In the landmark case of Ake v. Oklahoma,[120] the Supreme Court held that an indigent defendant is entitled to the assistance of a psychiatrist as a matter of due process, if he made an "ex parte threshold showing to the trial judge that his sanity" or future dangerousness is likely to be a significant factor at his trial. The Supreme Court gave trial judges discretion to implement this requirement of due process without allowing the defendant "to choose a psychiatrist of his personal liking" or giving him "funds to hire" one, but "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."[121]

The Texas Court of Criminal Appeals has adopted a liberal view of an indigent defendant's constitutional right to the assistance of experts under Ake v. Oklahoma.[122] This is a valuable right because expert testimony plays a major role in almost every capital murder trial. Counsel can use a well planned Ake motion to obtain substantial funds to retain an expert of his own choice in almost any subject who can function as a real defense consultant and keep his work product and communications with the defendant confidential until he testifies. The most astute capital defense attorneys use Ake motions as a plea bargaining chips. They request funds for many costly experts and persuade the judge and the prosecutor that the county cannot afford to pay for a fair trial.[123]

B.    The Threshold Showing of Need that Counsel Must Make to Obtain the Assistance of an Ake Expert

In Caldwell v. Mississippi,[124] the Supreme Court held that a defendant is not entitled to the assistance of an expert under Ake v. Oklahoma if his lawyer made nothing "more than undeveloped assertions" of need for an expert.[125] In Caldwell and most of the lower court cases where an Ake claim was rejected, counsel filed a skeletal request for an expert that did not even attempt to show that his assistance was likely to be a significant factor at the trial.[126]

---

[120]470 U.S. 68, 69, 83 (1985).

[121]470 U.S. at 83.

[122]470 U.S. at ___.

[123]See W. White, Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care, 2 Univ. Ill. L.Rev. at 329.

[124]472 U.S. 320 (1985).

[125]472 U.S. at 323-24 n.1.

[126]See DeFreece v. State, 848 S.W.2d 150, 156-57 (Tex. Crim. App. 1993) (collecting cases); Volson v. Lynaugh, 874 F.2d 243 (5th Cir. 1989) (counsel did not demonstrate that he needed a psychiatrist by merely giving formal notice of intent to present an insanity defense)..

In <u>Jordan v. State</u>,[127] the Texas Court of Criminal Appeals held that an <u>Ake</u> motion with a bit of meat on its bones failed to allege sufficient facts to make a threshold showing of need. Jordan's attorney stated in his motion that he wanted the court to order a CAT Scan test at "a hospital" because Jordan was an indigent person who had "suffered a severe blow to the head," "brain damage may have resulted from the blow" and the test would enable him to show that "he did suffer a physical as well as a mental illness."[128] The Court of Criminal Appeals found that this offer of proof was inadequate because it did not reflect the extent of the injury that Jordan sustained from the blow, when the injury occurred, the effect of the injury, the availability of an expert to perform the CAT Scan, the cost of the test, when it could be made or enough information about the evidence that counsel hoped to develop if the test was positive.[129] In all likelihood, Jordan's lawyer had access to these simple facts and carelessly failed to include them in his motion because he did not know that <u>Ake</u> requires a detailed showing of specific need for an expert.

<u>Ake v. Oklahoma</u> provides some guidance about what counsel must do to make an adequate threshold showing of need for an expert. The Supreme Court held that Ake was entitled to the assistance of a psychiatrist on the issue of his sanity because "Ake's mental state at the time of the offense was a substantial factor in his defense and...the trial court was on notice of that fact when the request for a court-appointed psychiatrist was made."[130] The court identified six facts that supported this conclusion:

> For one, Ake's sole defense was that of insanity. Second, Ake's behavior at arraignment, just four months after the offense, was so bizarre as to prompt the trial judge, sua sponte, to have him examined for competency. Third, a state psychiatrist shortly thereafter found Ake to be incompetent to stand trial, and suggested that he be committed. Fourth, when he was found to be competent six weeks later, it was only on the condition that he be sedated with large doses of Thorazine three times a day, during trial. Fifth, the psychiatrists who examined Ake for competency described to the trial court the severity of Ake's mental illness less than six months after the offense in question, and suggested that this mental illness might have begun many years earlier. Finally, Oklahoma recognizes a defense of insanity, under which the initial burden of producing evidence falls on the defendant. Taken together, these factors make clear that the question of Ake's sanity was likely to be a significant factor in his defense.[131]

The Supreme Court expressed "no opinion as to whether any of these factors, alone or in combination, is necessary to make (that) finding" in any case,[132] but two important propositions emerge from the court's application of the law to the facts: 1) a defendant's mental illness can show that his sanity is likely to be a significant factor at his trial, even if there is no direct evidence that it affected him at the time of the offense and 2) a reviewing court can consider all of the evidence that was presented at the trial to determine whether the trial judge erroneously denied a pretrial request for an expert.

---

[127]707 S.W.2d 641, 645 (Tex. Crim. App. 1986).

[128]707 S.W.2d at 645.

[129]707 S.W.2d at 645.

[130]470 U.S. at 85.

[131]470 U.S. at 85.

[132]470 U.S. at 86 n.12.

In DeFreece v. State,[133] the Texas Court of Criminal Appeals held that direct evidence of insanity at the time of the offense is not necessary to show that the defendant's sanity is likely to be a significant factor at his trial. DeFreece was examined by two neutral psychiatrists before he filed an Ake motion for the assistance of his own expert on the issue of his sanity. One of the neutral doctors found that DeFreece was sane at the time of his offense. There was no evidence that directly contradicted this doctor's opinion, but the Court of Criminal Appeals held that DeFreece made an adequate threshold showing of need for the assistance of a psychiatrist because the second neutral expert found that he suffered from schizophrenia without expressing an opinion about his sanity and the facts of the offense were "fairly bizarre."[134]

Other courts have placed a much greater burden on the defendant to establish that his sanity is likely to be a significant factor. In Williams v. Collins,[135] the Fifth Circuit held that a defendant must demonstrate to the trial judge that there is a reasonable probability that he was insane at the time of the offense to show that he is entitled to the assistance of a psychiatrist on that issue. The Tenth Circuit requires a showing to the trial judge that there is a reasonable ground to doubt the defendant's sanity at the time of the offense.[136] In the Eighth Circuit, the defendant must show "a reasonable probability that an expert would aid in his defense and the denial of expert assistance would result in an unfair trial."[137] Under these tests, counsel must present a substantial insanity defense to the trial judge without the help of a psychiatrist to show that he needs the assistance of a psychiatrist to present an insanity defense.

This Catch-22 exists to some degree in any case where counsel files an Ake motion. Counsel must have a working knowledge of the scientific subject that he wants an expert to advise him about to demonstrate to the trial judge that the assistance of an expert in that subject is likely to be helpful to the defense. A lawyer's ignorance of a scientific subject may therefore paradoxically prevent him from showing that he needs an expert to advise him about it. When the state relies on highly complex or novel scientific testimony, the most scientifically astute lawyer may need the advice of an expert just to determine whether an expert could possibly be of any assistance to the defense.

In Williams v. Collins, counsel's ignorance of psychiatry may well have been the cause of his failure to demonstrate that he was entitled to the assistance of a psychiatrist on the issue of insanity. Counsel supported his Ake motion with evidence of Williams' history of mental illness, but when Williams testified at a hearing on the motion he did not claim that his mental illness affected his thoughts or behavior at the time of his offense. The Fifth Circuit held that Williams was not entitled to the assistance of an Ake psychiatrist because his own testimony established that he could not mount a viable insanity defense.[138] A forensic psychiatrist could have

---

[133]848 S.W.2d 150 (Tex. Crim. App. 1993).

[134]848 S.W.2d at 158-59.

[135]984 F.2d 841, 845 (5th Cir. 1993).

[136]Liles v. Saffle, 945 F.2d 333, 336 (10th Cir. 1991).

[137]Little v. Armontrout, 835 F.2d 1240, 1243 (8th Cir. 1987). The Texas Court of Criminal Appeals used this draconian test in an unpublished opinion. See White v. State, ___ S.W.2d ___, No.69,861, slip op. at 4 (Tex. Crim. App. June 3, 1992) (unpublished). It is fortunate that White is not a precedent for deciding other cases because the defendant would have to meet the impossible burden of showing actual prejudice before the trial to obtain the assistance of an expert. ___ S.W.2d at ___, No.69,861, slip op. at 5-6.

[138]989 F.2d at 845; But cf. Ake v. Oklahoma, 470 U.S. at 85 (diagnosis of severe mental illness four months after the offense and defendant's bizarre behavior during the trial established that his sanity was likely to be a significant factor, even though there was no expert or lay testimony about his state of mind at the time of

advised Williams' lawyer that some people who suffer from episodic mental illnesses are adept at concealing their symptoms when they are in remission because they are ashamed of their disability or afraid that they will be confined in a mental hospital.[139]

There a split of authorities about whether the evidence at the trial may be considered by a reviewing court to determine whether the denial of a pretrial request for the assistance of an expert violated Ake v. Oklahoma. The Texas Court of Criminal Appeals implied in DeFreece v. State, that the fact that the defendant's sanity actually "turned out to be" a significant issue at his trial was not dispositive of his Ake claim, but it could be considered on appeal.[140] The Eleventh Circuit has held that the a reviewing court must only consider the facts that the trial judge was aware of at the time that he denied the Ake motion.[141] In the Tenth Circuit, a reviewing court must examine the entire record, including the evidence that was presented after the Ake motion was denied.[142] The question is still open in the Fifth Circuit.[143]

The test for a threshold showing of need for a future dangerousness expert is very different than the test that applies to a request for the assistance of a psychiatrist on the issue of sanity. In Ake v. Oklahoma, the Supreme Court found that Ake was entitled to psychiatric assistance on the issue of future dangerousness because his

> future dangerousness was a significant factor at the sentencing phase. The state psychiatrist who treated Ake at the state mental hospital testified (for the defense) at the guilt phase[144] that, because of his mental illness, Ake posed a threat of continuing criminal violence. This testimony raised the issue of Ake's future dangerousness, which is an aggravating factor under Oklahoma's capital sentencing scheme,...and on which the prosecutor relied at sentencing.[145]

This means that a capital defendant in Texas is always entitled to the assistance of a psychiatrist to rebut psychiatric testimony about future dangerousness because future dangerousness is always a significant

---

the offense); DeFreece v. State, 848 S.W.2d at 160 ("fairly bizarre" facts of the offense, defendant's history of mental illness and diagnosis of schizophrenia established that his sanity was likely to be a significant factor).

[139]See generally Gribble v. State, 808 S.W.2d 65, 76 (Tex. Crim. App. 1991) (Gribble "was able to keep (his) sexual aberrations secret from his family and friends over an extended period of time" and "(v)irtually all persons with whom he was acquainted...regard him as stable, sensible, hardworking, polite and generous. But at times...he suffered from a true psychosis in which episodes of violent criminal behavior were typically followed by feelings of intense remorse").

[140]848 S.W.2d at 160.

[141]McKinley v. Smith, 838 F.2d 1524, 1529-30 (11th Cir. 1988).

[142]Liles v. Saffle, 945 F.2d at 336.

[143]Williams v. Collins, 989 F.2d at 844.

[144]Ake's counsel made an unsuccessful attempt to establish an insanity defense at the guilt stage by introducing the testimony of the neutral psychiatrist who performed a court ordered competency examination. 470 U.S. at 72-73; 470 U.S. at 94 (Rehnquist, J., dissenting). The Supreme Court's opinion does not indicate whether the psychiatrist made his prediction of future dangerousness on direct or cross-examination or why it was admitted at the guilt stage of the trial.

[145]470 U.S. at 86.

aggravating factor at the sentencing phase. The Supreme Court apparently concluded that it is not necessary to show that the defense expert might give a favorable opinion about the individual defendant's propensity for violence because any psychiatrist's opinion about the future dangerousness of a defendant can be attacked with expert testimony about the general unreliability of such predictions.[146] The American Psychiatric Association believes that it is unethical and unscientific for a psychiatrist to predict future dangerousness and scientific studies have shown that these predictions are "wrong most of the time."[147] In fact, requiring a defendant to show that a psychiatrist might give favorable testimony about his future dangerousness is as senseless as requiring him to show that he can find a tarot card reader to disagree with the opinion of a carnival fortune teller who used a crystal ball.

The same argument can be made whenever the state relies on the testimony of an expert in a controversial subject, such as hair identification, odontology and rape trauma syndrome, that is not accepted by a substantial part of the relevant scientific community. In such a case, the defendant needs an expert to testify that the state's expert's opinion was unscientific, regardless of whether the defense expert might be able to offer a favorable opinion.[148]

The safest way to make a threshold showing of need for an expert's assistance is to support an Ake motion with an affidavit from that expert, stating that he has reviewed the relevant evidence and can probably provide a favorable opinion for the defense. Many experts can be persuaded to sign such an affidavit for free, if counsel provides a moderate amount of well organized material for them to review. Experts who frequently accept court appointments view the time spent preparing the affidavit as an investment that may earn them a substantial fee. Some experts do pro bono work in high profile capital cases to advance the cause of justice, obtain free publicity, gain experience or satisfy their egos.

Counsel should write the affidavit for the expert, if the expert will allow this. The affidavit should be a persuasive document, rather than a scientific treatise. The accuracy of the expert's opinion is almost irrelevant because his affidavit cannot be cross-examined, rebutted or discovered by the state.[149]

D.    The Right to the Assistance of a Partisan Defense Expert

The Texas Court of Criminal Appeals and the Fifth Circuit disagree about whether Ake v. Oklahoma can be satisfied by appointing neutral psychiatrist to perform a sanity examination and giving the defendant and the state equal access to him.

In Granviel v. Lynaugh,[150] the Fifth Circuit held that a neutral psychiatrist is sufficient to satisfy Ake

---

[146]470 U.S. at 71, 73, 84; But see White v. State, ___ S.W.2d at ___, No.69,861, unpublished slip op. at 4-5 (defendant was not entitled to psychiatric assistance on the issue of future dangerousness because his lawyer filed a pretrial motion for such an expert without making a particularized showing of need before the state introduced the testimony of a psychiatrist who found that White had an antisocial personality disorder and a "high possibility of recidivist activity").

[147]Barefoot v. Estelle, 443 U.S. 880, 901 (1983).

[148]This does not relieve the defendant of his burden of making a threshold showing of need: he must still satisfy that requirement by making an offer of proof to the trial judge that a defense expert may be able to testify that the state's expert used an unscientific standard, method or test to arrive at his opinion.

[149]DeFreece v. State, 848 S.W.2d at 161 n.8; Brooks v. State, 385 S.E.2d 81, 84 (Ga. 1989).

[150]881 F.2d 185 (5th Cir. 1989).

on the issue of sanity because a psychiatric "examination is not an adversary proceeding" and a neutral expert gives the defendant the "ability to uncover the truth."[151] In DeFreece v. State, the Court of Criminal Appeals agreed that a sanity "examination is not an adversarial proceeding," but the court refused to follow Granviel because the trial at which the state adduces evidence of that examination most certainly is" an adversarial proceeding.[152]

> DeFreece v. State held that Ake requires

> more than just an examination by a neutral psychiatrist. It also means the appointment of a psychiatrist to provide technical assistance to the accused, to help evaluate the strength of his defense, to offer his own expert diagnosis at trial if it is favorable to that defense, and identify weaknesses in the State's case, if any, by testifying himself and/or preparing counsel to cross-examine opposing experts. We recognize that the accused is not entitled to a psychiatrist of his choice, or even to one who believes the accused was insane at the time of the offense. Ake makes that much clear. But even a psychiatrist who ultimately believes the accused was sane can prove invaluable by pointing out contrary indicators and exposing flaws in the diagnoses of the state's witnesses.[153]

This reasoning applies to an Ake expert in future dangerousness,[154] mitigation[155] or any other subject. One of the most important functions of a defense expert is to advise counsel about "the probative questions to ask of the opposing party's" expert.[156] A neutral expert obviously "cannot effectively prepare counsel to cross-examine herself" if she is called as a witness for the state[157] and "offer a well-informed expert's opposing

---

[151]881 F.2d at 192.

[152]DeFreece v. State, 848 S.W.2d at 159 (emphasis added).

[153]848 S.W.2d at 159 (emphasis added). In Smith v. McCormick, 914 F.2d 1153 (9th Cir. 1990), the Ninth Circuit gave a detailed explanation of the difference between a neutral psychiatrist and the kind of "adversarial" expert that a defendant is entitled to under Ake. A neutral psychiatrist performs whatever test or examination the court orders, discloses his opinion to the lawyers for both sides before the trial, responds to their questions outside the courtroom and testifies for any party who calls him. An adversarial psychiatrist performs whatever test or examination is most likely to be of benefit to the defense; reviews evidence and interviews witnesses under counsel's direction; discloses his opinion to counsel only; helps counsel to determine whether his testimony will be of any value to the defense; advises counsel about how to expose any weaknesses in the opinion of the state's doctor even if he agrees with it; refuses to discuss the case with the prosecutor outside of the courtroom; helps counsel to prepare his direct testimony, if any, and cross-examination of the state's expert; and advises counsel about how to explain the scientific
evidence to the jury in his summation.

[154]Hood v. State, No. 71,167, unpublished slip op. at 2-3 (Tex. Crim. App. Nov. 24, 1993). Texas law does not permit a trial judge to appoint a neutral psychiatrist to perform a future dangerousness examination. Bradford v. State, ___ S.W.2d ___, No. 71,048, slip op. at 9 (Tex. Crim. App. June 9, 1993) (and cases cited therein).

[155]Smith v. McCormick, 914 F.2d at 1158-59.

[156]Ake v. Oklahoma, 470 U.S. at 80.

[157]DeFreece v. State, 848 S.W.2d at 160.

view."[158]

The trial court can satisfy the defendant's right to the assistance of an <u>Ake</u> psychiatrist on any issue by appointing a large state owned mental hospital, such as the Rusk Institute in Galveston, to serve as a defense consultant.[159] Many psychiatrists at these facilities are ill suited for the job of advising a defense attorney about how to evaluate, prepare and present his case because they perform standardized court ordered sanity and competency examinations on an assembly line basis and almost always testify for the prosecution. It is futile to object that the doctors at a state hospital like the Rusk Institute are biased in favor of the state,[160] but they must be replaced if they are unable or unwilling to perform all of the duties of a true defense expert.

In <u>Buttrum v. Black</u>,[161] a trial judge denied a capital defendant's request for funds to hire her own <u>Ake</u> psychiatrist and appointed the doctors at a large state hospital to be the defense experts in a case where the prosecution introduced psychiatric testimony at the punishment stage about future dangerousness and an unusual sexual disorder called paraphilia. The judge told counsel that a psychiatrist at the state hospital would be "glad to sit down and explain any psychiatric terms" and submit to an interview, but they would not have to "sit at counsel table" if they chose not to.[162] The state hospital gave Buttrum a standardized psychiatric evaluation that was ordinarily used for the purpose of determining a defendant's competency to stand trial. Defense counsel requested additional tests about dangerousness and paraphilia, but the trial court refused to order them. The Eleventh Circuit found that this was not "the level of assistance required by <u>Ake</u>," primarily because the trial judge gave the doctors at the state hospital "discretion" to decide "their level of involvement" in the case.[163]

E.     <u>Ake Applies to Experts in Almost Any Subject</u>

Many courts have held or assumed for the sake of argument that an indigent defendant is entitled to an <u>Ake v. Oklahoma</u> expert in any subject whose assistance is likely to be a significant factor at his trial,[164]

───────────────

[158]470 U.S. at 84. The Fifth Circuit has not decided whether <u>Ake</u> can be satisfied by appointing a neutral psychiatrist to assist the defendant on the issue of future dangerousness. <u>See</u> <u>James v. Collins</u>, 986 F.2d 1116, 1124 (5th Cir. 1993).

[159]<u>See</u> <u>DeFreece v. State</u>, 848 S.W.2d at 156 (and cases from other states cited therein).

[160]<u>See</u> <u>DeFreece v. State</u>, 848 S.W.2d at 156 ("many courts have denied <u>Ake</u> claims where the accused has received an examination in a state mental institution pursuant to a court order").

[161]721 F.Supp. 1268 (N.D. Ga. 1989), <u>opinion adopted and aff'd</u>, 908 F.2d 695 (11th Cir. 1990).

[162]<u>Buttrum v. Black</u>, 721 F.Supp. at 1313.

[163]<u>Buttrum v. Black</u>, 721 F.Supp. at 1313.

[164]<u>See, e.g.,</u> <u>Caldwell v. Mississippi</u>, 472 U.S. at 323-24 n.1 (implying that <u>Ake</u> applies to ballistics and fingerprint experts); <u>Terry v. Rees</u>, 985 F.2d 283, 284-85 (6th Cir. 1993) (applies to pathologist); <u>Yohey v. Collins</u>, 985 F.2d 222, 227 (5th Cir. 1993) (applying <u>Ake</u> to ballistics expert); <u>McKinley v. Smith</u>, 838 F.2d 1524,1528 (11th Cir. 1988) (assuming <u>Ake</u> applies to pathologists); <u>Little v. Armontraut</u>, 835 F.2d 702, 711 (18th Cir. 1987) (en banc) (applies to hypnotist); <u>DuBose v. State</u>, ___ So.2d ___, 1993 Ala. Crim. App. LEXIS 1091 at *74-76 (Ala. Crim. App. Sept. 10, 1993) (applies to all experts); <u>State v. Ballard</u>, 428 S.e.2d 178, 180 (N.C. 1993) (applies to all experts); <u>State v. Edwards</u>, ___ S.W.2d ___, 1993 Tenn. Crim. App. LEXIS 228 at *40 (Tenn. Crim. App. March 25, 1993) (all experts); <u>Tibbs v. State</u>, 819 P.2d 1372, 1376 (Okla. Crim. App. 1991) (applies to all experts); <u>Hansen v. State</u>, 592 So.2d 114, 125 (Miss. 1991) (assuming

including a psychiatrist to develop mitigating evidence.[165] Ake has not been extended to experts in subjects that relate to the selection of juries or private investigators, but the case probably applies to any subject that an expert could testify about at a trial or hearing on a motion to suppress evidence. Of course, the defendant is not entitled to the assistance of an expert in a subject that experts are not permitted to testify about because that subject cannot possibly be a significant factor at the trial.[166]

In McBride v. State,[167] the Texas Court of Criminal Appeals held that an indigent defendant was entitled to the assistance of a chemist under Ake v. Oklahoma because he could not afford to exercise his right under Article 39.14, V.A.C.C.P., to have his own expert perform a qualitative analysis of the controlled substance that he was convicted of possessing.[168] McBride did not make any factual showing to the trial judge that the state's chemist might have been mistaken about the identity of the drug before the judge denied his motion for his own expert, but the Court of Criminal Appeals still accepted his argument that he was "denied due process and effective assistance of counsel."[169]

McBride did not extend Ake very far from its facts because the case only applies to an expert whose assistance is needed to exercise a defendant's very narrow right under Article 39.14, to inspect and independently test tangible evidence that is "indispensable" to the state's case.[170] The Court of Criminal Appeals has only held that this right was violated in cases where the defendant wanted a chemist to test the drugs that he was accused of possessing. Former Presiding Judge Onion stated in his commentary to Article 39.14 that when "it is known that the state is planning to base its case on a fingerprint, bullet, pistol or rifle, book or record, the defendant can have his own expert examine the same,"[171] but these kinds of evidence are rarely "legally indispensable" to the state's case.[172] In Quinones v. State, the Court of Criminal Appeals held that a defendant did not have a right to have his own expert test the authenticity of a "very incriminating"

---

Ake applies to pathologists); State v. Asberry, 581 N.E.2d 592, 595 (Ohio App. 1989); State v. Coker, 412 N.W.2d 589, 593 (Iowa 1987); Cargill v. State, 340 s.e.2d 891, 905 (Ga. 1986); Schultz v. State, 497 N.E.2d 531, 533 (Ind. 1986); In re Allen, 506 A.2d 329,331 (N.H. 1986).

[165]Smith v. McCormick, 914 F.2d 1153, 1158-59 (9th Cir. 1990).

[166]Wunnenberger v. State, 844 S.W.2d 864, 869 (Tex. App.- Amarillo 7th Dist. 1992).

[167]McBride v. State, 838 S.W.2d 248, 252 (Tex. Crim. App. 1992).

[168]848 S.W.2d at 250-252.

[169]848 S.W.2d at 251 & n.7.

[170]848 S.W.2d at 251. Article 39.14 states that upon a showing of good cause, the court may order the state to allow the defendant to inspect any tangible evidence that the state possesses. The Court of Criminal Appeals has construed this statute to require an opportunity for the defendant to inspect any tangible evidence in the state's possession that is material to his defense and reasonably available for inspection. McBride v. State, 848 S.W.2d at 251 & n.6. The identity of a drug is always material to the defense in a drug possession case because the state must prove that it is a controlled substance to obtain a conviction. Id.

[171]McBride v. State, 848 S.W.2d at 250.

[172]McBride v. State, 848 S.W.2d at 251 (quoting Quinones v. State, 592 S.W.2d 933, 942-43 (Tex. Crim. App. 1980)).

tape recorded confession because it was legally possible for the state to obtain a conviction without it.[173]

Counsel should file an Ake/McBride motion for an expert to test any piece of tangible evidence that was made available for an inspection pursuant to Article 39.14, regardless of whether it is legally indispensable to the state's case. Judges routinely exercise their broad discretion under the statute to permit the defense to inspect such evidence[174] without objection from the state because they know that the district attorney will simply remove the items from the evidence locker and spread them out on a table for a meaningless visual inspection by counsel.[175] The trial court's refusal to provide the defendant with an expert to test evidence that he had no right to inspect would probably not be a reversible error under Article 39.14,[176] but McBride teaches that it is fundamentally unfair to limit an indigent defendant to a "visual examination" of evidence that would "not divulge anything of probative value" by denying his request for an expert to test it.[177] That principle should apply, regardless of whether the evidence was made available for an inspection as a matter of right or as a matter of discretion.

F.     The Right to Confidential Assistance From an Ake Expert

Counsel does not lose his "opportunity to prepare the defense in secret" when he requests the assistance of an expert under Ake v. Oklahoma.[178] It would "thwart the Supreme Court's attempt" to give indigent defendants "equality with non-indigent defendants" if counsel had to disclose any facts or work product to obtain that assistance.[179] Counsel must therefore be permitted to file his Ake motion without serving the prosecutor with a copy, exclude the prosecutor from a hearing on the motion and have the court seal every part of the record where it was discussed ex parte.[180]

An Ake v. Oklahoma expert's work product and communications with the defendant and his attorney are covered by the same rules of confidentiality that apply to an expert who was retained with the defendant's own money.[181] In Texas, an Ake expert is considered to be an agent of counsel.[182] This means that counsel can

[173]592 S.W.2d at 942-43.

[174]Quinones v. State, 592 S.W.2d 933, 940 (Tex. Crim. App. 1980).

[175]See Pabst v. State, 721 S.W.2d 438 (Tex. App.- 1st Dist. 1986).

[176]See Quinones v. State, 592 S.W.2d at 940 (Tex. Crim. App. 1980).

[177]McBride v. State, 838 S.W.2d 250 n.5 (quoting Detmering v. State, 481 S.W.2d 863, 864 (Tex. Crim. App. 1972).

[178]Brooks v. State, 385 S.E.2d 81, 84 (Ga. 1989).

[179]McGregor v. State, 733 P.2d 416 (Okla. Crim. App. 1987).

[180]Ake v. Oklahoma, 470 U.S. at 82; Brooks v. State, 385 S.E.2d 81 (Ga. 1989); McGregor v. State, 733 P.2d 416 (Okla. Crim. App. 1987); State v. Poulsen, 726 P.2d 416 (Okla. Crim. App. 1987); State v. Hickey, 346 S.E.2d 646, 654 (N.C. 1986); Wall v. State, 715 S.W.2d 208, 209 (Ark. 1986); But cf. Williams v. Collins, 989 F.2d at 845-46 (Ake claim rejected because counsel waived his right to exclude the state from the hearing and prosecutor elicited evidence that rebutted the defendant's threshold showing of need).

[181]Smith v. McCormick, 914 F.2d at 1158-59.

invoke the attorney-client privilege and the work product doctrine to keep the expert's opinions, report, notes and mental impressions secret until he testifies.[183] Counsel can use the expert to explore possible defenses without disclosing harmful evidence or his strategy to the prosecution.[184]

The right to keep an Ake psychiatrist's opinion and work product secret gives counsel an important tactical advantage at the punishment stage of a capital trial in Texas. Counsel can surprise the state with psychiatric mitigating evidence and prevent the state's psychiatrist from performing an examination of the defendant to rebut it. The state has no right to discover evidence in Texas.[185] A trial judge has no authority under Texas law to order a psychiatrist to examine the defendant on any issue other than sanity and competency to stand trial. The defendant has a right under the fifth amendment to refuse to submit to an examination by the state's psychiatrist and that right is not waived by presenting psychiatric mitigating evidence.[186]

The defendant does not waive his right to keep an Ake psychiatrist's opinion and work product secret until he testifies by giving notice of intent to present an insanity defense. The federal constitution would not be offended if the prosecution and the defense had a reciprocal duty to disclose the reports and opinions of experts,[187] but "(d)iscovery in Texas criminal cases (is) a 'one way proposition' with the focus on requests by defendants."[188] Article 46.03(3)(a)(d), V.A.C.C.P., only allows the court to grant the state's motion to have a neutral psychiatrist perform a sanity examination and give the state a copy of his report when the defendant gave notice of intent to present an insanity defense.[189] Article 46.03(f), V.A.C.C.P., gives the defendant a right to be examined by his own psychiatrist as well as the neutral expert, without requiring him to disclose his expert's opinion or work product to the state.[190] Of course, Ake provides no protection against disclosure of any

---

[182]DeFreece v. State, 848 S.W.2d at 161 n.8.

[183]DeFreece v. State, 848 S.W.2d at 161 n.8; see also Ballew v. State, 640 S.W.2d 237 (Tex. Crim. App. 1980) (on rehearing) (attorney-client privilege applies to defense expert); Washington v. State, ___ S.W.2d ___, No. 65-92, slip op. (Tex. Crim. App. June 23, 1993) (work product doctrine applies to defense investigator).

[184]Smith v. McCormick, 914 F.2d at .

[185] Washington v. State, ___ S.W.2d at ___, No. 65-92, slip op at 3.

[186]Bradford v. State, ___ S.W.2d ___, No. 71,048, slip op. (Tex. Crim. App. June 9, 1993). In Hood v. State, the court agreed to grant the defendant's request for the assistance of his own psychiatrist only if he submitted to a joint future dangerousness examination by his doctor and the state's doctor. ___ S.W.2d at ___, No.71,167, slip op. at 1-5 (unpublished). The court would have allowed Hood to keep his expert's opinion confidential, but this procedure was clearly unconstitutional because it forced him to waive his fifth amendment right not to answer the state's doctor's questions to obtain the assistance of his own psychiatrist. Hood's lawyer waived any error by objecting that he was entitled to funds to hire his own expert because he was not entitled to that relief under Ake and he did not object to the violation of the fifth amendment. Id. at 4-5 & n.3.

[187]See Williams v. Florida, 399 U.S. 78 (1970).

[188]Washington v. Texas, ___ S.W.2d at ___, No. 65-92, slip op. at 3.

[189]Granviel v. State, 552 S.W.2d 107, 115-16 (Tex. Crim. App. 1976).

[190]In Granviel v. Lynaugh, the Fifth Circuit held that Ake was satisfied in a case where the trial court granted the defendant's request to appoint a psychiatrist of his own choosing, who had already examined him, as a neutral expert under Art. 46.03, and denied his request to keep the psychiatrist's report confidential. DeFreece v. State did not directly address the confidentiality of an Ake expert's report, but the Court of

information that a defense expert relied upon it to form his opinion if he takes the stand.[191]

The state cannot call an Ake expert to testify against the defendant because he is an agent of counsel and cannot be forced to testify against his own client.[192] This rule applies even if the defendant presented evidence from another witness about the subject that his Ake expert advised him about.[193] However, the state can present the testimony of a psychiatrist who was appointed as a neutral expert at the defendant's request.[194] did not hold to the contrary.

When an Ake expert testifies for an indigent defendant, he may not have to disclose an affidavit that he created at counsel's request for the sole purpose of persuading the court to provide funds for counsel to retain him.[195] It would frustrate the Supreme Court's attempt to put poor defendants on equal footing with their wealthier counterparts if the affidavit could be used to impeach an Ake expert because a wealthy defendant could obtain an expert's assistance without creating such a document. Moreover, the affidavit is precisely the kind of document that should be covered by the work product doctrine because it was prepared in anticipation of litigation and contained counsel's theories.[196]

## G.    The Right to a Competent Expert and an Appropriate Examination

Ake v. Oklahoma held that a defendant is entitled to "competent psychiatric assistance in preparing his defense" and an "appropriate examination" when he makes the requisite showing of need.[197] The author of the Supreme Court's opinion in Ake v. Oklahoma, Justice Thurgood Marshall, argued in a subsequent dissent from denial of certiorari that this means that a defendant has a due process right to reasonably effective assistance from his Ake expert.[198] That right is separate from the sixth amendment right to effective assistance of counsel.

---

Criminal Appeals declined to follow Granviel in part because counsel must have the option of deciding whether to "offer his own expert('s) diagnosis at trial if is favorable to the defense." 848 S.W.2d at 159 (emphasis added).

[191]Smith v. McCormick, 914 F.2d at ___.

[192]See generally Acres of Land in New Castle County, 193 A.2d 799 (Del. Super. 1963); Annot. 139 A.L.R. 1250; Friendenthal, Discovery and Use of an Adverse Party's Expert Information, 14 Stan.L.Rev. 455 (1962).

[193]Miller v. District Court, 737 P.2d 834 636-37 (Colo. 1987) (and cases cited therein).

[194]Shippy v. State, 556 S.W.2d 246, 253-55 (Tex. Crim. App. 1977).

[195]There are two rules that the prosecutor can use to obtain a defense psychiatrist's report or information about its contents. If a defense psychiatrist used a document to prepare his testimony or refresh his recollection on the stand, the prosecutor is entitled to a copy of it before he cross-examines the doctor. Ballew v. State, 640 S.W.2d at 242-44 (on rehearing). The defense psychiatrist must also answer the prosecutor's questions about any underlying facts or data that he relied upon to form his opinion. See Tex.R.Crim.Evid., 705(a).

[196]See Washington v. State, ___ S.W.2d at ___. No. 65-92, slip op. at 5.

[197]470 U.S. at 77, 82.

[198]Brown v. Dodd, 96 L.Ed.2d 164 (1987) (Marshall and Brennan. JJ., dissenting from denial of cert.).

An attorney's ineffective use of an expert can violate the sixth amendment,[199] but the defendant is not entitled to a lawyer who has sufficient scientific knowledge to recognize all of an expert's mistakes and omissions.

The Florida Supreme Court is the only court that has adopted Justice Marshall's interpretation of Ake.[200] The Texas Court of Criminal Appeals has not addressed this issue. The Eleventh Circuit has held that an expert's mistakes are grounds for reversal under the rule of Ake v. Oklahoma only if they made the trial "so evidently and fundamentally unfair as to threaten to render the trial a mockery of justice."[201] This test makes the right to a competent expert almost meaningless because a defendant can usually prevail on a claim of ineffective assistance of counsel if his lawyer failed to ask the trial judge to replace an expert who made such obvious prejudicial blunders.[202]

The Seventh and Fourth Circuits have held that a psychiatrist is "competent" within the meaning of Ake if he is licensed and qualified to testify in a court of law.[203] These courts reasoned that a constitutional right to effective assistance of a psychiatrist would create a never ending battle of the experts because psychiatrists frequently disagree with each other.[204]

In Buttrum v. Black, the Eleventh Circuit held that psychiatrist violated Ake by effectively performing an inappropriate examination. Buttrum's counsel requested the assistance of a psychiatrist on the issues of future dangerousness and a rare disorder called paraphilia. The trial court gave him access to the psychiatrists who had effectively evaluated Buttrum's competency to stand trial, but it refused to pay for any additional tests. The doctors who performed the competency examination conceded that it was not an appropriate test for future dangerousness and paraphilia.[205]

Counsel can use the defendant's right to an appropriate examination to persuade the trial judge to order the most sophisticated, expensive scientific tests, if he requests the tests in a second Ake motion after the court grants his initial request for funds to hire an expert. The second motion should contain an affidavit from the expert recommending every additional test that could conceivably be helpful to the defense in his judgment. If the judge refuses to pay for any of the additional tests, counsel should demand an ex parte hearing and put the expert on the stand to explain why they are needed. If the judge denies the request, the record will show that he arbitrarily rejected the uncontradicted opinion of the expert he approved of to assist the defense.

---

[199]Ex parte Guzmon, 730 S.W.2d 724, 731 (Tex. Crim. App. 1987) (defense psychiatrist testified that Latins like defendant generally cannot take responsibility for their actions and counsel highlighted this damaging testimony in his punishment summation); Waters v. Zant, 979 F.2d 1473 (11th Cir. 1992) (ineffective use of psychiatrist); Lloyd v. Whitley, 977 F.2d 149, 158 (5th Cir. 1992) (failure to use expert testimony about mental illness as a mitigating factor); Troedel v. Wainwright, 667 F.Supp. 1456 (S.D.Fla. 1986), aff'd, 828 F.2d 670 (11th Cir. 1987) (failure to consult with gun powder residue expert); Curry v. Zant, 371 S.E.2d 647 (Ga. 1988) (failure to use available funds for psychiatric assistance).

[200]Sireci v. State, 502 So.2d 1221 (Fla. 1987); Mason v. State, 489 So.2d 734 (Fla. 1986).

[201]Clisby v. Jones, 960 F.2d 925, 934 n.12 (11th Cir. 1992).

[202]Clisby v. Jones, 960 F.2d at 934 n.12.

[203]Silagy v. Peters, 905 F.2d 986 (7th Cir. 1990); Waye v. Townley, F.2d (4th Cir. 19).

[204]Silagy v. Peters, 905 F.2d at 1013.

[205]721 F.Supp. at 1313, aff'd, 908 F.2d 695 (11th Cir. 1990).

H.      Article 26.05(a) and *Ake*

        Art. 26.05(a), V.A.C.C.P., is the only provision of Texas law that authorizes a trial judge to disburse
funds to pay an expert to assist an indigent criminal defendant. The statute states that when an attorney is
appointed to represent a poor person in a criminal case, he "shall be reimbursed for reasonable expenses[206]
incurred with prior court approval for purposes of investigation and experts." Counsel must therefore pay the
expert's retainer and seek reimbursement from the court after the expert submits his bill or persuade the expert
to take the risk of performing services without receiving any money in advance.[207] The court's refusal to
authorize counsel to incur the expense of hiring an expert is not reversible error if counsel failed to make a
particularized factual showing of need[208] and actual prejudice.[209]

        In DeFreece v. State, the Texas Court of Criminal Appeals sent a signal to trial judges that they must
provide an indigent defendant with an Ake expert when he is entitled to one, even if his attorney cannot afford
to take the financial risk of paying the expert's retainer and seeking reimbursement for the expense under
Article 26.05 (a).[210] DeFreece held that once a defendant shows that he is entitled to the assistance of an expert
under Ake, "the trial court abuses its discretion in failing to appoint or to give 'prior approval' to 'reasonable
expenses incurred' by counsel for the accused to obtain" that assistance.[211] A Texas trial judge technically has
no power to "appoint" a defense expert, but he can advance funds to counsel to pay his retainer.

I.      When to File an Ake Motion

        Counsel should file an Ake v. Oklahoma motion as soon as he can make a showing of need for an
expert because mid-trial requests for the assistance of an expert are strongly disapproved in Texas.[212] A
premature Ake motion may be denied if counsel is not ready to make an adequate factual showing of need for
an expert, but this problem can be solved by making a record of diligent attempts to acquire the necessary facts
and renewing unsuccessful Ake motions when new facts to support them become available. For example,
counsel can object that he needs a ruling on his motion for discovery, his motion to inspect tangible evidence
and a list of the expert witnesses that the state intends to call, in order to determine whether he needs Ake
experts. Counsel can renew an unsuccessful pretrial request for an Ake expert when he receives an expert's
report during discovery, a witness list from the state that contains the name of an expert, after the state's expert
testifies on voir dire, after he completes his direct testimony, after he testifies on cross-examination and when
the prosecutor makes a closing argument about his testimony.

---

[206]In 1987, the legislature removed the statutory cap of $500 for experts and investigation. See Acts 1987,
70th Leg., ch. 979, § 3, eff. Sept. 1, 1987.

[207]DeFreece v. State, 848 S.W.2d at 154 n.3 (and cases cited therein).

[208]Stoker v. State, 788 S.W.2d 1, 17 (Tex. Crim. App. 1988); Quin v. State, 608 S.W.2d 937 (Tex. Crim.
App. 1980); Day v. State, 704 S.W.2d 438 (Tex. App. 7 Dist. 1986).

[209]Reed v. State, 644 S.W.2d 479 (Tex. Crim. App. 1983); Cherry v. State, 488 S.W.2d 744 (Tex. Crim.
App. 1972); Ventura v. State, 801 S.W.2d 225 (Tex. App. 4 Dist. 1990).

[210]848 S.W.2d at 154 n.3.

[211]848 S.W.2d at 159 (quoting Art. 26.05(a), V.A.C.C.P.).

[212]See, e.g., Stoker v. State, 788 S.W.2d at 17; Hammett v. State, 578 S.W.2d 699, 707 (Tex. Crim. App.
1979).

It is especially important to take advantage of the opportunity to renew an Ake motion for the assistance of a psychiatrist on the issue of future dangerousness as soon as the prosecutor discloses that he intends to present psychiatric testimony about it. The state's use of psychiatric testimony about the defendant's future dangerousness is sufficient by itself for the defendant to make a threshold showing of need for the assistance of a psychiatrist,[213] but a defendant may not be able to prove that the prosecutor intends to present this evidence until the name of a killer shrink appears on the state's witness list.

In Stoker v. State, a meritorious request for a defense psychiatric expert in predicting future dangerousness was denied because counsel did not take these precautions to protect the record.[214] Stoker's counsel needlessly announced during a pretrial proceeding that he did not want to have his client examined by a psychiatrist or present psychiatric evidence.[215] At the conclusion of voir dire, after counsel had learned that Dr. James Grigson was listed as a witness for the state, he filed a motion for funds to retain an expert in psychiatry and a continuance without using that fact to make a showing of need. He waited until Grigson completed his testimony to ask for a ruling on his motion. When the trial court asked him to explain the delay, he made an unfounded assertion that he was surprised by the state's introduction of evidence of extraneous drug offenses before Grigson took the stand.[216] Grigson's name of the witness list would have been sufficient to establish that Stoker needed a psychiatrist,[217] but the Court of Criminal Appeals held that his request for one was properly denied because he appeared to be trying " 'to manipulate his asserted rights in such a manner as to obstruct the orderly administration of justice.' "[218]

In White v. State, a meritorious request for an expert in predicting future dangerousness was rejected in an unpublished opinion because counsel made it before he could demonstrate that he needed this assistance. White's lawyer made an unsuccessful pretrial request for a psychiatrist to assist him without making any factual showing of need. When the state presented psychiatric testimony about White's future dangerousness, his attorney did not renew his Ake motion and ask for an expert to rebut it. The Court of Criminal Appeals held that White failed to make a showing of need for the assistance of a psychiatrist.[219]

Counsel should never give notice of intent to present an insanity defense before he files Ake v. Oklahoma motion for the assistance of a psychiatrist and obtains a ruling on it.[220] When the counsel gives notice of intent to present an insanity defense, the court has discretion to order a sanity examination by a neutral

---

[213] Ake v. Oklahoma, 470 U.S. at 84-86.

[214] 788 S.W.2d at 17.

[215] Texas law does not require a defendant to give notice of intent to present psychiatric evidence at the punishment stage.

[216] 788 S.W.2d at 16-17.

[217] See Ake v. Oklahoma, 470 U.S. at 84.

[218] 788 S.W.2d at 17 (citation omitted).

[219] ___ S.W.2d at ___, No.69,861, slip op. at 4-5.

[220] In Lowenfeld v. Phelps, 671 F.Supp. 423, 435-36 (D. La. 1987), counsel forfeited an Ake claim by withdrawing his notice of intent to present an insanity defense before the trial judge ruled on his request for the assistance of a psychiatrist because this demonstrated to the judge that the defendant's sanity would not be a significant factor at his trial.

psychiatrist[221] and the defendant has no fifth amendment right to refuse to speak to him.[222] The court can find that the defendant is not entitled to the assistance of his own psychiatrist under Ake if the neutral doctor reported that his sanity is not likely to be a significant factor at the trial.[223] The court cannot order a sanity examination by a neutral psychiatrist if counsel filed an Ake motion without giving notice of intent to present an insanity defense.[224]

## V.

## CAPITAL VOIR DIRE STRATEGY: PRESERVING CURRENT ISSUES FOR APPEAL

The following suggests a strategy for a capital voir dire in Texas. While the following does not purport to exhaust every relevant issue of law and fact that conscientious counsel should cover in selecting a capital jury, it does describe some of the current federal and state constitutional issues that should be raised during a capital voir dire.

### A.    Introduction: Error Preservation

Voir dire is probably the single most difficult area to master in a death penalty case. At the same time, however, voir dire is potentially the most fertile area for appellate reversal -- at least under Texas' post-Penry capital sentencing statute. Thus, the time and effort invested in familiarizing oneself with basic principles is well spent.

Particularly if you have a case with "bad facts" (and few capital cases offer strong prospects for the defense), the single most important thing to keep in mind is error-preservation -- in particular, objecting on federal and state constitutional grounds (e.g., on Sixth, Eighth, and Fourteenth Amendments grounds or TEX. CONST. Art. I, § 10 grounds). More than any other area of Texas death penalty law, preserving voir dire error requires that counsel jump through numerous "hoops;" this section will set out those steps and explain how to follow them.

Although there are innumerable possible claims that arise during voir dire, every attorney should be automatically prepared to preserve at least the following four main types of claims:

    1.    An allegation that a juror (or a prospective juror that defense counsel was forced to
          remove with a peremptory strike) should have been excused "for cause."

---

[221]See Art. 46.03(2)(a) (3)(a), V.A.C.C.P.

[222]Buchanan v. Kentucky, 483 U.S. 402 (1987).

[223]848 S.W.2d at 159. However, if a neutral expert finds that there is no question about the defendant's sanity in an Art. 46.03 examination, the defendant may still be able to make a threshold showing of need for his own psychiatrist by introducing medical records, reports of previous psychiatric examinations or lay testimony about his bizarre behavior.

[224]See Ex parte Hodges, 314 S.W.2d 581 (Tex. Crim. App. 1958) (court committed reversible error by ordering sanity examination over the objection of defendant who did not give notice of intent to present an insanity defense); Battie v. Estelle, 655 F.2d 692, 700-01 (5th Cir. 1981) (defendant has a waivable fifth amendment right not to participate in a court ordered sanity examination).

BB-38

2.    An allegation that a prospective juror was wrongly excused "for cause" by the trial court on the prosecutor's motion.

3.    An allegation that the trial court refused to permit defense counsel to ask a "proper question" to one or more prospective jurors.

4.    An allegation that the prosecutor misinformed one or more members of the venire about some relevant principle of law.

Different rules govern the preservation of each type of claim.

1.    Preserving the first type of claim is the most difficult. The claim is not preserved merely by your making a motion to excuse the prospective juror "for cause," which the trial court then denies. In order to argue on appeal that the trial court should have removed a member of the venire "for cause," you *must* also do the following:

(a)    Make your "for cause" challenge on any and all grounds that you can think of -- most importantly, constitutional grounds, where applicable (see below); be sure to mention more than just the constitutional or statutory provision upon which you are relying; also give your specific theory or theories about why the prospective juror should be struck "for cause";

(b)    Once your "for cause" challenge is denied, you must use a peremptory challenge to remove the veniremember and state that you have been "forced" to do so because the trial court has wrongly denied your challenge "for cause";

(c)    At this point (whether or not you have any of your original peremptory strikes remaining), ask for an <u>extra</u> peremptory; on the record, state that any extra peremptories that you may receive after you've ultimately exhausted your 15 allotted peremptories will not be as helpful to you as an extra one would be <u>at this juncture</u>;

(d)    Ultimately, exhaust all 15 of your allotted peremptories and any extra peremptories that you may have been granted -- <u>do not finish voir dire if you have any peremptories remaining, even if you have to exhaust them on people who are not necessarily as bad as you think subsequent members of the array may be</u>;

(e)    After you've exhausted all of your peremptories and you are forced to proceed to select jurors without having any peremptories left, clearly object on the record that at least one juror who is ultimately seated is "objectionable" and state why. <u>There is no voir dire error if there is no one on the jury who is objectionable</u>. The "objectionable" juror doesn't have to be someone who is challengeable for some legally sufficient reason (such as bias against the law). Rather, by "objectionable" you only mean a juror whom you would have struck with a peremptory if you had any left. The larger point is that that you were unnecessarily forced to use one or more peremptories on a prior member(s) of the array (<u>i.e.</u>, one who <u>should</u> have been struck for cause), with the result that you are now stuck with someone you find "objectionable." This is how the trial court's prior erroneous failure to strike a prospective juror "for cause" -- which forced you to use a peremptory strike -- <u>harms</u> you at the end of voir dire.

2.    Error preservation regarding the second type of voir dire error is considerably easier. If the prosecutor moves to excuse a prospective juror "for cause" and the trial court erroneously grants the challenge, then you

simply need to object to the trial's granting of the motion. The key is to clearly articulate the reasons why the trial court erred -- including the constitutional or statutory provisions upon which your argument is based. The leading example is a Witherspoon challenge (discussed below). A related error is the trial court's refusal to permit you a reasonable opportunity to rehabilitate the prospective juror.

3.        Preserving the third type of claim described above requires an understanding of the relevant legal principles in your particular case. That is, you are permitted to voir dire about any area of the law that might reasonably pertain to the trial. In a Texas capital case, a potentially limitless number of legal issues could come into play at trial. The more you know about the underlying substantive law and the more issues that are potentially applicable to your case, the more questions that are proper during voir dire.

        The main legal basis for this type of error is Article I, § 10, of the Texas Constitution, although federal constitutional provisions may also apply. The Court of Criminal Appeals has repeatedly held that a trial court's failure to permit defense counsel to voir dire on a permissible area of the law violates Article I, § 10 by interfering with defense counsel's "intelligent exercise" of his peremptory challenges and, to a lesser degree, his assertion of "for cause" challenges. As Judge Miller stated in his concurrence in the most definitive case on this issue:

> The concept of allowing a defendant's counsel to effectively and intelligently exercise his peremptory challenges [and "for cause" challenges] is one of greatest importance under the Texas Constitution... With few exceptions, counsel is permitted to question venirepersons on virtually any area which aids in the intelligent use of peremptory challenges, as long as the trial judge considers the question proper. "A question is proper if its purpose is to disclose a juror's views on an issue applicable to the case." [citation omitted].... Generally, a trial court reversibly errs when it denies a proper question because that denial interferes with a defendant's intelligent exercise of peremptory challenges.

Maddux v. State, 862 S.W.2d 590, 593-99 (Tex. Crim. App. 1993) (Miller, J., concurring) (emphasis added).

        The U.S. Constitution may also come into play when the trial court forbids questioning about issues that implicate federal rights -- such as questions about a jurors' views on racial prejudice or the general propriety of the death penalty. See, e.g., Turner v. Murray, 476 U.S. 28 (1986) (Fourteenth Amendment permits defense counsel to question prospective jurors about their racial views in capital case involving inter-racial crime); Morgan v. Illinois, 112 S. Ct. 2222 (1992) (Fourteenth Amendment permits defense counsel in a capital case to question prospective jurors about whether they would automatically impose the death penalty in a case where the defendant is convicted of capital murder).

        Be creative. the main thing you want to look in proposed questions is sentencing bias that would violate some provision of the Constitution. For instance, in a case where the victim is female, ask the trial court to permit you to voir dire prospective jurors about whether they would be inclined to punish a convicted capital defendant more severely (i.e., be more inclined to impose the death penalty) if the victim was female rather than male. If the trial court denies the proposed questions, object on Fourteenth Amendment grounds as well as Art. I, § 10 grounds, since such a biased juror -- if they were discovered through the proposed questioning -- would be subject to excusal "for cause." Another good question (in a case with a minority defendant) is whether white venirepersons view minorities as more violence-prone than white jurors.

4.        Preserving the fourth type of voir dire claim set out above is relatively easy and is related to the technique for preserving the first type of claim (discussed above). If you believe that the prosecutor has misinformed a prospective juror about the applicable law during voir dire, immediately object and ask the trial court to tell the jury to disregard the prosecutor's mistaken interpretation of the law. Also ask the trial court to inform the prospective juror of the correct law. If the trial court refuses, then you must move that the juror be excused for cause, since the prosecutor -- and trial court, by refusing to correct the mistake -- have "biased" the

prospective juror against the law. If the "for cause" challenge is denied, use a peremptory on the juror and clearly state that you are using the peremptory because the trial court denied your challenge for cause. If you don't have any available peremptories left, ask for an additional one. If the trial court refuses to give you an extra peremptory strike, be sure to state that "an objectionable juror is being seated."

B.     Questions about a Prospective Juror's Views on the Death Penalty

1.     Witherspoon

In Witherspoon v. Illinois, 391 U.S. 510 (1968), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment is violated by a trial court's removal of a prospective capital juror "for cause" if that prospective juror was removed simply because of her moral "scruples" against the death penalty although she could have set aside those personal views and "followed the law" on the death penalty. The Supreme Court has discussed the Witherspoon rule in numerous subsequent cases. See, e.g., Adams v. Texas, 448 U.S. 38 (1980); Wainwright v. Witt, 469 U.S. 412 (1985).

The Witherspoon rule has traditionally been the best known issue in capital voir dire. It is also one of the most difficult to win. In Wainwright v. Witt, supra, the Supreme Court held that a trial court has extremely broad discretion to determine whether a prospective juror can "set aside" his or her personal bias and follow the trial court's instructions. With the new post-Penry capital sentencing statute – which makes a jurors' views on the death penalty critically important – it is unlikely that an anti-death penalty juror will survive a prosecutor's questions. Nevertheless, your goal should be to rehabilitate any anti-death penalty juror so that they can repeatedly say that they will not "automatically" vote for a life sentence in answering the special issues and that they key thing for them will be whether there are "sufficient mitigating circumstances"[225] supporting a life sentence.

If you are lucky enough to get a potential juror who favors life in most circumstances, you may convey to him or her that there will always be some mitigating evidence and what constitutes "sufficient" mitigating evidence is up to each individual juror. For obvious reasons, you can't have such a juror "commit" to this expectation – that is, the juror cannot state that she will always answer the "Penry" issue in favor of the defendant. Rather, simply make it clear that the Penry issue affords sentencing jurors a great deal of discretion to determine what does and what does not constitute "sufficient" mitigating circumstances. A generally pro-life juror could perhaps agree that in rare cases with no mitigating evidence – e.g., "Ted Bundy" – a life sentence would not be appropriate. The thing to really push is that even a scintilla of mitigating evidence can be legally "sufficient" if the juror concludes that it justifies a life sentence rather than the death penalty. A smart juror will realize that she can abide by her oath and still vote for life in 99.9% of cases.

This type of claim can easily be preserved by simply saying that the removal of a prospective juror for cause "violates Witherspoon."

2.     Reverse-Witherspoon: Morgan v. Illinois

In Morgan v. Illinois, 112 S. Ct. 2222 (1992), the Supreme Court held the converse of Witherspoon: a prospective capital juror should be excused "for cause" if that person has a pro-death bias that would prevent the juror from following the law during the capital sentencing phase. As with Witherspoon, presumably appellate courts will afford trial courts much discretion here. Again, the key thing is to "lock" the prospective

---

[225]The new Penry statutory special issues asks whether the jury believes that are "sufficient" mitigating circumstances supporting a life rather than death sentence.

juror into a position that admits that his or her bias is so strong in favor of the death penalty that the juror could not set aside that bias during the punishment phase. A good question along these lines is, "Could I change your mind about this?" Another good question to ask is whether that person would believe that someone like him could fairly sit in judgment of a close friend or loved one who was convicted of capital murder.

It should be noted that <u>Morgan</u> offers more hope for injecting error into the case than <u>Witherspoon</u> does. <u>Witherspoon</u> usually boils down to a single question -- would the prospective juror's <u>anti</u>-death penalty bias, as a general matter, cause the juror, if selected, to automatically vote against the death penalty, irrespective of the facts of the case. <u>Morgan</u> is a little more complicated. Rather than simply asking the pro-death penalty prospective juror whether he or she would automatically vote for the death penalty if a person is convicted of capital murder, you should specifically inquire about the prospective juror's views regarding different types of capital murder. For instance, if your client is charged with murder of a police officer, you need to ask the prospective juror whether they are going to automatically vote for the death penalty in that type of case, when they might not automatically vote for death in all cases of intentional murder in the course of a felony. Some jurors will say that in certain types of cases -- but not in all capital cases -- they will automatically vote for the death penalty if the defendant is convicted. Those prospective jurors should be struck under <u>Morgan</u>.

In order to preserve this type of claim, specifically object on "Sixth, Eighth, and Fourteenth Amendment grounds" to the court's refusal to excuse such a juror (that is, don't just object that the juror is "biased against the law"). Also, be certain to "follow through" as discussed above (exhausting peremptories, asking for additional peremptories, identifying an objectionable juror, etc.), or you will waive any error.

C.    Questions on Mitigating/Aggravating Evidence

   1.    Mitigating Evidence

There is currently a conflict between the Texas Court of Criminal Appeals and the United States (and several of the Federal Courts of Appeals) that presents excellent opportunity for reversible error after trial.

The Texas Court of Criminal Appeals has stated:

> "We do not believe that the law <u>requires</u> a juror to consider youth as mitigating...."[226]

> "[T]his Court has recently determined that it is not error for a trial court to overrule a challenge for cause where it is shown that a juror will not or may not give a particular variety of 'mitigating evidence' any consideration."[227]

The United States Supreme Court has stated:

> "Any juror to whom mitigating factors are ... irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the

[226]<u>Robertson v. State</u>, ___ S.W.2d ___, No. 71,224, slip op., at 16, n. 13 (Tex.Crim.App. Dec. 8, 1993).

[227]<u>Johnson v. State</u>, 773 S.W.2d 322, 330-31 (Tex.Crim.App. 1989), citing <u>Cuevas v. State</u>, 742 S.W.2d 331 (Tex.Crim.App. 1988), and <u>Cordova v. State</u>, 733 S.W.2d 175 (Tex.Crim.App. 1987). <u>See also</u> <u>Allridge v. State</u>, 850 S.W.2d 471, 481-82 (Tex.Crim.App. 1991) (citing <u>Cuevas</u>, <u>Cordova</u>, and <u>Johnson</u>).

merits of the case without basis in the evidence developed at trial."[228]

"The sentencer ... may determine the weight to be given to relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."[229]

"The sentencer may not refuse to consider ... any relevant mitigating evidence."[230]

Morgan v. Illinois, supra, is important for reasons other than the one discussed above. The Supreme Court's holding in Morgan that a prospective capital juror who would automatically vote for the death penalty in a capital case should be excused for cause was based on the assumption that seating such a capital juror would necessarily violate the Eighth Amendment principle that a capital sentencer must be willing to at least consider any and all types of constitutionally relevant mitigating evidence, such as child abuse or mental illness, before deciding punishment. Presumably, according to Morgan's reasoning, a prospective juror who refuses at least to be willing to "consider" any particular type of constitutionally relevant mitigating evidence in mitigation of punishment should be removed "for cause" under the Sixth, Eighth, and Fourteenth Amendments.

Strategically, you should be aware that the Court of Criminal Appeals' cases are in sharp conflict with the Supreme Court's decision in Morgan, and that the Court of Criminal Appeals has not yet confronted the issue or attempted to reconcile its cases. Indeed, the Texas Court of Criminal Appeals has never even cited Morgan in a case. Thus, the presence of their potentially mistaken precedent may well "seed" error in numerous cases that will have to be reversed somewhere down the road on appeal. Accordingly, during voir dire, you can easily set up this appellate error by informing the trial court of the CCA's cases and then asking for a bill of exception. This strategy will be explained further below.

    (a)     Background: The CCA's Confused Jurisprudence

The most recent case on this subject is Robertson v. State, ___ S.W.2d ___, No. 71,224, slip op., at (Dec. 8, 1993). In Robertson, the CCA overruled Trevino v. State, 815 S.W.2d 592 (Tex.Crim.App. 1991), rev'd on other grounds, ___ U.S. ___ (1992), and Teague v. State, ___ S.W.2d ___, 1993 Tex.Crim. App. LEXIS 132 at *8-*9 (Tex.Crim.App. 1993). Trevino and Teague had silently overruled the CCA's Johnson-Cuevas-Cordova line of cases (quoted above). In Trevino, the CCA had stated: "Clearly, ... the law [citing, e.g., Eddings v. Oklahoma, 455 U.S. 104 (1982)] provides that youth is a mitigating factor which must be considered [by a capital sentencing juror]. Failure of the trier of fact at least to consider youth in their determination of punishment constitutes error . ..." Trevino, 815 S.W.2d at 613-14. In Robertson, which overruled Teague and Trevino, the CCA conversely stated that, "[w]e do not believe that the law requires a juror to consider youth as mitigating. . . ."[231]

Note that although some of these cases specifically spoke of a capital defendant's youth as a mitigating

---

[228] Morgan v. Illinois, 112 S.Ct. 2222, 2235 (1992).  •

[229] Eddings v. Oklahoma, 455 U.S. 104, 114 (1982); see also id. at 117 * (O'Connor, J., concurring) ("Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, ... it is our duty to remand for resentencing.").

[230] Skipper v. South Carolina, 476 U.S. 1, 4 (1987).

[231]Robertson v. State, ___ S.W.2d ___, No. 71,224, slip op., at 16, n. 13 (Tex.Crim.App. Dec. 8, 1993).

factor,[232] their holdings obviously extend to any and all types of constitutionally relevant mitigating evidence — such as history of child abuse, mental illness, positive character traits, intoxication at the time of the crime, history of substance abuse, et cetera.   Keep that in mind in formulating your voir dire strategy.

Another relevant case is Hood v. State, ___ S.W.2d ___, No. 71,167, slip op. (Tex. Crim. App. Nov. 24, 1993), which went well beyond the Robertson line of cases.   In Hood, the Court of Criminal Appeals held that capital defense counsel is not even entitled to ask prospective jurors whether they "could" or "would" "consider" certain types of mitigating evidence — including child abuse and a good prison record — in mitigation of punishment.  Slip op., at 7-8 & footnote #5.  In the Roberston line of cases, the court only held that prospective capital jurors need not be removed for cause if they state that they stated that they would not "consider" certain types of mitigating evidence.  Hood permits a trial court to prevent such questioning altogether.  The Hood court reasoned that with such questions, defense counsel was attempting to have jurors "commit" to finding specific evidence to be mitigating in a given case.

Hood seems to directly conflict U.S. Supreme Court jurisprudence on this point.  Asking someone in the abstract to promise that he "would consider" a type of mitigating evidence in some cases does not mean that he will necessarily give any weight to the mitigating evidence in "considering" it in mitigation of punishment.  The court misunderstood the meaning of "consider."  The court's misunderstanding of the term "consider" is critically important to this claim.  Hood is currently pending before the Supreme Court on a petition for certiorari and will be conferenced in October.  Regardless of the Court's action at that time, it is a powerful issue that might save your client years down the road.

(b)     Suggested Approach

Currently, it seems the best approach is to be completely candid with the trial court and the prosecution.  Bring in copies of the slip opinions in Robertson v. State and Hood v. State and call the relevant portions of the opinions to the trial court's attention.  Recognizing that Robertson and Hood are presently the law in Texas, and accordingly that they might bind the trial court, argue against the CCA's position.  You might say something quite general like, "Robertson and Hood appear to conflict with the U.S. Supreme Court's capital sentencing and voir dire jurisprudence, which has stressed the consideration of mitigating evidence" — and say that you simply want "to preserve any potential state and federal constitutional error" for the future.  Cite to the relevant federal constitutional Amendments — the Sixth, Eighth, and Fourteenth.

Assuming that the trial court does not permit the requested questioning — "could you consider" — ask to make a bill of exception regarding every single member of the venire.  Be very specific about the questions that you would ask, and about the fact that you would pose them, if permitted to do so, to each member of the venire.  Remember, the questions should not seek to "commit" prospective jurors to do anything except "consider" any and all types of relevant mitigating evidence during the punishment phase.  "Consider" does not mean that a juror will necessarily vote for a life sentence simply because mitigating evidence is introduced.  Nor does it mean that the juror will necessarily credit the defendant's evidence (e.g., the juror may decide, based on the evidence actually presented at trial, that the defendant was not drunk at the time of the crime).  The bottom line is, if such evidence is introduced and the juror does find the existence of a mitigating factor, the juror must at least be willing to "consider" it in mitigation of punishment.  Do this for every venire member presented for questioning.

(c)     Some Specific Questions to Ask:

_____

[232]With respect to "youth" as a mitigating circumstance under the Eighth Amendment, the Court of Criminal Appeals and Supreme Court recognize a person in their early twenties as "youthful."

The first necessary thing to do is define "mitigating" evidence, as it is most broadly defined by the Supreme Court: any evidence relating to the circumstances of the crime, the defendant's background or character, that suggests that a life sentence may be appropriate rather than a death sentence.[233] The trial court may be approached for an instruction on this issue later considering its specific articulation in Tex. Code Crim. Proc., Art. 37.071. Next you could inform the juror that "the U.S. Constitution" requires that they be willing to "consider any and all relevant mitigating evidence" in mitigation of punishment.[234] "Consider" being the operative term.

Then ask the following questions:

Without yet knowing the facts of this particular case, could you promise me at this juncture that at least in some cases you would be willing to 'consider' the following types of mitigating evidence in deciding whether a convicted capital murder defendant receives a life or death sentence (if you believe that such is worthy of belief in a particular case):

(i)      A capital defendant's youth at the time of the crime.

Explain that, according to the courts, "youth" at least includes the early twenties or so and below, and definitely 19. Be sure to ask the venireperson if he or she would possess those views even though a capital defendant was old enough to be in the Army, vote, get married, hold a job, go to college, buy liquor, etc., at the time that he allegedly committed the crime.

Experience suggests that probably some venirepersons will say that a person over 17 should be treated like a 45-year old in every case. Try to get a venireperson to admit to such a "cut off" age in their mind -- that is, below the legal age of 18 at the time of the crime. Then object that such a "cut off" age is grounds for a removal for cause.

(ii)     A capital defendant was suffering from mental or emotional problems at the time of the crime.[235]

(iii)    A capital defendant was emotionally/physically neglected or abused as a child.

(iv)     A capital defendant has various positive character traits -- hypothetically describe the types of "good guy" evidence that you think that you'll introduce in the case -- so long as there is any support for such evidence.

(v)      A capital defendant played a lesser role in a crime than other co-defendants or

---

[233]If the trial court or prosecutor attempts to tie mitigating evidence solely to a defendant's "personal moral culpability" or "blameworthiness" for the capital murder -- as Article 37.071 does -- then object on Eighth and Fourteenth Amendment grounds. The basis of this objection will be explained below.

[234]If the trial court refuses to permit this statement, then object on federal (Eighth and Fourteenth Amendment) grounds and State (Art. I, § 10) grounds.

[235] Just because you might not ultimately put on such evidence is not necessarily relevant to preserving the error. If the trial court prohibits such questioning in the first place, on appeal you can argue that the reason that you didn't introduce such evidence to jurors is that you were afraid that they might view mental/emotional problem evidence as aggravating rather than mitigating. To fully preserve this issue, you should try to make an informal bill of exception saying that you "might" be putting such expert evidence, or at least you otherwise would plan on making that argument based on your own assessment of his social history, etc.

accomplices.

(vi)    The defendant has suffered from a history of alcoholism or other substance abuse.

(vii)   Any other type of mitigating evidence that might arguably apply to your case -- even based on evidence that you think, in good faith, you only might discover later. Intoxication evidence will be discussed separately below.

Be clear on the record that you are not trying to get prospective jurors to "commit" to returning a life sentence based on any particular species of mitigating evidence. Rather, you are only trying to weed out prospective jurors who state that under no circumstances will they give any "consideration" or mitigating weight to such types of mitigating evidence.

(d)     Preserving Two Distinct Types of Errors

You should seek to preserve two types of voir dire error with this line of questioning:

(i)     Federal constitutional error: (a) if the trial court does not permit such questioning, or (b) if he permits the questioning, but refuses to strike prospective jurors who say they won't consider certain species of mitigating evidence in any case.[236] In either situation, object on Sixth, Eighth, and Fourteenth Amendment (due process) grounds. Note that this particular type of error is related to "for cause" challenges -- not the "intelligent exercise of peremptory challenges." Of course, also follow the ordinary Texas preservation rules here.

ii)     Texas constitutional error: This applies only if the trial court does not permit such questioning in the first place. Such state constitutional error is under Texas Constitution, Art. I, section 10 -- trial court's impairment of intelligent use of peremptory challenges.

(e)     Moving for a "Cause" Strike.

Assuming that the trial court permits you to ask the above questions and a member of the venire states that they would never consider one or more types of constitutionally relevant mitigating evidence (e.g., youth, mental illness) to be "mitigating," then move that the prospective juror be struck for cause. Make sure that you have first informed -- or attempted to inform -- prospective jurors that "the U.S. Constitution" requires them to "consider" any and all types of relevant mitigating evidence in mitigation of punishment in a capital case. If the challenge for cause is denied, then jump through all of the hoops discussed above in order to preserve for appeal the trial court's denial of the challenge for cause.

(f)     Voir Dire Questions about Voluntary Intoxication -- Texas Penal Code § 8.04.

Evidence of voluntary intoxication at the time of the crime -- which the Supreme Court has repeatedly recognized as constitutionally relevant mitigating evidence -- presents a special situation in Texas. There is a Texas statute, Texas Penal Code § 8.04(b), which provides that evidence of a defendant's intoxication at the time of the crime cannot be considered as mitigating evidence during the punishment phase unless the intoxication rises to the level of "temporary insanity," as defined by Texas Penal Code § 8.01 (i.e., that the defendant did not know right from wrong). This statute is a straight-forward violation of the Eighth and Fourteenth Amendments, at least as applied in a capital case, because it entirely precludes a jury's consideration

---

[236]Note that Morgan v. Illinois, supra, dealt with both types of error.

of voluntary intoxication evidence unless jurors believe that the defendant was so intoxicated (drunk, stoned, high, etc.) that he was legally insane (which will be rare, if ever). As explained below, this statute presents an interesting approach to both voir dire.

In addition to the general mitigation voir dire strategy explained above, you also should do the following regarding mitigating evidence of voluntary intoxication. At the very beginning of voir dire, request that the trial court permit you to ask all prospective jurors whether, in a given case, they "could consider" voluntary intoxication in mitigation of punishment even if the defendant was not so intoxicated that he was legally insane under Texas law. Argue to the trial court that § 8.04(b) does not permit such questioning, but that you think § 8.04(b) is an Eighth Amendment violation and that "the law" about which you wish to inform prospective jurors -- that is, the U.S. Constitution -- requires that jurors must at least be willing to "consider" voluntary intoxication as mitigating evidence even if it does not rise to the level of temporary insanity.

Assuming that the trial court denies you the right to question jurors about the fact that their obligations under the Eighth Amendment trump the barrier of § 8.04, object on both federal grounds (Sixth, Eighth, and Fourteenth Amendments) and state grounds (Art. I, § 10). Assuming such questioning is permitted, move to excuse "for cause" any juror who will not at least be willing "to consider" non-insane voluntary intoxication as mitigating evidence.

(g)     The Possibility of a "Nexus" Requirement

In many post-_Penry_ cases, the Court of Criminal Appeals has held that the introduction of certain types of mitigating evidence (such as child abuse and substance abuse history) did not cause _Penry_ problems under the old, pre-_Penry_ special issues unless the defendant's mitigating evidence established a precise "nexus" between the evidence and the crime. For instance, the CCA held, unless evidence of child abuse somehow explained why the defendant committed the crime, there is no _Penry_ violation.

Of course, the new capital sentencing statute renders these cases inapplicable in terms of _Penry_ violations under Art. 37.071. However, the CCA's reasoning in these cases might be applied by trial courts and prosecutors to either keep out certain mitigating evidence entirely or, during voir dire, might lead the prosecutor or trial court to instruct jurors about the "nexus" requirement. That is, a trial court or prosecutor may tell prospective jurors that they can consider things such as child abuse evidence in mitigation of punishment only if the evidence establishes a "nexus" between the evidence and the crime. If this happens, strenuously object that the Supreme Court's Eighth Amendment cases say nothing about a precise "nexus" requirement and that it is solely up to the jury to infer about whether mitigating evidence is relevant in a given case. If the trial court overrules your objection, challenge the prospective juror(s) for cause on the ground that they have been misinformed of the law. If that is denied, use available peremptories on at least one prospective juror so as to preserve the error for appeal.

2.     Aggravating Evidence

Although aggravating evidence is the tool of the prosecution, there are ways to inform jurors or inject error into your voir dire through creative questioning and vigilant objections.

Ask the trial court to permit you to voir dire prospective jurors about whether they would, in any case, consider various types of relevant mitigating evidence -- youth, mental/emotional problems, race, religion, troubled social history, etc. -- as aggravating evidence rather than mitigating evidence. If the trial court does not permit such questioning, object on state and federal constitutional grounds and ask to make a bill of exception. If a trial court does permit such questioning and a venireperson says that he or she would consider things such as mental illness or child abuse to an aggravating factor, move to strike the juror for cause under the Sixth, Eighth, and Fourteenth Amendments. See _Zant v. Stephens_, 462 U.S. 862, 885 (1983) (capital

sentencing procedure constitutionally invalid if it "attaches the 'aggravating' label to factors [that] actually should militate in favor of a lesser penalty," such as "mental illness").

If the prosecution informs jurors that traditional types of mitigating evidence (such as mental illness or youth) can be considered as aggravating evidence as well as mitigating evidence, object on the ground that the prosecutor is misstating the applicable law. Follow all the procedural requirements discussed above.

D.     The Definition of "Mitigating Evidence"

The post-Penry sentencing statute defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Pro. Art. 37.071, § 2(f)(4) (emphasis added). The term "blameworthiness" links the larger definition of "mitigation" to the use of the term "personal moral culpability" as contained in the Penry statutory special issue.[237] The common dictionary definition of "culpable" is "deserving blame or censure; blameworthy." Webster's Encyclopedic Unabridged Dictionary of the English Language, at 353 (emphasis added).

Art. 37.071(f)(4)'s limiting definition of "mitigation" is unconstitutional, since it ties the concept of mitigation only to mitigating factors that reduce the defendant's moral blameworthiness (presumably) for the capital murder -- or at least that is how a typical juror could interpret the statutory definition of "mitigating evidence." The defendant's culpability for the capital crime of which he was convicted is only one relevant factor in the larger aggravation/mitigation scheme. The defendant's character -- at least the aspects of his character independent of whatever characteristics were displayed during the crime -- is a wholly separate area of mitigation. For instance, the fact that a capital defendant who committed a brutal, senseless murder may have extraordinary artistic talents or may have always been good to his family members in no way relates to his "moral culpability" for the crime. Rather, it relates to the larger notion of whether he deserves to die in view of the totality of mitigating and aggravating circumstances, not just those factors that relate to his blame or culpability (or lack thereof) for committing the capital murder itself.

Thus, in addition to attacking the statutory definition of "mitigating evidence" as unconstitutional during the charge conference at the punishment phase, you should request to voir dire prospective jurors about their own definitions of "mitigating evidence" and attempt to explain that the Eighth and Fourteenth Amendments do not narrowly define "mitigation" in the manner that the statute does. In all likelihood, the trial court will prohibit such questions. If so, object on both state grounds (Art. I , § 10) and federal grounds (Sixth, Eighth, and Fourteenth Amendments).

E.     Other Types of Questions

1.     Racial Prejudice

As noted above, in addition to Art. I, § 10 of the Texas Constitution, the U.S. Constitution -- the

---

[237]That special issue asks:

"Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and *the personal moral culpability* of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."

Tex. Code Crim. Pro. Art. 37.071, § 2(e) (emphasis added).

Sixth, Eighth, and Fourteenth Amendments — gives you the right to question prospective jurors about their views on race, at least regarding a multi-racial crime (typically black-on-white crimes). See Turner v. Murray, 476 U.S. 28 (1986). Assuming that you've got a multi-racial crime or even if the defendant is a minority in a minority-on-minority case, make race an issue during voir dire. In particular, in view of the "future dangerousness" special issue, you want to ask white venirepersons whether they view Blacks and Hispanics as generally more violence-prone than whites. Numerous studies have shown that whites do view minorities, particularly young black males, as more violence-prone than whites. If a venireperson is unable to state under oath that she will absolutely disregard the defendant's race, and the race of the deceased, in answering the "future dangerousness" issue, she should be removed "for cause" and you should object to any refusal by the trial court to do so.

### 2.      Gender of Defendant and Victim

Like race discrimination, gender discrimination implicates the Equal Protection Clause of the Fourteenth Amendment. Studies also show that capital juries are more likely give the death penalty to people who kill women and are more likely to give the death penalty to men rather than women. Particularly if you have a male-on-female crime, attempt to ask prospective jurors about whether they believe that a person who kills a female is, as a general matter, more deserving of the death penalty than a person who kills a male. Also ask whether the prospective juror would be more likely to give the death penalty to a male, as opposed to a female, if an otherwise identical case.

If the trial court denies you the right to ask this type of question, object on state (Art. I, § 10) and federal (6th, 8th, and 14th Amendment) grounds — in the form of a running objection -- and make a bill of exception. If the prospective jurors' answers indicate a gender bias, move to strike the venireperson for cause.

### 3.      Religious Views

There are two reasons to ask a prospective capital juror about his or her views on religion. First, it permits you to identify jurors whose religious views would make them more likely to vote for the death penalty ("an eye for an eye"; "he that smiteth a man shall surely be smiteth"). Second, it permits you to identify jurors whose religious views would make them more likely to vote against a life sentence ("thou shall not kill"; "vengeance is mine, sayeth the Lord"). A handy indirect way of determining a prospective juror's views here is to ask the juror whether her religious views are more dictated by the Old Testament or the New Testament. "Old Testament Christians" are more likely to favor the death penalty; "New Testament Christians" are less likely to.[238] (Obviously, this line of questioning only applies to Christians, but they will constitute 95% of your array.). Strict Catholics are also more likely to be anti-death penalty, since the Catholic Church publicly opposes the death penalty as a general matter.

During voir dire, you obviously want to move to strike any prospective juror who indicates that her religious views make her more prone to vote for death. However, don't view this as simply an occasion to use peremptories. If you get a prospective juror to admit that their religious views make them more prone to vote for death, ask the trial court to strike that juror for cause on federal Constitutional grounds. Specifically, object on the First, Sixth, Eighth, and Fourteenth Amendment grounds. Even if the prosecutor or trial court rehabilitates the prospective juror and gets them to agree to set aside their personal beliefs and "follow the law,"

---

[238] The "eye for an eye" passage comes from Holy Bible, Old Testament, Book of Exodus, XXI: 12. But see Holy Bible, New Testament, Gospel of Matthew, V: 38-44, in which Jesus says "Ye have heard that it hath been said, An eye for an eye, and a tooth for a tooth: But I say unto you . . . whoever shall smite thee on they right cheek, turn the other also . . . . " Thus, it is arguable that the "eye for an eye" maxim in the Old Testament was "overruled" by "turn the other cheek" maxim in the New Testament.

object that a person's religious views are too powerful to assume that a mere juror's oath will actually keep the person's religiosity in check. Argue that religion is something that runs very deep in a person's belief system and that subconscious religious bias in favor of the death penalty is more likely to be a factor regarding religion than in other areas.

One last note on voir dire -- in Knox v. Collins, 928 F.2d 657 (5th Cir. 1991), the Fifth Circuit reversed a Texas capital murder conviction on the grounds that the defendant was deprived of his federal constitutional right to intelligently use his peremptory challenges. In that case, the trial court had promised defense counsel during voir dire that the jury instructions would instruct jurors on Texas parole law; however, the trial court ultimately refused to submit such an instruction to the jury. Defense counsel relied to his detriment on the trial court's promise during voir dire by basing his peremptory challenges in part on prospective jurors' views on parole.

The rule in Knox can be extended to a great number of situations. If the trial court permits you to voir dire on some area of the law and promises that he will instruct the jury in a certain way and then ultimately refuses to instruct the jury as promised, object on state (Art. I, § 10) and federal (Sixth and Fourteenth Amendment) grounds.

E.   Applying Simmons V. South Carolina in Texas

On June 17, 1994, the U.S. Supreme Court handed down its landmark decision in Simmons v. South Carolina, ___ U.S. ___, No. 9059 (U.S. Sp. Ct. June 17, 1994). In Simmons, a South Carolina capital defendant argued that he was denied his rights under the Eighth and Fourteenth Amendments to the United States Constitution when the trial court refused to permit the jury to be informed that, as a matter of state law, a capital defendant convicted of capital murder would be ineligible for parole if he were sentenced to "life." A majority of the Court only reached the Fourteenth Amendment (due process) argument and held -- at least in cases where the State has argued that the defendant would be a future danger to society cases[209] -- that failure to so inform a capital sentencing jury required the invalidation of the death sentence. See Simmons, slip op., at 7-15 (plurality op.); id. at 1-4 (opinion of O'Connor, J., concurring, joined by Rehnquist, C.J. & Kennedy, J.).

The plurality opinion in Simmons also criticized the trial court's instruction that informed jurors that they should not consider South Carolina's parole law in their sentencing deliberations. By instructing jurors that they should not consider the possibility of parole in the event that the capital defendant was sentenced to "life," the trial court actually invited speculation about parole. See Simmons, slip op., at 17 (plurality op.).

Justice Souter's concurrence, which was joined by Justice Stevens, went further and contended that, in addition to whatever the due process clause required in such cases, the Eighth Amendment requires a capital sentencing jury to be informed of the meaning of "life" imprisonment under state law because the Eighth Amendment's "need for heightened reliability ... mandates recognition of a capital defendant's right to require instructions on the meaning of legal terms used to describe the sentences ... when a jury is required to consider[] in making a reasoned moral choice between sentencing alternatives." Id., slip op., at 2 (opinion of Souter, J., concurring, joined by Stevens, J.).

1.   Youth and the Simmons Rationale.

Although Texas law does not currently not require convicted capital defendants to serve "life" sentences without the possibility of parole, as in South Carolina, that difference may be constitutionally immaterial in certain cases. Texas law did require that defendants, if convicted of capital murder and sentenced to "life," had

---

[209]The State necessarily makes this argument in all Texas death penalty cases, including at your defendant's trial. See Tex. Code Crim. Proc. Art. 37.071 (Vernon 1993).

to serve at least 35 calendar years (and now 40) before even being eligible for parole. If your client was at all youthful (that is, 24 or less years old) at the time of the crime, and was facing trial within a year or two, if convicted and given a life sentence, he would be between 55 and 65 before he was eligible for parole! Because the State must argue and prove that your client will be a future threat to "society" if not sentenced to death, jurors will be led to believe that Petitioner would be a threat to <u>free</u> society. Under the Eighth and Fourteenth Amendments, your client is entitled to "deny or explain" this "future dangerousness" argument. <u>See</u> <u>Simmons</u>, slip op., at 15 (plurality).

In this regard, it is widely recognized that persons with a history of violent criminal activity rarely engage in violent criminal behavior once they reach their middle-age years. <u>See</u> <u>Johnson v. Texas</u>, 113 S. Ct. 2658 (1993). In <u>Johnson</u>, the Supreme Court, in explaining "[t]he relevance of youth as a mitigating factor," recognized that youth's mitigating force "derives from the fact that <u>the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness [i.e., violence-prone tendencies] that may dominate younger years may subside.</u>" <u>Id.</u> at 2669 (emphasis added).

Flipping the Eighth Amendment coin over to its aggravating side, this very same recognition arguably requires a Texas capital sentencing jury -- which in the majority of cases assesses a "youthful" defendant's prospects for being a "future danger to <u>society</u>"[240] -- to know that a life-sentenced capital defendant will be definitely be in a maximum security prison during the time that his violent-prone tendencies associated with youth still exist (<u>i.e.</u>, before his middle-aged years in most cases). If the violence-prone aspects of youth are indeed "transient," as the <u>Johnson</u> Court recognized, then surely that "transience" does not extend past 35 years in many, if not most, cases. Hence, in order to "deny or explain" a Texas prosecutor's "future dangerousness" arguments, <u>Simmons</u>, slip op., at 15 (plurality), a Texas capital defendant such as Defendant in this case has a constitutional right to tell the jury about the 35-year parole ineligibility requirement in the event of a life sentence. This is particularly true when the trial court's own instructions have invited speculation about parole, as this Court's instructions did. As Judge Frank so aptly stated in <u>United States v. Antonelli Fireworks</u>, 155 F.2d 613, 656 (2nd Cir. 1946) (Frank, J., dissenting), in a related context, the belief that such speculation can be removed by an instruction telling jurors not consider parole "is like the Mark Twain story of the little boy who was told to stand in the corner and not to think about white elephants." Such speculation is anathema to the Eighth Amendment's requirement of heightened reliability in the capital sentencing phase. <u>See</u>, <u>e.g.</u>, <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976).

By denying a "youthful" capital defendant the right to inform the jury that the defendant will be ineligible for parole for 35 years if sentenced to "life," a Texas capital defendant is not permitted to "explain or deny" the prosecutor's "future dangerousness" argument and, more importantly, the State invites the jury to speculate that the defendant will be paroled during the time while his "youthful" violent qualities still remain. In practical terms, that is, the jury in cases with a "youthful" defendant will believe that such a defendant may be paroled while he still is "youthful" -- <u>i.e.</u>, in as little as a few years. In this way, the jury is by inference "misled" about the operation of Texas' parole law. <u>Simmons</u>, slip op., at 17 (plurality).

## 2.     Preserving Error In Voir Dire

Throughout the voir dire, defense attorneys should attempt to question members of the venire about the operation of Texas parole law in capital cases. In light of the current express statutory prohibition, the trial court is unlikely to permit the defense to inform jurors that, if Defendant were convicted of capital murder and sentenced to "life," he would be ineligible for parole for 35 calendar years. However, throughout the same voir dire, the State will likely question members of the venire in a manner that would lead them to think that your client, if he were sentenced to "life," would be a future danger to <u>free</u> (as opposed to <u>only prison</u>) society. Although the record is as yet unavailable, Defendant believes that the record will bear out his characterizations of the voir dire questioning to date.

---

[240]The median age of persons on Texas' death row -- at the time of the crime -- is 25.

Under _Simmons_, a capital defendant has a constitutional right to question all prospective capital jurors about their preconceptions of "life" sentences in capital cases in view of the operation of the parole laws and inform jurors who have a mistaken notion of parole about what Texas law in fact requires. Because you will be prevented from asking, informing or arguing, you can argue at trial and on appeal that you were thus unable to use your peremptory strikes in an intelligent manner. Further, _Simmons_ makes it clear that such misinformation will likely taint the juror's role in sentencing. Ultimately, a prospective capital juror who has a mistaken pre-conception of parole law in a capital case must be informed of the actual law, particularly when the State has implied that the defendant will be a danger to free society of sentenced to "life." If not, that juror very well will render an unreliable sentencing verdict in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

### 3.     Request a Hearing

You may wish to further pursue this issue by requesting a hearing and, if denied, presenting a bill of exceptions on this issue. At the hearing you should introduce evidence and expert testimony on the issue of Texas citizens' perceptions of the operation of Texas' parole law in capital cases. You could also present evidence regarding the likelihood -- even after 35 or 40 years -- that the Texas parole board would actually grant parole to a capital sentenced inmate. The Supreme Court recognized in the _Simmons_ case that such empirical studies are highly relevant in determining the merit of such a claim.

### 4.     Request an Instruction

To fully preserve this issue, you should also request, before voir dire begins and before the punishment phase begins, an instruction that explains exactly what the parole eligibility requirements are for your client if the jury chooses a life sentence rather than a death sentence. _See_ Tex. Code Crim. Pro. Art. 42.18 §8.

## CONCLUSION

Hopefully, the suggestions and information in these materials will aid you in developing a defensive theory of punishment in the capital case to which you have been assigned. Absent favorable plea negotiations, a well investigated, fully prepared and well presented defense at punishment is your clients best chance for life. In the absence of a jury sentence that spares your client's life, you must have paved the way for appellate counsel -- and later state and federal habeas counsel -- to present and win points of error in post-trial litigation.

Look for friends. Although this requires near super-human efforts on your part as appointed counsel in a death case, don't forget that there are hundreds of attorneys who have blazed the trail before you -- most of whom are willing to help with advice and ideas. For those who have 'gone before,' remember what your first death penalty trials were like and assist those new attorneys each day receiving appointments in these ultimate cases. And while you are casting about for sympathetic ears, don't forget the many attorneys in this state -- and throughout the country -- who specialize in the appellate and post-conviction representation of death-sentenced defendants. These folks possess a wealth of ideas and are the most likely to be on top on the always radically developing death penalty law.

Finally, GOD BLESS! Many in this time and place are filled with respect and awe at the work you all do for the most forsaken among us.

# APPENDIX

# SAMPLE MOTIONS

## TABLE OF CONTENTS

1    MOTION TO DECLARE THE TEXAS CAPITAL SENTENCING SCHEME UNCONSTITUTIONAL AND MOTION TO PRECLUDE IMPOSITION OF THE DEATH PENALTY.    54

2    REQUEST FOR INSTRUCTION THAT JURY MUST FIND UNADJUDICATED OFFENSES TO HAVE BEEN PROVEN BEYOND A REASONABLE DOUBT BEFORE THEY MAY CONSIDER SUCH EVIDENCE IN ANSWERING THE SPECIAL ISSUES.    64

3    REQUEST FOR INSTRUCTION ON PAROLE ELIGIBILITY    68

4    DEFENDANT'S OBJECTION TO THE IMPLICIT DEFINITION OF "REASONABLE DOUBT" GIVEN TO JURORS DURING THE PUNISHMENT PHASE WITH RESPECT TO THE "FUTURE DANGEROUSNESS" SPECIAL ISSUE.    74

5    OBJECTION TO SUBMISSION OF ANY SPECIAL ISSUE ASKING THE JURY TO DETERMINE WHETHER THERE IS A PROBABILITY THAT THE DEFENDANT WILL COMMIT CRIMINAL ACTS OF VIOLENCE THAT WILL CONSTITUTE A CONTINUING THREAT TO SOCIETY AND, IN THE ALTERNATIVE, REQUEST FOR CURATIVE INSTRUCTIONS.    78

6    MOTION TO PRECLUDE IMPOSITION OF THE DEATH PENALTY    90

7    DEFENDANT'S MOTION TO EXCLUDE THE PENALTY OF DEATH AS A POSSIBLE PUNISHMENT ON GROUNDS THAT THE DEATH PENALTY IS ADMINISTERED IN A RACIALLY DISCRIMINATORY MANNER.    100

8    OBJECTION TO PROHIBITION ON INFORMING JURORS THAT IF A SINGLE JUROR "HOLDS OUT" FOR LIFE, THE DEFENDANT WILL RECEIVE A SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW.    108

9    REQUEST FOR INSTRUCTION THAT THE STATE HAS THE BURDEN OF PROVING THAT, IN LIGHT OF ALL EVIDENCE, BOTH MITIGATING AND AGGRAVATING, DEATH RATHER THAN LIFE IMPRISONMENT IS THE APPROPRIATE PUNISHMENT.    112

10    MOTION TO PRECLUDE THE SUBMISSION OF A § 8.04(b) INSTRUCTION ON VOLUNTARY INTOXICATION DURING THE PUNISHMENT PHASE.    116

11    DEFENDANT'S REQUESTED LESSER-INCLUDED OFFENSE INSTRUCTION ON FELONY-MURDER AND MEMORANDUM OF LAW IN SUPPORT THEREOF.    119

12    MOTION FOR THE ASSISTANCE OF A PSYCHIATRIST ON THE ISSUES OF INSANITY AND MITIGATION    124

13    MOTION FOR FUNDS TO PERFORM ADDITIONAL TESTS THAT ARE NECESSARY TO COMPLETE AN APPROPRIATE PSYCHIATRIC EXAMINATION    130

14    MOTION FOR THE ASSISTANCE OF A PSYCHIATRIST ON THE ISSUE OF FUTURE DANGEROUSNESS.    134

15    MOTION FOR THE ASSISTANCE OF AN EXPERT IN [A SUBJECT UNRELATED TO PSYCHIATRY]    139

IN THE DISTRICT COURT FOR THE ___ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS

CAUSE NO. _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

MOTION TO DECLARE THE TEXAS CAPITAL SENTENCING SCHEME
UNCONSTITUTIONAL AND MOTION TO PRECLUDE IMPOSITION OF THE
DEATH PENALTY.

Comes now the Defendant, who challenges the application of the Texas death penalty statute and the imposition of the punishment of death on the following constitutional grounds:

### I.

THE STATUTORY "PENRY" SPECIAL ISSUE IN TEX. CODE CRIM. PRO. ARTS.
37.071 & 37.0711 IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE
BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE.

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, e.g., Walton v. Arizona, 110 S. Ct. 3047, 3055 (1990) (State's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors"). In order to understand why Walton applies to the statutory "Penry" special issue, this Court must recognize that this special issue is a conduit for aggravating (as well as mitigating) factors. By asking jurors to determine whether there are "sufficient ... mitigating circumstances," Tex. Code Crim. Pro. Art. 37.071, § 2(e), the statutory special issue in effect tells jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. Cf. Johnson v. Texas, 113 S. Ct. 2568 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances). Because the statute is silent about whether the State or the defense has the burden of proof on aggravating factors, and, moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances in on the defense, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

### II.

THE STATUTORY "PENRY" SPECIAL ISSUE IS UNCONSTITUTIONAL UNDER
THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED
DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN
FURMAN V. GEORGIA.

In <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), in which the Supreme Court struck down capital punishment as it then was being administered, the chief constitutional infirmity that the controlling Members of the Court pointed to in their respective concurring opinions was arbitrariness. In particular, the Court condemned the open-ended, unstructured discretion that was given to capital sentencing juries. <u>See</u> <u>also</u> <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976); <u>Spaziano v. Florida</u>, 468 U.S. 447, 460-64 (1984).

In the years following the Supreme Court's decision in <u>Penry v. Lynaugh</u>, 109 S. Ct. 2934 (1989), the Texas Legislature enacted a new capital sentencing scheme that sought to cure the constitutional defect in the former capital sentencing scheme identified by the Court in <u>Penry</u>. The new statutory "<u>Penry</u>" special issue contained in Tex. Code Crim. Proc. Arts. 37.071 & 37.0711 (Vernon 1994), provides as follows:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Five Members of the modern Supreme Court have, directly or indirectly, condemned an open-ended, unstructured capital sentencing instruction -- such as Texas' statutory "<u>Penry</u>" special issue — as violative of the Eighth and Fourteenth Amendments to the United States Constitution. <u>See</u> <u>Penry v. Lynaugh</u>, 109 S. Ct. 2934, 2969 (1989) (Scalia, J., dissenting, joined by Rehnquist, C.J., White, J., & Kennedy, J.) ("In holding that the jury had to be free to deem Penry's mental retardation and sad childhood for whatever purpose it wished, the Court has come full circle, not only permitting but requiring what <u>Furman</u> once condemned."); <u>Graham v. Collins</u>, 113 S.Ct. 892, 903-15 (1993) (Thomas, J., concurring) ("<u>Penry</u> reintroduces the very risks that we had sought to eliminate through the simple directive that States in all events provide rational standards for capital sentencing."). In dicta, Justice Thomas has explicitly suggested that the type of sentencing scheme in operation at Appellant's trial violates <u>Furman</u>. <u>See</u> <u>Graham</u>, 113 S.Ct. at 913 n. 9 (discussing the present Texas capital sentencing statute).

Rather than submit such an open-ended, unstructured sentencing issue, the Eighth Amendment requires a trial court in the sentencing phase of a capital case to instead submit a charge that adequately structures the jury's sentencing discretion regarding mitigating and aggravating factors. <u>Cf.</u> <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976) (discussing Georgia's post-<u>Furman</u> capital sentencing statute). Unless such an instruction is submitted in

2

this case, a death sentence returned by Defendant's jury would violate the Eighth and Fourteenth Amendments.

III.

### TEXAS' STATUTORY CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW.

As discussed above, the pivotal sentencing issue in Texas capital cases -- the statutory "Penry" special issue -- does not specify the types of mitigating or aggravating factors relevant to a capital sentencing jury's deliberations during the punishment phase. Rather, the jury is simply asked whether there are "sufficient mitigating circumstance or circumstances" to warrant a life sentence rather than a death sentence. See Tex. Code Crim. Proc. Arts. 37.071 & 37.0711 (Vernon 1994). In a larger sense, however, the "Penry" special issue requires Texas juries to perform the same functions that other states' post-Furman capital sentencing juries perform: (i) the threshold findings of particular aggravating and mitigating circumstances; and (ii) the balancing process, whereby jurors determine whether the mitigating factors outweigh aggravating factors. Cf. Gregg v. Georgia, 428 U.S. 153 (1976) (discussing Georgia's post-Furman statute).

Defendant contends that Texas' unstructured sentencing scheme is unconstitutional because it does not permit meaningful appellate review, which is not only required by a Texas statute[1] but also is a prerequisite to a constitutionally implemented capital sentencing scheme.[2] Because the second statutory special issue is open-ended and unstructured -- i.e., not enumerating a list of mitigating and aggravating factors and not requiring jurors to make specific "findings" in this regard -- the Court of Criminal Appeals has no way to know which aggravating and mitigating factors that jurors considered. Thus, the appellate court has no way to know how, and indeed whether, the jury considered all of the constitutionally relevant mitigating evidence offered at trial. In this way, meaningful appellate review is impossible. The Supreme Court has recognized that an appellate court is in a virtually impossible position to review a jury's consideration of mitigating and aggravating evidence

---

[1] See TEX. CODE CRIM. PRO. Art. 44.251 (Vernon 1994).

[2] See Gregg v. Georgia, 428 U.S. 153, 195, 206 (1976); Parker v. Dugger, 498 U.S. 308, 321 (1991); Jurek v. Texas, 428 U.S. 262, 276 (1976); see also Stringer v. Black, 112 S. Ct. 1130, 1136 (1992).

without knowing which factors the jury in fact considered.  See Sawyer v. Whitley, 112 S. Ct. 2514, 2522-23

(1992) (noting "how difficult [a] task" a reviewing court faces in "assess[ing] how jurors" reacted to mitigating

and aggravating evidence "particularly considering the breadth of those factors that a jury ... must be allowed to

consider" without knowing how jurors actually considered the totality of the evidence).[3]

Because the Court of Criminal Appeals is required by statute and by the Constitution to review the

sufficiency of the evidence supporting a jury's negative answer to the statutory "Penry" special issue, the open-

ended and unstructured nature of Arts. 37.071 & 37.0711 prevents meaningful appellate review and renders the

Texas capital statute unconstitutional under the Eighth and Fourteenth Amendments to the United States

Constitution.

IV.

### ARTICLE 37.071'S SECOND SPECIAL ISSUE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The second statutory special issue contained in Tex. Code Crim. Proc. Art. 37.071, § 2(b) (Vernon 1994)

reads as follows:

> [I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the
> defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant
> actually caused the death of the deceased or did not actually cause the death of the deceased
> but intended to kill the deceased or another or anticipated that a human life would be taken.

Defendant contends that this statutory special issue is facially unconstitutional because of the statute's use of

the language "or anticipated that a human life would be taken."  Defendant believes that such language -- which

permits a capital sentencing jury to impose a death sentence based a finding that the defendant found guilty

under the "law of the parties" simply "anticipated" that death might occur -- violates the Eighth Amendment

principle announced by the Supreme Court in Tison v. Arizona, 481 U.S. 137 (1987), and Enmund v. Florida,

---

[3] Sawyer did not address the exact issue in this case.  Rather, the Court was speaking of the difficulty of an
appellate court's attempted hypothetical re-creation of a capital sentencing phase involving mitigating evidence
that trial counsel failed to introduce.  However, for purposes of the present case, the Court's discussion is
highly apposite.  The point both in Sawyer and in this case is that without actually knowing whether and how a
particular jury considered evidence during a capital sentencing phase, an appellate court cannot accurately assess
the jury's decision-making.

4

458 U.S. 782 (1982).

## V.

### THE TEXAS CAPITAL SENTENCING STATUTE'S DEFINITION OF "MITIGATING EVIDENCE" IS UNCONSTITUTIONAL BECAUSE IT LIMITS THE EIGHTH AMENDMENT CONCEPT OF "MITIGATION" TO FACTORS THAT RENDER A CAPITAL DEFENDANT LESS MORALLY "BLAMEWORTHY" FOR COMMISSION OF THE CAPITAL MURDER.

The present Texas capital sentencing statute defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Pro. Arts. 37.071, § 2(e)(4) & 37.0711, § 3(f)(3) (Vernon 1994). This definition of "mitigating evidence" is unconstitutionally narrow. The Supreme Court has held that constitutionally relevant mitigating evidence is not simply that type of mitigating evidence that relates to a capital defendant's moral culpability or blameworthiness for the crime,[4] but also includes any mitigating evidence relevant to a defendant's character, history, or circumstances of the crime that militates in favor of a life sentence. See, e.g., Skipper v. South Carolina, 476 U.S. 1 (1986). Numerous types of constitutionally relevant mitigating evidence thus have nothing to do with a capital defendant's moral culpability or blameworthiness -- such as a history of positive character traits, kindness shown toward children, or artistic talent.[5] Although the statutory "Penry" special issue speaks of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," Art. 37.071, §2 (e), the statute's separate definition of "mitigating evidence" limits jurors' consideration of such evidence to those mitigating factors that specifically implicate the defendant's moral blameworthiness.

Therefore, the statute's limited definition of "mitigating evidence" violates the Eighth and Fourteenth Amendments to the United States Constitution.

## VI.

---

[4] "Blameworthiness" and "culpability" are exact synonyms. See WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 353 (1989).

[5] Put another way, a capital defendant who has tremendous artistic talent is no less morally culpable or blameworthy for committing a horrible, senseless capital murder crime than a capital defendant who committed an identical crime but who does not possess such artistic talent. However, a rational jury may be less willing to sentence the talented capital defendant to death because his talents are a redeeming quality.

THIS COURT MUST PRECLUDE THE IMPOSITION OF THE DEATH PENALTY ON DEFENDANT BECAUSE, AT LEAST AS PRESENTLY ADMINISTERED IN TEXAS, CAPITAL PUNISHMENT IS CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 13 OF THE TEXAS CONSTITUTION.

A. Federal constitutional claim

Capital punishment is per se unconstitutional as it is presently administered. Defendant herein adopts the cogent arguments of Justice Harry Blackmun, which were recently made in his dissent from denial of certiorari in the Texas capital case of Callins v. Collins, No. 93-7054, ___ U.S. ___, 62 U.S.L.W. 3546 (U.S. Feb. 22, 1994). Justice Blackmun, who dissented in Furman and who voted in the majority in the 1976 cases affirming various states' post-Furman death penalty statutes, see, e.g., Jurek v. Texas, 428 U.S. 262 (1976), did not condemn capital punishment in the abstract as a cruel and unusual method of punishment that offends "evolving standard of decency." Cf. Gregg v. Georgia, 428 U.S. 153, 227-41 (1976) (Brennan & Marshall, JJ., dissenting). Rather, Justice Blackmun contended, inter alia, that capital sentencing procedures employed in the post-Furman era are per se unconstitutional because they are the product of paradoxical constitutional commands: on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence, while, on the other hand, there must be "structured discretion" in sentencing, as required by Furman. See Callins, supra, slip op., at 2 ("Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death ... can never be achieved without compromising an equally essential component of fundamental fairness -- individualized sentencing.").

Thus, at least regarding the death penalty as it is presently being administered in Texas, it is per se unconstitutional under the Eighth and Fourteenth Amendments. In particular, the present Texas capital sentencing scheme -- including the statutory "Penry" special issue -- is unconstitutional because it permits the very type of open-ended discretion condemned by the Supreme Court in Furman. Accordingly, this Court should preclude the State from seeking the death penalty against Defendant, at least so long as the present capital sentencing scheme remains in effect.

B. Texas constitutional claim

Although Defendant has cited federal Eighth Amendment authority supra, he intends that this Court

should separately consider his claim under the Texas and U.S. Constitutions. As the Texas Court of Criminal Appeals has noted, it can and should interpret the Texas Constitution in a more expansive manner than the federal Constitution. See, e.g., Parrish v. State, ___ S.W.2d ___, No. 0490-91, (Tex.Crim.App. Jan. 26, 1994); Richardson v. State, ___ S.W.2d ___, No. 901-92 (Tex.Crim.App. Oct. 27, 1993); Heitman v. State, 815 S.W.2d 681 (Tex.Crim.App. 1991); see also Ex parte Herrera, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 100 at *2 (Tex.Crim.App. May 11, 1993) (Maloney, J., dissenting, joined by Baird, Clinton & Overstreet, JJ.); Judge Rusty Duncan, Terminating the Guardianship: A New Role for State Court, 19 St. Mary's L.J. 809 (1988).

Particularly noteworthy is the fact the Texas Constitution proscribes "cruel or unusual punishments," while the U.S. Constitution proscribes "cruel and unusual punishments." Obviously, the Texas Constitution, based on its plain language, was intended offer broader protections than the United States Constitution. Cf. People v. Anderson, 493 P.2d 880, 883-87 (Cal. 1972) (attributing textual significance to similar state constitutional proscription against "cruel or unusual punishments").

## VII.

### ART. 37.071'S "10-12 RULE," WHICH REQUIRES AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE FIRST OR SECOND SPECIAL ISSUES AND AT LEAST TEN "YES" VOTES FOR THE JURY TO RETURN AN AFFIRMATIVE ANSWER TO THE THIRD SPECIAL ISSUE, VIOLATES THE EIGHTH AMENDMENT PRINCIPLE IN MILLS V. MARYLAND.

Defendant contends that the "10-12 provision" in Art. 37.071, § 2(d)(2) & § 2(f)(2), violates the constitutional principles discussed in Mills v. Maryland, 486 U.S. 367 (1988); see also McCoy v. North Carolina, 494 U.S. 294 (1990). The "10-12 provision" requires that, in order for the jury to return answers to the special issues that would result in a life sentence, (i) at least ten jurors must vote "no" in answering the first special issue, (ii) at least ten jurors must vote "no" in answering the second special issue, or (iii) at least ten jurors must vote "yes" in answering the third special issue.[6] Defendant contends that this "10-12 provision" violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present

---

[6] There are equivalent "10-12" provisions in Art. 37.0711, which contains four special issues. This motion applies equally to the constitutional infirmity in Art. 37.0711.

Texas capital sentencing scheme, all twelve jurors in a capital case could be believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special issues, the jury could not return a life sentence.

Hypothetically speaking, all twelve members of the jury in a case may individually believe that <u>different mitigating factors</u> have been established and that, under state law, a life sentence is appropriate. That is, different jurors might believe that different mitigating factors (for example: youth, mental illness, religious devotion) requiring a life sentence have been adequately proven without any ten agreeing on which factor requires life. However, even though all members of the jury agree that a defendant should receive a life sentence for <u>some</u> reason, ten do not agree on <u>the</u> reason.

Texas law forbids the imposition of a death sentence only if ten members of a capital sentencing jury agree collectively as to <u>which</u> statutory mitigating factor has been established; because such jurors could disagree about which of the three factors has been established, however, they are left without guidance as to how to proceed. In the absence of such guidance, there is a constitutionally unacceptable risk that Texas capital sentencing juries may feel coerced by a "majority rules" mentality into returning answers to the special issues that would result in a death sentence. A death sentence imposed by a jury so instructed is too likely a product of arbitrary decision-making for the Constitution to tolerate. <u>See</u> <u>McKoy v. North Carolina</u>, <u>supra</u>; <u>Mills v. Maryland</u>, <u>supra</u>.

## CONCLUSION

For the foregoing reasons, this Court should declare the Texas capital sentencing scheme unconstitutional and further preclude the imposition of the death penalty in this case.

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing motion has been furnished to counsel for the State by hand-delivery of a copy of the same on this ___ day of _____, 1994.

_____

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS


CAUSE NO. _____


THE STATE OF TEXAS          )
                            )
VS.                         )
                            )
YOUR CLIENT                 )


### ORDER

Upon consideration of Defendant's Motion to Declare the Texas Capital Sentencing Scheme

Unconstitutional and Motion to Preclude Imposition of the Death Penalty is hereby GRANTED/DENIED.


_____

JUDGE PRESIDING


Date: _____, 1994

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS


CAUSE NO. _____


| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |


**REQUEST FOR INSTRUCTION THAT JURY MUST FIND UNADJUDICATED OFFENSES TO HAVE BEEN PROVEN BEYOND A REASONABLE DOUBT BEFORE THEY MAY CONSIDER SUCH EVIDENCE IN ANSWERING THE SPECIAL ISSUES.**

Defendant contends that the admission of unadjudicated extraneous offenses during the capital sentencing phase should only be permitted if it promotes reliability and avoids undue prejudice. See Stringer v. Black, 112 S. Ct. 1130 (1992); Gardner v. Florida, 430 U.S. 349 (1977); Woodson v. North Carolina, 428 U.S. 280 (1976); see also Gregg v. Georgia, 428 U.S. 153, 203-04 (1976) (in discussing Georgia's "wide scope of evidence" permitted at capital sentencing hearings, the Court stated that "[s]o long as the evidence introduced at ... the pre-sentence hearing do[es] not prejudice a defendant, it is preferable not to impose restrictions" on the wide scope of admissible evidence) (emphasis added); cf. Johnson v. Mississippi, 486 U.S. 578 (1988).   At the very minimum, the only way to promote reliability is to require a specific limiting instruction that requires sentencing jurors to find beyond a reasonable doubt that unadjudicated extraneous offenses in fact occurred. See, e.g. Devier v. Zant, 3 F.3d 1445, 1467 (11th Cir. 1993) (Kravitch, J., concurring, joined by Clark, S.J.).

The "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 365 (1970).  This constitutional requirement goes to the degree of reliability and accuracy that our criminal system requires in order to stigmatize an act as "criminal." "The accused during a criminal prosecution has at stake an interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." Id. at 362-64.  Obviously such considerations apply a fortiori when life is at stake, rather than merely one's liberty,

11

money or reputation.

A specific "reasonable doubt" limiting instruction is also required under the Supreme Court's reasoning in McMillian v. Pennsylvania, 477 U.S. 79 (1986). In McMillian, the Court held that, in certain situations, a sentencing fact found during a punishment phase of a criminal trial could be a "tail which wags the dog of the substantive offense" in the sense that criminal punishment drastically increases upon finding of such a pivotal sentencing fact. McMillian, 477 U.S. at 87-88. In such a case, the Court held, a finding of the fact beyond a reasonable doubt may be required in order to satisfy the due process clause. See id.; see also United States Mergerson, 4 F.3d 337, 344-45 (5th Cir. 1993).

WHEREFORE, Defendant requests that the Court include the attached proposed instruction in its charge to the jury at punishment.

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ___ day of _____ 1994.

_____

**IN THE DISTRICT COURT FOR THE \_\_\_ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS**


CAUSE NO. _____


THE STATE OF TEXAS                    )
                                      )
vs.                                   )
                                      )
YOUR CLIENT                           )


**ORDER**


Defendant's Request For Instruction That Jury Must Find Unadjudicated Offenses To Have Been

Proven Beyond A Reasonable Doubt. . . is GRANTED / DENIED.




_____
Judge Presiding

13

DEFENSE REQUESTED INSTRUCTION # ____


THE STATE HAS PRESENTED EVIDENCE IN THE PUNISHMENT PHASE OF TRIAL
ALLEGING CRIMINAL ACTIVITY ON THE PART OF THE DEFENDANT,
CONCERNING WHICH HE WAS NOT FORMALLY CHARGED, TRIED, OR
CONVICTED. BEFORE YOU MAY CONSIDER SUCH EVIDENCE IN ANSWERING
THE SPECIAL ISSUE QUESTIONS, YOU MUST FIRST DETERMINE THAT THE
STATE HAS PROVEN SUCH ALLEGATIONS BEYOND A REASONABLE DOUBT. IN
MAKING THIS DETERMINATION, YOU MUST BE GUIDED BY THE DEFINITION OF
"REASONABLE DOUBT" WHICH WAS INCLUDED IN YOUR INSTRUCTIONS AT THE
EARLIER PHASE OF TRIAL.

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS


CAUSE NO. _____


| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |


## REQUEST FOR INSTRUCTION ON PAROLE ELIGIBILITY

Defendant respectfully requests that the Court instruct the jury that if he is sentenced to life imprisonment rather than the death penalty, he must serve at least ____ calendar years in prison before becoming eligible to be considered for release on parole. In support of which request, Defendant states as follows:

On June 17, 1994, the U.S. Supreme Court handed down its landmark decision in Simmons v. South Carolina, ___ U.S. ___, No. 9059 (June 17, 1994). In Simmons, a South Carolina capital defendant argued that he was denied his rights under the Eighth and Fourteenth Amendments to the United States Constitution when the trial court refused to permit the jury to be informed that, as a matter of state law, a capital defendant convicted of capital murder would be ineligible for parole if he were sentenced to "life." A majority of the Court only reached the Fourteenth Amendment (due process) argument and held -- at least in cases where the State has argued that the defendant would be a future danger to society [1] -- that failure to so inform a capital sentencing jury required the invalidation of the death sentence. See Simmons, slip op,, at 7-15 (plurality op.); id. at 1-4 (opinion of O'Connor, J., concurring, joined by Rehnquist, C.J. & Kennedy, J.).

The plurality opinion in Simmons also criticized the trial court's instruction that informed jurors that they should not consider South Carolina's parole law in their sentencing deliberations. By instructing jurors that they should not consider the possibility of parole in the event that the capital defendant were sentenced to "life," the

---

[1] The State necessarily makes this argument in *all* Texas death penalty cases, including at Defendant's trial. See *Tex. Code Crim. Pro.* Art. 37.071 (Vernon 1993).

trial court actually invited speculation about parole. See <u>Simmons</u>, slip op., at 17 (plurality op.).

Justice Souter's concurrence, which was joined by Justice Stevens, went further and contended that, in addition to whatever the due process clause required in such cases, the Eighth Amendment requires a capital sentencing jury to be informed of the meaning of "life" imprisonment under state law because the Eighth Amendment's "need for heightened reliability ... mandates recognition of a capital defendant's right to require instructions on the meaning of legal terms used to describe the sentences ... when a jury is required to consider[] in making a reasoned moral choice between sentencing alternatives." <u>Id</u>., slip op., at 2 (opinion of Souter, J., concurring, joined by Stevens, J.).

Although Texas law at present does not require convicted capital defendants to serve "life" sentences without the possibility of parole, as in South Carolina, that difference is immaterial here. Texas law does require that defendants such as Petitioner, if convicted of capital murder and sentenced to "life," had to serve at least ___ calendar years before even being eligible for parole.

Defendant was ___ years old at the time of the crime. Thus, if he had been convicted of capital murder and sentenced to "life," he would have been required to serve prison time, without the possibility of parole, until he was ___ years old. Because the State is expected to contend that Defendant will be a future threat to "society" if not sentenced to death, jurors may be led to believe that Defendant would be a threat to <u>free</u> society. Under the Eighth and Fourteenth Amendments, as well as under the Texas Constitution's "due course of law" provisions, Defendant is entitled to "deny or explain" this "future dangerousness" argument. See <u>Simmons</u>, slip op., at 15 (plurality).

In this regard, it is widely recognized that persons with a history of violent criminal activity rarely engage in violent criminal behavior once they reach their middle-age years. See <u>Johnson v. Texas</u>, 113 S. Ct. 2658 (1993). In <u>Johnson</u>, the Court, in explaining "[t]he relevance of youth as a mitigating factor," recognized that youth's mitigating force "derives from the fact that <u>the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness [i.e., violence-prone tendencies] that may dominate younger years may subside.</u>" <u>Id.</u> at 2669 (emphasis added).

This very same recognition requires a Texas capital sentencing jury -- which in the majority of cases

assesses a "youthful" defendant's prospects for being a "future danger to <u>society</u>" -- to know that a life-sentenced capital defendant will be definitely be in a maximum security prison during the time that his violent-prone tendencies associated with youth still exist (<u>i.e.</u>, before his middle-aged years in most cases). If the violence-prone aspects of youth are indeed "transient," as the <u>Johnson</u> Court recognized, then surely that "transience" does not extend past 35 years in many, if not most, cases. Hence, in order to "deny or explain" a Texas prosecutor's "future dangerousness" arguments, <u>Simmons</u>, slip op., at 15 (plurality), a Texas capital defendant such as Defendant in this case has a constitutional right to tell the jury about the ___-year parole ineligibility requirement in the event of a life sentence. This is particularly true when the trial court's own instructions <u>invite</u> speculation about parole, as this Court's instructions will if they include the typical "you are not to consider the possibility of any decision by the Board of Pardons and Paroles," or similar language. Such speculation is anathema to the Eighth Amendment's requirement of heightened reliability in the capital sentencing phase. <u>See</u>, <u>e.g.</u>, <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976).

By denying a capital defendant the right to inform the jury that the defendant will be ineligible for parole for __ years if sentenced to "life," a Texas capital defendant is not permitted to "explain or deny" the prosecutor's "future dangerousness" argument and, more importantly, the State invites the jury to speculate that the defendant will be paroled during the time while his violent qualities still remain. In practical terms, for example, the jury in cases with a "youthful" defendant will believe that such a defendant may be paroled while he still is "youthful" -- <u>i.e.</u>, in as little as a few years. In this way, the jury is by inference "misled" about the operation of Texas' parole law. <u>Simmons</u>, slip op., at 17 (plurality).

WHEREFORE, Defendant prays that the Court include the attached requested instruction in its charge at the punishment phase.

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ____ day of _____ 1994.

—————————————

**IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS**


CAUSE NO. _____


THE STATE OF TEXAS                    )
                                      )
vs.                                   )
                                      )
YOUR CLIENT                           )


**ORDER**

Defendant's request for an Instruction On Parole Eligibility is GRANTED / DENIED.



_____
Judge Presiding

DEFENSE REQUESTED INSTRUCTION # ___


YOU ARE INSTRUCTED THAT IF YOU SENTENCE THE DEFENDANT TO "LIFE IMPRISONMENT," HE WILL BE REQUIRED TO SERVE A TOTAL OF __ CALENDAR YEARS IN PRISON BEFORE HE IS ELIGIBLE TO BE RELEASED ON PAROLE.

IN THE DISTRICT COURT FOR THE ___ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS

CAUSE NO. _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

## DEFENDANT'S OBJECTION TO THE IMPLICIT DEFINITION OF "REASONABLE DOUBT" GIVEN TO JURORS DURING THE PUNISHMENT PHASE WITH RESPECT TO THE "FUTURE DANGEROUSNESS" SPECIAL ISSUE.

Tex. Code Crim. Proc. Art. 37.0711(c), "Procedure in a Capital Case for Offense Committed Before September 1, 1991," provides that jurors may return affirmative answers to the special issues only if jurors are convinced of their answers "beyond a reasonable doubt." Defendant contends that the second special issue, which asks jurors "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," effectively negates the "reasonable doubt" standard. For that reason, Defendant objects to the submission of this issue to the jury at the punishment phase of his trial.

As early as Jurek v. State, 522 S.W.2d 934 (Tex.Crim.App. 1975), Judges Odom and Roberts, in their dissents, discussed the primary linguistic infirmity with Article 37.071(b)(2) -- the use of the undefined term "probability" in the future dangerousness special issue, which is an invitation for juror confusion. "What did the Legislature mean when it provided that a man's life or death shall rest upon whether there exists a 'probability' that he will perform certain acts in the future? Did it mean as the [statute's plain language] read[s], is there a probability, some probability, any probability?" Jurek, 522 S.W.2d at 944-45 (Odom, J., dissenting); see also id. at 948 (Roberts, J., dissenting). Although the Court of Criminal Appeals, for purposes of its review of the sufficiency of a jury's findings of future dangerousness, has variously defined "probability" as meaning, inter alia, "more than a bare chance" or "more likely than not",[1] the Court has consistently refused

---

[1] See, e.g., Hughes v. State, ___ S.W.2d ___, 1992 Tex.Crim.App. LEXIS 234 at *6 (December 9, 1992) (defining probability as "more likely than not"); Smith v. State, 779 S.W.2d 417, 421 (Tex.Crim.App. 1989)

to require a definition of the term for capital sentencing juries.  That refusal has undoubtedly led countless jurors to vote for death because of a misapprehension of the term "probability."

A related problem is that the statutory special issue, as written, instructs jurors to find "beyond a reasonable doubt" that a "probability" exists.  See supra.  As a commentator has noted, "[the] concept of the existence of a 'probability' 'beyond a reasonable doubt' is and only can be puzzling -- even mind-boggling -- to a jury" because the two quantums of proof are "repugnant and at war with one another in the common speech in which juries, like all of us, think and talk."  See Charles L. Black, Jr., Due Process for Death: Jurek v. Texas and Companion Cases, 26 Cath. L. Rev. 1, 4, 6 (1976).  In effect, the beyond-a-reasonable-doubt quantum is swallowed by the probability quantum when the two are used in conjunction.[2]

In Cage v. Louisiana, 111 S. Ct. 328 (1990), the Supreme Court invalidated jury instructions which equated "reasonable doubt" with "grave uncertainty" and "an actual substantial doubt" and which stated what was required was not a "moral certainty."  The Supreme Court held that such a definition "suggest[s] a higher degree of doubt than is required for acquittal under the reasonable doubt standard ... required by the Due Process Clause."  Id. at 330.  Defendant contends that the juxtaposition of "reasonable doubt" with "probability" is unconstitutional in that it substantially lowers the quantum of proof required for jurors to return an affirmative answer to the "future dangerousness" special issue.

Respectfully submitted,

---

(defining probability as meaning "more than a bare chance"); see also Cuevas v. State, 742 S.W.2d 331, 346 (Tex.Crim.App. 1987).

[2] Even assuming a juror believes that "probability" means "more likely than not" (which is hardly a safe assumption), that would still mean that the total quantum of proof required by Article 37.071(b)(2) is a mere preponderance standard.  Mathematically speaking, the statute requires a finding "beyond a reasonable doubt" (say, a 98% level of confidence) that a "probability" (at best, a 51% level of confidence) exists.  That is: 0.98 $\times$ 0.51 (or less) = .50 (or less).

-------------------------

COUNSEL FOR DEFENDANT


CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ___ day of _____, 1994.


-------------------------

IN THE DISTRICT COURT, ___ JUDICIAL DISTRICT
OF _____ COUNTY, TEXAS


CAUSE NO. _____


THE STATE OF TEXAS            )
                              )
vs.                           )
                              )
YOUR CLIENT                   )


## ORDER


Defendant's Objection to the Implicit Definition of "Reasonable Doubt" Given to Jurors During the

Punishment Phase with Respect to the "Future Dangerousness" Special Issue is SUSTAINED / OVERRULED.


_____

Judge Presiding

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS

CAUSE NO. _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

**OBJECTION TO SUBMISSION OF ANY SPECIAL ISSUE ASKING THE JURY TO DETERMINE WHETHER THERE IS A PROBABILITY THAT THE DEFENDANT WILL COMMIT CRIMINAL ACTS OF VIOLENCE THAT WILL CONSTITUTE A CONTINUING THREAT TO SOCIETY AND, IN THE ALTERNATIVE, REQUEST FOR CURATIVE INSTRUCTIONS.**

Defendant respectfully objects to the submission of any special issue asking the jury to determine whether there is a probability that the defendant will commit criminal acts of violence that constitute a continuing threat to society.

1.

It is beyond dispute in 1994 that the death penalty must be surrounded by an especially heightened level of procedural safeguards. "When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed." Gregg v. Georgia, 428 U.S. 153, 187 (1976). Under the post-Furman Texas capital sentencing statute, however, the pivotal question[1] posed to capital sentencing juries since 1973 -- whether there is a probability that the convicted defendant will commit criminal acts of violence that constitute a continuing threat to society -- is inherently biased against minority defendants, particularly American-Americans who stand convicted of crimes against Caucasian persons, as in Defendant's case.

The future dangerousness question creates a situation where white jurors' racial attitudes are particularly likely unfairly to influence the sentencing decision. It is demonstrable that racial stereotypes of black people are

---

[1] See Graham v. Collins, 113 S. Ct. 892 (1993); Johnson v. Texas, 125 L. Ed.2d 290 (1993). Although the "future dangerousness" special issue is no longer the pivotal question asked of jurors in the amendments to the statute, the "future dangerousness" special issue is still asked of Texas capital sentencing juries. See TEX. CODE CRIM. PRO. Arts. 37.071 & 37.0711 (Vernon's 1993).

overwhelmingly negative. See, e.g., H. Blalock, Race and Ethnic Relations 21 (1982). Among the negative traits commonly associated with blacks is the propensity for blacks, particularly young black males, to commit violent crimes. See Sheri Lynn Johnson, Black Innocence and the White Jury, 83 Mich. L. Rev. 1611, 1645-47 (1985) (discussing numerous studies which support the characterization of white attitudes towards blacks as "overwhelmingly negative"). These studies indicate that blacks are more likely to be perceived as a "future threat to society." The experience in Texas capital cases corroborates the thesis of such studies. See, e.g., Callins v. State, 780 S.W.2d 176, 187-88 (Tex.Crim.App. 1986) (prospective white juror stated that he believed that African-American "culture" made blacks more likely than whites to be violent). The Texas sentencing scheme therefore "provides considerable opportunity for racial considerations, however subtle and unconscious, to influence charging and sentencing decisions." McCleskey, 481 U.S. at 334 (Brennan, J., dissenting).

The Constitution cannot tolerate the risk that Defendant's sentence might unfairly be influenced by the racial prejudices harbored by white jurors and given rein in answering the "continuing threat" inquiry. Accordingly, Defendant must object to the submission of that special issue as violative of the Sixth and Eighth Amendments, the due process and equal protection clauses of the Fourteenth Amendment, and the Texas Constitution. If the Court nevertheless determines to submit the issue, Defendant requests a curative instruction to forbid the jury from considering Defendant's race for any purpose whatsoever in answering the "continuing threat" inquiry. See Turner v. Murray, 476 U.S. 28 (1986).

2.

Defendant contends that Texas' failure to define the facially vague key terms in the "special issue" questions, or to give them meaningful content through judicial construction, violates the Eighth and Fourteenth Amendments. Maynard v. Cartwright, 486 U.S. 356 (1988); Godfrey v. Georgia, 446 U.S. 420 (1980).

The fact that Texas "narrows" the class of "death-eligible" defendants "by statute," rather than exclusively by jury consideration of aggravating factors, does not save the statute's facially vague terms from constitutional challenge.

The Supreme Court, however, has recently addressed precisely this question -- the applicability of Lowenfield v. Phelps, 484 U.S. 231 (1988)). to a claim under Godfrey and Maynard against the vague terms of

26

the Texas capital sentencing statute -- and its analysis makes plain that such definition or additional instruction is constitutionally required. Stringer v. Black, __U.S.__, 117 L.Ed.2d 367 (1992).

Stringer addresses primarily whether the result in Clemons v. Mississippi, 494 U.S. 738 (1990), was "dictated" by Maynard such that retroactive application of Clemons in Stringer's federal habeas corpus action was not barred by the doctrine of general nonretroactivity. See Teague v. Lane, 489 U.S. 288 (1989). However, in the course of determining that such application was not barred, the Supreme Court explained why Mississippi's capital sentencing statute is subject to the commands of Godfrey and Maynard -- and why such a claim is not defeated by Lowenfield. It is this discussion that illuminates Defendant's challenge. Stringer, 117 L.Ed.2d at 379-382.

As Stringer acknowledges, in Mississippi a defendant must be convicted of "capital murder" before he is eligible for the death penalty. 117 L.Ed.2d at 378. This narrow class of homicides includes, inter alia, murder of a police officer, murder for remuneration, and murder in the course of committing any of several enumerated felonies. See Johnson v. Thigpen, 806 F.2d 1243, 1247 (5th Cir. 1986). After the jury has found the defendant guilty of capital murder, however, it must determine whether the State has proven any of the statutory aggravating factors; if so, it must weigh those aggravating factors against any mitigating evidence to reach its sentencing decision. Stringer, 117 L.Ed.2d at 378.

The State of Mississippi in Stringer relied on Lowenfield in defending its failure to define precisely the terms of a particular vague aggravating circumstance. Id. at 380. According to the State's argument, the fact that Mississippi -- like Texas, as noted in this Court's order -- limited "death eligibility" to a small subset of homicides defined as "capital murder" satisfied the Eighth Amendment's command to minimize arbitrariness in capital sentencing. Thus, the State of Mississippi argued, no definition of terms or limiting construction for the vague aggravating circumstances was necessary once the State had "narrowed" the class of death-eligible defendants by its definition of capital murder. The State -- like this Court in its order of December 6 -- cited Lowenfield in support of this assertion. See Stringer, 117 L.Ed.2d at 380.

The Supreme Court soundly rejected this argument. Id. ("Lowenfield . . . is not applicable here"). First, the Court noted that the different function of aggravating factors under the two statutes in question

27

(Louisiana and Mississippi) made apparent the necessity for precise definitions: the more essential the aggravating factor to the imposition of death, the more important that the jury be provided clear guidance in applying the factor.  See Stringer, 117 L.Ed.2d at 381.  This aspect of Stringer's holding illustrates why the consequences of an ill-defined aggravating factor are, if anything, more harmful in Texas than in Mississippi.[2] Under the Mississippi statute, the aggravating factor must be weighed against any mitigating factors; if the aggravating factor is too vague for precise application, the "weighing" may be skewed in the direction of death. Stringer, 117 L.Ed.2d at 382 ("[a] vague aggravating factor used in the weighing process [creates] the risk that the jury will treat the defendant as more deserving of [death] than he might otherwise be by relying upon the existence of an illusory circumstance").

It is critically important to note that the Supreme Court has recently recognized that Texas' former capital sentencing scheme — the version of Tex. Code Crim. Proc. Art. 37.071 under which Defendant was previously sentenced to death -- required the jury to "weigh" mitigating factors in the course of determining its answers to the "special issue" questions, which answers in turn dictated the sentence that would be imposed.

---

[2]    The successive narrowing function of Tex. Penal Code §19.03 and former Tex Code Crim. Proc. Art. 37.071 is settled law in Texas:

> History teaches us that, after the Supreme Court of the United States struck down the Texas
> capital murder scheme in Branch v. Texas, decided with Furman v. Georgia, 408 U.S. 238
> (1972), the Texas legislature thereafter narrowed the scope of its laws relating to capital crimes
> and the punishment therefor.  Presently, Penal Code §19.03 narrows the class of persons who
> may be charged, tried, and convicted of capital murder.  Even where the defendant is found
> guilty of capital murder, this does not mean that he will die.  Whether he will live or die in
> that instance is first determined by the answers that the jury gives to the special issues
> submitted pursuant to Art. 37.071.  Thus, in Texas, we have a narrowing and then a further
> narrowing.  Art. 37.071 . . . commences where §19.03 ends.  Art. 37.071 . . . expressly
> provides that it is only when the jury answers the submitted special issues in the affirmative
> that the trial court must impose the death sentence.

Fearance v. State, 771 S.W.2d 486, 521 (Tex.Crim.App. 1988) (Teague, J., dissenting on other grounds)(emphasis added).  See also Smith v. State, 779 S.W.2d 417, 420 (Tex.Crim.App. 1989) (Art. 37.071 further narrows the class of death eligible offender to less than all those found guilty of capital murder); Roney v. State, 632 S.W.2d 598, 603 (Tex.Crim.App. 1982).  In light of the Texas court's own interpretation of the function of the special issues, they act as "aggravating circumstances."  Further, because Texas has determined that no person may be sentenced to
death unless the state first proves beyond a reasonable doubt the existence of statutorily mandated factors, Texas is constitutionally required to ensure that these predicate factors are not vague or ambiguous.  See Stringer, 50 Crim. L. Rep. at 2098.

Johnson v. Texas, __U.S.__, 125 L.Ed2d 290 (1993). According to the Court,

> by focusing on the deliberateness of the defendant's actions and his future dangerousness, the [special issue] questions compel the jury to make a moral judgment about the severity of the crime and the defendant's culpability.

125 L.Ed.2d at 308 (citation omitted) (emphasis added).[3] If this was true of the former statute, it is equally true of whatever charge the Court will employ in the present trial to accommodate the consideration of mitigating evidence, such as Defendant's mental retardation.

The Court's analysis in Johnson compels this conclusion: for purposes of determining whether the Eighth Amendment requires that the facially vague terms of the "special issues" be given meaningful definition, Texas is a "weighing state." As the Johnson Court put it, "consideration of the second special issue is a comprehensive inquiry that is more than a question of historical fact." Johnson, 125 L.Ed.2d at 308. The Texas sentencing jury "exercise[s] a range of judgment and discretion," and in answering the special issues must "weigh mitigating evidence as it formulates [its] answers." Id. However, this "weighing" process is skewed by Texas' failure to give meaningful content to the "aggravating" aspect of future dangerousness.

Put simply, the terms of the "future dangerousness" aggravator are facially vague -- and Texas has refused to give them content by defining them for the jury or imposing a limiting construction. As a result, there is a constitutionally unacceptable risk that the jury will conclude that the defendant does pose a "continuing threat to society," before it proceeds to weigh that "aggravating" conclusion against the defendant's mitigating evidence in order to reach its ultimate sentencing verdict. Properly instructed (that is, given meaningful definitions for the vague terms of the second special issue), Defendant's jury might well conclude that he does not pose a "future danger" -- and proceed to give greater weight to his mitigating evidence.

The facial vagueness of the key terms of the second special issue is beyond dispute. Strictly speaking,

---

[3] The Johnson Court emphasized that this view of the former Texas capital sentencing statute was not novel, but reflected its longtime understanding of the jury's role under that scheme. See Johnson, 125 L.Ed.2d at 308 (citing Adams v. Texas, 448 U.S. 38, 46 (1980): Texas capital jurors "exercise a range of judgment and discretion" in answering the special issues), id. (citing Franklin v. Lynaugh, 487 U.S. 164, 182 (1988): "a Texas capital jury deliberating over the [s]pecial [i]ssues is aware of the consequences of its answers, and is likely to weigh mitigating evidence as it formulates these answers in a manner similar to that employed by capital juries in 'pure balancing' States").

there is <u>always</u> some "probability" that any event may occur -- and thus that the second special issue would <u>necessarily</u> be answered "yes" under any circumstance. "Criminal acts of violence" is no less vague; such a description could comfortably include anything from simple assault through aggravated battery up to homicide.

Likewise, the term "continuing threat" gives no reasonable limitation on how far into the future -- one day or forever -- a juror is obliged to predict the defendant's behavior. No defendant poses a <u>perpetually</u> "continuing threat." By age seventy-five or eighty, even the most volatile defendant is likely to have left his dangerous years far behind. Without additional instructions, jurors faced with the "future dangerousness" inquiry are left to speculate about how long a defendant will be a "threat" before they should return an affirmative answer. This speculation is antithetical to rational sentencing and violates the Eighth and Fourteenth Amendment to the United States Constitution.

Closely related to the vagueness of "continuing threat" is the uncertain scope of "society" as that term is used in the second special issue. Jurors are again left to speculate about whether they must consider the defendant's status as a "threat" in the close confines of the Texas Department of Criminal Justice or in the world at large. Such speculation leads to arbitrary and unreliable results, with different jurors on the same panel considering the application of the inquiry in radically different ways.

This situation presents precisely the error condemned in <u>Stringer</u> -- that of "tipping the scale" in death's favor by the use of a vague, undefined aggravating circumstance. See <u>Stringer</u>, 112 S.Ct. at 1139; <u>see also</u> <u>Maynard V. Cartwright</u>, 486 U.S. 356 (1988); <u>Clemons v. Mississippi</u>, 494 U.S. 356 (1988). Although the "weighing" performed by the jury under Texas' former statute is <u>internal</u> (that is, it takes place "within" the process of answering the second special issue), that fact is no constitutional moment. Defendant's jury will be required to consider an "aggravating factor" with no apparent limiting principle, and which no definitional instruction clarifies.

Like the aggravating factors found unconstitutionally vague in <u>Godfrey v. Georgia</u>, 446 U.S. 420 (1980); <u>Maynard v. Cartwright</u>, 486 U.S. 356 (1988); and <u>Clemons v. Mississippi</u>, 494 U.S. 356 (1988), the aggravating second special issue in the Texas sentencing scheme, as applied, results in the arbitrary and capricious imposition of the death penalty. In light of these matters, the Court must either decline to submit the

vague "continuing threat" special issue to Defendant's jury, or submit curative instructions giving content and definition to its vague terms.

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ____ day of _____, 1994.

_____

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS

CAUSE NO. _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

### ORDER

Defendant's Objection to Submission of Any Special Issue Asking the Jury to Determine Whether There Is a Probability That the Defendant Will Commit Criminal Acts of Violence That Will Constitute a Continuing Threat to Society is hereby SUSTAINED / OVERRULED.  Defendant's requested curative instructions are GRANTED  /  DENIED.


_____
Judge Presiding

DEFENSE REQUESTED INSTRUCTION # ____


YOU ARE AWARE THAT THE DEFENDANT IS A PERSON OF THE AFRICAN-
AMERICAN RACE.  YOU MAY NOT CONSIDER THAT FACT, FOR ANY PURPOSE
WHATSOEVER, IN ANSWERING THE SPECIAL ISSUE WHICH REQUIRES YOU TO
DETERMINE WHETHER THERE IS A PROBABILITY THAT THE DEFENDANT WILL
COMMIT CRIMINAL ACTS OF VIOLENCE THAT CONSTITUTE A CONTINUING
THREAT TO SOCIETY.

DEFENSE REQUESTED INSTRUCTION # ____

THE WORD "PROBABILITY," AS USED IN THIS CHARGE, MEANS "SIGNIFICANT LIKELIHOOD," "VIRTUAL CERTAINTY," OR "PROPENSITY."

DEFENSE REQUESTED INSTRUCTION # ____

THE WORDS "CRIMINAL ACTS OF VIOLENCE," AS USED IN THIS CHARGE, MEAN
"UNLAWFUL ACTS RESULTING IN ACTUAL PHYSICAL INJURY TO THE VICTIM."
THREATS OF VIOLENCE ALONE, WITHOUT SOME ACT TAKEN TOWARD
ACCOMPLISHING THE THREAT, DO NOT CONSTITUTE "CRIMINAL ACTS OF
VIOLENCE." CRIMES AGAINST PROPERTY ALONE -- SUCH AS THEFT, OR
POSSESSORY CRIMES ALONE -- SUCH AS DRUG POSSESSION, DO NOT
CONSTITUTE "CRIMINAL ACTS OF VIOLENCE."

DEFENSE REQUESTED INSTRUCTION # ____

THE WORDS "CONTINUING THREAT TO SOCIETY," AS USED IN THIS CHARGE, MEAN "A DANGER OF HARM TO MEMBERS OF THE PUBLIC, ENDURING FOR A SUBSTANTIAL PERIOD OF TIME, WHICH CANNOT BE ACCEPTABLY NEGATED OR REDUCED BY IMPRISONING THE DEFENDANT."

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS

CAUSE NO. _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

## MOTION TO PRECLUDE IMPOSITION OF THE DEATH PENALTY

Defendant respectfully moves this Court to preclude imposition of the death penalty in this case, by instructing the jury to return such answers to the special issue questions as may be necessary to result in the imposition of a sentence of life imprisonment. In view of the many different capital sentencing schemes that have been in operation in Texas since 1989, the death penalty in Texas is being arbitrarily imposed and, thus, its imposition in this case would be unconstitutional under the Eighth Amendment, the Equal Protection clause of the Fourteenth Amendment, and analogous provisions in the Texas Constitution.

> "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."
>
> U.S. Const. Amend. VIII

There have been a large number of different capital sentencing schemes that have been operation in Texas capital cases since the early 1970s, when the modern, "post-Furman" death penalty statutes were enacted.[1] Of the many hundreds of persons sentenced to death in Texas since the "modern" capital sentencing

---

[1] See Michael Kuhn, Note, *House Bill 200: The Legislative Attempt to Reinstate Capital Punishment in Texas*, 11 HOUSTON L. REV. 410 (1974); see also David Crump, *Capital Murder: The Issues in Texas*, 14 HOUSTON L. REV. 531, 532-33 & nn.7-8 (1977); Stephen W. MacNoll, Note, *A Constitutional Analysis of Texas Death Statute*, 15 AMER. J. CRIM. L. 69, 79-81 (1988).

statute was enacted,[2] the vast majority were sentenced under jury instructions that simply tracked the unadorned "special issues" contained in Article 37.071(b) verbatim. See generally P.M. McClung, "Jury Charges for Texas Criminal Practice" 75-78 (rev. ed. 1981). After the landmark decision in Penry v. Lynaugh, 492 U.S. 302 (1989), however, the consistency in Texas capital sentencing instructions quickly disappeared, both as a result of legislative action and unsupervised judicial improvising by trial courts. See generally Peggy M. Tobolowsky, What Hath Penry Wrought?: Mitigating Circumstances and the Texas Death Penalty, 19 Amer. J. Crim. L. 345 (1992).

Roughly speaking, the various types of Texas capital sentencing instructions in the post-Furman era can be broken down into seven different categories, although at least two categories contain sub-categories:

(i) The unadorned "special issues" in the pre-1991 version of Article 37.071(b). That statute was in effect for all capital murder trials from January 1, 1974 until the date on which Penry was decided on June 26, 1989. For capital murders committed before September 1, 1991, it also was in effect for many cases tried from June 26, 1989 until August 30, 1993, when Art. 37.071 was amended (discussed supra).[3]

---

[2] Applicant is aware of no source that collects all of the capital trials that have occurred in Texas since the post-Furman statute was enacted. An informed estimate of that number is approximately 750. See James M. Marquart et al., Gazing Into the
Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?, 23 LAW & SOC. REV. 449 (1989) (as of end of 1988, approximately 600 capital murder trials in Texas at which the State sought the death penalty); Sean Fitzgerald, Note, Walking a Constitutional Tightrope: Discretion, Guidance, and the Texas Capital Sentencing Scheme, 28 HOUSTON L. REV. 663 (1991); see also NAACP Legal Defense Fund, Death Row U.S.A. Reporter, 1976-93 (Texas' death row has grown by approximately 20-50 inmates per year since 1973).

[3] That statute, in pertinent part, reads as follows:

(b) On conclusion of the presentation of the evidence, [at the sentencing phase of a capital murder trial] the
court shall submit the following three issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing

(ii) The 1991 version of the statute. This version of the sentencing instructions has been applied in all capital murder trials for murders committed on or after September 1, 1991.[4]

(iii) The pre-1991 statute with an extra-statutory "Quinones"-type instruction.[5] This version of the sentencing instructions was applied at a number of Texas capital murder trials both before and after Penry was decided. There have been several versions of this extra-statutory charge, each containing material differences.[6]

---

the deceased was unreasonable in response to the provocation, if any, by the deceased.

. . . .

(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. . . . .

There have been countless trials at which such instructions were submitted, both before and after Penry. See, e.g., Stewart v. State, 686 S.W.2d 118, 121-124 (Tex.Crim.App. 1984); see also State v. McPherson, 851 S.W.2d 846, 849 & n. 8 (Tex.Crim.App. 1992) (collecting cases).

[4] Simply put, that amended statute eliminated the "deliberateness" and "provocation" special issues and added two new special issues, one of which was directly in response to Penry. The first new special issue asked:

[I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

See Art. 37.071(b)(2) (Vernon 1992).

The new "Penry issue" asks:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating or circumstances to warrant that a sentence of life imprisonment rather than a death sentence should be imposed.

See Art. 37.071(e) (Vernon 1992).

[5] In Quinones v. State, 592 S.W.2d 933, 947 (Tex.Crim.App. 1980), this Court held that it was not error for the trial court to have refused to submit the following extra-statutory instruction to the capital defendant's sentencing jury: "Evidence presented in mitigation of the penalty may be considered should the jury desire, in determining the answer to any of the special issues."

[6] Compare Boggess v. State, 855 S.W.2d 645, 647 (Tex.Crim.App. 1991); Fuller (Tyrone) v. State, 827 S.W.2d 919, 937 (Tex.Crim.App. 1992), Rios v. State, 846 S.W.2d 310, 315-16 (Tex.Crim.App. 1992); Satterwhite v. State, 858 S.W.2d 412, 425 (Tex.Crim.App. 1993).

(iv) The pre-1991 statute with an extra-statutory "Penry"-type "fourth special issue."[7] This version of the sentencing instructions has been applied in at least one trial after Penry for a capital murder committed before September 1, 1991.

(v) The pre-1991 statute with a "nullification" instruction.[8] This version of the sentencing instructions has been applied at a large number of trials after Penry for capital murders committed before September 1, 1991. There have been several different versions of this extra-statutory instruction, each containing material differences.[9]

(vi) The pre-1991 statute in which "deliberately" is broadly defined.[10] This version of the sentencing instructions has been applied in at least two trial since Penry was decided for capital murders committed before September 1, 1991.

(vii) The 1993 version of the statute as applied to all crimes committed on or before August 30, 1991.[11] This version of the statute will apply to any trial or re-trial that commences after

---

[7] See, e.g., State v. McPherson, 851 S.W.2d 846 (Tex.Crim.App. 1992).

[8] See, e.g., San Miguel v. State, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 110 at *7 (Tex.Crim.App. May 26, 1993); Fuller (Aaron) v. State, 829 S.W.2d 191, 209 & n. 5 (Tex.Crim.App. 1992). The proto-typical "nullification" instruction was in Fuller, which read as follows:

> When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented at both phases of the trial. A mitigating circumstance may be any aspect of the defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues. If you determine, in consideration of this evidence, that a life sentence, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "No."

Fuller, 829 S.W.2d at 209 n.5.

[9] Compare the instruction in supra note, with Blue v. State, No. 72,912, unpublished slip op. at 9 (Tex.Crim.App. September 23, 1992). The instruction in Blue read as follows:

> In answering the Special Issues you shall consider: (1) all evidence offered by either party at the guilt/innocence phase of the trial regarding the defendant's individual participation in the commission of the Capital Murder; and (2) all evidence offered by wither party at the punishment phase of the trial, whether it be aggravating or mitigating evidence. If the mitigating evidence persuades you that the defendant should not be sentenced to death, then you shall answer one or more of the Special Issues "No."

See Blue v. State, supra, at 9.

[10] See, e.g., Martinez v. State, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 119 at *15-*18 (Tex.Crim.App. 1993).

[11] See Art. 37.0711 (Vernon 1993). This version of the statute contains all three of the "old" special i___. See id. (b)(1)-(b)(3). It further provides that, if the jury returns affirmative answers to all three special issues,

August 29, 1993, for capital murders committed on or before August 30, 1991 -- such as Defendant's trial.

(i) Federal Constitutional Grounds

In numerous cases, the Supreme Court has stated, in keeping with our Nation's federalism, that "we are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." Spaziano v. Florida, 468 U.S. 447, 464 (1984) (citing cases). The Court has stated, however, that within a single state, there must be consistency in the treatment of capital defendants who are subject to the death penalty. Id. at 460 ("If a State has determined that death should be an available for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not.") (citing cases). Thus, "'each distinct [state] system must be examined on an individual basis.'" See Pulley v. Harris, 465 U.S. 37, 45 (1984) (quoting Gregg v. Georgia, 428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell & Stevens, JJ.)).

In Furman v. Georgia, 408 U.S. 238 (1972), the chief constitutional infirmity that the controlling Members of the Court pointed to in their respective concurring opinions was arbitrariness. See id. at 274 (Brennan, J., concurring) ("In determining whether a punishment comports with human dignity, we are aided ... by ... [a] second principle inherent in [the Eighth Amendment Cruel and Unusual Punishments] Clause -- that the State must not arbitrarily inflict punishment."); id. at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual."); see also Spaziano, 468 U.S. at 460.

The above discussion of the various sentencing schemes concurrently[12] in operation in Texas, "a distinct system," Gregg, 428 U.S. at 195, amply demonstrate that the present Texas death penalty system is being

_____

then the trial court should further submit to jurors the new, Penry-type special issue enacted in the 1991 amendment.

[12] Although after August 29, 1993, all trials will be tried under either Art. 37.071 and Art. 37.0711, the pre-1991 version of Art. 37.071 was still in operation in many cases up until August 30, 1993. Moreover, *on appeal*, the pre-1991 version of Art. 37.071 will still be in operation in the foreseeable future in the Court of Criminal Appeals' sufficiency-of-the-evidence analyses regarding juries' affirmative answers to the special issues.

implemented in an "arbitrary" manner. At least seven categories of similarly situated capital defendants have been treated disparately. Put another way, it is certainly conceivable that, all other things being equal, a single hypothetical Texas capital defendant would be given a different sentence[13] depending on which of the seven different sentencing schemes was in operation at his trial. This is quintessential arbitrariness -- the very type condemned in Furman.

Defendant recognizes that the Texas Legislature was certainly justified in amending Art. 37.071(b) as it did in 1991; indeed, Penry certainly appeared to require such. See Shelley Clarke, Note, A Reasoned Moral Response: Rethinking Texas' Capital Sentencing Statute After Penry v. Lynaugh, 69 Tex. L. Rev. 407 (1990). If that were the only other scheme concurrently in operation with the pre-1991 version of Art. 37.071, in all likelihood the constitution could tolerate that disparity. But that is not what happened in the wake of Penry.

Rather, numerous trial courts throughout this state and the Texas Legislature have haphazardously created, in addition to the prevailing pre-1991 capital sentencing scheme, a total of at least six new, distinct capital sentencing schemes that have governed similarly or identically situated Texas capital defendants. Particularly noteworthy is the failure of the Texas Court of Criminal Appeals to impose uniformity among the practices adopted by the trial courts. Nor is the Legislature free from its share of the blame. By waiting until August 30, 1993, to amend Art. 37.071 as it applies to trials or retrials of capital defendants who committed their crimes before September 1, 1991, the Legislature has sowed the seeds of arbitrariness and inconsistency. Under both identical and analogous circumstances, other States have not dealt with seemingly sweeping invalidations of their post-Furman death penalty statutes in such a chaotic manner. See Oregon Revised Statutes, § 163.150 (as amended July 24, 1989); State v. Wagner, 786 P.2d 93, 99-100 (Ore. 1990); cf. Ohio Revised Code §§ 2929.02-06 (as amended 1981); State v. Melchior, 381 N.E.2d 195, 200 (Ohio 1978); David J. Benson, Constitutionality of Ohio's New Death Penalty Statute, 14 Toledo L. Rev. 77 (1982).

Fetterly v. Paskett, 997 F.2d 1295 (9th Cir. 1993), presents an analogous situation to the instant case. In that case, the Ninth Circuit condemned an instance of "Furman arbitrariness" within a single state's capital

---

[13] Of course, in a Texas capital case, where a defendant has been found guilty of capital murder, the only sentencing options are a life sentence and a death sentence.

sentencing system. In particular, the court in dicta stated that a federal constitutional violation occurred when

the Idaho Supreme Court's refusal to apply the clear mandate of state capital sentencing law, which governed

the weighing of aggravating factors against mitigating factors, to all similarly situated capital defendants. The

court's reasoning should be applied to Texas' experience:

> In Godfrey v. Georgia, 446 U.S. 420, 100 S. Ct. 1759, 64 L.Ed.2d 398 (1980), the Supreme
> Court held that states can impose the death penalty for certain crimes without running afoul of
> our Constitutional prohibition against cruel and unusual punishment, but only if the manner in
> which the penalty is selected "provide[s] a meaningful basis for distinguishing the few cases in
> which [the penalty] imposed from the many cases in which it is not." Id. at 427 ... . As
> pointed out by Justice Stevens, "this Court's decisions have made clear that States may impose
> this ultimate sentence only if they follow procedures that are designed to assure reliability in
> sentencing determinations. Barclay v. Florida, 463 U.S. 939, 958-59, 103 S.Ct. 3418, 3429,
> 77 L.Ed. 1134 (1983) (Stevens, J., concurring) (emphasis added). Part of the requirement of
> reliability is "'that the [aggravating and mitigating] reasons present in one case will reach a
> similar result to that reached under similar circumstances in another case.'" Id. at 954 ...
> (quoting Proffitt v. Florida, 428 U.S. 242, 251, 96 S. Ct. 2960, 2966, 49 L.Ed.2d 913 (1976)
> (opinion of Stewart, Powell, and Stevens, JJ.)) (internal quotations omitted). Because Fetterly
> may not have been sentenced to death as prescribed by Idaho Code § 19-2515(c), this goal of
> similar sentences in similar cases may not have been met. ...

Fetterly, 997 F.2d at 1299 (emphasis added).

Although Texas' experience is different in that it involves a global violation of all Texas capital defendants'

rights to be free from arbitrary, inconsistent capital sentencing procedures, while Idaho apparently only violated

one or a few defendant's rights, Fetterly's reasoning applies equally to Texas. The bottom line is that Texas

courts and the state Legislature, without any discernible rational basis, have haphazardly turned Texas' capital

sentencing scheme into a patch-work quilt. Because similarly situated Texas capital defendants -- including

Defendant — have been unjustifiably sentenced to death under radically different sentencing schemes, this Court

must prevent the State from seeking a death sentence and ensure that Defendant receives a sentence of life

imprisonment.

(ii) State Constitutional Grounds

> "Excessive bail shall not be required, nor excessive fines imposed, nor cruel
> or unusual punishments inflicted."
>
> Tex. Const. Art. I, § 13

Defendant adopts all of the arguments made supra with respect to his state constitutional claim. Although

Defendant has primarily cited federal Eighth Amendment authority herein, he intends that this Court should separately consider his claim under the Texas and U.S. Constitutions. As the Texas Court of Criminal Appeals has noted, the Texas Constitution may properly provide greater protections than its federal counterpart. See, e.g., Richardson v. State, ___ S.W.2d ___, No. 901-92 (Tex.Crim.App. Octo. 27, 1993); Heitman v. State, 815 S.W.2d 681 (Tex.Crim.App. 1991); Ex Parte Hererra, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 100 at *2 (Tex.Crim.App. May 11, 1993) (Maloney, J., dissenting, joined by Baird, Clinton & Overstreet, JJ.); see also Judge Rusty Duncan, Terminating the Guardianship: A New Role for State Court, 19 St. Mary's L.J. 809 (1988).

Particularly noteworthy is the fact the Texas Constitution proscribes "cruel or unusual punishments," while the U.S. Constitution proscribes "cruel and unusual punishments." Obviously, despite apparent implicit claims to the contrary by courts and commentators,[14] the Texas Constitution, based on its plain language, was intended offer broader protections than the U.S. Constitution. Cf. People v. Anderson, 493 P.2d 880, 883-87 (Cal. 1972) (attributing textual significance to state constitutional proscription against "cruel or unusual punishments"). Because Defendant's primary argument here is that the many sentencing schemes operating concurrently inject arbitrariness into the Texas capital sentencing scheme, at the very least Defendant's death sentence, if imposed, would be "unusual."

WHEREFORE, Defendant respectfully moves this Court to preclude imposition of the death penalty in this case by forbidding the State to proceed at punishment and imposing a sentence of life imprisonment.

Respectfully submitted,

_____

**COUNSEL FOR DEFENDANT**

## CERTIFICATE OF SERVICE

---

[14] See, e.g., Livingston v. State, 542 S.W.2d 655, 662 (Tex.Crim.App. 1976) (mistakenly treating Texas constitutional provision as if it proscribes "cruel *and* unusual punishment"); Peter Linzer, *Symposium on the Texas Constitution*, 68 Tex. L. Rev. 1573, 1592 & nn. 133-34 (1988) (treating Art. I, § 13 as identical to Eighth Amendment).

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this _____ day of _____, 1994.

_____

**IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,**
**_____ COUNTY, TEXAS**


**CAUSE NO. _____**


THE STATE OF TEXAS       )
                                  )

vs.                                  )
                                  )

YOUR CLIENT             )


**ORDER**


Defendant's Motion to Preclude the Imposition of the Death Penalty is GRANTED / OVERRULED.


_____
Judge Presiding

IN THE DISTRICT COURT FOR THE ___ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS

CAUSE NO: _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

**DEFENDANT'S MOTION TO EXCLUDE THE PENALTY OF DEATH AS A POSSIBLE PUNISHMENT ON GROUNDS THAT THE DEATH PENALTY IS ADMINISTERED IN A RACIALLY DISCRIMINATORY MANNER.**

Defendant respectfully moves this Court to preclude imposition of the death penalty in this case, by instructing the jury to return such answers to the special issue questions as may be necessary to result in the imposition of a sentence of life imprisonment. Because the imposition of the death penalty in this case would be influenced by racial discrimination, and because the death penalty is administered generally in a racially discriminatory manner, its imposition in this case would be unconstitutional under the Eighth Amendment, the Equal Protection and Due Process clauses of the Fourteenth Amendment, and under Article I, Sections 13, 19, 27, and 29 of the Texas Constitution.

In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme Court invalidated the death penalty under the vast majority of statutes in effect in the country. The five concurring Justices in the majority agreed that the death penalty was being imposed in an "arbitrary" manner. As Justice Thomas recently noted, the principal motivating factor of the Furman majority in finding that the death penalty was being arbitrarily imposed was a special concern about racial discrimination. See Graham v. Collins, 113 S. Ct. 892, 904-05 (1993) (Thomas, J., concurring) (discussing Furman).[1] Twenty years later, it is beyond dispute that if the imposition of the death

---

[1] See, e.g., Furman, 408 U.S. at 242 (Douglas, J., concurring) ("It would seem to be incontestable that the death penalty inflicted on one defendant is "unusual" if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices."); id., at 310 (Stewart, J., concurring) ("If any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race."); id. at 364 (Marshall, J.,

surveyed various studies on racism and the death penalty and concluded that the studies show "a pattern of

evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty after the

Furman decision" and that "race of victim influence was found at all stages of the criminal justice system."[3]

The studies recounted in the GAO survey make it clear that discrimination based on race remains widespread

and systematic in the imposition of the death penalty in the United States; in particular, such racism manifests

itself most vividly in the category of the race of capital murder victims. For example, of the 210 persons

executed between January 1977 and July 1993, only a small fraction killed non-whites, despite the fact that non-

white victims of murders are roughly equal in number of the percentages of white victims.[4]

    Numerous specific studies on the existence of systemic racial discrimination in the post-Furman Texas death

penalty have been undertaken.[5]  Such studies, based on aggregate data of the race of Texas capital murders and

---

Sorensen & James Marquart, *Prosecutorial and Jury Decision-Making in Post-Furman Texas Capital Cases*, 18
N.Y.U. REV. L. & SOC. CH. 743 (1990-91); United States General Accounting Office, DEATH PENALTY
SENTENCING: RESEARCH
INDICATES PATTERN OF RACIAL DISPARITIES (1990); David C. Baldus, et al., EQUAL JUSTICE AND THE DEATH
PENALTY: A LEGAL AND EMPIRICAL ANALYSIS (1990); Sheldon Eckland-Olson, *Structured Discretion, Racial
Bias, and the Texas Death Penalty*, 69 SOC. SCI. Q. 853 (1988); Jonathan R. Sorenson, "The Effects of Legal
and Extra-legal Factors on Prosecutorial and Jury Decision Making in Post-Furman Texas Capital Cases,"
unpublished Ph.D. dissertation, Sam Houston State University, Huntsville, Texas, 1990 (study based on Texas
capital murder statistics from 1974-88); David C. Baldus et al., *Arbitrariness and Discrimination in the
Administration of the Death Penalty*, 15 STETSON L. REV. 133 (1986); Samuel R. Gross, *Race and the Judicial
Evaluation of Discrimination in Capital Sentencing*, 18 U.C. DAVIS L. REV. 1275 (1985); David C. Baldus et
al., *Monitoring and Evaluating Contemporary Death Sentencing Systems: Lessons from Georgia*, 18 U.C. DAVIS
L. REV. 1375 (1985); Samuel R. Gross & Robert Mauro, *Patterns of Death: An Analysis of Racial Disparities in
Capital Sentencing and Homicide Victimization*, 37 STAN. L. REV. 27 (1984); David C. Baldus et al.,
*Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience*, 74 J. CRIM. L. &
CRIMINOLOGY 661 (1983); William Bowers, *The Pervasiveness of Arbitrariness and Discrimination under Post-
Furman Capital Statutes*, 74 J. CRIM. L. & CRIMINOLOGY, 1067 (1983); Raymond Paternoster, *Race of the
Victim and Location of Crime: The Decision to Seek the Death Penalty in South Carolina*, 74 J. CRIM. L. &
CRIMINOLOGY 754 (1983); William Bowers & Glenn Pierce, *Arbitrariness and Discrimination under Post-
Furman Capital Statutes*, 26 CRIME & DELINQ. 563 (1980).

[3] U.S. General Accounting Office, DEATH PENALTY SENTENCING, at 5-6 (1990).

[4] See NAACP Legal Defense and Educational Fund, "Death Row, USA," Summer 1993 (listing race of
executed persons and their victims).

[5] See Texas Judicial Council, "Capital Murder Study" (unpublished, 1976 & 1977) (capital murder data on
race of defendants, victims, and jurors for the first 74 post-Branch capital murder indictments); William J.
Bowers & Glenn L. Pierce, *Arbitrariness and Discrimination under Post-Furman Capital Statutes*, 26 CRIME &
DELINQ. 563, 596 (1980) (study based on Texas homicide data from 1973-78); Jim Henderson, & Jack Taylor,

their victims, overwhelmingly point to the existence of racial discrimination in the Texas death penalty. Such racism, the leading studies conclude, is considerably more pronounced in the exercise of prosecutorial (as opposed to jury) discretion. Furthermore, such racism manifests itself more in the race of the victim rather than the race of the defendant.[6]

University of Texas Professor Eckland-Olson's study using data from 1974-83 revealed that only 51% of all

---

*Killers of Dallas Blacks Escape the Death Penalty*, DALLAS TIMES HERALD, November 17, 1985, at A1, A16; Ronnie Dugger, *The Numbers on Death Row Prove that Blacks Who Kill Whites Receive the Harshest Judgment*, TIME, Spring 1988, Special Issue, at 88 (discussing University of Texas Law Professor Ed Sherman's analysis of Harris and Dallas County, Texas, death penalty data from 1978-80); Sheldon Eckland-Olson, *Structured Discretion, Racial Bias, and the Texas Death Penalty*, 69 SOC. SCI. Q. 853 (1988) (study based on Texas capital murder statistics from 1974-88); Jonathan R. Sorenson, "The Effects of Legal and Extra-legal Factors on Prosecutorial and Jury Decision Making in Post-Furman Texas Capital Cases," unpublished Ph.D. dissertation, Sam Houston State University, Huntsville, Texas, 1990 (study based on Texas capital murder statistics from 1974-88); Jonathen R. Sorensen & James Marquart, *Prosecutorial and Jury Decision-Making in Post-Furman Texas Capital Cases*, 18 N.Y.U. REV. L. & SOC. CH. 743 (1990-91) (study based on Texas capital murder statistics from 1980-86); Alan Widmayer & James Marquart, "Capital Punishment and Structured Discretion: Arbitrariness and Discrimination After Furman," in *Correction Theory and Practice* 178-96 (1992) (capital murder statistics from Harris County, Texas, from 1980-88).

[6] See, e.g., Widmayer & Marquart, supra, at 187 (capital murder of white victim five times more likely to result in death penalty than capital murder of African-American victim and over three times more likely to receive death penalty than capital murder of Hispanic victim); Eckland-Olson, supra, at 858-61, 871 (white-victim cases are 51% of capital murders in Texas, but represent 85% of all Texas death penalty cases; black-victim cases are 23.4% of Texas capital murders, but represent only 3.6% of all Texas death penalty cases; Hispanic-victim cases are 23.4% of Texas capital murders, but only 8.9% of all Texas death penalty cases); Sorenson & Marquart, supra, at 765-72 (capital murder of white victim five times as likely to result in death penalty than capital murder of African-American victim and over three times as likely to result in death penalty as capital murder of Hispanic victim). Such findings are consistent with similar statistical studies in other Southern death penalty jurisdictions. See McCleskey v. Kemp, 481 U.S. 279 (1987) (discussing statistical study of post-Furman study of Georgia death penalty); see generally Samuel R. Gross & Robert Mauro, *Death and Discrimination: Racial Disparities in Capital Sentencing* (1989).

The conclusion that racism manifests itself more in the race of the victim than in the race of the defendant has a racially invidious explanation: the race of the victim is the determinative factor in the vast majority of Texas cases, both those involving white and minority defendants. See Widmayer & Marquart, supra, at 187; Marquart & Sorenson, supra, at 764-65. Texas cases in which prosecutors do not seek capital murder charges or a death sentence against a minority defendant who has murdered a minority victim have had nothing to do with racial enlightenment. As a leading researcher on racism in the Texas death penalty has observed, Texas "[p]rosecutors seek capital punishment in cases where they are most likely to win, which may lead to a process of case typification. In other words, prosecutors choose cases involving the killing of whites, especially by blacks, because these cases fit the category of crimes that elicits the most fear from white jurors who identify with the victims." Sorenson, supra, at 14. The current District Attorney of Dallas County, Texas, John Vance, has openly admitted that such case typification occurs in Texas. See Ray F. Herndon, *Race Tilts the Scales of Justice*, DALLAS TIMES-HERALD, August 19, 1990, at A1, A22.

Texas capital murders during those years involved white victims, yet 85% of all death sentences were for the capital murder of whites; conversely, 23.4% of all Texas capital murders involved black victims, but such murders resulted in only 3.6% of all death sentences.[7] Similarly, Professors Sorenson and Marquart have concluded that, all other things being equal, a Texan who commits the capital murder of a white person is over five times as likely to be sentenced to death than a Texan who commits a capital murder of an African-American.[8] See also Ed Tims et al., A Pattern of Exclusion, Dallas Morning News, December 21, 1986.

Particularly notable among such statistics is the extremely large number of African-Americans on Texas' death row who murdered white women in the course of a rape, as contrasted to the paucity black-on-black murders in the course of a rape.[9] Similarly, although scores of African-Americans in Texas have been sentenced to death for murdering whites in the course of a simple robbery -- there are virtually no African-Americans on Texas' death row who murdered other African-Americans under such circumstances. Yet the statewide percentages of black-on-black robbery-murders and rape-murders are roughly equivalent to the statewide percentages of black-on-white robbery-murders and rape-murders.[10] There has, thus, been a clear

---

[7] See Eckland-Olson, supra, at 858-60.

[8] See Sorenson & Marquart, supra, at 765-72.

[9] Black-on-white rape-murders have resulted in dozens of Texas death sentences since 1974. There have been only a handful of cases where a person received the death penalty for murdering an African-American woman in the course of a rape. See, e.g., Granviel v. State, 723 S.W.2d 141 (Tex.Crim.App. 1986) (rape and murder of multiple persons, including two-year old child). In this sense, the post-Branch Texas death penalty strongly resembles the pre-Branch death penalty. See Robert C. Koeninger, Capital Punishment in Texas, 1924-68, 15 CRIME & DELINQ. 132, 138-39 (1969). Counsel has identified only one post-Furman Texas capital case involving a white-on-black rape; however, in that case, the prosecutors did not charge the defendant with murder in the course of a rape, but instead charged him with murder in the course of a robbery. See Vigneault v. State, 600 S.W.2d 318 (Tex.Crim.App. 1979).

[10] See Eckland-Olson, supra, at 861-63 (Texas capital murder data from 1973-83). Professor Eckland-Olson's data reveal remarkable disparities in this regard. Statewide between 1974-83, 12.8% of all capital murders were black-on-white robbery-murders, while 8.9% were black-on-black robbery-murders. Yet 18.2% of persons on Texas' death row population were blacks who murdered whites during a robbery, while only 1.2% of Texas' death row population were blacks who killed blacks during a robbery. That is, proportionally speaking, black-on-white robbery-murders were overrepresented by almost 50%, while black-on-black robbery-murders were underrepresented by almost 800%. Gross disparities were also evident with respect to the statistics regarding murders in the course of a rape. Statewide between 1974-83, 1.1% of all capital murders were black-on-white rape-murders, while 1.0% were black-on-black rape-murders. Yet 5.3% of Texas' death row population were blacks who murdered whites during the course of a rape, while only 0.4% were blacks who

pattern of racially-biased minority-victim devaluation in Texas death penalty cases. Finally, it is notable that, with the rarest of exceptions, whites in Texas[11] do not receive death sentences for the capital murders of blacks.[12] The obvious explanation for each of these trends is that Texas prosecutors, the overwhelming majority of whom are white, do not believe that such crimes warrant the ultimate punishment.[13]

It should also be generally noted that the demographics of Texas' death row population have changed since Furman, but not dramatically: in the pre-Furman era, racial minorities comprised roughly two-thirds of condemned persons, while whites comprised roughly one-third; in the post-Furman era, racial minorities

---

killed blacks during the course of a rape. That is, proportionally speaking, black-on-white rape-murders were *overrepresented* by 500%, while black-on-black rape-murders were *underrepresented* by over 200%.

[11] That phenomenon is not limited to Texas. See Michael L. Radalet & Michael Mello, *Executing Those Who Kill Blacks: An Unusual Case Study*, 37 MERCER L. REV. 911 (1986).

[12] For instance, of the first seventy-four capital murder indictments filed in Texas after Furman, five were cases where whites killed blacks. None of those five cases resulted in a death sentence. See Appendix to "Capital Murder Study," Texas Judicial Council, supra. Sorenson and Marquart's data covering Texas capital murders from 1980-86 show that the a white who committed the capital murder of an African-American during those years had, statistically speaking, *no* chance of receiving the death penalty, while an African-American who committed a capital murder of a white stood a 25% chance of receiving the death penalty. See Sorenson & Marquart, supra, at 765.

Research reveals that there is only one white person currently on Texas' death row who received a death sentence for killing an African-American. See Vigneault v. State, supra. Notably, that case involved especially horrific facts. See id. (murder committed during course of robbery, rape, and kidnapping; defendant shot female victim point-blank in head while he forced her to perform oral sodomy). In another post-Furman white-on-black capital case, which also involved egregious facts, see Brasfield v. State, 600 S.W.2d 288 (Tex.Crim.App. 1980) (murder in course of kidnapping and anal rape of male child), the Texas Court of Criminal Appeals amazingly held that the defendant's death sentence should be reformed to a life sentence because there was insufficient evidence that he posed a "future threat to society."

[13] The pervasiveness in racism in the Texas death penalty is also evident in the actions of defense lawyers. See, e.g., Ex Parte Guzmon, 730 S.W.2d 724 (Tex.Crim.App. 1987) (white capital defense lawyer repeatedly referred to Mexican client as a "wet back" in front of all-white jury); see also *A Different Approach*, NATIONAL LAW JOURNAL, June 11, 1990, at 34. In Guzmon, that same attorney failed to challenge the prosecution's selection of jurors who unabashedly stated that they did not believe that illegal aliens deserved the same level of constitutional protections as U.S. citizens. One of those jurors, who later served as foreman of Guzmon's jury, was asked whether, in view of Guzmon's illegal alien status, he would "be able to make a fair decision in this case." The jury foreman candidly admitted that "I would have to struggle with it." See id. at 726-727. Guzmon's lawyer permitted him to serve on the jury nonetheless.

comprise roughly three-fifths, while whites comprise roughly two-fifths of condemned persons.[14]

Also noteworthy about Texas capital juries is the racial effect of "death qualification" of jurors.  See Marilyn D. McShane et al., Eligibility for Jury Service in [Texas] Capital Trials: A Question of Potential Exclusion and Bias, Texas Bar Journal, April 1987, at 365.  McShane and her colleagues randomly selected 2000 Texans and questioned them extensively on their views on capital punishment, in order to simulate questions typically asked during voir dire in a Texas capital case.  Minorities consistently showed the weakest support for the death penalty, while white Texans, as a group, showed a stronger support for capital punishment.  See also Terry Williams, Blacks, Hispanics Still Feel Brunt of Racial Bias, Houston Post, March 17, 1993, at p.A1 (poll showing that white Texans favor the death penalty considerably more than African-American Texans).

The foregoing establishes that the administration of the death penalty generally in Texas is impermissibly influenced racial discrimination, especially in cases such as Defendant's (a crime by an African-American person against a white person).  It also demonstrates a substantial risk that racial discrimination will influence the jury in this case to impose a death sentence.  This risk is incompatible with the federal constitution, and with the constitution of Texas whose analogous provisions provide greater protection than their federal counterparts.

WHEREFORE, Defendant respectfully moves this Court to preclude imposition of the death penalty in this case, by instructing the jury to return such answers to the special issue questions as may be necessary to result in the imposition of a sentence of life imprisonment.  In the alternative, this Court should appoint and compensate an expert to conduct a study regarding racial disparity in Texas death sentencing and hold an evidentiary on that claim.

---

[14] Between 1924-68, Texas' death row population included at least 314 African-Americans and Hispanics and at least 146 whites. See Rubert C. Koeninger, *Capital Punishment in Texas, 1924-68*, 15 CRIME & DELINQ. 132-35 (1969).  As of the Summer of 1992, Texas' death row population included 157 whites and 199 minorities including African-Americans, Hispanics, Native Americans, and Asians. See NAACP Legal Defense Fund, Death Row U.S.A. (Summer 1992).  Although African-Americans have significantly decreased as a proportion of minorities on death row in the post-Furman era, their percentage on death row (36%) is still over three times their respective percentage of Texas' population (12%).

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ____ day of _____, 1994.

_____

**IN THE DISTRICT COURT FOR THE ___ JUDICIAL DISTRICT,**
**_____ COUNTY, TEXAS**


**CAUSE NO. _____**


THE STATE OF TEXAS                      )
                                        )
vs.                                     )
                                        )
YOUR CLIENT                             )


**ORDER**

Defendant's Motion to Exclude the Penalty of Death as a Possible Punishment On Grounds That The

Death Penalty Is Administered In A Racially Discriminatory Manner is GRANTED / OVERRULED.

Defendant's Motion For Appointment and Compensation Of An Expert To Conduct A Race Bias Study Is

GRANTED / OVERRULED.


_____
Judge Presiding

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS

CAUSE NO. _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

**OBJECTION TO PROHIBITION ON INFORMING JURORS THAT IF A SINGLE
JUROR "HOLDS OUT" FOR LIFE, THE DEFENDANT WILL RECEIVE A
SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW.**

Defendant respectfully objects that defense counsel should be permitted to inform jurors that, under
Texas law, if even a single juror "holds out" for life imprisonment, the defendant will receive a sentence of life
imprisonment rather than the death penalty. Because the effect of denying the jurors such accurate information
is to mislead and misinform them about their role in the sentencing process, and about the true operation of that
law, this provision violates Defendant's rights under the Eighth, and Fourteenth Amendments to the U.S.
Constitution and under the Constitution of the State of Texas.

A number of other jurisdictions have addressed this very issue and have found a constitutional violation
under indistinguishable circumstances. See, e.g., State v. Williams, 392 So.2d 619, 631 (La. 1980) (on
rehearing). In Williams, the court stated:

> In the present case the jurors were not fully informed of the consequences of their votes and
> the penalties which could result in each eventuality. . . . Instead, the members of the
> sentencing body were left free to speculate as to what outcome would be in the event there was
> no unanimity. Under these circumstances, individual jurors could rationally surmise that in the
> event of a disagreement a new sentencing hearing, and perhaps a new trial, before another jury
> would be required.

Williams, 392 So.2d at 631 (emphasis added). Such a risk of speculation and confusion was properly held to be
a constitutional violation by the Louisiana Supreme Court. Id. Citing Williams with approval, the New Jersey
Supreme Court has added:

The entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die. To hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uniformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by the modern death penalty jurisprudence.

State v. Ramseur, 524 A.2d 188, 284 (N.J. 1987) (emphasis added). See also Kubat v. Thieret, 867 F.2d 351, 369-73 (7th Cir.), cert. denied, 493 U.S. 874 (1989). As the Court stated in Kubat:

Kubat's jurors were never told that he would not be sentenced to death. . . . [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

867 F.2d at 373. See also Andres v. United States, 333 U.S. 740, 752 (1948) (federal capital case) (addressing essentially identical claim and ordering a new trial).

This provision of Texas' capital punishment scheme violates the Eighth and Fourteenth Amendments in two ways: First, this prohibition violates the principle underlying Caldwell v. Mississippi, 472 U.S. 320, 240 (1985). As the Supreme Court stated in Dugger v. Adams, 489 U.S. 401, 407 (1989), a Caldwell violation occurs when jurors are "improperly [informed of] the role assigned to the jury by local law." Jurors in Texas are not told that even one holdout juror results in an automatic life sentence.

Second, it violates the Eighth Amendment principle announced in Mills v. Maryland, 486 U.S. 367 (1988) — that a death sentence is unconstitutional if individual jurors are led to believe that their votes in favor of a life sentence are meaningless unless a certain numbers of other jurors are persuaded to vote along with the juror (in the case of Texas, at least nine other jurors, for a total of ten).

WHEREFORE, Defendant objects to the state-law prohibition on informing jurors accurately that a single "holdout" juror for life imprisonment requires the Court to impose life.

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

57

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ____ day of _____, 1994.

_____

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS


CAUSE NO. _____


THE STATE OF TEXAS                )
                                  )
vs,                               )
                                  )
YOUR CLIENT                       )


## ORDER


Defendant's Objection to Prohibition on Informing Jurors That If a Single Juror "Holds Out" for Life, the Defendant Will Receive a Sentence of Life Imprisonment by Operation of Law is SUSTAINED / OVERRULED.


_____
Judge Presiding

## IN THE DISTRICT COURT FOR THE ___ JUDICIAL DISTRICT,
## _____ COUNTY, TEXAS

CAUSE NO. _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

**REQUEST FOR INSTRUCTION THAT THE STATE HAS THE BURDEN OF PROVING THAT, IN LIGHT OF ALL EVIDENCE, BOTH MITIGATING AND AGGRAVATING, DEATH RATHER THAN LIFE IMPRISONMENT IS THE APPROPRIATE PUNISHMENT.**

Defendant respectfully submits that whereas the Eighth and Fourteenth Amendments forbid the State from imposing a mandatory sentence of death for any offense, no matter how aggravated, those constitutional protections likewise create a presumption that life imprisonment, rather than death, is the appropriate sentence for Defendant in the absence of proof to the contrary.

Defendant would further submit that the standard of proof to which the State should be held on this ultimate question is whether, in light of all evidence, both mitigating and aggravating, there is no reasonable doubt that death, rather than life imprisonment, is the appropriate punishment for this Defendant. Defendant moves the Court to so instruct the jury. At the very minimum, and in the alternative only, Defendant moves the Court to instruct the jury that the State must prove by clear and convincing evidence that, in light of all circumstances, death rather than life imprisonment is the appropriate punishment for Defendant.

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ____ day of _____, 1994.

---------------------------

**IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS**

CAUSE NO. _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

**ORDER**

Defendant's request for an Instruction That The State Has The Burden Of Proving, . . . That Death
Rather Than Life Is The Appropriate Punishment is GRANTED / DENIED.

_____
Judge Presiding

### DEFENSE REQUESTED INSTRUCTION # ___

THE STATE HAS THE BURDEN OF PROVING BEYOND A REASONABLE DOUBT
THAT, IN LIGHT OF ALL EVIDENCE, BOTH MITIGATING AND AGGRAVATING,
DEATH RATHER THAN LIFE IMPRISONMENT IS THE APPROPRIATE SENTENCE
FOR THE DEFENDANT. IF YOU HAVE A REASONABLE DOUBT AS TO WHETHER
THE STATE HAS PROVED THAT DEATH IS THE APPROPRIATE SENTENCE IN
LIGHT OF ALL THE EVIDENCE, YOU SHALL ANSWER THE SPECIAL ISSUES IN
SUCH A MANNER AS TO IMPOSE A LIFE SENTENCE.

### DEFENSE REQUESTED INSTRUCTION # ___

THE STATE HAS THE BURDEN OF PROVING BY CLEAR AND CONVINCING
EVIDENCE THAT, IN LIGHT OF ALL THE CIRCUMSTANCES OF THIS CASE, BOTH
MITIGATING AND AGGRAVATING, DEATH RATHER THAN LIFE IMPRISONMENT
IS THE APPROPRIATE SENTENCE FOR THE DEFENDANT. IF YOU ARE NOT
STRONGLY CONVINCED THAT DEATH IS THE APPROPRIATE SENTENCE IN LIGHT
OF ALL THE EVIDENCE, YOU SHALL ANSWER THE SPECIAL ISSUES IN SUCH A
MANNER AS TO IMPOSE A LIFE SENTENCE.

## IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT, _____ COUNTY, TEXAS


CAUSE NO. _____


| THE STATE OF TEXAS | ) |
|---|---|
| vs. | ) |
| YOUR CLIENT | ) |


## MOTION TO PRECLUDE THE SUBMISSION OF A § 8.04(b) INSTRUCTION ON VOLUNTARY INTOXICATION DURING THE PUNISHMENT PHASE.

In this case, Defendant has submitted mitigating evidence that he was voluntarily intoxicated at the time of the crime. Section 8.04 of the Texas Penal Code provides that "temporary insanity caused by intoxication" may be considered in mitigation of punishment. In Jaynes v. State, 673 S.W.2d 198, 202 (Tex.Crim.App. 1984), the Court of Criminal Appeals held that a trial court should submit a § 8.04 instruction when there is evidence that a defendant was intoxicated at the time of the crime.

Defendant contends that a § 8.04(b) instruction submitted during the punishment phase of a capital case would be a violation the Eighth and Fourteenth Amendments to the United States Constitution since it would entirely preclude jurors' consideration of mitigating evidence of a capital defendant's intoxication unless jurors believed that the intoxication rose to the level of temporary insanity. Cf. Smith v. McCormick, 914 F.2d 1153 (9th Cir. 1990); see also Ex Parte Rogers, 819 S.W.2d 533, 537 (Tex.Crim.App. 1991) (Clinton, J., dissenting, joined by Baird & Maloney, JJ.) ("[T]his instruction does not even purport to empower the jury to give mitigating effect to evidence of voluntary intoxication that does not rise to the level of temporary insanity. A juror who believed a capital [defendant] was not so intoxicated as to be incapable of appreciating the wrongfulness of his action [i.e., being temporarily insane] might nevertheless find him less morally culpable than would have been a sober man committing the same crime."). See also Jurek v. Texas, 428 U.S. 262 (1976); Eddings v. Oklahoma, 455 U.S. 104 (1982); Hitchcock v. Dugger, 481 U.S. 393 (1987); Bell v. Ohio, 438 U.S. 637, 640, 57 L. Ed. 2d 1010, 98 S. Ct. 2977 (1978) (companion case to Lockett v. Ohio, 438 U.S

586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978)); Winston v. United States, 172 U.S. 303, 313 (1899).

## CONCLUSION

Accordingly, this Court should not submit an instruction pursuant to § 8.04(b) and the State should be precluded from arguing to the jury that Texas law prevents their consideration of evidence of voluntary intoxication unless it rises to the level of temporary insanity.

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ____ day of _____, 1994.

_____

**IN THE DISTRICT COURT FOR THE ___ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS**

CAUSE NO. _____

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |

## ORDER

Upon consideration of Defendant's Motion to Preclude the Submission of a § 8.04(b) Instruction on Voluntary Intoxication During the Punishment Phase, the court is of the opinion that said motion should be GRANTED / DENIED.

_____
JUDGE PRESIDING

Date: _____, 1994

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS


CAUSE NO. _____


THE STATE OF TEXAS            )
                              )
vs.                           )
                              )
YOUR CLIENT                   )


**DEFENDANT'S REQUESTED LESSER-INCLUDED OFFENSE INSTRUCTION ON FELONY-MURDER AND MEMORANDUM OF LAW IN SUPPORT THEREOF.**


Comes now the Defendant and requests that this Court submit the attached lesser-included offense instructions to the jury.

## ARGUMENT AND AUTHORITIES

### The unconstitutionality of Tex. Pen. Code § 8.04(a)

According to a Texas statute, "[v]oluntary intoxication does not constitute a defense to the commission of crime." Tex. Penal Code § 8.04(a) (Vernon's 1974).[1] In Jaynes v. State, 673 S.W.2d 198, 202 (Tex.Crim.App. 1984), the Texas Court of Criminal Appeals held that "when evidence came in [at trial] which might have led the jury to believe that appellant was intoxicated at the time of the offense and this might have contributed to [the defendant's] defense ..., it was appropriate for the court to instruct the jury" on § 8.04.

Texas is in the distinct minority of states that do not allow evidence of voluntary intoxication in the guilt-innocence determination for the purpose of showing whether a defendant had the capacity to form the requisite intent for a specific intent crime. Courts in at least thirty-eight states have found that, although a

---

[1] See also Ramos v. State, 547 S.W.2d 33 (Tex. Crim. App. 1977); Dubois v. State, 301 S.W.2d 97 (Tex. Crim. App. 1957); Scott v. Gardner, 156 S.W.2d 513, 517 (Tex. 1941) (citing Ferdandez v. State, 116 S.W.2d 1067); Evers v. State, 31 Tex. Crim. 318, 20 S.W. 744 (1892); Turner v. State, No. A14-89-00835-CR, 1991 Tex. App. LEXIS 3191 (Tex. App.--Houston Dec. 19, 1991), vacated on other grounds, remanded, 827 S.W.2d 333 (Tex. Crim. App. 1992); Pimentel v. State, 710 S.W.2d 764 (Tex. App.--San Antonio 1986); Witherspoon v. State, 671 S.W.2d 143 (Tex. App.--Houston 1984).

defendant may not show voluntary intoxication to negate the element of general criminal intent, when the crime requires proof of specific intent, the evidence of voluntary intoxication may be used for the purpose of showing the absence of such intent. Annotation, <u>Modern Status of the Rules as to Voluntary Intoxication as a Defense to a Criminal Charge</u>, § 4a, 8 A.L.R.3d 1236 ("[T]he courts of most jurisdictions have agreed that although voluntary intoxication may not be shown for the purpose of negativing general criminal intent, when the prosecution is for a specific intent crime, intoxication ... which precludes the formation of [specific] intent may be shown as a defense."); <u>see</u> <u>also</u> Annotation, <u>Effect of Voluntary Drug Intoxication upon Criminal Responsibility</u>, § 2a, 73 A.L.R.3d 98 ("[I]t is the general rule, uniformly subscribed to, that voluntary drug intoxication may not be used to completely exonerate one from criminal responsibility....This does not mean that voluntary intoxication can have no effect under any circumstance upon the criminal responsibility of the accused. No court seems to have gone that far [save Texas].")

Numerous other courts have held that a jury instruction that deprives a criminal defendant of the right to present evidence of his intoxication at the time of the crime in order to disprove specific intent is unconstitutional. <u>See</u> <u>Brown v. Fair</u>, 739 F.Supp. 39, 41 (D. Mass. 1990), <u>aff'd</u>, 930 F.2d 907 (1st Cir. 1991); <u>People v. Del Guidice</u>, 606 P.2d 840, 843 (Colo. 1979) ("This Court has indicated that evidence of voluntary intoxication is competent [evidence], as a matter of due process, to disprove specific intent when that mental state is an element of a crime charged."); <u>Terry v. State</u>, 465 N.E.2d 1085, 1088 (Ind. 1984) (state constitutional grounds); <u>Commonwealth v. Henson</u>, 476 N.E.2d 947, 953 (Mass. 1985); <u>see</u> <u>also</u> <u>United States v. Morgan</u>, 33 M.J. 1055, 1060 (A.C.M.R. 1991) ("[S]ociety ... in a very pragmatic manner warns the alcoholic drinker that ... some ... of [his] acts may be excused due to voluntary intoxication and subsequent loss of the ability to form specific intent. Such a result ... [is] in keeping with precepts of an enlightened society's concern with due process.").

Under Tex. Penal Code § 19.03, capital murder is a specific intent crime. <u>See</u> <u>Kinnamon v. State</u>, 791 S.W.2d 84 (Tex. Crim. App. 1990); <u>Morrow v. State</u>, 753 S.W.2d 372, 375-76 n.3 (Tex. Crim. App. 1988). Because § 8.04(a) denies a capital defendant of the right to a lesser-included offense instruction on non-capital homicide when there is evidence of intoxication at the time of the crime, § 8.04(a) violates the Eighth and

Fourteenth Amendments by permitting the jury to convict a defendant of a capital offense when a rational juror could have found that the defendant lacked the specific intent required to commit capital murder because of his intoxication.

The Supreme Court has held that a state cannot constitutionally limit a capital jury's discretion to convict of a lesser-included non-capital offense, at least when the evidence would permit a rational jury to acquit of the greater offense and convict of a lesser-included offense. See Beck v. Alabama, 447 U.S. 625 (1980) (holding that the absence of the option of convicting defendant of a lesser-included offense "introduce[s] a level of unreliability into the factfinding process that cannot be tolerated in a capital case"). In this case, § 8.04(a) would do just that: it would deprive the jury from having the option of convicting Defendant for a felony that did not require specific intent.

Accordingly, Defendant requests that this Court submit the above lesser-included offense instruction on felony murder.

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ___ day of _____, 1994.

_____

**IN THE DISTRICT COURT FOR THE ___ JUDICIAL DISTRICT,**
**_____ COUNTY, TEXAS**


CAUSE NO. _____


THE STATE OF TEXAS       )
                                 )
vs.                                  )
                                 )
YOUR CLIENT             )

**ORDER**

Upon consideration of Defendant's Motion for Requested Lesser-Included Offense Instruction on

Felony Murder, this Court is of the opinion that said motion should be GRANTED / DENIED.


_____
JUDGE PRESIDING


Date: _____, 1994

DEFENSE REQUESTED INSTRUCTION # ____

## SPECIFIC INTENT

TEXAS LAW REQUIRES THAT A DEFENDANT MUST HAVE POSSESSED THE "SPECIFIC INTENT" TO CAUSE DEATH IN ORDER TO BE CONVICTED OF CAPITAL MURDER. IF A DEFENDANT DID NOT HAVE THE SPECIFIC INTENT TO CAUSE DEATH BECAUSE OF THE EFFECTS OF DRUGS OR ALCOHOL ON HIS MENTAL CAPACITY AT THE TIME OF THE MURDER, THEN HE CANNOT BE CONVICTED OF CAPITAL MURDER. THE VOLUNTARY USE OF DRUGS OR ALCOHOL, HOWEVER, CANNOT ENTIRELY EXCULPATE A CRIMINAL DEFENDANT IF IT IS PROVEN BEYOND A REASONABLE DOUBT THAT THE DEFENDANT DID IN FACT COMMIT THE CRIMINAL ACTS ALLEGED IN THE INDICTMENT. RATHER, VOLUNTARY INTOXICATION THAT NEGATES SPECIFIC INTENT WILL ONLY PREVENT THE DEFENDANT FROM BEING CONVICTED OF A CRIME THAT REQUIRES SPECIFIC INTENT, SUCH AS CAPITAL MURDER. THE DEFENDANT CAN STILL BE CONVICTED OF A CRIME THAT DOES NOT REQUIRE SPECIFIC INTENT, SUCH AS FELONY MURDER.

DEFENSE REQUESTED INSTRUCTION # ____

## FELONY MURDER

A PERSON COMMITS "FELONY MURDER" IF HE COMMITS OR ATTEMPTS TO COMMIT A FELONY, OTHER THAN VOLUNTARY OR INVOLUNTARY MANSLAUGHTER, AND IN THE COURSE OF AND IN FURTHERANCE OF THE COMMISSION OR ATTEMPT, OR IN THE IMMEDIATE FLIGHT FROM THE COMMISSION OR ATTEMPT, HE COMMITS OR ATTEMPTS TO COMMIT AN ACT CLEARLY DANGEROUS TO HUMAN LIFE THAT CAUSES THE DEATH OF AN INDIVIDUAL.

IN THIS CASE, IF YOU FIND THAT THE DEFENDANT COMMITTED THE MURDER OF [NAME OF THE VICTIM] IN THE COURSE OF THE FELONY OF [RAPE?], BUT YOU HAVE A REASONABLE DOUBT ABOUT WHETHER THE DEFENDANT POSSESSED THE SPECIFIC INTENT TO KILL BECAUSE OF THE EFFECTS OF DRUGS OR ALCOHOL ON HIS MENTAL CAPACITY, THEN YOU SHOULD NOT FIND THE DEFENDANT GUILTY OF CAPITAL MURDER. RATHER, YOU SHOULD FIND THE DEFENDANT GUILTY OF THE OFFENSE OF FELONY MURDER.

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS


CAUSE NO. _____


| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| vs. | ) |
| | ) |
| YOUR CLIENT | ) |


**MOTION FOR THE ASSISTANCE OF A PSYCHIATRIST
ON THE ISSUES OF INSANITY AND MITIGATION**

**FILED "EX PARTE" AND UNDER SEAL**

COMES NOW the defendant, by and through undersigned counsel, and moves this Honorable Court to provide him with the assistance of a psychiatrist at the guilt/innocence and punishment stages of his trial. In support of this motion the defendant will show:


**STATEMENT OF FACTS**

[WHAT FOLLOWS MUST BE A DETAILED RECITATION OF THE FACTS LEADING YOU TO CONCLUDE AN EXPERT IS NECESSARY]

1. The defendant is charged with a capital offense. He is [FACTS -- an 18 year-old, mentally retarded young man, abused as a child and from an impoverished family].

2. Counsel was appointed by this Court to represent defendant because he cannot afford to pay for any of the costs of his defense. He proceeds in forma pauperis before this court.

3. Counsel conducted a thorough investigation of the crime that defendant is accused of and his character and background to determine whether he has a viable defense. After reading all of the discovery materials, the defendant's school records, prison records, medical records and interviewing many witnesses, counsel determined that his fate will depend on the jury's evaluation of his mental condition.

4. Counsel expects the state to prove with the [EVIDENCE -- defendant's signed confession and the

testimony of two eyewitnesses] that he [FACTS OF CRIME -- ESPECIALLY ANY INDICATING MENTAL

ILLNESS, ADDICTION, INTOXICATION, ETC. -- kidnapped and killed a man he told the police he believed

was the devil's functionary named "Ozzy."]

5. The defendant has cooperated with counsel as best as he can and understands [doesn't understand]

the charges against him.   The defendant's description of the incident strongly suggests that he was suffering

from some sort of a severe mental problem that profoundly affected his thoughts and behavior at the time of the

offense.[2]

6. The defendant's grade school records reveal that he was diagnosed as mentally retarded and placed

in special education classes when he was six years old.  See Exhibit A.  In the fifth grade, a school nurse urged

his mother to take him to a clinic where free psychiatric treatment was available.  The defendant's mother was a

severe alcoholic who regularly beat her son with a leather whip.  She never took the defendant to the clinic for

assistance or counseling.

7. When the defendant was 13, he set fire to a neighbor's house because he believed that it was

haunted.  He was convicted of arson and spent two years in a reform school.  There, he started to sniff glue,

inhale gasoline, drink narcotic cough syrup, and consume mass quantities of beer.  This frequent intoxication

led to some minor involvements with the law (public intoxication, disorderly conduct).

8. When the defendant was 16, he was arrested for disorderly conduct.  Placed in the county jail with

adults, he was anally raped and nearly beaten to death.  He began to engage in irrational violent acts after he

recovered from his head injuries.

9. The defendant was later convicted of assault and sentenced to two years in prison in 1991.  A

psychologist at the Rusk Institute diagnosed him as borderline mentally retarded with an antisocial personality

disorder.  He was treated for frequent migraine headaches while he was serving his sentence.  See Exhibit B.

10. On January 9, 1994, counsel asked Dr. _____ to review his file and help him determine

---

[2]When a trial judge reads an Ake motion that describes the defendant as seriously mentally ill, he
may feel that it is necessary to protect the record by ordering a neutral psychiatrist to perform a
competency examination. Counsel can usually avoid this by assuring the court in the motion that the
defendant is competent to stand trial.   This tactic does not involve any risk because counsel can
request a competency trial after an Ake psychiatrist examines the defendant.

whether he needed the assistance of a psychiatrist to defend this case. The doctor is a forensic psychiatrist from Dallas. He has testified for the state and the defense in over 200 criminal trials in Texas and many other jurisdictions. He is a professor at Baylor University and a consultant to the Texas Department of Corrections. He has written several books and scientific articles about mental retardation and the long term emotional effects of child abuse. His curriculum vitae is attached to this motion in Exhibit C.

      11. Dr. _____ may provide favorable testimony about Johnny's mental condition at the time of the offense. Dr. _____ believes that the defendant was so severely impaired that he may have been legally insane. See Affidavit of Dr. _____, Exhibit D. Dr. _____ also believes that the defendant's mental retardation may have been caused by organic brain damage. He needs to examine the defendant to arrive at a definite diagnosis because psychological tests that were performed at the Rusk Institute when the defendant was incarcerated were not designed to detect this serious mental defect. See Exhibit D.

      12. Dr. _____ also believes that the defendant's history of being physically abused as a child probably caused long term emotional problems that contributed to his violent behavior as a young man. See Exhibit D.

      13. Dr. _____ is available to examine the defendant, and assist in the evaluation, preparation and presentation of his defense. His standard charge in court appointed cases is $150 per hour plus expenses.

      14. Counsel believes that Dr. _____ is highly qualified to assist him. Dr. _____ was recommended to counsel by two local attorneys who retained him as an expert witness. Counsel has developed an excellent relationship with him and is impressed by the work that he has done thus far without compensation.

      15. Counsel has determined that there is no psychiatrist in _____ County who is qualified to assist him in this unusually complex case. There are psychiatrists in the area, but they do not have specialized knowledge of mentally retarded criminal defendants and child abuse.

## ARGUMENT AND AUTHORITIES

### THE DEFENDANT IS ENTITLED TO THE ASSISTANCE OF A PSYCHIATRIST UNDER THE RULE OF AKE v. OKLAHOMA.

16. In the landmark case of Ake v. Oklahoma, 470 U.S. 68 (1985), the Supreme Court held that an indigent defendant is entitled to access to a competent psychiatrist to assist his attorney in the evaluation, preparation and presentation of his defense when he makes an ex parte threshold showing to the trial judge that his mental condition is likely to be a significant factor at the guilt or punishment stage of his trial.

17. In DeFreece v. State, 848 S.W.2d 150 (Tex. Crim. App. 1993), the Court of Criminal Appeals held that Ake requires access to an adversarial psychiatrist who will "provide technical assistance to the accused, to help evaluate the strength of his defense, to offer his own expert diagnosis at trial if it is favorable to that defense, and to identify the weaknesses in the state's case." 848 S.W.2d at 159. An "examination by a 'neutral' psychiatrist" pursuant to Art. 46.03, V.A.C.C.P., is not a constitutionally acceptable option. DeFreece v. State, 848 S.W.2d at 159.

18. The defendant has easily met his burden of showing that his mental condition will be a significant factor at the guilt and punishment stages of the trial. Dr. _____'s affidavit is sufficient by itself to make that showing because he swore that he can or probably will provide favorable testimony for the defense on the crucial issues of insanity, DeFreece v. State, 848 S.W.2d at 160 (opinion of psychiatrist that defendant was schizophrenic established that his sanity was likely to be a significant factor, even though the psychiatrist did not give an opinion about that issue), and mitigation of punishment. See Smith v. McCormick, 914 F.2d 1153 (9th Cir. 1990) (fact that defendant was intoxicated on LSD at time of capital murder established that he was entitled to the assistance of a psychiatrist at the punishment stage), cited with approval in, DeFreece, 848 S.W.2d at 157.

19. In Richard v. State, 842 S.W.2d 279 (Tex. Crim. App. 1992), a death sentence was reversed because the jury did not have a vehicle to consider the testimony of a defense psychiatrist that a mentally retarded defendant acquired an antisocial personality disorder because of the long term emotional effects of child abuse. Dr. _____ is capable of supplying similar testimony in this case. However, without the release of adequate funds by this Court, the jury will not be able to consider this critical evidence when deciding

the ultimate issues in this case.

> B. THE STATE HAS NO RIGHT TO PARTICIPATE IN THIS EX PARTE <u>AKE</u> MOTION AND THE DEFENDANT HAS THE SAME RIGHT TO  CONFIDENTIAL ASSISTANCE FROM DR. _____  AS HE WOULD IF HE RETAINED HIM WITH HIS OWN MONEY.

21. The Supreme Court held in <u>Ake v. Oklahoma</u> that a defendant has a right to make his showing of need for a psychiatrist to the trial judge in an ex parte proceeding. 470 U.S. at 82.  It would defeat the Supreme Court's attempt to treat indigent and wealthy defendants equally if the state was allowed to participate in or even know about an <u>Ake</u> motion because a poor person would have to disclose privileged information to obtain psychiatric assistance and a wealthy defendant would not. <u>Brooks v. State</u>, 385 S.E.2d 81, 84 (Ga. 1989); <u>McGregor v. State</u>, 733 P.2d 416 (Okla. Crim. App. 1987); <u>State v. Poulsen</u>, 726 P.2d 416 (Okla. Crim. App. 1987); <u>State v. Hickey</u>, 346 S.E.2d 646, 654 (N.C. 1986); <u>Wall v. State</u>, 715 S.W.2d 208, 209 (Ark. 1986).

22. In <u>DeFreece v. State</u>, the Court of Criminal Appeals held that an <u>Ake</u> psychiatrist's communications with the defendant and counsel and work product are confidential because he is an agent of counsel. 848 S.W.2d at 161 n.8 (citing Tex.R.Crim.Evid., Rule 503 (a)(4) (b)); <u>see also</u> <u>Ballew v. State</u>, 640 S.W.2d 237 (Tex. Crim. App. 1980) (on rehearing) (defense psychiatrist's opinion and report are covered by attorney-client privilege until he testifies); <u>Smith v. McCormick</u>, 9144 F.2d at 1158-59 (death sentence reversed under <u>Ake</u> because trial judge refused to provide confidential assistance from psychiatrist to develop mitigating evidence).

23. This motion vividly illustrates why a poor defendant must have an opportunity to seek psychiatric assistance in secret because it contains many privileged facts and a road map of counsel's trial strategy.  The defendant's trial presentation would be crippled if the district attorney obtained a copy of it.

26. Furthermore, fundamental fairness requires that the state be excluded from the process of determining whether the defendant is entitled to the assistance of an expert in a trial for his life. The defendant has no say in how the State of Texas will use its unlimited resources to seek his execution.  Further,  the district attorney is under no comparable requirement and does not have to ask the court for permission to hire experts.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, the defendant respectfully requests that the court:

1) order the immediate payment of a $1,000 retainer to Dr. _____.

2) order that Dr. _____ shall be paid $150 per hour to perform an appropriate examination and assist the defendant in the evaluation, preparation and presentation of his defense.

3) order the sheriff to allow Dr. _____ to have the same confidential access to the defendant as his attorney.

4) in the alternative, set an ex parte hearing on this motion to give counsel an opportunity to present additional evidence and arguments in support of it.

5) seal this motion and the orders and make them part of the record for an appeal.

Respectfully submitted,

_____

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ____ day of _____, 1994.

_____

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS


CAUSE NO. _____


THE STATE OF TEXAS                    )
                                      )
vs.                                   )
                                      )
YOUR CLIENT                           )


## MOTION FOR FUNDS TO PERFORM ADDITIONAL TESTS THAT ARE NECESSARY TO COMPLETE AN APPROPRIATE PSYCHIATRIC EXAMINATION

### FILED "EX PARTE" AND UNDER SEAL

COMES NOW the Defendant, by and through undersigned counsel, and moves this Honorable Court to

provide him with funds for additional tests that, in the judgment of his court appointed psychiatrist, are

necessary to perform an adequate and appropriate examination.

### STATEMENT OF FACTS

1. On March 2, 1994, the Court granted the defendant's <u>Ake v. Oklahoma</u> motion for funds to retain

Dr. _____ to "perform an appropriate examination" and assist counsel in the evaluation, preparation

and presentation of the defense.

2. Dr. _____ examined the defendant in his jail cell on March 9 and March 12.  He

performed a mental status examination, administered a Wechsler I.Q. test, an MMPI test and a Halstead-Retain

Battery.

3. The results of these tests produced information and evidence that is favorable to the defense theory

of the case, both at guilt/innocence and at punishment.  However, these tests have proven somewhat

inconclusive with respect to the crucial issue of organic brain damage.  The Halstead-Reitan Battery is a seven

hour long test that is specifically designed to detect brain damage, but the defendant proves to be so mentally

retarded that he was not able to complete it.

4. Dr. _____ believes that the defendant's brain may have been damaged at birth because

hospital records indicate that there were severe complications. See Exhibit A. The defendant has also sustained two head injuries that could have damaged his brain. See Exhibit B.

5. There are three scientific tests that Dr. _____ must perform to confirm his tentative diagnosis: Pet-Skan, Cat-Skan and EEG. Each of these tests provides vital information about a different part of the brain that cannot be obtained in any other way. See Affidavit of Dr. _____ in Exhibit C.

6. The defendant must be moved to a large psychiatric teaching hospital, such as the one at Baylor University, to have these tests performed. Dr. _____ is qualified to order the tests and explain them to a jury, but he will require the assistance of a specialist to administer them and interpret the raw data. He estimates that the total cost of the tests will be about $5,000. See Exhibit C.

7. Dr. (another available expert) is available to administer and interpret the tests. Dr. _____ is a neurologist and a professor at Baylor University Medical School who has performed Pet-Skan, Cat-Skan and EEG tests for Dr. _____ in the past. A copy of Dr. _____ curriculum vitae is attached to this motion in Exhibit D.

8. These tests are crucial to the defense because the court appointed expert cannot say with a reasonable degree of medical certainty whether the defendant has organic brain damage until they are performed. If the tests are positive, as he anticipates that they will be, he will be able to tell the jury that the defendant's ability to control his impulses, understand the consequences of his conduct and learn from his mistakes was profoundly impaired by a severe brain injury. See Exhibit C.

8. A diagnosis of organic brain damage will also enable Dr. _____ to explain why the psychologist at the Rusk Institute mistakenly found that the defendant was suffering from a personality disorder. Organic brain damage can cause a person to engage in the same violent behavior as an antisocial personality disorder. If the additional tests for brain damage are not performed, counsel may not be able to take the risk of putting Dr. _____ on the stand because he will have to concede that there is a possibility that the defendant has an antisocial personality disorder. See Exhibit C.

## ARGUMENT AND AUTHORITIES

9. It would violate the defendant's rights under Ake v. Oklahoma, 470 U.S. 68 (1985), to deny his request for these tests because Ake requires "an appropriate examination," as well as access to a competent psychiatrist. 470 U.S. 83. It is beyond dispute that these tests are necessary for Dr. _____ to perform an appropriate examination. The appointed expert's recommendation is based on an extremely thorough preliminary examination and a thoughtful study of the case. As the expert who was appointed by this Court to perform an appropriate examination of the defendant, he is clearly the best judge of what tests are needed to complete the evaluation.

10. The legal significance of the tests should be obvious to anyone who is familiar with the facts of Penry v. Lynaugh, 492 U.S. 302 (1989). The Supreme Court reversed Penry's death sentence because the jury did not have a vehicle to consider psychiatric testimony about his organic brain damage as a mitigating factor. The defendant will not even have a vehicle to present that mitigating evidence, if the court refuses to pay for the additional tests that are necessary to prove that he has organic brain damage.

11. In Buttrum v. Black, 721 F.Supp. 1268 (N.D. Ga. 1989), aff'd, 908 F.2d 695 (11th Cir. 1990), a death sentence was reversed because the trial judge gave the defendant access to a competent psychiatrist and denied her request for additional tests that were necessary to her defense at the punishment stage. The same result is likely to happen if the court denies this motion at this stage in the litigation.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, the Court must:

1) order the defendant to be transported by the sheriff to Baylor University Hospital in Houston, Texas.

2) authorize payment for Dr. _____ to perform Pet-Skan, Cat-Skan and EEG tests at that facility and provide any assistance with respect to those tests that Dr. _____ deems necessary to evaluate, prepare or present the defense.

3) in the alternative, set an ex parte hearing on this motion to give counsel an opportunity to present evidence and arguments in support of it.

4) seal this motion and the orders requested in it.

Respectfully submitted,


_____

COUNSEL FOR DEFENDANT


## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ____ day of _____, 1994.


_____

IN THE DISTRICT COURT FOR THE ___ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS


CAUSE NO. _____


THE STATE OF TEXAS           )
                             )
vs.                          )
                             )
YOUR CLIENT                  )


MOTION FOR THE ASSISTANCE OF A PSYCHIATRIST
ON THE ISSUE OF FUTURE DANGEROUSNESS

FILED "EX PARTE" AND UNDER SEAL

COMES NOW the Defendant, by and through undersigned counsel, and moves this Honorable Court to provide him with a psychiatrist to assist counsel in evaluating, preparing and presenting his defense on the issue of future dangerousness. In support of this motion, the defendant will show that:

STATEMENT OF FACTS

1. The defendant is charged with a capital offense. He is indigent and cannot afford to pay for any of the costs of his defense.

2. The defendant is represented by a court appointed attorney. The defendant proceeds in forma pauperis before this Court.

3. Counsel has determined after thoroughly investigating the case that the defendant does not have an airtight defense to the charge of capital murder. Counsel can anticipate that his client may be found guilty of that charge. Therefore, the critical issue in the defense of this case will be the State's ability to convince the jury that the defendant should be sentenced to death.

4. Counsel expects the prosecution to present psychiatric testimony about the issue of future dangerousness at the punishment stage because he has done this in seven previous capital trials (Cite names of cases and cause numbers). In each of these cases, the infamous Dr. Death, James Grigson, testified for the

82

state in response to a hypothetical question that the defendant was a severe sociopath who would definitely kill again, even if he was confined in a prison. The jury imposed the death penalty in every one of these cases.

5. Counsel has determined, by interviewing the defense attorneys and several of the jurors in these cases, that Dr. Grigson's testimony had a tremendous impact. As one juror put it, "after I heard that ol' boy testify, I wanted to climb out of the jury box and stick the needle right in the defendant's eye!"

6. Counsel believes that the jury's answer to the future dangerousness issue in this case will depend on whether they accept the State's proffered expert testimony. The facts of this crime are aggravated and the defendant has five convictions for non-violent burglary and auto theft charges and he has no history of violence in prison.

7. Counsel has asked Dr. _____ to review the case and determine whether he could be of any assistance to the defense on the issue of future dangerousness. Dr. _____ is a forensic psychiatrist from Austin. He has published fifteen books and scientific studies about predicting future violence and testified as an expert witness in that subject in the courts of Texas and several other states. His article about Dr. Grigson appeared in the prestigious American Journal of Forensic Psychiatry. His curriculum vitae is attached to this motion in Exhibit A.

8. Even if the State chooses not to call an expert at the punishment phase of this capital trial, Dr. _____ is willing and able to testify regarding the likelihood of violence on death row and the likelihood that the defendant would pose a continuing threat to society outside of prison in 40 years.

9. Further, Dr. _____ is prepared to testify for the defense that answers to hypothetical questions about future dangerousness are wrong more often than they are right and advise counsel about how to cross-examine any expert witness called by the State. Dr. _____'s affidavit is attached to this motion in Exhibit B. His fee is $100 per hour plus expenses.

## ARGUMENT AND AUTHORITIES

A. UNDER THE RULE OF AKE v. OKLAHOMA, THE DEFENDANT IS ENTITLED TO THE ASSISTANCE OF A PSYCHIATRIST ON THE ISSUE OF FUTURE DANGEROUSNESS.

9. In the landmark case of Ake v. Oklahoma, 470 U.S. 68 (1985), the Supreme Court held that an

indigent defendant is entitled to access to a competent psychiatrist to assist his attorney in the evaluation,

preparation and presentation of his defense when he makes an ex parte threshold showing to the trial judge that

his future dangerousness is likely to be a significant factor at the punishment stage of his trial.

10. In DeFreece v. State, 848 S.W.2d 150 (Tex. Crim. App. 1993), the Court of Criminal Appeals

held that Ake requires access to an adversarial psychiatrist who will "provide technical assistance to the

accused, to help evaluate the strength of his defense, to offer his own expert diagnosis at trial if it is favorable

to that defense, and to identify the weaknesses in the state's case." 848 S.W.2d at 159. An "examination by a

'neutral' psychiatrist" is not a constitutionally acceptable option, DeFreece v. State, 848 S.W.2d at 159, and

Texas law does not permit the court to appoint a neutral expert to perform a future dangerousness examination.

Bradford v. State, ___ S.W.2d ___, No. 71,048, slip op. at 9 (Tex. Crim. App. June 9, 1993).

11. The issue of future dangerousness is always a necessary predicate to the imposition of death at the

punishment stage of a capital trial in Texas. See Art. 37.07(2)(b)(1), V.A.C.C.P. When the state presents

testimony from a "killer shrink," as it will here, the defendant must have the ability to present the "'opposing

views of'" a psychiatrist like Dr. _____ who is "competent to 'uncover, recognize, and take due

account of... shortcomings' in predictions on this point.... Without a psychiatrist's assistance, the defendant

cannot offer a well-informed expert's opposing view, and thereby loses a significant opportunity to raise in the

jurors' minds questions about the State's proof of an aggravating factor. In such a circumstance...the

consequence of error is..great, the relevance of responsive psychiatric testimony...evident." Ake, 470 U.S. at

84 (citation omitted).

12. It would be fundamentally unfair to allow the State to secure, without prior court notice or

approval, an expert to testify at punishment without giving the defendant similar assistance of an expert in future

dangerousness. The late Judge Marvin Teague of the Texas Court of Criminal Appeals put it best when he

stated:

> After having read many records of capital murder cases in which Dr. Grigson testified at the
> punishment stage of the trial, I have concluded that, as a general proposition, when Dr.
> Grigson speaks to a lay jury, an uninformed jury about a person whom he characterizes as a
> "severe" sociopath, which a defendant who has been convicted of capital murder always is in
> the eyes of Dr. Grigson, the defendant should stop what he is then doing and commence
> writing out his last will and testament -- because he will in all probability soon be ordered by

the trial judge to suffer a premature death. Many attorneys have challenged Dr. Grigson, but few have succeeded in those capital murder cases in which Dr. Grigson testified at the punishment stage of a capital murder trial....

Bennett v. State, 766 S.W.2d 227, 232 (Tex. Crim. App. 1989) (Teague. J., dissenting).

13. Likewise, the State's unchallenged presentation of an expert in this case on the issue of future dangerousness cannot but work the same effect. Counsel for the defendant should not be forced to question the State's expert on the determinative issue of future dangerousness without the assistance of an expert of his own.

### B. THE STATE HAS NO RIGHT TO PARTICIPATE IN THIS EX PARTE AKE MOTION AND THE DEFENDANT HAS THE SAME RIGHT TO CONFIDENTIAL ASSISTANCE FROM DR. COYOTE AS HE WOULD IF HE RETAINED HIM WITH HIS OWN MONEY.

14. The Supreme Court held in Ake v. Oklahoma that a defendant has a right to make his showing of need for a psychiatrist to the trial judge in an ex parte proceeding. 470 U.S. at 82. It would defeat the Supreme Court's attempt to treat indigent and wealthy defendants equally if the state was allowed to participate in or even know about an Ake motion because a poor person would have to disclose privileged information to obtain psychiatric assistance and a wealthy defendant would not. Brooks v. State, 385 S.E.2d 81, 84 (Ga. 1989); McGregor v. State, 733 P.2d 416 (Okla. Crim. App. 1987); State v. Poulsen, 726 P.2d 416 (Okla. Crim. App. 1987); State v. Hickey, 346 S.E.2d 646, 654 (N.C. 1986); Wall v. State, 715 S.W.2d 208, 209 (Ark. 1986).

15. In DeFreece v. State, the Court of Criminal Appeals held that an Ake psychiatrist's communications with the defendant and counsel and work product are confidential because he is an agent of counsel. 848 S.W.2d at 161 n.8 (citing Tex.R.Crim.Evid., Rule 503(a)(4)(b)); see also Ballew v. State, 640 S.W.2d 237 (Tex. Crim. App. 1980) (on rehearing) (defense psychiatrist's opinion and report are covered by attorney-client privilege until he testifies); Smith v. McCormick, 914 F.2d at 1158-59 (death sentence reversed under Ake because trial judge refused to provide confidential assistance from psychiatrist to develop mitigating evidence).

16. Additionally, fundamental fairness requires that the state be excluded from the process of determining whether the defendant is entitled to the assistance of an expert in a trial for his life. Neither the defendant, undersigned counsel, or this Court have any say in how the State of Texas will use its unlimited resources to seek a sentence of death. Further, unlike the defendant, the district attorney does not have to ask

the court or the county for funds to hire experts at the punishment phase of a capital case.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, the court must:

1)      order the payment of a $500 retainer to Dr. _____.

2)      order that Dr. _____ shall be paid at the rate of $100 per hour to assist counsel in the
evaluation, preparation and presentation of the defense.

3)      in the alternative, set an ex parte hearing on this motion to give counsel an opportunity to present
evidence and arguments in support of it.

4)      seal the record of the hearing and any orders entered on this motion.


                                        Respectfully submitted,



                                        _____

                                        COUNSEL FOR DEFENDANT


## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand
upon counsel for the prosecution on this ____ day of _____, 1994.




                                        _____

IN THE DISTRICT COURT FOR THE ____ JUDICIAL DISTRICT,
_____ COUNTY, TEXAS


CAUSE NO. _____


THE STATE OF TEXAS                    )
                                      )
vs.                                   )
                                      )
YOUR CLIENT                           )


## MOTION FOR THE ASSISTANCE OF AN EXPERT
## IN [A SUBJECT UNRELATED TO PSYCHIATRY]

### FILED "EX PARTE" AND UNDER SEAL

COMES NOW the Defendant, by and through undersigned counsel, and moves this Honorable Court to give him sufficient funds to allow him access to an expert in [SUBJECT] to assist counsel in the evaluation, preparation and presentation of the defense. In support of this motion, the defendant will show that:

### STATEMENT OF FACTS

1. The defendant is charged with a capital offense. He is an illiterate migrant fruit picker with a wife and 10 children. He had no criminal record before he was arrested in this case.

2. Counsel was appointed by this Court to represent the defendant because he cannot afford to pay for any of the costs of his defense. The defendant proceeds in forma pauperis before this Court.

3. On [DATE], counsel demanded a list of all of the expert witnesses that the state intends to call at the trial. The district attorney refused to provide the list and the Court denied counsel's request for an order to turn it produce that list at this time.

4. Counsel has determined from his review of the evidence that was disclosed to him by the state and a thorough independent investigation of the case that the state will have to present testimony from an expert in [SUBJECT] to prove the allegations in the indictment.

5. Counsel has determined that the evidence at the trial will show that [EVIDENCE -- give a short summary of the testimony of non-expert witnesses and physical evidence that leaves open a crucial issue that can

87

only be resolved with expert testimony).

6. The state will have to present the testimony of an expert in [SUBJECT] to prove [NECESSARY ELEMENT OF THE OFFENSE] because there is no other evidence that [FACTS -- fact that will prove the element: e.g. the victim was shot with the defendant's .357 magnum; the defendant had fibers from the victim's rug on his shoes; the victim was raped).

AND/OR

The defendant will be convicted, unless he can create a reasonable doubt about [NECESSARY ELEMENT OF THE CRIME] by proving with the testimony of an expert in [SUBJECT] that [FACTS -- fact that will disprove the element: e.g. the victim drowned; the victim was not raped; the victim's front door was not forced open with a screwdriver].

7. Counsel has consulted with Dr. _____ to determine whether he needs the assistance of an expert. Dr. _____ is (describe the highlights of his resume). His curriculum vitae is attached to this motion in Exhibit A.

8. Counsel is convinced that he cannot possibly provide the defendant with effective representation without Dr. _____ assistance. Dr. _____ advised counsel that the opinion of the state's doctor can be impeached if he (performed the wrong test, misinterpreted the test, used an unreliable standard, contaminated the sample, etc.). Counsel will not be able to effectively cross-examine the state's expert if an expert does not advise him about these highly complex scientific issues.

9. Moreover, Dr. _____ advised counsel that an independent test may provide favorable evidence for the defense. Dr. _____ has testified in dozens of cases where his own tests disclosed that the state's expert was wrong.

10. Dr. _____ is available to perform an appropriate test for the defendant and participate in the evaluation, preparation and presentation of the defense. His fee in court appointed cases is $200 per hour plus expenses.

## ARGUMENT AND AUTHORITIES

A. THE DEFENDANT IS ENTITLED TO THE ASSISTANCE OF AN
EXPERT TO EXERCISE HIS RIGHT TO INSPECT THE (NAME
EVIDENCE) UNDER THE RULE OF MCBRIDE V. STATE AND AKE V.
OKLAHOMA.

11. In the landmark case of Ake v. Oklahoma, 470 U.S. 68 (1985), the Supreme Court held that due

process requires that an indigent defendant be provided with the assistance of an expert when it is one of the

"basic tools of an adequate defense." 470 U.S. at 77.

12. Ake v. Oklahoma applies to any kind of an expert whose assistance is necessary for an adequate

defense. See, e.g., Caldwell v. Mississippi, 472 U.S. 320, 323-24 n.1 (1985); McBride v. State, 838 S.W.2d

248(Tex. Crim. App. 1993)Terry v. Rees, 985 F.2d 283, 284-85 (6th Cir. 1993); Tibbs v. State, 819 P.2d

1372, 1376 (Okla. Crim. App. 1991). In McBride v. State, for example, the Court of Criminal Appeals held

that a defendant was denied due process because the trial court denied his request for an expert to test the drugs

that he was accused of possessing.

13. Ake applies with maximum force in capital cases. When a expert testifies about a fact for the state

in a capital trial, "that fact must be determined with the high regard for truth that befits a decision affecting the

life or death of a human being." Ford v. Wainwright, 477 U.S. 399, 411 (1986). A capital defendant must

have an "opportunity to clarify or challenge the state experts' opinions or methods" with the assistance of his

own expert because there is a "particularly acute need for guarding against error" when the opinion of one

witness can determine whether he lives or dies. Id. 477 U.S. at 412 (citing Ake).

14. To obtain the assistance of an expert, the defendant only has to show that expert testimony is likely

to be a significant factor at his trial. Ake v. Oklahoma, 470 U.S. at 82-83. He does not have to demonstrate

that an expert is likely to have a favorable opinion, DeFreece v. State, 848 S.W.2d 150, 160-61(Tex. Crim.

App. 1993), or the state's expert is likely to be wrong. McBride v. State, 838 S.W.2d at 251 n.7.

15. The defendant in this case has demonstrated that expert testimony about (issue) will be a significant

factor at his trial because the state has no other way to prove (fact alleged in the indictment) and Dr.

_____ may be able to discredit or rebut this evidence.

16. Moreover, the defendant is entitled to the assistance of an expert because there is no other way for him to meaningfully exercise his right to inspect (identify the tangible evidence to be tested). McBride v. State, 838 S.W.2d at 250-51. In McBride, a conviction was reversed because the court refused to provide a chemist for the defendant to independently test the drugs he was accused of possessing. He did not make any showing to the trial judge that the state's chemist might have been wrong about the identity of the substance. 838 S.W.2d at 251 n.7. The Court of Criminal Appeals held that he was entitled to an expert under Ake because the drugs were made available for his inspection pursuant to Art. 39.14, V.A.C.C.P., and a visual inspection was meaningless. 848 S.W.2d 249-52. A visual inspection of the [IDENTIFY THE EVIDENCE] would be equally futile here.

17. McBride is not limited to chemists. The Court of Criminal Appeals held that an indigent defendant is also entitled to an expert to independently test "'a fingerprint, bullet, pistol, rifle, book or record'" when he has a right to inspect that evidence. McBride v. State, 838 S.W.2d at 250 (citation omitted).

18. In the present case, the defendant's right to independently test the [EVIDENCE] is not an issue because the court has already ordered the state to make it available for inspection pursuant to his Art. 39.14 motion. The only question is whether the defendant will be limited to a "'visual examination'" that cannot possibly divulge anything of probative value" because he is too poor to hire an expert to test it. McBride v. State, 838 S.W.2d at 250 n.8 (citation omitted). McBride held that the answer to that question must be no.

> ### B. THE STATE HAS NO RIGHT TO PARTICIPATE IN THIS EX PARTE AKE MOTION AND THE DEFENDANT HAS THE SAME RIGHT TO CONFIDENTIAL ASSISTANCE FROM DR. _____ AS HE WOULD IF HE RETAINED HIM WITH HIS OWN MONEY.

19. The Supreme Court held in Ake v. Oklahoma that a defendant has a right to make his showing of need for an expert to the trial judge in an ex parte proceeding. 470 U.S. at 82. It would defeat the Supreme Court's attempt to treat indigent and wealthy defendants equally if the state was allowed to participate in or even know about an Ake motion because a poor person would have to disclose privileged information to obtain an expert and a wealthy defendant would not. Brooks v. State, 385 S.E.2d 81, 84 (Ga. 1989); McGregor v. State, 733 P.2d 416 (Okla. Crim. App. 1987); State v. Poulsen, 726 P.2d 416 (Okla. Crim. App. 1987); State v. Hickey, 346 S.E.2d 646, 654 (N.C. 1986); Wall v. State, 715 S.W.2d 208, 209 (Ark. 1986).

20. In <u>DeFreece v. State</u>, the Court of Criminal Appeals held that an <u>Ake</u> expert's communications with the defendant and counsel and work product are confidential because he is an agent of counsel. 848 S.W.2d at 161 n.8 (citing Tex.R.Crim.Evid., Rule 503 (a)(4) (b)); <u>see also</u> <u>Ballew v. State</u>, 640 S.W.2d 237 (Tex. Crim. App. 1980) (on rehearing) (defense psychiatrist's opinion and report are covered by attorney-client privilege until he testifies); <u>Smith v. McCormick</u>, 9144 F.2d at 1158-59 (death sentence reversed under <u>Ake</u> because trial judge refused to provide confidential assistance from expert).

21. Furthermore, fundamental fairness requires that the state be excluded from the process of determining whether the defendant is entitled to the assistance of an expert in a trial for his life.  Neither this Court, the defendant, nor counsel for defendant  have any say in how the State of Texas will use its unlimited resources to secure a sentence of death.  Further, unlike the defendant, the district attorney does not have to seek prior approval of this Court or of the County for permission to hire experts.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, the court must

1)      order the payment of a $1,000 retainer to Dr. _____

2)      order the payment of $150 per hour to Dr. _____ to perform an appropriate examination and assist counsel in the evaluation, preparation and presentation of the defense.

3)      in the alternative, set an ex parte hearing on this motion to give counsel an opportunity to present evidence and arguments in support of it.

4)      seal the record of the hearing and any orders entered on the motion.


Respectfully submitted,




_____

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served by hand upon counsel for the prosecution on this ___ day of _____, 1994.

_____