**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **ANTHONY MEDINA,** | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | **H-09-CV-3223** |
| | § | |
| **RICK THALER,** | § | **THIS IS A CAPITAL CASE.** |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional Institutions** | § | |
| **Division,** | § | |
| **Respondent.** | § | |

**SECOND AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**

Robert L. McGlasson
Texas Bar No. 13634050
Attorney at Law
1024 Clairmont Ave.
Decatur , GA 30030
TEL: 404-314-7664
FAX: 404-879-0005
Email: rlmcglasson@comcast.net

James William Marcus
Texas Bar No. 00787963
Capital Punishment Clinic
University of Texas School of Law
727 E. Dean Keeton Street
Austin , Texas  78705
TEL: 512-232-1475
FAX: 512-232-9171
Email: jmarcus@law.utexas.edu

Counsel For Petitioner Anthony Medina

# TABLE OF CONTENTS

PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.  The Crime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  The Investigation: A Case Built on Witnesses Who Lied to the Police. . . . . . . . . . . . . . 3

A.  The shooter:  Dominic "Flaco" Holmes or Anthony Medina?. . . . . . . . . . . . . 3

B.  Doing "what needed to be done in an attempt to locate possible
witnesses or suspects, who were present in the car": HPD used
promises, coercion, threats, and physical violence to extract
statements identifying Mr. Medina as the shooter from kids as
young as 13 years old. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

C.  An inconvenient truth: forensic evidence emerges proving that
Flaco (and perhaps his friends) hid the murder weapon and then
lied about it in their statements to the police. . . . . . . . . . . . . . . . . . . . . . . . . . 20

D.  The grand jury proceedings: witnesses change their stories,
punishment is reserved only for witnesses who do not fully
cooperate with the prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.  "Lethal Counsel": Mr. Medina's Defense Was Entrusted to "A Lawyer Known
Best for Losing Capital Cases". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A.  Mr. Medina's was one of *four* (4) capital cases tried by Mr.
Guerinot during the 6 ½ months he represented Mr. Medina; Mr.
Guerinot was also handling 174 other cases during this period and
had a part-time job as prosecutor for the City of Humble; and no
other member of the defense team picked up the slack for Mr.
Guerinot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B.  Defense counsel's "failure to conduct even [a] rudimentary
investigation[]". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1.  The 30 hours of investigative services, to prepare
for *both* phases of the trial, was facially inadequate. . . . . . . . . . . . . . . . . 31

2.   Trial counsel's files are devoid of any indication that they personally investigated the case. . . . . . . . . . . . . . . . . . . . . . . . 35

IV.   "He Doesn't Even Pick the Low-Hanging Fruit Which Is Hitting Him in the Head as He's Walking under the Tree":  Defense Counsel Were Unprepared to Challenge Prosecution Witnesses on Glaringly Obvious, Material Inconsistencies Throughout the Guilt/innocence Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.   The prosecution's theory: Tony Medina—who had some kind of personal grudge against the intended victim—was the shooter and the only person in a carload of seven who even had any idea there would be a shooting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B.   The only forensic evidence at trial relevant to the identity of the shooter pointed to Flaco. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

C.   Resolving the prosecution's identity crisis: putting the murder weapon back in Mr. Medina's hands; and new and improved (and perjured?) stories from the prosecution's star witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

1.   Witnesses who saw Mr. Medina with a gun on the night of the shooting but could not find him in the courtroom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

2.   Flaco and his friends make the State's case:  "As far as identifying the shooter, that was all we had.  So without the other gang members testifying, [Mr. Medina] would have been found not guilty". . . . . . . . . . . . . . . . . . . . . . . 50

V.   The Defense—No Thanks to Defense Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

VI.   Closing Arguments that Never Should have Happened. . . . . . . . . . . . . . . . . . . . . . . . . 68

VII.   Defense Counsel Devoted Little More Than *One (1) Hour* to their Case for a Life Sentence; the Entire Punishment Phase Trial Consumed Less Than 3.5 Hours. . . . . . . 75

## CLAIMS FOR RELIEF

I.   Trial Counsel Rendered Ineffective Assistance of Counsel with Respect to the Guilt/innocence Phase of Mr. Medina's Trial, in Violation of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . 88

A.   The *Strickland* Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

-ii-

B.   "There were obvious opportunities lost": Counsel's failure to investigate and numerous other omissions fell well below the prevailing standard of care. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

   1.   The prevailing professional norm required that the defense perform a basic, independent pre-trial investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

   2.   Trial counsel "fail[ed] to conduct even [a] rudimentary investigation.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

      a.   Defense counsel failed to investigate the prosecution's case or interview the prosecution's primary witnesses. . . . . . . . . . . . . . . . . . . . . 95

      b.   Defense counsel failed to investigate their own defensive theory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

   3.   Trial counsel failed to impeach the prosecution witnesses with readily available material.. . . . . . . . . . . . . . . . . . . . . . 109

   4.   Guerinot *conceded* that the defense mishandled the extraneous offenses and, had the defense not erred, Texas law would have required—at a minimum—that the jury be instructed to not consider them unless it was proven beyond a reasonable doubt that Mr. Medina in fact committed them. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

      a.   At the guilt/innocence phase of Mr. Medina's trial, the State introduced evidence of numerous extraneous acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

         i.   Prior drive-by shooting. . . . . . . . . . . . . . . . . . . . . . . . 123

         ii.   Fire bombing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

         iii.   Graffiti. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

         iv.   Destruction of a vehicle. . . . . . . . . . . . . . . . . . . . . . 124

                  v.        Alleged aggravated assault and other extraneous events against Marco Martinez. . . . . . . . . . . . . . . . . . . . . . . . . . . 124

                  vi.       Alleged incidents on Ingomar Way. . . . . . . . . . . . . . . . 126

         b.      Trial counsel failed to move *in limine* to exclude extraneous offenses or properly object to their admission during trial. . . . . 127

         c.      Failure to request a limiting instruction or a reasonable doubt instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

     5.     Trial Counsel Failed to Secure Independent Testing on the State's Firearms Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

   C.     There is a reasonable probability that this very close case would have ended differently absent counsel's numerous omissions and errors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

     1.     Dismantling the prosecution's case against Mr. Medina.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

     2.     A qualitatively different and stronger defense that Flaco was the shooter.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

   D.     Section 2254(d) poses no bar to granting relief on Mr. Medina's ineffective assistance of counsel claim because the state court rejection of the claim was both an unreasonable application of clearly established Supreme Court precedent and resulted from an unreasonable determination of the facts in light of the evidence before the state courts.  28 U.S.C. § 2254(d).. . . . . . . . . . . . . . . . . . . . . . . 156

     1.     The state court decision was based on an unreasonable application of *Strickland*. . . . . . . . . . . . . . . . . . . . . . . . . . 156

     2.     Unreasonable determination of facts in light of record before the state courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

II.    A Pervasive Pattern of Police and Prosecutorial Misconduct Violated Mr. Medina's Right to Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

   A.     The State continues to deny Mr. Medina access to exculpatory information in violation of his right to due process. . . . . . . . . . . . . . . . . . . . . . 159

    B.      The prosecution presented false testimony from Regina Juarez and failed to disclose to the defense that she testified for the State in exchange for leniency, *i.e.* freedom from prosecution. . . . . . . . . . . . . . . . . . . . . 164

        1.      Regina testified pursuant to an undisclosed deal for leniency, and her testimony was false in at least one material respect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

        2.      The use of false testimony and the failure to disclose that Regina testified in exchange for leniency violates due process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

    C.      *Brady* Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

        1.      Standard of review: the state courts failed to adjudicate all of Mr. Medina's claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

        2.      The State suppressed material impeachment evidence. . . . . . . . . . . . . . 174

                a.     Regina Juarez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

                b.     Flaco Holmes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

                c.     Johnny Valadez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

                d.     Maurice Argueta. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

                e.     Leon Guy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

                f.     Evidence of alternate suspects. . . . . . . . . . . . . . . . . . . . . . . . . . 181

        3.      The AEDPA poses no bar to granting relief on Mr. Medina's state misconduct claim because the state court rejection of the claim was both an unreasonable application of clearly established Supreme Court precedent and resulted from an unreasonable determination of the facts in light of the evidence before the state courts.  28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

III.   Trial Counsel Rendered Ineffective Assistance of Counsel with Respect to the Punishment Phase of Mr. Medina's Trial, in Violation of the Sixth Amendment and *Strickland V. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . 185

A.      The controlling clearly-established Supreme Court precedent. . . . . . . . . . . . . 185

B.      Deficient performance:  The prevailing professional norms
        required counsel that conduct a social history investigation but Mr.
        Medina's lawyers unreasonably failed to do this or any other
        meaningful preparation for the punishment phase. . . . . . . . . . . . . . . . . . . . . . . 186

        1.      The prevailing standard of care at the time of Mr.
                Medina's trial mandated that defense counsel
                conduct a thorough social history. . . . . . . . . . . . . . . . . . . . . . . . . . . 188

        2.      Defense counsel's preparation for the punishment
                phase did not remotely approach the prevailing
                professional norms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

                a.      "I never talked to the attorneys
                        before they put me on the stand":
                        Trial counsel failed to interview any
                        punishment phase witnesses—even
                        those who testified for the defense;
                        collect any social history documents;
                        interview their client about his
                        background; or take any other steps
                        reasonably necessary to investigate
                        Mr. Medina's social history. . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

                b.      Asking the guilt-phase investigator
                        for "character witnesses" on the first
                        day of trial did not discharge trial
                        counsel's duty to conduct the
                        thorough social history investigation
                        required by the prevailing
                        professional norms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

                c.      "Now, I'm not any sociologist or
                        anything like that": defense counsel
                        inexplicably declined the services of
                        a mental health expert even though
                        they represented to the court that the
                        expert services were *necessary* to
                        providing effective representation in
                        Mr. Medina's sentencing phase. . . . . . . . . . . . . . . . . . . . . . . 217

d.      Counsel failed to follow up on
        numerous red flags signaling the
        need for investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

e.      Counsel painted an unhelpful false
        picture of their client's background. . . . . . . . . . . . . . . . . . . . . . . 221

f.      Counsel failed to investigate and
        document their own punishment
        phase themes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

g.      Counsel were insufficiently versed in
        the relevant law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

        i.      Failure to object to court's response to jury's question
                about alcohol. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

        ii.     Trial counsel failed to make specific objections to the jury
                charge which inaccurately stated the law. . . . . . . . . . . . . 229

C.      But for counsel's deficient performance, there is a reasonable
        probability that one juror would have answered one of the special
        issues differently. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

        1.      The evidence counsel failed to discover "adds up to
                a mitigation case that bears no relation to the few
                naked pleas for mercy actually put before the jury.". . . . . . . . . . . . . . . 235

                a.      Contrary to the false picture
                        presented at trial, Tony Medina was
                        raised in a dysfunctional home
                        permeated by substance abuse and
                        domestic violence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

                        i.      The jury was incorrectly led to believe that "based on [Mr.
                                Medina's] growing up there's really nothing at all to
                                explain or excuse in any way the behavior that is the subject
                                of this case.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

                        ii.     Mr. Medina's childhood home was blighted by substance
                                abuse, domestic violence, and absence of any support
                                system.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

b. Mr. Medina's childhood speech impediment, placed in context, *was* a significant aspect of his social history.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

c. A child in "gangland": Tony Medina grew up in a war zone in which "kids joined gangs for survival.". . . . . . . . . . . . . . . . . . . . . . . . . . . 245

d. Tony's life was changed at age 12 when his friend was shot to death in a drive-by shooting.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

e. Those who recognized that Tony was an at-risk child could not overcome the destructive forces that permeated his life and the absence of family support system. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 252

f. Tony Medina was severely damaged by his traumatic childhood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256

2. The consequences that flowed from counsel's inadequate mitigation undermined the integrity of the defense function, and with it confidence in outcome of the sentencing proceeding.. . . . . . . . . . . . . . . . . . . . . . . 258

D. The AEDPA poses no bar to granting relief on Mr. Medina's ineffective assistance of counsel claim because the state court rejection was both an unreasonable application of clearly established Supreme Court precedent and resulted from an unreasonable determination of the facts in light of the evidence before the state courts.  28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . 261

1. The state court decision was based on an unreasonable application of *Strickland*. . . . . . . . . . . . . . . . . . . . . . . . . 262

2. Unreasonable determination of the facts in light of record before the state courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

IV. Trial Counsel was Ineffective Throughout Pre-Trial and Jury Selection.. . . . . . . . . . . . 267

A. Trial counsel failed to timely challenge the Harris County grand jury system. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

B. Ineffective assistance of counsel –*voir dire*. . . . . . . . . . . . . . . . . . . . . . . . 268

 1. Failed to strike jurors for cause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

  a. Juror Natale. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

  b. Juror Amanda Stewart. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273

 2. Failed to use *voir dire* to develop cause challenges. . . . . . . . . . . . . . . . 274

  a. Prospective Juror Roeseler. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

  b. Prospective Juror Clement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

 3. Failure to question jurors about potential bias towards gangs. . . . . . . . . 276

 4. Failure to question a juror who was absolutely disqualified. . . . . . . . . . 277

V. The Trial Court's Instructions to the Jury Regarding Parole Eligibility and Good Time Credits Were Confusing, Inaccurate, Unreliable, and Violative of Mr. Medina's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.s. Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

 **A.** The trial court's erroneous and misleading charge authorizing the jury to consider "good time" and parole violated Mr. Medina's rights under the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . 280

  1. The instruction violated the due process provisions of the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281

  2. The instructions violated the Eighth Amendment. . . . . . . . . . . . . . . . . 286

VI. The Cumulative Effect of the Ineffective Assistance of Counsel and the State's *Brady* Violations Undermined All Confidence in the Verdict at Mr. Medina's Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

VII. One of the Jurors Who Sat in Judgment of Mr. Medina Lied about Her Criminal past So That She Could Serve. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

A.      Ms. Volante's dishonest response to the *voir dire* question regarding her criminal and psychiatric history denied Mr. Medina his right to a fair trial under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

B.      Ms. Volante was absolutely disqualified from jury service and therefore Mr. Medina was denied his right under the Texas Constitution to a trial by jury.  TEX. CONST. art. I §15. . . . . . . . . . . . . . . . . . . 298

      1.      TEX. CODE CRIM. PROC. art 44.46 violates the Texas Constitution and therefore Mr. Medina does not need to show harm. . . . . . . . . . . . . . . . 299

      2.      Ms. Volante's false responses to her juror questionnaire regarding her criminal history and treatment by a psychiatrist deprived Mr. Medina of a fair trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

C.      The state court's resolution of this claim is due no deference under the AEDPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306

VIII.   The Process by Which Harris County Selects its Grand Juries Produces an Unconstitutional Under-Representation of Hispanics, in Violation of the Sixth and Fourteenth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

A.      Medina can demonstrate proof sufficient to establish a prima facie showing of underrepresentation under the state and federal constitutions. . . . . 308

B.      Hispanics are a distinct class in the community which merits constitutional protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 309

C.      Underrepresentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310

D.      This underrepresentation is the product of an unconstitutional selection process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

      1.      The process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

      2.      The grand jury selection process is susceptible to abuse because the judges are allowed to pick commissioners and forepersons they know, and commissioners pick panelees whom they know. . . . . . . . . . . . . . . . . . . 313

3.  Discretion-driven jury selection further reduces representation of the entire community because judges and commissioners are allowed to choose persons based on subjective, unreviewable criteria. . . . . . . . . . . . . . . . 315

IX.  Mr. Medina's Right to a Fair Trial under the Sixth Amendment, the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment Was Violated by the Hostile Atmosphere in the Courtroom. . . . . . . . . . . . . . . . . . . . . . . . . 317

A.  The applicable principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 317

B.  The concept of inherent prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

C.  The totality of the circumstances caused inherent prejudice to Mr. Medina's right to a fair trial at each phase of the proceedings. . . . . . . . . . . . . 322

X.  By Denying the Jury's Request for an Instruction on Voluntary Intoxication as a Mitigator, the Trial Court Denied Mr. Medina's Right to Individualized Sentencing under *Lockett* and Violated the Principles of *Eddings*. . . . . . . . . . . . . . . . 326

XI.  Mr. Medina's Fifth and Sixth Amendment Rights to Be Present at All Phases of the Proceedings Were Violated When *Voir Dire* of Potential Jurors Was Conducted Outside His Presence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

A.  Legal Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

B.  Application to this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 334

1.  The Cooper/Mares test—State Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

2.  44.2 Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

3.  Federal right to exercise peremptories. . . . . . . . . . . . . . . . . . . . . . . . . . 337

XII.  The Judgments of Conviction and Sentence of Death in Mr. Medina's Case Are Void Because the Judicial Officer Who Presided at His Trial Was Without Authority to Preside over the Trial in Violation of the Due Process Clause and the Eighth Amendment of the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . 338

XIII.  Mr. Medina's Prolonged Stay on Death Row Violates His Right to Be Free from Cruel and Unusual Punishment under the Eighth Amendment of the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340

A.    Mr. Medina's prolonged stay on death row for a crime which he did not commit, constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

    1.    The British Privy Council's Landmark Decision in *Pratt & Morgan.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 344

    2.    Eighth Amendment authority supporting Mr. Medina's claim. . . . . . . 346

    3.    The unconstitutional conditions at TDCJ-ID's Polunsky Unit further Mr. Medina's argument. . . . . . . . . . . . . . . . . . . 350

B.    Mr. Medina's execution after so many years on death row would have no deterrent or retributive effect and would therefore serve no penological purpose, thus constituting a breach of the Eighth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

XIV.    Mr. Medina Is Innocent and His Execution Would Constitute Cruel and Unusual Punishment and Violate Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

## PROCEDURAL HISTORY

Petitioner, Anthony Medina, was charged by indictment with capital murder in cause number 726088.  The indictment alleged that Mr. Medina on or about January 1, 1996:

> did then and there unlawfully, during the same criminal transaction, intentionally and knowingly cause the death of David Rodriguez, by shooting him with a deadly weapon, namely, a firearm, and intentionally and knowingly cause the death of Diana Rodriguez by shooting her with a deadly weapon, namely a firearm.

1 CR 6.[1]

On January 15, 1996, the trial court appointed John A. Millin and Gerard "Jerry" Guerinot to represent Mr. Medina at trial.  Jury selection began on July 15, 1996.  The State began submitting evidence to the jury on July 24, 1996.  On July 29, 1996, the jury found Mr. Medina guilty as charged in the indictment.  On August 1, 1996, the same jury answered "yes" and "no" to two punishment special issues submitted pursuant to Article 37.071 of the Texas Code of Criminal Procedure, TEX. CODE CRIM. PROC. ANN. art. 37.071(b), (e) (Vernon Supp. 1997).  1 CR 141-152.  As required by Article 37.071(g), the trial court sentenced Mr. Medina to death.  TEX. CODE CRIM. PROC. ANN. art. 37.071(g) (Vernon Supp. 1997).  1 CR 153, 154.  On August 29, 1996, Mr. Medina filed a motion for a new trial, which was overruled by operation of law.  1 CR 191.

The Texas Court of Criminal Appeals ("CCA") affirmed Mr. Medina's conviction and sentence on October 6, 1999.  *Medina v. State*, 7 S.W.3d 633 (Tex. Crim. App. 1999).  The United States Supreme Court denied his petition for writ of certiorari on May 1, 2000.  *Medina v. Texas*, 529 U.S. 1102 (2000).

---

[1] Mr. Medina will cite the reporter's record of his trial proceedings as [volume number] RR [page number].  The clerk's record, which includes pre-trial motions and other documents filed in the trial court, will be cited as [volume number] CR [page number].

-1-

Mr. Medina sought post-conviction review of his conviction and sentence.  The Harris County District Court signed the State's proposed findings of fact verbatim and forwarded the recommendations to the CCA which adopted them without further comment.  *Ex parte Medina*, No. WR-41,274-02 (Tex. Crim. App. September 16, 2009).

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2241(d) because Mr. Medina was convicted and sentenced to death by a jury in the 228th District Court, Harris County, Texas.

## STATEMENT OF FACTS

A brief history of the investigation and cultivation of the State's case is necessary to appreciate the magnitude of counsel's ineffectiveness and the State misconduct in Mr. Medina's case.  Petitioner will then catalogue the perfunctory defense work done prior to trial and review the deeply flawed trial that resulted in his conviction and death sentence.  His claims for relief will follow.

## I.    The Crime.

In the early morning hours of January 1, 1996, a passenger in a blue car opened fire into a group of people, most of whom were teenagers, outside of the Rodriguez residence at 15431 Campden Hill Road in Houston, Texas.  When the car was gone, nine-year-old David Rodriguez and fifteen-year-old Diane Rodriguez lay dead, and eighteen-year-old Rocio Pedraza had sustained a gunshot to her side.  The police crime scene investigation revealed bullet strikes on the gate enclosing the front door, bullet strikes in cars that were parked in the driveway, and eight spent cartridge casings in the road.  12 RR 1314-23.  None of the persons in the area could identify or describe the shooter, but the victims' family was sure that the assailants were members of the La

-2-

Raza 13 or LRZ gang.

## II.    The Investigation: A Case Built on Witnesses Who Lied to the Police.

### A.    The shooter:  Dominic "Flaco" Holmes or Anthony Medina?

The witnesses to the shooting were unable to give the police much to go on.  The drive-by happened without warning, the people in the yard ducked as soon as the shooting started, and it was night-time.  Most witnesses reported seeing a dark-colored car with at least two males in it.  Exhibit 1 (Houston Police Department ("HPD") File at 80).[2]

In the immediate aftermath, people at the Rodriguez residence informed HPD officers that they were certain the La Raza 13, or "LRZ," gang was responsible for the drive-by shooting.  The Rodriguez' fifteen-year-old daughter, Veronica, was dating Marco "Blue" Martinez, a member of the H-Town Crips gang ("HTC"), the rivals of LRZ.  A year earlier, in January of 1995, the H-Town Crips murdered LRZ member Hector "G-Money" Lopez outside of the Meyer Park movie theater in southwest Houston.  Veronica told HPD officers that the drive-by shooting was likely LRZ's revenge for G-Money's murder.  Exhibit 1 at 93.  After G-Money's murder, the LRZ gang had "tagged" (sprayed-painted their logo on) the Rodriguez' house on at least one occasion, and they were believed to be responsible for vandalizing Veronica's car and throwing a Molotov Cocktail at the house.[3]

On January 1, 1996, HPD interviewed Marco "Blue" Martinez, who offered the same

___

[2] Excerpts of the Houston Police Depart file on the case are attached as Exhibit 1.  The page numbers refer to the number stamped on the lower right hand corner of each page.

[3] As discussed more fully below, the prosecution introduced this evidence at trial to insinuate that the Mr. Medina was responsible, but Mr. Medina was housed at the Texas Youth Commission at the time of these incidents and thus clearly had nothing to do with them.

-3-

hypothesis as to the motive for the crime.  Additionally, Blue noted that some HTC gang members had received a voicemail from someone named "Pelon."[4]  Blue was asked to name LRZ members and he came up with six people, including a "Tony" who lived on Heathercrest (the street on which Mr. Medina lived at the time).  Exhibit 1 at 119-20.

On January 2, 1996, HPD received two Crime Stoppers tips.  The first reported "that an LRZ member by the name of Tony Medina has a car as described by the witnesses in this case."  Exhibit 1 at 124.  The person providing this "tip" obviously had no direct knowledge of the case because the admitted driver was Jamie Moore, and he used his own car.  The second caller "gave information on two suspects," Tony Medina and Robert Lucio.  Exhibit 1 at 124.  The two lead investigators in the case, Sergeant Glen Novak and Officer Henry Chisholm, later documented this call in their reports, noting: "Anonymous calls to the Homicide Office indicate that a Robert Lucio . . . and a Anthony Medina . . . are responsible parties to these murders."  Exhibit 1 at 143.  Like the first caller, it is unlikely that this caller had any direct knowledge of the crime, because no other witness has ever identified a Mr. Lucio as involved in this crime.  To this day, the defense has been denied access to information about the informants.

Also on January 2, 1996, Officers Novak and Chisholm met with Officer Faulhaber in the HPD Gang Task Force.  The Task Force officer provided information on the six alleged LRZ members named by Blue Martinez.  Exhibit 1 at 126.  Novak and Chisholm then "advised Officer Faulhaber that information had also been received that some black males may also be involved in this incident."  Exhibit 1 at 127.  In response, they "were advised that 'LRZ' has 2 documented

---

[4] Pelon is later identified as Johnny Valadez, one of the prosecution's star witnesses at trial.

members that are black males; 1. 'Wero', Dallas James Nacostte, . . . [and] 2. [Flaco], Dominic

Antoine Holmes." Exhibit 1 at 127.  This is the first mention of any black males being involved in

the shooting; neither Novak nor Chisholm documented the source of this information.  The only

reference to the race of the shooter that the police investigators included in their final report[5] was

from Leon Guy.  Mr. Guy gave a statement to the police at 8:48 a.m. on January 1, 1996, saying he

saw the shooting and, although he could not see who was in the car, the hand holding the gun was

either white or Hispanic.  Exhibit 1 100-01.  Mr. Guy would later admit to being "dead drunk" at the

time of the shooting.  3 RR 1484.

On January 3, 1996, HPD interviewed several people who had been at a different New Year's

Eve party on Ingomar Way, a street close to the scene of the shooting.  One of the party goers, Sam

Lopez, had filed a police report because a group of kids in the LRZ gang had confronted and

threatened him with a gun when he was outside urinating in the yard.  The HPD interviewed several

people from the Ingomar Way party and learned that a group of LRZ members came by twice on

New Year's Eve, first around 11:00 p.m. and again at 2:00 a.m. on January 1, 1996.  On both

occasions, the LRZ members pulled guns.  A brawl broke out during the second visit, which ended

when the father of the household came outside, fired a gun, and told everyone to go home.  Exhibit

1 at 133-39.  From photos of LRZ gang members the Ingomar Way party-goers identified the LRZ

party crashers: Dominic "Flaco" Holmes and Dallas Nacoste, both African-American, and Rico

---

[5] The police failed to include in their report the source of the information that "black males
may also be involved" in the crime.  The report itself was not prepared until January 22, 1996.
Exhibit 1 at 129.  By the time the officers reduced their notes to a typed report, Mr. Medina had been
charged as the lone shooter in the case.  To the extent that interviews and information inconsistent
with this theory are omitted from the official report, it may be intentional.  Counsel have discovered
instances in which the police interviewed witnesses but failed to document the interviews in their
report.

Savala, Alex Perez, and Anthony Medina.  Exhibit 1 at 133.

On January 4, 1996, Novak and Chisholm obtained arrest warrants on charges of aggravated assault—based on the Ingomar Way incidents—for Flaco Holmes, Anthony Medina, Alex Perez, Rico Savala, and Dallas Nacoste.  Exhibit 1 at 141.  HPD tried, unsuccessfully, to locate and arrest these people on January 4th.

On the night of January 5, 1996, Anthony Medina was arrested for the aggravated assault case at Ingomar Way.  In the early morning hours of January 6, 1996, Mr. Medina gave a statement about his activities on New Year's Eve.  Exhibit 1 at 146-50.  Mr. Medina admitted to being involved in both confrontations at the Ingomar Way party, but denied he was involved in any drive-by shooting.  He said that several other people—Dominic "Flaco" Holmes, Jamie Moore (who is also African American), and a small Hispanic kid—had left LRZ' New Year's Eve party at "Candyman's" house[6] to "do some dirt," which meant crimes such as auto theft or drive-by shootings.  Johnny "Pelon" Valadez, meets the description of the small Hispanic kid.  When Mr. Medina saw Flaco the next day, Flaco said over and over that he had "messed up."  Flaco did not explicitly say he had done a drive-by, but that was what Mr. Medina understood him to say.  *Id*. Flaco also said that he had "taken care of" the gun.  *Id*. at 150.  Flaco would initially lie about this to the police, but the forensic evidence and Flaco's admission on the witness stand confirmed what Mr. Medina told the police about the gun upon his arrest in early January.

Alex Perez was also arrested on January 5, 1996.  He told HPD he had nothing to do with

---

[6] There are three New Year's Eve parties relevant to the facts of the case: the party at the Rodriguez residence on Campden Hill where the shooting occurred; the Ingomar Way party twice visited by the LRZ kids; and an LRZ party which took place at the home of Candelario "Candyman" Guerrero.

the drive-by shooting.

The next arrests came on January 10, 1996.  Dallas "Wicked"[7] Nacoste, 16 years of age, was arrested at his school and taken to the Homicide Department where he gave a statement.  Novak and Chisholm told Nacoste, an LRZ member, that his "name was mentioned in this case as being present when the shooting occurred."  Exhibit 1 at 174.  The officers lied to Nacoste, telling him that Mr. Medina "had given them [Nacoste's] name and told them [he] was involved."  *Id*.  Nacoste was at the LRZ New Year's Eve at Candyman's but was under curfew and home by 1:00 a.m., before the shooting happened.  He had been with the LRZ kids at the first confrontation on Ingomar Way, and then went back to the LRZ New Year's gathering.  At this point in the evening:

> We had gotten back and were outside drinking beer for about 20 minutes or so and that is when Flaco and the other guy [Jamie Moore, the driver,] showed up.  When Flaco got there he was all pumped up.  He told us that he had driven by this girls [sic] house that dates an "HTC" member.  I do not know the name of the street, but you get to it off Anderson Road.  It's the main street through this sub-division.  I have been by this house in the past and everybody in the gang knew where she lived because she was dating an "HTC" member.  The guys [sic] name that she is dating is "Blue."  When Flaco got there he was all pumped and was saying that he just drove by the house and saw "Blue" outside at the [sic] girls house.  Flaco started asking for the "AK."[8]  He was asking everybody at the party for the gun.  Pelon told Flaco that the gun was at his house.  Pelon told Flaco how to get into his house and how to get the gun.  Flaco then started talking about how he was going to do a drive-by at the house where "Blue" was at.  Flaco said that he was going to "roll by" looking for Blue and that he was going to start busting at them.  He said that he was going to drop off the "AK" and come back to the party.

* * * *

On January 3rd, Pelon called me and told me about the second fight over at "Chi

---

[7] Mr. Nacoste's nickname is reported as both "Wero" and "Wicked."

[8] Flaco referred to the murder weapon throughout the investigation and trial as an "AK" but it was a "SKS" rifle.

-7-

> Chona's."[9]  He also told me about Flaco doing the drive-by and that he wasn't sure
> if he had hit anyone.  I had seen the news and knew that two people were killed and
> a third girl was shot.  I asked Pelon about the "AK" and he told me that they buried
> the gun somewhere in Westbury[10] and Flaco was leaving town until things cooled
> down.  No one is talking about the shooting because everyone is afraid to talk on the
> phone.

Exhibit 1 at 175.  After taking his statement, the police decided not to detain Nacoste on the

aggravated assault charge, and he was taken home.

Nacoste's statement was taken at 12:15 p.m. on January 10th.  At 2:34 p.m. that afternoon,

HPD sent an advisory to the Missouri City Police Department about Flaco and a dark blue Buick.

Across the top, in boldface, the memorandum warned: "**Consider the subject to be armed and**

**dangerous**," and it continued:

> The above listed subject is a juvenile and is a suspect in the drive by shooting that
> took place in Houston on New Years Eve where the 15 year old girl and 9 year [old]
> boy were killed.  *He is suspected as being the shooter*.  The weapon involved was
> of the 7.62 X 39MM variety and believed to be either a SKS or MAC 90.  If the
> above vehicle is spotted, stop the vehicle and hold all occupants for HPD Homicide.

Exhibit 1 at 350 (emphasis added).

At about 7:10 p.m. that evening, Flaco and Tyrone Fredricks committed an aggravated

robbery.  Armed with a rifle, Flaco and his accomplice stole a SUV and then led the police on a high-

speed chase through south Houston.  Exhibit 1 at 168-70.  Flaco, who was driving the stolen truck,

eventually crashed the vehicle into a light pole and then tried to out-run HPD on foot.  He was

captured in a field.

Flaco was subsequently interrogated by Sgt. Novak, who "confronted [Flaco] with the

---

[9] Michelle "Chichona" Argueta's brother, Maurice Argueta, was hosting the Ingomar Way
party.

[10] This is where the gun was discovered several months later.

information obtained during this investigation," causing the 15-year-old to want "to give a statement to clear his name."  Exhibit 1 at 177.

Because Flaco was a juvenile, Sgt. Novak had to take him before a magistrate before Flaco could make his statement or confession.  The magistrate was required to interview Flaco out of the presence of the police and make certain findings before returning him to the police.  Among certifications to be made by the magistrate was that the juvenile "[w]as not threatened or promised anything by law enforcement or other agents of the State."  Exhibit 2 (Magistrate's Warning to Dominic "Flaco" Holmes).  Next to this certification Magistrate Lewis wrote, "See additional observations."  In that section of the form, entitled "Additional observations the undersigned has made during the course of interviewing this said juvenile are as follows (if any)," Magistrate Lewis wrote: "Respondent said the **officers told him that if he told them what happened they would probably help out and see what they could do for him** but no specific promise was made to him."  Exhibit 2 (Magistrate's warning to Dominic "Flaco" Holmes) (emphasis added).  Magistrate Lewis' private interview of Flaco Holmes indisputably documents HPD's promise of help in exchange for Flaco's cooperation.  Flaco was then returned to HPD officers.

Though young, Flaco was no stranger to the criminal justice system: his arrest on January 10, 1996, was his **twelfth (12th) in just three years**.  Exhibit 1 at 176.  He now found himself charged with capital murder and "confronted [by the police] with the information obtained during" the investigation so far, almost all of which pointed to Flaco as the shooter.  Moreover, he had just been picked up for aggravated robbery, after leading the police on a high-speed chase that culminated in him wrecking a stolen SUV.  HPD having extended an offer of help in exchange for his cooperation, Flaco gave a statement.

Flaco described being present for the second confrontation at the Ingomar Way party.  He claimed the drive-by shooting happened after this incident while he was in a car driven by his friend Jamie Moore, with Mr. Medina, Alex Perez, Johnny "Pelon" Valadez (age 13), Veronica "China" Ponce (age 13), and Scharlene "India" Pooran (age 15).  Thus, according to Flaco, there were 5 males and 2 females in the car, and the shooting took place after the second confrontation on Ingomar Way. Flaco said that he heard Medina cock the gun and then fire about six or seven times.  Flaco averred he did not know what Medina had done with the gun afterwards.  Exhibit 1 at 179-80 ("I haven't talked to [Mr. Medina] since this happened and ***I don't know what he did with the A.K.***") (emphasis added).  Flaco probably said more about the gun than is documented in the HPD reports because, after Johnny "Pelon" Valadez was arrested on the following day, HPD officers reported to the District Attorney's Office that Flaco had told them that Johnny Valadez might have the gun or disposed of it: "I further advised [Assistant District Attorney Don Stricklin] that we had information from 'Flaco' that this suspect [Johnny "Pelon" Valadez] may have or disposed of the murder weapon in this offense."  Exhibit 1 at 190.[11]

Ten days after the crime, HPD had two suspects in custody who each alleged the other was guilty of the drive-by shooting.  One suspect, Flaco, identified Mr. Medina as the shooter.  Flaco was identified as the shooter by Dallas Nacoste, Mr. Medina, and—according to Nacoste—by Johnny

---

[11] This is another of many "facts"—inconsistent with prosecution's case—referenced in the HPD report but not documented.  There is nothing in the HPD file provided to counsel describing an interview in which Flaco said Johnny Valadez had the murder weapon or had disposed of it.  This, and numerous other oblique references to otherwise undocumented interviews demonstrates that Mr. Medina has yet to be provided with the complete HPD file in this case or that the investigators exercised some selectivity when reducing the information in their notes to an offense report.  Mr. Medina filed three separate motions in state habeas proceedings seeking this information, and all three motions were ignored by the state court.

"Pelon" Valadez.  At the time, the police did not know that their statements would be corroborated by the physical evidence.  Flaco had indeed disposed of the guns by burying them in the Westbury area.  Flaco admitted to being present, gave a statement in exchange for "help" from the police, and walked away from this whole affair without prosecution even though, as the prosecutor would later admit on the record, Flaco tampered with evidence in his effort to obstruct the police investigation into these murders.

> **B.    Doing "what needed to be done in an attempt to locate possible witnesses or suspects, who were present in the car"[12]: HPD used promises, coercion, threats, and physical violence to extract statements identifying Mr. Medina as the shooter from kids as young as 13 years old.**

Inexplicably, the police chose to focus on Mr. Medina rather than Flaco.  The day after Flaco's arrest, on January 11, 1996, HPD assigned four additional investigators to the case to assist Novak and Chisholm.  Exhibit 1 at 182.  Sgt. Novak briefed them on "what needed to be done in an attempt to locate possible witnesses or suspects, who were present in the car the time the complainants had been shot."  Exhibit 1 at 182.  HPD already had one eye-witness in Holmes, and they could be sure that Flaco's very close friend Jamie Moore would be especially motivated to cooperate because *everyone* put Moore behind the wheel for the drive-by.  Moore's only chance to escape prosecution would be to back his friend Flaco and say his car was loaded with kids and everyone (including himself) was surprised when the shooting started.

The police found Jamie Moore working at a Pizza Hut on January 11, 1996.  He was driving a blue car, like the one both Mr. Medina and Flaco said Jamie was driving on the night of the crime.  Exhibit 1 at 182.  Moore came to the police station in his own car, which was subsequently searched

---

[12] Exhibit 1 at 182.

and photographed by HPD.  Sgt. Novak began his interrogation by telling Moore "that he was a suspect in the drive-by shooting that occurred on Cam[p]den Hill in which a 9 year old and a 15 year old had been killed," and that "Dominic Holmes had implicated him as being the driver of the car at the time of the shooting."  Exhibit 1 at 183.  Moore immediately responded that he "did not know that he was going to shoot them kids."  Moore then asked to use the phone to call his mother and/or his lawyer, and Novak left Moore alone with a phone for 15 minutes.  When Novak returned, Moore claimed that he had called no one but he was ready to give a statement.  *Id.*

Moore's statement was similar to that of his friend Flaco Holmes in that he identified Mr. Medina as the shooter, but Moore's description of who was in the car and the sequence of events was quite different.  Moore said that he did not know any of these people before New Year's Eve, except Flaco, who took him to the LRZ party at Candyman's.  At some point, Flaco asked Jamie to drive a group of people to another location.  The group included "a real short pretty little Mexican girl" and a "dude with a trench coat," who sat in the front seat, and "a little young dude [who] got into the back seat with Flaco and two other girls . . . seated in the back with Flaco."  Exhibit 1 at 185.  When they arrived at their destination, all but the "dude with the trench coat" went inside and ate menudo. It was after leaving this location, on the way back to the LRZ party, that the passenger in the trench coat starting shooting at a party as they drove by.  Moore said he looked over and saw the person leaning out of the window shooting a gun.  He identified this person as Mr. Medina from a photo he was shown by HPD.  Exhibit 1 at 184-188.  He identified "the pretty little Mexican girl" as Veronica "China" Ponce, and the other two girls as Scharlene "India" Pooran and Regina Juarez.  He also identified Johnny "Pelon" Valadez as being in the car.  Exhibit 1 at 183.  Contrary to Flaco's chronology, Moore said that the second visit to Ingomar Way happened after the drive-by shooting.

-12-

Like Flaco, Moore did not admit to disposing of the guns during his January, 1996, police questioning.

Jamie Moore was very clear that the people with whom he drove to the other location, with whom he sat for 30 minutes or more while they ate and drank, and who were in his car at the time of the shooting, consisted of 3 females (Regina Juarez, Veronica "China" Ponce, and Scharlene "India" Pooran) and 4 males (Flaco Holmes, Johnny "Pelon" Valadez, Anthony Medina, and himself).  Exhibit 1 185-86.

Not only was Jamie Moore, the admitted driver, released the same day without charges, Exhibit 1 at 188, but the other witnesses questioned that day were warned that Mr. Moore enjoyed the protection of the police and they would be held responsible should anything happen to him. Exhibit 1 at 203 (Veronica "China" Ponce, also interrogated on January 11, 1996, was told by the police "that if anything happens to Jamie, they were going to come after her and India.").

While Moore was being interrogated, the police brought in Johnny "Pelon" Valadez, Veronica "China" Ponce, and Scharlene "India" Pooran.  Each was paraded before Moore and he said that all of them were in the car at the time of the shooting.  Exhibit 1 at 183.

Earlier that day, HPD officers had been dispatched to the manager's office of an apartment complex where Johnny Valadez' mother, Delfina Valadez, worked.  She was told that her son's name had come up in connection with a drive-by shooting.  Ms. Valadez informed the officers that Johnny was at Johnston Middle School, but that she could not leave work at that time.  Ms. Valadez gave them permission to check her 13-year-old son out of junior high school and take him—by himself—to the Homicide Department for questioning.

When the police arrived at Johnny's school, they met Johnny in the principal's office:

-13-

> We apprised [the principal] of the investigation and the fact that Johnny Valadez's name had come up in the investigation. We advised her that we needed to check him out of school that we needed to speak with him concerning the drive-by shooting where the two juveniles were killed. Johnny immediately began to deny any involvement and stated that he did not know anything about the shooting. *We advised him that we have information that he was in the vehicle along with several other persons*. Johnny denied this also. We advised Johnny that he would have to come with us to the homicide office. Prior to leaving the school, Johnny was allowed to call his mother at her work. Johnny spoke with his mother for several minutes. He then advised me that his mother wanted to talk to me. I, Sgt. Yanchak spoke with Mrs. Valadez by phone. Upon speaking with *Mrs. Valadez, she stated that she had changed her mind and that she wanted to be present when we interviewed her son*. I then advised her that she could meet us in the homicide office on Mykawa. I further advised her that Johnny is going to show us some other locations where other persons (China and India) involved in this incident may live. I advised her that we would meet her in the homicide office. We left the Johnston Middle School at approximately 12:50 pm.

Exhibit 1 at 188-89 (emphasis added). Johnny arrived at the Homicide Department at 2:15 p.m., and was viewed by Jamie Moore, who confirmed that Johnny was in the car during the shooting.

Instead of waiting for Ms. Valadez to arrive, HPD interrogated 13-year-old Johnny Valadez before she arrived at the homicide office:

> Johnny Valadez was placed in the interview room near the case file room. *He was interviewed by Inv. Chisholm who is one of the original scene investigators and is familiar with all the names involved in this incident. Inv. Chisholm went over with Johnny all the names of the other persons involved and the information we had concerning his involvement.* Inv. Chisholm further discussed with Johnny fact that he may have the murder weapon used in this incident. *It was at this time, that Johnny Valadez admitted being a passenger in the car*, but he denied having the murder weapon. At this time, the interview ceased and Johnny Valadez and the necessary juvenile forms were completed to take the suspect before a magistrate to have his warnings read to him. Prior to leaving the homicide office, Mrs. Valadez called the office concerning her son. The time of this call was noted at 15:10 hours (3:10 p.m.).

Exhibit 1 at 189 (emphasis added). As the HPD file itself documents, Johnny was fed a lot of information by the officer most intimately familiar with the case before he was asked for a statement (indeed, before they left his junior high school), including who was supposed to be in the car and all

-14-

of "the information they had."  This information was provided to him *before* he was questioned about the case.

As Johnny would later describe the process, he—a 13-year-old boy—was threatened and kicked by HPD officers.  Exhibit 3 (Affidavit of Serine Consolino).  He was then taken to a juvenile magistrate and it was made clear to him that he was facing up to 40 years in prison.  Once his cooperation was secured, officers coached Johnny's statement by telling him what had happened and simply having the terrified 13-year-old assent to it.[13]  *Id.*

Johnny put six people in the car at the time of the shooting, 5 males (Jamie Moore, Flaco Holmes, Mr. Medina, Alex Perez, and himself) and 1 female (Scharlene "India" Pooran).  Exhibit 1 at 191.  Johnny averred that he "did not see the gun but I was told later that the gun [Mr. Medina] shot was an 'AK' rifle."  Exhibit 1 at 192.  Johnny told the police that "about 4 days after the shooting my mom told me about some kids getting killed in a drive by shooting.  I didn't know if this was the kids that [Medina] shot at or not.  That is all I know about what happened."  Exhibit 1 at 192.

At the same time they collected Johnny from junior high school, the police brought Veronica "China" Ponce and Scharlene "India" Pooran in for questioning.  They also attempted to bring in Flaco's close friend Regina Juarez, but she had left the State after a visit the previous evening from Jamie Moore.  Exhibit 1 at 189 (Regina was at her house on the evening of January 10, 1996, "the

---

[13] Johnny's statement seemed quite uncertain on the details.  Exhibit 1 at 192 ("*I think* I saw a girl leaning on the red car.  *I think* the girl had on black clothes.  *I think* I heard music and as we got past the house after [Medina] had shot *I think* I heard screaming.") (emphasis added).  These were facts—the position of the bodies, the clothing of the victim, and that the victims were listening to music—that were *known* to his interrogator, Officer Chisholm, one of the original crime scene investigators.  As demonstrated below, Johnny would later contradict himself at trial about many "facts" that were not stated so tentatively in his statement.

blue Oldsmobile"[14] was parked outside of her house that night"); *id*. at 203 (Regina left for

Oklahoma on January 11, 1996).

Though Veronica "China" Ponce was a 13-year-old middle school girl, and she provided

HPD officers with her mother's name and telephone number, the police never tried to contact her

mother.  Instead, as with Johnny Valadez, they interrogated the child without parental consent.

Contrary to their practice with other witnesses, HPD officers failed to document in their report any

of their interactions with Veronica, or what she said to them, prior to her statement.  *Compare*

Exhibit 1 at 188-90 (documenting the events surrounding the questioning of Johnny Valadez,

including the information provided to him about the crime in advance of questioning); *id*. at 183

(documenting interactions with Jamie Moore and what Moore told Novak); *id*. at 177-78

(documenting interactions with Flaco Holmes and what Holmes told Novak); *id*. at 173 (same with

respect to Nacoste), *with* Exhibit 1 at 192-93 (complete silence regarding conversations leading up

to Veronica's statement or what information HPD provided to her before taking her statement).

The police subjected the child to threats, coercion, and physical abuse.  Veronica was told

that her friends had already put her in the car, and she was shown a diagram of the car depicting their

alleged seating positions.  At some point during the investigation, an HPD officer hit Veronica.

Exhibit 4 (Affidavit of Sarah L. Jack).  The officers told her they knew Mr. Medina was the shooter

and threatened to charge her with capital murder if she did not cooperate.  The 13-year-old girl

eventually succumbed to police coercion and signed a statement prepared for her by Sgt. Novak

accusing Mr. Medina.  *Id*.  The statement Veronica was coerced to sign was the most similar to

---

[14] Numerous witnesses described Jamie Moore's Oldsmobile, used in the drive-by, as blue.
Exhibit 1 at 149, 151, 162, 182, 193, 195.

Flaco's in that it is the only other one that put the same 7 people in the car: 5 males (Flaco, Jamie Moore, Johnny "Pelon" Valadez, Mr. Medina, and Alex Perez) and 2 females (Veronica "China" Ponce and Scharlene "India" Pooran).

The police also took a statement from 16-year-old Scharlene "India" Pooran. According to Scharlene, there were 6 people in the car at the time of the shooting: 5 males (Jamie Moore, Flaco, Johnny Valadez, Alex Perez, and Mr. Medina) and 1 female (herself). Exhibit 1 at 195. Scharlene asserted that the occupants in the car knew in advance that the purpose of the trip was to do a drive-by shooting against Marco "Blue" Martinez: "We drove by there to do a drive by on 'Blue' that night." Exhibit 1 at 195.[15] Scharlene also disclaimed any knowledge of what happened to the murder weapon: "The last time I saw the 'AK' gun it was at Candyman's house . . . . I do not know where the gun is at this time." *Id.*

After they gave their statements, Veronica Ponce and Scharlene Pooran were released. Exhibit 1 at 195. Johnny Valadez remained charged with capital murder and was held by the juvenile authorities. Exhibit 1 at 197.

The following day, on January 12, 1996, the police processed Jamie Moore's car. They

---

[15] Even Sgt. Novak apparently did not believe this highly aggravated assertion which contradicted the State's eventual theory of the case at trial. Novak would later testify under oath to the complete absence of evidence of culpability on the part of the occupants of the car:

Q.   So there was **no evidence** that any of the other six individuals [in the car] conspired with [Medina] or 6 cooperated with him in any way in that shooting; is that correct?

A.   That's correct.

*Ponce v. State*, No. 01-97-00930 (Tex. App.-Hous. (1st Dist.) Sept. 3, 1997), 4 RR 20 (emphasis added). Had Sgt. Novak thought Scharlene was telling the truth on this point, his subsequent sworn testimony would have been false.

-17-

photographed the car and searched for cartridge casings but found none. Exhibit 1 at 198. What they did find was gunpowder residue, on both the front and rear passenger-side doors:

> Officer recovered and tagged in the firearms lock box in the CSU office the following evidence:
>
> Powder residue samples:    1. Pass front door (inside) glass opening section
>                            2. Pass front door (outside) glass opening section
>                            3. Pass rear door (outside) glass/glass opening section
>                            4. Pass rear door (inside) glass opening section

Exhibit 1 at 198. This suggests Flaco's close friend Jamie Moore was involved in other drive-by shootings. Jamie Moore had known Flaco for years but only just met the other LRZ kids on New Year's Eve. There is no evidence that Jamie saw Mr. Medina before or after that night. Thus, if someone was firing guns from the back of Jamie Moore's car on other occasions, it was not Mr. Medina but it very well could have been Jamie's good friend Flaco.

The next entry in the copy of the police report provided to Mr. Medina is dated January 16, 1996, when Norma Juarez, Regina's mother, called Sgt. Novak. Exhibit 1 at 200. As noted, *supra*, HPD attempted to question Regina Juarez on January 11th—the same day they rounded up Jamie Moore, Johnny Valadez, Veronica Ponce, and Scharlene Pooran—but Regina had left the state after a visit from Jamie Moore on the previous evening. Novak told Ms. Juarez that police "needed to speak with her daughter concerning the drive-by shooting that occurred on Campden Hill on January 1, 1996. She was further advised that we had information that her daughter might have knowledge of this incident and may have possibly been a passenger in the vehicle at the time of the shooting." *Id*. The information putting Regina in the car came from Jamie Moore, the driver.

Regina Juarez, along with her mother, went to the police station at 11:00 a.m. on the morning of January 16th. Novak and Chisholm conducted the interrogation. Regina initially denied any

-18-

knowledge of the shooting.  She was told that the police had written statements from Veronica Ponce

and Scharlene Pooran, as well as others, putting her at the LRZ New Year's party and/or in the car

at the time of the shooting.  Exhibit 1 at 201.  The police yelled at Regina, and told her that they

knew she was in the car, sitting on Alex's lap during the drive-by.  When Regina said she was not

in the car, the police became angry and threatened her with prosecution if she did not cooperate.

Exhibit 4 (Affidavit of Sarah L. Jack).

Regina gave a sworn statement.  Regina averred that she was at the LRZ New Year's Eve

party in the yard of Candyman's house.  Sometime after 2:30 a.m., she went inside to use the phone.

When she came out again, a group of people were talking about a drive-by shooting.  Regina claimed

that she asked who had been the shooter and Tony Medina volunteered that it was him.  She then left

with this same group of people for another party.  Regina described the subsequent brawl at the

Ingomar Way party, from which she eventually departed in Jamie Moore's car, along with Flaco, Mr.

Medina, and several others.[16]  Exhibit 1 at 202.  After the brawl, Moore drove the group to Alex

"Slim" Perez's house, which backed up to a bayou.  Regina averred that it was at Slim's where she

last saw the murder weapon: "While we were all at Slim's house I saw the gun by the banks of the

bayou and *I think that they either threw it into the water or Slim did something with it*."  Exhibit

1 at 203 (emphasis added).  Finally, Regina memorialized in her statement what she had heard about

the investigation upon returning from her out-of-state trip: "I had left for Oklahoma on Thursday,

January 11, 1996 and returned last night around 6:00 pm being Monday, January 15, 1996.  China

called me about 8:00 pm and said that they had filed charges on Tony and that the guy Jamie

_____

[16] According to Flaco's story, in which the drive-by happened after the Ingomar Way brawl,
Regina would have been in the car during the drive-by shooting.

-19-

[Moore] was the one snitching and that the laws had told her that if anything happens to Jamie, they were going to come after her and India."  Exhibit 1 at 203.

On January 17, 1996, the day after Regina Juarez swore under oath that the murder weapon might have been thrown into the bayou, HPD deployed four investigators—including Novak and Chisholm—and a team of seven HPD scuba divers to scour the bayou site described by Regina.  The divers searched on their hands and knees through the bayou tributaries and drainage conduits.  They found nothing.  Exhibit 1 at 199.

### C.   An inconvenient truth: forensic evidence emerges proving that Flaco (and perhaps his friends) hid the murder weapon and then lied about it in their statements to the police.

Approximately two months after the police had wrapped up their witness interrogations, on March 8, 1996, the District Attorney's Office Investigator reported that a confidential informant had tipped him off that the weapon used in the drive-by was buried at Scharlene "India" Pooran's house, beneath or very near to the fence.  Exhibit 1 at 223.  After her father, Solo Pooran, signed a consent form, officers found a package buried 6" to 8" below ground.  Exhibit 1 at 225.  The package contained two automatic rifles, two magazines, and some cartridges.  They were wrapped in plastic bags and secured with electrical tape.  Exhibit 1 at 227.

Sgt. Novak submitted the evidence to HPD fingerprint examiner Jimmy Schraub.  Exhibit 1 at 335.  In the "Persons To Be Checked" portion of the Evidence Submission Form, Novak requested that Schraub run any prints on the evidence against Mr. Medina and Alex Perez.  *Id*.  In his March 8, 1996, examination, Officer Schraub found no latent prints on the guns or ammunition, but he discovered usable prints on the plastic bags in which the weapons were wrapped.  Exhibit 1 at 227.  On March 13, 1996, Officer Schraub matched palmprints on the bags to one of the prime

suspects in the case: Dominic "Flaco" Holmes.[17]

The palm print evidence was a potentially devastating development to the prosecution effort—which had been fully locked in on Mr. Medina since January—for at least two reasons. First, it was the *only* forensic evidence that connected anyone to the murder weapon, and the person it connected was Flaco. Flaco certainly looked more guilty when it became clear that he had disposed of the murder weapon. Second, and much more problematic for purposes of taking the case to trial, the prosecution's star witnesses—including Flaco—claimed that they had not seen the gun after the shooting or, in Regina's case, since it had been thrown into the bayou. Flaco's palm print was physical evidence demonstrating that at least one, and potentially all, of the State's key witnesses had lied in their statements to the police.

By the end of March, HPD firearms examiners Robert Baldwin and Charles Anderson had tested the weapons recovered at Scharlene "India" Pooran's house and determined that one of them was the weapon used in the drive-by shooting. Exhibit 1 at 223-24.

### D. The grand jury proceedings: witnesses change their stories, punishment is reserved only for witnesses who do not fully cooperate with the prosecution.

On March 14, 1996, the case against Mr. Medina was presented to the grand jury, which returned an indictment. Mr. Medina has been denied access to the transcripts of these proceedings. Even without access, it is clear that witnesses changed their stories in the grand jury proceedings.

Regina Juarez testified in the grand jury proceedings. 16 RR 1948. In her January statement to the police, which was under oath, this close friend of Flaco said that she had not seen the gun

---

[17] Undersigned counsel have yet to be provided with the portion of the police report documenting Officer Schraub's work on the case. Counsel have been informed by the public information officer for the City of Houston that Schraub's match to Flaco happened on March 13, 1996. Counsel will file proof of this when it is made available to them.

since the night of the crime.   However, the day before the grand jury proceedings, the police

discovered Flaco's palmprints on the wrapping in which he buried the murder weapon.  As shown,

*infra*, Regina's subsequent testimony about the guns at trial was materially inconsistent with her

January statement, in a manner that was more inculpatory of Mr. Medina.  If Regina's story to the

grand jury matched her January sworn statement to the police, then her subsequent testimony at trial

(if credible) is proof she lied under oath to the police and the grand jury.  Alternatively, if Regina's

grand jury testimony matched her testimony at trial, then she lied in her January sworn statement to

the police.  Regina is not the only witness who changed her account after giving a statement to the

police in January of 1996.  Without access to the grand jury proceedings, Mr. Medina cannot say,

in fact, that Flaco and Jamie Moore testified in those proceedings but, if they did, the same analysis

applies to them.

Veronica "China" Ponce and Scharlene "India" Pooran testified to the grand jury.  They too

gave accounts that differed from the January statements: they confessed to not having told the truth

to the police and testified that Mr. Medina was not the shooter (without access to the proceedings,

Mr. Medina cannot give this Court a precise account of their testimony).

Given the numerous witnesses who told conflicting stories under oath and lied to the police

in an effort to thwart the investigation, the perjury and/or obstruction prosecutions arising from this

case should have been legion.  Instead, most of these witnesses walked away scot-free.

The State's inaction was not because busy prosecutors could not be bothered to pursue these

otherwise slam-dunk charges against some teenagers.  To the contrary, the prosecution brought the

full weight of the State down on two teenaged girls, Veronica Ponce (age 14) and Scharlene Pooran

(age17),[18] who testified in the grand jury proceedings out-of-step with the prosecution's theory that Mr. Medina was the shooter.  They were convicted of aggravated perjury and sentenced to three years in prison, even though one girl was pregnant at the time (and eventually had her baby in prison) and the other girl had recently had a baby.  While most of the State's witnesses indisputably committed perjury, the alleged "perjury" committed by these young girls was actionable only because it contradicted rather than supported the State's effort to put Mr. Medina on death row.

Veronica Ponce and Scharlene Pooran were arrested for aggravated perjury on May 6, 1996. Veronica gave a second statement to the police on May 7, 1996.  According to this statement, on the night of the shooting, she and others left Candyman's LRZ party and went to her aunt's house, which is down the street from the scene of the crime, to eat menudo.  They passed the Rodriguez' house both on the way to her aunt's and on the way back to the LRZ party.  Both times, she saw people outside the house.  She was in Jamie Moore's car with Jamie, Flaco, Tiny, India, and Jessica. Exhibit 1 at 235.  Contrary to Jamie Moore's statement that the shooting happened on the trip back from Veronica's aunt's house to the LRZ party, Veronica claimed that nothing happened.  Instead, it was after she returned to the LRZ party that Jamie Moore, Flaco, Johnny Valadez, Alex Perez, Scharlene Pooran, and Mr. Medina left again for about 20 minutes.  Veronica "guess[ed] . . . they went to do the driveby."  Exhibit 1 at 235.

Veronica concluded her May 7th statement by saying that her sworn grand jury testimony that she was not in the car at time of the shooting was true.  She had previously told the police she was there because the police were insisting that she was there.  However, in this second statement to the

_____

[18] Veronica and Scharlene were 13-years-old and 16-years-old, respectively, on the night of the crime, but both had February birthdays thus they were 14-years-old and 17-years-old when charged with aggravated perjury.

police, Veronica disavowed her grand jury testimony that Mr. Medina did not do the shooting.  Now she was willing to say that Mr. Medina confessed to her a couple of days after the crime that he had done the shooting.  Exhibit 1 at 235.

### E.    Conclusion.

Such was the state of the prosecution's evidence a few months prior to trial: a series of conflicting accounts in which few witnesses could agree on when the shooting happened or who was in the car.  Jamie Moore said Regina was in the car, Regina said she was not.  Flaco said seven people were in the car, Johnny Valadez said six.  Two "facts" that these witnesses all agreed on were: (1) none of them ever saw the murder weapon again after the night of the shooting; and, (2) Mr. Medina was the shooter.  As demonstrated, *infra*, it is now beyond dispute that all of the prosecution witnesses lied about the first point.  Their inability to get their stories straight and demonstrated willingness to perjure themselves render them incredible on the second point.

## III.    "Lethal Counsel"[19]: Mr. Medina's Defense Was Entrusted to "A Lawyer Known Best for Losing Capital Cases."[20]

In light of the jumbled state of the prosecution's witnesses, and the fact that each of them would come up with stories at trial which were materially inconsistent with their prior statements to the police, it is surprising that a jury could have convicted Mr. Medina.  It was an outcome possible only because it was facilitated by the defense.

On January 15, 1996, ten days after Mr. Medina was arrested, the trial court appointed Gerard "Jerry" Guerinot, first chair, and John A. Millin III, second chair, to represent Mr. Medina at trial.

---

[19] David Rose, *Lethal Counsel*, THE OBSERVER, Dec. 2, 2007.

[20] Adam Liptak, *A Lawyer Best Known for Losing Capital Cases*, N.Y. TIMES, May 17, 2010 ("*Lawyer Best Known for Losing*").

Jerry Guerinot is infamous for his impossibly huge caseload and failure to prepare for capital trials. *Lawyer Best Known for Losing*, N.Y. TIMES, *supra*, (Guerinot's record "seems to boil down to a failure to conduct even rudimentary investigations."); Scott Horton, *The Texas Death Penalty Express*, HARPER'S MAGAZINE, May 20, 2010 (Guerinot "plays an essential role in [the Texas] system by creating the illusion that defendants have competent defense representation."); Lise Olsen, *Hundreds Kept Jailed for Months Pretrial: Lawyers for the Poor Have High Caseloads, but Little Oversight*, HOUSTON CHRONICLE, Oct. 4, 2009 ("*High Caseloads, but Little Oversight*") ("In 2007 and 2008, [Guerinot was] assigned to handle **more than 2,000 felony clients, . . . enough work to keep more than 12 lawyers busy**, according to caseload limits accepted by the National Legal Aid and Public Defender Association.") (emphasis added); David Rose, *Lethal Counsel*, THE OBSERVER, Dec. 2, 2007 ("Jerry Guerinot [is] probably America's most dangerous defence lawyer"); Mary Flood, *What Price Justice?*, HOUSTON CHRONICLE, July 1, 2000, at A1 (noting jokes about the "Guerinot Wing" on death row).

With 20 clients sentenced to death,[21] Mr. Guerinot has had more clients on death row than the death-sentenced population of almost half—16 of 34—of the states with the death penalty.[22] Mr. Guerinot amassed his 20 verdicts from 1980 to 2002, though his most prolific period by far was in 1996.  In just **six (6) months**, from February 1ˢᵗ to August 1ˢᵗ of 1996, Mr. Guerinot garnered **four**

---

[21] Debra Cassens Weiss, *Defense Lawyer Holds Possible Record for Most Clients Sentenced to Death*, ABA Journal, May 18, 2010 (available at http://www.abajournal.com/news/article/defense_lawyer_holds_possible_record_for_most_clients_sentenced_to_death/) (last visited Mar. 30, 2011).

[22] *See* Death Penalty Information Center, http://www.deathpenaltyinfo.org/death-row-inmates-state-and-size-death-row-year (last visited March 30, 2011) (Sixteen states have fewer than 20 people on death row).

*(4) death sentences*[23]—and Mr. Medina's verdict was the fourth and most flawed product of Mr. Guerinot's assembly line approach to capital defense.

Once the 2001 Fair Defense Act required Texas counties to come up with a plan for providing competent counsel in capital cases, Mr. Guerinot was no longer appointed to them.[24]

Mr. Millin, the second chair lawyer, was very ill with stomach cancer and receiving cancer treatments during Mr. Medina's trial. He was absent from Mr. Medina's trial for hours at a time in order to receive his treatments. Exhibit 5 (Affidavit of Golda Medina), at ¶ 21; Exhibit 6 (Affidavit of Anthony Luna Medina), at ¶ 11. He succumbed to his illness less than two months after Mr. Medina's trial. Despite Mr. Millin's terminal illness, Jerry Guerinot placed full responsibility for development of punishment phase evidence on Mr. Millin. Exhibit 7 (First Affidavit of Gerald Guerinot), at ¶ 2. In addition to being ill, Mr. Millin was likewise occupied with other capital cases in the few months that he represented Mr. Medina. Mr. Millin co-counseled one capital case with Mr. Guerinot from late April through all of May, 1996, and was in trial on the Edward Capetillo case from the date of his appointment in *Medina* until the jury returned with a death verdict on February 7, 1996.

---

[23] Eric Nenno, sentenced to death on February 1, 1996; George Whitaker, III, sentenced to death on April 2, 1996; Johnny Ray Johnson, sentenced to death on May 30, 1996; and Anthony Medina, sentenced to death on August 1, 1996. The other three defendants, Mssrs. Nenno, Whitaker, and Johnson, were executed within a 3½-month period from October 28, 2008, to February 12, 2009. http://www.tdcj.state.tx.us/stat/executedoffenders.htm.

[24] Petitioner cannot say whether Mr. Guerinot's departure from capital work in the wake of the Fair Defense Act was merely coincidence or whether he failed to qualify for appointment in capital cases. Mr. Guerinot has never been included on Harris County's post-Fair Defense Act lists of counsel qualified to try capital cases but—as relatively recent news coverage of his 1000 court-appointed felony cases per year demonstrates—he certainly has not retired from criminal court appointments. *See High Caseloads, but Little Oversight*, *supra*.

-26-

A.    Mr. Medina's was one of *four* (4) capital cases tried by Mr. Guerinot during the 6 ½ months he represented Mr. Medina; Mr. Guerinot was also handling 174 other cases during this period and had a part-time job as prosecutor for the City of Humble; and no other member of the defense team picked up the slack for Mr. Guerinot.

On January 15, 1996, the date on which he was appointed to defend Mr. Medina's case, Jerry Guerinot was in the middle of Eric Nenno's death penalty trial. Mr. Guerinot remained in trial until February 1, 1996, when a jury sentenced Mr. Nenno to death. With only 5½ months left before Mr. Guerinot would take his newest capital client to trial, one would expect him to turn immediately to investigating and preparing to try Mr. Medina's case. As every available piece of the record in this case confirms, however, Mr. Guerinot did no such thing. Instead, Mr. Guerinot turned to his next capital defendant, George Whitaker, III, whose trial was a mere *33 days* away. Mr. Whitaker's trial commenced on March 5, 1996, and ended on April 2, 1996, when Mr. Whitaker too was sentenced to death. Now with just 3½ months left before Mr. Medina's trial, it was imperative that Mr. Guerinot intensively prepare for both phases of Mr. Medina's trial. Counsel had yet to file a single pre-trial motion in Mr. Medina's case or employ any of the necessary litigation services, such as an investigator, a mitigation specialist, or any experts. *As of April 2, 1996, defense counsel's own files and the court's docket confirm defense counsel had done nothing on Mr. Medina's case*.

But once again, Mr. Guerinot did not train his focus on Mr. Medina's case because, as of April 2, 1996, he faced a more imminent litigation emergency: he was a mere *23 days* away from starting Johnny Ray Johnson's capital murder trial. Mr. Johnson's trial started on April 25, 1996, and concluded on May 30, 1996, when Mr. Johnson joined Mssrs. Nenno and Whitaker on death row.

With only 45 days left before Mr. Medina's trial, Mr. Guerinot was finally done with the

three other capital trials that had consumed his time since being appointed to Mr. Medina's case. Thus, he could turn his focus to juggling his caseload of 174 other clients,[25] his part-time job as City Attorney for the City of Humble, *see* Exhibit 61, and Mr. Medina's case.  Despite the imminency of Mr. Medina's capital murder trial, it would be another three weeks—on June 19, 1996, just 26 days before trial—before defense counsel would even file their first pre-trial motion in the case.

The chart below illustrates that Mr. Guerinot's in-court time alone would have deprived any attorney of the opportunity to adequately prepare for a capital murder trial, and Mr. Guerinot was also juggling 174 other cases and a part-time job as a city prosecutor:



**Serious Felonies Handled by Guerinot
January 16 - August 1, 1996**

---

[25] *See* Exhibit 63 (Harris County records showing that Mr. Guerinot had 174 cases open cases during the 6½ months he represented Mr. Medina).

-28-

The record confirms that other people responsible for preparing Mr. Medina's case for trial were no more focused on the case than Mr. Guerinot.  Mr. Millin was likewise burdened with a large caseload, and he obtained *3 death sentences in a span of less than six months*.[26]   In the six months prior to Mr. Medina's trial, Mr. Millin tried two other capital cases (each ending in a death sentence) and an aggravated sexual assault case to verdict, and handled many other serious felonies.

The chart below illustrates Mr. Millin's frenetic schedule:

## Serious Felonies Handled by Millin
## January 16 - August 1, 1996



_____

[26] Edward Capetillo, February 7, 1996; Johnny Ray Johnson, May 30, 1996; Anthony Medina, August 1, 1996.

The above chart, though, does not tell the entire story. Mr. Millin's health was in serious decline in 1996, to the extent that he was unable to be present for all of Mr. Medina's trial. Court records pre-dating Mr. Medina's trial show that Mr. Millin's illness was interfering with his ability to practice law more than a year before Mr. Medina's trial. In *State v. Alvarado*, No. 0696014, the docket reflects that Mr. Millin was in the hospital in June of 1995. Exhibit 8. He was ill the following month as well, and the case was reset. During Mr. Medina's trial, Mr. Millin had a shunt implanted in his chest and was receiving chemotherapy. Exhibit 6 at ¶11. Contrary to what he told the attorneys for the State during post-conviction proceedings, Mr. Guerinot reported to Mr. Medina's state habeas counsel that Mr. Millin was not well during trial. Mr. Guerinot recalled that during lunch, Mr. Millin did not eat meals. Mr. Guerinot recalled that Mr. Millin explained that he had to introduce medication/nutrients through his chest tube. Mr. Guerinot stated that while he would eat hamburgers, Mr. Millin tended to his medical needs during lunchtime.

The week before Mr. Medina's trial, Mr. Millin went on vacation, probably his last. Mr. Millin died on September 27, 1996, shortly after Mr. Medina's trial.

The only other members of the defense team were investigator John Castillo and his associate Pam Bosse-Hamilton. Despite being appointed on January 16, 1996, trial counsel waited until April 15, 1996, to retain an investigator on the case. Exhibit 9 (Fee statement of John Castillo). Even though counsel were busy trying the *Nenno*, *Capetillo*, *Whitaker*, and *Johnson* capital cases, their investigator could have begun work on Mr. Medina's case before counsel squandered half of the time between their appointment and the trial. After speaking to Mr. Medina on April 19th, and Mr. Medina's sister on April 22nd, Mr. Castillo did no more work on the case until mid-June, at which point he turned the case over to Ms. Bosse-Hamilton. Less than a month before trial, Ms. Bosse-

Hamilton started working on the case.  The attorneys did not request any work on the punishment phase until the first day of trial, July 15, 1996, at which point the "attorneys asked for character witnesses."  Exhibit 9.  The investigator's report reflects that "character witnesses" were contacted mid-trial on a single day, July 20, 1996.  There was no other work done in preparation for the punishment phase.  The entire investigative effort for both phases of the trial was just 30 hours.  *Id.*

### B. Defense counsel's "failure to conduct even [a] rudimentary investigation[]."[27]

#### 1. The 30 hours of investigative services, to prepare for *both* phases of the trial, was facially inadequate.

Counsel tried Mr. Medina's case without conducting even a rudimentary investigation.  Their work on this factually complex case was supplemented only by 30 hours of investigative services by John Castillo and Pam Bosse-Hamilton.  Because Castillo and Bosse-Hamilton documented their hours, there is a clear record of the extent, and therefore the inadequacy, of their investigation.[28]

---

[27] *Lawyer Best Known for Losing*, N.Y.TIMES, *supra*.

[28] Neither Mr. Guerinot nor Mr. Millin kept their time in this case; instead they were paid a lump sum fee for the case.  Mr. Guerinot's voucher in the trial court consists of one page and states only that he was first chair.  Exhibit 10 (Mr. Guerinot's voucher).  He was paid $16,000.00 for the case, and his fee would have been the same regardless of the whether he spent 10 hours or 1000 hours preparing for trial.

The county paid Mr. Guerinot $126,897.00 dollars for his court-appointed work in 1996, Exhibit 11, $10,000 more than the State of Texas paid then-Governor Bush. http://www.stateline.org/live/ViewPage.action?siteNodeId=136&languageId=1&contentId=14239 (last checked April 3, 2011).  Mr. Guerinot was not required to itemize his time or otherwise justify his $16,000 in the *Medina* case.  It was precisely this lack of accountability and quality control—and partially Mr. Guerinot himself—that led the Harris County Commissioners to adopt a public defender system:

> More than 100 private attorneys were assigned by judges to represent inmates who could not afford a lawyer in felony cases in 2008.  Sixty of them received more than $100,000.

By June 19, 1996, the only investigation performed by the investigators was Mr. Castillo's one conversation with Medina and one conversation with Mr. Medina's sister.  Exhibit 9 (Fee statement of John Castillo).

Thus, on June 19, 1996, with just 26 days left before trial the entire defense preparations amounted to the investigator's conversation with Mr. Medina and his sister, and Mr. Millin filing mostly boilerplate pre-trial motions.  The absence of preparation or delays in investigation were in no way attributable to Mr. Medina or his family, all of whom were eager to assist counsel and the investigator.  Mr. Medina's sister, Angie Medina, was the primary source of information for the investigators, and she had to work hard to get their attention.  A letter in Mr. Castillo's file from Mr. Medina postmarked May 31, 1996, 1½ months before trial began, explained that his sister Angie had been leaving messages for Mr. Castillo but her efforts had been "to no avail."  Exhibit 12 (May 31, 1996, letter from Tony Medina to John Castillo).  *See also* Exhibit 6 at ¶ 5 (Affidavit of Anthony Luna Medina) (Mr. Medina's father called Jerry Guerinot several times before trial to see whether the lawyer needed any information, Mr. Guerinot never returned the calls).

Despite Angie Medina's efforts to reach out to the investigators, they waited until June 25, 1996, *20 days before trial*, to meet with her and pick up a list of potential witnesses (which included addresses and phone numbers).  Inexplicably, the investigator waited another two weeks, until July 9, 1996—*just six days before trial*—to take the next step and attempt to contact and interview the

---

Yet, no one in Harris County is centrally assigned to oversee those attorneys or monitor their caseloads or complaints.  ***None of the lawyers are routinely required to document the hours or provide details on how much they worked on each case***, according to the county auditor's office and interviews with judges and attorneys.

*High Caseloads, but Little Oversight*, HOUSTON CHRONICLE, *supra* (noting that Mr. Guerinot had a caseload of more than 2000 felonies in 2007 and 2008) (emphasis added).

witnesses.  Exhibit 9 (Fee statement of John Castillo).  On that date, Ms. Bosse-Hamilton reported making several attempts to locate and interview the witnesses at home.  After one day of pounding the pavement, the defense investigator gave up and instead called witnesses and left messages asking them to call her at home.  *Id*.  The following day, five days before trial, Ms. Bosse-Hamilton conducted eight interviews by telephone.[29]  Just four days before trial, on July 11, 1996, Ms. Bosse-Hamilton interviewed two more witnesses[30] and then prepared an "investigation report for court readiness."  *Id*.  Thus, other than an interview with Mr. Medina and his sister, the entire guilt/innocence phase defense investigation leading to "court readiness" was a two-day affair consisting of 10 telephone calls.

Of the four State's witnesses later described by the prosecutor as essential to the conviction,[31] the defense managed to interview only one: Jamie Moore.  At the end of jury selection, on the eve of the guilt/innocence phase, the prosecution announced that it would have twenty-eight (28) witnesses when the court reconvened to take evidence.  11 RR 1285.  The defense had spoken with just three (3) testifying witnesses for the prosecution.[32]  The defense investigators never interviewed the key State's witnesses, nor did they interview the key ***defense*** witnesses, including Alex Perez, Domingo Valle, and Rene Reyna.  These people, the star guilt/innocence-phase witnesses for the defense, appeared only because Mr. Medina's family took responsibility for interviewing them and

---

[29]  (1) Veronica and Lourdes Ponce; (2) Louisa Escobar; (3) Cathy Ponce; (4) Cleo Martinez; (5) Sam Lopez; (6) Anastacio Boudres; (7) Jessica Ramirez; (8) Adela Moya.

[30]  (1) Rocio Pedraza, and, (2) Jamie Moore.

[31]  Flaco Holmes, Johnny Valadez, Regina Juarez, and Jamie Moore.

[32]  Rocio Pedraza, Louisa Escobar, and Jamie Moore.

getting them to the courthouse when it became frighteningly obvious the defense team was not ready.

As Mr. Medina's father explained:

> I did not meet Anthony's lawyers until the trial.  Before the trial, I knew Jerry
> Guerinot had been appointed to represent Anthony.  I called Mr. Guerinot two
> separate times about four to six weeks before the trial, but I was told he was not in
> his office.  Mr. Guerinot never returned my calls.  I wanted to meet with him to find
> out if there was any information he needed from me for Anthony's trial.  I did not
> know Anthony had a second attorney until I met Jack Millin at Anthony's trial.

> Before Anthony's trial, I met Mr. Castillo, an investigator working with Mr.
> Guerinot, once.  His biggest concern was the fact I had not contacted Toby
> Hernandez, my cousin who works in the Chicano Squad of the Houston Police
> Department.  I never understood why he wanted me to call my cousin.

> During jury selection, my family and I realized Anthony's attorneys had not
> subpoenaed any witnesses.  We told them they should talk to Domingo Valle, Alex
> Perez, and Rene DeLeon Reyna.  We also told Anthony's attorneys they should talk
> to Flaco's girlfriend.  I think her first name was Shelly.

> ***My family called the people who ended up testifying for Anthony from the
> courthouse and I had to leave the courtroom to go pick them up and bring them
> back to the courthouse.***

Exhibit 6 at ¶¶ 4-7 (Affidavit of Anthony Luna Medina) (emphasis added).  Mr. Medina's

description of the defense's lack of pre-trial preparation is borne out by the record.  The files of

Castillo and Bosse-Hamilton make no mention of ever talking to the defense witnesses.

The defense investigators billed for 30 hours of work, in preparation for both phases of the

trial.  The appointed investigator's inadequate, last-minute, telephonic investigation produced little

in the way of useful results.  The defense case at trial was developed and secured by Mr. Medina's

family.  Absent the determined exertions of Mr. Medina's family there would have been no defense

at all.

### 2.      Trial counsel's files are devoid of any indication that they personally investigated the case.

There is no indication in the files of either trial counsel, the court's docket, or the district clerk's file, that trial counsel performed any work on Mr. Medina's case before the conclusion of Johnny Johnson's capital murder trial at the end of May, 1996.  The first sign of life from the defense appears on June 19, 1996, ***156 days after counsel were appointed and just 26 days before trial***.  It is on this date that counsel filed their very first motions in the case, which included requests for discovery, an investigator, and an independent mental health expert (the latter was granted but—even after representing to the court that the mental health expert was so integral to the defense that the failure to appoint one would amount to a Sixth Amendment violation—the defense never bothered to hire one).  1 CR 24-53 (first defense motions filed on June 19, 1996); *see also* Docket Sheet, *State v. Medina*, No. 072608801010 (available at http://www.hcdistrictclerk.com/Edocs/Public/CaseDetails.aspx?CaseNbr=072608801010&CDI=3) (same).

Other than defense counsel's notes from meeting with their client, their files are devoid of any indication that they conducted investigation above and beyond the 30 hours of work by Mr. Castillo and Ms. Bosse-Hamilton.

In state habeas proceedings, Mr. Guerinot signed an affidavit for the State[33] averring that:

As part of the pre-trial investigation and preparation, the defense prepared and filed

---

[33] Typically, such affidavits are prepared by the assistant district attorney handling the habeas proceedings for the State.  That the State authored Mr. Guerinot's affidavit in this case seems particularly likely because the affidavit misspells the name of Mr. Guerinot's co-counsel and colleague, Mr. Millin, as "Mullin."  This same misspelling appears in all other documents authored by the state post-conviction prosecutor, including the State's answer to the state habeas application, the State's proposed findings of fact, and the affidavits of the trial prosecutors.

> pre-trial motions; engaged the services of investigator; interviewed witnesses;
> obtained discovery from the State; reviewed the State's file; read the offense
> report; visited the scene of the offense; interviewed the defendant's family, and talked with
> the defendant numerous times about the offense and pending trial.  Defense counsel
> spent a long time investigating this case and counsel's case load did not hinder our
> preparation or investigation at all.

Exhibit 13 (Second Affidavit of Jerry Guerinot).  Notably, even if every assertion in this catalogue of defense efforts is true, it fails to refute the fact that Guerinot personally did nothing to prepare for trial.  Moreover, as explained more fully *infra*, it is a damning indictment of the defense's failure to accomplish the numerous tasks required by the contemporaneous standard of care in Texas capital trials.

Mr. Guerinot refers to "the defense"; he never uses the first person singular.  True, "the defense" prepared and filed pre-trial motions, but the scant number of boilerplate motions they managed to file were prepared by Mr. Millin and filed less than a month before trial.  The same is true of the discovery requests.  "The defense," *i.e.* Ms. Bosse-Hamilton, interviewed witnesses, but a few critical witnesses and none of the defense's witnesses.  "The defense" interviewed Mr. Medina's sister before trial—and other family members in the five to ten minutes before they were put on the stand—but the defense failed to interview most of the family before trial, including Mr. Medina's parents.  Moreover, the lawyers were wholly unresponsive to the family's effort to contact them.  The record proves that the investigators were also unresponsive to Mr. Medina's family.  In the limited contacts the defense had with Mr. Medina's family, they never asked about basic social history information.

And while Mr. Guerinot may have read the State's file on the case, he failed to read it closely enough to appreciate the significance of copious evidence, as set out in detail below, that would have

impeached the key prosecution witnesses.  The statements of star prosecution witnesses were materially inconsistent with their trial testimony, but Mr. Guerinot was oblivious to this fact.

And finally, given that the intervals between Mr. Guerinot's three previous capital trials were just 33 days and 23 days,[34] the 45 days he had between his last death penalty trial and Mr. Medina's was—relatively speaking—"a long time."

While the defense investigation to challenge the prosecution's case and present its own during the guilt/innocence phase was far too little, far too late, the investigation for the punishment phase was even more paltry.  As Mr. Guerinot averred under oath in the state habeas proceedings, Mr. Millin "was responsible for the punishment phase of the trial."  Exhibit 7 at ¶2.

By the first day of trial, July 15, 1996, the defense had taken only one step to prepare for the punishment phase: the filing of a motion for a mental health expert.  1 CR 24-27.  Filed less than a month before trial, the motion argued that "[t]he Defendant is a man of both limited intelligence and education . . . .  The Defendant's counsel believe that it is *imperative* to retain a mental health expert solely for the purpose of advising counsel concerning the Defendant's past and present mental state."  1 CR 24 (emphasis added).  The defense insisted that they needed an "independent, qualified expert at Harris County [sic] expense to examine the Defendant and *consult with his defense counsel as to the appropriate legal strategy* to be taken on his behalf."  1 CR 25 (emphasis added).  Counsel represented to the trial court that if the court failed to grant the defense motion it would deny Mr. Medina his right to the effective assistance of counsel: "Without such independent and privileged expert consultation advice, and possible expert testimony, the Defendant *cannot receive a fair and*

---

[34] As described, *supra*, Mr. Guerinot started the *Whitaker* capital trial on March 5, 1996, 33 days after the February 1 1996, death verdict in *Nenno*, and then started the *Johnson* capital trial on April 25, 1996, 23 days after Mr. Whitaker was sentenced to death.

*impartial trial as required by the Sixth Amendment* of the United States Constitution . . . ."  1 CR 25 (emphasis added).

Though the motion was filed less than a month before trial, the court agreed that counsel required expert assistance to provide effective representation and thus granted the motion.  Yet, trial counsel never hired the mental health expert.  In light of counsel's representations to the trial court, it is hard to fathom why counsel would turn their backs on the available funding for a mental health expert.  Mr. Guerinot's affidavit for the State is silent on this issue, but the most plausible explanation from the record is that they were out of time and the lawyer responsible for handling sentencing phase-related matters was terminally ill and tending to his treatments.  Regardless, counsel proceeded in complete ignorance of any guidance and insight that could have been provided by a mental health expert.  As trial counsel themselves certified in a court of law in an effort to receive money for the defense, proceeding in this manner was a Sixth Amendment violation. Hence, filing this motion is not evidence of counsel's diligence, it is a contemporaneously documented admission by trial counsel that they violated Mr. Medina's Sixth Amendment rights.

Other than requesting funding and abandoning it, counsel's only other preparation for the punishment phase was to turn to their investigator on the first day of trial and ask for some "character witnesses."  The investigator's report indicates that a single day, July 20, 1996, was devoted to this task: "Obtained character witnesses and interviews [sic] several character witnesses."   With that, counsel went to trial.

IV. **"He doesn't even pick the low-hanging fruit which is hitting him in the head as he's walking under the tree":[35] Defense counsel were unprepared to challenge prosecution witnesses on glaringly obvious, material inconsistencies throughout the guilt/innocence phase.**

Jury selection, a process in capital cases that often lasts for one or two months, began on July 15, 1996, and was over in less than six days.[36] The selection process was expedited considerably by defense counsel who, on average, spent less than 7 minutes questioning each juror. Of the jurors who were eventually seated, trial counsel spent an average of 6 minutes per juror, including questioning one juror for 1 minute and failing to ask another juror a single question. As the *voir dire* progressed, trial counsel appeared to abandon questioning jurors altogether: the *voir dire* of the tenth seated juror was only five pages, 11 RR 1238-42, the eleventh a mere one page, consisting of asking the juror if he was "a fair guy", 11 RR 1262, and the last seated juror was asked no questions at all. 11 RR 1284.

A. **The prosecution's theory: Tony Medina—who had some kind of personal grudge against the intended victim—was the shooter and the only person in a carload of seven who even had any idea there would be a shooting.**

The prosecutor's opening statement summarized his theory of the case: a gang-related drive-by shooting from a car loaded with 7 people, only one of whom—a shooter armed with a large military assault rifle—had any inkling that the shooting would happen. 12 RR 1293-99.

Sgt. Novak was the first witness for the prosecution. 12 RR 1301. Through Novak, the prosecution described the crime and the State's theory of the case. The investigator described the crime scene, the victim's wounds, and offered his opinion that the crime was a gang-related drive-by

---

[35] *Lawyer Best Known for Losing*, N.Y. TIMES, *supra*.

[36] Jury selection began on Monday, July 15, 1996, and continued throughout the week. It resumed on Monday was July 22, 1996, and was over by 3:00 p.m. on the same day.

-39-

shooting.  12 RR 1304-60.  The prosecutor elicited that Novak interviewed the people who were in

the car with the shooter, including Jamie Moore, Flaco Holmes, Scharlene Pooran, Veronica Ponce,

Johnny Valadez.  12 RR 1365; 1368-69.  The prosecutor very deliberately asked Novak whether each

witness was interviewed separately from the others:

> Q:     Dominic Holmes.  Did you interview him?
>
> A:     Yes, we did.
>
> Q:     Okay.  And did you interview him separately or with Jamie Moore?
>
> A:     He was interviewed separately.
>
> Q:     How about Scharlene Pooran?  Did you interview her?
>
> A:     Yes, I did.
>
> Q:     Was she interviewed separately or with the others?
>
> A:     She was interviewed separately.
>
> Q:     And how about Veronica Ponce?
>
> A:     She was interviewed separately also.
>
> Q:     And how about Johnny Valadez?
>
> A:     He was also interviewed separately.
>
> Q:     And did those people give written statements?
>
> A:     They all did.  Yes.
>
> Q:     ***I'm not asking what they said, but were their statements consistent?***
>
> A:     ***Yes.***

12 RR 1368-69 (emphasis added).  As Novak testified, these statements were the basis for a capital

murder charge against Mr. Medina.  12 RR 1369-70.  Lastly, Novak described recovering the

-40-

weapons, in March of 1996, in Scharlene Pooran's backyard.

Novak's testimony that the statements of all five of alleged "eye-witnesses" were "consistent" was false,[37] and it improperly bolstered the prosecution's case by incorrectly informing the jury that Veronica Ponce and Scharlene Pooran—who were not called by the State—would confirm the testimony of State's witnesses Jamie Moore, Flaco, and Johnny Valadez.  Veronica Ponce had informed Novak that she was not even in the car but had only said so in her January statement because she was pressured into it.  Both Veronica and Scharlene had testified under oath that Mr. Medina was not the shooter.

On cross, Guerinot—who claimed to have read the State's file prior to trial—did not challenge Novak's assertion that the witness statements were all consistent.  13 RR 1399.  Guerinot's complete unfamiliarity with these witness statements was subsequently showcased when the witnesses took the stand.

The prosecution elicited descriptions of numerous extraneous offenses that happened at the

---

[37] As noted, *supra*, these statements were anything but consistent.  The five witnesses contradicted each other on who was present in the car, where they were sitting, when the shooting happened, and whether they knew in advance there would be a shooting.

Additionally, as the police report plainly documents, while the witnesses were questioned separately, the police fed them a lot of information, including what other witnesses had already said, *before* questioning them.  *See* Exhibit 1 at 183 (Jamie Moore was told what Flaco had said *before* Jamie gave a statement); *id*. at 189 (Officer Chisholm "went over with Johnny all the names of the persons involved and the information we had" *before* Johnny was questioned); Exhibit 4 (Affidavit of Sarah L. Jack) (police officers would not accept Veronica Ponce's account and confronted her with their own, including a diagram of where everyone was supposed to have sat in the car).

Thus, as both the prosecutor and Novak knew at the time (and the offense report clearly documents), emphasis on the fact that the witnesses were interviewed separately but still gave allegedly "consistent" statements was extremely misleading in light of HPD's incredibly suggestive approach to interrogating these kids.

-41-

same location as the drive-by shooting, and explicitly implied that Mr. Medina committed them because of his alleged gang-related grudge against anyone associated with the HTC gang. These offenses were doubly damaging to the defense in that they provided both an alleged motive for the crime and alleged evidence of Mr. Medina's dangerousness. They came in through witnesses who lived at the Campden Hill house where the shooting happened.

Evaristo Rodriguez, the owner of the house, testified that his house had been for sale at the time of the crime because they had already been the victim of a drive-by shooting on July 10, 1995. 13 RR 1411. Mr. Rodriguez testified that, on the day after the July, 1995, shooting, "La Raza 13" had been spray-painted on his garage. Around the same time, the windows were smashed out of his daughter's car, which was parked outside of his house, and it too was "tagged" with gang graffiti. 13 RR 1416-18. The State later called Mr. Rodriguez's daughter, Veronica Rodriguez, who testified about the attack on her car. 14 RR 1637-38. She also testified—*without objection from the defense*—to the July, 1995, drive-by shooting, *even though she was not there the night it happened*:

> I was not there that night but there was a shot, there was a drive-by by my house, a bomb fire, too. They threw a bottle of—I guess it was a fire bomb. I don't know what it was . . . . They threw it at the wall, you know . . . . I don't know what their intentions were, to burn something up, and, you know, and there were shots fired.

14 RR 1640-41. Mr. Rodriguez's other daughter, Esmarelda, also testified about these extraneous crimes, though she failed to mention the fire bomb. 13 RR 1431-32.

Guerinot knew in advance that the prosecution would introduce these extraneous offenses with the intention of imputing them to his client. In response to counsel's belated request for pre-trial discovery, the prosecution disclosed that among the "[e]xtraneous offenses, wrongs, or bad acts

***committed by the defendant***, that will be used by the state" were:

> March 29, 1995 at 8:30 am at 15431 Campden Hill (HPD #034703195).  Four [sic] hispanic males spray the house with La Raza 13 graffiti and leave in a red convertible.

> July 9, 1995, at 1:40 am at 15431 Campden Hill (HPD #077962295) a [sic] molatov cocktail is thrown at the house and shots are fired.

Exhibit 14 (Excerpt from State's response to request for discovery) (emphasis added).

Guerinot objected to Mr. Rodriguez' testimony about the extraneous offenses as irrelevant, but his objection was overruled.  13 RR 1413.  Because defense counsel performed no pre-trial investigation into the extraneous offenses—notice of which they requested and received prior to trial—they failed to assert a more cogent reason for excluding them: Mr. Medina was incarcerated in a boot camp at the time could not have been responsible or even present for these offenses.

The prosecution also attempted to bolster its case for identity through conspicuously incredible testimony that Mr. Medina had some kind of personal and specific animosity towards Marco "Blue" Martinez, the alleged intended target of the shooting.  Marco, a 17-year-old, testified that he was a gun-wielding associate of the H-Town Crips gang who "lived life by the bullet."  14 RR 1618.  The H-Town Crips, or HTC, were rivals of the LRZ who murdered an LRZ member at a movie theater in January of 1995.  Marco was Veronica Rodriguez's boyfriend and, according to the prosecution's theory, the intended target of the drive-by shooting.  Marco initially testified that he saw Tony Medina once or twice a day, 13 RR 1580, but then backtracked and said that he had seen Mr. Medina only once in 1995 and never in 1996.  13 RR 1580.  Martinez testified that this alleged lone interaction with Mr. Medina in 1995 happened in November or December, when Marco drove his car by Mr. Medina's house and the two exchanged gang signs as Marco passed.  During

Marco's drive-by, Mr. Medina allegedly ran to his car, retrieved a gun, and waved it at him.  13 RR

1583.

Marco described two other alleged incidents, though he said Mr. Medina was present for only

one of them, in which a group of LRZ kids allegedly drove by when he was visiting Veronica's

house.  13 RR 1587-88.  Because Marco testified that he saw Mr. Medina only the one time in 1995

and not at all in 1996, these alleged incidents must have happened in 1994 or earlier.  However, the

prosecution's theory was that LRZ was allegedly targeting Marco in revenge for HTC's murder of

G-Money, which happened in 1995.  Even if these two incidents actually happened, by Marco's own

account, they were more than a year before the crime and Mr. Medina was alleged to have been only

one of many people in a car.  Nothing about these incidents even remotely suggests a particularized

rivalry between Marco and Mr. Medina.

In an effort to reinforce the impression that there was some sort of special personal animosity

between Mr. Medina and Marco, the prosecutor showed Marco a picture of Flaco and asked whether

he knew Flaco.  Marco said that he did not know Flaco, he had never heard of him, he did not

recognize the person in the photo of Flaco, and he never "had any trouble at all with somebody who

looked like" the person in the photo.  13 RR 1586.

During cross-examination, Marco admitted that he had never met Mr. Medina, that he had

never spoken with Mr. Medina, and that Mr. Medina had never threatened him. 14 RR 1611; 1616;

1621.  He said that he had been personally threatened by Rudy Ruiz, another LRZ gang member but

Marco—a gun-toting gang member who "lived life by the bullet"—did not "lower" himself by taking

any action in response to Rudy's threats against him.  And yet, despite the fact that he had seen Mr.

Medina only once in the year preceding the crime, Marco's story was that Mr. Medina was trying

-44-

to kill him.  14 RR 1616.

**B.    The only forensic evidence at trial relevant to the identity of the shooter pointed to Flaco.**

As described, *supra*, two months after the police locked the prosecution witnesses into their statements and filed capital murder charges against Mr. Medina, an incredibly inconvenient fact emerged during the investigation.  On the day the guns were found wrapped in plastic bags and buried in Scharlene Pooran's yard, Sgt. Novak submitted the package for fingerprinting and asked Jimmy Schraub, the HPD latent fingerprint examiner, to compare them against Anthony Medina and Alex Perez.  Exhibit 1 at 335.  Obviously hoping for a match, Sgt. Novak did not ask for comparisons against anyone else.  *Id*.  Though counsel has yet to be furnished with Officer Schraub's report in this case, those comparisons must have been negative.  Five days later, on March 13, Schraub connected the package to Flaco.

Officer Schraub testified that he examined the guns and the plastic bags in which they were buried and found "four identifiable latent palmprints."  13 RR 1526.  The prosecutor asked Officer Schraub whether he compared the prints to Flaco Holmes, but there was no discussion of whether anyone else's palmprints were tested against the palmprints on the bags, and if so, the results of those tests.  13 RR 1527.  Two of the four palmprints were matched to Flaco, and the prosecution did not ask Officer Schraub whether he determined who left the other palmprints.  13 RR 1528.  Nor did the prosecutor elicit the fact that Mr. Medina and Alex Perez had been ruled out as possible contributors of the other two prints on the bag.  Officer Schraub was unable to find any identifiable prints on the weapons, magazines, or bullets submitted to him.  13 RR 1529.  The defense had *no* questions of Officer Schraub.  13 RR 1540.

-45-

The only other forensic evidence came from HPD Officer Robert Baldwin, whose ballistics work in other cases has been discredited.[38]   Officer Baldwin played a video for the jury to demonstrate the power of the semi-automatic rifle and told the jury that the shells discovered in the street matched one of the unearthed rifles.  13 RR1555.  Although Mr. Guerinot sought to elicit testimony from Mr. Baldwin which would show that the forensic evidence was inconsistent with the "eye-witness" accounts of Flaco and his friends, Mr. Baldwin merely told the jury that more testing would be necessary to answer the defense's questions, and that testing had not been requested or completed.  13 RR 1571.

        **C.**       **Resolving the Prosecution's Identity Crisis: Putting the Murder Weapon Back in Mr. Medina's Hands; and New and Improved (and Perjured?) Stories From The Prosecution's Star Witnesses.**

The prosecution did two things at trial to counter the impact of Flaco's palmprint.  First, it presented witnesses who allegedly saw Mr. Medina on New Year's Eve holding a gun that looked like the murder weapon.  Second, through its star witnesses, the prosecution presented a new story about how it came to pass that Flaco and his friends disposed of the murder weapon—even though this story squarely contradicted their prior statements to the police that they had not seen the guns since the night of the shooting.  Contrary to their aggressive pursuit of the two teenaged girls who had recanted their prior statements, the prosecution was apparently unconcerned about whether its own witnesses were committing perjury.

---

[38] *See e.g.* Roma Khanna, *Cases Cast Doubt on Ballistics Work at HPD Lab*, Houston Chronicle, Mar. 23, 2003, Sec. A, p. 1 ("Two death row convictions secured with ballistics evidence processed by the Houston Police Department raise questions about the accuracy of the crime lab's firearms work . . . .  In each of the two cases, a police ballistics examiner [Robert Baldwin] used methods that other experts say are unsound.  In one case, the lab's initial ballistics findings were later retracted.").

1.      **Witnesses who saw Mr. Medina with a gun on the night of the shooting but could not find him in the courtroom.**

Testimony from people other than Flaco and his friends putting the murder weapon back into Mr. Medina's hands was crucial to the prosecution.  All of the alleged "eye-witnesses" lacked credibility even before the prosecutors knew they would take the stand and contradict their own police statements.  Witnesses outside of Flaco's circle of friends lent an air of legitimacy to the assertion that Mr. Medina had the gun that night.[39]

Maurice "Nightrider" Agueta[40] was celebrating his 26th birthday on New Year's Eve with a party at his parents' house on Ingomar Way.  15 RR 1719.  Argueta testified that he was a family-oriented sort of person: "We kind of stick together.  You know, we try to be a real family.  We try to keep things—you know, be a family.  You know, just care about one another and help each other out."  15 RR 1718-19.  Maurice testified about two visits to his party that evening by a group of LRZ.

The first visit was at 11:00 p.m.  15 RR 1720.  Argueta testified that Mr. Medina had an argument with one of Argueta's friends during which Mr. Medina pulled out a handgun and pointed it at Argueta's friend.  15 RR 1728-29.  Argueta claimed that he played the role of peacemaker: "I put my hand on the gun and said, 'This is not going to be happening at my house.'" 15 RR 1728.  During the same encounter, according to Argueta, another LRZ member with a shotgun started going

_____

[39] Of course, as even the prosecution's case demonstrated, it was clear that guns were passed around and shared by the LRZ kids.  *See e.g.* 15 RR 1889-91 (Flaco, during prosecution's direct exam, explains how guns are passed around).  Thus, even if these witnesses actually saw Mr. Medina holding the gun at other locations on the night of the crime, it does not provide nearly the direct link to the murders as a palmprint on the packaging in which the gun was buried.

[40] Mr. Argueta's name was erroneously recorded as "Arguenta" in the court transcriptions.

towards Argueta's friend and (the apparently bulletproof) Argueta just walked up to the shotgun-wielding gang member and confiscated the weapon, telling him, "You're not shooting nobody." 15 RR 1731.

Later that night, about 15 LRZ people, including Mr. Medina, returned to the party. 15 RR 1734. This time a brawl erupted. 15 RR 1736. Argueta said he saw Mr. Medina cock a gun, fire it in the air, and then cock the gun again, and "[t]hat's when [Argueta] stepped up," "grabbed the gun and held [Mr. Medina] in a headlock." 15 RR 1736-37. Once again, Mr. Argueta portrayed himself as the family values-oriented hero of the evening:

> Q.    But weren't you afraid of him shooting you?
>
> A.    Sir, my family was out there.
>
> * * * *
>
> Q.    Did you hear him say anything?
>
> A.    He said, let me go, you know. He was saying, let me go. I'll fuck you up. Excuse me. I said, no. You're not going to fuck nobody up around here. And he said—I said it don't have to be like this. I said I don't know what your beef is about the situation.
>
> * * * *
>
> A.    I was trying to get [Mr. Medina] out of the situation, too, because anybody that's close to me I care for them not to be in such a thing. I don't know. You don't need a gang to be a family.
>
> Q.    What exactly did you tell Medina about G-Money?
>
> A.    I said, it's not the way to revenge somebody's death. I say, it's supposed to be God's wish.

15 RR 1737-39. Argueta testified that he held Mr. Medina for about a minute and a half, and then offered to fight him, and then the whole brawl was broken up when Argueta's father came out with

-48-

a pistol and fired it in the air.  15 RR 1739-40.

When asked by the prosecutor to describe the gun Mr. Medina allegedly fired, Argueta unhesitatingly pointed to State's Exhibit 61—the murder weapon—and announced: "[i]t's that gun over there."  15 RR 1737.  Even though Argueta's memory and eyesight were so sharp that he could identify the exact gun Mr. Medina was wielding that evening, he could not identify Mr. Medina without substantial assistance from the prosecutor:

> Q:    And do you see [Mr. Medina] in the courtroom today and could you point to where he's sitting and what he's wearing, for the record?
>
> A:    I do not see him in here.
>
> Q:    *This person over here?*

15 RR 1723 (emphasis added).  The defense did not object to this improper in-court identification.

On cross-examination, Guerinot rehashed a small portion of Argueta's testimony but never challenged his account or credibility.   The jury was left with no reason to question that Argueta was a credible, family-first, peacemaking sort of fellow lacking any ulterior motive to help the prosecution by saying he actually saw Mr. Medina shoot the murder weapon close-in-time to the drive-by.

As a result of either defense counsel's lack of diligence or the prosecution's failure to comply with *Brady*, the jury was not furnished with Argueta's résumé, which included convictions for assaulting one of his elderly relatives and misdemeanor theft.   Argueta was also on probation for tampering with a government record.  At the time of his testimony, Argueta's legal troubles were not all behind him: he was indicted for possession of cocaine just six days before testifying for the State against Mr. Medina, and had been charged with sexual assault on that very morning, right before he

testified.  *See*, *infra*, Claims 1 and 2.

The next prosecution witness was Candelario "Candyman" Guerrero, the host of the LRZ New Year's Eve Party.  15 RR 1750.  As the prosecutor explained in his opening statement to the jury, the State put on Candyman to "tell you about the defendant being [at the party], and he'll tell you about seeing the defendant with a military assault rifle."  12 RR 1298.  Candyman testified that, sometime after midnight on New Year's Eve, he saw Tony Medina with some other people standing in a field across the street from the party.  Mr. Medina was holding a long gun with a clip, and would hide it when a car drove by.  15 RR 1760-61.  Candyman could not describe the gun, what color it was, or whether it had a metal or wooden stock.  15 RR 1762-63.

Candyman also could not identify Mr. Medina in the courtroom, even when asked to come down from the witness stand, because he did not have his glasses on and everything was very blurry. 15 RR 1757.  He was not wearing his glasses on New Year's Eve either, when he allegedly saw Mr. Medina across the street in field with a gun.  And, he confessed, he was "really drunk" that night. 15 RR 1766.

> **2.    Flaco and his friends make the State's case:  "As far as identifying the shooter, that was all we had.  So without the other gang members testifying, [Mr. Medina] would have been found not guilty."[41]**

Other than Flaco and his friends, the prosecution had only one "eye-witness" who could allegedly shed any light on the identity of the shooter.  State's witness Leon Guy was standing in the neighbor's driveway when the shooting happened.  13 RR 1474.  Though he dove to the ground when the shooting started and did not get up until it had stopped, and the car was driving away by

---

[41] *Ponce v. State*, No. 01-97-00930 (Tex. App.-Hous. (1st Dist.) Sept. 3, 1997), 4 RR 44 (emphasis added) (lead prosecutor Steve Baldassano testifying under oath about the Medina trial).

the time he looked up, 13 RR 1482, Mr. Guy testified that he saw the hand of the shooter and it was a "white or Mexican" hand. 13 RR 1479. Mr. Guy also testified that though he was "dead drunk" at the time, 3 RR 1484, he was "sure" that the car used in the shooting was a "two-door" vehicle, 13 RR 1481, and that the car he saw was light gray in color, 13 RR1486. He was shown a picture of Jamie Moore's four-door dark blue or black car—the car actually used in the drive-by shooting—and said it did ***not*** resemble the car he saw that night. He testified that his memory was better at trial, six months after the shooting, than it was on the day of the shooting. 13 RR 1488. Mr. Guy said he was as sure that the shooter's hand was light colored as he was that the car was a light gray two-door. Ultimately, Mr. Guy admitted that he did not "really remember a whole lot of what went on out there other than there was some shooting," and that he "couldn't tell [the jury] one thing other than [he] heard some gunshots go off." 13 RR 1490.

As lead prosecutor Steve Baldassano later testified under oath, Mr. Medina's conviction would have been impossible without Flaco and three of his friends, Jamie Moore (the driver for the drive-by shooting), Johnny "Pelon" Valadez, and Regina Juarez:

> Q:      (By Miss Thornton) How important were the statements and the testimony of the other gang members in the car?
>
> A:      [Steve Baldassano] ***As far as identifying the shooter, that was all we had. So without the other gang members testifying, [Mr. Medina] would have been found not guilty***.

*Ponce v. State*, No. 01-97-00930 (Tex. App.-Hous. (1ˢᵗ Dist.) Sept. 3, 1997), 4 RR 44 (emphasis added).

And yet Guerinot was wholly unprepared to cross-examine these critical witnesses. Though their testimony was grossly inconsistent with their statements to the police, Guerinot's ineffectual

-51-

cross-examination generally amounted to little more than walking the witnesses back through their testimony for the prosecution, thus reinforcing it.

The record confirms that Guerinot cross-examined these witnesses without comparing their testimony to their statements.  At the time of Mr. Medina's trial, the Harris County District Attorney's Office had an "open file" policy.  This meant that defense attorneys were permitted to examine the portion of the prosecution file deemed public, which should include the witness statements.  But defense counsel were not allowed to make copies, they could only take notes. Guerinot claimed to have reviewed the State's files but there were no detailed notes from that review, certainly nothing on which to base his cross-examinations of state's witnesses.

During trial, at the conclusion of the prosecution's direct examination, defense attorneys customarily request from the prosecution a copy of any prior statements by the witness for purposes of cross-examination.  Trial courts routinely give defense counsel a few minutes to review the prior statement before engaging in cross-examination.  In fact, Guerinot did precisely this when he crossed Esmarelda Rodriguez.  *See* 13 RR 1446 (Guerinot asks for her prior statement and then asks the judge for "a moment" so he can review it).

However, when Guerinot cross-examined the prosecution's four most critical witnesses—Flaco Holmes and his three friends—***he did not bother to ask for a copy of their prior (highly) inconsistent statements***.  The record vividly depicts the devastating consequences of Guerinot's failure to exercise this minimal diligence with respect to the prosecution's star witnesses: he failed to identify ***any*** of the abundant, significant differences between their initial statements to the police and their subsequent trial testimony.  As a result, the fact that these critical witnesses ***indisputably lied*** to either the police or during trial (or both), and that they significantly embellished

the substance of their prior statements, was never brought to the attention of the jury.

**Jamie Moore**

Jamie Moore, the admitted driver for the drive-by shooting, never even managed to identify Mr. Medina in the courtroom at trial.  The prosecutor walked Moore through his background: he was a 22-year-old ex-convict who had served a couple of years in prison for burglaries.  14 RR 1654-55.  He was Flaco's friend of several years, but had been a member of a different gang, the Rolling 60's Crips.  14 RR 1656-57.

Moore testified that he drove Flaco to Candyman's New Year's Eve party.  14 RR 1661.  At some point, Flaco asked him to drive a group of people to another house where the group ate menudo while Moore had another beer.  14 RR 1664-65.  In his prior statement to police, Moore was very clear that the people in his car and with whom he spent time eating and drinking consisted of 3 females (identified as Regina Juarez, Veronica Ponce, and Scharlene Pooran) and 4 males (Flaco, Johnny Valadez, Mr. Medina, and himself).  Exhibit 1 185-86.  These individuals were in his car at the time of the shooting.  Exhibit 1 at 196.  However, this was not the prosecution's theory at trial, and it was no longer Moore's story either.

Moore, despite his inability to identify Mr. Medina in the courtroom, 14 RR 1665-66, was still sure that Mr. Medina was one of the people with him and Flaco in the car.  But he could no longer say how many people were in his car, 14 RR 1664, or even who they were:

> Q:    Do you know anybody else that was in the car that left with you to go get this menudo?  Any of the names you remember?
>
> A:    I know Flaco, Dominic, was in the car.  I'm not really sure about everybody else.

14 RR 1667.

-53-

In his statement to the police, Jamie Moore said that the shooting happened during the ride back from the house where the kids ate to Candyman's party, with the same 3 girls and 4 boys in the car.  Exhibit 1 at 186.  This was not the prosecution's theory at trial, and it was no longer Moore's story either.[42]  Instead, Moore's story had changed to more closely resemble the stories the other prosecution witnesses would tell the jury.  Moore's new trial story altered the chronology of events, which also permitted him to eject Regina Juarez from the car.

Moore testified that after he "spent some time . . . eating menudo" with these people, "we went back to Candyman's house."  14 RR 1667.  Contrary to his statement, Moore did not say the shooting happened during this trip.  After a while, Candyman's parents said the kids had to leave, and Flaco asked Moore to take him and his friends around the corner.  14 RR 1668.  Moore initially claimed he was unsure of who, in addition to Flaco and Mr. Medina, was in the car for this ride but then remembered that one person was "a short dude" called "Tiny," and the girls were "named India and China."  14 RR 1668.  Apparently, Moore could remember India's and China's names only in connection with the drive-by shooting, but not with eating menudo, and he had forgotten that State's witness Regina Juarez was in the car.

Moore testified that Mr. Medina was seated in the front passenger seat and that "voices" in the car were giving Moore driving directions.  14 RR 1670.  There was a girl seated between Moore and Mr. Medina.  Completely unexpectedly, shots rang out and Moore looked and saw Mr. Medina pulling a gun back into the car.  14 RR 1673-74.

According to Moore, they drove back to Candyman's house again after the shooting, even

---

[42] On cross-examination, Moore acknowledged that he had met with both prosecutors prior to testifying.  14 RR 1696.

though they had already been kicked out by Candyman's parents. 14 RR 1677.  Though Moore said

he was frightened and wanted to go home, he instead drove his friend Flaco to the party on Ingomar

Way, where the brawl ensued.  1680-81.  After the fight, Moore drove Flaco and his friends to a

bridge over a bayou where they sat around and talked for a while.  Moore did not remember any

further discussion of the gun that night, but remembered one that occurred "days afterwards."  He

eventually left with only Flaco.  14 RR 1685-86.

Moore added another very significant new chapter to his story at trial that was not in his

statement to the police: "just about a couple of days later or a week [after the shooting]," he, Flaco,

and the two girls in the car during the shooting, had a conversation about getting rid of the guns.  14

RR 1692.  In response to insistent prompting from the prosecutor, Moore amended his story and said

that one of the girls present for the discussion was India but he could not remember who the other

girl was or whether she was in the car during the shooting—thus allowing for the possibility that the

other girl could be Regina Juarez, who according to the prosecution's theory, was not in the car at

the time of the shooting.  14 RR 1693-94.  This discussion happened at the home of one of the girls.

Moore still could not remember, though, whether he had seen the gun again since the night of the

shooting.  14 RR 1694-95.

Guerinot did not attempt to impeach Moore's testimony with the significant inconsistencies

between his prior statement and his testimony.  Nor did he impeach Moore with the fact that he had

embellished his testimony with the post-crime discussion of the guns with Flaco.  Guerinot did not

seek to undermine the prosecution's case by pointing out that Moore had told the police that Regina

Juarez was in the car at the time of the shooting, which discredits both the testimony of Moore and

Regina.  Other than walking Moore back through, and thus reinforcing, his testimony for the

-55-

prosecution, the only points Guerinot made on cross was to emphasize Moore's incredible assertion that he had no idea that his passenger was armed with a large assault rifle and that Moore seemed very uncertain of the details.  There was nothing in Guerinot's relatively brief cross-examination that even hinted at familiarity with Moore's prior, highly inconsistent statement to the police.  14 1696-1710.

### Johnny "Pelon" Valadez

As described *supra*, Valadez' January, 1996, police statement was coached from him only *after* the police first fed him information about the crime and the accounts of other witnesses.  By Mr. Medina's July trial, Valadez also had a new story that contradicted his prior statement and contained new highly aggravating elements not found in his initial statement.

In his January statement, Johnny said there were 6 people in the car[43] but, by the time the case went to trial, he added a seventh.  15 RR 1794.  The new occupant, however, was not Veronica "China" Ponce, *it was Regina Juarez*.  15 RR 1794.

Though Johnny told the police that he did not see the gun before the shooting in his January statement, he told a different story at trial.  For the first time, Johnny reported that shortly before the shooting, Jamie Moore stopped the car and Mr. Medina got out and retrieved the gun from the trunk of Jamie Moore's car.  After retrieving the gun, Mr. Medina allegedly traded places in the car with Alex Perez, who had been in the passenger-side front seat.  Johnny testified that he saw Mr. Medina get into the car with the gun before the shooting and, for the first time, was able to describe it in detail.  In response to the prosecutor's pointed questioning, Valadez testified that he definitely saw

---

[43] Jamie Moore, Flaco Holmes, Alex Perez, Mr. Medina, Scharlene "India" Pooran, and himself.  Exhibit 1 at 191.

-56-

these pre-shooting events transpire.  15 RR 1796-97.

Not only is this episode not mentioned in Johnny's statement to the police, it also contradicts the testimony and statements of Flaco and Jamie Moore—and clearly inculpates the latter.  Unless Jamie Moore had previously given the keys to his car to the person planning to use the gun, it is unlikely that the military assault rifle could have been placed in Moore's trunk without his knowledge prior to leaving Candyman's house.  Even more dubious, though, is the proposition that the car came to a full stop before the shooting, two people got out, the trunk opened, the trunk closed again, two people got back in the car, the one who reentered the front of the car bore a military assault rifle, and *all of this happened without the driver's knowledge*.  Either Valadez or Moore committed perjury.  If it was Moore, his perjury was in the service of escaping his culpability in the double-homicide.  The defense, unprepared for trial, was oblivious to the prosecution's shifting evidence.  The prosecutors, however, seemed to expect and deliberately elicit Valadez' new stories.

Johnny testified that, after the shooting, they went back to Candyman's, where Mr. Medina allegedly said that he thought he had shot a girl and "saw fat meat flying off."  15 RR 1804-05.  This alleged statement by Mr. Medina was similarly newly minted for trial: it was not in Johnny's statement to the police.  Given the deliberate manner in which it was elicited by the prosecutor, 15 RR 1804, it was clearly something that had been discussed during Johnny's preparation for testifying.

Finally, the prosecution led Johnny through testimony asserting that there was a plan to "lie" to the grand jury and blame the crime on Flaco, but he ultimately did not go through with it.  The prosecutor tried to get Johnny to say that Veronica Ponce and Scharlene Pooran—who testified before the grand jury that Flaco did it—were close to Mr. Medina, but Johnny did not follow the

-57-

lead.  15 RR 1809-13.  Of course, of all the people in the La Raza gang, Johnny knew Flaco "more than anybody."  15 RR 1799.

Guerinot opened his cross-examination of Johnny in customary fashion, "you and I have never talked about this case, have we?"  15 RR 1814.  This fact, and Guerinot's failure to ask for a copy of Johnny's police statement for cross-examination, explains why Guerinot was wholly unprepared to cross him.  Again, Guerinot's "cross-examination" merely walked Johnny back through his State's testimony, as if Guerinot had just heard what Johnny had to say about the case for the first time and wanted to make sure he heard correctly.  15 RR 1814-30.  There was no mention of the glaring inconsistencies between his prior statement and his testimony.  Nor did Guerinot point out that Johnny's testimony was embroidered with new, significant—and prosecution-friendly—details, even though Johnny averred in January that he had told the police "all I know about what happened." Exhibit 1 at 192.  Nor did Guerinot ask Johnny whether Moore could have possibly been oblivious to the pre-shooting stop in which people retrieved a weapon from his trunk, which had been the only point that Guerinot tried to make in his cross of Jamie Moore.

**Dominic "Flaco" Holmes**

Flaco testified that he and Jamie Moore call each other "cousin" because they are "real close," they were "always together." 15 RR 1884.  According to Flaco, but contrary to the testimony of the other prosecution witnesses, the drive-by shooting happened after the brawl at the Ingomar Way party. 15 RR 1894-96.  Among the 3 or 4 conflicting rosters of passengers during the drive-by, it was Flaco's that had been adopted by the prosecution—in the opening statement and Novak's introduction to the case—and Flaco was the only prosecution witness who managed to testify in conformity with the State's case.  Flaco said that he was in the back seat with Veronica "China"

-58-

Ponce, Scharlene "India" Pooran, Alex Perez, and Johnny Valadez.  According to Flaco, Mr. Medina was the only person in the front with Moore.  15 RR 1894-96.  Flaco did not remember whether, as reported by Johnny, the car stopped before the shooting.  15 RR 1897.  Flaco was just sitting in the back seat with four other people when he heard the gun "cock back" and he saw it go out of the window and start shooting.  15 RR 1900.  After the shooting, they went back to Candyman's house. 15 RR 1904.

In January, Flaco told the police that he had not seen the gun since the night of the shooting nor had even talked to anyone else about the shooting since it happened: "I haven't talked to [Mr. Medina] since this happened and ***I don't know what he did with the A.K.  No one else has talked to me about what happened that night***."  Exhibit 1 at 180 (emphasis added).

Of course, this story would be difficult to maintain after his palm print was discovered on the bag in which the weapon was buried.  Yet, Flaco started to tell the same story at trial, but the prosecutor redirected him to a new one—a story not found in any of the police or prosecution files made available to the defense:

> Q:   Can you remember seeing the gun after the shooting?
>
> A:   Huh-uh.  I don't remember seeing—I didn't see the gun after that.  I didn't see the gun after that.
>
> Q:   Do you remember talking to anybody—not what anybody said, but talking to anybody about the gun and what to do with the gun?
>
> A:   Huh-uh.  No, sir.[44]
>
> Q:   Well, were you involved [sic] in the gun ***after it got wrapped up***?

---

[44] Of course, Jamie Moore had already testified about a conversation he had with Flaco and others about disposing of the weapon.

A:      Yes, sir.

Q:      ***Okay.  And we had a discussion about this several months ago, did we not***?

A:      Yes, sir.

Q:      And when was the next time you saw the gun either wrapped or unwrapped.

A:      The next time I seen it was we was wrapping the guns.  That's last time I seen it when we wrapped the guns.  After that night I didn't see the gun after that.

15 RR 1906-07 (emphasis added).  Flaco testified that he and Jamie Moore, along with Scharlene Pooran and a gang member named "Indio," stashed the guns at Scharlene's house ***five or six days after the crime***.[45]  15 RR 1907-09.  Flaco said that he personally helped wrap the guns, with help from Indio and Dallas Nacoste, and then they took the guns to a field outside to find a place to bury them.  15 RR 1909-10.

Flaco's trial testimony that he and his friends buried the weapons five or six days after the crime contradicted his January statement to the police, *i.e.* that he had not seen the gun since the night of the shooting.  Only Flaco and his friends felt the need to lie to the police about the guns.  As described, *supra*, Mr. Medina told the police in January that Flaco had "put up" or hidden the guns, and Dallas Nacoste—who told the police from the very start that Flaco was the shooter—truthfully told the police, shortly after the crime in January, that the guns had been buried.

As he affirmed on direct examination, Flaco's new story emerged during a pre-trial meeting with the prosecutor, presumably after Flaco's print was found on the bag containing the gun.  Certainly, Flaco's deception of the police—a patent lie to obstruct the investigation into the

_____

[45] Significantly, Flaco did not implicate Regina Juarez, with whom he was very close, in hiding the guns, even though she would subsequently confess to playing a major role in their disposal.

-60-

case[46]—and the fact that he came up with a new story about the gun in a meeting with the prosecutor would be the fodder for a devastating cross-examination.

Guerinot opened his cross by acknowledging he had never before spoken with Flaco. 15 RR 1912. Clearly, he also never read or did not remember Flaco's statement to the police. Flaco was not asked a single question about his new story, why he and his friends lied to the police about the guns, or how he and the prosecutor arrived at Flaco's new understanding about what happened to the guns. Nor did Guerinot impeach Flaco with the fact that Flaco cooperated with the police in exchange for their "help."

Instead, once again, Guerinot walked the witness through his testimony for the State a second time. Guerinot twice asked Flaco whether he committed the drive-by, and both times Flaco denied it. 15 RR 1922; 1924.

The only other effort to inculpate Flaco backfired because Guerinot had not prepared before trial. Guerinot tried to lead Flaco to say that he was not incarcerated in July of 1995, when shots were fired and a Molotov Cocktail was thrown at Rodriguez house. Of course, Guerinot or his investigator could have easily independently ascertained this information before trial instead of engaging in discovery in front of the jury. Guerinot's shoot-from-the-hip approach only confirmed that Flaco *was* incarcerated in July of the 1995, thus exculpating Flaco of these offenses.[47] 15 RR

---

[46] The State conceded at trial—out of the presence of the jury—that, at minimum, Flaco was guilty of tampering with evidence. The defense argued that the court should instruct the jury to consider whether Flaco was an accomplice as a matter of law based on his "obstruction of justice" when "cover[ing] up the crime." 17 RR 2263. The prosecution argued against the instruction, stating "*I think that makes [Flaco] guilty of tampering, Judge*. It does not make him an accomplice as that term is now defined." 17 RR 2264 (emphasis added). The State did not prosecute Flaco for his tampering or perjury.

[47] As noted, *supra*, Mr. Medina was also incarcerated in July of 1995.

-61-

1913.  Inexplicably, and to the great detriment of his own credibility, Guerinot later directly accused of Flaco of doing the July 1995 drive-by, and Flaco denied it.  15 RR 1926.

Once again, there was no hint in Guerinot's cross-examination that he was familiar with Flaco's January statement to the police, thus the jury never learned that Flaco lied to the police about his tampering with the evidence in an effort to obstruct the investigation and subsequently changed his story with assistance or encouragement from the prosecutor.

### Regina Juarez

Sixteen-year-old Regina Juarez testified that she was at Candyman's New Year's Eve party.  16 RR 1942.  At some point she noticed that Mr. Medina and some other people were gone from the party, and then she noticed they were back and were standing across the street from Candyman's house.  16 RR 1945.  Regina joined them and overheard them discussing a drive-by shooting.  Regina claimed that she pulled Mr. Medina aside to ask what had happened and Mr. Medina allegedly told her that they had done a drive-by shooting and he was the shooter.  16 RR 1947.  After Regina failed to satisfactorily respond to the prosecutor's request for further detail, the prosecutor refreshed Regina's recollection with her grand jury testimony.[48]  16 RR 1948.  The prosecutor then asked whether Mr. Medina smiled or not, and Regina responded "[y]eah."  16 RR 1949.  Thus, as with other prosecution witnesses, Regina's testimony was studded with a highly aggravated detail not found in her statement.

Regina testified that she subsequently saw Mr. Medina with a gun that looked like the murder weapon when they went to the Ingomar Way party.  16 RR 1950.  They later went to Alex Perez' house, where they sat by the bayou in back.  Regina testified that she saw the gun for the last

_____

[48] Again, Mr. Medina has requested access to this testimony but has yet to receive it.

time—***that night***—by the bayou.  16 RR 1956.

As noted above, Regina's January 16, 1996, statement to the police was under oath.  She averred that she thought the gun had been thrown into the bayou or that Alex Perez had done something with it.  Exhibit 1 at 203.  Her lie sent a team of 11 HPD officers, including 7 HPD scuba divers, on a wild goose chase down the bayou on January 17, 1996.

At trial, Regina had a new story about the guns.  She testified that Mr. Medina allegedly called her the day after he was arrested and asked her to dispose of the guns.  16 RR 1958.  This would have been January 6th or 7th, well ***before*** Regina's January 16th sworn statement that the guns were probably in the bayou.  On the same night that Mr. Medina allegedly called, Jamie and Flaco picked her up and drove her to Scharlene Pooran's house.  16 RR 1960.  Wearing gloves (thus conveniently explaining the absence of fingerprints on the weapons), Regina and Scharlene put the guns into plastic bags and took them outside.  16 RR 1962.  They threw the guns over a fence, and Flaco covered them up.  16 RR 1980-81.  Not only was Regina's gun story contrary to her sworn statement, it was inconsistent with Flaco's trial testimony—and the forensic evidence—that ***he*** personally wrapped the guns before they were taken outside.

There are compelling reasons to conclude that Regina's second story about the guns, at least the portion of it that inculpated Mr. Medina, was also false.  According to Regina, Mr. Medina called her from the jail the day after he was arrested and instructed her to dispose of the guns.  However, at approximately midnight on the night of his arrest, January 5, 1996, Mr. Medina gave a statement in which he said that Flaco had disposed of the guns.  Mr. Medina's statement, confirmed by forensic unknown to anyone until two months later, would have ***preceded*** the alleged post-arrest call to Regina from the jail.  Mr. Medina had no reason to call Regina after giving his statement, nor could

he have predicted that, months later, Flaco's palm print would be discovered on the bag. Additionally, Dallas Nacoste truthfully told the police on January 10, 1996, that he had heard the guns were buried in Westbury.  This conversation took place on January 3, 1996, two days before Mr. Medina was arrested.

Regina's testimony about the guns subjected her to criminal charges for perjury and obstructing the murder investigation in light of her January sworn statement to the police that resulted in the bayou diving expedition.  At a minimum, it should have subjected her to an absolutely blistering cross-examination.  Neither were forthcoming.

Once again, Guerinot failed to request the witness's prior statement and did not cross-examine her with it.  As with the other witnesses, he walked Regina back through her story and reinforced her direct examination.  Guerinot made some ineffectual attempts to impeach Regina, including asking her whether she had attempted suicide, 16 RR1966, eliciting that she was "very close" to Flaco, 16 RR 1969, and insinuating that because she lied to other gang members about her cooperation with the State, out of alleged fear for her safety, she might also be lying to the jury.  16 RR 1985.  The fact that she had **_lied under oath_** to the police and obstructed the investigation into the case clearly would have been a far more devastating attack on her credibility.

Guerinot also tried to get Regina, who was "very close" to Flaco, to say that Flaco had confessed to being the shooter but, not surprisingly, she denied it.  16 RR 1970-71.

The last prosecution witness was Louisa Escobar, who was the mother of Mr. Medina's baby son. 16 RR 1987, and to whom Mr. Medina had written several letters from jail while awaiting trial. In the letters, Mr. Medina expressed remorse for his lifestyle and the bad things that he had done, but there is no admission that he was responsible for the drive-by shooting.  16 RR 1995-99.

-64-

At the close of the State's case, the defense moved the court to order the prosecution to grant immunity to Veronica "China" Ponce and Scharlene "India" Pooran so they could be called as defense witnesses:

> Judge, at this time we would like to move that the State be—we would like to move that the State be ordered to give testimony of immunity to Veronica Ponce, who's otherwise been described during the trial as China, C-H-I-N-A, and also to Scharlene Pooran, who has also been described as India.
>
> These are the two young ladies that evidently gave a statement to the police then testified for the Grand Jury contrary to their sworn statements. The police then filed on them for aggravated perjury. I've talked to the lawyers for both Veronica Ponce and Scharlene Pooran. They say that without use immunity they won't testify, they'll take the Fifth, because of their pending charges of aggravated perjury.
>
> And, therefore, we move that the State be required to give them immunity for whatever they testify to so we have them available as witnesses. To say that in fact their testimony would be that Flaco, who's Dominic Holmes, told them that he was the one that did it and not Mr. Medina.
>
> And that's the reason for—without their being given testimonial immunity they couldn't testify. Without their testimony we have something that we're not going to be able to bring before the jury that could be probative of the defendant's innocence.

> THE COURT:       All right. Motion denied.

16 RR 2003-04.

Perhaps if the State's witnesses—like Regina Juarez, who indisputably committed perjury in this case—had also been prosecuted, the prosecution's pursuit of charges against Ponce and Pooran and the related refusal grant immunity might be viewed as an effort to protect the integrity of the proceedings by excluding perjurers from the trial. On this record, though, it is apparent that prosecution for perjury depended not solely on whether one lied under oath but whether the witness might be helpful to the defense.

Not only did the prosecutors deny Mr. Medina access to potentially exculpatory eye-witnesses, they created a materially false impression to bolster their case. As noted above, the prosecution very deliberately asked Sgt. Novak to affirm that Flaco, Jamie Moore, Johnny Valadez, Veronica Ponce, and Scharlene Pooran were each questioned separately but gave statements that were consistent. Thus, the prosecution led the jury to believe that China and India would validate the testimony of the other "eye-witnesses," Flaco, Jamie, and Johnny, and then successfully precluded their appearance at trial.

V.     **The Defense—No Thanks to Defense Counsel.**

As described above, neither defense counsel nor their investigators interviewed and secured the attendance of the witnesses who testified for defense during the guilt/innocence phase. This service was performed by Mr. Medina's family. If not for their efforts, there is no indication that the defense would have had witnesses.

Angie Medina, Mr. Medina's younger sister, testified that when she heard the police were looking for Flaco, she called to warn him. 16 RR 2013. Flaco told her that the police "had to know it was him," but the police would have to find him before they could arrest him. 16 RR 2015.

Mr. Medina's father testified that he was present on the day that Marco Martinez and his friends drove by and flashed gang signs. Contrary to Marco's assertion, the Petitioner did not have a gun or wave a gun at Marco. 16 RR 2032.

The defense next presented two witnesses, Domingo Valle and Rene Reyna, who testified that Flaco had confessed to committing the drive-by shooting. Domingo Valle was 16 years old and had been out of town over the Christmas Holidays. He returned to Houston on January 5th or 6th and was visiting a friend when Flaco Holmes came over. 16 RR 2043. Valle was sitting outside with

his friends, including Rene Reyna, when Flaco and Jamie Moore pulled up. Flaco told Valle about the drive-by and said that he had "put them hoes to rest." 16 RR 2045. Rene Reyna, who had recently enlisted into the Army and was about to become a Military Policeman at Fort Bravo, could not remember Flaco's exact words but he confirmed Domingo Valle's testimony and recounted the same visit in which Flaco confessed to being the shooter. 16 RR 2060.

Alex Perez, Mr. Medina's 19-year-old cousin, testified that he was with Mr. Medina on New Year's Eve. 17 RR 2082. He testified that he, Mr. Medina, and a couple of other friends went to the Ingomar Way location where they were supposed to meet their friend for a New Year's Eve party, but she was not home. 17 RR 2083. They decided to go to Candyman's instead. 17 RR 2084. Alex Perez testified that Mr. Medina never left Candyman's party until the end of the evening. 17 RR 2085.

Mr. Medina was the last defense witness to take the stand. He described what happened at the parties on New Year's Eve and denied committing the drive-by shooting. 17 RR 2117-2165. Mr. Medina was at Candyman's party. He was there when Flaco and Jamie Moore arrived in Jamie's car, and they had the rifle in the car. 17 RR 2142-43. At some point, Jamie and Flaco left the party and, when they returned, Flaco's demeanor was more withdrawn. 17 RR 2146-48. The last time Mr. Medina saw the gun, which was after the Ingomar Way brawl, it was still in Jamie's car. 17 RR 2163. Mr. Medina also testified that he was in boot camp during all of July, 1995, when the shots were fired at the Rodriguez house. Mr. Medina knew Veronica Rodriguez and had no grudge against her or anyone else in that house. 17 RR 2166-67. Mr. Medina also explained that his letters to Louisa saying that he had really screwed up referred to the fact that he was facing prison time because his probation would be revoked. 17 RR 2169-70. Finally, Mr. Medina denied telling

-67-

Flaco's close friend Regina Juarez that he had done a drive-by shooting, or that he had arranged to tell a false story.  17 RR 2170.

### VI.    Closing Arguments that Never Should have Happened.

The only truly contested issue in the guilt/innocence-phase closing arguments was identity: was the shooter Flaco or Mr. Medina?  The defense argued that the prosecution witnesses were no more credible than their own, and therefore the jury could not be sure of their answer beyond a reasonable doubt.  As evidence of the prosecution witnesses's unreliability, the defense pointed to their criminal histories, their close relationships with Flaco, and their general "trashiness."  The prosecutor countered by asserting that there was no possible reason for his witnesses to put themselves in the car during the drive-by if it was not true, that there was no reason they would have to testify against Mr. Medina to get out of trouble, that inconsistencies between the defense witnesses showed the case against Flaco was half-baked, and that Mr. Medina himself was not credible in light of inconsistencies between his January statement to the police and his testimony at trial.

In his very brief initial remarks to the jury, the prosecutor attacked the evidence that Flaco did it as based on "the defendant's plan to pin this on Flaco."  18 RR 2275.

Mr. Millin opened the defense argument with their primary theme: the witnesses on both sides of this case were too incredible a basis for a guilty verdict.  According to Mr. Millin, the jury had to decide whether Flaco or Mr. Medina was the shooter based on "the credibility of these witnesses, [and] the witnesses for both sides are not exactly perfect."  18 RR 2278.  Mr. Millin argued that the defense witnesses were more credible.  Angie Medina had never been in trouble with law and neither had Rene Reyna, who was going into the Army.  In contrast, prosecution witnesses Johnny Valadez and Flaco "came in here . . . in leg irons.  When they came in from this side of the

-68-

courtroom, you know that they're in custody." 18 RR 2278. "[W]itnesses for both sides in general

had something that you might question their credibility about," Mr. Millin argued, and if the jury

"can't decide beyond a reasonable doubt, then the only answer for you in a case like this is not

guilty." 18 RR 2278. Mr. Millin repeatedly emphasized this point:

> So if you can't decide that the State's witnesses are so much better than the defense
> witnesses, that you would believe them unquestionably, then the only thing you can
> vote is not guilty. Because basically how can you decide in this case, in a case with
> facts like this, that the State's witnesses are any better or even as good as the defense
> witnesses?

18 RR 2279. *See also id*. at 2283 ("with respect to reasonable doubt . . . there's no way you can

make a determination that the State's witnesses were any more credible or even as credible as the

defense witnesses"); 2284 ("the evidence is basically . . . the same kinds of people testifying on both

sides, how could you find Tony Medina guilty . . .?").

Mr. Millin encouraged the jury to discount the credibility of prosecution witnesses because

of their criminal histories: "[Jamie Moore has] been to the penitentiary. You can consider that as

to whether he's a credible person. Flaco Holmes, he's in a juvenile facility right now, brought in

custody. Pelon, the young kid with the shaved head, he's in custody. You can consider that if you

want or not, you know, with respect to his credibility." 18 RR 2285.

Mr. Guerinot began the final segment of the defense closing by sounding the same themes,

albeit in more colorful language. He characterized the witnesses for both sides as having a "trashy

way to live," 18 RR 2290, and assailed them in the strongest possible terms:

> People who's moral standard is as close to zero as is humanly possible and still
> continue to suck air on this earth.
>
> People who have not one moral fiber in them and yet the State brings them to tell you
> you need to believe these people; these are people worth believing. Jack [Millin] is

-69-

right.  I don't know who's more believable in this case, our side or their side.  Who's more believable?  Regina Juarez who covers for Flaco Holmes?  Or Alex Perez?

18 RR 2290.  *See also id.* at 2295 ("That's the whole problem with this case from one end to the other.  These are some of the trashiest witnesses I've ever seen.").

Guerinot recognized that there were "three key people in the car at the time . . . [of the crime]: James Moore, Flaco Holmes, and . . . Johnny Valadez."  18 RR 2291.  Guerinot argued that each was a liar.  "The physical evidence tells you that [Flaco]'s a liar," according to Guerinot, because the shells from the shotgun would have ejected into the car and not on the street if Flaco's description was true.  18 RR 2292.  Guerinot, however, had introduced no forensic evidence on which to base this argument.  Because Guerinot never brought Flaco's January statement to the attention of the jury, they were unaware that the physical evidence—the palm print on the bag of guns—really did prove that Flaco was a liar.

Moore was unbelievable, according to Guerinot, because he was intoxicated, he was driving the car, and he was a "good buddy" of Flaco's.  18 RR 2293.

Guerinot argued that "Regina Juarez is the biggest liar that came in here.  She hasn't even got Flaco Holmes touching the guns, touching the wrappers around the guns, she did it all.  And you know from the physical evidence that that is an absolute lie . . . .  Even Flaco says, I touched the bags."  18 RR 2294.

Johnny Valadez "would sell out anybody if it was to his benefit or could benefit a friend of his," Guerinot argued.  18 RR 2294.

Unlike his co-counsel, Guerinot did not reserve his criticisms for the prosecution witnesses and emphasize the legitimate reasons for believing the defense witnesses.  Instead, Guerinot

-70-

continued his biting critique by attacking his own witnesses.  18 RR 2295 ("I think it's scary, personally, to think that Rennie Reyna could be a policeman in the Army.  I think that is shocking.  Have we sunk to that depth?  And he is one of my witnesses.  I think that's scary."); *id*. ("Alex Perez is about as stupid a human being as I've ever seen . . ."); *id*. at 2296 (Angie Medina said she tried to talk to the police but they wouldn't listen; "Does that sound believable?  It does not to me.  Does not to me.").  It is one thing to acknowledge, as Millin did, that one's witnesses "are not exactly perfect"; however Guerinot affirmatively skewered his own case.

Unsurprisingly, the prosecutor closed the arguments with a defense of his key witnesses, starting with a theme he would sound repeatedly: "Why . . . would those kids say they were in the shooter's car?"  18 RR 2300.  "They could have easily said" they were not involved in the crime but "they gain a lot of credibility by telling you that they were in the car."  18 RR 2301.  The prosecutor argued that nobody at the scene could say who was driving the car, yet "Jamie Moore admits to driving the car."  *Id*.

The prosecutor acknowledged some inconsistencies between Flaco and his friends about the sequence of events and who was sitting where in the car, but noted that they all said Mr. Medina was sitting in the front seat and he was the shooter.  18 RR 2302.  Of course, Flaco and his friends also all agreed when lying to the police about not seeing the gun since the night of the shooting.  Their unanimity on this point was certainly not confirmation of their credibility, and their demonstrated willingness to change their story—in unison—to conform with the State's latest theory of the case only further illustrated their indifference to the truth.  But the jury did not know this.

The prosecution harped on inconsistencies between Mr. Medina's statement to the police and his testimony at trial—about minor subjects such as how much and what kind of alcohol he drank

on New Year's Eve—to argue that Mr. Medina "was a little hard to believe" and "not telling the whole truth." 18 RR 2302-03.  The prosecutor also attacked Mr. Medina's credibility based on the self-serving nature of his statements.  18 RR 2303-04.  Mr. Medina, according to the prosecution, "just can't come clean and tell the truth."  18 RR 2305.  Of course, Jamie Moore and Flaco escaped liability with self-serving statements that they had no idea in advance that the shooting would happen—even though Valadez described deliberate pre-shooting preparations only possible through Moore's full cooperation and participation.  The inconsistencies in Mr. Medina's testimony paled in comparison to the perjured testimony of witnesses like Regina Juarez, or all of the new, fantastic details that were not in the January statements of prosecution witnesses but surfaced for the first time at trial.  These inconsistencies, though, were not known to the jury.

The prosecutor reassured the jury that Flaco's palm print on the wrapping in which Flaco buried the murder weapon was "really, really explained," and "no big surprise."  18 RR 2305.  Of course, the explanation for this highly incriminating evidence against Flaco was likely perjury from Flaco and his friends, who had previously sworn they had not seen the gun since the night of the shooting.  This too, was not known to the jury.

The prosecutor argued that Regina Juarez—whom he *knew* had committed perjury either at trial, six months beforehand in the police station, or both—is "really credible."  18 RR 2309.  In fact, the prosecution *pointed to her newly-invented testimony about the guns as evidence of her credibility*, because her effort to dispose of the gun allegedly showed that she was a friend to Mr. Medina.  This "friendship" made it even more difficult for Regina to tell the "truth" at trial.  18 RR 2309-10.  And, even though Regina's rap sheet showing four juvenile charges—including a

-72-

terroristic threat against a witness in a criminal case—was in the prosecutor's trial file,[49] he argued that Regina should be believed because "[s]he's never been in trouble before."  18 RR 2310.  Regina "wants to tell the truth and she does tell the truth . . . .  I don't know how anybody based on what she told you could not believe what she said."  *Id.*

After trying to twist Mr. Medina's letters into a confession, 18 RR 231314, the prosecution attempted to poke holes in the defense case by arguing that it was concocted by Mr. Medina and his friends.  The "most telling" "lie" that proved the prosecution's point was that Mr. Medina wrote in February of 1996 that he knew of two people to whom Flaco had admitted the crime but his sister said in January of 1996 that she knew of four such people.  18 RR 2316-17.  This "inconsistency" showed that Mr. Medina's story was not "fully baked yet."

Had the defense been prepared and/or had the prosecutor disclosed all of the statements of its witnesses, the jury would have learned that the prosecution's case was not "fully baked" until its star witnesses—after meeting with the prosecutors—changed their stories to explain Flaco's palm print and better conform their stories to the prosecution's theory of the case at trial.

Finally, the prosecutor returned to the heart of his case: "You've got three eyewitnesses in the case.  They might not be the greatest people on earth . . . .  ***There's no reason on earth that those three kids . . . have to finger this defendant to get out of trouble***.  The only reason they do it is because he did it."  18 RR 2318-19 (emphasis added).[50]

─────────────────────

[49] Exhibit 15 (Regina Juarez Rap Sheet).

[50] As he acknowledged at the outset, "the bottom line comes down to these three kids":

Why would they possibly—What motive do they have to put themselves in the car of the shooting if it wasn't true?  What motive they have to pick the [Mr. Medina, Alex Perez, Veronica Ponce, and Scharlene Pooran]?  What motive do they have to

-73-

Of course, Flaco, Jamie Moore, and Regina Juarez disposed of the guns after the crime and then lied to the police about it.  As the prosecutor had already conceded to the trial court (out of the jury's presence), this made them guilty of tampering with evidence in a capital murder case.  Regina had given false testimony under oath about the guns, which made her guilty of perjury—and sent HPD officers on a scuba diving expedition down a Houston bayou and some drainage ditches.  Both Flaco and Johnny Valadez were actually facing capital murder charges, and the State had nailed Jamie Moore as the driver.  Considering how the prosecution treated Veronica Ponce and Scharlene Pooran, two teenaged girls who refused to testify in conformity with their case, ***the prosecution witnesses had numerous, compelling reasons "to finger [Mr. Medina] to get out of trouble."***  The prosecutor knew this, the jury did not.

Most of the prosecution's closing argument was plausible only because of the deficient performance of defense counsel, the flexibility of the prosecution witnesses when it came to the facts, and the prosecution's willingness to capitalize on these circumstances even if doing so created a materially false impression.  Despite the fact that all of these circumstances significantly skewed the proceedings towards conviction, this was still an extremely close case.  The jury deliberated for approximately ten hours.  1A CR 175-76 (jury retired for deliberations at 10:12 a.m. on July 29, 1996, and returned a verdict at 8:45 p.m., taking only a 58-minute lunch break).  Mr. Medina was convicted of capital murder.

---

put their other gang members in the car if it isn't true? . . .  These kids have absolutely no motive whatsoever to that whatsoever.

18 RR 2306.

**VII.    Defense Counsel Devoted Little More Than *One (1) Hour* to their Case for a Life Sentence; the Entire Punishment Phase Trial Consumed Less Than 3.5 Hours.**

All of the evidence at the punishment phase of Mr. Medina's trial was presented on July 30, 1996, in the space of ***three hours and twenty-five minutes***.   This time period includes the presentation of all witnesses for the State, and of all witnesses for the defense.   The evidence was presented from 10:30 a..m. to 11:25 a.m., from 12:40 p.m. to 2:05 p.m., and from 2:35 p.m. to 3:40 p.m.   The entire defense case was presented in the final session, from 2:35 p.m. to 3:40 p.m., thus requiring a mere ***one hour and five minutes***.   During this hour and five minutes, the defense presented ***seven*** witnesses, five of whom were cross-examined by the district attorney.   The examination of the seven defense witnesses was brief, generally two to four pages of examination for each witness, and necessarily superficial.

The State called eight witnesses to the stand.   The first was Edward Johnston, a former acquaintance of Mr. Medina who testified that the two had gotten into mischief together, slashing car tires and pushing cars through intersections.   19 RR 2335-2354.   The next was a police officer, Ronnie S. Cortez, who testified that in October of 1993 he arrested Mr. Medina and a co-defendant for multiple counts of burglary of a motor vehicle.   *Id*. at 2355-60.   Delberta Storz, court liaison officer for Harris County Probation, testified that Mr. Medina had received probation for burglary of a motor vehicle, including orders to perform community service and pay restitution.   She testified that he did not fully comply with his conditions of probation, and that in December of 1994 he was given four additional felony probations for arson offenses.   The witness described the conditions of probation:

> Drug/alcohol evaluation and necessary treatment.   There was—on one of the cases, the 9421844, we added on 240 more hours of community service, doing it at the rate

of 20 hours a month.  He was going to CRIPP, which is our boot camp and then
SIPP, which is where he reports daily and eventually drops down to what's called our
Tier 2 case load where he's seen twice a month.  He had $11,796.20 restitution due
at the rate of $100 a month.  He was to have no contact with gangs, he was to have
no contact with codefendants, and he was to legitimize his child by 12-22-95.

*Id*. at 2370-71.  On cross-examination, the witness clarified that Mr. Medina had been trying to make

restitution payments but was merely behind in the payments, and that she assumed that he had

worked toward the goal of legitimizing his child by hiring a lawyer and filing a petition to legitimize

the child, paying the lawyer, paying child support, and holding a minimum wage job.  *Id*. at 2378.

She also acknowledged that the "violations" on Mr. Medina's record from boot camp were

subjective reports that he had not followed instructions, and included no fights and no destruction

of property.  *Id*. at 2380-81.  The court then recessed for lunch.

After the lunch break, the State presented two witnesses who were victims of car thefts for

which Mr. Medina had been sentenced:  Jack Grant and Henry Simpson.  *Id*. at 2388-2403.  Both

men testified that their vehicles were stolen from their homes during the night, and that when

recovered by the police the vehicles had been destroyed by fire.  The prosecution also presented

Dante Medrano, a sixteen-year-old member of the Southside Syndicate Crips gang, a rival of the

LRZ 13 gang.  *Id*. at 2404-05.  Mr. Medrano testified that, in December 1995, he had been in his

driveway when Mr. Medina and Robert Lucio drove by in a blue car.  He claimed that Mr. Medina,

on the passenger side, had leaned out of the car and fired 10-15 shots with a rifle.  Some bullets hit

his house.  Medrano stated that he ran inside and retrieved his father's .22 caliber weapon and fired

it more than two times, hitting the blue car.  Medrano was arrested and released.  *Id*. at 2406-17.

Finally, the State presented two witnesses to provide victim impact testimony.  The first,

Rocio Pedroso, was the surviving victim of the drive-by shooting.  In the early morning hours of

January 1, 1996, she and the other young people were sitting in the driveway of the Rodriguez house when she heard two shots—which she initially thought were firecrackers—and then felt a third shot hit her in the back.  *Id*. at 2428-29.  Ms. Pedroso testified that she was in a lot of pain and was bleeding heavily, and "didn't think [she] was going to make it."  *Id*. at 2429.  At the prosecution's request, she showed the jury the bullet hole in her back, and indicated where the bullet had exited on her side.  She testified that she remembered hearing many people screaming and crying, including the parents of the two shooting victims.  *Id*. at 2430-31.  Because her colon had been destroyed, she required surgery and was given a colostomy bag; at the time of Mr. Medina's trial, she was scheduled for additional surgery to replace the bag.  *Id*. at 2432.  She further testified that she had suffered nightmares and flashbacks, and that her parents were scared for her safety.  *Id*. at 2434.

The final State's witness was Jesus Rodriguez, the father of the two victims.  Mr. Rodriguez described the family gathering on New Year's Eve and the moments when the family heard the shots and discovered the children in the driveway.  *Id*. at 2435-42.  He further testified that there had been a "big change" in his family since the shootings, and that his wife was "sick," "nervous" and "tense."  *Id*. at 2443.  His two surviving children, he said, were taking the loss of their siblings very hard.  *Id*. at 2443-44.  The witness then lost his composure on the stand.  *Id*. at 2445.

After reoffering all of the evidence presented at the guilt/innocence stage, the State rested.  *Id.* at 2448.  The court took a thirty-minute recess.  *Id*. at 2449.

Mr. Medina's home life was permeated by his parents' substance abuse and domestic violence.  As some of the same witnesses who testified could have explained, Mr. Medina grew up in "gangland," a war zone in which drive-by shootings were a common occurrence and the only way to survive was to join a gang for protection.  Mr. Medina's life was forever changed at the age of 12

when a drive-by shooting in which he was the target instead took the life of his best friend who standing right next to him.  As the result of his chaotic and traumatic childhood, Mr. Medina suffered from significant mental impairments.  *See generally* Claim 3, *infra*.

Because defense counsel failed to conduct a social history investigation, or even interview the witnesses before putting them on the stand, the jury that decided Mr. Medina's fate was not only deprived of an accurate picture of Mr. Medina's background, they were fed false one.  Defense counsel had few questions for his witnesses because he had failed to investigate the available mitigating evidence and was uninformed about his client's background.  The defense witnesses would later report that they had never met the defense attorney before they testified, they were never told what kind of information might be important or mitigating, and they had no idea what they would be asked by either the defense or the prosecution.  The were prepped, if it all, for just a few minutes in the courthouse hallway.

At 2:35 p.m., court resumed and the defense called the first of its seven witnesses.  Verlan Pegues testified that he was Mr. Medina's great uncle on his mother's side, and gave some information about his work history before his retirement.  Asked to describe Mr. Medina's childhood, Mr. Pegues stated that Tony had visited him for two weeks at the age of eleven, at his home in North Zulch, Texas, and appeared ready to launch into a description of what he and Mr. Medina had done together.  After the prosecutor objected to the narrative response, Mr. Millin proceeded as follows:

> Q.    Let me just ask you this:  When Tony visited with you, did you have any kind of problems with Tony or anything like that?
>
> A.    Never.  Not a problem.

Q.    What was his attitude towards adults and things like that in his growing up period?

A.    During his growing up period he was very polite and respected adults.

*Id.* at 2453.  Mr. Pegues then testified that he hadn't seen Mr. Medina much since he was about fourteen, and that he had a speech impediment, which he had overcome.  *Id.* When asked by Mr. Millin, the witness stated that he had moved away from Houston in 1980.  Mr. Millin then asked "And this would be one of the reasons why you haven't seen Tony as much as you had previously?" The witness answered, "Right," although the significance of this answer is unclear since previous testimony had established that Mr. Medina's extended visits with Mr. Pegues had taken place after Mr. Pegues had left Houston and was living in North Zulch.  The defense then passed the witness, asking no further questions about their visits, about positive experiences the witness had with Mr. Medina, or even about the speech impediment Mr. Medina had overcome.  The State asked no questions.

The defense next called Sherry Grein, Mr. Medina's aunt on his mother's side.  When asked in general terms about his childhood, Ms. Grein stated, "We were all a close family.  We were always there at birthdays and Christmases and having family functions."  *Id.* at 2457.  She testified in response to counsel's questions that Mr. Medina never "[gave] anybody problems" and "always got along with everyone."  *Id.*  Counsel asked her if she saw Mr. Medina often and she answered, "In the last couple of years not real often."  *Id.*  Counsel failed to ask for any elaboration or explanation of that statement.  Asked about her sister Golda, Mr. Medina's mother, Ms. Grein explained that she was not then at the courthouse because "[s]he wasn't feeling very well and holding herself together very well."  *Id.* at 2458.  Counsel again asked no follow-up questions to this apparent reference to the effect Mr. Medina's conviction was having on his family.

-79-

On cross-examination, the prosecutor was able to use Ms. Grein's testimony to counter any argument in mitigation of sentencing, eliciting testimony that she was aware of no sexual abuse against Mr. Medina, of no mental retardation or learning disability other than his speech impairment, of no childhood beatings, and of no drug addiction.  *Id.* at 2459-60.

> Q.    Would you say based on his growing up ***there's really nothing at all to explain or excuse in any way the behavior that is the subject of this case?***  Would you agree with that?
>
> A.    ***Yes, sir.***

*Id.* at 2460.  She then further testified that Mr. Medina had a good relationship with his parents, that his parents were together, that both had jobs.  *Id.* at 2460-61.  She stated she had no knowledge of any gang activity, although she did indicate an awareness that Mr. Medina had gotten "into trouble."  *Id.* at 2461.  However, she stated she had no knowledge of his burglarizing cars, stealing, or pushing cars into intersections, and that she would have been surprised to know that he had done such things since he acted differently around the family.  *Id.* at 2462.  She was not aware of his felony probations.  *Id.* at 2463.  When the prosecutor passed the witness, he had effectively painted a picture of a defendant who had played the role of a nice family boy when around his relatives—and who had suffered no childhood traumas and had the benefit of a close family—but nevertheless, had inexplicably chosen a life of crime and violence which he successfully hid from his loving family members.  The defense declined to re-examine Ms. Grein.

The defense next called David Castro, the cousin of Mr. Medina's father.  When asked about Mr. Medina as a young boy, he too answered that the family had often gathered for family functions, and that Mr. Medina "always showed a lot of respect and courtesy to the other family members, and he attended most of the functions that we had."  *Id.* at 2466-67.  He further stated, "I never had any

idea that any problems existed during the time he was coming up as a kid." *Id*. at 2467.  Mr. Medina

and his father frequently came to his home to do plumbing or mechanical work free of charge.  *Id*.

at 2468.  When asked if there was "anything else . . . [he] would like to tell the jury about Tony," the

witness responded:

> I just like to say, you know, that being a native Houstonian and the part of town
> where Tony was living at at [sic] the time that this happened, you know, it's pretty
> obvious it's pretty heavily, you know, gang activity over on that side of town.  You
> know, whether that had any bearing on the situation that he's faced with now I don't
> know that now.  But I know growing up as a kid in our family and then to his young
> adult years he was always a part of our family and attended every function that we
> had and showed respect and courtesy to all the family members.

*Id*. at 2469.

　　　This allusion to the pressures operating on Mr. Medina, and especially the pressure to join

a gang, was not pursued by Mr. Medina's counsel.  Instead, his counsel asked "Was he nice to the

little kids in the family?", and then passed the witness.  *Id*. at 2469.  On cross-examination, Mr.

Castro stated that he had been unaware of Mr. Medina's "troubles with the law" until his arrest for

capital murder.  *Id*. at 2471.  He testified that, while he was aware of gang activity in the

neighborhood, he was not aware that Mr. Medina was a gang member.  *Id*. at 2473.

　　　Eva Uribe, Mr. Medina's aunt on his father's side, testified that she was "the one in charge"

when Mr. Medina was going to Bellaire Christian Academy, and that he was "real involved" at the

church and the school during his teen years.  *Id.* at 2477.  Asked if she "ever ha[d] any problems"

with Mr. Medina, she stated that she had not, and that he was helpful and protective of her young

daughters.  *Id*. at 2478.  She testified that she had eventually learned that Mr. Medina was involved

in gang activity.  *Id*. at 2479.  As previous witnesses had, Ms. Uribe testified that Mr. Medina was

respectful of the family and helpful towards his grandparents.  *Id.* at 2480.  Although Mr. Millin

asked her if she wanted to tell the jury "anything else . . . about Tony," the prosecutor objected to the question and the court sustained the objection. *Id.* Mr. Millin then asked Ms. Uribe for her opinion of Mr. Medina, and she stated that he was loving, caring, and had done a lot for his son. The defense then passed the witness. *Id.* at 2481.

On cross-examination, the prosecutor quickly asked Ms. Uribe if there was "[a]nything in his background that would excuse or explain this capital murder or any other crimes that he's committed that you know of," and she answered "No." *Id.* at 2482. She stated that she was aware of "bits and pieces" about Mr. Medina's record for burglary of a motor vehicle and arson, and that she knew that he had been on probation. *Id.* at 2483. She also testified that she had known that he was involved with a gang. *Id.* at 2484. Finally, the prosecutor asked:

> Q.     You say he went to the [C]hristian academy. ***Is it safe to say that he had all the advantages that a person could have growing up in Houston***, a close family who cared about him and took care of him? Is that safe to say?
>
> A.     ***Yes***.

*Id.* at 2485 (emphasis added). The defense declined the opportunity to re-examine the witness.

Antonio Hernandez Medina, Mr. Medina's grandfather, was the next to testify. He stated that Mr. Medina was "real intelligent" and "mechanically inclined," and had "a good going prospect in prosthesis," which was his father's field. *Id.* at 2488. Then, as had previous witnesses, the witness testified that Mr. Medina had always been very helpful to the family, assisting with automobile repair or errands, that he interacted well with the children, and that he was respectful of adults. *Id.* at 2488-90. There was nothing in his upbringing, the witness said, that caused problems within the family. *Id.* at 2490. While he was now aware that his grandson had been involved with gangs, he had no personal knowledge of his gang activity. *Id.* The prosecutor did not cross-examine the witness.

The defense then called Anthony Luna Medina, Mr. Medina's father.  When asked by defense counsel about "what kind of child . . . Tony was . . . up to the age of 10," the witness answered that he was "a good child" who "spent a lot of time, weekends, with his grandparents."  *Id*. at 2492.  He stated that he had never had any kind of problems with Tony as a young child, and that he got along well with the family through his teen years.  *Id*. at 2493.  He testified that he had been aware that his son had been involved in gang activity, including an arrest prior to the capital murder charge, and that there were "several different gangs" in the neighborhood where the family lived.  *Id*. at 2494.  In response to a question from defense counsel, Mr. Medina also testified that his son had always been helpful to the family, that he was a good person, and that he loved him.  *Id*. at 2495.

On cross-examination, the witness stated that he was aware of Mr. Medina's 1991 arrest for burglary of a motor vehicle.  *Id*. at 2496.  He testified that his son had not graduated from Bellaire Christian Academy because he was kicked out after an incident involving the headmaster's car.  *Id*. at 2497.  Mr. Medina had then been homeschooled for a while and attended the Contemporary Learning Center, then got his GED and enrolled in Houston Community College.  *Id*. at 2498.  The witness testified that he was unaware that his son had broken into or crashed cars in the Medical Center area.  *Id*. at 2499.  He further testified that he was providing for "all [of his son's] needs and wants," and that his son could have worked with him to make extra money.  *Id*.  He acknowledged that he "didn't have total control" over his son, and that his son was out without a curfew on New Year's Eve, despite the fact that he was on probation.  *Id*. at 2501-03.  The prosecutor then elicited his agreement that his son had violated multiple conditions of his probation on that night.  *Id* at 2504.  The defense did not re-examine the witness.

Finally, the defense called Golda Medina, Mr. Medina's mother.  She testified that she had

been married for 22 years, and that she had two daughters and one son. She stated that Mr. Medina "was a good kid," "very polite" and had "respect for his elders." *Id*. at 2507. While he never gave her a problem as a young child, there later was a change in his behavior "like there is in most teenagers." *Id*. at 2508. She had learned that her son was involved with a gang "long after the fact," and was aware of gang activity in her neighborhood. *Id*. She testified that her son was well-loved by the family, and was always helpful to his great-grandfather and other members of the family. *Id*. at 2508-09. He was respectful of his elders and great with children. *Id*. at 2509. She stated that she and her husband had always tried to do their best for their son and that they had talked to him about gang activity. *Id*. She testified that her family was very close and that she loved her son very much. *Id*. at 2510.

> Anthony was a good kid. He's did some stupid and some bad stuff, but he was trying very hard to be brought up, to work, take care of his baby, be part of the family, and a whole lot less part of that gang.

*Id*. at 2511. Mr. Millin then passed the witness. On cross-examination, Ms. Medina testified she knew nothing about her son "building up" the La Raza gang and such information would surprise her. *Id*. at 2512. She testified that he was raised in a good family, with two parents who cared for him, that he was intelligent and had the opportunity to go to school, and that he had a large, close family. *Id*. at 2516. The prosecutor then had Ms. Medina review a letter she had written to a judge asking that her son receive probation for a prior offense, in which she had told the judge that her son had changed and would try to make a decent life for himself. *Id*. at 2519-20. She stated that he was working a regular job and taking care of himself. *Id*. at 2520. On re-direct examination, defense counsel asked if Ms. Medina was asking the jury to spare her son's life, and the witness responded, "Please." *Id*. at 2522. The defense then rested, and the evidence was closed.

-84-

On July 31, 1996, the attorneys presented their closing arguments.  Because the State waived its opening, defense counsel spoke first.  Mr. Millin explained in detail the burden of proof and the Special Issues before the jury.  Regarding the issue of future dangerousness, he argued to the jury that Mr. Medina would be in prison for at least 40 years. *Id*. at 2539.  While the State had presented evidence of Mr. Medina's bad acts "out on the street," he said, he now was going to be in confinement and unable to live his previous lifestyle, and the State had presented no evidence that he had been dangerous while previously in custody.  *Id*. at 2541-42.  Although counsel attempted to argue that Mr. Medina's clean record in custody was clear evidence against his future dangerousness, the defense had failed to introduce the relevant records into evidence, and therefore the court sustained the State's objection to this compelling argument.  Counsel also pointed out that Mr. Medina would be 61 years old when first eligible for parole and thus much less likely to commit crimes.  Although he attempted to argue that persons convicted of murder have lower recidivism rates than those convicted of property crimes, the court sustained the State's objection to the argument because no such evidence was in the record.  *Id*. at 2545.  Turning to the second special issue of mitigation, counsel explained that the potential mitigating circumstances were unlimited, and included intoxication and his young age.  *Id*. at 2549.  He called into question the quality of the State's witnesses, pointing out that their witnesses were largely gang members and persons with criminal records, and that those witnesses should not be sufficient to sentence Mr. Medina to death. *Id*. at 2551.

Discussing the testimony of Mr. Pegues, Mr. Millin then made reference to Mr. Medina's speech impediment:

[Y]ou know his great uncle who was the first witness yesterday testified as a child

-85-

he had a speech impediment.  Now, I'm not any sociologist or anything like that and I'm not trying to say that it means anything.  But who knows that that might not have caused such a psychological scar that it was healed only by his becoming, you know, respected as a gang member?  I don't know.  That might be something else you can consider, because we never know—we never know when we get down here to court we never know why people do anything, truly.  And who knows but something back in the past that nobody knows, that nobody testified to, put Tony on the road to where he ended up basically?  And who knows but it might be something that we might consider small like that.

*Id*. at 2551-52.  Finally, counsel told the jury that they could consider Mr. Medina's family and could decide on a life sentence if they did not want to take him away from his family.  *Id*. at 2554.

In rebuttal, the prosecutor acknowledged that one of the jurors "had a problem at the guilt stage of this case," and asked the jurors to "refocus" and decide "what is justice."  *Id*. at 2556.  The prosecutor argued that Mr. Medina would be a future danger to society, alleging an escalation of criminal activity from troublemaking in school, to vandalism and burglary of cars at the Medical Center, to arson and the drive-by shooting in the instant case.  He disparaged the judge who had given Mr. Medina probation on his charges of burglary of a motor vehicle, stating "I don't know what got into Judge Kegans."  *Id*. at 2558.  He asked the jurors, "Is he a continuing threat to society?  Do we have to allow the violence to escalate any more before the answer is obviously yes?"  *Id*. at 2561.  As for the mitigation issue, the prosecutor argued that the jurors should not consider "bits and pieces" of the evidence as suggested by the defense:

Let me take it all. . . . [F]irst thing you have to do is decide is there mitigation?  Is there something that less[e]ns his blameworthiness or tends to explain his crime?  Did you hear anything?  Anything whatsoever?  A speech impediment when he is a child explains why he murdered two children on New Year's Eve?  My God, that's ludicrous.

*Id*. at 2562.  The prosecutor argued, in rebuttal of the defense argument, that Mr. Medina's letters from prison demonstrated his future dangerousness, arguing that he was "running his gang in jail":

> That's the kind of thing we have to worry about in jail. . . . That boy as he sits there in that coat and tie isn't some clean-cut kid. He isn't. This is an orchestration, folks; make him look good, folks. You saw what he looks like out on the street. That's the guy you don't mess with. That's the cruz you don't mess with. That's this guy. That's this guy. Take off the coat and tie, put the moustache and goatee back on him and that's this guy. He's dangerous. He is the baddest mo' fo' in the world, and that's what he said in those letters . . . . You're going to put him in a prison population and let him organize something? He's a gang leader.

*Id*. at 2563-64. He argued that he had clearly disobeyed instructions to stay away from alcohol, guns, and gang members. After speaking at length about the pain the victims had suffered, he stated,

> And we talk about if there's mitigation that overcomes the moral blameworthiness for that crime. It is not a speech impediment, folks. You cannot overcome the death of these two children with a speech impediment. Those children will never breathe again.

*Id*. at 2567. Finally, the prosecutor asked the jury to send a message with their verdict, stating "[t]hese gangsters will know when you answer yes and no, we as citizens of this town will not excuse, will not mitigate, will not tolerate, that kind of terrorism, that kind of hoodlumism and that kind of cold-blooded, senseless, heartless murder." *Id*. at 1569.

The jury then retired to deliberate at 10:10 a.m. After 14 hours of deliberations over two days, they reached a verdict at 2:25 p.m. on August 1, 1996—when Mr. Medina became Jerry Guerinot's **fourth** death-sentenced client in a six-month span.

## CLAIMS FOR RELIEF

I.  **Trial counsel rendered ineffective assistance of counsel with respect to the guilt/innocence phase of Mr. Medina's trial, in violation of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984).**

Mr. Medina was saddled with counsel limping across the finish line of an unprecedented marathon of back-to-back capital trials.  For lead counsel Jerry Guerinot, Mr. Medina's was the *fourth death sentence*—from four separate capital trials—*in just six months*, during which Guerinot was *also* handling 174 of other cases *and* acting as a part-time prosecutor for the City of Humble, Texas.  Mr. Guerinot was in the middle of a capital trial when he was appointed to Mr. Medina's case and tried two more capital cases from beginning to end before turning any of his attention to Mr. Medina's case.  To put this extraordinary six months in perspective, Mr. Guerinot—who is notorious for the number of clients he has on death row—had 20 death verdicts in his 22 years of defending capital cases.  Four of them, 20%, were crammed into six months, and Mr. Medina's was the last of these cases and the one for which Mr. Guerinot was the least prepared.  As the record demonstrates, even the most obvious inconsistencies in the prosecution's presentation sailed, unnoticed, over defense counsel's head.

For the second chair lawyer, John Millin, Mr. Medina's was the third death sentence in six months.  There is similarly no evidence of Mr. Millin working on this case until the very last minute.  The *first* pre-trial defense motion of any kind in this case was filed by Mr. Millin, on June 19, 1996, just *twenty-six (26) days* before trial.  Sadly, Mr. Millin was also nearing the end of a debilitating battle with cancer.  He missed portions of the court proceedings to receive cancer treatments.  He died shortly after Mr. Medina's trial.

Counsel indisputably failed to adequately prepare for Mr. Medina's trial as they bounced

from one capital trial to the next during the six months between their appointment and the trial in this case. The very small amount investigation that was performed by the defense—30 hours of investigative time for both phases—barely scratched the surface of a minimally competent investigation. Counsel and the investigators failed to contact and interview even the witnesses located for them by Mr. Medina's family. In the end, it was Mr. Medina's family who secured the defense witnesses at trial.

Nor were counsel prepared to test the prosecution's case. Prosecution witnesses were vulnerable to legitimately devastating attacks on their credibility that would have revealed their bias (avoiding prosecution), their criminal backgrounds, and their fatally inconsistent statements—some of which were under oath.

Counsel's omissions were not the product of any strategy. The absence of a reasonable investigation left no basis for making informed strategic decisions. Moreover, much of what counsel failed to attempt or accomplish would have supported the themes they tried to develop at trial, including proving that Flaco was the shooter; discrediting the prosecution witnesses as liars; using forensics evidence to discredit the alleged eye-witnesses; and distancing Mr. Medina from the numerous prejudicial extraneous offenses the prosecution paraded before the jury during the guilt/innocence phase.

With adequate preparation, counsel could have simultaneously presented a far more credible case for the defense, eviscerated the prosecution's already vulnerable case, and excluded—or minimized the impact of—the extraneous offenses. There is a reasonable probability that, absent counsel's deficient performance, at least one juror would have voted to acquit Mr. Medina. Because the state court decision to the contrary was unreasonable in numerous respects, this Court must order

a new trial.

      **A.**    **The *Strickland* Standard.**

      This Court must apply *Strickland v. Washington*, 466 U.S. 668 (1984), to determine whether trial defense counsel's pre-trial investigation and subsequent representation was constitutionally deficient. Under *Strickland*, a petitioner first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." Second, the petitioner must demonstrate prejudice by showing "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

      The prejudice test is not outcome determinative. The *Strickland* Court expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. (emphasis supplied). Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard. *See Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990) (the prejudice prong imposes "a lower burden of proof than the preponderance standard."); *see also id*. (even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard."); *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (*Strickland* prejudice standard of

"reasonable probability" is "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n. 18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

Finally, as the Fifth Circuit has recognized, though the *Strickland* test is two-pronged, the facts and evidence adduced by the petitioner are often relevant to both: "In our analysis we do not attempt to place the events of trial into two separate airtight containers of the first and second prongs of *Strickland*. The facts that demonstrate a reasonable probability of a different outcome but for counsel's decisions can cast light on their reasonableness." *Draughon v. Dretke*, 427 F.3d 286, 293 (5th Cir. 2005).

### B. "There were obvious opportunities lost"[51]: Counsel's failure to investigate and numerous other omissions fell well below the prevailing standard of care.

#### 1. The prevailing professional norm required that the defense perform a basic, independent pre-trial investigation.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Strickland*, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. "Whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny. The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court." *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) (footnote omitted).

"At the same time, however, courts are 'not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when

---

[51] *Draughon v. Dretke*, 427 F.3d at 294.

it appears on the face of the record that counsel made no strategic decision at all.'" *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (quoting *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir.1999)).  When assessing counsel's performance, courts "look at what might have been, not to judge the performance of trial counsel by failures of strategic decisions reasonable when made, but to meaningfully examine whether counsels' failure to investigate was based on a 'reasonable decision' that made such an investigation 'unnecessary.'" *Draughon*, 427 F.3d at 296.

More than twenty-five years ago, well before Mr. Medina's trial, the Fifth Circuit "recognized that, at a minimum, ***counsel has the duty to interview potential witnesses*** and to make an ***independent investigation*** of the facts and circumstances of the case.  This duty is reflected in the American Bar Association Standards for Criminal Justice, a proper guide for determining what is reasonable under the circumstances." *Nealy v. Cabana*, 764 F.2d 1173, 1177-78 (5th Cir. 1985) (footnotes omitted) (emphasis added).  The fundamental duty to investigate the facts and circumstances of the case is a universally recognized requirement for effective representation:

> "Under *Strickland*, trial counsel has a duty to investigate his case." *Stewart v. Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2006).  "This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Id.* (quoting *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)).  Thus, the question is whether "reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052.

*Avery v. Prelesnik*, 548 F.3d 434, 437 (6th Cir. 2008).  *See also Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999) ("[A] lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine the confidence of the verdict, renders deficient performance.").

Moreover, the Fifth Circuit has "squarely rejected" *post hoc* rationalizations about the

credibility of evidence trial counsel failed to discover as wholly irrelevant to the question of whether

counsel complied with their duty to investigate:

> we squarely reject[] the argument made by the State here—that a failure to interview witnesses is excusable as "a strategic decision" if the witnesses would not have been credible.  Acknowledging that a lack of credibility might support a strategic decision not to call a witness to ***testify*** at trial, we explained that a witness's character flaws cannot support a failure to ***investigate***.  Without so much as contacting a witness, much less speaking with him, counsel is "ill-equipped to assess his credibility or persuasiveness as a witness."

*Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) (quoting *Bryant v. Scott*, 28 F.3d 1411, 1419

(5th Cir. 1994)) (emphasis in the original).

In the context of Mr. Medina's case, which all parties agreed came down to the credibility

of the witnesses because no other evidence tied Mr. Medina to the shooting, pre-trial interviews of

the witnesses for both sides were compulsory:

> [Counsel] should have interviewed the eyewitnesses.  Because there was no physical evidence connecting [the defendant] with the crime, the eyewitness identification of [the defendant] at the crime scene was the cornerstone of the state's case in chief.  Consequently, information relevant to [the defendant's] defense might have been obtained through better pretrial investigation of the eyewitnesses, and ***a reasonable lawyer would have made some effort to investigate the eyewitnesses' testimony***.

*Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994) (emphasis added); *see also Stanley v. Bartley*,

465 F.3d 810, 813 (7th Cir. 2006) ("To fail to interview any witnesses or prospective witnesses was

a shocking dereliction of professional duty in a case in which the state's evidence, though sufficient

to convict the defendant of murder beyond a reasonable doubt, was far from compelling."); *see also*

*id*. ("The lawyer could not know how complete or accurate a prospective witness's statement to the

police was without talking to the witness.").

### 2.   Trial counsel "fail[ed] to conduct even [a] rudimentary investigation."[52]

Given the clear duty to conduct a basic investigation, and the equally clear record of the absence of any such effort by defense counsel, this Court need not grapple long with the question of whether counsel's performance before and during trial fell below an objective standard of reasonableness under the prevailing professional norms. *Strickland*, 466 U.S. at 694.  Mr. Medina has catalogued, *supra*, the negligible pretrial work of the defense.  Even accepting at face value the self-serving statement that the State prepared for trial counsel during state habeas proceedings, that document merely confirms that counsel failed to fulfill the fundamental duty to investigate Mr. Medina's case.  *See* Exhibit 13 (Second Affidavit of Jerry Guerinot).

Trial counsel for Mr. Medina breached their duty by failing to conduct an investigation which would have uncovered readily available witnesses who were essential to demonstrate Mr. Medina's innocence.  Counsel's failure to investigate was all the more inexcusable here because the client and his family supplied the defense with the names of witnesses.

Despite being appointed on January 16, 1996, trial counsel let lapse half of their preparation time before retaining an investigator, John Castillo, on April 15, 1996.  Exhibit 9 (Fee statement of John Castillo).  By June 18th, less than a month before Mr. Medina's trial was to begin, the only "witnesses" Mr. Castillo had spoken to were Mr. Medina and his sister.  *Id.*

Astonishingly, the investigators only began their work in earnest *six days before* the July 15, 1996, start of trial, though Mr. Medina's family had tried to contact them with leads and information in the preceding months.  Pam Bosse-Hamilton, an investigator working for Mr. Castillo, first attempted to contact witnesses on July 9, 1996.  After just one day of attempts at in-person

---

[52] *Lawyer Best Known for Losing*, N.Y. TIMES, *supra*.

interviews, she spoke to 8 people by phone on July 10, 1996, five days before trial started.  *Id*.  The next day, Ms. Hamilton spoke to two more witnesses before preparing an "investigation report for court readiness."  *Id*.

That defense counsel must conduct a "prompt" investigation has been inherent in the right to the effective assistance of counsel since its inception.  *Powell v. Alabama*, 287 U.S. 45, 58 (1932) ("The Scottsboro Case") (recognizing that, in a capital case, the effective assistance of counsel requires a "prompt and thorough-going investigation").  *See also Richards*, 566 F.3d at 571 (counsel has a duty to "conduct a ***prompt*** investigation of the circumstances of the case.") (quoting ABA Criminal Justice Standard 4-4.1(a) (3d ed. 1993)).  The last-minute, two-day defense investigation-by-telephone was far below any objective standard of reasonableness.

### a.    Defense counsel failed to investigate the prosecution's case or interview the prosecution's primary witnesses.

A reasonable standard of practice in a capital case mandates that defense counsel "at least attempt interviews with all significant state's witnesses.  This is the most basic trial preparation." Exhibit 16 at 2 (Affidavit of Clive Stafford Smith).  *See also Bryant*, 28 F.3d at 1418 ("reasonable lawyer would have made some effort to investigate" eyewitness testimony); *Nealy*, 764 F.2d at 1177–78 (counsel has a duty to interview potential witnesses).  Other than interviewing Mr. Medina and his sister, the defense investigation into the offense consisted of 10 telephone calls on the eve of trial.  The bulk of the witnesses interviewed were not material to the case and ultimately only three witnesses who testified for the State were contacted by the defense before trial.  Mr. Guerinot was simply unprepared to cross-examine the vast majority of the State's witnesses.  *See* 15 RR 1814 (Cross-examination of Johnny Valadez: "Mr. Valadez, you and I have never talked about this case,

have we?"); 15 RR 1912 (Cross-examination of Dominic Holmes: "Mr. Holmes, you and I have never spoken, have we?"); 16 RR 1966 (Cross-examination of Regina Juarez: "Ms. Juarez, you and I have never talked before, have we?"); 14 RR 1696 (Cross-examination of James Moore: "You and I, number one, have never talked before, have we?"); 13 RR 1463 (Cross-examination of Laura Gomez: "Ms. Gomez, if I may, you and I have never talked before, have we?"); 13 RR 1569 (Cross-examination of State's firearms examiner Robert Baldwin: "Mr. Baldwin, we haven't talked previously to today on this case, have we?"); 14 RR 1610 (Cross-examination of Marco Martinez: "I have not spoken to you earlier, have I?"); 14 RR 1645 (Cross-examination of Veronica Rodriguez: "Ms. Rodriguez, you and I have never talked before, have we?"); 15 RR 1769 (Cross-examination of Candelario Guerrero: "You and I have never spoken, have we?").  As the Fifth Circuit noted in *Richards*, "questions by [Guerinot] at trial clearly establish that [he] had never spoken with [the State's key witnesses] before they took the witness stand." *Richards*, 566 F.3d at 571.

Trial counsel never spoke with even the most critical witnesses in the case, including Flaco Holmes, Johnny Valadez, and Regina Juarez.  The Fifth Circuit has repeatedly held that the failure to interview the prosecution's primary witnesses constitutes deficient performance, and a finding to the contrary is an unreasonable application of *Strickland*.  For example, in *Richards*, trial counsel failed to interview some of the key prosecution witnesses, and interviewed others only on the day of their testimony.  *Richards*, 566 F.3d at 570.  The Fifth Circuit held that

> [counsel's] pretrial investigation fell below an objective standard of reasonableness and was constitutionally inadequate.  *See Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003) ("Guided by *Strickland*, we have held that counsel's failure to interview eyewitnesses to a charged crime constitutes constitutionally deficient representation." (quotation omitted)); *see also* ABA Criminal Justice Standard 4-4.1(a) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the

merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty."). Moreover, ***given the fundamental importance of adequate pre-trial investigation, we again agree that the state court's decision was an "unreasonable application" of Strickland***, and further that the state court's contrary factual findings have been rebutted by clear and convincing evidence. 28 U.S.C. § 2254(d), (e)(1).

*Richards*, 566 F.3d at 571 (emphasis added); *see also Soffar v. Dretke*, 368 F.3d 441, 473-74 (5th Cir. 2004) ("failure to take the most elementary step of attempting to interview" eyewitnesses is "sufficiently deficient to satisfy the first prong of *Strickland*"). Mr. Medina's counsel also failed to take this "most elementary step," an omission that likewise renders their performance deficient under *Strickland* and the state court decision to the contrary unreasonable.

### b.      Defense counsel failed to investigate their own defensive theory.

Defense counsel did not interview any ***defense*** witnesses identified by their client and his family. The defense theory was that Flaco Holmes committed the crime. Thus, there was no plausible strategic reason for failing to pursue this line of investigation. Yet, the witnesses presented in defense of Mr. Medina were contacted only by Mr. Medina's own family, who realized during jury selection that the trial lawyers had not issued any subpoenas. Mr. Medina's father had to leave the trial to pick them up and drive them to the courthouse. *See* Exhibit 6 (Affidavit of Anthony Luna Medina). Mr. Medina's trial counsel utterly "abdicated [their] responsibility [for] investigating potential . . . witnesses" to support the defensive theory at trial. *Bryant v. Scott*, 28 F.3d 1411, 1417 (5th Cir. 1994). The investigators' fee statement cataloguing their 10 interviews confirms Mr. Medina's father's account that the Medina family had to perform the defense investigation.

Nor did the defense interview the critically important witnesses that Mr. Medina and his

family flagged for counsel's attention.  Mr. Millin elicited numerous leads from his client.  Exhibit 17 (Millin Notes) (notes indicating Millin's intention to call Mr. Medina's sister about other neighborhood gang members who knew about the shooting; notes indicating that Flaco confessed to the shooting to Dallas Nacoste and Dallas knew who buried the guns; notes indicating that Shelly Amato, Flaco's ex-girlfriend, had information about Flaco changing his story).  However, Mr. Millin's client interview took place *during trial*, on July 18, 1996, three days into jury selection when nine jurors had already been selected.  There is no evidence that counsel or his investigators followed up on any of these red flags and leads.  In fact, Mr. Medina's family had to fight for the attention of the defense investigator.  As noted, *supra*, a May 31, 1996 letter from Mr. Medina to the investigator complained that Mr. Castillo was unresponsive to his sister, Angie Medina, who was trying to provide him with information.  The investigators delayed until June 25, 1996, *20 days before trial*, to meet with Angie and pick up a list of potential witnesses (which included addresses and phone numbers).  Even then, the investigators did nothing more until just days before trial, when they made their 10 phone calls.  Because they failed to follow up on most of the leads supplied by Mr. Medina and his family, defense failed to discover critically important witnesses.

### Dallas Nacoste

Sergeant Novak and Officer Chisholm interviewed Dallas Nacoste on January 10, 1996.  When Mr. Nacoste was initially uncooperative, the police said that his name had been mentioned by others and that *an eyewitness described the shooter as a black male.  See* Exhibit 18 (Affidavit of Dallas James Nacoste).[53]  The police told Mr. Nacoste that they would drop the assault charge

---

[53] That this was not merely a lie by the officers to persuade Nacoste to talk is corroborated by Novack's report.  On January 2, 1996, the day after the shooting and before the police had any suspects, Novak and Chisholm informed another HPD officer that "information had also been

against him if he cooperated and that they were only interested in getting the shooter.[54]  *Id.*

Mr. Nacoste stated that he was at Candyman's New Year's Eve party when Flaco  showed up with another black male.  Mr. Nacoste noticed that Flaco "was all pumped up" when he arrived. Flaco told Nacoste that he had driven by "this girls [sic] house that dates an "HTC" member" named "Blue."  Exhibit 1 at 175.  Flaco said that he had just driven by the house and he saw Blue outside. Flaco began asking for the "AK."  *Id.*  Johnny "Pelon" Valadez told Flaco the gun was at his house but that Flaco could go into his house to retrieve it.  *Id.*

Flaco told the people at the party that he was going to "roll by" looking for Blue and he was going to "start busting at them."  *Id.*  Mr. Nacoste was higher up in the gang than Flaco and according to gang policy, nothing could occur unless permission was given from a leader.  Exhibit 18 (Affidavit of Dallas Nacoste).  Robert Lucio was in charge but he was not there, so Flaco asked Mr. Nacoste for permission to do a drive-by.  Mr. Nacoste remembered telling Flaco that he should be careful and make sure the people he saw were members of HTC.  *Id.*

After 2 a.m., Flaco and Jamie left in Jamie's car.  They came back to the party a short while later and Jamie was concerned that some shell casings were still in his back seat.  *Id.*

Flaco admitted later to Mr. Nacoste that he "messed up."  *Id*.  He told Mr. Nacoste that he wasn't sure how many people he had hit but he "did see two or three fall."  *Id.*  Mr. Nacoste was told by Flaco that if anyone asked, he should say Mr. Medina was the shooter.  According to Flaco, Mr.

---

received that some black males may also be involved in this incident."  Exhibit 1 at 127.  Mr. Medina has never been supplied with the eyewitness information identifying the assailants as black.

[54] This statement is corroborated by notes in a Houston Police Department offense report. *See* Exhibit 1 at 175 ("Upon completion of Dallas Nacoste's statement and a review of incident 150643895 a decision was made not to incarcerate him on the aggravated assault warrant . . . .").

Medina was already "known" by the police and would be a good person to blame.  When Mr. Nacoste told him that the leaders of the gang would have to vote on it, Flaco threatened him.  *Id.*

Nacoste told the police that, on January 3, 1996, he spoke with Johnny "Pelon" Valadez, who told him that Flaco had done the drive-by and that "they buried the gun somewhere in Westbury." Exhibit 1 at 175.  The police came to speak with Mr. Nacoste the following weekend and he again told them what he witnessed.  On this occasion, the officers did not ask him to sign anything. Exhibit 18 (Affidavit of Dallas Nacoste).

Mr. Nacoste was also with Regina Juarez the evening after she testified at Mr. Medina's trial. Mr. Nacoste recalls that Ms. Juarez was bragging and talking about how she "helped fuck over" Mr. Medina.  *Id.*

Mr. Nacoste was never contacted by Mr. Medina's attorneys or investigators.  Exhibit 28 (Affidavit of Dallas Nacoste).  It is clear that the defense was aware of Mr. Nacoste.  Guerinot should have seen Mr. Nacoste's statement in the prosecution file.  More importantly, Mr. Millin's notes from his July 18, 1996, meeting with Mr. Medina document that Mr. Medina told him that Dallas Nacoste had important information.  Mr. Millin made a notation to have Mr. Nacoste bench warranted from Fort Bend County.  Exhibit 17 (Notes of Mr. Millin).  However, no defense subpoenas were ever issued.

Mr. Nacoste's testimony was not critical merely because he identified Flaco as the shooter. Nacoste would have provided the defense with two critical lines of attack that significantly undermine the prosecution's case.  First, Nacoste was the only witness besides Mr. Medina who was honest with the police about the murder weapon in January of 1996.  Nacoste told the police that he had heard from Johnny Valadez that the guns had been buried, which was true.  According to

-100-

Nacoste, the guns had been buried by January 3, 1996, *before Mr. Medina was arrested*. Thus, Nacoste would have rebutted the new story at trial that Flaco and his friends concocted as an explanation for the incriminating presence of Flaco's palm print on the bags in which the guns were buried.

Flaco and his friends all lied to the police shortly after the crime to keep the police from finding the gun. Flaco's palm print was on the bag in which the gun was disposed, and Flaco and his friends all changed their story about the gun in unison at trial and gave an account that not one of them had seen fit to mention to the police in January. Nacoste's truthful statement to the police about the guns being buried in Westbury pre-dated any of these evolutions, and thus was made long before Mr. Medina could have known what the prosecution's trial theory would be. The fact that the guns were buried *before* Mr. Medina was arrested, together with the fact that Mr. Medina told the police that Flaco had disposed of the gun even before he could have called Regina, both convincingly discredits the prosecution's allegation that Mr. Medina called Regina Juarez from jail and told her to get rid of the guns, and further exposes the dishonesty of Flaco and his friends Jamie Moore and Regina Juarez.

Second, Nacoste could have helped rebut the prosecution's theme that Mr. Medina, while in jail awaiting trial, had concocted a plan to blame Flaco. The prosecutor told the jury in opening statements that "I expect the evidence will show that the defendant had a plan to try to get out of trouble by blaming Dominic Holmes, and you'll hear about who he told that plan to." 12 RR 1299. During the course of the trial, the State built on this theme, attempting to establish that any exculpatory testimony was given at the behest of Mr. Medina. Regina Juarez claimed that, in a March 7, 1996, telephone call from the jail, Mr. Medina had told her to say that Flaco was

responsible for the shooting.  16 RR 1963-64.

Later, the State introduced a letter Mr. Medina had written to Veronica Ponce and Scharlene Pooran on January 29, 1996, while incarcerated.  17 RR 2216.  During the State's lengthy cross-examination of Mr. Medina concerning this letter, the prosecutor continually insinuated Mr. Medina was attempting to tell witnesses what to say.  *See* 17 RR 2222 ("Did you want to firm up their support?"); 17 RR 2224 ("You're trying to firm up their support?"); 17 RR 2227 ("You wanted her to tell the story so you could work around it.  Isn't that true?"); 17 RR 2229 ("I mean, this letter's important, isn't it?  It tells all about you and your plan, doesn't it?"); 17 RR 2239 ("Do you agree with me that you're telling her what to say?").

The State again harped on this theme in closing argument, trying to convince the jury that Mr. Medina created this scheme to blame Flaco:

> For example, in my opening statement I talked about the defendant's plan to pin this on Flaco, Dominic Holmes.  And I think you saw that plan in action when the defense put on the case.  And I'm not talking about the defense attorneys.  Those guys are of the most honorable and honest people I know.  I'm talking about the defendant, and his friends, cooking up this plan to pin it on Flaco; and I think it's easy to see that.
>
> *****
>
> I mean, this is part of the big plan that they have.  And I can see this go step by step, so the defense case kind of supports the opening statement that I made at the beginning of the trial.

18 RR 2276.

> Also this same person is out there telling people what to say.  He tells Regina what to say and so maybe—you know, you don't know Regina and, you don't know whether to believe her, but the letters that defendant writes to other people support the same thing Regina says.  He's telling other people what to say later on.
>
> *****
>
> He tells people what to say directly in a letter on January 31st: By the way, Wicked will be calling China.  Wicked's that Dallas Nacosti [sic] guy.  We haven't heard

-102-

from Wicked.  Wicked will be calling China to call you.  He's helping me out with a couple little details.  Let him know what I said to say and all that other shit.  I mean, he's telling people what to say.  Read the letters.

18 RR 2315-16.

Because the defense failed to investigate Mr. Medina's case, they lacked the ability to counter these allegations.  Not only did Dallas Nacoste have personal knowledge that Flaco committed the drive-by shooting but *he told that to the police on January 10th*.  In other words, Dallas Nacoste informed the police that Flaco committed the shooting prior to Mr. Medina's alleged conversation with Regina Juarez on March 7th and prior to any of the letters the State introduced into evidence. Evidence that surfaced two months after the witness interrogations—the buried guns—confirmed that Nacoste was truthful with the police just as it confirmed that State's witnesses were all liars (and that Regina Juarez lied under oath).  Clearly, he was a more credible witness than Flaco and his friends.

In the state habeas proceedings, Guerinot's prosecution-drafted affidavit alleged that he did not call Nacoste as a witness because his credibility "was even lower than other witnesses and counsel was able to present other witnesses in an attempt to blame Falco."  Exhibit 13 (Second Affidavit of Jerry Guerinot) at 3.  The state court adopted the prosecution's findings crediting this statement.  Respondent's Proposed Findings of Fact, Conclusions of Law and Order (hereinafter "Findings") at 33.  Mr. Guerinot failed to allege that he or any other member of the defense team ever spoke with Nacoste.  As Nacoste has averred, Mr. Medina's state habeas counsel were the first members of Mr. Medina's defense to contact him, nobody from the trial team ever spoke with him. Exhibit 18 (Affidavit of Dallas Nacoste).  This fact is confirmed by the investigators' report, which

-103-

makes no mention of interviewing Nacoste.[55]  Even if there were any basis in fact for Mr. Guerinot's *post hoc* rationalization, it does not excuse his failure to interview Nacoste, and the state court finding to the contrary was an unreasonable application of *Strickland*.  *See Anderson*, 338 F.3d at 392 ("Without so much as contacting a witness, much less speaking with him, counsel is ill-equipped to assess his credibility or persuasiveness as a witness.") (internal quotation omitted).

Had the defense merely followed up on the lead to contact Dallas Nacoste, they could have cast legitimate doubt on the prosecution's theory that Mr. Medina concocted a plan to blame Flaco.  Rather than seeing Mr. Medina as a guilty man trying to "orchestrate" a defense from jail, the jury would have seen that it was Flaco and his friends who were concocting stories and lying to the police.  The defense failure to subpoena Mr. Nacoste, without doubt, undermines any confidence in the jury's verdict.

### Carlos McNickles and Chasity Hamilton

In 1996, Carlos McNickles lived at 5442 Danfield in the neighborhood where the drive-by

---

[55]  Moreover, when Mr. Guerinot met with Mr. Medina's state habeas counsel in November of 2001, Mr. Guerinot said that he could not recall anyone by the name of Dallas Nacoste.  Exhibit 19 (Affidavit of Naomi Terr).  Counsel then showed Mr. Guerinot Nacoste's January, 1996, statement to the police and, after reviewing it, Mr. Guerinot reiterated that the name did not sound familiar to him and that, as far as he could remember, he had never seen Nacoste's statement.  *Id*.

Thus, Mr. Guerinot's recovered memory—in May of 2002 when he signed the State's affidavit—that Nacoste was less credible than other witnesses, and his ensuing strategic decision to not call Nacoste as a witness is doubly surprising.  Mr. Guerinot had no idea who Nacoste was just six months earlier.  Moreover, he never met Nacoste or saw his statement.  Guerinot was unaware that the Nacoste was proven to be the most truthful of the witnesses, certainly more truthful than the State's witnesses.

When the state courts adopted the prosecution's finding on this issue, it resolved the claim based on an unreasonable determination of fact in light of the evidence before it.  28 U.S.C. § 2254(d)(2).

shooting occurred.  On New Year's Eve, Mr. McNickles was talking on the phone to a friend when he saw two black males driving a "dark blue late 80's four-door Park Avenue-type car."  Exhibit 20 (Affidavit of Carlos McNickles).  In the car, he saw a black male with glasses driving and the other black male was hanging out the window shooting a rifle into the air.  *Id.*

Mr. McNickles' account is far more detailed and accurate than that of prosecution witness Leon Guy.  Mr. McNickles correctly identified the type of car used in the drive-by shooting and was correct that the driver was an African-American man wearing glasses.[56]  State's witness Leon Guy was sure that Jamie Moore's car was ***not*** the one used in the drive-by shooting, the car he saw was a light gray two-door.

Mr. McNickles' recollections are substantiated by Chasity Hamilton.  Ms. Hamilton remembers speaking with Mr. McNickles on the phone on New Year's Eve.  Exhibit 21 (Affidavit of Chasity Hamilton).  As they spoke, she heard the sound of a gun being fired and asked Mr. McNickles what had happened.  Ms. Hamilton recalls Mr. McNickles telling her that two black men in a blue car were shooting a rifle in the air.  *Id.*

The jury never heard this testimony either.

### Jason Wade Crawford

Mr. Crawford lived in the same neighborhood as Jamie Moore.  Exhibit 22 (Affidavit of Jason Wade Crawford).  He attended high school with Flaco and lived across the street from Jamie Moore's sister, Angie.  *Id.*

Mr. Crawford knew how distraught Flaco was about the death of his friend and fellow gang

---

[56] Numerous witnesses described Jamie Moore, the driver, as a black man with glasses.  *See e.g.* 15 RR 1793 (Johnny Valadez says the driver was "that black guy with glasses").

member, G-Money.  Flaco was particularly close to G-Money and had a tattoo that Flaco said was in G-Money's memory.  Mr. Crawford remembered Flaco frequently commenting on how he was going to "do something" to the HTC gang members.  *Id*.  In late December of 1995, Flaco told Mr. Crawford that the LRZ gang had "something planned" for HTC although he would not reveal the details.

Shortly after New Year's Eve, Mr. Crawford was visiting Jamie Moore (whom he had known since 1992) at Moore's sister's apartment when Flaco arrived with a "long rifle wrapped in a towel." *Id*.  Mr. Crawford remembers Mr. Moore expressing concern about having the gun because he was on parole.  *Id*.  Mr. Crawford, like Mr. Nacoste, Mr. McNickles and Ms. Hamilton, was never contacted by Mr. Medina's investigator or lawyers prior to his trial.

Had Mr. Crawford been called, the jury would have heard that Flaco was particularly close to G-Money and was planning to get revenge for his murder.  According to the prosecution's theory, revenge for G-Money's murder the motive for the drive-by shooting.

Additionally, the jury would have learned that Flaco was running around with the murder weapon shortly after New Year's Eve.  This fact contradicts ***both*** Flaco's statement to the police (that he never saw the gun after the shooting) ***and*** his trial testimony that he next saw the gun after the shooting a week or so later when he was wrapping it up for burial.  Showing that Flaco was continuing to lie about the gun at trial would have demolished his credibility and heightened the probability in the jury's mind that he had committed the murder.

Finally, that Flaco was part of a "plan" for revenge on HTC for the murder of Flaco's close friend would have justified the defense's request for an accomplice instruction regarding Flaco's testimony, a request which was ultimately denied.  *See* 18 RR 2269.

-106-

### Ricardo Villanueva

Ricardo Villanueva called Regina Juarez in early January of 1996. During that conversation, Ms. Juarez told Mr. Villanueva that some "guys in LRZ" had done a drive-by shooting and that Dominic Holmes had killed an HTC's girlfriend and her little brother. Exhibit 23 (Affidavit of Ricardo Villanueva). Ms. Juarez informed Mr. Villanueva that Flaco wanted her to blame it on Mr. Medina. Mr. Villanueva also spoke with Flaco during this call. Flaco bragged about committing the murders, stating "that shit was cool." *Id.*

Mr. Villanueva, in addition to identifying Flaco as the shooter, could have provided trial counsel another means of impeaching Ms. Juarez, whose testimony was critical to the State.

### Raymundo Becerra

Mr. Becerra also had important information about Mr. Medina's case but was never contacted by the defense. Mr. Becerra had been dating State's witness Regina Juarez prior to New Year's Eve 1995. Exhibit 24 (Affidavit of Raymundo Becerra). Mr. Becerra was a leader in the LRZ gang and had control over a certain area of the city. Mr. Becerra remembers Flaco expressing interest in "earning his stripes" and also trying to get his cousin Jamie Moore involved in LRZ. *Id.*

While Mr. Medina was incarcerated in 1995, Flaco was trying to take control of Mr. Medina's branch of the gang. He also had made it clear that he wanted to become a "cruz" and had an interest in replacing Mr. Medina, who had announced that he was "stepping down." *Id.* Flaco was close with Robert Lucio, the leader of the LRZ gang, and it was clear that Lucio would pick Flaco to replace Mr. Medina as the "cruz." *Id.*

Mr. Becerra was in Fort Worth for New Year's but returned to Houston on January 2, 1996. Upon returning, Mr. Becerra noticed more police in the neighborhood than normal and called Regina

Juarez to find out what was going on.  *Id.*  Ms. Juarez told him that Flaco and his cousin had done a drive-by.  She stated that they had used Flaco's cousin's car because no one would recognize it. *Id*.

When Mr. Becerra went over to Ms. Juarez's house later, she was upset and crying.  *Id.*  She told Mr. Becerra that Flaco and his cousin Jamie had been there earlier and had threatened to "fuck up her world" if she said anything about the drive-by shooting.  *Id*.

Mr. Becerra, who was willing to testify at Mr. Medina's trial, was never approached by Mr. Medina's trial lawyers or their investigators.  Mr. Becerra's testimony would have been critical because he identified Flaco as the shooter.  He also explained Flaco's motive and rationale for pinning the shooting on Mr. Medina.

### Shelly Amato

Finally, had Mr. Millin followed up on Mr. Medina's suggestion that he speak to Shelly Amato about Flaco changing his stories, Exhibit 17 (Notes of Jack Millin), Ms. Amato would have confirmed it.  Flaco came to her house in the early morning hours of January 1, 1996.  Exhibit 4 (Affidavit of Sarah L. Jack).  He was filthy, covered in mud and dirt.  Flaco kept changing his story about what had happened the night before.  At first, he said that he had been fighting all night.  *Id*. A few days later, he changed his story and said that he had been passed out in the back of Jamie Moore's car all night and could not remember anything.  *Id*.  Flaco never told Shelly that he had seen the shooting.  *Id*.  The fact that Flaco was lying to his girlfriend, and changing his story, casts further doubt on his testimony that he was merely an innocent passenger in the back of the car.

"[C]ounsel were aware of the critical nature of" the credibility of the state's witnesses and evidence demonstrating that Flaco was the shooter, but "made only 'half-hearted' attempts to obtain

independent evidence" related to these witnesses "and abandoned those efforts for no strategic

purpose." *Loyd v. Whitley*, 977 F.2d 149, 157 (5th Cir. 1992).  As in *Richard*,

> even applying a strong presumption to the contrary and giving appropriate deference
> to the state court's factual findings, [counsel's] failure to bring in this evidence was
> objectively unreasonable under prevailing professional norms and was not the
> product of a "conscious and informed decision on trial tactics and strategy." *Virgil*,
> 446 F.3d at 608 (quotation omitted); *see also Moore*, 194 F.3d at 611 ("Counsel's
> decision to exclude [exculpatory evidence], which produced no conceivable benefit
> to the defense and prejudiced Moore by precluding reliance upon a plausible
> alternative defensive theory that was supported by other evidence in the record, was
> professionally unreasonable.").  Given the seriousness of [counsel's] unreasoned
> failure to present this powerful exculpatory evidence, we also agree that the state
> court's decision was an "unreasonable application" of *Strickland*, 28 U.S.C. §
> 2254(d).

*Richard*, 566 F.3d at 568.

> In Mr. Medina's case
>
> The fee statement of investigator John Castillo, together with the impossible
> caseloads of the two attorneys, and the evidence that the attorneys themselves did not
> meet witnesses or collect documentary evidence suggest that the only investigation
> into Mr. Medina's case was the thirty hours performed by Mr. Castillo's office.  This
> fact alone demonstrates that the preparation for Mr. Medina's trial was inadequate,
> so far below the required standards of practice among capital defense counsel that he
> was clearly denied effective representation.

Exhibit 16 at 26 (Affidavit of Clive Stafford Smith).  Had counsel investigated they would have

discovered compelling evidence that would have both augmented the defense case and undercut the

prosecution's case.  In the context of such a narrowly won conviction, an adequate investigation

would have tipped the scales.

### 3. Trial counsel failed to impeach the prosecution witnesses with readily available material.

Counsel's lack of preparation also permitted prosecution witnesses to testify free from the

taint of circumstances that—if known to the jury—would have drastically diminished their already

questionable credibility.  Missing from Guerinot's own catalog of the defense efforts is any assertion that the defense conducted an independent investigation of the prosecution witnesses.  With a few minor exceptions, none of the investigators' 30 hours of service were devoted to this task.

In his affidavit for the State, Mr. Guerinot said that he "reviewed the [state's] sub-file labeled 'Criminal Histories' and reviewed the criminal records or inquiries about the criminal records of numerous witnesses.  Also the defense investigator ran criminal histories of the witnesses."  Exhibit 13 (Second Affidavit of Jerry Guerinot) at 2.  However, the investigators' file reflects that they checked the criminal histories of only four people: Mr. Medina, Sergio Escobar (Mr. Medina's girlfriend's brother), James Moore (the driver), and Rocio Pedraza (the surviving victim of the shooting).  Exhibit 25 (Investigative notes of John Castillo).  Thus, other than running criminal background checks on these four people, the defense relied on the prosecution's investigation of its own witnesses.  The defense failed to conduct any independent investigation into key prosecution witnesses, including Flaco Holmes, Johnny Valadez, and Regina Juarez.

Even in the absence of an independent defense investigation, the State's file provided ample evidence with which to impeach State's witnesses.  But Mr. Guerinot's trial file consisted of a single red-roped folder with *no notes regarding any of the State's file* or photocopies of material from the state's file.  This fact is particularly damning in a case so exceedingly complex.  Without extensive notes about the documents in the prosecution file,[57] Mr. Guerinot's review of the prosecution trial file was only useful to the extent that he committed its contents to memory.  The HPD file alone in this case consists of several hundred pages, and that does not include the other materials Guerinot

---

[57] As noted, *supra*, at the time of Mr. Medina's trial, the Harris County District Attorney's Office permitted defense counsel to view portions of its trial file but it did not allow defense counsel to make copies.

should have seen in the prosecution's file,[58] including the criminal histories of the prosecution's witnesses.  Remembering all of the potentially useful information in the prosecution's file would have been a far more daunting memory exercise than remembering all of the information in the relatively concise Statement of Facts section of this petition.  In short, without extensive notes or copies, Guerinot's pre-trial review of the prosecution's file was useless to him during trial—a fact confirmed by the record.

Moreover, had Guerinot reviewed the prosecution file and managed to retain the information contained in the hundreds of pages of documents, it would be further proof of his deficient performance.  A review of the prosecution file would have put Guerinot on notice of numerous red flags and leads that any reasonable counsel would have pursued, including the prosecution's witnesses' prior inconsistent statements and criminal histories.  Charging Mr. Guerinot with knowledge of the information in the prosecution file renders his performance even more deficient because this Court must assess counsel's omissions based on what he allegedly knew at the time: "In *Wiggins v. Smith*, . . . we held counsel 'fell short of . . . professional standards' for not expanding their investigation beyond the . . . records they obtained, particularly 'in light of what counsel actually discovered' in the records." *Porter v. McCollum*, 130 S.Ct. 447, 453 (2010); *see also id.* ("like the counsel in *Wiggins*, [counsel] ignored pertinent avenues for investigation of which he should have been aware.").  Of course, the alternative possibility, that Guerinot failed to review—or carefully review—the prosecution file, is equally deficient.

---

[58] The bare assertion that trial counsel "reviewed the state's file" fails to resolve whether trial counsel had access to certain particular documents because, without additional discovery, undersigned counsel cannot ascertain with any certainty which documents the prosecutors revealed to the defense and which were held back.  If Guerinot was denied access to impeachment information, then—as alleged in Claim 2 below—the State violated Mr. Medina's due process rights.

Though clear from the record that Guerinot was simply not ready to challenge the State's case due to inadequate investigation, he signed an affidavit prepared for him by the State defending his failure to impeach State's witnesses.  Exhibit 13 (Second Affidavit of Jerry Guerinot) (Guerinot allegedly saw the criminal histories of the prosecution witnesses, but "attempted to impeach each witness on that witness's testimony and actions").  Although the Guerinot affidavit stopped short of ascribing his failure to impeach witnesses to a strategy, the state court findings drafted by the same prosecutor did not: "The Court finds, based on the credible affidavit of trial counsel Guerinot and on the appellate record, that trial counsel was aware of the criminal histories of the witnesses and ***trial counsel made the strategic decision to attempt to impeach each witness based on that witnesses's testimony and actions***."  Findings at 32 (emphasis added).

The state court finding was clearly an unreasonable determination of fact in light of the record before the state court.  28 U.S.C. § 2254(d)(2).  As noted above, trial counsel's strategy at trial was to argue that the prosecution's witnesses were less credible than defense witnesses ***because*** the prosecution witnesses had criminal histories.[59]  Thus, counsel made no strategic decision to keep from the jury the criminal histories of the prosecution witnesses.  "[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their

---

[59] Defense counsel urged the jury to disbelieve prosecution witnesses because of their criminal histories: "[Jamie Moore has] been to the penitentiary.  You can consider that as to whether he's a credible person.  Flaco Holmes, he's in a juvenile facility right now, brought in custody.  Pelon, the young kid with the shaved head, he's in custody.  You can consider that if you want or not, you know, with respect to his credibility."  18 RR 2285; *see also* 18 RR 2278. (defense argued that Angie Medina had never been in trouble with law and neither had Rene Reyna, who was going into the Army.  In contrast, prosecution witnesses Johnny Valadez and Flaco "came in here . . . in leg irons.  When they came in from this side of the courtroom, you know that they're in custody.").

deliberations prior to [trial]." *Wiggins*, 539 U.S. at 526-27.

Though defense counsel's strategy was to argue that their criminal histories diminished the credibility of the prosecution witnesses, their failure to investigate the leads Guerinot allegedly saw in the prosecution's file left them unprepared to do so convincingly and, more importantly, left key prosecutions witnesses untainted in the eyes of the jury.  Had defense counsel investigated, their closing arguments would have been far more powerful because they could have discredited additional important prosecution witnesses, including Maurice Argueta and Regina Juarez—the latter of whom the prosecutor falsely argued was credible because she had never been in trouble.  The state court decision, based on the findings about counsel's effort impeach prosecution witnesses, is unreasonable under 28 U.S.C. § 2254(d)(2) for an independent reason: Guerinot altogether failed to impeach the prosecution's witnesses on their "testimony and actions."  Numerous prosecution witnesses changed their stories and lied to the police, and were therefore vulnerable to impeachment based on their "testimony and actions" but Guerinot was simply unprepared to do so.  A review of the record confirms that counsel were deficient and the state court decision to the contrary was unreasonable.

Maurice Argueta testified that Mr. Medina was involved in two altercations at his house and that he saw Mr. Medina fire the murder weapon close in time to the drive-by shooting.  Mr. Argueta, with the prompting of the prosecutor, impressed the jury as a responsible, family-oriented peacemaker.  Unlike most of the prosecution witnesses, he was not a gang member, accomplice, or alternate suspect in the case.  His testimony was all the more credible because he seemingly lacked an ulterior motive to help the prosecution.

The jury never learned that this family-oriented, peacemaker had, in fact, been convicted of

-113-

several offenses, including assaulting an elderly relative, *see* Exhibit 26; was on probation in Harris County; and had been charged with sexual assault on the very morning he testified in Mr. Medina's trial.

In August of 1991, Mr. Argueta pleaded guilty to a misdemeanor theft. Exhibit 27. On November 7, 1995, Mr. Argueta was again arrested and charged with possession of cocaine. Exhibit 28. He was indicted by the grand jury on January 16, 1996, and a mere six days after his indictment gave a statement implicating Mr. Medina. Shortly thereafter, the charges were dismissed.

But Mr. Argueta's troubles were not over. On March 27, 1996, he pleaded guilty to a felony charge of tampering with a government record and received a probated five years in the Texas Department of Corrections. Exhibit 29. On July 25, 1996, the day he was to testify against Mr. Medina, Mr. Argueta—the family man—was charged with sexually assaulting a woman as she lay sleeping with her children. The charges were leveled against him by the Harris County District Attorney's office, the very same office for whom he testified. Exhibit 30.

Despite the existence of devastating impeachment evidence, Mr. Argueta's credibility was left unscathed during cross-examination. Had Mr. Medina's trial counsel conducted easily available record collection, they would have discovered most[60] of this evidence and could have added Argueta to the list of disreputable prosecution witnesses unworthy of the jury's trust—particularly since Argueta's fate was in the hands of the same office prosecuting Mr. Medina.

Incredibly, the defense failed to investigate the background of Flaco Holmes, the alternate suspect in the case and focus of the defense at trial. As described above, the defense made

---

[60] Of course counsel could not have known that Argueta had been charged with sexual assault on the day of his testimony, though that information should have been disclosed by the prosecution. *See*, *infra*, Claim 2.

ineffectual stabs at impeaching Flaco but had no material for cross-examination. However, a wealth of impeachment evidence—which counsel should have seen in the prosecution's file—was available to trial counsel but never put before the jury.

Flaco's cooperation in the case was part of a *quid pro quo* for assistance from the police. As recorded by the magistrate who met with Flaco privately before Flaco gave a statement, Flaco was told by police that they "would probably help him out and see what they could do for him" if he gave a statement. According to police reports, Mr. Holmes had 11 prior arrests in the previous 3 years and was currently charged with the unauthorized use of a motor vehicle. Flaco cooperated and walked away from this case without any charges, even though the prosecutor said on the record that Flaco was guilty of tampering with evidence in this capital murder case. The inference of a deal based on the absence of any consequences from Flaco's undisputed crime is strengthened by the fact Veronica Ponce and Scharlene Pooran were prosecuted when they ceased to cooperate with the State.

Additionally, Flaco lied in his statement to police about not having seen the gun since the night of the shooting, and even started to tell the same lie on the witness stand at trial. 15 RR 1906-07 ("I didn't see the gun after" the shooting). It was only after the prosecutor reminded Flaco that he wrapped the guns in plastic that Flaco remembered that he personally disposed of them several days after the shooting. *Id*. If Guerinot read the prosecution's file, then he should have seen that Flaco lied to the police about the guns.

Guerinot's strategy was to show that Flaco was a liar, and he even tried to support the assertion by reference to the physical evidence: "The physical evidence tells you that [Flaco]'s a liar." 18 RR 2291 (Guerinot's closing argument). However, Guerinot was referencing the testimony about the shell casings, which Guerinot personally believed could not have been ejected out of the

car based on Flaco's description of the shooting.  Because Guerinot failed to investigate this hypothesis or request any forensic analysis prior to trial, he had no proof to support his theory.

Unbeknownst to Mr. Guerinot, the physical evidence did in fact prove that Flaco lied to police in January of 1996 when he told them that he had not seen the gun since the night of the crime.  His lie obstructed the investigation into the murders—in which he had been a suspect and with which he was charged—for several months.  His palm print on the bags in which the gun was wrapped was physical evidence of his deceit to the police and his effort to thwart the investigation.  Obviously, this would too would have been devastating impeachment evidence of a witness the trial prosecutor later testified under oath was critical to the conviction.  Because presenting it would have been entirely consistent with the defense strategy at trial, there was no conceivable reason not to do so.

Nor did the defense provide the jury with the complete picture of Jamie Moore, the admitted driver of the car used in the drive-by.  Although the State asked Moore about his prior convictions on direct examination, Moore tried to bolster his credibility by admitting that he pled to those offenses because he was guilty.  16 RR 1656.  What the jury never heard was that Moore had lied to the TDCJ-ID admissions officer about his involvement in his prior convictions, had previously been convicted of 5 thefts, and was still currently on parole.  Exhibit 31.

Again, the finding that Guerinot elected to impeach Jamie Moore based on his "testimony and actions" was clearly erroneous in light of the trial record.  The admitted driver for a drive-by shooting of two children, Jamie Moore, walked away from the case with no charges whatsoever. Moore testified that he had no idea his passenger was going to shoot anyone until the shooting started.  Had counsel interviewed the State's key witnesses before trial, they would have learned that

Johnny Valadez was going to tell a new story not contained in his police statement: Jamie Moore had the gun in the trunk of his car on the night of the shooting, Moore stopped the car just before the shooting, Moore opened the trunk so that the gun could be retrieved, the shooter—bearing the assault rifle—traded places with the passenger in the front seat, and then Moore continued driving. Understandably, the prosecutor did not present Johnny's testimony until *after* Moore testified to his completely self-exculpatory version of events. Because Guerinot had no idea what Johnny would say after Moore testified, he could not cross-examine Jamie Moore about his "actions and testimony." *Stanley v. Bartley*, 465 F.3d at 813 ("[t]he lawyer could not know how complete or accurate a prospective witness's statement to the police was without talking to the witness.").

Also, though Guerinot disparaged Moore for his apparent lack of memory, he did not cross-examine Moore with his prior statement—which Guerinot should have seen in the prosecution's file—in which Moore recalled more vividly the evening in question. Among the "details" Moore could no longer remember at trial was who was in the car during the shooting; including key prosecution witness Regina Juarez. That Jamie Moore forgot about Regina being in the car was quite a happy coincidence for the prosecution, because Regina testified she was not there.

While Jamie Moore's memory for facts inconsistent with the State's case was diminished, his recall had improved for events consistent with prosecution's case at trial. Moore did not tell the police what he knew about getting rid of the guns even though it had happened only days before he gave his statement. Six months later, during trial, Jamie was able to remember a conversation about hiding the guns and thus corroborate the testimony of his close friend Flaco, and Flaco's close friend Regina. Guerinot, unprepared as he was, failed to cross-examine Jamie Moore about any of these aspects of his "testimony and actions."

-117-

Likewise, Guerinot's cross-examination of Johnny "Pelon" Valadez illustrates the unreasonableness of the state court decision. Johnny's story about the alleged preparations for the drive-by shooting did not appear in his January statement to the police. Moreover, Johnny told the police in January, 1996, that he did not see the gun at the time of the shooting, but he testified to the contrary at trial and was able to describe it in great detail. Johnny also recalled for the first time at trial that Mr. Medina allegedly said that he saw "fat meat flying off" the victim at the time of the shooting. Guerinot should have known from his review of the prosecution file that Johnny's memory of the night of the crime was far more vivid and detailed at trial than it was just days after the shooting. If Guerinot's strategy was to impeach witnesses based on their testimony and actions, he would have skewered Johnny Valadez with the significant contradictions and enhancements in his testimony.

Defense counsel's cross-examination of Regina Juarez is further evidence that the state court finding about Guerinot's impeachment strategy was clearly erroneous. Regina Juarez gave a ***sworn*** statement saying that, although she was not sure, her best guess was that the murder weapon was thrown into the bayou on the night of the shooting and she had not seen it since. The next day, the police sent a team of divers down the bayou but they came up empty handed. Guerinot's review of the prosecution file would have alerted him to the fact that according to Regina's testimony, at the time she gave her sworn statement about the gun possibly being in the bayou (on January 16, 1996), ***she had already helped Flaco bury it***.

Thus, as he sat and listened to Regina's direct examination, Guerinot should have known that Regina had committed perjury in her sworn testimony to the police, she deliberately led the police on a wild goose chase down the bayou in an effort to steer them away from the physical evidence

of the crime, and she never told the police that Mr. Medina had allegedly called her from the jail and asked her to dispose of the guns.  Despite "knowing" all of this about Regina's "testimony and actions," Guerinot failed to impeach her with any of it.  Nor did he impeach Regina's credibility with her actions in another criminal case, in which she tried to intimidate a witness against one of her friends.  Certainly Regina's actions in that case bear on her respect for the truth-seeking function of criminal trials.  Nor did Guerinot object when the prosecutor told the jury that Regina Juarez should be believed because "[s]he's never been in trouble before."  18 RR 2310.  Presumably, Guerinot saw Regina's rap sheet in the prosecution's file and knew the prosecutor was misleading the jury.

Guerinot's failure to meaningfully impeach these witnesses with their "testimony and actions" rebuts any finding that Guerinot was pursuing some kind of strategy in his effort to impeach prosecution witnesses.  Moreover, unless this Court is willing to indulge the highly dubious assumption that Guerinot was aware of this extensive impeachment evidence against the prosecution's star witnesses—and the opportunity to expose the prosecutors' willingness to foster false impressions, but chose to sit on it during cross-examination, Guerinot's omissions rebut any assertion that he read the prosecution file, if at all, with sufficient care to render it more than an empty gesture before going to trial.

To the contrary, had Guerinot truly been aware of the stark differences between the statements and testimony of these critical prosecution witnesses, the record is clear that he would have seized on them.  For example, Guerinot tried to suggest in his cross-examination of Sgt. Novak that the State's true motivation for pursuing perjury charges against Veronica Ponce and Scharlene Pooran was not merely because they testified under oath in conflict with their police statements, they "were charged with perjury because they didn't say what the State wanted."  13 RR 1399; *see also*

*id.* ("And if [these witnesses] changed their story, wouldn't it be safe to say that the State can't stand that kind of heat?").  Had he been aware, for example, of Regina Juarez's prior sworn statement that she had not seen the guns since the night of the shooting, he could have ***proven*** to the jury that Regina committed perjury, whether it was in the police station in January or when she took the stand in July.  Further, her perjury was intended to obstruct the investigation.  Yet, neither Sgt. Novak nor the prosecutors pursued Regina because she took the stand to "say what the State wanted" her to say.

As in *Richard*, counsel's "explanations [for his failure to impeach State's witnesses] were developed after the fact. [His] explanations make no sense, nor do they explain the basis for" his actions.  *Richard*, 566 F.3d at 570.  "[C]ourts are 'not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all.'" *Id.* at 564 (5th Cir. 2009) (quoting *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir.1999)).  The best explanation for counsel's actions is that their indisputable failure to investigate left them unprepared to meaningfully impeach the prosecution witnesses.

> **4.** **Guerinot *conceded* that the defense mishandled the extraneous offenses and, had the defense not erred, Texas law would have required—at a minimum—that the jury be instructed to not consider them unless it was proven beyond a reasonable doubt that Mr. Medina in fact committed them.**

The defense knew in advance that the prosecution would introduce prejudicial extraneous offenses with the intention of imputing them to Mr. Medina.  In response to counsel's belated request for pre-trial discovery, filed 26 days before trial, the prosecution disclosed that among the "[e]xtraneous offenses, wrongs, or bad acts ***committed by the defendant***, that will be used by the state" were:

March 29, 1995 at 8:30 am at 15431 Campden Hill (HPD #034703195). Four [sic] hispanic males spray the house with La Raza 13 graffiti and leave in a red convertible.

July 9, 1995, at 1:40 am at 15431 Campden Hill (HPD #077962295) a [sic] molatov cocktail is thrown at the house and shots are fired.

Exhibit 14 (Excerpt from State's response to request for discovery) (emphasis added).

In an attempt to bolster the suspect testimony of Flaco and his friends, the prosecution introduced these and numerous other incidents of previous gang activity, some allegedly involving Mr. Medina and some targeting the Rodriguez's house, the same house where the drive-by shooting occurred. These extraneous acts included: (1) a prior drive-by shooting at the Rodriguez house; (2) a firebombing at the Rodriguez house; (3) graffiti on the Rodriguez house; (4) destruction of a vehicle; (5) an alleged aggravated assault and other incidents against Marco Martinez; and, (6) the alleged aggravated assaults on Ingomar Way.

In light of the frailty of the evidence purporting to link Mr. Medina to the charged crime, these extraneous acts were critical evidence at the guilt/innocence phase of trial and were featured prominently by the prosecution throughout. However, many of the alleged incidents were never connected to Mr. Medina.

Given the requested pre-trial notice of these extraneous offenses, which was served on counsel on June 25, 1996, counsel had a duty under *Strickland* to investigate them or make a reasonable decision that investigation was unnecessary. The defense did neither. Had counsel merely talked to Mr. Medina about the extraneous offenses the prosecution planned to introduce against their client, defense counsel would have learned that ***Mr. Medina was incarcerated in a boot camp when most of them occurred***.

-121-

Mr. Medina's counsel failed to move *in limine* to exclude these extraneous acts, failed to properly object to the admission of the evidence during trial,[61] and failed to request that the jury be given a limiting or a reasonable doubt instruction.

In state post-conviction proceedings, Mr. Guerinot candidly admitted that this last failing was just plain error:

> After reviewing my file and the court record, I realize that Mr. Millin and I neglected to request either a limiting instruction or a reasonable doubt instruction at the guilt/innocence phase of trial regarding the numerous extraneous offenses that were introduced against Mr. Medina.
>
> I was aware at the time that if I had requested these instructions, the trial court would have been required to give them to the jury but I simply neglected to request them due to an oversight. Not requesting the instructions was not the result of any strategy.

Exhibit 7 (First Affidavit of Jerry Guerinot).

In fact, the CCA has reversed another capital murder conviction and death sentence when trial counsel admitted to the same mistake. *Ex Parte Varelas*, 45 S.W.3d 627, 633 (Tex. Crim. App. 2001). The state courts, however, wholly omitted reference to this aspect of Mr. Medina's state habeas application, or Guerinot's affidavit admitting error, thus the claim was not adjudicated in state court and § 2254(d) is inapplicable.[62] *Cullen v. Pinholster*, 131 S.Ct. 1388, 1401 (2011) ("not

---

[61] Numerous guidelines on trial counsel performance recognize the necessity of proper objections. *See e.g.* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.7.3 Objection to Error and Preservation of Issues for Postjudgment Review; NLADA Standards for the Appointment and Performance of Counsel in Death Penalty Cases, Standard 11.7.3 Objection to Error and Preservation of Issues for Postjudgment Review; Nebraska Commission on Public Advocacy, Standards for Indigent Defense Services in Capital and Non-Capital Cases, Standard VII. K Capital Standard No. 10, Objection to Error and Preservation of Issues for Postjudgment Review.

[62] Even if the claim is deemed adjudicated *sub silencio*, AEDPA still does not preclude relief. In light of counsel's affidavit admitting error and the CCA's decision in *Varelas* granting relief in identical circumstances, any *sub silencio* denial of relief would be both an unreasonable

all federal habeas claims by state prisoners fall within the scope of § 2254(d), which applies only to claims 'adjudicated on the merits in State court proceedings.'").

      **a.    At the guilt/innocence phase of Mr. Medina's trial, the State introduced evidence of numerous extraneous acts.**

          **i.    Prior drive-by shooting**

During the guilt/innocence phase of Mr. Medina's trial, three family members of the victims, Evaristo Rodriguez, Esmerelda Rodriguez and Veronica Rodriguez, told the jury that the Campden Way house had previously been shot at in July of 1995.  Mr. Rodriguez not only described the incident but also presented bullets he recovered which were then introduced into evidence by the State.[63]  13 RR 1413-14.  The State presented no evidence linking this shooting to Mr. Medina.

          **ii.    Fire bombing.**

State's witness Veronica Rodriguez, though she lacked first hand knowledge of the incident, told the jury that the house had been fire-bombed at the same time as the drive-by shooting in July of 1995:

> Q:    Was there any other incident about the time that the graffiti was put out there involving shots fired at your house?
>
> A:    Yes, there was.  Once there was – I was not there that night but there was a shot, there was a drive-by my house, a bomb fire, too.  They threw a bottle of – I guess it was a fire bomb.  I don't know what it was.
>
> Q:    What did it do?
>
> A:    They threw it at the wall, you know.  Try to, I guess, throw it up on top of the roof.

---

determination of the facts in light of the evidence before the state court and an unreasonable application of *Strickland*.

    [63] These bullets, according to the State's own firearms analyst did not match the murder weapon, a fact which the jury nor the defense was ever informed.  *See infra.*

I don't know what their intentions were, to burn something up, and, you know, and there were shots fired.

14 RR 1641.

The State presented no evidence linking this fire-bombing or shooting to Mr. Medina.

### iii.      Graffiti.

Several state witnesses testified that the house had been the target of LRZ gang graffiti on various dates, some unspecified.  Evaristo Rodriguez told the jury "La Raza 13" was painted on his garage door the day after the July, 1995, shooting, and again a "couple of months" later.  13 RR 1415-18.  Esmerelda and Veronica Rodriguez also testified about gang graffiti being placed on the Campden Hill residence.  13 RR 1432; 14 RR 1641.  The State presented no evidence connecting Mr. Medina to the graffiti.

### iv.      Destruction of a vehicle.

Both Veronica and Evaristo Rodriguez also told the jury that Veronica's car had been damaged around the time of the July, 1995, drive-by shooting.  Neither witness gave an exact date of the occurrence nor did they indicate any knowledge of who committed the crime.  Mr. Rodriguez testified that the perpetrators "broke down the back window, and one time—and after that, a couple months, they broke the windshield" of Veronica's car, but he had "no idea" who had done it.  13 RR 1416-18.  Veronica Rodriguez testified that, in the summer of 1995, someone threw a big rock through the rear window of her car.  14 RR 1637-38.  The State presented no evidence connecting Mr. Medina with these alleged incidents.

### v.      Alleged aggravated assault and other extraneous events against Marco Martinez.

State's witness Marco Martinez, the alleged target of the drive-by shooting, told the jury that

-124-

Mr. Medina had previously threatened him with a firearm.  Mr. Martinez had difficulty remembering the exact date the incident occurred.  He also had a sketchy recollection of the weapon Mr. Medina allegedly used, describing it as a "rifle or shotgun, some sort, something."   13 RR 1582. Nevertheless, the prosecution attempted to have Mr. Martinez identify the gun he saw as the ***same*** weapon used in the capital murder.  *Id* at 1584.  Further prejudicing the jury, the prosecutor had Mr. Martinez demonstrate Mr. Medina's alleged actions—once from the witness box and again after stepping down into the well—***using the murder weapon***, thus improperly conflating the evidence for the two incidents and using each to bolster the other.

Mr. Medina's counsel made no objection whatsoever to this testimony, failing even to object to the use of the capital murder weapon for demonstration.

More than half of Mr. Martinez's testimony was dedicated to recounting extraneous events which allegedly involved Mr. Medina.  In addition to the alleged assault, Mr. Martinez told the jury that, on another occasion, Mr. Medina rode by the house throwing up gang signs. 13 RR 1587.  Mr. Martinez informed the jury he was worried they were going to come back so he told his girlfriend, Veronica Rodriguez, to go inside and followed Mr. Medina's car.  *Id.* at 1587-88.  On another occasion, Mr. Martinez believed that Mr. Medina and his friends trailed him as he left Veronica Rodriguez's house.  13 RR 1588-89.

During the course of his testimony, Mr. Martinez also stated that his own house on the southwest side of Houston was the target of a drive-by shooting.  13 RR 1575.  Although this testimony was elicited by the prosecution, it was never given any contextual relevance, leaving the

jury simply to believe that Mr. Medina or his associates were responsible for these actions.[64]  Mr. Medina's counsel made no objection to any of this prejudicial testimony.

### vi. Alleged incidents on Ingomar Way

During its case-in-chief, the State introduced evidence of other extraneous offenses that allegedly occurred on the night of the drive-by shooting.  Maurice Argueta informed the jury that members of the LRZ gang, including Mr. Medina, arrived at his family's house on Ingomar Way at about 11 p.m.  15 RR 1720.  According to Mr. Argueta, an altercation ensued during which Mr. Medina pulled a handgun and pointed it at one of Mr. Argueta's friends.  *Id.* at 1729.  He also described, in great detail, the actions of the other people who arrived with Mr. Medina, claiming that one also threatened a friend with a firearm.  *Id.* at 1729-31.

Furthermore, Mr. Argueta told the jury that the same group came back later that evening and again fought with the guests at his party on Ingomar Way.  Id. at 1734.  During this altercation, Mr. Argueta claimed to have seen Mr. Medina with a different firearm, one that he said looked like the murder weapon.  *Id.* at 1737.  According to Mr. Argueta, Mr. Medina fired it into the air, cocked it again and "was fixing to point it the next time."  *Id.*  In Mr. Argueta's account, as Mr. Medina held the gun, Mr. Argueta ran to him and grabbed the gun.  Mr. Argueta proceeded to hold Mr. Medina for "about a minute and a half," "trying to get him out of the situation."  *Id.* at 1739.  These gratuitous comments by Mr. Argueta not only impermissibly attacked the character of Mr. Medina, implying that he was the kind of person who would commit the charged capital murder, but also painted Mr. Argueta as a law-abiding peacemaker, a clearly disingenuous implication.

---

[64] The State, in fact, unsuccessfully tried to make this connection by asking Mr. Martinez if Mr. Medina "live[d] in [his] neighborhood, like, when [his] house had gotten shot up." 13 RR 1576.

Flaco Holmes also testified that Mr. Medina had the murder weapon at the house on Ingomar Way. 15 RR 1891. He further told the jury that Mr. Medina pointed it at somebody and claimed he fired it into a field. *Id.* at 1892.

> **b. Trial counsel failed to move *in limine* to exclude extraneous offenses or properly object to their admission during trial.**

Evidence of a person's character cannot be introduced to prove conduct in conformity with that character. Tex. R. Cr. Evid, Rule 404. When a party seeks to introduce such evidence, the opponent must timely object, thus shifting the burden of admissibility to the proponent of the evidence. *See Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990). In order to satisfy the trial court of its admissibility, not only must the proponent demonstrate the evidence is relevant and not outweighed by its prejudice, but also that it falls into one of several narrowly-defined categories such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Moreover, such extraneous offense evidence may only be admitted if proven beyond a reasonable doubt. *Harrell v. State*, 884 S.W.2d 154 (Tex. Crim. App. 1994).

In order for 404(b) evidence to be admissible the accused must be shown to have participated. *See e.g. Ingham v. State*, 679 S.W.2d 503, 507 (Tex. Crim. App. 1984) ("[t]he accused's participation in the extraneous offense is an essential showing for the admission of evidence regarding the extraneous offense."). This rule was repeatedly violated during Mr. Medina's trial, with no objection from his counsel.

Much of the evidence introduced against Mr. Medina failed to comply with the narrow exceptions to the bar on impermissible character evidence and, had a proper objection been timely

-127-

lodged, the jury would never have been improperly swayed by its inflammatory nature.  Most striking is the paucity of evidence connecting Mr. Medina to the extraneous evidence.  In direct contravention of well-settled case law and absent a proper objection from trial counsel, the jury was allowed to hear testimony of a prior drive-by shooting, firebombing, destruction of Veronica Rodriguez's vehicle, and numerous instances of graffiti, none of which was ever connected to Mr. Medina.  In fact, all occurred while Mr. Medina was incarcerated, a fact known by the State.  *See* 18 RR 2379-81 (State's Witness Delberta Storz testified that Mr. Medina was incarcerated in Harris County from before December 22, 1994, until August 16, 1995).  This evidence clearly did not meet the "essential showing" that Mr. Medina participated in the offenses, much less the reasonable doubt standard required for its admission.  *See Harrell v. State, supra.*

Mr. Medina's trial counsel, however, made no pretrial motions to exclude the extraneous conduct evidence introduced by the State even though they had requested and received pre-trial notice of the State's intent to introduce it.  Moreover, as the testimony was admitted, trial counsel voiced only a few, improper objections, thereby failing to preserve these manifest errors.  No objections were lodged when Esmerelda Rodriguez told the jury about the prior drive-by shooting, the property damage to her sister's car, or the graffiti.  13 RR 1431-32.  No objections were raised when Marco Martinez claimed to have been assaulted by Mr. Medina with a firearm, that his house had been the target of a drive-by shooting, and that Mr. Medina and his friends followed him.  13 RR 1575; 1579-89.  No objection was raised when Mr. Martinez, who had a very foggy memory of the weapon Mr. Medina allegedly waved at him in 1995, "demonstrated" the alleged incident using the murder weapon.  *See* 13 RR 1584-85.  No substantive objections were raised when Veronica Rodriguez testified that her car windows had been smashed, graffiti was painted on her house and

neighborhood and the house had been shot up and fire-bombed.  14 RR 1637-41.  Counsel objected

to Evaristo Rodriguez's testimony only on relevancy grounds, thereby precluding appellate review

under Rule 404.  *See Medina v. State*, 7 S.W.3d 633, 643 (Tex. Crim. App. 1999) (finding Rule 404

claim not preserved).

Despite the fact that Mr. Medina was incarcerated when the majority of these extraneous

offenses were committed, trial counsel failed to bring that crucial fact to the attention of the trial

court or jury as this inflammatory evidence was being admitted.  This is not the first case in which

Mr. Guerinot failed to object to extraneous evidence committed while his client was incarcerated.

*See Estrada v. State*, No. 73, 054, slip op. (Tex. Crim. App. Sept. 15, 1999) (unpublished).  Unlike

the present case, however, the error in *Estrada* was corrected at trial when the State withdrew the

evidence and the jury was instructed to disregard it.  *Id.* at 13.  In Mr. Medina's case, Guerinot's first

acknowledgment that his client was incarcerated when these crimes were committed came during

cross-examination of a later State's witness, Regina Juarez,[65] when he weakly tried to connect State's

witness Flaco Holmes to the offenses.[66]  16 RR 1968.

Rather than fall into a narrow exception to the bar on character evidence, the testimony

presented by the State was nothing more than an impermissible bid to tag Mr. Medina with every

---

[65] Counsel never explicitly linked Mr. Medina's incarceration date to the extraneous acts, thereby utterly failing to alert the jury to this crucial evidence.  No further mention was made of this exculpatory information by any guilt/innocence witnesses and counsel made no reference to it in their closing arguments.

[66] Mr. Guerinot's attempt to implicate Flaco Holmes in the July 1995 drive-by, although seemingly consistent with defense strategy, was wholly untenable because the jury had already been informed that Flaco Holmes was also incarcerated in July of 1995.  *See* 15 RR1913.  It thus served no purpose but to undermine the defense credibility in the eyes of the jury and further expose counsels' lack of investigation and preparation.

alleged act by *any* gang member and bolster the State's otherwise weak case.  Such overly prejudicial

evidence cannot easily be disregarded by a jury even if so instructed.  As the Supreme Court has

acknowledged "there are some contexts in which the risk that the jury [cannot disregard information]

is so great, and the consequences of failure so vital to the defendant, that the practical and human

limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135 (1968).

Had trial counsel moved *in limine* to exclude these offenses or properly objected at the time of their

admission, the jury would never have been poisoned by their improper admission.

   This oversight by trial counsel also confirms the lack of preparation and investigation prior

to Mr. Medina's trial.  According to Mr. Clive Stafford Smith, an expert capital defense lawyer,

"[d]efense counsel's surprise as he learns in open court, that Mr. Medina could not have possibly

committed the prior crime, confirms that he did not conduct any document collection in preparation

for this case and did not adequately interview their client."  Exhibit 16 at 24 (Affidavit of Clive

Stafford Smith).

**c.**      **Failure to request a limiting instruction or a reasonable doubt instruction.**

   Even if these extraneous offenses were properly admitted, trial counsel has conceded that the

defense erred in not limiting their impact.  As described above, Mr. Guerinot has acknowledged that

his failure to request limiting or reasonable doubt instructions was an error, not a product of strategy,

and that trial court would have been required to give the instructions had he requested them.  Exhibit

7 (First Affidavit of Jerry Guerinot).

   The CCA has long required that a trial court instruct a jury, upon defense request, not to

consider evidence of extraneous offenses unless they believe, beyond a reasonable doubt, that the

defendant committed those offenses.  *See Miller v. State*, 53 S.W.2d 790, 791-92 (Tex. Crim. App. 1932); *Lankford v. State*, 248 S.W.2d 389, 389-90 (Tex. Crim. App. 1923).  Moreover, when the State is allowed to introduce evidence of extraneous acts, the defendant may also request an instruction limiting the consideration of those acts.  *Garcia v. State*, 887 S.W.2d 862 (Tex. Crim. App. 1994).  Thus, it is beyond dispute that a defendant is entitled to a reasonable doubt and a limiting instruction when such instructions are properly requested by the defense.  *See George v. State*, 890 S.W.2d 73, 76 (Tex. Crim. App. 1994) ("if the defendant so requests at the guilt/innocence phase of trial, the trial court must instruct the jury not to consider extraneous offense evidence admitted for a limited purpose unless it believes beyond a reasonable doubt that the defendant committed the extraneous offense."); *Abdnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994)("[f]ailure to give a limiting instruction, upon timely request, is 'reversible error'").

Despite the clear mandate of Texas law and to the detriment of Mr. Medina, trial counsel failed to request either a limiting instruction or a reasonable doubt instruction for the myriad extraneous offenses introduced by the State.[67]  This acknowledged error by trial counsel is further amplified when placed in context of the defense case.  As trial counsel himself acknowledged, the absent instructions would have been consistent with the defense theory at trial: that Dominic Holmes was responsible for the murders.  Exhibit 7 (Affidavit of Gerard Guerinot).

Trial counsel, as described *supra*, also sought to incriminate Dominic Holmes in the prior drive-by shooting, graffiti, and vehicle damage incidents, an attempt which miscarried when it was

---

[67] A limiting instruction was given pertaining to the evidence admitted of Mr. Medina's prior convictions.  1 CR 115.  This instruction, however, made no mention of uncharged, extraneous acts and thus likely had the effect of further confusing the jury.

revealed that Mr. Holmes was also incarcerated during those incidents.  Although trial counsel were unprepared, they realized the importance of these collateral offenses and sought to mitigate their effect on the jury.  A request for reasonable doubt and limiting instructions for these extraneous acts was clearly within the ambit of the defense theories and its absence was due to nothing but an unreasonable oversight on the part of trial counsel, not a part of any trial strategy.  *Id.*

Had the proper instructions been given, there is a reasonable probability that the result of the proceeding would have been different.  The function of the trial court's charge is to instruct the jury on how to apply the law and properly evaluate the facts, and is designed to "lead and prevent confusion" during deliberations.  *Ex Parte Varelas*, 45 S.W.3d 627, 633 (Tex. Crim. App. 2001) (quoting *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977)).  When a charge fails to contain an accurate description of the law "the integrity of the verdict is called into doubt."  *Id.*

As the Texas Court of Criminal Appeals made clear in *Ex Parte Varelas*, when a jury charge lacks the proper instructions, it cannot be presumed that the jury considered the evidence only for the proper purpose.  Santiago Varelas was convicted of capital murder and sentenced to death for the murder of his step-daughter.  To prove Mr. Varelas' state of mind, intent, motive, and relationship at the time of the murder, the State presented evidence of prior acts allegedly committed by Varelas.  Varelas allegedly "had excessively dunked [the victim] in a swimming pool, had 'thumped' the back of her head, had pushed her with his foot, had made her sit still on a couch for over two hours, and had hit her the night before her death."  *Id.* at 630.  Varelas contended that his wife committed this abuse.  There was no eyewitness testimony supporting either contention.  *Id.* This factual dispute about the abuse was at the center of the case because the victim died after being struck, either kicked or hit, in the abdomen with such force so as to tear her heart in four places.  *Id.*

-132-

The autopsy report also concluded that [the victim] had sustained physical abuse during the six weeks prior to her death. *Id.*

During the trial, Mr. Varelas' attorney did not request instructions detailing the burden of proof necessary to consider this evidence or instructions limiting the jury's use of this information. *Id.* Trial counsel filed an affidavit stating:

> my failure to request these instructions was not the result of trial strategy. It was simply an oversight. I was aware of *Harrell* and *George* at the time of the trial, but I simply neglected to invoke them and ask the trial court either for a burden of proof instruction or a limiting instruction. I had no reason in fact not to request these instructions, not can I think of any reason I should not have requested them on the facts of Mr. Varelas's case.

*Id.* at 632.

In assessing whether trial counsel's performance fell below an objective standard of reasonableness, the CCA noted that while there is a high standard for admitting evidence of extraneous acts, once the judge rules an act admissible, the court must give the beyond a reasonable doubt instruction if requested by the defendant. *Id.* at 631. Similarly, when the State is permitted to introduce extraneous acts for a limited purpose, the defendant is entitled to a limiting instruction. *Id.* Trial counsel's affidavit revealed that the failure to request the appropriate instructions was not trial strategy. *Id.* at 632. Because there was no reason for failing to request the instructions to which the defendant was entitled, trial counsel's performance fell below an objective standard of reasonableness. *Id.*

Turning to the prejudice prong, the CCA found that the extraneous acts were central to the State's case. The State highlighted the extraneous acts throughout the trial: "By emphasizing that applicant had committed these acts and by characterizing them as 'bad' acts, the State hoped to

persuade the jury that applicant was . . . engaged in a pattern of [behavior and] . . . probably . . . responsible for" the capital murder. *Id*. at 634.  The defense, on the other hand, sought to attribute the bad acts to an alternate suspect, the victim's mother. *Id*.

The CCA found there was a reasonable probability that the result of the proceeding would have been different but for the trial counsel's deficient performance:

> By not requiring the jury to find applicant committed the extraneous acts beyond a reasonable doubt before considering them as evidence during their deliberations, the jury was left with no guidance as to the proper weight to be given to those acts.  More than likely, the jury assumed that because the extraneous acts were part of the evidence surrounding the relationship between applicant and [the victim], they were proper factors in determining applicant's guilt.  The extraneous acts could have been considered as evidence that applicant killed [the victim] without the jury so much as even questioning the possibility that applicant may not have committed those acts. Additionally, without the limiting instructions, it is probable that the jury considered the extraneous acts as direct evidence of applicant's guilt, *i.e.*, propensity evidence, rather than for the purposes in which they were offered, which was limited to the applicant's state of mind, intent, relationship, motive and to rebut defensive issues.

*Id*. at 635.  Mr. Varelas "was prejudiced because the charged offense was similar in nature to the extraneous acts, and the extraneous acts were likely considered as direct evidence of applicant's guilt." *Id*. at 636.  Moreover, Mr. Varelas's "defense that [the victim]'s mother killed her was undermined because the jury was essentially informed that applicant had harmed [the victim] in the past, and therefore, he was the cause of her death." *Id*.

Just as in *Varelas*, Mr. Medina's jury must be presumed to have misapplied the evidence of extraneous acts and thus Guerinot's identical, confessed error was equally prejudicial to Mr. Medina's case.

The sole evidence linking Mr. Medina to the crime was the suspect testimony of gang members, most of whom were admittedly in the car during the shooting.  The State, therefore,

-134-

introduced evidence that the Rodriguez's house had been the target of a previous drive-by shooting, firebombed, marked with LRZ 13 graffiti, and that Veronica Rodriguez's Dodge had been damaged. As in *Varelas*, this pattern of behavior was intended to show that Mr. Medina was probably responsible for the capital murder which, as in *Varelas*, was committed in the same manner as some of the extraneous acts.

The prosecution alleged that Mr Medina had a particular animosity towards Marco Martinez (allegedly the intended victim) and thus had the motive for the drive-by shooting.  Marco claimed that Mr. Medina had previously threatened him with a firearm that looked like the murder weapon, flashed gangs signs at him, trailed him through the neighborhood on previous occasions, and that his house had been the target of a previous drive-by shooting.  To bolster their theory, the State also presented witnesses who claimed that Mr. Medina pointed the murder weapon at other people during a fight at another location the night of the murder because he thought they were associated with the rival gang, HTC.

As in *Varelas*, the Medina prosecutors highlighted the extraneous acts from start to finish. During the *voir dire* of several seated jurors, the prosecutor introduced the doctrine of transferred intent, explaining it in thinly veiled portraits of the State's theory.  *See, e.g.,* 4 RR 198 (*voir dire* of Juror Egras) ( "[I]t's not necessary that the person somebody wants to kill is actually there.  Say, for example, I want to kill the bailiff and I think he's home, so I run up to his apartment and see his bike out front or something or police car or whatever and I'm pretty sure he's home.  I go running up the stairs and shoot right into the door thinking I'm killing him and he's not even there but I kill his wife. That could be transferred intent if you believe that I was trying to kill the bailiff but I kill somebody else and he wasn't even there."); 4 RR 273 (*voir dire* of Juror Natale) ("The law says – it states that

-135-

if I go to somebody's house and I want to kill them and I think they're in there and I go to the door and I think I hear them talking but, you know, I don't see them, I shoot through the door and kill somebody else by mistake, turns out the person I want to kill wasn't even there.  The law says that my intent to kill one person transferred to the other and I'm still liable for the murder."); 6 RR 526-27 (*voir dire* of Juror Mata) ("[T]here's a rule in the penal code that says if I intend to kill one person and I kill another one by mistake, I'm still guilty of the murder of that person.  Say, for example, I go to the court reporter's house and I want to go kill the court reporter.  I see her car out front, I run up the stairs and I'm mad at her and I think she's there, but she's not, she's actually in court working.  And I shoot through the door and I kill her boyfriend or her husband.  I didn't mean to do that, I don't even know the guy.  The law says that I'm still guilty even thought the person wasn't even there as long as you believed that I intended to kill the person I was after.").

In opening statement, the prosecutor informed the jury "that the defendant had a motive.  His gang, the La Raza 13, despised the H-Town Crips or HTC.  Veronica Rodriguez, the girl that owned that Dodge, who lived there, her boyfriend, Marco was in that gang.  And I expect the evidence will show that this defendant and Marco Martinez knew each other."  12 RR 1293-94.  During Mr. Martinez's testimony, the prosecutor asked, "Did you feel responsible [for the shooting] that night that you might of been the intended target?"  13 RR 1594.  Marco Martinez, in step with the prosecution, vocalized the State's implication, stating "I felt responsible because I felt like the bullet was meant for me."  *Id*.

In closing argument, the State again relied heavily on the extraneous act evidence.  Referring directly to extraneous acts, the prosecutor told the jury that Mr. Medina "ha[d] the murder weapon, point[ed] it into a crowd of HTC guys or they think [are] HTC related people at Ingomar Way."  18

-136-

RR 2310.  This happened, the State argued to the jury, because he "has the motive because he dislikes Blue [Marco Martinez]."  *Id.* at 2311.  He continued: "[Marco Martinez] doesn't even know Flaco [Dominic Holmes], but he knows this defendant.  He's had it out with him before.  They shot gang signs at each other, and who's right or who's wrong between him and Blue [Martinez] I don't think that's all that relevant.  It's just a matter of the antagonism between them.  Even the defendant's father knows Blue.  He comes around the house, they shoot signs.  Blue said he held up a gun, threatening him with the gun.  He's followed him around before.  Remember he said the car and they had to go around? . . .  and Blue happens to be out there that night right where the shooting happened.  He was out there for five minutes, right on the road in public view."  *Id.*

As if the State's theory had not yet been made plain enough, the prosecutor closed his summation again by asking the jury to connect Mr. Medina to the capital murder through Marco Martinez: "He's trying to get Blue, he's trying to shoot up the house, he's shooting everybody around that house."  *Id.* at 2320.

At the close of trial, the jury was instructed that if they believed "Anthony Shawn Medina intended to cause the death of Marco Martinez by shooting him with a deadly weapon, namely, a firearm, and caused the death of David Rodriguez and Diane Rodriguez . . . and the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person was injured, then you will find the defendant guilty of capital murder . . . ."  1 CR 112.  The court further instructed the jurors that they "may consider all relevant facts and circumstances surrounding the murders, if any, and the previous relationship existing between the accused and the deceased . . . ."  *Id.*

This case is no different from *Varelas*, in which it was "[m]ore than likely, the jury assumed

-137-

that because the extraneous acts were part of the evidence surrounding the [murders], they were proper factors in determining applicant's guilt," and in which it was "probable that the jury considered the extraneous acts as direct evidence of applicant's guilt, *i.e.* propensity evidence, rather than for the purposes in which they were offered, which was limited to the applicant's state of mind, intent, relationship, motive and to rebut defensive issues." *Ex parte Varelas*, 45 S.W.3d at 635.

Counsel admitted his error but the state courts overlooked both the claim and trial counsel's concession.  Thus, this Court's review of Mr. Medina's *Varelas* claim is *de novo*.

### 5.    Trial Counsel Failed to Secure Independent Testing on the State's Firearms Evidence

The State's firearms examiner was Robert Baldwin.[68]  13 RR 1542-1568.  Mr. Baldwin told the jury that the shell casings recovered from the street had been ejected from the murder weapon. *Id.* at 1559.  On cross-examination, defense counsel repeatedly attempted to elicit testimony from Mr. Baldwin to support the theory that had the shooting occurred in the manner described by the State's witnesses, the shell casings would not have been expelled onto the street.  *Id.*  at 1596 *et seq.* Mr. Baldwin responded by stating that "[t]here's really no established pattern that one can establish with the ejection of cartridge cases because it depends on the attitude or, that is, the position of the firearm at the time it was discharged."  *Id.* at 1569.

After finally acknowledging that the casings would be ejected to the rear and the right side of the firearm, Mr. Baldwin told the jury that he could give no further details without making "some testing independently."  *Id.* at 1571.  Trial counsel asked the court to have that testing conducted, a

---

[68] Mr. Baldwin's testimony has been found to be inaccurate in a 1995 Harris County capital trial.  *See Ex Parte Nanon McKewn Williams*, No. 634442-A, Findings of Fact, ¶87 ("The Court finds that firearms examiner Robert Baldwin mistakenly characterized State's Exhibit 21, EB-1 as a .25 caliber bullet at the Applicant's trial.").

request which was denied.  Trial counsel, however, failed to secure an independent firearms expert who could have conduct the testing, choosing instead to simply rely on a fruitless cross-examination of the State's expert.

There is no duty in every case to consult experts even where the State is proposing to present expert testimony.  *United States v. Anderson*, 61 F.3d 1290, 1298-99 (7th Cir. 1995); *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993).  However, in a case where the defense cannot effectively cross-examine the State's expert and the evidence is crucial to the outcome of the case, it is irresponsible not to consult an expert.  *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001); *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999).  Moreover, "[w]here defense counsel knows that the State will present scientific evidence, counsel is obliged to make some effort to meet that evidence."  Exhibit 16 at 25 (Affidavit of Clive Stafford Smith).  In Mr. Stafford Smith's expert opinion, a "failure to even seek expert advice on the forensic evidence could not have been a strategy on the part of trial counsel, as counsel could have chosen not to use the results if necessary, and [this failure] constitutes performance below the standards of practice."  *Id.*

In Mr. Medina's case, an independent analysis of the firearms evidence was essential.  As the State has acknowledged, the testimony of the persons in the vehicle was crucial to their case.  *See Ponce v. State*, No. 01-97-00930 (Tex. App.-Hous. (1st Dist.) Sept. 3, 1997), 6 RR 44 ("State: How important were the statements and the testimony of the other gang members in the car?  Prosecutor Baldassano: As far as identifying the shooter, that was all we had.  So without the other gang members testifying, [Medina] would have been found not guilty.").  If trial counsel could have demonstrated that the physical evidence was inconsistent with these witnesses' testimony, the jury likely would have disregarded their assertions.  The importance of the physical evidence was not lost

-139-

on the State.  In closing argument, the prosecutor argued:

> [T]his gun probably doesn't have to be out the window all that far to have the shells come out.  But we know the people at the scene saw the gun, and they say just about the same exact thing as the guys in the car.  We know those shells were outside because they found them outside.

18 RR 2303

Without an independent expert, trial counsel had no means to counter the State's argument.

Mr. Medina's counsel also could not further the defense theory through the State's expert because Baldwin, at first, claimed that it would be impossible to establish an ejection pattern and finally, frankly told the jury that he had not done the testing needed to answer the defense's questions.  Trial counsel only realized that it was necessary to conduct an independent examination of the firearm when Mr. Baldwin was testifying, but simply felt it was futile to pursue when the trial court denied his request.  Exhibit 7 (First Affidavit of Gerard Guerinot).  Rather than request a continuance in order the gain the necessary time to consult an independent expert, trial counsel merely abandoned this crucial issue.  Mr. Guerinot discovered that he needed forensic analysis too late because he admittedly never talked to the prosecution's expert until he took the stand:

| Mr. Guerinot: | Mr. Baldwin, we haven't talked previously to today on this case, have we? |
|---|---|
| Mr. Baldwin: | Not on this case, sir. |

13 RR 1569.  This explains why it did not occur to Mr. Guerinot until mid-trial that the defense would need firearms analysis.  Though Mr. Guerinot had notice that Mr. Baldwin would testify, his failure to investigate the case prior to trial left him in a lurch.

Counsel's representation of Mr. Medina cannot be considered reasonable where (1) the testing was essential to the case, (2) the testing was not undertaken prior to trial, and (3) although

-140-

counsel realized that independent testing was necessary, he simply failed to secure it.

Had trial counsel sought independent assistance, there is a strong probability that the result of Mr. Medina's trial would have been different.  Juror Andrew Egras acknowledged strong concerns about his guilt/innocence phase verdict because of the firearms testimony.  Exhibit 32 (Affidavit of Andrew Egras).  Mr. Egras, because of his military experience, "knew that the shell casings wouldn't have been ejected the way they said they were if the shooting happened as the witnesses said."  *Id.*  Mr. Egras told jurors that he couldn't talk about the firearm, however, "because the judge had told [them they] weren't allowed to bring [their] personal knowledge or experience into the jury room." *Id.*

Mr. Dennis McGuire, a former Police Crime Laboratory Examiner of 23 years for the Metro-Dade Police Department in Miami, Florida examined the trial testimony of Sergeant Novak, Officer Ray Collins, Leon Guy, Jr., Laura Gomez, firearms examiner Robert Baldwin, Esmerelda Rodriguez, Dominic Holmes and Johnny Valadez.  Exhibit 33 (Affidavit of Dennis McGuire).  Based on his review of the testimony, Mr. McGuire opined that the shooting "probably could not have occurred in the manner described" by the witnesses.  *Id.*  Mr. McGuire further stated that "[c]ontrary to the trial testimony of Robert Baldwin, it is definitely possible to establish a reasonable ejection pattern of cartridge cases for this rifle under the circumstances dictated by the crime scene and the evidence."  *Id.*  Despite his concerns, Mr. McGuire was unable to make a definitive statement without actually conducting testing on the actual firearm.  *Id.*

In sum, counsel wholly failed to investigate Mr. Medina's case.  They failed to interview even the most critical State's witnesses.  They failed to pursue red flags and the leads to essential defense witnesses supplied by their client and his family.  They failed to prepare to impeach State's

witnesses.  They failed to investigate or defend against extraneous offenses they knew the State intended to introduce and, when this information was put before the jury (without objection), they admittedly failed to lessen the impact by requesting appropriate jury instructions to which they were indisputably entitled.  They failed to speak with the State's forensic expert, Robert Baldwin, about Mr. Medina's case until Baldwin was on the stand, and thus failed to obtain the forensic testing necessary to support their theory of the evidence.  Counsel's failure to do much of anything to prepare for trial was deficient, and the state court decision to the contrary was objectively unreasonable.

> ### C.    There is a reasonable probability that this very close case would have ended differently absent counsel's numerous omissions and errors.

Mr. Medina was prejudiced by counsel's deficient performance because there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.  When assessing prejudice, this Court must consider the totality of the circumstances. *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) ("the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available . . . evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding . . . .").

As a starting point for the prejudice inquiry, there is no dispute that the testimony of Flaco and three of his friends, Jamie Moore (the driver for the drive-by shooting), Johnny "Pelon" Valadez, and Regina Juarez, was essential to the conviction: "As far as identifying the shooter, that was all we had.  So without the other gang members testifying, ***[Mr. Medina] would have been found not***

*guilty*. *Ponce v. State*, No. 01-97-00930 (Tex. App.-Hous. (1st Dist.) Sept. 3, 1997), 4 RR 44 (Lead prosecutor Steve Baldassano) (emphasis added).  The credibility of these witnesses was the primary focus of the guilt/innocence phase closing arguments.  The prosecution encouraged the jury to believe that these witnesses had not reason to cooperate with the State and no fear of getting in trouble, their sole motivation was to tell the truth: "There's no reason on earth that those three kids . . . have to finger this defendant to get out of trouble.  The only reason they do it is because he did it" 18 RR 2318-19.  Mr. Medina's defense, on the other hand, was "half-baked" and concocted by the defendant from the jailhouse.  18 RR 2316-17.  Had they investigated, the defense counsel could have demolished the credibility of the prosecution witnesses, which would have significantly shifted the evidentiary landscape with respect to the most critical issues at trial.

This was a close case that hinged on a quartet of highly dubious prosecution witnesses.  The jury struggled to reach a verdict, so much so that the prosecutor felt the need to acknowledge it during his punishment-phase closing arguments: "I'm not naive.  I've been doing this for many, many, years and *I know somebody had a problem at the guilt stage of this case.  I know that*."  20 RR 2556.  The Supreme Court instructs that, when assessing the impact of counsel's deficient performance, "a verdict or conclusion only weakly supported by the record is *more likely to have been affected by errors* than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96 (emphasis added); *Mayfield v. Woodford*, 2001 WL 1359534, at *14 (9th Cir. Nov. 7, 2001) (in light of, *inter alia*, the duration of the jury's deliberations, court is not confident that a jury presented with all of the mitigating evidence would have returned a death sentence); *Nealy*, 764 F.2d at 1180.

Counsel's errors—almost all of which stem from counsel's deficient pre-trial investigation—had widespread and devastating impact on Mr. Medina's trial.  The prosecution's

feeble case, though vulnerable in numerous areas, was not meaningfully challenged.  The themes and theories the defense attempted to advance were undercut by a void of proof.

1.      <strong>Dismantling the prosecution's case against Mr. Medina.</strong>

Effective counsel would have dismantled the prosecution's case against Mr. Medina.  First, the jury would have learned Flaco and his friends all lied to the police about the murder weapon in January of 1996 in an effort to obstruct the investigation—and Regina Juarez did so under oath making her guilty of aggravated perjury.  Regina's first story sent a team of HPD divers on a fishing expedition down the bayou.  This was a critical fact because these same witnesses testified in unison to a wholly different story in which Mr. Medina allegedly called from the jailhouse and directed them to get rid of the guns.  This second story, in the words of the prosecutor, "really, really explained" why it was "no big surprise" that the only physical evidence in the case implicated Flaco. 18 RR 2305.  Moreover, the second gun story was evidence of Mr. Medina's guilt and bolstered the State's allegation that he was orchestrating his defense from the jail.

Had the defense interviewed Dallas Nacoste, they could have presented evidence that Flaco and his friends' second story about the guns itself was concocted for the purpose of explaining away Flaco's palm print.  Nacoste, the only witness besides Mr. Medina who was honest about the gun from day one (Mr. Medina told the police that Flaco had hidden the murder weapon, a fact confirmed by the physical evidence), told the police in January of 1996 that the gun was buried, and that he learned this on January 3, 1996, two days *before* Mr. Medina was arrested.  Exhibit 1 at 175.  Thus, Regina Juarez, who testified that Mr. Medina called her about the gun from the jail after he was arrested, lied under oath about the guns *a second time* during Mr. Medina's trial.  Not only was Nacoste more credible than the dissembling prosecution witnesses, Nacoste told this to the police

-144-

more than two months ***before*** the guns were unearthed bearing Flaco's palm print.  In other words, the rebuttal to the prosecution's trial story about the guns long pre-dated the existence of the prosecution's story.

The jurors would have viewed the prosecution's story about the murder weapon in an entirely different light had they known that: (1) this was the second story these witnesses told about the guns; (2) the story emerged only ***after*** Flaco's palm print was found on the bag in which the guns were buried; and, (3) contrary to Regina's testimony, there was evidence that the gun was buried before Mr. Medina was arrested went to jail.  The new gun story was born out of necessity, during conversations with the prosecutor.[69]  Instead of being evidence of that rationalizes away physical evidence pointing to Flaco and leads back to Mr. Medina, the jury would have seen that the testimony was a contrivance—the second one—to deflect suspicion away from Flaco.  The jury also would have seen that Flaco and his friends were willing to lie under oath.  And, in the case of Regina Juarez whose conflicting statements were both under oath, the jury would have learned that the prosecution—who knew about Regina's conflicting sworn statements about the gun—was apparently willing to tolerate perjury in this case so long as the perjurer was helping to convict Mr. Medina.

In addition to the fact that Regina Juarez swore to conflicting and false testimony about the gun, the jury should have heard that Regina Juarez had a criminal history for, among other things, making a terroristic threat against a witness in another criminal case.  The fact that she was willing to derail the truth-seeking function of another criminal trial would have corroborated Dallas Nacoste and others who said that Regina was helping Flaco pin the crime on Mr. Medina.

---

[69] *See e.g.* 15 RR 1906-07 (prosecutor corrects Flaco on the stand—pursuant to a conversation they had several months before trial: Flaco did not last see the gun on the night of the shooting, Flaco last saw it a week or so later when he personally wrapped the gun for burial).

Though the available evidence destroyed completely the credibility of Regina Juarez—a critical prosecution witness, because the defense failed to investigate Regina's background, the prosecutor got away with arguing that the jury could believe Regina Juarez because "[s]he's never been in trouble before."  18 RR 2310.  The State urged the jury to find Regina "really credible" because "wants to tell the truth and she does tell the truth . . . .  I don't know how anybody based on what she told you could not believe what she said."  18 RR 2309-10.

Regina Juarez was not the only indispensable prosecution witness who lied about the gun a second time at trial.  As noted above, the prosecutor coaxed Flaco to change his testimony from not having seen the gun since the night of the crime to not having seen the gun until the night—six or so days later—that he wrapped it in plastic and buried it.[70]  Had the defense investigated, they could have produced evidence that *neither* story was true (which perhaps explains why Flaco was so confused about what he was supposed to say on the witness stand).  Jason Crawford saw Flaco with the gun at Jamie Moore's sister's apartment after shortly after New Year's Eve but before the gun was buried.

Moreover, Flaco candidly informed a magistrate, before cooperating with the State, that he had been told his cooperation would earn him assistance from the police with his own case.  Flaco cooperated with the State and he walked away from this incident without any charges, despite the prosecutor's in-court acknowledgment that "[Flaco] is guilty of tampering, Judge."  17 RR 2264.  Witnesses Veronica Ponce and Scharlene Pooran, who did not cooperate with State, did not enjoy the same immunity from prosecution.  Knowing that Flaco was induced to cooperate by promises

---

[70] Presumably, by protecting the integrity of the firearm and burying it in a relatively accessible location, Flaco was preserving the gun for use on a future occasion.

of "help" from the State—help which in fact materialized—would have further undermined his credibility.

A reasonable investigation would have similarly demonstrated Jamie Moore's incredibility. Had counsel interviewed key witness Johnny Valadez before trial, they would have learned that Johnny was going to testify that Jamie Moore had the weapon in his trunk and—contrary to his self-serving testimony—Moore stopped the car before the shooting, opened his trunk, and was well aware of what was about to happen. This information would have subjected Moore to a devastating cross. Because defense counsel failed to interview the alleged eye-witnesses before trial, the prosecution was able to prevent Moore from being discredited simply by calling him to the stand before Valadez.

Additionally, though the defense tried to insinuate that Moore's professed inability to remember the details was disingenuous, they could have used Moore's statement to the police—had they bothered to ask for it—to show that Moore had in fact given a detailed statement to the police in which details varied significantly from the prosecution's theory of the case at trial, thus undercutting the credibility of both Moore and the prosecutors in the eyes of the jury.

Likewise Johnny Valadez would have been thoroughly discredited by competent counsel. Johnny told the police in January that he did not see the gun. At trial, he told a different and more detailed story about the deliberate preparations for the shooting and was able to describe the gun in detail. And he added a new, graphic alleged confession from Mr. Medina. Armed with Johnny's original statement, competent counsel would have thoroughly impeached him.

Additionally, Johnny's trial testimony that Regina Juarez, not Veronica Ponce, was in the car during the shooting would have prompted competent counsel to highlight the inconsistencies between prosecution witnesses in general, and in particular cross-examine Regina about her

-147-

potentially greater role in the crime.

The impact from impeaching these witnesses is magnified because doing so would have engendered legitimate doubts about the prosecutors' credibility. Had Argueta been crossed with his assault on his elderly relative and his sexual assault of a woman who was sleeping with her kids, it would have exposed the prosecution's willingness to present its witnesses in a false light. Similarly, Regina Juarez was the most demonstrably dishonest witness in the case, and she had a record for threatening witnesses. Exposing the jury to this information would have raised questions about the prosecutor's particular emphasis on her credibility despite knowing that she had committed perjury. Most fundamentally, the prosecution promoted the idea that its witnesses were credible because they had no motive to admit being in the car. Absent counsel's deficient performance, the defense could have demonstrated that the prosecution witnesses were so motivated to help the prosecution that the were willing to change their stories in unison to conform to the State's theory at trial—even if it meant giving conflicting stories under oath.

In addition to thoroughly discrediting the witnesses that the State concedes were essential to convicting Mr. Medina, a competent investigation would have dismantled most of the remaining material evidence. Maurice Argueta, the prosecution's upstanding family-values hero who put the murder weapon in Mr. Medina's hands close-in-time to the crime, was in truth a thug who assaulted his own elderly relative and sexually assaulted a woman as she lay sleeping with her children. Because he committed the latter offense while on parole for prior violations, and was facing new charges, he was squarely under the thumb of the prosecution when he testified against Mr. Medina. The jury, however, was entirely unaware of this because the prosecution's false portrait of Argueta was left undisturbed by an independent defense inquiry.

Defense counsel's admitted error also allowed the prosecution to bolster its weak case with numerous extraneous offenses, including a prior drive-by shooting at the same address and have the jury improperly consider this as evidence of Mr. Medina's guilt.  As in *Ex parte Varelas*, this error alone is sufficient to deem counsel prejudicially deficient.

Finally, counsel admittedly failed to begin his investigation into the forensics in this case until he stood up to cross-examine Robert Baldwin, the State's firearms examiner.  Had counsel started earlier, he could have used the physical evidence to further discredit he prosecution's alleged eye-witnesses.

### 2.    A qualitatively different and stronger defense that Flaco was the shooter.

Counsel's deficient performance not only allowed the prosecution to convict Mr. Medina on flimsy and improper evidence that would have crumbled or disappeared under adequate scrutiny, they failed to uncover a wealth of evidence that would have supported the defensive theory that Flaco was the shooter.  Had counsel conducted a professionally reasonable investigation they could have presented not merely a quantitatively better defense, *i.e.* enhanced only with a few additional instances in which Flaco admitted being the shooter, but a qualitatively different and stronger one.

First, Flaco's repeated lies about the gun, coupled with the immutable physical evidence proving that Flaco hid the murder weapon, would have both devastated Flaco's credibility before the jury and significantly bolstered the defensive theory that Flaco was the shooter.  That he and his friends lied to the police about the gun, and then lied again when his palm print emerged on the wrapping around the buried murder weapon is far more concrete evidence of a guilty party orchestrating a cover up than the prosecution's allegations against Mr. Medina.  This evidence was different in kind from anything the jury heard.

The jury also never heard other significant evidence pointing to Flaco's guilt.  An eye-witness, with an accurate description of both the car undisputedly used in the shooting and the undisputed driver, reported that the person shooting the rifle from the passenger side was African American.  His testimony is corroborated by another person with whom the witness he was talking on the phone and who heard gunshots during the call.

The jury never heard evidence that Flaco, not Mr. Medina, was far more likely to be individually motivated to retaliate against the rival H-Town Crips.  Flaco was particularly close to G-Money, the LRZ member whose murder was the motive for the drive-by shooting; Flaco even had a tattoo in G-Money's memory.  Flaco had announced that he wanted to retaliate against the H-Town Crips and "*had something planned*."

Several witnesses also made it clear that Flaco had a plan to blame Mr. Medina for the shooting, and that his close friend Regina Juarez was part of Flaco's plan.  This testimony would have been corroborated by the fact that Flaco and his friends, after Flaco's palm print was found on the bag containing the murder weapon, invented a new false story about Mr. Medina directing the disposal of the guns from jail.

And of course, the jury would have heard that Flaco admitted the shooting to several other members of the gang.

Viewed as a whole, counsel's failures had a devastating impact on Mr. Medina's trial.  The state court dismissively brushed aside the evidence presented in post-conviction as "either information that does not exculpate [Mr. Medina] or . . . that was presented at trial."  Findings at 33.

This finding is clearly erroneous in light of the record.[71]  To take but one example, as demonstrated above, the information from Dallas Nacoste was different in kind than anything the defense produced at trial because it discredits the story Flaco and his friends told to explain away Flaco's palm print on the bag in which he buried the murder weapon.

Nor did the state courts assess the cumulative impact from counsel's errors.  *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) ("the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding . . . .").  Instead, the state court concluded that Mr. Medina "fails to show ineffective assistance of counsel based on isolated, if any, instances of error or omission."  Findings at 53.  The state court finding of no prejudice was both based on an unreasonable determination of the facts in light of the evidence in state court,  28 U.S.C. § 2254(d)(2), and involved an unreasonable application of *Strickland*.  28 U.S.C. § 2254(d)(1),(2).

The new evidentiary landscape that has emerged in post-conviction consists of greatly diminished case against Mr. Medina and new, significant evidence pointing to Flaco as the shooter.

---

[71] Even if Mr. Medina's new evidence was—as the state courts mistakenly believed—limited to more witnesses who heard Flaco admit to the shooting, that would not preclude a finding of prejudice:

> The fact that there is "some overlap" among the excluded testimony and what came out trial will not necessarily preclude relief, however. *Harrison v. Quarterman*, 496 F.3d 419, 426 (5th Cir. 2007); *see also id.* (citing *Stewart v. Wolfenbarger*, 468 F.3d 338, 359 (6th Cir.  2006)) (finding additional alibi testimony was not cumulative where it "would have added a great deal of substance and credibility" to the defendant's alibi defense).

*Richards*, 566 F.3d at 568.

To prevail, Mr. Medina need not demonstrate his innocence: "[T]he issue is not whether [Mr. Medina] is innocent, but whether if he had had a competent lawyer he would have had a reasonable chance (it needn't be a 50 percent or greater chance, *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir.2001)) of being acquitted; given that guilt must be proved beyond a reasonable doubt, guilty people are often acquitted." *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006). Put differently, the issue is whether absent defense counsel's numerous errors and omissions, there is a reasonable probability that just one juror would have harbored a reasonable doubt about Mr. Medina's guilt. The facts and circumstances of this case compel an affirmative answer.

This case is indistinguishable from *Raygoza v. Hulick*, 474 F.3d 958 (7th Cir. 2007). On June 4, 1997, two teenagers were shot by a rival gang member in a pizzeria, one of the teenagers died. The surviving victim, and two friends who were with him in the pizzeria, identified Christopher Raygoza as the shooter. *Id*. at 959. Additionally, Raul Quezada, a member of Raygoza's gang who served as the look-out during the shooting, identified Raygoza as the shooter. *Id*. at 960. Quezada, who pled guilty to first-degree murder and aggravated battery in the case, testified that Raygoza and others discussed going to "get" some of the rival gang members in retaliation for the shooting of one of their own. The plan was to shoot or kill a member of the victim's gang. Brief for the Plaintiff-Appellee, *People v. Raygoza*, 805 N.E.2d 755 (Ill. App. 1 Dist 2001) (available at 2001 WL 34362637, at *6). Quezada went with Raygoza and co-defendant to the pizzeria where they recognized the victim and his friends as members of the rival gang. Quezada acted as a look-out and saw Raygoza enter the restaurant with a gun. After he heard gunshots, Quezada ran away. He next saw Raygoza three days later, and Raygoza told him that "they shot some" of the rival gang members. *Id*. at *6-*7.

-152-

Three other eyewitnesses described the shooter as having a blond ponytail, "a description that matched Raygoza at the time." *Raygoza*, 474 F.3d at 960. An additional witness, Jennifer Calatayud testified that she saw Raygoza and his alleged accomplice at a party before and after the shooting. The accomplice told Jennifer that he had to go do something.   The accomplice returned an hour later, out of breath, and said that "the boys" had shot someone in a pizzeria. *Id*. Raygoza was arrested and after 13 hours of interrogation, during which he told several different stories, he signed a statement admitting to the shooting (this statement was suppressed at trial because detectives refused to Raygoza's requests to speak with his lawyer). *Id*. at 960-61.

Trial counsel conducted little cross-examination of the prosecutions witnesses, and failed to impeach Ms. Calatayud with her initial statement to the police that she had not been at the party on the night of the shooting. *Id*. at 961.   Trial counsel put on an alibi defense: Raygoza was at his mother's fortieth birthday party that evening.   However, counsel called only one witness, Raygoza's girlfriend. *Id*.

In post-trial proceedings, new counsel called seven more alibi witnesses, including the defendant's mother, two of his siblings, two other guests at the birthday party for defendant's mother, and two people who spoke to the defendant on the phone during the party.   New counsel also submitted corroborating evidence, including train tickets and telephone records. *Id*. Other witnesses testified that one of Raygoza's fellow gang members was the shooter. *Id*.   In response to Raygoza's proffer, the prosecution introduced evidence that Raygoza's alibi defense had been scripted by the lawyer for whom the defendant's mother worked. *Id*. at 961-62.   Additionally, trial counsel testified about his strategic reasons for not calling the other alibi witnesses, all of which were based on circumstances that undermined their credibility. *Id*. at 962.   Counsel's strategy was to attack the

eyewitnesses, though he never interviewed them or Ms. Calatayud or others at the party from which Raygoza and his accomplice left to do the shooting and to which they returned afterwards.  *Id.*  On this record, the Illinois courts rejected Raygoza's ineffective assistance of counsel claim.

The United States District Court, though "disturbed" by the case, denied habeas corpus relief. The Seventh Circuit reversed and held that trial counsel was ineffective, and the state court decision to the contrary was unreasonable.  The court's opinion is a straightforward application of *Strickland* under the AEDPA:  "Here, it is the Illinois Appellate Court's application of *Strickland* to Raygoza's claim that concerns us.  This requires us to ask, as the Supreme Court held in *Williams*, 'whether the state court's application of clearly established federal law was objectively unreasonable.'" *Id.* at 963.

The court found that had counsel adequately assessed the available evidence, he would have learned that alibi witnesses both related and unrelated to client were available to testify.  *Id.*  While the court acknowledged that the prosecutor could have responded by attempting to impeach the additional witnesses with the implication that their testimony was scripted, "quite a few inferences must be drawn before" that implication destroyed the testimony of all or most of the witnesses.  *Id.* at 963-64.  The court noted counsel's explanations for not calling the additional witnesses (including the fact that one of the witnesses was the defendant's mother), but observed that "even if . . . each of these witnesses might have had vulnerabilities in cross-examination, [trial counsel] does not seem to have considered what impact they would have cumulatively."  *Id.* at 964.  Instead, he put on only the defendant's girlfriend.

The state court committed the same error: "At the conclusion of the hearing on the motion for a new trial, the judge summarized the problems he saw with each of the additional witnesses. He did not, however, pay particular attention to the possibility that in the aggregate, they may have

-154-

provided powerful evidence for Raygoza's alibi, even though individually each one might have been impeached." *Id*. at 965. The court concluded that counsel's failure to interview and call all of the available alibi witnesses was constitutionally inadequate representation. *Id*.

The court found prejudice from counsel's deficient performance, "even taking into account both the AEDPA standard of review and the fact that the trial judge[72] subjectively believed that the array of additional alibi witnesses would not have swayed his judgment." *Id*. The prosecution's case, based on the testimony of rival gang members and a passerby who could give only a general description of the shooter, "was not particularly strong." *Id*. The evidence adduced in post-trial proceedings might have tipped the balance:

> On the other side, Raygoza's alibi witnesses included both family members and unrelated people; their stories were corroborated by telephone records and train tickets. Obviously, a trier of fact approaching the case with fresh eyes might choose to believe the eyewitnesses and to reject the alibi evidence, but this trier of fact never had the chance to do so. This undermines our confidence in the outcome of the proceedings so seriously that we conclude that there is a reasonable probability that the result would have been different had Raygoza's attorney presented the testimony of all or most of his alibi witnesses.

*Id*. Because the Illinois court's application of *Strickland* was objectively unreasonable, the Seventh Circuit granted habeas corpus relief. *Id*. at 966.

Likewise, in light of counsel's abdication of their duty to investigate and the devastating impact it had on Mr. Medina's trial, this Court can have no confidence in the outcome. Mr. Medina's conviction must be vacated so that he may receive a constitutionally adequate trial in which the jury can assess all of the materially relevant circumstances.

---

[72] Mr. Raygoza's case was a bench trial.

-155-

**D.    Section 2254(d) poses no bar to granting relief on Mr. Medina's ineffective assistance of counsel claim because the state court rejection of the claim was both an unreasonable application of clearly established Supreme Court precedent and resulted from an unreasonable determination of the facts in light of the evidence before the state courts.  28 U.S.C. § 2254(d).**

As noted above, Mr. Medina's claim that counsel were ineffective for failing to request limiting and reasonable doubt instructions with respect to the extraneous offenses was not addressed by the state courts.  Trial counsel submitted an affidavit, which was also not mentioned by the state courts, admitting their error.  In light of the CCA's decision in *Ex parte Varelas*, Mr. Medina was undoubtedly entitled to relief based on this facet of his claim alone.  It was perhaps trial counsel's confession of error that led the State to omit this issue and evidence from the findings it submitted to the courts (which the courts signed).  Regardless, the claim was not adjudicated on the merits, thus AEDPA is inapplicable and this Court should review the *Varelas* claim *de novo*.

The AEDPA is no bar to relief on the rest of Mr. Medina's claim because the state court adjudication was unreasonable in numerous respects, many of which have been noted above.  Mr. Medina need demonstrate only that the state court rejection was unreasonable under either 2254(d)(1) or 2254(d)(2), but he can show both.

**1.    The state court decision was based on an unreasonable application of *Strickland*.**

The state court unreasonably applied *Strickland* in numerous respects.  For example, the state court credited assertions of alleged trial strategy even though trial counsel failed to conduct a reasonable investigation.  Findings at 53.  State courts unreasonably apply *Strickland* when crediting "strategic" decisions without an adequate basis.  *See e.g. Anderson v. Johnson*, 338 F.3d at 392-94. Moreover, the state courts applied their pre-*Strickland* precedent holding that "trial strategy will be

reviewed only if [the] record shows that [an] action was without [a] plausible basis." Findings at 53 (citing *Ex parte Ewing*, 570 S.W.2d 941 (Tex. Crim. App. 1978)). That is not the *Strickland* test.

The state court failed to recognized "the fundamental importance of adequate pre-trial investigation," which is "an "unreasonable application" of *Strickland*. *Richards*, 566 F.3d at 571.

The state courts also failed to assess the cumulative impact from counsel's errors. Findings at 53 (Mr. Medina "fails to show ineffective assistance of counsel based on isolated, if any, instances of error or omission."). As in *Williams v. Taylor*, 529 U.S. at 397-98, "the State  . . . Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding . . . ."

Because the state court decision was based on an unreasonable application of *Strickland*, AEDPA poses no bar to relief.

**2.      Unreasonable determination of the facts in light of record before the state courts.**

As noted above, the state court decision was also based on an unreasonable determination of the facts in light of the record before the state court. The most salient unreasonable determination of fact was that Mr. Medina "fail[ed] to show ineffective assistance of counsel" because "trial counsel [made] reasonable strategic decisions." Findings at 53. The state courts had before them evidence that counsel were busy trying other capital cases from the date they were appointed in this case until the eve of Mr. Medina's trial. Mr. Medina also submitted the investigators' statement documenting their measly 30 hours of work and which witnesses were interviewed (and, more importantly, the vast array of witnesses never contacted by the defense). The state courts saw Mr.

Millin's notes from his in-trial interview of his client, documenting all of the leads that required follow up. Even Mr. Guerinot's own affidavit revealed the unreasonably limited scope of counsel's investigation, and the affidavits of numerous witnesses submitted to the state courts confirmed that Mr. Medina's post-conviction counsel was the first member of the defense to contact them. On this record, a finding that counsel made "reasonable strategic decisions" is an unreasonable determination of fact. Counsel could not have made any strategic decisions without first conducting an adequate investigation.

Yet, the state court based its decision on numerous fact-findings that Guerinot made "strategic decisions." For example, the state court found, based on the Guerinot's affidavit and the appellate record, that Guerinot made a "strategic decision" to not impeach witnesses with their criminal histories. Findings at 32. As shown above, the appellate record confirms that counsel's strategy was precisely to impugn the credibility of prosecution witnesses based on their criminal histories. Moreover, Guerinot wholly failed to impeach witnesses, according to his professed "strategy," based on their "testimony and actions."

The state court found that Guerinot made a "strategic decision" to not call Dallas Nacoste, because his credibility "was even lower than other witnesses," Findings at 33, even though the undisputed record before the court was that: (1) Guerinot had never spoken with Nacoste; (2) Guerinot could not remember who Nacoste was; and, (3) Guerinot claimed he had never seen Nacoste's statement. Without this information Guerinot could not have assessed Nacoste's credibility. Thus, the state court determination that Guerinot made a strategic decision to not call this critical witness was unreasonable.

Like the trial counsel in *Richards v. Thaler*, it obvious that Mr. Guerinot "was doing what

[he] could to assist the State in defeating [his] former client's habeas petition, even if it meant being less than candid." *Richards*, 566 F.3d at 560. The record refutes any notion that his investigation could have formed a sufficient basis for the claimed strategy decisions.

As AEDPA poses no bar to relief, this Court should grant habeas corpus relief based on trial counsel's ineffective assistance with respect to the guilt/innocence phase of Mr. Medina's trial.

## II.   A pervasive pattern of police and prosecutorial misconduct violated Mr. Medina's right to due process.

### A.   The State continues to deny Mr. Medina access to exculpatory information in violation of his right to due process.

As demonstrated above, numerous prosecution witnesses lied to the police and gave highly suspect testimony at trial. Some of their stories, such as the one invented after Flaco's palm print turned up on the buried bag of guns, are almost certainly false. Mr. Medina has pieced together as much information as he can without assistance from the courts. His investigation has revealed that there are statements, files, and documents to which he has never been granted access.

For example, the prosecutor reminded Flaco Holmes during his direct examination about a conversation they had several months before trial in order to coax Flaco to say that he wrapped the guns and buried them sometime after Mr. Medina was arrested. 15 RR 1906-07. The files provided to Mr. Medina, and presumably trial counsel, make no mention of this conversation with Flaco. In fact that there is no mention of this story—*i.e.* that Mr. Medina called Regina Juarez from the jail after his arrest and, at Mr. Medina's request, Regina, Flaco, Jamie, and others buried the gun—in any of the materials furnished to Mr. Medina to date, including the statements of Flaco, Regina, and Jamie. The only statements from these witnesses supplied to Mr. Medina are from January 1996 and recite that they had not seen murder weapon since the night of the shooting. Given that Regina

Juarez, Flaco Holmes, and Jamie Moore all told an identical new story at trial, with the obvious encouragement of the prosecutor, they must have made other statements to the prosecutors that Mr. Medina has yet to receive.  Nor does Mr. Medina know to which version of events these witnesses testified in the grand jury proceedings.

Similarly, according to Dallas Nacoste, the police interviewed an eye-witness who reported that the shooter was African American.  Exhibit 18 (Affidavit of Dallas Nacoste).  This statement is corroborated by the HPD offense report.  On January 2, 1996, the day after the shooting and before the police had any suspects, Novak and Chisholm informed another HPD officer that "information had also been received that some black males may also be involved in this incident."  Exhibit 1 at 127.  Mr. Medina has never been supplied with the eyewitness information identifying the assailants as African American, though this is important exculpatory information.

Likewise, HPD officers reported to the District Attorney's Office that Flaco had told them Johnny Valadez might have the gun or disposed of it:  "I further advised [Assistant District Attorney Don Stricklin] that we had information from 'Flaco' that this suspect [Johnny "Pelon" Valadez] may have or disposed of the murder weapon in this offense."  Exhibit 1 at 190.  But there is no record of an interview with Flaco that contains this information.  Indeed, Mr. Medina has discovered that not all police witness interviews in this case were memorialized in the offense report, or at least the version disclosed to Mr. Medina.   For example, Mr. Medina has learned that Adela Moya—Candyman's girlfriend—was interviewed by the police and threatened with prosecution in the case as the driver of the car used during the shooting.  Her name, however, appears only in Candyman's statement, there is no record of the HPD's interview of Ms. Moya in the offense report.

Thus, it appears that the police and prosecution have withheld information inconsistent with

the case against Mr. Medina.  The few items of which Mr. Medina is aware certainly share this characteristic.  An eye-witness account of an African American shooter would have torpedoed the prosecution's case (and again pointed to Flaco).  If Flaco told the police that Johnny Valadez had the gun and/or disposed of it, that statement would be Flaco's *third* different story about the whereabouts of the murder weapon, and because it contradicts both his trial testimony and the physical evidence, it should have been disclosed for impeachment purposes.  There is no serious possibility that Adela Moya was the driver during the shooting, but the fact that police were intimidating witnesses with baseless threats of prosecution is relevant to the integrity of their investigation.

In response to the trial court's pre-trial discovery order, the prosecution maintained that all witness statements were available to the defense in the open prosecution file.  Exhibit 14 (State's Response to Defendant's Motion to Discovery and Court Order).  The prosecution represented to the trial court and the defense that its open file contained, *inter alia*, all statements made by Mr. Medina to third parties in this case, *id*. at 1, yet there is nothing in the prosecution's file about Mr. Medina's alleged call to Regina Juarez about hiding the gun.  Likewise, the prosecution represented that "[s]tatements of all witnesses . . . who gave information to law enforcement or the grand jury is [sic] available in the state's open file."  *Id*. at 2.  Yet none of above described information—witness statements about the burial of the murder weapon, the eye-witness account of an African American shooter, the interview of Adela Moya, Flaco's statement that Johnny Valadez had the gun or disposed of it—have been disclosed to the defense and nor is it in the copy of the prosecution file provided to Mr. Medina's post-conviction counsel.

After exhausting all non-judicial avenues for collecting information about his case in the possession of law enforcement, Mr. Medina turned to the state post-conviction courts.  In 2002, Mr.

Medina filed two separate motions seeking discovery and a hearing.  In his May 2002, "Motion for Discovery and Evidentiary Hearing," Mr. Medina requested "[a]ny and all previous statements and/or contact with the prosecution and/or law enforcement, whether before a grand jury or otherwise, including the date, location, who was present and the content of the conversations for the above-listed witnesses," and "[a]ny and all records or documents in the possession of the prosecution or law enforcement regarding the veracity and mental status of the above-listed witnesses."  *Id.* at 11.  The witnesses named in the motion included Flaco Holmes, Regina Juarez, Johnny Valadez, Jamie Moore, and 15 other people.  *Id.*  Although the trial court sat on the case for another six years before ordering the parties file proposed findings, it never ruled on Mr. Medina's motions.

While it appears that prosecution witnesses gave false testimony at trial, Mr. Medina cannot plead the full extent of the State's misconduct, including whether the prosecution knowingly presented the false testimony, without access to the information in the exclusive possession of the State.

To be clear, information in the possession of law enforcement officials that is inconsistent with the prosecution's case or impeaches prosecution witnesses is *Brady* material, and thus was—and still is—due to be disclosed to Mr. Medina without any request.[73]  Nonetheless, Mr. Medina requested it, both directly from the law enforcement agencies and, when those efforts failed,

_____

[73] The ABA Criminal Discovery Standard 11-4.1(c) (3d ed. 1996) provides that each party has "a ***continuing*** obligation to produce discoverable material to the other side."  *Id.* (emphasis added).  The Commentary to this Standard makes clear that the obligation continues after trial: "***Even after trial*** . . . the discovery of exculpatory material may require reevaluation of the fairness of the conviction or of the sentence."  ABA Criminal Discovery Standard 11-4.1 cmt. at 69 (emphasis added).

from the state courts.[74]

What follows are the state misconduct claims for which Mr. Medina has sufficient notice and factual basis to plead a *prima facie* case.  Not included here are any claims based on the above information because Mr. Medina cannot know what legal theories and facts to plead, if any, until he can review the additional information withheld by law enforcement agencies.[75]  Mr. Medina anticipates that additional state misconduct claims will emerge if and when the State complies with its *Brady* obligations or this Court orders discovery.

Just as Mr. Medina cannot plead the full breadth of the State's misconduct in his case without further disclosure or discovery, this Court cannot assess it.  *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) ("suppressed evidence [must be] considered collectively, not item by item").  Mr. Medina's plenary misconduct claim will not be ripe for review until after the State discloses the *Brady* information in its possession and Mr. Medina can plead the full extent of the State's misconduct.

---

[74] Mr. Medina will likewise file a motion for discovery in this Court.

[75] Claims based on information still withheld by the State will not be procedurally barred in these proceedings.  In *Strickler v. Greene*, 527 U.S. 263 (1999), the Court found that a claim based upon withheld evidence is not procedurally barred when the failure results from: (1) the failure of the prosecution to produce the evidence; (2) the petitioner's reliance on the prosecution's open file policy; and (3) the State's assurances during the state habeas proceeding that the petitioner has received everything known to the government.  *Strickler*, 527 U.S. at 289; *see also Banks v. Dretke*, 540 U.S. 668, 698 (2004) (continuing suppression of *Brady* evidence throughout state post-conviction proceedings is cause for the failure to plead state misconduct claim in state court).

All three parts of the *Strickler* test are met here.  At minimum, the State has yet to produce pretrial statements from its key witnesses that differed from their statements to the police.  Nor has the State disclosed the eye-witness account describing the shooter as African American.  The State maintained an open file, and Mr. Guerinot's affidavit demonstrates his reliance on it.  Exhibit 13 (Second Affidavit of Jerry Guerinot) at 2.  Finally, the prosecutors submitted affidavits in post-conviction proceedings averring that they maintained an open file which contained everything to which the defense was entitled, and the state courts relied on the prosecutor's assertions to deny relief.

A piecemeal adjudication would allow the State to benefit from its continued *Brady* violation.

However, because the known state misconduct alone is a sufficient basis for habeas corpus relief, this Court may properly grant relief instead of ordering further discovery.

**B.**   **The prosecution presented false testimony from Regina Juarez and failed to disclose to the defense that she testified for the State in exchange for leniency, *i.e.* freedom from prosecution.**

**1.**   **Regina testified pursuant to an undisclosed deal for leniency, and her testimony was false in at least one material respect.**

Prior to trial, Mr. Medina filed a discovery motion that requested, *inter alia*, "[a]ny 'deals,' whether expressly written or implied, to any individual who agrees to testify for the State in this case." CR at 32. The trial court granted this request, CR at 34, but the prosecution did not reveal the existence of any deals.

Subsequent to an in-person meeting, Regina telephoned undersigned counsel Jim Marcus on April 3, 2012, and revealed for the first time that she had to testify against Mr. Medina as part of a deal she made with the prosecutors. Regina said she had to testify for the State or go to jail herself. Moreover, Regina Juarez has informed undersigned counsel that, contrary to her trial testimony, she was not in fact present when the guns were buried. Regina stated that her trial testimony was based on information presented to her by the prosecution.

**2.**   **The use of false testimony and the failure to disclose that Regina testified in exchange for leniency violates due process.**

In *Mooney v. Holohan*, 294 U.S. 103 (1935), the Supreme Court held that the knowing use of false testimony by the prosecution violates a defendant's right to due process, because "a deliberate deception of the court and jury by the presentation of testimony known to be perjured" is inconsistent with "the rudimentary demands of justice." *Id.* at 112. In *Napue v. Illinois*, 360 U.S.

-164-

264 (1959), the Supreme Court condemned the State's knowing use of perjured testimony as a violation of the Fourteenth Amendment to the United States Constitution.  The Supreme Court has held that a prosecutor also has a constitutional obligation to correct his witness's perjured testimony, even if he did not know that the witness was going to lie.  *Giglio v. United States*, 405 U.S. 150 (1972).  Moreover, the prosecutor has a duty to correct a false impression that his witness created without committing perjury. *Miller v. Pate*, 386 U.S. 1 (1967); *Alcorta v. Texas*, 355 U.S. 28 (1957); *United States v. O'Keefe*, 128 F.3d 885, 897 (5th Cir. 1997).  "[U]nder the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications." *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979).

Furthermore, the testimony need not be "technically false, but merely leave the jury with a false impression."  *See e.g. Blankenship v. Estelle*, 545 F.2d 510, 513 (5th Cir.1977); *Dupart v. United States*, 541 F.2d 1148, 1149-50 (5th Cir.1976) (per curiam); *see United States v. McClintic*, 570 F.2d 685, 692 (8th Cir.1978); *Boone v. Paderick*, 541 F.2d 447, 450 (4th Cir.1976), *cert. denied*, 430 U.S. 959 (1977); *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir.), *cert. denied*, 419 U.S. 1069 (1974).

A petitioner is entitled to relief under *Napue* if: (1) the testimony was false; (2) the State knew the testimony was false; and, (3) "there is any reasonable likelihood that the false testimony could have affected the jury's verdict."  *Napue*, 360 U.S. at 269-72; *see Ex parte Adams*, 768 S.W.2d 289 (Tex. Crim. App. 1989).  The knowing use of false testimony renders the result of a proceeding "fundamentally unfair, and must be set aside if there is ***any*** reasonable likelihood that the false testimony ***could*** have affected the judgment of the jury." *United States v. Bagley*, 473 U.S. 667, 679

-165-

(1985) (emphasis added); *see Adams*, 768 S.W.2d at 290.

When assessing the second element of a *Napue* claim, "whether the prosecutor had actual knowledge of the falsity of the testimony is irrelevant." *Ex parte Adams*, 768 S.W.2d 281, 291 (Tex. Crim. App. 1989). "[K]nowledge of perjured testimony is imputable to the prosecution where such knowledge is possessed by anyone on the 'prosecution team,' which includes both investigative and prosecutorial personnel." *Ex parte Castellano*, 863 S.W.2d 476, 480 (Tex. Crim. App. 1993). Knowledge on the part of the police or, in this case, the Montgomery County Sheriff's Department, is imputed to the prosecution. *Ex parte Adams*, 768 S.W.2d at 292. Thus, "the State violates a defendant's right to due process when it actively or passively uses perjured testimony to obtain a conviction . . . . Such a violation occurs whenever the prosecutor has actual or imputed knowledge of the perjury." *Ex parte Castellano*, 863 S.W.2d at 481 (citations omitted).

Moreover, "the government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).

The third prong of a *Napue* claim—the effect of the false testimony on the trial—is not the same materiality showing applied to evidence suppressed by the prosecution, discussed *infra*. The *Napue* materiality standard is more favorable to a petitioner than the *Brady* materiality standard because, "the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves a corruption of the truth-seeking function of the trial process." *Bagley*, 473 U.S. at 681 (internal quotation marks omitted). Even if there is sufficient evidence in the case to support a guilty verdict, it is the jury, and not judges, that is the body given the constitutional responsibility to decide guilt or innocence. *Barham*, 595 F.2d at 242. The *Napue* standard is

-166-

equivalent to the harmless error standard of *Chapman v. California*, 386 U.S. 18 (1967), which requires the State "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Bagley*, 473 U.S. at 679 n.9; *Ex parte Castellano*, 863 S.W.2d at 485 ("the use of perjured testimony will be found to be material unless a reviewing court is convinced beyond a reasonable doubt that the perjury did not contribute to the conviction or punishment.").

> With respect to the State's deals with its witnesses, the law of this Circuit is clear:
>
> *Giglio* and *Napue* set a clear precedent, establishing that where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair. Although *Giglio* and *Napue* use the term "promise" in referring to covered-up deals, they establish that the crux of a Fourteenth Amendment violation is deception. A promise is unnecessary. Where, as here, the witness's credibility "was . . . an important issue in the case . . . evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility and the jury was entitled to know of it."

*Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) (emphasis in the original).

Regina's testimony about the burying the gun, *see supra*, was critical to the prosecution because it explained away the fact that the only forensic evidence in the case linked the murder weapon to Flaco. Regina now states that her trial story, which contradicted her prior sworn statement that the guns had been thrown in the bayou, was suggested to her by the prosecutors.

More fundamentally, Regina's entire testimony is undermined by the fact that she testified pursuant to a deal that, despite a specific request, was not disclosed to defense counsel.

Regina was undeniably a key witness for the prosecution. Both Johnny Valadez and Flaco Holmes had been charged with the capital murder at one point, and they were both incarcerated for other crimes when they testified in this case. Jamie Moore was a convicted felon who faced

significant liability for his own role in the drive-by shooting. Thus, the prosecution implored the jury to rely on Regina because she is "really credible." 18 RR 2309. The prosecution argued that Regina should be believed because "[s]he's never been in trouble before." 18 RR 2310. Regina "wants to tell the truth and she does tell the truth . . . . I don't know how anybody based on what she told you could not believe what she said." *Id.* The jurors would have viewed Regina's testimony with tremendous skepticism had they known that she was testifying in exchange for her freedom.

In light of Regina's status as a key prosecution witness, the newly discovered information about her deal and at least one material falsehood in her testimony could have affected the jury's verdict. Mr. Medina's conviction was secured in violation of the Due Process Clause.

### C. *Brady* violations.

Prior to trial, trial counsel for Mr. Medina filed a motion requesting, *inter alia*, the prior statements and criminal records of all State witnesses and/or other suspects and all photo spreads shown to any witness by any member of law enforcement. 1 CR 29-33. On June 19, 1996, the trial court granted each defense request with the sole exception of prior grand jury testimony. 1 CR 34. Despite the court's order, the prosecution in Mr. Medina's case suppressed material evidence that was favorable to Mr. Medina, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The suppressed evidence included crucial impeachment evidence regarding key guilt phase witnesses, Regina Juarez, Flaco Holmes, Leon Guy, Maurice Argueta, and Johnny Valadez. Moreover, in violation of *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), the State knowingly presented false testimony to the jury through Evaristo Rodriguez and Maurice Argueta and did not correct the testimony.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the

-168-

suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Subsequent decisions have abandoned the prerequisite of a defense request for exculpatory evidence before an accused may benefit from the Court's decision in *Brady*. *United States v. Bagley*, 473 U.S. 667, 682 (1985). Moreover, the Court has rejected any distinction between impeachment and exculpatory evidence for purposes of *Brady* analysis. *Id*. at 677; *Giglio v. United States*, 405 U.S. 150, 154 (1972). Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if: (1) the prosecution suppressed favorable evidence, and, (2) the evidence was material to either the guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *See Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *United States v. Bagley*, 473 U.S. 667, 683 (1985); *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir), *cert. denied*, 513 U.S. 1060 (1994); *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 434; *Bagley*, 473 U.S. at 682; *Blackmon*, 22 F.3d at 564. The *Kyles* decision clarified four significant aspects of materiality analysis under *Brady*. First, to demonstrate materiality, Mr. Medina is not required to demonstrate by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence. *Kyles*, 514 U.S. at 434. The inquiry is more properly whether the suppressed evidence undermines confidence in the jury's decision. *Id*.

Second, materiality analysis "***is not a sufficiency of the evidence test***." *Id*. (emphasis added). The Supreme Court clearly stated, "[a] defendant need not demonstrate that after discounting the

-169-

inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict [or return a sentence of death]." *Id*. at 434–35. One demonstrates a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435 (footnote omitted); *see also Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (suppressed impeachment evidence may have consequences for the case far beyond discrediting the witness's testimony).

Third, harmless error analysis is not applicable to *Brady* violations. *Kyles*, 514 U.S. at 435. The *Kyles* Court stated, "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless error review." *Id*.

Finally, materiality must be assessed "in terms of the suppressed evidence considered collectively, not item by item." *Kyles*, 514 U.S. at 436. The Supreme Court has found *Brady* violations where the State failed to disclose impeachment evidence that could have been used to impugn the credibility of the State's "key witness," *Giglio*, 405 U.S. at 154–55, or that could have "significantly weakened" key eyewitness testimony. *Kyles*, 514 U.S. at 441, 453. *See also Banks v. Dretke*, 540 U.S. 668, 701–02 (2004) (holding that a *Brady* violation occurred because the state suppressed impeachment evidence that two "essential" prosecution witnesses had been coached by police and prosecutors before they testified material); *Graves v. Dretke*, 442 F.3d 334, 344 (5th Cir. 2006) ("Because the state suppressed two statements of . . . its most important witness that were inconsistent with [the witness'] trial testimony, and then presented false, misleading testimony at trial that was inconsistent with the suppressed facts, we have no trouble concluding that the suppressed statements are material.").

1.      **Standard of review: the state courts failed to adjudicate all of Mr. Medina's claim.**

Mr. Medina acknowledges that, based on the affidavits of both trial prosecutors and Mr. Guerinot, the state court found that most—but not all—of the impeachment evidence described below was disclosed to defense counsel by placing it in the prosecution's alleged open file.[76]  Trial counsel averred that he saw the criminal histories of these witnesses but made a "strategic decision" not to impeach the prosecution witnesses.

The record inspires serious doubt about the credibility of trial counsel for both sides.  Mr. Guerinot signed an affidavit prepared by the prosecution ascribing incredible strategic reasons to his obvious failures.  For example, Mr. Guerinot signed off on a claim that he did not call Dallas Nacoste as a witness because Nacoste's credibility was even lower than that of other witnesses.  This might reflect the prosecution's view of Nacoste, but the record is clear that Guerinot had never met or spoken with Nacoste and had not reviewed Nacoste's statement.  Thus, Guerinot had no basis for assenting to the prosecution's proposed statement.[77]  That he did so anyway demonstrates that Mr. Guerinot "was doing what [he] could to assist the State in defeating [his] former client's habeas petition, even if it meant being less than candid."  *Richards*, 566 F.3d at 560.

The record also demonstrates that Mr. Guerinot was "being less than candid" when he claimed a strategic decision to not impeach witnesses with their criminal histories.  As described, *supra*, defense counsel pursued this line of attack at trial and argued to the jury that the prosecution

---

[76] As Mr. Medina has demonstrated, not all information known to the prosecution was contained in the files disclosed to him.

[77] Nor is there any indication that another member of the defense team spoke with Nacoste.  Nacoste was not among the witnesses interviewed by the investigators, and Mr. Millin's notes indicated his intention to bench warrant Nacoste, but no bench warrant was ever filed.

-171-

witnesses were less credible because of their criminal histories.  Thus, the state court finding that Guerinot made a strategic decision to refrain from using criminal histories to discredit prosecution witnesses is clearly erroneous, 28 U.S.C. § 2254(e)(1), and not binding on this Court.  While this may not resolve whether Guerinot in fact saw the criminal histories prior to trial, it does resolve that Guerinot is not a credible witness, particularly with respect to this claim.[78]

Likewise, there is evidence that the prosecutors were less than fully candid about this same issue.  Mr. Medina's state habeas application alleged that Regina Juarez was among the witnesses whose criminal background was not disclosed.  Application for Writ of Habeas Corpus By A Person Sentenced to Death at 21-22.  Even though the prosecutor knew differently, he argued in closing that the jury should believe Regina because "[s]he's never been in trouble before."  18 RR 2310.  Not only does this argument demonstrate the prosecutor's lack of candor about his witness's criminal history, it raises a strong inference that he failed to disclose it to defense counsel.  It would have been brazen of the prosecutor to hand defense counsel Regina's rap sheet and then argue before the jury that she did not have one.[79]  The risk to the prosecutor's credibility in the wake of a revelation that Regina had a criminal record would not have been worth effort.

In response to this claim, lead prosecutor Steve Baldassano claimed no specific recollection

---

[78] As demonstrated throughout this petition, many claims of strategy in Mr. Guerinot's prosecution-drafted affidavit—such as the alleged "strategy" of not discrediting prosecution witnesses with their criminal behavior—are flatly contradicted by the trial record in this case.  For example, as described in Claim 3 below, Mr. Guerinot claimed that the defense made a strategic decision to not investigate Mr. Medina's good disciplinary record while incarcerated, yet at trial defense counsel attempted to argue that Mr. Medina's good disciplinary record while incarcerated meant that he would not pose a future danger if sentenced to life (the argument was shut down by the prosecution's objection that there was no evidence to support it).  *See, infra*, Claim 3.

[79] Perhaps this is precisely what happened, but the prosecutor had no fear of objection based on an accurate assessment of defense counsel's preparedness.

of the trial file but alleged that it was his practice to disclose the criminal histories of his witnesses in his open file.  Findings at Exhibit A (Affidavit of Steve Baldassano).[80]  His co-counsel, however, specifically claimed that "the criminal histories of Leon Guy, Maurice Arguenta [sic], Dominic Holmes, [and] James Moore" were in the prosecution's sub-folder marked "Criminal Histories," and this sub-folder was made available to the defense.  Findings at Exhibit B (Affidavit of Casey O'Brien).  Regina Juarez is conspicuously absent from the roster of witnesses whose criminal history was disclosed to the defense.  Likewise, the prosecution's proposed findings, and therefore the state court findings, omit any reference to Regina's criminal history: "The applicant fails to show that the State mislead the jury or suppressed information concerning the criminal histories of the State's witnesses Leon Guy, Maurice Arguenta [sic], Dominic Holmes, and Johnny Valadez."  Findings at 39-40.  Thus, the record is clear that the trial prosecutor with actual knowledge of what was disclosed to the defense was unwilling to aver that the State disclosed Regina's criminal history.

Regardless, the prosecution and the state courts adjudicated the merits of Mr. Medina's claim with respect to all of the witnesses except Regina Juarez.  This Court's review of the allegation that the prosecution suppressed Regina's criminal history is *de novo*, the AEDPA applies to the remainder.  However, because the state courts failed to adjudicate Mr. Medina's claim with respect to evidence impeaching Regina Juarez, this Court's cumulative assessment of the harm from the prosecutor's suppression—the materiality element of the *Brady* analysis—must necessarily be made *de novo*.

---

[80] Because the trial court merely signed the prosecution's proposed findings, all of the prosecution's post-conviction exhibits are appended to the court's findings, including the trial prosecutors' affidavits.

### 2.    The State suppressed material impeachment evidence.

#### a.    Regina Juarez.

Mr. Medina has already demonstrated that Regina had a rap sheet.  Exhibit 15 (Regina Juarez Rap Sheet).  The criminal history of a State witness is indisputably *Brady* material, and the State is presumed to have knowledge of, and a duty to disclose, any criminal history information available through "routine" checks.  *East v. Scott*, 55 F.3d 996, 1003 (5th Cir. 1995) ("[T]he prosecution should bear the burden of obtaining and disclosing the criminal history of its witnesses 'in the interests of inherent fairness.'") (quoting *Calley v. Callaway*, 519 F.2d 14,,223 (5th Cir. 19775)).  This information is not limited merely to convictions but extends to parole status and deferred adjudication probation.  *See Maxwell v. State*, 48 S.W.2d 196 (Tex. Crim. App. 2001).

At the time of trial, Regina's most recent infraction was a terroristic threat against a witness in another criminal case against one of her friends.  The one prosecutor who professed in state post-conviction proceedings that he knew which criminal histories were in the State's "Criminal Histories" sub-folder, and thus, were disclosed to the defense at trial, omitted any reference to Regina Juarez's rap sheet.  The other prosecutor stood before the jury and urged them to believe Regina because "she's never been in trouble before."  18 RR 2310  This Court, reviewing this issue *de novo*, should unhesitatingly find that the prosecution suppressed Regina's rap sheet.[81]

Additionally, as described *supra*, Regina has recently revealed for the first time that she testified pursuant to an undisclosed deal with the prosecution: her testimony in exchange for

---

[81] The contrary conclusion requires an assumption that defense counsel were aware of Regina's criminal history and knew the prosecutor was misleading the jury but had no interest in discrediting either Regina **or** the prosecutor in front of the jury.  If true, this is compelling evidence of counsel's deficient performance.

avoiding prosecution.  Regina states that she had to testify for the State or go to jail.

Regina was one of the prosecution's admittedly critical witnesses, and she was ostensibly more credible than the others because she was not alleged to have been involved in or present for the drive-by shooting.  Discrediting Regina would have left the prosecution with only the other gang members who were far less credible.  Both Johnny and Flaco had been charged with the capital murder and were obviously motivated to shift the blame elsewhere.  There was substantial evidence that Flaco was the shooter.  Jamie Moore was a potential accomplice and, according to Johnny Valadez, an active participant in last-minute preparations for the shooting.  Finally, the nature of Regina's infraction—threatening a witness in order to protect a friend—would have lent credibility to defense counsel's effort to portray Regina as someone who was covering for her "very close" friend Flaco.  There is no question that this impeachment evidence and her undisclosed deal were material.

In *Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985), the Fifth Circuit rejected an arithmetical approach to the materiality analysis and recognized that *Brady* is not a sufficiency of the evidence test.  In *Lindsey*, the prosecution suppressed impeachment evidence that would have damaged the credibility of one eyewitnesses, but would have left the positive identification by a second eyewitness unshaken.  Even though there could be "no doubt that a reasonable trier of fact could have convicted Lindsey on the basis of [the unimpeached] identification alone," the court nevertheless held that the prosecution's failure to disclose the evidence required reversal of the conviction:

> We are tempted, but not persuaded, by this arithmetical approach; our experience at the bar has been that positive identification by two unshaken witnesses possesses many times the power of such an identification by one only, and that ***the destruction by cross-examination of the credibility of one of two crucial witnesses—even if the other remains untouched—may have consequences for the case extending far***

-175-

> ***beyond the discrediting of his own testimony***.
>
> We cannot and should not attempt to retry the case in our imaginations.  We can say, however, on the basis of our courtroom experience, that ***the evidence withheld by the prosecutor in today's case carried within it the potential both for the destruction of Alexander's identification of Lindsey and the discrediting, in some degree, of the police methods employed in assembling the case against him***.

*Id.* at 1042 (emphasis added).[82]  The fact that *Lindsey* was a capital case also influenced the court's assessment of the materiality of the suppressed evidence.  *Lindsey*, 769 F.2d at 1043; *see Wilson v. Whitley*, 28 F.3d 433, 442 n.20 (5th Cir. 1994).

> The Tenth Circuit, citing *Lindsey* with approval, further noted that
>
> withheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation that led to Bowen's arrest and trial.  ***A common tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible Brady violation***.

*Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) (citing *Lindsey*) (emphasis added).

Here too the impact of the impeachment evidence is amplified because it raises "serious questions about the manner" in which the prosecutors tried the case.  Armed with the rap sheet and her deal with the prosecution, defense counsel could have stood up during closing arguments and objected to the prosecution knowingly misleading the jury about Regina's alleged trouble-free past.  Particularly in the context of this very close case, in which the jury struggled to reach a verdict, the evidence impeaching Regina Juarez ***and*** exposing the prosecutor's disingenuousness undermines confidence in the outcome of the proceedings.  There is a reasonable probability, based on this

---

[82] The approach adopted in *Lindsey* finds additional support in *Kirkpatrick v. Whitley*, 992 F.2d 491 (5th Cir. 1993).  The Fifth Circuit observed in *Kirkpatrick* that "the withholding of exculpatory evidence from the jury might have led to a different result not only with respect to the sentence imposed, ***but also to the jury's consideration of Kirkpatrick's defense***."  *Id.* at 496 (emphasis added, footnote omitted).

evidence alone, that one juror would have harbored a reasonable doubt about Mr. Medina's guilt. But the prosecution's misconduct does not end with Regina's rap sheet.

### b.   Flaco Holmes

Although Flaco Holmes was attacked by Mr. Medina's trial attorneys who suggested that he, and not Mr. Medina, was responsible for the murders, critical impeachment evidence was withheld by the State.  This evidence would have been devastating to Flaco's already tenuous credibility.

After New Year's Day 1996, police were on the lookout for Flaco in connection with the drive-by shooting on Campden Hill.  *See* Exhibit 1 at 351 (Police inter-office memo).  The interoffice memo warned that Mr. Holmes is considered to be "armed and dangerous" and that "***he is suspected as being the shooter***."  *Id*. (emphasis added).  On January 10, 1996 Mr. Holmes was observed by police driving a stolen car.  *See* Exhibit 1 at 168-70 (HPD offense report).  Mr. Holmes fled from the police in this vehicle, eventually crashing the vehicle and trying to escape by foot.  *Id*. Police further note that Mr. Holmes had eleven prior arrests in the previous three years.  *Id*.  The jury heard none of this.

Moreover, despite the State's assurance that no deals were given to any State's witnesses, Exhibit 14 (State's response to discovery motion), the notes of Magistrate Lewis reveal ***Flaco's cooperation was secured by the promise of assistance in this case***.  According to Magistrate Lewis, Flaco was informed by police "that if he told them what happened they would probably help him out and see what they could do for him."  Exhibit 2 (Magistrate's warning to Dominic Holmes). Moreover, it is clear from the warning that Mr. Holmes was being charged with the capital murder.

Subsequently, Flaco walked away from this case without any criminal penalty, even though he lied to the police in order to obstruct their investigation and buried the most important piece of

-177-

physical evidence, the murder weapon.  As the prosecutor confirmed in open court, he personally believed that Flaco was guilty of tampering with evidence in a capital murder case:  "I think that makes [Flaco] guilty of tampering, Judge."  17 RR 2264.  Other witnesses who refused to cooperate, like Veronica Ponce and Scharlene Pooran, were sent to prison for what their alleged hindrance of the prosecution.  Flaco, who cooperated, faced no criminal penalty from the same prosecutor despite the prosecutor's insistence that Flaco too illegally thwarted the investigation.  There was a deal for Flaco's cooperation.

Because the State withheld Flaco's criminal background, the jury was also never permitted to weigh his testimony with the knowledge that he had multiple convictions.

The information withheld by the State corroborated the defense theory that Flaco, not Mr. Medina, was the shooter.  The State attacked this defense, telling the jury it was merely a story created by Mr. Medina while incarcerated but, as the documents above show, ***the police themselves believed Mr. Holmes was the shooter***.  This theory was corroborated by Flaco's palm print on the bag in which the murder weapon was buried and the testimony of witnesses to whom Flaco confessed.

The suppression of this crucial piece of evidence is all the more troubling when juxtaposed to the State's closing argument to the jury:  "Why would [Flaco and his friends] possibly—what motive do they have to put themselves in the car of the shooting if it wasn't true? . . .  These kids have absolutely no motive to do that whatsoever."  18 RR 2306.

The jury should have heard that the police themselves believed Flaco was the shooter, that he fled from the police when approached, that he had numerous prior convictions, that he was offered leniency in exchange for his statement, and that he in fact received a free pass from a

prosecutor who believed Flaco was guilty of tampering and who saw to it that other uncooperative witnesses were sent to prison. This evidence, together with the evidence at trial—physical evidence linking Flaco to the murder weapon and Flaco's confessions to the shooting, would have more than explained Flaco's motive to put himself (innocently) in the car. There can be no doubt that, had this critical information not been withheld, the already tenuous outcome of Mr. Medina's trial would have been different.

### c.      Johnny Valadez

Johnny Valadez was charged with Capital Murder on January 11, 1996, a charge which was dropped after he gave a statement implicating Mr. Medina. *See* Exhibit 1 at 197. Certainly if the jury had heard that Mr. Valadez gave a statement implicating Mr. Medina only *after* being charged with Capital Murder, his credibility would have been called into question.[83]

Moreover, the absence of this evidence allowed the prosecution to argue, falsely, that Johnny had no motive to finger Mr. Medina to get out of trouble: "There's no reason on earth that those three kids . . . have to finger this defendant to get out of trouble. The only reason they do it is because he did it." 18 RR 2318-19.

### d.      Maurice Argueta

Mr. Argueta's testimony was essential to the state's case because it afforded the prosecution an opportunity to portray Mr. Medina as part of a lawless gang, terrorizing law-abiding citizens at a family party. He also put the gun in Mr. Medina's hands close in time to the shooting. However,

---

[83] Because Johnny Valadez and Regina Juarez were juveniles, Mr. Medina has been unable to discover their criminal history without further assistance from the Court. Mr. Medina alleges that these witnesses also were under indictment or were under the supervision of the juvenile system and thus critical impeachment material was withheld from the defense.

as described above, Mr. Argueta, was far from the model citizen the jury was led to believe.  Though portrayed by the prosecution portrayed as a family-oriented peacemaker, he assaulted one of his elderly relatives and sexually assaulted a woman as she lay sleeping with her children, a crime with which he was charged immediately before he took the stand for the State.  His motive for helping the State, and as well as his sordid criminal history would have fatally diminished his credibility.  And cross-examining Argueta with this information would have also exposed the prosecution's willingness to knowingly allow its witness to masquerade as an upstanding member of the community when in fact he was a violent felon who prayed on the most vulnerable of victims.  Like Regina's rap sheet, the evidence diminishes the credibility of witness and the prosecutors alike.

### e.    Leon Guy

Leon Guy, an essential witness for the State because his story that he saw the shooter's "white or Mexican hand" excluded Flaco as a suspect, had criminal convictions that could have been used to impeach his testimony.  Additionally, Mr. Guy was on parole at the time.  This information was never disclosed to the defense.  Mr. Guy's credibility would have been shattered if the State had not suppressed his lengthy criminal history.

In March 1981, Mr. Guy pleaded guilty to the burglary of a habitation with intent to commit theft and was sentenced to ten years in prison.  Exhibit 34.  In July 1981, Mr. Guy was granted shock probation and received ten years probation.  *Id*.  Less than five years later, Mr. Guy violated his probation by committing a robbery.  Exhibit 35.  On December 3, 1985, Mr. Guy was sentenced to twelve years in the Texas Department of Corrections.  *Id*.  In May 1991, Mr. Guy was arrested and indicted for delivery of cocaine.  Exhibit 36.  On July 11, 1991, Mr. Guy was again sent to the Texas Department of Corrections for twenty years.  *Id*.  Released from prison on May 17, 1993, Mr. Guy

remained under correctional supervision and was on parole on New Year's Eve 1995.

Had this evidence been disclosed to the defense, the jury, rather than viewing Mr. Guy as simply a concerned neighbor who witnessed the tragic events of that evening, would have seen a three-time felon and drug dealer used who had recently been released from prison and was on parole. Instead, the State, even while suppressing Mr. Guy's prior criminal record and parole status, vouched for his credibility during closing argument: "Leon Guy, who has absolutely no motive to lie says he sees a light-skinned or Hispanic male holding the gun . . . . Why would he say that?  I mean why say that if it's not true?"  18 RR 2312.  The answer was to avoid going back to prison.

### f.      Evidence of alternate suspects

In July 1995, there was a prior drive-by shooting at the Rodriguez house, the same house targeted in the capital murder.  When interviewed in July 1995, Mr. Rodriguez informed the police that his daughter, Veronica, was dating a "possible gang member."  Exhibit 1 at 380-82.  Mr. Rodriguez believed that the LRZ gang was responsible for the shooting because his daughter told him "that a gang member from the LRZ *that just got out of jail* was going to kill one of her family members."  *Id*.  Mr. Medina was incarcerated from late 1994 until November 1995 and therefore was not the individual identified by Mr. Rodriguez.

This evidence, had it been disclosed, would have been central to the defense case.  Not only does it contradict the State's theory of transferred intent, but it also demonstrates that someone other than Mr. Medina wanted to kill Veronica's family members and had made a previous attempt.  It would have allowed the defense to wholly defeat the prosecution's effort to impute the July shooting to Mr. Medina.

Finally, as noted above, there was additional evidence of an alternate suspect in this case. The

police talked to at least one eye-witness who identified the shooter as African American.  Given that

Flaco, the other suspect in the case, is African American, this withheld information was obviously

critical.[84]

In sum, the above withheld impeachment evidence would have discredited numerous key

prosecution witnesses, including Regina Juarez, Flaco Holmes, and Johnny Valadez, ***and*** the

integrity of the prosecution itself by exposing the prosecutor's willingness to allow false impressions

to go uncorrected and even foster false impressions themselves.  Had the state disclosed the

evidence, the prosecutors would have been deprived of many arguments they advanced to bolster the

credibility of their tenuous case.  Because there is a reasonable probability of a different outcome,

Mr. Medina is entitled to relief.[85]

> **3.      The AEDPA poses no bar to granting relief on Mr. Medina's state
> misconduct claim because the state court rejection of the claim was both
> an unreasonable application of clearly established Supreme Court
> precedent and resulted from an unreasonable determination of the facts
> in light of the evidence before the state courts.  28 U.S.C. § 2254(d).**

Because the state court failed to adjudicate this claim with respect to the evidence impeaching

Regina Juarez, this Court reviews the allegations *de novo*: "not all federal habeas claims by state

prisoners fall within the scope of § 2254(d), which applies only to claims 'adjudicated on the merits

in State court proceedings.'" *Pinholster*, 131 S.Ct. at 1401.  Likewise, because the state courts failed

to address this critical part of Mr. Medina's *Brady* claim, they never undertook the mandatory

analysis of the cumulative impact from the State's suppression.  *See Kyles*, 514 U.S. at 436.  Thus,

---

[84] Mr. Medina has yet to receive this report and thus cannot provide more detail.

[85] Even if this Court determines that this impeachment evidence was not suppressed, Mr. Medina is still entitled to relief based on this showing of materiality.  If counsel were furnished with all of this information, their failure to use it was deficient.  *See supra*, Claim 1.

this Court's assessment of the materiality is likewise *de novo* because it was not adjudicated by the state court.  Alternatively, even AEDPA were deemed applicable here, the state court's failure to assess the cumulative weight of the suppressed evidence was an unreasonable application of *Kyles*; thus § 2254(d) does not bar relief.

The state court's determination that the remaining impeach evidence was not suppressed was based on an reasonable determination of the evidence before the state courts.  28 U.S.C. § 2254(d)(2).  First, the trial court credited the prosecutors' assertion that criminal histories were disclosed, even though one—Steve Baldassano—averred that he had no memory of what was disclosed during Mr. Medina's trial.  Findings at Exhibit A (Affidavit of Steve Baldassano) (Baldassano did "not remember this exact file" and could not specifically remember whether Mr. Medina's counsel reviewed the prosecution file).  His co-counsel attested to a more definite recollection but implicitly conceded that the State had not provided the defense with Regina's rap sheet.  Had ADA O'Brien acknowledged the State's possession of Regina's rap sheet, he would have simultaneously convicted his co-counsel of knowingly misleading the jury about Regina's background.  Given their lack of memory and candor about this issue, the state court's credibility finding was clearly erroneous, and the decision was based on this unreasonable determination fact.

Second, as Mr. Medina has already demonstrated, Guerinot "was doing what [he] could to assist the State in defeating [his] former client's habeas petition, even if it meant being less than candid."  *Richards*, 566 F.3d at 560.  Guerinot professed to have seen all of this information, with which he could have both shredded the credibility of prosecution witnesses *and* exposed the prosecutors' willingness to promote false impressions, but he simply chose not to do so based on an unexplained, blanket "strategy" of not attacking the credibility of prosecution witnesses with their

-183-

criminal histories.

Not only is this facially incredible, it is contradicted by the record. The theme of the defense closing argument was that prosecution witnesses were not credible ***because*** of their criminal histories: "[Jamie Moore has] been to the penitentiary. You can consider that as to whether he's a credible person. Flaco Holmes, he's in a juvenile facility right now, brought in in custody. Pelon, the young kid with the shaved head, he's in custody. You can consider that if you want or not, you know, with respect to his credibility." 18 RR 2285; *see also* 18 RR 2278 (defense argued that Angie Medina had never been in trouble with law and neither had Rene Reyna, who was going into the Army; defense argued that the prosecution witnesses Johnny Valadez and Flaco "came in here . . . in leg irons; the defense told the jury that when the prosecution witnesses "came in from this side of the courtroom, you know that they're in custody."). Moreover, Mr. Medina has demonstrated in Clam I, *supra*, that Guerinot wholly failed impeach prosecution witnesses in accordance with his professed strategy of focusing on their "testimony and actions." Guerinot is simply too incredible to be believed; thus, the state court decision denying relief was based on Guerinot's "credible" affidavit was based on an unreasonable determination of the facts in light of the record before the state court.

Because § 2254(d) poses no bar to relief, Mr. Medina asks this Court to reverse his conviction in light of the prosecution's failure to disclose material impeachment and exculpatory evidence.

III.    **Trial counsel rendered ineffective assistance of counsel with respect to the punishment phase of Mr. Medina's trial, in violation of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984).**

A.    **The controlling clearly-established Supreme Court precedent.**

This Court must apply *Strickland v. Washington*, 466 U.S. 668 (1984), to determine whether trial defense counsel were ineffective in failing to adequately investigate and present the available mitigating evidence during sentencing.   Under *Strickland*, the defendant first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." *Id*. at 688.   In evaluating a claim that counsel failed to adequately investigate, *Strickland* holds that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id*. at 691.

Second, the defendant must satisfy the prejudice requirement by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

This test is not outcome determinative.   The *Strickland* Court expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case.  *Strickland*, 466 U.S. at 693–94.   Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. (emphasis supplied).   Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard. *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990)

(the prejudice prong imposes "a lower burden of proof than the preponderance standard.").

The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court.  *Id*. at 405–06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in Strickland that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'").

>    **B.**     **Deficient performance:  The prevailing professional norms required counsel that conduct a social history investigation but Mr. Medina's lawyers unreasonably failed to do this or any other meaningful preparation for the punishment phase.**

The Eighth and Fourteenth Amendments require that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976).  Because "an individualized decision is essential," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), the Eighth Amendment mandates that the sentencer "not be precluded from considering ***as a mitigating factor***, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *id*. at 604.  Likewise,

the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence," *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), such as a "troubled youth," *id*. at 107.[86]

Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986).  Likewise, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004). Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604).

In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty.  *Woodson*, 428 U.S. at 304.  A jury can consider evidence in mitigation, however, only if trial defense counsel vigorously investigates and presents the available evidence.

"Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of

---

[86] In *Eddings*, the sentencing judge believed that he was legally prohibited from considering as mitigation that: the defendant was "raised without proper guidance;" his parents were divorced; he lived "without rules or supervision" with a mother who was possibly an alcoholic and a prostitute; when he stayed with his father he was subjected to "excessive physical punishment" and "physical violence;" he was "emotionally disturbed;" "his mental and emotional development" were less than his 16-years-of-age; and he "had a sociopathic or antisocial personality disorder." *Id.* at 107.

mitigation." *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996).  *See also Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("[t]he imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing").

The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community.  *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)).

### 1. The prevailing standard of care at the time of Mr. Medina's trial mandated that defense counsel conduct a thorough social history.

In state post-conviction proceedings, trial counsel admitted—and the state court found—that trial counsel were unaware of Mr. Medina's chaotic background and childhood.  *See* Exhibit 13 (Second Affidavit of Jerry Guerinot) at 3 (nobody ever told Guerinot about the domestic violence or drug and alcohol abuse in the Medina home); Findings at 38-39 (state court finds that Guerinot was uninformed about domestic violence or drug and alcohol abuse in the Medina home).

Thus, the trial counsel's ignorance about Mr. Medina's background is ***not*** in dispute, the sole question is who is at fault for counsel's ignorance.  The state court allowed trial counsel to lay the blame at the feet of their client, even though the record was clear that the whole of counsel's investigation—***for both phases of the trial***—was done in 30 hours.  In light of the applicable

standard of care, trial counsel's failure to affirmatively inquire about or investigate Mr. Medina's background was unquestionably deficient.

In *Bobby v. Van Hook*, 130 S.Ct. 13 (2009) (*per curiam*), the Supreme Court stated that "[r]estatements of professional standards, we have recognized, can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Van Hook*, 130 S.Ct. at 17 (emphasis added). Van Hook was tried 18 years before the promulgation of the ABA Guidelines relied upon by the lower court. *Id*. The Court contrasted the 2003 ABA Guidelines with the 1980 ABA Standards for Criminal Justice that would have been applicable to Van Hook's trial. The 1980 Standards were "quite different." *Id*. While the 1980 Standards described counsel's duties in only "general terms," the 2003 Guidelines

> discuss the duty to investigate mitigating evidence in exhaustive detail, specifying what attorneys should look for, where to look, and when to begin. *See* ABA Guidelines 10.7, comment., at 80–85. They include, for example, the requirement that counsel's investigation cover every period of the defendant's life from the "moment of conception, *id*., at 81, and that counsel contact "virtually everyone . . . who knew [the defendant] and his family" and obtain records "concerning not only the client, but also his parents, grandparents, siblings, and children, *id*., at 83.

*Id*. (quoting the ABA Guidelines).

The Supreme Court concluded that Van Hook's counsel were not deficient when measured against contemporaneous standards of care. *Id*. at 18 ("Van Hook insists that the Sixth Circuit's missteps made no difference because his counsel were ineffective even under professional standards prevailing at the time. He is wrong."). "Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial—was error. *Id*. *See also Cullen v. Pinholster*, 131 S.Ct. 1388, 1404 (2011) (trial counsel, after conducting a reasonable mitigation investigation, reasonably

deployed a defense known and used by the California defense bar at the time of Pinholster's 1984 capital trial).

Subsequently, the Supreme Court illustrated the sources from which courts can ascertain professional norms of criminal defense practice. In *Padilla v. Kentucky*, 130 S.Ct. 1473, 1482–83 (2010), in which the Court deemed deficient counsel's failure to advise a non-citizen defendant about the immigration consequences of a guilty plea, the Supreme Court relied on the ABA guidelines, as well as numerous other sources, to determine the prevailing standard of care:

> The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation. National Legal Aid and Defender Assn., Performance Guidelines for Criminal Representation § 6.2 (1995); G. Herman, Plea Bargaining § 3.03, pp. 20-21 (1997); Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L.Rev. 697, 713-718 (2002); A. Campbell, Law of Sentencing § 13:23, pp. 555, 560 (3d ed. 2004); Dept. of Justice, Office of Justice Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. D10, H8-H9, J8 (2000) (providing survey of guidelines across multiple jurisdictions); ABA Standards for Criminal Justice, Prosecution Function and Defense Function 4-5.1(a), p. 197 (3d ed.1993); ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2(f), p. 116 (3d ed.1999). "*[A]uthorities of every stripe-including the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications*-universally require defense attorneys to advise as to the risk of deportation consequences for non-citizen clients . . . ." Brief for Legal Ethics, Criminal Procedure, and Criminal Law Professors as *Amici Curiae* 12-14 (footnotes omitted) (citing, *inter alia,* National Legal Aid and Defender Assn., Guidelines, *supra,* §§ 6.2–6.4 (1997); S. Bratton & E. Kelley, Practice Points: Representing a Noncitizen in a Criminal Case, 31 The Champion 61 (Jan./Feb.2007); N. Tooby, Criminal Defense of Immigrants § 1.3 (3d ed.2003); 2 Criminal Practice Manual §§ 45:3, 45:15 (2009)).

*Id*. (emphasis added). Thus, the Court looked to the applicable ABA guidelines, as well as other publications and treatises, including the publications of criminal defense organizations, to establish the relevant standard of care.

"Authorities of every stripe," as well as reported decisions describing Texas capital trials,

-190-

confirm that the mid-1990's standard of care, like the 2003 ABA Guidelines, required a thorough

social history when preparing to defend a capital case.  As in the current ABA Guidelines, "the duty

to investigate mitigating evidence" was prescribed "in exhaustive detail, specifying what attorneys

should look for, where to look, and when to begin."  *Van Hook*, 130 S.Ct. at 17.

Materials from Texas capital defense CLE programs and defender publications well before

Mr. Medina's trial reflect a well-defined standard of care requiring counsel to seek out a wide range

of mitigating evidence.  For example, the State Bar of Texas 20th Annual Advanced Criminal Law

Course took place in July of 1994, two years before Mr. Medina's trial.  Materials distributed at the

State Bar course included a primer on defending capital cases at the sentencing phase.  Exhibit 37

(*Capital Sentencing Strategy: A Defense Primer*, July 1994) (hereinafter "1994 State Bar

Materials").  The materials reflect the expectation that defense counsel will conduct a searching life

history investigation:

> A thorough intergenerational life history ***must*** be developed, incorporating all life
> history documents and interviews with all first and second degree relatives, friends,
> [and] peers.  As relatives with histories of relevant physical illnesses (diabetes,
> endocrine/hormonal, and neurological) and mental illnesses are identified, obtain
> their medical and life history documents.

Exhibit 37 (1994 State Bar Materials) at 17–18 (emphasis added).  The standard of care required that

the defense team search for all potentially relevant mitigating circumstances because the then-

relatively new mitigation special issue made explicit that "everything about the circumstances of the

underlying offense (or other prior bad acts), the defendant's character, and the defendant's record

(read 'history') is relevant to the jury's final determination of the issue."  *Id*. (emphasis in the

original).

The 1994 State Bar of Texas materials document that counsel had a duty to independently

-191-

investigate the wide range of social, psychological, medical, environmental, and other factors that shaped the client's life.  Like the current ABA standards, the 1994 State Bar Materials instructed counsel to both collect a comprehensive set of life history documents and interview people who can shed light on the client's background.  To that end, the 1994 State Bar Materials provided counsel with "an *initial* list of essential people to talk to and records to obtain." *Id*. (emphasis added).  The list was not intended to be comprehensive because "[e]ach person and document will have information that will lead to additional people and records that [counsel] will need to talk to or obtain." *Id*.  Thus, the materials defined a starting point for a mitigation investigation that expands in the directions indicated by the information gathered by counsel.

According to the 1994 State Bar Materials, an appropriate document collection began with: birth certificates; birth records; prenatal records; church records; school records; educational records; childhood photographs; medical records; mental health records; work records; jail, court, and police records for family members; civil proceedings records; marriage records; social service agency records; Texas Youth Commission records; juvenile records; parole and probation records; military records; records from prior offenses (including attorney, jail, prosecution, court, and media records); records related to every co-defendant (including court, prosecution, jail, and attorney records); prison records; and prosecution records.  *Id*. at 18–21.

The standard of care called for a thorough intergenerational life history, which included interviews with "all first and second degree relatives, friends, [and] peers." *Id*. at 17.  Counsel were expected to interview life history witnesses about a wide range of topics, and not merely ask "Is there anything you think we should know about the client?"  Because the life history witnesses often have no concept of what is important or mitigating about a person's background, it was counsel's

obligation to raise and explore the relevant areas with the witnesses.  Hence the 1994 State Bar

Materials specifically instructed counsel to inquire into a broad range of topics, including:

- sexual and physical abuse;
- medical care, education, and nutrition;
- difficulty reading, speech impediments;
- nightmares, sleep disturbances, fear of the dark;
- withdrawal, quietness, shyness;
- rocking, biting, head banging during early childhood;
- anxiety, nervousness, crying,
- superstitions;
- fears;
- the parents' socio-economic history;
- client and family physical illness and disabilities;
- client and family mental illness and/or  mental retardation;
- family history of suicide;
- a detailed drug and alcohol history, including age first used, frequency, amounts, effects, and so forth.

*Id*. at 17-21.

The ultimate aim of the mitigation investigation is to support a punishment phase defense:

"Once you have assembled everything—both information and records—regarding your client's life,

you must create a defense."  *Id*. at 22.  Counsel should seek to "humanize" the client and "explain

as much as possible."  *Id*.  Counsel must relate the mitigating evidence to the criminal act.

"***Negative***" qualities, such as abuse or mental illness, "are often the ***primary*** source of explanatory

evidence."  *Id*. (emphasis added).  It is important to "[e]xplain as much as possible" because "[f]acts

in a vacuum are what prosecutions are made of."  *Id*.  Counsel's duty during the punishment phase

was to "[u]se [their] witnesses to fully develop the picture of a person who is life-worthy."  *Id*.

After describing the scope of the initial mitigation investigation, the 1994 State Bar Materials

address, at length, the strategic and legal justifications for obtaining expert assistance when preparing

for the punishment phase.  *Id*. at 23–36.  The primer explains that *Ake v. Oklahoma*, 470 U.S. 68

-193-

(1985), entitles indigent defendants to the assistance of a psychiatrist when sanity or future dangerousness is likely to be a significant factor at trial. Of course, future dangerousness is at issue in every Texas capital prosecution, thus *Ake* established "a valuable right because expert testimony plays a major role in almost every capital murder trial." Exhibit 37 (1994 State Bar Materials) at 23; *see also id*. at 26–27 ("a capital defendant in Texas is always entitled to the assistance of a psychiatrist to rebut testimony about future dangerousness because future dangerousness is always a significant aggravating factor at the sentencing phase"). The primer advised that "[c]ounsel can use a well planned Ake motion to obtain substantial funds to retain an expert of his own choice in almost any subject who can function as a real defense consultant and keep his work product and communications with the defendant confidential until he testifies." *Id*.

Finally, the 1994 State Bar Materials included a set of sample motions, three of which were for obtaining expert assistance in preparation for the punishment phase. The first, "Motion for the Assistance of a Psychiatrist on the Issues of Insanity and Mitigation," *id*. at 124–29, begins by noting that counsel has conducted a thorough investigation of the defendant's character and background (including reviewing the defendant's school records, prison records, medical records, and interviewing many witnesses). *Id*. at 124. The motion then models how to argue that the available social history information indicates that mental health issues will be at issue in the punishment phase, and that funding for a mental health expert is necessary because the jury must be able to consider mental health evidence "when deciding the ultimate issues in this case." *Id.* at 125-28.[87]

---

[87] As described below, Mr. Medina's counsel were sufficiently aware of the standard of care that they filed a boilerplate motion for a psychiatric evaluation. Even though it contained little information about Mr. Medina because counsel never investigated Mr. Medina's social history, the court granted the request—which itself is further evidence of the extent to which such evaluations were routinely done in the mid-1990's.

Two other sample motions gave defense counsel a template for requesting additional expert funding when further testing was warranted and for requesting expert assistance to rebut the State's expert on future dangerousness.  *Id*. at 130-38.

The 1994 State Bar of Texas Materials were hardly cutting-edge material, they merely conformed to the national capital defense norms in place since the mid-1980's.  *See e.g.* Exhibit 38 (David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, The Champion, Aug. 1986, at pp. 16–17) ("Upon appointment to a capital case, two concurrent investigations should be begun by separate and distinct investigatory personnel . . . .  A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present . . . .  Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny."); *see also id*. at 16 ("[A]ttorneys are not trained in . . . dealing with the psycho-social problems of their clients and explaining these to the jury.  Because of this, it is necessary for attorneys in capital cases to recognize at the beginning that the do not have they skills to accomplish the goals of mitigation and to go and seek the assistance of psycho-social professionals who are skilled in these fields.  For all practical purposes, the effective use of social workers, psychologists, and psychiatrists is necessary for the effective representation of a capitally-charged defendant."); Exhibit 39 (Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, The Champion, Aug. 1985, at pp. 27-31) (instructing capital defense counsel to thoroughly investigate the client's background by collecting documentary evidence and interviewing witnesses related to family background, medical history, school performance, military experience, work history, psychological profile, criminal record, institutional

-195-

record, significant others, religious background, drug/alcohol history, geography, skills and talents).

Decisions of the Texas Court of Criminal Appeals applying *Strickland* to cases tried in the mid-1990's confirm that the 1994 State Bar Materials accurately described the prevailing standard of care in Texas.  For example, in *Ex parte Gonzales*, 204 S.W.3d 391, 393–96 (Tex. Crim. App. 2006), the CCA held that trial counsel were deficient for not investigating whether there was a history of child abuse even though counsel "never even dreamed" it was an issue relevant to his client's case.  On July 20, 1994, Gabriel Gonzales, along with four other members of the Crips gang, robbed a pawn shop to get guns and money.  *Id.* at 393.  "While his accomplices were smashing display cases and stealing guns, [Gonzales] chased one of the proprietors of the shop into the back of the store and shot her.  Then he returned to the cash register and forced an employee to open it." *Id.*  Gonzales was sentenced to death on February 19, 1997.  The representation at issue in *Gonzales* spanned all of 1996, the same year of the representation at issue here.

Gonzales' trial counsel interviewed Gonzales about his life from birth up to the trial.  *Id.*  at 394.  Counsel also talked to the client's mother once before trial, and to the client's sister during trial.  None of them revealed that Gonzales was frequently sexually and physically abused when he was small child.  Unbeknownst to trial counsel, the mother believed that the father was sexually abnormal and used excessive force on the children and, when she learned that her husband was sexually abusing their daughter, she notified the police and obtained a divorce.  *Id.*  Trial counsel stated that he

> ***did not ask [the family members] or the applicant about any specific topics*** such as abuse in the applicant's past.  His interviews with the mother and sister started "globally in nature," but he "never even dreamed" of the issue of abuse, and he "certainly didn't really inquire about it."  He did ask the applicant about how he grew up.  "I just start from the beginning, you know, tell me all about you.  Where were

> you born and so forth, leading them up to—to this time." The applicant did not
> volunteer any information about abuse. The sister testified at the habeas hearing that
> she did not volunteer information about the abuse because she is ashamed of having
> been abused and it is not very easy to talk about.

*Id*. at 394–95 (emphasis added) (footnotes omitted).

Although Gonzales's trial counsel had interviewed both Gonzales's mother and sister about Gonzales's background—the sister even testified at punishment to Gonzales's difficult childhood and his borderline mental retardation—Gonzales's counsel never specifically asked these potential witnesses whether Gonzales had been abused, and thus did not present evidence of abuse at sentencing. *Id*. at 394–95.

Post-conviction counsel hired a psychiatrist who, after interviewing Gonzales and reviewing some of his records, diagnosed him with "chronic post-traumatic stress disorder, attention-deficit disorder with hyperactivity, mixed personality disorder with explosive and antisocial traits, hereditary epilepsy, dyslexia and other learning disorders." *Id*. at 395. The psychiatrist concluded that:

> This is an individual who at an early age had [neurological and learning disorders].
> He also had stigmata of Post Traumatic Stress Disorder as a result of extensive
> sexual abuse and molestation by his genetic father. He apparently was threatened
> with homicidal intention, by the perpetrator, if he revealed to his mother that this
> behavior was going on.
>
> This individual also has a Borderline Normal Intelligence Quotient which would lead
> to poor processing of information and probably lower level of control of behaviors
> which included antisocial behaviors and impulsive behaviors at an early age. There
> was extensive drug abuse at an early age which extended into adult age with
> participation in buying and selling drugs.
>
> This is an individual who has received many educational services, marginal
> psychiatric services as a child, and evolved into a very impulsive, angry adult whose
> trust was destroyed because of sexual molestation as a child. He, therefore, was not
> able to evolve deep interpersonal relationships that are so important for someone to

-197-

learn to control and monitor his own behavior so that he was able to function in a job as a normal productive citizen.

This individual would require extensive psychiatric treatment for Post Traumatic Stress Disorder and Chemical Dependence in order to be rehabilitated in to [*sic*] a law-abiding, productive member of society.

*Id.* at 395–96.

Because counsel was not aware of this information, the issue before the CCA was whether counsel failed to conduct a reasonable investigation to uncover mitigating evidence. The trial court found that trial counsel were not deficient: "The trial court was not persuaded, however, that defense counsel conducted an unreasonable investigation because 'this information was all known to Applicant, who was legally competent to stand trial, and he made no mention of it to his trial counsel.'" *Id.* at 396.

The CCA, however, held that the failure to investigate and inquire into the subject of abuse when interviewing the client and relevant witnesses fell below an objective standard of reasonableness for Texas capital trial counsel and rendered trial counsel's mitigation investigation unreasonable. *Id.* at 397. The CCA noted that the Supreme Court had made clear in *Penry v. Lynaugh*, 492 U.S. 302 (1989), that the pre-1991 Texas sentencing statute violated the Eighth Amendment when it precluded consideration of mitigating evidence beyond the scope of the special issues. In a footnote, the court catalogued numerous cases tried under the former statute in which counsel had investigated and presented mitigating evidence. *Gonzales*, 204 S.W.3d at 396 n.32.

In 1991, the Texas capital sentencing "statute was amended to comprise a much broader range of mitigating evidence, namely, 'all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the

-198-

defendant.'" *Id*. at 397 (footnote omitted).  According to *Gonzales*, courts must assess counsel's preparation for the punishment phase in light of this development.  Relevant mitigating evidence clearly included "the defendant's childhood and his physical and mental health."  *Id.*  Thus, "at the time of [Gonzales's] trial, an objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child."  *Id*. at 397.

In granting relief to Gonzales, the CCA plainly announced that, in a post-1991 trial, capital defense counsel were ***required*** to investigate the client's childhood and mental health—even in a case in which (1) counsel, ***before*** investigating, "never even dreamed" the investigation would turn up evidence of abuse; and, (2) counsel interviewed family members who did not spontaneously volunteer that the client had been abused.  Put differently, by the mid-1990's, Texas capital defense counsel had a duty to independently investigate mitigating circumstances related to mental and physical health, and the client's childhood, regardless of whether the information was volunteered by the client and his family.  *See also Ex parte Kerr*, 2009 WL 874005, at *2 (Tex. Crim. App. April 1, 2009) (unpublished) (overturning a 1995 death sentence based on ineffective assistance of counsel because trial counsel failed to discover "compelling evidence of physical and emotional abuse, familial violence, wretched treatment of the defendant by his father, alcoholism, the mental retardation of siblings, drug abuse, a history of head injuries, learning disabilities, and possible fetal alcohol syndrome.");  *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003) ("[I]n the context of a [1987 Texas] capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." (citation omitted));  *Moore v. Johnson*, 194 F.3d 586, 617 (5th Cir. 1999) (holding, when overturning a 1980

Houston death sentence, "that [because] counsel's conduct in failing to develop or present mitigating evidence was not informed by any investigation and not supported by reasonably professional limits upon investigation, we find that there is no decision entitled to a presumption of reasonableness under *Strickland*.").

Judge Cochran wrote a concurring opinion in *Gonzales* further clarifying the applicable professional norms. "[D]efense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty. ***The failure to investigate will not be excused simply because the defendant failed to mention such evidence himself***." *Ex parte Gonzales*, 204 S.W.3d at 400 (Cochran, J., concurring) (emphasis added). The Supreme Court has made it clear that "defense counsel may be required to investigate potential mitigating facts even when the defendant is 'uninterested in helping' or is 'even actively obstructive' in developing a mitigation defense." *Id*. (quoting *Rompilla v. Beard*, 545 U.S. 374 (2005). Judge Cochran—like both the 1994 State Bar Materials and the current ABA Guidelines—emphasized that counsel's duty to investigate encompassed, at a minimum, a duty to inquire into specific areas of potential mitigation:

> Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the "circumstances of the offense, the defendant's character and background, and [any evidence that lessens] the personal moral culpability of the defendant[.]" ***At a minimum, defense counsel must privately quiz his client about any and all positive and negative facts about the defendant's upbringing, personality, social interactions, thoughts and feelings. It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions***. Like a doctor, defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic. Such topics might include:
>
> 1.   Childhood accidents and injuries;
> 2.   Trips to the emergency room;

3.      Serious illnesses at any time;
4.      Physical abuse to the defendant or any other member of the family;
5.      Any sexual abuse to the defendant or any other member of the family;
6.      Size of the immediate family, and a history of the physical, educational, and emotional background of each member;
7.      The defendant's relationship with and attitudes toward every member of the family;
8.      Drug or alcohol use or abuse by himself and any or all members of the family;
9.      Any mental health treatment of any member of the family, including the defendant;
10.     The cohesiveness of the family;
11.     The family's standard of living and living conditions;
12.     Any and all available school records;
13.     Any record of learning disabilities;
14.     Childhood and adult social relationships with members of the same and opposite sex;
15.     Any marriage, divorce, children, step-children, or surrogate family relationships, and their positive or negative influence upon the defendant;
16.     Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;
17.     Any and all traumatic experiences;
18.     Any and all especially proud moments;
19.     Membership in religious, social, educational, charitable organizations;
20.     The client's five best and worst memories.

*Id.* 400–01 (emphasis added).

While *Strickland* accords deference to counsel's strategic decisions, Judge Cochran emphasized that this deference does not come due until ***after*** counsel complies with these prevailing norms of capital defense investigation:

> Only after a lengthy and thorough interview with his client will defense counsel be in a position to decide which are the most promising mitigation areas to pursue. Because of finite resources and time, capital counsel's strategic and tactical decisions regarding the further investigation, development, and use of potential mitigating evidence should be given great deference. ***But deference is not due to counsel who fails to interview his client at sufficient length and depth to discover, as accurately as possible, the unvarnished truth about his client . . . . [C]apital counsel bears the responsibility for at least making every reasonable attempt to uncover possible mitigation facts from his client***.

*Id.* at 401.

In addition to training materials and defense publications pre-dating Mr. Medina's trial, and

-201-

CCA decisions holding counsel to those same standards in contemporaneous trials, this Court can ascertain the prevailing professional practice from reported decisions describing numerous Texas capital trials in the decade leading up to the representation at issue here. Widespread litigation over whether Texas's pre-1991 sentencing scheme allowed jurors to give mitigating effect to a defendant's punishment phase evidence provides a rich body of caselaw describing the mitigating evidence that Texas capital defense counsel routinely investigated and presented to juries. A survey of capital cases in the late 1980's and early 1990's confirms the extent to which counsel gathered detailed social history evidence when preparing for capital trials—in Houston and elsewhere in Texas—for more than a decade before Mr. Medina's trial. *See e.g.*, *Ex parte Smith*, 309 S.W.3d 53, 59–60 (Tex. Crim. App. 2010) (***1990 Harris County trial*** in which defendant presented a detailed social history, including that his "family lived in poverty, caused in part by the loss of his father when he was 12 years old. [The applicant's] mother, . . . working as a maid, could not afford to move the family from Houston's "Fifth Ward," a dangerous neighborhood filled with prostitution, drugs, and crime. At the time of the crime, fourteen people lived in [the applicant's mother's] three-bedroom home. [The mother of the applicant's son] was violently killed, so [the applicant's mother] took [the applicant's son] into her house as well. Shortly before the crime, [the applicant] and his younger sister, . . . were violent crime victims themselves—with [the applicant's] sister forced to strip in public in front of him, and [the applicant] assaulted with a gun that misfired as it was held to his temple. Surrounded by drugs and poverty all his life, [the applicant] became a drug addict, using crack whenever he could get a hold of it. Lacking education and any job skills or opportunities, [the applicant] began to steal to support his addiction"); *Ex parte Davis*, 2009 WL 3839065, at *2 (Tex. Crim. App. Nov. 18, 2009) (unpublished) (***1992 Harris County trial*** in which

"[t]he jury was presented with evidence that applicant suffered from severe learning disabilities, functional illiteracy, childhood head injuries, deficits in social functioning, drug and alcohol 'dependency' by age fifteen, and a physically violent and emotionally traumatic upbringing."); *Ex parte Buntion*, 2009 WL 3154909, at *2 (Tex. Crim. App. Sept. 30, 2009) (unpublished) (***1991 Harris County trial*** in which "[t]he jury was presented with evidence that applicant had a troubled childhood in a 'very bad neighborhood,' was severely physically mistreated by his alcoholic father, and ran away from home to work on a dairy farm for room and board because his family was very poor.  Two psychologists testified that applicant suffered from 'primary paranoid personality disorder,' mild 'brain dysfunction' or 'neurological impairment,' and depression."); *Ex parte Jones*, 2009 WL 1636511, at *3 (Tex. Crim. App. June 10, 2009) (unpublished) (***1991 Harris County trial*** in which the defendant introduced mitigating evidence of "a psychological impairment that makes him susceptible to the influences of consistent, stronger, anti-social personalities in his environment, his abandonment by his biological father, and his intelligence, work ethic, reliability, and trustworthiness."); *Ex parte Martinez*, 233 S.W.2d 319, 320 (Tex. Crim. App. 2007) (***1989 Harris County*** trial in which defendant presented evidence of repeated admissions to the State Hospital for psychiatric illness, including "[s]chizophrenic reaction, chronic, undifferentiated, with paranoid and catatonic features"; a troubled childhood, and alcohol abuse starting at age thirteen.); *Gunter v. State*, 858 S.W.2d 430, 452 (Tex. Crim. App. 1993) (Clinton, J., dissenting) (***1987 trial in Harris County*** in which defendant presented mitigating evidence that he had been abused as child, his mother abandoned him when he was 3-and-a-half years-old (at which point he was still in diapers and not toilet trained), his adoptive parents were strict and sent him to school unbathed and unfed as punishment, he was hit with a strap until bloody, punished with an iron, school records indicated he

may have been sexually abused by his adoptive parents, he had deep emotional problems, he suffered

from a hearing impairment and a learning disorder, he was in and out of juvenile and foster families);

*Ramirez v. State*, 815 S.W.2d 636, 655–56 (Tex. Crim. App. 1991) (***1986 Harris County trial*** in

which defendant presented detailed social history evidence that the defendant was raised in poverty

and subsisted on food stamps (which ran out before the end of each month at which point the family

of 8 would live on bread, mayonnaise, and butter), the father abused the children and the mother, the

father once beat the defendant for intervening when his father was trying to rape his sister (after

which he beat up the sister and the mother), the father beat the defendant with extension cords and

fists, the defendant was getting high from sniffing paint by the time he was 9 or 10 years old, a

psychological evaluation performed for the juvenile probation revealed that defendant's IQ was

57).[88]

---

[88] Defense counsel were gathering and presenting social history evidence in contemporaneous capital trials throughout the State of Texas.  *See Ex parte Hood*, 304 S.W.3d 397, 400 (Tex. Crim. App. 2010) (1990 trial in which defendant offered mitigating evidence that he was crushed by a truck that backed over him at age 3, he was in the hospital for five months and had to relearn how to walk 2 years later, he was left with permanent injuries from the accident, his behavior changed, he had noticeable speech problems (including stuttering), he developed a fear of being inside of buildings, he was left with cognitive impairments and attended special education throughout his school career, he failed the second and seventh grade, he failed the army entrance exam three times, he suffered from brain impairments that compromised his judgment and impulse control); *Ex parte Hathorn*, 296 S.W.3d 570, 72–73 (Tex. Crim. App. 2009) (1985 trial in which defendant presented evidence that his "father and step-mother were neglectful; that his father was abusive and beat him nightly during his first two years of grade school—on one occasion for going to church; that his father had shot and killed his pony and a dog and appellant had to bury the dog; and that his father was violent and carried a weapon.  The former Chief Psychologist for the Texas Department of Corrections testified about Applicant's violent and dysfunctional home environment and how it may have shaped his development and contributed to the offense for which he was charged."); *(Damon) Richardson v. State*, 879 S.W.2d 874, 883 (Tex. Crim. App. 1993) (1988 trial in which defendant presented evidence that his mother was in and out of penal institutions, he never knew his father, he was raised in poverty with little supervision, sometimes went hungry, sometimes stole food, went to state institutions for children, he was illiterate, stuttered, slow learner); *Ex parte Moreno*, 245 S.W.3d 419, 423–24 (Tex. Crim. App. 2008) (1987 Bexar County trial in which defendant presented social

-204-

history evidence that he was born with a deformity to his left ear; abandoned by his birth parents and adopted as an infant; during the first seven years of his life; he underwent five surgeries to try to correct his deformity; neighborhood boys taunted him because of his deformity, and his mother would console him; when he was still a small child, both his mother and his grandmother became very ill; his father was compelled to take a second job in order to support his family and pay medical expenses; he was sent to live with relatives, necessitating frequent changes in the schools he attended; his mother died when he was fifteen years old; he dropped out of school and worked a number of menial jobs while living in his father's house; he was only eighteen years old at the time he committed his capital offense.); *Satterwhite v. State*, 858 S.W.2d 412, 426 (Tex. Crim. App. 1993) (defendant presented extensive social history evidence in the punishment phase of his 1989 trial, including inadequate parenting, an alcoholic mother, below average academic ability, an IQ of 74, a history of delusions and hallucinations, and expert testimony that defendant was a chronic paranoid schizophrenic); *Zimmerman v. State*, 860 S.W.2d 89, 101 (Tex. Crim. App. 1993) (1990 trial in which defendant presented mitigating evidence that he was twice abandoned as child, he was a victim of child abuse, he had a metal plate inserted into his skull at age 10, he had a low-average IQ, and he had been a good son to his adoptive mother); *Chambers v. State*, 866 S.W.2d 9, 27–28 (Tex. Crim. App. 1993) (1991 trial in which defendant's case in mitigation included evidence that his father never home, his father blew marihuana smoke in face, he lived in an atmosphere in which violence toward women was common, he only made it through the 10th grade in school, he had attempted suicide, he sought assistance from the Texas Department of Mental Health and Mental Retardation but had no received it, he almost froze to death and was found face down in the street, he had never been convicted of felony); *Elliott v. State*, 858 S.W.2d 478, 486 (Tex. Crim. App. 1993) (1987 trial in which defendant presented evidence that he had dropped out of school by the 8th grade, he was raised by single parent and grew up in a housing project, he was well behaved in jail); *Ex parte Kunkle*, 852 S.W.2d 499, 503 (Tex. Crim. App. 1993) (defendant was 18 years old at the time of the crime, used LSD and alcohol at time of crime, his father had been discharged from the military for depression, his mother had also been treated for depression, he was kicked out of the home for smoking marijuana, he weighed 189 pounds when expelled from his home but his weight dropped to 130 pounds—and he had sores on his face—after he was kicked out); *(Miguel) Richardson v. State*, 886 S.W.2d 769, 772–75 (Tex. Crim. App. 1991) (a history of kindness towards others, his artistic talent, child abuse by the defendant's father, testimony regarding racial strife in Oklahoma City and the effect of that strife on the defendant's emotional development, and a history of religious devotion and church membership)*; Ex parte McGee,* 817 S.W.2d 77, 79–80 (Tex. Crim. App. 1991) (***1984*** capital trial that recounted a childhood during which defendant's mother abandoned him and his eight brothers and sisters when he was four, but collected a government check for the children in order to support a drug habit, two of his sisters became prostitutes to support themselves, his six-month-old sibling died from starvation, he was then placed in a foster home where he was beaten with a broom and an extension cord leaving him with physical scars and emotional problems, defendant suffered a brain injury at birth and had possible brain damage and mental retardation, he had an IQ of 66); *Delk v. State*, 855 S.W.2d 700, 709 (Tex. Crim. App. 1993) (defendant presented evidence in his 1986 trial of a turbulent family life history that included numerous parental marriages and divorces, paternal abandonment, death of step-father, abuse of both the defendant and his mother

-205-

Cases in which life verdicts were returned also illustrate the prevailing professional norms of the mid-1990's.[89]  *See e.g. Sloan v. State*, 1997 WL 110000, at *1 (Tex. App.-Hous. (14th Dist.) Mar. 13, 1997) (1993 Harris County trial in which the jury answered the mitigation issue in favor of the defendant).  Andre Sloan was an ex-convict who shot killed three people, "[a]ll were killed execution-style, face down on the floor" during a robbery.  John Makeig, *Man Who Killed 3 Drug Dealers is Spared Execution*, Houston Chronicle, Sept. 4, 1993, at A35 (available at http://www.chron.com/CDA/archives/archive.mpl?id=1993_1151301).  Sloan's lawyers

> portrayed their client as a pathetic figure with an 81 IQ who grew up doomed to a life of crime.  He was one of three sons born to a now-deceased drug dealer who had his children selling marijuana for him before they were teen-agers.
>
> In his last year at Kashmere High School, Sloan made a straight-F report card, except for one passing grade in physical education.  At age 17, he was reading on the second-grade level.

*Id*.  The jury foreman reported that "the panel, in its day-long deliberations, was able to determine

---

at the hands of another step-father, dropping out of school in the 6th grade, and being shuffled from home to home, including a stay in a boys' home); *Gribble v. State* 808 S.W.2d 65, 75 (Tex. Crim. App. 1990) (defendant presented detailed evidence from his troubled childhood, which chronicled an upbringing in poverty, during which his mother was institutionalized for severe mental illness and his father for burglary, Mr. Gribble was shuffled around from home to home for the first few years of his life until his mother came home, he then moved with his family into a shack without running water, within a few months his step-father abandoned the family (his mother was pregnant at the time), his mother was unable to care for children and spent much of her time in bars, his mother sexually abused him as a small child, the defendant had severe mental illness, including depression and psychotic illusions, his history of abuse and mental illness was the cause of his violence towards women); *Lackey v. State*, 819 S.W.2d 111, 115–16 (Tex. Crim. App. 1989) (the defendant's father physically abused him and his mother, low IQ, troubled childhood, voluntary intoxication, and history of periodic drinking with blackouts).

[89]  These highly instructive cases are difficult to identify because, even if the defendant appeals, the points of error are generally all related to the guilt/innocence phase and thus there is no description of the mitigating evidence presented during the punishment phase.

Sloan is a continuing menace to society but felt there was *ample* 'mitigation' to bypass returning a sentence of death by injection." *Id.* (emphasis added).

The detailed and varied evidence summarized in these opinions (many from Harris County) demonstrates the extent to which extensive social histories were collected through punishment-phase investigation in Texas during the ten years or more preceding Mr. Medina's trial. Texas capital defense teams, consistent with state and national prevailing norms, routinely investigated the client's life and presented the client's social history in mitigation. And these cases were tried *before* the 1991 addition of the mitigation special issue gave Texas juries an adequate opportunity to give effect to mitigating evidence.

As the 1994 State Bar Materials and the CCA's ineffective assistance of counsel decisions make explicit, the 1991 addition of the mitigation special issue to Texas's sentencing scheme left no doubt that counsel had a duty to investigate all potentially relevant mitigating circumstances, and specifically the client's childhood and his mental and physical health. These sources specified what attorneys should look for and even where to look. They describe an investigation that begins at birth, or before, and documents the client's whole life.

At the time of Mr. Medina's trial, the prevailing professional norms required counsel to conduct a thorough mitigation investigation. *See Porter v. McCollum*, 130 S.Ct. 447, 454 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). *See also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), 93 (1989) (investigations into mitigating evidence "should comprise efforts to discover all reasonably available

mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor"); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing to 1989 ABA Guidelines to establish prevailing professional norms in 1989 capital trial).  The Texas and national practices reflect "well-defined norms" for mitigation investigation, and thus the floor below which counsel may not descend.  *Wiggins*, 539 U.S. at 524–25; *Rompilla*, 545 U.S. at 380.

The Texas standard of care is reflected in the ABA Guidelines specifying that counsel should investigate the defendant's full history, including "medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); . . . family and social history (including physical, sexual or emotional abuse)."  1989 Guideline 11.4.1.D.2.  Counsel must also interview "witnesses familiar with aspects of the client's history that might affect the . . . possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death."  1989 Guideline 11.4.1.D.3.  Counsel's duty "is not discharged merely by conducting a limited investigation."  *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007).  Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial."  *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006).

Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation.  *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527–28.  Even if counsel performed some investigation, that does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances.  *Rompilla*, 545 U.S. at 388–89; *Wiggins*, 539 U.S. at 527, 534.

Federal courts, even under the deferential scheme of the AEDPA, should scrutinize claims of strategy in light of a close reading of the record and a state court finding of strategic purpose for

an omission should be disregarded if it cannot withstand such scrutiny.  *Wiggins*, 539 U.S. at 526–27.

The duty to investigate and prepare for the punishment phase also includes rebutting the prosecution's case in aggravation.  Counsel must, at a minimum, secure the information in possession of law enforcement.  *Rompilla*, 545 U.S. at 385-87.

Further, under the circumstances of this case, counsel had an obligation to secure the assistance of experts in a capital trial.  1989 ABA Guideline 11.4.1 ("Counsel should secure the assistance of experts where it is necessary or appropriate for . . . presentation of mitigation"); *see also* Exhibit 38 (David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, Aug. 1986, at 18) ("The use of social workers and psychologists as part of the defense team is a necessity—not a luxury."); *Sears v. Upton*, 130 S.Ct. 3259, 3264 (2010) (holding trial counsel ineffective, in part, for failing to present expert testimony that could have helped jury better understand defendant in a 1993 capital trial because "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive").  Here, that duty was heightened because counsel represented to the trial court that expert assistance was necessary to effectively prepare for the punishment phase, and the trial court *agreed and authorized funding for an expert*.

### 2. Defense counsel's preparation for the punishment phase did not remotely approach the prevailing professional norms.

The first step in assessing counsel's punishment phase investigation is to "conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from

counsel's perspective at the time.'" *Wiggins*, at 511.

Co-counsel John Millin was gravely ill with cancer at the time of Mr. Medina's trial, and passed away soon after Mr. Medina was sentenced to death. Exhibit 40 (Affidavit of Eva Uribe), at ¶ 4; Exhibit 6 (Affidavit of Anthony Luna Medina), at ¶ 11. As various witnesses have stated, Mr. Millin was receiving cancer treatments during Mr. Medina's trial, and was even absent from the trial for hours at a time in order to receive his treatments. Exhibit 5 (Affidavit of Golda Medina), at ¶ 21; Exhibit 6 (Affidavit of Anthony Luna Medina), at ¶ 11.

Despite Mr. Millin's condition, defense counsel Jerry Guerinot placed full responsibility for development of punishment phase evidence on Mr. Millin. Exhibit 7 (First Affidavit of Gerald Guerinot), at ¶ 2. That Mr. Millin did not conduct a social history investigation of Mr. Medina's background cannot be seriously disputed. As described, *supra*, counsel's total preparation for their **one-hour** defense of Mr. Medina's life amounted to:

1.  Filing a motion for a mental health expert on June 19, 1996, ***26 days before trial.***

2.  Asking their guilt-phase investigator—on July 15th, the first day of trial—to find some "character witnesses."

3.  The investigator's one-day, mid-trial meeting with "character witnesses" on July 20, 1996.

The defense team failed to attempt a fraction of the most fundamental tasks outlined in the 1994 State Bar Materials and *Ex parte Gonzales*, *supra*.

Mr. Millin's penalty phase presentation consisted of seven witnesses. Witnesses were rushed to the stand without preparation other than an in-the-courthouse-hallway instruction to say good things about Mr. Medina. Their testimony was brief and largely inconsequential because trial counsel had never interviewed them. Counsel had no idea that these witnesses could relate

compelling mitigating information.

Counsel's preparation did not remotely approach the contemporaneous standard of care, the minute amount of work they did was last-minute and haphazard.  Counsel were demonstrably unprepared for just about every aspect of the punishment phase.

> a. **"I never talked to the attorneys before they put me on the stand"[90]: Trial counsel failed to interview any punishment phase witnesses—even those who testified for the defense; collect any social history documents; interview their client about his background; or take any other steps reasonably necessary to investigate Mr. Medina's social history.**

Mr. Millin was tasked with preparing, presenting, and arguing the punishment phase for the defense.  Exhibit 13 (Second Affidavit of Jerry Guerinot) at 2.  Under the prevailing professional norm, he was required to interview his client about a wide range of social history topics; collect social history records; interview social history witnesses; secure any necessary expert and/or investigative assistance; and, secure and prepare witnesses to testify at trial.  The record confirms that Millin failed to perform any of these duties.

There are no social history records of any kind in trial counsel's files.  Counsel failed to collect *any* of the records described by the 1994 State Bar Materials part of the mandatory initial round of document collection.  And, as the inventory of their work in this case confirms, the investigators also failed to request or collect any social history records.  Exhibit 9 (Fee Statement of John Castillo).

Mr. Millin also failed to conduct any social history interviews, or even make the mandatory inquiries of his client itemized in *Ex parte Gonzales*, *supra*.  Mr. Millin's trial file contains just one

---

[90] Exhibit 40 (Affidavit of Eva Uribe) at 1.

-211-

set of notes related to interviewing his client (the vast majority of his remaining notes consist of his real-time summary of the trial testimony, confirming that Mr. Millin did very little work in this case in advance of trial). Exhibit 17 (Mr. Millin's client interview notes). All of the notes relate to the guilt/innocence phase, it is apparent that Millin asked no social history questions of his client whatsoever or, if he did, he failed to note any of the social history information related to him by his client.

The absence of any notes in Mr. Millin's files regarding social history interviews (or even the names of Mr. Medina's family members) raises an inference that Millin failed to interview anyone. The affidavits of numerous witnesses confirm this failure. Mr. Medina's father "did not know Anthony had a second attorney until [he] met Jack Millin at Anthony's trial." *See* Exhibit 6 (Affidavit of Anthony Luna Medina) at 1. Nor did Mr. Millin interview or prepare Mr. Medina's mother before she testified:

> I testified at the punishment phase of Anthony's trial. I did not know there was a possibility I would testify until the day I testified.
>
> * * * *
>
> When I got to court, I spoke to Mr. Millin for about 5-10 minutes. Mr. Millin told me to be honest and to not feel bad if I got emotional, but to try to keep my composure. Mr. Millin also told me not to be hateful when the prosecutor cross-examined me. Mr. Millin did not tell me what questions he was going to ask or how to handle the cross-examination.
>
> Prior to Anthony's trial, I did not meet Anthony's attorneys. The investigators working with Anthony's attorneys never asked me questions about our family or Anthony's growing up years. I did not volunteer the information because I did not know it was important for Anthony's case.

Exhibit 5 (Affidavit of Golda Medina).

David Castro, described his similar experience as a defense witness:

> Tony's attorneys did not interview me before I testified. All they told me was that

-212-

> I would be asked questions about Tony's life.  They did not tell me what questions they were going to ask me or how to deal with the prosecutor's cross-examination.

> When I was on the stand, I could only answer questions the attorneys asked me.  It didn't take more than five minutes for Tony's attorneys to ask me all the questions they had . . . .  I was not able to tell the jury everything I knew . . . I felt the attorneys did not know what to ask me since they had not talked to me before I took the stand.

Exhibit 41 (Affidavit of David Castro), at ¶¶ 5-6.  Eva Uribe had the same experience:

> I testified at the punishment portion of Tony's trial.  The day I testified, a woman called me and told me to get to the courthouse immediately.  When I arrived at the courthouse, I was told I would be a character witness and that they would ask me a few questions, but that's really about it.

> \* \* \* \*

> I was never told what the prosecutors might ask.  I only talked to that woman for maybe five minutes.  I never talked to the attorneys before they put me on the stand.

> \* \* \* \*

> Because nobody had talked to me about my testimony, I felt like I had to say only good things about Tony and his family.  Nobody explained to me that it would be important for the jury to understand who Tony was and where he came from.

Exhibit 40 (Affidavit of Eva Uribe), at ¶¶ 7-8.  Sherry Grein's testimony was purely adventitious, she just happened to answer the phone when the investigator called in search of Mr. Medina's mother:

> I didn't know I was going to testify until the day I was called.  I was at Golda's house trying to comfort her because Tony had already been convicted.  Someone called the house to try to get Golda to testify.  Golda was devastated and didn't think she could do it.

> I was asked to come to the courthouse.  When I arrived, I talked with someone in the hall for about five minutes.  They told me to say what I could about Tony and the good things he did.  I never mentioned any of the bad stuff because Tony's attorney never asked me.  I didn't think Tony's attorney wanted the bad stuff to come out.

Exhibit 42 (Affidavit of Sherry Grein) at 1.  Mr. Medina's great-great-uncle, Verlan Pegues, was

plucked out of the audience and put on the stand without any preparation:

> Tony's attorneys never talked to me until the day I testified, even though I was in the courtroom almost every day.  On the day of the punishment phase, Jack Millin came up to me and told me he had seen me in the courtroom sitting with Tony's family.  He asked me if I would be willing to testify.
>
> * * * *
>
> I was nervous about testifying because Mr. Millin never told me what I would be testifying about.  He never spoke to me about my testimony before putting me on the stand.  Had Tony's attorneys contacted me before the trial, I would have gladly met with them.

Exhibit 43 (Affidavit of Verlan Pegues) at 1-2.[91]

Unsurprisingly, the testimony of these witnesses—with whom defense counsel had never spoken—was of limited use and, in some cases, even harmful to the defense.

Counsel's last-minute hunt for witnesses cannot pass for a social history investigation and "falls well outside the reasonable standard of practice of a capital attorney."  Exhibit 16 (Affidavit of Clive Stafford Smith), at ¶ 30.  After reviewing affidavits in this case, Mr. Stafford Smith concluded:

> This is very disturbing.  It is totally unfair to put a witness on the stand in any criminal case, let alone at the penalty phase of a capital case, without explaining what the procedure is, and the boundaries of the witness' permissible testimony.  Counsel should not tell the witness what to say (other than to admonish him or her to tell the truth), but counsel should always learn what the witness has to say, in order to ask the right questions, and facilitate a (generally nervous) witness giving the most complete testimony possible.  If counsel fails to do this, it is highly improbable that the witness will provide the kind of humanizing stories that will save the client's life.
>
> It is impossible to adequately prepare and present the type of punishment phase case necessary in a capital trial without a detailed and prolonged investigation into

---

[91] The only other witness for the defense was Mr. Medina's grandfather, Antonio Medina, whose testimony spanned just four pages of the record.  19 RR 2487–90.  There is no indication in Millin's examination of the elder Mr. Medina that the two had spoken beforehand; the witness was asked the same trite questions asked of the other defense witnesses.  *See infra*.

possible mitigation.

*Id*. at ¶¶ 28-30.

Additionally, numerous other people were willing and available to testify on Mr. Medina's behalf, but were never contacted.  *See, e.g.*, Exhibit 44 (Affidavit of Kim de la Cruz), at ¶ 9; Exhibit 45 (Affidavit of Samuel Gallegos), at ¶ 13; Exhibit 46 (Affidavit of Lillian Crowson), at ¶ 17; Exhibit 47 (Affidavit of Ruben Gallegos), at ¶ 12; Exhibit 48 (Affidavit of Tiffany Kimberlin), at ¶ 11; Exhibit 49 (Affidavit of Elaine Butler), at ¶ 11; Exhibit 50 (Affidavit of Catherine Uribe), at ¶ 12.  One potential witness from Bellaire Christian Academy, where Tony attended school, was briefly contacted by investigators who were interested in speaking with her children (who were Mr. Medina's classmates).  Although she and her children were willing to testify for Mr. Medina, they were never contacted again.  Exhibit 51 (Affidavit of Tamara Crosby), at ¶¶ 6-8.

The standard of care called for a thorough intergenerational life history, extensive document collection and interviews with "all first and second degree relatives, friends, [and] peers."  Exhibit 37 (1994 State Bar Materials) at 17.  As the CCA made clear, Texas practice required counsel to make basic social history inquiries even if counsel had no indication—or "never dreamed"—those inquiries would be fruitful.  Moreover, the *Gonzales* court explicitly rejected the trial court's conclusion that counsel were excused from investigating relevant mitigating evidence when the client himself failed to call it to counsel's attention.  After the 1991 addition of the mitigation special issue, it was "necessary [for capital defense counsel] to consider mitigating evidence in preparation for the trial of a capital case.  Such evidence could include the circumstances of the defendant's childhood and his physical and mental health."  *Gonzales*, S.W.3d at 397.  As in *Gonzales*, Mr. Millin "fell below" this "objective standard of reasonable performance for defense counsel in a

capital case." *Id.*

> **b.      Asking the guilt-phase investigator for "character witnesses" on the first day of trial did not discharge trial counsel's duty to conduct the thorough social history investigation required by the prevailing professional norms.**

Nor was the duty to investigate Mr. Medina's social history satisfied by the investigators. By July 15, 1996, the first day of trial, the investigators had done nothing in preparation for the punishment phase. Exhibit 9 (Fee Statement of John Castillo). On that date, the investigator went to court and the "attorneys asked for character witnesses." *Id.* The next entry in the investigators' report is dated July 20, 1996: "Obtained character witnesses and interviews [of] several character witnesses." *Id.* This is the whole of the social history investigation.

The defense investigators' activity report reflects a total of twelve entries, two of which are related to court appearances. Of the ten out-of-court entries, only the July 20th investigation is related to the punishment phase. *Id.* The investigators spent a total of 30 hours on the whole case—for both phases of trial. The vast majority of the investigators' 30 hours was devoted to the guilt/innocence phase at trial. Based on their own contemporaneously documented time records ***it is unlikely that the investigators spent more than 5 hours preparing for the punishment phase***, if that. The record confirms this because, as described *supra*, most defense witnesses never met anyone from the defense team until the day they took the witness stand.

As in the guilt/innocence phase, trial counsel failed to prepare a case for the defense. Rather, the witnesses who testified for the defense were mostly recruited by Mr. Medina's family members, and Mr. Medina's father drove them to the courthouse. Exhibit 6 (Affidavit of Anthony Luna Medina), at ¶ 7; Exhibit 41 (Affidavit of David Castro), at ¶ 4.

      **c.**     **"Now, I'm not any sociologist or anything like that"[92]: defense counsel inexplicably declined the services of a mental health expert even though they represented to the court that the expert services were *necessary* to providing effective representation in Mr. Medina's sentencing phase.**

As noted above, 26 days before trial, Mr. Millin filed a motion for a court-funded mental health expert to assist the defense.  Counsel represented to the court that it was "*imperative*" to have an "independent, qualified expert . . . to examine the Defendant and ***consult with his defense counsel as to the appropriate legal strategy*** to be taken on his behalf," and that "[w]ithout such independent and privileged expert consultation advice, and possible expert testimony, the Defendant ***cannot receive a fair and impartial trial as required by the Sixth Amendment*** of the United States Constitution . . . ."  1 RR 24-25 (emphasis added).  The court granted the motion before trial, specifying its appointment of Dr. Fred Fason.  *Id*. at 27.  However, the ailing Mr. Millin never contacted Dr. Fason to secure the evaluation approved by the court, *see* Exhibit 52 (Letter from Nina M. Campbell), and never obtained a mental health evaluation from any other expert.

Counsel argued in the motion that "[t]he Defendant is a man of both limited intelligence and education."  1 CR 24.  Assuming that defense counsel were candid with the trial court, there could be no strategic reason for abandoning this line of investigation.  The Supreme Court has repeatedly held that limited intellectual capacity is inherently mitigating:

> There is ***no question*** that a jury might well have considered petitioner's IQ scores and history of ***participation in special-education classes*** as a reason to impose a sentence more lenient than death.  Indeed, ***we have held that a defendant's IQ score of 79, a score slightly higher than petitioner's, constitutes relevant mitigation evidence***.  *See Wiggins v. Smith*, 539 U.S. 510, 535, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *cf. Tennard*, *supra*, at 288, 124 S.Ct., at 2572-2573.

---

[92] 20 RR 2551 (Mr. Millin's punishment phase closing argument to the jury).

*Smith v. Texas*, 543 U.S. 37, 44 (2004) (emphasis added).

As their closing arguments reveal, defense counsel clearly appreciated the relevance of, and need for, mental health evidence at the punishment phase of trial. Counsel raised Mr. Medina's childhood stuttering problem but, in the absence of expert testimony, struggled to meaningfully bring it to bear on Mr. Medina's moral culpability:

> Now, ***I'm not any sociologist or anything like that and I'm not trying to say that it means anything. But who knows that that might not have caused such a psychological scar that it was healed only by his becoming, you know, respected as a gang member?*** I don't know. That might be something else you can consider, because we never know—we never know when we get down here to court we never know why people do anything, truly. ***And who knows but something back in the past that nobody knows, that nobody testified to, put Tony on the road to where he ended up basically?*** And who knows but it might be something that we might consider small like that.

20 RR 2551-52 (Mr. Millin's closing argument) (emphasis added). In order to demonstrate any such "psychological scar," counsel needed the services of a mental health expert.

Given counsel's pre-trial motion and his closing argument to the jury alluding to the potential mitigating value of such evidence, it is clear that they had no strategic reason for failing to arrange for the mental health evaluation by Dr. Fason.[93] Rather, counsel's failure to avail themselves of the

---

[93] Mr. Guerinot signed an affidavit for the State implying that the defense refrained from seeking the advice of an expert because Mr. Medina's stuttering was remote in time and had been cured. Exhibit 13 (Second Affidavit of Jerry Guerinot) at 3. However, as Guerinot also averred, it was Mr. Millin who "prepared the punishment phase of the case, presented the punishment evidence, and argued the punishment case." *Id*. at 1-2. The record is clear that Mr. Millin attempted to argue that Mr. Medina's stuttering was a basis for answering the mitigation special issue in the affirmative. Given Mr. Millin's indisputable trial strategy, there can be no strategic reason for failing to pursue the available expert assistance necessary to support the argument.

This Court, even under the deferential scheme of the AEDPA, must scrutinize this claim of strategy in light of a close reading of the record. A state court finding of strategic purpose for an omission should be disregarded if it cannot withstand such scrutiny. *Wiggins*, 539 U.S. at 526–27. Guerinot's *post hoc* rationalization for the failure to hire a mental health expert is evidence of

-218-

expert services they requested and the court approved is evidence of their deficient performance. As described, *infra*, the failure to obtain a mental health evaluation was also highly prejudicial. Serious traumas during Mr. Medina's childhood—including his stuttering problem—**did** lead to problems later in his life.  Mr. Medina was evaluated by a psychological expert in state post-conviction proceedings, and her evaluation, discussed below, yielded compelling mitigating evidence that Mr. Medina's jury never heard.  Though trial counsel seemed to suspect this, he could present no evidence to support his suspicion because he had conducted no investigation.  He therefore could do no more than tell the jury that he did not know whether his client had any psychological scars, and to muse, "[W]ho knows but something back in the past that nobody knows, that nobody testified to, put Tony on the road to where he ended up?"  20 RR 2551-52.

Counsel's failure to pursue this line of investigation was objectively unreasonable.

> **d.    Counsel failed to follow up on numerous red flags signaling the need for investigation.**

Even though trial counsel failed to commence, much less complete, a social history investigation, they nonetheless confronted numerous red flags signaling the need for investigation. Consistent with their pattern of inaction, counsel failed to investigate these obvious leads as well.

One aspect of Mr. Medina's background of which counsel were certainly aware is that Mr. Medina lived in a violent part of town subject to the pervasive presence and influence of gangs.  Mr. Medina was obviously not born into a gang, but counsel never explored how Mr. Medina was drawn into this subculture.  Because this was a large part of Mr. Medina's life, a professionally reasonable

---

Guerinot "doing what [he] could to assist the State in defeating [his] former client's habeas petition, even if it meant being less than candid," *Richards*, 566 F.3d at 560, and should thus be disregarded.

social history would have included investigating the impact of the gangs and violence on Mr. Medina's life.

Instead of seeing an obvious red flag for punishment phase investigation, Mr. Guerinot saw only criminality.  Unfortunately, like the prosecution, he promoted this perspective on gangs to the jury:

> Have you ever heard such goings on in your entire life?  Tagging and crimeing and clicking in and out and flashing these goofy looking signs at everybody and acting like you're the baddest people on the street.  My God, I'm just shocked at this.  You know, I've been doing this for 25 years.  I spent six year sitting where [the prosecutor] sits, and I've never heard of stuff like this.  This is shocking.

18 RR 2297 (Guerinot's guilt/innocence phase closing argument to the jury).  Instead of seeking to understand this incredibly significant aspect of his client's life, Guerinot actually encouraged the jury to see Mr. Medina's peers—and thus Mr. Medina himself—as "[p]eople  who's moral standard is as close to zero as is humanly possible and still continue to suck air on this earth.  People who have not one moral fiber in them."  18 RR 2290.

As demonstrated below, counsel's unreasonable failure to pursue this line of investigation deprived the defense of compelling mitigating information.

Likewise, Mr. Medina's stuttering was sufficiently significant that counsel raised it in his closing argument about the mitigation special issue, it too was a salient lead that warranted further investigation.

Similarly, as described below, Mr. Millin apparently believed that Mr Medina had a good disciplinary record while incarcerated, but he failed to follow this lead by securing Mr. Medina's jail records or witnesses who would support this line of argument.

Counsel also believed their client to be of low intelligence, according to their motion for

-220-

expert funding, but they conducted no investigation into Mr. Medina's cognitive functioning.

"[L]ike the counsel in *Wiggins*, [Mr. Medina's counsel] ignored pertinent avenues for investigation of which he should have been aware." *Porter*, at 453.  Thus, as in *Wiggins*, the state court assumption that the investigation was adequate "reflected an unreasonable application of *Strickland*" pursuant to 28 U.S.C. § 2254(d)(1)

### e. Counsel painted an unhelpful false picture of their client's background.

Mr. Medina's family had an outward appearance of a large, close-knit, functional family. In fact, the evidence presented by his attorneys at the punishment phase reinforced this impression, as witness after witness called by the defense testified that the family was close and spent all of the holidays together. *See supra*.  However, counsel's perfunctory questioning, uninformed by pre-trial interviews of the witnesses, failed to elicit the whole story about Mr. Medina's family life.  Mr. Medina was raised in a dysfunctional and chaotic household, saturated with substance abuse and domestic violence.  His parents were emotionally absent.  As demonstrated below, the same witnesses who took the stand, as well as others who were available and willing to testify had they been asked, would have testified to these matters and provided a fuller portrait of Mr. Medina's young life.  However, Mr. Medina's attorneys failed to interview them before putting them on the stand.

Instead, Mr. Millin presented the jury with a tepid and sterile account of a young man who was respectful of elders, courteous, helpful to his relatives, attended family events, and loved small children. *See supra*.  Each defense witness recited the same factors when asked the same superficial questions about Mr. Medina's background.  Given what the jury had heard at the guilt-innocence

phase of the trial about a reckless and violent gang member, and the State's evidence at punishment of Mr. Medina's allegedly escalating violence, the defense's perfunctory evidence surely struck the jurors as hollow, and as radically disconnected from all other evidence they had heard.  It is, therefore, no wonder that the jury rejected the defense's request for a life sentence.

According to Guerinot's post hoc rationalization for their failure to investigate, "[t]he defense strategy was to present a picture of the defendant's background and home life to show that he as not a future danger."  Exhibit 13 (Second Affidavit of Jerry Guerinot) at 3.  However, contriving a strategy without first investigating, and then invoking that strategy as a reason not to investigate, is unreasonable.  Termination of mitigation investigation is only appropriate in the context of an **informed** decision, **after** a thorough investigation.  *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527–28.  Counsel could not make a strategic decision to not pursue or present evidence of Mr. Medina's violent and chaotic home life, of which they were unaware, based on uninformed and mistaken beliefs that resulted from inadequate preparation:

> This point is plain in *Williams:* We rejected any suggestion that a decision to focus on one potentially reasonable trial strategy—in that case, petitioner's voluntary confession—was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."  529 U.S., at 396, 120 S.Ct. 1495.  A "tactical decision" is a precursor to concluding that counsel has developed a "reasonable" mitigation theory in a particular case.

*Sears*, at 3265.  Here, trial counsel's misguided beliefs about Mr. Medina's allegedly comfortable home life were a **product** of their failure to conduct a professionally reasonable mitigation investigation, not an excuse for it.

Like the trial lawyer in *Ex parte Gonzales*, *supra*, Guerinot protested that "no family member told the defense that the father drank or that the mother smoked marijuana or that the parents

fought."  Exhibit 13 (Second Affidavit of Jerry Guerinot) at 3.  Like the trial lawyer in *Ex parte Gonzales*, counsel failed to inquire about this and many other areas of the client's social history.  More fundamentally, counsel failed to interview witnesses—and thus learn about Mr. Medina's background—before putting them on the stand.  As discussed below, witnesses would have been ready and willing to provide information about Mr. Medina's family had the defense merely asked for it.  As *Gonzales* demonstrates, the prevailing standard of care required that Guerinot inquire into Mr. Medina's family background.  His failure to do so was objectively unreasonable.

f.  <b>Counsel failed to investigate and document their own punishment phase themes.</b>

The State presented Mr. Medina's alleged prior bad acts as evidence of future dangerousness.  In his closing argument, Mr. Millin stated that the evidence introduced by the State was of bad acts "out on the street," but Mr. Medina would now be in confinement and unable to live his free-world lifestyle.  The State, Mr. Millin pointed out, had presented no evidence that Mr. Medina had been dangerous while in custody.  20 RR 2541–42.  Counsel then attempted to argue that Mr. Medina had a clean record in custody—a powerful argument against his future dangerousness in prison.  However, because defense counsel had failed to obtain and introduce into evidence the available, relevant records, the court sustained the prosecution's objection to this compelling argument.  20 RR 2542.

The prosecution subsequently argued that life imprisonment was inappropriate because Mr. Medina would pose a continuing threat to ". . . the prison, the jail, the doctors, the nurses, other prisoners, the librarian, anybody . . . ."  20 RR 2556–57.  However, at the time of Mr. Medina's trial, Harris County Jail records would have rebutted—or even prevented—the State's argument for an

-223-

affirmative answer to the future dangerousness special issue.

In state post-conviction proceedings, Mr. Guerinot signed off on the prosecution's *post hoc* rationalization of the defense's failure to investigate and collect evidence about Mr. Medina's conduct in jail.  Mr. Guerinot alleged that the defense did not "consider that jail records saying the defendant had no discipline records in jail to be sufficiently mitigating in the circumstances." Exhibit 13 (Second Affidavit of Jerry Guerinot) at 3.  This assertion is clearly incredible.

Jack Millin—not Mr. Guerinot—was the lawyer in charge of the punishment phase defense, and he delivered the entire defense closing argument.  Mr. Millin thought good behavior in jail "sufficiently mitigating" to devote approximately 20% of the defense closing argument trying to argue—even without having submitted evidence to back it up—that Mr. Medina was a model prisoner and thus posed no future danger in prison.  20 RR 2540-44; 2548.  Counsel could not have made a reasoned strategic decision to omit the evidence necessary to support his own arguments.[94]

---

[94] Mr. Guerinot's assertion that he did not consider this type of evidence mitigating is all the more incredible in light of his defense in Johnny Ray Johnson's case, the case Mr. Guerinot and Mr. Millin tried just two months before Mr. Medina's:

> The record further shows that [Guerinot and Millin] introduced Johnson's disciplinary records from his three prior incarcerations in the Texas Department of Criminal Justice, and argued that these records showed his lack of violent behavior while incarcerated and thus indicated that he would not pose a danger to society if sentenced to life imprisonment.
>
> In closing argument, defense counsel urged the jury to consider the fact that, if he were sentenced to life imprisonment, Johnson would have to serve forty years in prison before he would even be eligible for parole, and argued that Johnson's prison disciplinary records, introduced as exhibits by the defense, demonstrated his non-violent behavior while incarcerated.

*Johnson v. Quarterman*, 483 F.3d 278, 282 (5th Cir. 2007).  Arguing lack of future dangerousness was a far steeper hill to climb in *Johnson* than here.  "The jury convicted Johnson for [Leah] Smith's brutal murder.  Then at the punishment phase, the jury heard the State's evidence of Johnson's

Ultimately, what Mr. Guerinot thought is not the dispositive inquiry.  The Supreme Court has admonished that courts should not focus on trial counsel's post-trial statements regarding whether they would have used the mitigating evidence adduced in post-conviction proceedings, the relevant inquiry is whether a ***competent attorney*** would have introduced it.  *Wiggins*, 539 U.S. at 535.  Here trial counsel failed to even obtain the evidence, so any alleged "decision" about whether to introduce it was wholly uninformed.  Had Mr. Millin obtained the relevant evidence, it would have supported his jury argument.

Mr. Medina was incarcerated in the Harris County Jail from January 5, 1996, until his July 1996 capital murder trial.  Prior to the trial, the Harris County Sheriff's Department Classification Division completed two Inmate Needs Assessments on Anthony Medina.  *See* Exhibits 53 & 54.  The first Assessment took place on January 7, 1996.  *See* Exhibit 53.  At that time, the Classification Deputy did not find the "Violent/Aggressive" Special Management Concern applicable to Anthony Medina.  In addition, Mr. Medina was not found to be a "Known Management Problem" or an "Escape Risk."  The Assessment also noted Mr. Medina did not have an institutional disciplinary history.  Harris County Jail officials documented that Mr. Medina was ***not*** in need of a "Maximum," "High," or even "Medium" Level of Supervision."   Mr. Medina was classified as a Security Level 4, "Moderate Level of Supervision."  Mr. Medina was initially placed in administrative segregation upon arrival but did not remain there for even eight weeks before jail officials deemed his transfer to the general population appropriate.  Exhibit 55.  Harris County jail officials transferred Mr. Medina from administrative segregation to the general population on February 28, 1996.  *See* Exhibit

_____

extensive criminal history, beginning in 1975, including numerous other brutal sexual assaults and murders."  *Id*. at 280; *see also id*. at 281 ("The evidence of [Johnson's] brutal rapes and murders seemed endless.").

56.

On April 23, 1996, Mr. Medina received a second Inmate Needs Assessment. *See* Exhibit 54. Once again, jail officials did not classify Mr. Medina as "Violent/Aggressive," or as an "Escape Risk." *Id.* Like the first assessment, the classification deputy did not find Mr. Medina to be a "Known Management Problem." *Id.* After several months in jail, the initial assessment that Mr. Medina was not in need of a maximum, high, or even medium level of supervision remained unchanged and Mr. Medina was again classified as a Security Level 4-"Moderate Level of Supervision." *Id.* Mr. Medina remained in the general population of the Harris County jail. Mr. Medina's trial attorneys did not present this evidence to rebut the State's arguments of future danger, despite the fact such evidence was readily available evidence of his lack of dangerousness in prison.

This evidence was critical because Mr. Medina's sentence depended on the jury's answer to just two fact questions, and one was whether Mr. Medina posed a future danger. Counsel's failure to secure and present this evidence to support his closing argument was not strategy but an omission related to a critical question before the jury.

Mr. Millin was similarly unprepared for his own argument about recidivism. In his closing argument, Mr. Millin attempted to rebut the prosecution's future dangerousness argument by asserting that people convicted of murder have lower recidivism rates than those convicted of property crimes. However, the State objected that the defense had failed to introduce any evidence of this and the court sustained the objection. 20 RR 2545. An argument was therefore lost due wholly to counsel's lack of preparation.

There are studies supporting trial counsel's argument, and these studies were available at the time of Mr. Medina's trial. *See, e.g.,* James W. Marquart & Jonathan R. Sorensen, *A National Study*

-226-

*of the* Furman-*Commuted Inmates: Assessing the Threat to Society from Capital Offenders*, 23 LOY. L.A. L. REV. 5, 24-25 (1989) (citing H. Bedau, *Recidivism, Parole, and Deterrence*, in THE DEATH PENALTY IN AMERICA 175-80 (3d ed. 1982)). If counsel had researched and introduced evidence to support his point, the State would not have successfully kept this evidence from Mr. Medina's jury. The lack of such evidence was prejudicial, given jurors' common misconceptions about parole and the subsequent violence of those convicted of homicide. W.J. Bowers & B.D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 TEX. L.R. 605 (1999).

Though Mr. Millin identified some promising defense themes, he never investigated and supported them with readily available evidence and was thus unable to meaningfully argue them to the jury.

### g.    Counsel were insufficiently versed in the relevant law.

#### i.    Failure to object to court's response to jury's question about alcohol

In his punishment phase closing argument, Mr. Millin urged jurors to give mitigating weight to the evidence of voluntary intoxication. *See* 20 RR 2549. Counsel stated:

> ***And you can . . . consider that same intoxication with respect to mitigation on the second special issue***. Had he not, you know, drunk 18 beers—and the State agrees with everything that Tony talked about. They would agree that he had 18 beers plus a couple of mixed drinks and smoked some marijuana and that sort of thing . . . ***Special Issue No. 2 asks you to take his intoxication at the time of the offense that you-all have convicted him of in mitigation of punishment . . . . You can consider that in mitigation***.

*Id*. (emphasis added). The jury, however, was confused about whether it could give effect to such evidence when assessing punishment. During punishment-phase deliberations, the jury submitted

-227-

the following written question to the court:  ". . . was it stated in the courtroom during the trial, 'Alcohol is **not** a legal defense' and is that a true statement according to the law?"  *See* 1 CR 138 (emphasis added).  The trial court responded (in writing), "I am not permitted to answer your question.  You are referred to the charge for the law."  *See id.* (written response of the trial court to jury's question regarding voluntary intoxication).  However, the charge failed to provide any guidance to the jury on this matter.  At the close of the sentencing phase, the trial court had only submitted the two statutory issues required by Article 37.071 of the Texas Code of Criminal Procedure along with a general instruction to consider all evidence presented to the jury.  *See* 1 CR 142 (jury charge at conclusion of the penalty phase).

Defense counsel failed to lodge any objection to the trial court's improper and inadequate response to the jury's question.  Trial counsel had argued that Mr. Medina's intoxication supported an affirmative answer to the mitigation special issue.  Mr. Medina's jury should have been permitted to give full mitigating effect to this evidence.  Allowing the jury to labor under the false impression that intoxication could not be considered nullified Mr. Millin's closing argument.  This was a very close case, and there were clearly jurors who wanted to consider Mr. Medina's intoxication when answering the mitigation special issue.

As argued below, the instruction submitted to the jury at the punishment phase failed to provide an adequate vehicle through which the jury could give full mitigating potential to the evidence of voluntary intoxication.  *See infra* (citing *Boyde v. California*, 494 U.S. 370, 380 (1990)(standard for challenged jury instruction is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence").  Counsel's failure to object to it was deficient performance under *Strickland*.

-228-

### ii.    Trial counsel failed to make specific objections to the jury charge which inaccurately stated the law.

The jury charge at the punishment phase was erroneous because it incorporated part of the non-capital charge and specifically discussed parole and "good time." *See infra*. Mr. Medina submits that trial counsel preserved error because he objected to the court's charge and requested that the standard jury charge be delivered. 20 RR 2524. In the alternative, trial counsel's performance was deficient because counsel failed to specifically object to a charge which inaccurately stated the law and implied that Mr. Medina would serve less time in prison than he actually would if sentenced to a life term.

There could be no strategic reason for trial counsel's failure to specifically preserve error in the charge because the record indicates that he clearly did not want the charge as it was given. *See Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999) (the court should not "condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all."). The prejudice resulting from trial counsel's failure to object is measured by the merits of the claims of constitutional violation briefed *infra*.

In sum, when assessing the whole of counsel's punishment phase performance, the files of defense counsel and their investigators confirm what is readily apparent from the record: any defense preparation for the punishment phase was a mere afterthought. There was no pretrial investigation. Mr. Millin's notes from his client interview relate exclusively to the guilt/innocence phase, and he was the lawyer responsible for preparing, presenting, and arguing the punishment phase defense. Defense counsel ignored numerous obvious leads that reasonable counsel would have followed.

That counsel was aware of some leads is reflected by his attempt to argue the leads in closing arguments instead of investigating and introducing readily available evidence. The few witnesses called by the defense were contacted only on the day of their testimony and not interviewed or prepared before being called to the stand. Mr. Millin's blind and cursory direct examinations failed to elicit meaningful information from witnesses who, if asked, could have provided some of the compelling mitigating evidence described below. Measured against the prevailing standard of care, counsel's performance was objectively unreasonable.

### C. But for counsel's deficient performance, there is a reasonable probability that one juror would have answered one of the special issues differently.

Because counsel's preparation and presentation was so inadequate, they were left with little to say about why the jury should answer the mitigation special issue "yes." By failing to conduct a social history investigation, Mr. Medina's counsel effectively conceded this issue to the State, and with it the most fundamental Eighth Amendment guarantee to emerge from the Supreme Court's post-*Furman*[95] capital punishment jurisprudence: "our cases ha[ve] firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) (emphasis added). Trial counsel's deficient performance thwarted this critical function.

Several principles guide this Court's prejudice analysis of Mr. Medina's punishment-phase ineffectiveness claim. First, when determining whether counsel's errors resulted in the required

---

[95] *Furman v. Georgia*, 408 U.S. 238 (1972).

prejudice, a court must presume that the jury acted according to law. *Strickland*, 466 U.S. at 694. In other words, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id*. at 695. Therefore, not only does one presume that the decisionmaker followed the law, the law itself, *i.e.*, "the standards that govern the [sentencing] decision," must provide the context for determining whether a probability sufficient to undermine confidence in the outcome exists.

The prejudice inquiry is therefore a case-specific assessment of the effect trial counsel's deficient performance had on the reliability of a particular proceeding. In many death penalty states, sentencing laws require that the sentence in a capital case be determined by weighing aggravating factors against mitigating factors. If the jury determines that the mitigating factors outweigh the aggravating factors, the jury is instructed to return a verdict of life. If, however, the jury determines that the aggravating factors outweigh the mitigating factors, then the jury is instructed to return a verdict of death.[96] In these cases, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

---

[96] *See, e.g.,* Cal. Penal Code § 190.3 ("the trier of fact . . . shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole"); Fla. Stat. ch. 921.141 (trier of fact must determine "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist"); Md. Code Ann., Criminal Law § 2-303(i)(1) ("If the court or jury finds that one or more of the mitigating circumstances . . . of this section exists, it shall determine by a preponderance of the evidence whether the aggravating circumstances . . . of this section outweigh the mitigating circumstances.").

A court reviewing an ineffective assistance of counsel claim in a Texas death penalty case, however, does not ask this precise question because the Texas capital sentencing statute does not require the jurors to engage in a weighing analysis. Instead, Texas asks jurors to answer two "special issues."[97]  The special issues are fact questions that the jury must answer either "yes" or "no," and the jury's answers determine whether the defendant receives life or death.

The first special issue is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).  The second special issue is "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."[98]  Acts 1991, 72nd Leg., ch. 838, § 1 (1991) (amended 2005).  If the jury answers the first special issue "yes" and the second special issue "no," the trial court must impose a sentence of death. For any other combination of answers—including the inability of the jury to unanimously agree on an answer for any question—the trial court must assess a sentence of life.  Tex. Code Crim. Proc. art. 37.071, § 2(g).

The mitigation question is the most important question in Texas capital cases.  It contains

---

[97] In a minority of cases, the sentencing jury must answer three questions.  The third question asks whether the defendant intended or anticipated loss of life.  The jury is given this third special issue only when the jury was charged in the guilt phase under Texas's law of parties.  *See* Tex. Code Crim. Proc. art. 37.071 2(b)(2).

[98] Texas has since amended the sentencing options in capital cases to death and life without parole, accordingly special issue two now asks whether sufficient mitigating circumstances exist to warrant that a sentence of "life imprisonment without parole rather than a death sentence be imposed."  Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).

-232-

the constitutionally-required mechanism giving jurors broad discretion to consider and give effect to the defendant's proffered mitigating evidence, by asking jurors to answer the bottom-line question whether "sufficient mitigating circumstance[s]" warrant withholding the ultimate punishment for a defendant who they have already determined beyond a reasonable doubt poses a continuing threat to society.

In light of the Texas sentencing scheme, the existence of prejudice turns on whether there is a reasonable probability that, absent counsel's errors, *one juror* would have answered the mitigation *or* future dangerousness special issue differently or not at all. *Wiggins*, 539 U.S. at 537; *Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003) (relevant question is whether totality of evidence "would have affected the sentencing decision of at least one juror"). Prejudice ensues whenever the totality of the mitigating evidence "might well have influenced [a] jur[or]'s appraisal" of the defendant's moral culpability. *Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.

Second, and relatedly, "[m]itigating evidence unrelated to future dangerousness may alter the jury's selection of the death penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams v. Taylor*, 529 U.S. at 398. This is especially true in Texas because the capital sentencing scheme poses the two separate questions to the jury, and a judge may not impose a death sentence unless the jury unanimously answers both in the State's favor. Thus, even if the jury unanimously believes that the defendant will be a future danger to society, it still must answer the mitigation special issue.

Significantly, a Texas jury addresses this mitigation special issue *only* if it first unanimously finds that the defendant will pose a future danger. *See id.* at § 2(d)(2), (e)(1). Thus, in *every case*

-233-

where the mitigation question is in issue, the jury will already have determined unanimously and beyond a reasonable doubt that the defendant poses a continuing threat of future violence. The question of whether the undiscovered mitigation evidence might make the defendant appear even *more* dangerous thus has no practical consequence.

Third, in making the prejudice determination, a court must consider the totality of the evidence before the jury and then assess the effect the errors might have had on any of the fact findings made by the sentencer. As the *Strickland* Court observed:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. ***Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support***. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 695–96 (emphasis added). Thus, a court reviewing how counsel's errors affected the punishment phase of a Texas capital sentencing proceeding must examine the relevant special issue (*i.e.*, the "factual findings") to determine whether and to what extent it may have been affected in light of the evidence before the jury.

This was a ***very close*** case, and thus one "more likely to have been affected by errors than one with overwhelming record support": "[t]here was difficulty reaching a decision during sentencing deliberations. There were disagreements among the jurors and there was lots of cussing in the jury room . . . . I remember several jurors almost physically fighting with each other and other jurors had to step in and separate them." Exhibit 60 (Affidavit of Gregory Wiercioch) at Appendix

-234-

A.  The jury required extended deliberations to reach a verdict at punishment.  The jury retired to deliberate at 10:10 a.m. on July 31, 1996, and deliberated until approximately 7:00 p.m.  On August 1, 1996, the jury resumed deliberations at 8:32 a.m., and reached a verdict at 2:25 p.m.

Given the jury's difficulty in reaching a verdict even in the absence of a meaningful punishment phase defense, there is a reasonable probability that one juror would have changed her vote if presented with the following compelling mitigating evidence.

> **1.    The evidence counsel failed to discover "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury."[99]**

Had counsel conducted an adequate social history investigation, the defense case would have been a far more meaningful exploration of Mr. Medina's background than the lightning-quick parade of witnesses who were asked only trite questions, such as whether Tony was respectful of adults in his family.  Counsel could have explained to the jury the circumstances of Mr. Medina's life that led to his gang involvement and how the trauma from nearly being a child victim of a drive-by shooting left him permanently damaged.  While this information does not excuse the crime, it is what explains it.  In *Rompilla*, 545 U.S. at 393, the Supreme Court found that mitigation evidence

> adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test.  It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability," *Wiggins v. Smith*, 539 U.S., at 538, 123 S.Ct. 2527 (quoting *Williams v. Taylor*, 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, *Strickland*, 466 U.S., at 694, 104 S.Ct. 2052.

*Id*.  The same is true in Mr. Medina's case.

---

[99] *Rompilla*, 545 U.S. at 393.

a.      **Contrary to the false picture presented at trial, Tony Medina was raised in a dysfunctional home permeated by substance abuse and domestic violence.**

i.      **The jury was incorrectly led to believe that "based on [Mr. Medina's] growing up there's really nothing at all to explain or excuse in any way the behavior that is the subject of this case."**[100]

As described above, Mr. Medina's defense counsel allegedly made a "strategic decision" to paint an inaccurate picture of Mr. Medina's home life in an effort to persuade the jury to answer the future dangerousness special issue in the negative.  As Mr. Guerinot candidly conceded in the state court, the defense was unaware of the substance abuse and domestic violence in the Medina household.  Exhibit 13 (Second Affidavit of Jerry Guerinot) at 3.

In light of defense counsel's confessed ignorance of their client's social history, and their failure to interview or prepare their own punishment phase witnesses, the prosecution was able to manipulate the defense witnesses' testimony to support a negative answer to the mitigation special issue.

For example, when Mr. Medina's Aunt, Sherry Grein, testified for the defense, her direct examination was two-pages long, 19 RR 2456–58, and consisted of banal questions such as "what was [Tony's] attitude towards adults and the other members of his family?"  19 RR 2457.

The prosecutor, whose cross-examination was twice as long as the direct, 19 RR 2459–63, was able to use Ms. Grein's testimony to counter any argument in mitigation of sentencing, eliciting testimony that she was aware of no sexual abuse against Mr. Medina, of no mental retardation or learning disability other than his speech impairment, of no childhood beatings, and of no drug

---

[100] 19 RR 2460 (prosecutor's cross-examination of Mr. Medina's aunt, Sherry Grein).

addiction.  20 RR 2459-60.

> Q.     Would you say based on his growing up ***there's really nothing at all to explain or excuse in any way the behavior that is the subject of this case?***  Would you agree with that?

> A.      ***Yes, sir.***

*Id*. at 2460 (emphasis added).  The defense declined the opportunity to re-examine Ms. Grein.  As

Ms. Grein has later explained,

> ***The prosecutor tried to make it seem like Tony's family was perfect but because of what Tony's lawyers had told me earlier I didn't feel like I should volunteer information that would make the jury think poorly of Tony's family.***  If Tony's attorneys had let me know that was important for his case, I would have told the jury about it.

Exhibit 42 (Affidavit of Sherry Grein) (emphasis added), at ¶¶ 4-7.

Similarly, when Mr. Medina's aunt, Eva Uribe, was on the stand, the prosecutor asked her,

"[i]s it safe to say that [Mr. Medina] ***had all the advantages that a person could have growing up***

***in Houston, a close family who cared about him and took care of him***?," and the witness answered,

"Yes."  *Id*. at 2485 (emphasis added).  Like Ms. Grein, she had valuable information about Mr.

Medina's background but its importance had not been explained to her:

> Because nobody had talked to me about my testimony, ***I felt like I had to say only good things about Tony and his family.  Nobody explained to me that it would be important for the jury to understand who Tony was and where he came from.***

Exhibit 40 (Affidavit of Eva Uribe), at ¶¶ 7-8.  After the cross-examination, the defense declined the

opportunity to re-examine Ms. Uribe, utterly failing to challenge the "perfect family" image

presented by the State.

Thus, Mr. Medina's jury was led to believe that he was raised with all of the advantages and

that there was nothing in his background to explain his behavior.

ii.   **Mr. Medina's childhood home was blighted by substance abuse, domestic violence, and absence of any support system.**

The sanitized family portrait painted by trial counsel and the prosecution alike ignored and/or denied the negative factors in Mr. Medina's background, thus depriving him of compelling evidence that mitigated in favor of a life sentence.   In reality, his childhood was traumatic, chaotic and stressful.

Had counsel conducted the intergenerational family history investigation required by 1994 State Bar Materials, they would have learned about a variety of risk factors in his background.   For example,

Anthony's extended family has a pattern of intrafamilial sexual abuse.

Anthony's mother was sexually abused by her stepfather, Jerry Dial[,] from the ages of 8 to 18.   Catherine Uribe, Anthony's cousin, daughter of maternal aunt, Eva Uribe, was sexually molested by a paternal cousin and two years later by Anthony's sister, Christy.   Also, Uncle Verlan . . . a family member with whom Anthony stayed several weeks at the of 11 years, was accused of sexually assaulting a child.

Exhibit 57 (Affidavit of Dr. Paula Lundberg-Love) at 3.   According to Dr. Lundberg-Love, psychological testing reveals a

distinct possibility that [Tony] may have been sexually abused during childhood/adolescence even though he has not reported this to various interviewers.   Males tend to be more reluctant than females to report such events for an array of reasons.   It also possible that he does not define some sexual events that he experienced as a 13 year old with females significantly older than he was as abusive.   Or he may not recall some events.

Exhibit 57 (Affidavit of Dr. Paula Lundberg-Love) at 7.

A family history would have also revealed that "[i]n the extended family there are patterns of attention deficit disorder (ADD) and anger management problems."   *Id*. at 3.   One of Tony's paternal uncles "was diagnosed with ADD during childhood and has struggled to stay out of

-238-

trouble."   Another relative has ADD and her behavior is "out of control."   Tony's first cousin,

Chuck, lived with Tony when Tony was 9 years old.  Chuck

> is an emotionally disturbed and violent child.   He used to bang his head against the
> wall.   When he was young he asked a man in a restaurant bathroom to have sex with
> him.   At the age of 12 years, he ran away from home.   When older, Chuck and his
> sister joined a cult in Galveston, Tx and eventually had to flee the area to escape the
> cult.

*Id*.  There were references in the punishment phase to the fact Tony had anger management problems

as an adolescent, *see e.g.*19 RR 2374 (direct examination of prosecution witness Delberta Storz), but

the jury never heard about this generic component.   During his closing argument, the prosecutor

mentioned it again, 20 RR 2565, and the jury sent out a note during their punishment phase

deliberations asking for the testimony about Mr. Medina's drug and alcohol counseling and anger

management treatment."  20 RR 2570–71.

Nor did the jury learn that Mr. Medina was raised in a home without structure, curfews or

discipline, and with parents who were emotionally absent.  Exhibit 57 (Affidavit of Dr. Lundberg

Love), at ¶ 5(a).

Anthony's mother desired to give him a better childhood than her own, though she had no

model for good parenting.  Exhibit 5 (Affidavit of Golda Medina) at 1.  When she was little, her

family frequently moved in the middle of the night because the rent was due.  *Id*.  Her step-father

was an alcoholic who sexually abused her.  She left home for the first time at age 13 to escape.  *Id*.

She left again at age 15 and, at 16, married a man who was twelve years older than her, though she

left him because he sexually abused her.  At age 16, Golda returned home pregnant.  Golda had her

first child, Christy, when she was 17 years old.  *Id*.

Because her step-father resumed his sexual abuse, Golda again sought refuge in a marriage.

Golda soon left her second husband after he broke her arm by beating her with a bowling pin. Subsequently, Golda and her 16-year-old sister started living out of a car, which is when she met Mr. Medina's father. *Id*.

As Golda's sister recounts, this traumatic upbringing had an impact on Golda: "Golda has had to put up with a lot. I remember she used to smoke marijuana when Tony was little. She tried to hide it but I could sometimes smell it from under her door." Exhibit 46 (Affidavit of Lillian Crowson) at 1-2. Mrs. Medina coped with her abuse and marital problems by smoking marijuana when Mr. Medina was a small child. *Id*. at ¶ 9, 15; Exhibit 42 (Affidavit of Sherry Grein), at ¶¶ 9-10. As reported by Dr. Lundberg-Love, "Anthony . . . did not realize that his mother 'smoked dope' until the first time one of his peers smoked marijuana and he recognized the odor of the smoke as the same smell that used to come out from under his mother's bedroom door." Exhibit 57 (Affidavit of Dr. Lundberg-Love), at ¶ 5(b).

Defense counsel failed to present evidence that Mr. Medina's parents both had problems with substance abuse, which contributed to their lack of involvement in their son's life. Mr. Medina's father drank every day, sometimes arriving home "staggering" drunk. Exhibit 46 (Affidavit of Lillian Crowson), at ¶ 8; Exhibit 5 (Affidavit of Golda Medina), at ¶ 13; Exhibit 42 (Affidavit of Sherry Grein), at ¶ 10. As reported by Mr. Medina's aunt, his father's sister:

> My brother drank a lot during Tony's childhood. When Tony was a baby, my brother would drink at home but as Tony grew older he would stay out all the time. I used to call over to their house in the evenings, even late at night, to make plans for the next day and Tony would always say, "My Dad's not home yet."
>
> When you went over to their house there was always a bottle or two of Jack Daniels or something lying around.

Exhibit 40 (Affidavit of Eva Uribe), at ¶¶ 10-11.

Mr. Medina's father was often physically absent as well, either because he was working or because he was drinking, and was often gone at night. Exhibit 6 (Affidavit of Anthony Luna Medina), at ¶ 10; Exhibit 5 (Affidavit of Golda Medina), at ¶ 13; Exhibit 46 (Affidavit of Lillian Crowson), at ¶ 8; Exhibit 40 (Affidavit of Eva Uribe), at ¶ 10.

Mr. Medina's parents also had serious, violent fights, which had a profound effect on him as a small child. His aunt, Lillian Crowson, was available to testify to these frequent fights:

> When Tony Sr. was at home, he and Golda would frequently get into fights . . . . I remember one time when Tony was about 8 years old, Golda and Tony Sr. were having a real bad argument. It was so bad that Golda told me to take my kids and Tony and his sisters and lock ourselves in the bedroom. We could hear Golda and Tony Sr. screaming and I could tell they were in the front yard. Later on, Golda came into the bedroom and she had grass all over her back. She told me Tony, Sr. threw her on the ground.

Exhibit 46 (Affidavit of Lillian Crowson), at ¶ 10-12.

Mr. Medina's mother remembers this same incident:

> one day I was at a bar with my husband and he got mad at me. When we got home, he still talking about it and wouldn't let it go. He was getting very loud. My sister Didi was at my house that day and she went into my bedroom with my kids (Angie, Christy, and Anthony) and her kids and barricaded the door with a dresser. Anthony's father kept arguing with me and he banged my head on the sidewalk.

> That night, my sister and the kids slept in my bedroom. My husband and I slept in separate sofas in the living room. I kept a gun under my pillow and told my husband that if he came near me I would shoot.

Exhibit 5 (Affidavit of Golda Medina), at 2.

Another aunt described a separate incident:

> I remember once, when Tony was about 10, Tony Sr. was trying to get in his car but he was so drunk that Golda had to go outside and pick him up and drag him back in the house. I heard about the incident from the neighbors, Christy and Golda. It was a pretty big deal. I'm sure the kids saw the whole thing.

My brother and Golda always had marital problems.  It was mostly about my brother's drinking.

Exhibit 40 (Affidavit of Eva Uribe), at ¶¶ 12-13.

The domestic violence took a toll on Tony: "[w]hen his parents were fighting, Tony would get very quiet and sometimes he would cry.  Other times he would want to go out to the room where his parents were to try to make them stop."  Exhibit 46 (Affidavit of Lillian Crowson), at ¶¶ 10, 13. Tiffany Kimberlin was one of Tony's cousin who lived with the Medinas for a while and was present for the domestic chaos:

> [Tony's] mother and father argued a lot.  Tony and I and the other kids would be in a separate room but we could hear screaming, doors being slammed and things being thrown around. Tony's parents would fight about [his father's] drinking and affairs.  I know it hurt Tony. I will never forget the time I saw Tony crying when he was about 16 years old.

Exhibit 48 (Affidavit of Tiffany Kimberlin) at 2.

Because Tony's parents were mired in their own problems and were drunk and high much of the time, Tony Medina grew up in a home without structure, curfews or discipline, and with parents who were emotionally absent.  Exhibit 57 (Affidavit of Dr. Lundberg Love), at ¶ 5(a).  As Dr. Lundberg-Love explained, at the age of twelve Mr. Medina frequently snuck out his bedroom window late at night, roaming the neighborhood with friends.  *Id*.  Mr. Medina's mother stated that she knew her son was drinking and smoking marijuana, but "didn't think much about it at the time because [she] had smoked pot and his father drank."  Exhibit 5 (Affidavit of Golda Medina), at ¶ 19.

The defense witnesses have explained that Mr. Medina's attorneys had never asked for such information and thus were unaware of it.  Because they had not been properly prepared by counsel, the witnesses often did not understand the mitigating value of such evidence.

Through the years, Anthony's father and I have had our ups and downs.  It's not easy

-242-

to talk about the difficult times, but I would have told Anthony's trial attorneys about our ups and downs if they had explained they needed to know this information for Anthony's case.  When I testified I didn't talk about these things either because Anthony's attorneys didn't ask me about them.

Exhibit 5 (Affidavit of Golda Medina), at ¶¶ 6, 12.

This evidence of a troubled household clearly was a necessary response to the State's argument that Mr. Medina was raised in a functional, close-knit family.  *See, e.g.*, 20 RR 2459-63; *id*. at 2482-85.  However, while some of these witnesses were called to the stand, they were not asked questions that could have elicited this testimony.

> **b.     Mr. Medina's childhood speech impediment, placed in context, *was* a significant aspect of his social history.**

At the age of four, Mr. Medina developed a stuttering problem, which caused the children at school to make fun of him and made him feel humiliated and alienated.  Exhibit 57 (Affidavit of Dr. Lundberg-Love), ¶ 5(i).  He was teased for the stuttering, which made him embarrassed, frustrated, and angry.  Exhibit 45 (Affidavit of Samuel Gallegos), at ¶ 5; Exhibit 46 (Affidavit of Lillian Crowson), at ¶ 16.  His cousin Tiffany stated:

> Tony stuttered when he was little and other children teased him to the point he would get so mad he would go in his room and blare music.  It was like he shut himself in a world of his own.

Exhibit 48 (Affidavit of Tiffany Kimberlin), at ¶ 6.  Mr. Medina's parents, while aware of his stuttering problem, were wholly unaware of the emotional pain and humiliation their son suffered as a result of his stuttering, and of his subsequent loss of friends at school.  Exhibit 5 (Affidavit of Golda Medina), at ¶ 17 ("Anthony had a speech impediment when he was younger.  He received speech therapy which made his stuttering better.").

Dr. Lundberg-Love put Tony's speech impediment in context:

Anthony had a stuttering problem from the age of four, which rendered him an outcast in his early school years.

Children at school used to make fun of him.  They mocked him and called him "stutterbox."  This humiliated Anthony and engendered anger.  When he was teased at school, he coped by fighting the individuals who verbally abused him.  Afer he fought the children, they quit calling him names.  However, this type of behavioral "coping skill" resulted in Anthony having no close friends at school.  The few friends that he had were from his neighborhood.

Exhibit 57 (Affidavit of Dr. Lundberg-Love), at ¶ 5(a).

However, at Mr. Medina's trial, the connections between his speech impediment, his social isolation, his violent neighborhood, and his later gang involvement were wholly unexplored and, in closing arguments, the prosecutor even mocked the evidence of Mr. Medina's speech impediment, stating,

Is there something that less[e]ns his blameworthiness or tends to explain his crime?  Did you hear anything?  Anything whatsoever?  A speech impediment when he is a child explains why he murdered two children on New Year's Eve?  My God, that's ludicrous.

20 RR 2562.

Mr. Medina's trial counsel offered no evidence of context or consequences related to Mr. Medina's childhood speech impediment.  However, had counsel investigated and/or hired the mental health expert made available to them by the court, counsel could have done both.  Samuel Gallegos, a neighborhood friend, clearly saw the connection between Mr. Medina's alienation at school and his subsequent gang involvement:

When Tony became a teenager he wanted to have friends really bad.  He wanted to be cool because he was teased a lot.  Everyone would tease him because he stuttered.  He started hanging around gang members because back then that was all that was in our neighborhood—gangs and drug dealers.

Exhibit 45 (Affidavit of Samuel Gallegos), at ¶ 5.  Mr. Gallegos' astute observation was the type of

rejoinder that was sorely needed, but absent, at Mr. Medina's trial.

> **c.      A child in "gangland"[101]: Tony Medina grew up in a war zone in which "kids joined gangs for survival."[102]**

Because of Mr. Medina's alienation and isolation from the other children at school, his only friends were children from his neighborhood. These peers were bound to be—and were—a rough and violent influence. Mr. Medina's friends and family members consistently state that his neighborhood was exceedingly violent and was overrun by gangs.[103]

Mr Medina's aunt, Lillian Crowson, described the neighborhood as "gangland." Exhibit 46 (Affidavit of Lillian Crowson), at ¶ 5. Tony's father's cousin reported that

> Tony grew up in an extremely dangerous neighborhood. At that time, you couldn't turn on the local news without hearing about shootings, robberies, stabbings. When you drove through the neighborhood, the gang presence was apparent. Low rider groups were everywhere. Graffiti was real heavy. The neighborhood was dangerous even for an adult male.

Exhibit 41 (Affidavit of David Castro), at ¶ 7. *See also* Exhibit 40 (Affidavit of Eva Uribe), at ¶ 14; Exhibit 42 (Affidavit of Sherry Grein), at ¶ 12; Exhibit 47 (Affidavit of Ruben Gallegos), at ¶ 4.

Mr. Medina's family, friends, and neighbors could have provided the jury with vivid descriptions of the neighborhood. Exhibit 46 (Affidavit of Lillian Crowson), at ¶ 5 ("One time my kids were over at the Medinas when there was a driveby shooting across the street."); Exhibit 50 (Affidavit of Catherine Uribe), at ¶ 11 (as a child, witness saw police officers in the field near her house investigating a dead body); Exhibit 40 (Affidavit of Eva Uribe), at ¶ 14 (when her family was

---

[101] Exhibit 46 (Affidavit of Lillian Crowson) at ¶ 5.

[102] Exhibit 47 (Affidavit of Ruben Gallegos) at 2.

[103]  Statistics from the Houston Police Department corroborate the family's account. Exhibit 58 (Houston Police Department Crime Statistics, Beat 16E20, 1984-96).

living in the neighborhood, "[t]here was a driveby shooting across the street from our house and that's when our husband said, 'We're leaving now.'").

Samuel Gallegos, who grew up across the street from Mr. Medina, recounted the violent incidents that were part of everyday life in their neighborhood:

> We lived in a hard neighborhood.  There was a lot of violence.  Around 1985 a lot of gangs started moving into our neighborhood like the Crips, the Bloods, the Brown Rags, the Black Rags.  ***There were drive by shootings and killings all the time.***  The gangs would hang out by the bayou.  I could hear gunfire coming from the bayou all the time.  It was crazy.
>
> When I was about 8 or 9, I was walking with my friend J.R. on Prudence Street.  We were going to play video games.  My friend and I were going by warehouses when I saw some black people who had a guy pinned up against the wall and they were beating him.  One of the girls who was by the warehouse saw me and yelled to the other people to "get that Mexican."  My friend took off running.  I was so scared I kind of froze, but then I started running as fast as I could.  All the black people jumped in a car and started following me.  One of my neighbors happened to be going outside and when the people in the car saw my neighbor, they sped off.  I was so terrified I ran to the fire station and told the firefighters those people were trying to kidnap me because I saw them beating up someone.
>
> I also remember one day I was riding my bike with some friends at the corner of Catina and Heathercrest when some gang members tried to run us off the road with their car.  We gave them the finger and about five minutes later they came back and shot at us.  I was about 12 years old when this happened.
>
> We even had a drive-by shooting at our house. I remember it was a day or two before Halloween because my brother and I were trying on our costumes.  We heard gunfire and we got on the floor.  You can still see the bullet holes in our living room wall and in the wall by our dining table.  One bullet missed my aunt by a few inches.  To this day we have no idea who did it or why someone shot at our house.
>
> That was the kind of neighborhood Tony grew up in.  I know Tony was scared just like I was because all the kids in the neighborhood were afraid of being hurt or being shot by gang members.  There was a lot of pressure to join the gangs back then.  The Lucio brothers lived in our neighborhood and they were the leaders of LRZ.  From when I was about nine years old until I was sixteen they kept telling me to join the gang.  I remember one time they even told they would make me an offer I couldn't refuse.

-246-

Exhibit 45 (Affidavit of Samuel Gallegos), at ¶¶ 6-10.  Of course, this evidence helps explain how

Tony Medina ended up in gang:

> In order to understand why Tony joined a gang, you have to understand what kind of neighborhood he grew up in.  Around 1988, little gangs started moving into the neighborhood.  By 1990, things started to get really bad.  Robberies, gang shootings, and stabbings happened all the time.  Things were so bad I . . . moved[d] out of the neighborhood.  I didn't want my son growing up with all the violence that was happening.
>
> Even though I moved out of the neighborhood, I knew what was going on because I came to visit my mom often.  Around 1993, someone shot at our house.  We think the person who shot at our house thought it was someone else's house, but my mom was so scared she started sleeping on the floor.

Exhibit 47 (Affidavit of Ruben Gallegos), at ¶ 4.

Because of the neighborhood's escalating violence, Mr. Medina's aunts, uncles and cousins

either moved out of the neighborhood or stopped visiting the Medinas' home.  Exhibit 40 (Affidavit

of Eva Uribe), at ¶ 14;  Exhibit 42 (Affidavit of Sherry Grein), at ¶ 12;  Exhibit 41 (Affidavit of

David Castro), at ¶¶ 7-8.  Having moved farther away, these people were much less involved in Mr.

Medina's life.  *See, e.g.*, Exhibit 50 (Affidavit of Catherine Uribe), at ¶ 5 ("I was about 11 or 12

when we moved out of the neighborhood and we almost never saw [the Medinas] after that").

Friends also left.  Exhibit 47 (Affidavit of Ruben Gallegos), at ¶ 4.  Because these persons had been

steadying influences for him, their exodus from the neighborhood left him even more isolated.

To those who knew Mr. Medina at the Bellaire Christian Academy, it was patently obvious

that the neighborhood was a strong influence on Mr. Medina, and that he desperately needed a

constructive outlet for his energies.  Exhibit 44 (Affidavit of Kim de la Cruz), at ¶¶ 4-8; Exhibit 49

(Affidavit of Elaine Butler), at ¶7; Exhibit 51 (Affidavit of Tamara Crosby), at ¶¶ 4-5.  However,

none was available to him.

Although Mr. Medina's mother thought it would be best for him if the family left the neighborhood, they never did. Exhibit 42 (Affidavit of Sherry Grein), at ¶ 11. As is explored *infra*, the pressures of Mr. Medina's neighborhood, in combination with his home life, made it almost inevitable that he would become involved in gangs. *See, e.g.*, Exhibit 46 (Affidavit of Lillian Crowson), at ¶ 5 ("I wasn't surprised to hear Tony was in a gang because everybody in the neighborhood was in gangs."); Exhibit 47 (Affidavit of Ruben Gallegos), at ¶ 6 ("Kids joined gangs for survival. If you were not in a gang, you were a 'nobody' and you were an easy target for gang members.").

In fact, the only setting that provided the structure, belonging, and companionship that Mr. Medina sought was the LRZ 13 gang. However, while meeting a real need, the gang also provided a support system that "normalized" violence and substance abuse, thus exacerbating Mr. Medina's problems.

> **d.    Tony's life was changed at age 12 when his friend was shot to death in a drive-by shooting.**

Despite all of the adverse circumstances in Tony's life, "Tony's school performance was good until the seventh grade." Exhibit 57 (Affidavit of Dr. Paula Lundberg-Love) at 4.

At the age of twelve, Mr. Medina witnessed the shooting of his closest friend, "C.C." C.C. was several years older than Mr. Medina and was "the first significant male-male mentoring relationship that he had experienced." Exhibit 57 (Affidavit of Dr. Lundberg-Love), at ¶ 5(k). Mr. Medina recalled the event in his interview with Dr. Lundberg-Love:

> Anthony explained that he had "beaten up" a peer whose name he could not recall for a reason he could not recall. The peer told his older brother who knew that Anthony hung around with C.C. One night after Anthony sneaked out his bedroom window, he and C.C. went to the house of a friend of C.C. Anthony and C.C. drank some

alcohol and smoked some marijuana.  They were standing outside on the driveway
near a ditch.  Things became quiet.  Anthony said that he was not paying attention to
his surroundings and thus he did not see or hear a car drive up the street.  Everything
began to move "in slow motion."  C.C. yelled and pushed Anthony down onto the
ground.  Anthony saw a green car driving by and shots coming from it.  C.C. was
shot four times, twice in his chest, once in his neck, and once near his hip.  C.C. had
pushed Anthony out of the range of fire and had been shot in the process.  C.C. had
said nothing.  The friend of C.C. who lived at the house yelled to Anthony to hurry
up and leave.  Anthony got on his bike and rode home.  Even though it was a two-
hour bike ride, all Anthony recalls is finding himself back at home, climbing though
his bedroom window.  He threw away his bloodstained clothes and never told anyone
anything about those events.

*Id*. at ¶ 5(j).  Because the shooting had happened right in front of him, and because C.C. had been

such an important friend and influence in his life, Mr. Medina was "deeply traumatized" by the

shooting and felt guilty because he was the intended victim:

Anthony identified this event as the turning point in his life.  Anthony stated, "C.C.
taught me how to survive on the streets.  The last lesson he taught me was, 'Don't let
anyone sneak up on you.'  I was drunk.  I was high.  I let them sneak up on us.  I was
supposed to be watchful.  They were coming for me.  He lost his life for me."  At this
point in the interview, Anthony began crying.  Tears rolled down his cheeks.

Anthony continued, "C.C. always did what he wanted.  C.C. always had what he
needed.  He knew worldly things and taught me what he knew.  I knew him for a year
before he got killed.  Now he wasn't there, and I let it happen."  When asked to
describe the emotional pain that he had experienced at the time of C.C.'s death,
Anthony explained that somehow for him the pain was converted to anger.  He said,
"That was the one emotion I fed on.  It allowed me to become who I was. The anger
from C.C.'s death took a big part of me away from me.  After C.C.'s death, school
was not interesting.  Classes weren't interesting.  I wasn't interested in what teachers
had to say."  Anthony began skipping school regularly.  He began failing classes.  He
got into fights at school and received disciplinary action. Anthony remarked that, "I
was quicker to "go off" and lose control.  I didn't act rational.  I just reacted.  I drank
more, smoked more, and began using cocaine."

*Id*. at ¶ 5(k).

As a result of C.C.'s shooting, Mr. Medina's performance in school deteriorated and drug

use escalated.  *Id*. at ¶ 5(j) & (k).  Clearly, his life changed radically after the trauma, but his parents

were completely unaware of what he was going through, as was everyone else.  *Id*. at ¶ 5(j).  While his mother noticed that his grades "dropped drastically when he was in Middle School," she stated that she "[didn't] know why he started having trouble in school."  Exhibit 5 (Affidavit of Golda Medina), at ¶ 18.

As a means of coping with C.C.'s shooting, Mr. Medina resolved to become the best "person on the street" he could be.  Although such a coping mechanism was "dysfunctional," it was "not at all surprising that he gravitated toward a gang-related lifestyle to fill the emotional void created in his life by the absence of a supportive family structure and the loss of the most important relationship that he had experienced in his life, his friendship with C.C."  Exhibit 57 (Affidavit of Dr. Lundberg-Love), at ¶ 8(c).

Dr. Lundberg-Love's opinion is corroborated by Charles Rotramel, Executive Director of Youth Advocates, Inc., who has extensive experience working with gang members.  Exhibit 59 (Affidavit of Charles Rotramel), at ¶¶ 1-4.  Youth Advocates works to help young people stay out of gangs or leave gangs, and Mr. Rotramel has personally worked with over 5,000 young people since he founded Youth Advocates in 1988.  *Id.* at ¶¶ 4-5.  Speaking as to why young people join gangs, Mr. Rotramel stated:

> Based on my experience working with gang members and potential gang members for the past thirteen years, young people who affiliate with gangs typically share the same motivations for doing so.  There are three factors in particular that are present in nearly every gang member and form a common denominator among almost all of the young people I've worked with:  (1) the lack of a family support structure; (2) the absence of other support structures, such as a supportive school environment, an extracurricular activity, a sports team, or a church group; and (3) exposure to violence early in life.  Other characteristics that are common in a young person who gravitates towards gangs include depression; a sense of failure (whether in school or in other endeavors); a feeling that he or she cannot succeed or belong anywhere else and that the gang provides a setting where he or she can be successful; substance

abuse at an early age.

> Gangs can fill a void and provide critically needed structure in the lives of young people.  Although the gang environment usually is violent and unhealthy, the gang structure fills a real need for its members.  The gang members become a surrogate family for young people who lack support structures elsewhere in their lives.  The gang "family" meets basic needs, including identity, support, companionship, and activities.  Also, in rough neighborhoods with heavy gang activity, affiliation with a gang often is a means of simple survival for a young person.  There are few other groups to which they can belong, and the gangs often offer them the only means of support available.

*Id*. at ¶¶ 8-9.  Speaking about Mr. Medina's circumstances, Mr. Rotramel explained:

> If I were to see a hypothetical client who was from a violent neighborhood where gangs are active and whose parents were not involved in his daily life, I would expect that client to be drawn to gang membership.  If I then learned that the client had witnessed the shooting of his best friend on the streets around the age of twelve, that his parents had substance abuse issues, that he was teased from a young age about a stuttering problem, that he felt like he never fit in at school or at the church his aunt took him to, and that he started using drugs and alcohol around the age of twelve, these factors in combination would make it extremely likely for the client to seek the structure and surrogate family that a gang could provide.

*Id*. at ¶ 13.  Samuel Gallegos stated, "Tony got caught up with the gang because he just wanted attention and friends and joining the gang was the price he had to pay."  Exhibit 45 (Affidavit of Samuel Gallegos), at ¶ 12.  "[G]ang membership effectively reduces feelings of alienation and societal disenfranchisement."  Exhibit 57 (Affidavit of Dr. Lundberg-Love), at ¶ 8(c).

While a gang met some legitimate needs of a young person like Mr. Medina and provided a support system and needed protection, it was a violent and often unhealthy environment.  Exhibit 59 (Affidavit of Charles Rotramel), at ¶ 9; *see* Exhibit 47 (Affidavit of Ruben Gallegos), at ¶ 6 ("Kids joined gangs for survival.  If you were not in a gang, you were a 'nobody' and you were an easy target for gang members.  The way gang members convinced kids to join gangs was by telling them that if they joined, the gang would protect them.").  Street gangs reward violence and often

require it for membership.  Exhibit 45 (Affidavit of Samuel Gallegos), at ¶ 10.  Street gangs also exacerbate substance abuse problems, since they allow access to drugs and there is pervasive "normalized" use among their members.  Exhibit 59 (Affidavit of Charles Rotramel), at ¶ 12.

Because counsel failed to investigate Mr. Medina's background, the jury was never provided with this context for Mr. Medina's membership in a gang.

> e.    **Those who recognized that Tony was an at-risk child could not overcome the destructive forces that permeated his life and the absence of family support system.**

Several well-intentioned people tried to counter the immense pressure from gangs and Mr. Medina's neighborhood.  Tony's aunt, Eva Uribe, was concerned about his violent environment and enrolled Tony in the Bellaire Christian Academy during junior high school.  Exhibit 40 (Affidavit of Eva Uribe), at ¶ 9.

Inevitably, Tony had some trouble "fitting in" with "the 'preppies' or the jocks" at BCA, and one of his teachers, Kim de la Cruz, noted that Mr. Medina "seemed to gravitate towards the rougher kids," who were more like those from his neighborhood.  Exhibit 44 (Affidavit of Kim de la Cruz), at ¶¶ 4, 6.  His cousin, Catherine Uribe, made a similar observation:

> When Tony was at Bellaire Christian Academy, he felt like he was at school with a bunch of rich snobs and that they were better than him . . . .  He gravitated towards the kids who were always in trouble.  He seemed to feel more comfortable with those people because he didn't think they would judge him.

Exhibit 50 (Affidavit of Catherine Uribe), at ¶ 10.  This sense of "not belonging" is a common factor leading young people to seek "belonging" through gangs.  Exhibit 59 (Affidavit of Charles Rotramel), at ¶ 8.

Ms. de la Cruz recognized the disconnect between BCA and the rest of his life, and the

-252-

overwhelming pressures operating on Mr. Medina:

> I did not feel that Tony got the support he needed when he was not at BCA or in church activities.  I always questioned where his parents were because his aunt was the one that brought him to school and church functions.  My interactions with Tony and his siblings led me to believe Tony's father was not there for Tony . . . .

> Tony's Aunt Eva did the best she could to get Tony out of the environment he lived in, but she wasn't Tony's parent.  It seemed like there was a clash between the church environment and Tony's life outside of church.  I do not believe Tony's parents or friends from the neighborhood reinforced the values Tony was learning at BCA and in the youth group.

> At the time I knew Tony, he was at a critical stage in his development.  I always believed if he had an outlet, like sports, he wouldn't have been caught up with the wrong crowd.

Exhibit 44 (Affidavit of Kim de la Cruz), at ¶¶ 5-8; Exhibit 47 (Affidavit of Ruben Gallegos), at ¶ 10 ("I am convinced Tony would have stayed away from the wrong crowd if there had been something else to keep his mind occupied.  But there were no activities for kids in the neighborhood—no soccer games, no baseball games."); Exhibit 51 (Affidavit of Tamara Crosby), at ¶ 5 ("Tony didn't have extracurricular activities . . . .  Unlike Tony, . . . my son got his 'attaboys' through sports.  I always wondered where Tony got his 'attaboys.'").  *Cf.*  Exhibit 59 (Affidavit of Charles Rotramel), at ¶ 8 (the absence of a support structure "such as a supportive school environment, an extracurricular activity, a sports team, or a church group" increases the likelihood that a young person will join a gang).

Many who knew Mr. Medina at BCA described the obvious contrast between his home life and the BCA environment, and the sense that he lacked necessary support elsewhere in his life.  A BCA parent stated:

> Although Tony did well when he was involved in church activities, I worried about him when he was not with us.  He lived in a bad neighborhood.  It was common

knowledge that drugs were prevalent in the area where he and his family lived.  I always wondered if life outside of our church was so different for Tony that he couldn't talk about it.

Exhibit 51 (Affidavit of Tamara Crosby), at ¶ 4.  *See* Exhibit 49 (Affidavit of Elaine Butler), at ¶¶ 7-9 ("I got the impression there was something lacking in his life . . . . I felt one of the biggest things going against Tony was a lack of self-esteem . . . .  Tony had a need to be accepted for who he was.").

Ultimately, the efforts by those at church and BCA were not successful, despite the fact that Mr. Medina seemed eager for the guidance of these well-intentioned people.  Exhibit 57 (Affidavit of Dr. Lundberg-Love), at ¶ 8(b) ("none of these attempts was comprehensive enough to counter the consistent, overwhelming chaos and violence that were pervasive in [Mr. Medina's] home and neighborhood"); Exhibit 44 (Affidavit of Kim de la Cruz), ¶ 8 ("Tony was always eager for my attention and mentoring"); Exhibit 49 (Affidavit of Elaine Butler), at ¶ 4 ("I always felt Tony reached out to me for love and acceptance and a safe place").

As Dr. Lundberg-Love has explained, a child such as Mr. Medina could have been successfully treated with proper intervention:

> A child approximately 12 years old who experienced a childhood as traumatic as Anthony's would have an urgent need for proper diagnosis, treatment, and counseling.  With proper intervention, the psychological symptomatology of such a child could be dramatically improved by cognitive behavioral psychotherapy and psychopharmacological medications to improve PTSD, impulse control and aggression reduction, including the selective serotonin reuptake inhibitors (SSRIs) such as Paxil, Zoloft or Celexa, and/or mood stabilizing drugs such as Depakote, Lamictal or Neurontin.  ***Psychotherapeutic intervention is particularly important for children and adolescents because recovery from PTSD is eminently successful in this population when intervention occurs as closely in time after the traumatic experience as is possible***.  Also the creation of a more stable home environment, and the presence of nurturant, supportive adult mentors can aid a child in the evolution from being a victim of trauma to a successful survivor of traumatic experience.

Exhibit 57 (Affidavit of Dr. Lundberg-Love), at ¶ 8(a). However, "[s]uch necessary intervention was

utterly lacking in Anthony's life." *Id*. at ¶ 8 (b). Indeed, as was stated previously, his parents were

uninvolved in his life and wholly unaware of the traumas and pressures of his life.

Mr Medina was never provided with the necessary counseling and treatment to overcome the

trauma. As Dr. Lundberg-Love stated, she would expect a young person who had experienced such

trauma but lacked an adequate support system to cope with the trauma by self-medicating with drugs

and alcohol, and by seeking out gang membership to fill the void and reduce feelings of alienation.

*Id*. at ¶ 8(c). Psychological responses such as defensive avoidance or dissociation, which Mr.

Medina also exhibits, also are not surprising given his background. *Id*. at ¶6. Dr. Lundberg-Love

also points out that, in sharp contrast to the picture painted by the State at the punishment phase, Mr.

Medina was clearly capable of remorse. *Id*. at ¶ 5(k) ("During the course of this interview it was

apparent that Anthony still has deep feelings of remorse over the death of C.C., an event that was

***not*** his fault") (emphasis added).

Because the defense forfeited the opportunity to have Mr. Medina examined pretrial by Dr.

Fason, *see supra*, none of this psychological evidence was presented to Mr. Medina's jury.

The absence of a support system in Tony Medina's life also doomed his chances to escape

from the gang. Exhibit 59 (Affidavit of Charles Rotramel), at ¶ 10. As Mr. Rotramel explained:

> Because young people who affiliate with gangs often have no adequate support
> system outside of the gang, I have found that it is futile to try to get a young person
> to leave a gang if there is not an alternate support system in place to replace the gang.
> A young person cannot walk away from his or her only support system if there is no
> available replacement.
>
> Youth Advocates has had success in keeping young people out of gangs, or helping
> them leave gangs, by supplying such an alternate support system. We provide young

-255-

> people with a community of peers who are not affiliated with gangs, and with
> assistance in obtaining education and employment.  In my experience over the past
> thirteen years working with thousands of young people, I have seen repeatedly that
> young people are eager to leave a gang once an alternate support system is available
> to them.

*Id*. at ¶¶ 10-11.  Indeed, once an alternate system is provided, former gang members can often thrive

and build a "new life," and Mr. Rotramel states that he has known "at least 100 young people who

have been gang members—even gang leaders" who "are now on the honor roll at college or holding

steady jobs."  *Id*. at ¶ 15.

The kind of comprehensive, alternate support system described by Mr. Rotramel was not

available to Mr. Medina.  Countering the powerful influence of his neighborhood gangs would have

required a more comprehensive, alternate support system than mere attendance at a private school.

In order to successfully leave the gang, Mr. Medina would have needed

> comprehensive, hands-on support, such as that provided by Youth Advocates.  For
> example, he would need to build up relationships with non-gang members, to receive
> substance abuse counseling, and to receive detailed, step-by-step assistance in
> obtaining gainful employment.

*Id*.  at ¶ 14.  *See* Exhibit 45 (Affidavit of Samuel Gallegos), at ¶ 11.

### f.    Tony Medina was severely damaged by his traumatic childhood.

Dr. Lundberg-Love's testing revealed that Mr. Medina "suffers from a number of

psychological symptoms, some of which are consequences of the various types of childhood trauma

that he experienced."  Exhibit 57 (Affidavit of Dr. Paula Lundberg-Love) at 6.  Tests revealed "that

Anthony is a person with significant thinking and concentration problems accompanied by

impulsivity and the potential for 'acting out' behaviors."  *Id*.  Mr. Medina has "marked peculiarities

in thinking and experience that are often associated with an active psychotic episode, poor judgment,

and impairment in reality testing." *Id.*

According to Dr. Lundberg-Love, "[t]he use of drugs has had many negative consequences on his life that had numerous ill effects on his functioning . . . .  The data suggested that Anthony was drug dependent in the past to the extent that it disrupted his interpersonal relationships, occupational possibilities, and may even have had health complications."

The psychological testing also suggested "a significant depressive disorder marked by feelings of sadness, loss of interest in normal activities, and a lose of a sense of pleasure in activities that previously were experienced as pleasurable." *Id.* at 7.

Dr. Lundberg-Love found that "particular problems involving sensory or motor dysfunction were indicated," and that "[s]uch symptoms are consistent with a conversion disorder or could be the result of a number of neurological conditions." *Id.*

The Trauma Symptom Inventory (TSI), which assesses for Post-Traumatic Stress Disorder and other psychological sequelae that may be associated with traumatic events, showed clinically significant levels on six out of ten scales, including dysfunctional sexual behavior, tension-reducing behavior, defensive avoidance, dissociation, anger/irritability, and intrusive experiences. *Id.*  These results suggest attempts by Mr. Medina to "modulate, interrupt, avoid, or soothe negative internal states," and to avoid "aversive internal experiences" or "eliminate painful thoughts or memories from conscious awareness." *Id.* at 7-8.  The elevated score on the dissociation scale indicates that Mr. Medina "utilizes the coping mechanism of dissociation, which is a largely unconscious psychologically defensive alteration in conscious awareness, which evolves as an avoidance response to overwhelming, posttraumatic psychological distress." *Id.* at 8.

Dr. Lundberg-Love, whose examination was informed by state post-conviction counsel's

social history investigation, concluded that

> it was not unexpected that a 12 year old, who experienced a childhood history such as that of Anthony, lived in a dangerous, chaotic environment, and failed to receive any of the necessary therapeutic interventions, would be at great risk for involvement in dysfunctional coping methods.  In Anthony's case these included self-medication with drugs and alcohol, and interaction with the structure and protection afforded by gang involvement.

Exhibit 48 (Affidavit of Dr. Lundberg-Love) at 10.  Ultimately, Dr. Lundberg-Love diagnosed Tony

with, *inter alia*, Polysubstance Dependence and chronic Posttraumatic Stress Disorder.  *Id*. at 9.

> ### 2.       The consequences that flowed from counsel's inadequate mitigation undermined the integrity of the defense function, and with it confidence in outcome of the sentencing proceeding.

Defense counsel's closing argument on the mitigation special issue pointed to Mr. Medina's

intoxication on the night of the crime, his youth, residual doubt about guilt, the ineffectual speech

impediment argument, and a plea for sympathy for Mr. Medina's family.  Had defense investigated,

counsel could have argued that copious evidence supported a "yes" answer to the mitigation special

issue.   20 RR 2549; 2551-52; 2554.   Counsel's failure to conduct an adequate mitigation

investigation had a devastating impact on the trial.

First, and most essentially, counsel's deficient performance deprived the jury of an accurate

and textured picture of Mr. Medina, thus they could not preform their critical role of determining

whether "there is a sufficient mitigating circumstance or circumstances to warrant that a sentence

of life imprisonment rather than a death sentence be imposed."  As in *Porter*, this renders the

proceeding constitutionally suspect.

> The judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability.  They learned about Porter's turbulent relationship with [the victim], his crimes, and almost nothing else.  Had Porter's counsel been effective, the judge and jury would have learned of the "kind of troubled history we have declared relevant to assessing a

-258-

defendant's moral culpability." *Wiggins, supra,* at 535, 123 S.Ct. 2527.

*Porter*, 130 S.Ct. at 454.

Second, counsel harbored conspicuously false impressions about their client because they were ignorant of Mr. Medina's social history. Counsel thought Mr. Medina came from a loving and supportive family, and thus made a "strategic" decision to not pursue or present mitigating evidence about their client's family background. As in *Rompilla*, the undiscovered mitigating evidence

> would have destroyed the benign conception of Rompilla's upbringing . . . counsel had formed from talking with Rompilla himself and some of his family members . . . . With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case. Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview.

545 U.S. at 391. To the extent counsel engaged in any strategic decision-making in the planning and presentation of Mr. Medina's case, their efforts were throughly undermined by their professionally unreasonable poverty of knowledge about their client.

Third, in the absence of any accurate evidence of Mr. Medina's background, the prosecution freely painted a devastatingly false picture for the jury. As noted *supra*, the prosecutor used the defense witnesses—who were utterly unprepared to testify and unaware that the "bad" stuff about Mr. Medina's background was important—to portray Mr. Medina as coming from an idyllic background:

> Q.   You say he went to the [C]hristian academy. ***Is it safe to say that he had all the advantages that a person could have growing up in Houston***, a close family who cared about him and took care of him? Is that safe to say?
>
> A.   ***Yes***.

19 RR 2485 (prosecution cross of Mr. Medina's aunt, Eva Uribe) (emphasis added). And again:

-259-

Q.      Would you say based on his growing up *there's really nothing at all to explain or excuse in any way the behavior that is the subject of this case?* Would you agree with that?

A.      *Yes, sir.*

19 RR 2460 (prosecution cross of Mr. Medina's aunt, Sherry Grein).

Thus, in his closing argument, the prosecutor was able to effectively argue that the jury should answer the mitigation special issue "no" because nothing about his background was mitigating:

> . . . first thing you have to do is decide[,] is there mitigation? Is there something that [sic] lessons his blameworthiness or tends to explain his crime? Did you hear anything? Anything whatsoever? A speech impediment when he is a child explains why he murdered two children on New Year's Eve? My God, that's ludicrous.

20 RR 2562. Counsel's omissions allowed the prosecution to argue that nothing about Mr. Medina's background was mitigating.

As the Supreme Court recognized in *Sears*, even "adverse" aspects of a defendant's mitigation mental health evidence can actually help the jury understand the context of the defendant's actions and thus shape their view of his culpability:

> Finally, the fact that along with this new mitigation evidence there was also some adverse evidence is unsurprising, given that counsel's initial mitigation investigation was constitutionally inadequate. Competent counsel should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking, were features, in another well-credentialed expert's view, [] of a "profound personality disorder." *This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears, and his horrendous acts—especially in light of his purportedly stable upbringing*.

*Sears*, 130 S.Ct. at 3264 (emphasis added, internal citations omitted)

The jury was deprived of an accurate picture of Mr. Medina's background, childhood, and

mental health impairments.  The prosecution capitalized by telling a story about a scary gangster who, even as a child, was such a bad seed that he was irretrievably immune from the intervention of well-intentioned people.  As the evidence developed in a competent social history demonstrates, the prosecution's creation is a highly prejudicial fiction.  *See Sears*, 130 S.Ct. at 3262 (counsel's deficient performance allowed the prosecution to paint a false and damaging picture of a defendant's background bereft of mitigating circumstances).  That the jury was permitted to sentence Mr. Medina to death based on a such a distorted understanding of his background and the circumstances of the crime undermines confidence in the outcome of his trial.

"This is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.'" *Porter*, 130 S.Ct. at 454 (quoting *Strickland*, 466 U.S. at 700).  As in *Porter*,

> The judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to ***accurately gauge his moral culpability***.  They learned about Porter's turbulent relationship with [the victim], his crimes, and almost nothing else.  Had Porter's counsel been effective, the judge and jury would have learned of the "kind of troubled history we have declared relevant to assessing a defendant's moral culpability."  *Wiggins, supra,* at 535, 123 S.Ct. 2527.

*Id*. (emphasis added).  This Court should unhesitatingly find that Mr. Medina was prejudiced by counsel's deficient performance.

> **D.     The AEDPA poses no bar to granting relief on Mr. Medina's ineffective assistance of counsel claim because the state court rejection was both an unreasonable application of clearly established Supreme Court precedent and resulted from an unreasonable determination of the facts in light of the evidence before the state courts.  28 U.S.C. § 2254(d).**

The AEDPA is no bar to habeas corpus relief for Mr. Medina's claim because the state court adjudication was unreasonable in numerous respects, many of which have been noted above.  Mr.

Medina need demonstrate only that the state court rejection was unreasonable under either 2254(d)(1) or 2254(d)(2), but he can show both.

      **1.**      **The state court decision was based on an unreasonable application of** ***Strickland*.**

The state court rejection of Mr. Medina's punishment phase ineffective-assistance-of-counsel claim was an unreasonable application of *Strickland*.  For example, the state court concluded that Mr. Medina "failed to show ineffective assistance of counsel based on trial counsel's reasonable strategic decisions," Findings at 53, and that counsel's strategy was "to show that [Mr. Medina] was not a future danger."  *Id*. at 39.  However, counsel wholly failed to conduct a social history investigation.  Counsel could not have made an ***informed*** strategic decision about their punishment phase defense without first investigating.  Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation.  *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527–28.  Deferring to counsel's allegedly strategic decisions in the absence of a social history investigation was unreasonable under *Strickland*, especially when counsel failed to investigate and present evidence to support even the few arguments Mr. Millin advanced as a basis for a life sentence.

Additionally, the state court concluded that "[t]rial counsel were not ineffective for presenting extensive punishment evidence to support the defensive theory that the applicant would not be [sic] future danger."  Findings at 39; 53.  As in *Sears v. Upton*, 130 S.Ct. at 3265, "[t]here are two errors in the state court's analysis of Sears' Sixth Amendment claim.  First, the court curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory."  Second,

> And, more to the point, that a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation **before** arriving at this particular theory prejudiced Sears. The "reasonableness" of counsel's theory was, at this stage in the inquiry, beside the point: Sears might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not.

*Id* (emphasis added).  Likewise, even if trial counsel's preparation for the future dangerousness issue could be credibly deemed adequate, that would not excuse defense counsel from preparing and presenting a case for life on the mitigation special issue:

> This point is plain in *Williams:* We rejected any suggestion that a decision to focus on one potentially reasonable trial strategy—in that case, petitioner's voluntary confession—was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."  529 U.S., at 396, 120 S.Ct. 1495.  A "tactical decision" is a precursor to concluding that counsel has developed a "reasonable" mitigation theory in a particular case.

*Id*.  Nor was counsel's last-minute round-up and presentation of family members somehow sufficient to defeat a showing of prejudice:

> But we also have found deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase.  *E.g., Williams, supra*, at 398, 120 S.Ct. 1495 (remorse and cooperation with police); *Rompilla v. Beard*, 545 U.S. 374, 378, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (residual doubt).  We did so most recently in *Porter v. McCollum*, 558 U.S. ----, ----, 130 S.Ct. 447, 449, --- L.Ed.2d ---- (2009) (*per curiam*), where counsel at trial had attempted to blame his client's bad acts on his drunkenness, and had failed to discover significant mitigation evidence relating to his client's heroic military service and substantial mental health difficulties that came to light only during postconviction relief, *id.,* at 453-54.  **Not only did we find prejudice in Porter, but—bound by deference owed under 28 U.S.C. § 2254(d)(1)—we also concluded the state court had unreasonably applied Strickland's prejudice prong when it analyzed Porter's claim**.  *Porter, supra,* at ----, 130 S.Ct., at 454-55.

*Id*. at 3266 (emphasis added).

Because the state court decision involved an unreasonable application of *Strickland*, there is no bar to federal habeas corpus relief.  28 U.S.C. § 2254(d)(1).

-263-

## 2.  Unreasonable determination of the facts in light of record before the state courts.

Additionally, when the state courts rubber-stamped the prosecutor's proposed findings of fact and conclusions of law, they decided Mr. Medina's claim based on numerous unreasonable determinations of fact in light of the state court record, any one of which defeats the application of § 2254(d) to this claim.

As already noted, the state courts had before them evidence that Mr. Millin was solely responsible for the punishment phase. Mr. Millin's notes reflect that he never asked Mr. Medina any social history-related questions. The state courts also had the fee statement of the investigators who, at most, devoted a few hours to the punishment phase of the case, and only after the trial was under way. The testifying defense witnesses uniformly reported that they were were not interviewed or prepared before they were called to the stand. Almost all of the witnesses were first contacted by the defense on the same day they testified, one was plucked out of the audience. Numerous other witnesses were available but were never contacted. Trial counsel collected no social history records whatsoever, not even the records necessary to support Mr. Millin's argument that Mr. Medina would pose no future danger in custody. Despite the clear record of counsel's near total abdication of their duty to investigate and prepare for the punishment phase, the state courts found that Mr. Medina "failed to show deficient performance" or that counsel "failed to adequately prepare for punishment." This was an unreasonable determination of fact based on the record before the state courts.[104]

The state court decision was also based on a determination that the evidence presented in post-conviction was "presented at trial or is merely an enlargement upon trial counsel's punishment

---

[104] It is also an unreasonable application of *Strickland*.

theme of [Mr. Medina] being an essentially good person caught in a bad environment." Findings at 39. This finding cannot be squared with the extensive evidence developed for the first time in post-conviction proceedings, especially since trial counsel himself acknowledged that he was not even aware, for example, of the substance abuse and domestic violence in the Medina home. Likewise, though trial counsel represented to the trial court that they would be ineffective if not granted funding for a mental health expert, they never hired one. In post-conviction, Mr. Medina presented a mental health evaluation explaining how the traumas of Mr. Medina's childhood led to his PTSD, a serious, Axis I mental impairment. Mr. Medina also presented the affidavit of Charles Rotramel, an expert in street gangs. Nothing remotely similar to this evidence was developed or presented by trial counsel, and the state court finding to the contrary was a patently unreasonable determination of fact that undoubtedly undermined the prejudice analysis.

Additionally, the state court found that "[t]rial counsel were not ineffective for presenting **extensive** punishment evidence to support the defensive theory that the applicant would not be [sic] future danger." Findings at 53. Again, the defense performed no investigation and Mr. Millin's attempt to argue lack of dangerousness in prison was successfully defeated by the prosecution's objection that defense had introduced **no evidence** to support it. The defense case was only 65 minutes in length. Mr. Millin's two- to four-page direct examinations of his witnesses were often eclipsed by the prosecution's lengthier cross-examination. Trial counsel, who had never interviewed the witnesses, had no idea what he would elicit from his witnesses, and thus asked bland questions about whether Mr. Medina was respectful to the adults in the family. The only aspect of the defense case properly labeled "extensive" is the catalog of the shortcomings of the defense investigation in light of the prevailing professional norms. Denying relief based on a finding that trial counsel

presented "extensive" evidence was unreasonable.

The state court decision was also based on an unreasonable determination of fact in light of the evidence before it because the state court unreasonably adopted the prosecutor's finding that Dr. Lundberg-Love was "unpersuasive." Findings at 38. The state presented no expert of its own, failed to contest Dr. Lundberg-Love's credentials or qualifications to evaluate Mr. Medina, and failed to identify any flaws in Dr. Lundberg-Love's psychological testing and evaluation. Even if the state court had any legitimate reason to discount Dr. Lundberg-Love's expert opinion based on the evidence before it, wholly disregarding her evaluation—which the state court surely did if it concluded that the Mr. Medina's post-conviction evidence was merely cumulative of the trial case—was unreasonable. The Supreme Court has held that such a wholesale discounting of evidence is unreasonable even when the state presents competing expert testimony: "[w]hile the State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge." *Porter v. McCollum*, 130 S.Ct. at 455.

Because the state court decision was riddled with unreasonable applications of *Strickland* and based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d) poses no bar to habeas relief.

**IV.    Trial Counsel was ineffective throughout pre-trial and jury selection**

   **A.  Trial counsel failed to timely challenge the Harris County grand jury system**

A challenge to the grand jury array must be made when the grand jury is impaneled or, when that is not possible, before trial commences.  *Muniz v. State*, 573 S.W.2d 792 (Tex. Crim. App. 1978).  Trial counsel for Mr. Medina failed to challenge the process whereby Harris County grand juries underrepresent Hispanics and, thus, failed to preserve a meritorious claim.

In 1996, at the time of Mr. Medina's indictment and trial, the composition of Harris County grand juries raised serious concern.  So much so, in fact, that in the fall of 1996, the Houston Chronicle published a study finding serious underrepresentation of Hispanics in the grand jury process.  *See* Bob Sablatura, "Sword & Shield: Grand Juries in Texas/A question of fairness/Some Call Grand Juries a Tool of Prosecutors," Houston Chronicle, Nov. 24, 1996 at Sec A, pg. 1, http://www.chron.com/CDA/archives/archive.mpl?id=1996_1379750 (last visited 10/5/09); Bob Sablatura, "Sword & Shield: Grand Juries in Texas/A question of fairness/Grand jurors typically are affluent, middle-aged Anglos," Houston Chronicle, Nov. 24, 1996 at Sec A, pg.   24,   http://www.chron.com/CDA/archives/archive.mpl?id=1996_1379763   (last   visited 10/5/09) [insert].  Furthermore, it cannot be disputed that the Texas defense bar recognized the ability to challenge the grand jury process as such a challenge had been available for years prior to Mr. Medina's trial.  *See, e.g., Castaneda v. Partida,* 430 U.S. 482 (1977)(successful challenge to grand jury system) ; *State v. Rousseau*, 855 S.W.2d 666 (1993)(unsuccessful 1989 Harris County challenge based on juror forepersons); *Cerda v. State*, 644 S.W.2d 875 (Tex. App. Amarillo 1982)(successful challenge to Hale County grand jury system); *Flores v. State*, 783 S.W.2d 793 (Tex. App. El Paso 1990)(successful 1988 challenge to Ector County grand jury system).

Both the public concern in Harris County and the existing Texas case law should have indicated to Mr. Medina's counsel that an investigation into the Harris County grand jury system would prove fruitful.  Based upon a review of trial counsels' files, however, it is clear that such a challenge was never investigated nor pursued.   Trial counsels' failure to challenge the discriminatory practices of the Harris County grand jury system deprived Mr. Medina of effective assistance of counsel.   *See Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982)(ineffective assistance for failing to raise grand jury claim); *Hollis v. Davis*, 912 F.2d 1343 (11th Cir. 1990)(ineffective assistance in failing to challenge grand jury composition).

Had trial counsel undertook a minimal investigation, they would have discovered that, despite the growing population of Hispanics in Harris County, their representation as grand jury panelees was appallingly low.  A timely challenge to the Harris County grand jury system would have succeeded and Mr. Medina's indictment would have been dismissed.  (A claim of racial discrimination in the grand jury process, moreover, is not subject to harmless error analysis.  *See Rose v. Mitchell*, 443 U.S. 545 (1979)).  *See infra*.

## B.  Ineffective Assistance of Counsel –*Voir Dire*

Jury selection in capital cases is unlike that in conventional criminal cases.  Jurors are examined individually rather than en masse, and a complex set of precedents and principles applies to death penalty jury selection that have no play in a noncapital case.  The critical importance of *voir dire* has been acknowledged by courts, *see e.g. Rosales Lopez v. United States*, 451 U.S. 182, 188 (1981)(White, J., plurality opinion)("*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the

evidence cannot be fulfilled.  Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges...")(internal citations omitted) and administrative agencies overseeing the proper functioning of the criminal defense system, *see e.g.* Compendium for Standards for Indigent Defense Systems, U.S. Dept. of Justice, Vol. III, G 1 commentary ("Jury selection may be the most important responsibility of the trial attorney. Jury selection in capital cases is especially complex...").

*Voir dire* in a capital case also provides the only means to ascertain jurors' predispositions towards the death penalty, their ability to properly consider mitigating circumstances and any possible biases they may have against types of evidence that may be introduced.  As one Federal Court has observed, "competent capital defense lawyers try to develop a sentencing strategy well before *voir dire* to allow them to question potential jurors about mitigating evidence that will be offered in the sentencing phase." *Valdez v. Johnson*, 93 F.Supp.2d 769, 785 (S.D. Tex. 1999).  This view is echoed by Mr. Clive Stafford Smith who states, "[c]ounsel cannot properly *voir dire* the jury without knowing what the defense presentation will look like at both phases, since counsel must ask questions that identify jurors sympathetic with the themes the defense will present."  Exhibit 19 at 27. (Affidavit of Clive Stafford Smith).

A brief perusal of the record provides indisputable proof that counsel for Mr. Medina abdicated this most important responsibility of ensuring an impartial jury.  Despite the paramount importance of *voir dire* in a capital case, counsel for Mr. Medina spent little effort ascertaining individual juror's views.  Defense counsel spent, on average, less than 7 minutes questioning each juror.  Of the jurors who were eventually seated, trial counsel spent an average of 6 minutes per juror, including questioning one juror for 1 minute and failing to ask another

juror a single question.   As the *voir dire* progressed, trial counsel appeared to abandon questioning jurors altogether: the *voir dire* of the tenth seated juror was only five pages, 11 RR 1238-42, the eleventh a mere one page, consisting of asking the juror if he was "a fair guy", 11 RR 1262, and the last seated juror was asked no questions at all.  11 RR 1284.

> The Supreme Court has proclaimed that

> [a] trial ... is, at bottom, nothing more than the sum total of a countless number of small discretionary decisions made by each individual who sits in the jury box. The difference between conviction and acquittal turns on whether key testimony is believed or rejected; on whether an alibi sounds plausible or dubious; on whether a character witness appears trustworthy or unsavory; and on whether the jury concludes that the defendant had a motive, the inclination, or the means available to commit the crime charged.  A ... biased juror sits with blurred vision and impaired sensibilities and is incapable of fairly making the myriad decisions that each juror is called upon to make in the course of a trial.  To put it simply, he cannot judge because he has prejudged.

*Turner v. Murray*, 476 U.S. 28, 42-43 (1986)(Brennan, J., concurring in part and dissenting in part).

Mr. Medina's counsel failed to engage in meaningful *voir dire* to determine whether those "small discretionary decisions" that would mean the difference between life or death were to be made by unbiased jurors, capable of fairly deciding Mr. Medina's fate.  By abdicating this ultimate responsibility trial counsel ensured a jury predisposed against Mr. Medina, a failure which ultimately entrusted "the determination of whether a man should live or die to a tribunal organized to return a verdict of death."  *Witherspoon v. Wainwright*, 391 U.S. 510, 520 (1968). Among other things, counsel (1) failed to assert cause challenges for jurors who demonstrated obvious bias and inability to follow the law, (2) failed to use *voir dire* to develop cause challenges for obviously unqualified jurors, (3) failed to question juror about potential bias towards gangs, (4) failed to ask a single question of an absolutely disqualified juror.

### 1. Failed to strike jurors for cause

Throughout the *voir dire*, trial counsel failed to adequately follow up on comments by jurors which indicated they harbored preconceptions and biases that would have justified striking them for cause.  His attempts to question the jurors were often little more than rambling lectures and, rather than develop potential cause challenges during defense *voir dire*, counsel actually rehabilitated jurors who demonstrated bias and inability to follow the law.  This failure to strike biased venirepersons violated Mr. Medina's right to an impartial jury.  *See Hughes v. U.S.*, 258 F.3d 453 (6th Cir. 2001).

### a.  Juror Natale

Juror Francis Joseph Natale indicated to the Court that, although he was generally in favor of the death penalty, certain cases mandated a death sentence.

> Juror Natale:  I mean, I don't want to see anybody die, personally.  But if that person did whatever it is he did and that's the punishment, and that's what he deserves, I'm for it.  **There are, like I said before, a few cases where I would be outraged if they didn't get that and that's where it concerns small children.**  I mean, that could be because of my life, where I'm at, I have young children.

4 RR 269 (emphasis added).

Mr. Natale honestly expressed concern about certain cases because of "where he was at in his life:" a father with two young children, aged 13 and 7.  *Id.*  Despite such a clear signal that Juror Natale would automatically impose the death penalty in cases involving small children, trial counsel never inquired into Mr. Natale's obvious predisposition, thereby waiving challenges based on *Pierce v. State*, 604 S.W.2d 185 (Tex. Cr. App. 1980)(juror who demonstrates inability to consider full range of punishment for capital murder is subject to challenge for cause), *overruled on other grounds*, *Hernandez v. State*, 757 S.W.2d 744, 751-52 n. 15 (Tex. Cr. App.

1988), and *Morgan v. Illinois*, 504 U.S. 719 (1992)(federal constitution guarantees defendant right to strike for cause any juror who would automatically sentence defendant to death upon conviction for capital murder).  Trial counsel's failure was made even more egregious by the fact the victims in the present case were indeed children, close to the same age as Mr. Natale's own.

Trial counsel apparently recognized Mr. Natale's pro-prosecution propensity for he began the defense *voir dire* by stating, "You impress me as being a pretty law-enforcement-type person, law and order; is that correct?"  4 RR 280.

Mr. Natale, during the State's *voir dire*, also expressed concerns about the possibility of parole.

> Juror Natale:    The fact that they are in prison no one can say that person will stay in prison for their whole entire life.  In my lifetime I've seen a person who has been given the death penalty be put in a position where he is eligible for parole.  Whether he ever gets it or not I don't know ... I personally think that if a person's that bad, to get the death penalty, giving them life in prison, they have a chance to get out.  No matter how slight that is, they have an opportunity to get out.

4 RR 267-68.

Although well-settled case law of the Texas Court of Criminal Appeals instructs that a judge must sustain a cause challenge to a juror who is incapable of disregarding parole in determining matters of punishment in a capital case, *see e.g. Felder v. State*, 758 S.W.2d 760 (Tex. Crim. App. 1988), Mr. Medina's trial counsel made no such challenge.  Nor did he further question Mr. Natale in an attempt to better understand his concerns.  During defense *voir dire*, trial counsel for Mr. Medina lectured Mr. Natale until he rehabilitated this objectionable juror.

> Guerinot:      I want to touch very briefly on if you get to the punishment stage, and you voiced a concern about parole.  Now, I'm going to tell you up front that if we ever got to that stage, this Judge would tell you you're not to consider parole for any reason whatsoever.  It does not add into the mix at all.  The other is that if

it were a close question as to whether or not the State ever proved the first question should be yes or not you thought, well, it could be some mitigation here, but, gosh, if this guy ever got out of jail – and whatever that little slim deal is that you talked about – I wouldn't want that to happen so I'm going to go ahead and vote in such a way to get the death penalty.

Juror Natale:   What I believe my intent was not whether or not the person ever got parole or whether or not he got the death penalty. It was if the person got the death penalty and then somehow got put – paroled back on the streets.

\* \* \*

Guerinot: But the bottom line is that's not a concern or should not be a concern of yours, and it can't enter into the mix.

Juror Natale:   Well, if that's the rules, then I can – I wouldn't let that personal thing or that effect my decision.  No. There's rules you have to follow to do this job or this responsibility.

4 RR at 285-86

Counsel accepted Mr. Natale even though he 1) was admittedly pro-law-enforcement, 2) voluntarily expressed dismay at the possibility of parole and 3) informed the parties that he would be outraged if someone convicted in a case involving small children didn't get the death penalty.

### b.  Juror Amanda Stewart

Juror Amanda Riddle Stewart, during the State's *voir dire*, expressed her disagreement with the Texas capital murder statutes.  After an explanation of the statutes from the prosecutor, he asked if she thought it was appropriate to limit death eligibility to certain kinds of murders. 11 RR at 1228.  Juror Stewart responded:

Juror Stewart:          Well, actually no.  I think that any murder is capital murder.  I think all murders need to be looked at for any reason that someone decides to take someone else's life.  You know, we can't bring that other person back and whatever the circumstances behind it I think murder is serious.

> Mr. Baldassano:        Sure.
>
> Juror Stewart:        I don't think it's all capital letters or small letters or murder is murder.  And, you know, true, there are circumstances that are different things, but, I mean, murder is murder.  I don't know why he did it.  I don't know anything about this case, but to me murder is murder.

*Id.*

Notwithstanding Juror Stewart's admitted predisposition to automatically assess the death penalty in all murder cases, in clear contravention of *Morgan v. Illinois*, 504 U.S. 719 (1992), Mr. Guerinot asked no questions about this topic during *voir dire*.  In fact, Mr. Guerinot did not ask a single question relating to a possible punishment phase, but instead simply posed leading questions regarding witness credibility and the presumption of innocence.  11 RR 1238-42.  Juror Stewart was ultimately accepted by Mr. Guerinot despite her belief that all murders deserved the death penalty.

Mr. Medina, thus, began trial with a tribunal organized to return a verdict of death: one juror who would be outraged if a case involving children didn't end with the death penalty and another who believed that all murderers should be executed.

### 2.  Failed to use *voir dire* to develop cause challenges

In antithesis to counsels' failure to strike clearly objectionable jurors, trial counsel frequently, and inexplicably, exercised peremptories without moving for a cause challenge or even conducting *voir dire*.

### a.  Prospective Juror Roeseler

This utter abdication of his duty to ensure Mr. Medina's peremptories were intelligently exercised is clearly demonstrated with prospective juror Roeseler.  Before *voir dire* even began, obvious indications existed that Ms. Roeseler would be unable to follow the law in a capital case

and was a strong candidate for a defense cause challenge.   On her juror questionnaire, for example, when asked "Could there be facts about a person's character or background that would make you believe they were less blameworthy for a crime?" Ms. Roeseler answered "No".

Her predilection for assessing the death penalty was also brought to light in the first moments of the State's *voir dire*.  After the judge completed a brief *voir dire* of Ms. Roeseler and the State asked about her stepson's incarceration, the prosecutor began to ask about her views on capital punishment:

> Mr. O'Brien:          I want to ask you can you give us some idea of what your feeling is about capital punishment?  Regardless of what we asked you on this questionnaire, what comes to your mind when I throw out capital punishment or the death penalty?
>
> Juror Roeseler:          Well, it's very serious, or course.  It's very – I mean it's the ultimate.
>
> Mr. O'Brien:          Uh-huh.  Okay.
>
> Juror Roeseler:          But I think some crimes are heinous enough to warrant the death penalty.
>
> O'Brien:          Okay.  Can you tell us why do you think we ought to have the death penalty, if you are in favor of it?
>
> Juror Roeseler:          Well, they did away with hanging, so I think there has to be some sort of deterrence.
>
> Guerinot:          I'm going to excuse this juror, Judge.

5 RR 347.

Despite the juror's obvious likelihood to automatically assess the death penalty, trial counsel made no motion to strike the juror for cause nor even asked a single question to develop a cause challenge.

### b.  Prospective Juror Clement

Prospective juror Clement asserted his belief that "the death penalty would be imposed if

somebody has murdered someone else, taken somebody else's life." 6 RR 413. Realizing prospective juror Clement expressed views in contravention of *Morgan v. Illinois, supra*, the prosecutor unsuccessfully tried to rehabilitate the prospective juror:

> Mr. Baldassano:     Could you follow the law in this case that says – the Judge will give you – that the State has to prove a murder plus something else to make it a capital murder, otherwise, you could not find someone guilty of capital murder?  Could you follow that?
>
> Mr. Clement:         I don't think so.

6 RR 415.

Only when the prosecutor asked prospective juror Clement broadly if he could follow the law did Mr. Clement hesitantly accede, stating "I think so." *Id.* at 416. Defense counsel made no motion to strike Mr. Clement for cause nor did he attempt to further delve into Mr. Clement's obvious lack of qualifications to serve on a capital jury. Mr. Medina's trial counsel, in fact, conducted no *voir dire*:

> Mr. Guerinot:  We have no questions.
>
> The Court:       Pardon?
>
> Mr. Guerinot:  We have no questions and would excuse.

6 RR 416.

### 3.  Failure to question jurors about potential bias towards gangs

There was little doubt that the State was planning to introduce evidence of Mr. Medina's gang affiliation during trial. Not only was Mr. Medina's gang involvement undisputed but many of the State's own witnesses admitted membership in various Houston gangs. Moreover, the State's theory proposed that the drive-by murders were committed in retaliation for a previous gang-associated murder.

Gang evidence carries an undeniable ignominy in the eyes of the public, a stigma which has been recognized by many courts of law.  The Seventh Circuit, for example, decried the unfair prejudice associated with gang-affiliation evidence, acknowledging that "[g]angs generally arouse negative connotations and often evoke images of criminal activity and deviant behavior." *United States v. Irvin*, 87 F.3d 860, 866 (1996).  Even persons who "may have had no direct or indirect involvement with gangs, [may] yet be biased against gang members or hold a negative opinion on the subject of gangs."  *People v. Strain*, 742 N.E.2d 315 (Ill. 2000).  The danger in the presentation of gang-affiliation evidence is obvious: There is the possibility "that a jury's negative feelings towards gangs will influence its verdict.  Guilt by association is a genuine concern whenever gang evidence is admitted."  *United States v. Irvin*, 87 F.3d 860, 866 (1996).

Despite knowing gang related issues would play a major role in Mr. Medina's trial, counsel made no effort to ascertain prospective jurors' attitudes towards gangs.  Not once did Mr. Medina's trial counsel ask a single question pertaining to possible prejudice against gang association.  Without this information, trial counsel had no means of exercising informed and intelligent peremptory challenges nor asserting cause challenges against those jurors who could not set aside such a bias.  The perfunctory *voir dire* by trial counsel failed to assure the selection of a panel of jurors free from bias and prejudice.  *See People v. Strain*, 742 N.E.2d 315 (Ill. 2000)(reversing conviction where judge refused to conduct *voir dire* into possible bias against gangs).

### 4.  Failure to Question a Juror Who Was Absolutely Disqualified

Juror Alma Volante, the last juror seated in Mr. Medina's case, misrepresented numerous facts on her juror questionnaire. *See infra*.

Counsel has a duty to diligently question jurors regarding possible bias or prejudice.

*Brandon v. State*, 599 S.W.2d 567 (Tex. Crim. App. 1979).  This duty entails asking potential jurors specific questions and follow-up questions once possible bias is discovered.  *Armstrong v. State*, 897 S.W.2d 361 (Tex. Crim. App. 1995).   Absent diligent questioning, error is not properly preserved.  *See Gonzales v. State*, 3 S.W.3d 915 (Tex. Crim. App. 1999)(counsel failed to preserve error by failing to rephrase questions on juror questionnaire).

Mr. Medina's trial counsel failed to diligently question Juror Alma Volante and due to this failure allowed an absolutely disqualified juror to sit on Mr. Medina's trial.

**V.     The trial court's instructions to the jury regarding parole eligibility and good time credits were confusing, inaccurate, unreliable, and violative of Mr. Medina's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

After the close of testimony at the punishment phase of Mr. Medina's trial, the Court prepared a charge which was very different from that specified in the Texas Code of Criminal Procedure art. 37.071.  In 1996 when Mr. Medina was tried, the statutory punishment phase charge for capital cases made absolutely no reference to parole or good conduct time.  *See* TEX. CODE CRIM. PROC. art. 37.071§2(e) (Prior to Sept. 1, 1999).   In fact, voluminous case law specified that parole was not an appropriate consideration in deciding between a life sentence and death in a capital murder trial.  *See Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (citing *Jones v. State*, 843 S.W.2d 487, 495 (Tex. Crim. App. 1992); *Ellason v. State,* 815 S.W.2d 656, 665, n. 5 (Tex. Crim. App. 1991); *Stoker v. State*, 788 S.W.2d 1, 16 (Tex. Crim. App. 1989)).   Trial counsel requested that the standard punishment phase charge be given, but the trial judge significantly altered the charge in a manner that was confusing, inaccurate, and unconstitutional.  20 RR 2524.  Specifically, the trial judge utilized the charge for non-capital murder cases which specifically discussed issues of parole and, importantly to the claims presented here, the application of "good time" credits to sentences.  The section of the charge at

issue read:

> Under the law applicable in this case, the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration through the award of good conduct time.  Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation.   If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

> It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served equals forty (40) calendar years, without consideration of good conduct time.  Eligibility for parole does not guarantee that parole will be granted.

> It can not accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.

> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant.   You are not to consider the manner in which the parole law may be applied to this particular defendant.

1A CR at 145.

This charge is inaccurate and misleading and its use in Mr. Medina's sentencing phase was a violation of his rights under the United States constitution.   The charge is inaccurate because the jury was instructed as to how a Texas prisoner earns "good time" credit to his sentence.  The jury was then told that it could consider "the existence of the parole law and good conduct time."  The problems with this instruction are multiple.

First, the charge asked the jury to consider matters that Texas Courts have specifically and repeatedly held were irrelevant and improper.  *See Smith*, 898 S.W.2d at 846.  Further, the law was clear at the time of Mr. Medina's trial that "good time" credit was simply not available

to a person convicted of capital murder under TEX PEN CODE § 19.03.  *See* TEX. GOVT. CODE § 508.149 (a)(3).  Therefore, the Court's charge asked the jury to consider the existence of "good time" credits, which did not exist, and the possibility of parole, which had been repeatedly held to be improper and irrelevant.[105]

### A.  The trial court's erroneous and misleading charge authorizing the jury to consider "good time" and parole violated Mr. Medina's rights under the United States Constitution

Because the instruction given to Mr. Medina's jury told them that Mr. Medina would receive "good time" credit reducing the number of years to serve on a life sentence, and improperly directed them to consider the existence of parole, the jury was misled as to the amount of time Mr. Medina would be required to serve if sentenced to a life term rather than death.  The instruction misled the jury by informing them that they could consider the existence of good conduct time when Mr. Medina was statutorily ineligible for such a benefit.  *See* TEX. GOVT. CODE § 508.149 (a)(3).  The trial court's instruction in Mr. Medina's case was provided over the objection of the defendant, *see* 20 RR 2425, and adapted from a statute which specifically excluded itself from capital cases.  *See* TEX. CODE CRIM. PROC. Art. 37.07§ 4(a)

---

[105] The Texas Legislature has since enacted a law which allows the court to instruct, upon request, that:

> under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time.  It can not be accurately predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

TEX. CODE CRIM. PROC. art. 37.071§2(e)(2)(B).  That law, however, was not in place at the time of Mr. Medina's trial, and in any event, it in no way suggests that "good time" credits are available to a capital defendant such as Medina.

("unless the defendant has been convicted of a capital felony . . ."). Furthermore, the instruction misled the jurors by informing them that they could consider the existence of good conduct time when Mr. Medina was statutorily ineligible for such a benefit. *See* TEX. GOVT. CODE § 508.149 (a)(3).

### 1. The instruction violated the due process provisions of the United States Constitution

The instruction given to Mr. Medina's jury violated the Due Process Clause and the Eighth and Fourteenth Amendments to the United States Constitution. The charge incorrectly informed the jury that Mr. Medina "may earn time off the period of incarceration imposed through the award of good conduct time." *See* 1A CR at 145. It then implied that Mr. Medina might serve less than 40 years before being eligible for parole by stating that he would "not become eligible for parole until the actual calendar time served equals forty (40) calendar years, ***without consideration of good conduct time***." *Id.*[106] The charge further directed the jury's

---

[106] The ambiguity of this instruction is demonstrated by a comparison with the language of both the non-capital instruction from which it was adopted as well as the new capital instruction which was enacted by the Texas Legislature in 1999. In the non-capital instruction, the paragraph which was changed to include the language that the defendant would not be eligible for parole for 40 years describes how parole eligibility is normally calculated. The statutory instruction reads:

> if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served ***plus any good time*** equals one forth of the sentence imposed, or 15 years, whichever is less.

Tex. Code Crim. Proc. art 37.07 §4(b). Thus the instruction as a whole is designed such that good conduct time will be factored into any consideration of parole eligibility in the paragraph following the definition of good conduct time. By using the ambiguous phrase, "without consideration of good conduct time" in the charge to Mr. Medina's jury, the jury was invited to speculate that good conduct time would operate to reduce the time of parole eligibility further, as is done in the non-capital instruction.

The Texas Legislature corrected this misimpression when it drafted the parole eligibility instruction for capital cases applicable in cases tried after September 1, 1999. The Legislature omitted the paragraphs describing the operation of good conduct time and explicitly stated that the defendant would not be eligible for parole until he had served 40 years, "***without***

consideration to the inaccurate statement that Mr. Medina would "earn time off" his sentence because it instructed that jurors "may consider the existence of parole law and good conduct time." *Id*. This charge supplied the jury with false information which "had the effect bringing about an enhanced punishment." *See Rose v. State*, 752 S.W.2d 529, 532 (Tex. Crim. App. 1987). Such a charge fails to meet the constitutional standards required in capital sentencing proceedings. *See Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985).

As discussed more fully below, proceedings resulting in a sentence of death are subject to heightened standards of reliability because of the qualitatively different stakes in a capital case. *Woodson v. North Carolina*, 428 U.S. 280 (1976). Accordingly, the Supreme Court has offered a set of principles to ensure that juries in capital proceeding focus their attention upon relevant and accurate information about the nature and scope of the sentencing options. In *Gardner v. Florida*, 430 U.S. 349, 362 (1977), the Court invalidated a death sentence imposed after the sentencer relied upon potentially inaccurate information, holding that "the Due Process Clause does not allow the execution of a person on the basis of information which he had no opportunity to deny or explain." Similarly, in a case in which the jury was affirmatively misled about the consequences of its sentencing decision, the Court held that "it is constitutionally impermissible to rest a death sentence on a determination by the sentencer that the responsibility for determining the appropriateness of the defendant's sentence rests elsewhere." *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985).

---

*consideration of any good conduct time.*" Tex. Code Crim. Proc. art 37.07 § 2(e) (After September 1, 1999) (emphasis added). The addition of the word "any" changes the implication of the instruction. Simply stating that the defendant must serve 40 years "without consideration of good conduct time" implies that the issue of good conduct time will change the ultimate result. Instructing that the defendant must serve 40 years without consideration of *any* good conduct time makes the reference to good conduct time more specific and implies that no good conduct time will be applied against the 40 year time.

These principles reached their apex in *Simmons v. South Carolina*, 512 U.S. 154 (1994). In *Simmons*, the defendant argued that his Eighth and Fourteenth Amendment rights were violated by the trial court's refusal to inform the jury that if he were to receive a life sentence, he would have been ineligible for parole as a matter of state law because of his prior convictions. *Simmons*, 512 U.S., at 156 (plurality opinion); *id.* at 176 (O'Connor, J., concurring in judgment). During the penalty phase deliberations, Mr. Simmons's jury asked in a note to the judge: "Does the imposition of a life sentence carry with it the possibility of parole?"  *Id.*, at 160 (plurality opinion).  In response, the trial court, over defense counsel's objection, instructed the jury: "Do not consider parole or parole eligibility [in reaching your verdict].  That is not a proper issue for your consideration." *Id.*, at 160 (plurality opinion).  *Id.*[107]

On appeal, the Supreme Court held that it did not comport with due process for the State to "secur[e] a death sentence on the ground, at least in part, of [defendant's] future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its [only] noncapital sentencing alternative . . ."  *Id.*, at 162 (plurality opinion); *see id.* at 178 (O'Connor, J.) ("Where the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due

---

[107] In a later case, the Supreme Court specifically addressed whether the jury's questions was of legal significance, holding emphatically that it was not:

> But it cannot matter that Kelly's jury did not ask the judge for further instruction on parole eligibility, whereas the *Simmons* and *Shafer* juries did. *See Shafer*, 532 U.S., at 44, 121 S.Ct. 1263; *Simmons*, *supra*, at 160, 114 S.Ct. 2187. A trial judge's duty is to give instructions sufficient to explain the law, an obligation that exists independently of any question from the jurors or any other indication of perplexity on their part. *Cf.* C. Wright, Federal Practice and Procedure § 485, p. 375 (3d ed. 2000) ("It is the duty of the trial judge to charge the jury on all essential questions of law, whether requested or not"). Time after time appellate courts have found jury instructions to be insufficiently clear without any record that the jury manifested its confusion; one need look no further than *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001), for a recent example.

*Kelly v. South Carolina*, 534 U.S. 246, 256 (2002).

process entitles the defendant to inform the capital sentencing jury - by either argument or instruction - that he is parole ineligible.").[108] Justice Souter's concurring opinion, which Justice Stevens joined, held that the Eighth Amendment requires a capital sentencing jury to be informed of the meaning of life imprisonment under state law because the Eighth Amendment's "need for heightened reliability . . . mandates recognition of a capital defendant's right to require instructions on the meaning of legal terms used to describe the sentences . . . which a jury is required to consider in making a reasoned moral choice between sentencing alternatives." *Id.* (opinion of Souter, J., concurring, joined by Stevens, J.).

The errors in Mr. Medina's case similarly run afoul of the Supreme Court's principles as detailed in *Simmons* and the precedent upon which it relies.  As a result of the trial court's error Mr. Medina's jury labored under a mis-statement of Mr. Medina's parole and good time credit eligibility; Mr. Medina therefore was unable to avoid the same "misunderstanding[s]" and "false choice[s]" that concerned the Court in *Simmons*.  512 U.S. at 161.  Mr. Medina's jury accordingly based its sentencing determination on inaccurate information which Mr. Medina in fact could have corrected, had he been permitted, but instead he was afforded "no opportunity to deny or explain." *Gardner*, 430 U.S. at 362.

The *Simmons* Court also discussed the State's discretion to inform juries about parole and early release, but with the critically important restriction that such information is *true*::

> nothing in the Constitution prohibits the prosecution from arguing any ***truthful*** information relating to parole or other forms of early release.

*Simmons*, 512 U.S. at 168 (emphasis added); *see also Simmons*, 512 U.S. at 168, 169, 177; *California v. Ramos*, 463 U.S. at 1004, n19, 1009, 1012 (information contained in the instruction

---

[108] A majority of justices would later adopt the plurality's holding in *Shafer v. South Carolina*, 532 U.S. 36, 51 (U.S. 2001), holding that "whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole."

was "accurate").

The Ninth Circuit considered a similar issue to that presented by the erroneous and inaccurate instruction in Mr. Medina's case in *Gallego v. McDaniel*, 124 F.3d 1065 (9th Cir. 1997), *cert denied*, 524 U.S. 917 (1998).   In *Gallego*, the jury was given a sentencing instruction which inaccurately stated when the defendant would be eligible for parole if sentenced to a life term rather than death.  *Id*. at 1074.  The Court of Appeals cited *Ramos* in finding the instruction unconstitutional stating: "one of the key factors emphasized by the Court in *Ramos* was that of *accuracy*."  *Id*. at 1075 (emphasis in original).  The Court of Appeals further made clear that its holding was not declaring a "new rule," but rather an application of the holding in *Ramos*.

Without question, the instruction in Mr. Medina's case was inaccurate.  If Mr. Medina had been sentenced to a life term in his capital case, he would not have been eligible for good conduct time at all, period.  *See* TEX. GOVT. CODE § 508.149 (a)(3).  The jury nevertheless was directly instructed that it could consider the existence of good conduct time, 1A CR 145, a fact which would have substantially reduced the amount of prison time to serve under a life sentence. In addition, at the time of Mr. Medina's trial, Texas Courts had well established that evidence concerning parole eligibility was irrelevant and inadmissible.  *See Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (citing *Jones v. State*, 843 S.W.2d 487, 495 (Tex. Crim. App. 1992); *Ellason v. State,* 815 S.W.2d 656, 665, n. 5 (Tex. Crim. App. 1991); *Stoker v. State*, 788 S.W.2d 1, 16 (Tex. Crim. App. 1989)).  Therefore, Mr. Medina was faced with precisely the same situation that the Court considered a due process violation in *Simmons*.  He was unable to introduce any evidence to the jury to rebut the inaccurate information regarding his parole. Furthermore, like the South Carolina scheme, so too in Texas, the jury was specifically required to make findings regarding future dangerousness as a part of its determination of the appropriate

sentence.  Under these circumstances, the instruction given by the court violated due process.

**2.  The instructions violated the Eighth Amendment**

Death is different.  The United States Supreme Court has repeatedly recognized:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long.  Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) (noting that, "[b]ecause sentences of death are 'qualitatively different' from prison sentences, this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake") (quoting *Woodson*, 428 U.S. at 305); *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977) (holding that "[f]rom the point of view of the defendant, [death] is different in both its severity and its finality.  From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action.  It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion"); *Turner v. Murray*, 476 U.S. 28, 35 (1986) (recognizing that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination"); *Beck v. Alabama*, 447 U.S. 625, 638 (1980) (noting that because death is different, "we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination").

More specifically, the United States Supreme Court has held that when a jury is presented

inaccurate or misleading information in which there are reasons to fear unreliability or bias in sentencing, the introduction of that information violates the Eighth Amendment of the United States Constitution. *See Caldwell*, 472 U.S. at 330. The United States Supreme Court applied this rule in *Caldwell*, when a prosecutor argued to the jury that its sentencing decision on death would not be final and that it would be reviewed by the appellate courts. *Id*. at 325. The Court held that informing the jury that its sentencing decision would be automatically reviewed created an unacceptable risk of bias toward a death sentence. *See id*. at 330-334. The Court concluded that, in light of the heightened requirements for reliability in capital sentencing, the argument regarding appellate review violated the defendant's Eighth Amendment rights and mandated a new sentencing proceeding. *See id*. at 341.

As in *Caldwell*, Mr. Medina's jury was given misleading information which has been recognized to create a bias towards a harsher sentence. *See Rose*, 752 S.W.2d at 532 (consideration of parole by jurors enhances punishment). The jury was told that Mr. Medina would "earn time off" his sentence for "good conduct." 1A CR 145. The court then explained that, without consideration of good conduct, Mr. Medina would not be eligible for parole for 40 years. *Id*. In reading the charge as a whole, this language necessarily implied that, with the consideration of Mr. Medina's good conduct in prison, the time before his parole eligibility would be reduced to less than 40 years. Therefore, Mr. Medina's jury was instructed to consider inaccurate information which biased the jury toward death.[109] *See* Exhibit 60 (Affidavit of

---

[109] This inaccurate information concerning good time also violated the Eighth Amendment because it essentially nullified any evidence presented by Mr. Medina that he would not be a future danger. *See Coleman v. Calderon*, 210 F.3d 1047, 1055 (9th Cir. 2000) (instruction is constitutionally infirm when it diverts jury's attention from mitigating evidence). The inaccurate instruction given to Mr. Medina's jury informed them that Mr. Medina's period of incarceration, if given a life sentence, would be reduced if Mr. Medina's behavior in prison was good. Therefore, if the jury followed and understood the instruction, which it is presumed to do, it would necessarily view any evidence presented that Mr. Medina would not be dangerous

Gregory Wiercioch).  As in *Caldwell*, this violated his rights under the Eighth Amendment to the United States Constitution.

Justice O'Connor's concurrence in *Caldwell* confirms that the principles set forth there apply to Mr. Medina's case.  Justice O'Connor wrote specially to address how the Eighth Amendment, as interpreted in that case, applied to the introduction of information regarding post-sentencing procedures.  *See Caldwell*, 472 U.S. at 342 (O'Connor, J. concurring).  She noted that the majority opinion in *Caldwell* distinguished its holding from *California v. Ramos*, 463 U.S. 992 (1983), in which the Court held that the giving of "*nonmisleading* and *accurate*" information regarding the governor's role in the clemency process was not error.  *Id*. (emphasis in original).

Justice O'Connor made clear in *Caldwell* that *Ramos* did not imply that "States are free to expose capital sentencing juries to any information and argument concerning post-sentencing procedures no matter how inaccurate." *Id*. (citing the majority opinion).  She stressed that the Eighth Amendment was violated not by the introduction of the information regarding post-conviction procedures, but by the fact that the information given was misleading.  *Id*. at 343 (The fact that the jury was misinformed "creat[ed] an unacceptable risk that the death penalty may have been meted out arbitrarily or capriciously, or through whim or mistake") (internal citations and punctuation omitted).  The instruction in Mr. Medina's case was clearly inaccurate and misinformed the jury as to the length of time he would have to serve if given a life sentence. This is precisely the type of mis-information which *Caldwell* held to violate the Eighth Amendment of the United States Constitution.

In state post-conviction proceedings Mr. Medina challenged the court's unconstitutional

---

in the future as evidence that he would also be released from prison earlier.  This mandated conclusion reached by the jury was not only false, but unconstitutionally prevented the consideration of his mitigating evidence.  *See Coleman*, 210 F.3d at 1055.

instruction concerning good time and parole eligibility in the same manner that he presents here. Nevertheless, the state habeas court failed to even consider the claim as it related to the good time calculation.  *See* Order at 15-16, ¶¶ 76-82, 41-42, ¶¶ 6-9.  Equally enigmatic, while trial counsel requested that the court give the jury the pattern capital sentencing phase instruction, 20 RR 2524, and objected when the court instead chose to depart from the pattern instruction, 20 RR 2425, the state habeas court still found that the claim was procedurally barred.  Order at 46, ¶ 21.  That procedural default finding is clearly erroneous.  Alternatively, counsel's performance on this issue was necessarily deficient, and there is, therefore, cause sufficient to overcome any putative procedural default.  *McCleskey v. Zant*, 499 U.S. 467, 494 (1991);  *Murray v. Carrier*, 477 U.S. 478, 486-88 (1986).  Given the context of the proceedings, any failure to properly preserve the claim was prejudicial to Mr. Medina.  *United States v. Frady*, 456 U.S. 152, 170 (1982);  *Francis v. Henderson*, 425 U.S. 536, 542 n. 6 (1976).

Mr. Medina submits that trial counsel preserved error because he objected to the court's charge and requested that the standard jury charge be delivered.  20 RR at 2524.  In the alternative, trial counsel's performance was deficient because counsel failed to specifically object to a charge which inaccurately stated the law and implied that Mr. Medina would serve less time in prison than he actually would if sentenced to a life term.

Counsel's error was obvious and its prejudice was undeniable.  There could not have been a strategic reason for trial counsel's failure to specifically preserve error in the charge because the record indicates that he clearly did not want the charge as it was given.  *See Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999) (the court should not "condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at

all."). The prejudice resulting from trial counsel's failure to object is measured by the merits of the claims of constitutional violation briefed *infra* (discussing claims under the Due Course of Law and Separation of Powers provisions of the Texas Constitution, and the Due Process Clause and Eighth Amendment of the United States Constitution).

Mr. Medina's trial counsel objected to the charge given by Judge Robertson and offered that the charge contained in the Administrative Office charge bank be read to the jury. 20 RR at 2524. The trial court denied this request and gave the charge contained in the record. Direct appeal counsel did not raise the issue of the erroneous charge. The erroneous charge was obviously a misstatement of the law and direct appeal counsel's failure to raise the issue was deficient performance which deprived Mr. Medina of a fair trial under *Strickland*'s ineffective assistance of counsel standard.

Direct appeal counsel's failure to raise the issue of the erroneous jury charge clearly prejudiced Mr. Medina. As briefed *supra*, the instruction given to the jury at punishment was a misstatement of the law which led the jury to believe that Mr. Medina would be eligible for parole earlier than he would actually have been if given a life sentence. This instruction violated the Texas Constitution as well as the United States Constitution. Furthermore, the charge harmed Mr. Medina. *See infra; Hill v. State*, 30 S.W.3d 505, 509 (Tex. Ct. App – Texarkana 2000). Therefore, Mr. Medina respectfully requests that this Court place him in the position he would have been had he been appointed effective counsel and grant him a new direct appeal in which he may raise the issue. *See Ex Parte Goodall*, 632 S.W.2d 750 (Tex. Crim. App. 1982).

Finally, on the merits of the claim the state habeas court found that Mr. Medina had not made out a constitutional claim because any error was not sufficiently "egregious." Mr. Medina submits that the state court applied an incorrect standard, one that fundamentally distorts the law

and the facts connected with the claim.  As a result the state habeas decision produced a result that is contrary to and an unreasonable application of Supreme Court precedent.  Accordingly, federal habeas corpus relief remains available to remedy the constitutional wrong done to Mr. Medina.

**VI.     The cumulative effect of the ineffective assistance of counsel and the State's *Brady* violations undermined all confidence in the verdict at Mr. Medina's trial**

Even where individual error is insufficient to raise a probability that the outcome of a trial would have been different, the cumulative impact of *Brady* and *Strickland* error can suffice to warrant habeas relief.  *See Cargle v. Mullin*, 317 F.3d 1196, 1220-22 (10th Cir. 2003 (finding habeas relief was warranted on the basis of cumulative error related to ineffective assistance of counsel [and associated/alternative *Brady* error] and prosecutorial misconduct); *Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001) (remanding for cumulative prejudice analysis of *Brady* and *Strickland* errors); *Gentry v. Sinclair*,   576 F.Supp.2d 1130, 1171 (W.D. Wash. 2008) (analyzing prejudice stemming from the *Brady*/*Napue* and ineffective assistance of counsel claims cumulatively).

In *Cargle*, the Court of Appeals discussed the specific application of a cumulative error analysis in the context of *Brady* and *Strickland* violations:

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Toles, 297 F.3d 959, 972 (10th Cir.2002)* (quotation omitted) … .  Consistent with the unqualified reference to *all errors,* our cases reflect application of cumulative-error review to legally diverse claims such as those here. …

There is a further point to be made, arising from the fact that the particular types of error considered here are governed in the first instance by substantive standards which already incorporate an assessment of prejudice with respect to the trial process as a whole: *Strickland* errors require us to assess whether there is a reasonable probability that counsel's deficient performance affected the trial outcome; *Brady* errors require us to look for the same reasonable probability that the trial outcome was affected in order to assess the necessary "materiality" of withheld evidence; and claims of prosecutorial misconduct and admission of

improper victim impact evidence require a showing of fundamental unfairness in order to provide habeas relief, unless they involve the violation of specific constitutional rights, in which case the principles governing such rights control. These substantive prejudice components essentially duplicate the function of harmless-error review. Thus, such claims should be included in the cumulative-error calculus if they have been individually denied for insufficient prejudice. Indeed, to deny cumulative-error consideration of claims unless they have first satisfied their individual substantive standards for actionable prejudice "would render the cumulative error inquiry meaningless, since it [would] ... be predicated only upon individual error already requiring reversal.

*Cargle*, 317 F.3d at 1206-07 (citations and footnotes omitted).

In the present case, each of the *Brady/Napue* and *Strickland* errors in Mr. Medina's case, standing alone, was sufficiently prejudicial to warrant habeas relief. When considered together, there can be no reasonable debate that the cumulative impact of the egregious errors set forth in the petition rendered Mr. Medina's trial and sentencing fundamentally unfair; indeed, when viewed together, they demonstrate how Mr. Medina's trial was a complete travesty of justice.

## VII. One of the jurors who sat in judgment of Mr. Medina lied about her criminal past so that she could serve

Ms. Alma Volante served on the jury which convicted Mr. Medina of capital murder and sentenced him to death. This is so despite the fact that she is a convicted felon, and she lied about her prior record and her involvement with the criminal justice system during the voir dire proceedings in this case. As such, Mr. Medina's convictions and sentence were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

On November 8, 1980, Alma Volante was charged with felony theft. *See* Exhibit 65 (Certificate of Disposition). She entered into a deferred adjudication agreement in which she admitted the felonious conduct on April 2, 1981. *See* Exhibit 66 (Stipulation of Evidence). Ms. Volante was placed on probation for two years. *See* Exhibit 65 (Certificate of Disposition). On February 5, 1982, Ms. Volante pled guilty to misdemeanor theft and was sentenced to 3 days in the Harris County Jail and fined $250.00. *Id.* Ms. Volante's second theft offense was a clear

violation of her probation; the Harris County District Attorney's Office moved to adjudicate guilt.  *See* Exhibit 67 (Motion to Adjudicate Guilt).  The trial court, however, modified Ms. Volante's probation instead and ordered that she go to psychiatric therapy sessions.  *See* Exhibit 68 (Terms of Probation Agreement).  Prior to the modification, Ms. Volante had been examined by a psychiatrist who diagnosed her with the mental illness of an adjustment disorder with mixed disturbance of emotions and conduct.  *See* Exhibit 69 (Psychiatric Report: Alma Volante).  On October 22, 1983, Ms. Volante swore out an affidavit falsely stating that she had not violated the terms of her probation, and her probation was terminated.  *See* Exhibit 70 (Affidavit of Alma Volante).

Ms. Volante did not report this aspect of her life when directly questioned on her juror questionnaire prior to her empanelment at Mr. Medina's trial.  The juror questionnaire asked several relevant questions to which Ms. Volante answered dishonestly:

> 10.    HAVE YOU, A FAMILY MEMBER, OR A CLOSE FRIEND EVER BEEN INVOLVED IN A CRIMINAL CASE AS AN ACCUSED, VICTIM OR WITNESS?
>
> 11.    HAVE YOU, A FAMILY MEMBER , OR A CLOSE FRIEND EVER BEEN ARRESTED FOR OR CHARGED WITH AN OFFENSE ABOVE THE LEVEL OF A TRAFFIC VIOLATION?
>
> HAVE YOU EVER HAD AN UNPLEASANT EXPERIENCE INVOLVING LAW ENFORCEMENT?
>
> HAVE YOU EVER BONDED ANYONE OUT OF JAIL?
>
> 16.    HAVE YOU EVER BEEN UNDER THE CARE OF A PSYCHIATRIST/ PSYCHOLOGIST, OR HAVE YOU OR A FAMILY MEMBER WORKED WITH MENTAL HEALTH PATIENTS?

*See* Exhibit 71 (Juror Questionnaire).  Despite her two arrests, three days in jail, court appearances, court ordered psychiatric counseling, and two years of reporting to a probation officer, Ms. Volante answered "no" to each of these questions.  In doing so, Ms. Volante

concealed the fact that she was constitutionally disqualified from jury service, revealed a bias in the case, and denied Mr. Medina his right to intelligently exercise his peremptory strikes.

### A. Ms. Volante's dishonest response to the *voir dire* question regarding her criminal and psychiatric history denied Mr. Medina his right to a fair trial under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution

In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the Supreme Court set out the federal standard:  The defendant must demonstrate (1) that a juror failed to answer honestly a material question on *voir dire*, and (2) that a correct response would have provided a valid basis for a challenge for cause.  *Id.* at 556.  The Supreme Court has recognized that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.  The right to an impartial adjudicator, be it judge or jury, is such a right."  *Gray v.  Mississippi*, 481 U.S. 658, 668 (1987)(citations and internal quotation marks omitted).   Accordingly, the presence of a biased juror can never be harmless, and "the error requires a new trial without a showing of actual prejudice."  *Dyer v. Calderon,* 151 F.3d 970, 972 n. 2 (9th Cir.)(en banc), *cert. denied*, 119 S.Ct. 575 (1998)(citing *Arizona v. Fulminante,* 499 U.S. 279, 307-310 (1991)).

The first inquiry in determining whether Mr. Medina's right to a fair trial under the United States Constitution was violated through Ms. Volante's service on the jury is to determine whether Ms. Volante "failed to answer honestly a material question on *voir dire*."  *McDonough*, 464 U.S. at 556.  Although this fact can be best determined at a hearing, it is inconceivable how Ms. Volante's responses to the juror questionnaire could be considered anything other than a dishonest answer.

Ms. Volante's responses to five separate questions on her juror questionnaire were unmistakably false.  First, Ms. Volante was asked whether she had "been involved in a criminal

case as an accused, victim, or witness." *See* Exhibit 71 (Questionnaire).  She answered "no" despite the fact that she had been a criminal defendant on two theft charges.  *See* Exhibit 65 (Certificate of Disposition).  Second, Ms. Volante answered "no" to the question, "have you, a family member, or a close friend ever been arrested for or charged with an offense above the level of a traffic violation?" *See* Exhibit 71 (Questionnaire).  Ms. Volante had in fact been arrested twice for theft, negotiated a plea agreement, attended several court settings and served three days in the Harris County Jail.  *See* Exhibit 65 (Certificate of Disposition).  Third, Ms. Volante was asked if she ever "had an unpleasant experience with law enforcement." *See* Exhibit 71 (Questionnaire).  She answered "no" despite the fact that a report written by a psychiatrist that Ms. Volante was required to see as a condition of her felony probation, described her as "extremely upset and tearful" when explaining her circumstances.  *See* Exhibit 69 (Psychiatric Report).  Fourth, Ms. Volante was asked whether she had ever "bonded anyone out of jail." *See* Exhibit 71 (Questionnaire).  Ms. Volante answered "no" despite the fact that she had bonded herself out after both of her arrests for theft.  *See* Exhibit 72 (Bail Bond Forms). Finally, Ms. Volante was asked whether she "had ever been under the care of a psychiatrist/psychologist." *See* Exhibit 71 (Questionnaire).  She answered "no" despite the fact that one of the terms of her probation for felony theft was "to participate in therapy with Mary Ann Ford, M.D. as described by Dr. Ford until successfully discharged by Dr. Ford." *See* Exhibit 68 (Terms of Probation Agreement).  Ms. Volante's repeated misstatements show that her false answers were not merely a misunderstanding of an ill-phrased question.  The juror questionnaire contained a number of questions which would have revealed Ms. Volante's criminal history and her answers to all of them were false.  One can only conclude that Ms. Volante was intentionally concealing her criminal past.

The second inquiry set forth by the United States Supreme Court is whether a correct response to the questions posed to Ms. Volante would have provided a valid basis for a challenge for cause.  *See McDonough*, 464 U.S. at 556.  This inquiry is unquestionably satisfied in Mr. Medina's case.  Ms. Volante had been convicted of theft.  *See* Exhibit 65 (Certificate of disposition).  According to the Texas Constitution and the Texas Code of Criminal Procedure, Ms. Volante was ***absolutely disqualified*** from jury service.  *See* TEX. CONST. art. XVI § 2; TEX. CODE CRIM. PROC. art. 35.19 (no juror shall be impaneled when it appears that he has been convicted of theft or any felony).  Therefore a valid basis for a challenge for cause was clearly available.

Juror Volante's misstatements on *voir dire* raise different issues than in many of the cases following the *McDonough* standard.  In *McDonough* itself, a juror did not report that his son had been injured in the explosion of a truck tire when asked if a family member had ever been injured.  *McDonough*, 464 U.S. at 551.  The Court was then faced with the problem of determining whether the juror's misstatement indicated bias which would have made him eligible for a challenge for cause.  *Id*. at 556.  In contrast, Ms. Volante's status as a convicted thief made her automatically challengeable for cause and absolutely disqualified from jury service.  Once her criminal record is established, this court need not look any further.

A recent case applying the *McDonough* standard helps illustrate this point.  In *United States v. Carpa*, 2001 WL 1326708 (11th Cir. 2001), a juror was alleged to have been convicted of a felony or had felony charges pending.  The case was remanded for a hearing in the United States District Court on two limited issues,

> [1] whether Juror 505 was ever convicted of or had a charge pending for a felony under 28 U.S.C. § 1865 (b)(5),[110]and [2] whether Juror 505's response to the

---

[110] 28 U.S.C. § 1865, like TEX. CODE CRIM. PROC. art 35.16, specifies reasons that a juror in a federal trial may be challenged for cause.

court questioning could have been honestly mistaken, or even if technically accurate, was deliberately intended to deceive to permit him to serve on this jury.

*Carpa*, 2001 WL 1326708 at *5 (enumeration added).  In *Carpa*, as in Mr. Medina's case, the only relevant issues to a juror bias claim under *McDonough* are whether the answers to the questions on *voir dire* were honest and whether the juror was statutorily challengeable for cause.

Even regardless of Ms. Volante's absolute disqualification, however, her repeated lies indicate that she was a biased juror.  A juror's motive for intentionally concealing information during *voir dire* is a relevant factor in finding implied bias.  *Zerka v. Green*, 49 F.3d 1181, 1185 (6th Cir. 1995); *Hunley v. Godinez,* 975 F.2d 316, 320 (7th Cir. 1992); *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991); *United States v. Colombo*, 869 F.2d 149, 152 (2d Cir. 1989); *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988); *United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984).

Ms Volante's intentional concealment of her criminal history is well established.  Five separate questions were asked which would have elicited information regarding her criminal past, and Ms. Volante falsely answered all of them.  A juror's willingness to risk prosecution for perjury by lying in response to legitimate inquiries about her background raises troubling questions about that juror's ability to sit in judgment.  As one court explained:

> If a juror treats with contempt the court's admonition to answer *voir dire* questions truthfully, she can be expected to treat her responsibilities as a juror – to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions – with equal scorn.  Moreover, a juror who tells major lies creates a serious conundrum for the fact-finding process.  How can someone who herself does not comply with the duty to tell the truth stand in judgment of other people's veracity?  Having committed perjury, she may believe that the witnesses also feel no obligation to tell the truth and decide the case based on her prejudices rather than the testimony.

*Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir.)(en banc), *cert. denied*, 119 S.Ct. 575 (1998).  Therefore, even if Ms. Volante was not disqualified, bias may still be implied by her false

answers to the juror questionnaire.

**B. Ms. Volante was absolutely disqualified from jury service and therefore Mr. Medina was denied his right under the Texas Constitution to a trial by jury. TEX. CONST. art. I §15.**

Although harm need not be shown to establish a constitutional violation in this context, Texas law makes clear that, due to her criminal past, juror Volante was absolutely barred from service as a juror in Mr. Medina's case. As such, no greater harm can be shown. Texas law makes plain that she was prohibited from jury service in this case.

The Texas Constitution provides that:

The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency.

TEX. CONST. art, I § 15. It later commands that :

Laws shall be made to exclude from office, service on juries, and from the right to suffrage, those who may have been or shall hereafter be convicted of bribery, perjury, forgery, or other high crimes.

TEX. CONST. art. XVI § 2.

The right to a jury trial necessarily contemplates a body of twelve qualified members. *See Jordan v. Crudgington*, 231 S.W.2d 641, 646 (Tex. 1950); *R.R.E., and R.R.E., P.C. v. Glenn*, 884 S.W.2d 189, 192 (Tex. Ct. App. 1994, pet denied); *see also Dempsey v. Beaumont Hospital, Inc.*, 38 S.W.3d 287 (Tex. Ct. App. 2001).

Ms. Volante was constitutionally disqualified from jury service under Texas law and therefore, Mr. Medina was deprived of his right to a jury trial under the Texas Constitution. Ms. Volante's theft conviction clearly falls under the Texas constitutional provision barring jury service for those who have been convicted of bribery, perjury, forgery, or other high crimes. *See* TEX. CONST. art. XVI § 2. The Texas Court of Criminal Appeals recently considered what

constituted a high crime in *Perez v. State*, 11 S.W.3d 218, 221 (Tex. Crim. App. 2000).  In *Perez*, the Court concluded that the phrase "other high crimes" implied "criminal conduct which demonstrates the same type of moral corruption and dishonesty inherent in the specified offenses" of bribery, forgery, and perjury.  *Id*. at 221 (explaining that felony DWI conviction is not a "high crime").  Theft, however, clearly involves the same type of dishonesty and moral corruption as bribery, forgery, and perjury as recognized in its inclusion as a "crime of moral turpitude".  *Robertson v. State*, 685 S.W.2d 488, 492 (Tex. App. – Fort Worth 1985, no pet. h.).[111]

Because Ms. Volante was convicted of theft, Mr. Medina was not tried by a jury of twelve qualified members as required under Texas law.  Therefore his conviction and sentence of death should be reversed.  *See Dempsey*, 38 S.W.3d at 289-290 (showing of harm not required in cases involving juror disqualification).

### 1. TEX. CODE CRIM. PROC. art 44.46 violates the Texas Constitution and therefore Mr. Medina does not need to show harm

TEX. CODE CRIM. PROC. art 44.46 states that:

a conviction in a criminal case may be reversed on appeal on the ground that a juror in the case was absolutely disqualified from service under Article 35.19 of this code only if:

> (2) the disqualification was not discovered or brought to the attention of the trial court until after the verdict was entered and the defendant makes a showing of significant harm by the service of the disqualified juror.

*Id*.  This provision, however, does not apply to Mr. Medina's case because he claims error in violation of TEX. CONST. art. XVI § 2 rather than under the Texas Code of Criminal Procedure.  The statutory disqualification and the constitutional disqualification are clearly different issues.

---

[111] The legislature also recognized the constitutional mandate that persons convicted of theft offenses not serve on juries in TEX. CODE CRIM. PROC. art 35.19 (no juror shall be empanelled if he has been convicted of theft or any felony).

The Texas Constitution specifically bars jury service by those convicted of "bribery, perjury, forgery, or other high crimes."  TEX. CONST. art. XVI § 2.  This provision is different than the statutory disqualification which only mentions felonies, theft, and insanity.  *See* TEX. CODE CRIM. PROC. art. 35.19.  Had the legislature been merely codifying the Constitutional provision, it would have used the same language.

Alternatively, TEX. CODE CRIM. PROC. art 44.46 violates the Texas Constitutional provisions of art. I § 15 and art. XVI § 2 and therefore is void.[112]  *See Reyes v. State*, 753 S.W.2d 382 (Tex. Crim. App. 1988)(unconstitutional statute is void from its inception).  The Texas Constitution asks the Texas Legislature to enact laws which would bar jury service by those deemed constitutionally disqualified.  *See* TEX. CONST. art. I § 15,  XVI § 2.  A statute which would allow for disqualified jurors to serve on juries would clearly be inconsistent with these provisions.  The Texas Court of Appeals, Fort Worth, has expressed this view in an analogous situation in *R.R.E., and R.R.E., P.C. v. Glenn*, 884 S.W.2d 189, 192 (Tex. Ct. App. 1994, pet denied).

In *R.R.E.*, the Court reversed a malpractice judgment on the ground that one of the jurors who rendered the verdict had been convicted of a felony.  *Id*. at 191.  It was established on the record of the case that the juror had been placed on probation for eight years for the offense of Criminal Solicitation of Capital Murder.  *Id*.  He had satisfied his probation and an order was entered setting aside the judgment of conviction and dismissing the indictment.  *Id*.  It was then argued by the appellee in the case that, pursuant to TEX. CODE CRIM. PROC. art. 42.12, the juror in question had been released from "all penalties and disabilities" resulting from the crime and he was therefore not disqualified.  *Id*.  The Court held, however, that the Texas Legislature did

---

[112]  An argument regarding whether this statutory provision violates the Texas Constitution has been discussed, but not reached by the Texas Court of Criminal Appeals in *Perez*, 11 S.W.3d 218.

not have the power to restore the right to jury service to a person explicitly disqualified by the

Constitution.  *See id*. at 193.  The Court concluded that:

> Such statute [art. 42.12] flies in the face of article I, section 15 of the Bill of
> Rights which requires the legislature to maintain the purity and efficiency of the
> jury system.  It can not be said that such purity and efficiency is maintained by
> permitting juries to be composed of thieves, robbers, murderers, kidnappers,
> perjurers, rapists, drug dealers and others convicted of felonies simply because
> they completed the terms of their probation.

*Id.* at 193.  The Court further noted the analogy which Mr. Medina applies to the application of

Tex. Code Crim. Proc. art 44.46:

> We are aware of the significance of this opinion on the recently enacted article
> 46.46 of the Texas Code of Criminal Procedure.  Such article provides a criminal
> case can be reversed on appeal because of absolute disqualification of a juror
> (prior conviction or accusation or insanity) only if (1) the disqualification is raised
> before verdict is entered or (2) the disqualification was not discovered or brought
> to the court's attention until after the verdict was entered and a showing of
> significant harm by the service of the disqualified juror is made . . . While we
> make no holding as to the validity of this article, the effect of our opinion is that **a
> party, whether he be a party to a civil action or a defendant in a criminal
> action, has not been afforded his constitutional rights if the jury composition
> in his case includes a person who has been convicted of a felony and has not
> been pardoned by the Governor.**

*R.R.E.*, 884 S.W.2d at 193 (emphasis added).  The Fort Worth Court's holding makes the same

point raised by Mr. Medina in this claim – there can be no harm to a jury trial when a

constitutionally disqualified juror was on the panel because it was not a jury trial at all.

Mr. Medina was not harmed by an error in the selection of his jury, but was deprived of a

jury altogether because Ms. Volante's convictions rendered her constitutionally disqualified to

serve on a jury.[113]  *See R.R.E.*, 884 S.W.2d at 193; *Jordan*, 231 S.W.2d at 646.

---

[113] Although harm analysis is not appropriate for this claim, Mr. Medina would point out
that harm was clearly shown in this case because Ms. Volante's vote was necessary for a
unanimous verdict on both guilt and punishment.

**2. Ms. Volante's false responses to her juror questionnaire regarding her criminal history and treatment by a psychiatrist deprived Mr. Medina of a fair trial**

Under Texas law, a defendant is entitled to a new trial because a juror withheld information if: (1) the withheld information was material; and (2) defense counsel exercised due diligence in attempting to elicit that information.  *Armstrong v. State*, 897 S.W.2d 361, 368 (Tex. Crim. App. 1995)(Baird, J., dissenting).  Information is material:

> (1) where a juror withholds information that he had personal knowledge about or was in some way acquainted with either the complainant or the defendant; and (2) where a juror by reason of past personal experiences had the potential to be biased or prejudiced against the defendant.

*Petteway v. State*, 758 S.W.2d 861, 865 (Tex. Crim. App. 1988).  The Court has emphasized that defense counsel has an obligation to ask questions designed to bring out information indicating a prospective juror's inability to be impartial and truthful:  "Unless defense counsel asks such questions, the material information which a juror fails to disclose is not really 'withheld.'"  *Id.* at 363-64.  (citing *Jones v. State*, 596 S.W.2d 134, 137 (Tex. Crim. App. 1980)).  However, the Court explained, "when a partial, biased, or prejudiced juror is selected without fault or lack of diligence on the part of defense counsel, who has acted in good faith upon the answers given to him on *voir dire* not knowing them to be inaccurate, good ground exists for a new trial."  *Von January v. State*, 576 S.W.2d 43, 45 (Tex. Crim. App. 1978).  A juror who withholds material information in the *voir dire* process hampers the parties' selection of a disinterested and impartial jury by depriving them of the opportunity to intelligently exercise their peremptory challenges and make challenges for cause.  *Armstrong*, 897 S.W.2d at 363 (citing *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978)).[114]

---

[114] In addition to violating the right to a fair trial, a juror's concealment of information bearing a substantial likelihood of uncovering bias violates the right to representation guaranteed by Article I, Section 10, of the Texas Constitution.  The Court of Criminal Appeals has

As detailed above, the questionnaire provided to the jury contained several questions which Ms. Volante answered falsely in order to hide her prior theft convictions and mental health treatment.  This information was clearly material because it was information about Ms. Volante's past which so greatly called into question her ability to fairly adjudge the case, that her service on the jury was explicitly barred under the Texas Constitution.  *See supra*.  Furthermore, theft is a crime of moral turpitude which is regarded as  "peculiarly probative of credibility." *United States v. Towney*, 615 F.2d 277, 280 (5th Cir. 1980).  In answering "no" repeatedly to questions which would have lead to the revelation of her prior convictions, Ms. Volante successfully hid information about herself which the courts have found demonstrates a lack of respect for the truth.

Not only did Ms. Volante conceal her criminal record, but she also hid her lengthy contact with the criminal justice system.  Had Ms. Volante been forthcoming in her answers to the *voir dire* questions on the juror questionnaire, defense counsel would have known that she was able to avoid a severe punishment for her felony theft conviction and later misdemeanor theft conviction in violation of her felony parole.  *See supra* (Ms. Volante received two years probation for felony theft and then only had her probation modified so that she receive psychiatric counseling after she was convicted again of theft while on parole).  Ms. Volante's experience with the criminal justice system certainly would have colored her view of Mr. Medina's future regarding parole if given a life sentence.  If she was able to avoid an adjudication of guilt after being convicted of the same crime for which she was on probation,

---

repeatedly held that the right to representation guaranteed by Section 10 "includes the right to properly question prospective jurors during *voir dire* in order to effectively exercise peremptory challenges or to establish a predicate for a challenge for cause." *Ex parte McKay,* 819 S.W.2d 478, 483 (Tex. Crim. App. 1990).  A juror who withholds material information undermines the peremptory challenge process just like a judge who imposes improper restrictions upon the exercise of *voir dire* by trial counsel.

Ms. Volante would definitely have a biased view toward the length and legitimacy of a life sentence in Mr. Medina's case.[115]

Defense counsel also cannot be blamed for lack of diligence in failing to elicit the information of Ms. Volante's criminal record. Although trial counsel did not ask any questions of Ms. Volante on *voir dire*, his reliance on Ms. Volante's responses to the questionnaire in this context was reasonable.

The Court of Criminal Appeals recently held that an attorney was not diligent when he relied on a juror's statement that she had not been "accused, complainant or witness in a criminal case" and later discovered that the juror had been actually been a complainant in a criminal case. *See Gonzales v. State,* 3 S.W.3d 915, 916 (Tex. Crim. App. 1999). Although the court spoke in broad language regarding the vulnerability of questionnaires to misinterpretation by potential jurors, its actual holding focused on the trial counsel's lack of diligence as demonstrated by the fact that counsel did not ask the same questions to those jurors who did not return juror questionnaires. *Id*. at 917-918.

An almost identical factual situation to Mr. Medina's case has been addressed in the recent Austin Court of Appeals decision in *Preiss v. Moritz*, 2001 WL 1193916 (Tex. Ct. App. – Austin 2001). In *Preiss*, as in Mr. Medina's case, trial counsel did not question a potential juror, but instead relied on her questionnaire stating that she had never been the accused in a criminal case. *Id*. at *5. In fact, the potential juror had an outstanding warrant for theft by check. *Id*. at *2. The Court found that this fact was material because the information concealed by the

---

[115] Ms. Volante's view of the legitimacy of the criminal justice system and respect for the truth is also demonstrated by the fact that Ms. Volante was required to perjure herself on the affidavit which terminated her probation. Ms. Volante swore in an affidavit that she had not violated the terms of her probation despite the fact that all the parties involved knew she had been convicted of theft and served three days in the Harris County Jail during the period of her probation. *See* Exhibit 70 (Affidavit of Alma Volante).

inaccurate response statutorily disqualified the juror.  *Id*. at *3.[116]  It then considered whether trial counsel was diligent in relying on the inaccurate questionnaire.

The Austin Court of Appeals distinguished the holding in *Gonzales*, cited above, on the basis that in *Gonzales* trial counsel did not ask jurors who failed to submit a questionnaire about their involvement in criminal cases.  *See id*. at *7.  In *Preiss*, as in Mr. Medina's case, all of the jurors submitted questionnaires and therefore counsel's diligence in seeking the information is demonstrated.  *See id*.  The *Preiss* court also explained that the type of information concealed by the jury was distinguishable.  In *Gonzales*, as well as another cited case, *Spelling v. State*, 825 S.W.2d 533, 536-537 (Tex. Ct. App. – Fort Worth 1993, no pet.), the issue concerned information which revealed a juror's bias or prejudice rather than the juror's qualifications.  *See Preiss*, 2001 WL 1193916 at *8.  The Court explained:

> [w]e have been unable to locate any case, and have been cited to none, where a complainant's lack of diligence in discovering facts that would *statutorily disqualify* a juror from service has been discussed.  The justice system's use of devices to expedite the trial of cases should not become a snare for the advocates who practice within that system.

*Id*. at *8.  On the basis of the materiality inherent in the seating of a disqualified juror and the diligence of trial counsel in relying on the unambiguous questionnaire to determine whether the juror was qualified, the Court remanded the case for a new trial.  *Id*. at *9.

Mr. Medina's case is indistinguishable from *Reiss*.  He has now discovered that Ms. Volante, who provided one of the required votes for Mr. Medina's conviction and sentence lied on her questionnaire that she had never been convicted of a crime.  *See supra*.  Her criminal record would have made her both statutorily and constitutionally disqualified to serve.  This false

---

[116] The Court further explained that the disqualified juror had voted for the majority verdict of liability and therefore the appellant was materially injured.  *Id*. at *3.  Transferring this reasoning to Mr. Medina's case, materiality is inherent because a unanimous verdict is required for both a conviction and the sentence of death.

statement was material and trial counsel was diligent in relying on the questions in the jury questionnaire. *See Preiss*, 2001 WL 1193916 at *8. Therefore, this Court must reverse his conviction and sentence.

### C. The state court's resolution of this claim is due no deference under the AEDPA

In state habeas corpus proceedings, the State responded to this allegation in Mr. Medina's state habeas corpus petition with the unsupported assertion that Mr. Medina had not proven that the Alma Volante who served on his jury was the same person who had been previously convicted of multiple crimes. *See* State's Answer to State Habeas Corpus Petition, May 20, 2002, at p. 31-32. In response to this assertion in the State's answer, Mr. Medina filed a motion for discovery and an evidentiary hearing seeking to depose Ms. Volante to establish the identity of the juror. Attached to that motion were documents indisputably establishing that in fact juror Alma Volante was indeed the woman who was previously convicted in Texas. *See* Exhibit 73 (Appendix 5 to Applicant's Motion for Discovery and Evidentiary Hearing, July 23, 2002). The state never replied to the motion, and the state court never ruled on it.

Despite this documentary proof, the State's draft of the state court findings of facts and conclusions of law (signed verbatim by the state court judge) nevertheless concluded that Mr. Medina had not proven that juror Volante and convicted person Volante were the same individuals. *See* State Court Findings of Fact and Conclusions of Law, May 26, 2009, at pp. 42-43 ¶11. This finding is wholly unsupported by the record, and in any event should be subjected to further factual development should this Court have any doubt regarding whether the juror and the convict are the same person.

Under governing law, this Court owes no deference to a state court ruling that is either based on an unreasonable determination of the facts or an unreasonable application of the law to

those facts.  *See* 28 U.S.C. §2254(d).  In this case, the state court ruling violated both.  As a result the state court decision denying relief is contrary to and an unreasonable application of Supreme Court precedent and based on factual determinations that are unreasonable in light of all the evidence before the state court.  Accordingly, federal habeas corpus relief remains available to remedy the constitutional wrong done to Mr. Medina.

**VIII.   The process by which Harris County selects its grand juries produces an unconstitutional under-representation of Hispanics, in violation of the Sixth and Fourteenth amendments**

In this claim, Mr. Medina invokes his rights under the Sixth Amendment and Fourteenth Amendment to the United States Constitution to challenge the process which brought about his indictment.  Specifically, the Sixth Amendment guarantees criminal defendants "a speedy and public trial, by an impartial jury . . .."  This language has been interpreted to require that the panels from which petit juries are selected be drawn from a "fair cross section" of the community in which the proceedings are held.  *See, e.g., Taylor v. Louisiana*, 419 U.S. 522, 527 (1975)(citing *Brown v. Allen*, 344 U.S. 443 (1953)).  In states such as Texas where a grand jury system is employed, the fair cross section requirement applies to this process as well.[117]  *Atwell v. Blackburn*, 800 F.2d 502 (5th Cir. 1986), *cert. denied*, 490 U.S. 920 (1987); *Ciudadanos Unidos de San Juan v. Hidalgo County*, 622 F.2d 807, 825 (5th Cir. 1980), *cert. denied*, 450 U.S. 964 (1981); *Stanley v. State*, 664 S.W.2d 746 (Tex.App. – San Antonio 1983), *cert. denied*, 472 U.S. 1018 (1985); *Alexander v. Louisiana*, 405 U.S. 625, 635-37 (1972)(Douglas, J. dissent)(relying on *Carter v. Jury Commission*, 396 U.S. 320, 330 (1970); and *Brown v. Allen*, 344 U.S. 443, 474 (1953)); *Machetti v. Linahan*, 679 F.2d 236, 239 (11th Cir. 1982), *cert. denied*, 457 U.S. 1127

---

[117]   In felony cases, the Texas Constitution requires a grand jury to act as the charging body.  TEX.CONST., art. I, § 10.

(1983).

In addition to the Sixth Amendment fair cross section requirement, the equal protection clause of the Fourteenth Amendment prohibits the discriminatory selection of the panel from which a grand jury is drawn if that process produces disproportionately unrepresentative results. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977).  *See also, e.g., Alexander v. Louisiana*, 405 U.S. 625 (1972); *Turner v. Fouche,* 396 U.S. 346 (1970).

Since a defendant need not be a member of the underrepresented group in question to have standing to raise a Sixth or Fourteenth Amendment claim, there is no dispute that Mr. Medina, a Hispanic male, has standing to mount these challenges.  *Campbell v. Louisiana*, 523 U.S. 392 (1998); *Taylor v. Louisiana*, 419 U.S. 522, 526 (1975)(male raising gender claim).  *See also Duren v. Missouri*, 439 U.S. 357, 359 n.1 (1979); *Peters v. Kiff*, 407 U.S. 493 (1972)(white male raising claim of Blacks' absence from jury); *Powers v. Ohio*, 493 U.S. 1068 (1991); *Dobbs v. Kemp*, 790 F.2d 1499, 1510-11 (11th Cir. 1986), *cert. denied*, 481 U.S. 1059 (1987)(male defendants have standing to raise equal protection claim that women were underrepresented on grand jury).

## A.  Mr. Medina can demonstrate proof sufficient to establish a prima facie showing of underrepresentation under the state and federal constitutions

To establish a *prima facie* claim that the State has violated the fair cross section requirement, a defendant must show:

- that the group alleged to be excluded is a 'distinctive' group in the community;
- that the representation of the group in *venires* from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
- that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).[118]

Proving a *prima facie* showing of discrimination under the equal protection clause requires similar proof.  A claimant must show "the procedure employed resulted in substantial underrepresentation of his race or identifiable group," by demonstrating:

- the group is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied";
- underrepresentation of the group in the grand jury process *over a significant period of time*; and
- a selection procedure "that is susceptible of abuse **or** is not racially neutral."

*Castaneda*, 430 U.S. 482, 494 (1977)(emphasis added).[119]

Mr. Medina can demonstrate a *prima facie* case of discriminatory underrepresentation, under both the Sixth and Fourteenth Amendments, of Hispanics as grand jury panelees in Harris County.

## B.  Hispanics are a distinct class in the community which merits constitutional protection

Detailed below, the process by which Harris County selects a grand jury underrepresents Hispanics.  Hispanics have long been recognized by the courts as a "distinct class" -- the exclusion of whom from possible jury service and the rest of the criminal justice system is constitutionally suspect.  *See Castaneda v. Partida*, 430 U.S. at 495; *Hernandez v. Texas*, 347 U.S. 475 (1954).  Thus Mr. Medina satisfies the first prong of his Sixth and Fourteenth Amendment claims.

---

[118]   Under this standard, "systematic" is defined by showing that the pattern recurred over time and was "inherent to the particular jury selection process utilized."  *Id.*, at 366.

[119]   Under the equal protection clause, the claimant must also prove intentional discrimination, *see Duren, supra*, 439 U.S. at 368 n.26, while the Sixth Amendment fair cross section requirement "forbids any substantial underrepresentation of minorities, regardless of whether the State's motive is discriminatory."  *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir. 1986), *cert. denied*, 479 U.S. 1084 (1987).

### C.  Underrepresentation

Although the Supreme Court has "never announced mathematical standards for determining the significance of underrepresentations," *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972), the Fifth Circuit and the Texas Court of Criminal Appeals have employed a statistical approach involving "standard deviation."  *See Ovalle v. State*, 13 S.W.3d 774 (Tex. Crim. App. 2000); *McGinnis v. Johnson*, 181 F.3d 686 n.6 (5th Cir. 1999); *Boykins v. Maggio*, 715 F.2d 995 (5th Cir. 1983).

Under this statistical analysis, the court must first compare the actual number of Hispanics on grand juries with the expected number based on total population over a significant portion of time.  The measure of the predicted fluctuations from the expected value is the standard deviation, defined as "the square root of the product of the total number in sample ... times the probability of selecting a [Hispanic] times the probability of selecting a [non-Hispanic]."  *Ovalle*, 13 S.W.3d at 778, n.15 (quoting *Partida*, 430 U.S. at 496 n. 17).   In instances where the "difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist."  *Id*. (quoting *Partida*, 430 U.S. at 496 n.17).   Such situations establish a *prima facie* case of discrimination.

In Harris County, in the ten years prior to Mr. Medina's trial, only 447 of 3614 grand jury panelees were Hispanic.[120]   The mean Hispanic population for the same time period was

---

[120]  This figure was derived from comparing the surnames of grand jury panelees with the United States Census Bureau's 1990 Spanish Surname List of Heavily Hispanic Surnames and using Robert W. Buechley's orthographic structure.  These voluminous documents have not been attached but are available on request by the Court.  This approach was validated by the United States Supreme Court in *Partida, supra*.  Attempting to limit or expand the list of Hispanic grand jurors by adding or eliminating those with Hispanic surnames due to marriage could not be accomplished because neither the Department of Vital Statistics nor the United States Census Bureau keeps such statistics.  *See* Exhibit 74 (Letter from Texas Department of Health, dated

approximately 21.52%.[121] Thus, one would expect to find about 778 Hispanics on Harris County grand jury lists between 1987 and 1996.[122]

Employing the statistical method outlined by the Fifth Circuit and the Texas Court of Criminal Appeals, the standard deviation is 24.70.[123] As *Partida* and *Ovalle* make clear, if the difference between the expected number and actual number of Hispanics on Harris County grand juries is less than three standard deviations, no prima facie case is established. Thus, the number of Hispanics on the grand jury lists in Harris County would have to exceed 704 to meet constitutional muster.[124] It does not.

Clearly, the grand jury selection process in Harris County falls well below the constitutional standard. Between the years of 1987 and 1996 a paltry 447 Hispanics were on the

---

October 11, 2001).

[121] The 21.52% figure (mean Hispanic population for the years 1987-1996) was obtained by utilizing population data available from  the U.S. Census Bureau and the Texas State Data Center.  The percentages of the Harris County population that were comprised by Hispanics for the years 1987, 1988, and 1989 were obtained by extrapolating 1980 U.S. Census data (Ages 20-64), *See* Exhibit 75, and 1990 U.S. Census data (Ages 18-64), *See* Exhibit 76.  The source of the data for the year 1990 was the U.S. Census Bureau (Ages 18-64).  *See* Exhibit 76.  The source of the data for the 1991, 1992, 1993, 1994, 1995, and 1996 years was the Texas State Data Center's Estimates for the Population for Harris County (Ages 18-65).  *See* Exhibit 77.  When the U.S. Census Bureau's Estimates for the Population for Harris County are utilized for the years 1991, 1992, 1993, 1994, 1995 and 1996 (Ages 20-64)  in lieu of  the Texas State Data Center's Estimates for the Population of Harris County for the same years, the mean Hispanic Population for 1987-1996 period is 21.49%.  *See* Exhibit 78.

[122] Number of grand jurors (3614) multiplied by the percentage of Hispanics in the eligible pool (21.52%) = 777.73.

[123] Determined by the square root of the product of the total sample (3614) multiplied by the probability of selecting a Hispanic (.2152) multiplied by the probability of selecting a non-Hispanic (.7848).

[124] 778 - (24.70 x 3) = 703.9

grand jury lists, a result that exceeds **13 standard deviations**.[125]

This result would come as no surprise to most close observers of the Harris County Criminal Courts.  Indeed, on November 24th, 1996 approximately 4 months after Mr. Medina's trial, the Houston Chronicle studied the Harris County grand juries of 1995 and found a 14% absolute disparity between the Hispanic population and their service on grand juries.  *See* Houston Chronicle, Texas-style Justice/Some Call Grand Juries a Tool of Prosecutors, Bob Sablatura 11/24/96.  Robert Hirschhorn, an attorney who specializes in jury selection, confirmed that "for sure, on the issue of representation of Hispanics, it is not a cross section."  *Id* at 9A. State District Court Judge Krocker also expressed concern with the Harris County system, stating "obviously we need to work on the Hispanic participation."  Houston Chronicle, A Question of Fairness/ Grand Jurors Typically are Affluent, Middle-aged Anglos, Bob Sablatura 11/24/01.

**D. This underrepresentation is the product of an unconstitutional selection process**

**1.        The process**

Harris County continues to use a "key man" system to select its grand juries.  Under this system, the presiding district court judge selects between three and five grand jury commissioners.  These commissioners in turn select a group of fifteen to forty grand jury panelees, from whom the judge qualifies the first twelve to make up the actual grand jury and two alternates.

The minimum legal qualifications for a grand juror in Texas are:

1) citizen of state and county and qualified to vote therein;
2) of sound mind and good moral character;
3) able to read and write;
4) no felony or theft convictions or current indictments.
5) not related within the third degree of consanguinity or second
   degree of affinity to any other person selected to serve

---

[125] (778 - 447) / 24.70 = 13.40

6) not have served as a grand juror or commissioner within the last year

7) not be a complainant in any matter heard before the grand jury

TEX. CRIM. PROC. ANN. §19.08 (Vernon 2001).

This selection process is susceptible to abuse in two respects. First, judges and commissioners are predisposed to select only persons of their acquaintance, depriving the grand jury panel of a true representation of the community. Second, commissioners have unfettered discretion and little supervision in their selection of potential grand jurors, allowing them to apply their own criteria in selection and thus providing them with a "clear and easy" opportunity to discriminate. *Alexander v. Louisiana, supra*, 405 U.S. at 630. Mr. Medina's proof with respect to this process satisfies the final prong of his *prima facie* case under both the Sixth and Fourteenth Amendments.

### 2.    The grand jury selection process is susceptible to abuse because the judges are allowed to pick commissioners and forepersons they know, and commissioners pick panelees whom they know

Historically, Texas counties' implementation of the "key man" system has been vilified by the federal courts. *See, e.g., Castaneda, supra,* 430 U.S. at 449 (though facially constitutional, "key man" system is "susceptible to abuse as applied"); *Hernandez v Texas*, 347 U.S. 475, 480; *Cassell v. Texas*, 339 U.S. 282 (1950); *Akins v. Texas*, 325 U.S. 398 (1945); *Smith v. Texas*, 311 U.S. 128 (1940). Within a constitutional system that requires fair representation of all groups in the community, the "key man" system employed by Harris County shares the flaw of the systems employed in these cases -- it allows unfettered discretion on the part of the presiding judge and commissioners. As shown, these actors exercised their discretion to produce a grand jury that grossly underrepresents Hispanics at constitutionally significant stages of the process.

The principle flaw in the Harris County system is that actors are allowed to select people based on the subjective fact that they know the person and believe him/her to be qualified. Judges, who select the commissioners and forepersons, and commissioners, who selected panelees, are allowed to choose only those people with whom they are personally familiar.  As the Supreme Court has repeatedly recognized, such a system is chronically susceptible to abuse because people tend to associate with others of similar backgrounds. *See Alexander v. Louisiana, supra*, 405 U.S. 625; *Guice v. Fortenberry*, 722 F.2d 276, 281 (5th Cir. 1984).  In addition, since judges and the commissioners know only a fraction of the eligible population, they necessarily have a limited population of people from which to select potential jurors.  In Harris County, this sampling by association results in blatant underrepresentation of certain groups and inappropriate over representation of others.

One of the deleterious results of the Harris County system is the frequent selection of the same people.  Mr. Frumencio Reyes, for example, was selected as a grand jury commissioner 7 times in a ten-year period: May 1986 in the 248th Court; November 1988 in the 177th; November 1989 in the 351st; February 1990 in the 184th; August 1990 in the 248th; August 1992 in the 208th; and November 1993 in the 248th.  Even over a ten year period, if a random process was employed in lieu of the "key man" system, the chances of the same person being reselected 7 times out of a county with a population over 3 million persons, are infinitesimal.

The repeated selection of the same people was not limited to grand jury commissioners. Jessie Campos was selected on the grand jury lists 4 times in a ten year period: August 1987 in the 176th Court; August 1990 in the 248th Court; November 1993 in the 248th Court; and May 1995 in the 177th Court. Primo Acosta was also selected four times in ten years: August 1987 in the 176th; May 1988 in the 248th; November 1989 in the 351st; and May 1990 in the 208th.  The

under-diversification caused by this repetition violates "the gravamen of due process . . . that a fair cross-section of the community **must** be represented on grand juries. . .." *Stanley v. State*, 678 S.W.2d 80, 81 (Tex. Crim. App. 1984).

Moreover, this repetition and close-mindedness particularly adversely affects members of minority groups. Even when Hispanics were selected, the commissioners' tendency to choose the same people over and over further deprived **all** Hispanics of their chance to serve. As in the examples above, with the "key man" process, certain Hispanics were picked more than once, to the detriment of those who were never selected. Thus, not only were there fewer Hispanics than there **should have** been on grand jury panels, but even within this low percentage of Hispanics sitting, the discretion-driven repetition means that there were fewer Hispanics than there **could have** been on grand jury panels.

> **3.     Discretion-driven jury selection further reduces representation of the entire community because judges and commissioners are allowed to choose persons based on subjective, unreviewable criteria.**

Not only do judges and commissioners select persons only of their own community of acquaintances, but they are allowed to decide the qualifications of persons according to subjective criteria which further limits the community representation in grand jury panels. Such a process cannot survive constitutional scrutiny. *See Johnson v. Puckett*, 929 F.2d 1067, 1072 (5th Cir. 1991)(A selection process "in which the circuit judge appoints the foreman on the basis of his own subjective criteria after having access to data concerning the race and sex of the [potential candidates] ... is subject to abuse." *Id.* at 1072 (*citing Guice v. Fortenberry*, 661 F.2d 496, 503 (1981)(en banc), *reh'g denied*, 726 F.2d 752 (1984)).

Jury commissioners in Harris County are instructed to pick panelees with only the basic legal qualifications as guidelines. Because of the lack of guidelines and judicial supervision, jury

commissioners invariably are allowed to use personal, subjective criteria to select panelees, including racial, political, and social motives.  Indeed, the instruction to choose persons of sound mind and good moral character, without any further guidance, encourages commissioners to rely on their own, possibly biased, moral judgments.

As seen above, the commissioners' notions of who was "qualified" in the community often overlaps, further limiting the breadth of the pool of minority panelees.  A commissioner's lack of exposure to Hispanics and other minorities in positions of prominence can lead to selection of the same, few members of these groups as "token" representatives over and over again.

In sum, when commissioners are allowed to apply such subjective criteria to their selections, the ideal of a grand jury panel representing a cross section of the community is mocked.  This system is subject to abuse because it was "easily capable of being manipulated" when commissioners "'invoke their subjective judgment rather than objective criteria.'" *Gibson v. Zant,* 705 F.2d 1543, 1548 (11th Cir. 1983).

Through the choosing of grand jury commissioners and panelees on a personal basis and with unreviewable criteria and little supervision, Harris County produces a system that is susceptible to abuse such that Hispanics are severely under-represented throughout the grand jury process.  Mr. Medina has thus met the third prong of his Sixth and Fourteenth Amendment claims.

The state habeas court rejected Mr. Medina's grand jury composition claim on procedural grounds and on the merits.  Order at 44-45, ¶¶ 16-19.   The state court's result and reasoning distorts *Castaneda v. Partida*, 430 U.S. 482, 494 (1977); ; *Hernandez v. Texas*, 347 U.S. 475 (1954); *Cassell v. Texas*, 339 U.S. 282 (1950), and other seminal decisions.  As a result the state

habeas decision is contrary to and an unreasonable application of Supreme Court precedent.  It is also based on factual determinations that are unreasonable in light of all the evidence before the state court.  Accordingly, federal habeas corpus relief remains available to remedy the constitutional wrong done to Mr. Medina.

IX.   **Mr. Medina's right to a fair trial under the Sixth Amendment, the Eighth Amendment and the due process clause of the Fourteenth Amendment was violated by the hostile atmosphere in the courtroom**

Mr. Medina's trial was marked by the repeated, and often wholly irrelevant references to gang activity.  The pervasiveness of these references did not end solely on the witness stand but rather flowed into the gallery where observers were noticed flashing gang signs.  Observers in the gallery were also noticed wearing T-shirts with photos of the victims with inscriptions of memorial.  Despite the hostile atmosphere pervading the courtroom, the trial judge in Mr. Medina's case took no steps to prevent this hostility from affecting the jury.

**A.  The applicable principles**

The Sixth and Fourteenth Amendments guarantee a criminal defendant the right to a fair trial.  *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  The basic principle defining the right to a fair trial is that a criminal defendant is entitled to a verdict based only upon the evidence introduced at trial.  *Holbrook*, 475 U.S. at 567; *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)(holding that the verdict must be based upon the evidence developed at trial "regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies").  Accordingly, courts must guard against "factors that may undermine the fairness of the fact-finding process."  *Williams*, 425 U.S. at 503; *see Cox v. Louisiana*, 379 U.S. 559, 562 (1965)(noting that a state should "adopt safeguards necessary and appropriate to assure that the

administration of justice at all stages is free from outside control and influence"). Habeas corpus relief is available where a "defendant shows his conviction has been obtained in a trial tainted by an atmosphere of coercion or intimidation . . . whether the pressures were from partisans, or . . . from persons reacting to the drama of the moment who created an environment so raucous that calm deliberation by a judge or jury was likely compromised in a serious way." *Carey v. Musladin*, 549 U.S. 70, 80-81 (2006) (Kennedy, J., concurring).

To prevail on his fair trial claim, Mr. Medina must show either actual or inherent prejudice. *Flynn*, 475 U.S. at 572. The Supreme Court has held that, in some situations, "a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas*, 381 U.S. 532, 542-43 (1965). The standard for determining when a particular courtroom occurrence is inherently prejudicial is whether "an unacceptable risk is presented of impermissible factors coming into play." *Flynn*, 475 U.S. at 570-71; *Williams*, 425 U.S. at 505. A risk becomes unacceptable when the probability of deleterious effects exists. *Id.* at 504. The Supreme Court has held that courts should examine inherently prejudicial practices with close judicial scrutiny, because "the actual impact of a particular practice on the judgment of jurors cannot always be fully determined." *Williams*, 425 U.S. at 504; *see Flynn*, 475 U.S. at 568. Courts must evaluate the probability of deleterious effects based on reason, principle, and common human experience. *Williams*, 425 U.S. at 504. In performing this analysis, courts should examine the totality of circumstances. *Sheppard v. Maxwell*, 384 U.S. 333, 352 (1966).[126]

---

[126]   Moreover, when, as here, there is an "unacceptable risk" that a defendant's trial processes have been subverted, a harmless error analysis is not applicable. *See Woods*, 923 F.2d at 1460. This reflects the reasoning of the United States Supreme Court in *Irvin*, 366 U.S. at 722, in which the important threshold issue for the Court was whether the defendant was afforded a fair trial, not whether he was innocent. *See also Satterwhite v. Texas*, 486 U.S. 249, 256 (1988).

### B.  The concept of inherent prejudice

The Supreme Court first announced the concept of inherent prejudice in *Rideau v. Louisiana*, 373 U.S. 723 (1963).  In *Rideau*, the defendant contended that the trial court's denial of his motion for change of venue violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment.   The basis for his change of venue motion involved a local television station's broadcast of the defendant's jailhouse confession to a substantial portion of the community before the trial.  Without requiring the defendant to show the actual effect that the televised confession had on the fairness of the trial, the Court found the airing of the confession inherently prejudicial.  *Id.* at 727; *id.* at 729, 733 (Clark, J., dissenting).  Analogizing the televised confession as *the* trial itself, the Court noted that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality."  *Id.* at 726.

In *Turner v. Louisiana*, 379 U.S. 466 (1965), two deputy sheriffs gave critical testimony for the prosecution and also performed extensive official duties in sequestering the jurors during the course of the defendant's three-day trial for capital murder.  The Court determined that the practice was inherently suspect and, therefore, did not require the defendant to make a showing of actual prejudice:

> In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.   What happened in this case operated to subvert these basic guarantees of trial by jury.
>
> *****
>
> [E]ven if it could be assumed that the deputies never did discuss the case directly with members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution.

*Id.* at 473 (quotation marks omitted).[127]

In *Estes v. Texas*, 381 U.S. 532 (1965), the Court found that the totality of the circumstances surrounding the defendant's televised trial demanded a finding of inherent prejudice to his due process rights under the Fourteenth Amendment.   381 U.S. at 542-44 (plurality opinion of Clark, J.); *id.* at 552, 578-80 (Warren, C.J., concurring)(finding that the presence of television in the criminal courtroom was inherently unfair); *id.* at 593 (Harlan, J., concurring)(concluding that, "when the trial practices in question are instinct with dangers to constitutional guarantees," no showing of specific prejudice is required).   The trial court's decision to permit the televising of the trial injected irrelevant, external factors into the judicial process which stripped the courtroom as a place for conducting a trial with dignity and integrity. *Id.* at 561-62 (opinion of Warren, C.J., concurring).

Finally, in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Court found that the totality of the circumstances surrounding the defendant's notorious murder trial showed that the trial judge's failure to insulate the proceedings from inherently prejudicial publicity and to control disruptive influences deprived the defendant of his Fourteenth Amendment right to a fair trial. *Id.* at 358 n.11, 363.   The Court stated that, because the judge had absolute authority to control the courtroom, the "carnival atmosphere at trial could have been easily avoided."   *Id.* at 358. The massive pretrial publicity should have made the trial judge realize the need for strict rules governing the use of the courtroom by the press.   Instead, "bedlam reigned at the courthouse," and the press "took over practically the entire courtroom."   *Id.* at 355.   The judge approved the installation of a temporary table, inside the bar behind counsel's table, to provide additional

---

[127] *See Gonzales v. Beto*, 405 U.S. 1052 (1972)(citing *Turner* for the proposition that allowing the county sheriff, a key prosecution witness, to retain his duties as a bailiff responsible for the care of the jurors was inherently prejudicial); *Parker v. Gladden*, 385 U.S. 363 (1966)(finding inherently prejudicial a bailiff's remarks to several jurors that the defendant was guilty).

seating for twenty reporters.  *Id.*  The Court also admonished the trial judge for failing to prohibit the prosecution, police officers, defense counsel, and prospective witnesses from talking with the press.  *Sheppard* recognized that "trial courts must take strong measures to ensure" that the defendant receives a fair trial by an impartial jury free from outside influences.  *Id.* at 362.

In sum, the Supreme Court's inherent prejudice jurisprudence emphasizes that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see Chandler v. Florida*, 449 U.S. 560, 574 (1981)(holding that "[t]rial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law").  Accordingly, cases involving preventable intrusions on the trial proceedings present greater justification for presuming prejudice than do cases in which the trial court took appropriate steps to ensure the integrity and dignity of the trial.  *United States v. Haldeman*, 559 F.2d 31, 61 n.32 (D.C. Cir. 1976), *cert. denied*, 431 U.S. 933 (1977); *see, e.g., Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976)(noting that the trial court's failure to control the proceedings in *Estes* constituted one of the factors resulting in an inherent deprivation of the defendant's due process rights); *United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978)(finding inherent prejudice because the district court refused to conduct a *voir dire* examination of the jury to determine whether any juror had read a suggestive newspaper article about the case); *Norris v. Risley*, 918 F.2d 828 (9th Cir. 1990)(noting the relative ease with which the trial judge could have alleviated the risk of inherent prejudice caused by spectators wearing "Women Against Rape" buttons during rape trial).[128]

---

[128] Like race-based jury selection procedures, extraneous influences which exert pressure on jurors undermine public confidence in the fairness and reliability of the criminal justice

### C.   The totality of the circumstances caused inherent prejudice to Mr. Medina's right to a fair trial at each phase of the proceedings

Even a cursory review of Mr. Medina's case reveals the impermissible prejudice denounced by the Supreme Court decisions discussed, *supra*.  The prejudice and fear that surrounds images of gangs cannot be overstated.  It is beyond cavil that the overwhelming majority of the venire had read or heard about gang violence in the Houston area.  A brief, albeit non-exhaustive, review of Houston Chronicle stories dated at the time of Mr. Medina's trial serves to demonstrate the community's fear of and beliefs about local gangs.  An October 1993 article states that "[g]ang members, most of whom are teen-agers of Mexican heritage, rob and steal to make their money and kill to eliminate enemies."  Houston Chronicle, Civil War, Arrests Cooling Down Area Gang/4 of 5 Top Leaders Are In Jail or On The Lam, 10/31/93.  Another quoted a Houston police officer: "[Gang members] are mean and stupid.  They have guns they don't know how to use, and they want to be feared.  That makes them dangerous, but not in the way they'd like to be."  Houston Chronicle, Violent Times, 1/30/94.

The testimony elicited by the State, much of which was gratuitous, continued in painting a frightening portrait of gang allegiances.  The jury heard about getting "jumped in" to gangs, 15 RR 1751-52, were shown photos of gang members that did not even testify, 12 RR 1372, were told about gang signs, 13 RR 1587; 14 RR 1639; 16 RR 2034-35; 18 RR 253-55, were informed about gang "loyalty" 16 RR 1983; 16 RR 1685; tattoos, 15 RR 1882; 16 RR 2022; 16 RR 2177; 19 RR 2514-15; gang clothing, 15 RR 1881; 16 RR 1935; 17 RR 2177; 19 RR 2484, and were told that people who "snitch" on gang members are killed, 15 RR 1808.

Adding to the inhospitable atmosphere was the fact that Mr. Medina's trial was

---

system.  Accordingly, courts must guard against the possibility of a conclusion by the public that a jury's verdict "was in part a product of intimidation and did not flow from the fair and orderly working of the judicial process."  *Cox v. Louisiana*, 379 U.S. 559, 565 (1965).  *Accord Carey v. Musladin*, 549 U.S. at 80-81 (Kennedy, J., concurring).

conducted in an annex to the courthouse, where the confines were extremely limited.  In such a small room, the close proximity of the jury to the witnesses, the defendant and the gallery was extremely noticeable: a fact attested to by the prosecutor during examination of a witness by stating, "It's like trying a case in a shoe box."  12 RR 1316.

Jurors also expressed concerns about the propinquity of the witnesses and Mr. Medina and the presence of gang members in the courtroom.[129]  Juror Andrew Egras described jurors as being "haunted by the concern that someone might come after them if they didn't like the verdict."  Exhibit 32 (Affidavit of Andrew Egras).  Juror Adan Mata, Jr. also remembered jurors being concerned about gang members being so close to them and looking directly at the jurors.  During deliberations the fear of possible retaliation was in the back of their minds.  Exhibit 60 (Affidavit of Gregory Wiercioch).  Juror Connie Roane nervousness was already apparent during *voir dire*, causing Mr. Guerinot to reassure her: "You're almost through it.  Relax.  You're going to make it.  We haven't lost anybody yet.  I don't think you'll be the first."  8 RR 813.

Juror Egras also recalled the "tension in the audience" and remembers seeing "gang members in the audience flashing gang signs at each other."  Exhibit 32 (Affidavit of Andrew Egras).  The jurors were escorted to their cars after court and "specifically asked to be escorted after the punishment phase verdict."  Exhibit 32 (Affidavit of Andrew Egras).  *See also* 1A CR at 126 (Juror request for escort).  This request is particularly telling because the verdict was

---

[129] During state postconviction proceedings Mr. Medina sought to prove the presence of gang members and overt signs of hostility at the trial through affidavits of jurors themselves.  However, the state habeas court refused to consider the juror affidavits as evidence ruling instead that their affidavits were impermissible attempts to impeach the verdict.  Order at 21 ¶ 110.  Ironically, the state court made this ruling after denying Mr. Medina's motion to produce the television tape recordings of the trial so that he could prove that gang related activity was going on in the courtroom itself throughout the trial.  *See* Applicant's Motion for Discovery and Evidentiary Hearing, at E.

returned at 2:45 in the afternoon.  *See* 21 RR 2588.

Despite this inherent prejudice, the trial judge failed to take steps to ensure the jury felt secure to listen to testimony and deliberate fairly and impartially.  Jurors instead were escorted out through the hallway past arguments between witnesses and the victim's family.  *See* Exhibit 32 (Affidavit of Andrew Egras).

As disturbing, during the guilt/innocence portion of Mr. Medina's trial, the surviving victim and supporters were observed wearing T-shirts with photos of the deceased victims with the words "In Memory of," a situation factually identical to that in *Norris v. Risley, supra*. Exhibit 6 (Affidavit of Anthony Luna Medina).  Like the buttons in *Norris*, these T-shirts were "far more subtle than a direct accusation" and their message "was all the more dangerous because it was not a formal accusation." *Id*. at 833.  Mr. Medina had no means of refuting the assertions of his guilt implied by these shirts and thus "the accusation stood unchallenged, lending credibility and weight to the state's case without being subject to the constitutional protections to which such evidence is ordinarily subjected." *Id*. at 833.

The atmosphere of Mr. Medina's trial was much more problematic than the situation confronted in *Norris*.  Here, it was not just memories of victims in isolation that jeopardized fair trial rights at each phase of the proceedings.  The references to the victims must be considered along with the overt signs of gang presence, influence, and intimidation that occurred throughout each phase of the proceedings.   In tandem the distinct but related forces created an impermissible risk of coercion and a decision based on anything but the evidence and the law at the guilt and penalty phases.  The setting in which Mr. Medina's fate was determined was far more complicated and fraught with danger than what was found in *Norris*.  The combination of victim impact and gang threats were much more prejudicial and coercive than the two to four

inch buttons dealt with in *Carey v. Musladin*, 549 U.S. at 72 n. 1.  Taken together the factors infecting Mr. Medina's trial had the potential to derail deliberative process in ways similar to the specter of  violence and the threat of retaliation that the court confronted in *Frank v. Mangum*, 237 U.S. 309 (1915), and remedied in *Moore v. Dempsey*, 261 U.S. 86 (1923).

Viewing the atmosphere at Mr. Medina's trial in the totality of the circumstances, there can be no doubt an unacceptable risk of prejudice pervaded his trial at each phase of the proceedings.  While some risk may be necessary when dealing with gang testimony, the burden of alleviating the risk in this case was minimal.  Coupled with the myriad other errors tainting the prosecution of Mr. Medina, describe *infra*, the totality of the circumstances show that Mr. Medina's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by the hostile courtroom atmosphere.   As such his Sixth and Fourteenth Amendment rights to a fair determination of guilt was compromised. .  *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Estelle v. Williams*, 425 U.S. 501, 503 (1976); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Moore v. Dempsey*, 261 U.S. 86 (1923).   So, too, was his right to a reliable sentencing determination under the heightened standards of the Eighth Amendment. *California v. Ramos*, 463 U.S. 992, 998-99 (1983);   *Beck v. Alabama*, 447 U.S. 625, 638 n.13 (1980);  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Gregg v. Georgia* 428 U.S. 153, 187 (1976).

Mr. Medina's claim was presented to the state habeas court.  The court's denial of the merits of the claim disregards the standards and principles established in *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Estelle v. Williams*, 425 U.S. 501, 503 (1976); .  *Sheppard v. Maxwell*, 384 U.S. 333, 352 (1966); *Rideau v. Louisiana*, 373 U.S. 723 (1963);  *Moore v. Dempsey*, 261 U.S. 86 (1923); and *Frank v. Mangum*, 237 U.S. 309 (1915).   Moreover, the decision denying relief reflected fact findings that did not make sense, were not supported by the state court record, were

made in express disregard of key material that would be admissible evidence before this Court, and were entered only after frustrating Mr. Medina's efforts to obtain discovery and expand the record.  As a result the state court decision denying relief is contrary to and an unreasonable application of Supreme Court precedent and based on factual determinations that are unreasonable in light of all the evidence before the state court. Accordingly, federal habeas corpus relief remains available to remedy the constitutional wrong done to Mr. Medina.

X.      **By denying the jury's request for an instruction on voluntary intoxication as a mitigator, the trial court denied Mr. Medina's right to individualized sentencing under Lockett and violated the principles of Eddings**

The United States Supreme Court has long held that the Eighth Amendment to the U.S. Constitution requires an individualized determination of sentencing in death penalty cases, based on the character of the defendant, the record of the defendant, and the circumstances of the offense.  *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991 (1976)(plurality opinion).  In *Lockett v. Ohio*, the Court reversed a death sentence on Eighth Amendment grounds.  438 U.S. 586, 98 S.Ct. 2954 (1978).  According to *Lockett,* imposition of the death penalty is constitutional only if the sentencer is not precluded "from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Id.* at 605, 98 S.Ct. at 2964, 2965.  In the instant case, relevant evidence that Anthony Medina submitted at trial  in mitigation of the death penalty was not within effective reach of the jury.  Specifically, the trial court's failure to respond to the jurors' question and provide a special instruction addressing voluntary intoxication prevented the jury from considering the influence of alcohol and intoxication at the time of the offense as a mitigating factor.[130]  Therefore, Anthony Medina's

---

[130]  Evidence that Mr. Medina was intoxicated at the time of the murders is clearly constitutionally relevant.  *See Parker v. Dugger*, 498 U.S. 308, 314, 111 S.Ct. 731, 736

death sentence is  in violation of his constitutional right to be free from cruel and unusual punishment.

During Anthony Medina's trial, the defense presented evidence of voluntary intoxication. Mr. Medina testified he was under the influence of alcohol and marijuana the night of the offense for which he was convicted.  17 RR at 2120, 2121, 2123, 2135, 2140, 2141, 2153, 2173.  It was the uncontroverted testimony of Mr. Medina that in addition to smoking marijuana, he consumed over twenty beers, approximately two to three mixed drinks (liquor and orange juice), and one or two shots of tequila on the night in question.  *Id.*  Mr. Medina described his condition between 12:30 P.M. on December 31, 1995  and 3:00 A.M. on January 1, 1996:

> ...I would say that I was drunk, because I bought the beer and everybody had been drinking, and I was continually drinking.  I did drink a lot that night.

17 RR at 2140.  Witnesses who testified they attended the same gatherings Mr. Medina attended the evening of December 31, 1995 corroborated Medina's reports of heavy drinking that night.  *See* 13 RR at 1470, 1471, 1484, 1485, 1488; 14 RR at 1660-1663, 1665, 1669, 1681, 1700, 1701, 1708, 1709; 15 RR at 1742, 1756, 1792, 1793, 1915, 1942; 17 RR at 2084.  At the closing argument of the trial's penalty phase, defense counsel urged jurors to give mitigating weight to the evidence of voluntary intoxication.  *See* 20 RR at 2549.  Defense Attorney Jack Millin stated:

> And you can...consider that same intoxication with respect to mitigation on the second special issue.  Had he not, you know, drunk 18 beers -- and the State agrees with everything that Tony talked about.  They would agree that he had 18 beers plus a couple of mixed drinks and smoked some marijuana and that sort of thing...Special Issue No. 2 asks you to take his intoxication at the time of the offense that you-all have convicted him of in mitigation of punishment.....You can consider that in mitigation.

*Id.*

Despite defense counsel's explicit remarks regarding the appropriateness of considering

---

(1991)(stating that evidence that the defendant "was under the influence of large amounts of alcohol and various drugs ... during the murders" was mitigating evidence).

evidence of intoxication in mitigation of the death penalty, the jury evinced an utter lack of understanding of the effect it could give such evidence when assessing punishment.   During *punishment-phase* deliberations, the jury submitted the following written question to the court: "...[W]as it stated in the courtroom during the trial, 'Alcohol is *not* a legal defense' and is that a true statement according to the law?"   *See* 1A CR at 138 (emphasis added).   The trial court responded (in writing), "I am not permitted to answer your question.   You are referred to the charge for the law."   *See Id.*   At the close of the sentencing phase, however, the trial court had only submitted the two statutory issues required by Article 37.071 of the Texas Code of Criminal Procedure along with a general instruction to consider all evidence presented to the jury. *See* 1A CR at 142-149.

Mr. Medina recognizes that in *Jurek v. Texas,* the U.S. Supreme Court held that   the Texas capital sentencing procedure is constitutional.   428 U.S. 262, 272, 96 S.Ct. 2950, 2956 (1976).   Mr. Medina also recognizes that the United States Court of Appeals for the Fifth Circuit and the Texas Court of Criminal Appeals have held that the Texas special issues *standing alone* do not preclude the jury from giving mitigating effect to evidence of a defendant's voluntary intoxication at the time of the offense that does not rise to the level of insanity.   *See Drinkard v. Johnson*, 97 F.3d 751, 757 (5th Cir. 1996) (*citing Lackey v. Scott*, 28 F.3d 486, 489 (5th Cir. 1994), *cert. denied*, 513 U.S. 1086, 115 S.Ct. 743 (1995); *Cordova v. Collins*, 953 F.2d 167, 170 (5th Cir.), *cert. denied*, 502 U.S. 1067, 112 S.Ct. 959 (1992); *Kelly v. Lynaugh*, 862 F.2d 1126, 1133 (5th Cir. 1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3263 (1989)); *Nethery v. Collins*, 993 F.2d 1154, 1161 (5th Cir. 1993); *See also Cordova v. State,* 733 S.W.2d 175, 189-191 (Tex. Crim. App. 1987).   Mr. Medina further acknowledges that Section 8.04(b) of the Texas Penal Code has been interpreted to require the defendant to first establish that voluntary intoxication

rendered him temporarily insane before it is necessary that the trial court affirmatively instruct the jury on voluntary intoxication as mitigating evidence at the punishment stage of the trial. *See id.; Sawyers v. State*, 724 S.W.2d 24 (Tex. Crim. App. 1986); *Hart v. State*, 537 S.W.2d 21 (Tex. Crim. App. 1976). However, the Texas capital sentencing scheme as applied in *this* case rendered Anthony's Medina's sentence to die constitutionally inadequate. The U.S. Supreme Court has found that under certain circumstances, the statutory special issues must be augmented by jury instructions to preserve the constitutionality of the statute's application. *See Barnard v. Collins*, 958 F.2d 634, 637 (5th Cir. 1992) (citing *Penry v. Linaugh*, 492 U.S. 302, 109 S.Ct. 2934 (1989)). Undoubtedly, Medina's case presents such a circumstance. The general instruction the trial court submitted to the jury at the conclusion of the punishment phase failed to provide an adequate vehicle through which the jury could give full mitigating potential to the voluntary intoxication evidence.

The proper standard for reviewing a challenged jury instruction in the capital sentencing context is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198 (1990). Mr. Medina must demonstrate more than "only a possibility" that the jury interpreted the challenged instruction in an impermissible way. *Id.* Mr. Medina need not, however, prove a "more likely than not" impermissible interpretation. *Id.* In evaluating the instructions, the court must approach the instructions with a "commonsense understanding of the instructions in the light of all that has taken place at the trial" *Id.* at 381, 110 S.Ct. at 1198. This is especially so where, as here, the need for instruction came in response to a specific and targeted question from a deliberating jury. *Bollenbach v. United States*, 326 U.S. 607, 611-13 (1946) (court's response to question from jury

regarded as "critical stage" and need for supplemental instruction viewed with special scrutiny).

In light of all that took place during Anthony Medina's trial, there is more than a reasonable likelihood the jury failed to consider the voluntary intoxication evidence in mitigation of the death penalty.   As noted previously, the jury demonstrated a complete lack of understanding regarding how it could consider the evidence of voluntary intoxication during the punishment phase of the trial.   Although Mr. Medina had already been convicted of capital murder, the jury asked the court whether it was stated during trial that "Alcohol was *not* a legal defense."   *See* 1A CR at 138.   One can reasonably conclude from the content of the question and the timing of the question, the jury was erroneously applying Section 8.04(a) of the Texas Penal Code when considering what effect to give voluntary intoxication evidence during the punishment phase of the trial.   It goes without saying that Section 8.04(a), which reads, "Voluntary intoxication does not constitute a defense to the commission of crime", is only applicable during the guilt/innocence stage of a criminal trial.   In other words, it is inapplicable during the punishment stage.  *Compare Eddings v. Oklahoma*, 455 U.S. 104 (1982) (sentencer's belief that mitigation limited to matters that rise to the level of a defense or justification violates Eighth Amendment). Despite the jury's obvious misconception of the law, the court failed to take corrective action.  Instead, the court directed the jury to the general instruction the court had already submitted to the jury.  *See* 1A CR at 142-149.  It is safe to assume the jury would not have asked for clarification had the instruction it had already received been sufficiently clear with respect to the relevance of voluntary intoxication evidence in assessing punishment.

The source of the jury's confusion regarding how it could consider Mr. Medina's intoxication in the penalty phase of the trial can be traced to the individualized *voir dire* examinations of the jurors.   The information the trial court provided regarding the law as it

pertains to voluntary intoxication varied greatly from juror to juror.  The trial court informed only seven jurors (Phyllis Phifer Smith, Karen Shaw Smith, Elbert Thomas Ward, Connie Joanne Roan, Amanda Riddle Stewart, W.C. Walker, and Alma Volante) that evidence of voluntary intoxication could be considered as a mitigating circumstance.  *See* 7 RR at 631, 665; 8 RR at 713, 779; 9 RR at 1216, 1250, 1272.  Jurors Linda Ramirez Salazar and Anthony Carmen Attilio, Jr., on the other hand,  received no information whatsoever regarding how voluntary intoxication evidence could be considered.  *See* 4 RR at 222-253; 6 RR at 377-403.  The only information Jurors Andrew Egras and Adan Mata  received was that in Texas, voluntary intoxication is not a defense to the commission of a crime.  *See* 4 RR 172-214; 508-539.  The source of the information was the State's prosecuting attorney.   Juror Egras received the following explanation:

| Mr. Baldassano: | In Texas voluntary intoxication is no defense, that's the state of the law.  That is, if you get really liquored up, you can't go and kill your captain or something and say, "Hey, I was drunk.  That's why I did it." |
| Mr. Egras: | Yes, sir. |
| | Mr. Baldassano: Can you follow that law, and do you agree with that? |
| Mr. Egras: | Oh, yes sir. |

4 RR at 194.

Likewise, during Juror Mata's *voir dire* examination, the following exchange took place:

| Mr. Baldassano: | In Texas, voluntary intoxication is no defense that is, if you go out drinking with your friends and then you go kill someone, you can't say, you know, I was drunk.  I'm sorry officer.  I've been drinking so I'm not liable.   In Texas voluntary intoxication is no defense to a crime.  Do you believe in that? |
| Mr. Mata: | Yes, I do. |

6 RR at 526.

The trial court failed to provide clarification to  Juror Mata and Juror Egras that while intoxication is not a defense  to commission of a crime, it can be considered as a mitigating circumstance during penalty-phase deliberations.  *See* 4 RR at 172-214; 6 RR at 508-539.  At no point during Medina's trial did the trial court provide clarification regarding the relevance of voluntary intoxication evidence during the penalty stage of the trial.

In light of the highly inconsistent, and in four cases, deficient information the trial court provided to individual jurors regarding the relevance of voluntary intoxication in the punishment phase of the trial, as well as the jury's obvious lack of understanding of the law, it is reasonably likely the trial court's failure to submit a clarifying instruction to the jury prevented the jury from adequately considering the evidence of voluntary intoxication in mitigation of the death penalty.  Indeed, the court not only failed to give the jury an instruction that would have enabled jurors to give mitigating effect to a constitutionally recognized mitigating circumstance, the court mis-instructed jurors that they should only consider the influence of alcohol as a circumstance of the offense if jurors found that alcohol rendered Mr. Medina insane.  Such a result is untenable under *Eddings*.  Therefore, Anthony Medina has been sentenced to die in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

In state habeas the court found that this claim was defaulted.  Order at 46, ¶ 24. Given counsel's deficient performance at this point in the proceedings there is cause to overcome any putative procedural default.  *McCleskey v. Zant*, 499 U.S. 467, 494 (1991);  *Murray v. Carrier*, 477 U.S. 478, 486-88 (1986).  Given the context of the proceedings, any failure to properly preserve the claim was prejudicial to Mr. Medina.  *United States v. Frady*, 456 U.S. 152, 170 (1982);  *Francis v. Henderson*, 425 U.S. 536, 542 n. 6 (1976).

The state court also addressed the merits of the claim.  The court held that any error was

harmless because Medina argued that he was not involved in the shooting and that under Texas law, an instruction dealing with the effect of alcohol is necessary at the penalty phase only if intoxication results in insanity.  Order at 47, ¶¶ 25-27.  These conclusions fundamentally distort the law and the facts connected with the claim.  As a result, the state habeas decision is contrary to and an unreasonable application of Supreme Court precedent.  The result also is based on factual determinations that are unreasonable in light of all the evidence before the state court. Accordingly, federal habeas corpus relief remains available to remedy the constitutional wrong done to Mr. Medina.

### XI.  Mr. Medina's Fifth and Sixth Amendment rights to be present at all phases of the proceedings were violated when *voir dire* of potential jurors was conducted outside his presence

Portions of the juror *voir dire*, including the excusal of four potential jurors were conducted outside the presence of Mr. Medina.  5 RR 331-351.  Specifically, Sylvia Downing Roeseler and Deanne Basque Saltzman were questioned and excused without Mr. Medina's knowledge.  5 RR 332-351.  Veniremember Roeseler was excused through the defense's use of a peremptory strike.  5 RR 347.  Saltzman was excused by agreement, presumably for economic hardship reasons.  5 RR 350.  Two other potential jurors, James Edward Maze and Latarsha Lynnette Haskett Agnew were excused by agreement of the State and defense attorneys without being questioned and outside Medina's presence, though he was subsequently informed of their dismissal.  5 RR 351-352.

#### A. Legal Background

"*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored."  *Rosales-Lopez v. United States*, 451 U.. 182, 188 (1981).  Under the Due Process Clause, a defendant has a right to be present "whenever

his presence has a relation, reasonably substantial to the fullness of his opportunity to defend against the charge." *United States v. Gagnon*, 470 U.S. 522, 526 (1985), quoting Snyder v. Massachusetts, 291 U.S. 97, 105-106 (1934). This includes the right to be present during *voir dire*. *See Snyder*, 291 U.S. at 106; *United States v. Gordon*, 829 F.2d 119, 123-24 (D.C.Cir.1987), *United States v. Tipton*, 90 F.3d 861, 872 (4th Cir. 1996); (quoted in *Camacho*, 955 F.2d 950), *Crease v. McKune*, 189 F.3d 1188, 1192 (10th Cir. 1999); *Tankleff v. Senkowski*, 135 F.3d 235, 246 (2nd cir. 1998); *Campbell v. Wood*, 18 F.3d 662, 671 (9th Cir. 1994). The burden is on the state to demonstrate that a constitutional error did not effect the outcome of the proceedings. Courts have repeatedly found a defendant's exclusion from *voir dire* proceedings grounds for reversal. *Gordon*, 829 F.2d 119; *Bledsoe v. State*, 936 S.W.2d 350 (Tex. Ct. App. — El Paso, 1996); *See Camacho*, 955 F.2d 950 (4th Cir., 1992). (A defendant's absence during the impaneling of the jury certainly frustrates the fairness of the trial).

**B.  Application to this case**

When jury selection proceedings involving several potential jurors continued outside of defendant's presence, Mr. Medina's due process rights were violated. Although the constitutional right to presence may be waived, *United States v. Crutcher* 405 F.2d 239, 243 (2nd Cir. 1968) cert. denied, 394 U.S. 908, the record indicates that Mr. Medina did not waive this right, nor in the case of veniremembers Saltzman and Roeseler, that he even knew their *voir dire* examination had taken place. Courts will not infer a waiver where there is no evidence in the record. *Gordon*, 829 F.2d at 125-126; *United States v. Rodriguez*, 67 F.3d 1312, 1316 (7th Cir. 1995); *Proffitt v. Wainwright*, 685 F.2d 1227, 1258 (11th Cir. 1983).

In addition to his rights under the Federal Constitution, Mr. Medina held additional protection under Article 33.03 of the Texas Code of Criminal Procedure Art. 33.03 which grants

defendants a right to be present during the entirety of jury selection proceedings. Tex. Crim. Procedure. Code Ann. § 33.03 (1989).  This fact underscores the prejudice inherent in Mr. Medina's absence during critical portions of his trial.

Texas courts have recognized that Article 33.03 requires defendant's presence at *voir dire* and jury selection.  *Bledsoe*, 936 S.W.2d at 351.  This right cannot be waived.  *Miller v. State*, 692 S.W. 2d 88 (Tex. Crim. App. 1985).  The court erred under this statute in conducting jury selection outside of Mr. Medina's presence.

In evaluating an error under this rule, Texas courts apply two different tests. *Adanandus v. State*, 866 S.W. 2d 210, 219 (Tex. Crim. App. 1993).  The first test, set forth in *Cooper* and *Mares* looks for a reasonably substantial relationship between the defendant's absence and the opportunity to defend. *Bledsoe* 936 S.W.2d at 351; *Cooper v. State*, 631 S.W. 2d 508, 511 (1982); *Mares v. State*, 571 S.W.3d 303, 306 (1978).  This test derives from the federal constitutional standard set forth in *Snyder* and endorsed again in *Gagnon*.  *See Gagnon*, 470 U.S. at 527, quoting *Snyder*, 291 U.S. at 115.  The second test, originally codified in Texas Rule of Appellate  Procedure  81(b)(2) and later subsumed in Rule 44.2(a) "seeks to determine the effect of the defendant's absence on the outcome of the trial or punishment proceeding.  *Adanandus*, 866 S.W. 2d at 220; Tex. R. App. Proc. 44 (2001).  This statute codifies the test pronounced in *Chapman*.  See *Chapman v. California*, 386 U.S. 18, 23-24 (1967).  Because the two tests have distinct focuses, both should be applied.  *Adanandus* at 220.

### 1. Cooper/Mares test - State Law

In *Mares*, the Court of Criminal Appeals held that errors dealing with a defendant's right to presence should be evaluated by determining whether the defendant's presence bore a reasonably substantial relationship to the defendant's opportunity to defend. 571 S.W. 2d 306.

No showing of actual harm is necessary. *Bledsoe*, 936 S.W. 2d at 351. Because Mr. Medina did not have an opportunity to assist counsel in his defense, and otherwise participate in the *voir dire* of these jurors, his conviction should be reversed. Like Mr. Bledsoe, Mr. Medina was deprived of the opportunity to separately observe the veniremembers, thereby assisting his counsel and participating in his own defense. Id. Unlike situations in which a defendant's absence has been found to have no substantial relation to his opportunity to defend, here substantive portions of *voir dire* were performed in his absence. *See Bath v. State*, 951 S.W.2d 11, 22-23 (Tex. App. Corpus Christi, 1997)(defendant absent during hearing on venirepersons' excuses only); *Weber v. State*, 829 S.W. 2d 394, 396-397 (Tex. App., Beaumont, 1992)(defendant absent during hearing on excuses only); *Corwin v. Johnson*, 150 F.3d 467, 472-473 (5th Cir., 1998)(Defendant absent on initial day of jury selection, during which excuses and exemptions heard, and questionnaires answered). As the Court has recognized, "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Faretta v. California*, 422 U.S. 806, 819 (1975). Defendant's counsel's presence is not a sufficient substitute.

### 2. 44.2 analysis

Because Mr. Medina's absence from the *voir dire* proceedings was involuntary, this must be considered a constitutional error, in addition to a statutory violation. *Cf. Tracy v. State*, 14 S.W.3d at 826 (in which defendant's absence was voluntary). This error was compounded by the court's further error in allowing a peremptory strike to be used by the defense without the defendant's knowledge and outside his presence. Furthermore as argued in this petition, the defendant was denied a fair and impartial jury. Thus, the violation of Art.33.03 would be judged under the harmless error standard as set forth in 44.2(a). (court must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error

did not contribute to the conviction or punishment).   As in *Bledsoe*, the State cannot prove beyond a reasonable doubt that Mr. Medina's exclusion from *voir dire* did not contribute to his conviction or punishment, because any judgments about what would have occurred if he had been present would be speculative, and the State carries the burden of proving the error harmless. 936 S.W. 2d at 352.

Because Mr. Medina was absent during a critical portion of *voir dire*, in violation of his Fourteenth Amendment due process rights, and his Sixth Amendment right to exercise peremptory challenges was also impeded, his conviction must be overturned.

### 3. Federal right to exercise peremptories

Mr. Medina's right to effectively use his peremptory challenges was substantially impaired by his absence from and ignorance of the *voir dire* of veniremembers Roeseler and Saltzman.   Mr. Medina had no opportunity to examine veniremember Roeseler and yet one of his limited peremptory strikes was used without his consent.   The denial or impairment of this right is grounds for automatic reversal.   *Knox v. Collins*, 928 F.2d 657 (5th Cir. 1991), *United States v. Broussard,* 987 F.2d 215 (5th Cir. 1993), citing *Swain v. Alabama*, 380 U.S. 202, 219 (1965). *United States v. Underwood*, 122 F.3d 389, 392 (7th Cir. 1997)(reversal required where jury selection process violated defendant's Fifth Amendment due process rights, impairing intelligent exercise of peremptory challenges).   Mr. Medina's right to peremptory challenges was  impaired because he did not receive that which state law provides, the right to be present at the *voir dire* of the juror.   *See Ross v. Oklahoma* 487 U.S. 81, 89 (1981).   "Defendant need not show that jury was biased in order to obtain a new trial." *United States v. Taylor*, 92 F.3d 1313, 1325 (2nd Cir. 1996).

In *Pointer* the Supreme Court held, a "[defendant] cannot be compelled to make a

peremptory challenge until he has been brought face to face... with each proposed juror, and an opportunity given for such inspection and examination of him as is required for the due administration of justice." *Pointer v. United States*, 151 U.S. 396, 408-409 (1894).  As the Court of Criminal Appeals has recently noted, "It is the privilege of *accused* to exclude from service one whom, in his judgment is unacceptable to him." *Johnson v. State*, 43 S.W.3d 1, 6 (Tex.Crim.App. 2001).  Because Mr. Medina was deprived of all opportunity to confront two veniremembers and participate in the exercise of his peremptory strikes, his conviction should be reversed.

The state habeas court denied this claim on the merits. Order at 24, 48-49, ¶¶ 127-131, 32-34.  The state court's result and reasoning fundamentally distort the law and the facts connected with the claim. As a result, the state habeas decision is contrary to and an unreasonable application of Supreme Court precedent.  The result also is based on factual determinations that are unreasonable in light of all the evidence before the state court. Accordingly, federal habeas corpus relief remains available to remedy the constitutional wrong done to Mr. Medina.

**XII.  The judgments of conviction and sentence of death in Mr. Medina's case are void because the judicial officer who presided at his trial was without authority to preside over the trial in violation of the due process clause and the Eighth Amendment of the United States Constitution**

At the time of Mr. Medina's trial, Article 16, §1(c) of the Texas Constitution required all "appointed officers" of the State to take an oath or affirmation of office to faithfully execute the duties of office and protect and defend the laws and constitution of the United States and Texas. Moreover, pursuant to Article 16 §1(d) & (f), each appointed officer was required to "subscribe" and file a statement that they had not given anything of value as a reward to secure their appointment.   These oaths of office are a prerequisite to establishing the necessary legal

qualifications for office.   Absent such qualifications, no judicial officer, whether elected or appointed, may discharge the duties of his office.  *Herrod v. State*, 650 S.W.2d 814, 818 (Tex. Crim. App. 1983); *French v. State*, 572 S.W.2d 934, 939 (Tex. Crim. App. 1978); *Garza v. State*, 249 S.W.2d 212 (Tex. Crim. App. 1952); *Enloe v. State*, 150 S.W.2d 1039, 1041 (Tex. Crim. App. 1941).

As controlling case law makes clear, if a judicial officer does not take the oath or improperly takes an oath, he is unqualified to hold office and any actions undertaken by him are not actions of the court but rather are a nullity.  *See, e.g., Enloe, supra,* at 1041.  The nature of such a disqualification distinguishes itself from a mere procedural irregularity.   Where an appointment or assignment of an otherwise qualified judge is merely procedurally objectionable, it requires an objection to preserve the irregularity.  *See Wilson v. State*, 977 S.W.2d 379, 380 (Tex. Crim. App. 1998).   Where, however, a judge lacks the proper qualifications such as the oath of office, his actions do not speak for the court and his actions are a nullity.  Judgments of a non-qualified officer are void and may later be challenged by any available means, whether or not a contemporaneous objection was lodged.  *Johnson v. State*, 869 S.W.2d 347 (Tex. Crim. App. 1994); *Enloe*, 150 S.W.2d at 1041.

Judge Robertson, who presided over Mr. Medina's trial, was not properly sworn as a judicial officer at the time he presided over Mr. Medina's trial.  *See* Carol Christian, *Execution Set for Man Who Killed 5 Relatives*, Hous. Chron., Feb. 13, 2002, at A42 (Attached as Appendix 1).  Because Sam Robertson failed to take the oath of office, he lacked authority to act as a judicial officer at Mr. Medina's trial.  His actions in the case, therefore, including his rulings, his empanelling the jury, his instructions, his acceptance of the verdict and his judgment itself, are a nullity and cannot stand.

**XIII.  Mr. Medina's prolonged stay on death row violates his right to be free from cruel and unusual punishment under the Eighth amendment of the United States Constitution**

Mr. Medina has now spent over 15 years on death row for a crime he did not commit. Mr. Medina's continued incarceration under a death sentence violates both the United States Constitution as well as International Law, and this Court should give full consideration to his substantial claims of constitutional violations.

The question of whether the prolonged incarceration of an individual prior to their execution violates the Eighth Amendment is not a new issue.  Over 100 years ago, the Supreme Court of the United States granted a writ of habeas corpus to an individual awaiting execution in Colorado based upon the conditions under which he was imprisoned.  *In re Medley*, 134 U.S. 160 (1890)(holding uncertainty and delay in execution, along with the infliction of solitary confinement amounted to an *ex post facto* violation).  The Supreme Court, in *Medley*, recognized the anguish which an individual suffers awaiting an uncertain execution, stating that:

> when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it, which may exist for the period of four weeks, as to the precise time when his execution shall take place.

*Id*. at 388.

Furthermore, the Court recognized that forcing a prisoner to await his execution in solitary confinement was an "additional punishment of such a severe kind that it is spoken of...as 'a further terror and peculiar mak[e]r of infamy' to be added to the punishment of death."  *Id*. at 387.  The issue has also been debated in both international human rights tribunals and foreign courts.  In several cases, such courts have found long periods of confinement prior to execution to be incompatible with rights which are almost identical to those protected by the Eighth Amendment.

The Inter-American Commission on Human Rights has found that the confinement of a prisoner on death row for 18 years, coupled with repeated execution dates and a conviction and sentence by a "tainted" jury, violated Article XXVI of the American Declaration of the Rights and Duties of Man, which guarantees that "[e]very person accused of an offense has the right...not to receive cruel, infamous or unusual punishment".  *Andrews v. United States*, Case 11.139, December 6, 1996.

The European Court of Human Rights in *Soering v. United Kingdom*, 11 EHRR 439 (1989) similarly decided "the very long time spent on death row in such extreme conditions, with the ever present and mounting anguish of awaiting execution of the death penalty", in conjunction with the age and mental state of the defendant, constituted a violation of Article 3 of the European Convention on Human Rights, which prohibits "inhuman or degrading treatment or punishment". In that case, the Court considered a confinement of only six to eight years.

The United Kingdom Privy Council has described a delay of 14 years between sentencing and execution as "shocking" and "wholly unacceptable" and held that it amounted to a breach of section 17(1) of the Jamaican Constitution, which assures that "[n]o person shall be subjected to torture or to inhuman or degrading punishment or other treatment."  The Court held that "in any case in which execution is to take place more than five years after sentence there will be strong grounds for believing that the delay is such as to constitute 'inhuman or degrading punishment or other treatment'".  *Pratt & Morgan v. The Attorney General of Jamaica,* [1994] 4 All ER 769.

In the United States, the Supreme Court raised a new debate in the courts regarding this issue in the memorandum respecting the denial of *certiorari* in *Lackey v. Texas*, 514 U.S. 1045 (1995).  In *Lackey*, Justices Stevens and Breyer recognized the merit of claims that the inordinate delays in the execution of sentence in capital cases violated the Eighth Amendment of the United

States Constitution and invited the "state and federal courts to 'serve as laboratories in which the issue receives further study before it is addressed by [the Supreme Court].'" *Id*.

Following *Lackey*, prisoners who have spent many years on Death Row have asserted two types of Eighth Amendment claim.  First, that confinement on Death Row for such an extended period of time in itself constitutes cruel and unusual punishment because an inmate awaiting execution for an extended period of time subjects him to extraordinary psychological duress and extreme physical and social restrictions inherent in confinement on Death Row. Second, that, after a sufficient amount of time has elapsed since a prisoner's conviction the execution would violate the Eighth Amendment because the retributive and deterrent effects of actually carrying out the execution are dramatically diminished. Although the Supreme Court found the death penalty does not breach the Eighth Amendment as it serves valid social purposes of, *inter alia,* retribution and deterrence, *Gregg v. Georgia*, 428 U.S. 153 (1976), such justification all but disappears after years of delay.   Both of these claims are valid in Mr. Medina's case.

### A. Mr. Medina's prolonged stay on death row for a crime which he did not commit, constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution

 The torturous effects of the "death row phenomenon" – that is, the psychologically devastating effects of a lengthy stay on death row – have been widely noted by jurists during the last three decades.[131]  Similar views have been expressed by legal commentators and mental

---

[131] *See, e.g.*, *Elledge v. Florida*, 119 S. Ct. 366 (1998)(Breyer, J., dissenting from denial of certiorari); *Lackey v. Texas*, 514 U.S. 1045, 1045-47 (1995)(opinion of Stevens, J., respecting denial of certiorari)(citing cases); *Free v. Peters*, 50 F.3d 1362, 1363 (7th Cir.)*, cert. denied*, 514 U.S. 1034 (1995)(Cudahy, J., dissenting)(citing cases); *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981)(Stevens, J., concurring in the denial of certiorari)(recognizing that the mental pain suffered by a condemned prisoner awaiting execution "is [a] significant form of punishment" that "may well be comparable to the consequences of the ultimate step itself [*i.e.*, the actual execution]"); *Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950)(Frankfurter, J., dissenting)("In the

health experts.[132]

---

history of murder, the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."); *Furman v. Georgia*, 408 U.S. 238, 288-89 (1972)(Brennan, J., concurring)("[W]e know that mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death."); *People v. Anderson*, 493 P.2d 880, 6 Cal.3d 628, 649 (Cal. 1972)("The cruelty of capital punishment lies not only in the execution itself and the pain incident thereto, but also in the dehumanizing effects of the lengthy imprisonment prior to the execution during which the judicial and administrative procedures essential to due process of law are carried out. Penologists and medical experts agree that the [protracted] process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture."), *cert. denied*, 406 U.S. 958 (1972); *Suffolk County District Attorney v. Watson*, 411 N.E.2d 1274, 1289-95 (Mass. 1980)(Liacos, J., concurring)(vivid and detailed description of the type of psychological pain and torture that a condemned person experiences while awaiting execution); id. at 1287 (Braucher, J., concurring)(arguing that capital punishment is unconstitutional under Massachusetts Constitution in part because "it will be carried out only after agonizing months and years of uncertainty"); *Commonwealth v. O'Neal*, 339 N.E.2d 676, 680-81 (Mass. 1975)(Tauro, C.J., concurring)("The convicted felon suffers extreme anguish in anticipation of the extinction of his existence."); *State v. Richmond*, 886 P.2d 1329, 1994 WL 699008, at *3 (Ariz. Dec. 15, 1994); *Hopkinson v. State*, 632 P.2d 79, 209-11 (Wyo. 1981)(Rose, C.J., dissenting in part), *cert. denied*, 455 U.S. 922 (1982)  (recognizing "the dehumanizing effects of long imprisonment pending execution"); *State v. Ross*, 646 A.2d 1318, 1379 (Conn. 1994)(Berdon, J., dissenting)(same), *cert. denied*, 513 U.S. 1165 (1995); *Soering v. United Kingdom*, 11 Eur. Hum. Rts. Rep. 439, 28 I.L.M. 1063 (1989)(European Court of Human Rights refused to extradite a German national from UK to Virginia to face capital murder charges because of anticipated time that he would have to spend on death row if sentenced to death); *Vatheeswaran v. State of Tamil Nadu*, 2 S.C.R. 348, 353 (India 1983)(criticizing the "dehumanizing character of the delay" in carrying out an execution); *Sher Singh et al. v. The State of Punjab*, 2 S.C.R. 582 (India 1983)("Prolonged delay in the execution of a death sentence is unquestionably an important consideration for determining whether the sentence should be allowed to be executed."); *Catholic Comm'n for Justice & Peace in Zimbabwe v. Attorney General*, No. S.C. 73/93 (Zimb. June 24, 1993)(reported in 14 HUM. RTS. L. J. 323 (1993)).

[132] *See, e.g.*, Schabas, *Execution Delayed, Execution Denied*, 5 CRIM. L. FORUM 180 (1994) [available on WESTLAW]; Lambrix, *The Isolation of Death Row* in FACING THE DEATH PENALTY 198 (M. Radelet ed. 1989); Millemann, *Capital Post-Conviction Prisoners' Right to Counsel*, 48 MD. L. REV. 455, 499-500 (1989)("There is little doubt that the consciousness of impending death can be immobilizing. . . .   This opinion has been widely shared by [jurists], prison wardens, psychiatrists and psychologists, and writers.")(citing authorities); Mello, *Facing Death Alone*, 37 AMER. L. REV. 513, 552 & n.251 (1988)(same)(citing studies); Wood, *Competency for Execution: Problems in Law and Psychiatry*, 14 FLA. ST. U. L. REV. 35, 37-39 (1986)("The physical and psychological pressure besetting capital inmates has been widely noted .... Courts and commentators have argued that the extreme psychological stress accompanying death row confinement is an eighth amendment violation in itself or is an element making the

### 1. The British Privy Council's Landmark Decision in *Pratt & Morgan*

Mr. Medina's Eighth Amendment arguments are strongly supported by a recent landmark decision in a capital appeal rendered by the Judicial Committee of the Privy Council of the United Kingdom (the "Privy Council").[133]   See *Pratt & Morgan v. The Attorney General of Jamaica*, 33 I.L.M. 364 (Privy Council Appeal No. 10 of 1993, Nov. 2, 1993)(en banc).

In *Pratt & Morgan*, an appeal by two condemned men on Jamaica's death row, the Privy Council, sitting *en banc* for the first time in five decades, unanimously held that carrying out the death sentences of the two men would be "torture," and "inhuman" and "degrading" punishment. The Privy Council did not hold that capital punishment was cruel and unusual *per se*, but instead focused on the fact that the condemned men had been on death row for a protracted period of time (fourteen years). The Privy Council stated:

> There is an instinctive revulsion against the prospect of [executing] a man after he

death penalty cruel and unusual punishment.")(citing authorities); Stafer, *Symposium On Death Penalty Issues: Volunteering for Execution*, 74 J. CRIM. L. 860, 861 & n.10 (1983)(citing studies); Holland, *Death Row Conditions: Progression Towards Constitutional Protections*, 19 AKRON L. REV. 293 (1985); Johnson, *Under Sentence of Death: The Psychology of Death Row Confinement*, 5 LAW & PSYCHOLOGY REVIEW 141, 157-60 (1979); Hussain & Tozman, *Psychiatry on Death Row*, 39 J. CLINICAL PSYCHIATRY 183 (1979); West, *Psychiatric Reflections on the Death Penalty*, 45 AMER. J. ORTHOPSYCHIATRY 689, 694-95 (1975); Gallemore & Parton, *Inmate Responses to Lengthy Death Row Confinement*, 129 AMER. J. PSYCHIATRY 167 (1972); Bluestone & McGahee, *Reaction to Extreme Stress: Impending Death By Execution*, 119 AMER. J. PSYCHIATRY 393 (1962); Note, *Mental Suffering Under Sentence of Death: A Cruel and Unusual Punishment*, 57 IOWA L. REV. 814, 830 (1972); G. Gottlieb, *Testing The Death Penalty*, 34 S. CAL. L. REV. 268, 272 & n.15 (1961); A. Camus, *Reflections on the Guillotine* in RESISTANCE, REBELLION & DEATH 205 (1966)("As a general rule, a man is undone waiting for capital punishment well before he dies."); F. Dostoyevsky, THE IDIOT 47-48 (D. Magarshack trans. 1955); Duffy & Hirshberg, EIGHTY-EIGHT MEN AND TWO WOMEN 254 (1962)("One night on death row is too long, and the length of time spent there by [some inmates] constitutes cruelty that defies the imagination.  It has always been a source of wonder to me that they didn't all go stark, raving mad.")(quoting former warden of California's San Quentin Prison).

[133] The Privy Council is the highest appellate court for Commonwealth nations.   The jurists who sit on the Privy Council are likewise members of England's highest domestic appellate court, the House of Lords ("the Law Lords").

has been held under sentence of death for many years.  What gives rise to this instinctive revulsion?  The answer can only be our humanity; we regard it as an inhuman act to keep a man facing the agony of execution over a long extended period of time.

*Id.* at 380.

*Pratt & Morgan* also surveyed the history of English common law regarding the subject of lengthy imprisonment of a condemned man on death row and the repeated setting of execution dates in a single case.  The Privy Council concluded that neither practice was condoned historically at common law.  *See, e.g.*, *id.* at 367 ("It is difficult to envisage any circumstance in which in England a condemned man would have been kept in prison for years awaiting an execution."); *id.* at 369 (noting the "common law practice that execution followed as swiftly as practical after sentence"); *see also Riley v. Attorney General of Jamaica*, 1 AC 719, 3 All ER 469 (Privy Council 1983)(Lord Scarman, dissenting, joined by Lord Brightman)("[T]here is a formidable case for suggesting that execution after inordinate delay would have infringed the prohibition against cruel and unusual punishment to be found in Section 10 of the Bill of Rights of 1689....")(majority opinion overruled by *Pratt & Morgan*).[134]  *See also Lackey*, 514 U.S. at 1045 (a delay of 17 years, "if it ever occurred, certainly would have been rare in 1789, and thus the practice of the Framers would not justify the denial of petitioner's claim").  *Pratt & Morgan*, along with U.S. and international authorities discussed herein, offers a firm legal basis for Mr. Medina's Eighth Amendment claim challenging the State's right to execute the death sentence in this case.[135]

---

[134] As Justice Scalia has recognized, "[t]here is no doubt" that Section 10 of the English Bill of Rights of 1689 "is the antecedent" of the cruel-and-unusual-punishments clause of our Eighth Amendment.  *See Harmelin v. Michigan*, 501 U.S. 957, 966 (1991)(opinion of Scalia, J.).

[135] Hundreds of American courts and jurists have been guided by the decisions of the Privy Council, the highest expositor of law in the United Kingdom, whose common law has greatly shaped our own law.  *See, e.g.*, *United States v. Raddatz*, 447 U.S. 667, 679 (1980)(citing

## 2.   Eighth Amendment authority supporting Mr. Medina's claim

Mr. Medina's incarceration on death row violates the Eighth Amendment under both the standards in place in 1789, and under modern standards.   Recent Eighth Amendment decisions have, as a threshold matter, focused on whether a challenged punishment was considered unacceptable at the time of the adoption of our Bill of Rights.   *See, e.g.*, *Stanford v. Kentucky*, 109 S. Ct. 2969, 2974 (1989)(in rejecting claim that the execution of 16 and 17 year olds is cruel and unusual, the Court noted that the punishment was not "one of those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted'")(quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)).   If a punishment was considered cruel and unusual in 1789, then the Court's Eighth Amendment analysis goes no further; it is cruel and unusual today.   *See Ford*, 477 U.S. at 405-06.   Unquestionably, the Framers of the Constitution considered long delays between sentencing and execution cruel and unusual.   *Elledge v. Florida*, 119 S. Ct. 366 (1998)(Breyer, J., dissenting from denial of certiorari)(collecting sources, including petition seeking commutation of a death sentence in part because of a lengthy five-month delay).

The Privy Council's review of English common law establishes that a protracted stay on death row would never have been tolerated at common law under any circumstances.   Likewise, in the United States in the eighteenth and nineteenth centuries, executions routinely took place within one year of conviction.   *See* Dwight Arons, *Can Inordinate Delay Between a Death Sentence and Execution Constitute Cruel and Unusual Punishment*, 29 SETON HALL L. REV. 147, 179-81 (1998). Although elaborate appeals in capital cases (leading to frequent re-trials) are a

---

a Privy Council decision with approval); *Kilbourn v. Thompson*, 103 U.S. 168, 186 (1881)(same); *see also Fisher v. United* States, 328 U.S. 463, 486-88 (1946)(Frankfurter, J., dissenting)("This Court in reviewing a conviction for murder . . . ought not be behind . . . the Privy Council ....")(discussing Privy Council decisions).

relatively recent phenomenon – largely a function of the Supreme Court's post-*Furman* Eighth Amendment capital jurisprudence – the necessary delay occasioned by such appeals cannot constitutionally extend to the point where the State keeps a person on death row for well over a decade solely because of delay in adjudicating ordinary appeals.[136]  Such an inordinate delay – which would never have been permitted at common law – is by itself a sufficient reason to prohibit the State of Texas from carrying out Mr. Medina's scheduled execution.  *See Ford v. Wainwright*, 477 U.S. 399, 405 (1989)("There is now little room for doubt that the Eighth Amendment's ban on cruel and unusual punishment embraces, at a minimum, those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted").

Assuming that a particular type of punishment was permitted at the time that the Bill of Rights was adopted – or, in this case, assuming that the post-*Furman* requirement of meaningful appellate review in capital cases somehow alters the common law requirement described above – a second, more difficult question arises: whether a punishment that may have been acceptable to the Framers of the Constitution nonetheless now violates modern society's civilized standards. *See, e.g., Campbell v. Wood*, 18 F.3d 662 (9th Cir.)(en banc), *cert. denied*, 511 U.S. 1119 (1994)(hanging not a cruel and unusual punishment).  The Supreme Court has interpreted the reach of the Amendment in a "flexible and dynamic manner." *Gregg v. Georgia*, 428 U.S. 153, 171 (1976); *see also Weems v. United States*, 217 U.S. 349, 373 (1910)("a principle, to be vital, must be capable of wider application than the mischief which gave it birth").  In recent times, the Supreme Court has recognized that "the Eighth Amendment's proscriptions are not limited to

---

[136]  Relying on other international law cases, the Privy Council in *Pratt & Morgan* held that even if an inordinate delay between trial and execution is attributable to *discretionary* appeals filed by the condemned person, the government nevertheless has no right to carry out an execution if the delay resulted from legitimate, non-frivolous appeals.  *See, e.g., Pratt & Morgan*, at 380-84 (discussing cases).

those practices condemned by the common law in 1789." *Ford*, 477 U.S. at 406.  Rather, the Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trope v. Dulles*, 356 U.S. 86, 101 (1958).  As the concepts of dignity and civility evolve, so too do the limits of what is considered cruel and unusual.  Such factors include the practices among the majority of the states in this country and international practices.  *See, e.g., Stanford v. Kentucky*, 492 U.S. 361, 369 (1989); *Coker v. Georgia*, 433 U.S. 584 (1977); *Enmund v. Florida*, 458 U.S. 782 (1982).

International law and practice is particularly relevant for purposes of this claim.  The weight of international authority – including *Pratt & Morgan*, a recent unanimous decision by the highest court in a fellow common-law jurisdiction – strongly supports Mr. Medina's contention that his execution would violate the Eighth Amendment.

Other well-established Eighth Amendment principles of broad application also are relevant to this Court's analysis.  The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity and decency'" against which forms of punishment must be measured.  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)(citation omitted).  It "expresses the revulsion of civilized man against barbarous acts -- the 'cry of horror' against man's inhumanity to his fellow man." *Robinson v. California*, 370 U.S. 660, 676 (1962)(Douglas, J., concurring).

The Eighth Amendment's restrictions on the ability of a state to impose certain types of punishment "aim . . . to protect the condemned from [unnecessary] fear and pain . . . or to protect the dignity of society itself from the barbarity of exacting mindless vengeance." *Ford v. Wainwright*, 477 U.S. 399, 410 (1986).  At its core, the Eighth Amendment stands to safeguard "nothing less than the dignity of man." *Trope v. Dulles*, 356 U.S. 86, 100 (1958). In the

particular context of capital punishment – where the infliction of some incidental pain is obviously unavoidable – the Supreme Court's Eighth Amendment analysis of what is "cruel and unusual" turns on whether unnecessary or gratuitous pain is part of the punishment.  As the Court stated in *State ex. rel. Francis v. Resweber*, 329 U.S. 459 (1947):

> The traditional humanity of modern Anglo-American law forbids the infliction of *unnecessary pain* in the execution of the death sentence.  Prohibition against the wanton infliction of pain has come to our law from the [English] Bill of Rights [of 1689]. . . . Mr. Francis' suggestion is that because he once underwent the psychological strain of preparation for electrocution, now to require him to undergo this preparation again subjects him to a lingering or cruel and unusual punishment.... [The Constitution does not protect against] the *necessary suffering* involved in any method employed to extinguish life humanely.  The fact that an *unforeseen accident* prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution.  There is no purpose to inflict *unnecessary pain* nor any *unnecessary pain* involved in the proposed execution.  The situation of the unfortunate victim of this accident is just as though he had suffered the identical amount of mental anguish and physical pain in any other occurrence, such as, for example, a fire in the cell block.

*Id*. at 463-64 (emphasis added).

Mr. Medina has endured a needlessly lingering form of torturous psychological punishment that, if the State has its way, will culminate in a lethal injection.  *See Gregg v. Georgia*, 428 U.S. 153, 170-71 (1976)(unnecessarily lingering form of execution is unconstitutional under the Eighth Amendment)(*citing In re Kemmler*, 136 U.S. 436, 447 (1890)).  Mr. Medina has been given a life sentence and a death sentence.  The fact that Mr. Medina is challenging the lingering *psychological* anguish resulting from his excessively lengthy stay on death row and repeated execution dates – and is not alleging *physical* torture – does not foreclose an Eighth Amendment claim.[137]  It is well established that the infliction of extreme mental

---

[137]   In *Pratt & Morgan*, the British Privy Council focused exclusively on the *mental* torture inflicted on two condemned men on Jamaica's death row.  *See Pratt and Morgan*, slip op., at 1-2 (describing "the agony of mind that these men must have suffered as they have alternated between hope and despair in the 14 years that they have been in prison facing the gallows.  It is unnecessary to refer to the evidence describing . . . the *emotional and*

anguish can be a form of unconstitutional torture.[138]

### 3. The unconstitutional conditions at TDCJ-ID's Polunsky Unit further Mr. Medina's argument

Additionally, the conditions under which Mr. Medina has been incarcerated in the administrative segregation units have been found to violate the Eighth Amendment. In *Ruiz v Johnson* 37 F.Supp.2d 855 (1999), the United States District Court for the Southern District of Texas stated that:

> *The administrative segregation units of the Texas prison system deprive inmates of the minimal necessities of civilized life...* even those inmates who must be segregated from general population for their own or others' safety retain some constitutional rights. *Texas' administrative segregation units violate those rights through extreme deprivations which cause profound and obvious psychological pain and suffering. Texas' administrative segregation units are virtual incubators of psychoses-seeding illness in otherwise healthy inmates and exacerbating illness in those already suffering from mental infirmities.*

Id. at 906 (emphasis added). The District Court concluded that:

---

*psychological impact of this experience*, for it only reveals that which is to be expected.").

[138] *See, e.g., Trope v. Dulles*, 356 U.S. at 102 (expatriation as penalty for desertion "subjects the individual to a fate of ever-increasing fear and distress"); *Hudson v. McMillian*, 503 U.S. 1 (1992)(Blackmun, J., concurring)("I am unaware of any precedent of this Court to the effect that psychological pain is not cognizable for constitutional purposes [under the Eighth Amendment]. If anything, our precedent is to the contrary."); *Furman v. Georgia*, 408 U.S. 238, 271-73 (1972)(Brennan, J., concurring)("[T]he Framers also knew []that there could be exercises of cruelty other than those which inflicted bodily pain or mutilation."); *see also Smith v. Aldingers*, 999 F.3d 109, 110 n.4 (5th Cir. 1993)(collecting recent cases holding that mental or psychological torture can violate the Eighth Amendment); *cf. In re Medley*, 134 U.S. 160, 172 (1890)(recognizing the "immense mental anxiety" that a condemned man experiences when the authorities intentionally refuse to inform him of the precise date of his scheduled execution, and referring to it as "one of the most *horrible feelings* to which he can be subjected")(emphasis added).

In *re Medley* was an *ex post facto* case, its century-old recognition of the "immense" and "horrible" *mental* anguish that a condemned man feels when he does not know the date of his execution – which the Supreme Court recognized as a form of "punishment" implicating the *ex post facto* clause – is instructive here. *See Lackey, supra*. Mr. Medina does not allege that particular type of mental anxiety caused by his confinement on Texas's death row; however, he does contend that the mental anguish that he has faced has been equally or more "immense" and "horrible." Therefore, to permit the State to carry out an execution after requiring Mr. Medina to endure such torturous conditions would unquestionably violate the Eighth Amendment.

> Texas prison inmates continue to live in fear-a fear that is incomprehensible to most of the state's free world citizens. More vulnerable inmates are raped, beaten, owned, and sold by more powerful ones. Despite their pleas to prison officials, they are often refused protection. Instead, they pay for protection, in money, services, or sex. Correctional officers continue to rely on the physical control of excessive force to enforce order. Those inmates locked away in administrative segregation, especially those with mental illnesses, are subjected to extreme deprivations and daily psychological harm. Such practices and conditions cannot stand in our society, under our Constitution.

*Id.* at 940.

This case was focused extensively on expert opinions of the conditions in prison units including the Polunsky Unit -- the current death row. *See id*. at 911. Thus the length of Mr. Medina's incarceration, together with the conditions under which he has been held in the administration unit, constitute a clear violation of the Eighth Amendment and international law.

### B. Mr. Medina's execution after so many years on death row would have no deterrent or retributive effect and would therefore serve no penalogical purpose, thus constituting a breach of the Eighth Amendment

In *Gregg*, the Supreme Court found that the death penalty did not in itself violate the Eighth Amendment for two reasons. First, the death penalty was considered permissible by the Framers. Second, the Court held that the death penalty might serve two principal social purposes: retribution and deterrence. *Gregg v Georgia*, 428 U.S. at 177 and 183. If, therefore, a particular execution does not serve those purposes, the constitutional justification for such execution is removed.

Drawing upon the Supreme Court's previous judgments in *Furman v Georgia,* 408 U.S. 238 (1972) and *Gregg v Georgia*, 428 U.S. at 183 that "[t]he sanction imposed cannot be so totally without penalogical justification that it results in the gratuitous infliction of suffering", Justice Stevens in *Lackey* stated that when the death penalty does not serve the purposes of deterrence or retribution, it violates the Eighth Amendment. In the case of a prisoner who had

spent 17 years on Death Row, he stated that "the acceptable state interest in retribution has arguably been satisfied by the severe punishment already inflicted" and that "the additional deterrent effect from an actual execution now, on the one hand, as compared to 17 years on Death Row followed by the prisoner's continued incarceration for life, on the other, seems minimal." *Lackey v Texas*, 514 U.S. at 1422.

In *Knight*, Justice Breyer, dissenting, agreed with Justice Stevens, stating that "the longer the delay, the weaker the justification for imposing the death penalty in terms of punishment's basic retributive or deterrent purposes." *Knight v Florida*, 120 S.Ct. at 462.

In a Ninth Circuit case, *Ceja v Stewart,* 134 F.3d 1368 (1998)*,* Judge Fletcher (dissenting) questioned whether imposing the death penalty upon an inmate who had been incarcerated for 23 years would serve any penalogical purpose.  He stated that:

> At the very least, after such an extraordinary length of time, the State must demonstrate that its interest in securing stability and harmony to the community through the exaction of this most extreme form of retribution continues to have effect and force.

*Id.* at 1374, and that:

> there can be no doubt that Ceja has brought a substantial challenge, of precisely the kind that the [Supreme] Court envisioned in *Gregg*, to the continuing sufficiency of deterrence as a justification for carrying out his execution.

*Id.* at 1376.

Mr. Medina has now spent over 15 years on Death Row for a crime which he did not commit.  This period of delay, although less than that experienced by many inmates is sufficient to reduce any deterrent and retributive effect that his execution would have.  This is particularly the case when coupled with the credible doubt as to Mr. Medina's guilt, which would undoubtedly be well publicized at the time of any execution, the penalogical benefit of such execution would be so minimal as to constitute a breach of the Eighth Amendment.

Because Mr. Medina has now spent so many years on death row, his continued incarceration under a death sentence violates both the United States Constitution as well as International Law.  For this reason, this Court should commute his sentence to life and give full consideration to his substantial claims of constitutional violations.

In state post-conviction proceedings the court ruled on the merits of Mr. Medina's claim. The state court denied relief because, according to the court, the length of Mr. Medina's incarceration was due to his pursuit of appellate relief, the challenge was not cognizable in habeas proceedings, and Mr. Medina had not shown that conditions where he has been incarcerated were cruel and unusual.  Order at 51-52, ¶¶ 39-41.

Federal habeas corpus relief remains available to remedy the constitutional wrong done to Mr. Medina.  The state court's legal reasoning concerning the merits of the claim and the result it reached are contrary to and an unreasonable application of Supreme Court precedent.

## XIV.  Mr. Medina is innocent and his execution would constitute cruel and unusual punishment and violate due process

In *Herrera v. Collins*, 506 U.S. 390, 417 (1993), the Supreme Court assumed without deciding that the execution of an innocent person would violate the constitution.  *Accord House v. Bell*, 547 U.S. 518, 554-55 (2006).  *See also Schlup v. Delo*, 513 U.S. 289, 314 n. 28 (1995). Five members of the court in *Herrera* unequivocally found that the execution of an innocent would be unconstitutional.  506 at 419 ("the execution of a legally and factually innocent person would be a constitutionally intolerable event") (O'Connor, J., joined by Kennedy, J., concurring);  *Id.* at 431 (the Constitution forbids the execution of a person who has been validly convicted and sentenced but who, nonetheless, can prove his innocence with newly discovered evidence.") (Blackmun, J., joined by J.J. Stevens and Souter, dissenting).

Evidence used to convict Mr. Medina and sentence him to death is unreliable and was

obtained in a manner that offends the constitution for the reasons set forth in Mr. Medina's claims attacking his convictions and sentence.  State post-conviction and federal habeas corpus counsel have mustered a persuasive case that Mr. Medina is factually and legally innocent.  His execution, therefore, would violate the Eighth and Fourteenth Amendments.  *Herrera v. Collins*, 506 U.S. at 417, 419, 431.

## PRAYER FOR RELIEF

WHEREFORE, petitioner ANTHONY MEDINA prays that this Court:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

2. Grant him the authority to obtain subpoenas *in forma pauperis* for witnesses and discovery of documents, and other information necessary to prove the facts as alleged in his petition;

3. Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims and allow him a reasonable period of time subsequent to any hearing this Court may conduct in which to brief the issues of law and of fact raised by this petition and/or such hearing;

4. Grant such other relief as the ends of justice may require.


This 31st day of March, 2013.


Respectfully Submitted,

/s/ James Marcus