Exhibit 2

Name of Juvenile DOMINIC ANTOINE HOLMES

## MAGISTRATE'S VERIFICATION AND CERTIFICATION

I, the below listed magistrate of the State of Texas, verify and certify that I have examined the said juvenile listed above independent of any law enforcement officer or prosecuting attorney and have determined that the said juvenile:

1. Claims to be 16 years of age and reasonably appears to be that age.

2. Can read the English language, and demonstrated to me that he or she could do so.

3. Is a citizen of U.S.

4. Advised me that he or has completed the 8th grade in school.

5. Was not threatened or promised anything by law enforcement or other agents of the State. (See additional observations)

6. Does not appear to be under the influence of drugs or intoxicating beverages, and informs me that he or she is not under the influence of drugs or alcohol.

7. Does not appear to have been abused by law enforcement, or anyone else, and upon inquiry by the undersigned, denies that any type of abuse has occurred.

8. Shows no sign or psychiatric problems which might be readily apparent, and upon inquiry by the undersigned, claims no history or psychiatric treatment or problems.

9. Appears to understand the meaning of warnings given herein and had no questions about the warning, except as may be described as follows, if any:

10. Understands that the offense charged is a Capital Felony (Degree of offense).

11. Understands what the statement says, and agrees that the statement if his or her version of the facts surrounding the said offense, and that it is true.

12. Made such statement voluntarily and of his or her own free will without any improper inducements or prohibited conduct by representatives of law enforcement, or any other person.

13. Indicated that he or she had not been deprived of food, drink, or sleep.

Additional observations the undersigned has made during the course of interviewing this said juvenile are as follows (if any): Respondent said the officers told him that if he told them what happened they would try to help out and see what they could tell for him that no specified promise was made to him.

Based upon the foregoing determination, independent of any law enforcement officer or prosecuting attorney, I hereby verify and certify that said juvenile has knowingly, intelligently, and voluntarily waived the above listed statutory rights prior to making the statements which are attached hereto and made a part hereof for all purposes, and that said juvenile understands the nature and contents of that statement, and that the said statement was signed by the said juvenile in my presence on this the 11 day of JANUARY, 1996 at 3:10 o'clock P.M.

Done this 11 day of JANUARY 1996.

MAGISTRATE

TRAVIS W. LEWIS, SR.
Harris County Criminal Courts
Hearing Officer
Harris County
Houston, Texas

0268

Page 2 of 2 - See Reverse

Revised Nov. 1994

# Exhibit 3

State of Texas          )
                        )          In Re Anthony Shawn Medina
County of Travis        )

<u>Affidavit of Serine Consolino</u>

I, Serine Consolino, state that the following is true and correct to the best of my knowledge:

1.  On March 19, 2011, I visited with Veronica Ponce, now Veronica Salazar, at her home. She was extremely hesitant to discuss the case. Veronica said that the police were extremely coercive and threatening. They knew what they wanted her to say. They told her that her friends had already told them that she was in the car. They had a diagram of the car with everyone placed in it, and told her, "you were there, right?" They threatened to charge her with capital murder is she did not cooperate. She said, "how can I be charged, when I wasn't there?"

2.  Even though Veronica protested to the police that she was not there, the police continued to insist on their version of the facts. At one point during the interview, the police left and came back. When they came back, they said the shooter was Tony Medina.

3.  Veronica said that her perjury trial was postponed until she was 17 years old, and had a one-year-old baby.

4.  Regarding her January, 1996, statement, Veronica said, "I didn't know what I was signing."

5.  On March 19, 2011, I visited Johnny Valadez at his home. Valadez said that the cops did a "good cop/bad cop thing." His mother was not there and she was angry that the police interviewed him without her being there. He repeatedly said that he was "coached" or "coaxed" by the police. They appeared to have a version of the story that they wanted him to affirm, and asked him leading questions such as "then this happened, right?" Valadez said, "they knew what they wanted me to say. They already knew what happened." He was told that other people had already told the police that he was in the car. At one point, they left the room and then came back and said other people had already fingered Tony as the shooter and that they wanted him to say it was Tony Medina. He stated that he signed the statement because he was scared.

6.  His mother took him to the grand jury room. He was crying. The prosecutor kept showing him pictures of the deceased children—they kept "shoving them in [his] face." The person in charge of the grand jury finally told the prosecutor to stop.

7.   On March 19, 2011, I also met with Johnny Valadez' mother, Delfina Rico. She was sitting out in the hallway at the police station while Johnny was interviewed, and they told her that someone would come talk to her but no one ever did. At some point, the police told her that Johnny was "just a witness" and didn't need a lawyer. Johnny has a twin brother named Junior. Junior told Ms. Delfino that Johnny confided that the police officers kicked Johnny during the interrogation.

I have read this affidavit. I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_Serine Consolino_

Serine Consolino

Signed and sworn before me this 9th day of May, 2011.

_Kimberly Elizabeth Waters_

Notary Public

My commission expires: 9/7/14

> KIMBERLY ELIZABETH WATERS
> NOTARY PUBLIC
> State of Texas
> Comm. Exp. 09-07-2014
> **NOTARY WITHOUT BOND**

Page 2 of 2

# Exhibit 4

State of Texas     )
                  )       In Re Anthony Shawn Medina
County of Travis   )

<u>Affidavit of Sarah L. Jack</u>

I, Sarah L. Jack, state that the following is true and correct to the best of my knowledge:

1.     My name is Sarah L. Jack. I am over 18 years of age and competent to give this statement. I am currently studying at the University of Texas at Austin Law School.

2.     On March 19th, 2011, I visited with Regina Juarez, a witness for the State in Anthony Medina's trial, at her residence to discuss her memories of the 1st of January, 1996, and the police investigation that followed.

3.     Ms. Juarez was sitting in her garage with the door open and the entire conversation took place in that location.

4.     Ms. Juarez stated that when she first spoke with the police they told her that they knew she was in the car at the time of the drive-by shooting and that she was sitting on Alex Perez's lap. She said that this was a false accusation. Ms. Juarez stated that she was not in the car and if she was going to sit on someone's lap it would not be Mr. Perez's as he was dating one of her close friends at the time. She said that the police were trying to scare her and that they were saying whatever they could to get her to cooperate.

5.     Ms. Juarez recounted that she knew other witnesses had also been subjected to scare tactics during the police investigation and that one potential witness, Veronica Ponce, had been hit during her police interview.

6.     Ms. Juarez also noted that she had dealt with the police before. She said she had gone to court for terroristic threats for threatening a girl who had got her friend into trouble. She recounted that the mother of the girl who she had threatened had heard Ms. Juarez say "I'm going to kill you."

7.     The following day, March 20th, 2011, I met with Shelley Amato, who was the girlfriend of Dominic "Flaco" Holmes at time of the crime. We spoke in her living room.

8.     Ms. Amato explained that she was not with Dominic on the night of December 31, 1995, she had slept at her house. Sometime in the early morning hours of January 1, 1996, Dominic came to her house because he was there when she woke up. She said he was

filthy, covered in mud and dirt and that she did his laundry for him.  She noted he had also lost a necklace with his name on it that his mother had just given him for Christmas.

9.  Ms. Amato said that Dominic "kept changing his story" of what he had happened the previous night.  Ms. Amato said that initially Dominic said he had been fighting all night.  He stuck to this story for a few days.  She said a few days after the night of the crime he changed his story and said he was passed out in the back of Jamie Moore's car all night and couldn't remember anything.  Dominic never told Shelly that he had seen the shooting.

10.  Ms. Amato discussed the rivalry between the two gangs, La Raza 13 and the H-Town Crips.  Ms. Amato was near the scene where La Raza 13 member G-Money was stabbed by the H-Town Crips at the Meyer Park movie theater.  Ms. Amato was working in the Marble Slab ice cream shop next to the theater.  She came out sat with G-Money while waiting for the ambulance, but G-Money died.  Ms. Amato said the La Raza 13 gang spoke of revenge for months afterwards.  She confirmed that Anthony Medina was in jail at this time.

I have read this affidavit.  I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_____
Sarah L. Jack


Signed and sworn before me this __9th__ day of __May__, 2011.


_____
Notary Public

My commission expires: _9/7/14_

KIMBERLY ELIZABETH WATERS
NOTARY PUBLIC
State of Texas
Comm. Exp. 09-07-2014
NOTARY WITHOUT BOND

# Exhibit 5

State of Texas      )

                     )                       In Re Anthony Shawn Medina

County of Harris    )

### Affidavit of Golda Medina

I, Golda Medina, state that the following is true and correct to the best of my knowledge:

1. My name is Golda Medina. I am over 18 years of age and competent to give this statement. I presently live at 4319 Dalmatian, Houston, Texas 77045.

2. I am the mother of Anthony Shawn Medina and am married to Anthony Luna Medina, Anthony's father.

3. I testified at the punishment phase of Anthony's trial. I did not know there was a possibility I would testify until the day I testified.

4. I attended all of the guilt/innocence phase of the trial, but after Anthony got convicted I did not think I could handle being in the courtroom. I stayed home when the punishment phase started. My sister Sherry called me that day. She told me to get to the courthouse right away so I could testify on Anthony's behalf.

5. When I got to court, I spoke to Mr. Millin for about 5-10 minutes. Mr. Millin told me to be honest and to not feel bad if I got emotional, but to try to keep my composure. Mr. Millin also told me not to be hateful when the prosecutor cross-examined me. Mr. Millin did not tell me what questions he was going to ask or how to handle the cross examination.

6. Prior to Anthony's trial, I did not meet Anthony's attorneys. The investigators working with Anthony's attorneys never asked me questions about our family or Anthony's growing up years. I did not volunteer the information because I did not know it was important for Anthony's case.

7. If anyone from Anthony's defense team would have asked me I would have told them that I tried to give my son a different childhood than the one I had. When I was little, my family moved a lot. I remember my family was always having to up and leave in the middle of the night when the rent was due. My stepfather drank a lot. I was also sexually abused from the time I was eighteen years old until I was thirteen by my stepfather. I told one of my aunts about the abuse when it started and she told my mother, but no one believed me. I ran away from home when I was 13 years old because things were so bad at home.

8.   I ran away again when I was 15 years old.  That's when I met Henry Bracknell, who was twelve years older than me.  I ended up marrying him when I was 16, but I left him because he was sexually abusive to me.  I was pregnant with my oldest daughter Christy at the time, so I moved back to my parents' home.

9.   I was 17 years old when Christy was born.  The year Christy was born, I married Richard Moore.  I married Richard  because my stepfather had started sexually abusing me again.  I left Richard because one day he hit my arm with a bowling pin and broke it.

10.  When Richard and I split up, my younger sister Didi, who was 16 years old at the time, and I started living in a car.  That's when I met Anthony's father.  We got married shortly after Anthony was born.

11.  I didn't meet my biological father until I was 30 years old.  I found out my stepfather was not my father when I was 8 years old.  My biological father is an alcoholic and has been diagnosed as manic depressive.

12.  Through the years, Anthony's father and I have had our ups and downs.  It's not easy to talk about the difficult times, but I would have told Anthony's trial attorneys about our ups and downs if they had explained they needed to know this information for Anthony's case.  When I testified I didn't talk about these things either because Anthony's attorneys didn't ask me about them.

13.  When Anthony was growing up, my husband always worked two jobs.  He didn't get off his second job until 9:00 or 10:00 p.m.  About three times a week, he would stop off and have a few drinks.  On the weekends, he would go out and close the clubs.  He drank everyday.

14.  I remember one day I was at a bar with my husband and he got mad at me.  When we got home, he was still talking about it and wouldn't let it go.  He was getting very loud.  My sister Didi was at my house that day and she went into my bedroom with my kids (Angie, Christy, and Anthony) and her kids and barricaded the door with a dresser.  Anthony's father kept arguing with me and he banged my head on the sidewalk.

15.  That night, my sister and the kids slept in my bedroom.  My husband and I slept in separate sofas in the living room. I kept a gun under my pillow and told my husband that if he came near me I would shoot.  He cursed at me and passed out.

16.  We didn't have rocky times all the time.  When Anthony was little, we used to take family vacations.  We have a very large family and we always went to family gatherings.

17.  Anthony had a speech impediment when he was younger.  He received speech therapy which made his stuttering better.

18.   Anthony was a very good student when he was in elementary school.  His grades dropped drastically when he was in Middle School.  I don't know why he started having trouble in school.

19.   I did not find out Anthony was in a gang for a long time.  I didn't really know what he was doing at night.  I knew he was drinking and smoking pot, but I didn't think much about it at the time because I smoked marijuana and his father drank.

20.   Even though Tony started having problems as a teenager, he was always very good with kids.

21.   I found out Mr. Millin was ill with cancer during the trial.  During the guilt/innocence portion of the trial, he came up to me during at least two of the lunch breaks and told me he was not coming back for the afternoon sessions because he had to go get chemotherapy.

22.   I also remember seeing teenagers who knew the victims' family members wearing T-Shirts in the courtroom that had pictures of the deceased victims and "In Memory of" words.  The pictures on the T-shirts were the same pictures the prosecutors showed the jury during the trial-- the "quincianera" picture of the girl and the picture of the boy with a dog.

I have read this affidavit.  I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_Golda Medina_

Signed and sworn before me this 20th day of November, 2001.

Notary Public

My commission expires: 10-15-2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

# Exhibit 6

State of Texas       )
                       )        In Re Anthony Shawn Medina
County of Harris    )


### Affidavit of Anthony Luna Medina


    I, Anthony Luna Medina, state that the following is true and correct to the best of my knowledge:


1.    My name is Anthony Luna Medina.  I am over 18 years of age and competent to give this statement.  I presently live at 4319 Dalmatian, Houston, Texas 77045.

2.    I am the father of Anthony Shawn Medina and am married to Golda Medina, Anthony's mother.

3.    I testified during my son's trial at both the guilt/innocence portion and the punishment phase.  I was at the courthouse everyday, but sat outside the courtroom most of the time.  I watched the jury selection, but was not allowed to sit inside the courtroom after that because I testified.

4.    I did not meet Anthony's lawyers until the trial.  Before the trial, I knew Jerry Guerinot had been appointed to represent Anthony.  I called Mr. Guerinot two separate times about four to six weeks before the trial, but I was told he was not in his office.  Mr. Guerinot never returned my calls.  I wanted to meet with him to find out if there was any information he needed from me for Anthony's trial. I did not know Anthony had a second attorney until I met Jack Millin at Anthony's trial.

5.    Before Anthony's trial, I met Mr. Castillo, an investigator working with Mr. Guerinot, once.  His biggest concern was the fact I had not contacted Toby Hernandez, my cousin who works in the Chicano Squad of the Houston Police Department.  I never understood why he wanted me to call my cousin.

6.    During jury selection, my family and I realized Anthony's attorneys had not subpoenaed any witnesses.  We told them they should talk to Domingo Valle, Alex Perez, and Rene DeLeon Reyna.  We also told Anthony's attorneys they should talk to "Flaco's" girlfriend.  I think her first name was

Shelly.

7. My family called the people who ended up testifying for Anthony from the courthouse and I had to leave the courtroom to go pick them up and bring them back to the courthouse.

8. While jury selection was going on, Anthony's attorneys told me I was going to testify during the guilt/innocence portion of the trial. They told me I needed to testify about what happened the night Marco Martinez was saying Anthony shot at a car driving by our house. I did not feel like I was prepared to testify because they never explained how to handle the prosecutor's cross-examination.

9. After Anthony was convicted, Mr. Millin came up to me and told me I would be testifying at the punishment portion of the trial. Mr. Millin told me he was going to ask me some questions about Anthony's childhood. He never told me what the questions would be before I took the stand. He never told me how I should handle the prosecutor's cross examination.

10. While Tony was growing up, I always worked a lot. I worked extra hours and had more than one job. I wasn't involved with Tony's school activities or homework.

11. On two to three separate days of Anthony's guilt/innocence portion of the trial, Mr. Millin came up to me during trial breaks and told me he was not going to be returning to court that afternoon because he had to have "treatment." At that time, I did not know what the treatment was for, but I knew he had a shunt on his chest. About two months after Anthony was sentenced to death, I read in the paper Mr. Millin died of cancer.

12. The day of the punishment portion of the trial, but before any witnesses were called I went inside the courtroom and tried to sit on the first or second bench from the front. Mr. Casey O'Brien came up to me and told me I could not sit there because those seats were reserved for the victims' family members. I had to sit toward the back of the courtroom.

13. During the guilt/innocence stage of the trial, I saw Ms. Rocio Pedraza, who also testified, and six or seven teenagers wearing T-shirts with the words "In memory of" with pictures of the deceased children go inside the courtroom. I saw the teenagers wearing the T-Shirts on two to three separate days.

14. The Spanish-language media was all over the place during the trial. Reporters from one T.V. station even chased my family and me down the stairs as we were trying to leave the courthouse after the verdict.

I have read this affidavit. I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_Anthony Luna Medina_
Anthony Luna Medina

Signed and sworn before me this 15th day of November, 2001.

_N__ T__
Notary Public

My commission expires: 10-15-2005



NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

# Exhibit 7

STATE OF TEXAS      )
                            )
COUNTY OF HARRIS   )

## AFFIDAVIT OF GERARD GUERINOT, ESQ

1. My name is Jerry Guerinot. I am a resident of Harris County, Texas. I am over the age of eighteen and am competent to make this affidavit.

2. I was the lead attorney representing Anthony Shawn Medina in his 1996 capital murder case. Mr. John Millin, III was my co-counsel and was responsible for the punishment phase of trial.

3. After reviewing my file and the court record, I realize that Mr. Millin and I neglected to request either a limiting instruction or a reasonable doubt instruction at the guilt/innocence phase of trial regarding the numerous extraneous offenses that were introduced against Mr. Medina.

4. I was aware at the time that if I had requested these instructions, the trial court would have been required to give them to the jury but I simply neglected to request them due to an oversight. Not requesting the instructions was not the result of any trial strategy.

5. The instructions would have been consistent with the defensive issue we raised at trial: that Dominic Holmes was the shooter.

6. After the testimony of the State's firearms examiner, Robert Baldwin, I felt it was necessary to the defense to conduct an examination of the ejection pattern of the murder weapon. It was clear to me that the shooting could not have occurred as the State's witnesses claimed it did based on the location where the spent shell casings were recovered.

7. I asked Judge Robertson to have Mr. Baldwin do an analysis of the weapon's ejection pattern but this request was denied. Based upon Judge Robertson's response that he would not order the testing, I believed it would be futile to continue to pursue the matter with the Court.

I have read the above statement and swear, under the pain and penalty of perjury, that it is true and correct to the best of my knowledge. I give this statement of my own free will.

_____
Jerry Guerinot

11-13-01
_____
Date

Subscribed to and sworn before me by Jerry Guerinot on this 13th day of November, 2001.

_____
Notary Public

My Commission expires: _____

W. R. RANKIN
Notary Public
STATE of TEXAS
My Comm. Exp.: 11-13-2004

# Exhibit 8

NO. 0696014

THE STATE OF TEXAS VS.

OFFENSE:

AGG ASSAULT

ATTORNEY FOR STATE:

SCIRE FACIAS INFORMATION: AMOUNT OF BOND  $50,000.00

S.F. NO.

BONDSMAN

SETTINGS:

OTHER INFORMATION:

C3308 D PAGE l

ATTORNEY FOR DEFENDANT:

GERONIMO S. ALVARADO

GENERAL ORDER OF COURT

JUN 13 1995

FELONY INDICTMENT

LED _____  338

JUN 1 5 1995.

JUN 1 3 1995

JUL 1 8 1995

AUG 1 8 1995

SEP 1 5 1995

THE DEFENDANT,
IN PERSON WITH COUNSEL,
APPEARED

R-S  9-15-1995  disposition

# Exhibit 9

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CASTILLO INVESTIGATION SPECIALISTS, C.I.S.
### P. O. BOX 1082    SPRING, TEXAS 77383-1082
### TEXAS STATE LICENSE NUMBER  A - 07535

**CASE NO. :  96-90  TO :   JERRY GUERINOT, ATTORNEY  AT LAW**
**1314 TEXAS AVENUE, SUITE 1515, HOUSTON, TEXAS 77002  (713) 225-0094**
**REFERENCE :       THE STATE OF TEXAS vs ANTHONY MEDINA**
**CHARGE :        CAPITAL  MURDER**
**CAUSE NO. :        712607                         228th  DISTRICT COURT**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### ACTIVITY  REPORT

1.    Monday, April 15, 1996 :
    A.    Met with attorney and received investigation assignment
2.    Friday, April 19, 1996 :
    A.    Interviewed defendant at the county jail
3.    Monday, April 22, 1996 :
    A.    Met and took sworn statement from def's sister, Angie Medina
4.    Tuesday, June 18, 1996 :
    A.    Met with Angie Medina to discuss of possible defense witnesses
5.    Thursday, June 27, 1996 :
    A.    Failed attempt to locate and interview Shelly Amato
6.    Tueday, July 9, 1996 :
    A.    Failed attempt to locate witnesses at home and by telephone
7.    Wednesday, July 10, 1996 :
    A.    Interviewed -
        1).    Veronica Ponce and her mother
        2).    Louisa Escobar
        3).    Cathy Ponce
        4).    Cleo martinez,
        5).    Samuel Lopez,
        6).    Anastacio Baudres,
        7).    Jessica Ramirez,
        8).    Adela Moya
8.    Thursday,  July 11, 1996 :
    A.    Interviewed :
        1).    Rocio Pedraz
        2).    James Moore
    B.    Prepared investigation report for court readiness
9.    Saturday, July 13, 1996 :
    A.    Video and still photographs of scene area
10.    Monday, July 15, 1996 :
    A.    Court appearance - attorneys asked for character witnesses

## CASTILLO INVESTIGATION SPECIALISTS, C.I.S.
### P. O.  BOX  1082    SPRING, TEXAS 77383-1082
### TEXAS STATE LICENSE NUMBER  A - 07535

11.    Sunday, July 20, 1996 :
    A.     Obtained character witnesses and interviews several character witnesses
12.    Tuesday, July 23, 1996 :
    A.     Conference with attorney, request made that investigator be in court on
          Wednesday, July 24, 1996

TOTAL INVESTIGATION HOURS - 30 hrs.  X  $  50.00  ................  $ 1,500.00
         MILEAGE -   216 hrs.  X $ 0.45  ..........................................      97.20
         MISCELLANEOUS -film/devpm't, documents, Jims  ..............      30.00
**TOTAL AMOUNT DUE** >>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>  **$  1,627.20**
DATE SUBMITTED - Wednesday,  July 24, 1996
THANK YOU -

**J.M. "JOHN" CASTILLO, C.I.S.**
**OWNER/MANAGER**

DATE PAID : _____    CHECK NO. : _____

# Exhibit 10

COUNTY AUDITOR'S FORM #40-1
HARRIS COUNTY, TEXAS (REV. 10/93)

# ATTORNEY FEES EXPENSE CLAIM -
## DISTRICT COURTS
UNDER ARTICLE 26.05, CODE OF CRIMINAL PROCEDURE AS AMENDED

**INSTRUCTIONS**
1. Show only one defendant and type of case per claim.
2. Before payment can be authorized, each item must be completed legibly in ink.
3. For investigations, paid bills must be submitted by the attorney for expenses claimed.
4. Forward completed claim to the presiding judge for approval.

## COURT APPEARANCE INFORMATION

| COURT NUMBER | DEFENDANT | CASE NUMBERS |
|---|---|---|
| 228 | ANTHONY SHAWN Medina | 678640  712607  9421844 <br> 726088  678641  9421845 <br> 712126  9421846 <br> 9421847 |

| IN-COURT APPEARANCE | NUMBER OF COURT DAYS / HOURS | RATE (Judge Completes) | DAILY RATE MINIMUM | DAILY RATE MAXIMUM | TOTAL (Not to Exceed) | AMOUNT (Judge Completes) |
|---|---|---|---|---|---|---|
| **NON-TRIAL APPEARANCE**, to include: Pre-Indictment Appearance / Plea/Disposition / Post-Indictment Appearance / Pre-Trial Conference / Arraignment / Trial Setting with No Trial Testimony / Non-Issue | | | $ 65 | $ 130 | $ 650 | $ |
| **PRE-TRIAL HEARING/MOTION WITH TESTIMONY** | | | 65 | 175 | | |
| **NON-CAPITAL TRIAL** – Testimony must be taken | | | 180 | 270 | | |
| ☐ If Trial Exceeds Five Days | | | 180 | 270 | 2250 | |
| **CAPITAL TRIAL** (No more than two attorneys will be appointed) | | | | | | |
| ☒ 1st Chair  *CONTRACT* | | | 270 | 540 | | 16000 |
| ☐ 2nd Chair | | | 180 | 360 | | |
| ☐ Capital Non-Trial Appearance, (non-issue) | | | 130 | 400 | | |

| OUT OF COURT | NUMBER OF COURT DAYS / HOURS | RATE (Judge Completes) | HOURLY RATE MIN/MAX | FIXED RATE MINIMUM | MAXIMUM (Total Not to Exceed) | |
|---|---|---|---|---|---|---|
| **OUT OF COURT HOURS** – Prior Written Court Approval Required. Not to Exceed 10 Hours. To include: Documented Independent Research / Police Show Up / Grand Jury Appearances  Does Not Include: Routine Jail Visits / Interviews / Telephone Calls | | | $ 40 | $ | $ 240 | |
| **INVESTIGATION** – Prior Written Court Approval Required | | | | | 600 | |
| **EXPERT TESTIMONY, PLUS EXPENSES BASED ON CURRENT COUNTY POLICY** – Prior Written Court Approval Required | | | | 250 | 750 | |

| APPEALS | | | | | | |
|---|---|---|---|---|---|---|
| CAPITAL APPEAL | | | $ 45 | | 13000 | |
| NON-CAPITAL APPEAL | | | | | 1750 | |
| NON-CAPITAL APPEAL IN WHICH TRIAL EXCEEDED FIVE DAYS OR TRANSCRIPT EXCEEDED 800 PAGES | | | | | 2400 | |
| PETITION FOR DISCRETIONARY REVIEW **NOT** GRANTED | | | | | 300 | |
| PETITION FOR DISCRETIONARY REVIEW GRANTED | | | | | 450 | |
| NEW BRIEF AFTER PDR GRANTED | | | | | 1300 | |
| ORAL ARGUMENT AT COURT OF CRIMINAL APPEALS, AUSTIN, ON PDR | | | | | 450 | |
| CHANGE OF VENUE – Reasonable Expenses, According to County Travel Policies | | | | | | |
| THREE FULL-TIME APPOINTED COUNSEL | | | | | 2312/WK | |
| OTHER (Prior Approval of Fee Schedule Committee Required) | | | | | | |
| | | | | | **TOTAL** | $ 16000 |

DATES IN COURT (Enter Type of Case followed by Dates, EXAMPLE: In Court Appearance - 9/12, 9/13, 9/14/90)

*CAPITAL MURDER - CONTRACT & MRPS Hearings*

## PERSONAL INFORMATION

| SOCIAL SECURITY NUMBER | TELEPHONE NUMBER | BAR CARD NUMBER |
|---|---|---|
| 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 | 225-0074 | 08571500 |

MAILING ADDRESS  (Number)  (Street)  (Suite)  (City)  (State)  (Zip Code)
Jerry Guerinot  1314 Texas 1515  Houston  TX  77002

## CERTIFICATION

I, Jerry Guerinot, _____, Attorney at Law, swear or affirm to the Court and to the County Auditor that they may rely upon the information contained above to make payment according to the fee schedule adopted by the Board of Judges pursuant to Article 26.05 Code of Criminal Procedure effective September 1, 1987. I further swear or affirm that I have not received nor will I receive any other money or anything else of value for representing the accused, except as otherwise disclosed to the Court in writing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS

THE 10 DAY OF August AD 90 _____ Attorney at Law (Signature)

Approved _____  Presiding Judge (Signature)

228
COURT NUMBER

DISTRICT CLERK DEPUTY (SIGNATURE)

0088

White - Court        Green - Auditor        Yellow - Attorney

# Exhibit 11

GUERINOT ATTY, JERRY

| | | | | | |
|---|---|---|---|---|---|
| 06365527 | 01151842 | 01/08/96 | 0070802Z | 01/05/96 | 130.00 |
| 06365527 | | | 0070802S | 01/05/96 | 130.00 |
| 06365527 | | | 0070748S | 01/05/96 | |
| 06365527 | | | X708722A | 01/05/96 | 130.00 |
| 06365527 | | | 0708722A | 01/05/96 | 130.00 |
| 06365527 | | | 0708753B | 01/05/96 | .00 |
| 06365527 | | | 0708753B | 01/05/96 | .00 |
| 06365527 | | | 0708738B | 01/05/96 | 130.00 |
| 06365527 | | | 0710485A | 01/05/96 | 130.00 |
| 06365527 | | | 0710485A | 01/05/96 | .00 |

TOTAL CHECK 01151842 780.00

| | | | | | |
|---|---|---|---|---|---|
| 06365527 | 01156101 | 01/25/96 | 0065893B | 01/24/96 | 130.00 |
| 06365527 | | | 0070802B | 01/24/96 | .00 |
| 06365527 | | | 0070872S | 01/24/96 | 130.00 |
| 06365527 | | | 0065893B | 01/24/96 | 130.00 |
| 06365527 | | | 0065893C | 01/24/96 | 130.00 |
| 06365527 | | | 0065893D | 01/24/96 | 130.00 |
| 06365527 | | | 0065893A | 01/24/96 | .00 |
| 06365527 | | | 0065893B | 01/24/96 | .00 |
| 06365527 | | | 0065893D | 01/24/96 | .00 |
| 06365527 | | | 0708726A | 01/22/96 | 130.00 |

*** GRID E 2 ***

HARRIS COUNTY
LISTING OF PAYMENTS FOR APPROVAL

REPORT NUMBER AP-23
FISCAL YEAR 97

HARRIS COUNTY
LISTING OF PAYMENTS FOR APPROVAL
BY COMMISSIONERS COURT
ON DECEMBER 31, 1996

RUN DATE 01/07/97
PROCESS DATE 12/31/96   PAGE 5322

| VENDOR NAME | VENDOR NUMBER | CHECK NUMBER | CHECK DATE | INVOICE NUMBER | INVOICE DATE | AMOUNT |
|---|---|---|---|---|---|---|
| | 068365327 | | | 0708226B | 01/22/96 | 130.00 |
| | 068365327 | | | 0708226C | 01/22/96 | 130.00 |
| TOTAL CHECK | | J1158101 | | | | 1,170.00 * |
| | 068365327 | | | 0713193 | 01/26/96 | 130.00 |
| | 068365327 | 01157104 | 01/29/96 | 0713195A | 01/28/96 | 130.00 |
| TOTAL CHECK | | 01157104 | | | | 260.00 * |
| | 068365327 | 01158055 | 02/01/96 | 0069917B | 01/30/96 | 130.00 |
| TOTAL CHECK | | 01158055 | | | | 130.00 * |
| | 068365327 | 01159646 | 02/08/96 | 0065476D | 02/08/96 | 130.00 |
| | 068365327 | 01159646 | 02/08/96 | 0068992D | 02/06/96 | 25,000.00 |
| TOTAL CHECK | | 01159646 | | | | 25,130.00 * |
| | 068365327 | 01160900 | 02/12/96 | 0707638 | 02/12/96 | 130.00 |
| | 068365327 | | | 0707638A | 02/12/96 | 130.00 |
| | 068365327 | | | 0707638B | 02/12/96 | 130.00 |
| | 068365327 | 01160900 | | 0707638C | 02/12/96 | 130.00 |
| TOTAL CHECK | | 01160900 | | | | 520.00 * |
| | 068365327 | 01162794 | 02/19/96 | 0097994? | 02/19/96 | 130.00 |
| | 068365327 | | | 0097938 | 02/18/96 | .00 |
| | 068365327 | | | 0071490 | 02/19/96 | .00 |
| | 068365327 | | | 0714414 | 02/19/96 | .00 |
| | 068365327 | | | 0697947A | 02/19/96 | .00 |
| | 068365327 | | | 0697947B | 02/19/96 | 130.00 |
| | 068365327 | | | 0697947C | 02/19/96 | 130.00 |
| | 068365327 | | | 0697947D | 02/19/96 | 130.00 |
| | 068365327 | | | 0697947E | 02/19/96 | 200.00 |
| | 068365327 | | | 0697948A | 02/19/96 | .00 |
| | 068365327 | | | 0697948B | 02/19/96 | .00 |
| | 068365327 | | | 0697948C | 02/19/96 | .00 |
| | 068365327 | | | 0697948D | 02/19/96 | .00 |
| | 068365327 | | | 0711498 | 02/19/96 | .00 |
| | 068365327 | | | 0711499 | 02/19/96 | .00 |
| | 068365327 | | | 0711499C | 02/19/96 | .00 |
| | 068365327 | | | 0714908 | 02/19/96 | .00 |
| | 068365327 | | | 0714908A | 02/19/96 | .00 |
| | 068365327 | | | 0714908B | 02/19/96 | .00 |
| | 068365327 | | | 0711490C | 02/19/96 | .00 |
| | 068365327 | | | 0714414A | 02/19/96 | 200.00 |
| | 068365327 | | | 0714414B | 02/19/96 | .00 |
| | 068365327 | | | 0714414C | 02/19/96 | .00 |
| | 068365327 | | | 0714414D | 02/19/96 | .00 |
| TOTAL CHECK | | 01162794 | | | | 920.00 * |
| | 068365327 | 01164180 | 02/22/96 | 00689920 | 02/21/96 | 4,585.55 |

*** GRID F 2 ***

REPORT NUMBER AP-23
FISCAL YEAR 97

HARRIS COUNTY
LISTING OF PAYMENTS FOR APPROVAL

RUN DATE 01/07/97
PROCESS DATE 12/31/96   PAGE 5323

RPT N... R AP ...)
FISCAL YEAR 97

LISTING OF PAYMENTS FOR APPROVAL
BY COMMISSIONERS COURT
ON DECEMBER 31, 1996

| VENDOR NAME | VENDOR NUMBER | CHECK NUMBER | CHECK DATE | INVOICE NUMBER | INVOICE DATE | AMOUNT |
|---|---|---|---|---|---|---|
| TOTAL CHECK | | 01164180 | | | | 4,585.55 * |
| | 068365327 | 01167636 | 03/11/96 | 00716410 | 03/01/96 | 130.00 |
| | 068365327 | | | 0716410A | 03/01/96 | 130.00 |
| | 068365327 | | | 0716410B | 03/01/96 | 130.00 |
| TOTAL CHECK | | 01167636 | | | | 390.00 * |
| | 068365327 | 01169208 | 03/18/96 | 00710223 | 03/01/96 | 130.00 |
| | 068365327 | | | 0710723A | 03/01/96 | 130.00 |
| | 068365327 | | | 0710723B | 03/01/96 | 130.00 |
| | 068365327 | | | 0710723C | 03/01/96 | 130.00 |
| TOTAL CHECK | | 01169708 | | | | 1,120.00 * |
| | 068365327 | 01170478 | 03/21/96 | 00710773 | 03/01/96 | 130.00 |
| TOTAL CHECK | | 01170478 | | | | 130.00 * |
| | 068365327 | 01171553 | 03/25/96 | 00711884 | 03/22/96 | 130.00 |
| | 068365327 | | | 0711884A | 03/22/96 | 130.00 |
| | 068365327 | | | 0711884B | 03/22/96 | 130.00 |
| | 068365327 | | | 0711884C | 03/22/96 | 130.00 |
| TOTAL CHECK | | 01171553 | | | | 520.00 * |
| | 068365327 | 01172638 | 03/28/96 | 00889418 | 03/28/96 | 130.00 |
| | 068365327 | | | 0889418A | 03/28/96 | 130.00 |
| TOTAL CHECK | | 01172638 | | | | 260.00 * |
| | 068365327 | 01174550 | 04/04/96 | 00717410 | 04/04/96 | 400.00 |
| TOTAL CHECK | | 01174550 | | | | 400.00 * |
| | 068365327 | 01175658 | 04/11/96 | 00704044 | 04/10/96 | 130.00 |
| | 068365327 | | | 00718658 | 04/10/96 | 130.00 |
| | 068365327 | | | 00718659 | 04/10/96 | |
| TOTAL CHECK | | 01175658 | | | | 260.00 * |
| | 068365327 | 01177615 | 04/18/96 | 09424545 | 04/17/96 | 20,000.00 |
| TOTAL CHECK | | 01177615 | | | | 20,000.00 * |
| | 068365327 | 01187589 | 05/24/96 | 00711719 | 05/24/96 | 1,750.00 |
| TOTAL CHECK | | 01187589 | | | | 1,750.00 * |
| | 068365327 | 01190700 | 06/10/96 | 00694175 | 06/10/96 | 20,000.00 |
| | 068365327 | | | 00708031 | 26/10/96 | 130.00 |
| | 068365327 | | | 0708031A | 06/10/96 | 130.00 |
| | 068365327 | | | 0708031B | 06/10/96 | 130.00 |
| | 068365327 | | | 0708031C | 06/10/96 | 130.00 |
| | 068365327 | | | 0708031D | 06/10/96 | 130.00 |
| | 068365327 | | | 0708031E | 06/10/96 | 130.00 |
| | 068365327 | | | 0711719A | 05/30/96 | 1,750.00 |

*** GRID G 2 ***

HARRIS COUNTY
LISTING OF PAYMENTS FOR APPROVAL
BY COMMISSIONERS COURT

REPORT NUMBER AP-23
FISCAL YEAR 97

HARRIS COUNTY
LISTING OF PAYMENTS FOR APPROVAL
BY COMMISSIONERS COURT
ON DECEMBER 31, 1996

RUN DATE 01/07/97  PAGE 5325
PROCESS DATE 12/31/96

| VENDOR NAME | VENDOR NUMBER | CHECK NUMBER | CHECK DATE | INVOICE NUMBER | INVOICE DATE | AMOUNT |
|---|---|---|---|---|---|---|
|  | 068365327 |  |  | 09414006 | 06/10/96 | 1,842.45 |
| TOTAL CHECK | | 01190290 | 06/13/96 | | | 21,032.45 * |
|  | 068365327 | 01191875 |  | 00708137 | 06/12/96 | 130.00 |
|  | 068365327 |  |  | 00708137A | 06/12/96 | 130.00 |
|  | 068365327 |  |  | 00708137B | 06/12/96 | 130.00 |
|  | 068365327 |  |  | 00708137C | 06/12/96 | 130.00 |
|  | 068365327 |  |  | 00708137D | 06/12/96 | 130.00 |
|  | 068365327 |  |  | 00708137E | 06/12/96 | 270.00 |
| TOTAL CHECK | | 01191875 | | | | 920.00 * |
|  | 068365327 | 01193550 |  | 0714137 | 06/20/96 | 130.00 |
|  | 068365327 |  |  | 0714137A | 06/20/96 | 130.00 |
|  | 068365327 |  |  | 0714137B | 06/20/96 | 130.00 |
|  | 068365327 |  |  | 0714137C | 06/20/96 | 130.00 |
| TOTAL CHECK | | 01193560 | | | | 520.00 * |
|  | 068365327 | 01196761 |  | 00719145 | 06/30/96 | 130.00 |
|  | 068365327 |  |  | 00719605 | 06/30/96 | 130.00 |
|  | 068365327 |  |  | 07191450 | 06/30/96 | 130.00 |
|  | 068365327 |  |  | 0719145C | 06/30/96 | 130.00 |
|  | 068365327 |  |  | 0719145D | 06/30/96 | 130.00 |
|  | 068365327 |  |  | 0719145E | 06/30/96 | 130.00 |
|  | 068365327 |  |  | 0719605A | 06/30/96 | 130.00 |
|  | 068365327 |  |  | 0719605B | 06/30/96 | 130.00 |
|  | 068365327 |  |  | 0719605D | 06/30/96 | 130.00 |
|  | 068365327 |  |  | 0719605E | 06/30/96 | 130.00 |
| TOTAL CHECK | | 01196761 | 07/03/96 | | | 200.00 * |
|  | 068365327 | 01201207 |  | 0045860 | 07/22/96 | 540.00 |
|  | 068365327 | 01201207 |  | 0045980A | 07/22/96 | 1,080.00 |
| TOTAL CHECK | | 01201207 | 07/22/96 | | | 1,080.00 * |
|  | 068365327 | 01209200 |  | 0729295 | 08/19/96 | 130.00 |
|  | 068365327 |  |  | 0729366 | 08/19/96 | 130.00 |
|  | 068365327 |  |  | 0729884 | 08/19/96 | 130.00 |
|  | 068365327 |  |  | 0729884A | 08/19/96 | 130.00 |
|  | 068365327 |  |  | 0729884B | 08/19/96 | 130.00 |
| TOTAL CHECK | | 01209200 | 08/26/96 | | | 650.00 * |
|  | 068365327 | 01211234 |  | 00723492 | 08/23/96 | 130.00 |
|  | 068365327 |  |  | 00722555 | 08/23/96 | 130.00 |
|  | 068365327 |  |  | 00722088 | 08/23/96 | 130.00 |
|  | 068365327 |  |  | 00730461 | 08/23/96 | 130.00 |
|  | 068365327 |  |  | 00743492A | 08/23/96 | 130.00 |
|  | 068365327 |  |  | 0725565A | 08/23/96 | 130.00 |
|  | 068365327 |  |  | 0725565B | 08/23/96 | 130.00 |

*** GRID H 2 ***

HARRIS COUNTY

REPORT NUMBER AP-23

*** GRID 1 N 2 ***

REPORT NUMBER AP-23
FISCAL YEAR 97

HARRIS COUNTY
LISTING OF PAYMENTS FOR APPROVAL
BY COMMISSIONERS COURT
ON DECEMBER 31, 1996

RUN DATE 01/07/97   PAGE 5325
PROCESS DATE 12/31/96

| VENDOR NAME | VENDOR NUMBER | CHECK NUMBER | CHECK DATE | INVOICE NUMBER | INVOICE DATE | AMOUNT |
|---|---|---|---|---|---|---|
| | 068365327 | | | 09402280 | 08/23/96 | |
| | 068365327 | | | 09422600 | 08/26/96 | |
| | 068365327 | 01211234 | | 94022801 | 08/27/96 | 15,000.00 |
| TOTAL CHECK | | | | | | 16,380.00 * |
| | 068365327 | 01213972 | 09/09/96 | 00678640 | 09/09/96 | 16,000.00 |
| | 068365327 | | | 00678641 | 09/09/96 | .00 |
| | 068365327 | | | 00712207 | 09/09/96 | .00 |
| | 068365327 | | | 00712126 | 09/09/96 | .00 |
| | 068365327 | | | 00712088 | 09/09/96 | .00 |
| | 068365327 | | | 00731810 | 09/09/96 | .00 |
| | 068365327 | | | 09421844 | 09/09/96 | 130.00 |
| | 068365327 | | | 09421845 | 09/09/96 | .00 |
| | 068365327 | | | 09421847 | 09/09/96 | .00 |
| TOTAL CHECK | | 01213972 | | | | 16,130.00 * |
| | 068365327 | 01216092 | 09/16/96 | 00732184 | 09/16/96 | 130.00 |
| TOTAL CHECK | | 01216092 | | | | 130.00 * |
| | 068365327 | 01220142 | 09/30/96 | 00731824 | 09/27/96 | 13.00 |
| | 068365327 | | | 00733441 | 09/27/96 | 267.00 |
| TOTAL CHECK | | 01220142 | | | | 280.00 * |
| | 068365327 | 01221693 | 10/07/96 | 00732343 | 10/07/96 | 130.00 |
| | 068365327 | | | 00732343 | 10/07/96 | 130.00 |
| TOTAL CHECK | | 01221693 | | | | 260.00 * |
| | 068365327 | 01223758 | 10/14/96 | 00734474 | 10/11/96 | 130.00 |
| TOTAL CHECK | | 01223758 | | | | 130.00 * |
| | 068365327 | 01224621 | 10/17/96 | 00720761 | 10/16/96 | 130.00 |
| TOTAL CHECK | | 01224621 | | | | 130.00 * |
| | 068365327 | 01225577 | 10/21/96 | 00713559 | 10/18/96 | 130.00 |
| | 068365327 | | | 0713559A | 10/18/96 | 130.00 |
| | 068365327 | | | 0713559B | 10/18/96 | 130.00 |
| | 068365327 | | | 0713559C | 10/18/96 | 130.00 |
| | 068365327 | | | 0713559D | 10/18/96 | 130.00 |
| | 068365327 | | | 0713559E | 10/18/96 | 130.00 |
| TOTAL CHECK | | 01225577 | | | | 919.00 * |
| | 068365327 | 01227668 | 10/28/96 | 00725605 | 10/28/96 | 130.00 |
| | 068365327 | | | 0725605A | 10/28/96 | 130.00 |
| | 068365327 | | | 0725605B | 10/28/96 | 130.00 |
| | 068365327 | | | 0725605C | 10/28/96 | 130.00 |
| | 068365327 | | | 0725605D | 10/28/96 | 130.00 |
| TOTAL CHECK | | 01227668 | | | | 650.00 * |

*** GRID 1 2 ***

REPORT NUMBER AP-23
FISCAL YEAR 97

HARRIS COUNTY
LISTING OF PAYMENTS FOR APPROVAL

RUN DATE 01/07/97   PAGE 5326
PROCESS DATE 12/31/96

```
*** GRID  1  2 ***
```

REPORT NUMBER AP-23
FISCAL YEAR: 97

HARRIS COUNTY
LISTING OF PAYMENTS FOR APPROVAL
BY COMMISSIONERS COURT
ON DECEMBER 31, 1996

RUN DATE 01/07/97  PAGE 5326
PROCESS DATE 12/31/96

| VENDOR NAME | VENDOR NUMBER | CHECK NUMBER | CHECK DATE | INVOICE NUMBER | INVOICE DATE | AMOUNT |
|---|---|---|---|---|---|---|
| | 0083653527 | 01229346 | 11/04/96 | 0072887B | 10/31/96 | 130.00 |
| | 0083653527 | | | 0072887BA | 10/31/96 | 130.00 |
| | 0083653527 | | | 0072897BA | 10/31/96 | 130.00 |
| | 0083653527 | | | 0072524699 | 10/31/96 | 880.00 |
| TOTAL CHECK | | 01229346 | | | | 1,280.00 * |
| | 0083653527 | 01239008 | 11/07/96 | 0069201 | 11/07/96 | 400.00 |
| | 0083653527 | | | 0069301A | 11/07/96 | 270.00 |
| | 0083653527 | | | 0069301B | 11/07/96 | 400.00 |
| TOTAL CHECK | | 01239008 | | | | 1,070.00 * |
| | 0083653527 | 01241678 | 11/25/96 | 00700058 | 11/25/96 | 130.00 |
| | 0083653527 | | | 00700258A | 11/25/96 | 130.00 |
| | 0083653527 | | | 00700258B | 11/25/96 | 130.00 |
| TOTAL CHECK | | 01241678 | | | | 530.00 * |
| | 0083653527 | 01242353 | 11/27/96 | 0073B163 | 11/27/96 | 130.00 |
| | 0083653527 | | | 0073163A | 11/27/96 | 130.00 |
| | | | | | | 220.00 * |
| TOTAL CHECK | | 01242353 | | | | |
| | 0083653527 | 01244762 | 12/09/96 | 0075431 | 12/09/96 | 130.00 |
| | 0083653527 | | | 0075803 | 12/09/96 | 130.00 |
| | 0083653527 | | | 0075531A | 12/09/96 | 130.00 |
| | 0083653527 | | | 0075831B | 12/08/96 | 130.00 |
| | 0083653527 | | | 0075803A | 12/08/96 | 130.00 |
| | 0083653527 | | | 0075803C | 12/08/96 | 130.00 |
| TOTAL CHECK | | 01244762 | | | | 910.00 * |
| | 0083653 | 01245789 | 12/12/96 | 0072663B | 12/12/96 | 400.00 |
| | 0083653 | | | 0072663BA | 12/12/96 | 400.00 |
| | 0083653527 | | | 0072663BB | 12/12/96 | 400.00 |
| | 0083653547 | | | 0072663BC | 12/12/96 | 400.00 |
| | 0083653527 | | | 0072663BD | 12/12/96 | 400.00 |
| | 0083653527 | | | 0072663BE | 12/12/96 | 540.00 |
| | 0083653527 | | | 0072663BF | 12/12/96 | 540.00 |
| | 0083653527 | | | 0072663BG | 12/12/96 | 500.00 |
| | 0083653527 | | | 0072663BH | 12/12/96 | 500.00 |
| TOTAL CHECK | | 01245789 | | | | 4,020.00 * |
| | 0083653527 | 01249111 | 12/19/96 | 0073282 | 12/16/96 | 130.00 |
| | 0083653527 | | | 0073870 | 12/18/96 | 130.00 |
| | 0083653527 | | | 0073282A | 12/18/96 | .00 |
| | 0083653527 | | | 0072281 | 12/18/96 | .00 |
| | 0083653527 | | | 0072414439 | 12/16/96 | 130.00 |
| TOTAL CHECK | | 01249111 | | | | 390.00 * |
| TOTAL VENDOR | | | | | | 126,897.00 ** |

```
*** GRID  1  2 ***
```

REPORT NUMBER AP-23

Exhibit 12

31, May 1996

Anthony Medina Spn. 1346564
1307 Franklin 5c1
Houston, Texas 77002

J. M. "John" Castillo
P.O. Box 1662
Spring, Texas 77383

Re: Capital Murder
    Cause # 712607

0059

Dear Mr. Castillo:

I sincerely hope that, at this time of notice life blesses you with good health and a peaceful spirit. You told me to contact you in case I had any questions regarding my case, so I am taking advantage of the opportunity now in my effort to be better informed of my case status.

My sister Angie has left messages at your office trying to reach you but such effort has been to no avail. First, I would like to know if there has been any new and/or additional information you have came across.

I have concerns regarding the arrest of two(2) of the state's witnesses, and whether their arrest will have any bearing on the status of my cause?

-1-

Further, I would like to review any and all evidence up to and including fingerprints off the weapon, if any, list of states' witnesses, and any other material evidence the state intends to use against me at trial in this matter. Also, I would like to review the testimonies furnished at the Grand Jury hearing in Cause # 712607 that supported the issuance of the indictment against me.

Sir, I am scheduled to return to court on the 24th of June, and it is imperative that I speak to you prior to said ▮▮▮▮▮ date concerning the state's case. I'm aware that your case load possibly consumes most of your time, but I really need to see you, and also to began preparing my defense.

Most of what I have requested I'm sure can or must be obtained through a motion for discovery; however I would like to have filed the following motions: (1) motion in Limine under Rule 404(a) and 404(B) of the Texas Rules of Criminal Evidence, (2) motion to disclose favorable evidence and (3), motion to prohibit state from attempting to introduce statements allegedly made by the defendant, without prior hearing on admissibility. In addition to this request I would like to be furnished a copy of any and all motions on file in court in this instant cause.

0060

-2-

I am still being housed in 1301 Franklin, 5c/
and would deeply appreciate your scheduling an
appointment to visit me at your earliest convenience.
Again, it is of great importance, that I speak to you
prior to the scheduled court date.

Thanking you in advance for your time and
assistance.

Sincerely,

Anthony Medina

0061

-3-



Mr. John Castillo
P.O. Box 1082
Spring, Tx. 77383-1082

Tony Medina
#1346564-5C1
1301 Franklin
Houston, Tx. 77002

0062

# Exhibit 13

Cause No. 726088-B

| | | |
|---|---|---|
| EX PARTE | § | IN THE 228TH DISTRICT COURT |
| | § | OF |
| ANTHONY SHAWN MEDINA, | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

**AFFIDAVIT**

| | | |
|---|---|---|
| STATE OF TEXAS | § | DATE: May 17, 2002 |
| HARRIS COUNTY | § | |

Before me, the undersigned authority, a Notary Public in and for Harris County, Texas, on this day personally appeared Gerard Guerinot, who being by me duly sworn, upon his oath deposes and says:

"My name in Gerard Guerinot. I am presently licensed to practice law in the State of Texas and have been licensed since September 25, 1972. My Texas bar number is 08571500. The majority of my legal practice has been in the area of criminal law. I have tried approximately 40 capital murder cases. I was appointed to represent the defendant, Anthony Shawn Medina, in the 228TH District Court, cause no. 726088, for his 19963 capital murder trial. Defense counsel Jack Mullin, now deceased, was also appointed to represent the defendant.

As part of the pre-trial investigation and preparation, the defense prepared and filed pre-trial motions; engaged the services of an investigator; interviewed witnesses; obtained discovery from the State; reviewed the State's file; read the offense report; visited the scene of the offense; interviewed the defendant's family, and talked with the defendant numerous times about the offense and pending trial. Defense counsel spent a long time investigating this case and counsels' case load did not hinder our preparation or investigation at all. Counsel Jack Mullin's terminal illness did not hinder his ability or his performance. He was able to perform his

duties and thoroughly prepared the punishment phase of the case, presented the punishment evidence, and argued the punishment case.

The making of an opening statement is a matter of strategy and I, as a general rule, do not make an opening statement. I think that it can create the impression that the defense has the burden of proof and it can also be dangerous if there is a change mid-trial. Also, as part of the review of the State's file, I reviewed the sub-file labeled "Criminal Histories" and reviewed the criminal records or inquiries about the criminal records of numerous witnesses. Also, the defense investigator ran criminal histories of the witnesses. At trial, I attempted to impeach each witness based on that witness's testimony and actions.

I have reviewed Vol. V of the appellate record and can affirm that I excused prospective juror Sylvia Roeseler on July 16, 1996, after voir dire examination, and that we had an agreed excusal of the next prospective juror Deanne Saltzman. The defendant was present at all times during voir dire examination. After Saltzman left the room, the defendant was taken out of the courtroom to either go to the bathroom or get a drink or some other need. The defendant was returned to the court where he agreed on the record to the excusal of two more prospective jurors. Also, during voir dire, the defense made strategic decisions to accept, strike, or challenge the prospective jurors based on viewing the demeanor and listening to the prospective jurors during voir dire examination.

During the trial, I did not see anyone flashing gang signs or anyone wearing t-shirts with the victims' photos on them. I would have objected to anyone wearing such t-shirts in the courtrooms. The majority of the people there were the defendant's family. Judge Robertson ran a strict courtroom and, although we were in a small courtroom, there was not a "hostile" atmosphere. Any escorting of the jurors to their cars were a part of the routine in the criminal courts and not because of the type of case.

2

The defense did not present a mental health expert for so-called psychological scars from a stuttering that was cured and far-removed from the offense. The defense strategy was to present a picture of the defendant's background and home life to show that he was not a future danger. During the interviews with the defendant's family, no family member told the defense that the father drank or that the mother smoked marijuana or that the parents fought. The defense presented all the punishment evidence which was discovered and which we considered helpful to the defendant. We did not consider that any jail records saying that the defendant had no discipline records in jail to be sufficiently mitigating in the circumstances. Also, juries are typically not impressed with a "no-problems" jail record.

The defense did not seek the identity of the Crimestopper's callers because how the police got to the defendant and the weapons in this case was not the relevant question. The question was showing that he did not commit the offense. Even if the identity of the callers had been revealed, their testimony would likely be harmful as opposed to beneficial. There was no lack of evidence placing defendant at the New Year's Eve party and with the many witnesses who testified at one time or another during the evening. In fact, the defendant himself admitted that he fired the assault rifle at one point during the evening. Again, the issue was the defendant's location during the driveby shooting. The defense attempted to place the blame on Flaco or anyone else other than the defendant. However, there was no evidence of the defendant's innocence, other than the strategy to shift the blame. Dallas Nacoste was not called to testify because his credibility was even lower than other witnesses and the defense was able to present other witnesses in an attempt to blame Flaco.

During trial, I requested that Robert Baldwin conduct a firearms examination. The trial court did not deny the request but said that it would not order the test and that I could talk to Robert Baldwin about doing the testing. During a break, I talked

3

to Robert Baldwin at length and Baldwin said that he did not know for sure about the shell casings unless he actually was able to replicate the shooting position and angles. I was concerned that if this testing was done, then the defense theory about the ejection pattern would be proved wrong. Also, the witness who talked about the position of the hand during the shooting was drunk at the time which would necessarily affect his view of the events. Therefore, I chose to attempt to impeach Baldwin during cross-examination rather than pursue the independent testing.

I wanted the jury to know that the defendant was not able to be paroled in a few years, so I didn't object to the parole charge given. The giving of a parole charge is a matter of strategy and I prefer that the jury be aware that the defendant has to serve at least 40 years before he was eligible for parole in the case he got a life sentence.

I have read the above statement and find it to be true and correct to the best of my knowledge.

_____
GERARD GUERINOT
Affiant

SWORN AND SUBSCRIBED before me, under oath, on this the 17TH day of May, 2002.

_____
NOTARY PUBLIC in and for the
State of Texas

ANDREA LEWIS
Notary Public, State of Texas
My Commission Expires
JUNE 18, 2002.

My commission expires: June 18, 02

4

Exhibit 14

No. 712607

THE STATE OF TEXAS

V.

ANTHONY MEDINA

IN THE 228TH DISTRICT COURT

OF

HARRIS COUNTY, TEXAS

### STATE'S RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY AND COURT ORDER

**TO THE HONORABLE JUDGE POE:**

COMES NOW THE STATE OF TEXAS, by and through her assistant district attorney, Steve Baldassano, and files this, The State's Response to Defendant's Motion For Discovery and Court Order.

1. All confessions, admissions and statements, oral or written, allegedly made by the Defendant, in connection with this offense with which the Defendant is indicted are listed in the Houston Police Department offense report and in written statements of witnesses, all being available for defense viewing in the state's open file. As of this date witness interviews are continuing and all statements made by the defendant relevant to this case will be placed in the state's open file as they are discovered by the state.

2. All confessions, admissions and statements, written or oral, made by the Defendant in this case, or any case, made to any law enforcement agency or Grand Jury or third party are available in the state's open file. The state's open file in this case does include offense reports from HPD concerning the defendant's statements in other crimes and many letters by the defendant to his friends as well as a written statement by Regina Juarez wherein she states that the defendant admitted doing the crime to her.

3. Denied by Court.

4. All photographs, drawings and charts made by the District Attorney's Office, including law enforcement agencies regarding this case will be made available in the state's open file as they are created in preparation for trial.

5. All photographs and photospreads (or photographs of photospreads) shown to witnesses by law enforcement are available in the state's open file.

6. The prior criminal records of other arrested or investigated as a potential suspect will be available in the state's open file.

7. No drug tests were administered to the Defendant after his arrest.

1963

8. All records and reports relating to the Defendant that are in possession of the state and cannot be gotten by defense subpoena are available in the state's open file.

9. The prior criminal record of all DA witnesses are available in the state's open file.

10. All documents, papers, books, accounts, letters, objects, and tangible things which were found on the Defendant, in his school, house and/or car, which are in the custody of the state are available for viewing in the Houston Police Department property room upon request for appointment with the state anytime before trial commences.

11. All exculpatory evidence will be made available in the state's open file, including exculpatory grand jury testimony.

12. All evidence tending to mitigate the defendant's guilt will be made available in the state's file, if and when it is discovered.

13. Statements of all witnesses, and information as to their full name and whereabouts, who gave information to law enforcement or the grand jury is available in the state's open file.

14. All search warrants or arrest warrants are available as public records from the District Court Clerk of Harris County, Texas. The names of all officers involved are listed in the HPD offense report contained in the state's open file.

15. The results of scientific tests including ballistics and fingerprints are contained in the state's open file.

16. Copies of all official police department records and reports, including witness statements are available for viewing in the state's open file.

17. All physical evidence held by law enforcement is available in the state's open file and at the HPD property room and firearms lab by appointment before trial.

18. All prospective state's witnesses have been listed in the state's subpoena list which is available in the state's open file and in the public District Clerks case records. The list will be supplemented as new witnesses are discovered.

19. No pen packets exist relevant to the defendant. All known judgements and sentences against the defendant are available from the District Clerk of Harris County under case numbers: 678640, 678641, 9421844, 9421845, 9421846 and 9421847.

20. Available in the state's open file.

21. Available in the state's open file.

**1964**

22. Available in the state's open file.

23. Available in the state's open file.

24. Available in the HPD report and written statements in the state's open file.

25. None known at this time. If inmates to whom the defendant has spoken to give information to the state it will be made available in the state's open file.

26. The names of witnesses who may be called to testify negatively regarding the defendant's reputation and the substance of their testimony are available under the punishment section of the state's open file.

27. The names of witnesses called for Rule 404 and 609 evidence are listed in the main HPD offense report relevant to this offense and also in a separate HPD offense report relating to a fights on Ingomar Way on December 31, 1995 and January 1, 1996, said fight involving the defendant and many others individuals. In addition, several HPD reports contained in the state's open file detail gang activity between the defendant's La Raza 13 gang and the intended victim's HTC gang. See also, #31.

28. A copy of the autopsy reports will be supplied to the defense along with this response.

29. The expert witnesses the state's intends to call at trial at this time includes:

Robert Baldwin- HPD firearms and ballistics expert.
Vladimir M. Parungao, MD- Assistant Harris County Medical Examiner
RL Collins- HPD fingerprint expert
JL Schraub- HPD fingerprint expert
MJ Faulhaber- HPD gang expert

All expert's reports, if they made a report, are available in the state's open file.

30. There have been no "deals" made to witnesses to testify for the state.

31. Extraneous offenses, wrongs, or bad acts committed by the defendant that will be used by the state are listed in the state's open file and include:

March 29, 1995 at 8:30am at 15431 Campden Hill (HPD #034703195). Four hispanic males spray the house with La Raza 13 graffiti and leave in a red convertible.

July 9, 1995 at 1:40am at 15431 Campden Hill (HPD #077962295) a molatov cocktail is thrown at the house and shots are fired.

December 8, 1995 at 10:05pm at 14600 Nelson (HPD #141119195) complainant believes the defendant shot at the house and the bullet fired was from the same gun that was used to kill David and Diana Rodriquez.

December 10, 1995 at 2:40pm at 5500 Grapevine (HPD #141750495 Dante and George Medrano say that the defendant and Robert Lucio shot at them.

December 17, 1995 at 11:30pm at 5600 Newquay (HPD #144588295) Jorge Santos is shot dead in a drive-by using the same gun as was used to kill David and Diana Rodriguez.

The prior fight and aggravated assault that occurred on December 31, 1995 and January 1, 1996 on Ingomar Way against Samuel Lopez and his friends wherein the defendant pointed a handgun at Lopez. Also on December 31, 1995-January 1, 1996 the inmate was in possession of an assault rifle at 4035 Highpoint in Houston. In addition, the state has many letters sent to and from the defendant that show his mental state and motive towards the intended victim Marco Martinez of the HTC gang and others.

Punishment evidence against the defendant includes the aforementioned cases listed discovery response under #19 and many incidences of vandalism and burglary as listed in the HPD reports and witness statements available in the state's open file.

The state's open file is available for viewing at any time prior to trial at the District Attorney Building, 210 Fannin on the 7th floor, Houston, Texas upon request and by appointment. The information and evidence held by HPD is available for viewing at the HPD ballistics lab and property room, also by appointment. Please call (713) 755-6132.


Respectfully submitted,


Steve Baldassano
Assistant District Attorney
Harris County, T E X A S

## CERTIFICATE OF SERVICE

I, Steve Baldassano, certify that defense counsel has been served a copy of this notice by sending same to John A. Millin III by certified mail to: 1001 Texas Avenue, Suite 500, Houston, Texas 77002 on the 25th day of June, 1996.


Steve Baldassano

**1966**

Exhibit 15

M J                          MASTER DISPLAY                    4,      X JJSGO40M

JUV.NO.    JUVENILE NAME           Q RACE  SEX   D.O.B.    VER  LVL   UN  JPO
0180491    JUAREZ, REGINA            L     F   03/09/80   Y    S     O   JPG
ADDRESS:  3511 DALMATION,HOUSTON,TEXAS   ZIP: 77045   REF: 04 1040
FAM.NO    COUNTY    KEYMAP    SCHOOL DIST STAT GRADE PROG    RELG    EMPL    LIV/W
          101       572P      300      50  AT  08   RA     NA      NE      LP
                    ATTN:         STAT: C              SSN# 457 89 7592
LEGAL PARENTS/GUARDIAN(LAST,FIRST,MID) ADDRESS                        PHONE
FATHER: JUAREZ, BENITO N.        3511 DALMATION, HOUSTON,TEXAS   434 2595
MOTHER: JUAREZ, NORMA            3511 DALMATION, HOUSTON,TEXAS   434 2595
OTHER:
RELATIONSHIP:      SSN# BF = 453 78 3278       =
LEGAL PARENTS MAR STAT: MT  EMPL STAT: FW  SUPP. SRC. INCOME: NA  # IN HOME: 05
       NOTES: FA'S WK # 497-7296


    ALIASES: (LAST NAME,FIRST NAME,MIDDLE INITIAL)
    1.                                2.
    3.                                4.
    5.                                6.
            U LAST UPDATE: 950519        OPR: M3P M


JMAS04 - ENTER=REF DISP,PF1=ID UPDATE,PF2=SERV DEL DISP,PF4=CRT ACT,PF6=REF SUM
JMAS10 - PF8=FAC HIST SUM
R J                          REFERRAL DISPLAY                   X JJSGO44M
JUV.NO. 0180491  REF NO: 1040  NAME: JUAREZ, REGINA
    REF DATE, AGENCY          LAST UPDATE, OPR          CLOSED,  LEVEL
    11/17/95    11             951120   Q M3P           11/20/95  S
DETENTION HISTORY:          SECURE    NON-SECURE   ----------INTAKE----------
ORIG DATE IN FINAL REL DAYS HOURS  DAYS HOURS    DECSN    DATE   LVL/UNT JPO
                                                 REC  11/20/95  S    O   JPG
            * * * * * * PETITION INFO * * * * * *      ---COURT---
    CIR PREP"D   STATUS   FILED   TYPE  NUMBER AMEND ALLEG     LVL/UNT JPO

             U                L.O.C. _    M V.O.P. N
    OFFENSE    DATE   KEYMAP INVEST NO      CO-RESPONDENT NAME           AGE
1. DSRUPT 10/19/95 572J 120379495   1. VASQUEZ, LIDIDA              16
2.                                  2. ROMERO, ERICA                15
3.                                  3. FARCIERT, NANCY              14
4.                                  4. CASTELAN, JANET              15
5.                                  5.
6.                                  6.
7.                                  COURT: RESULT  FINAL DESCN/SCHED DATE
8.
9.                                  PROBATION / INF. ADJ.:      -PROBATION-
10.                                     STATUS   BEGIN    END    LVL/UNT JPO
11.
PF1=ID UPDATE,PF2=SERV DEL DISP,PF3=REF ACT,PF4=COURT ACT,PF5=MASTER DISP
R J                          REFERRAL DISPLAY                   X JJSGO44M
JUV.NO. 0180491  REF NO: 1030  NAME: JUAREZ, REGINA
    REF DATE, AGENCY          LAST UPDATE, OPR          CLOSED,  LEVEL
    01/15/95    72             950517   Q F2M           05/16/95  C
DETENTION HISTORY:          SECURE    NON-SECURE   ----------INTAKE----------
ORIG DATE IN FINAL REL DAYS HOURS  DAYS HOURS    DECSN    DATE   LVL/UNT JPO
  01/13/95  01/25/95  11  21                     PIP  01/17/95  S   1   ANC
            * * * * * * PETITION INFO * * * * * *      ---COURT---
    CIR PREP"D   STATUS   FILED   TYPE  NUMBER AMEND ALLEG     LVL/UNT JPO
    01/17/95      F    01/20/95  D  00089291      TRTHR1      C   1   D3M
             U                L.O.C. _    M V.O.P. N
    OFFENSE    DATE   KEYMAP INVEST NO      CO-RESPONDENT NAME         07395 AGE
1. TRTHR1 01/13/95 493L 004983395   1.
2.                                  2.
3.                                  3.

```
     4.
     5.
     6.
     7.                    COURT: RESULT  FINAL DESCN/SCHED DATE
     8.                    313      RST    NOS    05/10/95
     9.                    PROBATION / INF. ADJ.:      -PROBATION-
    10.                    STATUS   BEGIN    END      LVL/UNT JPO
    11.
PF1=ID UPDATE,PF2=SERV DEL DISP,PF3=REF ACT,PF4=COURT ACT,PF5=MASTER DISP
R J                      REFERRAL DISPLAY                    X JJSG044M
JUV.NO. 0180491  REF NO: 1020  NAME: JUAREZ, REGINA
     REF DATE, AGENCY          LAST UPDATE, OPR         CLOSED,  LEVEL
     06/29/94    11            940728   Q V2C          06/29/94    S
DETENTION HISTORY:          SECURE     NON-SECURE    ----------INTAKE----------
ORIG DATE IN  FINAL REL  DAYS HOURS  DAYS HOURS     DECSN   DATE   LVL/UNT JPO
                                                    REC  06/29/94       S  JPG
              * * * * * * PETITION INFO * * * * * *            ---COURT---
  CIR PREP"D    STATUS   FILED   TYPE  NUMBER  AMEND  ALLEG      LVL/UNT JPO

                   U              L.O.C. _    M V.O.P. N
     OFFENSE    DATE   KEYMAP INVEST NO      CO-RESPONDENT NAME          AGE
  1. RUNWY1 05/04/94 572P  048611294  1.
  2.                                  2.
  3.                                  3.
  4.                                  4.
  5.                                  5.
  6.                                  6.
  7.                                  COURT: RESULT  FINAL DESCN/SCHED DATE
  8.
  9.                                  PROBATION / INF. ADJ.:      -PROBATION-
 10.                                  STATUS   BEGIN    END      LVL/UNT JPO
 11.
PF1=ID UPDATE,PF2=SERV DEL DISP,PF3=REF ACT,PF4=COURT ACT,PF5=MASTER DISP
R J                      REFERRAL DISPLAY                    X JJSG044M
JUV.NO. 0180491  REF NO: 1010  NAME: JUAREZ, REGINA
     REF DATE, AGENCY          LAST UPDATE, OPR         CLOSED,  LEVEL
     06/23/93    11            930624   Q SOS          06/23/93    S
DETENTION HISTORY:          SECURE     NON-SECURE    ----------INTAKE----------
ORIG DATE IN  FINAL REL  DAYS HOURS  DAYS HOURS     DECSN   DATE   LVL/UNT JPO
                                                    NJJ  06/23/93       S  JPG
              * * * * * * PETITION INFO * * * * * *            ---COURT---
  CIR PREP"D    STATUS   FILED   TYPE  NUMBER  AMEND  ALLEG      LVL/UNT JPO

                   U              L.O.C. _    M V.O.P. N
     OFFENSE    DATE   KEYMAP INVEST NO      CO-RESPONDENT NAME          AGE
  1. COLATE 06/03/93 531X  057665293  1.
  2. TICKET 06/03/93 531X  6840644    2.
  3.                                  3.
  4.                                  4.
  5.                                  5.
  6.                                  6.
  7.                                  COURT: RESULT  FINAL DESCN/SCHED DATE
  8.
  9.                                  PROBATION / INF. ADJ.:      -PROBATION-
 10.                                  STATUS   BEGIN    END      LVL/UNT JPO
 11.
PF1=ID UPDATE,PF2=SERV DEL DISP,PF3=REF ACT,PF4=COURT ACT,PF5=MASTER DISP
R J                      REFERRAL DISPLAY                    X JJSG044M
JUV.NO. 0180491  REF NO: 1010  NAME: JUAREZ, REGINA
     REF DATE, AGENCY          LAST UPDATE, OPR         CLOSED,  LEVEL    0736
                                        Q
DETENTION HISTORY:          SECURE     NON-SECURE    ----------INTAKE----------
ORIG DATE IN  FINAL REL  DAYS HOURS  DAYS HOURS     DECSN   DATE   LVL/UNT JPO

              * * * * * * PETITION INFO * * * * * *            ---COURT---
  CIR PREP"D    STATUS   FILED   TYPE  NUMBER  AMEND  ALLEG      LVL/UNT JPO
```

Exhibit 16

STATE OF LOUISIANA      §

§      Re: Anthony Medina

PARISH OF ORLEANS      §

## AFFIDAVIT OF CLIVE A. STAFFORD SMITH

BEFORE ME, the undersigned authority, personally appeared Clive A. Stafford Smith, who stated the following:

1.      I am an attorney licensed to practice in the States of Louisiana, Mississippi, and Georgia. I am also a member of the bar of the Supreme Court of the United States, as well as various lower federal courts, including the Fifth Circuit and the Eastern District of Texas.

2.      I graduated from Columbia Law School in New York. For each of the three years of law school I was named a Harlan Fiske Stone Scholar, an academic distinction. I was an editor for the Columbia Human Rights Law Review.

3.      For roughly seventeen years, my practice has been almost exclusively devoted to the defense of indigent persons either sentenced to death, or under threat of the imposition of the death penalty. At various stages of the process I have been involved in well two hundred capital cases. I have been involved in capital cases in several states, including Alabama, Florida, Georgia, Louisiana, Mississippi, Ohio, Texas and Virginia.

4.      Over the years, I have been involved in dozens of cases at the trial level. Due to vigorous investigation and pre-trial litigation, the majority of these cases settle prior to trial. Over twenty have gone through to a verdict, including but not limited to: *State of Mississippi vs. Randy Bevill* (Circuit Court of Lee County, Mississippi) (retrial after conviction and death sentence reversed; not guilty of capital murder; guilty of non-capital murder); *State of Mississippi v. Sabrina Butler* (Circuit Court of Lowndes County, Mississippi) (child killing case, retrial after death sentence imposed; acquitted); *State of Louisiana v. Joel Durham* (Jefferson Parish Criminal District Court, Louisiana) (unanimous life verdict); *State of Alabama v. Olin Grimsley* (Henry County Circuit Court, Alabama) (first jury was hung 7-5 for acquittal; second jury found Mr. Grimsley not guilty of murder, but guilty of armed robbery; that conviction was subsequently reversed for a new trial that was conducted by other counsel); *State of Louisiana v. Christopher Guillory* (Calcasieu Parish Criminal District Court, Louisiana) (triple homicide, videotaped, boastful confession with prior violent criminal history; life verdict); *State of Louisiana v. Carl Hall* (Orleans Parish Criminal District Court, Louisiana) (retrial after conviction and death sentence reversed; acquitted of murder, convicted of manslaughter); *State of Mississippi v. Justin Shaffer* (Circuit Court, Mississippi) (not guilty of capital murder; guilty of simple murder); *State of Mississippi v. Samuel Johnson* (Covington/Warren Circuit Courts, Mississippi) (resentencing trial in murder of a police officer by a convicted felon; life); *State of*

*Louisiana v. Clarence Smith* (Orleans Parish Criminal District Court, Louisiana) (retrial after conviction and death sentence reversed; mistrial on first retrial, acquittal on second); *State of Louisiana v. Allison Scott Thibodeaux* (Calcasieu Parish Criminal District Court, Louisiana) (double mutilation homicide with the accused captured at the crime scene; three prior child molestation convictions; unanimous life verdict). Only once in the past decade has the jury returned with a death sentence. In that case, my client had allegedly killed a small child, had two prior convictions for child molestation, and in one statement admitted to molesting 250 other children. The conviction and death sentence in that case has recently been vacated.

5.      I have been the author or co-author of, *inter alia*, the following publications: Paduano & Stafford Smith, *Deathly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty*, 18 Colum. Hum. Rts. L. Rev. 211 (1987); Paduano & Stafford Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases*, 43 Rutgers L. Rev. 281 (1991); Stafford Smith, *The Death of Fairness*, 31 Houston L. Rev. 1166 (1994) (ABA presentation); Stafford Smith & Goodman, *Forensic Hair Comparison Analysis: Nineteenth Century Science or Twentieth Century Snake Oil?*, 27 Colum. Hum. Rts. L. Rev. 227 (1996); *Defending a Capital Case in Louisiana* (1987, 1994 eds.); *Mississippi Death Penalty Defense Materials* (four editions, most recently in 1991); *Defending a Capital Case in Georgia* (two editions).

6.      I have taught continuing legal education programs in capital litigation in, *inter alia*, Arizona, Colorado, California, District of Columbia, Florida, Georgia, Indiana, Louisiana, Massachusetts, Mississippi, New York, North Carolina, Ohio, Oregon, Tennessee, Texas, and Virginia.

7.      In addition to litigating a multitude of cases in the lower courts, I have secured certiorari review in four capital cases. *See Johnson v. Mississippi*, 486 U.S. 578 (1988) (unanimous reversal of death sentence for improper consideration of invalid prior conviction); *Shell v. Mississippi*, 498 U.S. 1 (1990) (unanimous reversal of death sentence for invalid consideration of aggravating circumstance); *Minnick v. Mississippi*, 498 U.S. 146 (1990) (reversal of conviction for violation of the Fifth Amendment right to counsel); *Lonchar v. Thomas*, 517 U.S. 314 (1996) (certiorari granted moments before petitioner's scheduled execution, resulting in unanimous decision in favor of the death sentenced inmate). In each case that was ultimately argued, because my primary focus is on the trial level, I secured a major law firm to perform that function. In each case, the Supreme Court ruled in favor of the death-sentenced Petitioner.

8.      In preparation for any criminal case, the defense attorney must ensure that a thorough independent investigation is conducted concerning the allegations against his client. This is particularly true in a capital case, where the stakes are so high and the punishment so final, and where the investigation must be far more pro-active, since the defense must evaluate the client's entire life for possible presentation at the penalty phase.

Page 2 of 8

9.  To give one example, I represented Sabrina Butler in the retrial of her capital case in Mississippi. At her first trial, her counsel had performed little or no investigation, had not even met with the State's experts let alone consulting with any independent defense experts, and had prepared very little evidence for the penalty phase. Not surprisingly, she was convicted and sentenced to death. At her retrial, we won an acquittal because we were able to demonstrate that no crime had been committed. First, we did extensive medical research of our own, which raised a strong probability that Ms. Butler's infant son had probably died of natural causes. Second, we conducted a thorough investigation of the facts, which suggested that if the child had not died of natural causes, the person who may truly have struck the child could have been an abusive boyfriend. Third, we consulted with our own experts to learn the correct questions to ask of the State's experts. Fourth, I personally interviewed the prosecution's experts and, by sharing the information we had uncovered, was able to persuade one of them that a grave miscarriage of justice might have occurred. Ms. Butler had spent six years on Mississippi's death row awaiting execution and one might have expected a new conviction if the same evidence had been presented in her second trial. In my opinion, this outcome would not have been possible without extensive pre-trial investigation. No matter how bleak a case may seem, it is the defense counsel's obligation to investigate each of the state's allegations.

10. Ms. Butler's case is only one such example. There have been a number where thorough investigation after an initial conviction has resulted acquittal or in a lesser verdict on retrial, illustrating dramatically the need for such investigation. At the same time, of course, an effective investigation will generally spare the client from spending years on Death Row in the first place. By "effective investigation," I mean an investigation that encompasses every witness known to the defense, and every expertise that may make a significant difference at trial.

11. In preparation for any capital trial, the defense attorney must be focused on the punishment phase as well as the guilt-innocence phase, especially when the evidence of the defendant's guilt is strong. Extensive investigation into mitigating circumstances is essential if any attorney is to render competent representation at the punishment phase. Evidence of child abuse and neglect is typical mitigation evidence that my legal team seeks in all of our capital cases.

12. Even seemingly hopeless cases are very winnable if the defense does its job properly. For example, one of my clients, Alvin Scott Loyd, had been sentenced to death twice before for kidnaping, raping and drowning a three year old girl. His second death sentence was reversed because of ineffective assistance of counsel, since his lawyers failed to investigate and present his mental health history. Evidence of abuse, or of mental illness, is not always apparent, and a lawyer cannot expect a client to speak of such taboo subjects freely. The lawyer must therefore spend sufficient time with the client and his family to ensure a degree of trust. In Mr. Loyd's case, we were finally able to persuade the family

Page 3 of 8

to be honest about the horrific abuse that he had suffered.  We therefore presented a compelling case and his life was spared.

13.   Another example would be Allison Scott Thibodeaux.  Mr. Thibodeaux was convicted of the mutilation and murder of two women.  The State presented evidence that Mr. Thibodeaux had cut off the breasts of one of the women, and stuffed one in her mouth and the other in her vagina.  The State also presented evidence that the crime had been witnessed by one of the victims' nine-year-old daughter.  At the punishment phase, the State introduced evidence his criminal record, including evidence that Mr. Thibodeaux had previously molested three girls.  In mitigation, my legal team conducted extensive investigation and presented over fifteen witnesses who testified about the physical and sexual abuse Mr. Thibodeaux had suffered during his childhood (including his rape as a young boy), his involvement in church, good deeds performed for friends and neighbors, and his record in jail as a model prisoner.  The jury voted unanimously to sentence Mr. Thibodeaux to life in approximately one hour.  In my opinion, my legal team's investigation and presentation of mitigating evidence was absolutely indispensable in securing a life verdict.

14.   These examples of investigative work in both phases of a capital trial are not by any means exceptional.  The standards for even minimally adequate representation in capital cases have always required defense counsel to investigate the state's charges and the defendant's background and character.

15.   I have attended and taught hundreds of hours of CLE classes and other workshops all over the country on the subject of trying capital murder cases.  Whether geared toward beginners or established capital counsel, every conference, workshop and class places a major focus on investigation.

16.   I have been asked to review certain materials, and provide an expert opinion as to the performance of Mr. Medina's counsel in his capital trial.  I do not do this lightly, and I do not make comments that are intended in any way personally.  A conscientious and decent person may sometimes, through force of circumstances or decisions that are unwisely made, provide ineffective assistance of counsel to his or her client. *See Curry v. Zant*, 371 S.E.2d 647, 649 (Ga. 1988) ("Conscientious counsel is not necessarily effective counsel.").  That said, I have been provided with records concerning the caseloads and timesheets of the legal team who represented Anthony Medina in his 1996 capital murder trial in Harris County, Texas.  Based on the information I have been provided, it is my expert opinion that the assistance provided to Mr. Medina fell below the level of reasonable effective counsel during both phases of his trial.  The reasons for this conclusion include those set forth below.

17.   The most striking indication of ineffective assistance in this case is the overwhelming caseloads of both trial counsel.  In my opinion and based upon my experience, trial

counsel could not possibly have provided effective assistance in the time provided.

18.   Mr. Guerinot and Mr. Millin agreed to bring Mr. Medina's case to trial only six months after their appointment. They were appointed on January 16, 1996 and Mr. Medina's trial began on July 15th of the same year. Based upon my experience, it generally takes approximately of 600 hours of attorney time to prepare for a capital trial, depending on the complexity of the case. On top of this, there must be a thorough investigation, which adds significantly more preparation time.

19.   Further, Mr. Guerinot was apparently appointed in at least three other capital cases and four serious felonies prior to being appointed in Mr. Medina's case, and received four additional capital appointments and six additional felony appointments in the six months he was representing Mr. Medina. Astoundingly, he took three capital cases to trial in that six month period. It is by no means astounding – indeed, it is rather predictable, that all three resulted in a death sentence. Two other felony cases went through jury selection before a plea agreement was reached. In addition, Mr. Guerinot apparently handled numerous lesser criminal cases and served as the counsel for the City of Humble during this period. In my opinion and based on my experience, it would be impossible for any attorney to provide effective assistance to his clients and try four capital cases in a six month period, unless he had spent many, many months preparing each of the cases beforehand.

20.   Mr. Millin was also unreasonably burdened during the six months of his representation of Mr. Medina. Mr. Millin took two other capital cases (both ending in death sentences) and one serious felony to trial during that same time period. I understand that he also brought at least three serious felony cases to conclusion by plea agreement during this period. I have been informed that Mr. Millin's practice was not limited to criminal cases, and he also maintained a civil caseload. I also understand the Mr. Millin was suffering from cancer during the trial and died only eight weeks later. Under such circumstances, it is unreasonable to suppose that Mr. Millin could have provided Mr. Medina with effective representation.

21.   I have been provided several excerpts from Mr. Medina's trial. Trial counsel begins various cross-examinations by confirming with the witness that they have never met with the defense team. This, in combination with the defense investigator's fee statement, makes clear that the defense team spoke with only three of the State's 20 witnesses prior to trial. Defense counsel are obligated to at least attempt interviews with all significant state's witnesses. This is the most basic trial preparation. Defense counsel for Mr. Medina announced ready for a capital trial in which they had not interviewed more than a fraction of the state's witnesses who were actually called, and an even smaller percentage of persons who knew about the case.

22.   Nor did counsel apparently collect records or even visit meaningfully with their client in preparation. It is apparent on the face of the transcript that defense counsel did not secure

copies of their own client's criminal history and jail records.

23.   For example, evidence of other bad acts is often crucial to a capital trial. Vigorous investigation is extremely important. I am in the middle of preparations for a capital trial now where the State is seeking to introduce such evidence. We have thus far proven that the alleged rape simply never happened, and are well on the way to proving that the prior drive-by shooting was an act of self-defense. This is a result of vigorous investigation, where my investigator has spoken with every person we could concerning the prior allegations. In a case where life is at stake, one's client (along with the Court and the jury) should expect nothing else. As a result, I anticipate that neither bad act will be admitted at the culpability phase of the trial.

24.   In Mr. Medina's case, by contrast, during the culpability phase of the trial, evidence of another, similar, crime was admitted apparently for the purpose of showing pattern. However, Mr. Medina's records indicate that he was in jail at the time of this prior crime. Defense counsel allowed three witnesses to testify about this prior crime before he even made mention of the impossibility of Mr. Medina's involvement. Defense counsel's surprise as he learns, in open court, that Mr. Medina could not possibly have committed the prior crime, confirms that he did not conduct any document collection in preparation for this case and did not adequately interview their client.

25.   It is apparent from the affidavit of trial counsel and the time sheets of the investigators that no member of the defense team made any effort whatsoever to investigate the forensic evidence in this case. In my opinion and from my experience, this failure to even seek expert advice on the forensic evidence could not have been a strategy on part of trial counsel, as counsel could have chosen not to use the results if necessary, and constitutes performance below the standards of practice. Where defense counsel knows that the State will present scientific evidence, counsel is obliged to make some effort to meet that evidence. Minimal standards would require counsel to consult with a defense expert to ascertain whether the state's methods were accepted in the field and whether additional testing might be fruitful.

26.   The fee statement of investigator John Castillo, together with the impossible caseloads of the two attorneys, and the evidence that the attorneys did not themselves meet witnesses or collect documentary evidence, suggest that the only investigation into Mr. Medina's case was the thirty hours performed by Mr. Castillo's office. This fact alone demonstrates that the preparation for Mr. Medina's trial was inadequate, so far below the required standards of practice among capital defense counsel that he was clearly denied effective representation.

27.   Time sheets indicate that the investigators were not hired until April 15, 1996 and apparently did not interview any witnesses outside Mr. Medina's family until July 10, 5 days prior to trial. A notation on the time sheets indicates that trial counsel did not even

ask the investigators to start looking for penalty phase witnesses until July 15th, the day voir dire began. All of this is unconscionable. The defense cannot expect to secure the trust of witnesses, and develop the theory of the defense at both phases, without more preparation. Counsel cannot properly voir dire the jury without knowing what the defense presentation will look like at both phases, since counsel must ask questions that identify jurors sympathetic with the themes that the defense will present.

28.  I have read an affidavit by Mr. Medina's father indicating that the family took the initiative to round up punishment and culpability phase witnesses themselves and transport them to the courthouse. I have read affidavits from Mr. Medina's mother, Verlan Pegues, David Castro, Sherry Grein and Eva Uribe who all state that Mr. Medina's attorneys first spoke with them about their testimony shortly before being called to the stand. Moreover, they did not discuss the content of their testimony other than to say they would be asked about Mr. Medina's childhood.

29.  This is very disturbing. It is totally unfair to put a witness on the stand in any criminal case, let alone at the penalty phase of a capital case, without explaining what the procedure is, and the boundaries of the witness' permissible testimony. Counsel should not tell the witness what to say (other than to admonish him or her to tell the truth), but counsel should always learn what the witness has to say, in order to ask the right questions, and facilitate a (generally nervous) witness giving the most complete testimony possible. If counsel fails to do this, it is highly improbable that the witness will provide the kind of humanizing stories that will save the client's life.

30.  It is impossible to adequately prepare and present the type of punishment phase case necessary in a capital trial without a detailed and prolonged investigation into possible mitigation. In my opinion, preparing a death penalty punishment phase case through brief interviews with witnesses immediately before they take the stand falls well outside the reasonable standard of practice of a capital attorney.

31.  During closing argument in the punishment phase, defense counsel attempted to convince the jury that Mr. Medina would not be a danger in the future by pointing to his lack of disciplinary problems while incarcerated. The trial judge would not allow the defense to make this argument because they had failed to introduce any evidence. Easily obtainable jail records would have shown that Mr. Medina was not a "Violent/Aggressive" management concern, not a "Known Management Problem", nor an "Escape Risk." These same records would have shown that Mr. Medina had been placed in general population on February 28, 1996 where he remained throughout his trial. This kind of evidence has been sanctioned by the United States Supreme Court, *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), and its effective presentation can be crucial in a capital case. In addition to the specific legal questions posed by Texas law, it answers the moral question, "why do we have to kill Mr. Medina?" Where the evidence is available, as it apparently was here, it is critical that counsel present it, and ask

the jury if Mr. Medina is not going to be a risk of future danger, then what is to be gained by taking his life?

32.     All in all, the facts compel the conclusion that the assistance provided to Mr. Medina by counsel fell below the minimum standard required of reasonably effective lawyers.

Further affiant sayeth not.

I have read the above statement and swear, under the pain and penalty of perjury, that it is true and correct to the best of my knowledge.  I give this statement of my own free will.

CLIVE A. STAFFORD SMITH

SWORN AND SUBSCRIBED TO BEFORE ME THIS _____ DAY OF NOVEMBER, 2001.

Notary Public

Page 8 of 8

# Exhibit 17

7-18-96  <u>Anthony Medina</u>
HCJ   visit ( 9:15 - 10:15 Pm)

Showed Anthony 2 letters to
Luisa, 2 letters to Matthew
(2ypa).

Talked re admissibility of
letters at trial : (1) admissible
if a witness could test.
knows his handwriting , etc.
(2) Q re "interpretation"

Luisa had baby July 14 -
C section.

Luisa - in Mexico at time of shoot
Shelly - hesitant , Flaco's ex-g.frian
        Flaco calling re to change
        story
Thomas Flores - w/ Δ whole night,
                with Δ at Candyman's
                when Samir & Flaco
                left in truck
Jessica Ramirez - willing to talk,
                tell truth
Flaco &   Alex Perez - cousin, w/ Δ that night
James  {  China - Veronica Ponce - { charged w/
told  {   India -Scharlene Pooran - { Agg. Perjury
China &                                    0446

Texas Syndicate
Mexican Mafia

\* Shelly — Flaco's ex-g. friend; told
\* sis.        ~ he did it, he afraid

\* Cleo — scared ; Flaco told her
721-1374         he did it
(also Kathy Ponce — Δ's g. friend at time)
China — w/ Δ    } at Candyman's house
India — w/ Δ    } when James &
Veronica Ponce        Flaco , 2:00 AM —
Scharlene Pooran       2:15 — had AK-4
                       w/ them in car —
                       James's blue
                       Park Ave., one of
                       back window's
                       broken out — not su
                       it  broken ou
                       before or after
                       fight

                       —sister; Flaco told sis.
                       he (Flaco) did it; was o
                       run from Juv. faciliti
                       no d.p. for juvenile

Dallas          — FBCJ on other charg
                Burg. Hab. case; former
                juv. charges ; Flaco tol
                him he did it, tol
                HPD Flaco did it;
                knows who burred

0447

buried post Δ's arrest

Δ had no long black coat -
sis. + others could test. that
T-shirt b/c was hot that
night.

Pam — said James told her
he was w/ Flaco, etc.

Δ $ dropped off  4:00 - 4:30 Am

would
have   } Veronica Rodriguez — knows personally,
been     best friend's  ex- g.friend;
1 Def    wouldn't be shooting up her house.
→ " 2 males in car " only

FBCJ  (Alex) $ Dallas — bench warrant Dallas
→ due to get out July 22 - talk to
Alex $ Dallas

Call Angie  re other neighborhood
gang members  re what they
know  re incident.
0443

James
is   } Δ in truck, not in car w/
Flaco's  James, as James says. James says
cousin  doesn't know Δ, had gun,

happened after people dropped
off (GS may/~~have~~ would
have sobered up).

7-8, 18-packs Buds,
smoking weed

was smoking embalming fluid —
reason put on anti-depressants

AK-47 — 39-round banana clip;
rifle made the rounds; semi-auto
HPD supposedly ~~found~~ dug up
2d AK-47.

7:00 AM Δ went to FBC to pick up
213?, whose car had broken down.

Δ says didn't kill 2 C/Ws,
doesn't want to PG to
something he didn't do, would
not accept to plea bargain
for life on cap murder.

0449

Exhibit 18

State of Texas    )
                     )    In Re Anthony Shawn Medina
County of Liberty  )

## Affidavit of Dallas James Nacoste

    I, Dallas Nacoste, state that the following is true and correct to the best of my knowledge:

1.  My name is Dallas Nacoste. I am over 18 years of age and competent to give this statement. I am presently incarcerated at the Hightower Unit near Dayton, Texas for a robbery conviction in 1997.

2.  On New Year's Eve 1995, I met Slim [Alex Perez] and White Boy Gary [Gary Graham] in Ridgemont. We went and picked up Tony and his sister and dropped his sister off at her house and then went to Candyman's [Candelario Guerrero] to a party. We got there about nine or so. We were drinking and smoking and hanging out. Candyman had a boat in his back yard and people were in and out of that during the night.

3.  Close to midnight or a little after, Flaco [Dominic Holmes] showed up with Jamie Moore. Flaco told me that he knew where some members of the gang HTC [Houston Town Crips] were at and he wanted to do something. He told me he felt like he wasn't getting the same respect I was and he wanted to do a hit. He explained that he had seen some HTCs over at this house where we knew a HTC's baby's momma lived. I told him that no HTCs lived over there but he said he was sure he saw some hanging out in front of the house.

4.  I was higher up in the gang than Flaco was and nothing could go down unless a higher up gave permission. Robert Lucio was in charge but he wasn't there so Flaco was asking me about doing the driveby. I told him I didn't want to do it and I told him to go do it. I told him to go by the house but if he didn't see the HTCs he shouldn't do anything because the laws would come down hard on us if they weren't gang members. He said he was sure they were HTCs in front of the house.

5.  Flaco and Jamie left in Jamie's car after 2 a.m. and took the SK [semi-automatic rifle] with them. When they came back to the party a short while later, Jamie wanted to make sure that all the spent casings were out of his back seat. I left the party after that because I had a curfew because of .

my probation.  I told the police in my statement I left at 1 but I was actually there longer than that.  I was on probation at that time and I was afraid they would revoke my probation if they knew I was out past my curfew.  Smurf [James Palladina], Pelon [Johnny Valadez], and a guy called Chino took me home.

6. After the crime, I was detained and questioned by police but never charged.  The cops picked me up from school and took a statement from me.  The tall detective told me that there was an eyewitness to the drive-by who said a black man did the shooting.  I told them it wasn't me and I didn't want to talk to them anymore.  They told me if I would give them a statement they would drop the assault charges against me. They also said that they were only interested in getting the shooter not anyone else.  So I told them the truth which is that Flaco was responsible.

7. After I signed my statement they dropped me off at China's [Veronica Ponce] Aunt Cleo's house.  Scharlene Pooran and China were at Cleo's when I got there.  Jamie and Flaco showed up and I went with them to Regina Juarez's house where we met a couple of his cousins.  Flaco told me he had messed up. He said that he didn't know how many people he had shot but he did see two or three fall.  I told him it might be a good idea if he left town for a while.  I also told him that the detectives said they were looking for a black man and me and him were the only ones in the gang.

8. He told me he was mad at Tony because Tony was trying to take control of the gang and that Tony was just interested in making money.  Flaco said that Tony would be a good person to blame because he was known and had a rap sheet. He said that Pelon already knew what to say and if I talked to the cops I was supposed to say Tony did it.

9. We went to meet Pelon at a bar by his apartments.  Flaco talked to Pelon about setting up Tony and Pelon asked me to say that he wasn't with me, Chino and Smurf.  I told Flaco that the leaders would have to vote on what to do.  That's when Flaco said he would kill me, Pelon and anybody else that wouldn't help him.  I told him I didn't want anything else to do with it and I wouldn't say anything.

10. The following weekend, the police came to talk to me again. I told them the truth which was the same thing I told them before.  They didn't write that down and I didn't have to sign anything that time.

11. I was at Regina's house the night after she testified in

court.  She was bragging to me about how well she handled herself on the stand and how she helped "fuck over" Tony.

12.   Tony's lawyers or investigators never talked to me on any occasion about his case.  I've always told anyone who would listen that Tony was innocent and I would have told them if they had asked me.  If they had asked I would have testified truthfully.  I was on probation at that time so I definitely would have appeared if I had been subpoenaed.

13.   I understand I am giving this affidavit to members of Tony's defense team who are neither from law enforcement nor the prosecutor's office.  I understand that they represent Tony's interests not mine and cannot give me legal advice.

        I have read this affidavit.  I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.


                                        _____
                                        Dallas Nacoste



Signed and sworn before me this  _14th_
day of  _SEPTEMBER_, 2001.

_____
Notary Public

My commission expires:_____


J.S. FITZHUGH
Commission Expires 07-30-2003

Exhibit 19

State of Texas            )
                          )        In Re Anthony Shawn Medina
County of Harris          )


Affidavit of Naomi E. Terr


I, Naomi E. Terr, state that the following is true and correct to the best of my knowledge:

1.   My name is Naomi E. Terr.  I am over 18 years of age and competent to give this statement.  I am currently completing a two year fellowship at Texas Defender Service.  I am licensed to practice law in the State of Texas.

2.   On November 12, 2001, I accompanied Morris Moon, attorney at law, to the law office of Gerard Guerinot.  The purpose of the meeting was to discuss Anthony Shawn Medina's capital case. Mr. Guerinot represented Mr. Medina at trial.

3.   I distinctly recall that during the meeting with Mr. Guerinot, Morris Moon asked Mr. Guerinot whether the name Dallas Nacoste sounded familiar.  Mr. Guerinot stated that he did not recall anyone by the name of Dallas Nacoste.

4.   After Mr. Guerinot indicated he had no recollection of anyone by the name of Dallas Nacoste, Mr. Moon presented Mr. Guerinot with a pre-trial Houston Police Department offense report which contained information regarding Dallas Nacoste, as well as a pre-trial statement by Dallas Nacoste. Mr. Guerinot reviewed the documents.

N.T.

5.   After reviewing the documents pertaining to Dallas Nacoste, Mr. Guerinot reiterated that the name Dallas Nacoste did not sound familiar.  He also stated that as far as he could remember, he had never seen the documents Mr. Moon brought to the meeting.


I have read this affidavit.  I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.


_____
Naomi E. Terr



Signed and sworn before me this 11th day of July, 2002.


_____
Notary Public

My commission expires:_____



Exhibit 20

State of Texas      )
                     )       In Re Anthony Shawn Medina

County of Harris     )

## Affidavit of Carlos Demetris McNickles

I, Carlos McNickles, state that the following is true and correct to the best of my knowledge:

1.    My name is Carlos McNickles.  I am over 18 years of age, read and write the English language, and am competent to give this statement.  I presently live at 3118 Corksie, Houston, Texas 77051.

2.    On New Year's Eve of 1995 I was standing outside my house at 5442 Danfield Street in southwest Houston. At that time I was under house arrest and couldn't leave my house.

3.    I was talking to a friend of mine, Chasity Hamilton, on the phone.  It was well past 1 a.m.

4.    I saw a dark blue late 80's four-door Park Avenue-type car drive by my house.  I could see two black dudes were inside the car.  The driver was a black dude wearing glasses.

5.    It caught my attention because the black dude in the passenger seat was leaning out the passenger window shooting a rifle.  The car was driving east and the dude shot the rifle about 10 times.

6.    The rifle looked like an AK-47 and the dude was shooting it up in the air.  I told Chasity that some crazy fools were shooting a gun out of a car.

7.    Later I found out there had been a driveby shooting on Campden Hill the same morning I saw those two black guys in the car.  I also found out the two kids that were killed lived on my street and I knew their family.

8.   I was never contacted by the police, any investigators or
     lawyers before Mr. Medina's trial.  If someone would have
     contacted me or asked me to testify I would have told the
     truth.

     I have read this affidavit.  I affirm that it is true and
correct to the best of my knowledge, and I so state under the
pains and penalties of perjury.

_Carlos McNickles_

Carlos McNickles


Signed and sworn before me this 11th
day of November , 2001.

Notary Public



NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

My commission expires: 10-15-2005

# Exhibit 21

State of Texas          )
                        )          In Re Anthony Shawn Medina
County of Harris        )


### Affidavit of Chasity Hamilton


     I, Chasity Hamilton, state that the following is true and correct to the best of my knowledge:

1.    My name is Chasity Hamilton.  I am over 18 years of age, read and write the English language, and am competent to give this statement.  I presently live at 13107 Donegal Way, Houston, Texas 77047.

2.    On New Year's Eve of 1995 I was at home with my mother. During the day, I spoke several times with my friend Carlos McNickles.  He had wanted to come over to my house because he was alone for New Year's.

3.    I didn't have any transportation, so I couldn't go pick him up.  He was also on probation at the time and he couldn't leave his house after curfew.

4.    Early in the morning, on January 1st, 1996 Carlos and I were talking on the phone.  He was outside in the front yard. During the conversation, I heard very loud gun shots and I asked him what was going on.

5.    Carlos told me that "two niggers in a blue car just drove by" and that one of them was hanging out the window, shooting a rifle.

6.    He didn't describe the people in the car to me but he did say he did not know who they were.

7.   I was never contacted by the police, any investigators or
lawyers before Mr. Medina's trial.  If someone would have
contacted me or asked me to testify I would have told the
truth.

I have read this affidavit.  I affirm that it is true and
correct to the best of my knowledge, and I so state under the
pains and penalties of perjury.

_Chasity Hamilton_
----------------------------
Chasity Hamilton


Signed and sworn before me this _11-17-01_
day of _11-17-_ , 2001.   _Saturday_

_signature_
----------------------------
Notary Public

My commission expires: _11/05/05_



DANALYNN RECER
Notary Public, State of Texas
My Commission Expires
November 05, 2005

Exhibit 22

State of Texas          )
                        )          In Re Anthony Shawn Medina
County of Harris        )


### Affidavit of Jason Wade Crawford


I, Jason Wade Crawford, state that the following is true and correct to the best of my knowledge:

1.  My name is Jason Wade Crawford.  I am over 18 years of age, read and write the English language, and am competent to give this statement.  I presently live at 12240 Bob White, Houston, Texas 77053.

2.  I have known James Moore since about 1992 and I have known ˢᵉ Flaco [Dominic Holmes] since about 1994.  I met James Moore at Myer Park ~~because~~ He used to live about three townhomes away from where I did.

3.  I met Flaco in high school and he would also come over to Jamie Moore's sister Angie's house which was right across the street from me.

4.  I used to be in La Tercera a rival gang to LRZ [La Raza 13] and my nickname was "Stimpy".

5.  I remember Flaco always making remarks about doing something to HTC [Houston Town Crips] because they killed a guy called G-Money.  Flaco was real close to G-Money and he has a tattoo that he says is in memory of him.

6.  In late December of 1995, Flaco was telling me the LRZ [La Raza 13] gang had something planned for the HTCs.  He never told me what exactly what they were going to do or when it would happen.

7.  Shortly after New Year's, I was at Angie Moore's place.  Flaco brought a long rifle wrapped in a towel into Angie's apartment.  Jamie got mad at Flaco and told him to get the gun out of his sister's apartment.  Flaco said he was going

to take the gun to his place but Jamie didn't want to drive him.

8.   Jamie said he didn't want to get caught with a gun because he was on parole.

9.   I was never contacted by the police, any investigators or lawyers before Mr. Medina's trial.  If someone would have contacted me or asked me to testify I would have told the truth.

I have read this affidavit.  I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.



Jason Wade Crawford

Signed and sworn before me this 18ᵗ day of November , 2001.

Notary Public

My commission expires: 11/05/05

DANALYNN RECER
Notary Public, State of Texas
My Commission Expires
November 05, 2005

Exhibit 23

State of Texas          )
                        )          In Re Anthony Shawn Medina
County of Karnes        )


### Affidavit of Ricardo Villanueva


I, Ricardo Villanueva, state that the following is true and correct to the best of my knowledge:


1.  My name is Ricardo Villanueva.  I am over 18 years of age and competent to give this statement.  I am presently incarcerated at the Connolly Unit in Kenedy, Texas for an aggravated assault conviction in 1995.

2.  I was from southwest Houston and I used to be friends with many people associated with the La Raza 13 [LRZ] gang.

3.  In January of 1996, I was locked up in the Harris County jail in section 7-F-2.  Early in the second week of January, I called Regina Juarez collect at her house.  She answered the phone and accepted the charges.

4.  Regina asked me when I was going to get out and I said it *La Raza 13   RU* was probably not going to be for a while.  Regina told me that some guys in ~~HTC~~ had done a driveby shooting a couple of weeks ago and that Flaco [Dominic Holmes] had killed a HTC's [Houston Town Crips] girlfriend and her little brother.

5.  Regina told me that on New Year's she was with Flaco and they were going to some parties.  He was trying to get somebody to do a driveby with him.  She said that she didn't want Flaco going to jail so she and Flaco were saying that Creeper [Tony Medina] did it.

6.  During the conversation, she put me on speaker phone so I could talk to Flaco too.  Another guy was there too but I didn't know him.  Flaco said it was "some wild-ass shit." He said "we smoked those fools."  He said they were driving and seen them and just started "spraying".  He kept saying "that shit was cool."

7.  Flaco said he was going to put it on Creeper because he's always wanting to take credit for putting something together.  I told him he was stupid to talk about it on speakerphone to the Harris County jail but he said Creeper's already "labeled" by the police and they think he's a threat.

to society so they'll believe it.

8.  No lawyers or investigators ever came to talk to me before
    Mr. Medina's trial.  I would have testified truthfully if I
    had been subpoenaed.

9.  I understand I am giving this affidavit to members of Tony's
    defense team who are neither from law enforcement nor the
    prosecutor's office.  I understand that they represent
    Tony's interests not mine and cannot give me legal advice.

    I have read this affidavit.  I affirm that it is true and
correct to the best of my knowledge, and I so state under the
pains and penalties of perjury.

Ricardo Villanueva

Signed and sworn before me this 20
day of November, 2001.

Notary Public

My commission expires 11 2002

JESSE VASQUEZ JR.
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 08-24-2002

# Exhibit 24

State of Texas          )
                        )          In Re Anthony Shawn Medina
County of Anderson      )


<u>Affidavit of Raymundo Becerra</u>


    I, Raymond Becerra, state that the following is true and
correct to the best of my knowledge:


1.   My name is Raymond Becerra.  I am over 18 years of age and
    competent to give this statement.  I am presently
    incarcerated at the Beto Unit near Tennessee Colony, Texas
    on a murder conviction from 1999.  I read and write the
    English language.

2.   Regina Juarez was my girlfriend at one time.  We were
    together for about 1 year and then we broke up for about a
    month before Christmas 1995.

3.   We got back together in the middle of January 1996 and
    stayed together only about 2 weeks.  When we were apart I
    still went over there a lot and hung out with her mother.

4.   I was a member of the LRZ [La Raza 13] gang and knew many of
    the other members.  I knew a black guy who went by the name
    of Flaco.  His real name was Dominic Holmes.

5.   Flaco's cousin, Jamie Moore, would chauffeur Flaco around
    all over.  He would do that because Flaco was in the clique
    [gang] and Flaco's cousin wanted to get in.  Flaco was
    bringing him around, trying to introduce him to all of us to
    try to get him in.

6.   Flaco was trying to move up in the gang.  That was well
    known.  Flaco was trying to gain stripes or a purple heart.
    You get a purple heart for combat.

7.   In late 1995, there were several groups in the clique:
    Bellaire Boys, Post Oak, Varrio (Barrio) Treces, Ridgemont
    and Spring Branch.  You were usually in the group of the
    neighborhood where you were from.



8.   I was the leader of Barrio Treces and the area there.  I really had control over two groups.  Tony was the cruz [leader] for Ridgemont.  That was his group.

9.   Tony was having problems because he was running his mouth off about wanting to get out of the gang.  He was trying to step back and people were having problems about that.

10.  I didn't really care because my brother had done the same thing.  I understood that when you have other obligations, like a kid and a wife you need to step back.  But others saw it in a bad light.

11.  Flaco was running the shots when Tony wasn't around, like when Tony was in boot camp.

12.  When Juan Lucio stepped down as leader of LRZ, he was supposed to pick the new leader.  There were several people who it was supposed to be but he picked Robert Lucio instead.

13.  Robert hadn't been involved much and didn't know what he was doing.  A lot of people thought he was picked based on favoritism rather than who was best.

14.  Flaco and Robert were tight.  So when Tony was talking about stepping back, Flaco wanted to be the cruz.  He knew that when it came time to pick the cruz to replace Tony, Robert Lucio would back him.

15.  I was in Ft Worth on New Years Eve 1995 and I came back on January 2nd, 1996.

16.  I knew something was wrong because I lived in the neighborhood where the shooting happened and when I came back from Ft Worth, there were too many laws [police] in the neighborhood.  You know, when you live in a neighborhood you learn what is normal and when I came back there were too many laws around.

17.  I made some calls and found out what happened.  I called Regina and she started crying and told me what went on that night.  Regina was at a party on New Year's at "Candyman's house.  "Candyman's" first name is Candelario.  Candyman was also a "Cruz."  Regina gave me a list of names of who was there.

18.  According to Regina, Flaco and his cousin and some dude left the party with an AK.  I think Regina said the other dude



was Pelon [Johnny Valadez].  Regina told me the shooting was about revenge for the HTC [Houston Town Crips] murder of Hector.

19.  She said they used Flaco's cousin's car because it was camouflaged.  When I say camouflaged I mean that it's a car that people in the neighborhood don't know.  It's not a lowrider or something.  When a lowrider goes through the neighborhood, everybody looks and you know who the guy is.  Plus Flaco's cousin is a black guy, so people won't think much about him driving around and think he's in LRZ because LRZ has mostly Hispanic members.

20.  Later I went over to Regina's house and we were sitting outside in the yard talking.  She told me Flaco and his cousin Jamie had been there about 3 or 4 in the afternoon and Flaco had threatened her.

21.  Regina said she knew that Flaco had a pistol because she could feel it when he went up on her.  Flaco threatened her and said if she didn't follow what he said or if she opened her mouth about that night there will be a 187.  That means there is going to be a murder.  Regina said he told her if anyone picked up Flaco or his cousin, the plan was to blame Tony.

22.  Regina told me she was scared because Flaco told her that he would "Fuck up her world" and hurt her family.  Regina was crying and hugging me.  I told her not to worry about it.

23.  Every Friday we used to have a meeting of the cruces [leaders].  Not long after Tony was arrested, Flaco came to a meeting.  He was pressuring us to give him his stripes.  He thought he should move up in the gang because he got rid of a "sell out."  A "sell out" is someone who is disloyal to the gang because he wants to leave the gang.  Flaco thought he should get rewarded for getting Tony locked up.

24.  Flaco also talked about how he and Chino hid the weapon in a wooded are where India [Scharlene Pooran] lived.  I think he said his cousin Jamie was there too.  They asked India for permission to do this.

25.  I was never contacted by the police or any of Tony's defense lawyers or investigators.  If they had talked to me I would have testified truthfully at Tony's trial.



26.   I understand I am giving this affidavit to members of Tony's
      defense team who are neither from law enforcement nor the
      prosecutor's office.  I understand that they represent
      Tony's interests, not mine, and cannot give me legal advice.


      I have read this affidavit.  I affirm that it is true and
correct to the best of my knowledge, and I so state under the
pains and penalties of perjury.

_____   10-29-01
Raymundo Becerra

Signed and sworn before me this 29
day of October, 2001.

_____
Notary Public

My commission expires:_____

ROBERT J. BERG
NOTARY PUBLIC
STATE OF TEXAS
COMMISSION EXPIRES 06/04/2005

# Exhibit 25

Jims Information

1. Anthony S. Medina
2. Sergio Escobar
3. James Alfred Moore
4. Rocio Pedraza. No Crim. Hist.

0027

```
-[                                                                    •• QCOC ••
              C A S E   N U M B E R   I N Q U I R Y              PAGE 1
                     PERSONS CONNECTED WITH CASE
  CASE #  9421845O1010   FILNG-DT 031694 CRT 228  BOND       $0 CST A OST N CLI
  OFFENSE ARSON          NEXT-DT 052396 CAD PROB CCD  122294 INS MRP

                     NAME                          CON NTY    SPN     CLS SNU
  GUERINOT. GERARD W                               AAT  P  58571500  459 995
  BURDETTE. ROBERT N                               JGE  P  53368000  388 996
  SCOTT. ROBERT R                                  PAT  P  67912000  835 997
  COX. GREGORY L                                   PHT  P  54945200  551 998
  MEDINA. ANTHONY SHAWN                            DEF  P  01346564  996 999




  •• END OF DISPLAYS ••
  _ENTER FOR QSET_   PF1=QINQ    PF2=QCAS    PF3=QDOC    PF4=QMNQ
```

0028

```
=N                    JUSTICE INFORMATION MANAGEMENT SYSTEM        QBOI
                              BONDING INQUIRY                      PAGE:  1

NAME: MEDINA, ANTHONY SHAWN              RAC: W   SEX: M   DOB: 110574
JAIL LOCATION: 1301 CENTRAL DETENTION FACIL       OUT OF STATE: N
                              BOOKING INFORMATION
COI CRT  CASE NUMBER      BOND      CRTSET  BK DAT  CHARGE
         CASE NAME
003 228  071260701010     000000    052396  011296  CAPITAL MURDER (MULTI MURDER)
         MEDINA, ANTHONY SHAWN
003 228  071212601010     000000    052396  010796  AGG ASSAULT W/DEADLY WEAPON
         MEDINA, ANTHONY SHAWN
003 228  942184701010     000000    052396  012696  ARSON
         MEDINA, ANTHONY SHAWN
003 228  942184601010     000000    052396  012696  ARSON
         MEDINA, ANTHONY SHAWN
003 228  942184501010     000000    052396  012696  ARSON
         MEDINA, ANTHONY SHAWN
003 228  942184401010     000000    052396  012696  ARSON
         MEDINA, ANTHONY SHAWN
003 228  067864101010     000000    052396  012696  BURG VEHICLE

ADDITIONAL INFORMATION EXISTS - PRESS ENTER  PF1=QNAM  PF2=QCAS
```

0029

```
?" t
CASE 942184501010                                              •• QSET ••
NAME MEDINA, ANTHONY SHAWN                                     PAGE 1
COURT 228     OFFENSE ARSON

DATE SET TIME COURT DNC    REASON      RESULTS    FUT-DATE  COMMENTS    ATY SNU
052396  0900  228  MD  ADJUdoK (□J□$H□                                       90
041096  0900  228  MD  ADJUD-HEAR  RSET DEF REQ 052396                 Y  991
040996  0900  228  MD  ADJUD-HEAR  RSET BY AGRE 041196                 Y  992
022296  0900  228  MD  ARRAIGNMENT RSET BY AGRE 040996                 Y  993
020299  0900  230  TR  TRANSFER    TRANSFER                            N  994
012596  0900  230  MD  NON-TRIAL   TRANSFER     020299                 Y  995
122294  0900  230  MD  PSI HEARING SENT TO PROB          10YEARS PROB  Y  996
111594  0900  230  MD  NON-TRIAL   PLED GUILTY  122294                 Y  997
102894  0900  230  MD  NON-TRIAL   RSET DEF REQ 111594                 Y  998
091994  0900  230  AC  ASSN CRT AP RSET BY CRT  101994                 N  999



•• END OF DISPLAY ••
ENTER FOR QDOC   PF5=QMNQ   PF8=QCOC
```

0030

```
=N
                        C A S E   T R A N S A C T I O N S                    •• QDOC ••
CASE #  942184501010    FILNG-DT 091694    CRT 228   BOND      $0 CST A    PAGE 01
OFFENSE ARSON           NEXT-DT 052396    CAD PROB   CCD  122294  INS MRP PTSA N
NAME: MEDINA, ANTHONY SHAWN
 FOR NEW QDOC ENTER NEW CDI/CAS _____ PF10-03=QDOC

OF
09/16/94 COMPLAINT FILED    0132 230 ARSON                 LEVEL F2 09/16/94
09/16/94 BOND SET             $10000                     SNU: 999   09/16/94
09/16/94 REVIEWED BY                                                09/16/94
09/16/94 ORI AGENCY HOUSTON FIRE DEPARTM  OFFENSE NO: 941557        09/16/94
09/16/94 COMPLAINANT        DELLASALA, DANIEL                       09/16/94


01/25/96 ACI/R/PROB         TIME 1211 AMOUNT      $0     SNU: 998   01/26/96
01/25/96                    ACKNOWLEDGED BY SHERIFF                 01/26/96
01/26/96 SERVICE ACTIVITY   BY PLACING DEF IN JAIL     ON 01/26/96 01/26/96
01/26/96                    RECEIPTED BY CLERK                      01/26/96
09/16/94 CMIF               TIME 2210 AMOUNT  $10000    SNU: 999   09/16/94
09/16/94                    NOT ACKNOWLEDGED BY SHERIFF             09/16/94


 =N FOR NEXT PAGE. HIT CLEAR TO TERMINATE.
  PF1=QCOC  PF2=QSET  PF3=QCAS  PF4=QINQ(ORIG NAME)  PF5=QMNQ  PF6=NAM50
```

0031

```
       TONY                              D   M   M 110574
                                                                      01346564996
       MEDINA, ANTHONY SHAWN             D   M   M 110574
   □        d x                                                       01346564997
TO SEE MORE ALIAS NAMES USE THE ALIAS NAME INQUIRY
LAST ADDRESS: 5423    HEATHERCREST    HOUSTON    TX      PHONE
HGT: 509 WGT: 175 EYES: BRO HAIR: BLK SKIN: LBR BLD: MED SMT:


  •••••                     CASE INFORMATION                          •••••

  LN   CDI   CASE NUMBER  CRT CON FIL-DT  OFFENSE    NXT-ST S CST   INS DISPOSITION

  01   003 0712607010I0  228 DEF 011296 CAP MURDER 052396 J  A    FID
  02   003 0712I2601010  228 DEF 010696 ASSAULT    052396 J  A    FID
  03   003 9421847010I0  228 DEF 091694 ARSON      052396 N  A    MRP PROB-122294
PLU        WAIT  INHIBIT  SYSTEM
  04   003 9421846010I0  228 DEF 091694 ARSON      052396 N  A    MRP PROB-122294

  05   003 9421845010I0  228 DEF 091694 ARSON      052396 N  A    MRP PROB-122294

  06   003 9421844010I0  228 DEF 091694 ARSON      052396 N  A    MRP PROB-122294

  07   003 0678641010I0  228 DEF 102893 BURGLARY   052396 N  A    MRP PROB-012794

  08   003 0678640010I0  228 DEF 102893 BURGLARY   052396 N  A    MRP PROB-012794
```

0032

_ENTER FOR QSET_   PF1=QINQ   PF2=QCAS   PF3=QDOC   PF4=QMNQ
PLU                 INHIBIT   SYSTEM

•• QSET ••

NAME MEDINA, ANTHONY SHAWN
COURT 228    OFFENSE CAPITAL MURDER (MULTI MURDER)

| DATE SET | TIME | COURT | DNC | REASON | RESULTS | FUT-DATE | COMMENTS | ATY | SNU |
|----------|------|-------|-----|--------|---------|----------|----------|-----|-----|
| 052396 | 0900 | 228 | MD | ARRAIGNMENT | | | | | 994 |
| 041096 | 0900 | 228 | MD | ARRAIGNMENT | RSET DEF REQ 052396 | | | Y | 995 |
| 040996 | 0900 | 228 | MD | ARRAIGNMENT | RSET DEF REQ 041196 | | | Y | 996 |
| 022296 | 0900 | 228 | MD | ARRAIGNMENT | RSET BY AGRE 040996 | | | Y | 997 |
| 013196 | 0900 | 228 | MD | ARRAIGNMENT | RSET BY AGRE 022296 | | | Y | 998 |
| 011696 | 0900 | 228 | AC | ASSN CRT AP | P-C FOUND | 012396 | | N | 999 |

0033

```
CASE #  071260701010    FILNG-DT 011296   CRT 228   BOND      $0 CST A    OST J

OFFENSE CAP MURDER     NEXT-DT  052396    CAD       CCD          INS FID PTSA N

NAME: MEDINA, ANTHONY SHAWN
 FOR NEW QDOC ENTER NEW CDI/CAS _____ PF10-03=QDOC
                               $0                   SNU: 999   01/12/96
OF
01/12/96 REVIEWED BY        WILSON, TED                         01/12/96

01/12/96 ORI AGENCY HOUSTON POLICE DEPAR  OFFENSE NO: 119296    01/12/96
                            TIME 2027 AMOUNT       $0   SNU: 999  01/12/96
01/12/96 COMPLAINANT        CHISHOLM, HENRY F                    01/12/96

03/14/96 GRAND JURY ACTION  FID    03/14/96   G232        SNU: 999  03/14/96

03/14/96 GRAND JURY ACTION  ROTATION CRT 228  OFF FREQ   BND    $0 03/14/96

03/14/96 GRAND JURY ACTION  OFFENSE CAPITAL MURDER (MULTI MU LEVEL FC 03/14/96


=N FOR NEXT PAGE.  HIT CLEAR TO TERMINATE.
 PF1=QCOC  PF2=QSET  PF3=QCAS  PF4=QINQ(ORIG NAME )  PF5=QMNQ  PF6=NAM50
```

0034

```
N  ESCOBAR  ... ...261577
LINE                NAME              ... ... SEX DOB                    ...
01   ESCOBAR  RUDY                    ...  M   M 231577                  ...
02   ESCOBAR  SERGIO                  ...  M   M 231577                  ...
03   ESCOBAR  SERGIO                  ...  M   M 231577                  ...
04   ...      ...                     ...  M   M 231577                  ...
```

•• END OF DISPLAY ••
TO SEE NEXT PAGE PRESS ENTER - HIT CLEAR TO TERMINATE
ENTER LINE NUM FOR PERSON   PFI=QBDI

0035

```
 04            JUSTICE INFORMATION MANAGEMENT SYSTEM                    01
                        PERSON MASTER DISPLAY
ESCOBAR, SERGIO                                            SPN  01393623
                          RELATED CASE RECORDS - JZ
  LN  CDI CAUSE NUMBER CRT CON FIL-DT   OFFENSE NXT-DT S CST  INS  DISPOSITION
```

• CASES LISTED ARE ATTACHED TO AN INACTIVE SPN
• NO ADDITIONAL PERSON RELATED INQUIRIES AVAILABLE ON INDIVIDUAL AT THIS TIME
END OF RELATED CASE RECORDS
SELECT LINE NO. AND PRESS: PF4=QCOC  PF5=QSET  PF6=QDOC PF7=NAM50

0036

CASE 9424265010010                                                        ** QDEF **
NAME ESCOBAR, SERGIO                                                      PAGE 1
COURT 001    OFFENSE FAIL IDENT TO P-O-FUGITIVE

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 070894 | 0900 | 001 | MO | FEL PEND | GPE SENTENCE | | PJG | | 992 |
| 070694 | 0900 | 001 | MO | FEL PEND | RESET | 070894 | PJG | | 993 |
| 070194 | 0900 | 001 | MO | FEL PEND | RESET | 070694 | DRT | | 994 |
| 062994 | 0900 | 001 | MO | FEL PEND | RESET | 070194 | DRT | | 995 |
| 062394 | 0900 | 001 | MO | FEL PEND | RESET | 062994 | DRT | | 996 |
| 062294 | 0900 | 001 | MO | FEL PEND | RESET | 062394 | DRT | | 997 |
| 061794 | 0900 | 001 | MO | HEARING | RESET | 062294 | PJG | | 998 |

** END OF DISPLAY **
ENTER FOR QDOC    PF5=QMNQ    PF8=QCOC

0037

=N

CAUSE INFORMATION INQUIRY    PAGE 01
CASE # 942426501010    FILING DT 061594    CRT 001    BOND    $500 CST C    RST D
OFFENSE OTHER MISD    NEXT DT 070894    CMD OISP    FDD 070894    CMD MIN    CMD N
NAME  ESCOBAR, SERGIO
FOR NEW QDOC ENTER NEW CDI/CAS    _____    PF10-03=QDOC

OF
06/15/94 COMPLAINT FILED    1153    I FAIL IDENT TO P-O-FUGIT LEVEL MB 06/15/94
06/15/94 BOND SET    $500    SNU. 999    06/15/94
06/15/94 REVIEWED BY    06/15/94
06/15/94 ORI AGENCY HOUSTON POLICE DEPAR  OFFENSE NO. 066026294    06/15/94
06/15/94 COMPLAINANT    WILLS, MICHAEL    06/15/94

06/16/94 CMI/MIN    TIME 1621 AMOUNT    $500    SNU. 999    06/16/94
06/16/94    NOT ACKNOWLEDGED BY SHERIFF    06/16/94

06/16/94 C87 ACTIVITY    PC FOUND    STATUS    CFI  I  SNU. 999    06/16/94
06/16/94 C87 ACTIVITY    PROBABLE CAUSE FOUND    06/16/94

07/08/94 SENTENCED IN    COURT  I STARTING 07/08/94    SNU. 999    07/08/94
07/08/94 SENTENCE TO    10  DAYS  CONFINEMENT    07/08/94
=N FOR NEXT PAGE.  HIT CLEAR TO TERMINATE.
 PF1=QCOC  PF2=QSET  PF3=QCAS  PF4=QINQ(ORIG NAME )  PF5=QMNQ  PF6=NAM50

0038

```
*M  MOORE//////032773/
                         NAME                      // RHC SEX DOB                        QINQ
 LINE                                                                                 *N A CLS
 01     MOORE  JAMES ALFRED              0    N    M 032773              J: 45663895
 02     MOORE  JAMES ALFRED              0    N    M 032773              J: 45663896
 03     MOORE  JAMES ALFRED              0    N    M 032773              J: 45663897
 04     MOORE  JAMES ALFRED              0    N    M 032773              J: 45663898
 05     MOORE  JAMES ALFRED              0    N    M 032773              J: 45663899
```

```
** END OF DISPLAY **
TO SEE NEXT PAGE PRESS ENTER - HIT CLEAR TO TERMINATE
ENTER LINE NUM FOR PERSON   PF1=QBDI
```

0039

```
     MOORE   JAMES ALFRED            D   N   M 032773
     MOORE   JAMES ALFRED            D   N   M 032773                    JIFFPROC0091
     MOORE   JAMES ALFRED            D   N   M 032773                    JIFFPROC0091

LAST 100-2355  7350      SEX ALT MALE    MOORE UN   EXP 2355   HOME  713 725 5672
HGT  600 WGT  197 EYES  BRO HAIR  BLK SKIN  OBR BLD  MED SMT

*****                        CASE INFORMATION                            *****

LN  COI  CASE NUMBER  CRT CON FIL-OF OFFENSE     NXT-ST S CST  INS DISPOSITION

01  002 933416201010 008 DEF 062193 OTHER MISD 100793 O  C   MIN DISP-100793

02  003 062822201010 184 DEF 032892 BURGLARY    100693 O  C   MRP DISP-100693

03  003 056096001010 184 DEF 111390 BURGLARY    100693 O  C   MRP DISP-100693



TO SEE NEXT PAGE PRESS ENTER.  CLEAR TO TERMINATE.   PF7=QLET
PF4=QMNQ PF5=QBDI PF6=NAM50   LINE NO.==> ENTER=QCOC PF1=LBFD PF2=QSET PF3=QDOC
```

0040

CASE TRANSACTIONS                          PAGE 02

CASE # 058096001010    FI NO-GT 111390    CRT 184    BOND    $0 CST C    RT D

OFFENSE BURGLARY        NEXT ACT 100693    GRD DISP    TBD 100693    DEL MRP RT A N

NAME  MOORE, JAMES ALFRED
FOR NEW QDOC ENTER NEW CDI/CAS _____ PF10-03=QDOC    10/26/92

10/23/92 JADERNDED IN        PROBATION                    SNU 993    03/23/93
                            PROBATION    10 YEARS  ENDING 10/22/02    03/23/93
10/23/92 PENALTYE TO        VOLUME  822 PAGE  423 APP    MINUTES CM    03/23/93
10/23/92 RECORDED           BURG HABITATION-THEFT              LEVEL F1 03/23/93

04/01/92 ORDER              ORD GRANT MO SUB                 SNU 994    04/02/92
                            VOLUME  666 PAGE  809 APP    MINUTES CM    04/02/92
04/01/92 RECORDED           BURG HABITATION-THEFT              LEVEL F1 04/02/92

04/01/92 ORDER              ATTORNEY FEE VOUCHER             SNU 995    04/01/92

04/01/92 ORDER    ATTY FEE VOLUME  665 PAGE  687 APP    MINUTES CM    04/01/92

=N FOR NEXT PAGE.  HIT CLEAR TO TERMINATE.
 PF1=QCOC  PF2=QSET  PF3=QCAS  PF4=QINQ(ORIG NAME )  PF5=QMNQ  PF6=NAM50

0041

** QREF **

NAME MOORE, JAMES ALFRED
COURT 008    OFFENSE UNLAW CARRY WPN

DATE SET TIME COURT UNO    REASON    RESULTS    FUT DATE    COMMENTS    * SEG

** END OF DISPLAY **
ENTER FOR QDOC   PF5=QMNQ   PF8=QCOC

0042

CASE TRANSACTIONS                                    PAGE 01

CASE # 933418201010    FILING-DT 082193    CRT 008    BOND    $1000 CST C    DST O

OFFENSE OTHER MISD    NEXT-DT 100793    CAO DISP  CCO  100793  ENA MIN PLGN N

NAME MOORE, JAMES ALFRED
 FOR NEW QDOC ENTER NEW CDI/TIME 0143 AMOUNT    $1000    SNU 999    08/21/93
                                                                    08/21/93

08/22/93 BOND FILED         CRT   8 TIME 0529 TYPE SURETY                08/22/93

08/22/93 BOND MADE        A A-AFBBC-GERALD P. MONKS                     08/22/93


10/07/93 SENTENCED IN        COURT   8 STARTING 10/07/93    SNU 999    10/07/93
                                                                       10/07/93

10/07/93 ORDER            CREDIT TIME SERVED             SNU 999    10/07/93

10/07/93 JUDGMENT        CONVICTION-PLEA OF GUILTY       SNU 999    10/07/93

=N FOR NEXT PAGE.  HIT CLEAR TO TERMINATE.
 PF1=QCOC  PF2=QSET  PF3=QCAS  PF4=QINQ(ORIG NAME)  PF5=QMNQ  PF6=NAM50

0043

```
                  C A S E   T R A N S A C T I O N S                    PAGE 02

CASE #  933418201010    FILING-DT 082193   CRT 008   BOND   $1000 1ST C    DST D

OFFENSE OTHER MISD    NEXT-DT 100793   CAD DISP  CCD  100793  ING MIN PTSR N

NAME: MOORE, JAMES ALFRED
 FOR NEW QDOC ENTER NEW CDI               60    DAYS      SNU  999   10/07/93

10/07/93 JUDG OFFENSE      UNLAW CARRY WPN                  LEVEL MA 10/07/93
```




```
_END OF DISPLAY_ HIT CLEAR TO TERMINATE.
 PF1=QCOC  PF2=QSET   PF3=QCAS  PF4=QINQ(ORIG NAME)  PF5=QMNQ  PF6=NAM50
```

0044

ENTER BASIC ID INFORMATION                    ‹‹ QMAM ››

LAST NAME  PEDRAZA_____
FIRST NAME  ROCIO_____
MIDDLE NAME  ROSALVA_
ETH: _
SEX: _
RACE: _
AGE: __
DOB: 120477
SOCIAL SECURITY NUMBER: _____
DRIVER'S LICENSE NUMBER: _____
STATE ID NUMBER: _____


NO RECORD FOUND FOR THE ABOVE QUERY.

Exhibit 26

THE STATE OF TEXAS

VS.

MAURICE DEROBERTO ARGUETA
5161 GLENRIDGE
HOUSTON, TX  77053

D.A. LOG NUMBER: **118039**
CJIS TRACKING NO.: **9001096158-A001**

SPN:  **01196527-9297**      BY: **JL**      DA NO: **558**
DOB: **NM 12-31-69**      AGENCY: **HPD**
DATE PREPARED: **5/27/94**      O/R NO: **58163494E**
                                ARREST DATE: **5-27-94**

NCIC CODE: 3802 57      RELATED CASES:
FELONY CHARGE:
  INJURY TO ELDERLY INDIVIDUAL   178th
CAUSE NO:  **9412552**            G.J            **188   15**      BAIL: $ **2,000**
HARRIS COUNTY                                              PRIOR CAUSE NO:
DISTRICT COURT NO: **180**

---

## IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, **MAURICE DEROBERTO ARGUETA**, hereafter styled the Defendant, on or about **MAY 27, 1994**, did then and there unlawfully, intentionally and knowingly cause bodily injury to JANIE LUNA, hereinafter styled the Complainant, an individual who was at least sixty-five years of age, by striking the Complainant with his hand.

FOREPERSON      178TH

*Kathie Ware*

FOREMAN OF THE GRAND JURY

**AGAINST THE PEACE AND DIGNITY OF THE STATE.**

**INDICTMENT**

Exhibit 27

```
JIMS REPORT NO. 739        JUSTICE INFORMATION MANAGEMENT SYSTEM        PAGE 001
RUN DATE - 11/09/95          HARRIS COUNTY CRIMINAL RECORD
TIME - 02:00
COURT - 263

SPN: 01198527


        FILING DATE:110895    DEFENDANT NAME:ARGUERTA, MAURICE DEROBERTO
        OFFENSE:POSS CS PG 1  1G              CRT/CASE: 263/070773101010
            JUDGEMENT          DAYS MONS YRS  IND   FINE   SENT DATE   VOL    PAGE
        * OPEN CASE *



        FILING DATE:052794    DEFENDANT NAME:ARGUETA, MAURICE DEROBERTO
        OFFENSE:ASSLT                        CRT/CASE: 180/941255201010
            JUDGEMENT          DAYS MONS YRS  IND   FINE   SENT DATE   VOL    PAGE
        DEFR ADJ GLT                         0001 TDC
        PUN UNSATISFACTORY PROBAT



        FILING DATE:081191    DEFENDANT NAME:ARGUERTA, MAURICE DEROBERTO
        OFFENSE:THEFT $200-$750              CRT/CASE: 004/913201001010
            JUDGEMENT          DAYS MONS YRS  IND   FINE   SENT DATE   VOL    PAGE
        CONVICTION-PLEA OF GUILTY  0015       HCJ            081291      0420   0764



              * * * * * * * * * END OF DISPLAY * * * * * * * * * * * *
```

Exhibit 28

NO. _____ 707731

THE STATE OF TEXAS VS.

MAURICE DEROBERTO ARGUERTA

OFFENSE:

POSSESSION OF A CONTROLLED SUBSTANCE

ATTORNEY FOR STATE:

ATTORNEY FOR DEFENDANT:

SCIRE FACIAS INFORMATION: AMOUNT OF BOND ___ 2,000

S.F. NO. _____ BONDSMAN

SETTINGS:

OTHER INFORMATION:

FILED   JAN 1 6 1996   263

GENERAL ORDER OF COURT

NOV 0 8 1995   FELONY COMPLAINT FILED

PRELIMINARY ARRAIGNED BOUND APPEARANCE SETTING   NOV 0 9 1995

NOV 0 9 1995

DEC 2 6 1995

JAN 1 6 1996   FELONY INDICTMENT

JAN 2 5 1996

FEB 0 7 1996

THE DEFENDANT:
IN PERSON W...

GENERAL ORDERS OF THE COURT

THE DEFENDANT ENTERED
IN PERSON WITH COUNSEL

3.23.96 Albert Matsumoto Arguines fue Seprated

C3308 D PAGE 2

Exhibit 29

THE STATE OF TEXAS      NO. _712834_

VS. _Maurice Deroberto Argueta_

IN THE _263_ DISTRICT

COURT OF HARRIS COUNTY, TEXAS

Change of Venue From: _NA_

## COMMUNITY SUPERVISION ORDER AND DEFERMENT OF ADJUDICATION OF GUILT

Judge Presiding: _Jim Wallace_    Date of Order: _3-27-1996_

Attorney for State: _Kaylynn Williford_    Attorney for Defendant: _Paul Winston_ ☐ Waived Counsel

Offense: _Tampering with a Governmental Record_

Degree: _3rd_ .    Date Offense Committed: _11-30-1995_

Charging Instrument: Indictment/~~Information~~

Plea: Guilty/~~Nolo Contendere~~

Terms of Plea Bargain (In Detail): _5yrs TDC Prob / $500.00 fine_

(Circle appropriate selection — N/A = not available or not applicable)

Plea to Enhancement Paragraph(s): True | Not True | (N/A)

Findings on Enhancement: True | Not True | N/A

Affirmative Findings: (Circle appropriate selection — N/A = not available or not applicable)
DEADLY WEAPON: Yes |No |(N/A)   FAMILY VIOLENCE: Yes |No | (N/A)   HATE CRIME: Yes |No |(N/A)

Sexual Offender Registration Req. Under Art. 6252.13.C.1: Yes|No|(N/A)   Victim's Age: _NA_

Date Imposed: _3-27-1996_      Costs: _126.50_

ADJUDICATION OF GUILT DEFERRED, DEFENDANT PLACED ON PROBATION FOR _5_ MOS./(YRS.)
AND A FINE OF $ _500.00_ .

Time Credited:      Total Amount of Restitution/Reparation/Reward:

Concurrent Unless Otherwise Specified:_____

Restitution/Reward to be Paid to:
Name:_____
Address:_____

Statement of Amount of Payment(s) required/Terms of Amount:_____

     This cause being called for trial, the State appeared by her District Attorney as named above, and the Defendant named above appeared in person and either by counsel as indicated above or knowingly, intelligently and voluntarily waived the right to representation by counsel as indicated above, and both parties announced ready for trial. The said Defendant elected to proceed under Article 42.12, Section 5a of the Code of Criminal Procedure, and in open court, jury having been waived, the Defendant was duly arraigned, pleaded as indicated above to the charge as shown above.

     Thereupon the Defendant was admonished by the Court of the consequences of the said plea, and the Defendant persisted in entering said plea; and it plainly appearing to the Court that the Defendant was sane and that he was uninfluenced by any consideration of fear, or persuasion, or delusive hope of pardon prompting him to confess his guilt, the said plea was accepted by the Court and is here entered of record upon the minutes. The Defendant having in open court, in writing, waived the appearance, confrontation, and cross-examination of witnesses, consented to the stipulation of evidence and to the introduction of testimony by affidavits, written statements of witnesses, and any other documentary evidence; and such waiver and consent having been approved by the Court in writing and filed in the papers of the cause, the said plea of the Defendant was received and entered of record upon the minutes.

     The trial proceeded before the Court, and after the evidence was submitted and the argument of counsel thereon, the Court found that such evidence substantiates the Defendant's guilt in this cause, and further found that the best interests of society and of the Defendant would be served by deferring proceedings without entering an adjudication of guilt and placing the Defendant on community supervision in this cause as indicated above.

     It is therefore CONSIDERED, ORDERED AND ADJUDGED, that in accordance with Article 42.12, Section 5a of the Code of Criminal Procedure, no judgment be entered in this cause and that the Defendant be, and he is hereby placed on community supervision in this cause for a period as indicated above, from this date, subject to the attached terms and conditions of community supervision. Further, the court finds the Presentence Investigation, if so ordered, was done according to the applicable provisions of Art. 42.12, Sec. 9, Code of Criminal Procedure.

**Deferment of Adjudication of Guilt/Felony or Misdemeanor**

Exhibit 30

THE STATE OF TEXAS
VS.
MAURICE DEROBERTO
ARGUETA
5406 ENYAMAN WAY
HOUSTON, TX

NCIC CODE: 1115 22
FELONY CHARGE:
  SEXUAL ASSAULT
CAUSE NO: __728548__
HARRIS COUNTY
DISTRICT COURT NO: __263rd.__

D.A. LOG NUMBER. 289256
CJIS TRACKING NO.:
SPN: __R  01198527/997__
DOB: BM 12-31-69
DATE PREPARED: 7/25/96

BY: DSF     DA NO: 610
AGENCY: HPD
O/R NO: 78746196
ARREST DATE: TO BE

RELATED CASES:

BAIL: $ 10,000
PRIOR CAUSE NO:

## IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

Before me, the undersigned Assistant District Attorney of Harris County, Texas, this day appeared the undersigned affiant, who under oath says that he has good reason to believe and does believe that in Harris County, Texas, **MAURICE DEROBERTO ARGUETA** , hereafter styled the Defendant, on or about **JUNE 17, 1996**, did then and there unlawfully intentionally and knowingly cause the penetration of the female sexual organ of Erica Ramos, hereinafter called the Complainant, by placing his finger in the female sexual organ of the Complainant, without the consent of the Complainant, namely the Complainant had not consented and the Defendant knew that the Complainant was unconscious and physically unable to resist and the Complainant had not consented and the Defendant knew the Complainant was unaware that the sexual assault was occurring.

PROBABLE CAUSE

AFFIANT, J. DELOSSANTOS, IS A CREDIBLE AND RELIABLE PERSON WHO IS REPUTABLY EMPLOYED AS A PEACE OFFICER WITH THE HOUSTON POLICE DEPARTMENT.  AFFIANT BELIEVES AND HAS REASON TO BELIEVE THAT THE DEFENDANT, MAURICE ARGUETA, COMMITTED THE OFFENSE OF SEXUAL ASSAULT ON OR ABOUT JUNE 17, 1996 IN HARRIS COUNTY, TEXAS.

AFFIANT SPOKE WITH THE COMPLAINANT, ERIC RAMOS, A CREDIBLE AND RELIABLE 25 YEAR OLD FEMALE WHO IS REPUTABLY EMPLOYED BY WILLIAM ESTES, P.C.  COMPLAINANT TOLD AFFIANT THAT ON JUNE 17, 1996, SHE HAD SEVERAL FRIENDS INCLUDING THE DEFENDANT, WHO SHE KNOWS BY NAME AND BY SIGHT AS MAURICE ARGUETA, OVER TO HER HOUSE LOCATED AT 4000 W. 34TH STREET #85 HOUSTON, HARRIS COUNTY, TEXAS. COMPLAINANT TOLD AFFIANT THAT THE DEFENDANT IS A FRIEND OF HER BOYFRIEND, AND HER BOYFRIEND, ROBERT PRITCHETT, WAS ALSO PRESENT.

COMPLAINANT TOLD AFFIANT THAT SHE WENT TO HER CHILDREN'S BEDROOM TO LAY WITH THEM AROUND 12 P.M.  COMPLAINANT WAS HALF ASLEEP WHEN SHE FELT SOMEONE TOUCHING HER AND REALIZED THAT SOMEONE HAD THEIR FINGER IN HER VAGINA.  COMPLAINANT TURNED OVER, BUT STILL PRETENDED TO BE ASLEEP.  COMPLAINANT PARTIALLY OPENED HER EYES AND OBSERVED THE DEFENDANT, CRAWLING OUT OF THE ROOM.  COMPLAINANT WAS POSITIVE IN HER IDENTIFICATION OF THE DEFENDANT, MAURICE ARGUETA AS THE PERSON WHO INSERTED HIS FINGER INTO HER VAGINA. COMPLAINANT STATES THAT SHE NEVER GAVE THE DEFENDANT PERMISSION OR CONSENT TO TOUCH HER VAGINA.

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Sworn to and subscribed before me on **July 25, 1996.**

AFFIANT

FILED
CHARLES BACARISSE
DISTRICT CLERK
HARRIS COUNTY, TEXAS

96 JUL 25 AM 10: 40   **COMPLAINT**

BY

ASSISTANT DISTRICT ATTORNEY
OF HARRIS COUNTY, TEXAS.

Exhibit 31

RESTRICTED
AND
CONFIDENTIAL

Texas Department of Criminal Justice
# INSTITUTIONAL DIVISION
Huntsville, Texas
ADMISSION SUMMARY / CASE SUMMARY

## I.  GENERAL INFORMATION

Code: _____

**OFFENDER CATEGORY:** SPECIAL ALTERNATIVE TO INCARCERATION PROGRAM

Name: MOORE, James Alfred _____ TDCJ-ID #: 619228AS

True Name: MOORE, James Alfred II _____ Int. Date: 7/6/92 / 9:15 am

Alias: NONE _____ Int. By: M. Dittfurth/lr

D.O.B. 9/27/73 ___ Age: 18 ___ Race: B ___ Sex: M ___ Ht: 5'10" ___ Wt. 165 ___ Hair: BLK ___ Eyes: BR

Segregative Class: I ___ E.A. Score: Not Tested ___ I.Q. Score: 106 ___ SSN: 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

DPS#: 4417997 _____ FBI#: 429585MA9 _____ Prior TDCJ-ID #: ___ N/A

IBM Code

_____ NATIVITY: Houston, Harris Co., TX

_____ CITIZENSHIP: USA

_____ RESIDENCE:* Houston, Harris Co., TX

_____ MARITAL: Single

_____ RELIGION: Baptist

IBM Code

_____ MILITARY: NONE

_____ MILITARY DISCHARGE CODE

_____ GRADE COMPLETED: 11

## II.  PREVIOUS CRIMINAL SUMMARY

|  | COMMITMENTS | ESCAPES |  | COMMITMENTS | ESCA |
|---|---|---|---|---|---|
| Adult Probations (State): | 1REV | | TDCJ-ID : | | |
| Juvenile Reformatories : | | | Other Prisons : | | |
| Adult Probations (Fed.) : | | | State Farms : | | |
| Juvenile Probations : | 1 | | Detention Hospitals : | | |
| Juvenile Detention Homes: | 5 | | Military Brigade : | | |
| Suspended Sentences : | | | Military Stockade : | | |
| Jails : | | | Military Guardhouse : | | |
| City Farms : | | | Military Prison : | | |
| County Farms : | | | Other : | | |
| TOTAL ARRESTS: 9 | | | | | |

## III.  PRESENT OFFENSE(S) DATA

Date Received TDCJ-ID: 7/2/92 _____ # Of Current Offenses: 2

Projected (Min.) Release Date: 03-27-1996 ___ Maximum Release Date: 03-28-2002

Offense: BURG OF MTR VEH WIC THEFT ___ Sent. Length: 10Y ___ County: Harris

Court: 184th Judicial District ___ Cause #: 628222

Date of Offense: 3/28/92 ___ Date Sentenced: 5/27/92 ___ Sent. Begin Date: 3/28/92

Type (cc/cu): CC ___ Plea: Yes ___ Flat Time Only: (yes/no) ___ No ___ Legislature: 70th/72nd

Accomplices/Codefendants: ___ Brian HORD

(Doc. Rev. 11/8/91)

SSP-110 (Rev. 3/91)

**Offense # 2**: BURG OF HABIT WIC THEFT _____ Sent. Length: _10Y_____ County: _Harris_

Court: _184th Judicial District_____ Cause #: _580960_____

Date of Offense: _11/13/90_____ Date Sentenced: _5/27/92_____ Sent.Begin Date: _3/28/92_

Type (cc/cu): _CC____ Plea: _Yes_ Flat Time Only (yes/no): _No_____ Legislature: _70th/72nd_

Accomplices/Codefendants: ___Steven BALTAZAR_____

```
DPS Report   No (X )
             Yes ( )   Date: _____

FBI Report   No (X )
             Yes ( )   Date: _____
```

## IV.  SUMMARY OTHER ARRESTS

NONE

## V.  PRESENT OFFENSE(S) SUMMARY

BURGLARY OF A HABITATION WITH INTENT TO COMMIT THEFT:  The official version states that on 11/13/90, during the daytime, in Houston, Texas, the subject and Steven BALTAZAR (19 year old Hispanic male, TDCJ-ID Boot Camp) entered the unlocked home of Meno ALGIANAKIS (40 year old Italian male) with the intent to steal property from the residence.  The owner of the residence came home, at which time, the subject struck the owner with a cue stick.  The victim then picked up a chair and struck the subject and codefendant.  The victim then used a knife to cut BALTAZAR.  The subject and codefendant fled the scene on foot with the owner in pursuit.  The owner caught the subject and codefendant and detained them until Houston City Police officers arrived.  The subject was arrested at the scene and was taken to the Harris County Jail where he posted a $2,000 bond after 3 weeks.

RATIONALE OF PRESENT OFFENSE "HIS SON GAVE US THE KEY TO THE HOUSE."

BURGLARY OF A MOTOR VEHICLE WITH INTENT TO COMMIT THEFT:  The official version states that on 03/28/92, during the daytime, in Houston, Texas, the subject and Brian HORD (a 15 year old white male, disposition UNKNOWN) entered an automobile by breaking out a vent glass window and then removing a radio and mobile telephone worth $289.  The subject and codefendant were observed by witnesses who notified Houston City Police officers.  The subject was arrested the same day by Houston City Police officers and was taken to the Harris County Jail where he failed to post a $90,000 bond.

RATIONALE OF PRESENT OFFENSE "I DIDN'T DO IT."

## VI.  DETAINER INFORMATION

N/A

## VII.  JUVENILE CRIMINAL HISTORY

The subject was detained for 5 commitments to the Harris County Juvenile Detention Home for Shoplifting between ages 11 and 14 and he was released to his parents on each occasion.  He received a 2 year juvenile probation from Harris County at age 15 for Burglary of a Habitation, claims completed.

## VIII.  ADULT PROBATIONS

| Date | Offense | Sentence | Disposition |
|------|---------|----------|-------------|
| 06/91 | Burg Habit WIC Theft | 10Y | Rev'd 5/92 as portion of P.O. due to conv. for Burg Veh WIC Theft. |

## IX.  ADULT INCARCERATIONS

NONE

## X.  "VICTIM IMPACT STATEMENT RECEIVED:  YES ( )  NO ( X )

Significant comments regarding "Victim Impact Statement":  N/A

## XI.  SUBSTANCE ABUSE HISTORY

ALCOHOL ABUSE History: The subject admits drinking approximately 6 BEERS daily beginning at age 15.  The subject denies being an ALCOHOLIC.  However, he does claim to be an EXCESSIVE DRINKER.  The subject denied treatment for ALCOHOL ABUSE and he denied being INTOXICATED at the time of the present offense.

DRUG ABUSE History: The subject admits SMOKING 1 to 2 MARIJUANA CIGARETTES monthly beginning at age 13.  The subject reports SELLING approximately $800 worth of CRACK COCAINE during a period of about 2 months at age 15.  The subject denied the use of any other illegal DRUGS and he denied treatment for SUBSTANCE ABUSE.  The subject reports that he was not under the influence of any DRUGS at the time of the present offenses.

## XII.  ACADEMIC EDUCATION HISTORY

A.  GRAMMAR/SECONDARY SCHOOLS

Highest Grade Completed: 11th      School Name/Location: Westbury H.S./Houston, TX
Dates of Attendance: 1990-1992          Reason For Leaving: Arrested
Special Educational Programs Attended: N/A
Other Languages Spoken: N/A

GED Completion Date: N/A      Program Name/Location: N/A

**B.  COLLEGE EDUCATION:**

N/A

## XIII.  VOCATIONAL EDUCATION HISTORY

N/A

## XIV.  EMPLOYMENT HISTORY

Longest Period of Continuous Employment: 1990-1990        Job Title: Usher

Name and address of Longest Continuous Employment:  Myer Park 14 Theater

   A/U, Houston, TX

Primary Job Skill: Laborer                        Length of Experience: N/A

Secondary Job Skill: N/A                          Length of Experience: N/A

Other Job Skills:  N/A

Within the past 2 years were you employed full time continuously in one job for 6 months or longer?                                              Yes ( )    No (

If employed at time of present offense, give job title:  N/A

   Length of time on the job:  N/A

   Name of Employer:  N/A

   Address:  N/A

If unemployed at time of present offense, give name and address of last employment:

   Name of Employer/Dates:   Myer Park 14 Theater

   Address:  A/U, Houston, TX

If unemployed at present offense, how long unemployed?  3M

Significant work experience during prior incarceration (type):  N/A

Union Affiliation/Memberships:(Name/#/Location): N/A

Union License(s) Held:(Dates) N/A

## XV.  MILITARY SERVICE

N/A

## XVI.  PRIOR RESIDENTIAL HISTORY

Houston, TX

1973-1992 A/CPO

## XVII.   FAMILY HISTORY

FA     Jay Alfred Moore/1947/7930 Secretariet Ln., Houston, TX

MO     Alice Mae (James) Moore/1949/6500 Harbor Town #305, Houston, TX  (713-773-4606)

SUB STS 1 H/SIB FROM MO ILL RELS WITH UNK MAN.

H/SIS    Angela Moore/1968/7809 W. Bellfort, Houston, TX  (713-729-3369)

## XVIII.  MARITAL HISTORY

NO MARRIAGES/NO CHILDREN

Exhibit 32

STATE OF TEXAS       }
                          }

COUNTY OF HARRIS    }

### AFFIDAVIT OF ANDREW EGRAS

My name is Andrew Egras. I am a resident of Harris County, Texas. I am over the age of eighteen and am competent to make this affidavit. All the facts stated here are within my personal knowledge.

1. I was a juror in the 1996 capital murder trial of Anthony Medina.

2. I was initially a holdout at the guilt/innocence portion of Mr. Medina's trial. I was concerned about the conflicting testimony of the seating positions in the car and the ejection of the shell casings. I was in military and had experience with firearms and I knew that no one could have held the gun the way the witnesses said he did.

3. I also knew that the shell casings wouldn't have been ejected the way they said they were if the shooting happened as the witnesses said. When the jurors asked me about that in deliberations, however, I told them I couldn't say anything about it because the judge had told us we weren't allowed to bring our personal knowledge or experience into the jury room.

4. It was hard knowing which witnesses to believe.

5. Most of the other jurors didn't have the same concerns I did during guilt/innocence deliberations. Two women in particular were in a hurry to finish the deliberations and get back to work. I wasn't going to be bullied and I told her them they shouldn't be on the jury if they were in a rush. They were bullying a Hispanic male as well who was also a holdout.

6.   During the punishment deliberations, one woman was concerned about the role

alcohol played and noted that the Boot Camp Mr Medina had been in didn't

offer him any alcohol counseling. ~~We told her that if you didn't sentence him~~

~~to death you'd be saying that you are not responsible if you are drunk.~~ We asked her then, if you

wanted to get away with a crime, you could just go out

and get drunk before you committed it.

7.   Some of the jurors were haunted by the concern that someone might come after

them if they didn't like the verdict.  I wasn't too happy when we were

individually polled and our names were called out in open court.

8.   You could sense tension in the audience.  I could see gang members in the

audience flashing signs at each other.  The victim's family was large.  At one

point the victim's family got into an argument with a group of people that were

with one of the girl witnesses in the hallway.  We had to pass by there to get to

the jury room.

9.   The bailiff would escort us to our cars throughout the trial and we specifically

asked to be escorted after the punishment phase verdict.


I have read all nine paragraphs of the above statement and swear, under the pain and
penalty of perjury, that it is true and correct to the best of my knowledge.  I give this
statement of my own free will.


NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

Andrew Egras

16 Nov 2001
Date


Subscribed to and sworn before me by Andrew Egras
on this 16th day of November, 2001.

_____
Notary Public

My Commission expires: _10·15·2005_



Exhibit 33

STATE OF FLORIDA          }
                           }
COUNTY OF DADE         }

### AFFIDAVIT OF DENNIS MCGUIRE, M.S., F.A.A.F.S.

1.      My name is Dennis McGuire. I am a resident of Dade County, Florida. I am over the age of eighteen and am competent to make this affidavit.

2.      I am a forensic examiner and have been in private practice since 1991. I received a Bachelor of Science from Florida Atlantic University in 1967 and a Master of Science from Florida International University in 1978

3.      I served as a Police Crime Laboratory Examiner for 23 years, including 19 years as a Police Laboratory Supervisor. I retired honorably from the Metro-Dade Police Department on March 15, 1991.

4.      I have been qualified as a court expert in firearms evidence examination and have made over 150 appearances in Federal, State and Municipal Courts in Florida in criminal and civil matters. I also have been accepted as an expert in the Magistrate and/or Supreme Courts of Jamaica, the Bahamas, and the Cayman Islands.

5.      I have instructed courses and seminars concerning the forensic sciences offered by the Southeast Florida Institute of Criminal Justice, The Metro-Dade Police Department, Miami-Dade Community College, and Florida Technological University, Orlando, Florida. I have also directed the training programs for all new firearms examiners of the Metro-Dade Crime Laboratory from 1970 to 1991.

6.      I am a Fellow of the American Academy of Forensic Sciences, Distinguished Member of the Association of Firearm and Toolmark Examiners, and a member of the Southern Association of Forensic Scientists, the International Association for Identification and the Florida Division of the International Association for Identification.

7.      At the request of Mr. Medina's defense team, I reviewed the police reports and firearms reports related the 1996 driveby shooting at Campden Hill, Houston, Texas. I also reviewed the trial testimony on July 24-25th, 1996 of Sergeant Novack, Officer Ray Collins, Leon Guy, Jr., Laura Gomez, firearms examiner Robert Baldwin, Esmerelda Rodriguez, Dominic Holmes and Johnny Valadez.

8.      I am familiar with the 7.62 X 39 Norinco Rifle, the type of weapon used in the January 1996 driveby shooting.

9.      It is my opinion after reviewing the above-mentioned documents that the shooting

probably could not have occurred in the manner described by the witnesses. Esmerelda Rodriguez, Dominic Holmes and Johnny Valadez describe the shooter as leaning back into the car. Moreover, Leon Guy, Jr. and the other witnesses on the street were unable to see any appreciable portion of the weapon outside of the vehicle.

10. The submitted documents do not indicate that an attempt was made to duplicate the conditions of the vehicle, its occupants, and the crime scene at the time of the shooting.

11. The cartridge case ejection pattern of the rifle used in the shooting is essential to determine the facts.

12. This inconsistency was not resolved in the trial testimony or the police and firearms reports that I have reviewed. I found no evidence of any attempt to accurately reconstruct the shooting or to determine the ejection pattern of the firearm.

13. Contrary to the trial testimony of Robert Baldwin, it is definitely possible to establish a reasonable ejection pattern of cartridge cases for this rifle under the circumstances dictated by the crime scene and the evidence

14. In my opinion, any firearms examiner who would have been contacted by the defense before trial would have given the same opinion based upon the information I have reviewed.

15. In order for a complete and definitive conclusion to be reached, it would be necessary to conduct independent testing with the actual firearm to reconstruct the shooting and determine the ejection pattern of the weapon.

I have read the above statement and swear, under the pain and penalty of perjury, that it is true and correct to the best of my knowledge. I give this statement of my own free will.

_____
Dennis McGuire

_____
Date   November 18, 2001

Subscribed to and sworn before me by Dennis McGuire on this ___ day of November, 2001.

OFFICIAL NOTARY SEAL
STEVEN PINKERT
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC997718
MY COMMISSION EXP. JAN. 30, 2005

Notary Public _____

My Commission expires: 1/30/2005

Exhibit 34

NO. __331274__

THE STATE OF TEXAS VS.

OFFENSE:   2202 02 03
BURGLARY

ATTORNEY FOR STATE:

SCIRE FACIAS INFORMATION:

S. F. NO.

SETTINGS:

LEON WILBUR GUY JR. (1)

ATTORNEYS FOR DEFENDANT:

BONDSMAN

AMOUNT OF BOND __10,000__

OTHER INFORMATION:

DPC   10,000

Jail - 3-16-81

FILED

GENERAL ORDER OF COURT

FELONY COMPLAINT FILED

PROBABLE CAUSE HEARING SET FOR 4/13/

MAR 13 1981   need to 9-18-81   3/

MAR 16 1981   MAR 16 1981   FELONY INFORMATION

COURT RULED THAT PROBABLE CAUSE EXISTS; CASE SET FOR
____ ____ ____ ____ , AND ARRAIGNMENT ON
AGENDA ON ____ 19__

COURT RULED THAT PROBABLE CAUSE EXISTS; CASE SET FOR
19__ . GRAND JURY
AGENDA ON ____ 19__ AND ARRAIGNMENT ON

DEFENDANT WAIVED INDICTMENT

DEFENDANT WAIVED ARRAIGNMENT AND FORMAL
READING OF THE INDICTMENT IN OPEN COURT
PLEADED _guilty_

THE COURT FOUND THE DEFENDANT GUILTY AND THAT
THE said DEFENDANT COMMITTED THE SAID OFFENSE

ON THE ____ DAY OF ____ A.D. 19__

THE COURT ASSESSED THE PUNISHMENT AT __10 yrs TDC__

## GENERAL ORDERS OF THE COURT.

— ten days first waived; Defendant sentenced to not
— less than _____ years nor more than _____
— years in the Texas Department of Corrections.

This sentence to begin on **8-6-81** and the Sheriff
of Harris County, Texas is hereby directed to attach to the
commitment a true and correct copy of this judgment assessing the defendant's confinement
while in jail in said cause.

Served 120 days jail pass 810 smith Gadsone

JUL 7 - 1981

THE DEFENDANT,

IN PERSON WITH COUNSEL,                                          **APPEARED**

THE DEFENDANT,

IN PERSON WITH COUNSEL,                                          **APPEARED**

came on to be heard block Probation

1st 7 - 1981.

180 could granted 3rd Grad for 10 yr Prob

Exhibit 35

| | | | | | |
|---|---|---|---|---|---|
| Summons........................ | | | Jury Fee........................ | | |
| Jury Fee........................ | | | Crim. Justice Planning Fund.... | 20 | 00 |
| Taking _____ Bonds ........... | | | L.E.O.S.E.F..................... | 1 | 00 |
| Commitment...................... | 2 | 00 | C.V.C.F......................... | 20 | 00 |
| Release......................... | 2 | 00 | D.C.L.C.F....................... | | 00 |
| Attachment ..................... | | | Attorney Fees .................. | | |
| | | | JCPTF | 1 | 00 |
| | | | WITNESSES | | |
| TOTAL................... | | | SENTENCE TO BEGIN: 7/15/85 | | |
| | | | TOTAL.......................... | $42 | 00 |

NO. 428865

# JUDGMENT

THE STATE OF TEXAS vs.

Leon Wilbur Guy, Jr.

Date **August 15, 1985**

Attorney for State : Asst. Dist. Atty. Joan Campbell/Dennis Buckl

Attorney for Defendant : Pat Burley      [ ] Appointed   [✓] Retained

Waiver of Attorney [ ] : The Defendant knowingly, intelligently and voluntarily waived the right to representation by counsel

Offense: robbery

DUPLICATE

Plea to Offense: guilty

Plea to Enhancement: na

Findings on Enhancement : The Defendant is the same person _na_ previously convicted
(Second Offender or Habitual)    of felonies as alleged in the indictment/information

Punishment : Fine of $ N/A and 12 years confinement in the Texas Department of Corrections

COURT ORDERED FINE AND/OR COSTS PAYABLE ON OR BEFORE _____ day of _____ 19___

Date of Offense: June 27, 1985 Sentence to begin: 7-15-85 day(s) confinement in jail

The Defendant having been indicted/charged by information, in the above entitled and numbered cause for the felony offense shown above and this cause being this day called for trial, the State appeared by her District Attorney as named above and the Defendant named above appeared in person and either by Counsel as named above or waived counsel as indicated above, and both parties announced ready for trial. The Defendant, in person, in writing, and in open court, waived his right of trial by jury, (such waiver being with the consent and approval of the Court and the District Attorney in writing and filed in the papers of this cause) pleaded as indicated above to the charge contained in the indictment/information. Thereupon the Defendant was admonished by the Court of the consequences of the said plea; and the Defendant persisted in entering said plea; and it plainly appearing to the Court that the Defendant was mentally competent and that the plea is free and voluntary. The Defendant, having in open court, in writing, waived the appearance, confrontation, and cross-examination of witnesses and consented to the oral stipulation of evidence and to the introduction of testimony by affidavits, written statements of witnesses, and any other documentary evidence. Such waiver and consent having been approved by the Court in writing and filed in the papers of the cause, the said plea of the Defendant was received and entered of record upon the minutes. The Court, having heard the evidence submitted, and the argument of Counsel thereon, found the Defendant guilty of the offense indicated above, a felony.

Volume 16 Page 250

Corrections for the period indicated above, be delivered by the Sheriff of Harris County, Texas, immediately to the Director of the Department of Corrections or other person legally authorized to received such convicts, and said Defendant shall be confined in said Department of Corrections for period indicated above, in accordance with the provisions of the law governing the Texas Department of Corrections."

The said Defendant was remanded to jail until said Sheriff can obey the directions of this sentence.

Signed and entered this the ___3rd___ day of ___December___, A. D. 19 85

Judge, 228 District Court
of Harris County, Texas
JUDGE TED POE
228th Dist. Ct.

10:00 AM

This sentence to begin on ___7-15-85___ and the Sheriff of Harris County, Texas is hereby directed to attach to the committing papers a statement assessing the defendants conduct while in jail in said cause.

to run concurrent with cause # 331274 D7

DUPLICATE

Exhibit 36

THE STATE OF TEXAS
VS.

*Leon Wilbur Guy*

NO. 598499

IN THE 184th DISTRICT

COURT OF HARRIS COUNTY, TEXAS

Change of Venue From: N/A

JUDGMENT ON PLEA OF GUILTY OR NOLO CONTENDERE BEFORE COURT - WAIVER OF JURY TRIAL

Judge Presiding: *Frank Price*
Attorney
for State: *G. Sellas*
Offense
Convicted of: *unlawfully, intentionally and knowingly deliver by actual transfer a controlled substance, namely cocaine*

Date of Judgment: *July 11, 1991*
Attorney
for Defendant: *Donald* / N/A Waived Counsel

Degree: *1st - enhanced*
Date Offense Committed: *May 17, 1991*

Charging
Instrument: Indictment/~~Information~~

Plea: Guilty/~~Nolo Contendere~~

Terms of Plea
Bargain (In Detail): *20 years TDCJID*
*State abandoned 2nd + 3rd H's*

Plea to Enhancement
Paragraph(s): *True*

Findings on
Enhancement: *Found true*

Findings on Use
of Deadly Weapon: *N/A*

Date Sentence
Imposed: *July 11, 1991*

Costs: *4/4.30*

Punishment and
Place of Confinement: Institutional Division *20 years* /Fine *N/A*

Date to
Commence: *May 17, 1991*

Time Credited: *N/A*
Concurrent Unless Otherwise Specified: _____

Total Amount of
Restitution/Reparation/Reward: _____
Restitution/Reward to be Paid to:
Name: _____
Address: _____ N/A

Statement of amount of Payment Required/Terms of Payment: N/A

Name of Victim/Other Person/Agency: _____

Mailing
Address: _____

This cause being this day called for trial, the State appeared by her District Attorney as named above and the Defendant named above appeared in person and either by counsel as named above or knowingly, intelligently and voluntarily waived the right to representation by counsel as indicated above and both parties announced ready for trial. The Defendant, waived his right to trial by jury, and pleaded as indicated above; thereupon the Defendant was admonished by the Court as required by Article 26.13, Code of Criminal Procedure. And it appearing to the Court that the Defendant is mentally competent to stand trial, the plea is freely and voluntarily made, and the Defendant is aware of the consequences of his plea, the plea is hereby received by the Court and entered of record. The Court, having heard the evidence submitted, found the Defendant guilty of the offense indicated above, a felony.

[ ] The Defendant, with the written agreement of the court, requested that a presentence investigation report not be made by the Probation Officer.
[ ] The Court directed the Probation Officer to prepare a presentence investigation report.

On the *11* day of *July*, A.D. 19*91*, the Court assessed punishment as indicated above.

It is therefore CONSIDERED, ORDERED AND ADJUDGED by the Court that the Defendant is guilty of the offense indicated above, a felony, and that the said Defendant committed the said offense on the date indicated above, and that he be punished by confinement in the Institutional Division, Department of Criminal Justice for the period indicated above, and that the State of Texas do have and recover of the Defendant all costs of the prosecution, for which execution will issue.

And thereupon the said Defendant was asked by the Court whether he had anything to say why sentence should not be pronounced against him, and he answered nothing in bar thereof. Whereupon the Court proceeded, in the presence of said Defendant, to pronounce sentence against him as follows, to wit: "It is the order of the Court that the said Defendant, named above who has been adjudged to be guilty of the offense indicated above, a felony, and whose punishment has been assessed at confinement in the Institutional Division, Department of Criminal Justice for the period indicated above, be delivered by the Sheriff of Harris County, Texas, immediately to the Director of Institutional Division of the State of Texas, or other person legally authorized to receive such convicts, and said Defendant shall be confined in said Institutional Division for the period indicated above, in accordance with the provisions of the law governing the Institutional Division, Department of Criminal Justice.

The said Defendant was remanded to jail until said Sheriff can obey the directions of this sentence.

RECORDERS MEMORANDUM:
This instrument is of poor quality
and not satisfactory for photographic
recordation, and/or alterations were

Plea of Guilty or Nolo Contendere Before the Court