# Exhibit 38

8/86

# CAPITAL CASES



# Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial

## by David C. Stebbins and Scott P. Kenney

### Introduction

When we were first approached by Dennis Balske to write an artical on the use of expert witnesses in the penalty phase of a capital trial, our initial response was, "How can we impress the world with an erudite analysis of *The Law*?" Our approach to this topic was to present more practice and procedure and less traditional legal analysis. Therefore, any mention of case law is an accidental spill-over from some brief in the memory of the computer we are using to rite this article.

### What Is Mitigation?

Webster's Dictionary defines *mitigate* in terms of making something become less intense, severe, or painful. Applying Webster's definition in the context of a capital case means, obviously, that the goal is to make the sentence less intense, less severe, or less painful, *i.e.*, to obtain a life verdict from the jury. (Since judges seldom overturn death verdicts, this article is written in terms of convincing the *jury* that life is appropriate.)

The question remains, however, how does defense counsel get this life verdict? *Lockett* says that the history, character, and background of the defendant, as well as the nature and circumstances surrounding the incident itself, must be considered in mitigation. *Eddings* says that the youth of the defendant must be considered. Most state statutes and/or jury instructions do not give even a rudimentary definition of what mitigation is. Most state statutes have a non-exclusive list of factors that *must* be permitted as mitigating as well as a catch-'l clause that permits the presentation of rtually any relevant evidence on the question of mitigation. None of these things, however, spell out the meaning of mitiga-

tion or give any indication of what will convince the jury in any particular case that a life sentence is the appropriate punishment. Because there are innumerable variables between cases, there can be no easy answer on winning any particular case, but the primary goal of defense counsel in mitigation must be to offer to the jury an explanation of the crime. The jury will want to know how this murder could have occurred— how this defendant came to such a position that he or she could have committed such a heinous act. The explanation is not an excuse. The explanation has to be an honest (although interpreted) history of how the client grew into the "heartless monster" that the prosecutor proved him to be in the guilt phase.

At first blush, criminal defense attorneys generally have two initial ideas for mitigation: a) to humanize the client; and b) to compile all of the nice things the client has done in his life which will necessarily outweigh the facts surrounding this one unfortunate incident (the murder). While the importance of portraying the client as a loving, breathing, caring, thinking, feeling human being with family connections cannot be overstressed, that is only the first step of any successful mitigation. It is axiomatic in capital defense literature that "it is much easier to kill a sack of cement than a human being." However, with 1500 people presently on death row, it seems fairly easy for a jury to kill a human being, too. The problem with planning mitigation as a compilation of a mass of good deeds that far outweigh the one incident of aberrant behavior is that most people facing the death penalty who took care of their mothers, obeyed their fathers, and placed flags on graves on Memorial Day. There is, of course, the rare client who has previously

lead an exemplary life, but even evidence that the murder was truly an aberration is not always enough to overcome the facts of the crime. Juries tend to wonder whether it might just not happen again. Painting a picture of the client's good deeds generally is impossible; even if possible, it is usually insufficient to overcome the jurors' revulsion over the facts of the crime.

The realities of mitigation are that jurors can kill human beings *and* choir boys when they cannot identify with the client and when they cannot understand why the crime occurred. Jurors need to identify with the client as a human being, if not as a social entity. They need to be able to identify with, or at least appreciate, the feelings and motivations that led up to the killing.

To mitigate a death sentence, the attorney must prove his client is not evil (or at least that he was not born evil). The facts of the crime and the arguments of the prosecutor at the guilt phase will cause this knee-jerk conclusion of the jury unless a credible explanation is given to explain the client's actions. Many prosecutors argue, and apparently believe, that some people are just born evil and that their whole lives have been a calculated plan to arrive at this one incident. Much of the prosecutor's case may be devoted to showing this evil and eliciting other opinions about this evilness. Defense counsel in mitigation must overcome this archaic notion of inherent evil and explain to the jury about the life of the defendant and the forces that shaped him into the person who could have taken the life of another. It is important to remember that the taking of another human life is beyond the conception of most jurors (except, of course, in the context of capital punishment). Jurors are likely to "buy" the

inherent evil argument solely because they cannot conceive of ever taking another human life. Thus, an explanation of the crime and the life events leading up to it is essential to giving the jurors some insight into how this could have happened.

> *In mitigation, it is the defense attorney who must gather and present the evidence and who must affirmatively prove the case.*

Prosecutors get a lot of mileage out of the "inherent evil" argument. It is always surprising to hear college-educated men and women arguing that evil people are never sorry, they never show remorse, they can never be rehabilitated, and they are likely to commit the same crime again if not executed. Nevertheless, this is an attractive, simplistic argument that jurors will accept if the defense team does not offer any equally acceptable explanation.

### The Roles of Defense Counsel
*The Go-Forward Advocate*

A second axiom of the literature on death penalty defense is "Death is Different." Among the myriad reasons why this is true is the role that defense counsel must play in a capital case—especially in mitigation. It is defense counsel's role to go forward in mitigation with evidence to convince the jury not to kill the client.[1] This is an affirmative obligation to present evidence—to go forward. Criminal defense attorneys are more accustomed to reacting to what the state does, reacting to evidence the state presents, reacting to theories the state has.

---

1. This article is written from the perspective of the laws of Ohio. Under the Ohio statutes, aggravating circumstances are proven at the guilt phase. Thus, the penalty phase deals solely with the presentation of mitigation and rebuttal to that mitigation. Aggravating circumstances are not reproven at the penalty phase. Nevertheless, in other states defense counsel still has the obligation of proving that his client does not deserve to die.

In mitigation, it is the defense attorney who must gather and present the evidence, who must create and present the theories of mitigation, who must explain his client's life and actions, and who must affirmatively prove the case for life.

This is often an unusual role for defense attorneys. Investigating, theorizing, and presenting an affirmative case for life is something that most attorneys are neither trained to do nor particularly well-suited to do. Criminal defense attorneys are generally lacking in the experience of "going forward." The prosecutor normally has the burden to prove things in a criminal case. The defense attorney generally operates in reaction to moves of the prosecutor.

Not only are criminal defense attorneys placed in a different posture in mitigation, they are faced with a field of expertise in which they have little or no training. Mitigation involves fields of expertise that are not part of the law school curriculum. There is also virtually no equivalent in most attorneys' experiences. In law school and general criminal law experience, the important factors to worry about are the subtleties of the law, the courtroom skills of direct and cross-examination, and the art of persuading the jury that the client was not there. These are also important in capital litigation.

*The Team Player*

What attorneys are not trained in, however, and generally have no experience in, is dealing with the psycho-social problems of their clients and explaining these to the jury. Because of this, it is necessary for attorneys in capital cases to recognize at the beginning that they do not have the skills to accomplish the goals of mitigation and to go out and seek the assistance of psycho-social professionals who are skilled in these fields. For all practical purposes, the effective use of social workers, psychologists, and psychiatrists is necessary for the effective representation of a capitally-charged defendant. Attorneys went to law school, whereas psychologists and psychiatrists and social workers spent an equal number of years specifically studying personal, family, and group dynamics. The ideal approach to capital litigation is a team of professionals including, at least, the attorneys, a criminal

investigator, a social investigator, a psychological expert, and the client.

Sucessful mitigation is a blame-shifting procedure where the jury is presented with evidence to demonstrate that the defendant was not born evil, but rather was the product of up-bringing, social environment, and physical and mental limitations. These are the kind of factors that are not totally subject to individual free-will and choice. Blame-shifting is a technique of evidence presentation and organization rather than a specific topic for argument; it is a counter to the prosecutor's argument of inherent "evil" that at the same time explains how the defendant found himself in a situation to take a life. Excuses and defenses are proper for the guilt phase; *explanations* control the mitigation phase.

> *It is necessary for attorneys in capital cases to seek the assistance of psycho-social professionals.*

Criminal attorneys are very comfortable attributing a client's behavior to his bad upbringing, depressed social environment, or substance abuse, because, from experience, there is a general feeling that these conditions do, indeed, contribute to shaping people. Juries, however, do not have the same experiences. To simply allege these conditions as explanatory factors does not *prove* anything. The jury must be told *how* and *why* these forces helped create this person who killed another. This is why psychologists and social workers are invaluable to the presentation of capital mitigation. Friends, family members, neighbors, teachers, prison personnel, etc., can testify to *facts*, but cannot render *opinions* as to how the family background, life experiences, physical and psychological conditions bear on the creation of the person whose life or death is to be decided.

### The Team Roles
*The Social History*

Upon appointment to a capital case, two concurrent investigations should be begun by separate and distinct investigatory per-

sonnel. The criminal investigation is self-explanatory. A social investigation or social history is a creature of capital litigation, however, and is a key to a successful mitigation. A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present.[2] The two investigations clearly overlap in many areas and many attorneys use the same investigators to do both the criminal and social investigations. The important distinction is that the social investigation has a separate goal: a detailed history of the client to assist a psychological expert and the rest of the defense team in understanding the client so that his actions can be explained to the jury. Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny.

A complete social history is necessary for psychological experts to gain a full understanding of the patient. In the criminal defense field (especially with indigent representation), however, evaluations are generally done solely for competency and insanity and are done on a lowest-bidder basis. The use of a social history helps prevent the familiar prosecutorial refrain during cross-examination of defense psychologists: "Doctor, isn't it a fact that all the information on the background of this defendant you received from his own mouth...?" A complete and professional social history is a necessity if psychological or psychiatric testimony is contemplated by the defense; this is true not only for mitigation, but any phase of any criminal trial.

The ability to conduct a social investigation and prepare a social history is a skill that is often possessed by people who have had training in clinical social work. This is not exclusive, however. Psychologists also often possess these skills, but the cost factor of having psychologists do this kind of "legwork" is generally prohibitive. Social workers are generally trained in the

interviewing process and possess the necessary skills to bring out often painful memories about the client's life from the client himself and from his family, friends, and acquaintances.

Sometimes people with little or no prior training or experience in this type of interviewing turn out to possess excellent interviewing and report writing skills. The important point is that it is essential to a successful mitigation that all of the significant events of the client's life are identified

---

## Some type of psychological expert should be made part of the defense team.

---

and a complete and accurate picture of the client's life is drawn. Armed with this, the defense team can explain the client's life to the jury and show what forces shaped the client into the person who committed this crime.

### The Psychological Expert

The psychological expert is also a keystone to a successful mitigation presentation to a jury. This is true not only where there is an attempt to show a recognized mental disease or defect, but also where lay witnesses have testified about the client's background and developmental history. The psychologist's explanation of the client's development is evidence, not merely argument of counsel.

Traditionally, psychological experts are used in criminal cases to show that the client is, or was, suffering from some mental disease or defect and that he either is incapable of assisting in his own defense, or was insane at the time the crime was committed. Attorneys sometimes conclude after meeting their clients and doing a brief social history that the client is not "crazy" and there is no reason to look into the use of a psychological expert. In virtually every capital case, some type of psychological expert should be made part of the defense team. The fact that it is increasingly difficult to win an insanity case should tell defense attorneys that it is going to be increasingly difficult for juries to be able to return life verdicts based on

the defendant's mental status or diminished capacity. This does not mean, however, that the use of psychological experts should be ignored. It means that the use of these experts needs to be expanded and refined.

The traditional use of psychological experts in mitigation has been similar to the use of psychological experts in insanity proceedings, i.e., to have a battery of tests performed on the client; to have the psychological expert diagnose the disease or defect (or lack thereof); and to have the expert give his or her opinion on whether this affected the client's ability to control behavior. While there are many cases where there is a valid mental disease or defect and it does affect the defendant's behavior, it is difficult in the post-Hinkley era to win on this issue. In a far greater number of cases, this traditional approval will result in either a questionable diagnosis of a disease or defect, an opinion that it did not affect the client's behavior, or an opinion that the client is a sociopath. In all such instances, the presentation of this testimony in mitigation is more likely to result in a death verdict than a life verdict.

The use of a psychologist by the defense team goes beyond testing and diagnosis and the giving of opinions at trial. The psychologist is a valuable resource to the defense team. Not only can the psychol-

## JURY SELECTION
### Sciences

- Profiles

- Voir Dire Questions

- Surveys

- Consultation

*Excellent References*

P.O. Box 556
E. Sandwich, Mass. 02537
(617) 428-8537

---

2. For further discussion of this, see Blum, *Investigation in a Capital Case: Telling the Client's Story*, THE CHAMPION, August 1985, at 27; Alfonso & Baur, *Capital Cases—Enhancing Capital Defense: the Role of the Forensic Social Worker*, THE CHAMPION, June 1986, at 26.

ogist provide the necessary expertise to determine if there is a mental disorder or defect and some analysis of its chances of success, but also can lead the defense team to other possible areas of inquiry (such as organic brain damage or post-traumatic stress disorder) and to various specialists who can possibly assist the defense team in preparing for mitigation. Many of these areas may be totally out of the realm of knowledge of the attorney.

If the psychologist sees some type of real mental disease or disorder and is of the opinion that it definitely affected the client's behavior (*i.e.*, insanity or some type of diminished capacity), then the defense team may want to consider pursuing the more traditional psychological defense for mitigation. At that point, it may well be best to bring in another professional, perhaps a psychiatrist, to buttress the opinions of the psychologist.

If the tests and interviews reveal no serious mental disease or defect, then the defense team needs to look to the social history for clues to explaining the client's behavior. A psychologist, in conjunction with the social investigator, can often develop a theory from the social history to explain the client's lack of control or the situation at the time of the crime. Unless one accepts the theory of inherent evil, most cases will reveal an explanation for the client's personality and actions. In some cases this explanation will not be sufficient to mitigate the crime for the jury. Without the explanation, however, the jury will not comprehend the crime, and the reaction will be to kill the client.

*Without the explanation, however, the jury will not comprehend the crime.*

Explaining the client's life, personality, and involvement in the crime goes beyond the diagnosis of a personality disorder to discover and show to the jury why this client acts the way s/he does — how all of the factors of his or her life added up to create the person who, at the time of the crime, could commit such a heinous act. There is more to the explanation than presenting evidence of a "bad childhood,"

sexual abuse, or unstable family relationships. Many jurors' reactions to such evidence is that a great number of people (often including themselves) have suffered through "bad childhoods" and do not go around killing people. What is needed in mitigation is, after all of the direct testimony from family, friends, school teachers, acquaintances, juvenile authorities, prison officials, medical personnel, and anyone else who had significant contact with the client, the testimony of a psychological expert who can interpret all of these varying factors and tell the jury how all of the myriad factors in the client's life gathered together to form the person who committed this murder. Without this focus, the jury is left to speculate on why any of these individual factors make any difference in whether death is the appropriate punishment.

The use of a psychological expert this way gives the defense team essentially two opportunities for closing argument; one, through the testimony of the expert, and two, through a repetition of the explanation in the attorney's closing argument. If an expert is unavailable, the attorney must make the same explanation in closing argument. If there is an expert available, having the explanation in testimony and reinforced by argument strengthens the presentation to the jury dramatically.

Once the psychological expert has been made part of the defense team, preferably very early on in the proceedings, defense counsel must work closely with him or her throughout, not only to gain as much possible insight into the client and how to present the case, but also to prepare the expert for testimony. Serious preparation for expert testimony is always essential. In mitigation, the client's life may depend on it. All defense attorneys have been in courtrooms where the dialogue between counsel and the expert on the stand is punctuated with five syllable words and is totally unintelligible to the jury. If a jury is going to believe an explanation of a defendant's life so that it will not return a death verdict, it must first understand the explanation. Perhaps more in mitigation than anywhere else, clear, simple, understandable language is essential to bringing across the explanation. Testimony that sounds like a doctoral dissertation is clearly out of place when explaining a client's life history. This will help to meet the first goal

of mitigation — humanizing the client rather than making him/her sound like a page out of textbook.

The expert's testimony is the glue that cements all the factors of the defendant's

*The use of social workers and psychologists as part of the defense team is a necessity—not a luxury.*

life into one cohesive picture; the explanation of how accident of birth, injury, family and environmental background, accident, chance, disease, or substance abuse put him/her in a position to commit the murder on the day in question. These are not defenses, they are the identification and explanation of the factors beyond the client's control that may give the jury a reason to keep the client alive. The psychologist will be able to explain how the many significant life factors placed the defendant in a position to intentionally kill another. This explanation hopefully, at the same time, shifts moral blame to external sources and counteracts the prosecutor's inevitable argument of "evil."

## Conclusion

In death penalty defense, an attorney must treat each case as the most important, possibly last, case s/he may ever handle, and use the most sophisticated tools available. Public opinion in favor of the death penalty is continuing to grow. There appears to be no sign that this trend is going to reverse itself in the near future. Therefore, it is unreasonable, as a criminal defense bar, to expect *Furman-* or *Lockett-*type decisions. The capital defense attorney must recognize that the profession demands a higher standard of practice in capital cases than that required by *Strickland v. Washington.* The use of social workers and psychologists as part of the defense team for mitigation in a capital case is a necessity — not a luxury. Before the courts and legislatures recognize this fact, the practicing defense attorney must recognize this and demand their assistance as a necessity to effective representation.

■

E

# Exhibit 39

# Investigation in a Capital Case:
# Telling the Client's Story

*by Jeff Blum*

You've been appointed as defense counsel in a first degree murder case. From what you have read in the papers and a cursory look at the indictment and facts, there is one definite aggravating circumstance, a probable second, and a possible third. You're familiar with the district attorney's office and you know that there is a relatively good chance they'll file for the death penalty either as a serious statement of intent or added leverage to extract a plea. Now what do you do?

At this point most defense counsel will visit the client, make some small talk, outline the legal proceedings, review the facts of the case, and then return to his or her office to plunge into the legal issues surrounding the offense. While all this is admirable and necessary, in a capital case, this type of attorney-client contact and pre-trial investigation is seriously inadequate if you expect to develop a proper defense in a sentencing hearing.

## Talk To Your Client

From your initial contact with your client, you should be accomplishing two separate tasks. First, you need to be building strong personal rapport and trust between you and the defendant. Whether the case goes to trial or is eventually pled, the defendant has to believe that you have his or her best interests in mind and needs to feel part of the process that is deciding his or her ultimate fate. Secondly, you need to be gathering broad, comprehensive, and detailed biographical information

*Jeff Blum is an ordained minister active in death penalty trials. He is staff director of the Tennessee Association of Criminal Defense Lawyers.*

about the individual for the preparation of a possible sentencing hearing. These goals cannot be accomplished through quick, businesslike, cursory visits.

Talk to your client. The first few hours of the initial visit should be directed toward the individual; informally gathering information, building rapport and trust. I was recently speaking about this topic at an attorney's conference and raised the example of the attorney who I sat with at lunch. In fifteen minutes, he knew more about our attractive waitress than most attorneys know about any one of their clients. Though the intentions are different, you should engage your client in this same type of probing conversation.

## What You're Trying To Find

There are no limits to the areas to be explored in these conversations, but there are bare minimums which should be discussed. In broad terms, you're trying to discover people and places: people who knew your client as he or she was growing up and places that would have documents concerning your client. These people can help explain to the jury how a child who was born into this world innocent developed into the person who committed this terrible crime. Places such as schools, rehabilitation programs, hospitals, prisons, summer camps, etc., harbor documents that chart your client's development and accurately record physical or emotional problems, life changing events, specific needs, and professional recommendations. In a sense, the sentencing hearing of a capital case is an opportunity to tell the defendant's story: to humanize the person to the jury. You can only do this if you have the information to develop a comprehensive understanding of the individual's life.

Areas that should be explored are:

**Family Background**

Have the client walk through his life naming as many people and relating as many events as possible. Attempt to gather any pre-natal family information such as the parents' criminal records, background, or drinking habits. Establish whether there were any problems during pregnancy or birth. Listen for any allusions to child abuse or neglect and carefully explore these areas. Discuss any marriages and children in depth.

**Medical History**

Discuss any serious injuries or illnesses experienced by the defendant as he or she was growing up. Be attentive to any that may have caused developmental damage such as severe head injuries, serious drug overdoses, or aphyxia. Compile a list of every hospital that the client remembers entering and the names of doctors who have treated the individual.

**School Performance**

Make a list of every school attended, every teacher remembered, the grades received, favorite courses and any extracurricular activities. Pay special attention to any special education classes attended by the client or severe disciplinary procedures.

**Military Experience**

If your client was in the military, establish if he or she was ever in combat, the rank received, skills learned, where stationed, nature of duty, and the type of discharge received. Obviously, any form of recognition, either positive or negative, should be carefully investigated as should any combat experience.

## Work History

What kind of jobs has your client held? Has he or she been a productive member of society? Make a list of every job the person has ever held, the employer, and a contact person who had positive feelings about your client.

## Psychological Profile

Find out if your client has ever been psychologically evaluated and/or institutionalized. If so, establish when and where and the names of their doctors or psychologists. Further, check and see if he or she has ever been prescribed psychotropic drugs of any type and the history of this drug therapy.

## Criminal Record

Carefully and comprehensively review this area, since this will play an important part in the prosecution's aggravating circumstances. Using a rap sheet if available, go through each prior offense and establish the place, time, main actors, legal disposition, and present status. If probation was received for previous convictions, find the name of the probation officer or other individuals involved in the case.

## Institutional Record

Since the bottom line of any sentencing hearing is the choice between death and life imprisonment, your client's performance during previous institutionalizations could be crucial. Establish dates, institutions, and personnel pertinent to the time of incarceration. How many disciplinary write-ups were received during the period of incarceration? What rehabilitative programs were completed? In what manner did the client exit from the system? Is there a staff person who would vouch that this individual is a model prisoner and presents no threat to guards, inmates, or any other member of the prison community?

## Significant Others

This is a broad heading which includes any number of people. It may be the scout master who knew the client as a child or the aunt and uncle who stepped in when parental care was woefully inadequate. Often, it will be a social worker, probation officer, or some other state designated individual who had a profound effect upon the client at a particularly difficult time. This person could be a real key, so spend

some time beating the bushes of your client's memory to flush this person out.

## Religious Background

Despite the fact that I am a minister who was drawn to death penalty work by my religious convictions, I am not an advocate of the "born again" defense. Thinking that some minister who has known the defendant for either a long or short period of time will persuade the jury to save his or her life because of a religious conversion or because he or she is "basically a good kid" is a fantasy. It is important, however, to establish the religious background of the individual, churches attended, and identify any significant individuals in the defendant's life. Often, these witnesses can help shift some of the blame back onto the parents or some other individual who stunted the client's moral development.

## Drug/Alcohol History

Very rarely does an individual reach this point in the legal process without a significant history of drug and/or alcohol abuse. Establish which drugs have been taken, during what period of time, and in what quantity. Did the client ever black out or experience a drug overdose which left him or her feeling significantly different? Has he or she ever been through any rehab programs? What was the level of abuse at the time of the instant offense?

## Geography

In gaining an adequate picture of the client's life and especially when attempting to contact witnesses or gather documents, it is important to know where the client lived and during what period of time. Work out a careful chronology of the places where the client lived and the timing of the moves. When a person moved

and the reason for moving could be significant in understanding your client.

## Particular Skills or Talents

The main thing the jury is going to know about your client is that he or she killed someone. Explore interests that your client has that may humanize him or her to the jury.

As you converse with your client and explore these areas, "chase rabbits." If a subtopic of interest surfaces, such as a particular childhood event, chase it down to its final conclusion. Even if it proves to be a dead-end in relation to the sentencing hearing, it will aid in building rapport with your client and you will gain a broader understanding of this person whose life is in your hands.

## Once Is Not Enough

With lists of areas to be covered in hand, you visit your client, engage him or her in meaningful conversation for three hours, and extract copious amounts of information while building fantastic rapport. You're done, right? Not at all. Don't expect to find out everything in one visit or through one interview. You're probing questions will dislodge an avalanche of memories and feelings in your client that will continue long after the interview ends. Go back to your client a few days later, re-open areas of particular concern, and probe deeper into areas that hold particular promise. Give your client permission to contact you whenever he or she remembers particular incidents or people that may be helpful. Challenge the person in subsequent visits to unearth new information or to reinterpret information already shared.

Realize that certain information such as child sexual abuse or drug problems will

**Telling the Client's Story**

not be easily shared with a stranger. It may take weeks or months of intimate contact before the individual shares some deep, painful secret that may be the key to understanding his or her violent or bizarre behavior. It is your job to nurture the environment of trust that will allow this sharing to take place.

## Collecting Paper

Of all the things you carry into the initial conversation with your client, the most important is a stack of information release forms for him or her to sign. Whereas memory can be faulty or subjective, documents from schools, hospitals, drug programs, military records, community programs and other agencies, programs, and organizations can offer a concrete record of the individual's past. In this age of cradle to the grave documentation, you will be amazed at the volume of paper available concerning your client: especially if the individual has had contact with the criminal justice or social service system.

It is important to get the information release forms signed and delivered to the proper agencies immediately. Bureaucratic organizations are notoriously slow at processing requests and providing information. Some government agencies, such as the Veterans' Administration, have special

forms that must be completed. Given that your client's involvement with the agency may have occurred fifteen or twenty years ago, the search through old, dead files can take weeks, maybe months. Once you have filed your release forms, call the agency weekly to ensure that they are searching for the information and if it is a government agency, call your congressperson to help expedite matters. The last thing you want is to receive a document that diagnoses your client as brain damaged three weeks after the individual has been sentenced to die. Start collecting paper immediately.

As the paper starts coming in, scour it for the names of people who have had a professional relationship with the defendant. Unlike family members whose obviously biased testimony is suspect, the jury will listen to the testimony of a professional who brings a more objective perspective to the stand. Add these names to the list of people given to you by the client during your multiple interviews.

A convenient manner of organizing the documents gathered is to punch holes and store them in a looseleaf folder in chronological order. It is also helpful to have the documents reviewed by a sympathetic individual familiar with the procedures of that particular institution. You will often

find that programs or organizations will remove documents that are particularly unflattering to the institution but may be invaluable to the client. A careful review by an experienced individual will catch these omissions.

## Players In The Story

From the list of people gathered through conversations with your client and culled from the various records you have procured, make a separate list which ranks people by their importance in this case. In most circumstances, family members will be your primary source of helpful information and should be interviewed as soon as possible.

Though it is more convenient to have family members come to your office, your time spent will be more productive if you meet with them in their own home. Encourage several family members to meet with you at the same time in the home that has been the primary residence of the defendant. Having everyone meet together will not only save you a great deal of time, the dynamics of the family group will give you insight into the way which the family operates and usually spurs a greater flow of information. Relaxed among themselves, the defendant's family is more likely to speak freely about events and individuals than when interviewed separately. You are also more likely to get valid information since members of the family will often correct misinformation offered by another member. Finally, in the ambiance of the home, surrounded by pictures and memorabilia of the family's past, you are more likely to stumble across valuable information while absorbing a feel for your client's history.

It is important to note that there are definite exceptions to conducting your family interviews in this manner. If there are issues such as child abuse or sexual irregularities that have surfaced, it is obvious that these topics will not be freely discussed in the presence of the guilty parent or party. Target a family member who seems particularly articulate or candid and contact that individual at a later date to explore sensitive topics. As is the case with your client, you may need to do repetitive interviews with various family members, especially if there is a good chance that you will use them as witnesses in the sentencing phase.

As you work your way through the family interviews and into interviews with the other priority people on our list, be attentive to gathering names of other people or places that may provide information. It is obvious that you will not be able to interview every person mentioned, but constantly evaluate your priority rankings and work yourself as far down the list as possible. It is helpful to keep a looseleaf witness book with a face sheet on each person, notes from your interview, and any additional information or documents that are pertinent to that witness.

## Putting It All Together

As you proceed through your interviews and study the documentation you have garnered, a theme for your sentencing phase should begin developing. One method of graphically discovering this theme is to construct a chronological chart which parallels the various areas investigated through your interviews. Illustration 1 on page 29 shows a small section of a chronology chart constructed on the spreadsheet program of a popular microcomputer.

This chart graphically shows how a kid who was getting B's and C's in school, was active in Cub Scouts, and was evaluated as normal by the school psychologist, suddenly had to be placed in special education classes, was caught for shoplifting, and was later diagnosed as anti-social. All of this occurs during or after the time that the child is experiencing a severe head injury, the death of a brother, and abandonment by the father. This is the kind of concrete explanation that helps you to establish a sentencing phase and gives you a resource you can place before the jury.

Once you have established your theme and found the witnesses from the individual's past to help tell the story, you should bolster your case with testimony from outside experts. In this area, the field is limitless. Psychologists, psychiatrists, child development specialists, drug/alcohol experts, social workers, or any other of a number of professionals can serve this purpose. Their role is to take the often inarticulate testimony of the other witnesses, merge it with any concrete displays, documents, or evidence that you have, and couch it in a cohesive explanation, not an excuse, for why your client committed this act.

This is the objective voice from the witness stand that will hopefully articulate the reason why your client does not deserve to be killed. Careful investigation of the person's credentials, experience, and court room demeanor by discussions with other attorneys or colleagues will ensure that his or her testimony will affect the jury as planned.

## Do You Really Need To Work This Hard?

The tendency of most defense attorneys is to play the odds. First he or she hopes that the district attorney won't seek the death penalty. When notice is received that the death penalty is being sought, defense counsel assures the client that a plea will be struck. When the D.A. fails to offer a plea or the client refuses the "generous" offer of two consecutive lives, the defense attorney deludes him/herself into believing that the jury will come back with less than first degree. With the verdict of guilty of murder in the first degree still ringing in his or her ears, defense counsel figures it can be pulled out at the sentencing hearing by a crying mother and a brilliant, impassioned closing argument. Finally, as the bailiff escorts the recently condemned client to Death Row, defense counsel mutters something about winning it on appeal.

Fifteen hundred men and women on death row and over forty-three executions in the past seven years attest to the fact that playing these types of odds can be fatal.

After the client and his or her immediate family, the person most negatively affected by a sentence of death is the defense attorney. Many legal careers have been destroyed when attorneys not prepared to bear the weight of a capital case have found themselves standing beside a client being condemned to die. If you have adequately investigated the case and invested the necessary time and energy, the loss of a capital case is difficult but not devastating. If you have been remiss in your duties and a sentence of death is levied upon your client, you may be able to convince the judge presiding over a post conviction hearing that your representation was adequate, but you will ultimately know that your poor performance may have caused the unwarranted death of a human being.

I don't say this to guilt trip some attorney who has recently lost a capital case: that individual already knows the personal grief from losing a case of this type. I do it as a warning to the unsuspecting attorney of the future who wades into a capital case acting as if it were no different than any other felony trial. A capital case is the ultimate trial and once the verdict has been rendered, and the sentence finally administered, it is irrevocable. Don't make the mistake of doing a less than adequate job on the most important trial of your life.

■

# Exhibit 40

State of Texas        )
                      )          In Re Anthony Shawn Medina
County of Harris      )


### Affidavit of Eva Uribe


I, Eva Uribe, state that the following is true and correct to the best of my knowledge:

1.  My name is Eva Uribe.  I am over 18 years of age, can read and write the English language, and am competent to give this statement.  I presently live at 515 Muirwood Lane, Sugarland, Texas 77478.

2.  I am Anthony Shawn Medina's aunt.  Tony's father is my brother.

3.  I testified at the punishment portion of Tony's trial.  The day I testified, a woman called me and told me to get to the courthouse immediately. When I arrived at the courthouse, I was told I would be a character witness and that they would ask me a few questions, but that's really about it.

4.  My neighbor went to church with one of Tony's lawyers. After he died, I learned that he had been sick for a long time.

5.  I was never told what the prosecutors might ask.  I only talked to that woman for maybe five minutes.  I never talked to the attorneys before they put me on the stand.

6.  I remember they had these blown up pictures of the victims and Tony in gang clothes.

7.  When I testified, I told the jury that I helped get Tony involved in the Bellaire Christian Academy.  I wanted to tell the jury more about that but the lawyer didn't ask me any questions.

8.  Because nobody had talked to me about my testimony, I felt like I had to say only good things about Tony and his family.  Nobody explained to me that it would be important for the jury to understand who Tony was and where he came from.

9.  The reason I was so involved in getting Tony to Bellaire Christian Academy was I had concerns about the environment he was growing up in.

*Eva*

10. My brother drank a lot during Tony's childhood. When Tony was a baby, my brother would drink at home but as Tony grew older he would stay out all the time. I used to call over to their house in the evenings, even late at night, to make plans for the next day and Tony would always say, "My Dad's not home yet."

11. When you went over to their house there was always a bottle or two of Jack Daniels or something lying around.

12. I remember once, when Tony was about 10, Tony Sr. was trying to get in his car but he was so drunk that Golda had to go outside and pick him up and drag him back in the house. I heard about the incident from the neighbors, Christy and Golda. It was a pretty big deal. I'm sure the kids saw the whole thing.

13. My brother and Golda always had marital problems. It was mostly about my brother's drinking.

14. At one time, my family lived 4-5 streets from where my brother and his family lived. The neighborhood started going downhill. There was a driveby shooting across the street from our house and that's when our husband said, "We're leaving now." The blocks around where Tony lived were even rougher, more drugs and gang stuff.

15. If Tony's attorneys would have asked to meet with me before or during Tony's trial, I would have been very willing to meet with them and give them all the information I had about Tony and his family.

I have read this affidavit. I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

*Eva M. Uribe*

Eva Uribe

Signed and sworn before me this 19th day of November, 2001.

Notary Public

My commission expires: 10-15-2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

# Exhibit 41

State of Texas          )
                        )          In Re Anthony Shawn Medina
County of Harris        )


### Affidavit of David Castro


I, David Castro, state that the following is true and correct to the best of my knowledge:

1.  My name is David Castro.  I am over 18 years of age, can read and write the English language, and am competent to give this statement.  I presently live at 7310 Tall Pines Drive, Houston, Texas 77088.

2.  Tony's father is my first cousin.  I lived in Houston during Tony's growing up years.  I always saw Tony and his family at family gatherings.  Sometimes Tony and his father came over to my house to help me when I had maintenance or car problems.

3.  I testified during the punishment portion of Tony's trial. Prior to Tony's trial, I was never contacted by Tony's attorneys or investigators.

4.  Tony's parents called me after the trial had started and asked me if I was willing to testify on Tony's behalf.  I told them I was willing to come to the courthouse and testify.

5.  Tony's attorneys did not interview me before I testified. All they told me was that I would be asked questions about Tony's life. They did not tell me what questions they were going to ask me or how to deal with the prosecutor's cross-examination.

6.  When I was on the stand, I could only answer questions the attorneys asked me.  It didn't take more than five minutes for Tony's attorneys to ask me all the questions they had. I tried to explain what kind of neighborhood Tony grew up in and how that environment may have had an impact on Tony, but I was not able to tell the jury everything I knew about the neighborhood.  I felt the attorneys did not know what to ask me since they had not talked to me before I took the stand.

7.  Tony grew up in an extremely dangerous neighborhood.  At that time, you couldn't turn on the local news without

hearing about shootings, robberies, stabbings. When you drove through the neighborhood, the gang presence was apparent. Low rider groups were everywhere. Graffiti was real heavy. The neighborhood was dangerous even for an adult male.

8.  Things were so bad that two of my cousins who lived in the area where Tony and his family lived ended up moving out of the neighborhood. I wish Tony's dad would have moved his family out of the neighborhood.

9.  I also wish I would have gotten a chance to tell the jury about Tony's interactions with my son who is two years younger than Tony. Tony was always very good with him, always willing to help. Tony helped my son install the radio in his car. Tony and my son were also very artistic. I have vivid memories of Tony teaching my son how to paint.

10. Had Tony's attorneys contacted me before Tony's trial, I would have been very willing to meet with them.


I have read this affidavit. I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.


_David Castro_ (signature)

David Castro


Signed and sworn before me this 15th day of November , 2001.


_Naomi Terr_ (signature)

Notary Public

My commission expires: 10-15-2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

Exhibit 42

State of Texas          )
                        )          In Re Anthony Shawn Medina
County of Harris        )

## Affidavit of Sherry Grein

I, Sherry Grein, state that the following is true and correct to the best of my knowledge:

1.  My name is Sherry Grein. I am over 18 years of age, can read and write the English language, and am competent to give this statement. I presently live at 21042 Stoney Haven Drive, Katy, Texas 77449.

2.  I am Anthony Shawn Medina's aunt. His mother, Golda, is my sister.

3.  I testified at the punishment portion of Tony's trial. I didn't attend much of the trial. I only went a couple times and just peeked in.

4.  I didn't know I was going to testify until the day I was called. I was at Golda's house trying to comfort her because Tony had already been convicted. Someone called the house to try to get Golda to testify. Golda was devastated and didn't think she could do it.

5.  I was asked to come to the courthouse. When I arrived, I talked with someone in the hall for about five minutes. They told me to say what I could about Tony and the good things he did. I never mentioned any of the bad stuff because Tony's attorney never asked me. I didn't think Tony's attorneys wanted the bad stuff to come out.

6.  They didn't prepare me at all for the cross-examination. It seemed to me their main concern was trying to figure out how to get Golda to the courthouse.

7.  The prosecutor tried to make it seem like Tony's family was perfect but because of what Tony's lawyers had told me earlier I didn't feel like I should volunteer information that would make the jury think poorly of Tony's family. If Tony's attorneys had let me know that was important for his case, I would have told the jury about it.

8.  I remember moving a lot when I was a child. Our family

never lived in one place for more than 2 years.

9.  My father was a heavy drinker.  He would also get mad very easily.  He was the disciplinarian in the family and spankings could get pretty rough sometimes.  Golda and my other sister, Didi, usually got the worst of it because they were older.

10. Tony Sr., Golda's husband, also drinks heavily.  It sometimes seems like all he does is drink.  Golda has had a rough time.  She started using marijuana when she met Tony Sr. and that continued throughout their marriage and Tony's childhood.

11. When Tony started to have problems, Golda desparately wanted to get him out of the neighborhood but Tony, Sr. wouldn't let them.  Golda went on and on about trying to get the family away from there but it was all about money.  Tony, Sr. loved being in that house because it was so cheap.  It's not like they didn't have the money to move away, but Tony, Sr. just didn't want to spend the money.

12. That neighborhood was bad.  I would never live there even if I had to.  It's just all drugs and kids driving around with their radios blaring.  My husband and I never even liked to go visit them there.


     I have read this affidavit.  I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.


                                        ___Sherry Grein_____
                                        Sherry Grein


Signed and sworn before me this 20th day of November, 2001.


Naa T___
Notary Public

My commission expires: 10-15-2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

# Exhibit 43

State of Texas          )
                        )       In Re Anthony Shawn Medina
County of Madison       )


## Affidavit of Verlan Pegues


    I, Verlan Pegues, state that the following is true and correct to the best of my knowledge:


1.    My name is Verlan Pegues. I am over 18 years of age, can read and write the English language, and am competent to give this statement. I presently live on Willow Street in North Zulch, Texas.

2.    I am the great-great-uncle of Anthony Shawn Medina on his mother's side of the family. I testified at Tony's trial during the punishment portion of the trial.

3.    I watched all of the trial except for the first day or two of the trial because I had to be in Fort Worth. After that I drove down every day and sometimes stayed in Houston overnight.

4.    Jack Millin, the only one of Tony's attorneys who ever talked to me, didn't look well and seemed tired all the time.

5.    Tony's attorneys never talked to me until the day I testified, even though I was in the courtroom almost every day. On the day of the punishment phase, Jack Millin came up to me and told me he had seen me in the courtroom sitting with Tony's family. He asked me if I would be willing to testify.

6.    Two hours after he asked me to testify, they called me to the stand. Since I didn't know I was going to testify, I was sitting in the courtroom while the other people testified. When they called me, the prosecutor said I shouldn't testify because I had been sitting in the courtroom. But the judge and the attorneys talked and they went ahead and let me testify.

7.   I was nervous about testifying because Mr. Millin never told me what I would be testifying about.  He never spoke to me about my testimony before putting me on the stand.  Had Tony's attorneys contacted me before the trial, I would have gladly met with them.

I have read this affidavit.  I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_Verlan Pegues_

Verlan Pegues

Signed and sworn before me this 9ᵗʰ day of November , 2001.

_Naci Tz_

Notary Public

My commission expires: 10·15·2005



NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

# Exhibit 44

State of Texas          )
                        )          In Re Anthony Shawn Medina
County of Harris        )

<u>Affidavit of Kim De La Cruz</u>

    I, Kim De La Cruz, state that the following is true and correct to the best of my knowledge:

1.  My name is Kim De La Cruz.  I am over 18 years of age, can read and write the English language, and am competent to give this statement.  I presently live at 4761 Redstart, Houston, Texas 77035.

2.  I work at Second Baptist Church in Houston, Texas.

3.  I met Tony Medina when Tony was about 13 years old.  I was working at Bellaire Christian Academy in southwest Houston at the time.  Most of my interactions with Tony were through the church youth group. I was also one of his teachers at BCA.

4.  Tony was a good kid but very impressionable.  He was a follower and not a leader.  I always felt that Tony needed and wanted to fit in but he didn't fit in with the "preppies" or the jocks at BCA.

5.  I did not feel that Tony got the support he needed when he was not at BCA or in church activities.  I always questioned where his parents were because his aunt was the one that brought him to school and church functions. My interactions with Tony and his siblings led me to believe Tony's father was not there for Tony. Tony would sometimes make comments about his father not being at home and always being mad. I often wondered what kept Mr. Medina from spending more time with his son.  Given what I knew about the family dynamics, I wondered whether Mr. Medina had a drinking problem. Another possibility I considered was that Mr. Medina was working a lot, trying to provide for his family.

6.  I was concerned about Tony because he seemed to gravitate towards the rougher kids.  It was clear to me from the way he interacted with other children that Tony was growing up in a rough neighborhood.

7.  Tony's Aunt Eva did the best she could to get Tony out of the environment he lived in, but she wasn't Tony's parent. It seemed like there was a clash between the church environment and Tony's life outside of church. I do not believe Tony's parents or friends from the neighborhood reinforced the values Tony was learning at BCA and in the youth group.

8.  At the time I knew Tony, he was at a critical stage in his development. I always believed if he had an outlet, like sports, he wouldn't have been caught up with the wrong crowd. Tony was always eager for my attention and mentoring.

9.  I was never contacted by Tony's defense lawyers or investigators before his trial. Had they contacted me, I would have gladly testified on Tony's behalf.


    I have read this affidavit. I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.


                                        _____
                                        Kim De La Cruz



Signed and sworn before me this 15th
day of November, 2001.


_____
Notary Public

My commission expires: 10-15-2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

Exhibit 45

State of Texas      )
                      )       In Re Anthony Shawn Medina
County of Harris   )

### Affidavit of Samuel Gallegos


     I, Samuel Gallegos, state that the following is true and correct to the best of my knowledge:


1.    My name is Samuel Gallegos.  I am over 18 years of age, can read and write the English language, and am competent to give this statement.  I presently live at 14006 Catina Lane, Houston, Texas 77045.

2.    I knew Tony Medina ever since I can remember.  Tony and his family lived across the street from where I grew up.  When we were little, we used to play together.  My mom and his mom were friends.

3.    I was shocked when I found out Tony was arrested for the drive-by shooting.  To this day, I don't think he did it. He wasn't the kind of person who would do something like that. I knew what kind of person he was.

4.    Tony was a good kid.  I didn't go to school yet, but I would see Tony go to school and come back and do his homework.  He wasn't into stealing or criming.  I remember seeing him by the window inside his house a lot.  His mother didn't let him come outside that much.  When he played with us he always treated me like his little brother. He was never mean to me. He was cool to me.

5.    When Tony became a teenager he wanted to have friends really bad.  He wanted to be cool because he was teased a lot. Everyone would tease him because he stuttered.  He started hanging around gang members because back then that was all that was in our neighborhood-gangs and drug dealers.

6.    We lived in a hard neighborhood.  There was a lot of violence. Around 1985 a lot of gangs started moving into our neighborhood like the Crips, the Bloods, the Brown Rags, the Black Rags.  There were drive by shootings and killings all the time. The gangs would hang out by the bayou. I could hear gunfire coming from the bayou all the time.  It was

S.G.

crazy.

7.  When I was about 8 or 9, I was walking with my friend J.R.
    on Prudence Street.  We were going to play video games.  My
    friend and I were going by warehouses when I saw some black
    people who had a guy pinned up against the wall and they
    were beating him.  One of the girls who was by the warehouse
    saw me and yelled to the other people to "get that Mexican."
    My friend took off running.  I was so scared I kind of
    froze, but then I started running as fast as I could.  All
    the black people jumped in a car and started following me.
    One of my neighbors happened to be going outside and when
    the people in the car saw my neighbor, they sped off.  I was
    so terrified I ran to the fire station and told the
    firefighters those people were trying to kidnap me because I
    saw them beating up someone.

8.  I also remember one day I was riding my bike with some
    friends  at the corner of Catina and Heathercrest when some
    gang members tried to run us off the road with their car.
    We gave them the finger and about five minutes later they
    came back and shot at us. I was about 12 years old when this
    happened.

9.  We even had a drive-by shooting at our house. I remember it
    was a day or two before Halloween because my brother and I
    were trying on our costumes.  We heard gunfire and we got on
    the floor.  You can still see the bullet holes in our living
    room wall and in the wall by our dining table.  One bullet
    missed my aunt by a few inches. To this day we have no idea
    who did it or why someone shot at our house.

10. That was the kind of neighborhood Tony grew up in.  I know
    Tony was scared just like I was because all the kids in the
    neighborhood were afraid of being hurt or being shot by gang
    members.  There was a lot of pressure to join the gangs back
    then.  The Lucio brothers lived in our neighborhood and they
    were the leaders of LRZ.  From when I was about nine years
    old until I was sixteen they kept telling me to join the
    gang.  I remember one time they even told me they would make
    me an offer I couldn't refuse.  They told me all I had to do
    was fight a guy who was known as "Tiny" for one minute and I
    could be in the gang.

11. Once you were in a gang, getting out was really hard.  You
    had to be "clicked out."  That meant you had to fight the
    whole gang for one minute before they would let you leave
    the gang.  If you tried to leave the gang without "clicking
    out" they thought you were trying to get out the "pussy way".

S G.

and they would beat you up.

12. Tony got caught up with the gang because he just wanted attention and friends and joining the gang was the price he had to pay. But even after everyone knew he was in a gang, Tony was always very respectful to me and my family.   He never tried to get me to join.

13. Tony's defense attorneys never contacted me before his trial. Had I been contacted by Tony's attorneys or an investigator, I would have gladly met with them.  I would have also been willing to testify on Tony's behalf.

I have read this affidavit.  I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_Samuel Gallegos_
Samuel Gallegos

Signed and sworn before me this 14th day of November , 2001.

_Nc  T_
Notary Public

My commission expires: 10-15-2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

Exhibit 46

State of Texas        )
                      )        In Re Anthony Shawn Medina
County of Galveston   )

Affidavit of Lillian Crowson

I, Lillian Crowson, state that the following is true and
correct to the best of my knowledge:

1.   My name is Lillian Crowson.  I am over 18 years of age, can
     read and write the English language, and am competent to
     give this statement.  I presently live at 2901 Gulf Freeway,
     Apt 24, Dickinson, Texas 77539.

2.   I am the aunt of Anthony Shawn Medina on his mother's side.
     I am known by my family as Didi.

3.   I lived in the Houston area from the time Tony was about
     five years old until he was thirteen.

4.   During that time, I spent a lot of time with Tony and his
     family.  At one point, I even lived with the Medinas.  Even
     after I moved out, I stayed in the neighborhood and would
     continue to take care of the kids.

5.   That neighborhood became very dangerous.  Golda would
     complain about how dangerous it was becoming all the time.
     It was "gangland".  One time my kids were over at the
     Medinas when there was a driveby shooting across the street.
     I wasn't surprised to hear Tony was in a gang because
     everybody in the neighborhood was in gangs.

6.   When Tony was 13, I moved to La Porte, Texas where I lived
     for approximately four years.  After I moved to La Porte, I
     didn't have as much contact with Tony's family.

7.   I always had concerns about my sister and her kids.  My
     sister has been married to Tony, Sr. for 27 years and ever
     since I can remember they have had marital problems.

8.   I remember throughout Tony's childhood, Tony Sr. was gone a
     lot.  On Friday nights he wouldn't even come home at all.
     He seemed like when I saw him he was always drunk and I can
     recall him coming in staggering after he was out drinking.

9.   Golda has had to put up with a lot.  I remember she used to

smoke marijuana when Tony was little.  She tried to hide it but I could sometimes smell it from under her door.

10.  When Tony Sr. was at home, he and Golda would frequently get into fights.  I always tried to keep the children sheltered from that but they knew what was going on.  It must have been very difficult for them.

11.  I remember one time when Tony was about 8 years old, Golda and Tony Sr. were having a real bad argument.  It was so bad that Golda told me to take my kids and Tony and his sisters and lock ourselves in the bedroom.  We could hear Golda and Tony Sr. screaming and I could tell they were in the front yard.

12.  Later on, Golda came into the bedroom and she had grass ~~stains~~ all over her back.  She told me Tony, Sr. threw her on the ground.  I knew though that Golda could take care of herself, I was just worried about the kids.

13.  When his parents were fighting, Tony would get very quiet and sometimes he would cry.  Other times he would want to go out to the room where his parents were to try to make them stop.

14.  Tony Sr. was always trying to make up by giving flowers and jewelry but he always seemed to go back to the same way. Golda always suspected that Tony Sr. was having extra-marital affairs.  I think Golda has stayed in the marriage with Tony Sr. even though they have problems because of co-dependence.  Golda went from having a bad childhood to having a bad marriage.

15.  My father, who is Golda's stepfather, was a very heavy drinker.  He had violent fits of temper.  My father's answer to everything was "beat the hell out of them."  Golda and I got the worst beatings.  I can remember Golda and I wore welts and stripes from the beatings.

16.  Tony was teased a lot by other kids when he was young because he stuttered.  It seemed like when he was teased, the stuttering got worse.  Tony would get so frustrated because he couldn't control his stuttering and you could tell he was getting angry.

17. I was living in Lufkin, Texas at the time of Tony's trial.
I never heard from anyone on Tony's defense team. If they
would have called me, I would have been willing to meet with
them and testify at Tony's trial.


I have read this affidavit. I affirm that it is true and
correct to the best of my knowledge, and I so state under the
pains and penalties of perjury.


_Lillian E. Crowson_

Lillian ~~Crawson~~ Crowson
Lec

Signed and sworn before me this 17th
day of November , 2001.

_Nai Te_

Notary Public

My commission expires: 10-15-2005



NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

# Exhibit 47

State of Texas        )
                      )        In Re Anthony Shawn Medina
County of Harris      )


## Affidavit of Ruben Gallegos


I, Ruben Gallegos, state that the following is true and correct to the best of my knowledge:


1.  My name is Ruben Gallegos. I am over 18 years of age, can read and write the English language, and am competent to give this statement. I presently live at 14006 Catina Lane, Houston, Texas 77045.

2.  I knew Tony all his life. His family and my family lived on the same street. Growing up, Tony and I were good friends. We used to play together.

3.  I still do not believe Tony was responsible for the drive by shooting because I know what kind of person Tony is. He was good with people. I remember Tony used to come over to our house and ask my mom if she needed help. He helped her move flower pots and rake leaves. Tony was also very good with children and I know he wouldn't do anything to hurt children. I know this because my son was born in 1990. Tony used to play with him. I never worried he would hurt my son.

4.  In order to understand why Tony joined a gang, you have to understand what kind of neighborhood he grew up in. Around 1988, little gangs started moving into the neighborhood. By 1990, things started getting really bad. Robberies, gang shootings, and stabbings happened all the time. Things were so bad I ended up getting married in 1990 to move out of the neighborhood. I didn't want my son growing up with all the violence that was happening.

R.G.

5.   Even though I moved out of the neighborhood, I knew what was going on because I came to visit my mom often.  Around 1993, someone shot at our house.  We think the person who shot at our house thought it was someone else's house, but my mom was so scared she started sleeping on the floor.

6.   Kids joined gangs for survival.  If you were not in a gang, you were a "nobody" and you were an easy target for gang members.  The way gang members convinced kids to join gangs was by telling them that if they joined, the gang would protect them.

7.   Tony felt extra pressure to prove himself because of his race.  Tony's mom is White and Tony's dad is Mexican.  Back then the neighborhood was all Black and Mexican.  The Mexican kids gave Tony a hard time because he was light skinned and he did not speak Spanish.  They used to call him things like "Bolillo."  Mexican kids would also tell him things like, "Get out of here White Boy, you don't belong here."  I think Tony wanted to fit in really bad and making friends with people in the neighborhood made him feel part of a group.

8.   The reason why my brothers and I did not end up joining gangs even though we were also pressured was that my dad was real strict.  We didn't dare do anything to make him mad.

9.   When Tony first started hanging out with the wrong crowd, his parents tried to make him stop.  But you have to remember it was two (Tony's mom and dad) against a whole gang who put a lot of pressure on Tony.  After a while, I think Tony's parents gave up.

10.  I am convinced Tony would have stayed away from the wrong crowd if there had been something else to keep his mind occupied.  But there were no activities for kids in the neighborhood-no soccer games, no baseball games.  There was nothing going on to keep him occupied.

11.  I know acting tough was all an act for Tony because I knew the real Tony. He was sensitive.

12. I never heard from Tony's attorneys or investigators before
    or during his trial.  I would have been willing to tell
    Tony's attorneys everything I knew about Tony had they asked
    me to meet with them. I would have also been willing to
    testify for Tony.


    I have read this affidavit.  I affirm that it is true and
correct to the best of my knowledge, and I so state under the
pains and penalties of perjury.


                                        _____
                                        Ruben Gallegos



Signed and sworn before me this 17th
day of November, 2001.


_____
Notary Public

My commission expires: 10·15·2005

R G.

# Exhibit 48

State of Texas            )
                          )        In Re Anthony Shawn Medina
County of Galveston )

### Affidavit of Tiffany Kimberland

*Kimberlin*

I, Tiffany Kimberland, state that the following is true and correct to the best of my knowledge:

1.  My name is Tiffany Kimberland. I am over 18 years of age, can read and write the English language, and am competent to give this statement. I presently live at 2901 Gulf Freeway, Apt 32, Dickinson, Texas 77539.

2.  Tony is my cousin. My mother and his mother are sisters.

3.  From the time I was very little until I was 11 or 12 years old, I lived with Tony and his family on and off. Even when I wasn't living there, I would spend about three weeks at Tony's house every summer.

4.  I knew Tony really well because I spent so much time with him. When he was little, he was a normal kid. He always treated me like his little sister. He and my brother would sometimes tease me and take toys away from me like all brothers do. But when other kids pushed me, Tony would get mad and tell them to stop. It seemed like he was trying to protect me.

5.  There is no way Tony was capable of hurting children. I'm not saying that because he is my cousin. Even if he was my worst enemy, I would tell you Tony would not hurt children. I think Tony loved children and was very protective because he knew what it was like to be hurt.

6.  Tony stuttered when he was little and other children teased him to the point he would get so mad he would go in his room and blare music. It was like he shut himself in a world of his own.

7.  When Tony was about 14 years old, he started hanging out with the wrong crowd. I think Tony joined a gang because his father wasn't really there for him and he didn't grow up with the best examples.

8.  My Uncle Tony was gone from the house all the time.  He also
    drank a lot.  His mother and father argued a lot.  Tony and
    I and the other kids would be in a separate room but we
    could hear screaming, doors being slammed and things being
    thrown around.  Tony's parents would fight about my Uncle
    Tony's drinking and affairs. I know it hurt Tony.  I will
    never forget the time I saw Tony crying when he was about 16
    years old.

9.  The kind of neighborhoods I grew up in were the same as
    Tony's neighborhood but I didn't join a gang.  I didn't join
    a gang because I had someone to talk to -- my mother.  I
    also knew there was no way my mother was going to allow me
    to do something like that. Tony's parents were different.
    In a way, my Uncle Tony's friends were like the friends Tony
    started hanging out with when he became a teenager.

10. I know that acting tough was all an act for Tony.  Even
    after Tony started hanging out with the wrong crowd, I
    remember he and my brother having normal conversations when
    his friends weren't around.  When Tony was around his
    friends, he felt had to put on an act.

11. Tony's attorneys and investigators never got a hold of me
    before or during his trial. I am sure that my mother would
    have let me talk  to Tony's attorneys had they asked her. I
    would have also been willing to testify on his behalf.


    I have read this affidavit.  I affirm that it is true and
correct to the best of my knowledge, and I so state under the
pains and penalties of perjury.

                                    _____
                                    Tiffany ~~Kimberland~~ Kimberlin


Signed and sworn before me this 19th
day of November, 2001.


_____
Notary Public

My commission expires: 10-15 2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

# Exhibit 49

State of Texas           )
                              )          In Re Anthony Shawn Medina
County of Montgomery    )

### Affidavit of Elaine Butler

I, Elaine Butler, state that the following is true and correct to the best of my knowledge:

1. My name is Elaine Butler. I am over 18 years of age, can read and write the English language, and am competent to give this statement. I presently live at 923 Paradise Lane, Montgomery, Texas 77356.

2. I teach at Magnolia High School in Magnolia, Texas.

3. I met Anthony Shawn Medina when he attended Bellaire Christian Academy (BCA), where I taught. My children also attended BCA. He was in junior high school at the time.

4. Although Tony was in one of my classes, I got to know Tony as a person outside the classroom. I always felt Tony reached out to me for love and acceptance and a safe place.

5. I was shocked and devastated to learn Tony has been sentenced to death. Tony always treated me and my daughter with utmost respect. I always found him to be honest with me. Tony was not a kid who sought attention through violence or aggression.

6. I will never forget the time Tony walked into the gym and gave my daughter a rose. My daughter was one year older than Tony.

7. Although I did not know what Tony's home life was like, I knew things were not going to be easy for him. I knew he lived in a very tough part of town. I got the impression there was something lacking in his life.

8. Tony always had questions about who he was, what he was going to do, whether he would be successful. I felt one of the biggest things going against Tony was a lack of self-esteem.

9. Tony had a need to be accepted for who he was. It was as if he was saying, "Here I am."

10. One of the most touching memories I have of Tony was the day he rode his bike all the way to our house to have lunch and spend the afternoon with us. We didn't know he was coming. He must have ridden his bike approximately ten miles. I know he was riding through some very difficult sections of town. He even expressed some concerns about his

physical well-being.

11.   The fact I was never contacted by Tony's attorneys or investigators before or during Tony's trial saddens me deeply.  I would have been very willing to testify on Tony's behalf.

I have read this affidavit.  I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

*Elaine D. Butler*

Elaine Butler

Signed and sworn before me this 20th day of November, 2001.

Notary Public

My commission expires: 10-15-2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

# Exhibit 50

State of Texas          )
                        )          In Re Anthony Shawn Medina
County of Harris        )


### Affidavit of Catherine Uribe


        I, Catherine Uribe, state that the following is true and
correct to the best of my knowledge:


1.   My name is Catherine Uribe.  I am over 18 years of age, can
     read and write the English language, and am competent to
     give this statement.  I presently live at 515 Muirwood Lane,
     Sugarland, Texas 77478.

2.   I am Anthony Shawn Medina's cousin on his mother's side.

3.   When I was little our family lived on Ridgecreek so we were
     close by Uncle Tony's house.  It seemed like our families
     were always together.  I would spend the night all the time
     and even after Tony started going to Bellaire Christian
     Academy we would carpool.

4.   I remember Uncle Tony drinking a lot.  At family functions,
     he always had a beer in his hand.  Once when I was 5, I
     remember someone telling me to get in the back room because
     Uncle Tony was coming home drunk and he would get mad.  When
     he would come home drunk, he would insult anyone that
     happened to be in front of him.

5.   I was about 11 or 12 when we moved out of the neighborhood
     and we almost never saw them after that.

6.   When I was five, Tony's sisters, Christy started doing stuff
     to me. I guess you could call it molestation.  I told my
     parents about it and my parents had a meeting with Tony's
     parents at my house with Christy.

7.   While the meeting was going on, Angie, Tony, and I were in
     the back room.  Angie asked what was going on and Tony said
     "I know what they are arguing about."  He looked at me like
     he was trying to say "I'm sorry" but he didn't say anything
     out loud.  I think he didn't want me to be embarrassed.

8.   Tony was always protective of me.  He never wanted me to
     know about what happened out on the streets.  When he was
     outside with his friends he would suggest that I go inside.

He was always very sweet and calm.  He would ask how I was
doing and talk to me for a little bit then say, "Why don't
you see what's going on inside?" or something like that.

9.   When I was little, I was sick and had bronchitis all the
     time.  I felt bad because I had to wear this mask and I
     thought it was stupid.  But Tony would make a joke out of it
     and try to make me feel better.

10.  When Tony was at Bellaire Christian Academy, he felt like he
     was at school with a bunch of rich snobs and that they were
     better than him.  I know Tony felt stupid for having to be
     held back a year.  He gravitated towards the kids who were
     always in trouble.  He seemed to feel more comfortable with
     those people because he didn't think they would judge him.

11.  My family left the nieghborhood where the Medinas lived when
     I was 11 or 12.  My parents knew we had to move right away
     when there was a shooting across the street.  There was also
     a time when two detectives came and were walking around the
     field by our house.  A bunch of us went to see what they
     were doing and they told us to get back because they were
     investigating a dead body.

12.  When Tony had his trial, I was still pretty young but I'm
     sure my parents would have let me talk to his attorneys if
     they explained how important it was.


     I have read this affidavit.  I affirm that it is true and
correct to the best of my knowledge, and I so state under the
pains and penalties of perjury.

                                    _Catherine Uribe_ _ _ _ _ _
                                    Catherine Uribe


Signed and sworn before me this 19th
day of November , 2001.

_____
Notary Public

My commission expires: 10-15-2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

# Exhibit 51

State of Texas       )
                  )       In Re Anthony Shawn Medina
County of Harris   )

## Affidavit of Tamara Crosby

I, Tamara Crosby, state that the following is true and correct to the best of my knowledge:

1. My name is Tamara Crosby. I am over 18 years of age, can read and write the English language, and am competent to give this statement. I presently live at 4512 Magnolia, Bellaire, Texas 77401.

2. I knew Tony when he attended Bellaire Christian Academy (BCA). I was on the BCA School Board for many years and my children attended BCA. My daughter Charmin was in Tony's class.

3. I was devastated when I heard Tony was arrested for a drive by shooting. I can't see Tony with a rifle shooting at people. He was not that kind of person. Tony was a great kid. I was never afraid to have Tony in my house. He was always very polite and respectful. When there were tasks that needed to be done and nobody else wanted to do them, Tony would volunteer. He babysat for church functions. He was very good with kids.

4. Although Tony did well when he was involved in church activities, I worried about him when he was not with us. He lived in a bad neighborhood. It was common knowledge that drugs were prevalent in the area where he and his family lived. I always wondered if life outside of our church was so different for Tony that he couldn't talk about it. Perhaps he felt like he couldn't come anymore.

5. Most kids had activities, such as sports to keep them busy. Tony didn't have extracurricular activities. Like Tony, my son was not a great student. Unlike Tony, however, my son got his "attaboys" through sports. I always wondered where Tony got his "attaboys."

6. A woman who identified herself as an investigator called my house around the time of Tony's trial. I am fairly certain she worked on Tony's defense. I believe her name was Pam or Pamela. The woman stated she was looking for character

witnesses for Tony.

7. My impression was that she was interested in finding people close to Tony's age group that could testify on Tony's behalf and that she thought my children would make good witnesses. My two oldest children had gotten to know Tony well when Tony attended Bellaire Christian Academy.

8. Bubba and Charmin both said they were willing to testify on Tony's behalf, but we never heard back from Tony's attorneys or any investigators. If I would have been asked, I would have been willing to testify on Tony's behalf.

I have read this affidavit. I affirm that it is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

*Tamara Crosby*

Tamara Crosby

Signed and sworn before me this 20th day of November, 2001.

*Na T*

Notary Public

My commission expires: 10-15-2005

NAOMI TERR
Notary Public
STATE of TEXAS
My Comm. Exp.: 10-15-2005

Exhibit 52

Fred L. Fason, M.D.
Diplomate of the American Board of Psychiatry and Neurology
1116 Fountainview Drive
Houston, Texas 77057
(713) 781-1189
Fax (713) 781-7284

August 24, 2001

Texas Defenders Service
412 Main Street
Suite 1150
Houston, Texas 77002
(713) 222-7788

ATTENTION:  Mr. Morris Moon

**Re:  Anthony Medina file**

Mr. Morris,

As per your request I am writing this letter as documentation that I, Nina M. Campbell, the administrative assistant for Dr. Fred L. Fason, am in charge of the patient file records. I have searched for Anthony Medina's file in our offices and have not recovered it nor do I have any knowledge or recollection of this individual. I am aware that you have stated that this individual would have been examined by Dr. Fason on approximately June 19, 1996, by a court order issued from Judge Ted Poe's court. However, I was not employed here until the year of 1998. Our policy is to keep patient records for 8 years. Patient files dating from 1993 til the present are kept in this office. There are miscellaneous files stored off-site from the approximate years of 1989-1992 and the prior administrative assisstant left me with a detailed list of those patients. Anthony Medina's name was not on this list of off-site files.

If you have any more questions, please do not hesitate to call our office.

Sincerely,

*Nina M Campbell*

Nina M. Campbell

cc:  Fred L. Fason, M.D.

# Exhibit 53

(A) NAME –

NAME: MEDINA, ANTHONY SHAWN
SEX: M   RACE: W   DOB: 110574
SPN: 01346554   PSN:

DOB _____ AGE _____

RACE:

SEX:  M / F   UNK

(B) ARE YO

HETEROSEXUAL?

(C) CUSTOD
SPECIAL . . .
SHALL BE THE MAXIMUM POINTS AWARDED.

OINTS , 10 POINTS

(1) SEVERITY OF CURRENT CHARGES/CONVICTIONS. RATE MOST SERIOUS CHARGE/
CONVICTION, INCLUDING ANY DETAINERS/WARRANTS:

| OFFENSE : MISDEMEANOR | | FELONY | |
|---|---|---|---|
| CLASS | C ...............1 | 3rd | DEGREE.................. 6 |
| CLASS | B ...............2 | 2nd | DEGREE.................. 7 |
| CLASS | A ...............3 | 1st | DEGREE.................. 8 |
| STATE FELONY ....... 5 | | CAPITAL FELONY .......... 10 | SCORE 7 |

(2) OFFENSE HISTORY (CONVICTIONS) EXCLUDING CURRENT CHARGES :

| OFFENSE : MISDEMEANOR | | FELONY | |
|---|---|---|---|
| CLASS | C ...............1 | 3rd | DEGREE.................. 6 |
| CLASS | B ...............2 | 2nd | DEGREE.................. 7 |
| CLASS | A ...............3 | 1st | DEGREE.................. 8 |
| STATE FELONY ........5 | | CAPITAL FELONY .......... 10 | SCORE 10 |

(3) ESCAPE HISTORY:
MISDEMEANOR CLASS A (WITHIN THE PAST 5 YEARS) ...........................................1
MISDEMEANOR CLASS A (WITHIN THE PAST 2 YEARS) ...........................................5
FELONY (ARRESTED, CHARGED WITH, OR CONVICTED) ...........................................10

SCORE 9

(4) HISTORY OF VIOLENCE (ASSAULITIVE TYPE CHARGES/CONVICTIONS) :   SCORE _____

| OFFENSE : MISDEMEANOR | | FELONY | |
|---|---|---|---|
| CLASS | C ...............1 | 3rd | DEGREE.................. 6 |
| CLASS | B ...............2 | 2nd | DEGREE.................. 7 |
| CLASS | A ...............3 | 1st | DEGREE.................. 8 |
| STATE FELONY ........5 | | CAPITAL FELONY .......... 10 | SCORE 7 |

(5) LENGTH OF INCARCERATON (TOTAL AMOUNT OF TIME) :

| 0 TO 1 YEAR ........................... 1 | 2 YEARS TO 5 YEARS ....................... 2 |
|---|---|
| 5 YEARS TO 10 YEARS ......... 3 | 10 YEARS TO 20 YEARS ................... 5 |
| 20 YEARS TO 30 YEARS ....... 7 | 30 YEARS TO 40 YEARS ................... 8 |
| 40 YEARS TO 99 YEARS ......... 9 | LIFE OR DEATH SENTENCE .... 10 | SCORE 2 |

(6) INSTITUTIONAL DISCIPLINARY HISTORY:
MINOR DISCIPLINARY ACTION ......................................................................1
2-3 MINOR INCIDENTS REQUIRING LOSS OF PRIVILEGES .................................3
4 OR MORE INCIDENTS REQUIRING LOSS OF PRIVILEGES .............................5
MAJOR INCIDENT REQUIRING SEG/LOSS OF GOOD TIME ............................7
2 OR MORE INCIDENTS REQUIRING SEG/LOSS OF GOOD TIME .................10

SCORE 9

(7) STABILITY FACTORS:
AGE - 21 YEARS TO 25 YEARS OF AGE ...............................................-1
    26 YEARS OF AGE AND OLDER ...............................................-2
EMPLOYMENT HISTORY - CONTINUOUS
    6 MONTHS TO 3 YEARS ...............................................-1
    3 YEARS AND UP ...............................................-2
RESIDENCE HISTORY - SAME ADDRESS
    6 MONTHS TO 3 YEARS ...............................................-1
    3 YEARS AND UP ...............................................-2

-1

SCORE _____

** IF AN INMATE WAS A WORKER OR GRADUATED FROM EDUCATIONAL
PROGRAMS DURING PREVIOUS INCARCERATION ...............................................-5

HCJ - F - 040 (REVISED 04/95)

(8) CHECK ALL SPECIAL MANAGEMENT CONCERNS WHICH APPLY TO THIS INMATE.
IF YES TO ANY SPECIAL CONCERNS, PROPER REFERRALS SHALL BE MADE AFTER
COMPLETION OF THE INMATES NEEDS ASSESSMENT:

_____FIRST OFFENDER 17-20          _____PASSIVE TENDENCIES
_____FIRST OFFENDER 21 AND OVER    _____KNOWN MANAGEMENT PROBLEM
_____PROTECTIVE CUSTODY            _____SUICIDE RISK
_____MENTAL DEFICIENCY             _____PHYSICAL IMPAIRMENT
_____ESCAPE RISK                   _____SUBSTANCE ABUSE
_____VIOLENT/AGGRESSIVE            _____JUVENILE
_Yes_KNOWN GANG AFFILIATION La Ra9A  _____WORKER
_____WITNESS                       _____SEXUAL PROTECTION
_____CIVIL CONTEMPT                _____OTHER

TOTAL SCORE _28_

ASSESSMENT OF RISK LEVEL
***

 0-11 POINTS ON ITEMS 1-7--(SECURITY LEVEL 6) MIN LEVEL OF SUPERVISION_____
12-23 POINTS ON ITEMS 1-7--(SECURITY LEVEL 5) LOW LEVEL OF SUPERVISION_____
24-32 POINTS ON ITEMS 1-7--(SECURITY LEVEL 4) MOD LEVEL OF SUPERVISION____✓____
33-41 POINTS ON ITEMS 1-7--(SECURITY LEVEL 3) MED LEVEL OF SUPERVISION_____
42-51 POINTS ON ITEMS 1-7--(SECURITY LEVEL 2) HIGH LEVEL OF SUPERVISION_____
52-60 POINTS ON ITEMS 1-7--(SECURITY LEVEL 1) MAX LEVEL OF SUPERVISION_____

CLASSIFICATION SUMMARY:

| CLASSIFICATION CODE: | GENDER | AGE | OFFENSE STATUS | LEVEL OF SUPERVISION | CONVICTION STATUS | DEFENDANT TYPE |
|---|---|---|---|---|---|---|
| F01 | | | | | | |
| F02 | | | | | | |
| R 1 | | | | | | |
| R 2 | 01 | 02 | 02 | 04 | 01 | 99 |
| | 01 | 02 | 03 | 04 | 05 | 06 |

NOTES: _____

INMATE HANDBOOK / KIT REC'D BY: X _Cynthia Motion_
DATE: _____

UNABLE OR WILLING TO SIGN: _____  _____
                              WITNESS            WITNESS

***NOTE: ALL INMATES SCORING 10 POINTS ON CATEGORIES 1-3, OR CHARGED WITH AN INFAMOUS
CRIME SHALL BE REVIEWED BY A CLASSIFICATION SUPERVISOR.

CLASSIFICATION DEPUTY: _CM Thomas_ DATE: _1-7-96_
HCJ-R-040 / 041 (REVISED 04/95)
◊

# ___NT / REASSESSMENT

NAM ___ NAME: HOPKINS, ANTHONY SHAWN ___ D.O.B. _____ AGE _____

RACI ___ SCAR M / RACE W. DOB: 110074 ___ Sex: M / F Unknown

Proce ___ SPN: 01946564 ___ PBN: ___ Rehab (JA02)

Choo ___ 3, or 4 )

**(A)**
1. Limited physical capacity, acute illness; needs hospitalization or outpatient treatment.
2. Mild disability or illness; outpatient treatment required nonstrenuous work
3. No problems which limit housing or work assignments. CODE __3__

COMMENTS: _____

**(B)** EMOTIONAL STABILITY
1. Has attempted suicide, or considered, (A) When ? _____ (B) Where ? _____
2. Severe impairment; danger to self, others; needs hospital environment.
3. Moderate impairment requires monitoring, individual or group?
4. Emotionally stable, no indications of mental illness. CODE __4__

COMMENTS: _____

**(C)** EDUCATION
1. 5TH grade or below reading, math skills; Needs remedial or special education classes.
2. No high school diploma; Needs adult educator G.E.D. program.
3. High school diploma, G.E.D. or equivalent.
4. Shows interest in enrolling in high school, G.E.D. or equivalent. CODE __2__

COMMENTS: _____

**(D)** VOCATIONAL
1. No discernible skill; Needs training.
2. Limited skills; Ability to hold semiskilled position, Needs training.
3. Possesses marketable skill or trade.
4. Shows interest in enrolling in a vocational program. CODE __1__

COMMENTS: _____

**(E)** SUBSTANCE ABUSE
1. Frequent abuse resulting in social, economic or legal problems; Needs treatment.
2. Occasional abuse causing disruption of functioning.
3. No disruption of functioning or legal difficulties.
4. Shows interest in attending some sort of substance abuse class. CODE __3__

COMMENTS: _____

**(F)** MENTAL STABILITY
1. Serious disability limiting ability to function; Needs sheltered living work situations.
2. Mild disability limiting educational, Vocational potential.
3. No discernible disability
4. Shows interest in counseling programs. CODE __3__

COMMENTS: _____

CLASSIFICATION DEPUTY ____GJ Chang____ DATE __1-7-96__

Individual Facility Recommendations: ( 1301, 701, 301, JA02 )

Program Recommendations - List Programs in order of importance, ( A, B, C, D, E, or F )
1) _____ 4) _____
2) _____ 5) _____
3) _____ 6) _____

List all Programs presently or previously enrolled in, ( A, B, C, D, E, or F )
1) _____ 4) _____
2) _____ 5) _____
3) _____ 6) _____

HCJ-034
◊ ( REVISED 09/92 )

Exhibit 54

# CLASSIFICATION PROFILE

(A)   NAME _____   SPN# 0134 6564   DOB 11-05-74   AGE 20

RACE: (WHITE) - BLACK - HISPANIC - OTHER _____   SEX: (M)/ F   UNK

(B)   ARE YOU:   BI-SEXUAL?   HOMOSEXUAL?   (HETEROSEXUAL?)

(C)   CUSTODY EVALUATION:
SPECIAL NOTE:   WHEN CUMULATIVE TOTAL IS MORE THAN 10 POINTS , 10 POINTS
SHALL BE THE MAXIMUM POINTS AWARDED.

(1)   SEVERITY OF CURRENT CHARGES/CONVICTIONS. RATE MOST SERIOUS CHARGE/
CONVICTION, INCLUDING ANY DETAINERS/WARRANTS:

| OFFENSE : MISDEMEANOR | FELONY |
|---|---|
| CLASS      C .............1 | 3rd    DEGREE................. 6 |
| CLASS      B .............2 | 2nd    DEGREE................. 7 |
| CLASS      A .............3 | 1st    DEGREE................. 8 |
| STATE FELONY ...... 5 | CAPITAL FELONY ......... 10 |

SCORE   7

(2)   OFFENSE HISTORY (CONVICTIONS) EXCLUDING CURRENT CHARGES :

| OFFENSE : MISDEMEANOR | FELONY |
|---|---|
| CLASS      C .............1 | 3rd    DEGREE................. 6 |
| CLASS      B .............2 | 2nd    DEGREE................. 7 |
| CLASS      A .............3 | 1st    DEGREE................. 8 |
| STATE FELONY ........5 | CAPITAL FELONY ......... 10 |

SCORE   10

(3)   ESCAPE HISTORY:
MISDEMEANOR CLASS A (WITHIN THE PAST 5 YEARS) ...............................................1
MISDEMEANOR CLASS A (WITHIN THE PAST 2 YEARS) ...............................................5
FELONY (ARRESTED, CHARGED WITH, OR CONVICTED) ...............................................10

(4)   HISTORY OF VIOLENCE (ASSAULTIVE TYPE CHARGES/CONVICTIONS) :   SCORE   4

| OFFENSE : MISDEMEANOR | FELONY |
|---|---|
| CLASS      C .............1 | 3rd    DEGREE................. 6 |
| CLASS      B .............2 | 2nd    DEGREE................. 7 |
| CLASS      A .............3 | 1st    DEGREE................. 8 |
| STATE FELONY ........5 | CAPITAL FELONY ......... 10 |

SCORE   7

(5)   LENGTH OF INCARCERATON (TOTAL AMOUNT OF TIME) :

| | |
|---|---|
| 0 TO 1 YEAR ......................... 1 | 2 YEARS TO 5 YEARS ......................... 2 |
| 5 YEARS TO 10 YEARS ......... 3 | 10 YEARS TO 20 YEARS ..................... 5 |
| 20 YEARS TO 30 YEARS ......... 7 | 30 YEARS TO 40 YEARS ..................... 8 |
| 40 YEARS TO 99 YEARS ......... 9 | LIFE OR DEATH SENTENCE ............. 10 |

SCORE   5

(6)   INSTITUTIONAL DISCIPLINARY HISTORY:
MINOR DISCIPLINARY ACTION ...............................................................1
2-3 MINOR INCIDENTS REQUIRING LOSS OF PRIVILEGES ......................................3
4 OR MORE INCIDENTS REQUIRING LOSS OF PRIVILEGES .....................................5
MAJOR INCIDENT REQUIRING SEG/LOSS OF GOOD TIME ...........................................7
2 OR MORE INCIDENTS REQUIRING SEG/LOSS OF GOOD TIME .................................10

SCORE   4

(7)   STABILITY FACTORS:
AGE - 21 YEARS TO 25 YEARS OF AGE ....................................................... -1
           26 YEARS OF AGE AND OLDER ................................................. -2
EMPLOYMENT HISTORY - CONTINUOUS
           6 MONTHS TO 3 YEARS ......................................................... -1
           3 YEARS AND UP ................................................................ -2
RESIDENCE HISTORY - SAME ADDRESS
           6 MONTHS TO 3 YEARS ......................................................... -1
           3 YEARS AND UP ................................................................ -2

SCORE   -1

**IF AN INMATE WAS  A WORKER OR GRADUATED FROM  EDUCATIONAL
PROGRAMS DURING PREVIOUS INCARCERATION ....................................... -5

HCJ - F - 040 (REVISED 04/95)
◊

(8) CHECK ALL SPECIAL MANAGEMENT CONCERNS WHICH APPLY TO THIS INMATE. IF YES TO ANY SPECIAL CONCERNS, PROPER REFERRALS SHALL BE MADE AFTER COMPLETION OF THE INMATES NEEDS ASSESSMENT:

| | |
|---|---|
| _____ FIRST OFFENDER 17-20 | _____ PASSIVE TENDENCIES |
| _____ FIRST OFFENDER 21 AND OVER | _____ KNOWN MANAGEMENT PROBLEM |
| _____ PROTECTIVE CUSTODY | _____ SUICIDE RISK |
| _____ MENTAL DEFICIENCY | _____ PHYSICAL IMPAIRMENT |
| _____ ESCAPE RISK | _____ SUBSTANCE ABUSE |
| _____ VIOLENT/AGGRESSIVE | _____ JUVENILE |
| __X__ KNOWN GANG AFFILIATION _LAROSA_ | _____ WORKER |
| _____ WITNESS | _____ SEXUAL PROTECTION |
| _____ CIVIL CONTEMPT | _____ OTHER |

TOTAL SCORE ___28___

ASSESSMENT OF RISK LEVEL
***

```
 0-11 POINTS ON ITEMS 1-7--(SECURITY LEVEL 6) MIN LEVEL OF SUPERVISION _____
12-23 POINTS ON ITEMS 1-7--(SECURITY LEVEL 5) LOW LEVEL OF SUPERVISION _____
24-32 POINTS ON ITEMS 1-7--(SECURITY LEVEL 4) MOD LEVEL OF SUPERVISION ✓
33-41 POINTS ON ITEMS 1-7--(SECURITY LEVEL 3) MED LEVEL OF SUPERVISION _____
42-51 POINTS ON ITEMS 1-7--(SECURITY LEVEL 2) HIGH LEVEL OF SUPERVISION _____
52-60 POINTS ON ITEMS 1-7--(SECURITY LEVEL 1) MAX LEVEL OF SUPERVISION _____
```

CLASSIFICATION SUMMARY:

| CLASSIFICATION CODE: | GENDER | AGE | OFFENSE STATUS | LEVEL OF SUPERVISION | CONVICTION STATUS | DEFENDANT TYPE |
|---|---|---|---|---|---|---|
| F01 | | | | | | |
| F02 | | | | | | |
| R 1 | | | | | | |
| R 2 | 01 | 02 | 02 | 04 | 01 | 99 |
| | 01 | 02 | 03 | 04 | 05 | 06 |

NOTES: _____
_____

INMATE HANDBOOK / KIT REC'D BY: _____
DATE: _____

UNABLE OR WILLING TO SIGN: _____ _____
                                       WITNESS                    WITNESS

***NOTE: ALL INMATES SCORING 10 POINTS ON CATEGORIES 1-3, OR CHARGED WITH AN INFAMOUS CRIME SHALL BE REVIEWED BY A CLASSIFICATION SUPERVISOR.

CLASSIFICATION DEPUTY: _____ DATE: 04-23-96

HCJ-R-040 / 041 (REVISED 04/95)

INMATE NEEDS ASSESSMENT / REASSESSMENT

NAME _____ SPN# 01346564 D.O.B. 11-5-74 AGE 20

RACE: (White) - Black - Hispanic - Other _____ Sex: (M) / F Unknown

Processing Center, 1301 (JA00), 701 (JA07), 301 (JA01), or Rehab (JA02)

Choose from one of the following available responses, ( 1, 2, 3, or 4 )

(A)   HEALTH
   1.   Limited physical capacity, acute illness; needs hospitalization or outpatient treatment.
   2.   Mild disability or illness; outpatient treatment required nonstrenuous work
   3.   No problems which limit housing or work assignments.        CODE ___3___

   COMMENTS: _____

(B)   EMOTIONAL STABILITY
   1.   Has attempted suicide, or considered, (A) When ? _____ (B) Where ? _____
   2.   Severe impairment; danger to self, others; needs hospital environment.
   3.   Moderate impairment requires monitoring, individual or group?
   4.   Emotionally stable, no indications of mental illness.        CODE ___4___

   COMMENTS: _____

(C)   EDUCATION
   1.   5TH grade or below reading, math skills; Needs remedial or special education classes.
   2.   No high school diploma; Needs adult educator G.E.D. program.
   3.   High school diploma, G.E.D. or equivalent.
   4.   Shows interest in enrolling in high school, G.E.D. or equivalent.   CODE ___2___

   COMMENTS: _____

(D)   VOCATIONAL
   1.   No discernible skill; Needs training.
   2.   Limited skills; Ability to hold semiskilled position, Needs training.
   3.   Possesses marketable skill or trade.
   4.   Shows interest in enrolling in a vocational program.        CODE ___(___

   COMMENTS: _____

(E)   SUBSTANCE ABUSE
   1.   Frequent abuse resulting in social, economic or legal problems; Needs treatment.
   2.   Occasional abuse causing disruption of functioning.
   3.   No disruption of functioning or legal difficulties.
   4.   Shows interest in attending some sort of substance abuse class.   CODE ___3___

   COMMENTS: _____

(F)   MENTAL STABILITY
   1.   Serious disability limiting ability to function; Needs sheltered living work situations.
   2.   Mild disability limiting educational, Vocational potential.
   3.   No discernible disability
   4.   Shows interest in counseling programs.              CODE ___3___

   COMMENTS: _____

CLASSIFICATION DEPUTY _____ DATE 04-23-98

Individual Facility Recommendations: ( 1301, 701, 301, JA02 )

Program Recommendations - List Programs in order of importance, ( A, B, C, D, E, or F )

1) _____ 4) _____
2) _____ 5) _____
3) _____ 6) _____

List all Programs presently or previously enrolled in, ( A, B, C, D, E, or F )

1) _____ 4) _____
2) _____ 5) _____
3) _____ 6) _____

HCJ-034

◊ ( REVISED 09/92 )

# Exhibit 55

# ADMINISTRATIVE SEGREGATION REVIEW SHEET

INMATE'S NAME Medina, Anthony SPN # 1346564 CELLBLOCK LOCATION 6B1 T

DATE HOUSED 1-7-96 INMATE'S CLASSIFICATION R 2 L4 POSITION"6" CODE 13

HOUSED BY: JJ Thomas AMOUNT OF TIME REC. — COURT DATE — ~~ON APPEAL Y / N~~

REASON FOR SEGREGATION Leader OF "LRZ 13." Possible

High Profile Case, Housed in Separation For

the Security OF the Jail

| TRANSFER RECORD | | | |
|---|---|---|---|
| DATE HOUSED | CURRENT CELL | TRANSFER TO CELL | AUTHORIZATION |
| 2-28-96 | 6B1 (701) | 5C1 (1301) | unknown |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

HCJ 236 (REV 5/93)

# Exhibit 56

# HARRIS COUNTY SHERIFF'S DEPARTMENT
## CLASSIFICATION DIVISION

## Transfer Sheet

NAME _MEDINA, ANTHONY_

SPN# ~~115 15 15~~ _1346564_

D.O.B. _11-05-74_   AGE _21_

LKR# _____

STATUS BAND : BAND ( COLORS )
(W)  G  BL  Y  P  BK  BLG  O

RACE _H_  SEX _M_  COURT _228_

CLASSIFICATION / L.O.S. _R2/24_

PRESENT JAIL _1A07_

CELLBLOCK _681-01 T_

TRANSFERRED TO JAIL _1A00_

CELLBLOCK _5C1-01H_  DATE _02-28-96_

REPORT MADE :     YES     (NO)

REASON :
    _ADMIN TRANS TO G.P._

REFERRAL TO : ( ) MEDICAL DIVISION   ( ) PSYCHOLOGIST   ( ) CLASSIFICATION SUPERVISOR

CLASSIFICATION DEPUTY _____

DATE _02-28-96_

HCJ-070( REVISED 12/93)

Exhibit 57

State of Texas                            §
                                          §
County of Smith                           §

## Affidavit of Paula K. Lundberg-Love, Ph.D.

My name is Paula K. Lundberg-Love.  I am a resident of Smith County, Texas.  I am over 18 years of age and competent to give this affidavit.  Having been duly sworn, I hereby state as follows:

1.    I am a Professor of Psychology at the University of Texas at Tyler, Texas, where I have been employed for 18 years and teach courses in Psychopharmacology, Physiological Psychology, Neuropharmacology, Family Violence, Child Sexual Abuse and Sexual Victimization Across the Lifespan. Additionally, I am licensed in the State of Texas as a Licensed Professional Counselor, Licensed Psychological Associate, and a Licensed Chemical Dependency Counselor. I provide outpatient therapeutic services at Tyler Counseling and Assessment Center, a group private practice facility, where I have been an independent contractor since 1984. My areas of therapeutic expertise include counseling trauma victims, victims of child maltreatment, sexual assault and domestic violence, as well as individuals with eating disorders and those with substance abuse problems. I hold Diplomate and Fellow status in the American College of Forensic Examiners and Diplomate status in the American Psychotherapy Association. My complete curriculum vitae are attached to this affidavit as Exhibit 1.

2.    At the request of Greg Wiercioch of the Texas Defender Service, I traveled to the Polunsky Unit of the Texas Department of Corrections in Livingston, Texas on September 14, 2001 to conduct a psychological assessment of Anthony Shawn Medina. I spent three and one-half hours interviewing Mr. Medina and two and one-half hours performing psychological testing including the administration of the Personality Assessment Inventory (PAI), a standardized 344 forced-choice item (False, Somewhat True, Mostly True, Very True) instrument designed to identify Axis I diagnostic possibilities, the Trauma Symptom Inventory (TSI), a 100 item standardized instrument that asks an individual to rate the level of a wide array of symptoms that have been found to be associated with various types of sequelae that stem from childhood maltreatment and/or trauma, and the Dissociative Experiences Scale (DES), an instrument which consists of 28 scenarios wherein an individual is asked rate the percentage of time that such events occur in his/her life and can detect the presence of a dissociative disorder.

3.    I have reviewed materials relevant to Anthony Shawn Medina's background, including: a genogram of Anthony Medina's family with notations regarding the presence of mental

illness and/or substance abuse, a social history, medical records from the Harris County District, records from Grissom Elementary School, Horn Elementary School, Welch Middle School, Bellaire Christian Academy (BCA), Contemporary Learning Center (CLC) and the Wyndham School System, and the affidavits of Charles Rotramel, Golda Medina, Anthony Luna Medina, David Castro, Samuel Gallegos, Kim De La Cruz, Sherry Grein, Tamara Crosby, Eva Uribe, Lillian Crawson, Ruben Gallegos, Tiffany Kimberlin, and Catherine Uribe.

4.   Based upon my interview and testing of Anthony, it is my professional opinion that significant trauma experienced during childhood resulted in psychological problems which manifested during early adolescence. Specifically, the data suggest that Anthony developed Post-Traumatic Stress Disorder (PTSD) at approximately 12 years of age after literally experiencing the drive-by shooting of his best friend right before his eyes. Because these psychological problems were not recognized then, and remain untreated at this point in time, Anthony's clinical consequences became more complicated with the subsequent development of substance abuse, stimulus-seeking behavior, dissociative symptoms, paranoia, and aggressive behavior in response to perceived threat.

5.   Such clinical sequelae are not unexpected for someone who endured a childhood like that of Anthony Medina. Based on my interview and testing of Anthony, I have learned the following:

a.   Anthony's immediate family lacked basic structure, supervision, and discipline.

Information from a variety of sources indicated that Anthony's father worked two jobs, and was both physically and emotionally absent from his son's life. One of Anthony's teachers from BCA, Kim De La Cruz, stated that Anthony's father was "not there for him," and that neither of his parents were involved in his school activities. Anthony also verified nearly a total lack of parental involvement in his life. They were unaware of the emotional pain and humiliation he experienced at the hands of his school peers and the angry behavior he exhibited toward those peers as a result of his childhood stuttering. At the age of 12 years Anthony routinely would sneak out of his bedroom window at approximately 10:30 PM, after his mother went to bed, roam the dangerous neighborhood streets with his 15 year old friend, C.C., until nearly 3:30 AM, when he would sneak back into his bedroom window and sleep until it was time for school. According to Anthony neither parent ever knew about his nightly activities because they never checked to see if he was in his room. Nor did they comprehend the importance of his friendship with C.C. and how the loss of that friend impacted the subsequent direction of his life.

b.   Anthony's mother and father used alcohol/drugs.

Based upon information obtained from Anthony and other family members, Tony Medina, Sr. significantly abused alcohol. Anthony's Aunt Eva indicated that "there was always a bottle or two of Jack Daniels or something else lying around." He drank daily

to excess such that he would stagger and verbally abuse any family members that he encountered when he arrived home. One time he was so drunk that when he began to leave the house, his wife had to go outside, pick him up and literally drag him back into the house. According to Sherry Grein, Anthony's mother, Golda Medina, smoked marijuana from the time she met Tony, Sr. and throughout Anthony's life. Anthony recalled that he did not realize that his mother "smoked dope" until the first time one of his peers smoked marijuana and he recognized the odor of the smoke as the same smell that used to come out from under his mother's bedroom door.

c.    Anthony's father was physically abusive.

Many family members have concurred that Anthony's father physically abused his mother. When Golda's sister, Didi, lived with the Medina's, she tried to shield her children and the Medina children from witnessing the domestic violence, but the children could hear their parents screaming at one another. Didi indicated that when his parents were fighting, Anthony would sometimes cry, and at other times he wanted to intervene to make his father stop the abuse.

d.    Anthony's extended family has a pattern of intrafamilial sexual abuse.

Anthony's mother was sexually abused by her stepfather, Jerry Dial from the ages of 8 to 18. Catherine Uribe, Anthony's cousin, daughter of maternal aunt, Eva Uribe, was sexually molested by a paternal cousin and two years later by Anthony's sister, Christy. Also, Uncle Verlan, the uncle of Nelda Dial, Anthony's maternal grandmother, and a family member with whom Anthony stayed several weeks at the age of 11 years, was accused of sexually assaulting a child.

e.    In the extended family there are patterns of attention deficit disorder (ADD) and anger management problems.

Anthony's paternal uncle, Louis, was diagnosed with ADD during childhood and has struggled to stay out of trouble. Dana, the daughter of Tony, Sr.'s younger brother, John, also has ADD and her behavior, allegedly, is "out of control." Another cousin, Chuck, the son of Aunt Didi, both of whom lived with Anthony's family when Anthony was 9 years old, was an emotionally disturbed and violent child. He used to bang his head against the wall. When he was young he asked a man in a restaurant bathroom to have sex with him. At the age of 12 years, he ran away from home. When older, Chuck and his sister joined a cult in Galveston, TX and eventually had to flee the area to escape the cult.

f.    The neighborhood in which Anthony grew up was a violent environment. Despite repeated pleas from his mother, his father refused to move the family out of the neighborhood.

In the preponderance of the affidavits reviewed, everyone agrees that Anthony Medina, lived in a dangerous, violent neighborhood filled with gangs, gang members, drug

dealers, and drive-by shootings. David Castro indicated that one could not turn on the "local news without hearing about shootings, robberies, and stabbings...The neighborhood was dangerous even for an adult male." Samuel Gallegos, a childhood, neighborhood friend, recalled, "There was a lot of violence. Around 1985 a lot of gangs started moving into the neighborhood...There were drive-by shootings and killings all the time. The gangs would hang out by the bayou. I could hear gunfire coming from the bayou all the time. It was crazy."

Extended family members such as David Castro and Eva Uribe could not understand why Tony Medina, Sr. did not move his family out of that neighborhood as they had done. Sherry Grein, Golda's sister, indicated that when Anthony began to have behavioral problems, Golda desperately wanted to get Anthony out of that neighborhood. "...but it was all about money. Tony, Sr. loved being in that house because it was so cheap. It's not like they didn't have the money to move away, but Tony, Sr. just didn't want to spend the money."

h.   Others in Anthony's extended family did leave the neighborhood, due to concerns about the violence, including Eva and Frank Uribe. This aunt and uncle were steadying influences in Mr. Medina's life, which became less involved in his life once they moved away.

i.   Anthony had a stuttering problem from the age of four, which rendered him an outcast in his early school years.

Children at school used to make fun of him. They mocked him and called him "stutterbox." This humiliated Anthony and engendered anger. When he was teased at school, he coped by fighting the individuals who verbally abused him. After he fought the children, they quit calling him names. However, this type of behavioral "coping skill" resulted in Anthony having no close friends at school. The few friends that he had were from his neighborhood. Samuel Gallegos, a neighborhood friend, corroborated that Anthony was teased by his peers because he stuttered, and that he wanted to have friends "really bad."

j.   Anthony's school performance was good until the seventh grade.

When asked why his school performance suddenly deteriorated, Anthony replied that during the summer prior to entering the seventh grade, a male friend of his, called C.C., "got killed." This interviewer probed the details surrounding that event more thoroughly because information supplied in the social history had not addressed that event sufficiently. Anthony indicated that he had begun "hanging out" with C.C. who was 15 or 16 years old at that time because there wasn't anyone his age in the neighborhood. They met riding bikes on bike ramps. C.C. had come to this country from Mexico when he was young, but was essentially homeless. His parents had moved from homeless shelter to homeless shelter and then C.C. ran away from his parents when he was 13 years old. His uncle was a United States citizen who resided in Houston and occasionally C.C. stayed with his uncle, but most often he stayed in abandoned buildings.

Anthony explained that he had "beaten up" a peer whose name he could not recall for a reason he could not recall. The peer told his older brother who knew that Anthony hung around with C.C. One night after Anthony sneaked out his bedroom window, he and C.C. went to the house of a friend of C.C. Anthony and C.C. drank some alcohol and smoked some marijuana. They were standing outside on the driveway near a ditch. Things became quiet. Anthony said that he was not paying attention to his surroundings and thus he did not see or hear a car drive up the street. Everything began to move "in slow motion." C.C. yelled and pushed Anthony down onto the ground. Anthony saw a green car driving by and shots coming from it. C.C. was shot four times, twice in his chest, once in his neck, and once near his hip. C.C. had pushed Anthony out of the range of fire and had been shot in the process. C.C. had said nothing. The friend of C.C. who lived at the house yelled to Anthony to hurry up and leave. Anthony got on his bike and rode home. Even though it was a two-hour bike ride, all Anthony recalls is finding himself back at home, climbing though his bedroom window. He threw away his bloodstained clothes and never told anyone anything about those events. He never returned to that house. He heard nothing about a funeral for C.C. Months later, he saw C.C.'s uncle but he did not say anything about the death or ask the uncle any questions. Anthony never saw C.C.'s uncle again.

k.   Anthony was deeply traumatized by the shooting of his friend C.C. that occurred when Anthony was approximately 12 years old.

Anthony's relationship with C.C. was the first significant male-male mentoring relationship that he had experienced. This was the first time that Anthony had ever lost anyone close to him. It was the first time that he had seen someone killed, and it literally had happened right in front of him. Anthony identified this event as the turning point in his life. Anthony stated, "C.C. taught me how to survive on the streets. The last lesson he taught me was, 'Don't let anyone sneak up on you.' I was drunk. I was high. I let them sneak up on us. I was supposed to be watchful. They were coming for me. He lost his life for me." At this point in the interview, Anthony began crying. Tears rolled down his cheeks.

Anthony continued, "C.C. always did what he wanted. C.C. always had what he needed. He knew worldly things and taught me what he knew. I knew him for a year before he got killed. Now he wasn't there, and I let it happen." When asked to describe the emotional pain that he had experienced at the time of C.C.'s death, Anthony explained that somehow for him the pain was converted to anger. He said, "That was the one emotion I fed on. It allowed me to become who I was. The anger from C.C.'s death took a big part of me away from me. After C.C.'s death, school was not interesting. Classes weren't interesting. I wasn't interested in what teachers had to say." Anthony began skipping school regularly. He began failing classes. He got into fights at school and received disciplinary action. Anthony remarked that, "I was quicker to "go off" and lose control. I didn't act rational. I just reacted. I drank more, smoked more, and began using cocaine."

During the course of this interview it was apparent that Anthony still has deep feelings of remorse over the death of C.C., an event that was not his fault. Moreover, in my professional opinion, it was clear that Anthony developed PTSD at the time of the shooting death of C.C. and presently still suffers from this disorder.

6.  The results of the tests administered to Anthony Medina also support the conclusion that he suffers from a number of psychological symptoms, some of which are consequences of the various types of childhood trauma that he experienced.

The scores obtained by Anthony Medina on the validity scales of the PAI indicated that he attended appropriately to the content of the items and responded in a consistent fashion to similar items. He was not unduly defensive. Nor did he portray himself as being relatively free of shortcomings or faults. Indeed, his answers to the items could best be understood as a "cry for help."

The PAI clinical profile suggested that Anthony is a person with significant thinking and concentration problems accompanied by impulsivity and the potential for "acting-out" behaviors. His social judgment is probably poor and combined with his impulsivity renders it difficult for him to control his acting-out behavior. Moreover, a number of aspects of Anthony's responses suggested that he has marked peculiarities in thinking and experience that are often associated with an active psychotic episode, poor judgment, and impairment in reality testing. It is likely that he experiences unusual perceptual experiences, unusual ideas, or delusional beliefs. Anthony is a socially isolated individual, who has had few interpersonal relationships that could be described as close and warm. He has difficulty interpreting the normal nuances of interpersonal behavior that provide the meaning to personal relationships. His thought processes are likely to be marked by confusion, distractibility, difficulty concentrating, and perceived as blocked or withdrawn.

Additionally, Anthony Medina is likely to have been unreliable, irresponsible, and sustained little success in the social or occupational realms. He has engaged in illegal behaviors in the past, is likely to be egocentric, and has placed little importance on his social role responsibilities. The use of drugs has had many negative consequences on his life that have had numerous ill effects on his functioning. He reported having little ability to control the effects that drugs have had on his life. Similarly, Anthony's use of alcohol has had a negative impact upon on his life. The data suggested that Anthony was drug and alcohol dependent in the past to the extent that it disrupted his interpersonal relationships, occupational possibilities, and may even have had health complications.

Anthony reported a level of suspiciousness and mistrust in his relations with others that is often associated with prominent hostility and paranoia, and perhaps may be of potentially delusional proportions. He is a hypervigilant individual who often questions and mistrusts the motives of those around him. Anthony is quite sensitive in his interactions with others, and may feel that he is being treated inequitably, even if the perceived affront is unintentional. He tends to hold grudges against others and may be perceived as being

hostile. These qualities can disrupt his relationships with others even when they try to demonstrate support and assistance.

The results of the PAI also suggested that Anthony reported a number of difficulties consistent with a significant depressive disorder marked by feelings of sadness, loss of interest in normal activities, and a loss of a sense of pleasure in activities that previously were experienced as pleasurable. However, his mood also can be emotionally labile with rapid and extreme mood swings that may result in episodes of poorly controlled anger. This emotionality probably has contributed to a history of involvement in intense and volatile relationships wherein he may be preoccupied with consistent fears of being abandoned or rejected by those around him.

Anthony Medina also reported concerns about physical functioning and general health matters. Particular problems involving sensory or motor dysfunction were indicated. Such symptoms are consistent with a conversion disorder or could be the result of a number of neurological conditions.

With respect to his self-concept, Anthony's attitudes may vary from states of pessimism and self-doubt to periods of self-confidence and self-satisfaction. During stressful situations he may be prone to self-critical, uncertain, and indecisive behavior.

As mentioned earlier in this affidavit, the TSI assesses for the presence of PTSD and other psychological sequelae that may be associated with traumatic events. The results obtained by Anthony Medina on the TSI indicated that the resultant profile was valid and that he scored at clinically significant levels on six out of ten scales. Clinically significant scores obtained and their respective scales in descending order included Dysfunctional Sexual Behavior (DSB), Tension Reducing Behavior (TRB), Defensive Avoidance (DA), Dissociation (DIS), Anger/Irritability (AI), and Intrusive Experiences (IE).

The DSB scale involves reports of sexual behavior that is, in some way, dysfunctional or problematic. Elevated scores on the DSB scale may involve indiscriminate sexual contact, getting into trouble because of ones sexual behavior, using sex to combat loneliness or internal distress, and sexual attraction to potentially dysfunctional persons. Elevated DSB scores have been associated with reports of childhood sexual victimization. It the case of Anthony Medina, his highest score was obtained on the DSB scale which raises the distinct possibility that he may have been sexually abused during childhood/adolescence even though he has not reported this to various interviewers. Males tend to be more reluctant than females to report such events for an array of reasons. It also is possible that he does not define some sexual events that he experienced as a 13 year old with females significantly older than he was as abusive. Or he may not recall some events.

TSBs are those external activities engaged in by an individual as a way to modulate, interrupt, avoid, or soothe negative internal states. The TRB scale measures an individual's tendency to externalize distress through suicidality, self-mutilation, inappropriate sexual behavior, and activities intended to forestall abandonment or

aloneness. TRB reflects a tendency to "act out" negative feelings. Individuals with high TRB scores may also be more likely to possess features of borderline or histrionic personality disorders.

The DA scale consists of avoidance responses consistent with a diagnosis of PTSD. Those who score at clinically significant levels describe a history of aversive internal experiences that they repeatedly seek to avoid. They also report frequent attempts to eliminate painful thoughts or memories from conscious awareness. Individuals who score high on the DA scale often attempt to avoid events or stimuli in their environment that might restimulate upsetting thoughts or memories, and have a strong desire to neutralize negative feelings about previous traumatic experiences. Elevated scores on the DA scale represent a conscious, intentional process of cognitive and behavioral avoidance as a means of managing post-traumatic stress.

The next highest score was obtained on the DIS scale. The DIS score measures the extent to which an individual utilizes the coping mechanism of dissociation, which is a largely unconscious psychologically defensive alteration in conscious awareness, which evolves as an avoidance response to overwhelming, posttraumatic psychological distress. Individuals who score at clinically significant levels on this scale may report distractibility, "spacing out," and feeling out of touch with themselves and their bodies.

Clinically significant scores on the AI scale are consistent with individuals who respond to trauma with increased levels of autonomic nervous system arousal, hypervigilance, an exaggerated startle response and symptoms of irritability and anger in response to perceived threat.

The IE scale consists of items reflecting intrusive posttraumatic reactions and symptoms. These include nightmares, flashbacks, and upsetting memories that are easily triggered by current events coupled with repetitive thoughts of unpleasant prior experiences that intrude into awareness. Individuals who obtain clinically significant scores on this scale report feeling out of control. Anthony had commented during the interview that he still had "memories" of C.C. dying in front of him.

Finally, the two-point profile obtained by Anthony on the TSI consisted of the two scales upon which he obtained the highest scores, DSB and TRB, respectively. The presence of an elevated TRB score in combination with an elevated DSB score suggests the possibility of sexual acting out behavior and dysfunctional personality traits. High TRB scores reflect a tendency to externalize internal distress. A co-elevation on the DSB scale indicates a proclivity to address internal trauma or dysphoria with sexual behavior. Such a two-point code reflects a greater potential for such behavior to occur when an individual is overwhelmed by internal or external stressors.

Although Anthony was an individual who coped with trauma by utilizing the psychological coping mechanism of dissociation, the score that he obtained on the DES did not indicate that he suffered from a Dissociative Disorder. However, his score was consistent with the presence of PTSD.

7.  Based upon the review of the extensive social history and affidavit information gathered by the mitigation specialist, considered in conjunction with the results of my diagnostic interview and test results obtained on the PAI, TSI, and DES, the following diagnostic impressions are supported:

| AXIS I | 304.80 | Polysubstance Dependence | (Prior History) |
|---|---|---|---|
| | 305.00 | Alcohol Abuse | (Institutional Remission) |
| | 305.20 | Cannabis Abuse | (Institutional Remission) |
| | 305.60 | Cocaine Abuse | (In Remission) |
| | 309.81 | Posttraumatic Stress Disorder | (Chronic) |
| | R/O 295.70 | Schizoaffective Disorder | (Bipolar Type) |
| | | | |
| AXIS II | 301.90 | Personality Disorder Not Otherwise Specified (NOS) With Paranoid, Borderline and Antisocial Features | |
| | | | |
| AXIS III | | None | |
| | | | |
| AXIS IV | Psychosocial Stressors | Problems With Primary Support Group Problems Related To Interaction With The Legal System, Incarceration | |
| | | | |
| AXIS V | GAF | Current GAF= 45 | |

8.  Given all of the above entities for which Anthony Medina meets the DSM-IV diagnostic criteria, the following issues need to be considered and understood:

a)  A child approximately 12 years old who experienced a childhood as traumatic as Anthony's would have an urgent need for proper diagnosis, treatment, and counseling. With proper intervention, the psychological symptomatology of such a child could be dramatically improved by cognitive behavioral psychotherapy and psychopharmacological medications to improve PTSD, impulse control and aggression reduction, including the selective serotonin reuptake inhibitors (SSRIs) such as Paxil, Zoloft or Celexa, and/or mood stabilizing drugs such as Depakote, Lamictal or Neurontin. Psychotherapeutic intervention is particularly important for children and adolescents because recovery from PTSD is eminently successful in this population when intervention occurs as closely in time after the traumatic experience as is possible. Also the creation of a more stable home environment, and the presence of nurturant, supportive adult mentors can aid a child in the evolution from being a victim of trauma to a successful survivor of traumatic experience.

b)  Such necessary intervention was utterly lacking in Anthony's life. His parents were uninvolved in his life and knew little or nothing of his activities. Nevertheless, several people, out of concern and genuine affection for Anthony,

made attempts to provide him with the structure and guidance that he lacked.  For example, his aunt, Eva Uribe, facilitated his enrollment in the BCA. Moreover, she encouraged and fostered his involvement in her Baptist church.  A teacher who was especially fond of Anthony reached out to him.   Anthony responded positively to each of these overtures, with improved levels of functioning in response to such structure. However, none of these attempts was comprehensive enough to counter the consistent, overwhelming chaos and violence that were pervasive in his home and neighborhood.

c)     Moreover, it was not unexpected that a 12 year old, who experienced a childhood history such as that of Anthony, lived in a dangerous, chaotic environment, and failed to receive any of the necessary therapeutic interventions, would be at great risk for involvement in dysfunctional coping methods. In Anthony's case these included self-medication with drugs and alcohol, and interaction with the structure and protection afforded by gang involvement. Unfortunately, gang involvement does fill the void created when parents are functionally uninvolved and emotionally absent from the lives of their children. A gang provides structure, clear rules and consequences for behavior, even if they are inappropriate guidelines. Most important, however, gang membership effectively reduces feelings of alienation and societal disenfranchisement. Gangs provide a surrogate family. For that reason they are very attractive to and provide emotional sustenance for disenfranchised adolescents. Such a state of affairs was true for Anthony Medina.  Thus, it is not at all surprising that he gravitated toward a gang-related lifestyle to fill the emotional void created in his life by the absence of a supportive family structure and the loss of the most important relationship that he had experienced in his life, his friendship with C.C.

I have read the above statement and swear, under the pain and penalty of perjury, that it is true and correct to the best of my knowledge.

Paula K. Lundberg-Love, Ph. D., L.P.C.
Professor of Psychology

SUBSCRIBED AND SWORN TO before me at _Tyler____, Texas this _21st_ day of November, 2001.

PETRA BENDER
Notary Public, State of Texas
My Commission Expires 11-12-05

EXHIBIT 1

# CURRICULUM VITAE

**PAULA K. LUNDBERG-LOVE, Ph.D.**

Tyler Counseling & Assessment Center
1121 ESE Loop 323
Woodgate Plaza I, Suite 204
Tyler, Texas 75701
(903) 581-0933

Department of Psychology
University of Texas at Tyler
3900 University Boulevard
Tyler, Texas 75799
(903) 566-7265

## PERSONAL

Born: February 27, 1949; Cincinnati, Ohio

## EDUCATION

B.S. in Chemistry, Xavier University, 1976

M.A. in Psychology, University of Cincinnati, 1978

Ph.D. in Physiological Psychology, University of Cincinnati, 1980

Post-Doctoral Fellowship, Washington University School of Medicine, St. Louis, MO 1980-83

## LICENSE & CERTIFICATION

1986      Licensed Psychological Associate, No. 1-2443
1992      Licensed Chemical Dependency Counselor, No. 4462
1999      Licensed Professional Counselor, No. 16014

## CURRENT AND RECENT EXPERTISE AND/OR POSITIONS

1995-Present    Professor of Psychology, University of Texas at Tyler, Texas

1989-2000    Adjunct Faculty Preceptor for Behavioral Science, Family Practice Residency
Department, University of Texas Health Center at Tyler, Texas

1999    Fellow, American College of Forensic Examiners

1999    Diplomate, American Psychotherapy Association

1997    Diplomate, American Board of Psychological Specialties, Psychopharmacology

Lundberg-Love
2

| 1997 | Diplomate, American Board of Psychological Specialities, Child Sexual Abuse |
|------|------|
| 1996 | Diplomate, American College of Forensic Examiners |
| 1996 | Diplomate, American Board of Forensic Medicine |
| 1996 | Certified Criminal Justice Specialist<br>National Association of Forensic Counselors |
| 1996 | Master Addictions Counselor<br>National Association of Forensic Counselors |
| 1988-1994 | Associate Professor of Psychology, University of Texas at Tyler, Texas |
| 1983-1988 | Assistant Professor of Psychology, University of Texas at Tyler, Texas |
| 1984-Present | Counselor and Licensed Psychological Associate, Tyler Counseling &<br>Assessment Center |
| 1994-1996 | Preceptor for Tall Trees, a group treatment program for sexually abused children,<br>Tyler, Texas |
| 1994-1996 | Research Consultant, Family Violence and Sexual Assault Institute, Tyler, Texas |
| 1992-Present | Licensed Chemical Dependency Counselor, Counseling, Testing & Psychiatric<br>Services, Tyler, Texas |
| 1990-Present | Forensic Consultation on Substance Abuse, Psychopharmacology and Child<br>Abuse Issues |
| 1991-1993 | Director of Sexual Assault Research, Family Violence and Sexual Assault<br>Institute, Tyler, Texas |
| 1986-1991 | Associate Director, Family Violence Research & Treatment Program, University<br>of Texas at Tyler, Texas |

## OTHER PROFESSIONAL EXPERIENCE

| 1970-1974 | Spectroscopist, Merrell-Dow Labs, Cincinnati, Ohio |
|------|------|
| 1974-1976 | Research Assistant, Merrell-Dow Labs, Cincinnati, Ohio |
| 1976-1978 | Research Assistant, Sleep Laboratory, University of Cincinnati |
| 1977-1979 | Research Assistant, Department of Gastroenterology, University of Cincinnati<br>College of Medicine |

Lundberg-Love
3

| 1978-1979 | Teaching Assistant, Research Methods, University of Cincinnati |
| 1979-1980 | Instructor, Drugs and Behavior, Perception, University of Cincinnati |
| 1979-1980 | Adjunct Assistant Professor, Project Talents, Wilmington College, Ohio |
| 1980-1983 | Postdoctoral Fellow (NHLBI), Department of Preventive Medicine, Washington University Medical School, St. Louis, Missouri |
| 1981-1983 | Lecturer, Department of Psychology, Washington University, St. Louis, Missouri |
| 1986 | Consultant, Parents Anonymous of Texas, Austin, Texas |
| 1988-1994 | Allied Consulting Staff, University Park Hospital, Tyler, Texas |

## TEACHING EXPERIENCE

Physiological Psychology
Psychopharmacology (Undergraduate and Graduate)
Psychology of Sleep and Dreams
Neuropharmacological Bases of Behavior
Drug Use, Misuse and Abuse
Diagnosis and Treatment of Child Sexual Abuse
Dynamics and Treatment of Family Violence
Sexual Victimization Across the Lifespan
Domestic Violence
Nutrition in Health and Performance
Behavioral Medicine
Elements of Psychology
Applied Therapy I
Applied Therapy II

## PUBLICATIONS

Lundberg, P. K. (1978. The somesthetic inventory: An instrument that attempts to measure drug mechanisms by measuring drug side effects. Master's Thesis, University of Cincinnati.

Lundberg, P. K. & Kramer, M. (1978). L-Tryptophan: A rational hypnotic with clinical potential. *Sleep Research, 7,* 368-371.

Lundberg, P. K. (1980). Assessment of drugs' side effects: Visual analogue scale versus checklist format. *Perceptual and Motor Skills, 50,* 1067-1073.

Lundberg, P. K. (1980). The effects of maternal diets enriched with tryptophan or histidine on offspring sensorimotor behavior. Doctoral Dissertation, University of Cincinnati.

Lundberg, P. K. & Paludi, M.A. (1981). Type A/B behavior patterns and the reporting of lifetime symptomatology: A=B. *Perceptual and Motor Skills, 52,* 473-474.

Bell, J. M., Gruenthal, M., Finger, S., Lundberg, P. K., & Johnson, E. M. (1982). Behavioral effects of early deprivation of nerve growth factor: Some similarities with familial dysautonomia. *Brain Research, 234,* 409-421.

Lundberg-Love
4

Bell, J. M. & Lundberg, P. K. (1985). The effects of dietary soy lecithin supplementation on development of sensorimotor behavior and brain biochemistry in the rat. *Developmental Psychobiology, 18*, 59-66.

Lundberg-Love, P. K. (1987). Sexual abuse education. *Family Violence Bulletin, 3*(3), 5.

Lundberg-Love, P. K. (1987). Satanic cults involved in sexual abuse of children. *Family Violence Bulletin, 3*(4), 5.

Lundberg-Love, P. K. (1988). The Sexual Abuse Legitimacy Scale: Concerns. *Family Violence Bulletin, 4*(3), 6.

Lundberg-Love, P. K. (1988). Sexual abuse update. *Family Violence Bulletin, 4*(4), 8-9.

Lundberg-Love, P. K. (1988). Movements are made from moments like this. *Family Violence Bulletin, 5*(1), 9-10.

Lundberg-Love, P. K. & Geffner, R. (1989). Date rape: Prevalence, risk factors, and a proposed model. In M. A. Pirog-Good & J. E. Stets (Eds.), *Violence in dating relationships: Emerging social issues.* New York: Praeger.

Lundberg-Love, P. K. (1989). Update on cults Part I: Satanic cults. *Family Violence Bulletin, 5*(2), 9-10.

Lundberg-Love, P. K. (1989). Update on cults Part II: Non-satanic cults and their consequences. *Family Violence Bulletin, 5*(3), 9-10.

Lundberg-Love, P. K., & Geffner, R. (1990). *Psychological sequelae and mental health issues for adult women who were victims of childhood incest: A preliminary report* (Technical Research Report to Hogg Foundation). Tyler, TX: University of Texas at Tyler Family Violence Research & Treatment Program.

Lundberg-Love, P. K. (1990). Adult survivors of incest. In R. T. Ammerman & M. Herson (Eds.), *Treatment of family violence: A sourcebook.* New York: John Wiley and Sons.

Lundberg-Love, P. K. (1991). Industrial neurotoxins. In L. Hartlage, D. Templer, & W. G. Cannon (Eds.), *Preventable brain damage: Brain vulnerability and brain health.* New York: Springer Publishing.

Lundberg-Love, P. K., Marmion, S., Ford, K., Geffner, R. A., & Peacock, L. (1992). The long term consequences of childhood incestuous victimization upon women's psychological symptomatology. *Journal of Child Sexual Abuse, 1*(1), 81-102.

Lundberg-Love, P. K. (1992). Childhood sexual abuse and psychobiology: A commentary. *Journal of Child Sexual Abuse, 1*(2), 107-109.

Lundberg-Love, P. K. (1997). Current treatment strategies for dissociative disorders in incest survivors. In R. Geffner, P. K. Lundberg-Love, & S. Sorenson (Eds.), *Violence and Sexual Abuse at Home.* New York: Haworth Publishers.

Geffner, R., Sorenson, S. B., & Lundberg-Love, P. K. (Eds.). (1997). *Violence and sexual abuse at home: Current issues, interventions, and research in spouse and child maltreatment.* Binghamton, NY: Haworth Maltreatment & Trauma Press.

Lundberg-Love, P. K. (1996). Special Book Review (Jeopardy in the courtroom: A scientific analysis of children's testimony.) *Family Violence and Sexual Assault Bulletin, 12* (1-2), 21-22.

Lundberg-Love
5

Lundberg-Love, P. K. (1996). Video Review (PTSD in children: Move in the rhythm of the child). *Family Violence and Sexual Assault Bulletin, 12* (1-2), 18-19.

Lundberg-Love, P. K. (1999). The resilience of the human psyche: Identification and treatment of adult incest survivors. In M. A. Paludi (Ed.). *The Psychology of Sexual Victimization.* Westport, CN: Greenwood Publishing Group.

Lundberg-Love, P. K., Ford, K., Marmion, S., Geffner, R. A., & Rogers, K. (Accepted for publication.) Identification of adult sexual abuse survivors: Implications for preventive medicine. *Journal of Child Sexual Abuse.*

Lundberg-Love, P. K., Ford, K., Marmion, S., Primes, P., Wilkerson, K., & Geffner, R. A. (Submitted for publication.) Adult survivors: The relationship between parental socioeconomic status and the sequelae of incestuous victimization. *Journal of Child Sexual Abuse.*

## PROFESSIONAL MEETING PRESENTATIONS AND ABSTRACTS

Lundberg, P. K., Roth, T., Kramer, M., Grissom, T., & Zorick, F. (1977, May). A hospital survey of prescription versus administration of hypnotics used. Annual Meeting of the Association for the Psychophysiological Study of Sleep (APSS), Houston.

Lundberg, P. K. (1979, April). Male disclosure patterns and the reporting of side effects: The medium influences the message. Annual Graduate Student Conference in Personality and Social Psychology, Columbus, OH.

Lundberg, P. K. (1980, April). In search of the invulnerables. Annual Graduate Student Conference in Personality and Social Psychology, Cleveland, OH.

Lundberg, P. K., Warm, J. S., Seeman, W., & Porter, P. (1980, May). Performance of the Type A individual in a vigilance task: Attentive, aroused and able. Abstracts of the Annual Meeting of the Midwestern Psychological Association, St. Louis.

Gruenthal, M., Bell, J. M., Finger, S., Lundberg, P. K., & Johnson, E. M. (1981, April). Behavioral consequences of NGF deprivation. Abstracts of the International Society for Developmental Neuroscience, New York.

Bell, J. M., Gruenthal, M., Finger, S., Lundberg, P. K., & Johnson, E. M. (1981, May). Behavioral and anatomical effects of NGF deprivation in rats. Abstracts of the Annual Meeting of the Midwestern Psychological Association, Chicago.

Bell, J. M., Lundberg, P. K., Finger, S., & Henkel, S. (1981, November). Sensorimotor effects of perinatal dietary histidine supplementation in rats. Annual Meeting of the Society for Neuroscience, Abstract #25.2, Los Angeles.

Lundberg, P. K., Nease, V. F., Zenick, H., & Price, D. (1981, November). Effects of early tryptophan or histidine exposure on offspring sensorimotor behavior. Annual Meeting of the Society for Neuroscience, Abstract #116.2, Los Angeles.

Lundberg, P. K., Laughlin, N., & Finger, S. (1982, October). Behavioral effects of dietary tryptophan administration in malnourished rats. Annual Meeting of the International Society for Developmental Psychobiology, New Orleans.

Lundberg-Love
6

Lundberg, P. K., Almli, C. A., Florman, R. W., & Morgane, P. (1982, November). The effects of prenatal and postnatal malnutrition on brain lipids. Annual Meeting of the Society for Neuroscience, Abstract #50.1. Minneapolis.

Lundberg, P. K., Almli, C. A. & Morgane, P. J. (1982, November). Prenatal and postnatal malnutrition effects on plasma cholesterol and triglycerides. Annual Meeting of the American Heart Association, *Circulation*, Abstract #450, Dallas.

Bell, J. M. & Lundberg, P. K. (1983, November). Effects of dietary phosphatidylcholine supplementation on sensorimotor behavior and brain biochemistry in the rat. Annual Meeting of the Society for Neuroscience, Abstract, #151.1, Boston.

Lundberg, P. K., Bell, J. M., Lewis, S. K., & Skokan, L. A. (1984, April). Effects of chronic soy lecithin on plasma lipids, reproductive capacity and brain development. Annual Meeting of the Federation of the American Societies for Experimental Biology, St. Louis.

Lundberg, P. K., Ehsani, A., & Schultz, J. (1985, April). Psychological effects of cardiac rehabilitation. Annual Meeting of the Southwestern Psychological Association, Austin.

Lundberg, P. K. & Bell, J. M. (1986, April). Dietary soy lecithin exposure: Effects on plasma triglycerides and cholesterol. Texas Women Scholars, Austin.

Lundberg, P. K., Sowell, C. B., & Geffner, R. A. (1986, May). Behavioral characteristics of adult incest survivors. Biennial meeting of the Society for Research in Lifespan Development, Akron, OH.

Lundberg, P. K. & Geffner, R. A. (1986, November). Characteristics of adult incest survivors. In R. A. Geffner (Chair), *Identification and treatment of sexually abused children and adults*. Symposium presented at the Texas Psychological Association annual meeting, Dallas.

Lundberg-Love, P. K., Crawford, C. M., & Geffner, R. A. (1987, April). Personality characteristics of adult incest survivors. In R. A. Geffner (Chair), *Characteristics and treatment of adult incest survivors*. Symposium presented at the Southwestern Psychological Association annual meeting, New Orleans.

Sowell, C. B., Lundberg-Love, P. K., & Geffner, R. (1987, April). Innovative techniques in group therapy with incest survivors. In R. A. Geffner (Chair), *Characteristics and treatment of adult incest survivors*. Symposium presented at the Southwestern Psychological Association annual meeting, New Orleans.

Lundberg-Love, P. K & Crawford, C. M. (1987, May). Characteristics of adult incest survivors. First Biennial Meeting of the Midwestern Society for Feminist Studies, Akron.

Lundberg-Love, P. K. (1988, March). Sexuality issues in the treatment of adult incest survivors. In P. K. Lundberg-Love (Chair), *The impact of incest upon the sexuality of adult women*. Symposium presented at the Society for the Scientific Study of Sex biennial meeting, Dallas.

Lundberg-Love, P. K. & Geffner, R. A. (1988, April). Treatment of adult incest survivors: Recount, repair, resolve. In R. A. Geffner (Chair), *Identification, treatment and prevention of sexual abuse in the family*. Symposium presented at the Western Psychological Association annual meeting, San Francisco.

Geffner, R. A. & Lundberg-Love, P. K. (1988, April). Characteristics of victims of incest: Identifying actual incidents of abuse. In R. A. Geffner (Chair), *Identification, treatment*

*and prevention of sexual abuse in the family.* Symposium presented at the Western Psychological Association annual meeting, San Francisco.

Sowell, C. B., Geffner, R. A., & Lundberg-Love, P. K. (1988, April). Group treatment of adult incest survivors. In R. A. Geffner (Chair), *Identification, treatment and prevention of sexual abuse in the family.* Symposium presented at the Western Psychological Association annual meeting, San Francisco.

Lundberg-Love, P. K. (1989, May). Treatment of adult incest survivors. Biennial Meeting of the Midwestern Society for Feminist Studies (Invited presentation), Muncie, IN.

Geffner, R., & Lundberg-Love, P. (1989, July). Treatment of adults molested as children: Recount, repair, and resolve. Invited seminar presented to annual Summer Institute in the Human Services, University of Utah Graduate School of Social Work, Salt Lake City.

Lundberg-Love, P. K. (1989, August). Treatment of adult incest survivors. In R. A. Geffner (Chair), *Treating incest victims and offenders: Applying recent research.* Invited symposium at the American Psychological Association annual meeting, New Orleans.

Lundberg-Love, P. K. (1989, August). Adult incest survivors: Sexual harassment viewed as part of the revictimization continuum. In M. A. Paludi (Chair), *Sexual harassment in the academy.* Workshop presented at the American Psychological Association annual meeting, New Orleans.

Lundberg-Love, P. K., Peacock, L., & Geffner, R. A. (1989, November). Long-term consequences of incest. In J. E. Stets (Chair), *Physical and sexual aggression among intimates.* Symposium presented at the annual meeting of the American Society of Criminology, Reno, NV.

Geffner, R., & Lundberg-Love, P. (1990, July). Treatment of adults molested as children: Recount, repair, and resolve. Seminar presented to annual Summer Institute in the Human Services, University of Utah Graduate School of Social Work, Salt Lake City.

Lundberg-Love, P. K. (1990, August). Ventilation and assimilation of anger in adult incest survivors. In R. Geffner (Chair), *Techniques for treating adult incest survivors.* Invited symposium presented at the American Psychological Association annual meeting, Boston.

Lundberg-Love, P. K. (1990, November). Facilitating memory retrieval in adult incest survivors. In R. A. Geffner (Chair), *Fundamental techniques for treating adult incest survivors.* Symposium presented at the annual meeting of the Texas Psychological Association, Dallas.

Lundberg-Love, P. K. (1991, February). Treatment of multiple personality disorder in adult incest survivors. In R. A. Geffner (Chair), *Recognizing and treating adult incest survivors: Repression and dissociation symptoms.* Symposium presented at the annual Mid-Winter meeting of Divisions 29, 42, & 43 of the American Psychological Association, San Antonio.

Lundberg-Love, P. K. (1991, March). Treatment of multiple personality disorder. Symposium presented on Multiple Personality Disorder, Dallas.

Lundberg-Love, P. K. (1991, July). Treatment of adults molested as children: Recount, repair and resolve. Invited seminar presented to annual Summer Institute in the Human Services, University of Utah Graduate School of Social Work, Salt Lake City.

Lundberg-Love, P. K. (1991, August). Current treatment strategies for dissociative disorders in incest survivors. In R. Geffner (Chair), *Treating Victims and Survivors of Childhood*

Lundberg-Love
8

*Incestuous Abuse*. Symposium presented at the annual meeting of the American Psychological Association, San Francisco.

 Lundberg-Love, P. K. (1991, August). Effectiveness of a treatment approach for adult incest survivors. In R. Geffner (Chair), *State-of-the-Art Research in Family Violence: Practical Applications*. Symposium presented at the annual meeting of the American Psychological Association, San Francisco.

 Lundberg-Love, P. K. (1991, November). Treatment of childhood and adolescent sexual abuse. In R. Geffner (Chair), *Treating Child and Adolescent Incest Victims: Practical Suggestions*. Symposium presented at the annual meeting of the American Association of Marriage and Family Therapists, Dallas.

 Lundberg-Love, P. K. (1992, January). Treatment of multiple personality disorder in survivors of incest. In C. Ewbank (Chair), *Differential Diagnosis and Treatment Issues of Borderline/Dissociative Clients*. Symposium presented at the annual meeting of the Texas Association of Marriage and Family Therapists, San Antonio.

 Lundberg-Love, P. K. (1992, May). Recognition and identification of child abuse victims. Keynote presentation at the annual conference sponsored by the Family Violence and Sexual Assault Institute, Tyler, TX.

 Lundberg-Love, P. K. (1992, May). Treatment of sexually abused children. Workshop presented at the annual conference sponsored by the Family Violence and Sexual Assault Institute, Tyler, TX.

 Lundberg-Love, P. K. (1992, July). Treatment of Adults Molested as Children: Recount, Repair and Resolve. Invited workshop presented to annual Summer Institute in the Human Services, University of Utah Graduate School of Social Work, Salt Lake City.

 Lundberg-Love, P. K. (1992, August). Recent advances in determining who is a survivor. In S. A. Kirschner (Chair), *Recent Advances in the Treatment of Incest Survivors*. Symposium presented at the annual meeting of the American Psychological Association, Washington, DC.

 Lundberg-Love, P. K. (1992, September). Identification of children with dissociative disorders. In I. Schmidt (Chair), *Childhood Dissociative Disorders*. Symposium presented at the annual Texas Conference on Dissociative Disorders and Multiple Personality Disorder, Austin.

 Lundberg-Love, P. K. (1993, April). Treatment of adult incest survivors. Workshop presented at the annual conference sponsored by the Family Violence and Sexual Assault Institute entitled Stop the Violence in Our Community, Tyler, TX.

 Lundberg-Love, P. K. (1993, July). Treatment of adults molested as children: Recount, repair and resolve. Invited workshop presented at the annual Summer Institute in the Human Services, University of Utah Graduate School of Social Work, Salt Lake City.

 Lundberg-Love, P. K. (1993, August). Identification of adult sexual abuse survivors: Implications for preventive medicine. Paper presented at the annual meeting of the American Psychological Association, Toronto.

 Lundberg-Love, P. K. (1993, October). The message of personality mapping: Differentiation to assimilation, fission to fusion. Paper presented at the Southwest Conference on Dissociative Disorders and Sexual Abuse, Tyler, TX.

Lundberg-Love
9

Lundberg-Love, P. K., Ford, K., Marmion, S., Welker, M. K., Wilkerson, D. K., & Geffner, R. (1993, October).  Adult survivors: The relationship between parental socioeconomic status and the sequelae of incestuous victimization.  In S. I. Singer (Chair), *Socioeconomic Status, Cultural Differences and Crime*.  Symposium presented at the annual meeting of the American Society of Criminology, Phoenix.

Lundberg-Love, P. K. (1994, April).  Personality mapping: The medium influences the message.  Workshop presented at the annual conference sponsored by the Family Violence and Sexual Assault Institute entitled Violence in Our Community: Time For a Change, Tyler, TX.

Lundberg-Love, P. K. (1994, July).  Treatment of adults molested as children: Recount, repair and resolve.  Invited seminar presented at the annual Summer Institute in the Human Services, University of Utah Graduate School of Social Work, Salt Lake City.

Lundberg-Love, P. K. (1994, August).  Training psychology graduate students in identifying and treating child sexual abuse.  A hospitality suite program for Division 43 (Family Therapy) at the annual meeting of the American Psychological Association, Los Angeles.

Lundberg-Love, P. K., Ford, J., & Sulkowski, L. (1994, September).  Tall trees: Group intervention with sexually abused children.  Workshop presented at the annual conference sponsored by the Texas Society for the Study of Trauma and Dissociation, Dallas.

Geffner, R. A., & Lundberg-Love, P. K. (1995, January).  Treatment of child and adolescent sexual abuse victims.  Workshop presented at the annual meeting of the American Professional Society on the Abuse of Children entitled Responding to Child Maltreatment, San Diego.

Lundberg-Love, P. K. (1995, August).  Child sexual abuse identification skills for the family practice physician.  Symposium presented at the annual meeting of the American Psychological Association, New York.

Sulkowski, L. & Lundberg-Love, P. K. (1995, September).  Human growth and development group: Intervention with adolescent sex offenders.  Workshop presented at the annual conference sponsored by the Texas Society for the Study of Trauma and Dissociation, Austin.

Lundberg-Love, P. K. (1997, September).  Issues common to the maltreatment of individuals in society.  Workshop presented at the annual Northeast Texas Regional Elder Awareness Conference on Health (Reach), Tyler.

Lundberg-Love, P. K. (1998, October).  "Tall Trees." Group intervention with sexually abused children.  Symposium presented at the Third International Conference on Children Who Are Victims of Violence.  San Diego.

Lundberg-Love, P. K. (2001, February). Dysfunctional Families and Substance Abuse.  Invited Presentation at the Capital Trial Project: Death Penalty Mitigation Seminar. Austin, TX.

## FUNDED GRANTS

1984-1985   University of Texas, Tyler Research Grant: Project to investigate the effects of dietary lecithin supplementation upon brain cholesterol concentration in rats.
1985-1986   J. S. Hudnall Endowed Professorship in American Affairs, University of Texas,

Lundberg-Love
10

|            | Tyler: Grant to investigate the effects of endurance exercise on brain catecholamine levels in rats. |
|------------|----|
| 1988-1989  | University of Texas, Tyler, Research Grant: Project to investigate the impact of a psychological treatment program upon the mental health of adult incest survivors. |
| 1988-1989  | Hogg Foundation for Mental Heath (to P. Lundberg-Love & R. Geffner): Research project investigating characteristics of adult incest survivors and effectiveness of treatment. |
| 1988-1990  | Hogg Foundation Grant to East Texas Crisis Center (for Family Violence Research & Treatment Program): 3 years funding in conjunction with state grant to establish a regional centralized counseling network for the shelters/crisis centers in East Texas. |
| 1989-1991  | University of Texas, Tyler, Research Grants: Projects to document the long-term consequences of childhood incestuous abuse and the impact of a on-year treatment program. |
| 1990-Present | University Park Hospital Training Grant: Project to provide training to the staff and patients concerning substance abuse, family violence, etc. |
| 1990-1991  | Hogg Foundation & UT-Tyler Grant to Robert Geffner, Paula Lundberg-Love, & Lloyd Mercer: Research project to investigate neuropsychological impairment and marital aggression. |
| 1992-1993  | University of Texas, Tyler, Research Grants: Research project to compare the symptomatology of adult female and male incest survivors. |

## ADDITIONAL PROFESSIONAL EXPERIENCE

- Abstract Reviewer for Society for Research in Lifespan Development, 1984.
- Abstract Reviewer for Society for Research in Lifespan Development, 1986.
- Abstract Reviewer for Society for Feminist Studies, 1987.
- Book Reviewer for Haworth Press, 1987.
- Associate Editor; *Journal of Child Sexual Abuse*, Haworth Publishing, 1990-1992.
- Book Reviewer, *Psychology of Women*, W. C. Brown Publishers, 1990.
- Grant Reviewer for the City Universities of New York (CUNY), 1991.
- Grant Reviewer for the Hogg Foundation, 1991.
- Editorial Board; *Journal of Child Sexual Abuse*, Haworth Publishing, 1992-Present.
- Abstract Reviewer for the Southwest Regional Conference on Dissociative Disorders and Trauma, 1993.
- Founding Member, Board of Directors for the Texas Society for the Study of Trauma and Dissociation, 1993-1996.
- Board Member, Texas Professional Society on the Abuse of Children, 1994-1995.
- Book Reviewer for SUNY Press, 1995.
- Book Reviewer for *Interviewing children and families: Guidelines for the mental health, education, pediatric, and child maltreatment fields.* By Jerome M. Sattler, 1997.

Lundberg-Love
11

- Book Reviewer for *Psychology of Women*, Brooks-Cole, 1997.
- Abstract Reviewer for the third International Conference on Children Who Are Victims of Violence, 1998.

## COLLOQUIA/WORKSHOPS

1985    Effects of Dietary Soy Lecithin on Plasma Lipids, Reproductive Capacity and Brain Development.  University of Texas at Tyler.

Nutrition and Behavior.  Sabine Valley MHMR, Longview, TX.

1986    Psychopharmacology for Psychologists.  East Texas Psychological Association, Tyler.

Techniques for Child Sexual Abuse Assessment.  Counseling and Testing Services, Tyler.

1987    Sexual Abuse Within the Family.  John Hopkins and Associates Family Seminars, Tyler.

1988    The Prevention of Child Sexual Abuse.  Texas Association for the Education of Young Children, Tyler.

Premenstrual Syndrome.  Mother Frances Hospital, Tyler.

The Importance of Sexuality Issues for Multiple Sclerosis Patients.  East Texas Multiple Sclerosis Society, Tyler.

1989    How Crisis Center Volunteers Can Help Cult Abuse Victims.  East Texas Crisis Center Training Workshop, Tyler.

Treatment of Adult Incest Survivors.  University Park Hospital, Tyler.

The Eating Disorders: Characteristics, Family Dynamics and Approaches to Treatment.  East Texas Crisis Center Training Workshop, Tyler.

Treatment of Adult Incest Survivors.  Counseling and Testing Services, Tyler.

Research and Treatment Issues in Multiple Personality Disorder.  Counseling and Testing Services, Tyler.

1989    Satanic Cult Abuse.  Counseling and Testing Services, Tyler.

1990    Treatment of Multiple Personality Disorder.  Counseling and Testing Services, Tyler.

The Investigation Phase in the Treatment of Child Sexual Abuse.  Counseling and Testing Services, Tyler.

1991    Treatment of Child Sexual Abuse.  Department of Human Services, Longview.

Child Emotional Abuse.  Henderson County Independent School District.

The Impact of Media Upon Violence in Society.  East Texas Methodist Women.

Child Sexual Abuse.  Nan Travis Hospital Physicians, Jacksonville, TX.

Child Sexual Abuse.  Nan Travis Hospital Nursing Staff, Jacksonville, TX.

Central Nervous System Physiology and the Impact of Lithium.  East Texas Baptist University, Marshall, TX.

Lundberg-Love
12

|      | |
|------|--|
|      | Treatment of Dissociative Disorders.  Annual meeting of East Texas Alcohol and Drug Abuse Counselors, Tyler, TX. |
|      | Group Discussion Leader.  Second Annual Texas Dissociative Disorders Conference, Houston, TX. |
|      | Alternatives to Physical Discipline.  Smith County Foster Parent Association, Tyler, TX. |
| 1992 | Loving Your Sexually-Abused Foster Child.  East Texas Foster Parent Association Workshop, Longview, TX. |
|      | Dissociative Disorders in Children Who Have Been Sexually Abused.  East Texas Foster Parent Association Workshop, Longview, TX. |
|      | Physiological Effects of Aging.  Workshop for Professionals and Caregivers of the Elderly, Nacogdoches, TX. |
| 1993 | Sexual Assault: Not Always a Stranger.  Annual Peer Helpers Mini-Conference, Palestine, TX. |
|      | Risk Factors For and Support Group Intervention in Child Maltreatment.  Parents Anonymous of Tyler Training Workshop, Tyler, TX. |
|      | Getting Past No: A Strategy for Successful Negotiation.  Tyler Human Services Providers Association, Tyler, TX. |
|      | The Long-Term Consequences of Incest.  Psi Chi colloquium, University of Texas at Tyler. |
| 1994 | Communicating With and Empowering Young Children in Day Care Centers.  Piney Woods Association for the Education of Young Children, Longview, TX. |
|      | Training Volunteers for Intervention and Prevention of Child Abuse.  Parents Anonymous, Tyler, TX. |
| 1995 | Psychopathology, Neuro- and Psychopharmacology Associated with Crime.  Department of Criminal Justice, University of Texas at Tyler. |
|      | Psychopharmacology, Neuroanatomy and Violent Behavior: Mitigating Factors in Capitol Murder Cases, Harris County Capitol Murder Certification Seminar, Harris County Bar Association, Houston, TX. |
| 1996 | Psychopharmacology: Update on Antidepressants.  Lecture for the Family Practice Residency Program, University of Texas Health Center at Tyler, TX. |
|      | Psychopharmacology: Anxiolytic Agents.  Lecture for the Family Practice Residency Program, University of Texas Health Center at Tyler, TX. |
|      | Good Ways to Handle Bad News.  Grand Rounds Lecture, University of Texas Health Center at Tyler, TX. |
| 1997 | Domestic Violence.  Lecture for the Family Practice Residency Program, University of Texas Health Center at Tyler, TX. |
|      | Guidelines for Effective Interviewing.  Lecture for the Family Practice Residency Program, University of Texas Health Center at Tyler, TX. |
|      | Cultural Considerations When Interviewing Hispanic Children for Child Sexual |

Lundberg-Love
13

Abuse.  Invited Program for the Andrews Center, Tyler, TX.

Factitious Disorder By Proxy.  Lecture for the Family Practice Residency
Program, University of Texas Health Center at Tyler, TX.

Diagnostic and Treatment Guidelines for Child Sexual Abuse.  Lecture for the
Family Practice Residency Program, University of Texas Health Center at
Tyler, TX.

The Physical Abuse of Children.  Lecture for the Family Practice Residency
Program, University of Texas Health Center at Tyler, TX.

1998        National Institute of Trial Advocacy (NITA).  Faculty member for teaching
defense attorneys how to interview and question witnesses in post-death
penalty Habeas Corpus cases, Univeristy of Texas Law School, Austin, TX

Physicians' Guide to the Recognition of Domestic Violence.  Presentation for
physicians and other medical personnel.  Community Workshop for
Recognition of Domestic Violence, Abilene, TX

Domestic Violence: It's Everyone's Responsibility.  Keynote luncheon
presentation for the Community Workshop for Recognition of Domestic
Violence, Abilene, TX

Identification of and Risk Factors for Domestic Violence.  Keynote hospital
luncheon presentation for medical assistants, Abilene, TX
A Biopsychosocial Model of Aggression.  A community lecture sponsored
by East Texas Medical Center, Tyler, TX

Treatment of Child Sexual Abuse.  Workshop for mental health providers at
Triangle Pines Residential Treatment Center, Overton, TX

1999        Behavior Modification Techniques for the Family Practice Physician.  Lecture for
the Family Practice Residency Program, University of Texas Health Center
at Tyler, TX

Identification and Management of Borderline Personality Disorder.  Lecture for
the Family Practice Residency Program. University of Texas Health Center
at Tyler, TX

Patient Interviewing Techniques for the Family Practice Physician. Lecture for the
Family Practice Residency Program. University of Texas Health Center at
Tyler, TX.

Lundberg-Love
14

Cognitive Distortions and Depression.  Lecture for the Family Practice Residency
Program.  University of Texas Health Center at Tyler, TX.

Pedophilia.  Lecture for the Family Practice Residency Program.  University
of Texas Health Center at Tyler, TX.

The Identification of and Interventions for Children Who Are Victims of Fetal
Alcohol Syndrome or Other Types of Prenatal Drug Exposure. Inservice
presented for Region VII Foster Parents, August, 1999, Grand Saline, TX

Ritualistic Sexual Maltreatment.  Training Program for East Texas Crisis Center
Volunteers, October, 1999, Tyler, TX

2000          Back From Madness: Treatments for Schizophrenia and Bipolar Disorder.
Video/Lecture presentation for Family Practice Residency Program,
University of Texas at Tyler  Health Center.

Factitious Disorder By Proxy. Lecture for the Family Practice Residency Program.
University of Texas at Tyler Health Center.

Domestic Violence. Lecture for the Family Practice Residency Program.
University of Texas at Tyler Health Center.

Helping Rape Victims. Lecture for the Family Practice Residency Program.
University of Texas at Tyler Health Center.

Ritualistic Sexual Maltreatment. Training Program for East Texas Crisis Center
Volunteers, October, 2000, Tyler, TX

## COMMUNITY LECTURES

1985          Psychological Effects of Endurance Exercise Training.  Tyler Mental Health
Association, Tyler, TX.
1985          Techniques for Relaxation.  Smith County Medical Technicians Association,
Medical Center Hospital, Tyler, TX.
Type A Behavior and Stress Management.  University of Texas at Tyler, TX.
1986          Cocaine Abuse: Symptoms and Treatment.  University of Texas at Tyler, TX.
Behavioral Sequelae of Child Sexual Abuse.  Texas Eastern School of Nursing.
Effects of Cocaine Use and Abuse.  University of Texas at Tyler, TX.
Stress Management.  East Texas Dietetic Association, University of Texas at
Tyler, TX.
1987          Family Dynamics of Sexual Abuse.  Texas Eastern School of Nursing, Tyler, TX.
PMS.  Mother Frances Hospital, Tyler, TX.

Lundberg-Love
15

| | |
|---|---|
| 1988 | Pre-Menstrual Syndrome: Fact vs. Fiction. Mother Frances Hospital, Tyler, TX. |
| 1989 | Identification of Child Sexual Abuse Victims. East Texas Counselors Association, University of Texas at Tyler, TX. |
| | The Couch Potato Syndrome. Medical Center Hospital, Tyler, TX. |
| | Long-Term Behavioral Consequences of Sexual Abuse. Department of Human Services Foster Parents, Longview, TX. |
| | Long-Term Behavioral Consequences of Sexual Abuse. Department of Human Services Foster Parents, Gilmer, TX. |
| 1990 | Family Discord. University of Texas at Tyler, Health Center Employee Assistance Program, Tyler TX. |
| | The Emotional Abuse of Children and Wife Abuse. Tyler Junior College, Tyler, TX |
| | The Emotional Maltreatment of Children. Athens, TX Independent School District (Teachers and Counselors). |
| | Recovery From Child Sexual Abuse. Department of Human Services Foster Children, Longview, TX. |
| 1991 | Child Abuse. Tyler Kiwanis Club, Tyler, TX. |
| | Childhood Dissociative Disorders. Longview, TX Foster Parent Association. |
| | The Impact of Media Upon Behavior. Pollard Methodist Church, Tyler, TX. |
| | The Impact of Media Upon Violence. Marvin Methodist Church, Tyler, TX. |
| | The Thunder Rolls: Spouse Abuse. Medical Center, Tyler, TX. |
| | But Names Can Hurt Forever. Department of Education, University of Texas at Tyler, TX. |
| 1992 | The Physiology of Stress Management. Smith County Foster Parent Association Tyler, TX. |
| | Teenage Parent "Rap Session." Campfire of Tyler Retreat for Teenage Mothers, Tyler, TX. |
| | Teenage Parent Support Group Session. Campfire of Tyler Retreat for Teenage Mothers, Tyler, TX. |
| 1992 | Dissociative Disorders in Children. Van Zandt County Foster Parent Association. |
| 1993 | Teenage Parent Support Group Session. Campfire of Tyler Retreat for Teenage Mothers, Tyler, TX. |
| | Sexuality in the 90's. University of Texas at Tyler Student Association, Tyler, TX. |
| | Psychopharmacology for Probation Personnel. Adult Probation Department, Tyler, TX. |
| 1994 | Teen Parent Support Group Session. Campfire of Tyler Retreat for Teenage Mothers, Tyler, TX. |
| | Behavior Modification of Sexually Abused Children. Smith County Foster Parents, Tyler, TX. |
| | Date Rape on Campus. University of Texas at Tyler Student Association, Tyler, TX. |
| | Current Issues Regarding Domestic Violence. Women's Center of East Texas, |

Lundberg-Love
16

|  | |
|---|---|
| | Longview, TX. |
| | Teen Parent Support Group Session. Campfire of Tyler Retreat for Teenage Mothers, Tyler, TX. |
| 1995 | Drug Abuse Issues. Parents Helping Parents, Tyler, TX. |
| | Teen Parent Support Group Session. Campfire of Tyler Retreat for Teenage Mothers, Tyler, TX. |
| 1996 | Teen Parent Support Group Session. Campfire of Tyler Retreat for Teenage Mothers, Tyler, TX. |
| 1996 | Coping With Fibromyalgia. East Texas Fibromyalgia Support Group. Longview, TX. |
| | Identification of and Risk Factors for Child Abuse. East Texas Medical Center, Tyler, TX. |
| 1997 | Hopes and Realities: An Educational Workshop for Survivors of Traumatic Brain Injury. East Texas Medical Center, Tyler, TX. |

## COMMUNITY SERVICE

| | |
|---|---|
| 1983-1992 | Board of Directors, Smith County Council on Alcoholism and Drug Abuse, Tyler, TX. |
| 1984-1986 | Board of Directors, Smith County Chapter of the American Heart Association, Tyler, TX. |
| 1985 | Group Facilitator, Parents Anonymous, Tyler, TX. |
| 1986 | Branch Advocacy Council, Planned Parenthood, Tyler, TX. |
| 1988 | Consultant for the Academic Decathlon Team, Robert E. Lee High School, Tyler, TX. |
| 1988-1989 | Mayor's Steering Committee on Children and Adolescent Services, Tyler, TX. |
| 1989-1995 | Board of Directors for Parents Anonymous of Tyler. (President, 1990-1992, Parliamentarian, 1992; Treasurer, 1993). |
| 1989 | Adjunct Faculty for Alternative Care Program, University Park Hospital, Tyler, TX. |
| 1990 | Adjunct Faculty for Inpatient Substance Abuse Program, University Park Hospital, Tyler, TX. |
| 1992-1993 | Allied Health Faculty for Inpatient Chemical Dependency Program, University Park Hospital, Tyler, TX. |
| 1992-1998 | Advisory Board Member for the Family Violence and Sexual Assault Institute, Tyler, TX. |
| 1995-1996 | Advisory Board for the Children's Advocacy Center, East Texas Crisis Center, Tyler, TX. |
| 1999-2000 | Sexual Assault Task Force, East Texas Crisis Center, Tyler, TX |
| 2000 | Consultant Academic Decathlon Team, Robert E. Lee High School, Tyler, TX |

Lundberg-Love
17

## PROFESSIONAL ORGANIZATIONS

- Society for Neuroscience
- New York Academy of Science
- American Association for the Advancement of Science
- American Psychological Association (Member of Family Psychology Division's
  Family Abuse Concerns Committee
- American Professional Society on the Abuse of Children
- International Society for the Study of Dissociative Disorders
- Texas Society for the Study of Trauma and Dissociation (1992-1995)
- Texas Professional Society on the Abuse of Children
- East Texas Psychological Association
        Past President (1989)
        President (1988)
        President-Elect (1987)
        Secretary (1986)
        Membership Chairperson (1985)
- Sigma Xi

## HONORS

- ★ Who's Who in the South and Southwest
- ★ Who's Who of Emerging Leaders in America
- ★ Who's Who of American Women
- ★ The International Directory of Distinguished Leadership
- ★ Nominee for Chancellor's Teaching Award, University of Texas at Tyler, 1991,
    1994, 1997, 1999, 2000, and 2001
- ★ Leadership Texas - 1992
- ★ Leadership America - 1993
- ★ Nominee for the Ralph and Mary Spence Endowed Professorship - 1998
- ★ Nominee for the Ralph and Mary Spence Endowed Professorship - 1999
- ★ Outstanding Psychology Faculty Member- 1999-2000
- ★ Tyler "Pioneer in Mental Health," Women in Tyler Day- April, 2000