# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ANTHONY MEDINA,** | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | **H-09-CV-3223** |
| | § | |
| **LORIE DAVIS,** | § | **THIS IS A CAPITAL CASE.** |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| **Respondent.** | § | |

## SUPPLEMENTAL AUTHORITIES RELATED TO PETITIONER'S STATE MISCONDUCT CLAIMS, PENDING REQUESTS FOR FACT DEVELOPMENT, AND RELATED PROCEDURAL ISSUES

James William Marcus
Texas Bar No. 00787963
Capital Punishment Clinic
University of Texas School of Law
727 E. Dean Keeton Street
Austin, Texas 78705
TEL: 512-232-1475
FAX: 512-232-9197
jmarcus@law.utexas.edu

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers (Texas Bar No. 24084578)
Jessica Graf (Texas Bar No. 24080615)
Capital Habeas Unit
Office of the Federal Public Defender
Northern District of Texas
525 Griffin Street, Suite 629
Dallas, Texas 75202
TEL: 214-767-2746
FAX: 214-767-2886
Jeremy_Schepers@fd.org
Jessica_Graf@fd.org

Counsel for Petitioner Anthony Medina

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Two recent court decisions addressing Harris County capital prosecutions are directly relevant to matters pending before this Court. In *Ex parte Ronald Hamilton*,[1] a long-time staff member of Houston Police Department's ("HPD") Identification Department testified that, as a matter of *policy*, HPD failed to document exculpatory lab results and stonewalled defense counsel seeking information about their work. The Harris County District Attorney's Office ("HCDAO") has represented to the courts that it was unaware of HPD's policy before June 2019. Taken together, these two new facts establish that representations by Harris County prosecutors about the disclosure of exculpatory information in the possession of the police are inherently unreliable. The *Hamilton* Court concluded that "HPD's policy of not documenting exclusions was designed to suppress relevant evidence from defense counsel, and that the policy succeeded in this case." Appendix 1 at 31. *Hamilton* reveals a systemic problem that left even the HCDAO post-conviction attorneys unaware of exculpatory evidence in the possession of HPD. Without court-ordered discovery, petitioners and their counsel simply have no access to exculpatory information discovered by HPD.

More recently, a federal court—after ordering the fact development necessary to access the closed portion of the HCDAO's allegedly "open file"—granted relief on several *Brady*[2] claims and a *Massiah*[3] claim based on information suppressed by the

---

[1] *Ex Parte Ronald Hamilton*, No. 0901049-B (180th Dict. Ct. Harris Co. Oct. 30, 2019) (attached as Appendix 1).

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

[3] *Massiah v. U.S.*, 377 U.S. 201 (1964).

1

HCDAO.[4] In *Prible*, as in this case, the HCDAO prosecutor represented to courts and counsel that the State's file was open to defense counsel, but the federal court found that she was "not credible" on this and other matters.[5]

*Hamilton* and *Prible* underscore why court-ordered fact development is indispensable to an accurate and just resolution of Mr. Medina's claims. As described more fully below, these cases and the evidence already before this Court demonstrate that:

- HPD systematically failed to document or otherwise disclose exculpatory information to defense counsel and intentionally stonewalled counsel who attempted to discover it.

- HCDAO prosecutors were unaware of HPD's policy and thus their assurances of compliance with *Brady*'s obligations to disclose exculpatory information in possession of the HPD were meaningless.

- "Open" HCDAO files are incomplete for at least two reasons: (1) prosecutors withhold "work product" even when it is *Brady* material; and (2) the HPD policy of omitting exculpatory information from its official reports means that the HPD information in the HCDAO file will often be incomplete.

- Public Information Act requests to HPD and HCDAO—the only processes available to Mr. Medina to date—are ineffective because both institutions continue withhold *Brady* information and stonewall defense counsel unless and until a court intervenes and orders fact development.

Courts have already determined that even the most senior HCDAO prosecutors—in the rare instances they are called to testify—fail to understand their *Brady* obligations, which has led to a pattern and practice of failing to disclose

---

[4] *Prible v. Davis*, H-09-CV-1896, 2020 WL 2563544 (S.D. Tex. May 20, 2020) (attached as Appendix 2).

[5] *Id*. *19 (Prosecutor "Siegler's testimony was not credible on both minor and major points. Siegler made several statements that the record directly refutes.").

exculpatory evidence. Doc. #133 at 74–87. *Hamilton* adds conclusive proof—in the form of sworn testimony from HPD staff—that HPD was intentionally hiding exculpatory evidence from defendants. *Prible* is yet another example of an HCDAO prosecutor from the same era in which Mr. Medina was tried withholding obviously exculpatory evidence in a death penalty case.

These recent decisions support Mr. Medina's pending requests for discovery. For example, as in *Prible* and *Hamilton*, the HCDAO withheld a thick "work product" file from Mr. Medina. Doc. #148 at 9. Mr. Medina has alleged, *inter alia*, that the prosecution had at least one undisclosed deal with a critical witness who was coaxed by HCDAO prosecutors to testify untruthfully at Mr. Medina's trial. Doc. #53 at 164–68. Additionally, prosecutors elicited trial testimony from critical witnesses that materially contradicted their sworn pre-trial statements to HPD. Doc. #53 at 159–60. In one instance, the prosecutor blatantly coaxed a witness to contradict his sworn statement by reminding him of their discussion during an intervening pre-trial meeting. *Id*. As in *Prible*, the State has never disclosed any information about its pre-trial contacts with witnesses or how their sworn testimony evolved to contradict their prior statements. *Prible* and *Hamilton* provide yet more evidence of the HCDAO's pattern of abusing the work product privilege to withhold *Brady* evidence.

Mr. Medina also seeks from HPD evidence that is known to exist but is not documented in its official report about this case, as well as information about HPD's forensic work—including the status of two palmprints recovered from the bag in which the murder weapon was recovered and which have never been publicly linked

3

to anyone. *Hamilton* supports Mr. Medina's pending requests by documenting a HPD *policy* of suppression and obfuscation with respect to such evidence that can only be overcome by court-ordered discovery.

Finally, *Prible* models the appropriate process in a federal habeas corpus case in which the petitioner is not at fault for failing to previously obtain *Brady* evidence sequestered in the state's file, and confirms this Court's authority to order discovery, consider all newly disclosed *Brady* evidence, and grant relief.

## I.   Two recent decisions illuminate how the Houston Police Department and Harris County District Attorney's Office violate their obligation to disclose exculpatory evidence to defendants.

### A.   *Ex parte Hamilton*: "HPD's policy of not documenting exclusions was designed to suppress relevant evidence from defense counsel."[6]

#### 1.   The centerpiece of HCDAO's case for death was that Mr. Hamilton had allegedly committed another capital murder.

Ronald Hamilton pled guilty to capital murder for the November 2001 shooting of a convenience store clerk during a robbery (the "Yellowstone Murder"). Thus, the only contested issue in Mr. Hamilton's case was whether he would be sentenced to death or life in prison. During Mr. Hamilton's November 2002 sentencing trial, the HCDAO introduced evidence that Mr. Hamilton had committed another convenience store robbery-murder (the "Holman Murder"). Unbeknownst to the defense, however, HPD and the HCDAO suppressed evidence developed before trial excluding Mr. Hamilton as the perpetrator of the Holman Murder. Even more alarming was the

---

[6] *Ex parte Hamilton* (Appendix 1) at 31.

testimony of HPD staff that the suppression in Mr. Hamilton's case was pursuant to HPD's policies of omitting exculpatory results from their police reports and stonewalling defense counsel.

The trial court granted the defense counsel's pretrial *Brady* motion. Appendix 1 at 34. "The trial prosecutors … represented to both the Court and defense during a pretrial conference that there were no fingerprint comparisons, or other testing results in connection with either the Yellowstone or Holman Murders." Appendix 1 at 2. Mr. Hamilton's counsel was allowed to view portions of the prosecution file before trial, including the HPD offense report, but there was no indication that fingerprints found at the Holman scene had been compared to suspects, including Mr. Hamilton, and that Mr. Hamilton had been excluded. Appendix 1 at 34–35.

The Holman murder was the primary focus of the prosecution's penalty phase case. Prosecutors discussed it in their opening statement, referred to the Yellowstone Murder as "the first capital murder," and called seven witnesses to testify about the Holman murder. Appendix 1 at 2–3.[7] One of the witnesses, Ms. Wanda Johnson, told police that she was outside of the Holman store when a car pulled up and man got out with a 40-ounce beer bottle. He set down the beer bottle outside of the store and then committed the murder. Appendix 1 at 13. The police, however, omitted from the

---

[7] One of the witnesses was a jailhouse informant named Joseph Montoyer who testified that while cutting Mr. Hamilton's hair in jail, he overheard Mr. Hamilton discussing a Holman Street robbery of an Asian or Chinese man. Prior to Mr. Montoyer's testimony, the prosecutor told the defense there had been no deals in exchange for his cooperation. It was later revealed during trial that Mr. Montoyer's bond had been lowered in exchange for providing information to the state. Appendix 1 at 3.

statement they typed for Ms. Johnson that the shooter had held the bottle, and this fact was not elicited at trial.

Prosecutors devoted a substantial portion of their closing argument to explaining why the jury should believe Mr. Hamilton committed the Holman murder. The prosecution noted that the crimes were only a month apart, occurred in the same area of town, around the same time, and occurred at convenience stores. The prosecutor misled the jury by asking "[i]s it just a coincidence that there weren't any prints found at either scene?" Appendix 1 at 6. The prosecutor's arguments also misled the jury by suggesting there was no DNA to test in the Holman Murder,[8] averring that because the witnesses "didn't come forward until two days later … there was not any evidence there to collect at that time." Appendix 1 at 6–7.

### 2. "The State and its prosecution team—the Houston Police Department, trial prosecutors, investigators and fingerprint examiners—actively suppressed exculpatory evidence."[9]

As the *Hamilton* post-conviction court recently found, the fingerprints on the 40-ounce beer bottle left by the suspect were the most reliable evidence of who committed the murder. Appendix 1 at 16. Prior to trial, HPD compared the fingerprints on the bottle against Mr. Hamilton and he was excluded. Recent post-

---

[8] In fact, DNA was recovered from both the mouth of the beer bottle left by the assailant and from beneath the fingernails of the victim. Appendix 1 at 19. In post-conviction proceedings, the parties' experts disagreed whether the samples were suitable for comparison. Mr. Hamilton's expert found that Mr. Hamilton was excluded from having deposited the DNA on the bottle. Appendix 1 at 20. The *Hamilton* court found that the DNA evidence collected at the scene, which had not been tested prior to trial, was additional evidence that Mr. Hamilton was not involved in the Holman murder. *Id*. at 23–24.

[9] Appendix 1 at 24.

conviction testing has matched them to Mr. Marshall Knight, a repeat offender with a record that includes aggravated robbery with a deadly weapon and who more closely matched the eye-witnesses' physical description of the shooter. Appendix 1 at 16.

Pursuant to HPD policy, the exclusion of Mr. Hamilton as the person who deposited the bottle was omitted from the police report. Appendix 1 at 26–27. HPD policy was "to only make an offense report supplement if there was a fingerprint match found." Appendix 1 at 27. In *Hamilton*, the HCDAO prosecutor dispatched an investigator to, *inter alia*, check the fingerprint results. Appendix 1 at 31. The investigator testified that he prepared a memo to the prosecutor well before trial informing her that Mr. Hamilton had been eliminated as a possible match to the fingerprints on the bottle; he was confident that the prosecutor knew this information. Appendix 1 at 31. Yet, as noted *supra*, prosecutors represented to both the court and defense during a pretrial conference that there were no fingerprint comparisons or other testing results in connection with either the Yellowstone or Holman Murders.

One of the key witnesses in the 2019 state post-conviction proceedings was Ms. Debbie Benningfield, who worked for HPD from 1975 to 2006. Ms. Benningfield was intimately familiar with the protocols of HPD's Identification Department during this period: she "spent her entire career in the HPD Identification Department"; "previously worked in the Ten Print Section, where her job was to record fingerprints of people who were arrested"; and "[e]ventually . . . became the manager of the AFIS

for HPD." Appendix 1 at 25. Ms. Benningfield testified about her work on Mr. Hamilton's case and the policies of the HPD Identification Department.

The court found that Ms. Benningfield "knew, prior to trial, that the four prints suitable for comparison collected at the scene of the Holman Murder excluded Ronald Hamilton, and his co-defendant Shawon Smith, from having left the prints" but she "actively suppressed this evidence by not making a supplement to the police report." Appendix 1 at 30. Further, even the fact that "[Ms.]Benningfield compared the fingerprints found at the scene, and on the 40 oz. Schlitz malt liquor bottle, to both Ronald Hamilton and Shawon Smith prior to trial . . . was never mentioned in her offense report supplements." Appendix 1 at 28. "[Ms.] Benningfield did not make a notation in the offense report about this exclusion because 'if we did not identify the print, we did not type a supplement if we excluded it.'" *Id.* (quoting Ms. Benningfield's 2019 testimony). However, "the information about the exclusion would be relayed to the person who requested the comparison" — a HPD detective investigating the case. *Id*. Thus, the court found that at least one of the HPD detectives "knew that Hamilton had been excluded from leaving the prints found at the scene." *Id*.

Postconviction testimony established that the HCDAO prosecutors who tried the case also knew that Mr. Hamilton had been excluded from leaving the prints found on the beer bottle. HCDAO investigator George "Buddy" Barringer testified that he was asked by trial prosecutor Colleen Barnett check for fingerprint results in both the Yellowstone Murder, and in the separate Holman Murder, and was "confident" that the trial prosecutor would have known Hamilton was eliminated

from having left the prints found at the scene of the Holman murder. *Id*. at 31. The trial court credited his testimony and found that the prosecutor knew or should have known, prior to trial, that Hamilton had been excluded from leaving any of the prints found at the Holman murder scene. *Id*. at 32.

Notably, Barringer's memo was in the prosecution's file but suppressed throughout Mr. Hamilton's trial, his initial state habeas corpus proceedings, and federal habeas proceedings in the United States District Court:

> It was not until just before the June 21, 2019, hearing that the DA's office turned over the pretrial memorandum written to [prosecutor] Colleen Barnett which shows that the trial prosecutors were aware, prior to trial, that Hamilton's fingerprints did not match those found on the 40 oz. beer bottle.

*Id*. at 43. HCDAO's post-conviction prosecutors professed ignorance of the HPD's policy of not documenting exclusions, stating they had only just learned in 2019 of the pretrial fingerprint analysis in Mr. Hamilton's case. *Id*. As the trial court concluded, "if the [post-conviction] attorneys working for the State of Texas did not know that the prints in this case had been compared to Hamilton's and excluded, then Hamilton's attorneys could not have known" either. *Id*. at 42–43.

### 3. HPD suppressed of exculpatory evidence pursuant to policies and standard practices that were not abandoned until well after the trials of Mr. Medina and Mr. Hamilton.

Ms. Benningfield's testimony established that it was the "policy" and "standard practice" of the HPD Identification Division to report only inclusions in their police reports; if a suspect was eliminated, no report would be generated. *Id*. at 27; 29; 31; 40. According to Ms. Rachel Green, a fingerprint examiner for the Houston Forensic

Science Center ("HFSC") which has replaced the HPD crime lab, "the former HPD crime lab has since changed its policy" and now documents all comparisons regardless of the outcome. *Id*. at 41. Ms. Green joined the former HPD lab in 2006, the same year Ms. Benningfield departed. *Id*.

Ms. Benningfield was not the only HPD analyst to testify to HPD's policy of not documenting exclusions. A firearms examiner testified in the 2019 hearing that, prior to Mr. Hamilton's trial in 2002, he had been asked to compare shell casings from the Yellowstone Murder (to which Mr. Hamilton admitted) to shell casings from the Holman Murder. "Once again, . . . there was also an elimination" but "no offense report supplement was ever made concerning this comparison." *Id*. at 40. The HPD firearm examiner explained that he would have conveyed the result to the investigating officers but "it was not the standard practice of HPD at the time of trial to document eliminations." *Id*. at 40–41. However, "[h]ad there been an identification between the two shell casings, then there would have been a report made." *Id*. The *Hamilton* court found "that the firearm examiner's testimony is yet more proof that it was the practice of the HPD crime lab to create supplemental offense reports when identifications were made, but to not make supplemental reports if exclusions were made." *Id*. at 41.

The suppression resulting from HPD's policy of omitting exculpatory testing from its official reports was exacerbated by a practice of intentionally stonewalling non-law enforcement people seeking information. Ms. Benningfield testified that "members of the District Attorney's Office could simply call the lab and ask if

10

fingerprints had been compared, and learn the results," but "[t]his would not happen with defense attorneys." *Id.* at 27. "If a defense attorney called, the examiner would not discuss a case with them, but would notify HPD legal about the defense's request to speak with the examiner." *Id.* Indeed, "[d]uring [Mr. Hamilton's recent] state habeas proceedings, Debbie Benningfield refused to have a meeting with habeas counsel without the Assistant District Attorney's being present," and testified that the "same would have been true prior to Hamilton's trial—Benningfield would not have spoken to defense counsel, but would have referred them to HPD legal." *Id.* at 30. The *Hamilton* court found that "[t]his policy compounded the problem in this case, and amounts to an active suppression of evidence." *Id.* at 27

* * * *

Mr. Hamilton's trial prosecutors defied a pretrial order to disclose forensic testing and represented to the court and defense counsel that there were no fingerprint comparisons done. The HCDAO resisted Mr. Hamilton's efforts to develop his claims, insisting as late as 2017 that "here, there is no indication the evidence had been tested prior to trial, or that the State was in possession of the results of this testing." *Id.* at 42. Thus, as the *Hamilton* court found, "[e]ven the representatives of the Harris County District Attorney's Office, throughout these current proceedings, were not aware that the fingerprints had previously been tested." *Id.* The exculpatory evidence was buried *by design* in the non-public files of HPD and the HCDAO. *Hamilton* illustrates why HCDAO prosecutors cannot be relied upon to produce exculpatory evidence that emerges during an HPD investigation.

11

**B.**    *Prible v. Davis*: **Hiding** *Brady* **evidence in the HCDAO "work product" file.**

    **1.  Mr. Prible's conviction depended on two key pieces of evidence: the testimony of a jailhouse informant and DNA allegedly deposited contemporaneously with the murder.**

Ronald "Jeff" Prible was sentenced to death for killing a couple, Steve Herrera and Nilda Tirado, and starting a fire that killed three children in the home. According to the court, "the State's case against Mr. Prible was not strong," and "rested on six main facts:"

> The State presented evidence that: 1) [Prible] was the last person seen with Steve at the house prior to the murders; 2) he had a motive to kill Steve; 3) the bullets that killed Nilda and Steve were fired from the same weapon; 4) [Prible's] sperm was deposited in Nilda's mouth at some point prior to her death; 5) a fire was set to destroy physical evidence, including evidence of [Prible's] DNA; and 6) [Prible] admitted to [fellow federal inmate Michael] Beckcom that he committed the murders.

*Prible*, 2020 WL 2563544, at *2 (citing *Prible v. State*, 175 S.W.3d 724, 730 (Tex. Crim. App. 2005)).  As the federal court observed, "most of this evidence does not explicitly inculpate Prible in the murders." *Id*. Indeed, "[t]he State's case rested on two facts: (1) a single witness who testified that Prible confessed to the murders and (2) testimony suggesting that Prible's DNA had entered Tirado's mouth only a short while before her death." *Id*. at *21.

The State's star witness was Michael Beckcom, who was housed with Mr. Prible in a federal prison when Mr. Prible was indicted for capital murder.[10]  Mr.

---

[10] The capital murder occurred in 1999. Mr. Prible was questioned at the time and informed the police that he was having an affair with the female victim and had engaged in consensual oral sex with her on the night she died. Mr. Prible had an alibi: a teenage neighbor had seen the male victim drop Mr. Prible off at his home before the crime. Thus, Mr. Prible was not even arrested. Two years later, Harris County prosecutor Kelly Siegler reviewed the case and—without any new evidence—charged Mr.

Beckcom testified that Mr. Prible confessed to him and another inmate named Nathan Foreman (Mr. Foreman did not testify at trial). Prior to trial, the defense sought discovery of information related to Beckcom, including information about the State's contacts with Beckcom and the terms of any deals Beckcom had with the prosecution. *Id.* at *2. The prosecutor balked at providing information about her contacts with the informant witness or her notes, and the trial court agreed that this information constituted work product. *Id.* *3. The prosecutor stated that she agreed to notify the AUSA who prosecuted Beckcom about the informant's cooperation, but downplayed the significance of this by stating she had no control over whether the AUSA would do anything with this information and, if he did, whether the federal judge would reduce Beckcom's sentence. *Id.*

The other pillar of the State's case was the fact that Mr. Prible's semen had been found in Ms. Tirado's mouth, but

> [l]ong before Prible was charged with capital murder, the prosecution knew that Prible's semen had been found in Tirado's mouth. That fact alone was not necessarily inculpatory. The evidence did not suggest that Tirado had been sexually assaulted, and while Prible admitted that he had sexual relations with Tirado, he claimed that it was consensual and had occurred long before the murders.

*Id.* at *31. Thus, "the prosecution . . . needed to prove that '[t]here is no way in the world that that semen wasn't deposited either moments before or seconds after [Tirado] died.'" *Id.* at *31 (quoting the prosecutor's argument at trial).

---

Prible with capital murder. *Prible*, 2020 WL 2563544 at *1–*2. At the time he was indicted, Mr. Prible was serving time in a federal prison for bank robbery. *Id.* at *2.

The State called two expert witnesses to testify about the DNA evidence. Chief Harris County Medical Examiner Dr. Joye Carter "did not help the State's theory that Prible's sexual contact with Tirado had to have occurred seconds before she was killed," as she "testified that sperm cells can be found in a person's mouth for hours after ejaculation." *Id.* at *31. The State "bolstered its theory with testimony from William Watson, an expert in molecular biology," who testified that "the quantity of the DNA sample was inconsistent with the semen being deposited into Tirado's mouth as long as an hour before she was killed." *Id.* His testing "certainly would be consistent with" Prible depositing the semen in Tirado's mouth "moments, if not seconds, before she was killed." *Id.*

The prosecutors' closing arguments highlighted the importance of Mr. Beckcom's testimony and the DNA evidence. First, "[p]rosecutor Vic Wisner's closing focused on two factors: Beckcom's testimony and the DNA evidence." *Id.* at *7. Mr. Wisner urged the jury to believe Mr. Beckcom because "everything he's telling you about what happened is the truth." *Id.* Mr. Wisner argued that, "to believe the defense's case, jurors would have to find that 'this Defendant is the unluckiest, unluckiest [sic] criminal defendant who's ever set foot in a courtroom.'" *Id.* Mr. Prible was unlucky "because the semen found in Ms. Tirado's mouth 'had to come right before she was killed or after she was killed,' '[t]here is no way in the world that that semen wasn't deposited either moments before or seconds after Nilda died.'" *Id.* (quoting HCDAO prosecutor Vic Wisner's closing argument).

After the defense closing, jurors last heard "an emotionally charged argument" from HCDAO prosecutor Kelly Siegler. *Id*. Ms. Siegler:

> challenged the defense DNA expert's testimony by being "crude for a minute" and suggesting that it depended on Prible having "some kind of magic semen, magic sperm that somehow lives longer than any of y'alls or any other man's in this whole universe." Siegler continued that, to believe the defense, jurors would have to assume that "his semen is so tasty that she walked around savoring the flavor of it in her mouth for a couple hours." In crass language, Siegler described Prible as someone so depraved that he could kill Tirado while sexually excited. Siegler summed up her argument: "[I]f Jeff Prible had managed to control his ejaculation and his mouth, he might not have ever been caught."

*Id*. (record citations omitted). Turning to Mr. Beckcom, Ms. Siegler acknowledged that he was himself a murderer but she asked the jury to consider the detailed nature of his testimony:

> But the most important thing, how would Mike Beckcon [sic] know all the things that he does know unless the killer told him? Whose fault is it that Mike Beckcom came to court? It's Jeff Prible's for telling him. And whose fault is it that Mike Beckcom knew all the details? Jeff Prible's for telling him. And how did Mike Beckcom know all the details? Because Jeff Prible did it. That's how he knows all these details.

*Id*. at *8. The jury convicted Mr. Prible and subsequently sentenced him to death.

**2. The HCDAO maintained an "open file" for defense counsel's inspection but stored *Brady* evidence in a dense "work product" file that only came to light when the Federal District Court ordered the HCDAO to produce its file for inspection.**

As in *Hamilton* and Mr. Medina's case, throughout Mr. Prible's post-conviction proceedings, the HCDAO answered all *Brady* requests with the assertion that it maintained an "open file." *Id*. at *25 (in her federal deposition testimony, "[Ms.] Siegler claimed that she had an 'open file' policy and did not maintain a separate

15

work product file."). As in *Hamilton* and Mr. Medina's case, however, the existence of

a file open to the defense did not guarantee access to *Brady* evidence:

> In reality, however, the State maintained a dense work product file
> containing a significant amount of exculpatory information that was not
> disclosed to the defense, including notes memorializing meetings with
> Foreman and Beckcom concerning Prible's case, letters from several
> [other] inmates . . . trying to inform on Prible, and a note revealing that
> Siegler had consulted Pam McGinnis,[11] the head of the Harris County
> Crime Lab, who told her semen could live up to seventy-two hours in the
> mouth. These materials came to light only because of court proceedings
> and court orders occurring after Prible filed his initial federal petition.

*Id.* at *25.

Buried in the HCDAO "work product" file was evidence of numerous

undisclosed contacts with Mr. Beckcom and other jailhouse informants with whom

he was housed that told very different story from the one jurors heard at trial: the

"suppressed documents  reveal[ed] the extent of Siegler's involvement with the ring

of informants and, in particular, Beckcom." *Id.* at *31. The *Prible* court described

these documents in great detail and concluded that

> the suppressed evidence—the letters to Siegler, the new information
> about Foreman, and the numerous other documents uncovered in
> Siegler's work product folder—reveals an orchestrated effort by a ring of
> informants to fabricate a confession from Prible in return for sentence
> reductions. Had this evidence been disclosed, the defense could have
> argued not only that Beckcom was part of a ring of informants that
> sought to obtain incriminating evidence against Prible for their own
> gain, but also that Beckcom, the State's star witness, had in fact
> fabricated and falsified evidence against Prible.

*Id.* at *33. Additionally, the "work product" file contained "[d]ocuments showing that,

---

[11] The *Prible* opinion refers to the head of the Harris County Crime Lab as both Pam "McGinnis" and
"McInnis." The latter is the correct spelling.

after Prible's trial, Siegler strenuously lobbied Beckcom's AUSA for a time cut and evidently even recruited an AUSA working out of the Houston office to weigh in on Beckcom's behalf." *Id*. at *31.

Moreover, the *Prible* court's inspection of the HCDAO "work product" file revealed a suppressed expert opinion—from a law enforcement crime lab—torpedoing the prosecution's theory that the semen was deposited "moments before or seconds after" the victim died:

> This Court performed an *in camera* review of the State's work product file. Siegler's notes revealed that she had investigated the survival period for semen to determine a PMI.[12] Siegler's notes revealed that she had contacted Pam McInnis, the head of the Harris County Crime Lab. McInnis told Siegler that semen can survive in the mouth for up to seventy-two hours. Siegler made a note about this but buried it in her work product file rather than reveal it to the defense.

*Id*. at *32.

After ordering discovery and an evidentiary hearing, the District Court concluded:

> Without question, the prosecution in this case engaged in a pattern of deceptive behavior and active concealment. And the evidence suppressed sufficiently serves to controvert the primary basis for Prible's conviction. Simply put, the prosecution withheld material evidence.

*Id*. at *35. The Court concluded that the HCDAO had suppressed exculpatory and impeachment evidence in violation of *Brady* and used a jailhouse informant to

---

[12] "PMI" stands for "perimortem interval," here the time between oral sex with the victim and her death. *Id*. at *31.

17

question a defendant in violation of *Massiah* and ordered a new trial.[13]

## II.   *Hamilton* and *Prible* are relevant to issues before this Court.

### A.   Discovery is the only mechanism for dislodging *Brady* evidence from the HCDAO and HPD.

Mr. Medina requests discovery of exculpatory information contained in HCDAO and HPD files and access to the individual law enforcement personnel with relevant knowledge regarding the investigation and prosecution of this case. *See* Doc. #148 (Motion for Discovery and an Evidentiary Hearing, and Memorandum of Law in Support); Doc. #159 (Reply to Respondent's Response to Petitioner's Motion Discovery and an Evidentiary Hearing, and Memorandum of Law in Support). Mr. Medina has pled specific facts demonstrating, *inter alia*, that the HPD failed to document exculpatory information in their police report (such as information from eye-witnesses who reported seeing "African American" assailants) and that the HCDAO suppressed a deal with a key prosecution witness. *See* Doc. #53 at 159–82; Doc. #93 at 130–47. Even without the recent decisions described above, Mr. Medina has documented the HCDAO's pattern and practice of withholding exculpatory information as "work product." Doc. #133 at 77–78. Courts have held that even the most senior HCDAO prosecutors from the era in which Mr. Medina's case was tried lacked a proper understanding of their *Brady* obligations. Doc. #133 at 74–87.

---

[13] Respondent argued throughout that the HCDAO's conduct in *Prible* did not violate *Brady*; it has noticed an appeal to the United States Court of Appeals for the Fifth Circuit. *Prible v. Davis*, No. 20-70010 (5th Cir.).

*Hamilton* demonstrates that until at least 2006, ten years after the investigation and prosecution of this case, HPD had a policy and practice of not documenting exculpatory information and stonewalling defense counsel. HCDAO prosecutors represented to the court that they were unaware of HPD's policy until 2019. Taken at face value, the prosecutors who tried Mr. Medina and opposed his applications for state habeas relief may have had no reason to think HPD possessed exculpatory information about this case. This fact *alone* is cause for great concern.

Critically, however, *Hamilton* casts new light on the *only* forensic evidence linking anyone to this crime: four identifiable latent palmprints[14] found on the bag in which the murder weapon was stashed after the crime. *See* Doc. #53 at 45. When the gun was recovered wrapped in plastic bags, the lead HPD detective submitted the package to the HPD fingerprint section. The detective asked that any prints recovered be compared against Mr. Medina and his cousin, Alex Perez. *Id*. Although the fingerprint examiner discovered that two of the palmprints belonged to the other suspect in the case—Dominic "Flaco" Holmes—in March of 1996, no supplement to the police report was prepared until several months later, shortly before trial.

Mr. Jimmy L. Schraub, the HPD fingerprint analyst in this case, testified in 1996 that he had worked in the HPD latent fingerprint laboratory for eleven years, 13 RR 1520, thus he was a contemporary of Ms. Debbie Benningfield and presumably adhered to the HPD policies described in *Hamilton*. At trial, the prosecutor asked Mr.

---

[14] The HPD examiner testified that an "identifiable" latent print is "one that contains sufficient clarity and . . . enough . . . characteristics to make a direct comparison of the latent fingerprint to [an] inked fingerprint." 13 RR 1526.

19

Schraub whether he compared the palmprints to Mr. Holmes, but there was no discussion of whether the prints were compared to anyone else and, if so, what results were obtained. Two of the four identifiable palmprints belonged to Mr. Holmes, but the prosecutor did not ask, and Mr. Schraub did not volunteer, whether the contributor of the other prints had been identified and, if so, who it was. *Id.*

To this day, Mr. Medina does not know whether HPD determined who deposited the other two palmprints on the bag in which the murder weapon was hidden, or even the identity of the people whose prints were compared to those prints. *Hamilton* explains these deficits in the HPD report and testimony, substantiates an inference that any undisclosed information about the testing of the palmprints is exculpatory, and confirms that this information is only available through the requested discovery.

Additionally, in his motions for discovery, Mr. Medina has pointed to specific evidence that is mentioned obliquely in HPD reports but is not otherwise documented. For example, the report refers to the fact that a witness reported seeing an "African American" assailant but does not identify the witness or provide any other information.

As Mr. Medina has informed this Court, his counsel have repeatedly invoked the Texas Public Information Act ("PIA") to review materials in possession of the HCDAO and HPD. *See* Doc. 148 at 8–9. But cases like *Hamilton* and *Prible*, as well as a number of others briefed by Mr. Medina,[15] illustrate why PIA requests are no

---

[15] *See* Doc. #133 at 87–94.

substitute for discovery in Harris County cases. As in *Hamilton* and *Prible*, Mr. Medina's counsel have seen the HCDAO's "open file" and a dense "work product" file remains withheld from him. *See* Doc. 148 at 8–9. As the Court noted in *Prible*, "'[t]he privilege derived from the work-product doctrine is not absolute.'" *Prible*, *supra*, at *25 n.21 (quoting *United States v. Nobles*, 422 U.S. 225, 239 (1975)). *Brady* trumps the HCDAO's work product privilege: "'Because *Brady* is based on the Constitution, it overrides court-made rules of procedure. Thus, the work-product immunity for discovery . . . prohibits discovery . . . but it does not alter the prosecutor's duty to disclose material that is within *Brady*.'" *Id.* (quoting 2 Charles Alan Wright, Federal Practice and Procedure § 254.2 (3d ed. 2000)). Yet, as illustrated in *Hamilton*, *Prible*, and other cases described in Mr. Medina's prior briefing, HCDAO prosecutors stash exculpatory evidence in their work product files.

Given the HCDAO's documented failure to understand its *Brady* obligations, *see* Doc. #133 at 74–87, and its use of "work product" files to shield *Brady* materials, the Respondent's reassurances that Mr. Medina has had access to the HCDAO's public file are irrelevant. *See* Doc. #151 at 11–12. Respondent describes HCDAO's withholding of a dense "work product" file as "unremarkable." *Id.* at 11. Remarkable or not, burying *Brady* information in the work product file is unconstitutional.

As previously briefed, HCDAO prosecutors held pretrial meetings with key prosecution witnesses and subsequently elicited trial testimony that materially differed from those witnesses' sworn statements to HPD. *See, e.g.*, Doc #148 at 11–13. Though prosecutors obviously knew that the witnesses would contradict their

prior sworn statements to the police, they did not provide any information about these witness interviews to the defense. Evidence that prosecution witnesses lied to HPD under oath is obviously *Brady* material, as is information about deals with witnesses and other information identified by Mr. Medina. Respondent's reflexive resort to the trope that all discovery requests are "fishing expeditions" notwithstanding, Doc. # 151 at 11, Mr. Medina has identified the specific information he seeks and has exhaustively documented HCDAO's pattern of withholding *Brady* material as "work product." Mr. Medina has thus established good cause of for discovery.

Additionally, pursuant to Mr. Medina's PIA request, HPD has disclosed only the official police report from this case. Pursuant to the HPD policies described in *Hamilton*, these materials—by design—do not contain exculpatory identification information.

The HPD and HCDAO successfully withheld *Brady* materials in *Hamilton* and *Prible* throughout trial, initial state habeas proceedings, and into federal habeas proceedings. Only court-ordered fact development dislodged the information that the prosecution had an affirmative duty to produce years beforehand. Mr. Medina seeks only the same opportunity to prove his claims.

**B.     Mr. Medina is not at fault for the failure to secure the evidence withheld by the State needed to prove prosecutorial misconduct claims.**

Throughout these proceedings, Respondent has faulted Mr. Medina for not providing more proof of the State's misconduct. *See*, *e.g.,* Doc. #151 (Mr. Medina "has not provided information that the State had deals with any prosecution witnesses").

Mr. Medina, however, is similarly situated to Mr. Prible in this regard.

Mr. Prible first heard about Ms. Siegler's ring of informants after he arrived on death row. He had no documentation but alleged the issue in two *pro se* state habeas applications filed while his initial state application was pending, both of which were dismissed as abusive. *Prible*, *supra*, at *8–*9. Mr. Prible alleged his claims in federal court and, like Mr. Medina, requested fact development. The Court, as in Mr. Medina's case, denied requests for fact development without prejudice and directed Mr. Prible to exhaust his claims in state court. *Id.* at *9; *see also Prible v. Davis*, No. 09-cv-01896 (S.D. Tex. April 30, 2010) (Doc. #23).

In support of his claims in the state court exhaustion proceedings, Mr. Prible's counsel was able to interview one of Ms. Siegler's informants, Carl Walker, but he could not secure an affidavit from Walker and instead submitted a transcript of the interview. The CCA directed the trial court to hold a hearing on whether Mr. Prible's claims were previously unavailable and ultimately dismissed them as abusive. *Id.* at *12.

Upon his return to federal court, Mr. Prible was, for the first time, permitted the fact development necessary to prove his claims. *Id.* at *12–*19. The materials—documenting the ring of informants and attempts to fabricate statements from Mr. Prible, as well as an opinion undermining the prosecution's presentation of the DNA evidence—were hidden in the HCDAO "work product" file. The federal court thus determined that Mr. Prible had shown cause for the failure to develop and litigate his claims on the merits in state court. First, the State itself was responsible for

suppressing the proof necessary to substantiate his allegations:

> Although Prible may have suspected prosecutorial misconduct, including *Brady* violations, during the course of state court proceedings, Siegler's efforts to suppress evidence of her contacts with Beckcom and the other informants left Prible with no concrete evidence to support such a claim during those proceedings, despite Prible and his counsel's diligent efforts to discover such evidence. Prible may not be penalized for failing to raise claims for which he lacked any evidence.

*Id*. at *26. Second, Texas law imposed obstacles to developing and exhausting claims in successive state proceedings:

> Prible also had no means to compel . . . testimony through court-ordered process. Texas law does not authorize discovery on subsequent applications unless a court finds that the application meets the requirements of Article 11.071 § 5, and the Texas Court of Criminal Appeals found that Prible did not meet those requirements.

*Id*. at *26 n.22.

"In sum," the court concluded, "Siegler's suppression of evidence created an external obstacle that impeded Prible's ability to bring his *Brady* claims during state habeas proceedings" and thus her "actions in this case therefore provide cause to forgive the procedural default of Prible's *Brady* claims." *Id*. at *27.

Mr. Medina has diligently requested discovery of *Brady* information at every turn, including pre-trial and throughout state habeas proceedings. Like Mr. Prible, Mr. Medina is not at fault for failing to produce evidence in the exclusive possession of the State to which he has been denied access. Mr. Medina will likewise be able to show cause to overcome any procedural default related to evidence suppressed by the HCDAO.

## CONCLUSION

24

Mr. Medina respectfully submits the above authorities in support of his claims for relief, his requests for discovery and evidentiary hearing, and his arguments that this Court has the authority to consider and grant relief on prosecutorial misconduct issues after the facts are fully developed.

Respectfully submitted,

/s/ James Marcus
James William Marcus
Texas Bar No. 00787963
Capital Punishment Clinic
University of Texas School of Law
727 E. Dean Keeton Street
Austin, Texas 78705
TEL: 512-232-1475
FAX: 512-232-9197
jmarcus@law.utexas.edu

Jason D. Hawkins
Federal Public Defender

Jeremy Schepers (Texas Bar No. 24084578)
Jessica Graf (Texas Bar No. 24080615)
Capital Habeas Unit
Office of the Federal Public Defender
Northern District of Texas
525 Griffin Street, Suite 629
Dallas, Texas  75202
TEL: 214-767-2746
Jeremy_Schepers@fd.org
Jessica_Graf@fd.org

Counsel for Petitioner Anthony Medina

## **Certificate of Service**

I hereby certify that a true and correct copy of the foregoing has been served

by CM/ECF upon counsel for Respondent:

> Mr. Garrett Greene, Esq.
> Office of the Texas Attorney General
> 300 W. 15th Street, 8th Floor
> Austin, Texas 78701
> Telephone: (512) 936-1400
> Email: garrett.greene@oag.texas.gov

This 30th day of June, 2020.

> /s/ James Marcus
> James Marcus

# Appendix 1

10/14/2019 2:52 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 37631616
By: T Reed
Filed: 10/14/2019 2:52 PM

Pgs-66

**Cause No. 0901049-B**

ADDO
(982)

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT** |
| | § | |
| **v.** | § | **180ᵗʰ JUDICIAL DISTRICT** |
| | § | |
| **RONALD HAMILTON, JR.** | § | **HARRIS COUNTY, TEXAS** |

### APPLICANT HAMILTON'S PROPOSED FINDING OF FACT AND CONCLUSIONS OF LAW

The Texas Court of Criminal Appeals remanded Claim One of Ronald Hamilton's subsequent application for writ of habeas corpus to this Court for consideration. *See* September 12, 2018, Order. Claim One consists of three sub-claims which all relate to whether or not Hamilton committed an extraneous capital murder (hereinafter referred to as the "Holman Murder") used against him at his punishment trial. Claim One alleges: (1) that the State presented materially inaccurate evidence that Hamilton had committed the Holman Murder in violation of the Eighth Amendment to the U.S. Constitution; (2) that the State presented false and misleading evidence that Hamilton had committed the Holman Murder in violation of the Federal Due Process Clause, and the Texas Constitution's Due Course of Law provisions; and (3) that the State suppressed favorable evidence that was material to proving Hamilton did not commit the Holman Murder in violation of Due Process. Additionally, as part of sub-claims one and two, Hamilton presented that the State misled the trial court about the existence of a plea deal with Hamilton's

1

co-defendant, Mr. Shawon Smith, allowing inaccurate, misleading, and false evidence to go uncorrected.

This Court finds that Mr. Hamilton has proven the constitutional violations alleged in Claim One, and each of its sub-claims, and recommends that the Texas Court of Criminal Appeals grant relief and order that a new punishment hearing be held in this matter.

## FINDINGS OF FACT

I.   **EVIDENCE PRESENTED AT TRIAL.**

Hamilton was indicted and charged with the offense of capital murder – for the shooting death of Ismail Matalkah, a convenience store clerk, during the commission of a robbery (hereinafter the "Yellowstone Murder"). 16 RR at 10-18. Hamilton entered a guilty plea to the indicted capital murder charge and the case proceeded directly into the punishment phase. It was during this punishment phase that the State introduced evidence of an extraneous capital murder – the Holman Murder.

### A.   **Evidence presented regarding the extraneous Holman Murder.**

1.   The trial prosecutors, Colleen Barnett and Luci Davidson, represented to both the Court and defense during a pretrial conference that there were no fingerprint comparisons, or other testing results in connection with either the Yellowstone or Holman Murders. 2 RR at 7-8, 13-14.

2.   The Holman Murder became the focus of the prosecution's case. The State discussed the Holman Murder in opening statements, referred to Yellowstone murder as the "first capital murder," called three police officers to testify about the Holman murder, called three civilian witnesses to testify about the

2

murder, and called medical examiner Paul Shrode who testified that the Holman murder was similar to the Yellowstone murder.  16 RR at 22-25; 17 RR at 198-224, 224-299; 18 RR at 8-98, 98-102.

3.  The first witness the State called concerning the Holman murder was inmate Joseph Montoyer.  Montoyer testified that he cut Mr. Hamilton's hair in jail, and that he overheard Hamilton discussing a "Holman Street" robbery of an Asian or Chinese man.  17 RR at 182-88.  Montoyer later explained the information about a "Chinese man" was not included in his statement to police, and that he used the term "Holman" as a reference to a general area of Houston, not the street in particular.  *Id.* at 188, 193-95, 197.

4.  Prior to Montoyer's testimony, trial prosecutor Luci Davidson told the defense that there had been no deals in exchange for Montoyer's cooperation.  17 RR at 179-80.  It was later revealed that Montoyer's bond had been lowered in exchange for providing the information to the State.  19 RR at 113-17.  Montoyer admitted that he had two convictions for forgery, and a prior felony conviction for possession of marijuana.  18 RR at 181, 19 RR at 128-29.  Montoyer denied having any other felonies or crimes of moral turpitude besides the forgery.  17 RR at 195.

5.  Houston Police Department Officer Dunn was dispatched to the murder scene, located at 3235 Holman, at 6 p.m., on December, 9, 2001.  17 RR at 201.  Officer Dunn knew the store owner, Mr. Huynh, by his nickname "Tulson."  Through Officer Dunn, the State entered dozens of pictures of the Holman crime scene, including gruesome pictures of Mr. Huynh lying in a pool of his own blood.  *Id.* at 66-70.

6.  Houston Police Department Officer Thomas testified that he was friends with Mr. Huynh, knew that Mr. Huynh's wife had passed away shortly before Mr.

3

Huynh's murder, and pointed out Mr. Huynh's family in the courtroom.  17 RR at 214-22.  The prosecutors once again went over the pictures of Mr. Huynh lying in a puddle of his own blood.  *Id.* at 218.

7.     Charles Douglas was an eyewitness to the Holman murder.  He and his friend Wanda Johnson walked to the Holman store on the night in question to purchase cigarettes and beer.  17 RR at 240.  Douglas testified that he saw a man (he later identified in-court as Hamilton) at the counter of the store.  *Id.* at 241, 259.  Douglas took his beer and walked outside, looked back into the store, and saw the man and Mr. Huynh struggling.  *Id.* at 243.  The man then shot Mr. Huynh one time, after which Douglas walked back into the store as the man ran out.  *Id.* at 247.  Two days later Douglas met with a sketch artist and helped to produce a sketch of the man.  *Id.* at 249-50.  Douglas was given the sketch to take home with him.  *Id.* at 254.  Twenty days later, Douglas picked Hamilton out of a photo lineup.  *Id.* at 256.

8.     Mr. Douglas had originally identified the shooter as being a teenager weighing 140 pounds.  17 RR 254, 259.  (Hamilton, who was born on April 21, 1977, was 24 years old at the time of the Holman Murder.  Marshall Dwayne Knight, born on December 17, 1980, was 20 at the time of the murder).  *See also* Defendant's Ex. 28 (District Clerk records showing that Knight weighed 150 lbs.).

9.     Wanda Johnson walked to the store with Mr. Douglas.  17 RR at 276.  It was dark when they arrived and she saw a dark two-door car parked on the side of the store, and a man urinating over a bench and a 40-ounce beer bottle.  *Id.* at 277.  A heavy-set black man was sitting in the driver seat of the car.  *Id.* at 279.  The man who was urinating walked into the store just before Ms. Johnson and approached the counter.  *Id.* at 281-82.  She made an in-court

4

identification that the man was Hamilton.  *Id.*  When she left the store, she heard a pop and saw Tulson (Mr. Huynh) fall to the floor.  *Id.* at 283-85.

10. Wanda Johnson also believed the shooter was in his late teens.  17 RR at 269-70.  When she first met with police, she also believed that the shooter had an "afro."  18 RR at 56-57.  She was given a copy of the police sketch just like Mr. Douglas, and she looked at the sketch every day until she picked Hamilton out of a photo lineup weeks after the shooting.  17 RR at 295.

11. Houston Police Department Detective Connie Park, one of the investigators for the Holman Murder, testified that the car and suspect descriptions in the Yellowstone and Holman murders were similar.  18 RR at 43-44.  She never investigated whether the car used in the Yellowstone murder was available on the day of the Holman murder.[1]  Park testified that prints had been found on the glass door of the store and on the 40 ounce bottle found outside of the store on a rail, and that none of the evidence tied back to Hamilton, or his Co-Defendant, Shawon Smith.  18 RR at 39-41.  However, no testimony established the fingerprint evidence found at the scene had been compared to any suspects.  *Id.*

12. To combat the idea that Shawon Smith's car had not been used in the robbery, Detective Park falsely testified that Smith was not a suspect in this crime.  18 RR at 45-47.[2]

---

[1] The car used in the Yellowstone Murder was in a police impound lot on the day of the Holman murder.  18 RR at 110-12.

[2] We now know that Smith was a suspect in the Holman Murder, because he is listed as a suspect on the long-suppressed evidence envelopes containing the fingerprint lifts in this case.  *See* Defense Ex. 3, 4.

5

13.    Assistant Medical Examiner Paul Shrode testified that the Yellowstone and Holman murders were similar.  18 RR at 60-97.  To prove the point, the State entered detailed photos of the autopsies of both complainant Matalkah and Huynh.  *Id.*  Prosecutor Barnett walked a picture of Mr. Huynh's brain in front of the jury to drive the point home.  *Id.* at 82-95.

14.    Immediately after showing the picture of Mr. Huynh's brain to the jury, the State called Mr. Huynh's daughter to testify and entered a nice picture of Huynh.  18 RR at 97; State's Trial Exhibit 96.  The State then rested its punishment case.

15.    Prosecutor Luci Davidson presented the State's initial closing arguments.  21 RR at 4-25.  She argued that "on December 9th of 2001, a little over one month later, the defendant takes a gun, goes into the Tucson store and in a cold-blooded manner blows away Mr. Tucson."  21 RR at 11.  The jury was told "on December 9th of 2001 he blew away Mr. Tucson with one of his guns, another unarmed man. That's how we know this defendant likes guns." *Id.* at 14.  The jury was told Hamilton was frustrated he couldn't find a job so he killed Mr. Tucson.  *Id.* at 16.  Davidson spent four pages of closing argument explaining the reasons why the jury should believe Hamilton committed the Holman murder.  *Id.* at 20-24.  The prosecution noted the crimes were only a month apart, occurred in the same area of town, around the same time, and were at convenience stores.  *Id.* at 21.  The prosecutor also misled the jury by asking "[i]s it just a coincidence that there weren't any prints found at either scene?"  *Id.* at 22.

16.    Prosecutor Colleen Barnett made the State's final arguments.  21 RR at 69-91.  Barnett repeatedly emphasized the two capital murders.  *Id.* at 75, 77, 79, 84-88.  …  Barnett argued: "[Hamilton] wanted to commit the two capital

6

murders," "[h]e is standing trial on two capital murder cases," "[W]e don't know what car he and Shawn used on that second capital.  We don't know.  I wish we did.  We are doing everything we can to find it out.  But we know he committed that second capital.  And you know it, too.", "Even, ladies and gentlemen, without that second capital, he is a future danger; but, with it, he is an absolute menace," "[Hamilton] will just go in there and kill the clerk a second time," "[T]here is not a thing that you can do to him that is as horrible as what he did to Mr. Tucson." *Id.*

17.    Prosecutor Barnett also misled the jury during her closing argument by suggesting there was no DNA to test in the Holman Murder. *Id.* at 85.  The State explained that because the witnesses "didn't come forward until two days later.  Certainly, there was not any evidence there to collect at that time." *Id.* at 86.

**B.    The prosecution's other future dangerousness evidence.**

18.    The State presented evidence during the punishment trial to prove that Hamilton had committed the Yellowstone Murder, the offense to which Hamilton had plead guilty.  The State called Officer Wofshohl, who arrived the scene of the crime shortly after the shooting; Ms. Miller, who witnessed the suspects fleeing from the scene; and Ronald's friend Billy Norris to whom Hamilton had confessed after the murder.  16 RR at 28-116.  Brooke Rogers, Hamilton's child's mother, also testified that Hamilton had confessed to her. *Id.* at 154-56.  Officer Robertson testified about Hamilton's arrest which was based upon the tip from Brooke Rogers. *Id.* at 116-135.  Detective Straughter explained the complete investigation into the Yellowstone murder, and fellow

7

clerk Ahmad Naimi explained what happened during the robbery that resulted in Mr. Matalkah's death.

19. The State also presented evidence from Brooke Rogers (Hamilton's child's mother) about her various altercations with Mr. Hamilton -- specifically:

   a. Mr. Hamilton was not a good father to their four-year-old son.  16 RR at 136-40.

   b. Mr. Hamilton and Brooke had fought about a remark another man made to her shortly after the birth of their son.  She claimed that Hamilton had kicked and pushed her, causing her to call the police.  Hamilton took their child with him for the night, and did not bring him back till the next day.  *Id.* at 161-62.

   c. Hamilton and Brooke got into another fight where he assaulted her, causing her to spray him in the eyes with air freshener, which prompted him to throw a telephone at her.  *Id.* at 170-73; 17 RR at 62-70.

   d. When asked if "he ever tried to shoot you," Brooke replied "[a] while back. I mean, he shot at me, but, I mean."  16 RR at 182.  Brooke could not remember the year, month, or date that this event allegedly took place.  *Id.*

20. Mr. Hamilton had previously been arrested for various drug offenses:

   a. When Hamilton was 17 years old, and while he was walking down the street with his mom, he was arrested for possession of cocaine. 17 RR at 26-29.

   b. Hamilton was arrested in 1997 – after he was caught running from a house where marijuana was being sold.  He was charged and plead guilty to felony possession of marijuana.  17 RR at 31-60.

   c. In 1998, Hamilton was stopped by police in a truck found to contain five grams of cocaine and a gun under the front seat.  17 RR at 106-07.

Hamilton was only charged with possession of a controlled substance and was sentenced to two years in prison.  *Id.* at 111-12.

21.  Finally, the State offered evidence of Hamilton's misconduct while in the Harris County Jail.  In 1997, Hamilton had been in a fight with a man named Ortiz in the county jail.  17 RR at 80.  That same year, he admitted to putting hair remover in another inmate's shampoo bottle.  17 RR at 114-16.  In June 2002, Hamilton received two food trays during a meal.  17 RR at 127-28.  Also in 2002, Hamilton fought with another inmate, Jason Gurley, who was in jail for aggravated assault with a deadly weapon.  17 RR at 141-48.

**C.    Hamilton's dire upbringing and remorsefulness would provide a convincing mitigation case, were it not for the extraneous capital murder.**

22.   Billie Norris, a prosecution witness and friend of Hamilton's, explained that his own dad and Hamilton's dad had been in prison together, that Hamilton's family consisted of drug addicts, that his mother was "walking the streets" when they were growing up, and that Hamilton was "fried out"[3] at the time of the Yellowstone Murder.  16 RR at 90-101.

23.  Norris also testified regarding Hamilton's remorsefulness about the Yellowstone Murder.  Norris testified that Hamilton said "he made a mistake," and that "he was sorry."  16 RR at 78-80.  Norris testified that, following the Yellowstone Murder, Hamilton was remorseful, started attending church every Sunday, and confessed his sins to the Lord.  16 RR at 80, 102.

24.  Brooke Rogers confirmed Billie Norris's testimony.  She recalled that Mr. Hamilton's entire family was on drugs, and that he grew up in a crack house.

---

[3] This means that Hamilton was smoking embalming fluid laced with PCP. *Id.* at 193, 199.

16 RR at 186-92.  Hamilton's mother was prostituting herself and abusing drugs.  *Id.* After the murder Hamilton had broken down and told her that he was trying to rob the store because he was broke (referring to the Yellowstone Murder).  16 RR at 155, 194-95.

25.     Ronald Hamilton, Sr., is Hamilton's dad (hereinafter Hamilton Sr.).  While pregnant with Hamilton, Hamilton's mom smoked marijuana and drank beer every day.  18 RR at 124.  When Hamilton was a child, both of his parents sold drugs out of the house, but soon thereafter, Hamilton's parents separated and he would rarely see his dad anymore.  *Id.* at 124-27.  Hamilton Sr. explained that the house where Hamilton grew up was in bad shape, and that the only stable person in the house was Hamilton's Aunt Viola.  *Id.* at 132-33.  When she died in the 1980's, young Hamilton was left to fend for himself.  *Id.* at 135.  Hamilton Sr. also explained that he had been a serious drug abuser himself, shooting drugs intravenously and smoking crack cocaine.  *Id.* at 136-37.  However, Hamilton Sr. emphasized that he never used "fry" (the drug Hamilton was using during the Yellowstone Murder) because that drug left its users "completely out of control."  *Id.*  Hamilton Sr. spent most of Hamilton's life either in prison or high on various drugs.  *Id.* at 141.  Hamilton Sr. also confirmed that Hamilton never learned to read and was socially promoted through school.  *Id.* at 146-47.

26.     Elsie Tippins, Hamilton's mom, verified Hamilton Sr.'s testimony.  She had smoked marijuana and drank during her pregnancy with Hamilton, and confirmed that Hamilton grew up in a violent household.  18 RR at 182-86.  Instead of caring for her boy, Elsie was engaged in prostitution and abusing cocaine.  *Id.* at 186-193.

10

27. Hamilton's cousin Darious Graves testified that Hamilton had never been a violent person until he began smoking "fry." 19 RR at 15-24. He explained that Hamilton was a good person, but that when he smoked fry "his mind changed." *Id.* Graves recalled times when Hamilton would smoke fry and punch holes in the walls, or cry, or run naked in the streets. *Id.* at 25-26.

28. Finally, the defense called Deedee Halpin, an education diagnostician. She explained that Hamilton had always struggled in school, remaining in the 2nd grade when he should have been in the 4th grade. 19 RR at 53-54. Hamilton suffered from a disorder that made him unable to assign a meaning or sound to letters. *Id.* Hamilton was placed in special education classes and when he was thirteen, was still reading at the 1st grade level. *Id.* at 54. He was socially promoted in school. *Id.* at 56-58. His reading ability was in the bottom .1 percentile. *Id.* Halpin explained that Hamilton's disabilities severely hampered his ability to perform in the social settings of school. *Id.* at 61-67.

29. The record also shows the defense intended to call Shawon Smith to testify that "after the incident on Yellowstone, that Mr. Hamilton was very upset by what happened and very affected by what happened and very sorry for what happened." 19 RR at 118. Additionally, the defense intended to call Smith to testify: "that Mr. Smith was not present during the Holman Murder, that Mr. Smith's car was not used in that incident, and that, to Mr. Smith's knowledge, the defendant, Mr. Hamilton, was not involved in that incident, and Mr. Smith would also testify about his car being totaled by Mr. Hamilton several days prior to the Holman incident occurring." 19 RR at 118. This plan was thwarted by the State's representation that it was no longer planning to honor the plea deal that it originally had in place because they had "to check some things out." 19 RR at 101.

11

## II.   MR. HAMILTON DID NOT COMMIT THE HOLMAN MURDER.

The evidence presented at trial showing that Hamilton committed the Holman murder was false, misleading, and materially inaccurate.  Hamilton has proven that he did not commit this extraneous murder.  This Court makes the following findings related to the previously designated issues:

### A.   The evidence is clear: the Holman shooter sat down the 40-ounce bottle prior to shooting Mr. Huynh.

30.   Wanda Johnson, the eyewitness to the Holman Murder, testified during the habeas proceedings. Ms. Johnson is credible.  She recalled the night of the Holman Murder, and she identified the crime scene.  5 RR2019 at 5-7; Defense Exhibit 31.

31.   Ms. Johnson recalled walking to the Holman store about 7 p.m., with her friend Charlie.  She bought a beer and pack of cigarettes.  5 RR2019 at 8. After arriving at the store and making her purchase, Ms. Johnson was waiting outside of the store for Charlie.  A car pulled up, and a guy drinking a 40-ounce beer got out. *Id.* at 9.  He finished the 40-ounce and set it on the little iron bench outside the store, and then he urinated over it before walking into the store. *Id.* at 9.

32.   Ms. Johnson describing the same 40-ounce bottle that HPD Fingerprint Examiner Debbie Benningfield found sitting outside of the Holman store while processing Mr. Huynh's murder scene.  5 RR2019 at 9.

33.   After setting the bottle down and urinating the man walked into the store, waited in line, and eventually killed "Tulson" (Mr. Huynh).  5 RR2019 at 10. When Ms. Johnson saw this happen, she took off running. *Id.* at 11.

34.    Ms. Johnson remembers telling the police about the bottle being sat down by the shooter, and she was also clear that the shooter never picked the bottle back up after it was sat down.  5 RR2019 at 12.  She never told the police that shooter had not touched the bottle.  *Id.* at 13.

35.    Ms. Johnson has maintained that the shooter touched this 40-ounce bottle.  Ms. Johnson told detectives this fact on the first day that she spoke with them.  *See Hoffmaster Deposition* at 15-16; Defendant's Exhibit 8, at 11.   Ms. Johnson was clear about this during her testimony before the Court.  5 RR2019 at 17.   Her testimony meshes with the Houston Police Department Holman Murder offense report, which states that although it was not included in her written and sworn statement, Ms. Johnson told police she witnessed the shooter "sit down an empty 40 once (sic) beer bottle on the rail that runs along the Burkett side of the store."  *See Hoffmaster Deposition* at 15-16; Defendant's Exhibit 8, at 11; see also Defendant's Exhibit 31 (showing the store and the metal rail/bench)  Ms. Johnson does not recall ever telling any detectives that shooter did not set down the bottle.  *Id.* at 19.

36.    Ms. Johnson is so certain about the shooter setting down the bottle; she "would put [her] life on it."  *Id.* at 29.

**B.     The fingerprints on the 40-ounce beer bottle belong to Marshall Knight.**

37.    Fingerprint Examiner Rachel Green, lead latent print examiner for the Houston Forensic Science Center (HFSC), is credible and is an expert in fingerprint analysis.  She explained that fingerprints are unique to each individual.  2 RR2019 at 32.

38.   Examiner Green explained that AFIS, the Automated Fingerprint Identification System, is a system which allows fingerprint labs to run unknown prints through a database of known prints in the hopes of finding a match. *Id.* at 35.

39.   The HSFC uses "the Harris County system, the State (the DPS) system, and the FBI system" in AFIS to search for known matching prints. 2 RR at 43.

40.   When reviewing records from the Holman murder, Ms. Green found pictures of the latent print collected from "from a 40-ounce Schlitz Malt Liquor bottle recovered on metal rail outside beside store." 2 RR2019 at 65. She matched these prints to Marshall Knight. *Id.* at 66. She made this match from the FBI AFIS database. *Id.* at 67. Ms. Green obtained Knight's actual print card from the FBI and verified that the print on the 40-ounce bottle was indeed Marshall Knight's print. *Id.* at 67-68. She was also able to match a second copy of a fingerprint taken from the same bottle to Marshall Knight. *Id.* at 72, 121. *See* Defendant's Ex. 16; State's Exhibit 1, Latent Print Section.

41.   The only other identifiable print found by Ms. Green was a fingerprint of eyewitness Charles Alonzo Douglas, which was found on a "Schlitz malt liquor can on top of outside ice cooler." 2 RR2019 at 43, 118; State's Exhibit 1, Latent Print Section, at 1-2; Defendant's Ex. 16. This matches with trial testimony showing that Charles Douglas had purchased a beer at the convenience store prior to the shooting.

42.   None of the fingerprints found on the 40-ounce Schlitz Malt Liquor bottle matched Ronald Hamilton. 2 RR2019 at 75; *see* Defendant's Ex. 16. He was

14

excluded from leaving any of the comparable prints found at the scene.  2 RR2019 at 99; see Defendant's Ex. 16.

43. No technology was needed to compare the fingerprints of a known suspect, Ronald Hamilton, to the prints found at the scene. 2 RR2019 at 124.  This could have been done prior to trial without running Hamilton's prints through AFIS. *Id.*

     **C.**    **Marshall Knight asserted his Fifth Amendment Privilege and refused to answer any questions posed by Applicant.**

44. Marshall Knight was called by Mr. Hamilton as a witness during the habeas hearing.  He was represented by appointed counsel at the request of the parties. Defense counsel tendered six questions to Mr. Knight and his appointed counsel.  6 RR2019 at 8.  Mr. Hamilton intended to ask Mr. Knight (1) if he was at the Tulson Convenience Store at 3235 Holman Street on December 8th of 2001; (2) if he "set down a 40-ounce beer bottle on the rail outside of the store on December 8th of 2001"; (3) if he could "explain how [his] fingerprints were found on the bottle sitting outside the store on the railing on December 8th of 2001"; (4) if he had possession of or access to a .380 auto handgun on December 8th of 2001; (5) if he entered the store at 3235 Holman Street on December 8th of 2001; and (6) whether he shot the clerk inside 3235 Holman on December 8, 2001. *Id.* at 8-9.

45. Knight, through his appointed counsel, asserted his Fifth Amendment rights and refused to answer any questions.  6 RR2019 at 9.  Knight's counsel verified he had discussed the matter with Knight and that Knight would "indeed invoke his right against self-incrimination to each question." *Id.*

46.    The Court finds that the Marshall Knight had an arrest record prior to the Holman murder.  *See* Defendant's Ex. 15.  Knight had been arrested by the Houston Police Department five times prior to the date of the Holman Murder.  *Id.*  Those arrests included unlawfully carrying a weapon and aggravated robbery with a deadly weapon.  *Id.*  The Court also finds that Knight was adjudicated guilty for this aggravated robbery in February 2002, for using alcohol while on community supervision.  *See* Defendant's Ex. 21.

47.    The Court finds that the Houston Police Department had taken Mr. Knights prints and loaded them into the local AFIS system prior to the date of the Holman murder.  *See* Defendant's Exhibit 29, AFIS records including prints from 1998.

**D.    The fingerprints on the bottle are more direct proof about the identity of the perpetrator of the Holman murder than the prior eyewitness identifications.**

48.    Eyewitnesses Douglas and Johnson both described the shooter as being in his teens.  Mr. Douglas had originally identified the shooter as being a teenager weighing 140 pounds.  17 RR 254, 259.

49.    Hamilton, who was born on April 21, 1977, was 24 years old at the time of the Holman murder.  Additionally, records indicate that Hamilton weighed 170 lbs.  *See* Defendant's Ex. 3, at 3.  Marshall Dwayne Knight was born on December 17, 1980, and was 20 at the time of the murder.  *See* Defendant's Ex. 28.  Knight weighed 150 lbs.  Applicant's Memorandum, Appendix 2 – Mugshot Photos & Criminal History Info of Marshall Dwayne Knight.

50.    The police failed to use an up-to-date photo of Mr. Hamilton in the photo lineup.  Witnesses Douglass and Johnson were presented with Hamilton's

16

September 3, 1998, booking photo, instead of the more recent January 21, 2002, booking photo. *Cf.* Defendant's Ex.'s 11, 13.

51.  Dr. Trent Terrell is a professor at the University of Mary Hardin-Baylor in Belton, Texas. 4 RR2019 at 124. Dr. Terrell's main area of research is eyewitness memory, and eyewitness identification. *Id.* at 126-27. The Court finds that Dr. Terrell was properly qualified as an expert in eye-witness identification, and that eye-witness identification is a proper area for scientific witness expert testimony.

52.  Dr. Terrell testified about factors that affect the ability of witnesses to make an identification from a photo-lineup. 4 RR2019 at 137. Certain variables affect a person's ability to correctly identify a suspect at a later time, and the "most important factor by far" is "called latency" which relates to the amount of time which passes between witnessing a crime and a later identification. *Id.* at 147. In this case, seven weeks had passed between the crime and when the witnesses picked Hamilton out of a photo-lineup. *Id.* After a week's delay "you see a majority of participants not able to make a correct identification." *Id.*

53.  Even the accuracy of the police sketch, which was made three days after the crime, could have suffered from the effects of latency. *Id.* at 148.

54.  Dr. Terrell was certain that witness Wanda Johnson's identification of Hamilton would have been affected by the police providing her the police sketch, which she looked at every day. *Id.* at 148. The police sketch "very likely became [the witnesses] memory of who they saw. . ." *Id.* at 150. "The presence of the sketch is the biggest problem in this case." *Id.* at 211.

55.  As Dr. Terrell pointed out, and as mentioned at trial, Ms. Johnson had originally described the shooter as having an afro, while Mr. Douglas

described the shooter as clean shaven with short hair.  4 RR2019 at 208, 213;
18 RR at 56-57.

56.  This Court finds noteworthy that the simultaneous "six-pack" lineup used in
this case is not the currently suggested best practice. 4 RR2019 at 153.  Today,
it is recommended that a sequential administration be used.  *Id.* "Someone is
more likely to make an identification when they are shown all the photos at
once rather than when they see them one at a time." *Id.*  However, at the time
the lineup was made, the Department of Justice had not suggested that a
sequential lineup was preferable to a simultaneous lineup. *Id.* at 198-99.

57.  Dr. Terrell also noted that the lineup created in this case showed Hamilton
"clearly holding a sign right here." 4 RR2019 at 154; *see* Defense Exhibit 11.
This is a problem because "[a]nything that is distinctive can cause a photo to
be chosen when that feature is not present in the others." *Id.* at 155.  Outside
of Hamilton's holding of a sign, this was a "pretty good lineup." *Id.* at 200.
Dr. Terrell also agreed that three of the six persons in the lineup had some sort
of distinguishing mark in their picture, but that Hamilton's was the most
obvious. *Id.* at 202.

58.  Hamilton's lineup was also "presented by an officer who knew who the
suspect was." 4 RR2019 at 156.  This is not the most reliable way to present
a lineup, instead, whoever presents the lineup should have "no knowledge
whatsoever of who the suspect is." *Id.*

59.  Whenever creating a lineup, "[a]n effort should always be made to find as
recent a picture as possible." 4 RR2019 at 162.  As noted above, the detectives
in this case did not use a recent picture of Hamilton when creating the lineup.
*See* Defense Exhibit 13, Defense Exhibit 11.  Instead, the detectives used a
mugshot over three years old.

18

60.   The Court finds that Dr. Terrell cannot testify concerning whether or not Mr. Hamilton committed the Holman murder.  4 RR2019 at 175.  However, the Court finds Dr. Terrell's testimony is relevant in explaining how and why two eyewitnesses could mistakenly identify Hamilton as the shooter even if he was not involved in the Holman Murder.

61.   The Court finds that the fingerprints found on the 40-ounce bottle are the most direct and reliable evidence showing who committed the Holman Murder.  As discussed above, the eyewitnesses in this case both identified a teenager as having committing the Holman Murder, and one witness originally described the shooter as having an afro.  The Court finds that the long period of time in between the commission of the Holman murder and the presentation of the line-up; the providing the witnesses with the sketch from a sketch artist; the use of a lineup where Mr. Hamilton is holding a booking placard; the use of an outdated photo; the presentation of the lineup by detectives who knew the identity of the suspect; and the use of a the six pack lineup all contributed to a false identification of Hamilton as related to the Holman murder.

**E.     The DNA evidence is also exculpatory for Hamilton.**

62.   The parties' experts both agree that Hamilton cannot be included as contributor to the DNA found under Mr. Huynh's fingernails or on the mouth of the 40-ounce bottle.  However, the experts disagree about whether the items of evidence were suitable for comparison.

63.   After Hamilton's trial, the Houston Forensic Science Center performed DNA testing and analysis on a few items of evidence collected in this case, specifically "one was a swab from the mouth area of the malt beer bottle, and then two other fingernail scrapings from the right fingernail and the left

fingernail from the victim; and then they also received two reference samples, which would be the victim's profile and suspect's profile."  5 RR2019 at 78; State's Ex. 1, 12-14.

64.    Dr. Collins, who testified as an expert for Mr. Hamilton, explained that he disagreed with the Houston Forensic Science Center's (HFSC's) conclusion about the DNA found on the mouth of the bottle.  *5 RR2019* at 91-92.  The HFSC concluded that there was a partial DNA profile found on the bottle, but also found there was *potentially* a second contributor to the DNA found on the mouth of the 40-ounce bottle.  *Id.* at 91; State's Ex. 1 at 13.  Because of the potential second contributor, the lab concluded the DNA on the bottle was not suitable for comparison.  *Id.*

65.    Dr. Collins believed a scientifically acceptable conclusion is that the DNA recovered from the mouth of the bottle came from a single person – so that the results showed only a single DNA profile.  *Id.* at 91-92.  Based upon the single contributor conclusion, Mr. Hamilton is excluded from the partial profile found on the 40-ounce malt liquor bottle.  *Id.* at 94-95.  Dr. Collins believed a single male profile was present because the data showed no possible alleles above the analytical threshold (which would have suggested a second contributor).  7 RR2019 at 95.

66.    Related to the right fingernail scrapings from Mr. Huynh, Dr. Collins agreed that Ronald Hamilton was excluded as a contributor to the major component of this DNA mixture.  5 RR2019 at 96. However, he once again disagreed with the HFSC's conclusion that the minor profile was not suitable for comparison.  *Id.* at 96-97.  Instead, he explained that, assuming Mr. Huynh's DNA was present under his own fingernails, Hamilton would be excluded from the remainder of the DNA found.  *Id.* at 99.  He testified that Hamilton

20

could not have contributed the minor profile found under Mr. Hunyh's fingernails. *Id.* at 99; 7 RR2019 at 61.

67.  Dr. Collins also found that, assuming Mr. Huynh's DNA was present in the fingernail scrapings from his left hand, Mr. Hamilton was excluded as a contributor to the DNA discovered under the fingernails on Mr. Huynh's left hand. *Id.* at 99-100.

68.  On cross-examination, Dr. Collins affirmed that his single contributor conclusion about the 40-ounce bottle was based upon the fact that there were never more than two alleles at any location on the allele table. 7 RR2019 at 32.

69.  No witnesses testified that any of the DNA tested from the scene belonged to Mr. Hamilton. 7 RR2019 at 41.

70.  Jessica Powers is a DNA analyst with the Houston Forensic Science Center. 7 RR2019 at 69-70.

71.  Ms. Powers affirmed that a DNA allele should only be "called," or considered an allele, when it is above the analytical threshold. 7 RR2019 at 82. In the HFSC lab the analysist will "not use data below the analytical threshold to call as a true allele because it hasn't been called by the software." *Id.* at 84. However, the lab analyst will still consider non-called alleles in their interpretation. *Id.* Although only the alleles above the analytical threshold are "considered real," peaks below the threshold cause the lab analyst to be cautious. *Id.* at 84.

72.  Ms. Powers, like Dr. Collins, would only use the alleles above the analytical threshold when making a comparison. 7 RR2019 at 85.

73.   Ms. Powers believed the DNA found on the mouth of the 40-ounce bottle was low template DNA, meaning there was very little DNA.  7 RR2019 at 89. Therefore, she had to be cautious.  *Id.*

74.   Ms. Powers would not make the same conclusions about Ronald Hamilton being excluded as a contributor the DNA tested because she is cautious.  7 RR2019 at 88.

75.   Ms. Powers does not dispute that the DNA profile on the 40-ounce beer bottle was a single source DNA profile, but she did decide not to draw any conclusions about the beer bottle.  6 RR2019 at 105.  She wanted to be cautious in calling this a single source DNA profile.  *Id.* at 106.  She was able to base her opinions on her "[a]nalyst discretion, whenever it's used in our standard operating procedure, it just means that you have a little bit of flexibility in what you're looking at on your electropherogram."  *Id.* at 107. She decided that presence of peaks below the analytical threshold might, or might not, mean there is a second contributor.  *Id.* at 111.  She "would say that there is evidence that there is possibly a second contributor."  *Id.* at 114.

76.   Regarding the fingernail scrapings, Ms. Powers agreed that it was permissible to subtract Mr. Huynh's profile from the DNA sample, which is what Dr. Collins had done in reaching his conclusion.  7 RR2019 at 61-62; 109. However, Ms. Powers did not do that in this case.  *Id.*  Once again, Ms. Powers did not "make any calls on the minor" contributor the DNA.  *Id.* at 109. According to Ms. Powers, the minor contributor DNA could have belonged to a mixture of up to four people.  7 RR2019 at 122.

77.   Regarding Dr. Collins exclusion of Hamilton from the DNA samples taken from Mr. Huynh's fingernail scrapings, Ms. Powers simply explained she "would not use that approach in our lab."  *Id.* at 110.

22

78.   Ms. Powers thought that Dr. Collins technique "would be bias, unfair, and not correct." *Id.* at 126.

79.   Ms. Powers knew who the "suspect" or "defendant" was prior to beginning her analysis.  7 RR2019 at 127-28

80.   All of the data suggesting there might have been a second contributor to the DNA found on the 40oz beer bottle was below the analytical threshold. 7 RR2019 at 130.

81.   Ms. Powers agreed, that "if I made the assumption that all of these alleles called were from one contributor, I would have excluded Ronald Hamilton from this piece of evidence." *Id.*  at 131.  Ms. Powers thought that the DNA sample in this case was "somewhere in between" a single source and mixture DNA sample.  7 RR2019 at 131-32.  She also recognized that she could not "call this [DNA sample] two [people], because you don't see clear signs of two."  7 RR2019 at 134.  That is why the sample is not a mixture. *Id.* at 134.

82.   Related to the fingernail scrapings, Ms. Powers agreed that "if I were able to say that this was a mixture of that two and I assumed that there were only two, I would have excluded Ronald Hamilton from the minor contributor."  *Id.* at 135-36.

83.   Ms. Powers was clear that the assumption of a single source DNA sample on the bottle, and a two-person mixture under Mr. Hunyh's fingernails, were simply "more aggressive than we're willing to do in our lab."  7 RR2019 at 137.  However, she would not go so far as claiming that Dr. Collins' assumptions were unsupported by the evidence. *Id.*

84.   The Court finds that DNA evidence collected at the scene is additional evidence that Hamilton was not involved the Holman Murder.  Hamilton's DNA was not found at the scene or on the bottle which the shooter sat down

prior to shooting Mr. Huynh. Further, although Ms. Green would not have made the same conclusions about the number of contributors to the DNA in question, the court finds that a jury might credit Dr. Collins testimony about the number of contributors because there are no alleles above the analytical threshold which prove there was more than a single contributor to the DNA found on the bottle, or more than two contributors to the DNA found under Mr. Huynh's fingernails. A jury could have given weight to the fact that Hamilton's DNA profile was not present on any of the evidence found at the scene.

85.   The Court also finds there is no proof that the DNA evidence in this case was tested or compared prior to trial. The DNA evidence was in the possession of the State of Texas at all times. Specifically, the evidence was in the possession of the Houston Police Department. As a result, the Court finds the DNA evidence is new evidence which was not previously available to Hamilton.

## III.   THE STATE AND ITS PROSECUTION TEAM – THE HOUSTON POLICE DEPARTMENT, TRIAL PROSECUTORS, INVESTIGATORS AND FINGERPRINT EXAMINERS -- ACTIVELY SUPPRESSED EXCULPATORY EVIDENCE.

86.    The Court finds, and is troubled by, the prosecution team's active suppression of exculpatory evidence. The Court finds that both the Houston Police Department and trial prosecutor Colleen Barnett actively suppressed exculpatory evidence that Mr. Hamilton was excluded from contributing the fingerprints at the Holman Murder scene, and particularly on the 40-ounce bottle that witness Johnson saw the shooter set down.

24

**A.** **Fingerprint Examiner Debbie Benningfield actively suppressed that she had compared Mr. Hamilton's fingerprints to those found at the scene, and that he had been excluded as a contributor.**

87. Debbie Benningfield is now retired from the Houston Police Department and her previous role as a fingerprint examiner. 3 RR2019 at 57-58. She spent her entire career in the HPD Identification Department. She had previously worked in the Ten Print Section, where her job was to record fingerprints of people who were arrested. 59. By 1985, HPD had obtained an automated fingerprint system. *Id* at 60-62. Eventually Ms. Benningfield became the manager of the AFIS for HPD.

88. Ms. Benningfield was well versed in using HPD's AFIS system. 3 RR2019 at 63. At the time of the Holman murder, HPD used an AFIS system called Print Track. *Id.* at 64. HPD had access to the Texas Department of Public Safety fingerprint system, called NES. *Id.* at 65. Also, Print Track would have contained the HPD database. *Id.* Someone at HPD had the job of entering the fingerprints of arrested people into the AFIS system. *Id.* at 69. Anyone arrested on a jailable offense would have had their fingerprints taken and entered into the HPD AFIS system. *ID.* at 71. Even when fingerprints were taken by ink, HPD would try to get the prints entered into the AFIS system the same day they were taken. *Id.* at 73. HPD has a policy of keeping and saving fingerprints of anybody that they arrest. *Id.* at 145. HPD would have had their own fingerprints in their system based on the arrests within their agency." 4 RR2019 at 70, 101-02.

89. A record should have been made when any unknown latent print was entered into the Print Track system for comparison with known prints. *Id.* at 76. The record would be made by notation on the envelope containing the print.

90.  On December 9, 2001, around 8 pm, Ms. Benningfield was called to the scene of a murder at 3235 Holman in Houston, Texas.  *Id.* at 81.  Benningfield would have discussed the scene with the detectives, and would have collected whatever evidence she deemed relevant.  *Id.* at 82.

91.  At scene of the murder Ms. Benningfield collected: "[o]ne Schlitz Malt Liquor can, one 24-ounce Heineken bottle, one 40-ounce Schlitz Malt Liquor beer bottle, and one 12-ounce Heineken bottle."  *Id.* at 84.  She would not just randomly pick up trash outside of stores.  *Id.* at 85.  She might have decided to pick up bottles and cans outside of the Holman store because she had been told by the "daughter [of] the complainant . . . that the business was kept clean by her father."  3 RR2019 at 86.  Benningfield learned it was rare for there to be trash outside of the store where the Holman Murder took place.  4 RR2019 at 111.  She would have collected evidence she felt "was important or could have an impact. . ." on solving the murder.  3 RR2019 at 87.

92.  The bottles collected were submitted to the crime lab for DNA testing and fingerprinting.  3 RR2019 at 87.

93.  If "prints of value" were found on any evidence, an offense report supplement would be created.  *Id.* at 89.  A supplement would be made "[i]f we made the scene, then we had a supplement.  If we brought evidence back to the lab and processed it, we did a supplement.  If there was a comparison request or if there was an identification in the case, then a supplement was typed."  3 RR2019 at 89.

94.  However, if there was a request to test fingerprints, and a known suspect was excluded from having left a fingerprint recovered from a crime scene, no offense report supplement would be made.  *Id.* at 90.

26

95.   The Court finds there was no evidence of a comparison or exclusion of fingerprint evidence in the offense report related to the Holman Murder.  *See* Defendant's Ex. 8.   Indeed, there is no evidence in the offense report or elsewhere that the fingerprints collected from the scene, or evidence collected from the scene, were ever compared to any suspect.  *Id.*

96.   According to Debbie Benningfield, it was HPD's policy to only make an offense report supplement if there was a fingerprint match found.  *Id.* at 90.  HPD's "standard practice" was not to issue reports on eliminations.  4 RR2019 at 61.  A supplement would have been typed had there been an identification.  4 RR2019 at 61.  The only notice given in the case of an elimination would have been to the person requesting the comparison.  *Id.* at 62.

97.   The HPD policy of not documenting fingerprint exclusions is troubling and directly led to the suppression of evidence in this case.  If a defendant was excluded from leaving a print at a scene or on an item of evidentiary value, that information should always be turned over the to the defense.  HPD policy prevented that from happening in this case.

98.   Benningfield testified that members of the District Attorney's Office could simply call the lab and ask if fingerprints had been compared, and learn the results.  5 RR2019 at 62.  This would not happen with defense attorneys.  *Id.* at 62.  If a defense attorney called, the examiner would not discuss a case with them, but would notify HPD legal about the defense's request to speak with the examiner.  *Id.* at 63.  This policy compounded the problem in this case, and amounts to an active suppression of evidence.

99.   Three fingerprints suitable for comparison were found on the 40 oz. Schlitz Malt Liquor bottle prior to Hamilton's trial.  *Id.* at 91.  This is the bottle that came from a rail outside of the business.  *Id.* at 91.  The bottle was taken to

Montgomery County, to a man named Butch Emmons, so that he could take special pictures of the print. This was done to get a better print for comparison. *Id.* at 92.

100. Based on a review of the Offense Report Supplements created by Debbie Benningfield, there was absolutely no indication that she compared any fingerprints in the Holman murder. 4 RR2019 at 93. Nor was there any indication that there was a request made to compare the prints. *Id.* at 94.

101. Someone else would have given Debbie Benningfield the names of "suspects" which were written on the envelopes containing fingerprints in this case. *Id.* at 98; Defendant's Ex. 3-4.

102. Debbie Benningfield compared the fingerprints found at the scene, and on the 40 oz. Schlitz malt liquor bottle, to both Ronald Hamilton and Shawon Smith prior to trial. *Id.* at 101, Defendant's Ex. 3-4. This fact was never mentioned in her offense report supplements. *Id.* at 101. Hamilton and Smith were excluded as having left all of the fingerprints found at the scene. *Id.* at 101-03. Debbie Benningfield did not make a notation in the offense report about this exclusion because "if we did not identify the print, we did not type a supplement if we excluded it." *Id.* at 101. However, the information about the exclusion would be relayed to the person who requested the comparison. *Id.* at 102. The Court finds that either Detective Park or Hoffmaster knew that Hamilton had been excluded from leaving the prints found at the scene.

103. Prior to trial, Hamilton was excluded from leaving the prints found on the side of the cash register, the 40-ounce Schlitz Malt Liquor bottle, and all other prints found at the scene of the Holman Murder. 5 RR2019 at 67.

104. In addition to excluding Hamilton from the prints found at the scene, the print from the malt liquor bottle was run through the Houston and Texas AFIS

28

databases.  3 RR2019 at 109-110.  Based on the fact that there was no offense report made about the AFIS search, Debbie Benningfield concluded the AFIS search did not return any fingerprints matching the prints from the 40 oz Schlitz Malt Liquor bottle.  *Id.* at 113-114.

105. Notes found with the fingerprint evidence suggest that Connie Park, investigator in this case, requested that the prints found at the scene be compared with potential suspects, including Ronald Hamilton.  *Id.* at 127-28. Further, it was generally the investigators who would guide Benningfield concerning what evidence to collect and test.  4 RR2019 at 43, 47.

106. In addition to testing Hamilton's and Smith's prints against those found at the scene, Debbie Benningfield also compared the prints to previously undisclosed suspects.  Those additional suspects were also eliminated as having left the prints at the scene.  3 RR2019 at 131.  Once again, this elimination was not reported in the offense report.  *See* Defense Ex. 8.  The names and identities of these additional suspects was not mentioned anywhere in the offense report, and were never disclosed to the defense.

107. The only way a non-law-enforcement person could have discovered that the fingerprints were compared to Hamilton's would be for the person to personally view the evidence collected from the scene, specifically the envelopes containing the fingerprints.  5 RR2019 at 51-53.  However, even if this was done, the person would not know the prints had been compared to Hamilton's, and that he was excluded, unless the person knew Debbie Benningfield's standard practices for recording her work.  *Id.*

108. Debbie Benningfield could not recall if she had run the fingerprints associated with Marshall Knight (the prints found on the 40-ounce bottle) through the AFIS system.  4 RR2019 at 88-89.  If an unknown print was run through AFIS

29

but not saved in the AFIS system, HPD policy at the time was simply to not record that the print had been run through AFIS. *Id.*

109. Debbie Benningfield knew, prior to trial, that the four prints suitable for comparison collected at the scene of the Holman Murder excluded Ronald Hamilton, and his co-defendant Shawon Smith, from having left the prints. 4 RR2019 at 94. She actively suppressed this evidence by not making a supplement to the police report.

110. During these habeas proceedings, Debbie Benningfield refused to have a meeting with habeas counsel without the Assistant District Attorney's being present. 4 RR2019 at 94-96. The same would have been true prior to Hamilton's trial – Benningfield would not have spoken to defense counsel, but would have referred them to HPD legal. *Id.* at 96.

111. If the District Attorney had walked in and asked to the see evidence envelopes, they would have been shown the evidence envelopes, but if a defense attorney asked to the do the same thing the defense attorney would have been directed to HPD legal. *Id.* Without permission from HPD's legal department, Benningfield would not speak with defense counsel, and would show them nothing. 4 RR2019 at 96-97.

112. There was no indication in the police report about Hamilton's (or Shawon Smith's) prints being compared to those found at the scene, nor was there any mention of the other suspects. *4 RR2019* at 97-98; Defendant's Ex. 8.

113. Benningfield would have obtained the names of Levigne and Brown, the alternative suspects, from one of the detectives, although this was never mentioned in the offense report. 4 RR2019 at 97-99.

114. Nothing in the offense report even suggests that comparisons were ever made to the prints found at the scene. 4 RR2019 at 98.

115. The Court finds that HPD's policy of not documenting exclusions was designed to suppress relevant evidence from defense counsel, and that the policy succeeded in this case.

   **B.    The Harris County District Attorney's Office, the prosecution team, and trial prosecutor Colleen Barnett were aware the fingerprints on the 40 oz. bottle did not belong to Mr. Hamilton, or his co-defendant.**

116. George "Buddy" Barringer was an investigator for the Harris County District Attorney's office at the time of Hamilton's trial.  5 RR2019 at 41.  The Court finds that his testimony at the habeas hearing was credible.

117. As part of his job, Barringer would follow up on tasks he had been assigned by trial prosecutors.  4 RR2019 at 45.

118. As part of Hamilton's case, Mr. Barringer was asked by trial prosecutor Colleen Barnett to conduct certain tasks.  4 RR2019 at 47.  Specifically, Mr. Barringer was asked to check for fingerprint results in both the Yellowstone Capital Murder, and in the separate Holman Murder.  4 RR2019 at 48; Defense Ex. 9.  Mr. Barringer discovered that prints were found in the Holman Murder case, and that they were "compared to defendants and eliminated." Defense Ex. 9.

119. Mr. Barringer was confident that the trial prosecutor would have known that Hamilton, and his co-defendant, had been eliminated from having left the prints found at the scene of the Holman Murder.  *Id.* at 48.

120. Mr. Barringer believed, based on reviewing his Investigator's Reply, that he would have checked on the fingerprint results prior to April 15, 2002.  5 RR2019 at 53, Defense Ex. 9.  Pretrial proceedings did not commence in

31

Hamilton's case until October 7, 2002, and testimony did not begin until November 6, 2002. *See* Trial Reporters Records vol. 2 and 16.

121. Mr. Barringer explained that as a member of the District Attorney's Office, he could simply call up HPD and ask for the result of the print comparisons, and the agency would "report back whether or not – they wouldn't give me a written report.  They would do that in a supplement type thing to their cases." 5 RR2019 at 52.

122. Mr. Barringer also believed that generally an offense report would tell you if prints had been tested. *Id.* at 53.

123. The Court finds based upon Mr. Barringer's testimony, and the Investigators Reply (Defendant's Exhibit 9) that trial prosecutor Colleen Barnett knew, or should have known, prior to trial that Hamilton had been excluded from leaving all of the prints recovered from the Holman Murder scene.

## IV.  THE DEFENSE WAS NEVER MADE AWARE THAT HAMILTON'S FINGERPRINTS HAD BEEN EXCLUDED FROM ALL FINGERPRINTS COLLECTED FROM THE HOLMAN MURDER SCENE.

124. Loretta Muldrow is an experienced criminal defense attorney practicing mostly in Harris County.  6 RR2019 at 21-22.  Prior to practicing criminal defense, she worked for 6 years at the Harris County District Attorney's office as an assistant district attorney.  *id.*  Ms. Muldrow was lead counsel for the defense at Hamilton's capital murder trial. *Id.* at 27. The Court finds her testimony credible.

125. At the time of Hamilton's trial, the discovery practices in Harris County were "arduous. Where what you had to do was go to the [DA's] office."  6 RR2019 at 23.  The DA's office would not allow defense counsel to make copies of

offense reports; defense counsel would be allowed to review the offense report and take handwritten notes. *Id.* At 24.

126. The defense was not provided with copies of any documents prior to trial. *Id.* at 24.

127. Defense counsel would not be permitted to review DA work product. 6 RR2019 at 25. Ms. Muldrow did not recall ever seeing work product in any of the DA files she was permitted to review at the time of Hamilton's trial.

128. If Ms. Muldrow had question for the HPD latent print lab, as a defense attorney, it would not have been possible for her to simply call the lab and ask them a question. 6 RR2019 at 26. If she tried to call the lab, she would be directed to "go through the D.A.'s Office and that was never ever going to be a direct call to law enforcement." *Id.* In 2001, "[l]aw enforcement and the Defense community had a gulf between them and there was no bridge connecting either side." *Id.* at 27.

129. Related to the future dangerousness special issue, the Holman Murder was the most important portion of the case for the defense. 6 RR2019 at 30.

130. The defense intended to prove that Hamilton was not involved in the Holman Murder though the testimony of Shawon Smith. 6 RR2019 at 31.

131. Defense counsel knew of a plea deal that Smith reached with the State through prosecutor Colleen Barnett and Smith's attorney, Alvin Nunnery. *Id.* At 32. The defense expected that Smith would testify at Hamilton's trial if called as a witness.

132. The defense planed on proving that Smith's car, the same car used in the Yellowstone Murder, had been wrecked and was in the impound storage lot at the time of the murder. 6 RR2019 at 32. Ms. Muldrow's belief was that the state acted as if Shawon Smith might no longer have a deal simply because

the state did not want Smith to testify that Hamilton could not have committed the Holman Murder.  6 RR2019 at 32-40.  She was not aware of the State needing to perform any additional investigation related to Smith.  *Id.*

133.   The Court finds that the defense team was aware of the deal in place for the co-defendant prior to trial.

134.   Ms. Muldrow noted that after the time for a motion for new trial had passed, the prosecution team from Hamilton's case went ahead and honored the agreement with Smith.  *Id.* at 41.

135.   Ms. Muldrow was allowed to view the offense report in this case, prior to trial. 6 RR2019 at 41-42.  However, the report did not mention that any fingerprints found at the scene had been compared to any known persons prints.  *Id.*

136.   The defense never learned prior to trial that the fingerprints had been compared in this case.  6 RR2019 at 42.  The defense never learned from any sources that Hamilton's fingerprints had been excluded from all the prints collected in this case.  6 RR2019 at 42.

137.   Had the defense known that Hamilton's prints had been compared to, and excluded from, all prints found at the Holman Murder scene, the defense strategy would have changed.  6 RR2019 at 43-44.  Defense counsel would have employed her own fingerprint expert.  *Id.* at 44.

138.   Defense counsel did have a *Brady* motion granted in this case, but defense counsel was never allowed, before trial, to review any evidence except for the offense report.  6 RR2019 at 45-46.

139.   Defense counsel never saw the envelopes containing the latent prints, which were in the possession of the Houston Police Department, prior to trial.  6 RR2019 at 46.

140. Based upon the statements of the trial prosecutors, and the lack of lab supplements noting fingerprint comparisons, defense counsel was led to believe that there were no identifiable fingerprints recovered at the scene of the Holman Murder – not that Hamilton was actually excluded from the found prints. 6 RR2019 at 48.

141. The open file policy in Harris County at the time of Hamilton's trial meant defense counsel had "to rely on the integrity of the person who was presenting those files for review, either prosecutors or the State of Texas." 6 RR2019 at 49.

142. When Ms. Muldrow examined Connie Park at trial, she did not know whether or not the fingerprints from the Holman Murder scene had actually been examined. 6 RR2019 at 50. Because the State had represented in the pretrial hearing that there were no scientific results in this case, she presumed there would be no prints to prove a "connection to Ronald James Hamilton, Junior and Shawon D. Smith." 6 RR2019 at 51. Had she been told that the prints excluded both men, Ms. Muldrow would have changed the way she examined Investigator Park. *Id.* Further, Ms. Muldrow chose to stop her examination regarding the absent of fingerprints linking Hamilton to the scene because she believed the prints had never been tested. 6 RR2019 at 132-33.

143. Ms. Muldrow recalls that the DA's file related to Mr. Hamilton's case was generally in the possession of Colleen Barnett. 6 RR2019 at 59. Colleen Barnett was the person Ms. Muldrow would typically deal with on the prosecution team. 6 RR2019 at 71.

144. Ms. Muldrow explained that during the preparations for a capital murder trial, the defense has to focus not only investigating and strategizing for the charged offense, but also for all other future dangerousness evidence, and the

35

mitigation case.  6 RR2019 at 70-71.  The defense cannot simply focus on any single aspect the case.  *Id.*

145.  The defense team had multiple investigators working on various parts of the case from guilt and innocence to mitigation.  6 RR2019 at 87-91.  In spite of these investigators, the State has completely failed to present any evidence showing that any of the investigators knew, or should have known, that the prosecution team had suppressed the fact that Hamilton had been excluded from leaving any of the prints discovered at the scene of the Holman Murder.

146.  There is evidence, on a note from the prosecutor's file, that Ms. Muldrow was provided with copies of some discovery in this case.  6 RR2019 at 97-98; State's Ex. 7.  The note discusses Hamilton's statement to police, a copy of scene photos, a copy of the photo spread, a copy of the "c.m.," a copy of the composite sketch, and a copy of Smith's statement.  *Id.*  The note shows these documents were for the benefit of Hamilton's co-defendant, Shawon Smith, and were being given to Alvin Nunnery through Ms. Muldrow.  *Id.*  There is no evidence that the defense was provided a copy of the Holman Murder offense report, or was ever notified that the fingerprints obtained from the scene of the Holman Murder had been compared to Hamilton's and that Hamilton was excluded from leaving the prints.

147.  The State has not presented any evidence showing that the defense was aware, or was made aware, that the comparable fingerprints found at the scene of the Holman murder were compared to Hamilton and Smith, but that they were both excluded from having left the prints.

148.  The Court notes that the State did not call the original trial prosecutors, Colleen Barnett or Lucy Davidson to testify in this case.  There is no evidence that the fingerprint evidence was ever made known to the defense.  Rather,

the credible evidence presented to this Court is that the defense team was never made known about Hamilton's exclusion from the fingerprint testing prior to trial.

149. The defense theory related to the Holman Murder was that Hamilton was not present at the scene. 6 RR2019 at 100-101. Proving that his fingerprints were not present at the scene would have been strong evidence bolstering the defense punishment case.

150. Defense counsel believed Prosecutor Davidson when she explained there were no comparison tests performed in this case. 6 RR2019 at 114. The Court finds it is reasonable for a defense attorney to rely on the representations of trial prosecutors.

151. At trial, prosecutor Barnett told the court that there were no scientific tests, including fingerprint comparisons in this case. 6 RR2019 at 131. Ms. Muldrow rightfully took the prosecutor at her word. *Id. At 131, 134, 138.*

152. Ms. Muldrow was never shown the investigator's report proving that Hamilton had been excluded from leaving the prints recovered from the Holman Murder. *Id. At 139-40.*

**V.   THE PROSECUTION HAD REACHED A DEAL WITH CO-DEFENDANT SHAWON SMITH PRIOR TO TRIAL.**

153. Alvin Nunnery is a long time Harris County criminal defense attorney, who also previously worked for the Harris County District Attorney's Office, the Tarrant County District Attorney's Office, and the Texas Attorney General's Office. 5 RR2019 at 107-08. The Court finds Mr. Nunnery to be credible.

154. Mr. Nunnery represented Mr. Hamilton's co-defendant, Shawon D. Smith. *Id.* at 108. Mr. Nunnery, after reviewing the clerk's record from his client's case,

37

testified that there was a plea agreement in place for his client. *Id.* at 110. "In exchange for him testifying in the matter of the State vs. Mr. Hamilton, his charge wherein he was indicted for capital murder was to be reduced to aggravated robbery. And in exchange for truthful testimony, he was to be sentenced to 20 years TDC, credit for any time that he had already served." *Id.*

155. Mr. Nunnery was certain this plea agreement would have been solidified *prior* to setting the case for a plea. *Id.* at 111. Mr. Nunnery remembered the plea "would have been entered into and negotiated prior to the trial of Mr. Hamilton." *Id.* at 111. The clerk's records show that the plea would have been agreed upon by October 3rd, 2002. 5 RR2019 at 111. The trial testimony did not begin until November 6, 2002. *See* Trial Reporter Record vol 16.

156. Mr. Nunnery would have made the deal with either Prosecutor Colleen Barnett or Luci Davidson. 5 RR2019 at 12.

157. Mr. Nunnery also affirmed that his client, Shawon Smith, had previously provided information to the prosecution in exchange for his plea agreement. 5 RR2019 at 117.

158. Mr. Nunnery was present at Hamilton's trial on the day Mr. Smith was expected to testify. 5 RR2019 at 114-15. He has no idea of the reason why the plea agreement was potentially revoked, but because of prosecutor Luci Davidson's suggestion that there was no longer a plea agreement in place, Mr. Nunnery was forced to invoke the Fifth Amendment on behalf of his client. *Id.* at 115-16, 131, 135.

159.   It was Mr. Smith's position that he was not involved in the Holman Murder. 5 RR2019 at 133.  Further, Mr. Smith believed that Ronald Hamilton was not involved in the Holman Murder.  *Id.*  However, after the State suggested it had revoked Mr. Smith plea offer, Mr. Nunnery would not have permitted his testimony.  *Id.* at 134.

160.   Had the prosecution not suggested the plea deal for Mr. Smith had been called off, Mr. Nunnery would have permitted his client to testify at Hamilton's trial. *Id.* at 136.  Mr. Smith knew that Hamilton did not commit the Holman Murder based upon "Mr. Hamilton's inability to or not have access to the vehicle." *Id.* at 137.  "And that their relationship was such that had he been involved; I think he said he would have probably told [him]." *Id.*

161.   Mr. Nunnery believed that Smith would have testified "[t]hat Mr. Hamilton could not be involved in that extraneous if he did not have access to his car, which I understood he would testify to was at a mechanic shop." 5 RR2019 at 140.

162.   After Hamilton's trial, the prosecution decided to honor its previous plea agreement with Smith.  *Id.* at 117-18.  Mr. Smith did not do anything after the trial to have the original plea agreement put back in place.  *Id.*

163.   The Court finds that prior to Hamilton's trial the State of Texas had reached a deal with co-defendant Shawon Smith.  Shawon Smith was to testify truthfully at Hamilton's trial, and in exchange would plead guilty to aggravated robbery and a 20-year sentence.  The Court finds that Smith provided consideration for this deal, specifically, he had already provided

information to the police and prosecution team.  After Hamilton's trial was complete, Mr. Smith was given the same deal agreed to before trial.

164. The Court finds that there was no evidence presented by the State of Texas showing that additional investigation was needed, at the time of Hamilton's trial, before the State of Texas would honor the previously agreed upon deal with Mr. Smith.  Instead, the most likely reason that the prosecution claimed there was no deal in place is because the prosecution knew Smith would testify truthfully about Hamilton's non-involvement in the Holman Murder, and sought to prevent that testimony.

## VI.   THE FACTUAL BASIS OF THESE CLAIMS WAS NOT PREVIOUSLY AVAILABLE TO HAMILTON.

165. The Court finds that the State's failure to disclose Hamilton's exclusion from the prints found at the scene is the direct result of the Houston Police Department's policy of not reporting exclusions related to forensic evidence, and the Harris County District Attorney's Office's failure to turn over the fingerprint evidence in this case.

166. The Court would note that, in addition to the withheld fingerprint comparisons which excluded Hamilton, other comparison evidence was omitted from the offense report.  For example, although not dispositive to the issue of who committed the Holman Murder, the Court would note that there was a comparison of firearm shell casings related to the Holman Murder, but that no offense report supplement was ever made concerning this comparison.  4 RR at 14-22.  Once again, related to the shell casing's comparison, there was also an elimination.  The firearm examiner would have conveyed the results of the comparison to the investigating officers who apparently did not request that an offense report supplement be made.  4 RR2019 at 21.  However, had there

been an identification between the two shell casings, then there would have been a report made. *Id.* at 22.

167. The firearm examiner, like the fingerprint examiner, explained that it was not the standard practice of HPD at the time of trial to document eliminations. *Id.* at 24.

168. The Court finds that the firearm examiner's testimony is yet more proof that it was the practice of the HPD crime lab to create supplemental offense reports when identifications were made, but to not make supplemental reports if exclusions were made.

169. Appropriately, the former HPD crime lab has since changed its policy. Fingerprint Examiner Green testified that she always documents everything she does in cases. 2 RR2019 at 76. This includes documenting comparisons that don't result in a match, and any prints that are run through AFIS. *Id.* at 76. This is done for transparency, and has been a consisted part of her job no matter what lab she was working with. *Id.* For the last 13 years that she worked as an examiner, she has always documented exclusions. *Id.* at 100, 123. Had Ms. Green eliminated Hamilton from prints found at the scene, she would have made a record of the elimination. *Id.* at 124. She would make a report. *Id.* at 125. In the hours and hours of training that Ms. Green has gone through, it has never been suggested that she should not record and report elimination comparisons. *Id.* at 139.

170. Fingerprint Examiner Green, who had access to all of the evidence in this case, had not seen any evidence that, prior to her work, the prints in this case were previously compared. 2 RR2019 at 77,92-39, 134-35. The Court finds that if the State's own fingerprint examiner experts could not tell that the prints had

been previously tested, then Hamilton and his attorneys certainly could not tell that the prints had been tested prior to trial.

171.  Even the representatives of the Harris County District Attorney's Office, throughout these current proceedings, were not aware that the fingerprints had previously been tested. As the State recognized in its *State's Original Answer After Remand*: "here, there is no indication the evidence had been tested prior to trial, or that the State was in possession of the results of this testing. Additionally, even during the October 7, 2002, pretrial conference, the State informed the trial court there were no reports of any scientific tests like DNA or fingerprint comparisons." *See* State's Original Answer After Remand at 23. Additionally, the State represented: "On May 11, 2017, the applicant's federal habeas counsel contacted the State to see if the State would oppose forensic testing in the Holman Murder. After checking with HPD and finding no indication that any forensic analysis had been conducted on the recovered prints or DNA swabs, the State did not oppose counsel's request for the forensic testing and comparison of certain items." *See* State's Original Answer After Remand at 11.

172.  The State learned for the first time just days prior to June 21, 2019, that there were no written supplements made for any comparisons, because HPD did not "do elimination reports at the time." R.R. June 21, 2019, Hearing, at 5-6. The lab only made "positive identification reports." *Id.* at 6. This is why HPD's general litigation did not find any fingerprint comparison reports. Indeed, had the Harris County DA's office had known that Hamilton's prints had been excluded from those found at the scene prior to this date, the DA's office would not have agreed to retesting. *Id.* The DA's "post-conviction counsel did not know about these eliminations." *Id.* The Court finds that if the

attorneys working for the State of Texas did not know that the prints in this case had been compared to Hamilton's and excluded, then Hamilton's attorneys could not have known that the fingerprints on the 40-ounce bottle, and the Holman Murder scene, had ever been compared to Hamilton and that he had been excluded.

173. It was not until just before the June 21, 2019, hearing that the DA's office turned over the pretrial memorandum written to Colleen Barnett which shows that the trial prosecutors were aware, prior to trial, that Hamilton's fingerprints did not match those found on the 40 oz. beer bottle.  R.R. June 21, 2019, Hearing, at 5-9.

174. Defense counsel cannot be faulted for failing to go beyond the police report in trying to discover that the fingerprint evidence had been tested.  Detective Hoffmaster explained that pretty much everything that was learned by detectives would go into the police report.  Depo at 8.  Hoffmaster believed that everything relevant would make it into the offense report.  *Id.*  Detective Hoffmaster believed that if the lab had performed testing or comparisons on forensic evidence, the lab personnel would create a supplement concerning the results of the forensic testing.  *Id.* at 20, 23-24, 29.  If it was reasonable for the investigating detective to believe the offense report was complete and accurate, it was also reasonable for Hamilton's defense counsel to believe the offense report was complete and accurate.

175. The DNA in this case was never tested until ordered by this Court, but, as noted by the prosecution, Hamilton had no legal ability to have the DNA evidence tested until the District Attorney's office agreed to his request.

### CONCLUSIONS OF LAW

I.   **HAMILTON WAS SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION THROUGH THE STATE'S USE OF MATERIALLY INACCURATE EVIDENCE.**

1.   Hamilton was subjected to cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution, applicable to the States via the Fourteenth Amendment to the U.S. Constitution, because his death sentence was obtained upon the use of materially inaccurate evidence.  Accordingly, this Court recommends that the Texas Court of Criminal Appeals grant relief on this claim.

2.   In *Johnson v. Mississippi*, the Supreme Court reversed a sentence of death where the "jury was allowed to consider evidence that has been revealed to be materially inaccurate." *Id* at 590.  The *Johnson* Court applied a two-factor test in analyzing the presented Eighth Amendment claim: 1) determining whether the jury was allowed to consider materially inaccurate evidence; and 2) determining whether the evidence was prejudicial. *Id.* at 586.  This Court applies this test in analyzing Hamilton's presented Eighth Amendment claim.

3.   This Court concludes that, with respect to the first factor, the jury in Hamilton's case was allowed to consider materially inaccurate evidence – namely, any and all evidence presented at the original trial that Hamilton committed the extraneous Holman Murder.  The evidence regarding the

44

Holman Murder presented originally at trial is described in Section I-A of the above Findings of Fact and is incorporated by reference herein.

4.   This evidence presented at the punishment trial was materially inaccurate in light of the firmly established evidence showing that the perpetrator of the Holman Murder held, drank out of, and set down a particular 40-ounce beer bottle on a rail outside of the store immediately prior to committing the murder – and that forensic testing on this bottle excludes Hamilton and inculpates another individual, Marshall Knight, in the Holman Murder.  *See* Findings of Fact Section II-A, II-B (incorporated by reference herein).

5.   Eyewitness Wanda Johnson observed the shooter holding this bottle, drinking out of it, setting it down on a metal rail outside the store, and urinating over it immediately before entering the store and shooting and killing Mr. Huynh.

6.   This 40-ounce bottle was collected as evidence by HPD Fingerprint Examiner Debbie Benningfield during the scene investigation which took place immediately following the murder.  Forensic testing on this bottle, including fingerprint and DNA testing, establishes that Hamilton was not the person who possessed or touched this bottle.  Hamilton was excluded as a contributor to the fingerprints found on the bottle.   Hamilton was also excluded as a contributor to any and all identifiable fingerprints found at the Holman Murder scene.  Additionally, a scientifically valid interpretation of the DNA

45

testing results excludes Hamilton as a contributor to the DNA found on the bottle.  (This Court observes that the State's DNA expert, using interpretative discretion, concluded that the DNA on the fingernail scrapings was insufficient for comparison – thus, the State's expert made no conclusions regarding the DNA test results.).

7. Additional forensic DNA testing was conducted on both the left and right fingernail scrapings of the Holman Murder victim, Mr. Huynh, with whom the shooter had a brief physical struggle before committing the murder.  A valid interpretation of the DNA testing results excludes Hamilton as a contributor to both these left and right fingernail scrapings.  (This Court observes that the State's DNA expert, using interpretative discretion, and concluded that the minor profile DNA from the fingernail scrapings was insufficient for comparison – thus, the State's expert made no conclusions regarding the DNA test results.).

8. Fingerprint testing and comparisons were originally conducted on the prints taken from this bottle in 2002.  The prints from the bottle were compared with the known prints of Hamilton and his co-defendant, Shawon Smith.  The results of the 2002 fingerprint testing and comparisons excluded Hamilton, Smith, and two other suspects that were never previously disclosed to the defense.  Similarly, the exclusion of both Hamilton and Smith from being the

46

contributors to these fingerprints was never revealed or disclosed to Hamilton or the defense.

9. Despite the State's awareness of these facts, prosecutors Colleen Barnett and Luci Davidson represented to the trial court and to the defense that there were no fingerprint comparisons during the original pretrial hearing.  2 RR at 8-9.

10. Additional fingerprint testing, in 2017, excluded Hamilton and identified Marshall Dwayne Knight as the individual whose fingerprints were found on the bottle.  *See* Findings of Fact Section II-B (incorporated herein for all purposes).  This Court also notes that the Houston Police Department would have had Knight's fingerprints, through multiple arrests, in their fingerprint database at the time of the fingerprint testing and comparisons in 2002.  There is no direct evidence, however, that the Houston Police Department identified Knight prior to the 2017 testing.

11. The DNA testing was conducted exclusively in 2017, and there is no indication that any DNA testing was conducted prior to 2017.

12. In addition to the forensic evidence directly linking Knight to the bottle, Knight's physical description was also similar to the descriptions provided by eyewitnesses Charles Douglas and Wanda Johnson.  Both witnesses described the shooter as being a teenager.   And eyewitness Douglas described the shooter as weighing 140 pounds.  Knight was 20 years old at the time of the

Holman Murder, and District Clerk records indicate that Knight weighed 150 lbs.  By contrast, Hamilton would have been 24 years at the time of the Holman Murder and records indicate that Hamilton weighed 170 lbs.

13.   Knight also had a criminal history involving violence, and a history involving alcohol use.  At the time of the Holman Murder, Knight had been previously convicted of unlawful carrying of a weapon and was on a deferred adjudication for aggravated robbery with a deadly weapon.  Knight was adjudicated guilty for this aggravated robbery in February 2002, for using alcohol while on community supervision.

14.   Knight was called as a witness during the writ hearing and exercised his Fifth Amendment privilege to refuse to answer the questions that were posed by Applicant.  *See* Findings of Fact Section II-C (incorporated herein for all purposes).

15.   In light of the above, and this Court's Findings of Fact, this Court concludes that Hamilton has proven by a preponderance of the evidence that the State presented materially inaccurate evidence at Hamilton's punishment trial.  Further, the Court finds it is more likely that Marshal Knight committed the Holman murder than Hamilton.

16.   This Court concludes, after analyzing the second factor, that Hamilton was prejudiced by the State's introduction of the materially inaccurate and false

48

and misleading evidence – the extraneous Holman capital murder in this death penalty case.

17. Because Hamilton had entered a guilty plea to the capital murder charge with which he was indicted, the Yellowstone Murder, the Holman Murder became the State's main focus during the punishment trial.

18. At the punishment phase of the trial, the jury was tasked with answering Texas's two special issues relating to future dangerousness and mitigation. *See* 2 CR at 330; *see also* TEX. CODE CRIM. PROC. art. 37.071 §(b)(1), (e)(1).

19. The extraneous capital murder was material to the analysis of both special issues.

20. At the outset of the punishment trial, prosecutor Colleen Barnett emphasized the importance of the Holman Murder, stating during opening statements that the State would prove the extraneous murder beyond a reasonable doubt and that, therefore, the State would meet their burden on both prongs of the punishment question. 16 RR at 22-25.

21. During the trial, the State presented eight witnesses, hundreds of pages of testimony, and numerous exhibits to prove up that Hamilton had committed this extraneous capital murder. *See* Findings of Fact I-A (incorporated by reference). These exhibits included, among other items, gruesome

49

photographs of Mr. Huynh laying in his own blood and pictures of his brain. Prosecutor Barnett walked the picture of Mr. Huynh's brain in front of the jury just before resting the State's case. *Id.*

22. The State also heavily and repeatedly emphasized and relied on this extraneous capital murder in each of its closing arguments – arguing that the jury should answer the special issues in a manner that resulted in a death sentence. *See* Findings of Fact I-A, (incorporated by reference) (discussing the closing arguments given by prosecutors Colleen Barnett and Luci Davidson).

23. The jury was also instructed that it could not consider evidence of an extraneous crime or bad act in answering the special issues, unless the State had first shown beyond a reasonable doubt that Hamilton had committed the extraneous crime or bad act. 2 C.R. at 325. Both prosecutors emphasized that the jury should find beyond a reasonable doubt that Hamilton committed the Holman Murder – an extraneous capital murder. The State made this argument while depriving Hamilton of the strongest evidence that he did not commit this extraneous capital murder – exculpatory forensic testing results from an item of physical evidence left behind by the true Holman shooter.

24. This Court finds that Hamilton has proven by a preponderance of the evidence that he was deprived of his right to be free from cruel and unusual punishment

50

under the Eighth Amendment to the U.S. Constitution through the State's use of materially inaccurate evidence at his punishment trial. This Court recommends that the Texas Court of Criminal Appeals grant relief on this claim.

25. Finally, the Court finds that the factual basis of this claim was not previously available to Mr. Hamilton. *See* Tex. C. Crim. P. art. 11.071, Sec. 5 (a)(1); *See* Findings of Fact, VI, *supra*. The fact that the fingerprint evidence had been compared to Hamilton's prior to trial, and that Hamilton was excluded from all fingerprint evidence was actively suppressed by the prosecution team. Further, the DNA evidence, which has been in the exclusive possession of the prosecution team, was not tested until after Hamilton's initial habeas application was denied, and Hamilton had no legal mechanism to have the DNA evidence tested without the blessing of the state. Finally, the identity of Marshal Knight and the presence of his fingerprints on the 40-ounce beer bottle was not known or disclosed until after Hamilton's initial application was denied.

26. The Court also finds that "[a] rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

Based upon clear Due Process jurisprudence the failure to disclose the favorable evidence in this case falls on the State of Texas.

II. **HAMILTON WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION AND DEPRIVED OF HIS RIGHT TO DUE COURSE OF LAW UNDER THE TEXAS CONSTITUTION THROUGH THE STATE'S USE OF FALSE AND MISLEADING EVIDENCE.**

27. This Court finds Hamilton was deprived of his right to due process of law under the Fourteenth Amendment to the U.S. Constitution because his death sentence was obtained upon the use of false and misleading evidence material to the punishment decision.

28. This Court also finds that Hamilton was deprived of his right to due course of law under Art. I, §§ 13 and 19 of the Texas Constitution because his death sentence was obtained upon the use of false and misleading evidence material to the punishment decision in this case.

29. The Fourteenth Amendment's due process clause prohibits the State from securing a conviction or death sentence through the use of false or highly misleading evidence. *See Napue v. Illinois*, 360 U.S. U.S. 264, 269 (1959) (holding that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.")  "The same result [is obtained] when the State, although not

52

soliting false evidence, allows it to go uncorrected when it appears." *Id*. at 79.

30.   It is not necessary that the State actually knew that the testimony in a case was false, it is enough that the prosecution should have known as much. *See e.g., U.S. v. Agurs*, 427 U.S. 97, 103) (1976) (explaining this error occurs with the use of false evidence where the "evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.").   Convictions based on false evidence must be reversed if the false evidence "may have had an effect on the outcome of the trial." *Napue*, 360 U.S. at 272 (1959).

31.   Texas also recognizes that "'[t]he Due Process Clause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly.'" *Ex Parte Chavez*, 371 S.W.3d 200, 207–08 (Tex. Crim. App. 2012) (citing *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex.Crim.App.2011)); *see also Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011).

32.   The question is whether the testimony, taken as a whole, gives the jury a false impression. *Ghahremani*, 332 S.W.3d at 477.

33.   "The present standard for materiality of false testimony is whether there is a 'reasonable likelihood that the false testimony affected the applicant's

53

conviction or sentence. This standard is 'more likely to result in a finding of error' than the standard that requires the applicant to show a 'reasonable probability' that the error 'affected the outcome.'" *Ex Parte Chavez*, 371 S.W.3d at 206-07 (internal citations omitted).

34. As with Hamilton's related Eighth Amendment claim, this Court finds that Hamilton has proven the constitutional violation.

35. This Court concludes that, with respect to the first factor, the jury in Hamilton's case was allowed to consider materially inaccurate evidence – namely, any and all evidence presented at the original trial that Hamilton committed the extraneous Holman Murder. *See* Findings of Fact section I-A.

36. This evidence presented at the punishment trial was materially inaccurate in light of the firmly established evidence showing that the perpetrator of the Holman Murder held, drank out of, and set down a particular 40-ounce beer bottle on a rail outside of the store immediately prior to committing the murder – and that forensic testing on this bottle excludes Hamilton and inculpates another individual, Marshall Knight, in the Holman Murder. *See* Findings of Fact Section II-A, II-B (incorporated by reference herein); *see also* Conclusions of Law Section I.

37. In light of the above, and this Court's Findings of Fact, this Court concludes that Hamilton has proven by a preponderance of the evidence that the State

54

presented false and misleading evidence at Hamilton's punishment trial. Indeed, based upon the evidence before this Court, the Court finds that Hamilton has proven his false and misleading evidence claim by clear and convincing evidence.

38.   This Court concludes, after analyzing the second factor, that Hamilton was prejudiced by the State's introduction of the false and misleading evidence – the extraneous Holman capital murder in this death penalty case. *See* Conclusions of Law Section I (detailed discussion of harm).

39.   This Court concludes that the record shows that there is a reasonable likelihood that the false and misleading evidence – that Hamilton had committed the Holman Murder – affected the judgment of the jury during the punishment phase of trial. *See Chavez*, 371 S.W.3d at 207-08.

40.   Because Hamilton had entered a guilty plea to the capital murder charge with which he was indicted, the Yellowstone Murder, Hamilton's trial went directly into the punishment phase.  The Holman Murder became the State's focus during the punishment trial.

41.   The extraneous capital murder was material to the analysis of both special issues – to both the future dangerousness and mitigation prongs.

42.   The State relied upon the false evidence that Hamilton committed a second capital murder throughout trial, starting with opening statements and ended in

55

closing argument.  The State used the testimony to prove that Hamilton was a future danger to and to refute the defense's mitigation case.  The State called eight witnesses to prove the Holman murder, but concealed the evidence needed for Hamilton to prove he was not involved in the murder.  *See also* Conclusions of Law Section I (discussing harm in more detail).

43.     This Court finds that Hamilton has proven by a preponderance of the evidence that he was deprived of his right to due process of law under the Fourteenth Amendment to the U.S. Constitution, and under the due course of law provisions of the Texas Constitution, based on the State's use of false and misleading evidence at his punishment trial.  This Court recommends that the Texas Court of Criminal Appeals grant relief on this claim.

44.     For the reasons discussed in Conclusion of Law no. 25, and Findings of Fact section VI, the factual basis of this claim was not previously available to Mr. Hamilton.  *See* Tex. C. Crim. P. art. 11.071, Sec. 5 (a)(1); *See also* Findings of Fact, VI, *supra.* Further, to the extent that this claim relies upon the unknowing use of false testimony, the legal basis of this claim was not previously available to Mr. Hamilton.  *Ex Parte De La Cruz,* 466 S.W.3d 855 (Tex. Crim. App. 2015) (establishing the *Ex parte Chabot* grated new law for Texas' applicants in 2009).

56

**III.  HAMILTON WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION, AND UNDER THE DUE COURSE OF LAW PROVISIONS OF THE TEXAS CONSTITUTION, BECAUSE THE STATE FAILED TO DISCLOSE EXCULPATORY EVIDENCE THAT WAS MATERIAL TO HAMILTON'S DEFENSE.**

45.    Hamilton was deprived of his right to due process of law under the Fourteenth Amendment to the U.S. Constitution because the State failed to disclose exculpatory information that was material to Hamilton's defense.  Hamilton was also deprived of his right to due course of law under Art. I, §§ 13 and 19 of the Texas Constitution because of the State's failure to disclose exculpatory information that was material to Hamilton's defense.   Accordingly, this Court recommends that the Texas Court of Criminal Appeals grant relief on these claims.

46.     In *Brady v. Maryland*, the Supreme Court held that suppression by the State of "evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *Brady* applies even if there has been no request by the defendant, *United States v. Agurs*, 427 U.S. 97 (1976), and that this duty includes both impeachment and exculpatory evidence.  *United States v. Bagley*, 473 U.S. 667 (1985).

47.   The State is deemed to possess evidence that is in the possession of any part of the prosecutorial team. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The Court finds, that in addition to the trial prosecutors, the prosecutor's investigator, and all police officers investigating this case (including Debbie Benningfield) were part of the prosecution team. *Ex Parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012).

48.   Evidence withheld by the State is material, and a new trial is required, if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. *See e.g. Giglio v. U.S.*, 405 U.S. 150, 154 ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.)

49.   With respect to the first and second prongs, this Court finds that the State failed to disclose favorable evidence to Hamilton – evidence that was both exculpatory and had impeachment value.

50.   The prosecution team failed to disclose to Hamilton that fingerprint comparisons had been made from the fingerprints taken from the Holman Murder scene, and particularly from the 40-ounce bottle that witness Wanda Johnson saw the shooter hold, drink from, and set down on the metal rail

58

immediately before committing the murder.  *See* Findings of Fact Sections III-IV, *supra*, fully incorporated by reference herein.

51. Wanda Johnson told police when she was first interviewed that the shooter held the bottle.  Either Detective Connie Park or Sgt. Larry Hoffmaster documented Johnson's statement about the shooter holding the bottle in the Holman Murder offense report.

52. The prosecution team knew about the existence of the fingerprint comparisons.   Members of the prosecution team specifically knew that Hamilton and Shawon Smith were excluded from leaving all identifiable prints at the murder scene, but the prosecution team actively concealed this information from the defense team.

53. HPD had a policy of not documenting fingerprint comparisons that resulted in an exclusion, and specifically did not document these exclusions in the offense report or any supplement to the offense report in this case.  Rather, Benningfield would relay the result of the exclusion to the person who had requested that she conduct a comparison – either Detective Connie Park of Sgt. Larry Hoffmaster, the HPD lead investigators in this case.

54. The State's prosecutors were made aware of the results of the fingerprint exclusions before trial.  Prosecutor Colleen Barnett assigned DA's Office investigator George "Buddy" Barringer the task of determining whether there

59

were fingerprint comparisons and results in the Holman Murder. Barringer documented in an internal DA's office memorandum that in the Holman Murder case "prints found were compared to defendants and eliminated." This information was never given to Hamilton or his defense, and was only revealed in the days before the habeas hearing in this Court.

55.   Compounding this error, the State's prosecutors represented to both the trial court and the defense team during the pre-trial conference that there were no fingerprint comparisons. 2 RR at 8-9. Further, the State was ordered to turn over fingerprint comparisons, but specifically failed to do so. 2 RR at 14.

56.   Hamilton's exclusion from the fingerprints on the bottle has significant exculpatory and impeachment value. Exculpatory evidence is that which may justify, excuse, or clear the defendant from fault. *Ex parte Miles*, 359 S.W.3d 647, 665 (Tex.Crim.App. 2012). The fingerprints constituted direct forensic evidence about the identity of the shooter in the Holman Murder, as it was an item of physical evidence the State's own witness, Wanda Johnson, observed the shooter leave behind at the murder scene. And she told police about this fact on the day she was interviewed. The testing of these prints, and Hamilton's resulting exclusion, would have been the strongest evidence available to clear Hamilton from fault in that extraneous capital murder – and

he was wholly deprived of using this evidence, despite specifically asking that fingerprint comparisons be produced.

57. Additionally, the testing results showing Hamilton's exclusion from this physical evidence would serve to dispute, disparage, deny, and contradict the entirety of the State's evidence presented suggesting Hamilton's involvement in the Holman murder – a vitally important task in Hamilton's defense of the extraneous capital murder, and what was described as the most important task in the defensive effort to keep Hamilton from receiving a death sentence.

58. Finally, although there is no direct evidence that the Houston Police Department identified Knight prior to the 2017 testing, Knight's fingerprints were in the Houston Police Department's database on account of his multiple arrests.  The Houston Police Department arrested Knight shortly after they arrested Hamilton in connection with the Yellowstone Murder.  Knight was arrested and booked by the Houston Police Department on February 11, 2002, many months before Hamilton's November 2002 trial ultimately took place. It could very well be the case that had this favorable evidence been turned over, and not actively suppressed, that either the State or Hamilton's defense team would have been able to figure out what was established in 2017 – Marshall Knight's identity and the fact that it was his fingerprints that were on this bottle.

61

59.  For these reasons, and those described below, the Court finds that the withheld and favorable evidence was material – and that there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different.

60.  This Court applies the principles set forth in *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), in conducting its materiality analysis and concluding that there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different.

61.  The confidence in Hamilton's punishment verdict is undermined by the State's failure to disclose the favorable evidence in this case.  Restated, the undisclosed favorable evidence related to the extraneous capital murder could reasonably be taken to put the whole case in such a different light as to undermine confidence in the punishment verdict.

62.  The Holman Murder – an extraneous capital murder – was, in connection with the Yellowstone Murder – the strongest future dangerousness evidence presented in this death penalty punishment case.  Additionally, it was the strongest evidence that there was not a sufficient mitigating circumstances or circumstances warranting that a sentence of life imprisonment rather than death be imposed.

62

63.   This Court does recognize that other evidence was presented in the State's future dangerousness and lack of sufficient mitigation case.  *See* Findings of Fact I-B, *supra* (incorporated by reference).  However, none of the other presented bad acts or extraneous crimes rise nearly to the level of a second capital murder -- none were as severe, strong, or determinative in evaluating the future dangerousness and mitigation special issues.  And the State recognized as much in its closing arguments, heavily emphasizing the importance of this extraneous capital murder in the jury's analysis of the special issues.

64.   The verdict given in the punishment phase of this case is not worthy of confidence where Hamilton was deprived of the most vital and important evidence illustrating that he did not commit the extraneous Holman Murder – forensic testing excluding him from an important piece of physical evidence and inculpating another in that crime.

65.   This Court finds that Hamilton has proven by a preponderance of the evidence that the State violated his right to due process of law under the Fourteenth Amendment to the U.S. Constitution and under the due course of law provisions of due course of law under Art. I, §§ 13 and 19 of the Texas Constitution.  Accordingly, this Court recommends that the Texas Court of Criminal Appeals grant relief on these claims.

63

66.     Finally, the Court finds that the factual basis of this claim was not previously available to Mr. Hamilton.  *See* Tex. C. Crim. P. art. 11.071, Sec. 5 (a)(1); *See* Findings of Fact, VI, *supra*.  The fact that the fingerprint evidence had been compared to Hamilton's prior to trial, and that Hamilton was excluded from all fingerprint evidence discovered at the Holman murder scene was actively suppressed by the prosecution team.

## CONCLUSION

Ronald Hamilton's death sentence was obtained in violation of the United States and Texas Constitutions.  The Applicant has demonstrated that his death sentence was unlawfully obtained, and therefore it is recommended to the Texas Court of Criminal Appeals that relief be granted in the from of a new punishment proceeding.

**By the following signature the Court adopts these findings of fact and conclusions of law in this cause number and recommends that relief be granted.**

Signed this 30th day of OCTOBER , 2019

Signed:

10/30/2019

Honorable DaSean Jones

180th District Court, Harris County, Texas

64

**Cause No. 0901049-B**

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT** |
| | § | |
| **v.** | § | **180th JUDICIAL DISTRICT** |
| | § | |
| **RONALD HAMILTON, JR.** | § | **HARRIS COUNTY, TEXAS** |

<u>**ORDER**</u>

THE CLERK IS HEREBY ORDERED to prepare a transcript of all papers in cause number 901049-B and transmit same to the Court of Criminal Appeals as provided by Article 11.071 of the Texas Code of Criminal Procedure. The transcript shall include certified copies of the following documents:

1. all of the applicant's pleadings filed in cause number 901049-B including any exhibits and affidavits;

2. all of the Respondents pleadings filed in cause number 901049-B including exhibits and affidavits;

3. all orders of the Court (including the order regarding Larry Hoffmaster's deposition, and the deposition itself);

4. all proposed findings filed by either party;

5. A complete transcript of all Reporters Records relating to the proceedings which took place before this Court (including the habeas hearing and all recorded habeas proceedings);

6. the indictment, judgment, sentence, docket sheet;

65

7. appellate record in cause number 901049 unless they have been previously forwarded to the Court of Criminal Appeals, and;

8. Any other matters used by the convicting court in resolving issues of fact.

THE CLERK IS FURTHER ORDERED to send a copy of these findings to both parties, either by electronic means or by mail.

Signed this ___30TH___ day of ___OCTOBER___, 2019

_____

Honorable DaSean Jones

180th District Court, Harris County, Texas

66

# Appendix 2

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

2020 WL 2563544
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston
Division.

Ronald Jeffery PRIBLE, Petitioner,
v.
Lorie DAVIS, Director, Texas Department of
Criminal Justice, Correctional Institutions
Division, Respondent.

H-09-CV-1896
|
Signed 05/20/2020

Attorneys and Law Firms

Gretchen N. Scardino, Scardino LLP, Austin, TX, James Gregory Rytting, Hilder Associates PC, Houston, TX, Philip Harlan Hilder, Hilder & Associates, P.C., Houston, TX, for Petitioner.

Jefferson David Clendenin, George A. D'Hemecourt, Kelli L. Weaver, Thomas M. Jones, Office of the Attorney General, Austin, TX, Tina Dettmer Miranda, Criminal Appeals Division, Austin, TX, for Respondent.

### MEMORANDUM OPINION AND ORDER

KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE

**\*1** In 2002, a Texas jury convicted Ronald Jeffery Prible of capital murder. He was sentenced to death. After unsuccessfully seeking state appellate and post-conviction remedies, Prible filed a federal petition for a writ of habeas corpus in 2009. Now before the Court is Prible's Fourth Amended Petition for Writ of Habeas Corpus. The matters raised by Prible's petition have required significant factual development, extensive briefing, and serious judicial consideration. For the reasons described below, the Court finds that Prible is entitled to federal habeas corpus relief.

## I. BACKGROUND

### A. The Murders, The Investigation, and Prible's Arrest

At around 6:00 a.m. on April 24, 1999, a neighbor saw smoke pouring from Esteban "Steve" Herrera's house. Authorities found Herrera lying in the middle of the garage in a pool of blood. Four bodies were found inside the smoky house. Herrera's girlfriend Nilda Tirado lay face-down on a couch inside, naked from the waist down. Three children were found dead in the bedrooms.

A forensic investigation revealed that the assailant had used an accelerant to create a flashfire that self-extinguished, but not before suffocating the sleeping children. Both Tirado and Herrera had died from a single gunshot to the back of the head. Both adults had died before the fire started.

Prible, a friend of Herrera and Tirado, was quickly identified as a suspect. The police investigation established that Prible had spent the evening with Herrera. Herrera's brother-in-law had accompanied Prible and Herrera to a club until around 2:00 a.m. on the morning of the murders. They returned to the Herrera home. Herrera and Prible were in the garage playing pool when the brother-in-law left.

Scientific evidence confirmed that Prible had been present in the Herrera home. A forensic examination uncovered sperm cells from oral, vaginal, and anal swabs taken from Tirado's corpse. Herrera's DNA matched the anal and vaginal swabs. DNA testing identified Prible as the source of the semen found on the oral swab.

The police questioned Prible, but he disclaimed any involvement in the murder. Prible admitted that he had been in the Herrera home after returning from the club, but said that Herrera drove him home at around 4:00 a.m. When the police asked what he would do if they found his DNA at the scene, he added that he had been having an affair with Tirado and had engaged in consensual oral sex with her.

Police searched the home of Prible's parents, where Prible also resided. The search uncovered guns and ammunition.

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

A firearms examiner later testified at trial that a magazine found at Prible's residence could hold bullets similar to those found at the crime scene. But the murder weapon was never recovered. Investigators could not find blood stains, accelerant, or any forensic evidence on Prible or his clothing.

In addition, Prible had an alibi. A teenage neighbor saw Herrera drop Prible off at his parents' home in the early morning hours.

Prible's DNA alone was not enough to pursue prosecution. Prible was not arrested, let alone indicted, in connection with the murders for two years. The case went cold.

**\*2** In early 2001, Harris County Assistant District Attorney Kelly Siegler was asked to review the cold case. By that point, no new information had been developed that would come out at trial. The State, nonetheless, charged Prible with capital murder on July 5, 2001.

At that time, Prible was housed in the federal prison FCI Beaumont Low for a federal bank robbery conviction.[1] Rather than be transferred to Harris County custody for the state capital murder charges, however, on the day Prible was charged he was transferred to FCI Beaumont Medium. That same day, Nathan Foreman was also transferred to FCI Beaumont Medium and eventually became cellmates with Michael Beckcom. Beckcom would later testify at trial that Prible had confessed the murders in detail to him and Foreman.

Siegler presented Prible's case to the grand jury on August 29, 2001, without calling any witnesses. The grand jury returned an indictment. The State of Texas tried Prible for capital murder in 2002. The State's case against Prible was not strong. As summarized on direct appeal, the State's case rested on six main facts:

> The State presented evidence that: 1) [Prible] was the last person seen with Steve at the house prior to the murders; 2) he had a motive to kill Steve; 3) the bullets that killed Nilda and Steve were fired from the same weapon; 4) [Prible's] sperm was deposited in Nilda's mouth at some point prior to her death; 5) a fire was set to destroy physical evidence,

including evidence of [Prible's] DNA; and 6) [Prible] admitted to Beckcom that he committed the murders.

*Prible v. State*, 175 S.W.3d 724, 730 (Tex. Crim. App. 2005).

Most of this evidence, however, does not explicitly inculpate Prible in the murders. At issue in the instant proceedings are the two factors that the State argued directly incriminated Prible: the State's use of inmate testimony and the DNA evidence.

### B. The State's Use of Inmate Testimony Against Prible

The star witness for the State was Michael Beckcom, a "jailhouse snitch" who was housed with Prible at FCI Beaumont Medium. Beckcom's key inculpatory testimony was that Prible confessed to him and his cellmate, Nathan Foreman, on November 24, 2001. Before trial, the trial court held a conference devoted largely to discussing the State's interaction with its anticipated witness Beckcom. Trial counsel requested that the State provide (1) information about Beckcom's criminal record and any sentence reductions he had received; (2) information about "the date, time, place, and manner of the State's contacts with [Beckcom], including a statement of how the contact was first issued and with whom it was made"; (3) information about any other cases in which he had provided testimony; (4) a copy of Beckcom's statement to prosecutors and any notes related to conversations between Beckcom and prosecutors; and (5) a copy of any agreement about what Beckcom would receive for his testimony. 2 RR 4, 6, 8.[2] The trial court ordered the release of the first category of information, Beckcom's prior history of testifying, and information about any deals with the prosecution.

**\*3** The prosecution balked at providing information about its contacts with Beckcom. Siegler stated:

> I'll agree to tell Mr. Gaiser how we

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

came into contact and the times that we've met. I don't remember the dates. I didn't take any notes. And the best that I can remember, I'll let him know what they are, but I'm not going to write it all down. He can come to my office and I'll sit down and tell him what I can remember.

*Id.* at 5–6. The trial court granted the second request "as to Siegler's oral transmission of the information to Mr. Gaiser as described on the record." *Id.* at 6. The prosecution provided the defense a summary of Beckcom's statement, but the trial court agreed that any notes constituted attorney work product. *Id.* at 7. The prosecution also agreed to tell the defense about any disciplinary violations Beckcom may have committed. *Id.* at 24.

The prosecution also provided some information about any deals it made with Beckcom in exchange for testifying. At the hearing, Siegler stated:

> [I]n exchange for his cooperation and truthful testimony, when this trial is completely over with and resolved I will notify his Assistant United States Attorney [whose] name is Mark Cullers, in Fresno, California, that [Beckcom] cooperated in this case, what the level of his cooperation was, the extent of his cooperation, and whether or not I believe that it was truthful. At that time it will be Mark Cullers' decision as to whether or not to file a 📄 [Federal Rules of Criminal Procedure] Rule 35 📄 reduction. Even if he files that Rule 35 reduction, it will be his superior's decision whether or not to proceed with it. And even if they decide to proceed with it, it will be his Federal Judge in California's decision whether or not to give him any kind of reduction in his sentence.

*Id.* at 29. In that same pre-trial conference, the parties discussed the admission of any written and oral statements the prosecution intended to use. The prosecution had already given the defense all written statements. *Id.* at 27. Siegler told the defense that Prible "made comments and statements to other people in the Beaumont prison" but she already "gave [the defense] their names." *Id.* She told the defense that Beckcom was the only federal inmate the prosecution would use at trial. *Id.* at 28.

The State's opening statement at trial discussed extensively Beckcom's proposed testimony. The State bluntly told jurors that Beckcom is a "vial [sic], disgusting man himself. Who is himself an ex-con several times over. Who is himself convicted of murder on a case that was at one time a capital murder....You're not going to like him. He's going to make you sick to your stomach." 21 RR 79. The State then informed the jury that Beckcom hoped for, but was not guaranteed, a benefit from his testimony. *Id.* at 79–81. The State's emphasis on Beckcom foretold his importance to their case because only Beckcom would "tell you all of the details of everything that Jeff Prible told him about how he did it that night, including the fact that he was proud of the fact that he killed the whole family." *Id.* at 82.

Beckcom was the State's penultimate witness in its case-in-chief. After preliminary questions regarding his background, the State asked Beckcom about his extensive criminal history. At the time of trial, Beckcom had been incarcerated in federal prison for five years. 26 RR 9. Beckcom explained that he had previously testified against others in exchange for deals with the government. *Id.* at 12–13. Beckcom explained the deal he made with the State that resulted in his testimony against Prible: "[I]f I testify truthfully to this Court that you will reciprocate by calling my Federal prosecutor. At that point it's out of your hands, but just to let him know what I've done." *Id.* at 14. Otherwise, testified Beckcom, the State made him no other promises. *Id.* at 17. Beckcom testified that he could not return to FCI Beaumont because other inmates knew about his testimony against Prible. *Id.* at 19–20. He had, in fact, already been put into protective custody. *Id.* at 21.

**\*4** When asked when he had heard about Siegler, Beckcom responded: "I didn't learn about your name until...probably the end of September, early October of 2001." *Id.* at 22. Beckcom testified that "[p]rior to that I had heard of the case just briefly, something about a guy coming from the [FCI Beaumont] Low charged with murder. I didn't really get too much information on it." *Id.* Beckcom testified that he got Siegler's name from Nathan Foreman who "lived in

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

[his] unit at the prison and then ultimately became [his] cellmate." *Id.* at 23. When he learned about Siegler, Beckcom stated, he did "[n]othing immediately," but eventually called her in "the first half of October 2001." *Id.* at 23, 24. He told her that he "had information regarding this case involving a murder." *Id.* at 24. Siegler visited him in "either late November or early December." *Id.* Siegler brought investigator Johnny Bonds with her. *Id.* at 24–25. Beckcom thought Siegler was "probably a little skeptical of another inmate maybe spinning a yarn to [her]." *Id.* at 25. Beckcom gave her a letter dated December 10, 2001, detailing his knowledge of the crime. *Id.* Beckcom testified that he had "spoken" with Siegler on the phone "two or three times" and that the phone calls were mostly about her recommending a sentence reduction. *Id.* at 26–27.

In his direct testimony, Beckcom testified as follows regarding his interactions and conversations with Prible:

Beckcom and Prible met in the recreation yard through a shared acquaintance. *Id.* at 28– 29. Prible began exercising with the two men, but did not engage Beckcom in conversation for "weeks or maybe a month." *Id.* at 31. Initially, they engaged in "general conversation" mostly about people they both knew. *Id.* at 32. Beckcom had previously "heard bits and pieces of information when [Prible] got there," but he "still really didn't know who he was." *Id.* Eventually, Beckcom asked Prible about the capital charges. *Id.* The two men initially had general conversations about the capital prosecution, but Prible disclaimed any involvement in the crime. *Id.* at 33–34. Beckcom claimed that he "wasn't paying a lot of attention" to Prible's statements about his case, "because it's not something [he] care[d] to relive, [his] capital murder case." *Id.* at 34.

In "bits and pieces of conversations," Prible began to provide Beckcom with details about the crime. *Id.* at 33. Details came out in "[s]everal conversations" over "weeks if not a month." *Id.* at 37. In the beginning, when Prible "was still struggling with actually confiding a lot," he told Beckcom: " 'I'm not a sane man'....'Your deepest, darkest reaches of your worst nightmares don't come close to me, don't come close to what I am capable of.' " *Id.* at 42. Prible also implied that he would murder for hire. *Id.* at 42–43.

At first, Beckcom "was getting information...with no intention of even using it. I was actually curious, trying to find out what the situation looked like." *Id.* at 37. Prible told Beckcom that "they got DNA on [Tirado]," but

"everybody knew [he] was having an affair with her," because she and Herrera "had some kind of open relationship." *Id.* at 33–34. Prible also said that the police "were looking for a .38 caliber pistol that they knew he had had, but he had sold it." *Id.* at 34. At any rate, "[i]t was clean. That wasn't the [murder] weapon." *Id.* Still, Prible described Herrera as "his best friend." *Id.* at 39.

Beckcom "at one point...actually became interested in" contacting Siegler so he "began prodding [Prible] into conversations at times." *Id.* at 36. When Beckcom asked Prible if he was "sure [the murder weapon] can't be found," Prible answered, "asphalt's good some times for hiding things." *Id.*

Eventually, Beckcom contacted Siegler. From her, Beckcom learned that he would have to know "[s]pecifics about the case, facts," so he "sought to find out as much as [he] could." *Id.* at 37.

After speaking with Siegler for the first time, Beckcom told Prible that he did not care whether Prible had committed the murders, and Prible "softened up a bit" and gave Beckcom more details. *Id.* at 47–48. Prible described how "Steve was shot in the pool room. Nilda was face down on the couch, shot in the back of the head, she was partially clothed." *Id.* at 48. Prible said the children died from smoke inhalation. *Id.* at 49. Prible "gave [Beckcom] the impression" that he had sex with the victim "in the bathroom" on the night of the murder. *Id.* at 44. At the time, Herrera was "[i]n the pool room, in the garage." *Id.* at 45. Prible told Beckcom that he had "a witness that saw [Herrera] take me home that night." *Id.* at 40. "[A] child of maybe 12 or 13 years ...had gotten up in the middle of the night to use the restroom and saw him through the window with [Herrera] out in front of his parents' home." *Id.* at 41.

**\*5** Prible increasingly gained confidence in Beckcom and Foreman. Beckcom said: "He became close to Foreman and I. He called us his brothers and said he loved us....[A]t one point he told us he's told us things that only he and God knows." *Id.* at 49. The two men expressed interest in forming a business with Prible after their incarceration. Beckcom specifically testified that "Foreman was interested. Foreman was interested in investing in the business so we were actually making plans on something to do when we got out." *Id.* at 35.

The last, and most important, conversation was on November 24, 2001. *Id.* at 53. That day, Beckcom, Foreman, and Prible took a photograph together with their

**Marcus, James 6/5/2020**
**For Educational Use Only**

Prible v. Davis, Slip Copy (2020)

---

parents. *Id.* at 56. Later that night, Prible "really poured it all out." *Id.* at 53. Prible had "finally gotten used to us and relaxed. He felt like, you know, we were going to help him out. We told him we would give him any help we could. We planned on doing business." *Id.* Beckcom described the circumstances under which Prible finally described the murders:

> We were sitting out in the rec yard that particular evening. It was getting dark, we were sitting under—we had these little pavilions out on the rec yard with tables underneath where you can play cards and dominoes.
>
> And [Prible] was just sitting there and he got pretty quite [sic] for a while and I could tell he was thinking about some things. So, he pulled Foreman and I aside and that's when he gave me the information....
>
> He said, "You know, Steve screwed me. He screwed me out of $250,000.00. That was my money." And then he gave me the story about, you know, they were planning to buy some drugs....
>
> Well, [Prible] was very agitated especially when he got to the part, "Well, he was going to steal my money and he's going to kill me, fuck him." And he was literally spitting on us. He was pretty agitated. I could tell he was thinking back to the scene like he was thinking back to the actual event.

*Id.* at 53–54. Prible said that Herrera "was going to kill [him], so [he] handled [his] business." *Id.* at 51. Prible described how, while they were arguing, he shot Herrera, then when Tirado ran into the house to call the police, Prible shot her. *Id.* Prible looked for the stolen money, but could not find it. *Id.* at 52. Prible lit a fire to cover evidence, but "it didn't take." *Id.* at 51–52.

Beckcom asked Prible: "How the hell did you get in and out of this house without being seen?" Prible responded: "Anybody that can go in a house and take out a whole family and get out without being seen is a bad mother fucker and I'm that mother fucker." *Id.* at 52–53. Referring to his military service, Prible "said that his parents lived a couple of miles from there so it wasn't far. And he said it was a high intensive, low drag maneuver. That's what I was trained for, in and out. I'm a ghost." *Id.* at 55.

Beckcom's direct testimony ended with a confirmation of Prible's confidence in his prison friends. Prible said: "You know, I trust you guys. You're my brothers. You're the

only ones that could convict me, but basically he had made his peace. He said, If you do that you'll have to live with it. I'm prepared to die." *Id.* at 54–55.

In cross-examination, trial counsel reviewed Beckcom's extensive criminal history, including prior times he had assisted the Government to get a lesser sentence. *Id.* at 64–69, 77–80. Beckcom admitted: "Oh, I've told lies in the past," but assured that he was now "just telling...what [Prible] told me." *Id.* at 62. Beckcom admitted that he had lied under oath before. *Id.* at 91.

**\*6** When trial counsel questioned why Prible would trust Beckcom and confess after only a few months, Beckcom said: "[O]ne of the first things I told him is you shouldn't be talking about a case that's pending." *Id.* at 70–71. Beckcom admitted that there were similarities between Prible's crime and a capital murder charge which Beckcom had faced, leaving Beckcom with the impression that Prible "seemed to want to try to understand how they were going to approach him, how long this thing might play out how, how long he might be in jail. And I told him mine took, you know, a year." *Id.* at 72. Beckcom admitted that he made notes about Prible's story. *Id.* at 75.

Trial counsel also asked Beckcom about the written statement that he provided to Siegler after Prible's alleged confession in order to impeach his credibility:

> Trial counsel: And you knew at that point in time, from the time you wrote this statement from a previous conversation you had with Ms. Siegler that what she wanted was details, right? Beckcom: I pretty much had them all by that time. Trial Counsel: But you knew—well, he had left by that time, but you knew
>
> what you needed to make this story come to life, right?
>
> Beckcom: I didn't necessarily know what I needed. I just gave her what
>
> he gave me.
>
> Trial Counsel: So, you had to put the details, specific details of the murder itself so that— Beckcom: So that she would believe me, sure. *Id.* at 84. Beckcom stated that he had not seen or heard anything from any person or media about Prible's case, except for Prible's own statements. *Id.* at 85 ("Q: [N]obody talked to you about the case, you didn't know anything about it...all the knowledge you acquired, you acquired from Jeff Prible? A: Yes.").

---

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

Beckcom said that he received Siegler's name from Foreman, and that he understood that Foreman had provided other informants to Siegler. *Id.* at 82. He also confirmed that he and Foreman knew that they were planning to provide Siegler with information about Prible when they took the photo together the day of Prible's confession to corroborate that they knew him. *Id.* at 83. Beckcom clarified that, while Prible told them about his case "[i]n bits and pieces" over two months, he "pretty much had [all the details] by" the time he talked to Siegler. *Id.* at 84.

On redirect, Siegler had Beckcom review numerous details from the crime and affirm that he learned them from Prible. *Id.* at 92–95.

### C. Testimony About Prible's DNA

The jury also heard evidence about the DNA found in Tirado's mouth. The State presented two witnesses. The Chief Harris County Medical Examiner, Dr. Joye Carter, testified that sperm cells can be found in a person's mouth at least several hours after ejaculation, and maybe longer. She testified that "semen is a very sticky substance and some of it could actually adhere or stick to like plaque that's on the teeth or in the recesses of the mouth [and] not fully be cleaned out." 23 RR 68. She also stated that there was "no indication" that Tirado had been sexually assaulted. *Id.* at 128.

William Watson also testified for the State. At the time of trial, Watson held a master's degree in biology. He performed DNA testing on the sperm cells found on Tirado. Watson testified that a "microscopic" amount of DNA was collected on the swabs taken from Tirado's mouth. This DNA was Prible's. 24 RR 118. In the report that he prepared after the murders, Watson did not try to estimate exactly how long before death the sperm had been deposited in her mouth. Watson testified that he had never developed a DNA profile from an oral swab and had not seen it in the literature. *Id.* at 100, 112. However, Watson stated that the fact that he could develop a profile from the oral swab was "consistent with there being a great deal of sperm present." *Id.* at 94. Watson testified that the fact that he was able to generate a full and complete male profile from the oral swab was inconsistent with the semen being deposited into Tirado's mouth a long time before she was killed. He also said that the fact that he was able to obtain

the male profile "certainly would be consistent with" Prible depositing the semen in Tirado's mouth "moments, if not seconds, before she was killed." *Id.* at 101–03.

**\*7** Dr. Robert Benjamin, a molecular biologist, testified for Prible. Dr. Benjamin said that he did not agree with Watson's testimony because there were too many variables and Watson made too many assumptions. Dr. Benjamin stated that, if the semen had been deposited in a consensual act, the recipient may not take steps to remove it from the mouth. 27 RR 118–21. Dr. Benjamin also stated that using quantities of DNA to estimate time since ejaculation is "just not scientifically valid." *Id.* at 123–24. He said that "there were no controlled scientific studies" to support Watson's conclusions. *Id.* at 136.

### D. Arguments and Conviction

The arguments made by the prosecutors in closing foreshadowed the issues raised in the instant proceedings. Prosecutor Vic Wisner's closing focused on two factors: Beckcom's testimony and the DNA evidence. On one hand, Wisner bolstered Beckcom's testimony, urging jurors that "Mike Beckcom is telling the truth." 28 RR 7. On the other hand, Wisner guaranteed that "[w]e've got enough without him. Beckcom just kind of fleshes out what happened, fills in some of the details. We have enough evidence without him, but I suggest to you everything he's telling you about what happened is the truth." *Id.* Wisner told jurors that, in order to believe the defense's case, jurors would have to find that "this Defendant is the unluckiest, unluckiest [sic] criminal defendant who's ever set foot in a courtroom. And there has been a conspiracy to frame this Defendant both in the free world and prison, so audacious it makes any frame up that has ever been conducted in the annals of crime look like child's play." *Id.* at 9. In particular, Prible was unlucky "from a practical hands-on perspective," because the semen found in Ms. Tirado's mouth "had to come right before she was killed or after she was killed." *Id.* at 10. In fact, "[t]here is no way in the world that that semen wasn't deposited either moments before or seconds after Nilda died." *Id.* at 11.

In their closing argument, the defense tried to bolster their DNA testimony and detract from Beckcom's credibility.

But jurors heard last from Siegler. In an emotionally charged argument, Siegler attempted to dismantle the

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

defense's case. Siegler dismissed the claim that Prible and Tirado had an affair, because "appearance is what leads to affairs" and Prible "is creepy and gives you the creeps." *Id.* at 55. Siegler challenged the defense DNA expert's testimony by being "crude for a minute" and suggesting that it depended on Prible having "some kind of magic semen, magic sperm that somehow lives longer than any of y'alls or any other man's in this whole universe." *Id.* Siegler continued that, to believe the defense, jurors would have to assume that "his semen is so tasty that she walked around savoring the flavor of it in her mouth for a couple hours*." Id.* at 55–56. In crass language, Siegler described Prible as someone so depraved that he could kill Tirado while sexually excited. *Id.* at 59. Siegler summed up her argument: "[I]f Jeff Prible had managed to control his ejaculation and his mouth, he might not have ever been caught." *Id.* at 72.

Siegler's argument eventually turned to Beckcom's testimony, arguing: "Is there any evidence in this trial that Michael Beckcom got any facts about what happened anywhere except out of the mouth of this Defendant?" *Id.* at 75. She also told jurors: "[Y]ou can believe everything Mike Beckcom said and find him guilty of capital murder. You can hate his guts and think he's a creep and believe he's telling the truth and find this Defendant guilty of capital murder or you cannot believe one word he had to say and still find Jeff Prible guilty of capital murder." *Id.* at 77. After addressing problems with Beckcom's credibility, Siegler said:

> **\*8** But the most important thing, how would Mike Beckcon [sic] know all the things that he does know unless the killer told him? Whose fault is it that Mike Beckcom came to court? It's Jeff Prible's for telling him. And whose fault is it that Mike Beckcom knew all the details? Jeff Prible's for telling him. And how did Mike Beckcom know all the details? Because Jeff Prible did it. That's how he knows all these details.

*Id.* at 81.

The jury convicted Prible of capital murder.

### E. Punishment

Under Texas law, a jury decides a capital convict's sentence by answering special issue questions. In this case, the jury had to answer two questions: (1) would Prible be a future threat to society and (2) did mitigating circumstances warrant a life sentence? The State presented testimony from Prible's former wife, a Harris County Sheriff's deputy, and a former business partner whom Prible threatened. The State also relied on evidence of Prible's prior bank robberies. The defense presented testimony from a correctional counselor and family members, and evidence about Prible's good character. The jury answered Texas' special issues in a manner requiring the imposition of a death sentence.

## II. PROCEDURAL BACKGROUND

### A. State Litigation

On direct appeal, Prible claimed that the evidence supporting his capital-murder conviction was insufficient. Prible emphasized that "Beckcom's testimony was questionable because he testified in the hope of having his own sentence reduced and he could have learned the details of the alleged offense through the probable cause affidavit in [Prible's] possession." *Prible v. State*, 175 S.W.3d 724, 730 (Tex. Crim. App. 2005) (internal quotation marks omitted). The Texas Court of Criminal Appeals found that,

> Beckcom, however, testified about some details that were not contained in the probable cause affidavit. For example, he knew that there was a pool table in the garage and [Prible] had drops of catsup on his shoe. Beckcom's testimony also contradicted or excluded some details that were contained in the probable cause affidavit. He testified that [Prible] told him that Steve "took $250,000 of [his] hard-earned money," but the amount recited in the probable cause affidavit was $45,000. He knew that the police had DNA evidence and

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

that [Prible] claimed to have had an affair with Nilda, but he apparently did not know about [Prible's] and Nilda's alleged sexual encounter in the bathroom while Steve was in the garage. The jury was free to take these discrepancies into account and to believe or disbelieve Beckcom's testimony based on their evaluation of his credibility.

*Id.* (alterations in original). The Court of Criminal Appeals concluded that, "[b]ased on the evidence at trial, a rational jury could have concluded beyond a reasonable doubt that [Prible] committed the murders of Nilda Tirado and Steve Herrera during the same criminal transaction." *Id.*

Prible's initial state habeas application, which was filed by state habeas counsel on November 19, 2004, did not raise any issues relating to Beckcom's testimony or mention anything about an alleged ring of informants. Then, while on death row, Prible started to hear about other defendants—including a man named Hermilo Herrero—who had been prosecuted by Siegler using what seemed to be an overlapping set of prison informants. (Doc. No. 17, at 19). Suspecting that something similar had happened in his case, Prible filed two *pro se* applications in 2007, raising *Brady*,[3] *Giglio*,[4] *Massiah*,[5] and *Strickland*[6] issues relating to the use of inmate testimony in his case. In one application, Prible alleged that "the prosecution (Kelly Siegler) hid her true ties to Mike Beckom [sic] and her jailhouse informants in Beaumont Federal Prison" and was "using Beckom [sic] and his group of friends from Federal Prison to aid her in making cases." (Doc. No. 99, at 44 (citing Ex. 24, at 00384)). Prible argued that, had he "been made aware of the ties [Siegler] had to Beckcom and his group of friends who aided Siegler in other cases," he could have used that as impeachment evidence in his case. (*Id.* (citing Ex. 24, at 00386)). In the other application, Prible alleged that his trial counsel was ineffective for not investigating Hermilo Herrero as a potential witness. (*Id.* at 45 (citing Ex. 25, at 00411–15)).

**\*9** The Court of Criminal Appeals denied Prible's initial state habeas application and construed the second and third *pro se* pleadings as subsequent applications, found that they did not meet the requirement for merits review because neither application contained "sufficient specific facts establishing that the application meets one of the exceptions set out in in Art. 11.071, § 5," *see* TEX. CODE CRIM. PRO. art. 11.071, § 5, and dismissed them as abusive. *Ex parte Prible*, Nos. WR-69,328-01, WR-69,328-02, WR-69,328-03, 2008 WL 2487786, at \*1 (Tex. Crim. App. June 18, 2008).

**B. Initial Stages of Federal Litigation**

Prible timely filed his original federal habeas petition on June 18, 2009. (Doc. No. 1). The petition raised numerous claims, four of which related to the State's development and use of inmate testimony for trial:

- The State intentionally sponsored false and misleading testimony in violation of Prible's due process rights, as established in *Giglio v. United States*, 405 U.S. 150 (1972).

- The State violated Prible's due process rights by suppressing evidence of the nature of the arrangement between Beckcom, Foreman, and the lead prosecutor, contrary to *Brady v. Maryland*, 373 U.S. 83 (1963).

- The State violated Prible's rights under the Sixth Amendment and *Massiah v. United States*, 377 U.S. 201 (1964), by employing Beckcom as a state agent.

- Trial and habeas counsel provided ineffective representation under *Strickland v. Washington*, 466 U.S. 668 (1984), for not raising a *Massiah* objection.

(Doc. No. 1). Unlike some of Prible's other claims,[7] the above four claims had not been properly exhausted in state court.

Prible filed an amended petition on August 17, 2009. (Doc. No. 7). Respondent then moved for summary judgment. (Doc. No. 12). On April 30, 2010, the Court denied the summary judgment motion without prejudice and stayed this action to allow Prible to seek state court review of his unexhausted claims. (Doc. No. 23, at 3). This Court's stay order noted that "Prible secured the affidavits supporting his unexhausted claims after state habeas review had concluded," raising the possibility that the state court might allow Prible to file a successive state habeas action. (*Id.*).

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

---

### C. Successive State Proceedings

On September 8, 2010, Prible filed a successive application for habeas relief in the 351st District Court of Harris County, raising the following claims:

- Whether "[t]he State violated Prible's rights guaranteed by the Sixth Amendment" and *Massiah*;

- Whether "[t]he State intentionally sponsored false and misleading testimony in violation of Prible's due process rights," as established in *Giglio*;

- Whether "[t]he State violated due process by concealing the nature of the arrangement between Beckcom, Foreman and the lead prosecutor," contrary to *Brady*;

- Whether "[i]n violation of due process, the State permitted its key witness to mislead the jury about the existence and extent of the benefits he expected to receive for testifying against Prible," contrary to *Giglio*; and

- Whether "Prible is actually innocent of capital murder." U.S. Const. amends. VIII, XIV.

### 1. Factual Basis of Prible's Successive State Litigation

**\*10** The above five claims were based on allegations that Beckcom and Foreman were part of a ring of informants at FCI Beaumont whom Prosecutor Kelly Siegler had recruited and fed information to assist her in securing a conviction against Prible. The allegations relied heavily on an August 26, 2010, interview that Prible's federal habeas counsel had with a federal inmate, Carl Walker, Jr. Federal counsel did not secure an affidavit memorializing Walker's story, but prepared a transcription of the interview. (Doc. No. 99, Ex. 2).

In the interview, Walker described how informants were "recruited" at FCI Beaumont Medium to testify in particular cases, including Prible's. (*Id*. at 4). Walker recounted that, not long after he arrived at FCI Beaumont in the summer of 2000, Beckcom and Foreman approached him in an attempt to bring him into the informant circle. Walker assumed that "the prosecutor was working directly with Foreman," but he was not sure whether Foreman or

Beckcom "had more direct control or direct communication with the prosecutor." (*Id*. at 9, 29).

According to Walker, Beckcom and Foreman knew from Siegler that Prible was coming to FCI Beaumont even before Prible arrived. (*Id*. at 9). Walker described how Beckcom and Foreman "s[at] me down, they t[old] me these various events and supposedly details of [Prible's] case and whose [sic] who, and what's what." (*Id*. at 11). Beckcom and Foreman then gave Siegler's number to Walker and directed Walker to call Siegler so that she could assess whether Walker was "a candidate" to testify against Prible. (*Id*. at 13). Walker said he called Siegler "[o]nce or twice." (*Id*.). The other men were "always on the phone" with Siegler. (*Id*. at 23). Foreman was "on the phone almost on a daily basis" regarding the case. (*Id*. at 28). Walker also said that the recruiters directed him to "write a letter" to be sent to Siegler describing "details about [Prible's] case" that Beckcom and Foreman had told him. (*Id*. at 13). Walker claimed that "common sense" told him that "someone high on the food chain was feeding these guys the information because [Prible] wasn't telling" Walker facts about the crime. (*Id*. at 14, 15). "[T]he whole plot was made out before it was actually executed." (*Id*. at 14).

The understanding was always that informants would be rewarded with "time off, or benefits." (*Id*. at 16). Overall, Walker described a ring of "five or six" informants who were trying to incriminate inmates like Prible. (*Id*. at 22). That same ring, Walker explained, was simultaneously involved in setting up another inmate, Hermilo Herrera, for another cold case murder. (*Id*. at 21–22). According to Walker, "this is how you have [the] miraculous coincidence that the same group of guys...have been confessed to by two different people on two different murders, totally different murders." (*Id*. at 21). Walker further described how the informants associated with Prible, including Beckcom and Foreman, got Prible drunk and high, and took group pictures with him to create at least the appearance of a bond with Prible. The men's role was to "get...information, then bank it, bank, it." (*Id*. at 20).

To Walker's knowledge, however, Prible never actually confessed. (*Id*. at 16). Walker did not think that Prible had committed the murders. (*Id*. at 18). Ultimately, Walker did not testify against Prible. He said he came to a "moral...crossroad" when he asked himself: "[Am I] going to openly lie about information I had no idea about and send this man to his death?" (*Id*. at 30). He added: "I just know these guys is guilty of conspiring against him and

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

working to recruit me and others or whomever that would listen to, actually, ah, get him on death row. I know that for a fact. I do know for a fact that Kelly Siegler was involved." (*Id.* at 49).

**2. Litigation of Prible's Successive State Application**

**\*11** After Prible filed his successive habeas application in the trial court on September 8, 2010, the trial court forwarded his application to the Texas Court of Criminal Appeals. Under article 11.071 § 5(a) of the Texas Code of Criminal Procedure, a Texas inmate may file a successive state application only in limited circumstances, including when "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application ... because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application...." The Court of Criminal Appeals remanded Prible's application for the convicting court to determine "whether the factual basis for these claims was unavailable on the dates that applicant filed his previous applications." *Ex parte Prible*, No. WR-69,328-04, 2010 WL 5185846, at *1 (Tex. Crim. App. Dec. 15, 2010). The Court of Criminal Appeals ordered that Prible "shall have the opportunity to show when and how he obtained the evidence at issue and whether he exercised reasonable diligence to obtain this evidence at the earliest opportunity." *Id.*

In January 2011, Prible moved for *in camera* review of the prosecutor's file.[8] The State did not oppose the motion and voluntarily provided some material for review. The State disclosed three letters that prosecutors had sealed in a letter-sized envelope that was designated "attorney work product."[9] The letters from federal inmates Jesse Gonzalez, Mark A. Martinez, and Walker each described how Prible provided details of the crime while in prison. (Doc. No. 99, Ex. 3). Each explained that Prible told them varying details about the killing. The men referred to prior conversations with Siegler and her interaction with all three. Walker's letter named Beckcom and Foreman, hinted at Siegler's "previous conversations" with them, described how Walker was "present on many occasions when [Prible] was telling his side of the story," and ended: "I'm more than willing to testify to these things in court. I'm currently serving a thirty year sentence for Possession w/Intent to

Distribute. I will help you in any way I can and would appreciate any help you could give me." (*Id.* at 10).

The state trial level habeas court held an evidentiary hearing on June 8 and 9, 2011, to determine whether the factual basis for Prible's conspiracy and prosecutorial misconduct claims was unavailable when Prible filed his previous state habeas applications. At this hearing, the court heard testimony from an investigator who worked with Prible's trial counsel; an investigator who worked with defense attorneys who represented inmate Hermilio Herrero, a defendant in an unrelated case involving the same alleged ring of informants; Roland B. Moore, III, Prible's initial state habeas counsel; and Kurt Wentz, one of Prible's trial attorneys.

State habeas counsel Moore provided an affidavit in state habeas court explaining what efforts he made to develop evidence outside the trial record to contest the legality of Prible's capital conviction and sentence, including information regarding the ring of informants. Successive State Habeas Record at 411–16.[10] In his affidavit, Moore stated that, during the period of time that he represented Prible, he "suspected that Beckcom had perjured himself" and "that [Beckcom's] cellmate Nathan Foreman was involved with Mr. Beckcom in a scheme to give false testimony." *Id.* 412. Moore accordingly took "extraordinary measures to contact [Foreman, who was] the one person who had been identified as a possible member of such a ring or organization." *Id.* Trial counsel "had no leads to any other members of a ring or organization of informants" at the time of trial. *Id.* Among those measures, state habeas counsel "subpoenaed Foreman and attached him to another case." *Id.* at 413. But Foreman "refused to say anything. Foreman refused to talk after he realized what [trial counsel] wanted to speak to him about." *Id.*

**\*12** On June 24, 2011, the state habeas court issued its "Findings of Fact Pursuant to Tex. Code Crim. App. Art. 11.071, Sec. 5(a)(1)." *Id.* at 797–804. As the title suggests, the court did not rule on the substance of Prible's claims, but found, as a procedural matter, that Texas's abuse-of-the-writ doctrine foreclosed review. The court specifically found that "the factual basis for the instant claims were available when [Prible's] initial habeas petition was filed in November, 2004" and that "a factual basis for [Prible's] conspiracy theory may have been available at the time of [his] trial." *Id.* at 801, 803.

The state court's procedural determination was,

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

nonetheless, intertwined with its assessment of the evidence Prible had provided for his claims. The court summarized that Prible "raise[d] five claims alleging a conspiracy among the lead prosecutor in his case and several federal prison inmates who were housed with [Prible] at FCI Beaumont." *Id.* at 798. The court's findings acknowledged Prible's allegations that Siegler had fed "otherwise-unknown details about [Prible's] case" to Foreman, who in turn "provided information with a ring of snitches he recruited to assist the lead prosecutor in obtaining a false confession from [Prible]," rendering Beckcom a "state agent" and his trial testimony "perjured." *Id.* at 799. The state court concluded that Prible's allegations were largely based on Walker's interview statement. *Id.* The state court, however, found Walker's statement not persuasive because it "consist[ed] almost entirely of hearsay and speculation and contain[ed] no direct evidence of [Prible's] conspiracy theory." *Id.* The state court further concluded that Prible "present[ed] no evidence establishing that State's witness Michael Beckcom has recanted his testimony regarding [Prible's] confession that he committed the capital murder," and, in fact, Beckcom "denies [Prible's] claim that he was provided with information about [Prible's] case from Nathan Foreman or the lead prosecutor." *Id.* at 800. In the end, the court concluded that Prible was not entitled to successive habeas proceedings because he failed to show that "the factual basis for his claims was unavailable on the dates that [Prible] filed his three previous applications, as required by TEX. CODE CRIM. PRO. art. 11.071 § 5(a)(1)." *Id.* at 803.

In reaching its conclusion, however, the state habeas court did not consider the new supporting and corroborating evidence developed during state habeas review. For instance, the state court did not discuss the impact of the letters suppressed in Siegler's work product file. Instead, the decision focused on the facts presented in the state habeas application filed before factual development occurred, centering its analysis on Walker's statement. Based on this circumscribed analysis, the habeas court found that "the factual basis for the instant claims were available when [Prible's] initial habeas petition was filed in November, 2004." *Id.* at 801.

Without explicitly adopting the lower court's findings, the Court of Criminal Appeals held that "the allegations fail[ed] to satisfy the requirements of Article 11.071, § 5(a)" and dismissed Prible's successive application as an abuse of the writ. *Ex parte Prible*, No. WR-69,328-04, 2011 WL 5221864, at *1 (Tex. Crim. App. Nov. 2, 2011).

### D. Prible's Fourth Amended Federal Petition

Prible returned to this Court and requested additional discovery to develop his claims. This Court granted additional discovery, including allowing Prible to access additional portions of Siegler's work product file. (Doc. No. 134). Federal habeas counsel also conducted various authorized interviews and depositions of the prosecution team, FCI Beaumont informants, and Bureau of Prisons personnel throughout 2017.

**\*13** On March 26, 2018, Prible filed his Fourth Amended Petition for Writ of Habeas Corpus, which is now before the Court. (Doc. No. 181). In his Fourth Petition, Prible raised sixteen claims for relief:

Claim 1: The State violated due process by sponsoring false and misleading testimony that minimized the State's contact with key witnesses and communications with, and use of, other informants as state agents, to develop evidence incriminating Prible. (Doc. No. 181, at 162).

Claim 2: In violation of due process guaranteed under *Brady*, the State suppressed material evidence that Beckcom and Foreman were part of an organized attempt to secure favors in return for fabricating a false confession. (Doc. No. 181, at 177).

Claim 3: In violation of *Brady* and due process guaranteed by the Fourteenth Amendment, the prosecution suppressed evidence that Foreman, who Beckcom represented could corroborate his story, gave a different account, and was, in fact, fabricating evidence against Prible. (Doc. No. 181, at 196).

Claim 4: In violation of *Brady*, the State suppressed evidence impeaching Beckcom's testimony regarding the circumstances of the alleged "confession" and his motives for questioning Prible. (Doc. No. 181, at 199).

Claim 5: The State withheld evidence that the trial court ordered produced pursuant to *Brady*. (Doc. No. 181, at 203).

Claim 6: The State violated Prible's rights guaranteed by the Sixth Amendment and *Massiah*. (Doc. No. 181, at 233).

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

Claim 7: Prible was denied his Sixth Amendment right to effective assistance of counsel. (Doc. No. 181, at 237).

Claim 8: In violation of *Massiah*, the State suppressed evidence that independently established that it had deployed Beckcom and Foreman as agents to pry incriminating information from Prible, even though the State was aware Prible was represented by counsel. (Doc. No. 181, at 242).

Claim 9: Prible was deprived of his Fourteenth Amendment right to due process by the admission of evidence documenting the deaths of the complainants' children. (Doc. No. 181, at 244).

Claim 10: In violation of due process under *Brady*, the State suppressed material evidence that Siegler had consulted the head of the Harris County Crime Lab to ask how long semen could remain in the oral cavity and was told it lives up to 72 hours. (Doc. No. 181, at 233).

Claim 11: The State violated due process by sponsoring false and misleading testimony, and engaging in false and misleading argument, concerning the amount of time that semen could persist in the oral cavity, after being advised by the head of the Harris County Crime Lab that it could live up to 72 hours. (Doc. No. 181, at 256).

Claim 12: Prible received ineffective assistance of counsel, as a matter of federal constitutional law, where trial counsel failed to effectively address and rebut the testimony of William Watson that the semen found in Tirado must have been deposited in her mouth near or at the time of her death, where there was no scientific basis for this expert conclusion. (Doc. No. 181, at 258).

Claim 13: Prible was denied his constitutional right to an impartial jury because the venire did not reflect a fair cross-section of the community. (Doc. No. 181, at 269).

Claim 14: Prible is actually innocent of capital murder and may receive relief through the actual innocence gateway under *Schlup v. Delo*, 513 U.S. 298 (1995). (Doc. No. 181, at 276).

**\*14** Claim 15: In violation of due process, the State sponsored false testimony to bolster its rape/murder theory and to prevent corroboration of Prible's alibi witness. (Doc. No. 181, at 282).

Claim 16: Trial counsel's failure to utilize Prible's phone

records and failure to exclude or refute the foundation of the state's rape theory violated Prible's Sixth Amendment right to effective assistance of counsel. (Doc. No. 181, at 266).

Respondent filed a Motion for Summary Judgment and Answer to Petitioner's Fourth Amended Petition. (Doc. No. 191). Prible filed an opposed motion for an evidentiary hearing to further explore his habeas claims on August 8, 2018. (Doc. No. 199). The stated purpose of the hearing was to explore relevant procedural issues, including whether Prible could establish cause and prejudice to overcome the procedural default of his prosecutorial misconduct claims. (*Id.* at 2–3). The Court granted the motion for evidentiary hearing on February 25, 2019. (Minute Entry 2/25/2019).

The Court held an evidentiary hearing in which the parties presented testimony and evidence relating to the claims involving the prosecution's use of inmate testimony at trial.

**III. EVIDENTIARY HEARING**

The Court held a three-day evidentiary hearing from April 29, 2019 to May 2, 2019. At this hearing, the Court heard live testimony from Nathan Foreman, Carl Walker, Kelly Siegler, and Terrence Gaiser (Prible's trial attorney). The Court also viewed portions of the depositions of Michael Beckcom, Johnny Bonds (Siegler's investigator on Prible's case), Victor Wisner (the other prosecutor on Prible's case), and Siegler. The Court summarizes the testimony as it applies to Prible's federal habeas claims, as follows.

**A. Testimony of Nathan Foreman**

At the evidentiary hearing, Foreman's testimony served two purposes: (1) provide background into the ring of informants and their interaction with Siegler, and (2) "testify that Beckcom's story of him and Foreman hearing a confession from Prible was not true." HT1-21.[11]

While incarcerated in FCI Beaumont in 2001, Foreman was held in the Special Housing Unit ("SHU"), which is "like, somewhat solitary, but only difference is there you have, like, two other cellmates." HT1-37. There, he met

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

inmate Jesse Moreno, from whom he had learned some facts about Prible's case. HT1-39.[12] Moreno suggested that Foreman contact Siegler. HT1-40. Foreman, Moreno, Beckcom, and another inmate named Rafael Dominguez all contacted Siegler from the unit manager's phone. HT1-45.

**\*15** Foreman did not remember when he contacted Siegler but recalled meeting her at the Federal Detention Center in Houston. HT1-44. Siegler and her investigator, Johnny Bonds, met with Foreman at the Federal Detention Center in Houston on August 8, 2001. HT1-14. Foreman did not remember the content of that conversation. HT1-44, 80–81.

Foreman testified that, after he became cellmates with Beckcom in October 2001, they met Prible in the recreational yard. HT1-47. By that point, however, Foreman already knew some facts about Prible's case and had relayed them to Beckcom. HT1-51, 54. Foreman had gotten his information from Moreno and Siegler. HT1-54.

Foreman and other inmates were trying to "roll[ ] over on" Prible in exchange for "time cuts." HT1-49. But Prible would not talk about the crime—"he didn't really talk about what he was accused of," other than to say that "they were trying to accuse him for something that he didn't do." HT1-51.

Prible's federal habeas attorneys took Foreman line-by-line through the December 10, 2001, letter that Beckcom wrote to Siegler relating to Prible's alleged confession. Foreman directly contradicted Beckcom's account and denied that Prible had ever made inculpatory statements. Importantly, Foreman testified that he did not recall the November 24, 2001, conversation in which Prible had allegedly confessed to the murders in his presence. HT1-59–60. On the day that Beckcom said that Prible confessed, Foreman testified that the group of inmates used homemade wine to try to get Prible to talk. HT1-71. Prible eventually got so drunk that Foreman had to help him back to his unit, but Prible did not confess. HT1-71–72. Foreman said that he would have remembered if Prible had said anything inculpatory, because he would have used that to inform on Prible. HT1-63.

Foreman convincingly and unwaveringly challenged the basis for Beckcom's trial testimony. Foreman unequivocally and credibly testified that Beckcom did not provide truthful testimony at trial. HT1-64, 70. Foreman testified that Beckcom "should have been a book writer or

something," because his testimony was "not true" and completely fictional. HT1-64. The Court finds that Foreman was a credible witness.

### B. Testimony of Carl Walker, Jr.

The constitutional claims in Prible's federal petition find their origin in the interview Carl Walker Jr. gave to Prible's attorney in 2010.[13] Walker was incarcerated in FCI Beaumont contemporaneously with Prible. Walker testified credibly about his involvement in the ring of informants vying to inform on Prible. Walker testified that he was "approached or recruited" by some inmates who asked "if [he] wanted a blessing, opportunity to get out of jail without having to do all [his] sentence." HT1-95. The men offered him an opportunity to get a time cut by testifying against Prible. HT1-97. Walker said that he thought that Foreman approached him, but it could also have been Beckcom or his cellmate Oscar Gonzalez. HT1-95, 126. Prible was to be "a mark...[i]n every sense of the word....[H]e was going to be a scapegoat for several individuals to have an opportunity to get out of prison sooner than later." HT1-106.

The men already had a "plethora of information about Mr. Prible's case" when they approached Walker—"details, locations, what was found, where the body was, what happened." HT1-95. The men concocted a plan to "collaborate as if we became prison buddies or pals or et cetera [with Prible], and then he, all of a sudden, feel compelled to confess all these horrific things." HT1-98. The men would then "writ[e] letters to the prosecutor asking to be a witness or—or volunteering to be a witness because we was just so overwhelmed about the information he supposedly give us." *Id.* The two main people involved in this plan were Beckcom and Foreman. HT1-99. Walker was given instructions to call Siegler and tell her what he had supposedly found out from Prible. HT1-100.

**\*16** In the meantime, a grand jury returned an indictment against Prible on August 29, 2001. Prible would be transferred from FCI Beaumont Medium to the Harris County Jail on November 29, 2001. Before he left, however, on November 24, 2001, the group staged a photo "to create a picture of close intimacy with Mr. Prible, a close connection....to show that...he would be comfortable enough or confident enough in your friendship to give you this information." HT1-111. Walker said that everyone in

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

the photo was involved in the plot against Prible, as well as against other inmates. HT1-102, 103.

Walker testified that the group made a batch of wine specifically for Prible and drank it with him. The men intended for him to get so drunk that he would provide details about the murders. HT1-114. However, Walker said that it "really didn't matter" if Prible actually confessed, because "the knowledge was already there, you know. That was more of a formality, like, you would go through the motions. You would set it up." HT1-114–15, 127. To Walker's knowledge, Prible never actually confessed. HT1-115.

Walker, nonetheless, sent Siegler a letter offering to testify that Prible had confessed. Walker testified that he did not write it himself, he only signed it. HT1-116. Walker's letter was among those kept in the work product folder. Walker explained that the inmates' letters were designed to corroborate each other. HT1-117. He believed that Beckcom wrote the letters, primarily because "[t]he only place to type letters is either in the law library, or maybe if you, like, a teacher or instructor or something teaching a class, you could have privacy or you'll have the exclusivity to have access to a typewriter." HT1-132. Beckcom was the only inmate in the conspiracy with that access.

Walker was a credible witness who was unwavering in his testimony. Walker provided trustworthy testimony that corroborated Foreman's rejection of Beckcom's trial testimony.[14]

### C. Deposition Testimony of Johnny Bonds
Bonds was Siegler's investigator on the Prible case. Bonds provided some general background information about the investigation into Prible. He also noted that, initially, there was not enough information to charge Prible. HT1-143. Bonds's experience with the case, however, was somewhat limited. Bonds said that he had never spoken to Beckcom. HT1-140. Bonds also explained that he never saw Walker's letter to Siegler. HT1-154–55. However, after reviewing the informant letters, he acknowledged that it looks like the same person typed them, because they look identical. HT1-180–81.

**\*17** Bonds testified that, during the August 2001 meeting with Foreman at the Federal Detention Center, "two

minutes into his conversation, I'm like, This [sic] guy is lying. He doesn't know anything about this case." HT1-140. Bonds said that Siegler felt the same way. HT1-172.

When confronted with his own notes documenting a visit that he and Siegler had with Foreman at FCI Beaumont in December 2001, Bonds was surprised. HT1-160–62. He only recalled meeting Foreman once. Bonds did not know why they would meet with Foreman when they knew he was a liar. HT1-162–63. Bonds assumed that his notes reflect Siegler's report to him about a meeting that she had with Foreman, rather than a meeting both Bonds and Siegler were in. HT1-164.[15]

Bonds acknowledged that Foreman and Beckcom "might have colluded to get more information." HT1-169. He also acknowledged that it was unlikely that Prible would talk about his crime to other inmates after he was indicted. HT1-171–72.

### D. Deposition Testimony of Vic Wisner
Wisner was Siegler's co-counsel on the Prible case. Wisner, however, did not have much information directly relevant to this case. For example, Wisner did not know about Foreman. HT1-190. From Wisner's testimony, it was obvious that Siegler guided the prosecution and trial.

Although Wisner said that, as a defense attorney, he would have wanted to know about Foreman and the other inmates who wrote letters in the case, he placed the greatest weight on the presence of Prible's semen in Tirado's mouth. HT1-200–10. He acknowledged that, without the semen, the evidence about the informants would be much more important. HT1-204.

### E. Deposition Testimony of Michael Beckcom
Beckcom's testimony was presented from a video deposition. In many ways, Beckcom's hearing testimony mirrored that which he gave at trial. Beckcom found out about Siegler's connection to Prible's case from Foreman after they became cellmates. HT1-215. Beckcom said that he called Siegler from the unit manager's phone. HT1-214. The purpose of Beckcom's first phone call was to discuss

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

the possibility of arranging for a reduction in his sentence. HT1-238. Siegler made clear in that conversation that he needed to get specifics about the case. HT1-238. From then on, Beckcom took notes after conversations with Prible "[t]o have the information that Kelly Siegler asked [him] to get." HT1-239. Beckcom, however, said that a prosecutor has never given him details about a crime in connection with his work as an informant, HT3-7, and that Siegler specifically did not give him details about the facts of Prible's case, HT3-12–13.

At trial, Beckcom testified that he found out that Prible was coming to FCI Beaumont Medium before he arrived. HT1-221. Beckcom and Foreman talked about trying to get a confession from Prible "plenty." HT1-220. But Beckcom did not recall Foreman telling him facts about Prible's case. HT3-17.

Beckcom explained that he was one of "a group of guys from Houston, which after this whole thing got set in motion, it kind of became evident to me that this whole group of, like, fricking ten guys were trying to get information, and somehow I ended up with the information." HT1-218. Beckcom, however, did not know at the start of a conspiracy against Prible; he "kind of surmised that later on." HT1-220.

**\*18** Beckcom confirmed that Foreman was with him every time Prible talked about his case. HT1-239. Beckcom explained, "[t]he details Jeff Prible gave me, he gave completely and explicitly to me and Nathan Foreman one night. He just rolled it out." HT1-218. Beckcom opined that Foreman's affidavit stating that Prible never confessed is false. HT1-249.

From the beginning, Beckcom testified that Siegler led him to believe that he would "get walked out...for [his] testimony" against Prible. HT1-214. Siegler told Beckcom, "[t]his probably will get you out of prison." HT1-213. Beckcom thought that Siegler told him that she had talked to the federal prosecutors about his own case and they would "play ball." HT1-230– 31. He said that he had no other reason to develop evidence against Prible other than to receive a 📙 Rule 35 letter for a sentence reduction. HT1-236. Beckcom "knew [Siegler] had lied" because he only received one year off of his sentence for his testimony. HT1-214.

In many ways, Beckcom was not a credible witness. From the Court's review of the record and its observation of his

live testimony, it is obvious that Beckcom was dishonest when it suited his needs. In other areas, however, Beckcom's testimony corroborated other testimony and the timeline of events. While the Court finds that Beckcom was generally not a credible individual, certain areas of his testimony can be confirmed when compared to the record.

### F. Testimony of Kelly Siegler

Siegler testified both by deposition and in live examination before the Court. Siegler testified about her meeting with Foreman at FDC in August 2001. While she brought the Prible case to the grand jury after she met with Foreman, Siegler testified that her decision had nothing to do with him. HT2-45. She did not tell the grand jury that there was a prison informant in Prible's case. HT2-47.

Siegler testified that she never met with Foreman after the FDC meeting. Siegler said that Foreman probably tried to call her, but she did not remember "what we talked about for very long because I knew he was a liar." HT2-95. Siegler claimed that she simply did not believe Foreman and would not have wanted more information from him. HT2-40–41. Siegler conceded, however, that even though she similarly did not believe Foreman in Herrero's case and accordingly did not use his testimony at trial, she nonetheless wrote a 📙 Rule 35 letter for him. HT2-52–53, 56–57. When confronted with the evidence that she requested a second meeting with Foreman in December 2001, after she received a letter from Foreman's attorney stating that Foreman knew where the murder weapon was, she said she did not remember why she wanted the second meeting. HT2-105–09.

Siegler recalled receiving the letters from Gonzalez, Walker, and Martinez, but she claimed that she did not believe their accounts. HT2-67–70. As Respondent observes, "Siegler did not use Forman [sic], Gonzalez, Martinez, or Walker as witnesses, because she did not find them credible." (Doc. No. 240, at 9). Curiously, Siegler said that the letters were in the file open for Prible's defense attorneys to read. HT2-71. This, of course, turned out to be untrue.

Siegler acknowledged that she reached out to Beckcom's federal prosecutor months before Prible's trial to introduce herself. HT2-115–16. She discussed a possible 📙 Rule 35

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

for Beckcom in those pretrial conversations. HT2-117. Siegler said she told Beckcom about the conversations she had with his prosecutor to reassure him about the 📄 Rule 35 letter. HT2-118–19.

**\*19** Consistent with her deposition testimony, Siegler maintained in her live examination that she did not find Foreman credible and did not need to disclose information about her meetings with him to Prible's defense counsel. HT3-38, 42–43. She opined Foreman was a liar "in a category all by himself." HT3-49. She also reiterated that she did not need to disclose information about Moreno to Prible's defense counsel. HT3-35–43.

Siegler testified that she did not give any inmate at FCI Beaumont information about Prible's case or encourage any inmate to obtain information against Prible. HT3-46–47. Siegler said that, to the best of her knowledge, this was the only capital case in which she used prison inmates who were in the same facility as the accused as witnesses. HT3-47.

Siegler acknowledged that she first spoke to Pam McInnis, head of the Harris County crime lab, about the semen and DNA evidence. HT2-144–45. McInnis said that semen could live up to 72 hours in the oral cavity. HT2-145. Siegler thought this evidence was in the trial, but she could not remember if she told Prible's counsel about McInnis's conclusion. *Id.*

Siegler's testimony was not credible on both minor and major points. Siegler made several statements that the record directly refutes. For example, when asked about the SHU (which is where Foreman met Jesse Moreno), she claimed she did not know what the SHU was and that she had never heard the term before. HT2-25. In addition to the fact that SHU is a well-known term, Siegler herself referred to the SHU at Prible's trial. HT3-26 (quoting 26 RR 96). She also testified that the letters from the other inmates trying to inform on Prible were in the open file; it is now undisputed that they were in her work product file and were not disclosed to defense counsel. She testified that she never saw Foreman after the August 2001 FDC meeting; yet, there is unrefuted evidence that she had a meeting with him in December 2001 at FCI Beaumont. She testified that this was the only capital case in which she used prison inmates as witnesses; in fact, she has done so in numerous other cases. (Doc. No. 241, at 39–40). Siegler was also combative in demeanor and did not appear forthcoming with many of her answers.

### G. Testimony of Terry Gaiser

Gaiser, Prible's trial attorney, was appointed on September 28, 2001. HT2-155. Gaiser confirmed that he had not seen the note about McInnis's conclusions on the semen evidence before the federal habeas proceedings. HT2-193. Gaiser said that he asked Siegler for information about how she came into contact with Beckcom. HT2-164. However, Siegler never told him that she had communicated with Foreman or that she had determined that Foreman was lying. HT2-165. In fact, Siegler did not tell Gaiser anything about Foreman; Gaiser was aware of Foreman only because of Beckcom's statements. HT2-165–66. Siegler also did not tell Gaiser that she wrote a 📄 Rule 35 letter for Foreman in connection with other cases. HT2-172. Siegler never mentioned Jesse Moreno to Gaiser either. HT2-166.

Gaiser said he would have wanted the letters and evidence about the other inmates because that evidence "brings into question the credibility of these people in the Beaumont facility in terms of people wanting to give information to get consideration for doing this." HT2-179. However, he never saw any of these pieces of evidence before trial. HT2-179–80.

Gaiser confirmed that Siegler had previously told him that she could not contact inmates at FCI Beaumont by phone. HT2-187–88. Gaiser said that the knowledge that she could, in fact, call them was important so he could ascertain "who was cultivating who?...[W]ho precipitated the—the information? Who—who was the instigator of the—the informant's testimony?" HT2-188.

**\*20** With that background, the Court will consider the constitutional claims raised in Prible's fourth amended petition.

### IV. LEGAL STANDARDS

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." 📄 *Harrington v. Richter*, 562 U.S. 86, 91 (2011). Federal habeas corpus review provides an important, but limited,

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

examination of state criminal judgments. Because "state courts are the principal forum for asserting constitutional challenges to state convictions," *id.* at 103, concerns for comity, federalism, and finality define the contours of federal habeas review. *See Calderon v. Thompson*, 523 U.S. 538, 555–56 (1998); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Accordingly, federal jurisprudence sets procedural hurdles to federal habeas review of state criminal proceedings. "[T]wo fundamental tenets" govern federal review of state convictions:

> First, a state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court....Second, a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule.

*Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). "These requirements ensure that the state courts have the first opportunity to correct any error with a state conviction and that their rulings receive due respect in subsequent federal challenges." *Skinner v. Switzer*, 562 U.S. 521, 541–42 (2011) (Thomas, J., dissenting). In the case of procedural default, however, the bar to federal review may be lifted "if the prisoner can demonstrate cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law." *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (internal quotation marks omitted) (alterations in original).

If an inmate has presented his claims in a manner allowing the state courts to resolve their merits, AEDPA provides for a highly deferential federal review. AEDPA "bars relitigation of any claim adjudicated on the merits in state court, subject only to the exceptions in [ 28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Richter*, 562 U.S. at 98 (internal quotation marks omitted). Under those provisions,

"a federal court may not grant a habeas corpus application...unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.' " *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (first quoting 28 U.S.C. § 2254(d)(1), then quoting *id.* § 2254(d)(2)).[16] "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 409–10 (2000)); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002). Simply put, "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). Federal courts also generally presume that the state courts have made correct factual findings, unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## V. ANALYSIS

### A. *Brady* Claims (Claims 2, 3, 4, 5, and 10)

**\*21** Claims 2 through 5 and 10 rely on *Brady v. Maryland*, 373 U.S. 83 (1963), in which the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "There are three components of a true *Brady* violation: (1) the evidence at issue, whether exculpatory or impeaching, must be favorable to the accused; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Canales v. Stephens*, 765 F.3d 551, 574 (5th Cir. 2014) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). In

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

evaluating whether the evidence was material, the evidence is "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). Impeachment evidence must also be disclosed under *Brady*. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence that enables the defense to "attack[ ] the reliability of the investigation" is also *Brady* material. *Kyles*, 514 U.S. at 446.

The extensive factual development in this case has created a rich and complicated portrait of what happened at trial and what was not known to the defense. Years of litigation have resulted in a dense record full of complex arguments and detailed allegations, often branching out into different cases and implicating various incarcerated individuals.

But the ultimate facts of this case are simple. The State's case rested on two facts: (1) a single witness who testified that Prible confessed to the murders and (2) testimony suggesting that Prible's DNA had entered Tirado's mouth only a short while before her death. As the Court will discuss further below, the State did not disclose the full extent of its interaction with its star witness, Michael Beckcom. The State also failed to disclose evidence which would enable the defense to argue that Beckcom had fabricated his story, conspired with others to inculpate Prible, and tried to corroborate his contrived story by typing letters for other inmates to sign. Given the weakness of the State's case against Prible, stopping the defense from developing impeachment evidence against its star witness is unconstitutional.

The State also hid evidence about its DNA evidence. Prible admitted that he had sexual relations with Tirado. He claimed, however, that they had done so hours before the murder happened. The State's case depended on showing that the sexual acts occurred moments before Tirado died. The State did not disclose that it had developed evidence supporting the defense's expert testimony on the DNA, but still presented testimony with directly opposite scientific conclusions. The suppression of information from the defense hampered, if not prevented, the development of a defense to counter the two facts that supported Prible's conviction.

As previously discussed, no matter how egregious the underlying constitutional violation, certain procedural requirements curb federal habeas review. Before turning to the merits of Prible's *Brady* claims, the Court must decide whether he has presented those arguments in a timely and procedurally proper manner.

**1. Procedural Reviewability**

Respondent argues that procedural defects preclude federal review of Prible's *Brady* claims. First, Respondent contends that Prible did not file some of those claims in federal court in a timely manner, rendering them time-barred by the AEDPA one-year limitations period. Second, Respondent argues that Prible failed to litigate his claims in compliance with state law, rendering them procedurally unreviewable. As discussed below, the Court finds that all of Prible's *Brady* claims are available for federal review.

a. Limitations Period

Respondent argues that Prible filed Claims 3, 4, 5, and 10 outside the time period allowed under AEDPA's limitations period. AEDPA established a one-year deadline, subject to statutory and equitable tolling, in which an inmate must raise his federal habeas claims after the conclusion of state review.[17] Prible filed a timely federal habeas petition on June 18, 2009. On March 26, 2018, Prible filed his Fourth Amended Habeas Petition raising Claims 3, 4, 5, and 10 for the first time. Because Prible raised those claims almost nine years after his original petition, Respondent contends that they are barred from federal consideration. As discussed below, the Court finds that the claims are available for federal consideration because (1) Claims 3, 4, and 5 relate back to the original petition and (2) the facts leading to Claim 10 could not have been discovered previously.

**\*22** Prible argues that Claims 3, 4, and 5 relate back to the seventh claim in his original petition. A federal habeas court may consider the merits of an otherwise untimely claim if it relates back to a timely filed federal habeas petition. *See Mayle v. Felix*, 545 U.S. 644, 656 (2005). A claim in an amended federal habeas petition relates back under Federal Rule of Civil Procedure 15(c) if the timely claim and the proposed claim to be added by amendment "are tied to a common core of operative facts." *Id.* at

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

664. "An amended habeas petition...does not relate back...when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650.

Prible's seventh claim, the only *Brady* claim in the original petition, focused on the State suppressing evidence of its relationship with Foreman, Beckcom, and other informants, and the impact this suppression had on the defense's ability to impeach Beckcom's credibility at trial. Specifically, the seventh claim's "core of operative facts" asserted that the State suppressed:

• evidence that Siegler had contacted Foreman, Beckcom's cellmate, on numerous occasions;

• evidence that Siegler was using a circle of informants (including Beckcom and Foreman) at the prison to investigate and provide testimony against Prible;

• evidence that Foreman and his crew were told specifics about the offense that the State was trying to prove against Prible; and

• evidence that Siegler used the ring of informants to prosecute defendants in other cases.

The original petition alleges that the suppressed evidence was material, because "defense counsel would have completely undermined the integrity of the State s [sic] case if he had information that would have allowed him to demonstrate that the State was involved in a conspiracy to violate Mr. Prible's right to counsel and was trying to incriminate Mr. Prible with the testimony from members of this conspiracy." (Doc. No. 1, at 44).

Claims 3, 4, and 5 in the Fourth Amended Petition cover substantially the same allegations. Specifically, the Fourth Amended Petition describes the challenged claims as follows:

• **Claim 3**: In violation of *Brady* and due process guaranteed by the Fourteenth Amendment, the prosecution suppressed evidence that Foreman, whom Beckcom represented could corroborate his story, gave a different account, and was, in fact, fabricating evidence against Prible. (Doc. No. 181, at 196).

• **Claim 4**: In violation of *Brady*, the State suppressed evidence impeaching its [Beckcom's] testimony

regarding the circumstances of the alleged "confession" and his motives for questioning Prible. (Doc. No. 181, at 199).

• **Claim 5**: The State withheld evidence that the trial court ordered produced pursuant to *Brady*. (Doc. No. 181, at 203).

The only difference between the *Brady* claim in the original petition and those in the Fourth Amended Petition is that, as a result of additional discovery in the case, the new claims specify with greater particularity the evidence that Siegler suppressed. In other words, the original and amended claims share a common core of operative facts: they concern suppression of exculpatory evidence that (1) originates from the same time (a five-month period between July and December, 2001), (2) was suppressed by the same actor (Siegler), (3) concern the same subject matter (the State's relationship to Foreman and Beckcom and their motives and roles in the ring of informants), and (4) is material for the same reason (impeachment of Beckcom's testimony regarding the alleged confession).

*Mandacina v. United States,* 328 F.3d 995 (8th Cir. 2003), which the Supreme Court in *Mayle* cited with approval in laying out the relation back standard, is instructive. In *Mandacina,* the inmate's original federal habeas petition raised a *Brady* violation involving the suppression of "evidence of other suspects obtained by the Gladstone Police Department." *Id.* at 1001. The inmate then sought to amend his habeas petition to include suppression of a particular report—to which the original petition made no reference—that documented a witness interview implicating other persons in the victim's murder. The Eighth Circuit held that the amended pleading related back to the original pleading. *See id. Mayle* suggests that relation back was appropriate in *Mandacina* because "[b]oth pleadings related to evidence obtained at the same time by the same police department." *Mayle,* 545 U.S. at 664 n.7. The relationship between Claims 3, 4, and 5 and the original seventh claim closely resembles the relationship between the original and amended pleadings in *Mandacina*. The only difference between the allegations in the original petition and the challenged ones is that, as a result of additional discovery in the case, the later claims specify with greater particularity the evidence that was suppressed by Siegler. As in *Mandacina,* the suppressed evidence that is mentioned for the first time in the new claims falls directly under the category of suppressed evidence already identified in the original petition and,

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

thus, those claims relate back to the original petition. The Court thus finds that Claims 3, 4, and 5 relate to a common core of facts that do not differ in substantial thrust from the allegations made in Prible's earlier filings.[18]

**\*23** Respondent also argues that Prible failed to raise Claim 10 in a timely manner. Claim 10 argues that, "[i]n violation of due process under *Brady*, the State suppressed material evidence that Siegler had consulted the head of the Harris County Crime Lab to ask how long semen could remain in the oral cavity, and was told it lives up to 72 hours." (Doc. No. 181, at 233). Habeas counsel learned of the suppressed evidence only through Siegler's own notes, which were disclosed on May 11, 2017, pursuant to this Court's order. The suppressed evidence is material, Prible argues, because "it supports his defense that he had consensual sexual contact with Nilda earlier in the night before she was murdered, rather than immediately prior to her execution." (*Id.*) Prible highlights the fact that "Petitioner could not have discovered these notes earlier; it took a court order for the HCDA [Harris County District Attorney's] Office to finally let Petitioner see them." (Doc. No. 198, at 56).

Section 2244(d)(1)(D) provides that the AEDPA limitations period begins to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Because the State kept information about Siegler's interaction with the crime lab hidden in the attorney work product file, Prible could not have known of the facts that would have supported a *Brady* claim until at least May 11, 2017, when the State finally disclosed Siegler's work product file. Prible could not have discovered the factual basis of that claim earlier because the State only disclosed Siegler's work product material pursuant to court order. Prible filed his amended habeas petition on March 26, 2018, within one year of the disclosure. Thus, Prible filed Claim 10 in a timely manner under 28 U.S.C. § 2244(d)(1)(D).

The Court therefore concludes that Claims 3, 4, 5, and 10 are not barred by AEDPA's limitations period.

### b. Procedural Default

Respondent next argues that Prible's *Brady* claims are procedurally unreviewable because Prible failed to litigate his claims in compliance with state law. A federal constitutional claim raised on federal habeas is procedurally defaulted and may not be reviewed if the last state court to consider that claim expressly relied on an adequate and independent state procedural bar for denial of relief. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A procedural default may be excused, however, if a petitioner can show cause and prejudice to overcome the default. *Id.* at 750–51. The Court finds that Prible's *Brady* claims are procedurally defaulted, but that Prible has shown cause and prejudice to overcome the default.

#### i. *Prible's* Brady *Claims Are Procedurally Defaulted*

The Court agrees that Prible's second *Brady* claim is procedurally defaulted. As discussed above, the state court dismissed Prible's successive state habeas application, which included Claim 2, under Texas's "abuse of the writ doctrine," codified at Texas Code of Criminal Procedure Article 11.071 § 5(a). A dismissal pursuant to Article 11.071 "is an independent and adequate state ground for the purpose of imposing a procedural bar" in a subsequent federal habeas proceeding. *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).

The Court further agrees with Respondent that Prible's other *Brady* claims are procedurally defaulted. "A procedural default also occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)); *see also Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001). Without distinguishing between individual claims, the state trial level habeas court dismissed Prible's successive state habeas petition because it concluded that the "factual basis" for Prible's ring-of-informants "conspiracy theory" was "available" when Prible filed his original state habeas petition in 2004. (Doc. No. 90-1 ¶¶ 26, 32, 34). Given the breadth of this conclusion, as well as the similarities

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

between Claims 3–5 and Claim 2, which was included in the successive petition, it is clear that the state court would apply the same procedural bar to Claims 3–5 if presented with those claims. Respondent reaches the same conclusion. For Claims 3–5, Respondent avers that "the Texas abuse-of-the-writ doctrine, set out in Tex. Code Crim. Proc. Art. 11071 § 5, would procedurally bar Prible's attempt to raise this unexhausted claim in a subsequent writ application." (*Id.* at 32). Respondent similarly asserts that Claim 10 "would be dismissed as an abuse of the writ if he were to raise [it] in a subsequent state habeas application." (Doc. No. 191, at 150). Prible's *Brady* claims are procedurally defaulted.[19]

ii. *Cause and Prejudice Overcomes Default*

**\*24** A procedural default may be excused upon a showing of cause and prejudice. *Fisher v. State*, 169 F.3d 295, 301 (5th Cir. 1999). "The resolution of 'when and how defaults in compliance with state procedural rules can preclude federal court consideration of a federal question is itself a federal question.' " *Barrientes v. Johnson*, 221 F.3d 741, 763 (5th Cir. 2000) (alterations omitted) (quoting *Fairman v. Anderson*, 188 F.3d 635, 641 (5th Cir.1999)). "To the extent, therefore, that the Texas Court of Criminal Appeals decided issues of cause and prejudice in dismissing [defendant's] [successive] State Petition, we are not bound by its decision."[20] *Id.*

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard." *Id.* (citations omitted). "A *Brady* violation can provide cause and prejudice to overcome a procedural bar on a habeas claim." *Thompson v. Davis*, 916 F.3d 444, 455 (5th Cir. 2019); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004).

The Supreme Court has recognized overlap between a substantive *Brady* claim and the showing required to overcome the procedural bar of a *Brady* claim. For a defaulted *Brady* claim, "cause and prejudice parallel two of the three components of the alleged *Brady* violation itself." *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *see also Banks*, 540 U.S. at 691. There are three elements of a substantive *Brady* claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82. "Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." *Banks*, 540 U.S. at 691. "[C]oincident with the third *Brady* component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes." *Id.*

**\*25** The Court will discuss the favorable evidence that Siegler suppressed, and its materiality under *Brady*'s prejudice prong, at length in addressing the merits of Prible's *Brady* claims, *see infra* V.2.a & V.2.b. Here, the Court focuses on how Siegler's suppression of that evidence prevented Prible from developing his *Brady* claims in state court, thus providing cause to overcome their default.

"Under *Banks*, a petitioner shows 'cause' if 'the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence.' " *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018) (quoting *Banks*, 540 U.S. at 691). It is beyond serious dispute that the prosecution withheld critical information from the defense in this case. Siegler knew that Beckcom was associated with several other inmates intent on gaining favor by securing evidence against Prible, and that some of these same inmates were involved in the case against Hermilo Herrero. Yet the State did not divulge that other inmates sought out the prosecution to inform against Prible. Nor did Siegler disclose the extent of her interactions with Beckcom or the precise nature of the deals made for his testimony. Nor did she reveal the extent of her interactions with Foreman or divulge that Foreman—who, without testifying, still loomed over the trial testimony— had twice given patently false accounts of Prible's supposed confession to her.

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

In the end, the Court need not look further than the State's own file to demonstrate that Siegler prevented the defense from learning about exculpatory material evidence. In her deposition, Siegler claimed that she had an "open file" policy and did not maintain a separate work product file. (Doc. No. 181, Ex. 4-A, at 112, 141). In reality, however, the State maintained a dense work product file containing a significant amount of exculpatory information that was not disclosed to the defense, including notes memorializing meetings with Foreman and Beckcom concerning Prible's case, letters from several inmates—including Walker—trying to inform on Prible, and a note revealing that Siegler had consulted Pam McGinnis, the head of the Harris County Crime Lab, who told her semen could live up to seventy-two hours in the mouth.[21] These materials came to light only because of court proceedings and court orders occurring after Prible filed his initial federal petition.

**\*26** The State's suppression of evidence prevented Prible from developing his *Brady* claims in state court proceedings. Prible's trial attorney, Terrence Gaiser, brought several pre-trial *Brady* motions requesting that the State furnish, among other things, the date, place, and manner of all contacts with Beckcom, a statement of how contact with Beckcom was first initiated, a copy of all statements made by Beckcom, notes of any conversations had with Beckcom, and any agreements made with Beckcom concerning benefits in exchange for testimony. 2 RR 4, 6, 8. In response, Siegler provided a handwritten note from Beckcom and indicated that he had been the one to initiate contact. HT2-165. At a pre-trial hearing, Siegler disclosed that she had had four or five telephone conversations with Beckcom. Siegler did not, however, disclose that she had initiated some of those contacts, that she had long been communicating with Beckcom's cellmate Foreman, or that she found Foreman's testimony regarding Prible's confession to not be credible. *Id*. Gaiser testified at the evidentiary hearing that he had reviewed everything in the State's file on Prible, but that the file did not include the letters from Walker and other inmates concerning Prible's case, or any other information that would have alerted him to Siegler's contacts with the other informants. Indeed, Siegler's co-counsel, prosecutor Victor Wisner, attested that even he was not made aware of Siegler's communications with the other informants, or the letters they sent her. HT1-189–97. Because of the evidence Siegler suppressed, Prible's defense team had no knowledge of her contacts and communications with other FCI Beaumont informants, or even the full extent and nature of her contacts with Beckcom.

Similarly, evidence of a larger ring of informants was not available to Prible's state habeas counsel, Roland Moore, despite his diligent attempts to discover it. Siegler's suppression of evidence left precious little for Moore to work with in investigating suspicions of prosecutorial misconduct. The only information Moore had was the identities of Beckcom and Foreman, and Prible's suggestion that a man with the last name of Walker might have relevant information. (Doc. No. 198-1, at 57–59). Beckcom and Foreman refused to speak with Moore. (*Id.* at 57). And though Moore tried to find a person named Walker, with no other identifying information, that effort quickly became "a fool's errand." (*Id.* at 59). With no concrete evidence to support such claims, Moore did not include any prosecutorial misconduct claims in Prible's original federal habeas application.

Prible later sought to discover Walker's identity and whereabouts on his own, but mistakenly assumed that a different person, Larry Wayne Walker, was the Walker with information about the ring of informants. Prible sent Larry Walker several letters through Ward Larkin, a layperson and anti-death penalty advocate. (Doc. No. 181-51, at 14). Only through sheer coincidence did Prible learn Carl Walker's identity: after Larry Walker was transferred from FCI Beaumont to a BOP facility in Yazoo, Mississippi, where Carl Walker had also since been transferred, he realized Carl Walker might be the intended recipient of the letters and shared them with him. (*Id.* at 48); HT1-121. Although Carl Walker did alert Larkin that he was the Walker being sought, Carl Walker did not respond to further inquiries at the time, (Doc. No. 181-51, at 48), and Prible had no way to contact him further (Doc. No. 198, at 15–16). Thus, even though Prible identified Carl Walker before he filed his 2007 *pro se* petition, he had no way to obtain supporting evidence from him.[22] Only after federal proceedings commenced did Walker change his mind and provide a statement.

Respondent argues that Prible cannot establish cause to overcome the default of his *Brady* claims because he, like the defendant in 🔖⚠️ *Robison v. Johnson*, 151 F.3d 256 (5th Cir. 1998), "confuses knowledge of the factual predicate of the claim with access to the best evidence supporting that claim." (Doc. No. 191, at 37). But the facts adduced at the evidentiary hearing as just described clearly undermine this argument. Although Prible may have suspected prosecutorial misconduct, including *Brady* violations, during the course of state court proceedings, Siegler's efforts to suppress evidence of her contacts with

**Marcus, James 6/5/2020**
**For Educational Use Only**

Prible v. Davis, Slip Copy (2020)

Beckcom and the other informants left Prible with no concrete evidence to support such a claim during those proceedings, despite Prible and his counsel's diligent efforts to discover such evidence. Prible may not be penalized for failing to raise claims for which he lacked any evidence. *Strickler*, 527 U.S. at 286 ("Proper respect for state procedures counsels against a requirement that all possible claims be raised in state collateral proceedings, even when no known facts support them."). Relatedly, because Prible has shown by clear and convincing evidence that the factual predicates for his *Brady* claims were not available until after he had filed his state court habeas applications, Prible has refuted any presumption of correctness owed to the State court's findings to the contrary.

**\*27** In sum, Siegler's suppression of evidence created an external obstacle that impeded Prible's ability to bring his *Brady* claims during state habeas proceedings. Siegler's actions in this case therefore provide cause to forgive the procedural default of Prible's *Brady* claims.

In addition to cause for the default, Prible must show actual prejudice. As discussed above, the prejudice inquiry in this context overlaps with *Brady*'s materiality standard. *See Banks*, 540 U.S. at 698 ("Unless suppressed evidence is material for *Brady* purposes, its suppression does not give rise to sufficient prejudice to overcome a procedural default." (quotation and alterations omitted)). The test for materiality and prejudice is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280; *see Banks*, 540 U.S. at 698. As the Court will discuss *infra* in connection with the underlying *Brady* claim, Prible has shown actual prejudice from the State's withholding of information.

Accordingly, the Court finds that Prible's *Brady* claims are procedurally reviewable. The Court first reviews Prible's *Brady* claims stemming from the prosecution's use of informants (Claims 2–5) and then Prible's *Brady* claim relating to the State's investigation into DNA evidence (Claim 10). Because the state courts did not adjudicate the merits of Prible's *Brady* claims, this Court's review of those claims is *de novo*.

**2. The Suppressed Evidence Was Favorable to Prible's Defense**

a. Prible's Ring of Informants *Brady* Claims (Claims 2–5)

Prible's four interrelated *Brady* claims concern the suppression of evidence about the group of FCI Beaumont informants. Prible claims that:

• Claim 2: In violation of due process guaranteed under *Brady*, the State suppressed material evidence that Beckcom and Foreman were part of an organized attempt to secure favors in return for fabricating a false confession. (Doc. No. 181, at 177).

• Claim 3: In violation of *Brady* and due process guaranteed by the Fourteenth Amendment, the prosecution suppressed evidence that Foreman, whom Beckcom represented could corroborate his story, gave a different account, and was, in fact, fabricating evidence against Prible. (Doc. No. 181, at 196).

• Claim 4: In violation of *Brady*, the State suppressed evidence impeaching [Beckcom's] testimony regarding the circumstances of the alleged "confession" and his motives for questioning Prible. (Doc. No. 181, at 199).

• Claim 5: The State withheld evidence that the trial court ordered produced pursuant to *Brady*. (Doc. No. 181, at 203).

At their core, each of the four claims relate to Prible's purported confession and Siegler's interaction with FCI Beaumont inmates.

i. *Information about Nathan Foreman*

The State suppressed substantial evidence about Nathan Foreman, who, although he did not testify at trial, was used by the state to corroborate Beckcom's testimony. At trial, the State based its case in large part on inmate witness Beckcom, without calling any other witnesses to corroborate his testimony that Prible confessed to other

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

inmates. Even so, the State sought to implicitly bolster Beckcom's testimony by emphasizing that Prible told Foreman, and others, about the murders.

**\*28** Beckcom testified at trial that he received Siegler's name from his cellmate, Foreman, and that Foreman was present for each of his relevant conversations with Prible. Beckcom was able to create a more convincing story by adding Foreman to his narrative because it gave the impression that someone else had heard the same confession, thereby making it less likely that Beckcom fabricated the story. Foreman was, in essence, a non-testifying corroborating witness to Beckcom's story about Prible's confession—and the prosecution implied as much. For instance, when countering the defense's argument that Beckcom derived information about Prible's probable cause statement, Siegler argued in closing that other inmates "never saw Jeff Prible show it to Mike Beckcom or Nathan Foreman." 28 RR 83.

The facts developed through the federal habeas process show, however, that the jury lacked significant information about Foreman, and consequently, about Beckcom's credibility. Well before Prible was indicted, Siegler anticipated using inmate testimony. (Doc. No. 181, at 19–20). Jesse Moreno, an inmate who had acted as an informant in the past, suggested that Siegler and investigator Johnny Bonds seek out the assistance of Foreman. In a pre-trial hearing, Siegler stated that Foreman first contacted her in October of 2001 and that she did not meet with him until December of 2001. 20 RR 12. Not until this Court ordered the disclosure of Siegler's work product notes, however, was it verified that Siegler and Bonds met with Foreman at the Federal Detention Center in Houston on August 8, 2001.

After charges were filed on Prible, he was moved from FCI Beaumont Low to FCI Beaumont Medium on July 25, 2001. Around this time, Foreman was moved from FCI Beaumont Medium's SHU back into general population. (Doc. No. 181, Ex. 17, 18). Foreman and Beckcom became cellmates.

On August 8, 2001, Siegler and Bonds met with Foreman at the Federal Detention Center in Houston to find out what Foreman knew about Prible (the "August 8 Meeting"). They learned that Foreman was looking for a deal to testify against Prible. However, both Siegler and Bonds testified that they believed that Foreman not only lacked credibility, but also was fabricating evidence against Prible before he had even met him.

Board of Prisons (BOP) records indicate that Foreman continued to speak with Siegler after the August 8 Meeting. (Doc. No. 181, Ex. 21). Foreman's attorney also contacted Siegler. (Doc. No. 181, Ex. 23). Siegler's notes show that even Foreman's wife contacted her. (Doc. No. 181, Ex. 19).

Bonds' notes show that Siegler met with Foreman again on December 10, 2001, immediately before an interview she had with Beckcom, in which Beckcom drafted a ten-page document describing his alleged conversation with Prible. (Doc. No. 181, at 26). The notes memorializing that meeting were placed in the work file. (Doc. No. 181, Ex. 20). Siegler maintains that they did not find Foreman credible throughout the interaction. HT3-38–39.

Siegler did not tell the defense about her interactions with Foreman, other than to mention that he called her "around October of 2001" and that they did not "go see him until December." 20 RR 12. Respondent argues that, "[d]espite what Prible contends...the prosecutor was under no duty to disclose this information" primarily because "Forman [sic] did not testify against Prible. Th[e] nature and extent of his meetings with the State is [sic] not, therefore, likely to impact the jury's verdict on guilt-innocence." (Doc. No. 191, at 113–14).

Respondent's argument relies on a constricted view of Foreman's explicit and implicit influence in this case. Before even meeting Prible, Foreman claimed to have knowledge about him. The prosecution continued communicating with Foreman, even though Siegler professed to find him lacking credibility.

**\*29** Importantly, Foreman's credibility was not independent from Beckcom's testimony. Foreman was the only other man present when Prible allegedly confessed; he was the only person who could vouch for Beckcom's testimony. Because Beckcom's testimony turned on conversations witnessed by Foreman, information about Foreman and his credibility would be central to the jury's assessment of the only testimony describing the crime. Yet for reasons not completely apparent on federal habeas review, the prosecution found Beckcom credible while determining that Foreman was not. Evidence that Foreman had previously claimed, falsely, that Prible confessed; that Foreman was working with Beckcom and other inmates to provide evidence against Prible in exchange for a sentence reduction; that Siegler provided Foreman with information about Prible's case (namely, the existence of the DNA

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

evidence); that Siegler had written Foreman a 📄 Rule 35 letter in another case even though she determined that he was not credible; and that Foreman worked with Beckcom to orchestrate a confession, all had substantial impeachment value. The information about Foreman also casts doubt on the State's method of investigation: it demonstrated that Siegler was willing to meet with, take evidence from, and do favors for inmates she deemed not credible. Siegler kept that information from the defense. HT2-165, 186–87. Simply put, the State suppressed exculpatory and material evidence about Foreman.

### ii. *Letters from Other Inmates*

During his successive state proceedings, Prible sought *in camera* review of the State's file. The State did not oppose that motion, but still did not turn over the whole file. For the first time in February 2011, the State provided Prible with three letters that prosecutors had sealed in a letter-sized envelope designated "attorney work product." The letters to Siegler were from inmates Carl Walker, Mark Martinez, and Oscar Gonzalez. These letters all indicated that several inmates had heard Prible confess to the murders. As described in Walker's letter, "[a]s you may, or may not, know from previous conversations with Nathan Foreman, myself, Mark Martinez, Jesse Gonzalez, his father Felix Gonzalez and Beckcom were all close friends of Pribble [sic]." (Doc. No. 99-3, at 10). Each letter offered to testify against Prible in exchange for a time cut. (Doc. No. 99-3). The letters each told a similar story and provided corroboration for the others.

At a minimum, the letters reveal that a ring of informants was engaged in a collective, coordinated effort to secure sentence reductions in return for providing the State with incriminating evidence in the form of manufactured confessions. Testimony developed on federal habeas review has shown that the corroboration was likely due to Beckcom's calculated efforts. The inmates testified in the evidentiary hearing that they did not write the letters. Walker testified that although he signed a letter, he did not write it. HT1-116. Martinez denied altogether signing the letter bearing his name. (Doc. No. 181, at 121). According to Walker, the inmates' letters were designed to corroborate each other, HT1-117, and he believed that they were all written by Beckcom. Walker explained that

Beckcom was the only inmate in the conspiracy with access to a typewriter, and all of the letters were typewritten. HT1-132. Each letter misspells Prible's name as "Pribble," (Doc. No. 99-3), and Beckcom's deposition suggests that he believed that this latter spelling, "Pribble," was the correct one, HT1-233. It goes without saying that evidence showing that the State's star witness was fabricating statements by other witnesses, especially those the prosecutor apparently did not deem credible, is favorable to the defense.

Disclosure of these letters would have prompted a reasonable attorney to interview each of the inmates. Both Gaiser and Wisner testified at the evidentiary hearing that the letters would have been relevant and useful to argue that a group of men engaged in a coordinated attempt to obtain and/or manufacture incriminating evidence against Prible.

Respondent argues that "[t]he State had no duty to produce these letters to the defense because they are not 'favorable' as contemplated under *Brady*." (Doc. No. 191, at 45). Respondent, however, bases this argument on a confined view of the benefit the documents would have had to the defense. Respondent argues:

> Each of the letters contain the assertion that Prible confessed to the murders. Nor are they impeachment evidence. They do not, as Prible claims, prove his ring-of-informants claim or undermine the credibility of Beckcom's testimony. The fact that multiple federal inmates wrote to the prosecutor regarding another fellow inmate seeking to trade incriminating information for a reduction in their sentence does not prove the State solicited their help, or that Beckcom's testimony is false. Nor does the fact that Beckcom was not the only inmate looking to inform on Prible prove a state-run conspiracy. And, as acknowledged by the state court in the habeas hearing "everyone knows" that it is not uncommon for federal inmates to come forward to testify against other inmates in order

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

to reduce their sentences.

**\*30** (*Id.*). True, the letters themselves do not establish that Siegler guided a ring of informants that would fabricate testimony against Prible. As shown in the evidentiary hearing, however, and as discussed *supra*, the letters could certainly have been the first steps toward showing a conspiracy formed by the inmates themselves.

Had the letters not been hidden away in the work product file, the defense could have pointed out similarities in the letters, both in form and in content. Testimony from the evidentiary hearing suggested that only Beckcom would have had the opportunity to type the letters for other inmates. And disclosing the letters would have allowed the defense to develop testimony, such as that from Walker in the evidentiary hearing: that Prible never confessed but was in fact set up by other inmates and that someone, likely the State's star witness Beckcom, wrote letters for the other inmates saying that Prible had in fact confessed.

The evidentiary hearing testimony uncovered that the letters were likely fabricated. From that information, as evinced by the federal evidentiary hearing, the defense could have developed rich, credible evidence that would have challenged the content and reliability of testimony from the State's star witness. On federal review, disclosure of the false letters, along with suppressed information about the State's dealings with Foreman, shows that Beckcom was committed to creating a false narrative about Prible's confession. Indeed, the State did not believe Foreman, who was said to corroborate Beckcom's testimony against Prible. Armed with full knowledge of Beckcom's efforts, a reasonable jury may well have reached a different outcome. The Court thus concludes that this evidence would have been favorable to the defense.

### iii. *Other Information from the Work Product File*

Prible has identified significant amounts of information that was not previously available to the defense. Such information consists of, among others, BOP records and records from other trials. Most problematic, however, is the information contained in the prosecutor's work product file. In October 2015, the State also provided for the first

time other documents from the work product file. As described by Prible, these documents included:

> • The November 12, 2001, letter from Nathan Foreman's attorney, Alan Percely, to Siegler, in which Percely conveys Foreman's desire to provide evidence against Prible in exchange for Siegler's assistance in getting Foreman's sentence reduced.
>
> • Texas Crime Information Center (TCIC)/National Crime Information Center (NCIC) criminal background reports for Foreman and Rafael Dominguez, dated December 6, 2001. These reports were produced from a folder of privileged material containing TCIC/NCIC reports for potential witnesses and testifying witnesses at Prible's trial.
>
> • A sticky note attached to would-be informant Mark Martinez's April 30, 2002, letter to Siegler, which appears to memorialize a March 7th voicemail from Martinez regarding the Prible case. It directs Siegler to call Martinez's counselor at FCI Beaumont.
>
> • An undated letter from Beckcom to Siegler referencing his upcoming testimony in Prible's trial and expressing concern that he could not count on his California AUSA to assist him, and proposing that Siegler help him secure a 📄 Rule 35 sentence reduction by arranging for him and another FCI Beaumont inmate named Anton Davi to inform on even more FCI Beaumont inmates.
>
> **\*31** • A letter from the HCDA to Lt. Robert Clark at FCI Beaumont, asking for permission for Siegler and Bonds to interview Beckcom and Anton Davi, as Beckcom requested, in May 2002, five months before Prible's trial.
>
> • Documents showing that, after Prible's trial, Siegler strenuously lobbied Beckcom's AUSA for a time cut and evidently even recruited an AUSA working out of the Houston office to weigh in on Beckcom's behalf.

(Doc. No. 181, at 73–74). These suppressed documents reveal the extent of Siegler's involvement with the ring of informants and, in particular, Beckcom. Indeed, the documents indicate that, in exchange for information on Prible and other inmates, Siegler lobbied to reduce the informants' sentences. They also reveal that Beckcom in fact proposed to Siegler that he inform on other FCI Beaumont inmates in exchange for a 📄 Rule 35 sentence

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

reduction. This information tends to impeach Beckcom's credibility and the manner in which the State assembled its case against Prible. The withholding of these documents further solidifies the Court's finding that the State in this case withheld important, favorable information from the defense.

Prible has accordingly demonstrated that the suppressed evidence would have been favorable to his defense for the purposes of his third, fourth, and fifth *Brady* claims.

b. Prible's DNA Evidence *Brady* Claim (Claim 10)

Long before Prible was charged with capital murder, the prosecution knew that Prible's semen had been found in Tirado's mouth. That fact alone was not necessarily inculpatory. The evidence did not suggest that Tirado had been sexually assaulted, and while Prible admitted that he had sexual relations with Tirado, he claimed that it was consensual and had occurred long before the murders. The prosecution thus needed to prove that "[t]here is no way in the world that that semen wasn't deposited either moments before or seconds after [Tirado] died." 28 RR 11. Accordingly, at trial the prosecution's case in chief relied heavily on evidence about the longevity of semen to prove that Prible had been in the house around the time of the killings. Indeed, Prible's DNA evidence was one of two pillars upon which the prosecution's case relied almost exclusively, the other being Beckcom's testimony.

At trial, the State called two expert witnesses to testify as to the DINA evidence. Testimony from the first witness, Chief Harris County Medical Examiner Dr. Joye Carter, did not help the State's theory that Prible's sexual contact with Tirado had to have occurred seconds before she was killed. Dr. Carter testified that sperm cells can be found in a person's mouth for hours after ejaculation, possibly because "it could actually adhere or stick to like plaque that's on the teeth or in the recesses of the mouth." 23 RR 68. The State instead bolstered its theory with testimony from William Watson, an expert in molecular biology. Watson did not try to estimate an exact perimortem interval (PMI) between oral sex and death, but still testified that the quantity of the DNA sample was inconsistent with the semen being deposited into Tirado's mouth as long as an hour before she was killed. He also said that the fact that

he was able to obtain the male profile "certainly would be consistent with" Prible depositing the semen in Tirado's mouth "moments, if not seconds, before she was killed." 24 RR 101–03.

**\*32** The defense responded with testimony from a molecular biologist, Dr. Robert Benjamin, who disagreed with Watson's testimony because there were too many variables and Watson made too many assumptions. Dr. Benjamin testified that using quantities of DNA to estimate time since ejaculation is "just not scientifically valid" and "no controlled scientific studies" supported Watson's conclusions. 27 RR 123–24, 136. The prosecution, nonetheless, heavily emphasized Watson's testimony in its closing argument.

In Claim 10, Prible argues that the State suppressed *Brady* evidence relating to Watson's testimony. Factual development on federal habeas review has added important new dimensions to the DNA evidence at trial. Recent evidence refutes Watson's methodology and conclusions.[23]Even more importantly, however, factual development has revealed that the State suppressed evidence that the prosecution had information that contradicted Watson's testimony, but did not turn it over to the defense.

This Court performed an *in camera* review of the State's work product file. Siegler's notes revealed that she had investigated the survival period for semen to determine a PMI. Siegler's notes revealed that she had contacted Pam McInnis, the head of the Harris County Crime Lab. McInnis told Siegler that semen can survive in the mouth for up to seventy-two hours. Siegler made a note about this but buried it in her work product file rather than reveal it to the defense. (Doc. No. 181, Ex. 20).

Prible contends that the State violated *Brady* by hiding the State's knowledge about the PMI in the work product folder. There is no question that the prosecution kept that information from the defense. This evidence is favorable to Prible because it supports his assertion that the oral sex was consensual and took place many hours before the murder. It also impeaches Watson's testimony that semen survives for only minutes, if not seconds, which the State relied heavily on at trial.

**\*33** Respondent advances two arguments, however, as to why the suppression of this evidence did not amount to a *Brady* violation that warrants habeas relief. First, Respondent argues that "[a]lthough the evidence appears

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

to be impeachment evidence, it lacks foundational
support." (Doc. No. 191, at 152). True, neither party has
produced any evidence that would support the position that
the semen may exist inside the victim's mouth for seventy-
two hours. However, the veracity of McInnis's opinion is
not the issue. The value in divulging that material to the
defense would be proving that the prosecution knew that
DNA samples could last longer, possibly much longer, than
the seconds or minutes testified to by Watson. Also,
disclosure would allow Prible to argue that the State had
information that would support his defense, but hid it and
instead, shopped for an expert who would support its
theory.

Second, Respondent contends that the suppressed evidence
is "immaterial." (*Id.* at 153). Respondent argues that,
because Dr. Carter testified that semen could exist in the
victim's mouth for some time and Dr. Benjamin testified
that scientific research did not support Watson's testimony,
"the testimony offered at trial was sufficient to refute
[Watson's] testimony for Prible's purposes." (*Id.*). The
Court disagrees. Further evidence undercutting one of the
State's principal arguments, especially when that evidence
is from the head of the Harris County Crime Lab, could
have been of paramount importance to the defense.

The DNA testimony was critical to the State's case, as the
State was able to argue that Prible killed Tirado
immediately after ejaculating in her mouth. Evidence that
Siegler received McInnis's contradicting opinion
undercuts both the veracity of the State's DNA theory and
Siegler's method of investigation. The defense could have
used the suppressed note about McInnis's opinion to show
that Siegler shopped around for someone willing to say that
Prible was lying about the timing of the oral sex, even
though she knew that Prible's version was scientifically
plausible. Accordingly, this evidence is favorable under
*Brady* because it both refutes the validity of Watson's
testimony and undermines the integrity of the State's
investigation of Prible's case.

### 3. Prejudice

To establish prejudice, Prible must show that the
nondisclosed information was material. The test for
materiality is whether "there is a reasonable probability

that, had the evidence been disclosed to the defense, the
result of the proceeding would have been different."
*Strickler*, 527 U.S. at 280; *see Banks*, 540 U.S. at 698.
"[T]he materiality standard for *Brady* claims is met when
'the favorable evidence could reasonably be taken to put
the whole case in such a different light as to undermine
confidence in the verdict.' " *Banks*, 540 U.S. at 698
(quoting *Kyles*, 514 U.S. at 435). "[M]ateriality must be
assessed collectively, not point by point." *Banks v. Thaler*,
583 F.3d 295, 328 (5th Cir. 2009) (citing *Kyle*, 514 U.S.
at 436).

The cumulative effect of the suppressed evidence in this
case is such that it can "reasonably be taken to put the
whole case in such a different light as to undermine
confidence in the verdict." *Id.* Had this evidence been
disclosed to the defense, it would reasonably have undercut
the two pillars upon which the prosecution's case against
Prible solely rested: Beckcom's testimony and Prible's
DNA evidence.

The Court turns first to the suppressed evidence relating to
Beckcom's testimony. As discussed *supra*, the prosecution
at trial relied heavily on Beckcom's testimony that Prible
had confessed to him and Foreman about the murders.
Beckcom's testimony was bolstered by his claim that
Foreman was present at each interaction with Beckcom.
Yet, as the Court has discussed at length *supra*, the
suppressed evidence—the letters to Siegler, the new
information about Foreman, and the numerous other
documents uncovered in Siegler's work product folder—
reveals an orchestrated effort by a ring of informants to
fabricate a confession from Prible in return for sentence
reductions. Had this evidence been disclosed, the defense
could have argued not only that Beckcom was part of a ring
of informants that sought to obtain incriminating evidence
against Prible for their own gain, but also that Beckcom,
the State's star witness, had in fact fabricated and falsified
evidence against Prible.

**\*34** Indeed, the suppressed evidence could have been used
to impeach Beckcom's credibility. Armed with the letters
to Siegler from several would-be informants that echoed
Beckcom's testimony regarding Prible's confession, the
defense could have emphasized Siegler's curious decision
to present only Beckcom at trial. Such evidence, as Gaiser
testified at the hearing, would have raised questions as to
what made Beckcom unique amongst the corroborating
informants and, accordingly, cast doubt on his motivations

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

and credibility. HT2-180–81. Moreover, as Gaiser testified, the defense could have used documents showing that Beckcom proposed informing on even more FCI Beaumont inmates in exchange for Siegler's help securing a ⚑ Rule 35 sentence reduction, to highlight the extent to which Beckcom was willing to go to receive personal benefit. HT2-194–95; *supra* at 61–62. This evidence would have certainly impugned Beckcom's motivations and credibility.

Not only could the defense have used this evidence to impeach the State's star witness individually, but indeed, it could have been used to uncover a broad, orchestrated effort to manufacture confessions against Prible and others, like Herrera. For instance, the defense could have invoked the curious similarity in the form and content of the letters—including consistently misspelling Prible's name as "Pribble," (Doc. No. 99, Ex. 3)—to show that the letters were written by the same person or, at a minimum, in a deliberately coordinated effort. Indeed, as Gaiser testified, the letters could have been used to demonstrate just how many inmates were willing to act for personal benefit. HT2-179. To bolster this presentation of a ring of informants, the defense could have pointed to the suppressed evidence that Siegler wrote and lobbied for ⚑ Rule 35 sentence reductions for Beckcom, Foreman, and numerous other informants. Moreover, the defense could have used suppressed evidence that Foreman was apparently present during all critical interactions between Prible and Beckcom to cast doubt on the veracity of Beckcom's testimony and the trustworthiness of the State's assembly of its case against Prible, especially in light of Siegler's professed distrust of Foreman. Using this evidence, in conjunction with the other documents suppressed in Siegler's work product file, the defense could have developed a compelling argument around the ring of informants and cast doubt both on Beckcom's testimony and the manner in which the State investigated and constructed its case against Prible. Without the suppressed evidence, the defense at trial was left to attempt to impeach Beckcom with only his past conduct.

Taken as a whole, these efforts would have, at the very least, cast serious doubt on the veracity of the State's star witness and, in turn, one of the State's two pillars against Prible. The materiality standard for *Brady* prejudice requires that there be a reasonable probability that the outcome would have been different. ⚑ *Banks*, 540 U.S. at 699. That standard is certainly met here. This is especially true when considering the additional impact of the

suppressed evidence related to the State's second pillar—DNA evidence—to which the Court turns next.

At trial, the prosecution's case in chief relied heavily on using Prible's semen to prove that he had been in the house at the time of the killings. Critical to the State's theory of the case was Watson's testimony that Prible likely deposited the semen in Tirado's mouth "moments, if not seconds, before she was killed." 24 RR 101–03. Suppressed evidence from Siegler's work product file, however, revealed a contradicting opinion from McInnis, the head of the Harris County Crime Lab, that semen can survive in the mouth for up to seventy-two hours. (Doc. No. 181, Ex. 20). Had this evidence been disclosed to the defense, it would have bolstered the defense's theory that Prible's sexual encounter with Tirado occurred hours, not seconds, before she was killed, and that Prible had returned home by the time of the killing. Indeed, that this evidence came from the head of the Harris County Crime Lab, which is connected with law enforcement, may have lent more credibility to McInnis and accordingly may well have held more sway in the eyes of a reasonable jury.

**\*35** Where, as here, the suppressed evidence taken as a whole would have allowed the defense to seriously undercut the two main arguments the prosecution relied upon, the Court has no trouble finding that a reasonable jury may well have reached a different outcome. The Court thus concludes that the suppressed evidence is material and, accordingly, that Prible has shown prejudice to overcome any procedural default and to satisfy the third prong of his *Brady* claims.

### 4. Conclusion of *Brady* Claims

Unlike a civil attorney representing a client, there is a "special role played by the American prosecutor in the search for truth in criminal trials." ⚑ *Strickler*, 527 U.S. at 281. A prosecutor may litigate with zeal, but the Constitution ensures that, "though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that justice shall be done. He is the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." ⚑ *United States v. Agurs*, 427 U.S. 97, 110–11 (1976) (quotation omitted).

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

"Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction]...plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.' " *Banks*, 540 U.S. at 696 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Here, it plainly was not. Without question, the prosecution in this case engaged in a pattern of deceptive behavior and active concealment. And the evidence suppressed sufficiently serves to controvert the primary basis for Prible's conviction. Simply put, the prosecution withheld material evidence. The Constitution requires far more, especially in the case of a man sentenced to death. The Court will grant habeas relief on Claims 2, 3, 4, 5, and 10.

### B. *Giglio* Claims (Claims 1 and 11)

Prible also contends that the State sponsored false and misleading testimony through Beccom and Watson in violation of *Giglio v. United States*, 405 U.S. 150 (1972). In Claim 1, Prible focuses on Beccom's testimony that Beccom and Foreman had learned of the crime only from Prible himself. Prible relies on an array of sources—testimony from the other inmates, records showing extensive contacts between the inmates and Siegler, and documents from other cases—to demonstrate that Siegler gave Beccom the information that served as the basis of his trial testimony. In Claim 11, Prible argues that the prosecution adduced false and misleading testimony because Watson's DNA testimony was scientifically baseless and likely wrong.

In *Giglio*, the Supreme Court held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Id.* at 153 (quotation omitted). "To establish a due process violation based on the State's knowing use of false or misleading evidence, [petitioner] must show (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false." *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (citing *Giglio*, 405 U.S. at 153–54). The Court "will not tolerate prosecutorial participation in technically correct, yet seriously misleading, testimony which serves to conceal the existence of a deal with

material witnesses." *Blankenship v. Estelle*, 545 F.2d 510, 513 (5th Cir. 1977).

Prible has made a strong showing that he can meet the first two prongs of the *Giglio* test with regards to Beccom's testimony. As discussed *supra*, testimony and evidence developed after trial have shown that the defense could have developed a strong and possibly successful argument that Beccom testified falsely. Additionally, Beccom's testimony, as one of two main pieces of evidence that the prosecution relied on, was certainly material.

**\*36** However, the Court finds that Prible has not satisfied the third *Giglio* criterion. Prible has presented evidence supporting the assertion that Siegler knew that she was presenting false evidence. The record undeniably shows that Siegler contacted Beccom's prosecutor several times in an effort to secure him a sentence reduction. Siegler minimized and hid the extent and content of those contacts. Siegler and Beccom even disclosed to the jury that Beccom's goal in testifying was to obtain a sentence reduction. As already discussed, Siegler certainly suppressed material that would have significantly undercut Beccom's story. Beccom acted as her agent in securing information from Prible. However, while this evidence may not reflect well on Siegler, the Court finds that, taken as a whole, the evidence is not conclusive as to whether Siegler knew she was presenting false or seriously misleading testimony.

Likewise, Prible has not shown that Siegler knew that Watson's DNA testimony was false or seriously misleading. Siegler was aware that experts had different views on the amount of time that semen could survive in the oral cavity. As discussed *supra*, she was obligated under *Brady* to disclose to Prible the information that she found. However, Siegler's failure to disclose does not necessarily mean that she knew Watson's testimony was false or seriously misleading.

This Court does not endorse the cavalier attitude Siegler has displayed regarding her constitutional duty to preserve the fundamental fairness of the trial proceedings. Siegler intentionally and knowingly withheld information with the defense, was deceptive about her efforts to do so, and was far from credible in her federal court testimony. But the evidence has not shown that she knew that Beccom was lying or that the scientific evidence was indisputably false. Although the issue is not free from doubt, the Court must deny Prible's *Giglio* claims.

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

**C. *Massiah* Claims (Claims 6, 7, and 8)**

Prible raises three claims relating to the State's influence over inmates as they sought information from Prible. In Claims 6 and 8, Prible argues that Beckcom and Foreman unconstitutionally acted as agents of the State in securing information against him. In Claim 7, Prible argues that he was denied his Sixth Amendment right to effective assistance of counsel at trial and on state habeas because his trial counsel failed to object to Beckcom's testimony under *Massiah* and his state habeas counsel failed to make an ineffective-assistance claim on that basis. (Doc. No. 181, at 215–19).

As previously discussed, the prosecution's ability to convict Prible hinged on the testimony of a single informant. The use of informant testimony is constitutionally permissible. The Constitution, however, requires that the informant acquire information independently, not as an agent for the State. Under *Massiah v. United States*, 377 U.S. 201 (1964), a government agent may not seek information from a criminal defendant outside the presence of the defendant's counsel once the Sixth Amendment's right to counsel has attached. *See Thompson v. Davis*, 916 F.3d 444, 454 (5th Cir. 2019).

"A *Massiah* violation has three elements: (1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel's being present; and (3) that agent 'deliberately elicit[s]' incriminating statements from the defendant." *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006) (quoting *Massiah*, 377 U.S. at 206). "Under the Fifth Circuit's two-prong test for determining whether an agency relationship exists between the government and a jailhouse informant, the defendant bears the burden of showing that 'the informant: (1) was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant; and (2) acted pursuant to instructions from the State, or otherwise submitted to the State's control.'" *United States v. Bates*, 850 F.3d 807, 810 (5th Cir. 2017) (quoting *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998)).

**\*37** When Prible first filed his federal habeas petition, he alleged that Siegler had recruited inmate informers who, at her direction, set into motion circumstances in which they could extract a confession from Prible. Although extensive factual development in the years since has lent support to this ring-of-informants theory, not all of Prible's allegations have been completely verified. Yet, even on Beckcom's and Siegler's accountings of the facts, Beckcom still acted as an agent of the State by taking Prible's uncounseled statements with the promise of a reward from Siegler. Before turning to the merits of Prible's *Massiah* claims, however, the Court will discuss procedural concerns raised by Respondent.

**1. Procedural Bar**

Respondent argues that Prible defaulted his *Massiah* claims by litigating them in a manner that did not comply with state law. Prible first raised a *Massiah* claim in his *pro se* application that the Court of Criminal Appeals found to be an abuse of the writ. Prible raised the *Massiah* issue again in his federal petition in 2009. By that point, Prible had developed additional evidence supporting his allegation that Siegler had used inmates as agents to gather information against him. As discussed above, this Court stayed proceedings in 2010 to allow Prible to exhaust state court review of several claims, including his *Massiah* claim, by filing a successive state habeas application. The subsequent actions of the state habeas court in reviewing Prible's *Massiah* claim mirror those already discussed above in relation to Prible's *Brady* claims: the state court allowed some factual development of the *Massiah* claim, but ultimately did not reach the claim's merits after finding the claim procedurally barred by Texas's abuse-of-the-writ doctrine. Respondent argues that this state-imposed procedural bar renders Prible's *Massiah* claim procedurally defaulted. The Court agrees. Prible has shown, however, that he can establish cause and prejudice to overcome the procedural default.

As discussed *supra* in connection with Prible's *Brady* claims, an inmate can meet the cause requirement by showing that "some objective factor external to the defense impeded [the defense's] efforts to comply with the State's procedural rule," *Murray v. Carrier*, 477 U.S. 478, 488 (1986), or that "the factual or legal basis for a claim was

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

not reasonably available to counsel," 📄 *Coleman v. Thompson,* 501 U.S. 722, 753 (1991). As with his *Brady* claims, Prible's ability to develop his *Massiah* claims in state court proceedings was hobbled by Siegler's suppression of information regarding the extent of her relationship with Beckcom and other inmates, and the nature of the arrangement between her and Beckcom. During trial, direct appeal, and state habeas proceedings, Prible and his attorneys had no reason to know that Siegler was suppressing evidence of her relationship with informers. As with Prible's *Brady* claim, it was only after federal habeas counsel was finally able to conduct interviews with Walker and other inmates that Prible's *Massiah* claim became anything more than speculative. Indeed, the full nature of Beckcom's interaction with the prosecution only came into focus with Beckcom's interview, clarified and contextualized by later testimony from other inmates. Only in his deposition did Beckcom finally acknowledge that the only reason he acted was to get himself a sentence reduction. In sum, only once federal review began was Prible able to remove the obstacle that Siegler's suppression of evidence had created for the development of his *Massiah* claims. Because Siegler's suppression of evidence was an "objective factor" that impeded the development of Prible's *Massiah* claims, Prible has shown cause to overcome the default of those claims. Moreover, as discussed further below, prejudice is clear given the critical import of Beckcom's testimony at trial. The Court finds cause and prejudice to allow federal review of Prible's *Massiah* claims. Because the state courts never adjudicated the merits of his claims, federal review of those issues is *de novo*.

### 2. Prible's *Massiah* Claim: Beckcom (Claim 6)

**\*38** In Claim 6, Prible argues that the State violated *Massiah* because:

> Beckcom's testimony leaves little doubt that (1) his initial phone call to Siegler in early October 2001 was for the purpose of reaching an agreement for him to serve as an agent to investigate Prible, and (2)

Beckcom had learned very little about the case from Prible until after he and Siegler had worked out a deal that would reward him for informing on Prible.

(Doc. No. 181, at 213). From this, Prible concludes that "[t]he State and Beckcom thereafter conspired to violate Prible's constitutional rights by eliciting statements about the crime in the absence of defense counsel." (*Id.* at 214). The issue before the Court is thus whether Beckcom acted as an agent of the state in deliberately eliciting incriminating evidence from Prible after his right to counsel had attached. For the purposes of analyzing this issue, the Court assumes that Beckcom testified credibly at trial and that Prible did indeed confess to the murder, because even under these assumptions, the Court finds that Beckcom was in an agency relationship with Siegler in violation of Prible's constitutional rights.

Prible's Sixth Amendment right to counsel had attached by the time Prible's trial counsel was appointed on September 28, 2001. *See* 📄 *United States v. Gouveia,* 467 U.S. 180, 189 (1984) ("[T]he right to counsel attaches at the initiation of adversary judicial criminal proceedings."). Beckcom acknowledged that he first contacted Siegler in October 2001 to discuss the possibility of receiving a sentencing reduction in exchange for information. HT1-238.

The second question under *Massiah* is whether Beckcom sought out information from Prible as an agent of the State. Under Fifth Circuit law, Beckcom must have solicited information because he was "promised, reasonably led to believe, or actually received a benefit," and "acted pursuant to instructions from the State, or otherwise submitted to the State's control." *United States v. Bates,* 850 F.3d 807, 810 (5th Cir. 2017) (quotation omitted); *see Thompson v. Davis,* 941 F.3d 813, 816 (5th Cir. 2019).

As Beckcom's testimony shows, he entered into an agency relationship with the State during that first conversation with Siegler. At the time of the initial meeting, Beckcom did not have any real information about Prible. HT1-236. Beckcom said that the purpose of his initial call with Siegler was to see whether he could arrange for a reduction in his sentence *even though he did not have any evidence at that time*.[34] At trial, Beckcom testified that Siegler told him that she would be interested only if he knew "[s]pecifics about the case." 26 RR 37; HT1-238. Beckcom

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

left that meeting on a mission to secure information from Prible, knowing that he would receive a benefit if he obtained a confession and testified against Prible. Thus, at a minimum, Beckcom was "reasonably led to believe" that he would receive a 🔖 Rule 35 letter in exchange for getting information from Prible, and then acted pursuant to instructions from Siegler to get details about the crime from Prible.

**\*39** Beckcom's conversations and meetings with Siegler after the first phone call in October 2001 provide further evidence that Beckcom was acting based on promises of relief from Siegler. As described above, in her deposition, Siegler testified that she reached out to the Assistant U.S. Attorney working on Beckcom's federal criminal case to talk about a 🔖 Rule 35 reduction before Beckcom even testified. Beckcom testified that he asked for assurances and wanted to make sure that Siegler was in contact with the AUSA. Beckcom said Siegler told him he would probably get out. And indeed, although Beckcom wanted a greater reduction, he did eventually receive a year off his sentence as a result of his testimony. All this evidence indicates that Beckcom was in an agency relationship with Siegler, which predated Beckcom's substantive conversations with Prible.

Finally, Prible has shown that Beckcom "deliberately elicited" incriminating statements while acting as the State's agent. Beckcom acknowledged that he talked about trying to get a confession from Prible with Foreman; accordingly, he was not merely a passive recipient of information. Even in his testimony at trial, he admitted to asking questions about the evidence in the case to gather the "specifics" Siegler requested. Beckcom acted deliberately in seeking out a confession from Prible, in hopes of obtaining a reduction to his own sentence. Thus, Prible has shown that the State violated *Massiah* when it used Beckcom to elicit incriminating statements from Prible.

Prejudice is not a close question. Beckcom's testimony was plainly the most compelling evidence that the jury heard at trial. Although the defense could and did impeach Beckcom's credibility as a jailhouse snitch, they did not have strong impeachment evidence about the actual substance of what he relayed to the jury about Prible's confession. Prible has made a strong case that there is more than a "reasonable probability" that exclusion of Beckcom's testimony would have altered the outcome of the trial.

### 3. Prible's *Massiah* Claim: Foreman (Claim 8)

Prible has also raised a *Massiah* claim based on Foreman's alleged work as a state agent. Prible argues that the State suppressed evidence that Foreman was a state agent before and during the time that he and Beckcom were trying to obtain a confession from Prible. Prible primarily bases this claim on the meeting that Foreman had with Siegler and Bonds at FDC in August 2001. Although it is undisputed that the State did not disclose this meeting and that Foreman tried to inform on Prible, Foreman did not testify that Siegler gave him any instructions at that meeting or made any promises to him. Prible has not shown that there was any agency relationship or *quid pro quo* between Foreman and the State. Accordingly, Prible has not shown that the State violated *Massiah* in Siegler's dealings with Foreman.

### 4. Prible's *Massiah* Claim: Ineffective Assistance of Trial Counsel (Claim 7)

Prible also argues that trial counsel provided ineffective assistance for not raising a *Massiah* claim at trial. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." 🔖 *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "To establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness." *Id.* (quotation omitted). The Court must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 🔖 *Strickland v. Washington*, 466 U.S. 668, 689 (1984). To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

proceeding would have been different." *Id.* at 694. *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), provide a limited exception to the procedural default rules when state habeas counsel was ineffective for failing to assert a substantial ineffective assistance of trial counsel claim in the petitioner's first state habeas petition. In order to successfully assert a *Strickland* claim for appellate counsel, Prible must also have a reasonable probability that he would have prevailed on appeal but for his counsel's deficient performance. *See Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

**\*40** The root of this claim is that trial counsel knew that Beccom tried to obtain a confession and information from Prible while both were in detention, starting in late October or early November 2001.[25] At this time, Prible's Sixth Amendment right to an attorney had already attached, and Beccom had already spoken with the lead prosecutor. Despite having information about this timeline, Prible's trial counsel failed to object to Beccom's testimony or to request a *Massiah* hearing. Prible argues that, had his counsel objected, the trial court would have excluded Beccom's testimony. Since Beccom's testimony was critical to the prosecution's case, Prible argues that it is "reasonably probable" that the outcome of the trial would have been different if Beccom's testimony had been excluded." *Strickland*, 466 U.S. at 693–94. Similarly, state habeas counsel had the same information but failed to make an ineffective-assistance claim in the first state habeas application based on trial counsel's failure to make a *Massiah* objection. Respondent argues that Prible's trial counsel was not ineffective for failing to object to Beccom's testimony at trial because there was no evidence that Beccom was an agent of the state: "Counsel is not deficient for, nor can prejudice result from, the failure to raise a baseless objection." (Doc. No. 191, at 98).

While the record developed through Prible's state and federal habeas proceedings has enabled Prible to show successfully that Beccom was an agent of the State, the information at trial was not so clear. At trial, Beccom seemed to suggest that Prible confessed to him before he contacted Siegler. 26 RR 23–24; 36–37, 47. According to Beccom, after Prible had made inculpatory statements, Beccom then found out that Siegler would need specifics. *Id.* at 37. Beccom testified about the November 24, 2001, conversation in which Prible allegedly confessed as if Prible had voluntarily and without solicitation told Beccom about the crime. *Id.* at 53–54. In fact, Beccom

also testified that he counseled Prible not to talk about his case. *Id.* at 70–71.

Much more information about the agency relationship emerged only during habeas proceedings. While trial counsel knew that Beccom reached out to Siegler well before he had any substantive conversations with Prible, the full extent of Beccom's efforts to secure a confession was not apparent to them at that time. While an attorney could have raised a *Massiah* objection, it does not appear that Beccom would have been so forthcoming at trial to describe his efforts to communicate with Siegler and secure information from Prible. Further, even if Prible's state habeas counsel should have been aware of the potential *Massiah* issues, Prible has not shown that the state habeas court would have granted relief absent the full record developed in federal habeas proceedings. The Court finds that Prible is not entitled to relief on his ineffective assistance of counsel claim.

### 5. Conclusion of *Massiah* Claims

"[T]he prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine v. Moulton*, 474 U.S. 159, 171 (1985). Prible's initial complaint was that Siegler orchestrated a trap wherein Prible would become entangled in a web of informers who, having gained his confidence, would extract from him a confession. Prible alleged that Siegler not only seeded this conspiracy with facts about the murder, but somehow caused the federal prison to place within his orbit the men who would take advantage of him. Prible argued that Siegler then maintained regular contact with, and control of, the informers.

The evidence has not completely verified all of Prible's allegations. Still, the evidence sufficiently proves a *Massiah* claim in relation to Beccom. Siegler promised Beccom time off his sentence if he got information from Prible. Nothing suggests that Siegler instructed Beccom to be a passive listener. *Cf. Kuhlmann v. Wilson*, 477 U.S. 436, 460 (1986) (finding no *Massiah* violation when the police instructed the inmate informant "only to listen to" the defendant). Siegler must have known that, by telling Beccom she needed specifics, Beccom "would take

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

affirmative steps to secure incriminating information" and that "such propinquity [between the inmates] likely would lead to that result." *United States v. Henry*, 447 U.S. 264, 271 (1980). Siegler regularly communicated with Beckcom after their initial meeting and, when he claimed to have created a situation in which Prible confessed, again made promises to him. Beckcom acted as an agent of the State in taking Prible's uncounseled statements. The Court therefore grants relief on Claim 6.

**D. Due Process (Claim 9)**

**\*41** In Claim 9, Prible argues that the trial court improperly admitted evidence at trial. The State only charged Prible with killing Herrera and Tirado. The trial court, however, allowed the State to introduce guilt/innocence phase evidence that their three children also died in the fire. On direct appeal, Prible argued that the evidence of the children's deaths was inadmissible under Texas Evidence Code § 404(b) and the due process clause. Under Texas law, evidence of other crimes is generally inadmissible, but exceptions exist to prove motive, provide context, or corroborate statements. The Court of Criminal Appeals provided two justifications for the admission of those deaths: (1) "the State used the evidence of the children's deaths to support the testimony of a jailhouse informant, Michael Beckcom...detailing the manner in which the crimes were committed with information that Beckham [sic] could not have obtained except from [Prible] himself" and (2) "the evidence was admissible as same-transaction contextual evidence...[which was] so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand." *Prible*, 175 S.W.3d at 731, 732.

Federal habeas courts do not "sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998); *see also Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) ("[E]rrors of state law, including evidentiary errors, are not cognizable in habeas corpus...."). The Court of Criminal Appeals found on direct appeal that evidence of the children's deaths was admissible under state law. The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal

court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). The Court's sole inquiry, then, is whether the admission of this evidence violated the Constitution, *see Estelle v. McGuire*, 502 U.S. 62, 68 (1991), which only provides relief from an evidentiary ruling that is "so unduly prejudicial that it render[ed] the trial fundamentally unfair," *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *see also Hafdahl v. Johnson*, 251 F.3d 528, 536 (5th Cir. 2001) ("If evidence of an extraneous offense is wrongly admitted, however, habeas corpus relief is proper only if the error is of such magnitude that it resulted in 'fundamental unfairness.' ").

Here, Texas law allowed the prosecution to introduce the extraneous evidence as an exception to general evidentiary principles. Evidence of the deaths filled in gaps that would otherwise exist in the evidentiary picture for jurors:

> First, evidence of the children's deaths was part of the crime scene. That evidence was necessary to fully understand the situation as neighbors and firefighters found it....Second, the children's deaths were a direct consequence of [Prible's] conduct of setting fire to Nilda. Thus, Steve and Nilda's murders are so intertwined with the deaths of their children that the State's case might well be incomplete without some mention of the children's presence in the home. Under these circumstances, testimony about the children's deaths fills in gaps of the interwoven events and consequences of a defendant's criminal conduct and thus helps the jury to understand the case in context.

*Prible*, 175 S.W.3d at 732. The state court reasonably found that any error was not a denial of "fundamental fairness" under the Due Process Clause. Prible has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

### E. Ineffective Assistance of Counsel: DNA Claim (Claim 12)

In addition to his claims that the State violated *Brady* by suppressing DNA evidence regarding how long semen could remain in the victim's mouth and sponsoring false and misleading testimony about the DNA evidence, Prible contends that trial counsel provided ineffective representation by not effectively rebutting the testimony of the State's expert. Trial counsel secured expert assistance to refute Watson's testimony and strongly disputed Watson's conclusions in closing argument. It is true that counsel could have crafted Siegler's withheld note into a theory that the State had shopped experts until finding one who would agree with their timeline of the evidence. However, such information was not available to Prible's trial counsel at the time of trial. Prible has not shown that, given the information available to them, trial counsel was unreasonable in how they approached the evidence or deficient in their efforts.

### F. Fair Cross-Section (Claim 13)

**\*42** Prible claims that he was denied his right to a jury drawn from a fair cross-section of the community because Harris County systematically excludes Hispanics from jury service. In order to demonstrate a prima facie violation of the fair cross-section requirement for juries, a petitioner must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Prible argues that Harris County's process of selecting jurors underrepresents Hispanics for various reasons, such as low jury pay and the use of stale address lists.

Prible raised this claim on state habeas review. The state habeas court found that Prible defaulted judicial consideration of this claim by failing to lodge a trial objection to the jury panel. Successive State Habeas

Record at 465. The state habeas court relied on Texas's contemporaneous rule which requires "a party to preserve an issue for appellate review" by making "a timely objection with specific grounds for the desired ruling." *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997). Texas's contemporaneous objection rule is an adequate and independent state law bar to federal review. *See Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999) (citing *Amos v. Scott*, 61 F.3d 333, 345 (5th Cir. 1995)). Because Prible has not shown cause or prejudice for the default of this claim, federal review is barred. *See Roberts v. Thaler*, 681 F.3d 597, 604–05 (5th Cir. 2012).

### G. Actual Innocence (Claim 14)

Prible raises a stand-alone claim of actual innocence. "Actual innocence" is not an independent ground for habeas corpus relief. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993); *In re Raby*, 925 F.3d 749, 755 (5th Cir. 2019); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006). Insofar as Prible argues that his actual innocence entitles him to relief separate from any other constitutional issue, he does not raise a cognizable habeas claim.

### H. Final Claims (Claims 15 and 16)

Prible's fifteenth claim argues that the State sponsored false testimony in order to mislead the jury, bolster the argument that he had raped Tirado, and detract from Prible's alibi witnesses. Prible argues that the State knowingly presented false testimony about the period between oral sex and Tirado's death, crime scene evidence regarding burn patterns and sexual assault, his relationship with Tirado, Tirado's personal opinion of Prible, and phone calls made from the Herrera home. In his sixteenth claim, Prible faults trial counsel for not developing defensive efforts to counteract the false testimony he outlines in Claim 15.

Respondent observes that Prible raised these claims for the first time in his Fourth Amended Petition. On that basis, Respondent argues that the claims are procedurally unreviewable. The Court agrees and finds that Prible has

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

not shown that he can overcome the procedural default. Claims 15 and 16 are thus procedurally unreviewable.

## VI. CERTIFICATE OF APPEALABILITY

Respondent does not need permission to appeal from the grant of habeas relief. Under AEDPA, however, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA"). *See* 28 U.S.C. § 2253(c). Prible has not yet requested that this Court grant him a COA on the denied claims; however, this Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *see Soliz v. Davis*, 750 F. App'x 282, 287–89 (5th Cir. 2018). "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

**\*43** The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). The Fifth Circuit, however, anticipates that a court will resolve any questions about a COA in the death-row inmate's favor. *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484; *see also Miller-El v. Cockrell*, 537 U.S. 322, 336–38 (2003). On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484; *see also Miller-El*, 537 U.S. at 336–38.

Unless the prisoner meets the COA standard, "no appeal would be warranted." *Slack*, 529 U.S. at 484.

Having considered the merits of the denied claims, and in light of AEDPA's standards and controlling precedent, this Court declines to grant a COA.

## VII. CONCLUSION

Prible is entitled to federal habeas relief on claims two, three, four, five, six, and ten. The Court **DENIES** the State's Motion for Summary Judgment and **CONDITIONALLY GRANTS** federal habeas relief as discussed above. It is therefore **ORDERED** that a writ of habeas corpus shall issue unless, within 180 days, the State of Texas either begins new proceedings against Prible or releases him from custody. The 180-day time period shall not start until the conclusion of any appeal from this Memorandum and Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings. The 180-day period may also be extended on further order of the Court. The Court **DENIES** a certificate of appealability for all claims.

The Clerk will deliver a copy of this Memorandum and Order to the parties. **SIGNED** at Houston, Texas, on this 20th day of May, 2020.

HON. KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE

**All Citations**

Slip Copy, 2020 WL 2563544

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

## Footnotes

1   In June 1999, Prible pled guilty to bank robbery in violation of ▥ Title 18 U.S.C. § 2113(a). *United States v. Prible*, No. 4:99-cr-348-1 (S.D. Tex. June 17, 1999) (Doc. No. 6). Prible was sentenced in federal court in September 1999. *Id.* (Doc. No. 13).

2   The Court will refer to the Reporter's Record from Defendant's Appeal from the 351st District Court of Harris County, Texas, No. 75587, as — RR —.

3   ▥ *Brady v. Maryland*, 373 U.S. 83 (1963).

4   ▥ *Giglio v. United States*, 405 U.S. 150 (1972).

5   ▥ *Massiah v. United States*, 377 U.S. 201 (1964).

6   ▥ *Strickland v. Washington*, 466 U.S. 668 (1984).

7   Prible's original petition also included claims of improper admission of testimony about the children's deaths, ineffective representation in the handling of DNA evidence, violation of his right to a jury composed of a fair cross-section of society, withholding of information by the prosecution from the defense, and actual innocence.

8   During the pendency of the state habeas proceedings, this Court also authorized discovery of Bureau of Prisons telephone records which showed repeated phone calls between Beckcom and Siegler before trial. *Prible v. Quarterman*, No. 4:08-mc-316, Doc. 18 (S.D. Tex. 2018).

9   The letters are not dated. Two envelopes with the letters were dated in April and May 2002, a few months before trial and a few months after Prible left federal custody.

10  The Court will refer to the Record from Defendant's application for writ of habeas corpus in the 351st District Court of Harris County, Texas, No. 921126-B, as "Successive State Habeas Record at _."

11  The transcript for the three-day evidentiary hearing is located at docket entries 234, 235, and 236. The Court will cite to the transcript as HT—.

12  Respondent succinctly summarized Moreno's initial interaction with Siegler as follows:
    On April 4, 2001, Jesse Moreno, an inmate at FCI Beaumont-Medium wrote a letter to Kelly Siegler, a prosecutor with the Harris County District Attorney's (HCDA) Office, stating that he had information that could be helpful in one of her unsolved cases. Pet.'s Hrg. Ex. 6. Moreno served as an informant for Siegler several years prior in a case against Jason Morales. *Id.* Siegler met with Moreno on July 3, 2001, at FCI Beaumont-Medium. 2 EHRR 23–25. Moreno was housed in the Special Housing Unit (the "SHU") at the time. *Id.*; *see also* Pet.'s Hrg. Ex. 7. During the interview, which Siegler recorded, Moreno provided her with information implicating fellow-inmate Hermelio Herrero in the murder of Albert Guajardo. Pet.'s Hrg. Ex. 11. Moreno told Siegler that when Herrero confessed his involvement in this murder to him, fellow inmates Raphael Dominguez and Nathan Foreman were also present. Pet.'s Hrg. Ex. 11 at 17. It appears from the transcript that this is the first time Siegler learned of Nathan Foreman. *See* Pet.'s Hrg. Ex. 11 at 18–19. Two days later, on July 5, 2001, Siegler charged Herrero with the murder, specifically referencing the inculpatory information

**Marcus, James 6/5/2020**
**For Educational Use Only**

**Prible v. Davis, Slip Copy (2020)**

provided by Moreno. 6 Resp.'s Hrg. Ex. 6.
(Doc. No. 240, at 4–5) (footnote omitted).

[13]   Counsel had difficulty finding Walker because of confusion over an inmate with a similar name. HT1-119–20.

[14]   Respondent argues that "Prible's conspiracy theory alleging a state-run ring of informants rests almost entirely on speculative statements made by Carl Walker." (Doc. No. 240, at 12). Respondent supports that argument with a factual finding by the state habeas court that "Walker's statements...consist almost entirely of hearsay and speculation and contain no direct evidence of [Prible's] conspiracy theory," and that Walker's statements "are unpersuasive and have little evidentiary value with respect to the validity of [Prible's] habeas claims regarding any alleged conspiracy involving the lead prosecutor and federal inmates." (Doc. No. 191, at 13) (quoting Successive State Habeas Record at 799–800). Respondent fails to consider important differences between the allegations in the state habeas proceedings and those as they have developed in the instant case. The state court only considered Walker's statement, which included hearsay and speculation. His federal evidentiary hearing testimony, however, provided substance to his speculation and first-hand knowledge about the events. Walker's evidentiary hearing did not provide much testimony placing Siegler at the head of a ring of informants, but more than confirmed that a conspiracy existed at least among the inmates themselves. The state factual findings, therefore, addressed a much different issue than that considered by this Court.

[15]   Respondent concedes that "[n]either Bonds, Siegler, nor Foreman recalled that meeting, but handwritten notes from Bonds suggest the meeting likely occurred." (Doc. No. 240, at 8).

[16]   The Supreme Court has clarified that relief lies under 🔖 § 2254(d)(1) if (1) "the state court arrives at a conclusion opposite to that reached by this Court on a question of law," (2) "the state court decides a case differently than this Court has on a set of materially indistinguishable facts"; or (3) "the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also* 🔖 *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); 🔖 *Bell v. Cone*, 535 U.S. 685, 694 (2002); 🔖 *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

[17]   AEDPA provides:
(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.
🔖 28 U.S.C. § 2244(d).

[18]   In the alternative, Prible argues that the Court can reach any procedurally defaulted claims through the 🔖 *Schlup v.*

**Marcus, James 6/5/2020**
**For Educational Use Only**

Prible v. Davis, Slip Copy (2020)

Delo, 513 U.S. 298 (1995), actual innocence gateway. In *Schlup*, the Supreme Court held that prisoners seeking review of defaulted claims on the ground of actual innocence must establish that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." Id. at 324, 327. A *Schlup* claim of innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Id. at 315 (quoting Herrera v. Collins, 506 U.S. 390, 404 (1993)). However, because the Court determines that Prible's amended pleadings relate back to his original pleadings and are thus are not barred by AEDPA's limitations period, the Court need not reach Prible's actual innocence claim.

[19]    Respondent also briefly argues that Claims 3–5 are unreviewable because they are unexhausted, (Doc. No. 191, at 32), though Respondent does not raise the same argument against Claim 10, (*Id.* at 150; Doc. No. 240). However, by acknowledging the procedural default of Claims 3–5 and 10, Respondent has effectively waived any nonexhaustion argument. *See* Thompson v. Wainwright, 714 F.2d 1495, 1501 (11th Cir. 1983) ("[W]hen the state affirmatively acknowledges futility [of exhaustion]...its statement is often considered under the rubric of waiver."); *see also* McGee v. Estelle, 722 F.2d 1206, 1212–13 (5th Cir. 1984) (citing *Thompson* for the proposition that "the state may waive exhaustion"). Treating an acknowledgement of procedural default as a waiver of exhaustion makes sense because exhaustion is a matter of comity, not jurisdiction, and comity does not require that a federal court force a case back into the state system when the state itself has determined that review will be procedurally barred. *See* Felder v. Estelle, 693 F.2d 549, 551–54 (5th Cir. 1982) (discussing waivers of exhaustion and comity). Moreover, waiver aside, nonexhaustion does not bar review of Claims 3–5 and 10 because "exhaustion is not required if it would plainly be futile." Graham v. Johnson, 94 F.3d 958, 969 (5th Cir. 1996). Exhaustion is futile if "there is no opportunity to obtain redress in state court...." *Id.* (quoting Duckworth v. Serrano, 454 U.S. 1, 3 (1981)). The procedural default of Claims 3–5 and 10 renders redress in state court unavailable. *See* Coleman v. Thompson, 501 U.S. 722, 732 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."). Thus, ultimately, it is the procedural default, and not the nonexhaustion, of Claims 3–5 and 10 that presents a procedural hurdle to their federal review.

[20]    The situation in *Barrientes* closely parallels that here. Barrientes's federal habeas petition contained prosecutorial misconduct claims, including a *Brady* claim, related to exculpatory evidence from a sheriff's file that Barrientes alleged was unavailable to him when filing his state court habeas application. *See* Barrientes, 221 F.3d at 752, 764. Barrientes was sent back to state court to exhaust his prosecutorial misconduct claims. Id. at 750. The Texas Court of Criminal Appeals denied his successive petition as an abuse of the writ, rendering his claims procedurally defaulted. *Id.* In considering whether Barrientes had shown cause and prejudice to overcome the default, the Fifth Circuit held that it was "not bound" by the Texas Court of Criminal Appeals' abuse-of-the-writ decision and that the district court should have held an evidentiary hearing to reach its own findings as to cause and prejudice. Id. at 763, 768.

Still, Respondent argues that 28 U.S.C. § 2254(e)(1)—which provides that "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by "clear and convincing evidence"—nonetheless requires that this Court, in conducting its cause analysis, apply a presumption of correctness to the state court's underlying factual determinations articulated in its "Findings of Fact Pursuant to Tex. Code Crim. App. Art. 11.071, Sec. 5(a)(1)." Respondent cites no binding precedent for this claim. Even so, the Court finds, as discussed *infra*, that Prible has rebutted with clear and convincing evidence the state court's key findings of fact in support of its decision to apply the abuse of the writ doctrine to his successive state court habeas petition.

Marcus, James 6/5/2020
For Educational Use Only

Prible v. Davis, Slip Copy (2020)

[21]   As discussed in this Court's order compelling production of certain materials contained in Siegler's work product file, the work product doctrine does not excuse Siegler's suppression. (Doc. No. 154, at 2). As an attorney representing a client, a prosecutor is entitled to rely on the work product, within constitutional limitations. The work-product doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative [ ]including the other party's attorney...." Fed. R. Civ. P. 26(b)(3). "[T]he work product doctrine insulates a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries." Dunn v. State Farm Fire & Cas. Co., 927 F.2d 869, 875 (5th Cir. 1991). But "[t]he privilege derived from the work-product doctrine is not absolute." United States v. Nobles, 422 U.S. 225, 239 (1975). "Because Brady is based on the Constitution, it overrides court-made rules of procedure. Thus, the work-product immunity for discovery...prohibits discovery...but it does not alter the prosecutor's duty to disclose material that is within Brady." See 2 Charles Alan Wright, Federal Practice and Procedure § 254.2 (3d ed. 2000); see also Dickson v. Quarterman, 462 F.3d 470, 479 n.7 (5th Cir. 2006) (quoting Wright § 254.2). The work-product doctrine cannot excuse Siegler's efforts to hide relevant and exculpatory information from the defense, including information about her contacts with inmates and letters inmates sent to her claiming that Prible confessed.

[22]   Prible also had no means to compel Walker's testimony through court-ordered process. Texas law does not authorize discovery on subsequent applications unless a court finds that the application meets the requirements of Article 11.071 § 5, and the Texas Court of Criminal Appeals found that Prible did not meet those requirements.

[23]   Prible attaches to his petition a report from Dr. Elizabeth A. Johnson, an expert in molecular biology and DNA analysis. Dr. Johnson's report rejects both Watson's methodology and conclusions. Dr. Johnson states that Watson "could not reliably" state that the oral swab was "consistent with there being a great deal of sperm present" because he did not perform either a microscopic evaluation of the sample to assess the number of spermatozoa present or a test for the P30 protein. (Doc. 181, Ex. 114 ¶¶ 14–16). She states that, using Watson's stated yield of DNA in the oral swab, the volume of seminal fluid "is far less than the volume of seminal fluid that would be found in someone's mouth if ejaculation had occurred moments if not seconds before the victim was killed as Mr. Watson testified upon direct examination." (Id. ¶ 16). Dr. Johnson also points out that there was literature at the time of trial "on the duration of spermatozoa in the mouth after ejaculation into the oral cavity of live individuals," which confirms that "[t]he removal and dilution of spermatozoa from any body cavity occurs faster in a live individual than a deceased individual due to activity." (Id. ¶¶ 18–19). She concludes from this that "Mr. Watson could not have reliably testified as he did at trial regarding the amount of spermatozoa on the oral swab taken from [Tirado] or the timing of the deposit of semen into her mouth relative to the time of her death." (Id. ¶ 20). Accordingly, Prible argues Dr. Johnson's expert testimony meets the Schlup standard for innocence and that an evidentiary hearing is necessary to determine how the report and its impeachment of Watson's testimony would affect a jury. (Doc. No. 199, at 21). However, because the Court grants Prible habeas relief on his Brady claims, as discussed infra, the Court need not address Prible's actual innocence claim.

[24]   Respondent emphasizes that "Beckcom, the informant who testified at Prible's trial, also indicated that he was the one to reach out to the prosecutor with information, not the other way around." (Doc. No. 240, at 30). Whether Beckcom or Siegler initiated contact, however, is not the inquiry. Even if Beckcom initiated contact, he was subsequently led to believe that he would benefit in exchange for informing on Prible and acted pursuant to Siegler's instructions that he obtain specific incriminating information about Prible. The Court thus concludes that Beckcom was a state agent.

[25]   Respondent claims that Prible failed to raise this claim in a manner consistent with AEDPA's limitations period. As with Prible's Brady claims, the Court finds that this claim relates back to the earlier petitions and, at any rate, the circumstances discussed supra also prevented Prible from advancing this claim in a timely manner. See supra V.A.1.a.

**Marcus, James 6/5/2020**
**For Educational Use Only**

**Prible v. Davis, Slip Copy (2020)**

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.