United States District Court
Southern District of Texas
**ENTERED**
June 06, 2023
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| ANTHONY MEDINA, §<br>§<br>Petitioner, §<br>§<br>VS. §<br>§<br>BOBBY LUMPKIN,[1] Director, Texas §<br>Department of Criminal Justice, §<br>Correctional Institutions Division, §<br>§<br>Respondent. § | CIVIL CASE NO.  09-CV-3223 |

## MEMORANDUM AND ORDER

Anthony Medina was convicted of capital murder and sentenced to death in 1996.  Medina first petitioned for federal habeas relief in 2009.  Over the past decade, Medina has litigated numerous issues in federal and state court.  Respondent Bobby Lumpkin has moved for summary judgment.  (Docket Entry No. 76).  Medina's federal petition is now ripe for adjudication.

This Court has reviewed the numerous pleadings, the voluminous records, and the applicable law, paying special attention to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). With that background, the Court finds that Medina is not entitled to federal habeas relief.  The Court grants Respondent's motion for summary judgment and denies all other pending motions.  The Court will provide the reasons for these rulings below.

---

[1]      The previously named Respondent in this action was Lorie Davis.  On August 11, 2020, Bobby Lumpkin succeeded Lorie Davis as Director of the Correctional Institutions Division. Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Lumpkin "is automatically substituted as a party."

## BACKGROUND

### I.     The Murders

A New Year's Eve party ran late at the Rodriguez family's house in Houston, Texas.  In the early morning hours of January 1, 1996, the adults gathered in a room to play dominos while most of the 15 to 20 children at the party played in the backyard.  A few children went out front.  Street lamps illuminated the foggy, misty night as the children danced and listened to music from the boombox on the top of Veronica Rodriguez's red Dodge Shadow.  Nine-year-old David sat on the trunk of the car; his fifteen-year-old sister Diane stood nearby.

A car turned down the dead-end street at around 2:30 a.m.  As it slowly passed, a person reached out the front passenger window—whose hand an eyewitness described as "white or Mexican" but definitely not "black," Tr. Vol. XIII at 1479, 1480, 1488-89—with an assault rifle. Bullets sprayed toward the children.  Slugs hit Veronica's car, the Rodriguez's house, and the children.  As the car drove away, David and Diane lay dead and their cousin injured.

The driveby murders were only the last act in escalating violence aimed at the Rodriguez family.  About six months prior to the murders someone had shot at their house.  The next day someone painted gang-related graffiti on the Rodriguez's garage.  Tr. Vol. XIII at 1416.  Later, someone vandalized Veronica Rodriguez's car as it sat outside their home.  Tr. Vol. XIII at 1417. Another time someone threw a Molotov cocktail at her house.  Tr. Vol XIV at 1640-41.

Gang warfare had brought the needless violence to the Rodriguez family.  But no one in the Rodriguez family belonged to a gang.  The violence stemmed from Veronica's two-year relationship

with Marco "Blue" Martinez, a member of the H-Town Crips ("HTC").[2]

Throughout the time that Martinez dated Veronica, a gang war brewed between the HTC and its rival gang, La Raza 13 ("LRZ"). LRZ was one of Houston's most violent street gangs. Tr. Vol. XVII at 2248-49. Tensions intensified after an HTC member killed an LRZ member. Personal animosity particularly built between Martinez and Anthony "Creeper" Medina, an LRZ "cruz" (or leader).[3] The two men started by giving each other dirty looks, then flashing gang signs, and then threatening with weapons. Once, Martinez and a car load of other gang members drove by Medina's house flashing gang signs. Later, Medina drove by and did the same as Martinez was outside the Rodriguez house.

There was no question that it was Veronica's relationship with Martinez which brought violence upon the Rodriguez house, culminating in the New Years murders. Veronica's "house and her red Dodge were 'marked' . . . because of her association with [Martinez]." State Habeas Record at 930. But Martinez and Veronica were not home at the time of the shooting; Martinez had picked up Veronica and they had left before the LRZ members began their assault.

Veronica's marked car, however, was parked outside the Rodriguez's house. The children dancing around the car died in a hail of gunfire from a passing car.

No one outside the Rodriguez home could see the face of the person who fired shots that

---

[2] The prosecution and the defense liberally referred to the participants in the circumstances surrounding the offense by their gangland names. In fact, the trial court provided the jury a list of trial witnesses and their street names. Clerk's Record at 121. Because of the pervasive use of gang names, the Court will more frequently use those nicknames when referring to individuals in this case.

[3] Trial testimony established that a "cruz" was "a position below the top gang leader." State Habeas Record at 930.

3

night.  Positive identification of the shooter could only come from those inside the car, though statements people made after the killing and evidence relating to the gun provided useful circumstantial evidence as to the killer's identity.  The prosecution eventually fingered Medina as the shooter.  The defense would claim that Dominic "Flaco" Holmes, an African-American "peewee" or junior member of the predominantly Hispanic LRZ gang, was the killer.

## II.    The State's Trial Testimony

Testimony about the circumstances leading up to and following the murders provided integral context at trial.  As the Rodriguez family met to celebrate the new year, Medina and his fellow LRZ gang members began partying at the house of Candelario "Candyman" Guerrero.  Throughout the night, LRZ members, including Medina, would come and go from Candyman's house.  At around 11:00 p.m., Medina and others went to a different party at the house of former LRZ member Michele "Chichona" Aguenta.  A dispute erupted, however, when LRZ members accused another person of having a brother affiliated with HTC.  When that person looked like he was going to hit another "cruz," Medina brandished a gun.  The LRZ members left after Chichona's brother put an end to the tension.

Medina returned to Candyman's house.  At around 2:00 or 2:30 a.m. a group left Candyman's house to carry out the driveby murders.  The prosecution's theory was that Medina left in James Moore's[4] car with Johnny "Pelon" Valadez, Alex "Slim" Perez, Veronica "China" Ponce, Scharlene "India" Pooran, and Flaco.  Medina was the only "cruz" in the car.  The others were either

---

[4]    Moore, known as "Jamie," was not a member of the LRZ, but had been a member of the Rolling 60's Crips.  Moore testified at trial that he was Flaco's friend, but that he did not know any of the other LRZ members.  Tr. Vol. XIV at 1656-57, 1659-60, 1666-67.  According to police reports, Moore drove a "1989 Oldsmobile eighty-eight royal, 4 door, . . . black in color with red pin striping[.]"  (Docket Entry No. 25 at 192).

4

not gang members or were young peewees.

Moore, who was not an LRZ member, had been drinking heavily before he drove the group around.  Moore, Pelon, and Flaco—who each testified for the prosecution—all admitted to being present in the car.  They all identified Medina, Slim, India, and China as being there also.  Tr. Vol. XV at 1668, 1794, 1894-95.

The gang members directed Moore to the Rodriguez's street.  The car briefly stopped and Medina "got a Russian SKS semiautomatic assault rifle . . . from the trunk and moved to the front passenger seat."  State Habeas Record at 931.  Moore, Pelon, and Flaco would testify at trial that Medina fired at the Rodriguez house.[5]

Medina and other LRZ members returned to Chichona's house at around 3:00 a.m.[6]  Medina told Regina Juarez that they had done a drive by and that he had shot the gun.  Tr. Vol. XVI at 1947, 1977.  Medina bragged about the murder as he told people that "he shot her and he saw that fat meat come off, or something like that."  Tr. Vol. XV at 1805.  People saw Medina with the murder

---

[5]     Moore testified that Medina was sitting in the passenger seat.  Tr. Vol. XIV at 1674, 1691.  While Moore did not initially see the gun, as he drove he saw "white flashes" from the blasts of gunfire.  Tr. Vol. XIV at 1673-76.  Moore testified that he saw Medina draw the gun back into the car.  Tr. Vol. XIV at 1674, 1712.  He also saw Medina with the gun when the group returned to Candyman's house.  Tr. Vol. XIV at 1677-78, 1681-83.  Pelon testified that Medina fired at the Rodriguez house.  Tr. Vol. XV at 1798.  Pelon testified that Flaco was in the back seat.  Tr. Vol. XV at 1799-1803  Flaco testified that Medina was in the front passenger seat, Tr. Vol. XV at 1896, and he saw Medina shoot from the window.  Tr. Vol. XV at 1901.  On direct appeal, Medina argued that the evidence did not sufficiently show that he had formed the specific intent to kill.  The Court of Criminal Appeals found that "[o]pening fire with an automatic rifle, at close range, on a group of people supports the conclusion that [Medina] acted with the specific intent to kill."  *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999).

[6]     Regina Juarez corroborated the prosecution's theory of the case when she testified that she saw Medina return to Candyman's house with Flaco, Moore, India, and China.  Tr. Vol. XVI at 1945.

5

weapon at Chichona's house.  Medina pointed the gun at someone he suspected to have a brother who was in a rival gang.  Tr. Vol. XV at 1728.  A fist fight soon broke out.  Medina cocked the assault rifle, shot it into the air, and began to cock it again when Chichona's brother restrained him in a headlock.  Medina tried to scuffle with Chichona's brother and told him, "Let me go.  You don't know who you're messing with."  Tr. Vol. XV at 1739.  The LRZ members left when Chichona's father came out of the house, fired a shotgun into the air, and "told everybody to get the hell out." Tr. Vol. XV at 1740.

After his arrest, Medina called Regina Juarez and told her to get rid of the murder weapon which was at India's house.  Tr. Vol. XVI at 1958.  Regina Juarez, Flaco, Moore, and another gang member disposed of the gun.  Medina also directed gang members to lay the blame on Flaco.  Tr. Vol. XVI at 1963-65.  Medina told Regina Juarez that he was trying to "change it around and make it look like . . . it's Flaco's fault."  Tr. Vol. XVI at 1964.  China and India helped with Medina's plan.  Tr. Vol. XV at 1807-09.  China and India told Pelon to blame Flaco and "if [he] told the truth, that they were going to come after [his] family or try to do something to [him]."  Tr. Vol. XV at 1810.[7]

---

[7]     China and India did not testify at trial.  The prosecution elicited testimony from a police officer that they had both been arrested for aggravated perjury.  Tr. Vol. XIII at 1398.  Trial counsel informed the jury that the charges stemmed from differences between their grand jury testimony and their original police statements.  Tr. Vol. XIII at 1399.  The defense moved out of the jury's presence for the trial court to order "the State . . . to give testimony of immunity to . . . China . . and . . . India" because the defense had "talked to the lawyers for both" and, although they would otherwise "take the Fifth because of their pending charges of aggravated perjury," "their testimony would be that Flaco . . . told them that he was the one that did it and not Mr. Medina." Tr. Vol. XVI at 2003-04.  The prosecution clarified that they had "no information whatsoever that either of them would say that Flaco said he did it."  Tr. Vol. XVI at 2006.  In fact, China "gave three statements, all under oath, all different, and her last statement was that the defendant admitted to her that he had done it."  Tr. Vol. XVI at 2006.  The trial court denied the motion and India and China's
(continued...)

### III.    The Defense

The trial court had appointed John A. Millin and Gerald "Jerry" Guerinot to represent Medina at trial.[8]  The defense team crafted a case putting the blame for the killings on Flaco.  The defense based this strategy on two primary themes: (1) Flaco had made incriminating statements and (2) Medina disclaimed being the shooter.[9]  The defense supported these theories with testimony that Flaco told Medina's sister that the police "had to know it was him, but they had to find him before they could arrest him."  Tr. Vol. XVI at 2015-16.  Flaco also told one friend that he "put them hoes to rest," Tr. Vol. XVI at 2046, and another friend that he made the hoes "lie down," Tr. Vol. XVI at 2060.[10]

The defense had Slim testify that he had not left Candyman's house to do the driveby.  Also, Slim said that he did not see Medina with a weapon at Candyman's house.  Slim claimed that neither Flaco nor Medina had claimed responsibility for the shootings.  Tr. Vol.  XVII at 2093.

Medina took the stand and testified that he did not participate in the crime.  Medina claimed

---

[7]      (...continued)
testimony did not come before the jury.

[8]      Unless necessary to specify one individual, the Court will refer to the attorneys collectively as "trial counsel."

[9]      On direct appeal, Medina faulted the trial court for not delivering an accomplice-witness instruction for Flaco because "the evidence established that [Flaco] was [Medina's] fellow gang member, was with [Medina] during the offense, and helped conceal the murder weapon." *Medina*, 7 S.W.3d at 641.  The trial testimony, however, established that Medina "did not announce his plans to [Flaco and the others in the car] and that the offense came as a complete surprise to them."  *Id.*  In fact, the occupants of the car "thought they were targets of the shooting."  *Id.* Because of his gang membership and efforts to conceal the crime, however, the Court of Criminal Appeals found that Flaco was party to the offense.  *Id.* at 643.

[10]      The friend who testified that she knew Flaco pretty well, however, could not identify him in a photograph.  Tr. Vol. XVI at 2058.

that he stayed at Candyman's house until around 3:30 a.m.  Medina, however, testified that he saw a weapon in Moore's car and that Moore and Flaco left around the time of the killings.

The jury found Medina guilty of capital murder.

## IV.    Punishment Hearing

Texas law decides an inmate's sentence after a separate punishment hearing.  As Medina's federal petition challenges trial counsel's presentation of evidence in the penalty phase, the Court will later discuss the information that came before jurors.  The Court, however, observes that the State presented extensive evidence of Medina's lawlessness.  Crucially, the jury would consider evidence that Medina had previously been involved in a gang driveby shooting.

Jurors considered that evidence against the defense's case resting on family members who described Medina's background, protective attitude toward others, and good character. Notwithstanding, the jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence.

## LITIGATION HISTORY

Extensive litigation in both state and federal court has developed the constitutional claims Medina raises in his federal habeas petition.  Before adjudicating Medina's grounds for relief, the Court will review Medina's state direct appeal, five state habeas applications, and detailed federal litigation.  Prior litigation provides context for procedural barriers to federal relief and the significant deference paid to state court adjudications.

## I.    Appeal

Medina raised twenty-two points of error on direct appeal. The Court of Criminal Appeals affirmed his conviction and sentence on October 6, 1999.  *Medina v. State*, 7 S.W.3d 633 (Tex.

Crim. App. 1999).[11]   The United States Supreme Court denied Medina's petition for a writ of certiorari on May 1, 2000.  *Medina v. Texas*, 529 U.S. 1102 (2000).

## II.   Initial Round of State Habeas Review

The trial court appointed Alain G. Harvey to represent Medina on state habeas review. Through Mr. Harvey, Medina filed his first state habeas application on November 23, 1998.  The Court of Criminal Appeals dismissed that application as untimely filed.  *Ex parte Medina*, No. WR-41,274-01 (Tex. Crim. App. Apr. 28, 1999).  However, the Court of Criminal Appeals removed Mr. Harvey and appointed new counsel pursuant to Article 11.071 § 4(a).[12]

The Court of Criminal Appeals allowed Medina to file a new habeas action.  New counsel filed Medina's second application with the trial court on November 21, 2001 ("2001 habeas application").  The 2001 habeas application raised fourteen points of error, many containing detailed sub-arguments.  State Habeas Record at 35.[13]  The trial court did not hold an evidentiary hearing.

---

[11]     On appeal, Medina argued that: legally and factually insufficient evidence established an intent to kill; the trial court erred in instructing the jury on transferred intent; the trial court erred in denying his requested instructions on lesser included offenses; the trial court erred in overruling his objection to the instruction regarding knowing conduct; the trial court erred in refusing to give accomplice-witness instructions; trial counsel provided ineffective assistance by failing to request accomplice-witness instruction; the trial court erred in allowing testimony about gang-related offenses; and the trial court erred in failing to instruct the jury on the State's burden of proof as to the mitigation special issue.

[12]     Scott Kruka represented Medina in his 2001 state habeas proceeding.

[13]     Specifically, Medina's 2001 application argued: that the State withheld material evidence, particularly about the possibility of an alternate suspect; Medina received ineffective assistance because counsel failed to request disclosure of Crimestopper callers, challenge the Harris County grand jury system, perform adequately in voir dire, make an opening statement, challenge inadmissible evidence, object to gang reference, impeach prosecution witnesses, investigate his innocence, test the State's firearm evidence, perform effectively in the penalty phase, and perform effectively on appeal; the trial court erroneously instructed jurors on parole; the State withheld evidence; one juror lied about her criminal past; Harris County violates the Constitution in how it
(continued...)

On April 25, 2008, the trial court signed the State's proposed facts and conclusions of law recommending that the Court of Criminal Appeals deny relief.  The Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief on Sept. 16, 2009.  *Ex parte Medina*, No. WR-41,274-02, 2009 WL 2960466, at *1 (Tex. Crim. App. Sept. 16, 2009).

During the pendency of Medina's 2001 habeas application, he filed a third and fourth habeas application.  The Court of Criminal Appeals denied those two applications as an abuse of the writ.  *Ex parte Medina*, WR-41,274-02 (Tex. Crim. App. Sept. 16, 2009) (not designated for publication); WR-41,274-03 (Tex. Crim. App. Nov. 25, 2005) (not designated for publication).

## III.   Federal Petition for a Writ of Habeas Corpus

In 2009, this Court appointed counsel to represent Medina on federal review of his capital conviction and death sentence.  Medina filed his federal petition on October 5, 2009.  (Docket Entry No. 1).  Medina amended his petition on May 31, 2011.  (Docket Entry No. 24).  Respondent filed an answer and motion for summary judgment on January 17, 2012.   (Docket Entry No. 31).  Respondent argued that procedural law barred federal review of many claims raised in Medina's petition.  Respondent also argued that all Medina's claims lacked merit.

Before Medina filed a reply to the summary judgment motion, he asked the Court to stay the instant action while the United States Supreme Court considered a case addressing a petitioner's ability to overcome procedural barriers to habeas review.  On February 6, 2013, the Court stayed

---

[13]      (...continued)

selects grand jurors; the trial court should have ordered the State's firearm testing expert to test ballistics evidence; a hostile atmosphere existed in the courtroom; the trial court erred by rejecting an instruction on voluntary intoxication; the State violated the law by granting immunity to witnesses; the trial court improperly conducted voir dire outside of his presence; the State improperly relied on an enhancement; and his prolonged stay on death row violated the Constitution.

and administratively closed this case.  (Docket Entry No. 51).

While the stay was still in effect, Medina filed a Second Amended Petition for a writ of habeas corpus on March 31, 2013.  (Docket Entry No. 53).  Medina's second amended petition raised the following grounds for relief:

1. Ineffective assistance of trial counsel in the guilt/innocence phase (pp. 90-157)
2. Police and prosecutorial misconduct violated Medina's constitutional rights (pp. 159-178)
3. Ineffective assistance of trial counsel in the punishment phase (pp. 180-259)
4. Ineffective assistance of trial counsel in pre-trial stages (pp. 263-73)
5. The trial court's instructions on parole eligibility violated the Fifth, Sixth, Eighth, and Fourteenth amendments (pp. 274-82)
6. Cumulative effect of *Strickland* and *Brady* claims violated Medina's constitutional rights (p. 287)
7. A disqualified juror sat at trial (pp. 288-302)
8. The process by which Harris County selects its grand juries violates the Constitution (pp. 303-11)
9. A hostile atmosphere in the courtroom violated Medina's constitutional rights (pp. 313-18)
10. The trial court violated Medina's constitutional rights by refusing to give a jury instruction on the mitigating value in voluntary intoxication (p. 322)
11. The trial court violated his constitutional rights by conducting portions of jury selection without Medina present (pp. 329-33)
12. The trial judge lacked authority to preside over his trial proceedings (p. 334)
13. Medina's lengthy stay on death row violates his constitutional rights (pp. 336-47)
14. Medina is actually innocent (p. 349)

(Docket Entry No. 53).

On August 13, 2013, the Court reopened the case.  (Docket Entry No. 62).  After the Court received briefing on recent Supreme Court precedent (Docket Entry Nos. 68, 69, 72), Respondent again moved for summary judgment.  (Docket Entry No. 76).  On May 12, 2015, Medina filed a summary judgment response.  (Docket Entry No. 93).

The parties' briefing disputed the procedural posture of several claims.  Medina conceded

11

that at least one claim was unexhausted and that "he ha[d] a remaining state court remedy for [that] claim[.]" (Docket Entry No. 100 at 3). Because a federal habeas petitioner has not exhausted the remedies available in the state courts "if he has the right under the law of the State to raise, by any available procedure, the question presented," 28 U.S.C. § 2254(c), the Court again stayed this action to allow the exhaustion of state court remedies. (Docket Entry No. 103). In doing so, the Court did not limit what issues he could advance in state court, but allowed Medina to "present to the state courts any issue needing exhaustion before returning to federal court." (Docket Entry No. 103 at 3).

## IV.    Successive State Habeas Proceedings

On December 16, 2015, Medina filed his fifth state habeas application. Medina's fifth state habeas application raised three issues: (1) police and prosecutorial misconduct violated his constitutional rights; (2) ineffective assistance of counsel at the guilt/innocence phase of trial; and (3) actual innocence. The state district court forwarded his application to the Court of Criminal Appeals for a determination of whether it was an abuse of the writ under Tex. Code. Crim. Pro. art. 11.071 §5. On January 25, 2017, the Court of Criminal Appeals dismissed the application as an abuse of the writ. *Ex parte Medina*, No. WR-41,274-05, 2017 WL 690960, at *1 (Tex. Crim. App. Jan. 25, 2017). Medina unsuccessfully moved for the Court of Criminal Appeals to reconsider the matter on its own motion under Tex. R. App. P. 79.2(d). The Court of Criminal Appeals denied further review on May 17. 2017.

## V.    Recent Federal Litigation

The parties returned to federal court and provided updated briefing. (Docket Entry Nos. 127, 133, 136, 143). Medina now argues that he has exhausted all claims in state court. (Docket Entry

12

No. 127 at 13; Docket Entry No. 133 at 14).  Respondent contends that, despite having opportunities to do so, Medina has still not exhausted some portions of his ineffective-assistance claim in state court.  (Docket Entry No. 136 at 4-5).[14]  The parties also dispute whether procedural hurdles foreclose federal review of several claims.

Medina has moved for discovery and an evidentiary hearing.  (Docket Entry No. 148). Respondent opposes any additional factual development.  (Docket Entry No. 151).  Medina has recently supplemented his claims with new arguments and reemphasized his request for factual development.  (Docket Entry No. 165).

## LIMITATIONS ON FEDERAL HABEAS REVIEW

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011).  Federal habeas corpus review provides an important, but limited, examination of state criminal judgments.  Because "state courts are the principal forum for asserting constitutional challenges to state convictions," *id.* at 103, concerns for comity, federalism, and finality define the contours of federal habeas review.  *See Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

---

[14]     Respondent argues:

Specifically, Medina did not present the following guilt/innocence arguments to the state court: (1) counsel failed to investigate Shelly Amato who possessed information relating to Dominic "Flaco" Holmes's activities the morning after the shooting (ECF No. 53 (Amended Petition) at 121–22); (2) counsel failed to impeach James Moore with pretrial statements (*id*. at 129–30); (3) counsel failed to impeachment Johnny Valadez with pretrial statements (*id*. at 131); and (4) counsel failed to impeach Regina Juarez with pretrial statements (*id*.).

(Docket Entry No. 136 at 4).

If an inmate has presented his claims in a manner allowing the state courts to resolve their merits, AEDPA provides for a forgiving federal review.[15]  AEDPA "imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases," *Shoop v. Hill*, ___ U.S. ___, 139 S. Ct. 504, 506 (2019), by barring "relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Richter*, 562 U.S. at 98.  Under those provisions, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S. 370, 379 (2010) (quoting 28 U.S.C. § 2254(d)(1)).[16]  "The question under [§ 2254(d)] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002).  Simply put, AEDPA "prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state

---

[15]     Medina raises lengthy arguments which, essentially, contend that the state court adjudication should not merit federal deference because it was too flawed, superficial, or favorable to the State.  AEDPA predicates federal deference on the existence of a state adjudication without commenting on the quality of state review.  Medina's arguments about the inapplicability of AEDPA deference have no basis in the law.  *See Freeney v. Davis*, 737 F. App'x 198, 206 (5th Cir. 2018); *Basso v. Stephens*, 555 F. App'x 335, 342, 343 (5th Cir. 2014); *Green v. Thaler*, 699 F.3d 404, 416 n. 8 (5th Cir. 2012); *Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001).

[16]     The Supreme Court has clarified that relief lies under section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts"; or (2) "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

14

courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010).[17]  Federal courts also generally presume that the state courts have made correct factual findings.  *See* 28 U.S.C. § 2254(e)(1).

This deference limits a federal habeas court's ability to allow new factual development.  *See* 28 U.S.C. § 2254(e)(2); *see also Shinn v. Ramirez*, ___ U.S. ___, 142 S. Ct. 1718 (2022) ("[A] federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements.").  Additionally, the Supreme Court has "emphasize[d] that review under § 2254(d)(1) focuses on what a state court knew and did." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).  Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  *Id.* at 182-83.  Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review" and this Court's review "is limited to the record in existence at [the time of the state court decision] *i.e.*, the record before the state court." *Id.* at 182;

## PROCEDURAL ADEQUACY OF MEDINA'S CLAIMS

Federal jurisprudence sets high procedural hurdles to federal habeas adjudication.  As a precursor to federal review of his conviction and sentence, Medina must show that he presents his claims in a procedurally adequate manner.  Respondent argues that procedural law precludes federal consideration of several claims.

---

[17]     The Fifth Circuit recently held that, even when an inmate meets AEDPA's demanding requirements, federal review is unavailable "in the absence of factual innocence." *Crawford v. Cain*, 55 F.4th 981, 993-94 (5th Cir. 2022).

The exhaustion and procedural default doctrines, both of which embody acquiescence to principles of comity and federalism, guide a federal court's consideration of habeas claims.  Federal courts have long required inmates to give state courts the first chance to rectify constitutional violations.  *See Ex parte Royall*, 117 U.S. 241, 251-52 (1886).  To avoid the "'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), AEDPA requires an inmate to raise his federal habeas claims in the highest state court before habeas relief becomes available.  *See* 28 U.S.C. 2254(b)(2); *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999); *Burns v. Estelle*, 695 F.2d 847, 849 (5th Cir. 1983).  Absent compliance with the exhaustion doctrine, AEDPA only gives a federal court authority to deny a habeas claim.  *See* 28 U.S.C. § 2254(b)(2).

The procedural default doctrine similarly defines the scope of federal habeas review for claims that an inmate has not exhausted properly.  As "[a] corollary to the habeas statute's exhaustion requirement, . . . federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v. Haley*, 541 U.S. 386, 392-93 (2004); *see also Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (stating that federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment").  Under the procedural bar doctrine, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732.  The procedural default doctrine likewise bars claims that are "technically exhausted"; that is, when the inmate has not raised

them in state court and state procedural law would prevent him from doing so in successive state

habeas proceedings.  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  In such cases, consideration of a

federal issue gives way to state procedural law.  *See Lambrix v. Singletary*, 520 U.S. 518, 523

(1997); *Coleman*, 501 U.S. at 731.

## I.      Claims Medina Defaulted in State Court

Respondent argues that Medina raises several issues in a procedurally defective manner.[18]

Respondent contends that Medina presented claim five and claims seven through fourteen to the

state courts in a manner that did not fully comply with state procedure.  The state courts dismissed

these claims under two separate procedural doctrines.

First, Respondent argues that the state courts applied their own procedural law to find that

Medina had not preserved several issues for post-conviction review.  Medina raised claims five,

seven, eight, nine, ten, eleven, and thirteen in his initial state habeas application.  Specifically,

Medina claimed that:

- •      The trial court's instructions on parole eligibility violated the Fifth, Sixth, Eighth, and Fourteenth Amendments (claim five)
- •      A disqualified juror sat at trial (claim seven)
- •      The process by which Harris County selects its grand juries violates the Constitution (claim eight)
- •      A hostile atmosphere in the courtroom violated Medina's constitutional rights (claim nine)
- •      The trial court violated Medina's constitutional rights by refusing to give a jury instruction on the mitigating value in voluntary intoxication (claim ten)
- •      The trial court violated his constitutional rights by conducting portions of jury selection without Medina present (claim eleven)
- •      Medina's lengthy stay on death row violates his constitutional rights (claim thirteen)

---

[18]      Insofar as Respondent contends that Medina has defaulted portions of otherwise-proper claims, the Court will consider those arguments in the context of the related claim.

17

When Medina raised those issues, the state habeas court found that he had defaulted consideration of his arguments by failing to object at trial.  State Habeas Record at 969, 970, 972, 974, 975, 976-77, and 979.  Under Texas law, "in order for a party to preserve an issue for appellate review, that party must have made a timely objection with specific grounds for the desired ruling-unless apparent from the context." *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997). The Fifth Circuit "has consistently held" that Texas' contemporaneous-objection requirement "constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999); *see also Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003).  Accordingly, Respondent has shown that Texas procedural law forecloses federal consideration of claims five, seven, eight, nine, ten, eleven, and thirteen.

Second, Respondent agues that Medina did not raise two issues in a manner that complied with state law.  Medina did not assert claims twelve and fourteen in his initial state habeas application. Medina raised claim twelve–arguing that the trial judge lacked authority to preside over his trial proceedings–in his third state habeas application (filed in 2002).  Medina raised claim fourteen–arguing that he is actually innocent–for the first time in his federal habeas petition. Medina subsequently exhausted his actual-innocence claim in his fifth state habeas application (filed in 2015).  The state courts dismissed both claims under Texas' abuse-of-the-writ doctrine, codified in Article 11.071 § 5 of the Texas Code of Criminal Appeals.  The Fifth Circuit has held that "[a] dismissal pursuant to Article 11.071 is an independent and adequate state ground for the purpose of imposing a procedural bar in a subsequent federal habeas proceeding." *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (quotation omitted).

18

Claim five and claims seven through fourteen are procedurally barred from federal review. A petitioner has the burden to overcome a procedural bar. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). A petitioner meets this burden by showing: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'" *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## II.    Cause and Prejudice

Medina raises several arguments to show cause that would overcome Texas' invocation of its procedural law. First, Medina argues that trial counsel provided deficient performance by not objecting to those issues which the court subsequently barred under Texas' contemporaneous-objection doctrine (claims five, eight, nine, and ten). However, "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted" unless "the prisoner can satisfy the cause-and-prejudice standard with respect to that claim." *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In other words, the claim of ineffective assistance of counsel for failing to make trial objections that resulted in a procedural bar is an independent constitutional violation, which must itself be exhausted using state collateral review procedures. *See Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009); *Rachal v. Quarterman*, 265 F. App'x 371, 375 (5th Cir 2008). Medina's failure to challenge trial counsel's representation on that basis precludes a finding of cause to overcome the procedural bar.[19]

Second, Medina argues that Texas should not have imposed a procedural bar on claims five,

---

[19]    Medina advanced a separate claim that trial counsel provided ineffective representation for failing to raise the arguments in claim eight involving how Harris County selects its grand jurors. The Court's discussion in that section shows that trial counsel did not provide ineffective assistance in that regard. Further, that discussion also demonstrates that Medina cannot show actual prejudice to overcome the procedural bar.

seven, eleven, and thirteen in the first place. It is a "'basic tenet of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default, if based upon an adequate and independent state ground.'" *Smith v. Johnson*, 216 F.3d 521, 523 (5th Cir. 2000) (quoting *Barnes v. Thompson*, 58 F.3d 971 (4th Cir. 1995)); *see also Rowell v. Dretke*, 398 F.3d 370, 375 (5th Cir. 2005) ("It is not the role of the federal habeas court to reexamine state-court determinations of state-law questions."). A "federal court may only inquire into whether cause and prejudice exist to excuse that default" but it may not ask "whether the state court properly applied its own law." *Barnes*, 58 F.3d at 974.

Third, Medina contends that Texas has not regularly applied its procedural law to those categories of claims which were barred in this case. The Court's review of the briefing and the relevant law, however, finds that he has not shown that Texas does not adequately and independently apply its procedural law in those circumstances.

Even considering Medina's arguments for cause, he also must show "actual prejudice." A mere possibility of prejudice will not satisfy the actual prejudice prong of the cause and prejudice test." *United States v. Guerra*, 94 F.3d 989, 994 (5th Cir. 1996). While the Supreme Court "has been reluctant to define the precise contours of the prejudice requirement," *Barrientes v. Johnson*, 221 F.3d 741, 769 (5th Cir. 2000), an inmate must show "a reasonable probability that the result of the trial would have been different." *Strickler v. Green*, 527 U.S. 263, 289 (1999); *see also Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003) (an inmate mist show "but for the error, he might not have been convicted"). The Court has reviewed the record and pleadings relating to each of the barred claims. Given the extensive length necessary to resolve the procedurally proper claims, judicial economy does not favor elaborate discussion of the merits and impact of the claims which Medina

has defaulted in state court.  It is sufficient to observe that, especially when placed into the entire context of trial and the strong evidence against Medina, this Court's review conclusively shows that Medina has not shown actual prejudice with regard to any of the barred claims.[20]

## III.  Fundamental Miscarriage of Justice

Medina also argues that he can show a fundamental miscarriage of justice which would overcome the procedural bar of claim thirteen, his actual-innocence claim, because "the merits and procedural arguments of Mr. Medina's innocence claim collapse into one underlying and fundamental point: Mr. Medina did not commit this offense . . . ."  (Docket Entry No. 133 at 102). Medina argues that the "evidence used to convict [him] and sentence him to death is unreliable and was obtained in a manner that offends the constitution for the reasons set forth in Mr. Medina's claims attacking his convictions and sentence."  (Docket Entry No. 53 at 353-54).  Medina, however, does not brief an actual-innocence argument that would forgive a procedural bar.

---

[20]     Alternatively, the Court has reviewed the merits of each barred claim.  Given the procedural bar, and the lengthy discussion required to adjudicate the procedurally proper claims in Medina's petition, the Court will not discuss their merits at length.  The Court's review of the record, the pleadings, and the relevant law, however, indicates that none of the barred claims provides for federal habeas corpus relief.  This Court's discussion of Medina's related ineffective-assistance claim faulting counsel for not discovering the potential disqualification of a juror amply demonstrates that claim seven lacks merit on its own.  Similarly, the related ineffective-assistance claim addressing the manner in which Harris County selects grand jurors provides an ample basis to summarily find that claim eight is meritless.  The state habeas court made alternative holdings regarding Medina's ninth claim regarding the trial atmosphere which, under AEDPA deference, were not contrary to, or an unreasonable application of, federal law.  Likewise, alternative state habeas findings show that the trial court did not violate Medina's constitutional rights by refusing to give a voluntary intoxication instruction.  Unrebutted state habeas finding relating to Medina's eleventh claim also show that his temporary absence from the courtroom did not violate the Constitution.  Finally, claims eleven, twelve, and thirteen not only rely on unproven allegations, they each rest on constitutional arguments which have yet to be endorsed by the Supreme Court.  Habeas relief does not exist to create constitutional law, precluding relief on Medina's final procedurally deficient claims.  In sum, federal relief would not be available even if the Court were to consider fully the merits of Medina's procedurally barred claims.

The fundamental-miscarriage-of-justice exception to the procedural bar doctrine requires an inmate to prove his actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 329 (1995). An inmate claiming to be actually innocent must show that "new reliable evidence" exists which would have prevented a reasonable jury from finding him guilty. *See Id*. This "gateway" to review of a procedurally barred claim "should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial. . . .'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup*, 513 U.S. at 316). Medina does not adduce any new evidence or material that would reliably prevent a reasonable jury from finding him guilty. Medina presents little evidence that would tend to show his innocence. *See Resendez v. United States*, 841 F. App'x 741, 743 (5th Cir. 2021) (emphasizing that an actual-innocence argument must rely on "new evidence showing that it is more likely than not that no reasonable juror would have found him guilty of the charged offense"); *Shank v. Vannoy*, 2017 WL 6029846, at *2 (5th Cir. 2017) ("Evidence that was available to be presented to the jury at the time of trial is not now 'new' evidence, even if it was not actually presented to the jury."). Instead, Medina's actual-innocence allegations relate more closely to arguments of cumulative error or insufficiency of the evidence. Having reviewed Medina's arguments, the Court finds that they are insufficient to meet the *Schlup* standard.[21]

In conclusion, Medina has not shown that the Court can reach the merits of claim five and claims seven through fourteen.

## ANALYSIS OF PROCEDURALLY VIABLE CLAIMS

---

[21]     As a separate basis for denying claim thirteen, the Fifth Circuit does not recognize federal habeas claims based on freestanding assertions of actual innocence. *Floyd v. Vannoy*, 894 F.3d 143, 155 (5th Cir. 2018); *Coleman v. Thaler*, 716 F.3d 895, 908 (5th Cir. 2013).

22

Claims one through four and claim six are available for federal consideration.  Medina's procedurally viable claims fall into two categories: (1) ineffective assistance of counsel under the standards established in *Strickland v. Washington*, 466 U.S. 668 (1984) and (2) suppression of material under *Brady v. Maryland*, 373 U.S. 83 (1963).  Medina raises multiple challenges to counsel's performance through each stage of representation.  The parties debate whether Medina raises several *Strickland* claims or just one *Strickland* claim with several components.  Whether he intended to group his allegations into one claim or many, the Court will divide discussion of his allegations against his trial attorneys by their responsibilities at the various stages of trial.  The Court will first review counsel's representation as it evolved through the grand jury, jury selection, trial preparation, guilt/innocence defense, and efforts to avoid a death sentence.[22]  The Court will then turn to Medina's *Brady* arguments.  The Court will also review the cumulative effect of his *Strickland* and *Brady* claims.

## I.    Ineffective Assistance of Trial Counsel Before Trial (claim four)

A reviewing court must assess counsel's representation under *Strickland*'s two-pronged test:

---

[22]       Before assessing whether the state habeas court was unreasonable in denying Medina's *Strickland* arguments, the Court observes that, despite having opportunities to do so, Medina has not exhausted all nuances of his ineffective-assistance arguments.  Medina argues that, under *Martinez v. Ryan*, 566 U.S. 1 (2012), his initial counsel's failure to advance those claims opens the door to federal review.  *Martinez* relies on equitable principles.  Equity does not favor those who sleep on their rights.  *See Fisher v. Johnson*, 174 F.3d 710, 715 (5th Cir. 1999).  Medina chose not to advance the issues in his return to state court for successive habeas proceedings. Independent of that concern, Medina must show that his claim was "substantial" and also comply with the "actual prejudice" requirement.  Having extensively discussed the procedurally proper portions of Medina's claim, judicial economy favors a summary conclusion regarding the procedurally barred issues.  The Court has fully reviewed the unexhausted issues, the record, the law, and the arguments Medina makes under *Martinez*.  With that review, the Court finds that *Martinez* does not provide a basis for full federal review of the issues.  Moreover, the Court finds that Medina has not shown prejudice to overcome the procedural bar of those issues.

a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct," *Wiggins*, 539 U.S. at 521, but instead "measure[s] . . . attorney performance" for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  This "highly deferential" review eliminates "the distorting effect of hindsight" by looking at "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 689-90.

A petitioner must also show prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.  The Court does not consider prejudice in a vacuum; "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

"Surmounting *Strickland*'s high bar is never an easy task[.]" *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  When the state court has already adjudicated the merits of a *Strickland* claim, "[a] state court must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  Under

24

the AEDPA, federal courts employ a "doubly deferential judicial review," that gives wide latitude to state adjudications. *Knowles v. Mirayance*, 556 U.S. 111, 123 (2009); *see also Cullen v. Pinholster*, 563 U.S. 170, 230 (2011). "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard*." Richter*, 562 U.S. at 105.

Medina extensively discusses background information about his trial representation. To summarize, Medina portrays his attorneys as too busy managing an unrealistically heavy caseload to provide constitutionally acceptable representation. Observing that his case was only one of four capital cases his attorneys tried in a three-month period, Medina emphasizes the short amount of time they spent preparing for his case. According to Medina, his overloaded attorneys did not have enough time to engage in adequate investigation and trial preparation. Medina also alleges that lead counsel's poor reputation and second chair counsel's illness compounded the difficulty in what was already a nearly impossible task.

Along those lines, Medina's briefing meanders through general criticism of trial counsel's investigation and preparation for trial. While a discussion of trial counsel's efforts, or lack thereof, leads to a fuller understanding of the trial proceedings, constitutional error cannot rest on allegations that trial counsel did not spend enough time on his case. Medina's briefing provides context to his *Strickland* claims, but the Constitution and federal law do not place specific requirements on the hours a trial attorney must spend working on a case or the number of clients he may represent at one time. Professional organizations provide expectations for a criminal attorney's representation, but they are "'only guides'" to what a diligent attorney should do. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (quoting *Strickland*, 466 U.S. at 688). The law only "imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000).

25

Medina's briefing also exists in opposition to presumptively correct state court findings.  The state habeas court found that "counsel's caseload did not hinder preparation or investigation into [Medina's] case," primarily because trial counsel

> prepared and filed pre-trial motions, employed an investigator, interviewed witnesses, obtained discovery from the State, reviewed the State's file, read the offense report, visited the scene of the offense, interviewed [Medina's] family, talked with [Medina] numerous times about the offense and pending trial, was familiar with the facts of the case and relevant law, presented evidence, vigorously cross-examined State's witnesses, made objections, presented a reasonable defensive theory, and competently argued to the jury.

State Habeas Record at 955.

While presumptively correct, the state court findings do not preclude Medina from raising specific *Strickland* claims regarding counsel's trial preparation, conditioned by his obligation to "allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial."  *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *see also Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010).  The Court's concern is what counsel did not investigate, develop, or present, and how that would have made a difference.

### A.    Failing to Challenge Harris County's Grand Jury System

Medina faults trial counsel for not moving to dismiss the indictment because Harris County allegedly underrepresents the Hispanic population in selecting those who will serve on a grand jury. (Docket Entry No. 53 at 267-68).  Trial counsel made no effort to question the composition of the grand jury that returned an indictment against Medina.  According to Medina, "despite the growing population of Hispanics in Harris County, their representation as grand jury panelees was appalling low." (Docket Entry No. 53 at 268).  Medina claims that trial counsel should have argued that his Sixth Amendment rights were violated because the grand jury did not consist of a fair cross section

of the community.

"The Supreme Court has clearly and consistently stated that indictment by a grand jury from which members of a racial group purposefully have been excluded violates equal protection principles." *Sosa v. Dretke*, 133 F. App'x 114, 126 (5th Cir. 2005). The fair-cross-section requirement, however, does not guarantee "'jur[ies] of any particular composition.'" *Paredes v. Quarterman*, 574 F.3d 281, 289 (5th Cir. 2009) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). To establish a prima facie fair-cross-section claim a petitioner must show that (1) "the group alleged to be excluded is a 'distinctive' group in the community," (2) "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community," and (3) "this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

When Medina raised this claim on state habeas review, he also advanced a separate Sixth Amendment fair-cross-section claim based on the same arguments.[23] Medina's arguments rely on a comparison between census data of the Hispanic population and "the surnames of grand jury panelees . . . ." State Habeas Record at 264 n.47. The state habeas court found that Medina relied on "unreliable" and "speculative" assumptions in challenging Harris County's grand jury process. State Habeas Record at 946-47. Harris County's process followed Texas' statutory requirements in which "names are randomly selected  from a list complied from registered voters and people with valid driver's licenses and identification cards." State Habeas Record at 947. The County did not

---

[23]     The state habeas court found that Medina's failure to comply with the contemporaneous-objection rule resulted in a procedural default of his stand-alone claim. State Habeas Record at 972. The state habeas court, however, considered the substance of his claim in the alternative. Medina renews that separate claim on federal habeas review (claim eight).

"remove Hispanics from jury lists" or "prevent Hispanics from registering to vote or from obtaining driver's licences or identification cards based on their ethnicity[.]"  State Habeas Record at 947. Thus, the state habeas court concluded that Medina had not "establish[ed] a *prima facie* case of a violation of the fair cross-section requirement" because he "fail[ed] to support his allegation of Hispanic under-representation with reliable factual data[.]" State Habeas Record at 973.[24]  Because he "fail[ed] to show systematic exclusion of Hispanics in Harris County" and also "fail[ed] to show that the Harris County grand jury process violate U.S. Const. amends VI and XIV," the state habeas court denied relief on the grand jury challenges.  State Habeas Record at 973.

The state habeas court relied on those factual findings to reject Medina's related ineffective-assistance claim.  The state habeas court specifically found that "counsel are not ineffective for failing to lodge an objection against the constitutionally-sound Harris County grand jury process." State Habeas Record at 956.

AEDPA affords deference to the state habeas court's rejection of his *Strickland* claim based on the failure to object to the grand jury composition.  The Fifth Circuit has found in other cases that the method Medina uses to demonstrate exclusion of Hispanic grand jury panelees "is unreliable insofar as . . . it [is] based solely on his view of which of the names on juror lists appear Hispanic. Such evidence is clearly insufficient for establishing the actual number of Hispanic grand jurors and, by extension, the ratio between Hispanic and non-Hispanic grand jurors."  *Vasquez v. Thaler*, 505 F. App'x 319, 334 (5th Cir. 2013); *see also Paredes v. Quarterman*, 574 F.3d 281, 290 (5th Cir.

---

[24]    The state habeas court suggested that Medina could have supported his claim with information "such as relative percentages of Hispanics eligible to vote, Hispanics with a drivers license or Texas identification card, or statistics showing the *actual* percentage of Hispanics in Harris County eligible to serve on a grand jury or jury."  State Habeas Record at 973.

2009) (rejecting similar methodology as "irrelevant" and "unreliable"); *Alvarez v. Davis*, 4:09-cv-3040, 2017 WL 4844570, at *16 (S.D. Tex. Oct 25, 2017) (same).  Medina has not shown that, at the time of trial, his attorney possessed a better-supported or more-reliable basis to raise a similar challenge.  Based on the related findings, the state habeas court was not unreasonable in concluding that trial counsel did not miss a viable objection by not challenging the grand jury composition and process in this case.  Because "[c]ounsel is not required by the Sixth Amendment to file meritless motions," *United States Gibson*, 55 F.3d 173, 179 (5th Cir. 1995), the state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### B.    Deficient Representation During Voir Dire

Medina complains that trial counsel provided deficient representation during jury selection. (Docket Entry No. 53 at 268-77).  Specifically, Medina argues that trial counsel should have: moved to strike two objectionable jurors for cause, made better use of peremptory strikes, questioned prospective jurors about their attitude toward gangs, and removed a disqualified juror from the panel.[25]  The state habeas court rejected each of these arguments on state habeas review.

---

[25]    In addition to the specific complaints, Medina broadly alleges that trial counsel took jury selection too casually.  Medina claims that trial counsel did not question prospective jurors to the depth necessary to uncover any latent biases.  In fact, Medina claims that "[a]s the voir dire progressed, trial counsel appeared to abandon questioning jurors altogether; the voir dire of the tenth seated juror was only five pages [of transcript] . . .  the eleventh a mere one page . . . and the last seated juror was asked no questions at all."  (Docket Entry No. 53 at 270).  While Medina's allegations about the length of trial counsel's questioning provides some context to his constitutional claims, an inmate alleging error during jury selection must show actual prejudice, primarily by identifying "any particular juror [who] was in fact prejudiced" because of the inept questioning. *Neville v. Dretke*, 423 F.3d 474, 483 (5th Cir. 2005); *see also Teague v. Scott*, 60 F.3d 1167, 1172-73 (5th Cir. 1995) (holding that an inmate must make specific factual allegations showing that a biased venire member actually served on the jury); *Clark v. Collins*, 19 F.3d 959, 965 & n. 25 (5th

(continued...)

### 1.      Move to Strike Two Jurors for Cause

Medina faults trial counsel for not seeking to dismiss two jurors, Francis Joseph Natale and Amanda Riddle Stewart, for cause.  (Docket Entry No. 53 at 271-74).  "Texas law provides that either the state or defense may challenge a prospective juror for cause if [he or she] has a bias or prejudice for or against the defendant."  *McCoy v. Lynaugh*, 874 F.2d 954, 960 (5th Cir. 1989) (citing Tex. Code Crim. Pro. art. 35.16(a)(9)).  Counsel did not argue that either Mr. Natale or Ms. Stewart had a disqualifying bias or prejudice.  Both served on the jury.

### a.      Mr. Natale

Medina first argues that trial counsel should have moved to strike Mr. Natale for cause because "1) he was admittedly pro-law-enforcement, 2) voluntarily expressed dismissed dismay at the possibility of parole, and 3) informed the parties that he would be outraged if someone convicted in a case involving small children didn't get the death penalty."  (Docket Entry No. 53 at 273).  Trial counsel began his questioning by saying that Mr. Natale seemed like "a pretty law-enforcement-type person, law and order," and asked about whether he could "be fair and impartial to both sides."  Tr. Vol. IV at 280, 282.  Mr. Natale repeatedly expressed his ability to be impartial and said that he "want[ed] it to be as fair as possible for all sides."  Tr. Vol. IV at 284.  Mr. Natale expressed concern about an individual being sentenced to death eventually getting parole.  During the defense's questioning, trial counsel explained that the law required the "Judge [to] tell you you're not to consider parole for any reason whatsoever," to which Mr. Natale responded that he would not let

---

[25]      (...continued)

Cir. 1994) (requiring an inmate to prove that counsel's performance in voir dire led to seating of biased jury). The Court, therefore, must specifically analyze trial counsel's questioning of specific jurors.

"that personal thing [affect] his decision."  Tr. Vol. IV at 286.

Medina's claim focuses on Mr. Natale's comments in response to the prosecution's question about whether his views on the death penalty would change when "looking at another person" who "could get the death penalty":

> I can look at the gentleman over there and tell you that everything depends on what's said in the courtroom and not really how I feel.  The law says—that law says what will happen to the gentleman if he's found guilt.  And I don't have a feeling about it as far as that goes.  I mean, I don't want to see anybody die, personally.  But if that person did whatever it is he did and that's the punishment, and that's what he deserves, I'm for it.  *There are, like I said before, a few cases where I would be outraged if they didn't get that and that's where it concerns small children.*  I mean, that could be because of my life, where I'm at, I have young children.

Tr. Vol. IV at 268-69 (emphasis added).  The prosecutor then clarified that "the death penalty is one possible punishment for . . . killing a young child."  Tr. Vol. IV at 269.

The state habeas court found that Mr. Natale was not subject to removal for cause.  Mr. Natale said that he "understood the presumption of innocence, the burden of proof, the concept of judging the credibility of a witness," and "he could answer the sentencing questions based on the evidence."  State Habeas Record at 956.  Mr. Natale indicated that he "could consider all of the facts, keep an open mind, consider mitigating evidence," "be fair and impartial to both side[s]," "hear all of the evidence before making a decision," and "would follow the rules about not considering parole."  State Habeas Record at 956.  Further, while Mr. Natale stated that the death penalty "was deserved in some crimes if the person was guilty, such as where a child may be raped or sodomized and then murdered," he also said "'everything depends on what's said in the courtroom and not really how I feel.'"  State Habeas Record at 956 (citing Tr. Vol. IV at 266-78).  Because Mr. Natale "did not express an inability to disregard parole or a propensity to automatically impose the death penalty on cases involving small children," and "repeatedly that he would render

31

a verdict and answer the sentencing questions based on the evidence," the state habeas court found that he "was not subject to a successful challenge for cause."  State Habeas Record at 956–57.

The state habeas court's rejection of this claim was not unreasonable.  While Medina points to a statement that may suggest that Mr. Natale held a  prejudice toward imposing the death penalty for certain crimes, a fulsome review of his voir dire indicates an ability to be impartial.   For example, Mr. Natale was far from insistent that the death penalty be employed in all murders involving children.  Mr. Natale told the prosecutor: "I hate to see it have to be used but I can see in situations where it's the only punishment for the crime . . . [s]ome crimes deserve it and some don't."  Tr. Vol. IV at 265.  Still, Mr. Natale conceded that it "[d]epends on each individual case." Tr. Vol. IV at 264.  Taken as a whole, the questioning did not expose any view or predisposition for which a reasonable trial attorney would have been able to raise a successful challenge for cause. Having reviewed the whole of Mr. Natale's questioning, the Court finds that the state habeas court's rejection of this claim was not unreasonable.  *See* 28 U.S..C. § 2254(d)(1).

### b.    Ms. Stewart

Medina argues that trial counsel should have challenged Ms. Stewart for cause because she would automatically vote for a death sentence in any murder case.  "It is well-settled that a juror who will automatically vote for the death penalty is challengeable for cause."  *Austin v. Davis*, 876 F.3d 757, 787 (5th Cir. 2017).   Medina bases his claim on one portion of the questioning in which Ms. Stewart seemed to disagree when told that not all murderers deserved a death sentence:

> I think that any murder is a capital murder. I think all murders need to be looked at for any reason that someone decides to take someone else's life.  You know, we can't bring that other person back and whatever the circumstances behind it I think murder is serious.
> . . .
> I don't think it's all capital letters or small letters or murder is murder.  And you

32

know, true, there are circumstances that are different things, but, I mean, murder is
murder. I don't know why he did it. I don't know anything about this case, but to me
murder is murder.

Tr. Vol. XI at 1228. Trial counsel did not ask Ms. Stewart any questions relating to the penalty
phase.

The state habeas court found that Ms. Stewart "understood the concepts of mitigation and
burden of proof; that she could follow the law," that she "thought that death was appropriate in"
some cases "but she did not know anything about the circumstances of this case." State Habeas
Record at 957. The state habeas court specifically found that "she could follow the law that would
result in a life sentence if the State did not prove a sentencing question; and, she could answer the
mitigation issue depending on whether she determined there were mitigating circumstances." State
Habeas Record at 957. While she "did not display a predisposition to automatically assess the death
penalty in all murder cases, albeit that she thought that murder was serious, and that she consistently
indicated that she understood the principles of a capital murder trial and that she could follow the
law." State Habeas Record at 957.

A full reading of Ms. Stewart's questioning does not show any predisposition that would
result in an automatic death sentence. One of her isolated statements indicated that all murders
should be *capital* murders, possibly reflecting confusion about the definition of the word "capital"
that would style all murders with an uppercase letter. The whole of her questioning shows that the
state habeas court reasonably found that she properly understood her role in the criminal process and
could answer Texas' special issue questions based on the evidence, not her opinions. This Court's
review of the record shows that, in the context of the entire questioning, the state habeas court
reasonably found that she was not subject to a challenge for cause. The state habeas court, therefore,

33

was not unreasonable in finding no *Strickland* error on that ground.  *See* 28 U.S.C. § 2254(d)(1).

## 2.      Use of Peremptory Strikes

Medina complains that trial counsel provided deficient performance by "frequently, and inexplicably, exercis[ing] peremptories without moving for a cause challenge . . . ."  (Docket Entry No. 53 at 274).  Medina, however, only identifies two prospective jurors—Sylvia Downing Roeseler (Tr. Vol. V at 332-347) and Raymond M. Clement (Tr. Vol. VI at 404-16)—who counsel should have challenged for cause rather than removed by peremptory strike.  (Docket Entry No. 53 at 274-76).

When Medina raised this claim on state habeas review, the state court did not review the prospective jurors' questioning to decide whether trial counsel could have lodged a successful challenge.  Instead, the state habeas court summarily rejected this claim because, as "trial counsel used 13 of 15 of his peremptory strikes,"[26] it was "irrelevant whether trial counsel exercised a peremptory strike against" the two jurors.  "[P]eremptorily striking Roesler and Clement did not place [Medina] in a position where he used all his available peremptory strikes."  State Habeas Record at 957.  Accordingly, the state habeas court found that "trial counsel are not ineffective for making the strategic decision to strike Roeseler and Clement, rather than attempting to strike them for cause."  State Habeas Record at 958.

Medina has not shown that the state court's resolution of this claim was contrary to, or an unreasonable application of, federal law.  Trial counsel's choice to expend a peremptory challenge removed the two potential jurors as effectively as a challenge for cause would have.  Trial counsel's

---

[26]      Texas state law entitles the defense to fifteen peremptory challenges.  *See* Tex. Code Crim. Pro. art 35.15(a).

choice did not prejudice the defense because it did not exhaust the available peremptory strikes. Medina has not shown that the Court of Criminal Appeals was unreasonable for denying this claim.

### 3.    Question Potential Jurors about Potential Bias Toward Gang Members

Medina's gang membership played an integral role in the events that led up to the murders. Medina's gang membership was undisputed, as was the gang affiliation of various trial witnesses. Complaining that "[g]ang evidence carries undeniable ignominy in the eyes of the public," Medina complains that trial counsel "made no effort to ascertain prospective jurors' attitudes towards gangs." (Docket Entry No. 53 at 276, 277).  Because discussion about gang membership would saturate the testimony of several witnesses, Medina faults counsel for "[n]ot once . . .ask[ing] a single question pertaining to possible prejudice against gang association." (Docket Entry No. 53 at 277).

Respondent counters that Medina has not pleaded this issue with sufficient specificity to ascertain if any error existed.  Medina has not shown what questions trial counsel should have asked potential jurors, how they may have responded, or what benefit such questioning would give the defense.  Indeed, Respondent correctly argues that "[o]ne might presume that any reasonable member of the venire panel would be biased against gang violence and gang members." (Docket Entry No. 76 at 179).

The state habeas court summarily denied this claim without issuing specific findings of fact. Nonetheless, the state habeas court still generally found that trial counsel assured that jurors could consider the evidence impartially and follow the law.  State Habeas Record at 958.  Given the possibly prejudicial – but inextricably important – nature of evidence of gang membership, the lack of specificity about what questions counsel should have asked, and Medina's failure to identity

harm, the Court summarily finds that the state court rejection of this claim was not contrary to, or
an unreasonable application of, federal law.

### 4.      Allegedly Disqualified Juror

Medina claims that trial counsel's questioning failed to uncover that the final juror selected,
Alma Volante, was not qualified for jury service. (Docket Entry No. 53 at 277-78).[27] Medina claims
that Juror Volante was a "convicted felon [who] lied about her prior record and her involvement
with the criminal justice system." (Docket Entry No. 24 at 288). According to Medina's research,
a person named Alma Volante was charged with felony theft in 1980. As part of her deferred
adjudication that resulted in two years' probation, she admitted to the felonious conduct. In 1982,
she pleaded guilty to misdemeanor theft and was sentenced to three days in jail. Her second theft
conviction violated her probation which, after the State moved to adjudicate her guilt, resulted in
court-ordered psychiatric therapy. Her treatment resulted in a diagnosis of adjustment disorder.
After she later falsely stated she had not violated her probation, it was terminated. Medina claims
that Juror Volante lied about her criminal history in her juror questionnaire. Medina faults trial
counsel for not discovering her unsuitability for jury service.

The state habeas court provided several reasons for rejecting Medina's challenge to Juror
Volante's eligibility. The state habeas court observed that, while "an Alma Volante" had the
criminal record adduced by Medina, he had not shown it was the same person who served on the
jury. Even assuming that it was, the state habeas court found that her criminal history—consisting
of minor offenses, rather than "high crimes"—would not automatically disqualify her from jury

---

[27]      Medina bases this claim on the arguments he makes in his seventh ground for relief,
a claim he defaulted in state habeas court.

service.  State Habeas Record at 946.  Finally, the state habeas court found that her jury service would not have imposed "significant harm" on Medina, especially in conjunction with the state court's finding that she could render an impartial decision.  State Habeas Record at 945-46, 958, 971-73.

Before discussing the reasonableness of the state habeas court's decision, however, the Court observes that Medina's briefing undercuts the viability of this claim.  In discussing another claim, Medina agues that trial counsel "was not able to make an objection at the time of trial due to Ms. Volante's dishonesty, and her dishonesty prevented Mr. Medina from discovering the grounds for her exclusion, thereby resulting in a biased jury." (Docket Entry No. 92 at 213).  Medina contends that his "ignorance of the facts underlying this claim is not his own responsibility or that of his trial attorney; rather, [it] arose directly from Ms. Volante's blatant dishonesty and failure to reveal her criminal history." (Docket Entry No. 92 at 216).  In other words, Medina's argument presupposes that trial counsel could not have known about Ms. Volante's criminal record.  Given that argument, Medina cannot show that counsel provided deficient performance by relying on Ms. Volante's answers to the jury questionnaire.

Alternatively, Medina has not shown that the state court's rejection of his ineffective-assistance claim was unreasonable.  As in state court, Medina has not produced any reliable means of ascertaining if the juror who sat in his trial was the same person who had previously violated the law.  However, even assuming that Medina could make that showing, he would still have to prove that Ms. Volante's criminal record made her ineligible for jury service.[28]  The state habeas court

---

[28]     Medina requests discovery relating to Ms. Volante's record.  (Docket Entry No. 148 at 30-31).  Even if he could conclusively prove that she had a criminal record, Medina would still
(continued...)

found that Ms. Volante's prior crimes did not automatically disqualify her from being a juror.  At the time of trial, the Texas Constitution provided that "laws shall be made to exclude from . . . serving on juries . . . those who may have been or shall hereafter be convicted of bribery, perjury, forgery, or other high crimes."  Tex. Const. art. XVI, § 2.  Texas state courts have held that misdemeanor theft, such as that committed by Ms. Volante, is not a high crime that automatically disqualifies an individual from jury service.  *See Loredo v. State*, 47 S.W.3d 55, 58 (Tex App. Houston [14 Dist.], 2001).  The state courts maintain the right to decide their own law, and this Court cannot second guess their interpretation of the Texas qualifications for jury service.

Moreover, Medina could only succeed on this claim after making a showing of prejudice. He has not shown that the state habeas court was unreasonable in finding that Juror Volante was not "prejudiced or biased . . . ."  State Habeas Record at 958.  For those reasons, the state habeas court's rejection of his *Strickland* claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).[29]

## II.     Ineffective Assistance of Trial Counsel in the Guilt/Innocence Phase (claim one)

As previously mentioned, trial counsel developed a strategy of blaming the murder on Flaco. Medina does not disparage trial counsel's chosen defensive theory.  Medina, however, complains that trial counsel did not engage in an investigation that would adequately support that theory. Again pointing to trial counsel's heavy case load and allegedly minimal preparation, Medina claims that a competent attorney would have put on a much stronger case to blame Flaco for the driveby.

---

[28]     (...continued)
have to show that it would have disqualified her from jury service.

[29]     For those same reasons, the Court would deny Medina's seventh claim if he had properly placed it before the state courts.

To that end, Medina argues that trial counsel failed to prepare, particularly by not impeaching trial witnesses with readily available material.  In addition, Medina complains that trial counsel should have disputed testimony showing his commission of various extraneous acts.  Finally, Medina claims that trial counsel erred by not securing independent testing of forensic evidence.

## A.    Failure to Interview Prosecution Witnesses and Prepare an Adequate Defense

Medina claims that trial counsel failed to conduct an adequate investigation into his case. (Docket Entry No. 53 at 94-120).  Because trial counsel allegedly only engaged in "negligible pretrial work," (Docket Entry No. 53 at 94), Medina claims that counsel did not interview an important witness for the State, develop sufficiently their own defensive theory, and prepare readily available material to impeach prosecution witnesses.

### 1.    Perform a basic investigation and interview prosecution witnesses (Docket Entry No. 53 at 95-97)

In an argument consisting of broad statements about counsel's lack of preparation, Medina faults trial counsel's pre-trial activities, alleging that, "[o]ther than interviewing Mr. Medina and his sister, the defense investigation into the offense consistent of 10 telephone calls on the eve of trial." (Docket Entry No. 53 at 95).  However superficial counsel's investigation, Medina must provide specific information about what more counsel should have done.  Medina claims that trial counsel provided deficient performance because "only three witnesses who testified for the State were contacted by the defense before trial."  (Docket Entry No. 53 at 95).  Specifically, trial counsel "never spoke with even the most critical witnesses in the case, including Flaco Holmes, Johnny Valadez, and Regina Juarez."  (Docket Entry No. 53 at 96).

Respondent correctly observes that "Medina is vague about the benefits that would have arisen from pretrial interviews."  (Docket Entry No. 76 at 182).  Medina has not provided affidavits

or any other verifiable means of ascertaining how those witnesses would have changed their trial testimony had counsel interviewed them. Even if the Court were to presume that counsel performed deficiently by not probing the testimony of State's witnesses, Medina cannot meet *Strickland*'s prejudice prong without some showing of how it would have changed their testimony, which in turn would have caused a reasonable probability of a different result. Medina has not shown *Strickland* error on this argument.

### 2. Investigate own trial theory (Docket Entry No. 53 at 97-109)

Medina faults trial counsel's preparation of a defense blaming the murder on others. Medina does not take issue with the theory; rather, Medina claims that trial counsel did not do enough to instill doubt as to the shooter's identity in the mind of jurors. Medina specifically wishes that trial counsel would have called several witnesses, each of whom would have pinned the murder on Flaco. Medina claims that trial counsel should have called the following witnesses who would have provided the indicated testimony:

> <u>Dallas Nacoste</u> - In a September 14, 2001, affidavit, Nacoste describes how he was at Candyman's house when Flaco arrived at the party with another black male. Flaco, who was "all pumped up," said that he drove by the house of "Blue's" girl friend, saw Blue outside, and wanted to "do a hit." Because Flaco was not a gang leader, he asked Nacoste for permission to do a drive-by. Nacoste said he saw Flaco and Moore leave with a semiautomatic rifle. When Flaco returned, he expressed concern that shell casings were in the back seat. Flaco later admitted to Nacoste that he had "messed up" and had seen "two or three [people] fall" in the drive-by. Flaco told Nacoste to blame the murders on Medina. Flaco became angry when Nacoste told him that gang leadership would have to vote on that plan. Pelon later told Nacoste that Flaco had committed the drive-by and that they had buried the weapon. Nacoste told this information to the police. During trial, Nacoste spoke with Regina Jackson after she testified against Medina. She bragged about how she "helped fuck over" Medina.[30] State Habeas Record at 442-444.

---

[30]     Nacoste provided a similar witness statement prior to trial which varies in some
(continued...)

<u>Carlos McNickles and Chastity Hamilton</u> - McNickles lived in the same neighborhood as the Rodriguez family. He told the police that he was speaking on the phone at approximately 1:00 a.m. when he saw a "dark blue late 80's four-door Park Avenue-type car" containing two black males. One male was driving and the other was hanging out the window as he shot a rifle into the air. Hamilton, who had been speaking on the phone with McNickles, confirmed that he described two black men as the perpetrators. State Habeas Record at 448, 451-52.

<u>Jason Wade Crawford</u> - Crawford, who lived in the same neighborhood as Flaco, knew that Flaco had been good friends with the LRZ member whose murder had spurred the gang warfare. Flaco told him that the LRZ gang had "something planned" for the HTC. He saw Flaco with a "long rifle wrapped in a towel" a shortly after the murders. The police and defense never contacted Crawford before trial. State Habeas Record at 454-55.

<u>Ricardo Villanueva</u> - Regina Juarez called Villanueva and told him that "some guys in LR+Z" had committed the murders and blamed them on Flaco. She said that Flaco wanted her to blame it on Medina. During the same phone conversation, Flaco bragged about committing the murders, saying he "smoked those fools" and bragging that "shit was cool." Flaco said he was going to "put it on [Medina] because he's always wanting to take credit for putting something together." Neither the police nor the defense contacted Villanueva before trial. State Habeas Record at 457.

<u>Raymundo Becerra</u> - Becerra, an LRZ leader who had been dating Regina Juarez, said that Flaco had been trying to take control of Medina's gang role after his incarceration. Regina Juarez told Becerra that Flaco had done a drive-by. Flaco had threatened her not to tell anyone. Becerra said that Flaco was "pressuring [the cruces] to give him stripes . . . because he got rid of a 'sell out'" by "getting

---

[30]      (...continued)
details. State Habeas Record at 438-40, 446. In that account, he states that, when questioned by police officers, they told him that Medina "had given them [his] name and told them [he] was involved" in the driveby. Nacoste "figured if [Medina] told the police about [him] then [he] should tell what [he] know[s]." State Habeas Record at 439. Nacoste told the police that Flaco wanted to do a driveby and asked for the gun, but Nacoste did not mention giving Flaco permission to kill and did not mention any conversation with Flaco after the killings. (Docket Entry No. 25 at 175). He did mention, however, that Pelon had said Flaco committed the killings. Others who were with Nacoste, including James "Smurf" Palladina told police officers that Flaco told them "they did a driveby at the [Rodriguez's] house and that [Medina] had shot a bunch of people that were standing in the front yard." (Docket Entry No. 25 at 214, 216).

[Medina] locked up." State Habeas Record at 460-63.[31]

The state habeas court recognized that trial counsel adopted a strategy similar to the testimony in some of the affidavits: "counsel's trial strategy was to place the blame on others," including by adducing testimony that "'Flaco' told others that he committed the offense . . . ." State Habeas Record at 961. The state habeas court generally found that "the information [Medina] presents in postconviction affidavits is either information that does not exculpate [Medina] or is information that was presented at trial and rejected by the jury, as shown by the jury's finding of guilty." State Habeas Record at 961.

Mr. Guerinot provided two reasons for not calling Nacoste to testify: (1) Nacoste was not credible and (2) the defense had enough witnesses who shifted the blame to Flaco. The state habeas court found that "Nacoste's habeas affidavit gives essentially the same version of the offense that he gave in his statement to the police, a statement available to trial counsel." State Habeas Record at 960. The state habeas court also endorsed counsel's decision because he "chose not to call Nacoste to testify because [his] credibility was even lower than other witnesses and counsel was able to call other witnesses in an attempt to blame 'Flaco.'" State Habeas Record at 961.

The state habeas court found that McNickles and Hamilton's affidavits did not "exculpate [Medina] concerning the instant capital murder." State Habeas Record at 960. The testimony those

---

[31]     In his federal petition, Medina also alleges that trial counsel should have called Flaco's girlfriend, Shelly Amato who would have testified that Flaco kept changing his story about what happened on the night of the murders. Medina did not exhaust his argument that counsel should have called Shelly Amato as a witness. While the procedural defects in this argument preclude federal consideration of Medina's arguments relating to Ms. Amato, the Court observes that Medina has not secured an affidavit from her, but instead relies on hearsay statements related by a law student who interviewed her. Medina's failure to support the claim with admissible evidence precludes any finding that it merits federal relief or additional federal consideration.

witnesses provided, that an hour and a half before the murders two men were joyriding and firing a weapon on a different street in a different vehicle than that seen by witnesses at the shooting, would have done little to support the defense's efforts to pin the murder on Flaco.

The state habeas court also found that Crawford's testimony would have benefitted the defense little, and in fact, may have inculpated Medina.   In particular, Crawford's statement that Flaco said "that the LRZ gang had something planned for the HTC's . . . is as incriminating to [Medina] as it is to other LRZ gang members."  State Habeas Record at 961.  Further, Crawford's testimony that Flaco brought a weapon to Angie Moore's house "corroborated trial testimony that . . . 'Flaco' . . ., along with others, helped hide the guns" which "does not exculpate [Medina]." State Habeas Record at 961.

Also, the state habeas court did not find any error in counsel's failure to call Villanueva and Becerra.  Both witnesses would have "assert[ed] that Regina Juarez said that 'Flaco' had done the shooting . . . ."  State Habeas Record at 961.  However, that testimony would have fit into the narrative provided by Regina Juarez where "she agreed at one point to participate in a plan to blame 'Flaco' Holmes for the shooting."  State Habeas Record at 961.

In the end, much of the testimony in the affidavits would have supported the defense at trial without fundamentally altering the evidentiary picture before jurors.  Allegations of ineffective assistance of that character "come down to a matter of degrees" and are thus particularly susceptible "to judicial second-guessing."  *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000).  With the strong presumption that counsel's representation fell within the wide range of reasonable professional assistance, *see Strickland*, 466 U.S. at 689, Medina's argument that trial counsel failed to "present available, helpful evidence on the theory it had adopted" is "a difficult route by which

to demonstrate ineffective assistance." *Hummel v. Davis*, 908 F.3d 987, 992 (5th Cir. 2018).  Unless

the inmate can adduce evidence that is "'shocking and starkly different than that presented at trial,'"

an ineffective-assistance claim "is not viable."  *Sorto v. Davis*, 672 F. App'x 342, 350 (5th Cir.

2016) (quoting *Blanton v. Quarterman*, 543 F.3d 230, 239-40 n.1 (5th Cir. 2008); *Coble v.

Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007)).  To the extent the affidavits present information

different from trial, counsel provided strategic reasons for not calling those witnesses.  In the end,

Medina has not shown that the state habeas court was unreasonable for denying this portion of his

*Strickland* claim.

### 3.    Impeach prosecution witnesses (Docket Entry No.  53 at 109-120)

Medina claims that trial counsel should have impeached the credibility of the State's

witnesses by emphasizing their criminal histories.    Medina focuses on prosecution witnesses

Maurice Argueta, Flaco, and Jamie Moore arguing that counsel should have told jurors about their

various prior crimes and bad acts.  Specifically, Argueta pleaded guilty to misdemeanor theft, had

been charged with possession of cocaine, pleaded guilty to tampering with a government record, and

had been charged with sexually assaulting a woman.  Flaco had been arrested eleven times.  At the

time of trial, Flaco was facing charges of unauthorized use of a motor vehicle.  Medina also

emphasizes unadjudicated offenses committed by Flaco.  Moore admitted to prior convictions while

on the stand, but counsel never asked him about lying to a prison official about his prior convictions,

which included a probated sentence for five thefts.[32]

---

[32]    Medina also argues that Valadez and Regina Juarez contradicted themselves in
various statements to police officers and argues that it amounted to perjury. Despite ample
opportunities to do so, Medina did not raise this complaint in state court. The Court finds that
Medina has not shown that federal habeas review is available on this issue.

In his state habeas affidavit, Mr. Guerinot said that he "reviewed the [state's] sub-file labeled 'Criminal Histories' and reviewed the criminal records or inquiries about the criminal records of numerous witnesses.  Also the defense investigator ran criminal histories of the witnesses."  State Habeas Record at 694.  Aside from finding that "much of the witnesses' prior actions being inadmissible," the state habeas court found that "[t]rial counsel were aware of the criminal histories of the witnesses and trial counsel made the strategic decision to impeach each witness based on that witness's testimony and actions."  State Habeas Record at 960.

A witness may be impeached for prior criminal history or a final conviction.  However, under Texas R. Crim. Evid. 609 a witness cannot be "impeached with a case for which deferred adjudication was received, cases where charges were dismissed, arrests which did not lead to conviction, and cases against a juvenile."  State Habeas Record at 941.  Trial counsel cannot be deficient for not impeaching witnesses with bad acts and crimes which are inadmissible under state law.  Accordingly, the prior arrests and juvenile records of the trial participants were not available areas for defense questioning.

Additionally, the jury already knew that some witnesses had previously violated the law.  Some information about criminal histories came before jurors, such as when the prosecution asked Moore questions about his prior convictions.  Also, Flaco admitted that he was, at the time of trial, in Texas Youth Commission custody, suggesting to jurors prior violations of the law.  Medina has not shown how additional information about their criminal activity would have measurably changed the jury's assessment of their credibility.

Moreover, jurors had ample opportunities to see that the trial witnesses lived lives intricately entwined with gang culture, already suggesting involvement in a life of lawlessness.  To the extent

that Argueta's prior convictions could have come before jurors, Respondent persuasively argues that "the believability of Argueta's inculpating testimony arose not from his character but from the corroboration of other witnesses, including Medina." (Docket Entry No. 76 at 52). The Court finds that Medina has not shown that the state court's adjudication of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### B.   Extraneous Acts

The prosecution adduced testimony at trial which placed the shootings into a larger context of gang warfare, particularly that surrounding the Rodriguez family. Medina claims that trial counsel should have objected when the State presented evidence of "numerous extraneous acts." (Docket Entry No. 53 at 123). Specifically, Medina claims that trial counsel should have acted to prevent the jury from learning about: (1) a July 1995 driveby at the Rodriguez house; (2) a July 1995 incident where someone threw a fire bomb at the house; (3) the painting of gang-related graffiti on the house; and (4) damage to Veronica Rodriguez's vehicle. The testimony did not specifically attribute those acts to Medina, but the evidence instead showed a pattern of gang violence by various people, placing the murders into the broader context of ongoing gang warfare.

The prosecution, however, also adduced some testimony describing Medina's own actions, specifically: (1) threatening and aggressive interactions between Medina and Veronica Rodriguez's boyfriend Marco "Blue" Martinez and (2) Medina's brandishing a weapon before, and firing it after, the driveby. Medina argues that, had trial counsel made a sufficient objection, the jury would not have known about those incidents. (Docket Entry No. 53 at 123-27). Medina also insists that, at a minimum, trial counsel could have ensured that the jury receive a limiting instruction or other requirement that they only consider the incidents if the prosecution proved them beyond a

reasonable doubt.  (Docket Entry No. 53 at 130-38).  Medina contends that there is a reasonable probability that the trial counsel have had a different result had trial counsel objected.

Medina must show that a reasonable attorney would have objected to the prosecution's evidence and that failure to do so prejudiced the defense.  The Court will review separately the testimony showing general acts of aggression against the Rodriguez family and the specific acts committed by Medina.

### 1. General Gang-Related Aggression

On both direct appeal and state habeas review, Medina challenged the testimony about gang violence toward the Rodriguez family.  On direct appeal, Medina claimed that the trial court erred by allowing Mr. Rodriguez to testify about the previous gang-related violence directed at his home, "the site of the offense."  Medina argued that the evidence constituted an inadmissible extraneous offense under Tex. R. Evid. 404.  The Court of Criminal Appeals found that trial counsel failed to preserve a trial objection on that basis.  Alternatively, the Court of Criminal Appeals summarized:

> Rodriguez testified that he had put his house on the market prior to the offense because his house had been targeted by the 'La Raza' gang.  He testified that there had been a drive-by shooting on July 10, 1995, that the next day, 'La Raza' had been painted on his garage, and that the rear window of his daughter's car had been smashed.  Rodriguez speculated that his daughter's relationship with a member of the H-Town Crips was the reason 'La Raza' targeted his home.

The Court of Criminal Appeals held:

> We believe that the evidence was relevant to explain the context of gang rivalries in which the offense occurred.  The evidence furthered the State's theory that the Rodriguez's home was a target of [Medina's] gang.  That the house was a target of the gang had some tendency to show that [Medina] had a motive to shoot and kill persons at that house.

*Medina*, 7 S.W.3d at 643.

On state habeas review, Medina claimed that trial counsel provided ineffective assistance

by not objecting to the prior gang activity directed against the Rodriguez family.  Relying on the Court of Criminal Appeals' appellate decision, the state habeas court held that "gang references and testimony were admissible as part of the circumstances surrounding the instant offense, and that trial counsel are not ineffective for not lodging objections to the admission of the relevant evidence of the July, 1995 drive-by shooting and related events and to the numerous gang references throughout the trial."  State Habeas Record at 959.

The Court of Criminal Appeals found that the testimony was admissible.  Texas law generally allows the admission of "[s]ame transaction contextual evidence" which "is evidence that reflects the context in which a criminal act occurred and is admissible under Texas Rule of Evidence 404(b) where it is necessary to the jury's understanding of the offense." *Ramirez v. Stephens*, 641 F. App'x 312, 326 n.14 (5th Cir. 2016) (citing *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000)).  Same-transaction contextual evidence "imparts to the jury information essential to understanding the context and circumstances of events which, although legally separate offenses, are blended or interwoven." *See Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993).

The state courts found that the testimony about the gang violence toward the Rodriguez family was admissible.  "A federal court lacks authority to rule that a state court incorrectly interpreted its own law." *Charles v. Thaler*, 629 F.3d 494, 500-01 (5th Cir. 2011); *see Schaetzle v. Cockrell*, 343 F.3d 440, 448-49 (5th Cir. 2003) ("[W]e defer to [the Texas Court of Criminal Appeals's] determination of state law. 'It is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law . . . .'").  Medina offers no objection based on federal law that would have prevented the jury from knowing about the prior gang activity. Because "a state court's interpretation of state law binds a federal court sitting in habeas corpus,"

48

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991), this Court must assume that the trial court would have rejected any effort by trial counsel to put the murders into a broader context.[33]

Even so, Medina faults counsel for not seeking instructions that required the jury to find the commission of any extraneous acts beyond a reasonable doubt, or that would otherwise limit the jury's consideration of the evidence. When a petitioner alleges prejudice from trial counsel's failure to raise an objection, he "must show there was a reasonable probability that the trial court would have granted it, or would have reversibly erred by refusing it." *Amos v. Thornton*, 646 F.3d 199, 219 (5th Cir. 2011) (quotation omitted); *see also Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986) ("[A] meritorious . . . issue is necessary to the success of a Sixth Amendment claim[.]"), *United States v. Flores-Ochoa*, 139 F.3d 1022, 1024 (5th Cir. 1998) (determining that a defendant cannot show that he was prejudiced where "there is no evidence that the court would have granted the

---

[33]  Trial counsel provided an affidavit on state habeas review in which he explained:

> After reviewing my file and the court record, I realize that Mr. Millin and I neglected to request either a limiting instruction or a reasonable doubt instruction at the guilt/innocence phase of trial regarding the numerous extraneous offenses that were introduced against Mr. Medina.

> I was aware at the time that if I requested these instructions, the trial court would have been required to give them to the jury but I simply neglected to request them due to an oversight. Not requesting the instructions was not the result of any strategy.

> The instructions would have been consistent with the defensive issue we raised at trial: that Dominic Holmes was the shooter.

State Habeas Record at 410. A trial counsel's confession of error does not make it so, especially because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702 (2002). This Court's analysis is an objective inquiry into whether "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

motion."); *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (finding that *Strickland*'s prejudice inquiry requires a petitioner to show that (1) had his counsel filed the motion, it is likely that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is likely that there would have been an outcome more favorable to him).    State law does not hold evidence to a reasonable-doubt standard or require a limiting instruction when the State relies on same-transaction contextual evidence.  *See Camacho*, 864 S.W.2d at 534-35; *Ramirez v. State*, 815 S.W.2d 636, 644 (Tex. Crim. App. 1991); *King v. State*, 553 S.W.2d 105, 106 (Tex. Crim. App. 1977).  Medina does not provide any other authority that would allow trial counsel to receive such instructions with regard to the third-party extraneous evidence.

The state court, therefore, was not unreasonable in finding no *Strickland* error in trial counsel's handling of testimony placing the murder into a broader context.

### 2.    Specific Acts Committed by Medina

Medina also argues that trial counsel should have objected when the prosecution presented testimony about what he did before and after the driveby shootings.  On direct appeal, Medina specifically

> complain[ed] of the admission of Maurice Argueta's testimony that, earlier on the night of the offense, [Medina] along with some other members of his gang got involved in an altercation with Sam Lopez, allegedly a relative of an H-Town Crips gang member.  Argueta testified that [Medina] threatened Lopez with a gun. [Medina] argue[d] that the evidence was irrelevant, Tex R. Evid. 401, et. seq., more prejudicial than probative, Tex. R. Evid. 403, and inadmissible extraneous-offense evidence, Tex. R. Evid. 404(b).

The Court of  Criminal Appeals held that, because "evidence of an extraneous offense may be admitted if it is relevant as to motive, identity, intent, opportunity, preparation, plan or absence of mistake," and "the State's theory of the offense was that [Medina] opened fire into the group

gathered in front of a home in revenge for the murder of a fellow gang member," the challenged testimony "was most relevant as to [Medina's] motive and intent on the night of the offense." *Medina*, 7 S.W.3d at 643-44.[34]

Additionally, "in the context of the entire record, it cannot be said that Argueta's testimony was more prejudicial than probative. The elements of the testimony which might be considered prejudicial to [Medina]—that he was a gang member, that he had a violent grudge against the H-town Crips, that he carried a deadly weapon and that he did not hesitate to threaten others with this gun—were facts established elsewhere in the record." *Medina*, 7 S.W.3d at 643-44. The Court of Criminal Appeals found under state law that the acts Medina committed before and after the driveby shooting were admissible against him. Medina offers no independent federal basis to bar introduction of that testimony. Relying on the decision on direct appeal, the state habeas court found that trial counsel did not provide deficient, prejudicial performance by not challenging the testimony of Medina's other bad acts. The state habeas court found that the testimony "was relevant to [Medina's] motive and intent on the night of the offense . . . ." State Habeas Record at 959.

While weakly arguing that trial counsel provided deficient performance by not objecting or seeking to limit the effect of the extraneous-offence evidence, Respondent most strongly emphasizes that any such failure did not harm the defense. To reiterate, the evidence Medina complains needed a limiting instruction included his previous aggressive interactions with Blue, his brandishing a weapon before the shootings, and his participation in a fight afterward in which he fired the murder

---

[34]     The Court of Criminal Appeals has held that "the unfolding of events and the progression of the crime is necessary to a full picture and understanding of what took place. In a prosecution for capital murder where consideration of the behavior of the defendant is critical, the entire context of the offense showing his actions is vital." *Mann v. State*, 718 S.W.2d 741, 744 (Tex. Crim. App. 1986).

weapon into the air.  Medina, however, has not shown that the jury would not have found that he committed those acts or that the incidents caused a reasonable probability of a different result.[35] Medina himself confessed during his trial testimony that he displayed a weapon and fired an assault rifle into the air consistent with the unobjected-to testimony.  Tr. Vol. XVII at 2131-32, 2158-61. As to the prior incidents involving his personal interaction with Blue, the jury already knew that his gang had acted out violently toward the Rodriguez house.[36]  Given the whole evidence and instructions from trial, the state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### C.     Forensic Evidence

Medina faults trial counsel's handling of the State's forensic evidence in this case.  (Docket Entry No. 53 at 138-42).  The police recovered six shell casings from the road in front of the Rodriguez home.  The police also found two casings in the driveway.  The State presented forensic evidence at trial through firearms examiner Robert Baldwin.  Mr. Baldwin told the jury that the shell

---

[35]      Medina asserts that trial counsel also should have requested a limiting instruction. He does not specify, however, for what limited purpose the jury should have considered the evidence.

[36]       Medina narrowly construes the State's case as one of transferred intent.  Medina claims that the State's whole case intended to show that, while trying to kill Blue, Medina accidentially shot others.  (Docket Entry No. 24 at 135-36).  The prosecution instead insisted that Medina showed a "clear intent to kill" by using a "miliatry assault rifle and [shooting] at least eight time, hitting three of the six children out there at least once . . . from fairly close range."  Tr. Vol. XII at 1293.  The motive was that "[h]is gang, the La Raza 13, despised the H-Town Crips or HTC. Veronica Rodriguez, the girl who owned that Dodge, who lived there, her boyfriend Marco, was in the gang." Tr. Vol. XII at 1294.  The jury instructions did allow for a conviction if, meaning to kill Blue, Medina caused the victims' death.  Clerk's Record at 112.  The instructions, however, also provided for his conviction if he "intentionally and knowingly caused the death" of the two victims. Clerk's Record at 111. While the prosecution's case and closing argued that Medina was "trying to get Blue," the prosecution also hammered that Medina was "trying to shoot up the house, he's shooting everybody around that house."  Tr. Vol. XVIII at 2320.

casings had been ejected from the murder weapon.  Tr. Vol. XIII at 1559.  Trial counsel questioned Mr. Baldwin about the ejection of cartridges from the murder weapon, attempting to call into question the eyewitness testimony showing Medina firing out the car window.  Trial counsel attempted to show that, had Medina fired the gun consistent with trial testimony, the cartridges would have ejected into the car, not the street.  Mr. Baldwin explained, "There's really no established pattern that one can establish with the ejection of cartridges because it depends on the attitude or, that is, the position of the firearm at the time it was discharged."  Tr. Vol. XIII at 1569.  Trial counsel then asked the trial court to order Mr. Baldwin to test whether firing the murder weapon consistent with trial testimony would have ejected shells into the car.  Tr. Vol. XIIII at 1571.  The trial court declined to order testing.  Tr. Vol. XIV at 1600.

On state habeas review, Medina claimed that trial counsel provided ineffective representation by not performing independent analysis of the shell casing.  (Docket Entry No. 53 at 138-42).  Trial counsel's habeas affidavit, however, explained why the defense had not tested that evidence.  Trial counsel explained: "During a break, I talked to Robert Baldwin at length and Baldwin said that he did not know for sure about the shell casings unless he actually was able to replicate the shooting position and angles."  State Habeas Record at 695-96.  Trial counsel feared, however, that additional testing could prove conclusively the State's theory of the case.  Trial counsel chose to impeach Baldwin during cross-examination rather than risk getting counterproductive results from independent testing.  The state habeas court found that "trial counsel made the strategic decision to use cross-examination for attempted impeachment of firearms examiner Robert Baldwin, rather than to pursue independent firearm testing that might prove harmful to [Medina]"  State Habeas Record at 962

53

Medina has not shown that trial counsel was ineffective for not securing independent testing. On state habeas review, Medina presented an affidavit from Dennis McGuire, an independent firearms examiner. Mr. McGuire disputed Mr. Baldwin's opinion, stating that "it is definitely possible to establish a reasonable ejection pattern of cartridge cases for this rifle under the circumstances dictated by the crime scene and the evidence." While he opined that the shooting possibly could not have occurred as described by the trial testimony, he had not performed any independent testing. Mr. McGuire only opined that additional testing with the murder weapon would be necessary to determine the ejection pattern. Medina has not produced any testing that would have disproved the State's version of events from trial.

In the absence of proof contradicting the forensic evidence at trial, the state habeas court was not unreasonable in finding that trial counsel made a reasonable decision to undercut the evidence through cross-examination, rather than through additional testing. "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter*, 562 U.S. at 791. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.* (noting also that "[w]hen defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict"). If based on an adequate investigation and understanding of the issues, an attorney's decision to attack the Government's expert witnesses on cross-examination rather than calling additional experts can be reasonable performance. *See Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007). Here, Medina's state habeas expert could only say that additional testing may establish the ejection pattern; he offered no guarantee that additional testing would have aided the defense. Given the eyewitness testimony,

the paucity of evidence otherwise challenging the link between the murder weapon and the shooting, and the entire context of trial, trial counsel could reasonably choose to forgo forensic testing. The state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## III.  Ineffective Assistance of Counsel in the Punishment Phase (claim three)

Medina argues that trial counsel's representation fell below constitutional requirements with respect to the penalty phase of trial. (Docket Entry No. 53 at 185-64). Medina raised this claim on state habeas review. Medina must show that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law.

Before examining the state court's disposition of this claim, the Court pauses to review trial counsel's responsibility to prepare for a capital sentencing hearing. Under Supreme Court jurisprudence, a capital sentencing process must contain two elements: "the eligibility decision and the selection decision." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). "To render a defendant eligible for the death penalty in a homicide case, [the Supreme Court has] indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Id.* at 971-72. In Texas, jurors make the eligibility decision in the guilt/innocence phase by finding that the defendant killed under one of several specifically defined circumstances. *See* Tex. Penal Code § 19.03; *Lowenfield v. Phelps*, 484 U.S. 231, 246-47 (1988); *Jurek v. Texas*, 428 U.S. 262, 270-71 (1976); *Adams v. Thaler*, 421 F. App'x 322, 337 (5th Cir. 2011). Once the prosecution proved Medina's guilt of a capital offense beyond a reasonable doubt, the jury considered his fate in a separate penalty phase.

Texas' capital sentencing scheme provides a comprehensive review of a defendant's life,

allowing the parties to introduce wide-ranging information about his background, previous acts, and personal qualities.  Only relevancy circumscribes the outer boundaries of what each party may present in the penalty phase.  *See* Tex. Code Crim. Pro. art. 37.071 § 2(a) ("In the proceeding, evidence may be presented *by the state and the defendant or the defendant's counsel* as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty.") (emphasis added).  "The focus of the Texas capital sentencing procedure is to have *all* the relevant evidence before the jury[.]"  *Williams v. Lynaugh*, 814 F.2d 205, 207 (5th Cir. 1987) (emphasis added); *see also Jurek v. Texas*, 428 U.S. 262, 275-76 (1976) ("What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.").

A Texas jury decides a capital defendant's sentence by answering special-issue questions. In this case, the special issues asked: (1) will the defendant be a future danger to society; and (2) do sufficient circumstances mitigate against a death sentence?  *See* Tex. Code Crim. Pro. art. 37.071 § 2(b); Clerk's Record at 150-51.   A capital defense attorney carries a heavy burden in preparing to defend against a death sentence.  *See Florida v. Nixon*, 543 U.S. 175, 191 (2004).  Constitutional and professional standards guide trial counsel's search for circumstances that may militate for a life sentence.  The Supreme Court has repeatedly emphasized a trial attorney's duty to investigate viable theories to craft a penalty-phase defense.  *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 522-23; *Williams v. Taylor*, 529 U.S. 362, (2000).   Although the Constitution does not "require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be" or "require defense counsel to present mitigating evidence . . . in every

56

case," he or she must still employ "reasonable professional judgment" in defending against a death sentence.  *Wiggins*, 539 U.S. at 533-34.  Defense counsel must deeply probe a defendant's background, extensively exhaust various avenues of investigation, and seriously consider potentially mitigating themes.  A cursory effort will not suffice; "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 236, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332 (5th Cir. 1983)).

Because Medina challenged trial counsel's penalty-phase representation in state court, AEDPA guides this Court's review.  This Court must assess whether the state habeas court was unreasonable in denying Medina's ineffective-assistance-in-the-penalty-phase claim.  AEDPA, however, does not only channel *how* this Court considers Medina's claim; AEDPA constrains *what* this Court may consider.  After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]" *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).  "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id*.  With that context, the Court will review the testimony and evidence the parties presented in state court, discuss the matters litigated on state habeas review, and decide whether the state habeas court's adjudication was reasonable.

A.     **The Trial**

In its expansive sentencing review, Texas law allows prosecutors to present evidence of prior bad acts, unadjudicated offenses, and extraneous crimes.  *See Powell v. State*, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994) ("Extraneous offenses are admissible at the punishment phase of a capital trial whether adjudicated or unadjudicated."). To that end, prosecutors scour a defendant's life for

lawlessness, hoping to convince a jury that the murder which the defendant committed was not an aberration, but one facet in his future danger to society. Prosecutors will often call a parade of witnesses who attest to a defendant's violent crimes and violent nature.

But before the prosecution called a single witness in Medina's penalty phase, the jury already had before it significant evidence showing that Medina was a violent man. Jurors knew that Medina recklessly fired an assault rifle into a crowd of youngsters in retaliation for a gang murder. The jury knew that Medina was not just a gang member, but an important leader in the LRZ. Also, the jury had before it other aggressive acts Medina committed against rival gang members on the night of the shootings. The jury also knew that Medina, instead of showing remorse, attempted to orchestrate a plan that would blame the murders on a subordinate gang member.

With that background, the prosecution showed that the murders for which Medina was convicted were only a part of the brutally escalating violent acts he committed. The state habeas court provided a concise summary of the significant evidence presented by the State during the punishment phase:

- Edward Johnston testified that he and [Medina] skipped school almost daily after they met in 1991; that they took turns slashing the tires of 8 to 12 cars at a time; that [Medina] drove his SUV into other cars to damage them or to push them into street intersections; and, that they stole items from the cars after they smashed the windows with a sledgehammer.

- The State presented evidence that [Medina] was arrested on October 28, 1993, and that multiple counts of burglary of a motor vehicle were filed against [Medina] and his accomplice.

- Delberta Storz, probation officer, testified that [Medina] received five years probation for the offense of burglary of motor vehicle both cause nos. 678640 and 678641, and that motions to revoke [Medina's] probations were filed within ten months based on [Medina's] failure to comply with the terms of his probation.

58

- The State presented evidence that [Medina] received ten years probation on December 23, 1994, in four arson cases, cause nos. 9421844, 9421845, 9421846, and 9421847, and that [Medina's] original probations for burglary of a motor vehicle continued with amended conditions.

- The State presented evidence that [Medina] violated the terms of his probation, and that his probation was revoked and he was sentenced in all six cases.

- Sixteen-year old Dante Medrano, a former South Side Syndicate Crips gang member, testified that [Medina] and Robert Lucio drove by Medrano's house in December, 1995; that Medrano heard gunshots and saw [Medina] hanging from the car window with a rifle; that bullets hit Medrano's house; and, that Medrano grabbed his father's .22 rifle and shot twice at the car.

State Habeas Record at 935-36.[37]

On state habeas review, trial counsel provided an affidavit explaining the defense's strategy

for the penalty phase: "to present a picture of the defendant's background and home life to show that

---

[37]    The jury also heard testimony about the effect of the murders:

- Rocio Pedrosa testified that she was shot on New Year's Eve at the Rodriguez house; that she had a three-hour surgery on her destroyed colon, was in the hospital for eleven days, and still had a colostomy bag at the time of [Medina's] trial; that a future surgery was scheduled to replace the colostomy bag with an ileostomy tapedown; that she had not returned to school; and, that she had nightmares and flashbacks and was afraid to be alone.

- Jesus Rodriguez, father of complainants Diane and David, testified that he was in the house when he heard the shots from the drive-by shooting; that he ran outside and saw his daughter, his son, and Pedrosa; that his wife could not sleep and was sick and nervous after the shooting; and, that his son Francisco was different after the shootings and his daughter Jennifer gave him a poem about her feelings after the shooting.

State Habeas Record at 935-36.

59

he was not a future danger." State Habeas Record at 695.[38]  The defense called seven witnesses,

each of whom provided brief testimony about Medina's life.  The defense called Medina's

great-uncle, Verlan Pegues; his aunt, Sherry Grein; his cousin, David Castro; his aunt, Eva Uribe;

his grandfather, Antonio Hernandez Medina; his father, Antonio Luna Medina; and his mother,

Golda Medina.  The state habeas court summarized their testimony as follows:

- Verlan Pegues testified about Medina's help and his good characteristics; that Medina had a speech impediment that he overcame; and, that Pegues had not seen Medina much since he was fourteen.

- Sherry Grien, Medina's aunt, testified about Medina's good qualities and stated that she did not have as much contact with Medina in the last couple of years.

- David Castro, Medina's cousin, testified that Medina lived in a gang area; that he was not aware of Medina having problems; that Medina was respectful and courteous to family members; and, that Medina helped Castro with house repairs.

- Eva Uribe, Medina's aunt, testified she picked up Medina and his sisters from the Bellaire Christian Academy when they attended; that Medina was involved in church; that he would protect Uribe's younger daughters; that he was respectful toward family members; that he would help his grandfather who had suffered a mild stroke; and, that Medina was a loving, caring person who took care of his son.

- Uribe testified that she was not really aware of Medina's gang involvement, but she eventually learned that Medina was in a gang.

- Antonio Hernandez Medina, Medina's grandfather, testified that Medina was intelligent, mechanically-inclined, and helpful to his relatives with errands and auto repairs, and that he interacted with children and was respectful to adults.

---

[38]      In the defense's division of responsibilities, Mr. Millin prepared for the penalty phase though suffering from terminal illness.  According to lead counsel: "Counsel Jack Millin's terminal illness did not hinder his ability or his performance.  He was able to perform his duties and thoroughly prepared the punishment phase of the case, presented the punishment evidence, and argued the punishment case."  State Habeas Record at 694.

- Anthony Luna Medina, Medina's father, testified that Medina was a good child; that he spent a lot of time with grandparents; that he got along well with children in the family; that he helped his family; that he had a good relationship with his parents; and, that his relationship with his family stayed the same when he became a teenager. . . . Medina's father testified that he . . . learned about Medina's gang activities after he was arrested; that he knew that Medina had been previously arrested for being in a gang fight and knew that there were several gangs in the neighborhood; that there was nothing to indicate Medina's gang activity except his music and some of the people who came to the house; and, that Medina was a good person whom Medina loved.

- Golda Medina, Medina's mother, testified that she and her husband had been married twenty-two years; that they had two daughters and [Medina]; that Medina was a good child, polite, respectful, and had no problems; that Medina worked with his dad and helped his grandfather; that Medina was good with children; and, that Medina's family loved him. . . . Golda Medina testified that Medina's change in behavior as he became a teenager was like most teenagers; that she learned about Medina's gang activity after the fact; that she and her husband talked to Medina after they learned about the gang activity and thought that it had an effect; that they always tried to do what was best for [Medina]; that he was a good kid who did some stupid and bad things but who tried hard to work and take care of his family and be more a part of his family and less a part of the gang; and, that they still loved him very much.

State Habeas Record at 964-66. In sum, Medina presented testimony "concerning [his] childhood, his early speech impediment, his family relationships, his behavior, his church activities, his interaction with children and adults, his attendance at Bellaire Christian Academy, his protective attitude toward others, and their lack of knowledge of his gang activities." State Habeas Record at 936.

Counsel's closing argument first focused the jury's attention on the long incarceration Medina would serve if given a life sentence, and his ability to control his behavior in a controlled environment. Tr. Vol. XX at 2539-42. Trial counsel argued that the State had presented no testimony to show that Medina would be a danger while incarcerated. Tr. Vol. XX at 2543-44,

61

2547-49.[39]

The defense's argument then shifted to the mitigation special issue.  The defense argued that the jury should consider his intoxication at the time of the murder as a mitigating factor.  Tr. Vol. XX at 2549.  The defense also relied on residual doubt from the conviction to mitigate against a death sentence.  Tr. Vol. XX at 2551.[40]  Turning to the testimony from the punishment phase, trial counsel speculated that Medina's stuttering left a "psychological scar that . . . was healed only by his becoming . . . respected as a gang member . . .  And who knows but something back in the past that nobody knows, that nobody testified to, put [Medina] on the road to where he ended up[.]"  Tr. Vol. XX at 2552.  Trial counsel asked the jury "to take a look at Tony Medina, take a look at his family, and this young man here is a young man that doesn't deserve to die under the evidence of this case . . . so that he can be some good to the community in which[] he [is] going to be living, even if that community is the prison[.]"  Tr. Vol. XX at 2555-56.

The jury deliberated for two days during which time they apparently changed their vote repeatedly.  Tr. Vol. XXI at 2580.  The jury answered Texas' special issues in a manner requiring the imposition of a death sentence.

---

[39]   The State successfully objected when trial counsel argued that Medina "had a perfect record" while incarcerated because "[t]here's been no evidence of his behavior in the record about his being in jail."  Tr. Vol. XX at 2542.  Trial counsel then emphasized that the State bore the burden of proof and pointed to the absence of evidence showing bad behavior while incarcerated.  Tr. Vol. XX at 2542-44.

[40]   "[R]esidual doubt may be a reasonable, even highly beneficial, strategy in a capital case."  *Martinez v. Quarterman*, 481 F.3d 249, 256 (5th Cir. 2007) (explaining the holding in *Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999)); *see also Lockhart v. McCree*, 476 U.S. 162, 181 (1986); *Andrews v. Collins*, 21 F.3d 612, 623 n.21 (5th Cir. 1994); *Stringer v. Jackson*, 862 F.2d 1108, 1116 (5th Cir. 1988).

### B.       The State Habeas Proceedings

Medina's state habeas application soundly criticized trial counsel's preparation for the punishment phase.  As Medina now argues, the habeas application alleged that trial counsel's "penalty phase presentation consisted of seven witnesses.  Witnesses were rushed to the stand without preparation other than an in-the-courthouse-hallway instruction to say good things about Mr. Medina.  Their testimony was brief and largely inconsequential because trial counsel had never interviewed them.  Counsel had no idea that these witnesses could relate compelling mitigating information."  (Docket Entry No. 53 at 210).

Medina complained that trial counsel made an inadequate investigation into his background, thus hampering their ability to ascertain what mitigating evidence and themes should come before the jury.  Medina alleged that his two trial attorneys were "burdened with an impossibly heavy caseload" and thus could not properly investigate his case.  State Habeas Record at 72.  In addition, Medina claimed that trial counsel Millin—who had assumed responsibility for punishment-phase preparations—was battling cancer at the time of trial and physically could not give his case the constitutionally required attention it deserved.  In particular, trial counsel did not interview witnesses who could have provided mitigating details about Medina's life.  Also, Medina alleged that trial counsel failed to discuss his case adequately with those witnesses who testified at trial, thus leaving many mitigating factors unpresented.

Aside from complaining about the depth of preparation, Medina also attacked the substance of the case the defense put on against a death sentence.  According to Medina, trial counsel "presented the jury with a tepid and sterile account of a young man who was respectful of elders, courteous, helpful to his relatives, attended family events, and loved small children."  (Docket Entry

No. 24 at 217). Medina, however, did not see this good-character defense as the one trial counsel should have chosen. Relying on mitigating evidence from numerous individuals, Medina complained that trial counsel's chosen defense should have taken a different path which explained his bad actions and placed his life into a traumatic context.

Medina relied on several documents to support the defensive case he wishes trial counsel had presented. That material falls into three categories: affidavits from family members who testified in the punishment phase; affidavits from friends and family members who did not testify; and reports from experts.

In the first category, Medina's great-uncle, Verlan Pegues;[41] his cousin, David Castro; his aunt, Eva Uribe; and his mother, Golda Medina, each provided an affidavit explaining that their trial testimony did not give an accurate or full account of Medina's life. The state habeas affidavits provided a different picture from the close, supportive family described at trial. According to the witnesses, Medina grew up in an "extremely dangerous neighborhood." State Habeas Record at 479; *see also* State Habeas Record at 473, . Medina's father was often absent during his youth, both because he worked two jobs and because he "drank excessively." State Habeas Record at 476. Medina's father drank "a lot during [Medina's] childhood," often stopping after work and being gone weekend nights to drink. State Habeas Record at 473, 476. Once, Medina's mother had to drag his intoxicated father into the house. State Habeas Record at 472. His drinking caused problems in their marriage. State Habeas Record at 473. During one particularly severe fight, Medina's father physically abused his mother. State Habeas Record at 476. Medina's parents slept

---

[41]     Medina's great uncle Verlan Pegues provided no new testimony, but described his brief interaction with the attorneys before giving testimony. State Habeas Record at 497-98.

on separate sofas in the living room that night, with his mother keeping a loaded pistol under her pillow.  State Habeas Record at 476.  However, when he was young Medina's mother would lock herself in the bedroom and smoke marijuana.  State Habeas Record at 477.[42]  His parents' substance abuse caused them to turn a blind eye to his own use of marijuana and alcohol.  State Habeas Record at 477.  Medina argues that, had trial counsel met with the witnesses beforehand or asked the right questions, each witness would have provided the above information at trial.  State Habeas Record at 473, 475, 479. 497.

The second category consisted of individuals Medina wishes that trial counsel had contacted before trial and then called as witnesses.  Like the first category of state habeas affiants, they would have described how Medina's father was absent in the home, though they attributed it to either excessive drinking or working hard to provide for his family.  State Habeas Record at 489, 539, 542, 550.  They also mentioned his mother's marijuana use.  State Habeas Record at 539.  These witnesses discussed the domestic turmoil in the Medina home.  State Habeas Record at 490.  Medina's father "was always trying to make up by giving flowers and jewelry but he always seemed to go back the same way."  State Habeas Record at 490.  One aunt described how she arranged for Medina's admission to the Bellaire Christian Academy at age 13, but because of a clash in values between what Medina learned at home and in a religious environment, he was not successful there.

---

[42]    Medina's mother, who wanted to give Medina a "different childhood than the one [she] had," also described intergenerational problems with poverty, physical abuse, and sexual abuse.  She described how a sexually abusive step-father caused her to run away from home at both age 13 and 15.  State Habeas Record at 475.  The second time she met an older man, married him, but left him because of sexual abuse.  Her stepfather renewed his abuse, she remarried, but divorced after her second husband broke her arm.  Medina's father was her third husband.  State Habeas Record at 476.  None of the witnesses, however, pointed to any physical or sexual abuse in Medina's own life.

State Habeas Record at 482-83. Despite his eventual role as a "cruz" in the LRZ gang, his aunt described him as a follower who never fit in at school.

Medina lived in a "very dangerous" neighborhood that was "gangland" State Habeas Record at 489. Median's mixed white and hispanic racial heritage made him an easy target for gang membership, as did his lack of sports participation or other age-appropriate activity. State Habeas Record at 483, 494. A cousin described how Medina "got caught up with the gang because he just wanted attention and friends and joining the gang was the price he had to pay." State Habeas Record at 487. Children also teased Medina because of his stuttering as a child. State Habeas Record at 490. Some family members believed that Medina joined a gang "because his father wasn't really there for him and he didn't grow up with the best examples." State Habeas Record at 540. Each individual would have provided testimony consistent with their state habeas affidavit had trial counsel contacted them.

Taken together, lay witnesses wished they could have provided the jury a fuller view into Medina's life. They blamed his eventual gang membership on several factors: a violence-prone neighborhood, a turmoil-filled home, insecurity from a speech impediment, misdirection from lack of a father figure, and lack of acceptance from a mixed racial background. All affiants agreed that, notwithstanding these deficits in Medina's background, he had a good character and could have chosen a different path in life. Some witnesses even felt that he could never have killed children. All would have testified at trial, had Medina's attorneys asked them.

Finally, Medina presented affidavit from Paula K. Lundburg-Love, a professor of psychology at the University of Texas at Tyler, Texas. Dr. Lundberg-Love interviewed Medina, performed various psychological tests, and reviewed documents addressing Medina's background, including

the state habeas affidavits.  Unlike the lay affidavits, Dr. Lundberg-Love blamed the majority of Medina's problems on an incident about which noone else knew.  According to Dr. Lundberg-Love, Medina "developed Post-Traumatic Stress Disorder (PTSD) at approximately 12 years of age after literally experiencing the drive-by shooting of his best friend right before his eyes."  State Habeas Record at 509.  Dr. Lundberg-Love related that Medina told her about the murder of his friend "C.C."  When Medina was 12, he had "beaten up" another youth "whose name he could not recall for a reason he could not recall."  Later, while drinking alcohol and hanging out with his older, homeless friend C.C., a car drove by.  As shots rang out, C.C. pushed Medina.  Medina felt like C.C. "lost his life" for him.  Dr. Lundberg-Love explained that Medina, who had looked up to C.C. as a mentor, "identified this event as a turning point in his life" from which he had learned important lessons about "surviving on the streets" such as to not "let anyone sneak up on you." Afterwards, Medina lost interest in school, he fought more, drank more, and began using cocaine.  State Habeas Record at 512.  While mentioning other factors in Medina's life that caused various other problems, Dr. Lundberg-Love focused on the murder of his friend as the traumatic episode causing PTSD.[43]

The State submitted an affidavit from trial counsel Mr. Guerinot describing the defense's efforts to prepare for the punishment phase.  When the attorneys divided duties, Mr. Millin assumed responsibility for punishment-phase preparation.  Mr. Guerinot said that Mr. Millin's terminal illness: "did not hinder co-counsel's ability or performance.  He was able to perform his duties and thoroughly prepared the punishment phase of the case, presented the punishment evidence, and

---

[43]     Medina overstates the psychological issues identified by Dr. Lundberg-Love.  In his petition, he alleges that he received "a mental health evaluation explaining how the traumas of Mr. Medina's childhood led to his PTSD[.]"  (Docket Entry No. 53 at 265).  In reality, Dr. Lundberg-Love did not base her diagnosis of PTSD on the neighborhood he grew up in, but on a single incident from Medina's youth.

argued the punishment case." State Habeas Record at 996-97.  Mr. Guerinot also explained:

> The defense did not present a mental health expert for so-called psychological scars from a stuttering that was cured and far-removed from the offense. The defense strategy was to present a picture of the defendant's background and home life to show that he was not a future danger. During the interviews with the defendant's family, no family member told the defense that the father drank or that the mother smoked marijuana or that the parents fought. The defense presented all the punishment evidence which was discovered and which we considered helpful to the defendant. We did not consider that any jail records saying that the defendant had no discipline records in jail would be sufficiently mitigating in the circumstances. Also, juries are typically not impressed with a "no-problems" jail record.

State Habeas Record at 998.

The state habeas court generally found "based on the credible affidavit of trial counsel Guerinot and the appellate record" that "counsel's caseload did not hinder preparation or investigation into [Medina's] case." State Habeas Record at 955.  With specific regard to the punishment-phase preparation, the state habeas court found that "[Mr.] Millin's terminal illness did not hinder his ability or his performance in [Medina's] trial; that counsel Millin performed his duties and thoroughly prepared for punishment; that punishment preparation included interviewing witnesses, including [Medina's] family; and, that [Mr.] Millin presented evidence and made argument." State Habeas Record at 962. Nevertheless, "no one informed defense counsel that [Medina's] father drank and was gone a lot; that [his] parents fought; or, that [his] mother smoked marijuana when he was little." State Habeas Record at 966-67.

The state habeas court found that trial counsel's justification for not obtaining a mental health expert to testify about the effect of his early childhood stuttering was reasonable. State Habeas Record at 963.  Also, after reviewing the evidence presented through the punishment phase witnesses, the state habeas court found that much of the "information . . . present[ed] in postconviction affidavits was presented to [Medina's] jury[.]" State Habeas Record at 966.  Some

of the other information, such as that family members believed that Medina's father "was not there

for him," was "conclusory, vague, or inconsequential. State Habeas Record at 966. Also, the state

habeas court found Dr. Lundberg-Love's diagnosis of PTSD "unpersuasive . . . in light of extensive

evidence that [Medina] was a good kid who lived in a rough neighborhood and went wrong after he

joined a gang at the age of thirteen." State Habeas Record at 966. Trial counsel made a reasonable

strategic decision to focus on future dangerousness but "presented all punishment evidence . . . that

was considered helpful to [Medina]." State Habeas Record at 967.

On those findings, the state habeas court concluded that trial counsel did not provide

ineffective representation and that Medina had not shown a reasonable probability of a different

result. State Habeas Record at 980-81.

## C.    AEDPA Review

Medina argues that trial counsel failed to "conduct a social history investigation" and

otherwise prepare for the penalty phase (Docket Entry No. 53 at 186-264). While making broad

allegations about the material trial counsel allegedly failed to put before jurors, Medina specifically

faults counsel for not calling witnesses who could testify about turmoil in the Medina household,

social stigma he suffered from childhood stuttering, and the lasting effects of witnessing the murder

of his best friend as a young teen. Medina challenged trial counsel's punishment-phase preparation

on state habeas review. At this stage, the Court's inquiry is not simply whether the petitioner has

met *Strickland*'s two-pronged test. The "pivotal question is whether the state court's application of

the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. This Court must afford the

state court's analysis "a deference and latitude that are not in operation when the case involves

review under the *Strickland* standard itself." *Id.* This exceedingly forgiving inquiry applies the

69

"'doubly deferential' standard of *Strickland* and AEDPA." *Pinholster*, 563 U.S. at 202.  Thus, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal*, 286 F.3d at 246.

Medina emphasizes that trial counsel engaged in a superficial, last-minute effort to discover any mitigating evidence in his background.  Thus, according to Medina, trial counsel offered the jury a superficial review of his life which missed major mitigating themes.  In what Medina claims "was a **very close** case," he alleges that the state habeas court was objectively unreasonable for not finding a reasonable probability of a different result had counsel performed differently.  (Docket Entry No. 24 at 230).[44]  Yet this is simply not a case where trial counsel completely abdicated the duty to present a case against a death sentence.  Trial counsel called witnesses and put mitigating evidence before the jury, some of which the state habeas evidence mirrors precisely.  The question is whether trial counsel did enough.

From the outset, the circumstances of this case make it difficult to assess the whole of trial counsel's performance accurately.  On one hand, Medina makes a facially compelling argument that trial counsel's investigation was too superficial and slipshod to comply with constitutional standards.  Many of the individuals who provided state habeas affidavits, including those who testified at trial, testified that they had little or no contact with the defense.  Medina's proffer of evidence makes it appear that trial counsel limited his mitigation investigation to a few courtroom hallway conversations.

---

[44]     Medina supports that statement with an unsigned affidavit from a juror describing intense disagreement in jury deliberations.  Fed. R. Evid. 606(b) prevents any consideration of a juror's mental processes during deliberations.  The transcript does show that the jury took some time to reach a verdict in this case.  The record, however, leaves the reason for difficulty in deciding the special issues open to speculation, as does the unsigned affidavit.

Because of those limited interactions with his family, Medina complains that trial counsel misapprehended his background. To summarize, trial counsel adduced testimony showing that, despite growing up in a gang-ridden environment, Medina was a good person who loved, and was loved by, his family. Medina contends that trial counsel did not know that his life was filled with turmoil. His parents, both of whom abused substances, fought in front of the children. The murder of his best friend at age 12, accompanied by his stuttering and the lack of a strong father figure, led him into gang life. Notwithstanding, Medina had a good character and was close to his family.

On the other hand, the record does not contain a full recounting of how much of that information trial counsel possessed. The defense team divided the responsibilities, with Mr. Millin assuming all responsibility for the punishment phase. Mr. Millin suffered from cancer at the time of trial, a circumstance Medina complains hampered his ability to complete an investigation. The state habeas court, however, found that Mr. Millin's "terminal illness did not hinder his ability or performance[.]" State Habeas Record at 962. Because Mr. Millin succumbed to that disease after trial, the Court is left with large gaps in the evidentiary record. The Court cannot accurately assess what trial counsel did, what trial counsel knew, and how trial counsel decided to respond to that information. The Court can make some assumptions, such as that trial counsel made limited efforts to discuss the case with family members. Billing records also suggest that the defense spent a limited amount of time investigating. But the Court still cannot assess the whole of the information known by counsel. In that absence, however, Medina does not rebut Mr. Guerinot's statement that "[d]uring interviews with [Medina's] family, no family member told the defense that the father drank or that the mother smoked marijuana or that the parents fought." State Habeas Record at 998.

Importantly, the Court cannot ascertain what information Medina conveyed to Mr. Millin.

The possibility remains that counsel spoke with Medina, Medina conveyed to him the same information he gave to Dr. Lundberg-Love, and trial counsel made a strategic decision to pursue a different defensive path. Medina has never testified or sworn an affidavit describing exactly what information he provided his attorneys and their personal response.

Nonetheless, this Court's primary role is to decide whether the state habeas court's denial of relief was unreasonable. The state habeas court offered two reasons for finding that Medina had "fail[ed] to show deficient performance, much less harm" with regard to the presentation of mitigation evidence. State Habeas Record at 980. First, much of the evidence "was either presented or is merely an enlargement upon trial counsel's punishment theme of [Medina] being an essentially good person caught in a bad environment." State Habeas Record at 967. Trial testimony showed that Medina grew up in an area dominated with gangs where violence was considered a daily part of life.[45] The evidence, while not necessarily presented with the same purpose, allowed the jury to see him as having a good character despite the bad swirling about him. Some of the state habeas

---

[45]     For instance, Medina's father testified that there were "several different gangs" in their neighborhood. Tr. Vol. XIX at 2494. His mother testified there was gang-related activity in their neighborhood. Tr. Vol. XIX at 2508. The entire context of trial allowed the jury to surmise the extent to which gang violence dominated the world in which Medina lived. Even so, the state habeas record may provide some information about the gang violence, but some of the same witnesses portrayed his character and upbringing as being in contrast to that environment. His cousin, David Castro, told the jury:

> [T]he part of town where [Medina] was living at the time that this happened, you know, it's pretty obvious it's pretty heavily, you know, gang activity over on that side of town. You know, whether that has any bearing on the situation that he's face with now I don't know that. But I know growing up as a kid in our family and then to his young adult years he was always a part of our family and attended every function that we had and showed respect and courtesy to all the family members.

Tr. Vol. XIX at 2469.

material did not differ in mitigating function, but only in depth and detail, from the information trial counsel gathered for the jury's consideration.  To the extent that Medina does not wish that counsel present a different defense, but criticizes how the defense strategy was executed, he fails to show that the state habeas decision was unreasonable.  The Fifth Circuit has refused to find *Strickland* error in the accumulation of additional and amplified good-character evidence when trial counsel presented similar mitigating evidence, even if only in a less-than-complete form, at trial.  *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007); *Rodriguez v. Quarterman*, 204 F. App'x 489, 501 (5th Cir. 2006); *Alexander v. Quarterman*, 198 F. App'x 354, 359-60 (5th Cir. 2006); *Parr v. Quarterman*, 472 F.3d 245, 257-58 (5th Cir. 2006).  A state court finding of no *Strickland* error may not be unreasonable when the habeas case "was largely cumulative and differed from the evidence presented at trial only in detail, not in mitigation thrust." *Davila v. Davis*, 650 F. App'x 860, 869-70 (5th Cir. 2016); *see also Villegas v. Quarterman*, 274 F. App'x 378, 384 (5th Cir. 2008).  It is not unreasonable to find no prejudice even when the evidence "was presented to the jury in an abbreviated form with no elaboration."  *Neal v. Puckett*, 286 F.3d 230, 238 (5th Cir. 2002).

Second, the state habeas court found that new evidence which exceeded the outlines drawn at trial was conclusory, vague, unpersuasive, or otherwise not compelling enough to afford relief. The crux of the new evidence focused on three factors: (1) turmoil in the Medina household; (2) social stigma from childhood stuttering; and (3) witnessing the murder of his best friend.  Each of those categories, however, came with caveats.  A reasonable attorney could assess the weight of Medina's new evidence and still not pursue a different path than his trial attorneys.

To summarize the turmoil in Medina's childhood, he lived in a home in which both parents engaged in substance abuse when he was a small child.  His father, who worked two jobs,

73

occasionally stayed out late drinking and "was not there for [Medina]." State Habeas Record at 482. His father and mother fought, but with an account of only one minor physical altercation. Eager for attention and mentoring, Medina found his way into gang life.

An attorney would have to weigh testimony about his parents fighting against showing the jury that Medina was a good individual with a strong family support network should he ever return to free society. Medina's evidence of childhood tumult was not the strongest. No evidence showed that his parents had physically, sexually, or emotionally abused him. His parents both abused substances, but the record contains no evidence about how disruptive that was on his mother's parenting. Also, his father, who apparently drank heavily, was a positive influence according to some witnesses. His parents did not abuse Medina. They argued, often harshly, but the record only contains one example of domestic abuse. While some indication that his home was sometimes filled with turmoil, his mother explained that they "didn't have rocky times all the time. When [Medina] was little, [they] used to take family vacations." State Habeas Record at 476. Trial questioning allowed witnesses to talk about problems in the Medina home, but witnesses were not forthcoming about discussing problems until well after Medina was sentenced to death. Medina now assumes that the witnesses would have been more forthcoming, had trial counsel asked the right questions. Even the state habeas evidence showed that any problems in the Medina home did not crowd out all positive factors. Some of the same witnesses who provided affidavits about the turmoil also told the jury that he had a good relationship with his father and mother. Tr. Vol. XIX at 2460. For example, one witness explained that "[w]hen [Medina] started hanging out with the wrong crowd, his parents tried to make him stop." State Habeas Record at 494.

The evidence would require a reasonable attorney to weigh the benefit presenting evidence

74

that Medina came from a good, supportive family against that of showing that he came from a home filled with a minor amount of chaos.  While a different attorney may have come to a different conclusion about the best approach to take in the punishment phase, "[t]here are countless ways to provide effective assistance in any given case[.]"  *Strickland*, 466 U.S. at 689.  "Even the best criminal defense attorneys would not defend a particular client in the same way."  *Id.*; *see also Pinholster*, 563 U.S. at 189.

Trial counsel made a decision not to emphasize Medina's childhood stuttering.  The record is not clear on the pervasiveness or effect of the stuttering.  The state habeas record mentions that Medina's stuttering caused problems with his peers: "He wanted to be cool because he was teased a lot. Everyone would tease him because he stuttered.  He started hanging around gang members because back then that was all that was in our neighborhood—gangs and drug dealers."  State Habeas Record at 485.  Medina did not stutter at the time of trial.  His mother testified that she sought treatment and that "speech therapy . . . made his stuttering better."  State Habeas Record at 476.  "He had a speech impediment in his early years that he has overcome."  Tr. Vol. XIX at 2453. In the words of trial counsel Guerinot, Dr. Lundberg-Love offered "so-called psychological scars from a stuttering that was cured and far-removed from the offense."  State Habeas Record at 998. A jury could view undue reliance on his stuttering—years in the past—as a disingenuous explanation for his gang membership.  A reasonable attorney could decide not to stress Medina's stuttering any more than the testimony actually given at trial.

Finally, Medina argues that trial counsel should have presented evidence about PTSD, which Dr. Lundberg-Love explained came from him witnessing his friend's murder. Medina never told anyone about that experience; nothing suggests that trial counsel had information from any source

that would prompt an investigation into that event.  The murder of Medina's best friend could have come before the jury through Medina himself, and he does not argue that counsel should have called him as a penalty-phase witness.  Now, Medina presents the event through the testimony of a psychologist, but nothing suggests that he told any mental-health professional, or would have told one, about it before trial.

Even calling a psychologist such as Dr. Lundberg-Love to describe the effect of that incident, however, would be problematic.  First, the episode would put before the jury that, at a young age, Medina already had serious problems with substance abuse, spent time with homeless peers, and assaulted others with little justification.  Also, a jury could doubt the seriousness of the incident's impact of Medina's life because he did not report it to any individual close to him.

Additionally, the jury could doubt that the incident was the factor that thrust him into a gangland life.  Medina testified that he "had been in a former gang before it was LRZ" but "stopped associating with them" and "began associating with them again after a friend of mine's death." Tr. Vol. XVII at 2116.  In those intervening years, he had positive influences on his life and, other than some social discomfort, nothing but positive influences at the Christian school.  In that regard, the state habeas court was not unreasonable in finding "unpersuasive the postconviction assertion of Dr. Paula Lundberg-Love that [Medina] suffered from post-traumatic stress syndrome based on 'significant trauma suffered during childhood' in light of extensive evidence that [Medina] was a good kid who lived in a rough neighborhood and went wrong after he joined a gang at the age of thirteen."  State Habeas Record at 966.  An attorney could fear that the intervening years would cause a jury to perceive Dr. Lundberg-Love "unpersuasive" as the state habeas court did because she failed to put that incident into the whole of his life.

76

In performing a *Strickland* review, the Court may not turn a blind eye to harmful information that would have accompanied any new mitigation evidence. The prejudice inquiry looks at all available evidence, not just that favoring the defense. *See Berghuis v. Thompkins*, 560 U.S. 320, 389 (2010) ("In assessing prejudice, courts must consider the totality of the evidence before the judge or jury."). The Fifth Circuit has indicated that a court looks to see if the petitioner's new evidence will "lessen the impact of the other evidence against him[,]" *Conner v. Quarterman*, 477 F.3d 287, 294 (5th Cir. 2007), because "overwhelming aggravating factors" can outweigh unpresented mitigating evidence. *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007).

Some of the testimony about Medina's malfeasance was minor, such as that he skipped school. But new testimony from Dr. Lundberg-Lund would tell jurors that at a young age Medina was fighting and abusing substances. While her testimony could weakly, and not reliably, explain Medina's gang membership, he was not only a gang member, but a violent one. And he was a gang leader. Testimony from the guilt/innocence phase showed that not only did he engage in gang violence, but as a "cruz" he would be one who could authorize violence by underlings. Medina's gang membership caused him to engage in an escalating pattern of aggression toward other gang members, and Blue specifically. His escalating violence existed in contrast to his rejection of positive influences, such as the schooling provided by his aunt.[46] The State of Texas filed multiple

---

[46] In the prosecution's cross-examination Eva Uribe testified that nothing in Medina's "background . . . would excuse or explain this capital murder or any other crimes that he's committed[.]" Tr. Vol. XIX at 2482. In fact, he "went through the normal teenage years that most teenagers got through." Tr. Vol. XIX at 2482. The prosecution, however, used Medina's arrest record to show he did not have a normal teenage period, but one in which he chose to commit crimes. Tr. Vol. XIX at 2482-83. In fact, Ms. Uribe agreed that Medina "he went to the christian academy. . . . . [H]e had all the advantages that a person could have growing up in Houston, a close family who cared about him and took care of him[.]" Tr. Vol. XIX at 2485.

charges of motor vehicle theft against him.  But even when afforded with the grace of probation, Medina would not comply with the terms and continued his lawlessness.  Medina had engaged in previous driveby shootings.  And the jury had heard heart-wrenching testimony about how Medina killed the victims in the case as he recklessly shot an assault weapon into a group of children.

Trial counsel made an effort to avoid conviction and death.  Considering the defense's punishment phase case and the related, and weak, testimony presented on state habeas review, and placing it in the context of the extremely violent life Medina lived, this Court cannot say that the state habeas court's rejection of Medina's *Strickland* claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### D.   Conclusion of All Medina's Ineffective Assistance Arguments in his *Strickland* Claims

Medina invites the Court to review the entirety of trial counsel's representation and find that the alleged errors, taken cumulatively, resulted in actual prejudice.  Trial counsel's representation was imperfect.  But the Constitution does not require "perfect advocacy judged with the benefit of hindsight," only reasonable competence.  *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  Counsel's representation in this case may have fallen short of the ideal, but Medina has not shown that the state court was unreasonable in finding that any errors—taken individually or collectively—did not violate constitutional expectations.

This is particularly the case considering the entirety of the circumstances any trial attorney would have faced in representing Medina.  Other attorneys may have done more or taken vastly different defensive paths, but any proposed defense still sounds against the State's highly inculpatory case.  During a violence-filled night, Medina, who described himself as a gang leader, traveled with fellow gang members to an innocent household which had been the target of gangland

78

aggression.  Witnesses identified Medina as the man who fired a semiautomatic weapon into a group of children.   Medina spoke coarsely of the shootings immediately afterwards, and wrote incriminating statements about it while incarcerated.  He directed others to hide the murder weapon and lay the blame on a young gang member.  The witnesses against Medina were far from flawless–they were enmeshed in the same violent gang world as Medina.  But his efforts to disparage their testimony does not weaken the collective strength of the evidence against him.  Trial counsel presented a case against a death sentence, which even when amplified by the theories and evidence from Medina's federal petition, did not eclipse the weighty evidence that he would be a future danger and was not deserving of mitigating mercy.  Considering the totality of counsel's representation and the case against Medina, the Court finds that the state court was not unreasonable in denying Medina's *Strickland* claims.

## V.      Police and Prosecutorial Misconduct (claim two)

Medina claims that the prosecutor and the police violated their duty to disclose exculpatory information.  (Docket Entry No. 53 at 168-85).  "[T]he special role played by the American prosecutor in the search for truth in criminal trials" encourages the full disclosure of all exculpatory or impeachment evidence.  *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see also Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.'").  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Three essential components comprise a valid *Brady* claim: "The

evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

The allegations in Medina's *Brady* claim fall into two categories. First, Medina's federal petition renews *Brady* arguments he first made in state court. In his 2001 state habeas application, Medina alleged that the prosecution team withheld material impeachment evidence relating to several prosecution witnesses. Additionally, Medina claimed that the prosecution did not disclose evidence suggesting the existence of alternate suspects. The state habeas court rejected the merits of the *Brady* claim in his 2001 state habeas application. The Court will review that decision under AEDPA's deferential standards.

Second, for the first time in his federal habeas petition Medina argued that his investigation "revealed that there are statements, files, and documents to which he has never been granted access." (Docket Entry No. 53 at 159). Medina's petition did not identify specific material suppressed by the State. Instead, Medina "pieced together as much information" as he could to reveal on-going *Brady* violations. (Docket Entry No. 53 at 159). Medina raised the same arguments in his 2015 state habeas application. Successive State Habeas Record at 125-71. The state courts relied on Tex. Code Crim. Pro. 11.071 §5 to find that Medina's 2015 state habeas application was an abuse of the writ. "A dismissal pursuant to Article 11.071 'is an independent and adequate state ground for the purpose of imposing a procedural bar' in a subsequent federal habeas proceeding." *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)). Medina must show that the claims he exhausted in the 2015 application are procedurally available for federal review before the Court addresses their merits.

## A.    *Brady* Arguments in the 2001 State Habeas Application

Medina exhausted *Brady* arguments in his 2001 state habeas application relating to impeachment material and evidence of other possible suspects.  Specifically, Medina argued that the State suppressed (1) the criminal histories of trial witnesses and (2) evidence that someone else committed an earlier driveby, which Medina hopes would convince jurors he had not committed the one for which he was convicted  The state habeas court denied relief.  Medina, accordingly, must show that the state court's adjudication was contrary to, or an unreasonable application of, federal law.  28 U.S.C. § 2254(d)(1).

### 1.    Criminal Histories

Medina claims that the State suppressed criminal histories of trial witnesses and thus deprived the defense of material impeachment information.  Specifically, Medina's federal petition claims that the prosecution did not disclose information about the criminal background of Flaco Holmes, Johnny Valadez, Maurice Argueta, Leon Guy, and Regina Juarez.  On state habeas review, the State presented state habeas affidavits from both assistant district attorneys who prosecuted this case.  The lead prosecutor submitted an affidavit stating he "maintained an open file prior to and during the defendant's trial which was available for trial counsel's review."  State Habeas Record at 988.  While he "did not remember this exact file," he would typically "use a subfile labeled 'Criminal Histories'" which would contain "the criminal histories and/or inquiries concerning criminal histories of all witnesses and potential witnesses."  State Habeas Record at 988.  "This file, along with all other discoverable information was in the State's file which was available to the defense."  State Habeas Record at 988.  The second-chair prosecutor also submitted an affidavit verifying that information and explicitly stating that "in his sub-file were the criminal histories of

Leon Guy, Maurice Argueta, Dominic Holmes, James Moore, Johnny Valadez." State Habeas Record at 992.

Trial counsel Guerinot provided an affidavit in which he explained that he had "reviewed the State's file" including "the sub-file labeled 'Criminal Histories[.]'" State Habeas Record at 694. Mr. Guerinot explained that "the defense investigator ran criminal histories of the witnesses." State Habeas Record at 694. With that information, the defense "attempted to impeach each witness based on that witness's testimony and actions." State Habeas Record at 694.

The state habeas court found the prosecutors' and defense attorney's affidavits credible. State Habeas Record at 937. The state habeas court found that "the State disclosed criminal histories and/or inquiries for possible criminal histories for approximately twenty-eight witnesses in [Medina's] case, including witnesses Leon Guy, Maurice Argueta, Dominic Holmes, and Johnny Valadez." State Habeas Record at 937. Based on those affidavits and the record, the state habeas court concluded that the State had not suppressed the criminal histories. The state habeas court also found that the State's file contained the relevant criminal histories and that trial counsel had reviewed that information. State Habeas record at 937. The state habeas court found that, "based on the State's disclosure of [their] criminal history to trial counsel, that the State did not withhold information[.]" State Habeas Record at 937, 938, 939. In addition, the state habeas court specifically found that contemporaneous criminal charges against Maurice Argueta did "not constitute prior criminal history or a final conviction with which [he] could be impeached." State Habeas Record at 938.

Medina asks this Court to find that the prosecutors' and trial counsel's affidavits were not credible and, therefore, the state habeas court was not reasonable to rely on them in denying relief.

82

Medina, however, does not bring forth "clear and convincing evidence" to rebut the presumptively correct factual findings. 28 U.S.C. § 2254(e)(1). In light of the state court record and the reasonable findings derived therefrom, Medina has not shown a *Brady* violation with regard to Flaco Holmes, Johnny Valadez, Maurice Argueta, and Leon Guy.

Medina also argues that the state habeas court did not adjudicate the merits of his argument as it related to Regina Juarez. In his 2001 state habeas application, Medina summarily stated that "Regina Juarez . . . also testified against [him]," but, because she was a juvenile, he "has been unable to discover [her] criminal history . . . ." State Habeas Record at 66. Medina now apparently argues that this single sentence was sufficient to alert the state courts that he intended to raise a *Brady* claim relating to Regina Juarez. The state habeas findings do not explicitly discuss the criminal history of Regina Juarez,[47] but Medina's single statement mentioning her was far from a focus of the state habeas proceedings. State Habeas Record at 65. Without referring to her by name, however, the state habeas court found that "witnesses at [Medina's] trial could not have been impeached with . . . cases against a juvenile." State Habeas Record at 941. The state habeas court also found that "inadmissible impeachment evidence does not become admissible by virtue of speculative value to [Medina]." State Habeas Record at 941.

Even if the defense could have used her criminal history for impeachment purposes, however, the state habeas court's rejection of the case was still reasonable. The jury knew that Regina Juarez was a gang member. She had immersed herself in a violent world and freely

---

[47]      Without specification, the findings state that "the State disclosed criminal histories . . .for approximately twenty-eight witnesses . . . ." State Habeas Record at 937. Inferentially, the state prosecutors' affidavits which explain that they had criminal histories prepared for trial witnesses would include that for Regina Juarez.

associated with a criminal element.  She helped hide the murder weapon.  She testified that at one point she had agreed to take part in the plan to blame the murder on Flaco.  The jury knew that Regina Juarez lived a criminal  lifestyle and, even in that context, could evaluate her credibility. Adding information about pending, and not-yet-final, criminal charges would not create a reasonable probability of a different result.

### 2.    Evidence of a Prior Driveby Shooting

In his 2001 state habeas application, Medina argued that the State suppressed evidence relating to a July 1995 driveby shooting at the Rodriguez home.  Medina complains that the State did not disclose a police report which indicates that, when interviewed after the July 1995 shooting, Mr. Rodriguez informed the police that his daughter, Veronica, was dating a "possible gang member."  (Docket Entry No. 53 at 181).  Believing that the LRZ gang was responsible for the shooting, Mr. Rodriguez told the police that his daughter said "that a gang member from the LRZ that just got out of jail was going to kill one of her family members."  (Docket Entry No. 53 at 181). Medina claims that this information was exculpatory because, as he was incarcerated from late 1994 until November 1995, it would have ruled him out as a suspect for that crime.  He contends that the information also would have contradicted the State's theory of transferred intent and called his identity as the killer into question because other people wanted to kill members of the Rodriguez family.

The state habeas court denied this claim for three primary reasons.  First, the state habeas court found that Medina had not "show[n] that the State withheld information concerning the July, 1995 drive-by . . . ."  State Habeas Record at 968; *see also* State Habeas Record at 940.  Presumably, the state habeas court assumed that trial counsel had access to police reports about the crime.

Second, the state habeas court emphasized that the State did not tell jurors that Medina had committed the July 1995 driveby. Rather, the State presented testimony about that crime "to place the instant offense into context." State Habeas Record at 940. Third, and relatedly, the state habeas court found that the allegedly suppressed police report did not create "an 'alternate' suspect in the instant offence." State Habeas Record at 940. The State did not attempt to "prove that [Medina] performed the July, 1995 drive-by." State Habeas Record at 940.[48]

Medina has not shown that the state habeas court was unreasonable in rejecting his *Brady* arguments relating to the July 1995 shooting. The Court finds that the state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### B.    Procedurally Barred *Brady* Arguments

Medina's federal habeas petition argued that his investigation "revealed that there are statements, files, and documents to which he has never been granted access." (Docket Entry No. 53 at 159). Medina's petition did not identify specific material suppressed by the State. Instead, Medina "pieced together as much information" as he could to reveal on-going *Brady* violations. (Docket Entry No. 53 at 159). Medina's petition, however, did not specify any material which the State had suppressed.

The Court stayed these proceedings to allow the exhaustion of state court remedies, (Docket Entry No. 103). Medina raised his previously unexhausted *Brady* arguments in his 2015 state habeas application. Successive State Habeas Record at 135-83. Medina, however, did not add any

---

[48]    Additionally, Medina himself would have known that he was in custody when the driveby shooting occurred.

additional specificity to his *Brady* claim.  Instead, Medina complained that the lack of discovery had prevented him from providing details about what material the State had allegedly withheld from him. Medina, however, speculated that the State suppressed evidence or presented false testimony relating to: (1) Regina Juarez's testimony in general, and specifically about the disposal of the murder weapon, Successive State Habeas Record at 145-48; (2) deals the prosecution had with Flaco, Successive State Habeas Record at 148-49; (3) deals the prosecution may have had with other witnesses, such as Johnny Valadez and Jamie Moore, Successive State Habeas Record at 149-52; (4) information the police received that indicated that the shooter was African American, Successive State Habeas Record at 159-60; (5) evidence that would impeach various witnesses, Successive State Habeas Record at 160-71; and (6) evidence about the shooter in the July 1995 driveby at the Rodriguez home, Successive State Habeas Record at 171-76.

The state courts relied on Tex. Code Crim. Pro. 11.071 §5 to find that Medina's 2015 state habeas application was an abuse of the writ.  "A dismissal pursuant to Article 11.071 'is an independent and adequate state ground for the purpose of imposing a procedural bar' in a subsequent federal habeas proceeding."  *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)).  Medina argues that he "will be able to show cause and prejudice for procedural default, if any."  (Docket Entry No. 93 at 145; *see also* Docket Entry No. 127 at 69-101).  Medina argues that the suppression of evidence—during trial, during the initial round of state habeas, and insofar as it continued—should forgive his failure to raise the unexhausted portions of his *Brady* claim in his 2001 state habeas application.

A *Brady* violation may establish cause to excuse procedural default. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004).  Medina, however, has not presented concrete evidence that the State

86

suppressed exculpatory information, but argues that he can only do so after discovery. The Fifth Circuit, however, has cautioned that it is "unwise to infer the existence of *Brady* material based upon speculation alone." *United States v. Stanford*, 823 F.3d 814, 841 (5th Cir. 2016) (internal quotations omitted); *see also Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004)(stating that "speculation about the suppression of exculpatory evidence" cannot support a *Brady* claim); *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) ("Murphy has failed to establish a prima facie claim under *Brady* by virtue of his having failed to demonstrate the existence or concealment of a deal between the prosecution and the witness . . . . Allegations that are merely 'conclusionary' or are purely speculative cannot support a *Brady* claim."); *Hughes v. Johnson*, 191 F.3d 607, 629-30 (5th Cir 1999) (stating that mere speculation does not adequately support a claim for relief under *Brady*). Medina's allegations about suppressed deals with the prosecution or undisclosed material rests wholly on speculation and surmise.

Moreover, Medina has not shown that the information underlying his *Brady* claim was not previously available to him with the exercise of diligence. For example, Medina premises his *Brady* claim relating to Regina Juarez on a phone conversation she had with his federal attorneys. Medina, however, does not show why any of his prior attorneys could not have extracted the same information from her previously. In short, the Court's review of the record and pleadings suggests that Medina cannot provide cause or show actual prejudice that would overcome the procedural bar of his unexhausted claims.

## V.   Cumulative Prejudice from Medina's *Strickland* and *Brady* Claims (claim six)

In his sixth ground for relief, Medina argues that the cumulative prejudicial effect from his *Brady* and *Strickland* claims merits habeas relief. "In order for cumulative error analysis to apply,

[a defendant] must have something to cumulate." *United States v. $9,041,598.68*, 163 F.3d 238, 253 (5th Cir. 1998). The state habeas court found that Medina "fails to show *Brady* error or ineffective assistance of counsel, much less cumulative error on alleged *Brady* error or alleged ineffective assistance of counsel." State Habeas Record at 967. For the reasons more fully discussed with respect to his *Strickland* and *Brady* claims, Medina has not shown that error infected the trial with fundamental unfairness. While Medina possibly did not receive a perfect trial, he had one that complied with constitutional requirements. The state habeas court's rejection of his cumulative error claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## VI.   Pending Motions

Medina has filed a motion for discovery and an evidentiary hearing. (Docket Entry No. 148). Medina also moves for the Court to hold a hearing on his motions. (Docket Entry No. 160). Medina has recently supplemented his motions with information *Brady* violations and other prosecutorial misconduct in cases arising from Harris County (but prosecuted by different assistant district attorneys). (Docket No. 165).[49]

The law significantly limits what material a federal court may consider on habeas review. Generally, federal habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. While *Pinholster* only explicitly

---

[49]    Respondent complains that Medina did not seek permission to file supplementary material under Local Rule 7.8 ("The Court may in its discretion, on its own motion, or upon application, entertain and decide any motion, shorten or extend time periods, and request or permit additional authority or supporting material."). The Court, in its discretion, will consider Medina's recent pleading, but observes that it is of minimal assistance to it because his case involves different prosecutors and distinct facts from the cases addressed in the supplement.

addressed the *consideration* of new facts, federal precedent has applied its principles to limit a federal habeas petitioner's *development* of new facts. Specifically, the Fifth Circuit cites *Pinholster* as an additional limit on federal habeas evidentiary hearings. *See Evans v. Davis*, 875 F.3d 210, 217 n.5 (5th Cir. 2017); *Allen v. Vannoy*, 659 F. App'x 792, 810 (5th Cir. 2016); *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011); *see also Shoop v. Twyford*, ___ U.S. ___ 142 S. Ct. 2037, 2044 (2022) (limiting the development of new evidence on federal review); *Shinn v. Martinez Ramirez*, ___ U.S. ___, 142 S. Ct. 1718, 1739 (2022) (same).[50] The logic behind limiting factual development through evidentiary hearings, however, applies with equal force to all requests to develop the factual record of issues that the state courts have adjudicated on the merits, including discovery. *See Cole v. Davis*, 4:17-CV-940, 2018 WL 12642575, at *2 (S.D. Tex. Nov. 16, 2018); *Soffar v. Stephens*, 4:12-CV-3783, 2014 WL 12642575, at *2 (S.D. Tex. July 14, 2014) ("Presumably, good cause cannot exist for discovery that would result in evidence a court cannot consider.").[51]

An inmate only qualifies to expand review beyond the record before the state courts "where § 2254(d)(1) does not bar federal habeas relief," either because the claims "were not adjudicated on the merits in state court," *Pinholster*, 563 U.S. at 185, or "the state habeas court unreasonably applied federal law[.]" *Evans*, 875 F.3d at 217 n.5; *see also Allen*, 659 F. App'x at 810; *Smith v.*

---

[50]     The Supreme Court itself has hinted that *Pinholster*'s limitations permeate the development of claims on federal habeas review. *See Ryan v. Gonzales*, 568 U.S. 57, 75 (2013) (finding that the possible incompetence of a habeas petitioner did not require a stay of federal proceedings because, in part, "[a]ny extrarecord evidence" that his assistance may allow counsel to develop "would . . . be inadmissible" under *Pinholster*).

[51]     "[J]udicial economy demands that *Pinholster* be considered in determining whether good cause exists for conducting discovery." *Davis v. Bobby*, 2017 WL 2544083, at *3 (S.D. Ohio 2017) (listing cases). *Pinholster* "begs the question, 'How can good cause exist to conduct discovery that, as a matter of law, cannot be used? Put simply, unusable evidence cannot lead to relief.'" *Id.*

*Cain*, 708 F.3d 628, 635 (5th Cir. 2013).  Here, Medina has not shown that he has met the requirements of § 2254(d)(1) with regard to his exhausted claims.  Discovery and an evidentiary hearing, therefore, are not appropriate or necessary.

To the extent that Medina asks for discovery and an evidentiary hearing on claims that he has not exhausted, he has not shown that he can overcome the resultant procedural bar of their merits.  Nor has he shown that factual development would make merits review available to him.  As an additional limitation on Medina's request for a hearing, AEDPA precludes a hearing when a petitioner "failed to develop the factual basis of a claim in State court proceedings" of his claims which he "could have . . . previously discovered through the exercise of due diligence" and, as the Court's alternative merits review determined, he cannot show that the "facts underlying the claim would be sufficient by clear and convincing evidence" for a "reasonable factfinder" to find he was not "guilty of the underlying offense."  28 U.S.C. § 2254(e)(2).

The Court has fully reviewed Medina's requests for factual development, placing them into a broader review of the pleadings, the record, and the law.  The Court has reviewed the procedural adequacy of Medina's claims, the application of AEDPA's limitations on federal review, and the federal discovery standards.  The Court finds that factual development is not available, or not necessary, for a fair adjudication of his claims.  The Court specifically finds that Medina has not shown that good cause exists to allow discovery that would support the claims in his petition.  The Court also finds that a hearing to discuss his requests for factual development is not necessary.  The Court, therefore, will deny all Medina's pending motions.

## CERTIFICATE OF APPEALABILITY

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment

without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Medina has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  The Fifth Circuit anticipates that a court will resolve any questions about a COA in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484; *Miller-El I*, 537 U.S. at 336-38. On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484; *Miller-El I*, 537 U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted."  *Slack*, 529 U.S. at 484.

Having considered the merits of Medina's petition, and in light of AEDPA's standards and controlling precedent, this Court determines that a COA should not issue on any claim.

## CONCLUSION

The Court finds that Medina is not entitled to federal habeas corpus relief.  The Court,

therefore, **GRANTS** Respondent's motion for summary judgment (Docket Entry No. 76) and

**DENIES** Medina's petition for a writ of habeas corpus.  The Court **DENIES** Medina's motion for

discovery (Docket Entry No. 148) and motion for a status conference (Docket Entry No. 160).  All

other requests for relief are denied.  The Court will not certify any issue for appellate review.  This

case is **DISMISSED WITH PREJUDICE**.

       **SIGNED** on this 6th day of June,2023.


                                   JOHN D. RAINEY
                                   SENIOR U.S. DISTRICT JUDGE